# RECORD NO. 23-3126
# [ORAL ARGUMENT HAS NOT BEEN SCHEDULED]

*In The*

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

**v.**

## GERARDO GONZALEZ VALENCIA,

*Defendant-Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
_____

## BRIEF OF APPELLANT
_____

**Devin Burstein**
**WARREN & BURSTEIN**
**(619) 234-8467**
**501 W. Broadway, Ste. 240**
**San Diego, CA 92101**
**db@wabulaw.com**

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities .................................................................. iv

INTRODUCTION ...................................................................... 1

JURISDICTIONAL STATEMENT ............................................ 3

STATUTORY AND REGULATORY PROVISIONS ................... 3

ISSUES FOR REVIEW .............................................................. 3

STATEMENT OF THE CASE ..................................................... 4

I.    The investigation, extradition, and pretrial proceedings .............. 4
II.   The sentencing proceedings ................................................... 6
      A.   The government's witnesses .......................................... 6
      B.   The defense witnesses ................................................. 8
      C.   The parties' sentencing submissions ............................. 9
      D.   The final sentencing hearing ...................................... 11
           1.   The Guidelines calculations ................................ 11
           2.   The sentencing arguments .................................. 13

SUMMARY OF ARGUMENT .................................................. 15

ARGUMENT ........................................................................... 17

I.    The correct Criminal History Category is II ............................ 17
II.   The district court erred in calculating the applicable offense level
      ............................................................................................ 24
      A.   The district court plainly erred in applying two enhancements
           barred by ex post facto principles .............................. 25
           1.   Standard of review ............................................ 25
           2.   The court's plain error ....................................... 25
                a.   The error .................................................. 25
                b.   The error was plain ................................... 27

i

   c. The error affected Mr. Gonzalez Valencia's substantial rights ................................................ 28

   d. The error "seriously affected the fairness, integrity, and public reputation of judicial proceedings" ....................................................... 30

  3. The government's likely response is without merit .... 31

 B. The district court plainly erred in applying two enhancements based on entirely foreign conduct ........................................ 33

  1. Standard of review ...................................................... 34

  2. The court's plain error ................................................ 34

   a. The error ............................................................. 35

   b. The error satisfies the remaining requirements under Rule 52(b) ................................................ 40

  3. The government's likely response is without merit .... 41

III. The district court erred in failing to abide by, or at least consider, Uruguay's express condition of extradition that Mr. Gonzalez Valencia not receive a life sentence ................................................ 43

 A. Relevant facts ........................................................................ 44

  1. Extradition proceedings in Uruguay ........................... 44

  2. Sentencing arguments based on the extradition condition ...................................................................... 46

 B. The district court's errors ...................................................... 46

  1. The district court was required to abide by Uruguay's express limitation ...................................................... 47

  2. At the very least, the district court was required to consider Uruguay's express limitation as part of its sentencing analysis ...................................................... 52

IV. The district court erred in failing to grant Mr. Gonzalez Valencia's motion to dismiss based on an invalid extradition proceeding ..... 54

 A. Waiver ................................................................................... 54

 B. The government failed to establish probable cause to support the extradition ................................................ 55

CONCLUSION ................................................................................ 59

CERTIFICATE OF COMPLIANCE .............................................. 61

ii

CERTIFICATE OF SERVICE..................................................................62

ADDENDUM

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**                                                                    **Page(s)**

*Calder v. Bull,*
    3 U.S. 386 (1798) ................................................................. 33

*Copeland v. Ryan,*
    852 F.3d 900 (9th Cir. 2017) ........................................... 39

*Guedes v. BATFE,*
    45 F.4th 306 (D.C. Cir. 2022) ........................................ 51

*Harmelin v. Michigan,*
    501 U.S. 957 (1991) ......................................................... 22

*Helm v. Solem,*
    684 F.2d 582 (8th Cir. 1982), aff'd 463 U.S. 277 (1983) ................. 22

*Huber v. Taylor,*
    469 F.3d 67 (3d Cir. 2006) ............................................. 55

*In re Sealed Case,*
    936 F.3d 582 (D.C. Cir. 2019) ........................................ 38

*LaShawn A. v. Barry,*
    87 F.3d 1389 (D.C. Cir. 1996) (en banc) ......................... 32

*Molina-Martinez v. United States,*
    578 U.S. 189 (2016) .................................... 25, 27, 29, 30

*Peugh v. United States,*
    569 U.S. 530 (2013) ............................. 25, 26, 27, 28, 32

*Rengifo-Valencia v. United States,*
    2020 U.S. App. LEXIS 10468 (11th Cir. 2020) ................. 54

*RJR Nabisco, Inc. v. European Cmty.,*
    579 U.S. 325 (2016) ......................................................... 39

*Rosales-Mireles v. United States,*
    138 S. Ct. 1897 (2018) ............................... 23, 25, 30, 40

*United States v. Azeem,*
 946 F.2d 13 (2d Cir. 1991) .................................................... 35, 36, 43

*United States v. Baez,*
 349 F.3d 90 (2d. Cir. 2003) .................................................. 47, 51, 53

*United States v. Bigley,*
 786 F.3d 11 (D.C. Cir. 2015) ............................................................ 54

*United States v. Borda,*
 848 F.3d 1044 (D.C. Cir. 2017) ........................................................ 52

*United States v. Chunza-Plazas,*
 45 F.3d 51 (2d. Cir. 1995) ......................................................... 36, 38

*United States v. Claybron,*
 88 F.4th 1226 (7th Cir. 2023) ............................................... 16, 19, 21

*United States v. Cuevas,*
 496 F.3d 256 (2d Cir. 2007) ................................. 47, 48, 49, 50, 51, 52

*United States v. Delgado-Garcia,*
 374 F.3d 1337 (D.C. Cir. 2004) ........................................................ 54

*United States v. Flores,*
 912 F.3d 613 (D.C. Cir. 2019) .................................................... 34, 37

*United States v. Flores,*
 995 F.3d 214 (D.C. Cir. 2021) ................................................ 41, 42, 43

*United States v. Fuller,*
 531 F.3d 1020 (9th Cir. 2008) .......................................................... 39

*United States v. Garcia,*
 497 F.3d 964 (9th Cir. 2007) ............................................................ 59

*United States v. Gunning,*
 401 F.3d 1145 (9th Cir. 2005) .......................................................... 22

*United States v. Head,*
 817 F.3d 354 (D.C. Cir. 2016) ................................................ 25, 27, 29

*United States v. Huang,*
 687 F.3d 1197 (9th Cir. 2012) .......................................................... 39

*United States v. Lombard,*
 72 F.3d 170 (1st Cir. 1995) ............................................................. 22

*United States v. Mack,*
 841 F.3d 514 (D.C. Cir. 2016) ......................................................... 52

*United States v. Olano,*
 507 U.S. 725 (1993) ......................................................................... 28

*United States v. Puentes,*
 50 F.3d 1567 (11th Cir. 1995) ......................................................... 56

*United States v. Rauscher,*
 119 U.S. 407 (1886) ......................................................................... 52

*United States v. Sensi,*
 879 F.2d 888 (D.C. Cir. 1989) ......................................................... 47

*United States v. Surratt,*
 797 F.3d 240 (4th Cir. 2015) (Gregory, J. dissenting) ...................... 22

*United States v. Trabelsi,*
 845 F.3d 1181 (D.C. Cir. 2017) ................................................. 56, 59

*United States v. Turner,*
 548 F.3d 1095 (D.C. Cir. 2008) ................................................. 31, 32

*Weaver v. Graham,*
 450 U.S. 24 (1981) ........................................................................... 33

**Federal Statutes**

18 U.S.C. § 3231 ..................................................................... 3, 25, 26
18 U.S.C. § 3582 ......................................................................... 20, 25
28 U.S.C. § 1291 ............................................................................. 3, 25
28 U.S.C. § 2106 ................................................................... 20, 21, 24

**Federal Rules**

Federal Rule of Criminal Procedure 52(b) ................... 25, 27, 30, 34, 40

vi

## United States Sentencing Guidelines

U.S.S.G. § 1B1.3(a)(2) ............................................................... 35

U.S.S.G. § 1B1.11(b)(1) ............................................................. 28

U.S.S.G. § 1B1.11(b)(2) ............................................................. 28

U.S.S.G. § 2B1.1(b)(10)(B) ........................................................ 40

U.S.S.G. § 2D1.1(a)(5) ............................................................... 13

U.S.S.G. § 2D1.1(b)(1) .............................. 4, 10, 12, 13, 16, 24, 34, 39, 43

U.S.S.G. § 2D1.1(b)(2) ................. 4, 10, 12, 13, 16, 24, 27, 29, 34, 39, 43

U.S.S.G. § 2D1.1(b)(2)(B) .......................................................... 26

U.S.S.G. § 2D1.1(b)(3)(B) .......................................... 4, 13, 16, 24, 26, 27

U.S.S.G. § 2D1.1(c)(1)................................................... 11, 13, 29

U.S.S.G. § 2E1.1 ........................................................................ 37

U.S.S.G. § 3B1.1(a) ............................................................. 10, 13, 29

U.S.S.G. § 3E1.1 ............................................................... 13, 29, 37

U.S.S.G. § 4A1.1(a) ................................................................. 18, 19

U.S.S.G. § 4A1.1(d) .................................................................. 18

U.S.S.G. § 4A1.2(e)(1).............................................................. 18

U.S.S.G. § 4A1.2(h) .................................................................. 35

U.S.S.G. § 4A1.3(a) ................................................................... 35

U.S.S.G. Ch. 5 *Pt.* A ........................................................... 9, 21

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23-3126

UNITED STATES OF AMERICA,

       Appellee,

v.

GERARDO GONZALEZ VALENCIA,

       Appellant.

## APPELLANT'S OPENING BRIEF

## <u>INTRODUCTION</u>

Gerardo Gonzalez Valencia received no benefit for his guilty plea. Despite accepting responsibility for his role in a drug-importation conspiracy, the district court sentenced him to life in prison. At the time, he was only 46-years old.

The court based its decision on the Sentencing Guidelines. After calculating a total offense level of 45 (capped at 43 by the Guidelines

table), and a Criminal History Category (CHC) of III, the sentencing range was life. Joint Appendix (JA)1466, 1490. And that is what the court imposed. JA1518-19.

This was error. Given retroactive changes to the Guidelines, the correct CHC is now II, not III. The district court also erroneously applied Guidelines enhancements for use of a semisubmersible, violence, and possession of a gun, which materially impacted the sentencing range. The semisubmersible and violence enhancements violated the Ex Post Facto Clause because the subject conduct took place before those enhancements existed. Additionally, the violence enhancement and the gun enhancement were based on purely foreign conduct that does not score under the Guidelines.

In addition to the district court's failure to calculate the Guidelines correctly, which alone requires reversal, it also ignored important principles of internationally comity. When Uruguay agreed to extradite Mr. Gonzalez Valencia, it placed an express condition that he not receive a life sentence. The district court, however, failed to abide by, or even consider, that condition, which should have been an important sentencing consideration.

Nor does the record demonstrate that absent these errors – together or individually – the district court would have imposed a life term. This Court, therefore, should vacate Mr. Gonzalez Valencia's sentence.

It should also reconsider the validity of his conviction because the district court further erred in failing to grant Mr. Gonzalez Valencia's motion to dismiss based on errors in the extradition proceedings. While acknowledging this claim was likely waived by his unconditional guilty plea, the Court should address it because there is considerable merit.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. Mr. Gonzalez Valencia filed a timely notice of appeal on July 26, 2023. JA1551. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations appear in the addendum.

## ISSUES FOR REVIEW

1. Whether the Court should follow the Seventh Circuit and order a limited remand for the district court to reconsider Mr. Gonzalez Valencia's life sentence based on his changed Criminal History Category under the retroactive amendments to the Sentencing Guidelines.

2. Whether the district court plainly erred in calculating the sentencing range by:

   A. Applying two Guidelines enhancements – use of a semisubmersible under U.S.S.G. § 2D1.1(b)(3)(B) and use of violence under section 2D1.1(b)(2) – barred by ex post facto principles.

   B. Applying two Guidelines enhancements – possession of a firearm under section 2D1.1(b)(1) and use of violence under section 2D1.1(b)(2) – based on foreign conduct that was not purposefully directed to and did not in fact target the United States or any American citizen.

3. Whether the district court erred by failing to abide by, or even consider, Uruguay's express extradition condition that Mr. Gonzalez Valencia not receive a life sentence.

4. Whether the district court erred in denying Mr. Gonzalez Valencia's motion to dismiss based on an invalid extradition proceeding.

## STATEMENT OF THE CASE

### I.
### The investigation, extradition, and pretrial proceedings.

This case stems from the government's investigation into two Mexican drug trafficking organizations, "Los Cuinis" and the "Cartel de

Jalisco Nueva Generacion." JA368. According to the government, "the Los Cuinis drug trafficking organization, made up of the Gonzalez Valencia siblings, was the financial arm of the Cartel de Jalisco Nueva Generacion (CJNG), but was not directly involved in the production, movement, or distribution of drugs." JA117.[1]

On April 19, 2016, the government filed a single-count indictment against Mr. Gonzalez Valencia, an alleged member of Los Cuinis, charging him with conspiracy to important and distribute five or more kilograms of cocaine and five-hundred grams or more of methamphetamine. JA1.[2] At the time of the indictment, Mr. Gonzalez Valencia was living with his family in Uruguay, having left Mexico in 2009 to distance himself from the drug business. JA482, 492, 499-502. Unmoved by these efforts, the government sought his extradition to the United States. JA40.

Uruguay complied, arresting Mr. Gonzalez Valencia on the

---

[1]  Unless otherwise noted, within quotations, all emphasis is added and all internal citations as well as internal quotation and punctuation marks are omitted.

[2] The government later abandoned the methamphetamine allegations. JA437.

extradition warrant.  JA44.  After nearly two years in custody, Uruguay formally ordered his extradition on the condition that, if convicted, he not be sentenced to a life term.  JA44, 46, 1242, 1244.

After Mr. Gonzalez Valencia arrived in the United States, he moved to dismiss his case, arguing that he was extradited without probable cause.  JA26-86.  The district court denied the motion.  JA367, 371. Thereafter, Mr. Gonzalez Valencia entered an unconditional guilty plea to the sole count of the indictment.  JA417.  Because there was no plea agreement, the district court directed the parties to file a written factual basis.  JA409.  Mr. Gonzalez Valencia admitted investing in five kilograms or more of Colombian cocaine to be imported into the United States and Europe.  JA409-410.  He also admitted investing in a 2007 shipment of cocaine knowing it would be transported from Colombia in a semisubmersible vessel.  JA410, 423.

## II.
### The sentencing proceedings.

Following the guilty plea, the district court held a contested evidentiary hearing with multiple witnesses.  JA674.

## A.   The government's witnesses.

The prosecution primarily relied on three cooperators:

- Oscar Nava Valencia, the former leader of the Milenio Cartel in Mexico and an admitted mass murderer of over 100 people.  JA695-98, 735-36.

- Jose Maria Guizar Valencia, an admitted member of the Zetas Cartel, who escaped from jail in Mexico.  JA838-39, 846.

- Elpidio Mojarro Ramirez, who distributed cocaine with the Milenio Cartel and worked for Oscar Nava Valencia.  JA915, 918-19.

As relevant, they testified that Mr. Gonzalez Valencia and his brothers were involved in drug trafficking with the Milenio Cartel. JA700-01, 705, 849, 921.  They also claimed he carried a handgun during meetings in Mexico and helped to secure rifles used in fighting rival groups.  JA727, 732-34, 852.  They further said that he and his brothers ordered several murders, including the 2005 killing of known narcotics trafficker Antonio Guizar Valencia, based on a drug dispute.  JA724-26, 732-34, 855, 930-31.  All three admitted they were testifying in the hopes of a sentencing reduction.[3]  JA698, 872, 944-45.

---

[3] Oscar Nava Valencia's hopes were answered when he was released in November 2023, after serving 12 years of a 25-year sentence.  *See BOP inmate locater* for Register Number 84193-279, at https://www.bop.gov/inmateloc/.

In addition to the cooperating witnesses, DEA Special Agent Kevin Novick opined that Mr. Gonzalez Valencia was a member of Los Cuinis. JA983. He testified about the incident on August 20, 2007, when the U.S. Coast Guard interdicted a semisubmersible and seized about 280 kilograms of cocaine. JA987.

During Agent Novick's cross-examination, the government stipulated that when Mr. Gonzalez Valencia was arrested in Uruguay on an extradition warrant, his electronic devices were seized, but there was no relevant evidence on those devices connecting him to drug trafficking. JA1028. Agent Novick also agreed that the only evidence tying Mr. Gonzalez Valencia to drug trafficking after 2009 were a few Blackberry messages to and from a person called "Silverio," who the government believed was Mr. Gonzalez Valencia. JA1033.

## B. The defense witnesses.

After the government's evidence, the defense called several witnesses to rebut the prosecution's claims. While not contesting Mr. Gonzalez Valencia's guilt, the defense witnesses clarified that the scope of his participation was far less than the government's cooperators portrayed. JA897-902. They also detailed Mr. Gonzalez Valencia's

efforts to leave the drug trafficking business by moving his immediate family far from Mexico.  JA1077-79.  To this end, of the thousands of Blackberry messages from the overarching investigation, only a handful were attributed to Mr. Gonzalez Valencia.  JA1145-46.

## C.    The parties' sentencing submissions.

Following the close of evidence, the district court ordered further briefing on the appropriate sentence.  JA1151.

In its papers, the government argued for a life sentence.  JA1181.  It calculated "a base offense level of 38 determined by drug quantity, a four-level enhancement for leadership, and a two-level enhancement each for the use of a semisubmersible, violence, and firearms[.]"  JA1180.  This resulted in an "adjusted offense level [of] 48. With a three-point reduction for acceptance of responsibility, the total offense level is 45, which is treated as an offense level of 43 pursuant to Chapter 5, Part A (comment n.2)."  JA1180-81.  In CHC III, the sentencing range was life imprisonment.    JA1181.    The government argued there were "no mitigating circumstances in this case to justify a variance[.]"  JA1181.

The defense disagreed with the government's calculations and recommendation.  It began with "base offense level at 36, not 38" based

on drug quantity.  JA1203.  The defense further argued that the court should not apply "enhancements . . . for threatening or using violence under U.S.S.G. § 2D1.1(b)(2), using a firearm under U.S.S.G. § 2D1.1(b)(1), or acting as an 'organizer or leader' under U.S.S.G. § 3B1.1." JA1203.  Further, "in the interests of fairness and justice, the Court [should] use its discretion to apply Criminal History Category II[.]" JA1203.

Given this calculation, it argued, "a sentence of 188 months (15 years, 8 months) as recommended by the U.S. Probation Office ("USPO") comports with the appropriate Guidelines range, the appropriate consideration of the history and characteristics of the defendant, the need to avoid unwarranted sentence disparities, and the purposes of the Sentencing Reform Act[.]"  JA1203.

The defense also explained that "the Court cannot impose life imprisonment on Mr. Gonzalez-Valencia (as requested by the Government) because the Uruguayan Extradition Order [] that brought Mr. Gonzalez-Valencia to the United States imposed the condition that he not be sentenced to life imprisonment, instead limiting his potential maximum sentence to thirty years' imprisonment. This Court is required

10

to honor this condition of the Extradition Order under the principle of international comity." JA1204.

## D.    The final sentencing hearing.

### 1.    The Guidelines calculations.

During the final sentencing hearing, the district court began with the Guidelines, adopting the government's arguments. The court ruled that "Criminal History Category III shall apply" because Mr. Gonzalez Valencia "has five criminal history points, three points from his 1998 conviction in the Northern District of Georgia for possession with intent to distribute methamphetamine, and two points for committing the instant offense while on escape status." JA1466, 1468.

The court then turned to the offense-level calculations. As to the base offense level, the court found: "The government has proven by a preponderance of the evidence that defendant is responsible for a number of cocaine shipments that far exceed even 450 kilograms of cocaine." JA1478. Thus, "the defendant's base offense level is 38, under Section 2D1.1(c)(1) of the guidelines, because he is accountable for 450 kilograms or more of cocaine." JA1483.

Next. the court considered the government's argument for a "two-

11

offense level increase under Section 2D1.1(b)(1) [] because the defendant possessed a dangerous weapon, specifically a firearm." JA1483. The court again sided with the government: "Nava Valencia and Guizar Valencia both testified that defendant carried certain firearms on his person as he conducted cocaine transactions in furtherance of the conspiracy. And evidence of such conduct is sufficient to warrant the enhancement." JA1485.

The court also accepted the government's argument that a "use of violence enhancement under [] Section 2D1.1(b)(2) shall apply because the government has proven by a preponderance of the evidence that defendant used violence in furtherance of the conspiracy." JA1486. Specifically, "[a]lthough the government presented evidence of five instances when defendant used -- allegedly used violence to further the conspiracy, application of the enhancement requires that the government prove that only one of these incidents occurred by a preponderance of the evidence. And the government has done that for defendant's role in the [2005] murder of Antonio Guizar Valencia. Thus, I will not address the other ones any further." JA1487.

The court then determined that a four-level "leadership

12

enhancement under the role adjustment guideline at Section 3B1.1(a) shall apply[.]" JA1489.

Based on these findings, the court calculated the Guidelines as follows:

The base offense level is 38, pursuant to the guideline at Section 2D1.1(a)(5) and (c)(1). Two levels are added [] for possession of a firearm under Section 2D1.1(b)(1). Two offense levels are added [] under Section 2D1.1(b)(2). And four offense levels are added for the guideline role adjustment at Section 3B1.1(a) [¶] [T]wo offense levels are added under the guideline at Section 2D1.1(b)(3)(B) because defendant unlawfully imported or exported a controlled substances under circumstances in which a submersible vessel or semisubmersible vessel was used. [¶] And three offense levels are subtracted under the guideline at Section 3E1.1. And defendant timely notified authorities of his intentions to enter a plea of guilty. [¶] So as a result his total offense level is 45. The Guidelines sentencing table caps the offense level at 43. So the total offense level is 43, which in combination with his Criminal History Category of III results in an advisory sentencing range of life imprisonment.

JA1489-90.

2.    The sentencing arguments.

After the court calculated the Guidelines, the government renewed

its argument for a life sentence, citing the large quantity of drugs involved and the alleged violence.  JA1491-93.

The defense responded with a recommendation of 20-to-25 years. Defense counsel explained: "It is uncontradicted, Your Honor, that while Mr. Gonzalez Valencia participated in these acts, dating back at this point 15 plus years, that he had physically withdrawn from the conspiracy over threats to his family and to himself to start a new life in Argentina. It is uncontradicted that while in Argentina he led a lawful life. That he set up a new grocery business. That he and his family . . . were threatened with their own lives, moved to Argentina with him to physically remove himself from that which we have heard, that which he has admitted to, and that which he was almost born into."  JA1493.

Defense counsel continued: "there were months and months and thousands and tens of thousands of text messages, and there was no indication of drug activity by Mr. Gonzalez Valencia except this one incident that's been identified in 2013. And if you believe it involved drugs, then you have to believe, because it's uncontradicted, it was initiated by his brother pulling him back in, despite the fact that he was outside the country and trying to physically absent himself from his past

life." JA1495.

Mr. Gonzalez Valencia also addressed the court: "Your Honor, I truly, truly do understand the problems caused and the damage caused by drugs to society at large, both to the addicts and the families. I'm perfectly aware and acknowledge it. And sincerely, Your Honor, I ask for the forgiveness of all of these people, the victims of all those families who have lost their loved ones. And I deeply regret from the bottom of my heart everything that has happened, and I accept my responsibility for what I have done, I know it was bad to invest in these drugs and draw profits from them. And I acknowledge and accept that there's no justification for what I have done, that these things I have done are bad and I am paying for it now." JA1502.

The court then turned to the appropriate sentence. Without ever addressing Uruguay's condition that no life sentence be imposed, the court concluded "a guidelines sentence is appropriate here," and sentenced Mr. Gonzalez Valencia to life in prison. JA1518-19.

## SUMMARY OF ARGUMENT

The Court should vacate Mr. Gonzalez Valencia's life sentence and remand for resentencing.

First, as the Seventh Circuit recently held in an analogous case, the now retroactive change to Mr. Gonzalez Valencia's CHC – from III to II – is grounds for a limited remand. *See United States v. Claybron*, 88 F.4th 1226 (7th Cir. 2023). Because the district court did not state it would impose the same sentence regardless of the CHC, there is a reasonable possibility the change could impact the ultimate sentence. And given the life term at issue, that possibility cannot be ignored.

Second, apart from the criminal history issue, the Court should vacate Mr. Gonzalez Valencia's sentence because the district court plainly erred in calculating the sentencing range. It incorrectly applied enhancements for use of a semisubmersible under U.S.S.G. § 2D1.1(b)(3)(B) and use of violence under section 2D1.1(b)(2) that were barred by ex post facto principles. The court further plainly erred in applying Guidelines enhancements for possession of a firearm under section 2D1.1(b)(1) and use of violence under section 2D1.1(b)(2) because the underlying conduct took place entirely in Mexico and was not purposefully directed to and in fact did not target the United States or any American citizen. Each of these Guidelines' errors impacted the proper sentencing range and thus satisfy the plain-error requirements

16

under controlling Supreme Court precedent.

Third, the district court erred in failing to abide by, or even consider, Uruguay's express extradition condition that Mr. Gonzalez Valencia not be sentenced to life. This was a strong mitigating argument that the district court simply missed.

Finally, the Court should reverse the district court's denial of Mr. Gonzalez Valencia's motion to dismiss based on an invalid extradition proceeding. The extradition order was invalid because the government's extradition package failed to establish probable cause for the specific charge. The Court, therefore, should remand to determine the proper remedy.

## ARGUMENT

This appeal presents multiple claims that are both factually nuanced and legally complex. But one issue is simple and beyond dispute; Mr. Gonzalez Valencia is now in Criminal History Category II, not III. This matters.

## I.
### The correct Criminal History Category is II.

Over Mr. Gonzalez Valencia's objection, the district court determined his CHC was III, not II. JA446. He received three points for

a 1998 drug-related conviction. JA446, 1468; U.S.S.G. §§ 4A1.1(a); 4A1.2(e)(1). He received an additional two status points for committing his current offense while on escape status (because he allegedly walked away from a halfway house while serving a prior sentence). JA446, 1468. This resulted in five total criminal history points, putting him in Category III. JA1468.[4]

But the law has now changed *retroactively*, such that he no longer receives 2 points for escape status. He is now in Category II. The analysis is as follows.

Under the former version of U.S.S.G. § 4A1.1(d) in place during sentencing, the district court was directed to "[a]dd 2 points if the defendant committed the instant offense while under any criminal justice sentence, including . . . *escape status*." However, effective November 1, 2023, the Sentencing Commission retroactively amended Guidelines § 4A1.1(d). *See* U.S. Sent'g Guidelines Manual Amends. 821, 825 (U.S. Sent'g Comm'n 2023).

---

[4] During his sentencing, Mr. Gonzalez Valencia challenged the additional two status points because he could not be charged with escape based on his extradition and there was no formal finding of escape. JA1205. He maintains those positions on appeal, but they are ultimately irrelevant to his argument in this section.

18

Pursuant to Amendment 821, district courts can no longer add two additional criminal history points when the defendant committed the offense of conviction while under any criminal justice sentence. *Id.* at Amend. 821. Additionally, under Amendment 825, the Sentencing Commission expressly made retroactive the changes embodied in Amendment 821. *See* U.S. Sent'g Guidelines Manual Amend. 825 (U.S. Sent'g Comm'n 2023). Accordingly, although Mr. Gonzalez Valencia was sentenced on July 21, 2023, before the change to section 4A1.1 became effective, it applies to him retroactively and is grounds for a limited resentencing.

The Seventh Circuit reached precisely this conclusion in *United States v. Claybron*, 88 F.4th 1226, 1228 (7th Cir. 2023). There, the defendant asked the court "to order a remand for resentencing [] because of these recent, retroactive Guidelines amendments." *Id.* And the Seventh Circuit granted his request, explaining: "applying the retroactive and effective Amendment 821, Claybron's criminal history score would have been twelve points, not thirteen, reducing his criminal history category on the robbery counts from VI to V." *Id.* at 1229. Given the change, the court concluded that a limited remand for resentencing

19

was warranted under 28 U.S.C. § 2106.[5] *See id.*

In doing so, the court rejected the government's argument that it "should decline to exercise our discretion under § 2106 and, instead, wait for Claybron to file a motion [in district court] under 18 U.S.C. § 3582." *Id.* at 1230. The court agreed that "§ 3582(c)(2) is available to Claybron as a path for him to seek relief. But here, we see no difference between that statute and § 2106. Amendment 821 is retroactive, and the district court did not state it would have imposed the same sentence regardless of the applicable [Criminal History Category]. So, the same relief would be available to Claybron on either statutory path. And there is no reason why remand under § 2106 is unjust or imprudent, particularly where it promotes judicial economy." *Id.* at 1231.

The court continued: "§ 2106 gives this court discretion to remand a cause and require such further proceedings to be had as may be just under the circumstances. Remand under that statute is not limited to

---

[5] The statute provides: "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment ... of a court lawfully brought before it for review and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106.

when the district court errs or when a full resentencing is needed. . . . *We hold that the . . . enactment of retroactive Amendment 821 warrants a § 2106 remand and limited resentencing[.]" Id.*

Here too, that is the correct result. Under the retroactive Amendment 821, Mr. Gonzalez Valencia has only three criminal history points for his 1998 conviction, placing him firmly in CHC II, not III. *See* U.S.S.G. Ch. 5 Pt. A (sentencing table). Moreover, the district court never said it would have imposed the same sentence regardless of the applicable CHC. On the contrary, the court discussed the CHC at length in arriving at the final setence. JA1465-68. Accordingly, as in *Claybron*, the circumstances here warrant a limited resentencing.

The government will almost certainly respond that *Claybron* is distinguishable because the change in criminal history score there impacted the sentencing range, whereas here, it does not. But there are two problems with this argument. First, given the Guidelines errors discussed below, the criminal history score does in fact impact the sentencing range. Second, even if the ultimate range stayed the same, that should not carry the day.

The life sentence Mr. Gonzalez Valencia received is "the second

21

most severe penalty known to the law[.]" *Harmelin v. Michigan*, 501 U.S. 957, 996 (1991). As the Eighth Circuit has observed, "[a] life sentence without parole differs qualitatively from a sentence for a term of years" because it represents the "total[] rejection of rehabilitation as a basic goal of our criminal justice system." *Helm v. Solem*, 684 F.2d 582, 585 (8th Cir. 1982), *aff'd* 463 U.S. 277 (1983).

For Mr. Gonzalez Valencia, it "leaves him to spend the rest of his life in prison; a death sentence of a different kind." *United States v. Surratt*, 797 F.3d 240, 270 (4th Cir. 2015) (Gregory, J. dissenting). He has no hope of ever again knowing freedom. That fact carries consequences. In the First Circuit's words, "the harshness of [a] life sentence in relation to the offense of conviction highlights the need for rigorous inquiry." *United States v. Lombard*, 72 F.3d 170, 178 (1st Cir. 1995). Here, that rigorous inquiry should result in remand.

There are no crystal balls. Given the gravity of a life term, and because Mr. Gonzalez Valencia could receive a sentence less than life on remand, the interests of justice weigh heavily in favor of returning the case to the district court. *See United States v. Gunning*, 401 F.3d 1145, 1149 (9th Cir. 2005) ("[W]hen a district court *could have* lowered a

defendant's sentence, we have presumed prejudice and remanded, even if we doubted that the district court *would have* done so.") (emphasis in original).

Nor is this a particularly big ask under the circumstances. As the Supreme Court highlighted in *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018), "a remand for resentencing, while not costless, does not invoke the same difficulties as a remand for retrial does. A resentencing is a brief event, normally taking less than a day and requiring the attendance of only the defendant, counsel, and court personnel." Accordingly, because "[a] decision remanding a case to the district court for resentencing on the basis of a [sentencing] miscalculation is far less burdensome than a retrial, or other jury proceedings, [it] does not demand such a high degree of caution." *Id.* at 1909.

This is certainly true here. The transcript from the final sentencing spans just 63 pages. JA1459-1521. A limited resentencing proceeding would be far shorter. And when weighed against the lifetime Mr. Gonzalez Valencia may otherwise spend behind bars, this remedy fits squarely within the Court's authority to "remand the cause . . . [for]

such further proceedings [] as may be just under the circumstances." 28 U.S.C. § 2106.

## II.
### The district court erred in calculating the applicable offense level.

Apart from the criminal history issue, resentencing is also required because the district court incorrectly calculated the offense level.

First, it imposed two enhancements barred by *ex post facto* principles. The court added two levels for the use of a semisubmersible under U.S.S.G. § 2D1.1(b)(3)(B) and two levels for the use of violence under section 2D1.1(b)(2). Neither of these provisions existed at the time of the underlying conduct, 2007 and 2005 respectively. As such, their application was unconstitutional.

Second, the court imposed two enhancements for foreign criminal conduct with no connection to the United States. The court added two levels for possession of a firearm under section 2D1.1(b)(1) and, as noted, two levels for use of violence under section 2D1.1(b)(2). Both acts occurred entirely within Mexico and were not aimed at the United States. Accordingly, those enhancements were also improper.

**A.    The district court plainly erred in applying two enhancements barred by ex post facto principles.**

1.    <u>Standard of review</u>.

Mr. Gonzalez Valencia did not raise an ex post facto challenge below and thus his claim is reviewed for plain error. *See United States v. Head*, 817 F.3d 354, 358-59 (D.C. Cir. 2016). But the Supreme Court has made clear that where, as here, the district court errs in calculating the Guidelines, the plain-error requirements are met under Federal Rule of Criminal Procedure 52(b). *See Molina-Martinez v. United States*, 578 U.S. 189, 201 (2016); *Rosales-Mireles*, 138 S. Ct. at 1910-11; *Head*, 817 F.3d at 361-62 (reversing for plain error where "the district court's decision stemmed from ex post facto application of a Guideline").

2.    <u>The court's plain error</u>.

a.    *The error.*

For over a decade, the law has been clear: "there is an ex post facto violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal *acts* and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." *Peugh v. United States*, 569 U.S. 530, 533 (2013). As the Supreme Court explained in *Peugh*, this rule is compelled

by "the basic principles of fairness that animate the Ex Post Facto Clause." *Id.* at 544. Specifically, "[t]he Clause ensures that individuals have fair warning of applicable laws[.]" *Id.* at 544. Here, imposition of the subject enhancements violated this principle.

Beginning with the two-level increase for use of a semisubmersible under U.S.S.G. § 2D1.1(b)(3)(B). The court based this enhancement on the stipulated fact that in 2007, Mr. Gonzalez Valencia and others "invested in a shipment of cocaine that the Defendant knew would be transported from Col[o]mbia to a location off the coast of Guatemala in the Pacific Ocean using a semi-submersible vessel." JA410; 712.

The ex post facto problem arises because, when this act occurred in 2007, the Guidelines did not contain an enhancement for using a semisubmersible. *See* U.S.S.G. § 2D1.1(b)(2)(B) (2006 ed., 2007 ed., 2008 ed.). That enhancement did not exist until 2009. *See* U.S.S.G. § 2D1.1(b)(2)(B) (2009 ed.), § 2D1.1(b)(3)(B) (current addition).[6] Consequently, because Mr. Gonzalez Valencia was "sentenced under

---

[6] The semisubmersible enhancement was originally enacted in 2009 and placed in section 2D1.1(b)(2)(B) before being moved to its current location in U.S.S.G. § 2D1.1(b)(3)(B).

Guidelines promulgated after he committed [t]his criminal act[,]" "there [was] an ex post facto violation." *Peugh*, 569 U.S. at 533.

The same is true of the district court's two-level increase for violence under section 2D1.1(b)(2). The court based this enhancement expressly and solely on its finding that, in 2005, Mr. Gonzalez Valencia participated in ordering others to kill Antonio Guizar Valencia. JA1487-88. But again, when this "criminal act[]" took place, the Guidelines did not contain an enhancement for the use of violence. *See* U.S.S.G. § 2D1.1(b)(2) (2006 ed., 2007 ed., 2008 ed., 2009 ed.). That enhancement was first enacted in the Supplement to the 2010 Guidelines Manual. *See* U.S.S.G. § 2D1.1(b)(2) (Supplement 2010). As such, its application also amounted to "an ex post facto violation," *Peugh*, 569 U.S. at 533, and a "significant procedural error." *Molina-Martinez*, 578 U.S. at 199.

> b.    *The error was plain.*

The next question is whether the ex post facto errors satisfy the requirements for plain-error reversal under Rule 52(b). They do.

"In this circuit, one circumstance in which an error may be plain is if, at the time it was made, a clear precedent in the Supreme Court or this circuit established its erroneous character." *Head*, 817 F.3d at 361.

Here, as noted above, the Supreme Court held in 2013 that sentencing a defendant under Guidelines other than those in effect at the time the defendant "committed his criminal acts" was a violation of the Ex Post Facto Clause. *See Peugh*, 569 U.S. at 533. Thus, this was a decade-old, well-established precedent at the time of Mr. Gonzalez Valencia's sentencing in 2023. The error was plain.

    c.   *The error affected Mr. Gonzalez Valencia's substantial rights.*

The error also affected Mr. Gonzalez Valencia's substantial rights. *See United States v. Olano*, 507 U.S. 725, 734 (1993).

Under the so-called "one book rule," when applying the Guidelines Manual on the date of sentencing would violate the ex post facto clause, the district court must use an earlier edition of the Guidelines Manual. *See* U.S.S.G. § 1B1.11(b)(1). It cannot "apply, for example, one guideline section from one edition of the Guidelines Manual and another [] section from a different edition of the Guidelines Manual." U.S.S.G. § 1B1.11(b)(2).

Based on this rule, the court here should have applied either the 2005 or 2007 Guidelines Manuals (it would not make a difference). Under either, Mr. Gonzalez Valencia would not receive a combined four

28

levels for the semisubmersible and violence enhancements.  Instead, his Guidelines would be as follows:

- Base offense level 38 for drug quantity.  U.S.S.G. § 2D1.1(c)(1).

- [Plus two levels for possession of a firearm.  U.S.S.G. § 2D1.1(b)(2).][7]

- Plus four levels for aggravated role.  U.S.S.G. § 3B1.1(a).

- Minus three levels for acceptance of responsibility.  U.S.S.G. § 3E1.1.

This produces a total adjusted offense level of 41.  In either CHC II or III, the sentencing range would no longer be life, but instead 360-life.  This lower range, in turn, establishes that the error affected Mr. Gonzalez Valencia's substantial rights.  "[U]nder plain-error review, the use of the wrong Guidelines, resulting in the risk of an increased sentence, should be presumed to affect the defendant's substantial rights." *Head*, 817 F.3d at 361.

To this end, as the Supreme Court explained in *Molina-Martinez*, 578 U.S. at 198, "[n]othing in the text of Rule 52(b), its rationale, or the Court's precedents supports a requirement that a defendant seeking appellate review of an unpreserved Guidelines error make some further

---

[7] However, as discussed below, this enhancement should not apply because it was based on entirely foreign conduct.

showing of prejudice beyond the fact that the erroneous, and higher, Guidelines range set the wrong framework for the sentencing proceedings. This is so even if the ultimate sentence falls within both the correct and incorrect range."

      d.   *The error "seriously affected the fairness, integrity, and public reputation of judicial proceedings."*

The analysis, therefore, moves to the final prong of plain-error review, whether the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles*, 138 S. Ct. at 1906. This criterion is also met. In the Supreme Court's words, the "risk of unnecessary deprivation of liberty particularly undermines the fairness, integrity, or public reputation of judicial proceedings in the context of a plain Guidelines error because Guidelines miscalculations ultimately result from judicial error, as the district court is charged in the first instance with ensuring the Guidelines range it considers is correct." *Id.* at 1908. And because the defendant's fundamental right to liberty is at stake, it is critical to the "public perception of fairness and integrity in the justice system" that district courts correctly calculate the applicable sentencing range. *Id.* at 1907.

In this case, that did not happen. Accordingly, because

Mr. Gonzalez Valencia has satisfied all four prongs of plain-error review, this Court should vacate his sentence and remand for resentencing under a correct range.

      3.    <u>The government's likely response is without merit</u>.

Against the weight of this commonsense remedy, the government will likely claim no remand is required because there is no ex post facto problem and thus no error. Mr. Gonzalez Valencia anticipates the prosecution will argue that because the conspiracy extended until 2016, that is the controlling date under the Ex Post Facto clause. For support, it will probably rely on *United States v. Turner*, 548 F.3d 1095 (D.C. Cir. 2008).

At the outset, Mr. Gonzalez Valencia acknowledges that *Turner* considered "the duration of the conspiracy" in analyzing the defendant's ex post facto Guidelines claim. *Id.* at 1096-97. But that was because both the parties and the Court seemingly assumed the end of the conspiracy – rather than the date of the conduct at issue – was the trigger point for ex post facto consideration. As the Court noted, "Turner's argument [that the district court's Guidelines calculation violated ex post facto principles] and the government's answer require us to determine

31

the duration of the conspiracy[.]" *Id.* at 1096.

The *Turner* Court, therefore, focused only on that question. It did not consider, much less decide, whether the end of the conspiracy or the date of the criminal act was the relevant marker. Thus, it cannot be precedent on that point. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 n.7 (D.C. Cir. 1996) (en banc) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

More importantly, *Turner* came years before *Peugh* clarified that the ex post facto trigger is the specific criminal act in question. *See Peugh*, 569 U.S. at 533. This focus on conduct is necessary to further the core goals of the ex post facto prohibition – notice and fair warning. *Id.* at 544. The logic is straightforward: A person cannot make the knowing decision to avoid a specific act that would result in an enhanced penalty if that enhancement does not yet exist.

This case illustrates the point. When the alleged act of violence was committed, and the semisubmersible employed, there were no sentencing enhancements for that conduct. Thus, there was no notice or fair

warning that such acts would result in an increased offense level. The post hoc application of those enhancements, therefore, violates ex post facto principles because the sentencing range and likely punishment are higher than when the criminal acts were committed. *See Weaver v. Graham*, 450 U.S. 24, 29 (1981) ("[T]wo critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.").

Indeed, this is precisely the understanding of the ex post facto rationale embodied in our country's earliest jurisprudence: "the plain and obvious meaning and intention of the prohibition is this; that the Legislatures . . . shall not pass laws, after *a fact* done by a subject, or citizen, which shall have relation to such fact, and shall punish him for having done it." *Calder v. Bull*, 3 U.S. 386, 390 (1798).

Accordingly, for all the reasons already discussed, the district court plainly erred under the Ex Post Facto clause in calculating Mr. Gonzalez Valencia's Guidelines. His sentence cannot stand.

## B.   The district court plainly erred in applying two enhancements based on entirely foreign conduct.

Independent of ex post facto considerations, the district court also

erred by increasing Mr. Gonzalez Valencia's offense level based on entirely foreign conduct.

1.    <u>Standard of review</u>.

Mr. Gonzalez Valencia did not challenge the gun and violence enhancements on this ground. Thus, this claim too is reviewed for plain error under Rule 52(b). *See United States v. Flores*, 912 F.3d 613, 618 (D.C. Cir. 2019).

2.    <u>The court's plain error</u>.

The district court increased Mr. Gonzalez Valencia's offense level by two levels for possession of a firearm under section 2D1.1(b)(1) and an additional two levels for use of violence under section 2D1.1(b)(2). JA1485, 1488. In support of the firearm enhancement, the district court noted that multiple witnesses "testified that defendant carried certain firearms on his person as he conducted cocaine transactions [in Mexico] in furtherance of the conspiracy. And evidence of such conduct is sufficient to warrant the enhancement." JA1485. In support of the violence enhancement, as discussed, the court found that, in 2005, Mr. Gonzalez Valencia participated in ordering others to kill Antonio Guizar Valencia in Mexico. JA1487-88.

34

However, there was no evidence and no finding that Mr. Gonzalez Valencia ever possessed a weapon in the United States or committed or ordered any act of violence in the United States or against an American national.[8]  For this reason, both enhancements were improper.

        a.    *The error.*

The analysis begins with *United States v. Azeem*, 946 F.2d 13, 17 (2d Cir. 1991).   There, the Second Circuit explained that "[t]he Guidelines section on base offense levels is broadly worded to include all such acts and omissions that were part of the same course of conduct or common scheme or plan, but does not explicitly address the issue of foreign crimes and activities. U.S.S.G. § 1B1.3(a)(2). However, the Guidelines elsewhere note that foreign sentences may not be used in computing a defendant's criminal history category, but may be used for upward departures from the otherwise applicable range. *See* U.S.S.G. §§ 4A1.2(h), 4A1.3(a)." *Id.*

The Second Circuit concluded, "[f]rom these provisions, it follows that Congress, while it has not remained entirely silent, has chosen to

---

[8] As noted, the murder on which the enhancement was based took place in Mexico and there was no evidence the victim was an American national.

assign to foreign crimes a rather limited role. We decline to find that Congress intended to require that foreign crimes be considered when calculating base offense levels simply because Congress did assign foreign crimes a role in fixing upward departures, while remaining silent on their role in calculating base offense levels. Not every congressional silence is pregnant. In general, congressional consideration of an issue in one context, but not another, in the same or similar statutes implies that Congress intends to include that issue only where it has so indicated." *Id.* Thus, the Second Circuit "decline[d] to create the complexities that the inclusion of foreign crimes in the base offense level calculation would generate." *Id.* at 18.

Following *Azeem*, in *United States v. Chunza-Plazas*, 45 F.3d 51, 57-58 (2d. Cir. 1995), the Second Circuit further determined that even when foreign conduct is part of the same conspiracy, it should not be used to increase the defendant's offense level. "The same considerations considered in *Azeem* with respect to base offense level, should guide our determination of whether Chunza's conduct in Colombia may be considered for an upward departure. . . . Chunza's illegal activities in Colombia were not crimes against the United States, and therefore

36

should not be included in the guideline calculation." *Id.* at 57.

This Court reached an analogous conclusion in *United States v. Flores*, 912 F.3d 613 (*Flores I*) (D.C. Cir. 2019). There, the defendant "appeal[ed] his sentence, arguing the District Court erred when it considered his murder of a Mexican national in Mexico when calculating his sentence under the Sentencing Guidelines." *Id.* at 615. The Court "agree[d] with Flores" and vacated his sentence. *Id.* In doing so, the Court explained that the "murder of the Mexican kidnap victim" could not be used to support the relevant guidelines enhancement under U.S.S.G. § 2E1.1. *Id.* at 621.

Here also, the purely foreign conduct underlying gun and violence enhancements should not have been used to increase the offense level.[9] First, as to the gun possession, the government did not establish this was even a crime in Mexico. Second, neither the gun possession nor the

---

[9] On this point, Mr. Gonzalez Valencia acknowledges a potential distinction between these enhancements and the offense level calculations tied to the drug quantity and his role in the conspiracy to import drugs into the United States. Those are arguably direct parts of the offense against the United States – the importation – forming the basis of his conviction. For this reason, and because plain-error review applies, he is not challenging those aspects of the Guidelines' calculation. He does not concede the validity of their application, but has simply decided to narrow the issues on appeal.

violence targeted our country or its citizens.  They did not take place on our soil.

Thus, to borrow from the Second Circuit, those "activities in [Mexico] were not crimes against the United States, and therefore should not be included in the guideline calculation." *Chunza-Plazas*, 45 F.3d at 57.  Indeed, as applied here, there appears no constitutionally permissible basis to impose sentencing enhancements for purely foreign conduct that did not economically impact the United States.  *See In re Sealed Case*, 936 F.3d 582, 590 (D.C. Cir. 2019) ("Doubt certainly exists as to Congress's ability under the Foreign Commerce Clause to criminalize conduct with no effect on the United States.").

This conclusion finds considerable support "in [the] basic premise of our legal system that, in general, United States law governs domestically but does not rule the world.  This principle finds expression in a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application. The question is not whether we think Congress would have wanted a statute to apply to foreign conduct if it had thought of the

situation before the court, but whether Congress has affirmatively and unmistakably instructed that the statute will do so. When a statute gives no clear indication of an extraterritorial application, it has none." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016).

Applying these principles to the Guidelines reveals no clear indication that the gun and violence enhancements in sections 2D1.1(b)(1) and 2D1.1(b)(2) were intended to have an extraterritorial application. The provisions do not state they apply extraterritorially. Nor does the commentary. This is strong evidence supporting the presumption. There is more.

Under the doctrine of negative implication (expressio unius est exclusio alterius), courts should presume that where the drafters include particular language in one part of a statute or guidelines provision, but omit it in another, the omission is intentional. *See United States v. Fuller*, 531 F.3d 1020, 1027 (9th Cir. 2008); *United States v. Huang*, 687 F.3d 1197, 1205-06 (9th Cir. 2012). In other words, "[u]nder the maxim of expressio unius est exclusio alterius, there is a presumption that . . . all omissions should be understood as exclusions." *Copeland v. Ryan*, 852 F.3d 900, 908 (9th Cir. 2017).

This maxim applies here because the Sentencing Commission knows how to make a Guidelines provision extraterritorial when it wants to. Section 2B1.1(b)(10)(B), for instance, provides a two-level increase when "a substantial part of a fraudulent scheme was committed from *outside the United States*." The lack of any such similar language in the gun and violence enhancements strengthens the conclusion that they do not apply to conduct entirely outside of the United States. As such, the district court erred in applying them in the context of this case.

           b.   *The error satisfies the remaining requirements under Rule 52(b).*

The error was plain. "The district court has the ultimate responsibility to ensure that the Guidelines range it considers is correct[.]" *Rosales-Mireles*, 138 S. Ct. at 1904. And all the precedent and principles regarding foreign conduct discussed above were well-established at the time of Mr. Gonzalez Valencia's sentencing.

To be clear, this is not a matter of blame. Instead, as the Supreme Court has explained, "[g]iven the complexity of the calculation, [] district courts sometimes make mistakes. It is unsurprising, then, that there will be instances when a district court's sentencing of a defendant within the framework of an incorrect Guidelines range goes unnoticed by the

parties as well, which may result in a defendant raising the error for the first time on appeal." *Id.*

That is what happened here. Because Mr. Gonzalez Valencia was sentenced under an incorrect range, the error satisfies the remaining plain-error requirements. *See id.* at 1906-07. Indeed, when all the Guidelines errors are considered together – i.e., the enhancements for the gun, violence, and semisubmersible – it amounts to a six-level reduction. This would take Mr. Gonzalez Valencia to a total offense level of 39. In CHC II, the range would be 292-365 months (and even in CHC III, the range would be 324-405). Accordingly, in light of the lower range, resentencing is required.

> 3.  The government's likely response is without merit.

Once again, Mr. Gonzalez Valencia can anticipate the government's answer. In the district court, it cited *United States v. Flores*, 995 F.3d 214, 222 (D.C. Cir. 2021) (*Flores* II) for the proposition that these enhancements "may apply to acts committed in Mexico against Mexican victims where such conduct served to protect the DTO's lucrative drug routes to the United States." JA1186. Mr. Gonzalez Valencia assumes the government will make the same argument here.

41

But *Flores II* is easily distinguished. There, in concluding that the defendant's acts of violence in Mexico could be "'relevant conduct' for the RICO conspiracy," the Court relied on the fact that "Flores admitted to kidnap[p]ing, assault, attempted murder, and murder as a means of protecting the . . . *lucrative drug distribution routes from Mexico to the United States*." *Flores*, 995 F.3d at 222-23. Flores further "admitted he carried out various acts of violence and intimidation on behalf of [Los Zetas] against Mexican law enforcement officers and rival drug cartel members for the purpose of maintaining control over the . . . *drug smuggling routes to the United States*. Thus, Flores' guilty plea effectively concedes that his violent conduct was related to the drug smuggling conspiracy and therefore was racketeering activity." *Id.* at 223.

The Court simply held, "[i]n light of Flores' *admission* that he committed kidnappings, murders, and numerous other violent crimes to protect Los Zetas' *Mexico-United States drug trafficking routes*, the district court did not commit reversible error in imposing a two-point enhancement for the use of threats and violence and a two-point enhancement for the use of physical restraints." *Id.*

42

Here, there were no admissions, no evidence, and no findings that the gun and violence enhancements were based on conduct undertaken for the specific purpose of protecting Mexico-United States drug trafficking routes, as opposed to Mr. Gonzalez Valencia more generally protecting himself within the dangerous world of Mexican organized crime and maintaining his position within that world.

Moreover, *Flores II* did not even address the *Azeem* line of cases, the presumption against extraterritorial application, or the doctrine of negative implication. Nor did it consider whether purely foreign conduct not aimed at the United States could support gun and violence enhancements under section 2D1.1(b)(1) and (b)(2). That case, therefore, is inapposite. It does not control the analysis here, which demonstrates the district court plainly erred. The sentence should be vacated.

## III.
## The district court erred in failing to abide by, or at least consider, Uruguay's express condition of extradition that Mr. Gonzalez Valencia not receive a life sentence.

Independent of the Guidelines issue, this Court should reverse because the district court failed to place sufficient weight on Uruguay's express extradition condition that Mr. Gonzalez Valencia not receive a life sentence.

## A.    Relevant facts.

### 1.    Extradition proceedings in Uruguay.

After the United States sought Mr. Gonzalez Valencia's extradition, the Uruguayan court of first instance granted the request on the condition that "in the event that Gerardo Gonzalez Valencia is convicted in the criminal proceedings that are intended to be initiated in [the United States], he shall not be punished with the death penalty or a *life in prison sentence*[.]" JA1242.  This condition prohibiting a punishment of life imprisonment was then expressly affirmed on appeal to both the Uruguayan intermediate appellate court and the Uruguayan Supreme Court.  JA1243.

Following the Uruguayan Supreme Court's decision upholding the no-life-sentence condition, Uruguay formally wrote to the Embassy of the United States, informing them that with the expiration of his final appeal, the extradition of Mr. Gonzalez-Valencia could proceed, subject to the condition that "in the event Gerardo Gonzalez Valencia is convicted in the criminal proceeding that is intended to be initiated in your country, he will not receive the death penalty or a sentence of life imprisonment." JA1243.    The United States replied, "regarding the requested life

sentence assurance, the United States notes that the Treaty does not provide a basis for conditioning extradition on the provision of the assurances requested by the Government of the Republic of Uruguay. Therefore, the United States is under no obligation to provide such an assurance[.]" JA1243-44.

After receiving this response, Mr. Gonzalez Valencia again appealed to the Uruguayan court. JA1244. But the court rejected his concerns because Uruguay interpreted the United States' response to mean that, although it was not obligated to accept the sentencing condition, it would voluntarily comply:

"If the note from the Embassy of the United States of America is read carefully, *it does not express that the petitioning State does not accept the imposed condition, nor that it refuses to provide the required guarantees*, but it claims verbatim that 'the United States does not have the obligation to give such guarantee,' a position that – as discussed – has a basis in the rules of the Treaty and it is only possible to conclude that it has legal reason for this. In other words, *the note does not say that the United States will not comply with the condition or with the provision of guarantees* - as the Defense alleges - but rather it says that it is not

obliged to do so, which is substantially different." JA1244.

Based on this understanding, Uruguay allowed the extradition to proceed. JA1244.

2.    <u>Sentencing arguments based on the extradition condition</u>.

Also based on this understanding, during sentencing Mr. Gonzalez Valencia argued to the district court, "out of respect for the decision of the Uruguayan Court under the principle of international comity, this Court is bound by the condition of the Extradition Order that Mr. Gonzalez-Valencia not be sentenced to life imprisonment[.]" JA1244-45. The government took the contrary view. JA1457. The district court, however, never ruled on this issue. Nor did it even mention Uruguay's condition during the sentencing proceeding. This was error for two reasons.

## B.    The district court's errors.

First, under principles of international comity, the district court was required to comply with the Uruguay's condition and thus the life sentence imposed was unlawful. Second, even assuming the condition was not binding, the district court was required to consider and address all nonfrivolous sentencing arguments. Here, Uruguay's condition

46

should have been an important substantive factor in the sentencing calculus. The district court erred in ignoring it. Mr. Gonzalez Valencia addresses these points in turn.

    1.    <u>The district court was required to abide by Uruguay's express limitation</u>.

The first point is a straightforward application of the rule of specialty, "which is derived from principles of international comity [and] generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country." *United States v. Cuevas*, 496 F.3d 256, 262 (2d Cir. 2007).[10] Ordinarily, "the rule of specialty is invoked to circumscribe the specific crimes for which a defendant may be tried following extradition." *Id.*; *see also United States v. Sensi*, 879 F.2d 888, 892 (D.C. Cir. 1989) (the "doctrine of specialty" is the "rule that, once extradited, a person can be prosecuted only for those charges on which he was extradited.").

The rule, however, "has application in the sentencing context as well . . . . a district court, in sentencing a defendant extradited to this

---

[10] "A district court's interpretation of an extradition agreement and application of the principle of specialty involve questions of law, and we therefore review them de novo." *United States v. Baez*, 349 F.3d 90, 92 (2d. Cir. 2003).

country in accordance with a diplomatic agreement between the Executive branch and the extraditing nation, . . . delicately must balance its discretionary sentencing decision with the principles of international comity in which the rule of specialty sounds. In more concrete terms, this means that a district court should temper [its] discretion in sentencing an extradited defendant *with deference to the substantive assurances made by the United States to an extraditing nation*." *Cuevas*, 496 F.3d at 262 (emphasis in original).

In applying this rule here, it is helpful to begin by contrasting the facts in *Cuevas* with the circumstances of Mr. Gonzalez Valencia's extradition.

In *Cuevas*, the defendant was extradited from the Dominican Republic to the United States and ultimately sentenced to 390 months for drug crimes. *See id.* at 258. During his extradition proceedings, there were *no* diplomatic communications regarding the potential sentence he faced. *See id.* In fact, "between November 1999, when the Dominican Republic acknowledged receipt of the extradition request, and July 6, 2002, when the Dominican Republic relinquished custody over Cuevas, the United States did not receive any diplomatic communications from

48

the Dominican Republic regarding Cuevas's extradition." *Id.* at 262-63.

Instead, it was not until weeks after the custody transfer that "the United States received a copy of a decree, signed by the President of the Dominican Republic, authorizing Cuevas's extradition." *Id.* at 259. That decree referenced a certain provision of Dominican Republic law, which in turn stated: "when the extradition of a national is granted, no penalty greater than the maximum established in this country, which at the moment this law enters into force is thirty years, shall be imposed." *Id.* Based on this post-extradition decree, the defendant challenged his sentence, arguing that "[t]he Dominican Republic's decree granting the United States' request for extradition required limitation of [his] sentence to 30 years, viz., 360 months." *Id.* at 258.

The Second Circuit rejected the argument. It explained that, before the extradition was completed, "the United States never made any substantive assurances to the Dominican Republic that if extradited and convicted, Cuevas would not be sentenced to a term of more than 30 years' imprisonment . . . . While the extradition decree indicates that officials of the Dominican Republic believed, no doubt based on the domestic law of the Dominican Republic, that [Cuevas's] sentence would

be so limited, critically, nothing in the decree point[s] to any agreement or undertaking made by the United States to limit his sentence.  The Dominican Republic's unilateral belief that Cuevas would be covered by [its domestic law] is insufficient to bind the United States." *Id.* at 263.

Moreover, "Cuevas d[id] not dispute the District Court's finding that the United States provided no diplomatic assurances regarding the limitation of his sentence as part of the extradition arrangement." *Id.* Accordingly, the Second Circuit held that "[t]he District Court did not offend against the rule of specialty" by imposing a sentence greater than 30 years. *Id.*

Here, it is the opposite scenario.  Unlike *Cuevas*, there were multiple pre-extradition diplomatic communications in which Uruguay made clear that any grant of the extradition was conditioned on Mr. Gonzalez Valencia not receiving a life sentence.  Further, and also unlike *Cuevas*, Uruguay's final extradition decree reflected its understanding that the United States would voluntarily comply with its condition.

As the Uruguayan court explained: "If the note from the Embassy of the United States of America is read carefully, it does not express that

the petitioning State does not accept the imposed condition, nor that it refuses to provide the required guarantees[.]"    JA1244.    The most reasonable interpretation of this statement is that Uruguay understood the United States would comply with Uruguay's condition, although it was not strictly required to do so under the treaty. *See Guedes v. BATFE*, 45 F.4th 306, 321-22 (D.C. Cir. 2022) (the rule of lenity "instructs courts to resolve ambiguity in favor of a criminal defendant."). And it was based on this understanding of the United States' position that Uruguay approved the extradition.

This should be outcome-determinative for Mr. Gonzalez Valencia. Unlike the unsupported, unilateral belief of the Dominican Republic in *Cuevas*, here, Uruguay acted in reliance on its reasonable interpretation of the United States' diplomatic note.[11]  Under the rule of specialty, that reasonable interpretation is binding.  As the Supreme Court explained over a century ago, "[i]t is unreasonable that the country of the asylum [here, Uruguay] should be expected to deliver up such person to be dealt

---

[11] For this reason, the circumstances here are also materially different than in *Baez*, where the United States' diplomatic correspondence "expressly contemplated the possibility that a sentencing court might impose a term of life imprisonment." 349 F.3d at 92.

with by the demanding government without any limitation, *implied or otherwise*, upon its prosecution of the party." *United States v. Rauscher*, 119 U.S. 407, 419 (1886).  Remand for a lesser sentence is required.

      2.    <u>At the very least, the district court was required to consider Uruguay's express limitation as part of its sentencing analysis</u>.

This remains the appropriate result, even assuming counterfactually that there was no binding condition as to the length of the sentence.  Regardless of whether the district court was bound by Uruguay's condition, it was undoubtedly required to consider it in determining the appropriate sentence.

"Where a defendant provides a non-frivolous argument for mitigation, the district court *must* consider this argument when pronouncing a sentence." *United States v. Borda*, 848 F.3d 1044, 1071 (D.C. Cir. 2017).  "If the sentencing judge gives such an explanation, [this Court] will generally presume that he adequately considered the arguments and will uphold the sentence if it is otherwise reasonable. By contrast, if the sentencing judge fails to respond to a nonfrivolous argument, the presumption of adequate consideration is rebutted." *United States v. Mack*, 841 F.3d 514, 523 (D.C. Cir. 2016).

Here, the district court failed to respond to Mr. Gonzalez Valencia's argument regarding Uruguay's sentencing limitation. The presumption of adequate consideration is rebutted.

Nor was this a minor oversight. "Courts should accord deferential consideration to the limitations imposed by an extraditing nation in an effort to protect United States citizens in prosecutions abroad. Moreover, in evaluating the exact limitations set by the extraditing nation, courts should not elevate legalistic formalism over substance. To do otherwise would strip comity of its meaning." *Baez*, 349 F.3d at 93.

In this case, not only did the district court fail to accord deferential consideration to the limitation imposed by Uruguay, but the record suggests the court did not even consider the condition. This was a significant oversight. It is entirely possible that had the court properly weighed Uruguay's condition in the context of international comity, it would have complied by imposing a term of years, as the probation department recommended. JA1491

Accordingly, because Uruguay's no-life-sentence condition – confirmed by every level of its judiciary – was an important, non-frivolous argument for mitigation and because the district court missed it entirely,

resentencing is not only required but is the just and fair outcome. *See United States v. Bigley*, 786 F.3d 11, 12 (D.C. Cir. 2015) ("Because the district court failed to consider a nonfrivolous claim . . . when it pronounced its sentence, we vacate the sentence and remand.").

## IV.
### The district court erred in failing to grant Mr. Gonzalez Valencia's motion to dismiss based on an invalid extradition proceeding.

Separate from the sentencing claims just discussed, the Court should also vacate Mr. Gonzalez Valencia's convictions because the district court erred in failing to grant his motion to dismiss based on an invalid extradition proceeding. JA26, 367.

## A.    Waiver.

Mr. Gonzalez Valencia raises this issue but notes it may have been waived by his unconditional guilty plea. Consistent with the duty of candor, he acknowledges that "[u]nconditional guilty pleas . . . waive the pleading defendants' claims of error on appeal, even constitutional claims." *United States v. Delgado-Garcia*, 374 F.3d 1337, 1341 (D.C. Cir. 2004); *see also Rengifo-Valencia v. United States*, 2020 U.S. App. LEXIS 10468, at *3 (11th Cir. 2020) ("Mr. Rengifo-Valencia waived any challenge to the extradition process by pleading guilty. Even if his

54

extradition was illegal, it implicates only the court's personal jurisdiction over him, not subject matter jurisdiction to hear his case, and therefore, it is not considered a jurisdictional error that cannot be waived by a guilty plea.").

Nevertheless, because the Court could determine that "exceptional circumstances" exist providing discretion to hear an otherwise waived argument, the issue is presented below. *Huber v. Taylor*, 469 F.3d 67, 84 (3d Cir. 2006).

## B.    The government failed to establish probable cause to support the extradition.

Mr. Gonzalez Valencia moved to dismiss the indictment based on flaws in the extradition proceeding.  JA37.  He argued the government "presented no evidence to support a probable cause determination for extradition."  JA49-50.[12]  The district court denied the motion, finding "the government's extradition request was indisputably predicated on probable cause, as reflected in the indictment returned by a grand jury

---

[12] He also argued "the uncontroverted Uruguayan court record shows that the foreign court applied the wrong legal standard in determining to grant extradition[.]"  JA49-50.  However, without conceding the issue, he does not pursue this argument in the present appeal.

sitting in this District upon determining that there was probable cause to charge defendant with committing the conspiracy charged." JA371. This conclusion was erroneous.

At the outset, there is no dispute that Mr. Gonzalez Valencia had a right to bring this extradition challenge in district court. As this Court has explained, courts in the United States "have jurisdiction to review [a foreign country's extradition] decision, but that [] review is highly deferential." *United States v. Trabelsi*, 845 F.3d 1181, 1186 (D.C. Cir. 2017). Here, even under such deferential review, Mr. Gonzalez Valencia established that his extradition was unlawful because it was not supported by a showing of probable cause.

In concluding to the contrary, the district court relied solely on the indictment. JA371.[13] This reliance was misplaced. An indictment signifies that the grand jury has found probable cause. But just because an American grand jury has found probable cause based on the evidence it received does not mean that, in the extradition context, the indictment

---

[13] The probable cause requirement for extradition under the United States-Uruguay treaty is discussed at JA271-72, 274-79; *see United States v. Puentes*, 50 F.3d 1567, 1575-76 (11th Cir. 1995) (discussing the probable cause requirement in the United States-Uruguay extradition treaty).

itself can substitute for that evidence.

The indictment is simply a piece of paper containing a conclusion; it is not the evidence. In the Ninth Circuit's words, "[t]he indictment simply describes the charge the government brings against the defendant. The indictment is not evidence and does not prove anything." Ninth Cir. Model Crim. Jury Instr. 1.2. This proposition should be self-evident.

Were it otherwise, the government could simply send an indictment as the sole basis for its extradition request, thereby denying the requested country the ability to conduct an independent review of the evidence. JA281 ("If an indictment alone was enough to establish probable cause, there would be no need to provide '[a] statement of the facts of the case' or any other documentation as required by the Treaty; the Government could simply hand Uruguay an indictment and demand extradition.").

A domestic analogy is helpful. Suppose a law enforcement agent seeking a warrant entered the reviewing judge's chambers with just an indictment. Surely, the judge would not find probable cause for the warrant based on the indictment alone; instead, he or she would need to

see the actual evidence.  The same is true here.  Accordingly, the district court erred in finding that the government's extradition package established probable cause based on the indictment.  JA371.

Nor does the remainder of the package fill in the gaps.  As explained in Mr. Gonzalez Valencia's motion, the Government was required to establish probable cause for the actual charge – i.e., that he conspired to distribute cocaine and methamphetamine within the applicable five-year limitations period.  JA52-71, 281.[14]  But it failed to do so.

The government's sole offer of proof within the limitations period was a BlackBerry Messenger exchange in 2013, supposedly about a drug transaction involving an individual known as Silverio that did not identify the substance involved.  JA282-83.

Thus, it could not establish probable cause that Mr. Gonzalez Valencia participated in a drug conspiracy related to cocaine or methamphetamine, the sole charge on which extradition was sought.[15]

---

[14] The drug-conspiracy indictment was filed in April 2016.  JA1.  A five-year statute of limitations applies under 18 U.S.C. § 3282.

[15] Mr. Gonzalez Valencia was not identified in the conversation, his name was never used, and there were no documents showing the account was registered to him.  JA67-70.

JA56; *cf. United States v. Garcia*, 497 F.3d 964, 967 (9th Cir. 2007) (vacating conviction because evidence of cocaine sales did not establish a conspiracy to distribute methamphetamine, the specific drug charged). As he argued below, "[w]ithout naming the alleged drug in question in the sole piece of evidence within the limitations period, the evidence, as a matter of law, cannot support a probable cause determination." JA62.

For this reason – the government's failure to establish probable cause for the specific charge – Mr. Gonzalez Valencia's extradition was unlawful. This Court, therefore, should reverse and remand for a determination of the proper remedy, including the possibility of dismissing the indictment. *See Trabelsi*, 845 F.3d at 1193 (explaining that the appropriate remedy for an invalid extradition remains an open question).

## CONCLUSION

The Court should remand for resentencing because Mr. Gonzalez Valencia is now in Criminal History Category II, not III. Additionally, resentencing is appropriate because the district court incorrectly calculated the sentencing guidelines and failed to consider Uruguay's express condition that Mr. Gonzalez Valencia not receive a life sentence.

Finally, the Court should reverse the district court's decision upholding

the extradition and remand for a remedy determination.

Respectfully submitted,

*s/ Devin Burstein*

Devin Burstein
Warren & Burstein
501 W. Broadway, Ste 240
San Diego, CA 92101
(619) 234-4433

May 30, 2024

60

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume limit, Typeface Requirements, and Type-Style Requirements:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

    This document contains 11,272 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

This Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-pt Century font.

 *s/ Devin Burstein*
Devin Burstein
Warren & Burstein
501 W. Broadway, Ste 240
San Diego, CA 92101
(619) 234-4433

CERTIFICATE OF SERVICE

I certify that on May 30, 2024, I caused to be filed a copy of the foregoing Appellant's Opening Brief with the Clerk of the Court via the Court's Electronic Case Filing System, which electronically served them upon the following:

Kaitlin J. Sahni, Trial Attorney
Direct: 202-598-2493
Email: kaitlin.sahni@usdoj.gov
U.S. Department of Justice, Criminal Division, Narcotic & Dangerous Drug Section
145 N Street, NE
Second Floor, East Wing, 2e113
Washington, DC 20530

Chrisellen Rebecca Kolb, Assistant U.S. Attorney
Direct: 202-252-6833
Email: Chrisellen.R.Kolb@usdoj.gov
U.S. Attorney's Office, (USA) Appellate Division, Room 8104
601 D Street, NW
Washington, DC 20530

USAO Appellate Counsel
Firm: 202-252-6829
Email: USADC.ECFAppellate@usdoj.gov
U.S. Attorney's Office, (USA) Appellate Division
601 D Street, NW
Washington, DC 20530

*s/ Devin Burstein*
Devin Burstein
Warren & Burstein
501 W. Broadway, Ste 240
San Diego, CA 92101
(619) 234-4433

# ADDENDUM

## *18 USCS Appx § 2D1.1, Part 1 of 3*

Current through Public Law 118-62, approved May 13, 2024.

*United States Code Service  >  TITLE 18. CRIMES AND CRIMINAL PROCEDURE (§§ 1 — 6005)  > 18 USCS appendix  >  SENTENCING GUIDELINES FOR THE UNITED STATES COURTS  > CHAPTER TWO. Offense Conduct  >  Part D. Offenses Involving Drugs and Narco-Terrorism  >  1. Unlawful Manufacturing, Importing, Exporting, Trafficking, or Possession; Continuing Criminal Enterprise*

# § 2D1.1. Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy

**(a)** Base Offense Level (Apply the greatest):

    **(1)** 43, if—

        **(A)** the defendant is convicted under *21 U.S.C. § 841(b)(1)(A)* or (b)(1)(B), or *21 U.S.C. § 960(b)(1)* or (b)(2), and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance and that the defendant committed the offense after one or more prior convictions for a serious drug felony or serious violent felony; or

        **(B)** the defendant is convicted under *21 U.S.C. § 841(b)(1)(C)* or *21 U.S.C. § 960(b)(3)* and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance and that the defendant committed the offense after one or more prior convictions for a felony drug offense; or

    **(2)** 38, if the defendant is convicted under *21 U.S.C. § 841(b)(1)(A)*, (b)(1)(B), or (b)(1)(C), or *21 U.S.C. § 960(b)(1)*, (b)(2), or (b)(3), and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance; or

    **(3)** 30, if the defendant is convicted under *21 U.S.C. § 841(b)(1)(E)* or *21 U.S.C. § 960(b)(5)*, and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance and that the defendant committed the offense after one or more prior convictions for a felony drug offense; or

    **(4)** 26, if the defendant is convicted under *21 U.S.C. § 841(b)(1)(E)* or *21 U.S.C. § 960(b)(5)*, and the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance; or

    **(5)** the offense level specified in the Drug Quantity Table set forth in subsection (c), except that if (A) the defendant receives an adjustment under § 3B1.2 (Mitigating Role); and (B) the base offense level under subsection (c) is (i) level 32, decrease by 2 levels; (ii) level 34 or level 36, decrease by 3 levels; or (iii) level 38, decrease by 4 levels. If the resulting offense level is greater than level 32 and the defendant receives the 4-level ("minimal participant") reduction in § 3B1.2(a), decrease to level 32.

**(b)** Specific Offense Characteristics

    **(1)** If a dangerous weapon (including a firearm) was possessed, increase by 2 levels.

    **(2)** If the defendant used violence, made a credible threat to use violence, or directed the use of violence, increase by 2 levels.

**(3)**  If the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance, (B) a submersible vessel or semi-submersible vessel as described in *18 U.S.C. § 2285* was used, or (C) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance, increase by 2 levels. If the resulting offense level is less than level 26, increase to level 26.

**(4)**  If the object of the offense was the distribution of a controlled substance in a prison, correctional facility, or detention facility, increase by 2 levels.

**(5)**  If (A) the offense involved the importation of amphetamine or methamphetamine or the manufacture of amphetamine or methamphetamine from listed chemicals that the defendant knew were imported unlawfully, and (B) the defendant is not subject to an adjustment under § 3B1.2 (Mitigating Role), increase by 2 levels.

**(6)**  If the defendant is convicted under *21 U.S.C. § 865*, increase by 2 levels.

**(7)**  If the defendant, or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct), distributed a controlled substance through mass-marketing by means of an interactive computer service, increase by 2 levels.

**(8)**  If the offense involved the distribution of an anabolic steroid and a masking agent, increase by 2 levels.

**(9)**  If the defendant distributed an anabolic steroid to an athlete, increase by 2 levels.

**(10)**  If the defendant was convicted under *21 U.S.C. § 841(g)(1)(A)*, increase by 2 levels.

**(11)**  If the defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense, increase by 2 levels.

**(12)**  If the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance, increase by 2 levels.

**(13)**  If the defendant (A) knowingly misrepresented or knowingly marketed as another substance a mixture or substance containing fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4piperidinyl] propanamide) or a fentanyl analogue, increase by 4 levels; or (B) represented or marketed as a legitimately manufactured drug another mixture or substance containing fentanyl (N-phenyl-N-[1-(2-phenylethyl )-4-piperidinyl] propanamide) or a fentanyl analogue, and acted with willful blindness or conscious avoidance of knowledge that such mixture or substance was not the legitimately manufactured drug, increase by 2 levels. The term "drug," as used in subsection (b)(13)(B), has the meaning given that term in *21 U.S.C. § 321(g)(1)*.

**(14)**  (Apply the greatest):

   **(A)**  If the offense involved (i) an unlawful discharge, emission, or release into the environment of a hazardous or toxic substance; or (ii) the unlawful transportation, treatment, storage, or disposal of a hazardous waste, increase by 2 levels.

   **(B)**  If the defendant was convicted under *21 U.S.C. § 860a* of distributing, or possessing with intent to distribute, methamphetamine on premises where a minor is present or resides, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

   **(C)**  If—

      **(i)**  the defendant was convicted under *21 U.S.C. § 860a* of manufacturing, or possessing with intent to manufacture, methamphetamine on premises where a minor is present or resides; or

      **(ii)**  the offense involved the manufacture of amphetamine or methamphetamine and the offense created a substantial risk of harm to (I) human life other than a life described in subdivision (D); or (II) the environment,

increase by 3 levels. If the resulting offense level is less than level 27, increase to level 27.

**(D)** If the offense (i) involved the manufacture of amphetamine or methamphetamine; and (ii) created a substantial risk of harm to the life of a minor or an incompetent, increase by 6 levels. If the resulting offense level is less than level 30, increase to level 30.

**(15)** If (A) the offense involved the cultivation of marihuana on state or federal land or while trespassing on tribal or private land; and (B) the defendant receives an adjustment under § 3B1.1 (Aggravating Role), increase by 2 levels.

**(16)** If the defendant receives an adjustment under § 3B1.1 (Aggravating Role) and the offense involved 1 or more of the following factors:

**(A)** (i) the defendant used fear, impulse, friendship, affection, or some combination thereof to involve another individual in the illegal purchase, sale, transport, or storage of controlled substances, (ii) the individual received little or no compensation from the illegal purchase, sale, transport, or storage of controlled substances, and (iii) the individual had minimal knowledge of the scope and structure of the enterprise;

**(B)** the defendant, knowing that an individual was (i) less than 18 years of age, (ii) 65 or more years of age, (iii) pregnant, or (iv) unusually vulnerable due to physical or mental condition or otherwise particularly susceptible to the criminal conduct, distributed a controlled substance to that individual or involved that individual in the offense;

**(C)** the defendant was directly involved in the importation of a controlled substance;

**(D)** the defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense;

**(E)** the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood,

increase by 2 levels.

**(17)** If the defendant receives the 4-level ("minimal participant") reduction in § 3B1.2(a) and the offense involved all of the following factors:

**(A)** the defendant was motivated by an intimate or familial relationship or by threats or fear to commit the offense and was otherwise unlikely to commit such an offense;

**(B)** the defendant received no monetary compensation from the illegal purchase, sale, transport, or storage of controlled substances; and

**(C)** the defendant had minimal knowledge of the scope and structure of the enterprise,

decrease by 2 levels.

**(18)** If the defendant meets the criteria set forth in paragraphs (1)–(5) of subsection (a) of § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), decrease by 2 levels.

**(c)** Drug Quantity Table

**Controlled substances and quantity***

**Base offense levels**

(1) *Level 38*

90 KG or more of Heroin;

450 KG or more of Cocaine;

25.2 KG or more of Cocaine Base;

90 KG or more of PCP, or 9 KG or more of PCP (actual);

45 KG or more of Methamphetamine, or 4.5 KG or more of Methamphetamine (actual), or 4.5 KG or more of "Ice";

45 KG or more of Amphetamine, or 4.5 KG or more of Amphetamine (actual);

900 G or more of LSD;

36 KG or more of Fentanyl;

9 KG or more of a Fentanyl Analogue;

90,000 KG or more of Marihuana;

18,000 KG or more of Hashish;

1,800 KG or more of Hashish Oil;

90,000,000 units or more of Ketamine;

90,000,000 units or more of Schedule I or II Depressants;

5,625,000 units or more of Flunitrazepam;

90,000 KG or more of Converted Drug Weight.

(2) *Level 36*

At least 30 KG but less than 90 KG of Heroin;

At least 150 KG but less than 450 KG of Cocaine;

At least 8.4 KG but less than 25.2 KG of Cocaine Base;

At least 30 KG but less than 90 KG of PCP, or at least 3 KG but less than 9 KG of PCP (actual);

At least 15 KG but less than 45 KG of Methamphetamine, or at least 1.5 KG but less than 4.5 KG of Methamphetamine (actual), or at least 1.5 KG but less than 4.5 KG of "Ice";

At least 15 KG but less than 45 KG of Amphetamine, or at least 1.5 KG but less than 4.5 KG of Amphetamine (actual);

At least 300 G but less than 900 G of LSD;

At least 12 KG but less than 36 KG of Fentanyl;

At least 3 KG but less than 9 KG of a Fentanyl Analogue;

At least 30,000 KG but less than 90,000 KG of Marihuana;

At least 6,000 KG but less than 18,000 KG of Hashish;

At least 600 KG but less than 1,800 KG of Hashish Oil;

At least 30,000,000 units but less than 90,000,000 units of Ketamine;

At least 30,000,000 units but less than 90,000,000 units of Schedule I or II Depressants;

At least 1,875,000 units but less than 5,625,000 units of Flunitrazepam;

At least 30,000 KG but less than 90,000 KG of Converted Drug Weight.

(3) *Level 34*

At least 10 KG but less than 30 KG of Heroin;

At least 50 KG but less than 150 KG of Cocaine;

At least 2.8 KG but less than 8.4 KG of Cocaine Base;

At least 10 KG but less than 30 KG of PCP, or at least 1 KG but less than 3 KG of PCP (actual);

At least 5 KG but less than 15 KG of Methamphetamine, or at least 500 G but less than 1.5 KG of Methamphetamine (actual), or at least 500 G but less than 1.5 KG of "Ice";

At least 5 KG but less than 15 KG of Amphetamine, or at least 500 G but less than 1.5 KG of Amphetamine (actual);

At least 100 G but less than 300 G of LSD (or the equivalent amount of other Schedule I or II Hallucinogens);

At least 4 KG but less than 12 KG of Fentanyl;

At least 1 KG but less than 3 KG of a Fentanyl Analogue;

At least 10,000 KG but less than 30,000 KG of Marihuana;

At least 2,000 KG but less than 6,000 KG of Hashish;

At least 200 KG but less than 600 KG of Hashish Oil;

At least 10,000,000 but less than 30,000,000 units of Ketamine;

At least 10,000,000 but less than 30,000,000 units of Schedule I or II Depressants;

At least 625,000 but less than 1,875,000 units of Flunitrazepam;

At least 10,000 KG but less than 30,000 KG of Converted Drug Weight.

(4)  *Level 32*

At least 3 KG but less than 10 KG of Heroin;

At least 15 KG but less than 50 KG of Cocaine;

At least 840 G but less than 2.8 KG of Cocaine Base;

At least 3 KG but less than 10 KG of PCP, or at least 300 G but less than 1 KG of PCP (actual);

At least 1.5 G but less than 5 KG of Methamphetamine, or at least 150 G but less than 500 G of Methamphetamine (actual), or at least 150 G but less than 500 G of "Ice";

At least 1.5 KG but less than 5 KG of Amphetamine, or at least 150 G but less than 500 G of Amphetamine (actual);

At least 30 G but less than 100 G of LSD (or the equivalent amount of other Schedule I or II Hallucinogens);

At least 1.2 KG but less than 4 KG of Fentanyl;

At least 300 G but less than 1 KG of a Fentanyl Analogue;

At least 3,000 KG but less than 10,000 KG of Marihuana;

At least 600 KG but less than 2,000 KG of Hashish;

At least 60 KG but less than 200 KG of Hashish Oil;

At least 3,000,000 but less than 10,000,000 units of Ketamine;

At least 3,000,000 but less than 10,000,000 units of Schedule I or II Depressants;

At least 187,500 but less than 625,000 units of Flunitrazepam;

At least 3,000 KG but less than 10,000 KG of Converted Drug Weight.

(5) *Level 30*

At least 1 KG but less than 3 KG of Heroin;

At least 5 KG but less than 15 KG of Cocaine;

At least 280 G but less than 840 G of Cocaine Base;

At least 1 KG but less than 3 KG of PCP, or at least 100 G but less than 300 G of PCP (actual);

At least 500 G but less than 1.5 KG of Methamphetamine, or at least 50 G but less than 150 G of Methamphetamine (actual), or at least 50 G but less than 150 G of "Ice";

At least 500 G but less than 1.5 KG of Amphetamine, or at least 50 G but less than 150 G of Amphetamine (actual);

At least 10 G but less than 30 G of LSD;

At least 400 G but less than 1.2 KG of Fentanyl;

At least 100 G but less than 300 G of a Fentanyl Analogue;

At least 1,000 KG but less than 3,000 KG of Marihuana;

At least 200 KG but less than 600 KG of Hashish;

At least 20 KG but less than 60 KG of Hashish Oil;

At least 1,000,000 but less than 3,000,000 units of Ketamine;

At least 1,000,000 but less than 3,000,000 units of Schedule I or II Depressants;

At least 62,500 but less than 187,500 units of Flunitrazepam;

At least 1,000 KG but less than 3,000 KG of Converted Drug Weight.

(6) *Level 28*

At least 700 G but less than 1 KG of Heroin;

At least 3.5 KG but less than 5 KG of Cocaine;

At least 196 G but less than 280 G of Cocaine Base;

At least 700 G but less than 1 KG of PCP, or at least 70 G but less than 100 G of PCP (actual);

At least 350 G but less than 500 G of Methamphetamine, or at least 35 G but less than 50 G of Methamphetamine (actual), or at least 35 G but less than 50 G of "Ice";

At least 350 G but less than 500 G of Amphetamine, or at least 35 G but less than 50 G of Amphetamine (actual);

At least 7 G but less than 10 G of LSD;

At least 280 G but less than 400 G of Fentanyl;

At least 70 G but less than 100 G of a Fentanyl Analogue;

At least 700 KG but less than 1,000 KG of Marihuana;

At least 140 KG but less than 200 KG of Hashish;

At least 14 KG but less than 20 KG of Hashish Oil;

At least 700,000 but less than 1,000,000 units of Ketamine;

At least 700,000 but less than 1,000,000 units of Schedule I or II Depressants;

At least 43,750 but less than 62,500 units of Flunitrazepam;

At least 700 KG but less than 1,000 KG of Converted Drug Weight

(7) *Level 26*

At least 400 G but less than 700 G of Heroin;

At least 2 KG but less than 3.5 KG of Cocaine;

At least 112 G but less than 196 G of Cocaine Base;

At least 400 G but less than 700 G of PCP, or at least 40 G but less than 70 G of PCP (actual);

At least 200 G but less than 350 G of Methamphetamine, or at least 20 G but less than 35 G of Methamphetamine (actual), or at least 20 G but less than 35 G of "Ice";

At least 200 G but less than 350 G of Amphetamine, or at least 20 G but less than 35 G of Amphetamine (actual);

At least 4 G but less than 7 G of LSD (or the equivalent amount of other Schedule I or II Hallucinogens);

At least 160 G but less than 280 G of Fentanyl;

At least 40 G but less than 70 G of a Fentanyl Analogue;

At least 400 KG but less than 700 KG of Marihuana;

At least 80 KG but less than 140 KG of Hashish;

At least 8 KG but less than 14 KG of Hashish Oil;

At least 400,000 but less than 700,000 units of Ketamine;

At least 400,000 but less than 700,000 units of Schedule I or II Depressants;

At least 25,000 but less than 43,750 units of Flunitrazepam;

At least 400 KG but less than 700 KG of Converted Drug Weight.

(8) *Level 24*

At least 100 G but less than 400 G of Heroin;

At least 500 G but less than 2 KG of Cocaine;

At least 28 G but less than 112 G of Cocaine Base;

At least 100 G but less than 400 G of PCP, or at least 10 G but less than 40 G of PCP (actual);

At least 50 G but less than 200 G of Methamphetamine, or at least 5 G but less than 20 G of Methamphetamine (actual), or at least 5 G but less than 20 G of "Ice";

At least 50 G but less than 200 G of Amphetamine, or at least 5 G but less than 20 G of Amphetamine (actual);

At least 1 G but less than 4 G of LSD (or the equivalent amount of other Schedule I or II Hallucinogens);

At least 40 G but less than 160 G of Fentanyl;

At least 10 G but less than 40 G of a Fentanyl Analogue;

At least 100 KG but less than 400 KG of Marihuana;

At least 20 KG but less than 80 KG of Hashish;

At least 2 KG but less than 8 KG of Hashish Oil;

At least 100,000 but less than 400,000 units of Ketamine;

At least 100,000 but less than 400,000 units o1f Schedule I or II Depressants;

At least 6,250 but less than 25,000 units of Flunitrazepam;

At least 100 KG but less than 400 KG of Converted Drug Weight.

(9) *Level 22*

At least 80 G but less than 100 G of Heroin;

At least 400 G but less than 500 G of Cocaine;

At least 22.4 G but less than 28 G of Cocaine Base;

At least 80 G but less than 100 G of PCP, or at least 8 G but less than 10 G of PCP (actual);

At least 40 G but less than 50 G of Methamphetamine, or at least 4 G but less than 5 G of Methamphetamine (actual), or at least 4 G but less than 5 G of "Ice";

At least 40 G but less than 50 G of Amphetamine, or at least 4 G but less than 5 G of Amphetamine (actual);

At least 800 MG but less than 1 G of LSD (or the equivalent amount of other Schedule I or II Hallucinogens);

At least 32 G but less than 40 G of Fentanyl;

At least 8 G but less than 10 G of a Fentanyl Analogue;

At least 80 KG but less than 100 KG of Marihuana;

At least 16 KG but less than 20 KG of Hashish;

At least 1.6 KG but less than 2 KG of Hashish Oil;

At least 80,000 but less than 100,000 units of Ketamine;

At least 80,000 but less than 100,000 units of Schedule I or II Depressants;

At least 5,000 but less than 6,250 units of Flunitrazepam;

At least 80 KG but less than 100 KG of Converted Drug Weight.

(10) *Level 20*

At least 60 G but less than 80 G of Heroin;

At least 300 G but less than 400 G of Cocaine;

At least 16.8 G but less than 22.4 G of Cocaine Base;

At least 60 G but less than 80 G of PCP, or at least 6 G but less than 8 G of PCP (actual);

At least 30 G but less than 40 G of Methamphetamine, or at least 3 G but less than 4 G of Methamphetamine (actual), or at least 3 G but less than 4 G of "Ice";

At least 30 G but less than 40 G of Amphetamine, or at least 3 G but less than 4 G of Amphetamine (actual);

At least 600 MG but less than 800 MG of LSD (or the equivalent amount of other Schedule I or II Hallucinogens);

At least 24 G but less than 32 G of Fentanyl;

At least 6 G but less than 8 G of a Fentanyl Analogue;

At least 60 KG but less than 80 KG of Marihuana;

At least 12 KG but less than 16 KG of Hashish;

At least 1.2 KG but less than 1.6 KG of Hashish Oil;

At least 60,000 but less than 80,000 units of Ketamine;

At least 60,000 but less than 80,000 units of Schedule I or II Depressants;

60,000 units or more of Schedule III substances (except Ketamine);

At least 3,750 but less than 5,000 units of Flunitrazepam;

At least 60 KG but less than 80 KG of Converted Drug Weight.

(11) *Level 18*

At least 40 G but less than 60 G of Heroin;

At least 200 G but less than 300 G of Cocaine;

At least 11.2 G but less than 16.8 G of Cocaine Base;

At least 40 G but less than 60 G of PCP, or at least 4 G but less than 6 G of PCP (actual);

At least 20 G but less than 30 G of Methamphetamine, or at least 2 G but less than 3 G of Methamphetamine (actual), or at least 2 G but less than 3 G of "Ice";

At least 20 G but less than 30 G of Amphetamine, or at least 2 G but less than 3 G of Amphetamine (actual);

At least 400 MG but less than 600 MG of LSD (or the equivalent amount of other Schedule I or II Hallucinogens);

At least 16 G but less than 24 G of Fentanyl;

At least 4 G but less than 6 G of a Fentanyl Analogue;

At least 40 KG but less than 60 KG of Marihuana;

At least 8 KG but less than 12 KG of Hashish;

At least 800 G but less than 1.2 KG of Hashish Oil;

At least 40,000 but less than 60,000 units of Ketamine;

At least 40,000 but less than 60,000 units of Schedule I or II Depressants;

At least 40,000 but less than 60,000 units of Schedule III substances (except Ketamine);

At least 2,500 but less than 3,750 units of Flunitrazepam;

At least 40 KG but less than 60 KG of Converted Drug Weight.

(12) *Level 16*

At least 20 G but less than 40 G of Heroin;

At least 100 G but less than 200 G of Cocaine;

At least 5.6 G but less than 11.2 G of Cocaine Base;

At least 20 G but less than 40 G of PCP, or at least 2 G but less than 4 G of PCP (actual);

At least 10 G but less than 20 G of Methamphetamine, or at least 1 G but less than 2 G of Methamphetamine (actual), or at least 1 G but less than 2 G of "Ice";

At least 10 G but less than 20 G of Amphetamine, or at least 1 G but less than 2 G of Amphetamine (actual);

At least 200 MG but less than 400 MG of LSD;

At least 8 G but less than 16 G of Fentanyl;

At least 2 G but less than 4 G of a Fentanyl Analogue;

At least 20 KG but less than 40 KG of Marihuana;

At least 5 KG but less than 8 KG of Hashish;

At least 500 G but less than 800 G of Hashish Oil;

At least 20,000 but less than 40,000 units of Ketamine;

At least 20,000 but less than 40,000 units of Schedule I or II Depressants;

At least 20,000 but less than 40,000 units of Schedule III substances (except Ketamine);

At least 1,250 but less than 2,500 units of Flunitrazepam;

At least 20 KG but less than 40 KG of Converted Drug Weight.

(13) *Level 14*

At least 10 G but less than 20 G of Heroin;

At least 50 G but less than 100 G of Cocaine;

At least 2.8 G but less than 5.6 G of Cocaine Base;

At least 10 G but less than 20 G of PCP, or at least 1 G but less than 2 G of PCP (actual);

At least 5 G but less than 10 G of Methamphetamine, or at least 500 MG but less than 1 G of Methamphetamine (actual), or at least 500 MG but less than 1 G of "Ice";

At least 5 G but less than 10 G of Amphetamine, or at least 500 MG but less than 1 G of Amphetamine (actual);

At least 100 MG but less than 200 MG of LSD;

At least 4 G but less than 8 G of Fentanyl;

At least 1 G but less than 2 G of a Fentanyl Analogue;

At least 10 KG but less than 20 KG of Marihuana;

At least 2 KG but less than 5 KG of Hashish;

At least 200 G but less than 500 G of Hashish Oil;

At least 10,000 but less than 20,000 units of Ketamine;

At least 10,000 but less than 20,000 units of Schedule I or II Depressants;

At least 10,000 but less than 20,000 units of Schedule III substances (except Ketamine);

At least 625 but less than 1,250 units of Flunitrazepam;

At least 10 KG but less than 20 KG of Converted Drug Weight.

(14) *Level 12*

Less than 10 G of Heroin;

Less than 50 G of Cocaine;

Less than 2.8 G of Cocaine Base;

Less than 10 G of PCP, or less than 1 G of PCP (actual);

Less than 5 G of Methamphetamine, or less than 500 MG of Methamphetamine (actual), or less than 500 MG of "Ice";

Less than 5 G of Amphetamine, or less than 500 MG of Amphetamine (actual);

Less than 100 MG of LSD;

Less than 4 G of Fentanyl;

Less than 1 G of a Fentanyl Analogue;

At least 5 KG but less than 10 KG of Marihuana;

At least 1 KG but less than 2 KG of Hashish;

At least 100 G but less than 200 G of Hashish Oil;

At least 5,000 but less than 10,000 units of Ketamine;

At least 5,000 but less than 10,000 units of Schedule I or II Depressants;

At least 5,000 but less than 10,000 units of Schedule III substances (except Ketamine);

At least 312 but less than 625 units of Flunitrazepam;

80,000 units or more of Schedule IV substances (except Flunitrazepam);

At least 5 KG but less than 10 KG of Converted Drug Weight.

(15) *Level 10*

At least 2.5 KG but less than 5 KG of Marihuana;

At least 500 G but less than 1 KG of Hashish;

At least 50 G but less than 100 G of Hashish Oil;

At least 2,500 but less than 5,000 units of Ketamine;

At least 2,500 but less than 5,000 units of Schedule I or II Depressants;

At least 2,500 but less than 5,000 units of Schedule III substances (except Ketamine);

At least 156 but less than 312 units of Flunitrazepam;

At least 40,000 but less than 80,000 units of Schedule IV substances (except Flunitrazepam);

At least 2.5 KG but less than 5 KG of Converted Drug Weight.

(16) *Level 8*

At least 1 KG but less than 2.5 KG of Marihuana;

At least 200 G but less than 500 MG of Hashish;

At least 20 G but less than 50 G of Hashish Oil;

At least 1,000 but less than 2,500 units of Ketamine;

At least 1,000 but less than 2,500 units of Schedule I or II Depressants;

At least 1,000 but less than 2,500 units of Schedule III substances (except Ketamine);

Less than 156 units of Flunitrazepam;

At least 16,000 but less than 40,000 units of Schedule IV substances (except Flunitrazepam);

160,000 units or more of Schedule V substances;

At least 1 KG but less than 2.5 KG of Converted Drug Weight.

(17) *Level 6*

Less than 1 KG of Marihuana;

Less than 200 G of Hashish;

Less than 20 G of Hashish Oil;

Less than 1,000 units of Ketamine;

Less than 1,000 units of Schedule I or II Depressants;

Less than 1,000 units of Schedule III substances (except Ketamine);

Less than 16,000 units of Schedule IV substances (except Flunitrazepam);

Less than 160,000 units of Schedule V substances;

Less than 1 KG of Converted Drug Weight.

\* Notes to Drug Quantity Table:

(A) Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance. If a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level.

(B) The terms "PCP (actual)", "Amphetamine (actual)", and "Methamphetamine (actual)" refer to the weight of the controlled substance, itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual). In the case of a mixture or substance containing PCP, amphetamine, or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual), amphetamine (actual), or methamphetamine (actual), whichever is greater.

The terms "Hydrocodone (actual)" and "Oxycodone (actual)" refer to the weight of the controlled substance, itself, contained in the pill, capsule, or mixture.

(C) "Ice," for the purposes of this guideline, means a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity.

(D) "Cocaine base," for the purposes of this guideline, means "crack." "Crack" is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form.

(E) In the case of an offense involving marihuana plants, treat each plant, regardless of sex, as equivalent to 100 grams of marihuana. *Provided*, however, that if the actual weight of the marihuana is greater, use the actual weight of the marihuana.

(F) In the case of Schedule I or II Depressants (except gamma-hydroxybutyric acid), Schedule III substances, Schedule IV substances, and Schedule V substances, one "unit" means one pill, capsule, or tablet. If the substance (except gamma-hydroxybutyric acid) is in liquid form, one "unit" means 0.5 milliliters. For an anabolic steroid that is not in a pill, capsule, tablet, or liquid form (e.g., patch, topical cream, aerosol), the court shall determine the base offense level using a reasonable estimate of the quantity of anabolic steroid involved in the offense. In making a reasonable estimate, the court shall consider that each 25 milligrams of an anabolic steroid is one "unit".

(G) In the case of LSD on a carrier medium (e.g., a sheet of blotter paper), do not use the weight of the LSD/carrier medium. Instead, treat each dose of LSD on the carrier medium as equal to 0.4 milligrams of LSD for the purposes of the Drug Quantity Table.

(H) Hashish, for the purposes of this guideline, means a resinous substance of cannabis that includes (i) one or more of the tetrahydrocannabinols (as listed in *21 C.F.R. § 1308.11(d)(31)*), (ii) at least two of the following: cannabinol, cannabidiol, or cannabichromene, and (iii) fragments of plant material (such as cystolith fibers).

(I) Hashish oil, for the purposes of this guideline, means a preparation of the soluble cannabinoids derived from cannabis that includes (i) one or more of the tetrahydrocannabinols (as listed in *21 C.F.R. § 1308.11(d)(31)*) and (ii) at least two of the following: cannabinol, cannabidiol, or cannabichromene, and (iii) is essentially free of plant material (e.g., plant fragments). Typically, hashish oil is a viscous, dark colored oil, but it can vary from a dry resin to a colorless liquid.

(J) Fentanyl analogue, for the purposes of this guideline, means any substance (including any salt, isomer, or salt of isomer thereof), whether a controlled substance or not, that has a chemical structure that is similar to fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4piperidinyl] propanamide).

(K) The term "Converted Drug Weight," for purposes of this guideline, refers to a nominal reference designation that is used as a conversion factor in the Drug Conversion Tables set forth in the Commentary below, to determine the offense level for controlled substances that are not specifically referenced in the

Drug Quantity Table or when combining differing controlled substances.

**(d)** Cross References

**(1)** If a victim was killed under circumstances that would constitute murder under *18 U.S.C. § 1111* had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline.

**(2)** If the defendant was convicted under *21 U.S.C. § 841(b)(7)* (of distributing a controlled substance with intent to commit a crime of violence), apply § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to the crime of violence the defendant committed, or attempted or intended to commit, if the resulting offense level is greater than that determined above.

**(e)** Special Instruction

**(1)** If (A) subsection (d)(2) does not apply; and (B) the defendant committed, or attempted to commit, a sexual offense against another individual by distributing, with or without that individual's knowledge, a controlled substance to that individual, an adjustment under § 3A1.1(b)(1) shall apply.

Commentary

*Statutory Provisions: 21 U.S.C. §§ 841(a)*, (b)(1)–(3), (7), (g), 860a, 865, 960(a), (b); *49 U.S.C. § 46317(b)*. For additional statutory provision(s), see Appendix A (Statutory Index).

*Application Notes:*

**1.** Definitions.

For purposes of the guidelines, a "plant" is an organism having leaves and a readily observable root formation (*e.g.*, a marihuana cutting having roots, a rootball, or root hairs is a marihuana plant).

For purposes of subsection (a), "serious drug felony," "serious violent felony," and "felony drug offense" have the meaning given those terms in *21 U.S.C. § 802*.

**2.** "Mixture or Substance". "Mixture or substance" as used in this guideline has the same meaning as in *21 U.S.C. § 841*, except as expressly provided. Mixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used. Examples of such materials include the fiberglass in a cocaine/fiberglass bonded suitcase, beeswax in a cocaine/beeswax statue, and waste water from an illicit laboratory used to manufacture a controlled substance. If such material cannot readily be separated from the mixture or substance that appropriately is counted in the Drug Quantity Table, the court may use any reasonable method to approximate the weight of the mixture or substance to be counted.

An upward departure nonetheless may be warranted when the mixture or substance counted in the Drug Quantity Table is combined with other, non-countable material in an unusually sophisticated manner in order to avoid detection.

Similarly, in the case of marihuana having a moisture content that renders the marihuana unsuitable for consumption without drying (this might occur, for example, with a bale of rain-soaked marihuana or freshly harvested marihuana that had not been dried), an approximation of the weight of the marihuana without such excess moisture content is to be used.

**3.** Classification of Controlled Substances. Certain pharmaceutical preparations are classified as Schedule III, IV, or V controlled substances by the Drug Enforcement Administration under 21 C.F.R. § 1308.13-15 even though they contain a small amount of a Schedule I or II controlled substance. For example, Tylenol 3 is classified as a Schedule III controlled substance even though it contains a small amount of codeine, a Schedule II opiate. For the purposes of the guidelines, the classification of the controlled substance under *21 C.F.R. § 1308.13*–15 is the appropriate classification.

**4.** Applicability to "Counterfeit" Substances. The statute and guideline also apply to "counterfeit" substances, which are defined in *21 U.S.C. § 802* to mean controlled substances that are falsely labeled so as to appear to have been legitimately manufactured or distributed.

**5.** Determining Drug Types and Drug Quantities. Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. See § 1B1.3(a)(2) (Relevant Conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

If the offense involved both a substantive drug offense and an attempt or conspiracy (e.g., sale of five grams of heroin and an attempt to sell an additional ten grams of heroin), the total quantity involved shall be aggregated to determine the scale of the offense.

In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. For example, a defendant agrees to sell 500 grams of cocaine, the transaction is completed by the delivery of the controlled substance — actually 480 grams of cocaine, and no further delivery is scheduled. In this example, the amount delivered more accurately reflects the scale of the offense. In contrast, in a reverse sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not by the defendant. If, however, the defendant establishes that the defendant did not intend to provide or purchase, or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that the defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing.

**6.** Analogues and Controlled Substances Not Referenced in this Guideline. Except as otherwise provided, any reference to a particular controlled substance in these guidelines includes all salts, isomers, all salts of isomers, and any analogue of that controlled substance. Any reference to cocaine includes ecgonine and coca leaves, except extracts of coca leaves from which cocaine and ecgonine have been removed. Unless otherwise specified, "analogue," for purposes of this guideline, has the meaning given the term "controlled substance analogue" in *21 U.S.C. § 802(32)*. In determining the appropriate sentence, the court also may consider whether the same quantity of analogue produces a greater effect on the central nervous system than the controlled substance for which it is an analogue.

In the case of a controlled substance that is not specifically referenced in this guideline, determine the base offense level using the converted drug weight of the most closely related controlled substance referenced in this guideline. See Application Note 8. In determining the most closely related controlled substance, the court shall, to the extent practicable, consider the following:

**(A)** Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.

**(B)** Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance referenced in this guideline.

**(C)** Whether a lesser or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline.

**7.** Multiple Transactions or Multiple Drug Types. Where a mandatory (statutory) minimum sentence applies, this mandatory minimum sentence may be "waived" and a lower sentence imposed (including a downward departure), as provided in *28 U.S.C. § 994(n)*, by reason of a defendant's "substantial assistance

in the investigation or prosecution of another person who has committed an offense." See § 5K1.1 (Substantial Assistance to Authorities). In addition, *18 U.S.C. § 3553(f)* provides an exception to the applicability of mandatory minimum sentences in certain cases. See § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases).

**8.**  Use of Drug Conversion Tables.

**(A)**  Controlled Substances Not Referenced in Drug Quantity Table. The Commission has used the sentences provided in, and equivalences derived from, the statute (*21 U.S.C. § 841(b)(1)*) as the primary basis for the guideline sentences. The statute, however, provides direction only for the more common controlled substances, i.e., heroin, cocaine, PCP, methamphetamine, fentanyl, LSD, and marihuana. In the case of a controlled substance that is not specifically referenced in the Drug Quantity Table, determine the base offense level as follows:

**(i)**  Use the Drug Conversion Tables to find the converted drug weight of the controlled substance involved in the offense.

**(ii)**  Find the corresponding converted drug weight in the Drug Quantity Table.

**(iii)**  Use the offense level that corresponds to the converted drug weight determined above as the base offense level for the controlled substance involved in the offense.

(See also Application Note 6.) For example, in the Drug Conversion Tables set forth in this Note, 1 gram of a substance containing oxymorphone, a Schedule I opiate, converts to 5 kilograms of converted drug weight. In a case involving 100 grams of oxymorphone, the converted drug weight would be 500 kilograms, which corresponds to a base offense level of 26 in the Drug Quantity Table.

**(B)**  Combining Differing Controlled Substances. The Drug Conversion Tables also provide a means for combining differing controlled substances to obtain a single offense level. In each case, convert each of the drugs to its converted drug weight, add the quantities, and look up the total in the Drug Quantity Table to obtain the combined offense level.

For certain types of controlled substances, the converted drug weights assigned in the Drug Conversion Tables are "capped" at specified amounts (e.g., the combined converted weight of all Schedule V controlled substances shall not exceed 2.49 kilograms of converted drug weight). Where there are controlled substances from more than one schedule (e.g., a quantity of a Schedule IV substance and a quantity of a Schedule V substance), determine the converted drug weight for each schedule separately (subject to the cap, if any, applicable to that schedule). Then add the converted drug weights to determine the combined converted drug weight (subject to the cap, if any, applicable to the combined amounts).

**Note:** Because of the statutory equivalences, the ratios in the Drug Conversion Tables do not necessarily reflect dosages based on pharmacological equivalents.

**(C)**  Examples for Combining Differing Controlled Substances.

**(i)**  The defendant is convicted of selling 70 grams of a substance containing PCP (Level 20) and 250 milligrams of a substance containing LSD (Level 16). The PCP converts to 70 kilograms of converted drug weight; the LSD converts to 25 kilograms of converted drug weight. The total therefore converts to 95 kilograms of converted drug weight, for which the Drug Quantity Table provides an offense level of 22.

**(ii)**  The defendant is convicted of selling 500 grams of marihuana (Level 6) and 10,000 units of diazepam (Level 6). The marihuana converts to 500 grams of converted drug weight. The diazepam, a Schedule IV drug, converts to 625 grams of converted drug weight. The total, 1.125 kilograms of converted drug weight, has an offense level of 8 in the Drug Quantity Table.

**(iii)**  The defendant is convicted of selling 80 grams of cocaine (Level 14) and 2 grams of cocaine base (Level 12). The cocaine converts to 16 kilograms of converted drug weight, and the cocaine

base converts to 7.142 kilograms of marihuana. The total therefore converts to 23.142 kilograms of converted drug weight, which has an offense level of 16 in the Drug Quantity Table.

**(iv)** The defendant is convicted of selling 76,000 units of a Schedule III substance, 200,000 units of a Schedule IV substance, and 600,000 units of a Schedule V substance. The converted drug weight for the Schedule III substance is 76 kilograms (below the cap of 79.99 kilograms of converted drug weight set forth as the maximum equivalent weight for Schedule III substances). The converted weight for the Schedule IV substance is subject to a cap of 9.99 kilograms set forth as the maximum equivalent weight for Schedule IV substances (without the cap it would have been 12.5 kilograms). The converted weight for the Schedule V substance is subject to the cap of 2.49 kilograms set forth as the maximum equivalent weight for Schedule V substances (without the cap it would have been 3.75 kilograms). The combined equivalent weight, determined by adding together the above amounts, is subject to the cap of 79.99 kilograms of converted drug weight set forth as the maximum combined equivalent weight for Schedule III, IV, and V substances. Without the cap, the combined equivalent weight would have been 88.48 (76 + 9.99 + 2.49) kilograms.

**(D)** Drug Conversion Tables.

| Schedule I or II Opiates* | Converted Drug Weight |
|---|---|
| 1 gm of 1-(2-Phenylethyl)-4-phenyl-4-acetyloxypiperidine (PEPAP) = | 700 gm |
| 1 gm of 1-Methyl-4-phenyl-4-propionoxypiperidine (MPPP) = | 700 gm |
| 1 gm of 6-Monoacetylmorphine = | 1 kg |
| 1 gm of Alphaprodine = | 100 gm |
| 1 gm of Codeine = | 80 gm |
| 1 gm of Dextromoramide = | 670 gm |
| 1 gm of Dextropropoxyphene/Propoxyphene-Bulk = | 50 gm |
| 1 gm of Dipipanone = | 250 gm |
| 1 gm of Ethylmorphine = | 165 gm |
| 1 gm of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] Propanamide) = | 2.5 kg |
| 1 gm of a Fentanyl Analogue = | 10 kg |
| 1 gm of Heroin = | 1 kg |
| 1 gm of Hydrocodone (actual) = | 6,700 gm |
| 1 gm of Hydromorphone/Dihydromorphinone = | 2.5 kg |
| 1 gm of Levo-alpha-acetylmethadol (LAAM) = | 3 kg |
| 1 gm of Levorphanol = | 2.5 kg |
| 1 gm of Meperidine/Pethidine = | 50 gm |
| 1 gm of Methadone = | 500 gm |
| 1 gm of Mixed Alkaloids of Opium/Papaveretum = | 250 gm |
| 1 gm of Morphine = | 500 gm |
| 1 gm of Opium = | 50 gm |
| 1 gm of Oxycodone (actual) = | 6,700 gm |
| 1 gm of Oxymorphone = | 5 kg |

| | |
|---|---|
| 1 gm of Racemorphan = | 800 gm |

\* *Provided*, that the minimum offense level from the Drug Quantity Table for any of these controlled substances individually, or in combination with another controlled substance, is level 12.

| *Cocaine and Other Schedule I and II Stimulants (and their immediate precursors)\** | *Converted Drug Weight* |
|---|---|
| 1 gm of 4-Methylaminorex ("Euphoria'") = | 100 gm |
| 1 gm of Aminorex = | 100 gm |
| 1 gm of Amphetamine = | 2 kg |
| 1 gm of Amphetamine (actual) = | 20 kg |
| 1 gm of Cocaine = | 200 gm |
| 1 gm of Cocaine Base ("Crack") = | 3,571 gm |
| 1 gm of Fenethylline = | 40 gm |
| 1 gm of "Ice" = | 20 kg |
| 1 gm of Khat = | .01 gm |
| 1 gm of Methamphetamine = | 2 kg |
| 1 gm of Methamphetamine (actual) = | 20 kg |
| 1 gm of Methylphenidate (Ritalin) = | 100 gm |
| 1 gm of N-Benzylpiperazine = | 100 gm |
| 1 gm of N-Ethylamphetamine = | 80 gm |
| 1 gm of N-N-Dimethylamphetamine = | 40 gm |
| 1 gm of Phenmetrazine = | 80 gm |
| 1 gm of Phenylacetone (P2P) (when possessed for the purpose of manufacturing methamphetamine) = | 416 gm |
| 1 gm of Phenylacetone (P2P) (in any other case) = | 75 gm |

\* *Provided*, that the minimum offense level from the Drug Quantity Table for any of these controlled substances individually, or in combination with another controlled substance, is level 12.

| *Synthetic Cathinones (except Schedule III, IV, and V Substances)\** | *Converted Drug Weight* |
|---|---|
| 1 gm of a Synthetic Cathinone (except a Schedule III, IV or V substance) = | 380 gm |

\* *Provided*, that the minimum offense level from the Drug Quantity Table for any synthetic cathinone (except a Schedule III, IV, or V substance) individually, or in combination with another controlled substance, is level 12.

| *LSD, PCP, and Other Schedule I and II Hallucinogens (and their immediate precursors)\** | *Converted Drug Weight* |
|---|---|
| 1 gm of 1-Piperidinocyclohexanecarbonitrile (PCC) = | 680 gm |
| 1 gm of 4-Bromo-2,5-Dimethoxyamphetamine (DOB) = | 2.5 kg |
| 1 gm of 2,5-Dimethoxy-4-methylamphetamine (DOM) = | 1.67 kg |
| 1 gm of 3,4-Methylenedioxyamphetamine (MDA) = | 500 gm |
| 1 gm of 3,4-Methylenedioxymethamphetamine (MDMA) = | 500 gm |

| | |
|---|---|
| 1 gm of 3,4-Methylenedioxy-N-ethylamphetamine (MDEA) = | 500 gm |
| 1 gm of Bufotenine = | 70 gm |
| 1 gm of D-Lysergic Acid Diethylamide/Lysergide (LSD) = | 100 kg |
| 1 gm of Diethyltryptamine (DET) == | 80 gm |
| 1 gm of Dimethyltryptamine (DM) = | 100 gm |
| 1 gm of Mescaline = | 10 gm |
| 1 gm of Mushrooms containing Psilocin and/or Psilocybin (dry) = | 1 gm |
| 1 gm of Mushrooms containing Psilocin and/or Psilocybin (wet) = | 0.1 gm |
| 1 gm of N-ethyl-1-phenylcyclohexylamine (PCE) = | 1 kg |
| 1 gm of Paramethoxymethamphetamine (PMA) = | 500 gm |
| 1 gm of Peyote (dry) = | 0.5 gm |
| 1 gm of Peyote (wet) = | 0.05 gm |
| 1 gm of Phencyclidine (PCP) = | 1 kg |
| 1 gm of Phencyclidine (PCP) (actual) = | 10 kg |
| 1 gm of Psilocin = | 500 gm |
| 1 gm of Psilocybin = | 500 gm |
| 1 gm of Pyrrolidine Analog of Phencyclidine (PHP) = | 1 kg |
| 1 gm of Thiophene Analog of Phencyclidine (TCP) = | 1 kg |

\* *Provided*, that the minimum offense level from the Drug Quantity Table for any of these controlled substances individually, or in combination with another controlled substance, is level 12.

| *Schedule I Marihuana* | *Converted Drug Weight* |
|---|---|
| 1 gm of Cannabis Resin or Hashish = | 5 gm |
| 1 gm of Hashish Oil = | 50 gm |
| 1 gm of Marihuana/Cannabis (granulated, powdered, etc.) = | 1 gm |
| 1 gm of Tetrahydrocannabinol (organic) = | 167 gm |
| 1 gm of Tetrahydrocannabinol (synthetic) = | 167 gm |

| *Synthetic Cannabinoids (except Schedule III, IV, and V Substances)\** | *Converted Drug Weight* |
|---|---|
| 1 gm of a Synthetic Cannabinoid (except a Schedule III, IV, or V substance) = | 167 gm |

\* *Provided*, that the minimum offense level from the Drug Quantity Table for any synthetic cannabinoid (except a Schedule III, IV, or V substance) individually, or in combination with another controlled substance, is level 12.

"Synthetic Cannabinoid," for purposes of this guideline, means any synthetic substance (other than synthetic tetrahydrocannabinol) that binds to and activates type 1 cannabinoid receptors (CB1 receptors).

| *Flunitrazepam\*\** | *Converted Drug Weight* |
|---|---|
| 1 unit of Flunitrazepam = | 16 gm |

** *Provided*, that the minimum offense level from the Drug Quantity Table for flunitrazepam individually, or in combination with any Schedule I or II depressants, Schedule III substances, Schedule IV substances (except flunitrazepam), and Schedule V substances is level 8.

| Schedule I or II Depressants (except Gamma-hydroxybutyric Acid) | Converted Drug Weight |
|---|---|
| 1 unit of a Schedule I or II Depressant (except Gamma-hydroxybutyric Acid) = | 1 gm |

| Gamma-hydroxybutyric Acid | Converted Drug Weight |
|---|---|
| 1 ml of Gamma-hydroxybutyric Acid = | 8.8 gm |

| Schedule III Substances (except Ketamine)*** | Converted Drug Weight |
|---|---|
| 1 unit of a Schedule III Substance = | 1 gm |

*** *Provided*, that the combined converted weight of all Schedule III substances (except ketamine), Schedule IV substances (except flunitrazepam), and Schedule V substances shall not exceed 79.99 kilograms of converted drug weight.

| Ketamine | Converted Drug Weight |
|---|---|
| 1 unit of Ketamine = | 1 gm |

| Schedule IV Substances (except Flunitrazepam)***** | Converted Drug Weight |
|---|---|
| 1 unit of a Schedule IV Substance (except flunitrazepam) = | 0.0625 gm |

***** *Provided*, that the combined converted weight of all Schedule IV (except flunitrazepam) and V substances shall not exceed 9.99 kilograms of converted drug weight.

| Schedule V Substances****** | Converted Drug Weight |
|---|---|
| 1 unit of a Schedule V Substance = | 0.00625 gm |

****** *Provided*, that the combined equivalent weight of Schedule V substances shall not exceed 2.49 kilograms of converted drug weight.

### List I Chemicals

| (relating to the manufacture of Amphetamine or Methamphetamine)******* | Converted Drug Weight |
|---|---|
| 1 gm of Ephedrine = | 10 kg |
| 1 gm of Phenylpropanolamine = | 10 kg |
| 1 gm of Pseudoephedrine = | 10 kg |

******Provided, that in a case involving ephedrine, pseudoephedrine, or phenylpropanolamine tablets, use the weight of the ephedrine, pseudoephedrine, or phenylpropanolamine contained in the tablets, not the weight of the entire tablets, in calculating the base offense level.

### Date Rape Drugs

| (except Flunitrazepam, GHB, or Ketamine) | Converted Drug Weight |
|---|---|
| 1 ml of 1,4-Butanediol = | 8.8 gm |
| 1 ml of Gamma Butyrolactone = | 8.8 gm |

*To facilitate conversions to converted drug weight, the following table is provided:*

**Measurement Conversion Table**

1 oz = 28.35 gm

1 lb = 453.6 gm

1 lb = 0.4536 kg

1 gal = 3.785 liters

1 qt = 0.946 liters

1 gm = 1 ml (liquid)

1 liter = 1,000 ml

1 kg = 1,000 gm

1 gm = 1,000 mg

1 grain = 64.8 mg.

**9.** Determining Quantity Based on Doses, Pills, or Capsules. If the number of doses, pills, or capsules but not the weight of the controlled substance is known, multiply the number of doses, pills, or capsules by the typical weight per dose in the table below to estimate the total weight of the controlled substance (e.g., 100 doses of Mescaline at 500 milligrams per dose = 50 grams of mescaline). The Typical Weight Per Unit Table, prepared from information provided by the Drug Enforcement Administration, displays the typical weight per dose, pill, or capsule for certain controlled substances. Do not use this table if any more reliable estimate of the total weight is available from case specific information.

**Typical weight per unit (Dose, Pill, or Capsule) Table**

*Hallucinogens*

| | |
|---|---|
| 2,5-Dimethoxy-4-methylamphetamine (STP, DOM)* | 3 mg |
| MDA | 250 mg |
| MDMA | 250 mg |
| Mescaline | 500 mg |
| PCP* | 5 mg |
| Peyote (dry) | 12 gm |
| Peyote (wet) | 120 gm |
| Psilocin* | 10 mg |
| Psilocybe mushrooms (dry) | 5 gm |
| Psilocybe mushrooms (wet) | 50 gm |
| Psilocybin* | 10 mg |

*Marihuana*

1 marihuana cigarette — 0.5 gm

*Stimulants*

Amphetamine* — 10 mg

Methamphetamine* — 5 mg

Phenmetrazine (Preludin)* — 75 mg

*For controlled substances marked with an asterisk, the weight per unit shown is the weight of the actual controlled substance, and not generally the weight of the mixture or substance containing the controlled substance. Therefore, use of this table provides a very conservative estimate of the total weight.

**10.** Determining Quantity of LSD. LSD on a blotter paper carrier medium typically is marked so that the number of doses ("hits") per sheet readily can be determined. When this is not the case, it is to be presumed that each ¼ inch by ¼ inch section of the blotter paper is equal to one dose. In the case of liquid LSD (LSD that has not been placed onto a carrier medium), using the weight of the LSD alone to calculate

the offense level may not adequately reflect the seriousness of the offense. In such a case, an upward departure may be warranted.

**11.**  Application of Subsections (b)(1) and (b)(2).

   **(A)**  Application of Subsection (b)(1). Definitions of "firearm" and "dangerous weapon" are found in the Commentary to § 1B1.1 (Application Instructions). The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet. The enhancement also applies to offenses that are referenced to § 2D1.1; see §§ 2D1.2(a)(1) and (2), 2D1.5(a)(1), 2D1.6, 2D1.7(b)(1), 2D1.8, 2D1.11(c)(1), and 2D1.12(c)(1).

   **(B)**  Interaction of Subsections (b)(1) and (b)(2). The enhancements in subsections (b)(1) and (b)(2) may be applied cumulatively (added together), as is generally the case when two or more specific offense characteristics each apply. See § 1B1.1 (Application Instructions), Application Note 4(A). However, in a case in which the defendant merely possessed a dangerous weapon but did not use violence, make a credible threat to use violence, or direct the use of violence, subsection (b)(2) would not apply.

**12.**  Application of Subsection (b)(5). If the offense involved importation of amphetamine or methamphetamine, and an adjustment from subsection (b)(3) applies, do not apply subsection (b)(5).

**13.**  Application of Subsection (b)(7). For purposes of subsection (b)(7), "mass-marketing by means of an interactive computer service" means the solicitation, by means of an interactive computer service, of a large number of persons to induce those persons to purchase a controlled substance. For example, subsection (b)(7) would apply to a defendant who operated a web site to promote the sale of Gamma-hydroxybutyric Acid (GHB) but would not apply to coconspirators who use an interactive computer service only to communicate with one another in furtherance of the offense. "Interactive computer service", for purposes of subsection (b)(7) and this note, has the meaning given that term in section 230(e)(2) of the Communications Act of 1934 (*47 U.S.C. § 230(f)(2)*).

**14.**  Application of Subsection (b)(8). For purposes of subsection (b)(8), "masking agent" means a substance that, when taken before, after, or in conjunction with an anabolic steroid, prevents the detection of the anabolic steroid in an individual's body.

**15.**  Application of Subsection (b)(9). For purposes of subsection (b)(9),"athlete" means an individual who participates in an athletic activity conducted by (A) an intercollegiate athletic association or interscholastic athletic association; (B) a professional athletic association; or (C) an amateur athletic organization.

**16.**  Application of Subsection (b)(11). Subsection (b)(11) does not apply if the purpose of the bribery was to obstruct or impede the investigation, prosecution, or sentencing of the defendant. Such conduct is covered by § 3C1.1 (Obstructing or Impeding the Administration of Justice) and, if applicable, § 2D1.1(b)(16)(D).

**17.**  Application of Subsection (b)(12). Subsection (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution.

Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.

Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

**18.** Application of Subsection (b)(14).

**(A)** Hazardous or Toxic Substances (Subsection (b)(14)(A)). Subsection (b)(14)(A) applies if the conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct) involved any discharge, emission, release, transportation, treatment, storage, or disposal violation covered by the Resource Conservation and Recovery Act, *42 U.S.C. § 6928(d)*; the Federal Water Pollution Control Act, *33 U.S.C. § 1319(c)*; the Comprehensive Environmental Response, Compensation, and Liability Act, *42 U.S.C. § 9603(b)*; or *49 U.S.C. § 5124* (relating to violations of laws and regulations enforced by the Department of Transportation with respect to the transportation of hazardous material). In some cases, the enhancement under subsection (b)(14)(A) may not account adequately for the seriousness of the environmental harm or other threat to public health or safety (including the health or safety of law enforcement and cleanup personnel). In such cases, an upward departure may be warranted. Additionally, in determining the amount of restitution under § 5E1.1 (Restitution) and in fashioning appropriate conditions of probation and supervision under §§ 5B1.3 (Conditions of Probation) and 5D1.3 (Conditions of Supervised Release), respectively, any costs of environmental cleanup and harm to individuals or property shall be considered by the court in cases involving the manufacture of amphetamine or methamphetamine and should be considered by the court in cases involving the manufacture of a controlled substance other than amphetamine or methamphetamine. See *21 U.S.C. § 853(q)* (mandatory restitution for cleanup costs relating to the manufacture of amphetamine and methamphetamine).

**(B)** Substantial Risk of Harm Associated with the Manufacture of Amphetamine and Methamphetamine (Subsection (b)(14)(C)–(D)).

**(i)** Factors to Consider. In determining, for purposes of subsection (b)(14)(C)(ii) or (D), whether the offense created a substantial risk of harm to human life or the environment, the court shall include consideration of the following factors:

**(I)** The quantity of any chemicals or hazardous or toxic substances found at the laboratory, and the manner in which the chemicals or substances were stored.

**(II)** The manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances.

**(III)** The duration of the offense, and the extent of the manufacturing operation.

**(IV)** The location of the laboratory (e.g., whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

**(ii)** Definitions. For purposes of subsection (b)(14)(D):

"Incompetent" means an individual who is incapable of taking care of the individual's self or property because of a mental or physical illness or disability, mental retardation, or senility.

"Minor" has the meaning given that term in Application Note 1 of the Commentary to § 2A3.1 (Criminal Sexual Abuse).

**19.** Application of Subsection (b)(15). Subsection (b)(15) applies to offenses that involve the cultivation of marihuana on state or federal land or while trespassing on tribal or private land. Such offenses interfere with the ability of others to safely access and use the area and also pose or risk a range of other harms, such as harms to the environment.

The enhancements in subsection (b)(14)(A) and (b)(15) may be applied cumulatively (added together), as is generally the case when two or more specific offense characteristics each apply. See § 1B1.1 (Application Instructions), Application Note 4(A).

**20.** Application of Subsection (b)(15).

**(A)** Distributing to a Specified Individual or Involving Such an Individual in the Offense (Subsection (b)(16)(B)). If the defendant distributes a controlled substance to an individual or involves an individual in the offense, as specified in subsection (b)(16)(B), the individual is not a "vulnerable victim" for purposes of § 3A1.1(b).

**(B)** Directly Involved in the Importation of a Controlled Substance (Subsection (b)(15)(C)). Subsection (b)(15)(C) applies if the defendant is accountable for the importation of a controlled substance under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct (Factors that Determine the Guideline Range)), i.e., the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the importation of a controlled substance.

If subsection (b)(3) or (b)(5) applies, do not apply subsection (b)(16)(C).

**(C)** Pattern of Criminal Conduct Engaged in as a Livelihood (Subsection (b)(16)(E)). For purposes of subsection (b)(165)(E), "pattern of criminal conduct" and "engaged in as a livelihood" have the meaning given such terms in § 4B1.3 (Criminal Livelihood).

**21.** Applicability of Subsection (b)(18). The applicability of subsection (b)(18) shall be determined without regard to whether the defendant was convicted of an offense that subjects the defendant to a mandatory minimum term of imprisonment. Section 5C1.2(b), which provides that the applicable guideline range shall not be less than 24 to 30 months of imprisonment, is not pertinent to the determination of whether subsection (b)(18) applies.

**22.** Application of Subsection (e)(1).

**(A)** Definition. For purposes of this guideline, "sexual offense" means a "sexual act" or "sexual contact" as those terms are defined in *18 U.S.C. § 2246(2)* and (3), respectively.

**(B)** Upward Departure Provision. If the defendant committed a sexual offense against more than one individual, an upward departure would be warranted.

**23.** Interaction with § 3B1.3. A defendant who used special skills in the commission of the offense may be subject to an adjustment under § 3B1.3 (Abuse of Position of Trust or Use of Special Skill). Certain professionals often occupy essential positions in drug trafficking schemes. These professionals include doctors, pilots, boat captains, financiers, bankers, attorneys, chemists, accountants, and others whose special skill, trade, profession, or position may be used to significantly facilitate the commission of a drug offense. Additionally, an enhancement under § 3B1.3 ordinarily would apply in a case in which the defendant used his or her position as a coach to influence an athlete to use an anabolic steroid. Likewise, an adjustment under § 3B1.3 ordinarily would apply in a case in which the defendant is convicted of a drug offense resulting from the authorization of the defendant to receive scheduled substances from an ultimate user or long-term care facility. See *21 U.S.C. § 822(g)*.

Note, however, that if an adjustment from subsection (b)(3)(C) applies, do not apply § 3B1.3 (Abuse of Position of Trust or Use of Special Skill).

**24.** Cases Involving Mandatory Minimum Penalties. Where there are multiple transactions or multiple drug types, the quantities of drugs are to be added. Tables for making the necessary conversions are provided below.

**25.** Imposition of Consecutive Sentence for *21 U.S.C. § 860a* or *§ 865*. Sections 860a and 865 of title 21, United States Code, require the imposition of a mandatory consecutive term of imprisonment of not more than 20 years and 15 years, respectively. In order to comply with the relevant statute, the court should determine the appropriate "total punishment" and divide the sentence on the judgment form between the sentence attributable to the underlying drug offense and the sentence attributable to *21 U.S.C. § 860a* or *§ 865*, specifying the number of months to be served consecutively for the conviction under *21 U.S.C. § 860a* or *§ 865*. For example, if the applicable adjusted guideline range is 151–188 months and the court determines a "total punishment" of 151 months is appropriate, a sentence of 130 months for the underlying offense plus 21 months for the conduct covered by *21 U.S.C. § 860a* or *§ 865* would achieve the "total punishment" in a manner that satisfies the statutory requirement of a consecutive sentence.

**26.**  Cases Involving "Small Amount of Marihuana for No Remuneration". Distribution of "a small amount of marihuana for no remuneration", *21 U.S.C. § 841(b)(4)*, is treated as simple possession, to which § 2D2.1 applies.

**27.**  Departure Considerations.

**(A)**  Downward Departure Based on Drug Quantity in Certain Reverse Sting Operations. If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

**(B)**  Upward Departure Based on Drug Quantity. In an extraordinary case, an upward departure above offense level 38 on the basis of drug quantity may be warranted. For example, an upward departure may be warranted where the quantity is at least ten times the minimum quantity required for level 38. Similarly, in the case of a controlled substance for which the maximum offense level is less than level 38, an upward departure may be warranted if the drug quantity substantially exceeds the quantity for the highest offense level established for that particular controlled substance.

**(C)**  Upward Departure Based on Unusually High Purity. Trafficking in controlled substances, compounds, or mixtures of unusually high purity may warrant an upward departure, except in the case of PCP, amphetamine, methamphetamine, hydrocodone, or oxycodone for which the guideline itself provides for the consideration of purity (see the footnote to the Drug Quantity Table). The purity of the controlled substance, particularly in the case of heroin, may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs. As large quantities are normally associated with high purities, this factor is particularly relevant where smaller quantities are involved.

**(D)**  Departure Based on Potency of Synthetic Cathinones. In addition to providing converted drug weights for specific controlled substances and groups of substances, the Drug Conversion Tables provide converted drug weights for certain classes of controlled substances, such as synthetic cathinones. In the case of a synthetic cathinone that is not specifically referenced in this guideline, the converted drug weight for the class should be used to determine the appropriate offense level. However, there may be cases in which a substantially lesser or greater quantity of a synthetic cathinone is needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cathinone in the class, such as methcathinone or alpha-PVP. In such a case, a departure may be warranted. For example, an upward departure may be warranted in cases involving MDPV, a substance of which a lesser quantity is usually needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cathinone. In contrast, a downward departure may be warranted in cases involving methylone, a substance of which a greater quantity is usually needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cathinone.

**(E)**  Departures for Certain Cases involving Synthetic Cannabinoids.

**(i)**  Departure Based on Concentration of Synthetic Cannabinoids. Synthetic cannabinoids are manufactured as powder or crystalline substances. The concentrated substance is then usually sprayed on or soaked into a plant or other base material, and trafficked as part of a mixture. Nonetheless, there may be cases in which the substance involved in the offense is a synthetic cannabinoid not combined with any other substance. In such a case, an upward departure would be warranted.

There also may be cases in which the substance involved in the offense is a mixture containing a synthetic cannabinoid diluted with an unusually high quantity of base material. In such a case, a downward departure may be warranted.

**(ii)** Downward Departure Based on Potency of Synthetic Cannabinoids. In the case of a synthetic cannabinoid that is not specifically referenced in this guideline, the converted drug weight for the class should be used to determine the appropriate offense level. However, there may be cases in which a substantially greater quantity of a synthetic cannabinoid is needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cannabinoid in the class, such as JWH-018 or AM-2201. In such a case, a downward departure may be warranted.

*Background:* Offenses under *21 U.S.C. §§ 841* and *960* receive identical punishment based upon the quantity of the controlled substance involved, the defendant's criminal history, and whether death or serious bodily injury resulted from the offense.

The base offense levels in § 2D1.1 are either provided directly by the Anti-Drug Abuse Act of 1986 or are proportional to the levels established by statute, and apply to all unlawful trafficking. Levels 30 and 24 in the Drug Quantity Table are the distinctions provided by the Anti-Drug Abuse Act; however, further refinement of drug amounts is essential to provide a logical sentencing structure for drug offenses. To determine these finer distinctions, the Commission consulted numerous experts and practitioners, including authorities at the Drug Enforcement Administration, chemists, attorneys, probation officers, and members of the Organized Crime Drug Enforcement Task Forces, who also advocate the necessity of these distinctions. Where necessary, this scheme has been modified in response to specific congressional directives to the Commission.

The base offense levels at levels 24 and 30 establish guideline ranges such that the statutory minimum falls within the range; e.g., level 30 ranges from 97 to 121 months, where the statutory minimum term is ten years or 120 months.

For marihuana plants, the Commission has adopted an equivalency of 100 grams per plant, or the actual weight of the usable marihuana, whichever is greater. The decision to treat each plant as equal to 100 grams is premised on the fact that the average yield from a mature marihuana plant equals 100 grams of marihuana. In controlled substance offenses, an attempt is assigned the same offense level as the object of the attempt. Consequently, the Commission adopted the policy that each plant is to be treated as the equivalent of an attempt to produce 100 grams of marihuana, except where the actual weight of the usable marihuana is greater.

Because the weights of LSD carrier media vary widely and typically far exceed the weight of the controlled substance itself, the Commission has determined that basing offense levels on the entire weight of the LSD and carrier medium would produce unwarranted disparity among offenses involving the same quantity of actual LSD (but different carrier weights), as well as sentences disproportionate to those for other, more dangerous controlled substances, such as PCP. Consequently, in cases involving LSD contained in a carrier medium, the Commission has established a weight per dose of 0.4 milligram for purposes of determining the base offense level.

The dosage weight of LSD selected exceeds the Drug Enforcement Administration's standard dosage unit for LSD of 0.05 milligram (i.e., the quantity of actual LSD per dose) in order to assign some weight to the carrier medium. Because LSD typically is marketed and consumed orally on a carrier medium, the inclusion of some weight attributable to the carrier medium recognizes (A) that offense levels for most other controlled substances are based upon the weight of the mixture containing the controlled substance without regard to purity, and (B) the decision in *Chapman v. United States, 500 U.S. 453 (1991)* (holding that the term "mixture or substance" in *21 U.S.C. § 841(b)(1)* includes the carrier medium in which LSD is absorbed). At the same time, the weight per dose selected is less than the weight per dose that would equate the offense level for LSD on a carrier medium with that for the same number of doses of PCP, a controlled substance that comparative assessments indicate is more likely to induce violent acts and ancillary crime than is LSD. (Treating LSD on a carrier medium as weighing 0.5 milligram per dose would produce offense levels equivalent to those for PCP.) Thus, the approach decided upon by the Commission

will harmonize offense levels for LSD offenses with those for other controlled substances and avoid an undue influence of varied carrier weight on the applicable offense level. Nonetheless, this approach does not override the applicability of "mixture or substance" for the purpose of applying any mandatory minimum sentence (see *Chapman;* § 5G1.1(b)).

Frequently, a term of supervised release to follow imprisonment is required by statute for offenses covered by this guideline. Guidelines for the imposition, duration, and conditions of supervised release are set forth in Chapter Five, Part D (Supervised Release).

The last sentence of subsection (a)(5) implements the directive to the Commission in section 7(1) of *Public Law 111-220*.

Subsection (b)(2) implements the directive to the Commission in section 5 of *Public Law 111-220*.

Subsection (b)(3) is derived from Section 6453 of the Anti-Drug Abuse Act of 1988.

Subsection (b)(11) implements the directive to the Commission in section 6(1) of *Public Law 111-220.*

Subsection (b)(12) implements the directive to the Commission in section 6(2) of *Public Law 111-220*.

Subsection (b)(14)(A) implements the instruction to the Commission in section 303 of *Public Law 104-237*.

Subsections (b)(14)(C)(ii) and (D) implement, in a broader form, the instruction to the Commission in section 102 of *Public Law 106-310*.

Subsection (b)(16) implements the directive to the Commission in section 6(3) of *Public Law 111-220*.

Subsection (b)(17) implements the directive to the Commission in section 7(2) of *Public Law 111-220*.

The Drug Conversion Tables set forth in Application Note 8 were previously called the Drug Equivalency Tables. In the original 1987 Guidelines Manual, the Drug Equivalency Tables provided four conversion factors (or "equivalents") for determining the base offense level in cases involving either a controlled substance not referenced in the Drug Quantity Table or multiple controlled substances: heroin, cocaine, PCP, and marihuana. In 1991, the Commission amended the Drug Equivalency Tables to provide for one substance, marihuana, as the single conversion factor in § 2D1.1. See USSG App. C, Amendment 396 (effective November 1, 1991). In 2018, the Commission amended § 2D1.1 to replace marihuana as the conversion factor with the new term "converted drug weight" and to change the title of the Drug Equivalency Tables to the "Drug Conversion Tables." *See* USSG App. C, Amendment 808 (effective November 1, 2018).

# History

**HISTORY:**

Effective November 1, 1987. Amended effective January 15, 1988 (see Appendix C, amendments 19, 20, and 21); November 1, 1989 (see Appendix C, amendments 123–134, 302, and 303); November 1, 1990 (see Appendix C, amendment 318); November 1, 1991 (see Appendix C, amendments 369–371 and 394–396); November 1, 1992 (see Appendix C, amendments 446 and 447); November 1, 1993 (see Appendix C, amendments 479, 484–488, and 499); September 23, 1994 (see Appendix C, amendment 509); November 1, 1994 (see Appendix C, amendment 505); November 1, 1995 (see Appendix C, amendments 514–518); November 1, 1997 (see Appendix C, amendments 555 and 556); November 1, 2000 (see Appendix C, amendments 594 and 605); December 16, 2000 (see Appendix C, amendment 608); May 1, 2001 (see Appendix C, amendments 609–611); November 1, 2001 (see Appendix C, amendments 620–625); November 1, 2002 (see Appendix C, amendment 640); November 1, 2003 (see Appendix C, amendment 657); November 1, 2004 (see Appendix C, amendments 667, 668, and 674); November 1, 2005 (see Appendix C, amendment 679); March 27, 2006 (see Appendix C, amendment 681); November 1, 2006 (see Appendix C, amendments 683 and 688); November 1, 2007 (see Appendix C, amendments 705, 706 and 711); May 1, 2008 (see Appendix C, amendment 715); November 1, 2009 (see Appendix C, amendments 727 and 728); November 1, 2010 (see Appendix C, amendments 746 and 748); November 1, 2011

(see Appendix C, amendments 750, 751, and 760); November 1, 2012 (see Appendix C, amendments 762 and 770); November 1, 2013 (see Appendix C, amendment 777); November 1, 2014 (see Appendix C, amendments 782 and 783); November 1, 2015 (see Appendix C, amendments 793, 797); November 1, 2018 (see Appendix C, amendments 807, 808); November 1, 2023 (see Appendix C, amendments 817, 818, and 824).

## *18 USCS Appx § 4A1.1*

Current through Public Law 118-62, approved May 13, 2024.

*United States Code Service  >  TITLE 18. CRIMES AND CRIMINAL PROCEDURE (§§ 1 — 6005)  > 18 USCS appendix  >  SENTENCING GUIDELINES FOR THE UNITED STATES COURTS  > CHAPTER FOUR. Criminal History and Criminal Livelihood  >  Part A. Criminal History*

## § 4A1.1. Criminal History Category

The total points from subsections (a) through (e) determine the criminal history category in the Sentencing Table in Chapter Five, Part A.

**(a)**  Add 3 points for each prior sentence of imprisonment exceeding one year and one month.

**(b)**  Add 2 points for each prior sentence of imprisonment of at least sixty days not counted in (a).

**(c)**  Add 1 point for each prior sentence not counted in (a) or (b), up to a total of 4 points for this subsection.

**(d)**  Add 1 point for each prior sentence resulting from a conviction of a crime of violence that did not receive any points under (a), (b), or (c) above because such sentence was treated as a single sentence, up to a total of 3 points for this subsection.

**(e)**  Add 1 point if the defendant (1) receives 7 or more points under subsections (a) through (d), and (2) committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status.

Commentary

The total criminal history points from § 4A1.1 determine the criminal history category (I–VI) in the Sentencing Table in Chapter Five, Part A. The definitions and instructions in § 4A1.2 govern the computation of the criminal history points. Therefore, §§ 4A1.1 and 4A1.2 must be read together. The following notes highlight the interaction of §§ 4A1.1 and 4A1.2.

*Application Notes:*

**1.**  *§ 4A1.1(a).* Three points are added for each prior sentence of imprisonment exceeding one year and one month. There is no limit to the number of points that may be counted under this subsection. The term "prior sentence" is defined at § 4A1.2(a). The term "sentence of imprisonment" is defined at § 4A1.2(b). Where a prior sentence of imprisonment resulted from a revocation of probation, parole, or a similar form of release, see § 4A1.2(k).

Certain prior sentences are not counted or are counted only under certain conditions:

A sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's incarceration extended into this fifteen year period. See § 4A1.2(e).

A sentence imposed for an offense committed prior to the defendant's eighteenth birthday is counted under this subsection only if it resulted from an adult conviction. See § 4A1.2(d).

A sentence for a foreign conviction, a conviction that has been expunged, or an invalid conviction, is not counted. See § 4A1.2(h) and (j) and the Commentary to § 4A1.2.

18 USCS Appx § 4A1.1

**2.** *§ 4A1.1(b).* Two points are added for each prior sentence of imprisonment of at least sixty days not counted in § 4A1.1(a). There is no limit to the number of points that may be counted under this subsection. The term "prior sentence" is defined at § 4A1.2(a). The term "sentence of imprisonment" is defined at § 4A1.2(b). Where a prior sentence of imprisonment resulted from a revocation of probation, parole, or a similar form of release, see § 4A1.2(k).

Certain prior sentences are not counted or are counted only under certain conditions:

A sentence imposed more than ten years prior to the defendant's commencement of the instant offense is not counted. See § 4A1.2(e).

An adult or juvenile sentence imposed for an offense committed prior to the defendant's eighteenth birthday is counted only if confinement resulting from such sentence extended into the five-year period preceding the defendant's commencement of the instant offense. See § 4A1.2(d).

Sentences for certain specified non-felony offenses are never counted. See § 4A1.2(c)(2).

A sentence for a foreign conviction or a tribal court conviction, an expunged conviction, or an invalid conviction, is not counted. See § 4A1.2(h), (i), (j), and the Commentary to § 4A1.2.

A military sentence is counted only if imposed by a general or special court-martial. See § 4A1.2(g).

**3.** *§ 4A1.1(c).* One point is added for each prior sentence not counted under § 4A1.1(a) or (b). A maximum of four points may be counted under this subsection. The term "prior sentence" is defined at § 4A1.2(a).

Certain prior sentences are not counted or are counted only under certain conditions:

A sentence imposed more than ten years prior to the defendant's commencement of the instant offense is not counted. See § 4A1.2(e).

An adult or juvenile sentence imposed for an offense committed prior to the defendant's eighteenth birthday is counted only if imposed within five years of the defendant's commencement of the current offense. See § 4A1.2(d).

Sentences for certain specified non-felony offenses are counted only if they meet certain requirements. See § 4A1.2(c)(1).

Sentences for certain specified non-felony offenses are never counted. See § 4A1.2(c)(2).

A diversionary disposition is counted only where there is a finding or admission of guilt in a judicial proceeding. See § 4A1.2(f).

A sentence for a foreign conviction, a tribal court conviction, an expunged conviction, or an invalid conviction, is not counted. See § 4A1.2(h), (i), (j), and the Commentary to § 4A1.2.

A military sentence is counted only if imposed by a general or special court-martial. See § 4A1.2(g).

**4.** *§ 4A1.1(d).* In a case in which the defendant received two or more prior sentences as a result of convictions for crimes of violence that are treated as a single sentence (see § 4A1.2(a)(2)), one point is added under § 4A1.1(d) for each such sentence that did not result in any additional points under § 4A1.1(a), (b), or (c). A total of up to 3 points may be added under § 4A1.1(d). For purposes of this guideline, "crime of violence" has the meaning given that term in § 4B1.2(a). See § 4A1.2(p).

For example, a defendant's criminal history includes two robbery convictions for offenses committed on different occasions. The sentences for these offenses were imposed on the same day and are treated as a single prior sentence. See § 4A1.2(a)(2). If the defendant received a five-year sentence of imprisonment for one robbery and a four-year sentence of imprisonment for the other robbery (consecutively or concurrently), a total of 3 points is added under § 4A1.1(a). An additional point is added under § 4A1.1(d) because the second sentence did not result in any additional point(s) (under § 4A1.1(a), (b), or (c)). In contrast, if the defendant received a one-year sentence of imprisonment for one robbery and a nine-month consecutive sentence of imprisonment for the other robbery, a total of 3 points also is added under § 4A1.1(a) (a one-year sentence of imprisonment and a consecutive nine-month sentence of imprisonment are treated as a

combined one-year-nine-month sentence of imprisonment). But no additional point is added under § 4A1.1(d) because the sentence for the second robbery already resulted in an additional point under § 4A1.1(a). Without the second sentence, the defendant would only have received two points under § 4A1.1(b) for the one-year sentence of imprisonment.

**5.  *§ 4A1.1(e).*** One point is added if the defendant (1) receives 7 or more points under § 4A1.1(a) through (d), and (2) committed any part of the instant offense (*i.e.*, any relevant conduct) while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status. Failure to report for service of a sentence of imprisonment is to be treated as an escape from such sentence. See § 4A1.2(n). For the purposes of this subsection, a "criminal justice sentence" means a sentence countable under § 4A1.2 (Definitions and Instructions for Computing Criminal History) having a custodial or supervisory component, although active supervision is not required for this subsection to apply. For example, a term of unsupervised probation would be included; but a sentence to pay a fine, by itself, would not be included. A defendant who commits the instant offense while a violation warrant from a prior sentence is outstanding (*e.g.*, a probation, parole, or supervised release violation warrant) shall be deemed to be under a criminal justice sentence for the purposes of this provision if that sentence is otherwise countable, even if that sentence would have expired absent such warrant. See §4A1.2(m).

*Background:* Prior convictions may represent convictions in the federal system, fifty state systems, the District of Columbia, territories, and foreign, tribal, and military courts. There are jurisdictional variations in offense definitions, sentencing structures, and manner of sentence pronouncement. To minimize problems with imperfect measures of past crime seriousness, criminal history categories are based on the maximum term imposed in previous sentences rather than on other measures, such as whether the conviction was designated a felony or misdemeanor. In recognition of the imperfection of this measure however, § 4A1.3 authorizes the court to depart from the otherwise applicable criminal history category in certain circumstances.

Subsections (a), (b), and (c) of § 4A1.1 distinguish confinement sentences longer than one year and one month, shorter confinement sentences of at least sixty days, and all other sentences, such as confinement sentences of less than sixty days, probation, fines, and residency in a halfway house.

Section 4A1.1(e) adds one point if the defendant receives 7 or more points under § 4A1.1(a) through (d) and was under a criminal justice sentence during any part of the instant offense.

# History

**HISTORY:**

Effective November 1, 1987. Amended effective November 1, 1989 (see Appendix C, amendments 259–261); November 1, 1991 (see Appendix C, amendments 381 and 382); October 27, 2003 (see Appendix C, amendment 651); November 1, 2007 (see Appendix C, amendment 709); November 1, 2010 (see Appendix C, amendment 742); November 1, 2013 (see Appendix C, amendment 777); November 1, 2015 (see Appendix C, amendment 795); November 1, 2023 (see Appendix C, amendment 821).