# RECORD NO. 23-3126
## [ORAL ARGUMENT HAS NOT BEEN SCHEDULED]

In The

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## GERARDO GONZALEZ VALENCIA,

*Defendant-Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

## PUBLIC APPENDIX
## Volume I of VII

_____

Devin Burstein
WARREN &
BURSTEIN
501 W. Broadway,
Ste. 240
San Diego, CA
92101
(619) 234-8467
db@wabulaw.com

*Counsel for
Appellant*

Chrisellen R. Kolb U.S.
ATTORNEY'S OFFICE
(USA) Appellate Division
Room 8104 555 4th Street,
NW Washington, DC 20530
(202) 252-6833
Chrisellen.R.Kolb@usdoj.gov

*Counsel for Appellee*

Kaitlin J. Sahni U.S.
DEPARTMENT OF
JUSTICE (DOJ)
Criminal Division 145
N Street, NE Second
Floor, East Wing
Washington, DC 20530
(202) 598-2493
kaitlin.sahni@usdoj.gov

*Counsel for Appellee*

# TABLE OF CONTENTS

**Volume I**

Indictment (April 19, 2016) [DE1] .......................................................... iv

Transcript of Motion Hearing (January 11, 2022) ................................... 5

Motion to Dismiss (April 28, 2022) (DE97) ............................................ 26

Government's Opposition to Defendant's Motion to Dismiss (April 29, 2022) (DE99) ......................................................................................... 229

Defendant's Reply in Further Support of his Motion to Dismiss (May 12, 2022) (DE103) ....................................................................................... 258

**Volume II**

Exhibits in Support of Defendant's Reply in Further Support of his Motion to Dismiss (May 12, 2022) (DE103) .......................................... 297

Memorandum and Order (July 5, 2022) (DE108) ................................. 367

Memorandum Opinion and Order (September 1, 2022) (DE120) ........ 376

Plea Agreement (December 1, 2022) (DE134) ...................................... 389

Joint Statement of Stipulated Facts (December 1, 2022) (DE135) ...... 398

Joint Submission Regarding Sentencing Guidelines (December 16, 2022) (DE138) ................................................................................................ 403

Defendant's Statement of Facts (December 16, 2022) (DE139) ........... 409

Transcript of Plea Colloquy (December 22, 2022) ............................... 412

Government's Sentencing Memorandum (March 23, 2023) (DE153) .. 439

Defendant's Memorandum in Aid of Sentencing (April 6, 2023) (DE159). ............................................................................................................ 480

## Volume III

Continued Exhibits in Support of Defendant's Memorandum in Aid of Sentencing (April 6, 2023) (DE159) ....................................................593

Notice of Filing of Letter in Support (April 10, 2023) (DE160)...........656

Stipulation (April 18, 2023) (DE161)....................................................672

Transcript of Hearing (May 2, 2023) ....................................................674

## Volume IV

Transcript of Hearing (May 3, 2023) ....................................................787

## Volume V

Transcript of Hearing (May 4, 2023) ....................................................978

Government's Supplemental Sentencing Memorandum (June 16, 2023) (DE170)................................................................................................1179

Defendant's Post-Hearing Response Brief (July 7, 2023) (DE179)....1201

## Volume VI

Exhibits in Support of Defendant's Post-Hearing Response Brief (July 7, 2023) (DE179)....................................................................................1247

Government's Reply in Support of Supplemental Sentencing Memorandum (July 12, 2023) (DE180)................................................1443

Transcript of Sentencing Hearing (July 21, 2023) ............................1459

## Volume VII

Notice of Appeal (July 26, 2023) (DE186)..........................................1551

Amended Judgment (September 1, 2023) (DE188) ............................1552

Reason for Amendment (September 1, 2023) (DE189) ..................... 1560

Docket Report ...................................................................... 1561

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn on May 5, 2015**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO. _____** |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **21 U.S.C. §§ 959(a), 960, 963** |
| | ) | **(Conspiracy to Distribute Five** |
| **GERARDO GONZALEZ-VALENCIA,** | ) | **Kilograms or More of Cocaine,** |
| also known as "Lalo," "Flaco," "Silver," | ) | **and Five Hundred Grams or** |
| "Silverio," "Eduardo," and "Laline," | ) | **More of Methamphetamine for** |
| | ) | **Importation into the United** |
| **Defendant.** | ) | **States)** |
| | ) | |
| | ) | **18 U.S.C. § 2** |
| | ) | **(Aiding and Abetting)** |
| | ) | |
| | ) | **21 U.S.C. § 853** |
| | ) | **21 U.S.C. § 970** |
| | ) | **(Criminal Forfeiture)** |

**INDICTMENT**

**THE GRAND JURY CHARGES THAT:**

**COUNT ONE**

From in or about January 2003, and continuing thereafter, up to and including the date of

the filing of this Indictment, both dates being approximate and inclusive, in the countries of

Mexico, the United States, and elsewhere, the defendant, **GERARDO GONZALEZ-**

**VALENCIA, also known as "Lalo," "Flaco," "Silver," "Silverio," "Eduardo," and "Laline,"**

together with others, both known and unknown to the Grand Jury, did knowingly, intentionally

and willfully conspire: (1) to knowingly and intentionally distribute five (5) kilograms or more of

a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled

substance; and (2) to knowingly and intentionally distribute five hundred (500) grams or more of

a mixture or substance containing a detectible amount of or more of methamphetamine, a Schedule II controlled substance, knowing and intending that such substances would be unlawfully imported into the United States from a place outside thereof, in violation of Title 21, United States Code, Sections 959(a); all in violation of Title 21, United States Code, Section 963 and Title 18, United States Code, Section 2.

With respect to the defendant, the controlled substances involved in the conspiracy attributable to him as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, is five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, and five hundred (500) grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Section 960(b)(1).

> (Conspiracy to distribute 5 kilograms or more of cocaine, and 500 grams or more of methamphetamine, for importation into the United States in violation of Title 21, United States Code, Sections 959(a), 960 and 963, and Title 18, United States Code, Section 2.)

## CRIMINAL FORFEITURE ALLEGATION

The United States hereby gives notice to the defendant that upon conviction of the Title 21 offense alleged in Count One of this Indictment, the government will seek forfeiture in accordance with Title 21, United States Code, Sections 853 and 970, of all property constituting or derived from any proceeds the defendant obtained directly or indirectly as a result of the alleged Title 21 violation, and all property used or intended to be used in any manner or part to commit and to facilitate the commission of such offense.

Said property includes, but is not limited to:

A sum of money equal to all proceeds the defendant obtained directly or indirectly as a result of the Title 21 offense charged in this indictment, and all property used or intended to be used to

2

JA2

facilitate such offense, that is, not less than a sum of money representing the amount of funds involved in the offense, and all interest and proceeds traceable thereto; in that such sum, in aggregate, was received by the defendant in exchange for the distribution of controlled substances or is traceable thereto. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third person;

    (c)    has been placed beyond the jurisdiction of the Court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be subdivided without difficulty;

JA3

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to

seek forfeiture of any other property of the said defendant up to the value of the above forfeitable

property.

> (Criminal Forfeiture, in violation of Title 21, Untied States Code, Sections 853 and
> 970.)

A True Bill.

_____

Foreperson

_____

Arthur G. Wyatt
Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C.  20530

By:

_____

Amanda N. Liskamm
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
145 N Street, NE
Washington, D.C. 20530
Amanda.Liskamm@usdoj.gov

4

JA4

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
    *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,            )  Criminal Action
                                     )  No. 16-065
vs.                                  )
                                     )
GERARDO GONZALEZ VALENCIA,           )
            Defendant.               )
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  )  Criminal Action
UNITED STATES OF AMERICA             )  No. 16-192
                                     )
vs                                   )
                                     )  January 11, 2022
JOSE GONZALEZ VALENCIA,              )  12:47 p.m.
            Defendant.               )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

<u>**APPEARANCES:**</u>

FOR THE UNITED STATES:

                        KAITLIN JULIA SAHNI
                        KATE M. NASEEF
                        KIRK KENNETH HANDRICH
                        U.S. Department of Justice
                        Narcotics and Dangerous Drug Section
                        45 N Street, NE
                        Washington, D.C. 20530
                        (202) 353-8810
                        Email: kaitlin.sahni@usdoj.gov


FOR GERARDO GONZALEZ VALENCIA:

                        STEPHEN A. BEST
                        TIFFANY BROOK LIETZ
                        DAVID ROSENTHAL
                        Brown Rudnick, LLP
                        601 Thirteenth Street, NW
                        Washington, D.C. 20005
                        (202) 536-1737
                        Email: sbest@brownrudnick.com

                        ***(Appearances continued)***

**<u>APPEARANCE (continued)</u>**:


FOR GERARDO GONZALEZ VALENCIA:

                        LILLY ANN SANCHEZ
                        Four Seasons Tower, Suite 1200
                        1441 Brickell Avenue
                        Miami, FL 33131
                        (305) 503-5503
                        Email: lsanchez@thelsfirm.com


FOR JOSE GONZALEZ VALENCIA:

                        ALFRED GUILLAUME III
                        6305 Ivy Lane
                        Greenbelt, MD 20770
                        (301) 377-2158
                        Email: ag3law@gmail.com


<u>ALSO PRESENT</u>:        TERESA SALAZAR,
                        Spanish Language Interpreter


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                        Official Court Reporter

*This hearing was held via videoconference and telephonically and is, therefore, subject to the limitations associated with the use of technology, static interference, etc.*


Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

1       **P R O C E E D I N G S**

2               THE COURTROOM DEPUTY:  Matter before the Court,

3       Criminal Case No. 16-165 (sic), United States of America

4       versus Gerardo Gonzalez Valencia and Jose Gonzalez Valencia.

5               Your Honor, the interpreter, Ms. Teresa Salazar,

6       is present.

7               Counsel, please state your names for the record,

8       starting with the government.

9               THE COURT:  Excuse me just one second.

10              (Whereupon, the Court and staff confer.)

11              THE COURT:  Sorry.  The video screen looked very

12      different to me than it normally does and it's because, I

13      guess, we're not using Zoom.  We're using some other

14      platform, so I can barely see you-all.

15              You may be able to see me, but I can barely see

16      you because your little squares are so small.  So this is a

17      good experiment to explain why Zoom is so popular.

18              Okay.  Well, at least I can see the defendant.

19              Okay.  So let's proceed with people identifying

20      themselves for the record, starting with the government.

21              MS. SAHNI:  Good afternoon, Your Honor.

22      Kaitlin Sahni for the government; and I am joined by Kate

23      Naseef and Kirk Handrich.

24              THE COURT:  All right.  And then for Gerardo

25      Gonzalez Valencia.

1          MS. SANCHEZ:  Good afternoon, Your Honor.

2     Lilly Ann Sanchez, on behalf of Gerardo Gonzalez Valencia;

3     and along with me are Stephen Best, and on the phone, I

4     believe, is Tiffany Lietz.

5          MR. BEST:  Also, Your Honor -- this is Stephen

6     Best.  I see David Rosenthal from our firm on the call as

7     well.

8          THE COURT:  Okay.  Well, who is going to be

9     speaking on behalf of Gerardo-Gonzalez today, Ms. Sanchez?

10         MS. SANCHEZ:  Yes, Your Honor.

11         THE COURT:  All right.  Okay.  And then for Jose

12    Gonzalez Valencia?

13         MR. GUILLAUME:  Good afternoon, Your Honor.

14    Alfred Guillaume, on behalf of Mr. Jose Gonzalez Valencia.

15         THE COURT:  All right.  Mr. Gerardo Gonzalez

16    Valencia, do you agree, after consultation with your

17    counsel, to participate in today's status conference using

18    videoconferencing rather than being physically present in

19    the courtroom?

20         DEFENDANT GERARDO GONZALEZ VALENCIA:  Yes.

21    I agree to that.

22         THE COURT:  Okay.  Mr. Jose Gonzalez Valencia is

23    not here today.  We are advised by the jail where he is that

24    he has tested positive so he is in isolation; and because he

25    is in isolation, they can't get a phone to him.

1          Mr. Guillaume, were you aware of that?

2          MR. GUILLAUME:  Yes, Your Honor.  I was aware, in

3     the weeks prior, my client had been quarantined -- had been

4     quarantined.  I have been unable to see him.

5          This morning, when I went to visit him -- one last

6     attempt before the hearing -- I was informed that he was, in

7     fact, himself positive.  So, yes, Your Honor; I was aware.

8          THE COURT:  So, Mr. Guillaume, were you told when

9     they anticipate he will be put back into the general

10    population or in quarantine so he would be available for a

11    hearing?

12         MR. GUILLAUME:  Your Honor, I was not informed.

13    Although, I did plan on attempting to call over to the jail,

14    once we got off this status, to kind of get a more exact

15    determination.  I wasn't able to do so prior to this hearing

16    today because I had another court hearing this morning.

17         THE COURT:  All right.  So, I mean, do you want to

18    postpone until he can be here?  Or are you prepared to

19    proceed today since, Mr. Guillaume, you and the government

20    agree on a schedule?

21         MR. GUILLAUME:  Your Honor, with the Court's

22    permission, I would proceed without him today, excuse his

23    presence for obvious reasons; and I can relay all of the

24    information that we discuss today to him.

25         I would just like to get some kind of -- more

closure with respect to this second -- this trial date because I know that cocounsel has -- although they have agreed to be available if necessary; but their preference is not to go on the date I suggested.  So I would just want to try and get that issue resolved today if we could.

THE COURT:  All right.  Well, I mean, the whole purpose of the status conference today is to set the trial schedule, pretrial conference, and motion schedule.  And the government and the defendant Jose Gonzalez Valencia have agreed that the trial would be scheduled to begin between September 5 and 12; and I would like to set the trial date for September 12th, as those two parties agreed.

I didn't understand from Defendant Gerardo Gonzalez Valencia's papers that there is an objection to September 12th or the proposed dates, other than the fact that Gerardo is continuing to re-litigate the consolidation motion and insisting on keeping his February 7th date.

Do I have that correct, Ms. Sanchez?

MS. SANCHEZ:  Your Honor --

(Whereupon, interpreter proceeds to interpret.)

MS. SANCHEZ:  Your Honor, Mr. Gonzalez Valencia has been here in the United States awaiting trial since May --

THE COURT:  No, no, no.  Ms. Sanchez, is that a correct summary; that you want -- you are insisting on the

1    date originally set of February 7th; and you have interposed

2    no other objection to the September 5 to September 12

3    suggested dates?  Yes or no?

4              MS. SANCHEZ:  Yes.

5              THE COURT:  Do I hear a response from Ms. Sanchez?

6              MS. SANCHEZ:  I said yes.

7              THE COURT:  Okay.  I'm sorry.  That wasn't picked

8    up.

9              MS. SANCHEZ:  It's hard with the interpretation.

10             THE COURT:  All right.  So I am going to set the

11   date for trial for September 12th, with jury selection

12   starting that day, at 9 a.m.; and then I will work backwards

13   by setting the pretrial conference date and the motion

14   schedule.

15             Let me ask you, Mr. Guillaume, you know, the

16   last -- I will let the interpreter do that, and then I will

17   go on to my next question.

18             Okay.  So, Mr. Guillaume, you have a pending

19   motion to withdraw as counsel because you expected retained

20   counsel to step into this case.  And, in fact, my

21   recollection is that potential retained counsel even

22   appeared in the audience at the last hearing, but no new

23   retained counsel has entered an appearance.

24             I will let the interpreter do that.

25             So, Mr. Guillaume, do you have any more or

1   additional information about the potential for retained

2   counsel entering an appearance?

3            MR. GUILLAUME:  Yes, Your Honor.

4            But I will say, at the outset, that I am prepared

5   to go forward on September 12th, which is why that date is

6   cleared for my calendar.  However, I have maintained contact

7   with the retained counsel who was present at the court

8   hearing, Mr. Perez.  And I have had a number of other

9   attorneys contact me with reference to this case; but as

10  Your Honor has noted, no one has entered their appearance.

11  So until that time, I am going to continue as attorney in

12  this matter.

13           THE COURT:  Okay.  So given this --

14           THE INTERPRETER:  Your Honor, may the

15  interpreter --

16           THE COURT:  Yes.  Yes.  I'm sorry.  Go ahead.

17           All right.  So, Mr. Guillaume, your motion to

18  withdraw as counsel, which is docketed as ECF 19, is denied.

19  And you should just plan and expect to remain as counsel in

20  this case through trial.

21           And let me just spend a couple of minutes just

22  addressing the repeat of the motions, arguments, made in

23  connection with the consolidation motion that Mr. Jose

24  Gonzalez Valencia (sic) expressed in the joint status

25  conference -- joint status report, and reiterating his

JA12

1    opposition to any date other than the currently scheduled

2    date of February 7th.

3            And let me just say, of course, there is some

4    delay in the scheduled trial date due to Gerardo Gonzalez

5    Valencia's (sic) appearance in the case; but that delay is

6    not the measure of whether consolidation and a new trial

7    date is appropriate.  Any delay due to the joinder of

8    Gerardo to this case is not undue, nor is it unfair, given

9    the record in this case.

10           As I have already pointed out --

11           THE INTERPRETER:  Your Honor, may I?

12           THE COURT:  Go ahead.

13           THE INTERPRETER:  Your Honor, could you -- the

14    interpreter would request a repetition of the last thing you

15    said.

16           THE COURT:  That any delay is not undue, nor is it

17    unfair, given the record in this case.

18           Are you finished, Ms. Salazar?

19           THE INTERPRETER:  Yes, I am, Your Honor.

20           THE COURT:  Okay.

21           MS. SANCHEZ:  Your Honor.

22           THE COURT:  Yes.

23           MS. SANCHEZ:  Your Honor, it was --

24           THE COURT:  I am going to continue explaining

25    this, Ms. Sanchez, because you have repeated some of the

1    arguments in your status report.

2          I have already pointed out during the

3    consolidation hearing that any claims of undue delay by the

4    defendant Gerardo are unavailing because the government here

5    promptly moved for consolidation on the same day that the

6    defendant Jose Gonzalez Valencia made his initial appearance

7    in this district, and just two days after the defendant

8    Jose's extradition from Brazil.

9          Ms. Salazar.

10          (Interpretation continues.)

11          THE COURT:  When I look at the record in this

12    case, both defendants were indicted by grand juries just

13    months apart from each other in 2016.

14          These two cases could have been consolidated and

15    tried together years ago had both defendants been promptly

16    extradited to the United States.  But Defendant Jose was

17    just extradited to the United States from Brazil less than

18    two months ago; and Defendant Gerardo was finally extradited

19    to the United States in May 2020, after spending four years

20    detained in Uruguay, following his indictment in this

21    district, while he was vigorously contesting extradition.

22          As this record reflects, delay in the scheduling

23    of the trial in this case is not attributable to

24    consolidation or to the pace of proceedings in this court in

25    the district more generally but is, instead, to the

1    defendant Gerardo's deliberate choice, as was his right, to

2    contest extradition to this country for almost -- for over

3    four years in Uruguay.

4           And as I have already said, any delay caused by

5    the joinder of the defendants' cases is offset by the

6    substantial interest of justice promoted by consolidation

7    given the substantial overlap between the evidence and

8    witnesses to be introduced against both defendants.

9           Joinder advances the interest of justice by

10   conserving substantial and limited judicial resources, as

11   well as making efficient use of the time of both the

12   witnesses, the trial participants that will be called to --

13   witnesses, and the government attorneys who will be running

14   the trial and called to testify at the trial, and of the

15   jurors in this district who have to be called upon to serve

16   as a trial jury in the defendants' cases.

17          All right.  So working backwards from the

18   September 12th, 2022, trial date, I will direct that any

19   pretrial motions, including motions in limine, will be due

20   by June 24, 2022.  Oppositions in response to any pretrial

21   motions will be due by July 8, 2022.  Replies in further

22   support of the motions will be due by July 15, 2022.  The

23   joint pretrial statement will also be due by July 15, 2022.

24   The pretrial conference will take place on Friday, August 5,

25   2022.

1        MR. BEST:  Your Honor, this is Stephen Best.

2        May I be heard, please?

3        THE INTERPRETER:  Please pause for the

4   interpretation.

5        MR. BEST:  Sure.  Of course.  I'm sorry.

6        THE INTERPRETER:  And, Your Honor, the interpreter

7   did not catch the last date.

8        THE COURT:  The pretrial conference will take

9   place on Friday, August 5, 2022.

10        THE INTERPRETER:  Thank you, Your Honor.

11        THE COURT:  And if the parties -- any of the

12   motions require an evidentiary hearing at any -- I will hold

13   that between August 5 and the start date of the trial.

14        All right.  Mr. Best, did you want to say

15   something?

16        MR. BEST:  Yes, Your Honor.  Thank you.

17        I'd respectfully request an accelerated schedule

18   on dispositive motions -- at least two of our dispositive

19   motions in this case if at all possible.  I normally don't

20   make this request.  I know that Your Honor has a calendar

21   and this is your normal orderly process.  But we have --

22        THE COURT:  But actually, Mr. Best, what I was

23   going to ask is whether all of the pending motions should

24   just be denied without prejudice so they can be re-filed

25   consistent with any new evidence, any new considerations,

```
 1    given the fact that the contours of the case have been

 2    changed somewhat because of the joinder of a defendant

 3    and -- with denial without prejudice, and then start afresh

 4    with a new set of motions filed on June 24th.

 5              THE INTERPRETER:  Your Honor.

 6              THE COURT:  Yes.  Please proceed, Ms. Salazar.

 7              Mr. Best, I think you have the floor.

 8              MR. BEST:  Your Honor, I do not object to your

 9    denial without prejudice to our re-filing of motions.

10              My interest -- Mr. Gerardo Gonzalez Valencia's

11    interest is, though, on a more accelerated motions schedule

12    for at least two of the dispositive motions in that we

13    believe we have a good-faith basis to ask for it given the

14    strength of our motions.

15              THE COURT:  Are you going to share with me what

16    motions you are talking about?

17              THE INTERPRETER:  One second, Your Honor.  One

18    second.

19              MR. BEST:  Yes, Your Honor.  It's our motion to

20    dismiss or other appropriate relief for the lack of probable

21    cause in the government's extradition, the United States'

22    extradition to the United States; and the second is a motion

23    to dismiss the indictment for insufficiency of the evidence

24    or, in the alternative, for your in camera review of the

25    grand jury record in this case for a determination of
```

1    sufficiency of the evidence.

2            THE COURT:  All right.  What's the government's

3    position?

4            THE INTERPRETER:  One second, Your Honor.

5            THE COURT:  All right.  Let me just ask you

6    first -- before I turn to the government, Mr. Best or

7    Ms. Sanchez, how many separate motions to dismiss the

8    indictment did you file already?

9            MS. SANCHEZ:  We filed two.  And then, of course,

10   there was the third one that was within the response for the

11   November 19th hearing.  And that third -- that one, we're

12   going to file on its own correctly.

13           THE COURT:  Well, it would seem to me that you

14   have filed multiple different motions that could have all

15   been consolidated; and it was my impression that there were

16   more motions attacking parts of the indictment that were

17   separately filed in that.

18           But I will hear the government on the request for

19   an expedited schedule which, I guess, would take the form

20   since -- you know, of the defendant filing those motions

21   sooner, and rather than requiring the government to respond

22   by July 8th -- to respond earlier to those two motions, with

23   replies due earlier than the date of July 15th, and that

24   then would be subject to the Court's -- the demands on my

25   schedule, whether or not I would resolve it earlier than I

1      would resolve all the rest of the motions.

2              So essentially what you are asking for, Mr. Best,

3      is to file your motions as soon as you can and have the

4      government's opposition due date due before July 8, and

5      moving up your reply date earlier than July 15.  So that's

6      how I understand your request for expedited consideration.

7              THE INTERPRETER:  Your Honor.

8              THE COURT:  And let me just say given the -- go

9      ahead.

10             So from where I sit, the piecemeal nature of the

11     pretrial motions that I have seen already --

12             THE INTERPRETER:  Your Honor, excuse me.

13             The interpreter did not get that --

14             THE COURT:  Okay.  All right.  I'm sorry.

15             THE INTERPRETER:  The what nature?

16             THE COURT:  What is it Ms. Salazar?

17             THE INTERPRETER:  Your Honor, that first sentence;

18     the what nature?

19             THE COURT:  I said given the nature of what this

20     Court has seen in terms of the piecemeal nature of the

21     various motions filed by the defense, I will be somewhat

22     reluctant to deal with two motions at a time separate from

23     dealing with all of the motions in front of me.

24             All right.  But I will hear what the government's

25     response is to the defense request to have two motions to

1    dismiss the indictment expedited, which would basically

2    result in the government potentially having to file an

3    opposition earlier than July 8 to two of the defense

4    motions.

5            MS. SAHNI:  Your Honor, the government does not

6    oppose setting an earlier deadline for those particular

7    motions, but would request at least that the government have

8    the standard two weeks to respond.  Of course, the

9    government defers to Your Honor and your schedule.

10           THE COURT:  All right.  So any pretrial motions,

11   including motions in limine, as I stated before, will be due

12   by June 24, 2022.  Should the defense --

13           Go ahead, Teresa.

14           Should the defense file the two motions that

15   Mr. Best discussed prior, prior to June 24 --

16           Go ahead, Teresa.

17           -- then the government opposition will be done --

18   will be due two weeks after the filing, and any replies

19   seven days after that.

20           All right.  I will exclude time between today and

21   September 12th, and find that exclusion of the time is

22   appropriate under both 18 U.S.C. Section 3161(h)(6), which

23   allows a reasonable period of delay when the defendant is

24   joined for trial with a codefendant --

25           Go ahead.

1    -- with a codefendant as to whom the time for

2    trial has not run.

3    And I also am excluding time in the interest of

4    justice under Section 3161(h)(7)(A).  I find that the

5    interest of justice in this continuance of the trial date,

6    from early February to September 12, outweighs the interests

7    of the parties and the public in a speedier trial.

8    This continuance and further exclusion of time is

9    consistent with the interest of justice to permit the

10   government to complete production of voluminous discovery to

11   the defendant Jose Gonzalez; allow counsel for both

12   defendants an adequate opportunity to consider which

13   pretrial motions to file in light of the recent

14   consolidation; and the continuance will also effectuate the

15   efficiencies that served as the basis for the Court's

16   decision to consolidate these cases, including; the savings

17   of trial preparation time; witness time; foreign travel;

18   court time; jurors' time -- particularly in a case of

19   significant complexity involving a conspiracy extending over

20   several jurisdictions over a lengthy period of time.

21   The continuance of the trial is also in the

22   interest of justice considering the recent surge of COVID

23   cases in this district which has already required suspension

24   of jury trials until at least January 24 in this court.  And

25   I have detailed all of the reasons for extension -- you

1  know, for exclusion of time under the Speedy Trial Act in my

2  standing order for the entire court numbered 21-83, issued

3  on December 30th, 2021, and incorporate all of those

4  findings here.

5            All right.  So I will enter orders following this

6  hearing vacating the February 7th trial date, denying

7  without prejudice all pending motions with leave to re-file,

8  and entering the scheduling order that I have already

9  detailed at the status conference.

10            Is there anything further that the government

11  wants to talk about at this status conference?

12            MS. SAHNI:  Your Honor, if I may address CIPA very

13  briefly.  The government expects to file a CIPA Section 4

14  motion; and we would respectfully request a Section 4

15  deadline set in late March.

16            THE COURT:  All right.  I will set that -- do you

17  have a --

18            THE INTERPRETER:  The interpreter would ask for a

19  repetition.

20            THE COURT:  Yes.  Go ahead, Teresa.

21            THE INTERPRETER:  Yes.  Would counsel please

22  repeat what kind of motion the government expects to file?

23            MS. SAHNI:  Yes, Ms. Salazar.  CIPA.  That's C --

24            THE COURT:  It's --

25            THE INTERPRETER:  CIPA, okay.

1          THE COURT:  All right.  I will add that to the

2     order.

3          Anything further from you, Mr. Guillaume?

4          MR. GUILLAUME:  Not at this time, Your Honor.

5     Thank you.

6          THE COURT:  All right.  And from Ms. Sanchez or

7     Mr. Best?

8          MR. BEST:  One matter, Your Honor.

9          If you recall, in our November hearing, I brought

10    up the issue and Your Honor confronted the issue that the

11    United States had informed the defendant of their intention

12    of walking away from a conspiracy to distribute the

13    methamphetamine part of the case.

14          And, if I recall, Your Honor directed the

15    government to inform defense counsel of the government's

16    intentions in short order.  We have not heard anything from

17    the government, and we'd like resolution of that.

18          It's fair to conclude if given more time and they

19    resuscitate their case, it's because of this extension; they

20    have gone out and found new witnesses to support their

21    claim, which would be direct prejudice to the defendant --

22    to our client.  And so we'd just simply like clarity that,

23    in fact, they are walking away from that part of the

24    indictment.

25          THE COURT:  So I will hear from the government.

1          So will the government respond?  Are you going to

2     backpedal now, or what?

3          MS. SAHNI:  Your Honor, the government will not be

4     pursuing the methamphetamine portion of the charge against

5     Gerardo Gonzalez Valencia; although we do not concede the

6     prejudice that Mr. Best described.

7          THE COURT:  All right.  Anything further,

8     Mr. Best?

9          MR. BEST:  No, Your Honor.

10          THE COURT:  Okay.  You are all excused.

11          MS. SANCHEZ:  Your Honor.

12          Just one thing, Your Honor.

13          If possible, instead of the August 5th date, can

14     we get the following Friday, August 12th, if it works on

15     everybody's calendar for the hearing?

16          THE COURT:  What is the government's position?

17          MS. SAHNI:  The government has no objection.

18          THE COURT:  All right.  We can set it for -- let

19     me just check my trial schedule.

20          No, I can't.  I am not available August 12th.

21          We can do it August 9th.

22          MS. SANCHEZ:  That's fine, Your Honor.

23          THE COURT:  All right.  I have a judicial

24     conference the latter part of that week.  So we can set it

25     for August 9th, which is a Tuesday, at 9:30.

1          All right.  You are all excused.

2          MS. SANCHEZ:  Thank you, Your Honor.

3          MR. BEST:  Thank you.

4          (Whereupon, the proceeding concludes, 1:44 p.m.)

5                    * * * * *

6                    **CERTIFICATE**

7          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
certify that the foregoing constitutes a true and accurate
8     transcript of my stenographic notes, and is a full, true,
and complete transcript of the proceedings to the best of my
9     ability.

10          PLEASE NOTE:  This hearing was held via
videoconference and/or telephonically in compliance with the
11    COVID-19 pandemic stay-safer-at-home recommendations and is
therefore subject to the limitations associated with the use
12    of technology, including but not limited to telephone signal
interference, static, signal interruptions, and other
13    restrictions and limitations associated with remote court
reporting via telephone, speakerphone, and/or
14    videoconferencing capabilities.

15          This certificate shall be considered null and void
if the transcript is disassembled and/or photocopied in any
16    manner by any party without authorization of the signatory
below.

17

18     Dated this 28th day of January, 2022.

19     /s/ Elizabeth Saint-Loth, RPR, FCRR
       Official Court Reporter
20

21

22

23

24

25

**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**JOSE GONZALEZ-VALENCIA &<br>GERARDO GONZALEZ-VALENCIA,**<br><br>Defendants. | **CRIMINAL NO. 16-CR-065<br>(BAH)** |

**DEFENDANT GERARDO GONZALEZ-VALENCIA'S MOTION TO DISMISS OR, IN
THE ALTERNATIVE, FOR *IN CAMERA* REVIEW, AND INCORPORATED
MEMORANDUM OF POINTS AND AUTHORITIES**

**FILED UNDER SEAL**

## TABLE OF CONTENTS

**Page**

I.   BACKGROUND ................................................................................................4

   A.   The Extradition Affidavit............................................................................ 5

   B.   The Extradition Process ............................................................................. 8

   C.   Salient Facts Learned After Mr. Gonzalez-Valencia's Extradition ..................... 11

II.  ARGUMENT ...............................................................................................13

   A.   Jurisdiction.............................................................................................. 13

   B.   This Court Should Review *De Novo* the Sufficiency of the Evidence of Probable
        Cause in the Extradition Package ............................................................... 13

   C.   The Government Failed to Offer Sufficient Evidence of Probable Cause That Mr.
        Gonzalez-Valencia Engaged in a Conspiracy to Distribute Cocaine and
        Methamphetamine Including and Through the Limitations Period...................... 15

        1.   Standing Alone, the BBM Exchange Does Not, as a Matter of Law,
             Support Probable Cause.................................................................... 19

        2.   The BBM Exchange is Not Evidence of Probable Cause in Support of a
             Conspiracy Tied to Prior Events. ....................................................... 26

             (i)    2007............................................................................... 27

             (ii)   2009............................................................................... 28

             (iii)  The BBM Exchange is Not Connected to the Limitations Period 29

   D.   The Government Failed to Provide any Evidence to Identify Mr. Gonzalez-
        Valencia as a Participant in the BBM Exchange. .......................................... 31

   E.   The Government is Required to Provide Sufficient Evidence of Probable Cause
        Under the Treaty. ................................................................................... 34

   F.   Uruguay Failed to Apply the Correct Legal Standard in Granting Mr. Gonzalez-
        Valencia's Extradition. ............................................................................ 37

   G.   Requested Relief ..................................................................................... 39

        1.   The Court Should Exercise its Supervisory Powers and Dismiss the
             Indictment with Prejudice. ............................................................... 40

             (i)    International Comity and Deterrence Requires Dismissal............ 44

             (ii)   The Government's Misconduct Requires Dismissal................... 46

        2.   Alternatively, Before Ruling on the Motion to Dismiss, the Court Should
             Conduct an *In Camera* Review of the Grand Jury Record ...................... 48

III. CONCLUSION...............................................................................................50

FILED UNDER SEAL

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afanasjev v. Hurlburt,*
 418 F.3d 1159 (11th Cir. 2005) ........................................................34

*Aguilar v. Texas,*
 378 U.S. 108 (1964) ..........................................................................16

*Baker v. McCollan,*
 443 U.S. 137 (1979).....................................................................34, 42

*Bank of Nova Scotia v. United States,*
 487 U.S. 250 (1988)...........................................................................41

*Barr v. U.S. Dep't of Just.,*
 819 F.2d 25 (2d Cir. 1987)..................................................................43

*Beck v. Ohio,*
 379 U.S. 89 (1964).............................................................................38

*Borchardt v. United States,*
 469 U.S. 937 (1984) ...........................................................................17

*Brady v. Maryland,*
 373 U.S. 83 (1963)..................................................................12, 49, 50

*Caltagirone v. Grant,*
 629 F.2d 739 (2d Cir. 1980)...........................................................36, 42

*In re Capitol Breach Grand Jury Investigations Within D.C.,*
 339 F.R.D. 1 (D.D.C. 2021) ...............................................................49

*Collins v. Loisel,*
 259 U.S. 309 (1922).............................................................................33

*Commonwealth v. McCarthy,*
 385 Mass. 160 (1982) ........................................................................31

*Cook v. City of Antioch,*
 No. 19-CV-01370-PJH, 2020 WL 9066046 (N.D. Cal. May 12, 2020).................................43

*Coppedge v. United States,*
 311 F.2d 128 (D.C. Cir. 1962)........................................................16, 48

JA28

**FILED UNDER SEAL**

*County of Riverside v. McLaughlin,*
 500 U.S. 44 (1991) ........................................................................42, 44

*Dorsey v. District of Columbia,*
 234 F. Supp. 3d 1 (D.D.C. 2017) ................................................................42

*Ellison v. United States,*
 238 A.3d 944 (D.C. 2020) ........................................................................21

*In re Extradition of Garcia,*
 825 F. Supp. 2d 810 (S.D. Tex. 2011) ........................................................34

*In re Extradition of Platko,*
 213 F. Supp. 2d 1229 (S.D. Cal. 2002) ..................................................16, 32

*In re Extradition of Singh,*
 124 F.R.D. 571 (D.N.J. 1987) ..................................................................34

*In re Extradition of Singh,*
 No. 01-6215 OWW, 98-5489 OWW, 2005 WL 3030819 (E.D. Cal. Nov. 9,
 2005) ..........................................................................................33

*In re Extradition of Suyanoff,*
 No. 12-MJ-462 JMA, 2012 WL 4328523 (E.D.N.Y. Sept. 20, 2012) ....................32

*In re Extradition of Trinidad,*
 754 F. Supp. 2d 1075 (N.D. Cal. 2010) ........................................................16

*Fisher v. United States,*
 328 U.S. 463 (1946) ..............................................................................40

*Fox v. Tomczak,*
 No. 04 C 7309, 2006 WL 1157466 (N.D. Ill. Apr. 26, 2006) ............................43

*Furtado v. Maloney,*
 125 F. App'x 318 (1st Cir. 2005) ................................................................31

*Petition of Geisser,*
 627 F.2d 745 (5th Cir. 1980) ....................................................................43

*Gerstein v. Pugh,*
 420 U.S. 103 (1975) ........................................................................ *passim*

*Giordenello v. United States,*
 357 U.S. 480 (1958) ..............................................................................16

*Goodwine v. Lee,*
 No. 10 CV 6019 (VB), 2016 WL 6834017 (S.D.N.Y. Nov. 17, 2016) ..................31

FILED UNDER SEAL

*In re Grand Jury Investigation*,
   No. 18-GJ-00008 (BAH) (D.D.C. Apr. 1, 2020) ..................................................48

*Hill v. Virginia*,
   379 S.E.2d 134 (Va. Ct. App. 1989) ...............................................................21

*Illinois v. Gates*,
   462 U.S. 213 (1983)................................................................................32, 33

*Jones v. United States*,
   342 F.2d 863 (D.C. Cir. 1964)........................................................................40

*Kirkland v. Preston*,
   385 F.2d 670 (D.C. Cir. 1967)........................................................................15

*Manta v. Chertoff*,
   518 F.3d 1134 (9th Cir. 2008) ......................................................................43

*\*Manuel v. City of Joliet, Illinois*,
   137 S. Ct. 911 (2017)...................................................................................20

*McFadden v. United States*,
   576 U.S. 186 (2015).............................................................................19, 27

*McNabb v. United States*,
   318 U.S. 332 (1943)....................................................................................41

*\*Meshal v. Higgenbotham*,
   47 F. Supp. 3d 115 (D.D.C. 2014), *aff'd*, 804 F.3d 417 (D.C. Cir. 2015)..................34, 35, 43

*New York v. Swamp*,
   84 N.Y.2d 725 (1995) ..................................................................................21

*North Carolina v. Turshizi*,
   625 S.E.2d 604 (N.C. Ct. App. 2006), *writ denied, review denied sub nom.*
   *North Carolina v. Ahmadi-Turshizi*, 631 S.E.2d 133 (N.C. 2006) .........................21

*North Dakota v. Turbeville*,
   895 N.W.2d 758 (N.D. 2017) .........................................................................21

*Ohio v. Jackson*,
   980 N.E.2d 1032 (Ohio 2012) .......................................................................21

*Olmstead v. United States*,
   277 U.S. 438 (1928) ....................................................................................42

*Olson v. Tyler*,
   771 F.2d 277 (7th Cir. 1985) ........................................................................42

FILED UNDER SEAL

*Reid v. Covert*,
    354 U.S. 1 (1957)..................................................................................34, 43

*In re Ribaudo*,
    No. 00 Crim. Misc. 1 Pg. (KNF), 2004 WL 213021 (S.D.N.Y. Feb. 3, 2004)........................32

*Ridings v. Dep't of Just.*,
    38 F. App'x 20, 2002 WL 1359490 (D.C. Cir. 2002).................................49

*Simmons v. Braun*,
    627 F.2d 635 (2d Cir. 1980)....................................................................33

*Sivard v. Pulaski County*,
    959 F.2d 662 (7th Cir. 1992) ..................................................................42

*United States v. Alvarez-Machain*,
    504 U.S. 655 (1992)................................................................................46

*United States v. Baggot*,
    463 U.S. 476 (1983)................................................................................48

*United States v. Brodie*,
    403 F.3d 123 (3d Cir. 2005)....................................................................27

*United States v. Buckland*,
    289 F.3d 558 (9th Cir. 2002) ..................................................................22

*United States v. Bundy*,
    968 F.3d 1019 (9th Cir. 2020) ................................................................41

*United States v. Burnett*,
    No. 12-CR-00042-BAH-3, 2013 WL 12430549 (D.D.C. Mar. 21, 2013), *aff'd*,
    827 F.3d 1108 (D.C. Cir. 2016)..............................................................32

*United States v. Childress*,
    58 F.3d 693 (D.C. Cir. 1995)..................................................................19

*United States v. Davis*,
    863 F.3d 894 (D.C. Cir. 2017)................................................................26

*United States v. Duarte*,
    No. 15-20540-CR, 2018 WL 310025 (S.D. Fla. Jan. 4, 2018), *aff'd sub nom.*
    *United States v. Mejia-Duarte*, 780 F. App'x 730 (11th Cir. 2019).......................35

*United States v. Dumes*,
    313 F.3d 372 (7th Cir. 2002) ..................................................................17

JA31

**FILED UNDER SEAL**

*United States v. Dunn*,
  No. 05-CR-127 (KMK), 2005 WL 1705303 (S.D.N.Y. July 19, 2005) ................................49

*United States v. Fernandez*,
  694 F. Supp. 858 (S.D. Fla. 1988) ........................................................................................17

*United States v. Fernandez-Morris*,
  99 F. Supp. 2d 1358 (S.D. Fla. 1999) ...................................................................................16

*United States v. Fiorito*,
  499 F.2d 106 (7th Cir. 1974) .................................................................................................18

*United States v. Garcia*,
  497 F.3d 964 (9th Cir. 2007) .................................................................................................20

*United States v. Gardner*,
  488 F.3d 700 (6th Cir. 2007) .................................................................................................27

*United States v. Gaskins*,
  690 F.3d 569 (D.C. Cir. 2012) ........................................................................19, 20, 26, 27

*United States v. Graham*,
  83 F.3d 1466 (D.C. Cir. 1996) ..............................................................................................18

*United States v. Hassan*,
  578 F.3d 108 (2d Cir. 2008) ..................................................................................................19

*United States v. Hasting*,
  461 U.S. 499 (1983) ...............................................................................................................41

*United States v. Holder*,
  990 F.2d 1327 (D.C. Cir. 1993) ............................................................................................17

*United States v. Hunte*,
  196 F.3d 687 (7th Cir. 1999) .................................................................................................26

*United States v. Isgro*,
  974 F.2d 1091 (9th Cir.1992) ................................................................................................41

*United States v. Knight*,
  No. 3:19-CR-00038-MMD-CLB, 2021 WL 134589 (D. Nev. Jan. 13, 2021) ......................31

*United States v. Laughlin*,
  226 F. Supp. 112 (D.D.C. 1964) ...........................................................................................49

*United States v. Manafort*,
  314 F. Supp. 3d 258 (D.D.C. 2018) ......................................................................................32

*United States v. Matta-Ballesteros*,
  71 F.3d 754 (9th Cir. 1995) ............................................................41

*United States v. Morgan*,
  385 F.3d 196 (2d Cir. 2004)............................................................19

*United States v. Naegele*,
  474 F.Supp.2d 9 (D.D.C.2007)........................................................49

*United States v. Navarez*,
  954 F.2d 1375 (7th Cir. 1992) ........................................................26

*United States v. Nolan*,
  651 F. Supp. 2d 784 (N.D. Ill. 2009) ..............................................16

*United States v. Osunde*,
  638 F. Supp. 171 (N.D. Cal. 1986) .................................................44

*United States v. Paul*,
  73 M.J. 274 (C.A.A.F. 2014) ..........................................................20

*United States v. Pena-Bencosme*,
  No. 05-M-1518 (SMG), 2006 WL 3290361 (E.D.N.Y. Nov. 13, 2006) ................34

*United States v. Perry*,
  353 F. Supp. 1235 (D.D.C. 1973).....................................................44

*United States v. Puentes*,
  50 F.3d 1567 (11th Cir. 1995) ..................................................35, 36

*United States v. Sells Eng'g, Inc.*,
  463 U.S. 418 (1983)........................................................................48

*United States v. Sensi*,
  664 F. Supp. 566 (D.D.C. 1987) .....................................................14

*United States v. Sensi*,
  879 F.2d 888 (D.C. Cir. 1989)..............................................13, 14, 15

*United States v. Simpson*,
  927 F.2d 1088 (9th Cir. 1991) ........................................................41

*United States v. Siriprechapong*,
  181 F.R.D. 416 (N.D. Cal. 1998)....................................................41

*United States v. Sitzmann*,
  74 F. Supp. 3d 96 (D.D.C. 2014)........................................17, 18, 49

FILED UNDER SEAL

*United States v. Smith,*
   373 F. Supp. 3d 223 (D.D.C. 2019) ................................................................16

*United States v. Townsend,*
   924 F.2d 1385 (7th Cir. 1991) ........................................................................18

*\*United States v. Trabelsi,*
   845 F.3d 1181 (D.C. Cir. 2017) ...............................................13, 14, 15, 37

*United States v. Turner,*
   319 F.3d 716 (5th Cir. 2003) ........................................................................17

*United States v. Twersky,*
   No. S2 92 CR. 1082 (SWK), 1994 WL 319367 (S.D.N.Y. June 29, 1994) ...........................49

*United States v. Vera,*
   770 F.3d 1232 (9th Cir. 2014) .......................................................................22

*United States v. Wardell,*
   591 F.3d 1279 (10th Cir. 2009) .....................................................................27

*United States v. Wexler,*
   838 F.2d 88 (3d Cir. 1988), *abrogated on other grounds by United States v.*
   *Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013) ...............................................20

*United States v. Williams,*
   784 F.3d 798 (D.C. Cir. 2015) .......................................................................17

*United States v. Wolff,*
   840 F. Supp. 322 (M.D. Pa. 1993) ................................................................49

*Wesby v. District of Columbia,*
   765 F.3d 13 (D.C. Cir. 2014) ........................................................................38

*In re Zhenly Ye Gon,*
   No. 08-596(JMF), 2010 WL 169468 (D.D.C. Jan. 8, 2010)..............................43

**Statutes**

18 U.S.C. § 2 ................................................................................................4

18 U.S.C. § 3282 .........................................................................................4

21 U.S.C. § 801 ...........................................................................................17

21 U.S.C. § 846 ...........................................................................................17

21 U.S.C. § 959(a) .......................................................................................4

JA34

FILED UNDER SEAL

21 U.S.C. § 960 ...................................................................................................4

21 U.S.C. § 963 ...................................................................................................4

1 Ohio Criminal Practice and Procedure § 6.101 (2021) .............................................22

1 Ninth Circuit Criminal Handbook § 10.04 (2021) ...................................................22

1 Virginia Criminal Law Case Finder § 6-71 (2021) ..................................................22

**Other Authorities**

ABA Crim. Just. Standards for the Prosecution Function Rule 3-1.4(a) ........................7

ABA Crim. Just Standards for the Prosecution Function Rule 3-1.4(b) .........................7

David O. Stewart, *The Price of Vengeance: U.S. Feels Heat for Ruling that
    Permits Government Kidnapping*, 78-Nov A.B.A. J. 50 (1992) ..............................46

DOJ, *Narcotic and Dangerous Drug Section (NDDS)*,
    https://www.justice.gov/criminal/ndds ..........................................................22

European Migration Network, *Ad-Hoc Query on* Expulsion *Definition of
    Manifestly Unfounded as Related to Directive 2008/115/EC* (2014),
    https://www.udi.no/globalassets/global/european-migration-network_i/ad-hoc-
    queries/ad-hoc-query-expulsion-definition-unfounded-2014.pdf............................38

Fed. R. Crim. P. 6(e)(3)(E)(i) ............................................................... *passim*

Fed. R. Crim. P. 6(e)(3)(E)(ii) ...............................................................1, 39, 49

Fed. R. Crim. P. 12 ...............................................................................................1

Fed. R. Crim. P. 12(b)(2) ......................................................................................1

John J. Privitera, *Toward a Remedy for Int'l Extradition by Fraud: The Case of
    Leonard Peltier*, 2:49 Yale L. & Pol'y Rev. 49, 57 (1983), available at
    https://openyls.law.yale.edu/bitstream/handle/20.500.13051/16936/06_2YaleL
    _PolyRev49_1983_1984_.pdf?sequence=2&isAllowed=y ....................................45

Pablo Sandonato de Leon, *Update: A Guide to Uruguay's Legal System and
    Research*, Hauser Global Law School Program at NYU School of Law, at §
    3.1 (July/Aug. 2016), https://www.nyulawglobal.org/globalex/Uruguay1.html ......36, 37

Press Release, DEA, *2,669 Pounds of Methamphetamine, Two Kilograms of
    Cocaine, One Kilogram of Tar Heroin Seized in Joint DEA Investigation* (Feb.
    28, 2020), https://www.dea.gov/press-releases/2020/02/28/2669-pounds-
    methamphetamine-two-kilograms-cocaine-one-kilogram-tar-heroin.....................2, 7, 22

JA35

**FILED UNDER SEAL**

Sen. Exec. Rep. No. 105-23 (1998), available at
https://www.govinfo.gov/content/pkg/CRPT-105erpt23/html/CRPT-
105erpt23.htm ................................................................................................................45

Vol. 7, Foreign Affs. Manual §§ 1614.1, 1615.......................................................................10

UN High Commissioner for Refugees (UNHCR), UN High Commissioner for
Refugees (UNHCR), *The Problem of Manifestly Unfounded or Abusive
Applications for Refugee Status or Asylum,* Executive Committee Conclusion
No 30 (Oct. 20, 1983), https://www.unhcr.org/en-
us/excom/exconc/3ae68c6118/problem-manifestly-unfounded-abusive-
applications-refugee-status-asylum.html ................................................................................38

FILED UNDER SEAL

NOW COMES, the Defendant, Gerardo Gonzalez-Valencia, by and through undersigned counsel, and respectfully moves this Honorable Court, through its exercise of supervisory powers, to dismiss the indictment pending against Mr. Gonzalez-Valencia pursuant to Rule 12 of the Federal Rules of Criminal Procedure and the Due Process Clause of the United States Constitution, or, in the alternative, conduct an *in camera* review of the grand jury proceedings against Mr. Gonzalez-Valencia pursuant to Rules 12(b)(2), 6(e)(3)(E)(i) and 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure, and in support thereof states as follows:

The United States Government (the "Government") knowingly or, with willful ignorance, violated the constitutional rights of Mr. Gonzalez-Valencia, a U.S. citizen, by unlawfully seizing, detaining *for years,* and extraditing him from Uruguay without probable cause.

The Government made a formal extradition request to Uruguay to extradite Mr. Gonzalez-Valencia to the United States on a charge of conspiracy to distribute cocaine and methamphetamine from 2003–2016. In support of probable cause, the Government included an affidavit from Drug Enforcement Agency ("DEA") Special Agent Kyle Mori ("Agent Mori") (the "Extradition Affidavit"). The Extradition Affidavit, however, failed to allege any relevant evidence that the conspiracy continued into the five-year statute of limitations period. The Government's *sole* offer of proof within the limitations period to support probable cause is a 2013 Blackberry Messenger exchange (the "BBM Exchange") which, on its face, is so vague that Agent Mori could not state in his affidavit that this exchange involved ***cocaine, methamphetamine, a Schedule I controlled substance, or even illegal drugs.*** Agent Mori also failed to offer any requisite proof that Mr. Gonzalez-Valencia was indeed a participant to the BBM Exchange. Further, the Extradition Affidavit is utterly devoid of evidence tying the BBM Exchange to any earlier events, so it could not support a charge of conspiracy.

1

JA37

**FILED UNDER SEAL**

The most basic tenet of a drug prosecution is that, even at the probable cause stage, the Government must offer sufficient evidence of the specific drug charged in the indictment within the limitations period.[1]  Yet, not only did the Government fail in its burden, the Department of Justice ("DOJ") trial attorney swore under oath to Uruguay that she is "particularly knowledgeable in the area of law relating to violations of the federal narcotics statutes," that "[she had] reviewed the affidavit of DEA Special Agent Kyle J. Mori and the evidence in this case," and "that the prosecution of the charge in this case is . . . not barred by the statute of limitations."[2]  She even continued that the Extradition Package demonstrated not only probable cause, but Mr. Gonzalez-Valencia's **guilt**.[3]  That is extraordinary: the Government's failure in its offering of proof is so basic that its sworn statement could only have been offered in bad faith.

The Government's conduct became more egregious after Mr. Gonzalez-Valencia was seized and detained in Uruguay.  A Uruguayan court made repeated requests to the Government for all the evidence surrounding the case and, particularly, the BBM Exchange.  For over *eight months, and while Mr. Gonzalez-Valencia was detained solely on its extradition warrant*, the Government ignored and then ultimately refused the Uruguayan court's multiple requests for additional evidence.

The prejudice to Mr. Gonzalez-Valencia was cemented when the Uruguayan court acknowledged it did not assess the evidence submitted by the Government[4]—a manifest violation of its duty to make a determination of the sufficiency of the evidence under the standard of

---

[1]  *See infra* note 56 (explaining that identification of the drug in question is a fundamental requirement of a narcotics charge, as explained in prosecution manuals and treatises published throughout the country).

[2]  Ex. A (Req. for Extradition (June 1, 2016)) at 12, 15, 17–18 ¶¶ 4, 13, 23 (*Aff. in Supp. of Req. for Extradition*, signed by Amanda N. Liskamm (May 6, 2016)).

[3]  *Id.* at 17–18 ¶ 23.

[4]  Indeed, as explained herein, the Uruguayan court could not possibly have assessed the sufficiency of the evidence because the Government's proof was insufficient as a matter of law.

2

FILED UNDER SEAL

probable cause pursuant to the United States-Uruguay Extradition Treaty (the "Treaty"), as expressly acknowledged by the Government in this case and others.   Instead, in granting extradition, the Uruguayan court succumbed to the pressure of the Government and reviewed the Government's offering of proof only to make sure the charge was "not manifestly unfounded," a standard found nowhere in American jurisprudence.

Conveniently, and only after Mr. Gonzalez-Valencia was extradited to the United States, the Government abandoned the prosecution of the charge of conspiracy to distribute methamphetamine.  It can be presumed that the Government lacked sufficient evidence that Mr. Gonzalez-Valencia conspired to distribute methamphetamine and so it dropped the charge.  This late determination reinforces the Government's indifference to Mr. Gonzalez-Valencia's due process rights through the extradition process.  Despite declaring under oath to the contrary and despite refusing to substantively respond to Uruguay, the Government apparently assessed fundamental concerns relating to the strength of its evidence only after Mr. Gonzalez-Valencia had been extradited to the United States.

Respectfully, for the aforementioned reasons that are further detailed herein, this Court should condemn the egregious conduct by the Government in violation of Mr. Gonzalez-Valencia's constitutional rights.  The appropriate redress will also help restore the delicate balance of international comity and the integrity of the Government in prospective extradition requests with Uruguay and other foreign sovereigns.   Dismissal of the Indictment is warranted.[5] Alternatively, if the Court wishes to review the entire record before ruling on this Motion, this Court should conduct an evidentiary hearing to determine the true extent of the Government's

---

[5]  At a minimum and as discussed herein, we respectfully request this Court to release Mr. Gonzalez-Valencia from his illegal detention, waive any state or federal detainers as against Mr. Gonzalez-Valencia while he seeks renewal of his United States passport, order the Department of State to renew Mr. Gonzalez-Valencia's passport and allow him safe passage from the United States.

FILED UNDER SEAL

misconduct and to perform an *in camera* review of the evidentiary proof within the limitations period submitted to the grand jury to determine whether the lack of competent evidence within the limitations period also infected the grand jury process.

## I.   BACKGROUND

On April 19, 2016, the Government obtained an indictment charging Mr. Gonzalez-Valencia with conspiracy to distribute cocaine and methamphetamine, in violation of 21 U.S.C. §§ 959(a), 960, and 963, and 18 U.S.C. § 2.[6]  A five-year statute of limitations applies to these charges pursuant to 18 U.S.C. § 3282.

On June 1, 2016, the Government sought Mr. Gonzalez-Valencia's extradition from Uruguay.[7]  The documents that the Government sent to Uruguay in support of extradition (collectively, the "Extradition Package") consisted of: a Diplomatic Note from the Embassy of the United States,[8] certifications by the United States Department of State and the DOJ,[9] and an affidavit of DOJ Trial Attorney Amanda Liskamm (the "Liskamm Affidavit").[10]  Appended to the Liskamm Affidavit were four exhibits: (a) the relevant United States statutes,[11] (b) the Indictment,[12] (c) the arrest warrant,[13] (d) the Extradition Affidavit,[14] and (e) identifying information, including Mr. Gonzalez-Valencia's United States birth certificate, fingerprints, and Mexican passport.[15]

---

[6] Dkt. 1 (Indictment).

[7] Ex. A.

[8] *Id.* at 2–8 (Diplomatic Note No. 125).

[9] *Id.* at 9–11.

[10] *Id.* at 12–18 (*Aff. in Supp. of Req. for Extradition*, signed by Amanda N. Liskamm (May 6, 2016)).

[11] *Id.* at 20–30 (annexed to the Liskamm Affidavit as Exhibit A).

[12] *Id.* at 31–35 (annexed to the Liskamm Affidavit as Exhibit B).

[13] *Id.* at 36–37 (annexed to the Liskamm Affidavit as Exhibit C).

[14] *Id.* at 38–45 (*Aff. in Supp. of Req. for Extradition*, signed by Kyle J. Mori (May 5, 2016)) (annexed to the Liskamm Affidavit as Exhibit D).

[15] *Id.* at 46–53 (annexed to the Liskamm Affidavit as Exhibits E-1–E-3).

FILED UNDER SEAL

A.     **The Extradition Affidavit**

The Extradition Affidavit would not support a finding of probable cause in any United States federal or state court.  It suffers from several fatal defects in its offering of proof, most notably the absence of evidence that Mr. Gonzalez-Valencia (i) committed any act in furtherance of the alleged conspiracy to distribute cocaine and methamphetamine within the limitations period; (ii) entered into an agreement with a unified purpose to conspire to distribute cocaine and methamphetamine during the limitations period; and (iii) was a participant in the BBM Exchange that served as the sole evidence within the limitations period.

First, the Extradition Affidavit purports to summarize the BBM Exchange, a series of Blackberry messages between two unidentified individuals where undefined "units" of an unknown drug were discussed.  Notably, the native BBM Exchange is not included with the Extradition Affidavit, presumably because any review of the messages would further highlight the Extradition Affidavit's fatal defects.[16]  ***Critically, while Agent Mori swore before a United States Magistrate Judge that the discussion concerned drugs, he did not state that this conversation concerned cocaine, methamphetamine, a controlled substance, or any other type of illegal drug***:

> One [*sic*] June 26, 2013, during a lawfully-intercepted text messages [*sic*], Gonzalez-Valencia and a co-conspirator discussed whether a drug trafficking transaction was complete.  Gonzalez-Valencia and his co-conspirator discussed 85 units of drugs which belonged to the co-conspirator as well as 15 more units that Gonzalez-Valencia was saving.  Gonzalez-Valencia and his co-conspirator further discussed a drug sample.  Based on my training and experience, and knowledge of this investigation, drug traffickers usually request a drug sample before agreeing to a large drug purchase.  Gonzalez-Valencia also discussed additional drug amounts which were being prepared for shipment "up there," which I believe is a reference to the United States, the intended shipment point for those drugs.[17]

Second, the Extradition Affidavit does not allege any facts that evidence an agreement with

---

[16]  The native BBM Exchange and Government-produced translation are attached hereto as Exhibit B for the Court's review and consideration of this Motion.

[17]  Ex. A at 43–44 ¶ 19.

FILED UNDER SEAL

a unified purpose by Mr. Gonzalez-Valencia and others to conspire to distribute cocaine and methamphetamine during the limitations period.  The Extradition Affidavit declares without any factual predicate that Mr. Gonzalez-Valencia is the leader of a Mexican-based drug trafficking organization, without naming others, and then details conduct purportedly involving Mr. Gonzalez-Valencia in 2007 and 2009 and the BBM Exchange in 2013.  The 2007 and 2009 events seem to have a relationship with one another, but there is no proof that these events are, in any way, connected to the purported BBM Exchange in 2013.  In fact, the evidence as offered suggests that no relationship exists between the BBM Exchange and other events.  The only alleged event in 2007 was self-contained and ended with the interdiction of the vessel allegedly carrying the drugs in question, rendering it impossible for the conduct six years later to be linked to the same drugs.  The allegations in 2009 relate to both cocaine and precursor chemicals to make methamphetamine.  By comparison, the allegations during the limitations period do not specify any particular drug.  The Extradition Affidavit's failure to identify the drugs in question in the 2013 BBM Exchange works against the Government as the discussion could have just as easily involved other types of drugs such as heroin, fentanyl, or marijuana.[18]  The Extradition Affidavit also does not tie the conduct discussed in the BBM Exchange to the same drug routes discussed in earlier events, the same people or their known associates, or even the same type of drug.[19]

Third, Paragraph 19 of the Extradition Affidavit also failed to present any evidence that Mr. Gonzalez-Valencia participated in the BBM Exchange.  In its native form, the BBM Exchange

---

[18] *See infra* note 68 for discussion of other drugs the DEA has publicly attributed to Mexico-based drug trafficking organizations ("DTOs").

[19] Agent Mori vaguely asserts that Mr. Gonzalez-Valencia "discussed additional drug amounts which were being prepared for shipment 'up there.'"  Ex. A at 43–44 ¶ 19.  Without any factual basis, Agent Mori concluded that "up there" referred to the United States to the exclusion of all other possibilities, such as Canada or Europe.  *Id.*  Agent Mori also did not identify who stated to whom that the "drug amounts" were being prepared for shipment "up there," yet used this to purportedly establish probable cause as to the charges against Mr. Gonzalez-Valencia.

**FILED UNDER SEAL**

merely contains a series of letters and numbers and arbitrary screen names that identify the specific Blackberry Messenger devices.  Instead of explaining the evidentiary basis tying Mr. Gonzalez-Valencia to one of the Blackberry Messenger devices, Agent Mori simply asserted "Gonzalez-Valencia" engaged in this exchange.[20]  The native format of the BBM Exchange never identifies Mr. Gonzalez-Valencia or provides any factual predicate to tie him to this exchange, and the law does not permit such a conclusory assertion without a proper factual predicate.[21]

The Extradition Affidavit was also sworn to in the wrong court and captioned with the incorrect court and case.  The Extradition Affidavit purports to be executed in a case before the Honorable Andrew J. Wistrich, United States Magistrate Judge for the Central District of California, captioned *United States v. Gerardo Gonzalez-Valencia*, Criminal No. 1:16-CR-00065.  Yet, no such case exists in that court or before Judge Wistrich.  Thus, the Extradition Affidavit gives the appearance that it is sanctioned by the court before which Mr. Gonzalez-Valencia would appear, but that is not so.

In her accompanying affidavit, DOJ Trial Attorney Amanda Liskamm swore that she is "particularly knowledgeable in the area of law relating to violations of the federal narcotics statutes," that "[she had] reviewed the affidavit of DEA Special Agent Kyle J. Mori and the evidence in this case," and that "the prosecution of the charge in this case . . . is not barred by the statute of limitations."[22]  She then continued that the Extradition Package demonstrated not only probable cause, but Mr. Gonzalez-Valencia's ***guilt***.[23]

---

[20] *Id.*

[21] *See infra* Section II.D for a discussion of why conclusory assertions are insufficient to establish probable cause.

[22] Ex. A at 12, 15, 17–18 ¶¶ 4, 13, 23.

[23] *Id.* at 17–18 ¶ 23.  Notably, as a federal prosecutor, DOJ Attorney Liskamm has a "heightened duty of candor to the courts and in fulfilling other professional obligations."  ABA Crim. Just. Standards for the Prosecution Function Rule 3-1.4(a).  Moreover, "[t]he prosecutor should not make a statement of fact or law, or offer evidence, that the prosecutor does not reasonably believe to be true, to a court, lawyer, witness, or third party."  *Id.* Rule 3-1.4(b).

FILED UNDER SEAL

### B.      The Extradition Process

Uruguay seized and detained Mr. Gonzalez-Valencia for nearly two years—from June 27, 2018 until May 14, 2020—solely at the request of the Government for extradition to the United States.[24]  For *eight months* during this period,[25] and after its initial ruling, the Uruguayan court of first instance repeatedly asked for additional information from the Government in support of its Extradition Package, yet the Uruguayan court's requests were ignored and ultimately refused.[26] These requests asked for all evidence in the Government's possession relating to the crime for which the Government requested extradition and specifically asked for a copy of the BBM Exchange referenced in the Extradition Affidavit.[27]

On or around November 20, 2018, the Uruguayan court[28] hand-delivered its first request to the Embassy of the United States in Montevideo, seeking:

> ***everything related to the evidence in your possession for the alleged crime for which the extradition of Gerardo González Valencia was requested, including the text of the alleged message linking him to the offense of drug trafficking.[29]***

Despite knowing that Mr. Gonzalez-Valencia had been seized and was being detained by Uruguay at the time, the Government ***did not respond***.

On or around February 22, 2019, the Uruguayan court hand-delivered a second request for more evidence to the United States Embassy in Montevideo.[30]  The second request reiterated its

---

24  Ex. C (Oficio No 334/2020 (July 28, 2020)) (translated to English).
25  From November 20, 2018, through July 16, 2019.
26  Ex. D (Oficio No. 950/2018 (Nov. 20, 2018)) (translated to English); Ex. E (Oficio No 75/2019 (Feb. 22, 2019)) (translated to English).  Both requests were produced by the Government to Mr. Gonzalez-Valencia as part of his extradition file during discovery in the present case.
27  Exs. D, E.
28  The Uruguayan court making the request was the Criminal Court of First Instance Organized Crime 1st Term.
29  Ex. D (emphasis added).
30  Ex. E.

**FILED UNDER SEAL**

prior request, highlighted the Government's failure to respond to its previous request for three months and, in bold capitalized letters**,** emphatically stated the request was ***urgent***:

> [B]y ruling No. 763 dated 11/09/2018, everything related to the evidence in your possession for the alleged crime for which the extradition of Gerardo González Valencia was requested, including the text of the alleged message linking him to the offense of drug trafficking. . . .
> **THIS SERVICE IS URGENT** THIS IS A RENOTIFICATION OF THE OFFICIAL LETTER NO. 950/2018.[31]

The Government did not respond for an additional *five months*, during which Mr. Gonzalez-Valencia was still being detained pending extradition to the United States.  Finally, on July 16, 2019, the Government notified Uruguay that (i) the Government had "attached ***all evidentiary documentation to***" its extradition request provided to the government of Uruguay on June 1, 2016 "***that establishes probable cause***," and (ii) "***the [June 1, 2016] extradition request includes all evidence supporting the narcotics charge***."[32]  The Government made this statement despite possessing the specific BBM Exchange requested by the Uruguayan court (*i.e.*, "the text of the alleged message linking him to the offense of drug trafficking").

On March 2, 2022, counsel for Mr. Gonzalez-Valencia wrote to the DOJ requesting additional detail and clarity concerning the Government's response to the requests from the Uruguayan court.[33]  Incredibly, on March 7, 2022, the DOJ responded that:

> The Diplomatic Note was not written by the Department of Justice.  The Department of Justice did not adopt the Diplomatic Note as its own statement.  Nor does the Diplomatic Note purport to be a statement of the Department of Justice.[34]

---

[31] *Id.* (emphasis in original).

[32] Ex. F (Diplomatic Note No. 273 from the U.S. Embassy to the Ministry of Foreign Affairs of Uruguay (July 16, 2019)) at 2–3 (emphasis added).  Importantly, Mr. Gonzalez-Valencia must rely on the evidence produced to him by the Government, yet the Government's extradition file as produced to Mr. Gonzalez-Valencia was incomplete.  The record indicates that the English version of Diplomatic Note No. 273 was the version sent to Uruguay by the Government.  However, the Spanish translation was the only version produced to counsel by the Government as part of Mr. Gonzalez-Valencia's extradition file.  Counsel obtained the original English version from Mr. Gonzalez-Valencia's Uruguayan counsel.  For completeness, both versions are included in Exhibit F.

[33] Ex. G (Letter from Stephen A. Best to Kaitlin Sahni, Kate Nassef & Kirk Handrich (Mar. 2, 2022)).

[34] Ex. H (Letter from Arthur G. Wyatt to Stephen A. Best & Lilly Ann Sanchez (Mar. 7, 2022)).

FILED UNDER SEAL

In other words, the DOJ, i.e., the Government agency purported to have particular knowledge of the facts and the criminal law guiding this matter, conceded it did not know of or participate in any way in responding to Uruguay's requests for additional evidence.  The only reasonable inference to be drawn from the DOJ's response is that, in apparent violation of its own guidance,[35] the U.S. Embassy in Montevideo did not share the Uruguayan court's repeated requests with the DOJ.[36] The facts before this Court are that apparently an unidentified person(s) from the wrong governmental agency ignored the Uruguayan court's repeated requests while Mr. Gonzalez-Valencia was illegally detained.  Worse, this unidentified person, without consulting the DOJ, unilaterally refused the Uruguayan court's request and, in the process, made representations to Uruguay that the offering of proof was sufficient to establish probable cause.

The Uruguayan court of first instance ordered the extradition of Mr. Gonzalez-Valencia because it determined that the Government's request was not "clearly unfounded."[37]   The Uruguayan court conceded that it did not assess any of the evidence provided by the Government.[38] Despite the Government's refusal to provide any additional evidence to support the charge as requested, Uruguay's highest judicial body deferred to the Government and entered a final judgment in favor of extradition on February 11, 2020, again without analyzing the sufficiency of the evidence to support a probable cause determination.[39]   On May 14, 2020, Mr. Gonzalez-Valencia was extradited to the United States.

---

[35] *See* Vol. 7, Foreign Affs. Manual §§ 1614.1, 1615.

[36] Ex. H.

[37] Ex. I (Sentencia Nro. 13/2017 (Aug. 28, 2017)) at 00054535.

[38] *Id.* at 00054534 ("It is then not appropriate to assess the evidence produced by the requesting State, but rather only to assess it to determine that the extradition request and the arrest warrant are not manifestly unfounded.") (translated to English).

[39] Ex. J (Cedulón Nro 203/2020, IUE 474-76/2016 (Feb. 11, 2020)) (translated to English).

FILED UNDER SEAL

### C.    Salient Facts Learned After Mr. Gonzalez-Valencia's Extradition

During a call on November 12, 2020, the Government informed Mr. Gonzalez-Valencia's counsel, who took detailed and contemporaneous notes of the conversation, that it did not yet have any witnesses that would provide testimony of events occurring within five years of the Indictment.[40]  Thus, the evidence in the Extradition Package regarding Mr. Gonzalez-Valencia's alleged criminal conduct within five years of the Indictment consisted solely of the BBM Exchange.[41]  However, during a call on January 22, 2021, the Government informed counsel that an additional witness had come to its attention who would testify as to the alleged conspiracy during the 2013–2015 time frame.[42]  The Government stated that it wanted to raise this additional witness to counsel's attention because they are relevant to the statute of limitations issue that counsel had previously brought to the Government's attention.  The attached declaration of Tiffany Lietz details the almost verbatim and contemporaneous notes of the meeting with the Government.[43]

In addition, on November 19, 2021, the Government declared before this Court its intent to abandon the charge of conspiracy to distribute methamphetamine.[44]  On January 11, 2022, when pressed by the Court, the Government stated on the record that it did not intend to pursue the charge.[45]

Earlier this week, on April 12, 2022, over six months since Mr. Gonzalez-Valencia moved

---

[40] *See* Ex. K (Decl. of T. Lietz (Apr. 15, 2022) at ¶ 5).

[41] While the 2013 wiretap was provided in full to counsel as part of the Government's discovery, the only evidence in the Extradition Affidavit from the wiretap during the limitations period is the BBM Exchange.

[42] Ex. K at ¶ 8.

[43] *Id.* at ¶¶ 6, 9.

[44] Dkt. 83 (Tr. of Mot. Hr'g) at 11:18–24.

[45] Dkt. 88 (Tr. of Mot. Hr'g) at 20:1–6.

**FILED UNDER SEAL**

for timely disclosure of *Brady* material,[46] and after the Government represented that it had turned over all *Brady* material,[47] the Government sent a letter to undersigned counsel stating in part:

> In late October 2015, the Government obtained an assessment, based on information from sources unknown to the Government, that the Los Cuinis drug trafficking organization, made up of the Gonzalez Valencia siblings . . . **was not directly involved in the production, movement, or distribution of drugs.[48]**

This assessment not only directly contradicts Agent Mori's Extradition Affidavit in all material respects, it is foundational proof that, in 2016, at the time the Government requested extradition, it had no relevant evidence of Mr. Gonzalez-Valencia's participation in a conspiracy to distribute cocaine or methamphetamine within the limitations period.

Despite possessing this critical exculpatory information since October 2015, the Government did not furnish it to Uruguay as part of the Extradition Package or upon Uruguay's specific requests for this information.  This exculpatory information further calls into question the veracity of DOJ Attorney Liskamm's sworn statement and the Government's later statement  to Uruguay that, **"the [June 1, 2016] extradition request includes all evidence supporting the narcotics charge."[49]**  Finally, this exculpatory information further supports Mr. Gonzalez-Valencia's position that the Government had no competent evidence that Mr. Gonzalez-Valencia engaged in a conspiracy to distribute cocaine or methamphetamine within the limitations period to present to the grand jury.

---

[46] On October 4, 2021, Mr. Gonzalez-Valencia filed his Motion for Timely Disclosure of *Brady/Giglio* Materials and Early Disclosure of *Jencks* Material. Dkt. 32.

[47] On November 9, 2021, counsel for Mr. Gonzalez-Valencia sent a formal demand letter to the Government for *Brady* material.  Ex. L (Letter from Stephen A. Best to Brett Reynolds, Kaitlin Sahni & Kate Naseef (Nov. 9, 2021)). On November 11, 2021, in a response to this Court's November 9, 2021 Minute Order, the Government stated it "is currently in compliance with [its disclosure requirements under *Brady*] because it has turned over all such information to the defense that is currently known to and in the possession of the prosecution team." Dkt. 70.

[48] Ex. M (Letter from Arthur G. Wyatt to Stephen A. Best & Lilly Ann Sanchez (Apr. 12, 2022)) (emphasis added).

[49] Ex. F at 2–3 (emphasis added).

FILED UNDER SEAL

II.    **ARGUMENT**

   A.    **Jurisdiction**

As a preliminary matter, this Court has jurisdiction to hear this Motion.  Mr. Gonzalez-Valencia was indicted in this District.  The Government's conduct at issue occurred in this District. Mr. Gonzalez-Valencia's constitutional rights were abridged by foreign agents working on behalf of Government agents from this District.   Accordingly, the Court has jurisdiction to review Uruguay's extradition decision for purposes of this Motion.  *United States v. Sensi*, 879 F.2d 888, 896 (D.C. Cir. 1989); *see also United States v. Trabelsi*, 845 F.3d 1181, 1186 (D.C. Cir. 2017).

   B.    **This Court Should Review *De Novo* the Sufficiency of the Evidence of Probable Cause in the Extradition Package**

U.S. courts have the authority and responsibility to review foreign extradition decisions to ensure their compliance with all applicable requirements, including sufficiency of the evidence to establish probable cause.  *Sensi,* 879 F.2d at 896 ("Our final task is to determine whether the evidence submitted with the United States' request for extradition sufficiently established the facts underlying Sensi's prosecution."); *see also Trabelsi*, 845 F.3d at 1186 ("We hold that we have jurisdiction to review [a foreign country's extradition] decision.").

D.C. Circuit cases provide two different standards of review for addressing whether a foreign court has properly granted extradition.  In challenges to the *sufficiency of the evidence* to support a request for extradition, the D.C. Circuit applies a *de novo* review.  By contrast, in challenges to *legal determinations* by foreign courts in granting extraditions, the D.C. Circuit applies a standard whereby, absent evidence to the contrary, there is a rebuttable presumption that the extraditing nation has complied with its obligations under the treaty and that the extradition is lawful.  Here, Mr. Gonzalez-Valencia's extradition does not survive either standard of review; the Government presented no evidence to support a probable cause determination for extradition and

**FILED UNDER SEAL**

the uncontroverted Uruguayan court record shows that the foreign court applied the wrong legal standard in determining to grant extradition, overcoming any presumption that Mr. Gonzalez-Valencia's extradition was lawful.

In *Sensi*, the Circuit Court addressed whether a foreign court had insufficient evidence to extradite for the charges in the indictment. 879 F.2d at 896. The Circuit Court held that it was necessary to independently determine whether the evidence submitted with the extradition request was sufficient to support extradition under a treaty with the United Kingdom. *Id.* (analyzing *de novo* "whether the evidence submitted with the United States' request for extradition sufficiently established the facts underlying [the defendant's] prosecution"). Although the Circuit Court agreed with the District Court that the evidence there was sufficient, importantly, it recognized that the District Court correctly applied a *de novo* review to preserve the defendant's constitutional rights when the District Court stated:

> Although the Treaty between the United States and The United Kingdom is a contract between the governments of those nations, it is also the supreme law of this land by virtue of the Constitution (Article VI). For the United States "government to detain [a] person for trial on any [non-extradited] charge would be not only an infraction of the contract between the parties to the treaty, but also a violation of the supreme law of this land in a matter directly involving his personal rights." *Ex Parte Hibbs*, 26 F. 431 (D. Or. 1886). Therefore, the Court concludes it is sound to allow defendant to invoke the doctrine in challenging the manner of his extradition. *See id.* at 430–31, and cases cited therein.

*United States v. Sensi*, 664 F. Supp. 566, 570–71 (D.D.C. 1987) (alteration in original) (basing sufficiency of the indictment upon "*[t]he Court's own analysis of the evidence*") (emphasis added).

In *Trabelsi*, the D.C. Circuit Court of Appeals applied a standard of deference to a foreign court's *legal determinations* when confronted with whether an extradition would violate an extradition treaty with Belgium by granting extradition where the defendant claimed he had been prosecuted and adjudicated for the same offenses in Belgium. 845 F.3d at 1185–86. The Circuit

14

JA50

FILED UNDER SEAL

Court stated that while courts "presume, absent evidence to the contrary, that the extraditing nation has complied with its obligations under the treaty and that the extradition is lawful," that presumption is rebuttable.  *Id.* at 1186.  One can overcome the presumption by showing (1) "misconduct on the part of the United States in procuring an extradition," (2) "the absence of review of the extradition request by the requested party," or (3) "that the requested state or party did not apply the correct legal standard adopted in the Treaty."  *Id.* at 1189.

Given the clear language of *Sensi*, as well as the paramount importance of Mr. Gonzalez-Valencia's constitutional rights surrounding his pre-trial detention and extradition, *de novo* review of the sufficiency of the evidence for a probable cause determination is appropriate.[50] Alternatively, under *Trabelsi*, the record is unequivocal that the Uruguayan court did not comply with its obligations under the Treaty insofar as it did not apply the correct legal standard adopted by the Treaty with respect to probable cause and the sufficiency of the evidence, and that the Government engaged in misconduct in procuring Mr. Gonzalez-Valencia's extradition.

C. **The Government Failed to Offer Sufficient Evidence of Probable Cause That Mr. Gonzalez-Valencia Engaged in a Conspiracy to Distribute Cocaine and Methamphetamine Including and Through the Limitations Period.**

As a matter of law, the facts articulated in the Extradition Affidavit do not support a probable cause determination.  The only evidence adduced within the limitations period, *i.e.*, Agent Mori's description of the BBM Exchange (rather than the BBM Exchange itself), is not sufficient

---

[50] *See Gerstein v. Pugh*, 420 U.S. 103, 111–12 (1975) (stating that "[b]oth the standards and procedures for arrest and detention have been derived from the Fourth Amendment and its common-law antecedents" and "[t]o implement the Fourth Amendment's protection against unfounded invasions of liberty and privacy, the Court has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible"); *see also Kirkland v. Preston*, 385 F.2d 670, 676 (D.C. Cir. 1967) (noting that "[t]he law appreciates the hardship which extradition can involve: not only the suspension of one's liberty, but his deportation from the state in which he lives into another jurisdiction which may be hundreds of miles from his home. The law accordingly surrounds the accused with considerable procedural protection to stave off wrongful rendition") (footnotes omitted).

FILED UNDER SEAL

evidence to sustain the charge.  *Cf. Coppedge v. United States*, 311 F.2d 128, 132 (D.C. Cir. 1962)

(finding there must be at least "some competent evidence to sustain the charge").

 To determine probable cause, a court must review the evidence presented and make an

independent determination that the accused committed the crime alleged.  As stated by the

Supreme Court:

> The Commissioner must judge for himself the persuasiveness of the *facts* relied
> upon by a complaining officer to show probable cause.  He should not accept
> without question the complainant's mere conclusion that the person whose arrest is
> sought has committed a crime.

*Giordenello v. United States*, 357 U.S. 480, 486 (1958) (emphasis added); *see, e.g.*, *United States*

*v. Nolan*, 651 F. Supp. 2d 784, 810 (N.D. Ill. 2009) ("This Court must make an independent

assessment of the evidence offered in support of an extradition request and determine if it is

sufficient to sustain a finding of probable cause."); *In re Extradition of Platko*, 213 F. Supp. 2d

1229, 1239 (S.D. Cal. 2002) ("To make the probable cause determination, a judge is to review the

evidence presented and make an independent determination that the accused committed the crimes

alleged." (internal quotations and citation omitted)).  This independent review allows a court to

perform a "neutral and detached function and not serve merely as a rubber stamp."  *Aguilar v.*

*Texas*, 378 U.S. 108, 111 (1964) (internal quotations omitted); *In re Extradition of Trinidad*, 754

F. Supp. 2d 1075, 1082 (N.D. Cal. 2010); *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358,

1365 (S.D. Fla. 1999).

 The evidence is sufficient and probable cause is established if a person of ordinary

prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the

accused.  *Gerstein*, 420 U.S. at 111; *United States v. Smith*, 373 F. Supp. 3d 223, 242 (D.D.C.

2019) ("Probable cause to arrest exists only 'if a reasonable and prudent officer would conclude

from the totality of the circumstances that a crime has been or is being committed.'") (quoting

*United States v. Holder*, 990 F.2d 1327, 1328 (D.C. Cir. 1993)).  This is the standard against which the independent determination of probable cause must be made.

For a drug conspiracy charge, the Government must offer sufficient proof that: (1) two or more persons, directly or indirectly, reached an agreement to violate the Controlled Substances Act, 21 U.S.C. § 801, et *seq.*; (2) those persons knew of the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully.  *See United States v. Williams*, 784 F.3d 798, 801 (D.C. Cir. 2015); *United States v. Turner*, 319 F.3d 716, 721 (5th Cir. 2003); *United States v. Dumes*, 313 F.3d 372, 382 (7th Cir. 2002).

The sufficiency of the evidence determination begins with an analysis of the purported conduct within the limitations period.  "In a prosecution for conspiracy under 21 U.S.C. § 846, the government must prove that the conspiracy continued into the five-year statute of limitations period."  *United States v. Sitzmann*, 74 F. Supp. 3d 96, 107 (D.D.C. 2014).  Specifically, the Government must allege that Mr. Gonzalez-Valencia knowingly and willingly entered into an agreement with others to distribute cocaine and methamphetamine into the United States and that agreement continued into the limitations period.  *Id.*; *see also United States v. Fernandez*, 694 F. Supp. 858, 862 (S.D. Fla. 1988) ("The time period requirement is met where the government proves that the conspiracy was in existence within five years of the date of the indictment.").

Here, the Government relies on a continuing conspiracy theory and, as such, it must show that the conduct in question was part and parcel to a continuing conspiracy, rather than isolated events.  *Borchardt v. United States*, 469 U.S. 937, 940 n.1 (1984) (Brennan, J., dissenting from denial of certiorari) (finding "the Government's proof on the cocaine charge rested on entirely different overt acts from [other] charges," so the offenses did not qualify as "segments of an overarching continuing conspiracy to import drugs").  In other words, the Government's evidence

**FILED UNDER SEAL**

must show "that the conspiracy that existed during the statute of limitations period in this case was the same one that had existed all along." *Sitzmann*, 74 F. Supp. 3d at 110. "In determining whether a single conspiracy exist[s], as opposed to separate unrelated activities or multiple conspiracies, [courts] look for several factors, including whether participants shared a common goal . . . ; interdependence between the alleged participants in the conspiracy; and, though less significant, overlap among alleged participants." *United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996); *see also Sitzmann*, 74 F. Supp 3d at 110 (finding that the government's evidence that "virtually all of [the defendant's] activities, including those that occurred during the limitations period, involved the same core group of people and the same goal" was sufficient to establish the conspiracy continued into the statute of limitations period). By contrast, courts have held that isolated incidents related to a narcotics transaction are not necessarily related to a larger drug conspiracy. *See e.g.*, *United States v. Townsend*, 924 F.2d 1385, 1391, 1395–1402 (7th Cir. 1991) (holding that there were three separate conspiracies between three different suppliers and a common purchaser); *United States v. Fiorito*, 499 F.2d 106, 109 (7th Cir. 1974) (finding that even if an isolated phone call referred to a narcotics transaction between defendant and a co-conspirator it was insufficient to establish that the defendant was part of a larger narcotics conspiracy).

Accordingly, the Government must offer sufficient proof for probable cause that Mr. Gonzalez-Valencia knowingly and with criminal intent reached an agreement with one or more persons, directly or indirectly, to distribute cocaine and methamphetamine and that the alleged conduct in 2013 (i) evidences this agreement on its own; or (ii) is connected to the described events in 2007 or 2009.

"[C]onspiracy is a 'specific intent' crime" and the Government must establish "proof of specific intent to further the conspiracy's objective," in this case, to distribute cocaine and

methamphetamine. *United States v. Childress*, 58 F.3d 693, 707–08 (D.C. Cir. 1995); *United States v. Gaskins*, 690 F.3d 569, 572 (D.C. Cir. 2012) ("To convict a defendant of conspiracy to distribute a controlled substance, the government must prove, beyond a reasonable doubt, that the defendant knowingly entered into the conspiracy with the specific intent to further the unlawful objective of drug distribution."); *see also McFadden v. United States*, 576 U.S. 186, 194 (2015) (holding that, to prove the knowledge element under the Controlled Substances Act, the government must establish that either "a defendant knew that the substance with which he was dealing is some controlled substance" or "the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue"). Thus, "[i]n a conspiracy case, 'proof that the defendant knew that *some* crime would be committed is not enough.'" *United States v. Hassan*, 578 F.3d 108, 130 (2d Cir. 2008) (quoting *United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004)) (emphasis in original).

Whether the Government is alleging that the BBM Exchange is either stand-alone evidence within the limitations period or a continuing course of conduct connected to earlier events, both theories fail because the Government did not offer any proof that the conduct within the limitations period involved conduct in furtherance of a conspiracy to knowingly distribute cocaine and methamphetamine.

        **1.**      **Standing Alone, the BBM Exchange Does Not, as a Matter of Law, Support Probable Cause.**

As sworn before a United States Magistrate Judge, Agent Mori's sole description of conduct within the limitations period is contained in Paragraph 19 of the Extradition Affidavit. As discussed above in Section I.A, the conclusory statements offered by Agent Mori include an allegation of Mr. Gonzalez-Valencia discussing with a purported and unidentified "co-conspirator"

**FILED UNDER SEAL**

via Blackberry Messenger the movement of unidentified drugs.[51]  *Critically, while Agent Mori averred that the discussion concerned drugs, he did not state that the drug units being discussed in this conversation were cocaine, methamphetamine, a controlled substance, or any other type of illegal drug.*

Where there is no evidence of illegal drugs, no probable cause exists for pretrial detention. *See Manuel v. City of Joliet, Illinois*, 137 S. Ct. 911, 915 (2017).  The Supreme Court, in *Manuel*, considered whether the defendant could bring a claim against the Government for violating his civil rights by (i) arresting him for no reason and (ii) detaining him for 48 days "based entirely on made-up evidence." *Id.* at 916.  The defendant was arrested "without probable cause, based solely on his possession of pills that had field tested negative for an illegal substance." *Id.* at 919.  The Court found that "because Manuel's subsequent weeks in custody were *also* unsupported by probable cause" (where the laboratory tests returned negative), his detention was "*also* constitutionally unreasonable." *Id.* (emphasis in original).

Courts have repeatedly held that the Government must offer sufficient evidence that identifies the specific drugs in question, *e.g.*, cocaine or methamphetamine, to support probable cause or guilt. *See Gaskins*, 690 F.3d at 578 (observing that evidence of a sale of a quarter ounce of crack cocaine was irrelevant for proving any of the elements of the charged offense in that the cocaine sale was unrelated to the charged conspiracy to distribute heroin); *United States v. Garcia*, 497 F.3d 964, 967 (9th Cir. 2007) (vacating conviction because evidence of cocaine sales did not establish conspiracy to distribute methamphetamine, the specific drug charged); *United States v. Paul*, 73 M.J. 274, 277 (C.A.A.F. 2014) (finding proof to support conviction was insufficient where evidence showed that the defendant used ecstasy, not MDMA as charged); *United States v.*

---

[51]  Ex. A at 43–44 ¶ 19.

FILED UNDER SEAL

*Wexler*, 838 F.2d 88, 92 (3d Cir. 1988) (finding that evidence failed to "support a holding that the government met its burden to prove beyond a reasonable doubt that [the defendant] knew this was a conspiracy to transport hashish"), *abrogated on other grounds by United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013); *Hill v. Virginia*, 379 S.E.2d 134, 136 (Va. Ct. App. 1989) (holding that the "nature of the illegal substance" must be demonstrated either by direct or circumstantial evidence); *North Carolina v. Turshizi*, 625 S.E.2d 604, 606 (N.C. Ct. App. 2006) (holding that an indictment was "fatally flawed" because it failed to include the full name of a controlled substance as provided in Controlled Substances Act), *writ denied, review denied sub nom. North Carolina v. Ahmadi-Turshizi*, 631 S.E.2d 133 (N.C. 2006); *Ohio v. Jackson*, 980 N.E.2d 1032, 1033 (Ohio 2012) (holding "an indictment charging a defendant with trafficking in drugs" must, at a minimum, "identify[ ] the schedule in which a drug appears"); *New York v. Swamp*, 84 N.Y.2d 725, 732–33, 778 (1995) (requiring *prima facie* evidence of the presence of a particular controlled substance to support an indictment).

Evidence of a specific drug can take myriad forms—a physical description,[52] a field test,[53] a lab test,[54] or some other competent testimony[55]—but there must be evidence.  Here, no physical description of the drug units is provided.  No counterparty to the conversation has ever stated that the discussion was about cocaine or methamphetamine and no witness has provided a statement that the drug units in question were cocaine or methamphetamine.

---

[52] *Ellison v. United States*, 238 A.3d 944, 951–52 (D.C. 2020).

[53] *Swamp*, 84 N.Y.2d at 731.

[54] *Id.* at 730–31.

[55] *North Dakota v. Turbeville*, 895 N.W.2d 758, 763 (N.D. 2017) (noting that "[t]he evidence presented included: testimony an officer found 'a sizable amount of marijuana that looked like it had been processed into smaller, equal pieces for distribution,' a 'box to a small pocket scale,' a grinder, baggies containing marijuana, and $379.00 in cash in Turbeville's bedroom.  The officer also testified, based on his training and experience, the fact the marijuana had been divided into equal portions and the presence of baggies containing marijuana, Turbeville was more than a casual user").

**FILED UNDER SEAL**

Critically, the Extradition Affidavit fundamentally failed to identify that the "drugs" purportedly referenced in the BBM Exchange (the sole evidence within the limitations period) were specifically ***cocaine or methamphetamine***. This failure is fatal to the Government.[56] There are no predicate facts in the native BBM Exchange or in any of the Government's evidence that would allow Agent Mori to reasonably conclude that the BBM Exchange was about cocaine or methamphetamine. The discussion was about units. Nothing more. There was no discussion about the weight[57], price[58] or origin of the units, for example, which could allow Agent Mori to render an informed opinion about the type of drug involved.

When the facts allow, Agent Mori includes in his narrative the specific type of drug at issue. In the Extradition Affidavit, Agent Mori specifically referenced the drugs at issue as cocaine when discussing events in 2007 and 2009. *Compare* Ex. A at 43–44 ¶ 19, *with* Ex. A at 40–43 ¶¶ 5–10, 14, 16–17. In a separate affidavit in support of an application to intercept electronic

---

[56] Counsel finds it difficult to believe that Agent Mori or DOJ Attorney Liskamm would have made such a basic blunder in the Government's proof. It is "Prosecution 101" that the type of drug must be identified, as demonstrated in prosecution manuals and treatises published throughout the country:

- "After *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Ninth Circuit treats drug quantity and type—which fix the maximum sentence for a conviction—as elements of the crime: they must be charged in the indictment, submitted to the jury, subject to the rules of evidence, and proved beyond a reasonable doubt." *United States v. Buckland*, 289 F.3d 558, 568 (9th Cir. 2002); *see also United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014)." 1 Ninth Circuit Criminal Handbook § 10.04 (2021).
- "To sustain a drug conviction, it is advisable to allege and prove the specific controlled substance that is at issue. *In re D.F.*, 193 Ohio App. 3d 78, 2011-Ohio-1004, 951 N.E.2d 99 (7th Dist.)." 1 Ohio Criminal Practice and Procedure § 6.101 (2021).
- "(1988)–*Graves v. Commonwealth*, 234 Va. 578, 363 S.E.2d 705. Since indictment charged defendant with conspiracy to distribute more than one-half ounce of marijuana, Commonwealth was required to prove agreement to distribute proscribed substance and to prove both identity and quantity of substance contemplated by agreement." 1 Virginia Criminal Law Case Finder § 6-71 (2021).

[57] Large quantities of methamphetamine and marijuana, for instance, are most commonly weighed by pounds whereas large quantities of cocaine and heroin are measured in kilograms. *See, e.g.*, Press Release, DEA, *2,669 Pounds of Methamphetamine, Two Kilograms of Cocaine, One Kilogram of Tar Heroin Seized in Joint DEA Investigation* (Feb. 28, 2020), https://www.dea.gov/press-releases/2020/02/28/2669-pounds-methamphetamine-two-kilograms-cocaine-one-kilogram-tar-heroin (quantifying methamphetamine in pounds and cocaine and heroin in kilograms); DOJ, *Narcotic and Dangerous Drug Section (NDDS)*, https://www.justice.gov/criminal/ndds (quantifying cocaine and heroin in kilograms and marijuana in pounds).

[58] As an expert in narcotics trafficking in 2016, Agent Mori knew the approximate price for various drugs being trafficked yet because there was absolutely no predicate facts speaking about the costs of the units, he was not able to discern the type of drug purportedly being discussed.

FILED UNDER SEAL

communications for another individual, Agent Mori detailed certain intercepted communications

where the parties purportedly spoke in code regarding a drug transaction:

> On April 8, 2013, agents intercepted an electronic communication between
> TARGET DEVICE #1 (screen name "[X]") and BlackBerry PIN ▮▮▮▮▮▮▮
> (screen name "[Y]")(the user of TARGET DEVICE #8). [X] and [Y] greet each
> other. [Y] tells [X] that he . . . has a friend "over there" that wants to "buy 300."
> [Y] continues and asks [X] if he . . . has anyone in Venezuela that "has any" and at
> what "price would be there." [X] relies [*sic*], "yes, I do," and explains that he . . .
> does not want [Y] to be busy with anything at the moment. [X] tells [Y] not to be
> busy until "we get done with this," because "this week it is going to be busy."[59]

Agent Mori was able to articulate his belief that the discussion involved cocaine because the

exchange included an additional key fact: the purported drugs discussed were coming from

Venezuela, and Agent Mori stated he knew from his lengthy investigation that the target subject

traffics in cocaine:

> I know that Venezuela is a source country for cocaine. Moreover, I know that
> TARGET SUBJECT [X] traffics large quantities of cocaine. I therefore believe [Y]
> is asking [X] for 300 kilograms of cocaine for a third party to purchase.[60]

Conversely, when there are no other predicate facts present in an intercepted exchange,

Agent Mori does not name the specific type of drug at issue.  In an exchange remarkably similar

to the BBM Exchange, Agent Mori describes a discussion about "apples," which he believed was

code for drugs.  Since there were no other predicate facts, Agent Mori could not discern the type

of drugs purportedly being discussed:

> Based on my training, experience, and knowledge of this investigation I believe [X]
> and [Y] are discussing drug trafficking. For example, when [X] refers to the
> "apple," I believe they are using coded language to refer to drugs. [X] then asks [Y]
> if the "apple" or almost [*sic*]. I believe [X] is asking [Y] if the quantity of drugs is
> prepared. [Y] replies "it" might be ready tomorrow. I believe [Y] is informing [X]
> that the drugs may be ready the next day. [X] replies that hopefully everything will
> be fine. I believe [X] is telling [Y] that he hopes that the drugs will be prepared and
> no problems will arise. [X] then says "one of the five." I believe [X] is telling [Y]
> that he ([X]) is already in possession of one of the five. ***Based on the limited***

---

[59] Ex. N (*Aff. In Supp. of Appl. to Intercept Electronic Communications*, signed by K. Mori (May 31, 2013)) at ¶ 58.
[60] *Id.* at ¶ 59.

FILED UNDER SEAL

***information, it is impossible to tell what type of drugs are being discussed*** and how many units [X] and [Y] are discussing (i.e., literally five units, 500 units, or 5,000 units).[61]

In another text exchange cited in Agent Mori's wire-intercept affidavit, he describes a discussion about "500" being sent and "arriving tomorrow."[62]  Again, without any other predicate facts, Agent Mori does not render an opinion as to the identity of the drug being discussed: "***From the intercepted information, I have no way of knowing which drug [X] is referring to***."[63]

Importantly, Agent Mori does not always expressly state his inability to name the drug in question.   In the wire-intercept affidavit, Agent Mori articulates his interpretation of those conversations without rendering his view of the purported drug being discussed, with no further commentary:

> When [X] tells [Y] the "captain" wants to pickup "things" for Holland, I believe [X] is informing [Y] that the captain is willing to transport ***drugs*** from South America to Europe.[64]
>
> When [X] tells [Y] he has a "good job" for him, I believe he is referring to a shipment of ***drugs***. I know that Mexican traffickers often refer to ***drug*** shipments as "jobs." [X] then tells [Y] he will pay him 100,000 dollars for completing the ***drug*** transaction or shipment. [X] tells [Y] the "job," or drugs, are in Morelia, which is a city in Michoacán, Mexico. [Y] later responds "Okay, done."[65]

---

[61] *Id.* at ¶ 27 (emphasis added). Similarly, in an affidavit in support of a wiretap application dated December 19, 2013, Agent Mori stated:

> Based on my training, experience, and knowledge of this investigation, I believe [X] and [Y] are discussing narcotic trafficking in the United States. When [X] mentions checking on "[Z]" and states, "Maybe there is someone willing with the 12," I believe [X] is asking [Y] if an unknown subject would be willing to transport 12 units of narcotics to Tennessee. [Y] responds by telling [X] that "there is 10" and states, "I'll put two." I believe [Y] is informing [X] that 10 units of narcotics are available and [Y] would be willing to add 2 units of narcotics for a total of 12 units. . . . ***Based on the conversation, I have no way of knowing what type of drug [Y] and [X] are discussing transporting***.

Ex. O (*Aff. In Supp. of Appl. to Intercept Electronic Communications*, signed by K. Mori (Dec. 19, 2013)) at ¶ 25 (emphasis added).

[62] Ex. N at ¶ 54.

[63] *Id.* at ¶ 55 (emphasis added).

[64] *Id.* at ¶ 46 (emphasis added).

[65] *Id.* at ¶ 51 (emphasis added).

FILED UNDER SEAL

The Extradition Affidavit also details alleged conduct by Mr. Gonzalez-Valencia in 2009 involving both cocaine and the importation of precursor chemicals to make and ship methamphetamine (which related to a component of the Indictment that the Government has abandoned).[66] Thus, the Extradition Affidavit itself states that Mr. Gonzalez-Valencia is purportedly engaging in drug distribution involving a variety of drugs. Because nothing in the BBM Exchange identifies the drug as cocaine or methamphetamine and because Agent Mori cannot state what type of drugs are being discussed, the reader is left to speculate.[67] Given this statement, it is just as likely that the units being discussed in the BBM Exchange were some other type of drug. The DEA itself has publicized that Mexican-based DTOs are known distributors of numerous types of illegal drugs such as marijuana, heroin, ecstasy and many other controlled substances aside from cocaine and methamphetamine.[68] Thus, the Government was required to offer proof that the purported drug units being discussed in the limitations period were cocaine or methamphetamine to exclude all other possibilities.

---

[66] Ex. A at 42 ¶ 15.

[67] In fact, Mr. Gonzalez-Valencia disputes the conclusion that the conversation even relates to drugs—the plain meaning of the text does not support the notion that the participants, whoever they were, contemplated a drug transaction.

[68] This Court can take judicial notice that the Government has repeatedly and publicly stated that Mexican-based DTOs are involved in a vast array of drug distribution across multiple continents, including, but not limited to, methamphetamine, heroin, fentanyl, cocaine, and marijuana. Ex. P (Press Release, DEA, High-Level CJNG Assoc. Financially Sanctioned (Mar. 3, 2021), https://www.dea.gov/press-releases/2021/03/03/high-level-cjng-associate-financially-sanctioned) (describing CJNG as being "responsible for trafficking a significant proportion of the fentanyl and other deadly drugs that enter the United States"); Ex. Q (Press Release, U.S. Atty.'s Off., W.D. Va., Fed. Grand Jury Indicts 12 Members of Jalisco New Generation Cartel (CJNG) (Mar. 25, 2019), https://www.justice.gov/usao-wdva/pr/federal-grand-jury-indicts-12-members-jalisco-new-generation-cartel-cjng) (detailing that indicted members of CJNG allegedly held various properties for the "purpose of receiving, storing, packaging, and distributing multiple kilograms of cocaine and multiple pounds of marijuana which they had received directly from members of CJNG"); Ex. R (Press Release, DOJ, Just., Treasury, and State Dep'ts. Announce Coordinated Enf't Efforts Against Cartel Jalisco Nueva Generacion (Oct. 16, 2018), https://www.justice.gov/opa/pr/justice-treasury-and-state-departments-announce-coordinated-enforcement-efforts-against) (alleging that "[t]he cartel has also expanded globally, with significant presence and illicit business not only throughout the United States and Mexico, but also Europe, Asia, and Australia").

JA61

FILED UNDER SEAL

Without naming the alleged drug in question in the sole piece of evidence within the limitations period, the evidence, as a matter of law, cannot support a probable cause determination. Nor, as discussed next, can the Government link the BBM Exchange to cocaine or methamphetamine transactions in 2007 or 2009.

> **2.** **The BBM Exchange is Not Evidence of Probable Cause in Support of a Conspiracy Tied to Prior Events.**

Because the BBM Exchange does not, by itself, support probable cause, the Government must evidence that the conversation relates back in some way to an earlier purported event(s) as a continuing course of conduct. Critically, however, the Extradition Affidavit fails to link the BBM Exchange to any conspiratorial agreement or explain how it relates in any way to prior events outside the limitations period.

Absent proof of the essential facts regarding unity of interest and actions in furtherance of the conspiracy's objective during the limitations period, probable cause does not exist. *Gaskins*, 690 F.3d 569; *see also United States v. Davis*, 863 F.3d 894, 904–06 (D.C. Cir. 2017) (finding evidence insufficient to support conviction for conspiracy to commit tax fraud because defendant's participation in preparing tax returns, without more, "was insufficient to demonstrate that [defendant] knowingly joined [the] conspiracy"); *United States v. Hunte*, 196 F.3d 687, 691 (7th Cir. 1999) (holding that in drug conspiracy cases, the Government must establish "a 'participatory link' between the conspiracy and the defendant" which "must be established by sufficient evidence demonstrating that the defendant knew of the conspiracy and intended to join its criminal purpose") (quoting *United States v. Navarez*, 954 F.2d 1375, 1380–81 (7th Cir. 1992)). In *Gaskins*, the Government attempted to link the defendant to the conspiracy with evidence of his name being listed on utility bills and the lease of a residence where there was ample evidence of a drug distribution operation. 690 F.3d at 574–75. The D.C. Circuit Court of Appeals rejected such

**FILED UNDER SEAL**

evidence as insufficient to establish knowledge and intent because the Government did not offer evidence that Gaskins knew that the apartment and the utility bills were indeed in his name. *Id.* at 578; *see also United States v. Gardner*, 488 F.3d 700, 711 (6th Cir. 2007) ("[M]ere association with conspirators is not enough to establish participation."); *McFadden*, 576 U.S. at 194 (holding that to prove knowledge under the Controlled Substances Act, the government must prove that either "a defendant knew that the substance with which he was dealing was a 'controlled substance'" or "that the defendant knew the specific analogue he was dealing with, even if he did not know its legal status as an analogue").

Here, the Extradition Affidavit provides *no evidence* linking the BBM Exchange to a larger or existing conspiratorial agreement or continuing course of conduct.  Agent Mori alleges that Mr. Gonzalez-Valencia was involved in a thirteen-year conspiracy to distribute cocaine and methamphetamine, spanning from approximately January 2003 to April 19, 2016.[69]  But the Extradition Affidavit speaks only to specific individual events prior to the limitations period, none of which are alleged to have any factual ties to the purported BBM Exchange, which has not even been shown to involve cocaine or methamphetamine.

### (i)    2007

The first purported event described in the Extradition Affidavit is an alleged arrangement between Mr. Gonzalez-Valencia, CW-1, Abigael Gonzalez-Valencia ("Abigael") and possibly unnamed others for an August 20, 2007 shipment of cocaine from an unknown origin to Mexico

---

[69] Ex. A at 40 ¶ 5.  As discussed above, the Extradition Affidavit is missing any discussion of an agreement or unified purpose of individuals to conspire to distribute cocaine or methamphetamine.  A conspiratorial agreement can be shown by direct or circumstantial evidence.  *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005).  But there must be evidence which is sufficient in nature to allow for a probable cause determination. "Relevant circumstantial evidence [may] include[]: the joint appearance of defendants at transactions and negotiations in furtherance of the conspiracy; the relationship among codefendants; mutual representation of defendants to third parties; and other evidence suggesting unity of purpose or common design and understanding among conspirators to accomplish the objects of the conspiracy." *United States v. Wardell*, 591 F.3d 1279, 1287–88 (10th Cir. 2009) (internal quotations omitted).

**FILED UNDER SEAL**

by way of submarine.[70]   The U.S. Coast Guard interdicted the vessel and the drugs were

confiscated by the Government.[71]

**(ii)    2009**

The Extradition Affidavit contains a relatively clear and detailed discussion tying the

purported event(s) in 2007 to the events that allegedly took place in 2009 through the introduction

of evidence obtained from CW-2, ███████████████



In 2009, CW-2 purportedly had at least two separate discussions with Mr. Gonzalez-

Valencia and Abigael about cocaine trafficking. ██████████████████████

████████████████████████████████████████████

████████████████████████████████████ ███████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████

---

[70] Ex. A at 40 ¶ 5.  The Extradition Affidavit makes clear the sources of the information of Mr. Gonzalez-Valencia's purported involvement are CW-1 and CW-2, though only CW-1 participated in the described events.
[71] *Id.*
████████████████████████████████████████████
████████████████████████████████████████
[72] *Id.* at 42–43 ¶¶ 12–17.
[73] *Id.* at 43 ¶ 16.
[74] *Id.*
[75] *Id.*

FILED UNDER SEAL



### (iii)     The BBM Exchange is Not Connected to the Limitations Period

The Extradition Affidavit's description of the BBM Exchange in 2013, the sole evidence within the limitations period, is completely devoid of any relevant facts that tie the conversation back in any way to either the 2007 or 2009 events or an overarching conspiracy to distribute cocaine and methamphetamine among the participants. There is no evidence whatsoever of commonality between the BBM Exchange and any of the earlier alleged events.

If the Government contends that these events are indeed connected, then the Government has the duty to demonstrate such a connection, but nothing in the Extradition Affidavit ties the conduct alleged in 2013 to any prior conduct touching on an agreement, unity of purpose, or common design and understanding to accomplish the object of the charged conspiracy—conspiring to distribute cocaine and methamphetamine into the United States.

The Extradition Affidavit itself suggests that the BBM Exchange is unrelated to earlier events.  For example, the alleged arrangement in 2007 is a self-contained event that ended with the U.S. Coast Guard's interdiction of the vessel.[79]  The conversation in Paragraph 19 of the BBM

---

[76] *Id.* at 43 ¶ 17.
[77] *Id.*
[78] *Id.* at 42 ¶ 15.
[79] *Id.* at 40 ¶ 5.

FILED UNDER SEAL

Exchange concerning "85 units of drugs which belonged to the co-conspirator as well as 15 more units that Gonzalez-Valencia was saving" could not possibly relate back to that event because the 2007 contraband had been seized.[80]

The Extradition Affidavit also details alleged conduct by Mr. Gonzalez-Valencia in 2009 involving both cocaine and the importation of precursor chemicals to make and ship methamphetamine.[81]  The Extradition Affidavit's lack of clarity as to the specific type of drugs at issue in the BBM Exchange coupled with the inclusion of facts that Mr. Gonzalez-Valencia was "the leader of a Mexico-based DTO,"[82] and the Government's own publication of press releases stating that Mexico-based DTOs are involved in distribution of many other types of drugs such as fentanyl, heroin and marijuana[83] proves again fatal to the Government; one cannot even reasonably guess what is being discussed in the BBM Exchange much less state with reasonable probability that it involved cocaine or methamphetamine and was a continuation of an overarching conspiracy.

Moreover, the Extradition Affidavit does not state that either CW-1, CW-2 or Abigael, or one of their known affiliates, was the counterparty in the BBM Exchange; it simply states that the counterparty was a "co-conspirator" without anything more.  This is a conclusory statement, not evidence.[84]  While a discussion of Mr. Gonzalez-Valencia purportedly controlling drug routes into the United States in 2007 and 2009 is described, Agent Mori does not state that these routes were exclusive to cocaine or methamphetamine or that Mr. Gonzalez-Valencia continued to control these routes through the limitations period.  The spatial sequencing between these events supports the reasoned conclusion that indeed there is no connection between the events; the time between

---

[80] *Id.* at 43-44 ¶ 19.

[81] *Id.* at 42 ¶ 15.

[82] Ex. A at 40 ¶ 5.

[83] *See supra* note 68.

[84] *See infra* Section II.D for further discussion of proper summary evidence versus conclusory statements.

FILED UNDER SEAL

earlier events and the BBM Exchange is *not* four hours, four days, four weeks or four months. *Four years* passed between the alleged events, leading to only one plausible conclusion—that absent evidence to the contrary, the BBM Exchange cannot relate to these earlier described events.

### D. The Government Failed to Provide any Evidence to Identify Mr. Gonzalez-Valencia as a Participant in the BBM Exchange.

As a matter of law, the Government has also failed to prove the identity of Mr. Gonzalez-Valencia as one of the participants in the BBM Exchange.[85]  Where the Government fails to present sufficient evidence that identifies the accused as the person who committed the alleged crime, there can be no probable cause.  *See, e.g.*, *United States v. Knight*, No. 3:19-CR-00038-MMD-CLB, 2021 WL 134589, at *1 (D. Nev. Jan. 13, 2021) (finding lack of competent identification evidence plausibly meant "grand jury was not provided with the evidence needed to support probable cause" and "grounds for dismissal may exist"); *Commonwealth v. McCarthy*, 385 Mass. 160, 164 (1982) (dismissing indictment because "the grand jury had no evidence before it" that the defendant was the person who committed or participated in the alleged assault).

Evidence of identity can be in direct form through the counterparty or another eyewitness, or through circumstantial evidence.  *Goodwine v. Lee*, No. 10 CV 6019 (VB), 2016 WL 6834017, at *4 (S.D.N.Y. Nov. 17, 2016) ("[E]ven in the absence of a direct identification, the circumstantial evidence against petitioner was undoubtedly sufficient to establish probable cause."); *Furtado v. Maloney*, 125 F. App'x 318, 320 (1st Cir. 2005) (allowing circumstantial identification evidence).  Proof, however, cannot be assumed through conclusory self-serving statements without any evidentiary support.  A conclusory statement gives "virtually no basis" to determine probable

---

[85] Or, for that matter, that the counterparty was indeed a co-conspirator to the conspiracy alleged or that Mr. Gonzalez-Valencia was "the" leader of a Mexico-based DTO.  Agent Mori begins his affidavit by conclusively stating that Mr. Gonzalez-Valencia is "the leader of a Mexico-based DTO."  Ex. A at 40 ¶ 5.  The Extradition Affidavit failed to explain how a trier of fact could reasonably infer that Mr. Gonzalez-Valencia was the "leader of a Mexico-based DTO."  The Government was required to offer evidence to support such a claim but failed to do so.

**FILED UNDER SEAL**

cause where it is a "mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *see also In re Extradition of Suyanoff*, No. 12-MJ-462 JMA, 2012 WL 4328523, at *4 (E.D.N.Y. Sept. 20, 2012) ("A magistrate may not . . . merely ratify conclusory statements that a fugitive committed a crime.").  An affidavit relying on conclusory statements precludes a determination of probable cause.  *United States v. Manafort*, 314 F. Supp. 3d 258, 266 (D.D.C. 2018) ("The law is clear that an affidavit in support of a warrant application 'must provide the magistrate with a substantial basis for determining the existence of probable cause,' and it cannot consist of 'wholly conclusory statement[s].'") (quoting *Gates*, 462 U.S. at 239); *United States v. Burnett*, No. 12-CR-00042-BAH-3, 2013 WL 12430549, at *3 (D.D.C. Mar. 21, 2013) (Howell, J.) ("[P]robable cause may not be based on mere allegations or conclusory statements."), *aff'd*, 827 F.3d 1108 (D.C. Cir. 2016); *see also In re Ribaudo*, No. 00 Crim. Misc. 1 Pg. (KNF), 2004 WL 213021, at *6 (S.D.N.Y. Feb. 3, 2004) (holding the Government's contention that the word "shoes" was code for "heroin" in phone conversations without transcripts or summaries of the conversations was "entirely conclusory"); *Platko*, 213 F. Supp. 2d at 1239 (noting affidavits "must identify the facts and go beyond conclusory characterizations" to demonstrate probable cause).

Nothing in the native format of the BBM Exchange identifies Mr. Gonzalez-Valencia as a participant, which is perhaps why the Government refused to provide it to the Uruguayan court even when specifically requested.  Yet, Agent Mori not only concluded that Mr. Gonzalez-Valencia was involved, but that he was messaging with an unidentified "co-conspirator."[86]  That is not tenable.

---

[86] Ex. A at 43–44 ¶¶ 18–19.

FILED UNDER SEAL

The messages at issue are in Spanish with only Blackberry Messenger pin numbers, dates and times, and unattributable screen names[87] as identifiers of the messaging devices:



**Wed 26 Jun 2013**
**19:05:31**[88]

Nowhere does the native BBM Exchange identify Mr. Gonzalez-Valencia as one of the persons messaging.  Moreover, Agent Mori, in his own words, has explained how challenging it is to identify users of Blackberry devices when he stated, "I know that narcotics traffickers and money launderers frequently obtain telephones in third party names and addresses to avoid detection by law enforcement."[89]  Yet, the Extradition Affidavit purports to provide "a summary of a lawfully intercepted text messages [*sic*] in California between Gonzalez-Valencia and a co-conspirator."[90]  It further states that "One [*sic*] June 26, 2013, during a lawfully-intercepted text messages [*sic*], Gonzalez-Valencia and a co-conspirator discussed whether a drug trafficking transaction was complete."[91]  Agent Mori did not elaborate how he concluded that one of the individuals communicating in the BBM Exchange was Mr. Gonzalez-Valencia.  This conclusion is not proper summary evidence; it is a conclusory statement with no factual predicate.[92]  *Gates*, 462 U.S. at

---

[87] Agent Mori conclusively states that Mr. Gonzalez-Valencia is also known as "Silverio." *Id.* at 44 ¶ 20.  One of the BBM pin numbers is paired with the screen name "Silverio," but Agent Mori fails to explain the purported link between Mr. Gonzalez-Valencia and "Silverio" in the Extradition Affidavit, stating only that the conversation is "between Gonzalez-Valencia and a co-conspirator." *Id.* at 43 ¶ 18.  The Government has informed Mr. Gonzalez-Valencia, through his counsel, that it does not have a single witness who knows of Mr. Gonzalez-Valencia as "Silverio."  Moreover, the wiretap affidavits provided to counsel by the Government do not conclusively identify Mr. Gonzalez-Valencia as "Silverio."  Rather, Agent Mori states that "Eduardo Gonzalez-Valencia" is only a "possible user" of the target device with the screen name "Silverio." Ex. O at ¶ 1.

[88] *See* Ex. B at 00025524–29.

[89] Ex. N at ¶ 67.

[90] Ex. A at 43 ¶ 18.

[91] *Id.* at 43–44 ¶ 19.

[92] Affidavits offered in support of extradition may include detailed summary statements. *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (citing *Collins v. Loisel*, 259 U.S. 309, 317 (1922)).  The credibility of summarized statements is determined by the extradition judge. *In re Extradition of Singh*, No. 01-6215 OWW, 98-5489 OWW,

FILED UNDER SEAL

239 (holding that a "wholly conclusory statement" in an affidavit fails to support a finding of probable cause).  Equally unsupported was Agent Mori's conclusory assertion regarding the unnamed "co-conspirator."

This failure demonstrates again that the Extradition Affidavit, as a matter of law, does not support probable cause.

### E.   The Government is Required to Provide Sufficient Evidence of Probable Cause Under the Treaty.

It is axiomatic that pursuant to the U.S. Constitution, the detention of a U.S. citizen requires a showing of probable cause.  The Fourth Amendment requires a "fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty."  *Baker v. McCollan*, 443 U.S. 137, 142 (1979) (citing *Gerstein*, 420 U.S. 103).  This principle applies with equal force to the Government regardless of whether the seizure and detention is within the confines of the United States or abroad.  *See Reid v. Covert*, 354 U.S. 1, 6 (1957) ("When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land."); *Meshal v. Higgenbotham*, 47 F. Supp. 3d 115, 120 (D.D.C. 2014) ("It has been well settled for over fifty years that the Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed at United States

---

2005 WL 3030819, at *55 (E.D. Cal. Nov. 9, 2005) (ordering a trial to resolve conflicts in proffered affidavits).  Summary statements may consist of "hearsay statements of witnesses" summarized in a foreign official's affidavit.  *United States v. Pena-Bencosme*, No. 05-M-1518 (SMG), 2006 WL 3290361, at *2, *8 (E.D.N.Y. Nov. 13, 2006) (finding the government's inclusion of four witness statements, ballistics test results, and pathology reports "sufficient to establish probable cause to support the homicide charge" against the defendant); *see also Afanasjev v. Hurlburt*, 418 F.3d 1159, 1165 (11th Cir. 2005) (Lithuanian prosecutor's 106-page bill of indictment summarizing victims' statements supported a finding of probable cause).  However, summary statements that lack specificity or adequate detail may not be sufficient to support a finding of probable cause.  *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 830 (S.D. Tex. 2011) ("[W]hen a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude, on a review of the affidavits submitted, that there are insufficient [or sufficient] indicia of reliability or credibility to establish probable cause." (citing *In re Extradition of Singh*, 124 F.R.D. 571, 577 (D.N.J. 1987))).

JA70

**FILED UNDER SEAL**

citizens.") (internal quotation and citation omitted), *aff'd*, 804 F.3d 417 (D.C. Cir. 2015).  This

principle also applies whether the seizure and detention are made directly by the Government or

through foreign agents acting at the Government's direction. *Meshal*, 47 F. Supp. 3d at 120.

Recognizing this foundational principle, the Executive Branch, in executing the Treaty

with Uruguay, incorporated a probable cause requirement.  Specifically, Article 10 provides:

> When the request relates to a person who has not yet been convicted, it must be
> accompanied by a warrant of arrest issued by a judge or other judicial officer of the
> requesting Party.
>
> The requested Party may ***require the requesting Party to produce evidence to
> establish probable cause*** that the person claimed has committed the offense for
> which extradition is requested.  The requested Party may refuse the extradition
> request if an examination of the case in question shows that the warrant is
> manifestly ill-founded.[93]

Courts have found that this Treaty requires a probable cause determination to support extradition.

In *United States v. Puentes*, for example, the court approved an extradition from Uruguay because

"***in the Uruguayan court's opinion, the United States had submitted sufficient evidence to

establish probable cause*** to believe that Puentes had committed the offense charged."  50 F.3d

1567, 1576 (11th Cir. 1995) (emphasis added).  Indeed, in that case, the Uruguayan Court of

Appeal found that in order to extradite an individual from Uruguay to the United States, "complete

certainty is not required, ***but only a plausible, a judgment of probability, a 'fumus bonis juris,'***"[94]

which the Eleventh Circuit interpreted to mean probable cause.  *Puentes*, 50 F.3d at 1576; *see also*

*United States v. Duarte*, No. 15-20540-CR, 2018 WL 310025, at *3 (S.D. Fla. Jan. 4, 2018)

(explaining that the *Puentes* court "focused on the fact that the extradition order was based on the

Uruguayan court's determination of the existence of probable cause" to uphold the validity of the

---

[93]  Ex. S (Uruguay International Extradition Treaty with the United States, art. 1, Apr. 11, 1984, TIAS 10850) (emphasis added).
[94]  Ex. T (UY/JUR/15/1991) at 16 (emphasis added).

FILED UNDER SEAL

extradition (citing *Puentes*, 50 F.3d at 1576)), *aff'd sub nom. United States v. Mejia-Duarte*, 780 F. App'x 730 (11th Cir. 2019).  Other Uruguayan courts have likewise found that a finding of "fumus bonis juris," *i.e.*, probable cause, is required.[95]

Indeed, U.S. courts have found that treaties cannot be interpreted to absolve the requesting party from demonstrating probable cause.  *See Caltagirone v. Grant*, 629 F.2d 739, 747–48 (2d Cir. 1980) (rejecting the government's argument that the treaty at issue did not require showing of probable cause because "the Government's view raises grave questions concerning the constitutional proprietary of any interpretation of [the treaty] which does not require a showing of probable cause").  Of course, if an individual waives their challenge to extradition, as is often the case, the requesting country may be relieved of its burden to establish probable cause.  But the Treaty cannot reasonably be interpreted to permit the Government to extradite an individual without probable cause if, such as here, the individual is contesting extradition.

The Government has previously recognized, if not conceded, *in this case* that the Treaty requires it to establish probable cause.  In its July 16, 2019 response to the Uruguayan court's request for supplemental proof to support the charge, the Government stated:

> The United States affirms that the extradition request provided to the Government of Uruguay on June 1, 2016 **includes all requirements enumerated in Article 10 of the Treaty**.  The Embassy of the United States **attached all evidentiary documentation to this Diplomatic Note that establishes probable cause.**[96]

---

[95] Ex. U (UY/JUR/27/1989) at 17 (finding evidence requirement is "fumus bonis juris" which means "probability or likelihood or the alleged facts or claimed rights").  In the Uruguayan legal system, decisions by Uruguayan courts do not constitute legal precedent and subsequent decisions by higher courts do not supersede prior decisions or decisions by lower courts.  *See* Pablo Sandonato de Leon, *Update: A Guide to Uruguay's Legal System and Research*, Hauser Global Law School Program at NYU School of Law, at § 3.1 (July/Aug. 2016), https://www.nyulawglobal.org/globalex/Uruguay1.html.  Accordingly, the Uruguayan Supreme Court of Justice's erroneous decision to extradite Mr. Gonzalez-Valencia without probable cause has no bearing on the *Puentes* decision or other decisions, nor does it establish legal precedent in Uruguay.

[96] Ex. F at 2 (emphasis added).

**FILED UNDER SEAL**

Thus, the Government expressly stated that the "requirements enumerated in Article 10" required it to provide "all evidentiary documentation . . . that establishes probable cause."[97]

F. **Uruguay Failed to Apply the Correct Legal Standard in Granting Mr. Gonzalez-Valencia's Extradition.**

Uruguay failed to apply the correct legal standard by granting the Government's extradition request without assessing the evidence to determine probable cause. Accordingly, any presumption under *Trabelsi* that the extradition is lawful is clearly and conclusively rebutted. 845 F.3d at 1189 (holding presumption is rebutted if the "requested state or party did not apply the correct legal standard adopted in the Treaty").

The Uruguayan court ordered the extradition of Mr. Gonzalez-Valencia because it determined that the Government's request was not "clearly unfounded."[98] The Uruguayan court conceded that it did not assess any of the "evidence" provided by the "requesting state" (*i.e.*, the United States). The court of first instance in Uruguay issued an order granting extradition, stating:

> [T]he only thing the judge has to do is control the formal regularity of the request and compliance with the requirements of the Treaty applicable to the case.
>
> *It is then not appropriate to assess the evidence produced by the requesting State, but rather only to assess it to determine that the extradition request and the arrest warrant are not manifestly unfounded*, in accordance with the provisions of Art. 10.3 *in fine* of the Treaty, which establishes that "the party subject to the request may ask that the requesting party to submit sufficient evidence to establish *prima facie* that the person subject to the request has committed the crime for which the extradition is made."[99]

After the Government refused to provide any additional evidence as requested, Uruguay's highest judicial body nevertheless entered a final judgment in favor of extradition on February 11, 2020, again without analyzing the sufficiency of the evidence.[100]

---

[97] *Id.*

[98] Ex. I at 00054535.

[99] *Id.* at 00054534 (emphasis added).

[100] Ex. J.

FILED UNDER SEAL

The Uruguayan courts' determination that the extradition request was "not manifestly unfounded" does not satisfy the requirements of the Treaty.  Importantly, "not manifestly unfounded" is not a standard of proof in American jurisprudence, nor in any extradition proceeding.  By no stretch is it equivalent to "probable cause."[101]  The U.N. defines "manifestly unfounded" applications as "clearly fraudulent or not related to the criteria for the granting of refugee status laid down in the 1951 United Nations Convention . . . nor to any other criteria justifying the granting of asylum."[102]

"The assessment of probable cause is an objective one."  *Wesby v. District of Columbia,* 765 F.3d 13, 19 (D.C. Cir. 2014).  Probable cause exists if "the facts and circumstances . . . were sufficient to warrant a prudent man in believing that the suspect has committed or is committing a crime."  *Id.*  (citing *Beck v. Ohio*, 379 U.S. 89 (1964)) (internal quotations omitted).  This Circuit looks to each element of the offense, including *mens rea*, to determine if probable cause existed. *Id.* at 20.  By contrast, "not manifestly unfounded" requires only the slightest showing that the

---

[101]  In fact, "not manifestly unfounded" is the international asylum screening standard.  The United Nations High Commissioner for Refugees established the standard of "manifestly unfounded" to identify asylum claims that "are considered so obviously without foundation as not to merit full examination at every level of the procedure."  UN High Commissioner for Refugees (UNHCR), UN High Commissioner for Refugees (UNHCR), *The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum,* Executive Committee Conclusion No 30 (Oct. 20, 1983), https://www.unhcr.org/en-us/excom/exconc/3ae68c6118/problem-manifestly-unfounded-abusive-applications-refugee-status-asylum.html.  In 2014, the Norwegian Immigration Appeals Board openly discussed how to interpret the meaning of the term "manifestly unfounded":

> When implementing the Directive in the Norwegian Immigration Act, our legislator states, *inter alia*, that the legal exclusion provision was not intended to be applied in most cases, but in cases where the application *is presumed to be mainly based on false information.*  There must be a causal link between the incorrect information and the decision to reject the application for a permit.  Illustrative examples: (i) if a foreigner alleged problems related to economic conditions and unemployment as the basis for his application or if (ii) the applicant provides false identity, or (iii) the asylum explanation is fabricated, and / or if (iv) the applicant comes from an EU country or another country which is normally considered safe for return.

European Migration Network, *Ad-Hoc Query on* Expulsion *Definition of Manifestly Unfounded as Related to Directive 2008/115/EC* (2014), https://www.udi.no/globalassets/global/european-migration-network_i/ad-hoc-queries/ad-hoc-query-expulsion-definition-unfounded-2014.pdf (emphasis added).

[102]  UN High Commissioner for Refugees (UNHCR), *supra* note 101.

**FILED UNDER SEAL**

allegation is not clearly fraudulent or has even the slightest merit.  It is arguably a much lower standard of proof than any standard of proof in American jurisprudence, including civil cases. Even in civil cases, the burden of persuasion to prove a claim by "a preponderance of the evidence" requires a showing that a particular fact or event was more likely than not to have occurred.[103]

When this review is conducted through the lens of a mere cursory review of the Extradition Package, it is undeniable that the wrong legal standard was applied; no court could find probable cause on the evidence submitted.  The Government effectively strong-armed Uruguay by submitting affidavits from self-described experts that essentially told Uruguay "this is more than enough," and then refused Uruguay's request for more evidence on the particular point at issue— the BBM Exchange.  The Uruguayan court succumbed to the Government even though Uruguayan courts had previously recognized their obligation to assess the evidence to determine probable cause.  As such, the extradition of Mr. Gonzalez-Valencia at the request of the Government was improper and deprived Mr. Gonzalez-Valencia of his constitutional rights.

## G.  **Requested Relief**

We respectfully move this Court to dismiss the Indictment with prejudice without further review and order the immediate release of Mr. Gonzalez-Valencia from custody.  In the alternative, and before ruling on dismissal, we respectfully move pursuant to Rules 6(e)(3)(E)(i) and (ii) of the Federal Rules of Criminal Procedure for the Court to conduct an *in camera* review of the grand jury record on the narrow issue of whether there was any competent evidence adduced within the limitations period.

In the counter-alternative, we move this Court to order the Government to expedite the renewal of Mr. Gonzalez-Valencia's passport and his safe passage out of the United States to the

---

[103]  Burden of Proof (D.C. Std. Civ. Jury Instr. No. 2-3).

**FILED UNDER SEAL**

country of his choosing, and to not file any detainers or cause any detainers to be filed against Mr. Gonzalez-Valencia for at least ninety days from his departure from this country.  This minimal remedy, however, acts only as a reset for the Government and does not address the harm to Mr. Gonzalez-Valencia, sanction the Government for its egregious misconduct, or act as a deterrent to the Government committing similar misconduct in future extraditions.

Given the egregious misconduct of the Government here, any remedy short of dismissal with prejudice would fail to right the harm to Mr. Gonzalez-Valencia or restore the integrity of the extradition process.

> **1.      The Court Should Exercise its Supervisory Powers and Dismiss the Indictment with Prejudice.**

This case presents an issue of first impression as to an appropriate remedy.  What is the appropriate remedy when the Government, pursuant to a Treaty, initiates extradition proceedings against a U.S. citizen but violates the Treaty by causing the seizure, detention and eventual extradition of that U.S. citizen abroad without probable cause?  Notably, this Court is empowered to hold the Government to the highest of standards in matters concerning the constitutional rights of U.S. citizens, including when those citizens are abroad.  The D.C. Circuit Court of Appeals has articulated the following view regarding judicial oversight against due process concerns caused by Government misconduct:

> In *Fisher v. United States*, 328 U.S. 463, 476 (1946), the Supreme Court said: "Matters relating to law enforcement in the District are entrusted to the courts of the District." . . . The "Court, in its decisions, and Congress, in its enactment of statutes, have often recognized the appropriateness of one rule for the District and another for other jurisdictions so far as they are subject to federal law." *Griffin v. United States*, 336 U.S. 704, 712 (1949). ***The courts of the District of Columbia should not concern themselves with enforcing the minimum standards which the Constitution requires. They should also set for the Nation an example of respect for the rights of citizens.***

*Jones v. United States*, 342 F.2d 863, 868 (D.C. Cir. 1964) (emphasis added).

**FILED UNDER SEAL**

In this case, the Court has the power to protect the integrity of the United States in prospective extradition requests and, more generally, in international relations. Moreover, it has the power to remedy the egregious constitutional violations suffered by Mr. Gonzalez-Valencia at the hands of the Government. Put simply, justice demands dismissal.

Courts may dismiss an indictment under their supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995) (citing *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)); *United States v. Hasting*, 461 U.S. 499, 505 (1983). The defendant must demonstrate prejudice, such as through an "abrogation of constitutional rights," before the court may exercise its supervisory powers to dismiss an indictment. *United States v. Siriprechapong*, 181 F.R.D. 416, 423 (N.D. Cal. 1998) (holding dismissal may rest on "abrogation of constitutional rights sufficient to support dismissal of an indictment" (citing *United States v. Isgro*, 974 F.2d 1091, 1096 (9th Cir.1992)); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988). "The court's exercise of its supervisory powers protects the integrity of the federal courts and prevents the courts from making themselves accomplices in willful disobedience of law." *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (quoting *McNabb v. United States*, 318 U.S. 332, 345 (1943) (internal quotation marks and modifications omitted)).

In exercising its supervisory powers, the Court should also keep in mind the significance of the Government's actions, as a leader among nations in the international arena. As Justice Brandeis cautioned:

> In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent

**FILED UNDER SEAL**

teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution.[104]

"[T]he Fourth Amendment requires . . . a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker*, 443 U.S. at 142 (citing *Gerstein*, 420 U.S. at 95); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 52–53 (1991) (finding absent extraordinary circumstance, detention of more than 48 hours without probable cause determination is unconstitutional); *Caltagirone*, 629 F.2d at 747 (noting that detention of individual pending extradition without probable cause "raises grave questions concerning the constitutional propriety"). Accordingly, "[w]hen an individual is deprived of his liberty pursuant to a warrant that does not conform to the requirements of the [F]ourth [A]mendment, he is deprived of liberty without due process of law." *Olson v. Tyler*, 771 F.3d 277, 282 (7th Cir. 1985) (citing *Baker*, 443 U.S. at 143–44).

Detention based on a probable cause determination that is not "fair and reasonable" is an unconstitutional violation of due process. *See, e.g., id.*; *Dorsey v. District of Columbia*, 234 F. Supp. 3d 1, 8 (D.D.C. 2017) ("The Fourth Amendment is therefore violated when a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant, if the allegedly false statement is necessary to the finding of probable cause.") (internal quotations and citation omitted). For example, courts have routinely found an actionable and unconstitutional due process violation when a government official knew or should have known that an individual was being detained without probable cause. *Sivard v. Pulaski County*, 959 F.2d 662 (7th Cir. 1992) (finding continued detention where sheriff knew it was wrongful states claim under Section

---

[104] *Olmstead v. United States*, 277 U.S. 438, 468 (1928) (Brandeis, J., dissenting).

FILED UNDER SEAL

1983 for due process violation); *Cook v. City of Antioch*, No. 19-CV-01370-PJH, 2020 WL 9066046, at *1 (N.D. Cal. May 12, 2020) (finding detention violates due process "if the arrest was without probable cause or other justification and the defendant knew or should have known that plaintiff was entitled to release"); *Fox v. Tomczak*, No. 04 C 7309, 2006 WL 1157466, at *3 (N.D. Ill. Apr. 26, 2006) ("An allegation that a public official knew of a plaintiff's wrongful detention and continued to detain him despite this knowledge is sufficient to state a cause of action under Section 1983 for a public official's personal involvement in an unconstitutional deprivation of due process."); *see also In re Zhenly Ye Gon*, No. 08-596(JMF), 2010 WL 169468, at *3 (D.D.C. Jan. 8, 2010) ("Surely, a man who is imprisoned to await extradition has been deprived of his liberty, and that deprivation is without due process of law when the government conceals information that would negate the probable cause offered by the demanding state.").[105]

In *Meshal*, for example, the defendant, a U.S. citizen, was traveling abroad when he was detained and held for over four months by foreign agents at the direction of the Government. 47 F. Supp. 3d at 117–18. Judge Sullivan of this Court found that the facts alleged were "deeply troubling" and that Meshal had sufficiently alleged deprivation of his constitutional rights. *Id.* at 121 ("Plaintiff has alleged that Defendants violated his Fourth Amendment rights by detaining him for four months without a probable cause hearing . . . Plaintiff has plausibly alleged that his detention without a hearing for four months . . . is unreasonable.").

---

[105] The fact that Mr. Gonzalez-Valencia was detained pursuant to the Treaty does not strip him of his Fourth Amendment protections. *Manta v. Chertoff*, 518 F.3d 1134, 1147 (9th Cir. 2008) ("[T]he Fourth Amendment's protections extend to those arrested pursuant to treaties."); *Reid*, 354 U.S. at 16 ("[N]o agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution."); *Barr v. U.S. Dep't of Just.*, 819 F.2d 25, 27 (2d Cir. 1987) ("[I]t is unquestionably the law that a treaty may authorize only such governmental action as is in conformity with the Constitution."); *Petition of Geisser*, 627 F.2d 745, 750 (5th Cir. 1980) ("[A] purported treaty obligation of the United States government cannot override an individual constitutional right")).

FILED UNDER SEAL

Mr. Gonzalez-Valencia's lengthy detention for nearly *two years* based solely on the Government's deficient Extradition Package is *de facto* prejudice warranting dismissal of the Indictment.  While detained in Uruguay, Mr. Gonzalez-Valencia was not able to have regular access to his family including his three young children.  Moreover, he has been deprived of his ability to support his family.  *See McLaughlin*, 500 U.S. at 52 ("[P]rolonged detention based on incorrect or unfounded suspicion may unjustly 'imperil [a] suspect's job, interrupt his source of income, and impair his family relationships.'" (quoting *Gerstein*, 420 U.S. at 114)).  His detention has prejudiced his ability to defend this charge in that he intends on asserting a defense of withdrawal from the conspiracy.  His ability to contact key witnesses with whom he has personal relationships in both Argentina and Uruguay, who could have assisted Mr. Gonzalez-Valencia in his defense, has been critically impaired.  *See United States v. Perry*, 353 F. Supp. 1235, 1240 (D.D.C. 1973) (explaining that lengthy delay "must inevitably impair the case of both the prosecution and the defense.  The memory of witnesses for both prosecution and defense fade and become confused . . . [and] [s]ome witnesses for both sides may become unavailable.").

In other contexts, courts have held that lengthy detention without a probable cause determination was sufficiently severe to warrant dismissal of the indictment.  *See United States v. Osunde*, 638 F. Supp. 171, 175–77 (N.D. Cal. 1986) (dismissing an indictment with prejudice because "the passage of 106 days between the defendant's arrest and his first appearance before [a magistrate judge] was, without a doubt, a grossly unnecessary delay" and the 118-day delay between defendant's arrest and indictment "was entirely the fault of the government").

### (i)      International Comity and Deterrence Requires Dismissal.

Extradition treaties serve the several purposes of promoting the enforcement of criminal law, protecting the sovereignty of each signatory nation over its own territory, and providing

**FILED UNDER SEAL**

safeguards for the civil liberties of citizens and other individuals in inter-state surrenders.   As

Senator Helms stated in a 1998 Committee on Foreign Relations Report:

> Extradition relationships have long been a basis of bilateral relationships, and
> represent a recognition by the United States of the legitimacy of a country's judicial
> system. Respect for a treaty partner's judicial system is essential since the treaties
> permit the transfer of individuals to another country in order to stand trial for
> alleged crimes.[106]

The conduct of the Government here is antithetical to these principles.   As Senator Helms

noted, the Government's decision to enter a bilateral extradition treaty is predicated on both its

view of the legitimacy of a country's judicial system and *respect*.   Indeed, the ability for national

governments to trust other nations to comply with their treaty obligations lies at the heart of

international diplomacy.   As one scholar eloquently explained:

> If sovereign nations are to trust one another in carrying out their treaty obligations,
> there must be an obligation of fair dealing, good faith and truthfulness imposed on
> every contracting state making sworn representations in the tribunals of another
> sovereign.   Admittedly, extradition treaties generally contain no explicit
> requirement that a requesting state be truthful in the presentation of evidence to the
> judicial body of the requested state. However, implicit in any workable contract
> between nations in which they agree to submit evidence in support of probable
> cause to the courts of either state must be an understanding that the parties will not
> defraud one another. This understanding provides the necessary foundation for
> international relations. . . . Whether fraud in the execution of treaty obligations is
> barred by the fundamentals of natural law, international public policy, imperative
> norms, customary law, morality, or the requirement of public order is immaterial.
> No school of thought on the subject would argue that misrepresentation should be
> allowed to go uncorrected. The nations of the world have a vital obligation not only
> to one another to preserve the international rule of law against illegal usurpation by
> another state but also to their own citizenry to redress fraud which taints their
> judicial institutions.[107]

---

[106]   Sen. Exec. Rep. No. 105-23 (1998), available at https://www.govinfo.gov/content/pkg/CRPT-105erpt23/html/CRPT-105erpt23.htm.

[107]   John J. Privitera, *Toward a Remedy for Int'l Extradition by Fraud: The Case of Leonard Peltier*, 2:49 Yale L. &
Pol'y      Rev.         49,         57         (1983),         available         at
https://openyls.law.yale.edu/bitstream/handle/20.500.13051/16936/06_2YaleL_PolyRev49_1983_1984_.pdf?sequen
ce=2&isAllowed=y (footnotes omitted).

JA81

FILED UNDER SEAL

Considering these principles, the Government's egregious gamesmanship and lack of respect for Uruguay in procuring Mr. Gonzalez-Valencia's prolonged detention and extradition to the United States requires nothing short of dismissal with prejudice, as it challenges the very foundation of international relations.  This Court must do what the Government chooses not to—show respect for a foreign country's legal system and right the extreme wrong here.  The message to Uruguay cannot be that the Government may demand extradition from Uruguay despite an objective failure to meet the requirements of the Treaty.  Indeed, Uruguay (and other nations) have already heavily criticized the Supreme Court's decision in *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), which permitted the Government to circumvent the United States' treaty obligations to kidnap a defendant.[108]  This continued behavior, if left unbridled and uncensured, will only serve to deteriorate already delicate foreign relations.  Accordingly, dismissal with prejudice is necessary.

### (ii)     The Government's Misconduct Requires Dismissal.

The Government's misconduct and blatant disregard for Mr. Gonzalez-Valencia's right to due process serves as an alternative basis for dismissal, and this conduct begins with the woefully deficient Extradition Affidavit.  As explained above, the Extradition Affidavit would not survive a probable cause determination in any court in this country, yet the Government requested that Uruguay detain and extradite Mr. Gonzalez-Valencia on that basis.  The threshold element needed to establish probable cause is proof of the identity of the specific drug, yet Agent Mori failed to identify the "units" as cocaine or methamphetamine.  It is abundantly clear in reviewing both the Extradition Affidavit and Agent Mori's affidavit in support of a wiretap that DOJ Attorney

---

[108] *See* David O. Stewart, *The Price of Vengeance: U.S. Feels Heat for Ruling that Permits Government Kidnapping*, 78-Nov A.B.A. J. 50 (1992) ("[A] resolution adopted by the lower house of the parliament of Uruguay asserted that the [*Alvarez-Machain*] decision shows 'a lack of understanding of the most elemental norms of international law, and in particular an absolute perversion of the function of extradition treaties.'").

FILED UNDER SEAL

Liskamm and Agent Mori understand the critical importance of naming the controlled substance at issue. This is why, at minimum, the Court's *in camera* review of the evidence adduced within the limitations period is so critical; if the Government indeed produced competent evidence within the limitations period before the grand jury, this is the best evidence that the Government's deficient offering of proof to extradite Mr. Gonzalez-Valencia was by design and not mistake.

Despite the absence of any evidence in the Extradition Affidavit that Mr. Gonzalez-Valencia conspired to distribute cocaine or methamphetamine within the limitations period, and instead of requiring Agent Mori to correct these fatal errors, DOJ Attorney Liskamm stated that, "[she had] reviewed the affidavit of DEA Special Agent Kyle J. Mori and the evidence in this case," and, "the prosecution of the charge in this case . . . is not barred by the statute of limitations."[109] She went even further to state that the Extradition Package demonstrated not only probable cause, but Mr. Gonzalez-Valencia's **guilt**.[110] Uruguay then *twice* asked for additional evidence. The Government, in blatant disregard of the Uruguayan court's multiple requests and Mr. Gonzalez-Valencia's constitutional right to due process, ignored Uruguay's requests and then outright refused to provide additional proof. With no further recourse, Uruguay simply deferred to the Government and granted its extradition request.

Moreover, not only did Mr. Gonzalez-Valencia's detention without probable cause itself violate the Treaty, but the length of his prolonged detention also was in direct violation of the Treaty. Article 11 of the Treaty requires release of a detained individual if "within ***forty-five calendar days*** from the date of provisional arrest, the requesting Party fails to present the formal request for extradition . . . ***supported by the documents required by Article 10***."[111] Similarly,

---

[109]  Ex. A at 15, 17 ¶ 13, 23.

[110]  *Id.* at 17–18 ¶ 23.

[111]  Ex. S art. 11 (emphasis added).

47

**FILED UNDER SEAL**

Article 12 of the Treaty requires the timely provision of additional evidence requested by the requested party and if the additional evidence is "not sufficient" or not provided timely, requires release of the detained individual.[112]   Despite these requirements, the Government failed to respond to the Uruguayan court's multiple requests for additional information for ***eight months***, during which time Mr. Gonzalez-Valencia was detained in Uruguay solely on the Government's extradition request.   Then, when the Government eventually did respond, the response came from someone purportedly from the Department of State ***without consulting the DOJ***.   Someone unilaterally decided on their own to refuse the Uruguayan court's request for the underlying evidence of the BBM Exchange central to the issue of the statute of limitations defense.   The Department of State's role in the extradition process is not to make unilateral decisions on important matters by and between the requesting and requested sovereigns.

The Government's documented flagrant and unconscionable misconduct in this case in violation of the Treaty, and the resulting deprivation of Mr. Gonzalez-Valencia's liberty, serves as a standalone basis for this Court to exercise its supervisory powers and dismiss the Indictment.

> **2.      Alternatively, Before Ruling on the Motion to Dismiss, the Court Should Conduct an *In Camera* Review of the Grand Jury Record**

In the alternative, and before ruling on dismissal, we respectfully move for the Court pursuant to Rules 6(e)(3)(E)(i) and (ii) of the Federal Rules of Criminal Procedure to conduct an *in camera* review of the grand jury record on the narrow issue of whether there was any competent evidence adduced within the limitations period.[113]  *See Coppedge*, 311 F.2d at 131–32 (holding

---

[112]  *Id.* art. 12.

[113]  Rule 6(e)(3)(E)(i) of the Federal Rules of Criminal Procedure allows for disclosure of grand jury material where the petitioner makes "a strong showing of particularized need," *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983), that "the materials sought [are] 'needed to avoid a possible injustice in another judicial proceeding' and the moving party's request be 'structured to cover only material so needed.'" Mem. Op. at 5, *In re Grand Jury Investigation*, No. 18-GJ-00008 (BAH) (D.D.C. Apr. 1, 2020) (quoting *United States v. Baggot*, 463 U.S. 476, 480

**FILED UNDER SEAL**

that there must be at least some evidence to support the charge); *United States v. Laughlin*, 226 F. Supp. 112, 114 (D.D.C. 1964) (holding that an indictment without competent evidence must be dismissed); *United States v. Wolff*, 840 F. Supp. 322, 323 (M.D. Pa. 1993) (dismissing an indictment because there was no evidentiary basis on which the grand jury could have found probable cause to indict the defendant).

There is a clear and particularized need for this narrow, *in camera* review—there has been a detailed showing that the Government likely did not adduce any competent evidence within the limitations period. Agent Mori is presumed to have testified before the grand jury consistent with his sworn affidavit a mere two weeks later. That testimony cannot identify the units in the BBM Exchange as cocaine or methamphetamine. There is no factual basis for anyone to reasonably conclude that the discussion in the BBM Exchange involved cocaine or methamphetamine and Agent Mori himself did not conclude that the BBM Exchange concerned cocaine or methamphetamine. Importantly, had he testified before the grand jury that, in his opinion, the BBM Exchange involved a discussion of cocaine or methamphetamine, this would be in material conflict with his sworn affidavit and thus, constitute evidence that tended to exculpate Mr. Gonzalez-Valencia under *Brady v. Maryland*, 373 U.S. 83 (1963). The Government, to date, has

n.4 (1983)). In addition, grand jury material may be disclosed "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii); *Sitzmann*, 74 F. Supp. 3d at 124 n.12. "While there is some small disagreement among courts regarding what precise standard a defendant must meet in order to gain disclosure of grand jury materials under Rule 6(e)(3)(E)(ii), most courts have held that the appropriate standard is that of 'particularized need,' borrowed from the standard under the case law applying to Rule 6(e)(3)(E)(i)." *United States v. Naegele,* 474 F.Supp.2d 9, 10 (D.D.C.2007) (citing *Ridings v. Dep't of Just.*, 38 F. App'x 20, 21, 2002 WL 1359490, *1 (D.C. Cir. 2002) (per curiam (unpublished)). "This standard applies both to in camera review and disclosure to the parties of grand jury minutes." *United States v. Dunn*, No. 05-CR-127 (KMK), 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005). The "particularized need" must outweigh the Government's interest in maintaining the secrecy of the grand jury proceeding. *United States v. Twersky*, No. S2 92 CR. 1082 (SWK), 1994 WL 319367, at *5 (S.D.N.Y. June 29, 1994). "Generally, however, once an investigation is over, most of the policies which warrant maintaining the secrecy of the grand jury proceeding, including, preventing the escape of those not yet indicted, are no longer present." *Id.*; *cf. In re Capitol Breach Grand Jury Investigations Within D.C.*, 339 F.R.D. 1, 24 (D.D.C. 2021) (Howell, C.J.) (noting interests in grand jury secrecy "are at their strongest when a grand jury investigation, and grand jury proceedings, are ongoing").

**FILED UNDER SEAL**

not indicated that it is in possession of any *Brady* material relating to Agent Mori's testimony, and we therefore rely on the Government's recognition of its obligations under *Brady* to presume that Agent Mori did not testify before the grand jury that the BBM Exchange involved cocaine or methamphetamine.[114]  Moreover, during a teleconference on November 12, 2020, DOJ attorneys informed Mr. Gonzalez-Valencia's counsel that, in essence, this BBM Exchange was the sole evidence adduced before the grand jury.[115]

An *in camera* review will lead to one of two possible conclusions—either the Government provided the same evidence to the grand jury that it provided to Uruguay, which does not demonstrate probable cause; or the Government's failure to provide sufficient evidence to establish probable cause to Uruguay and subsequent failure to provide *Brady* material to Mr. Gonzalez-Valencia was by design and not by mistake, providing the Court further justification to conduct a show cause hearing regarding the extent of the discovered misconduct.[116]  Either conclusion, we respectfully submit, mandates this Court's dismissal of the Indictment.

## III.    CONCLUSION

Accordingly, we respectfully implore this Court to use its supervisory powers to dismiss this case with prejudice or, alternatively, before ruling on the motion to dismiss, to conduct an *in camera* review of the grand jury record, or any further relief the Court deems just and proper.

---

[114] *See supra* Section I.C (discussing the Government's first *Brady* disclosure on the eve of the filing of this Motion).
[115] Ex. K, Lietz Decl. at ¶ 5.
[116]  The show cause hearing, we submit, creates "another judicial proceeding" under Federal Rule of Criminal Procedure 6(e)(3)(E)(i) which allows this Court, in its exercise of its supervisory powers, to conduct an *in camera* review narrowly tailored to determine whether the Government engaged in other misconduct by requesting that the grand jury return an indictment when they knew, or should have known, there was no evidence to sustain the charge.

**FILED UNDER SEAL**

Dated: April 15, 2022

Respectfully submitted,

 /s/ Stephen A. Best

**BROWN RUDNICK LLP**

Stephen A. Best (DC Bar No. 428447)
Tiffany B. Lietz (admitted *pro hac vice*)
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005
Telephone: (202) 536-1737
sbest@brownrudnick.com

-and-

**The L●S LAW FIRM**

Lilly Ann Sanchez (admitted *pro hac vice*)
Four Seasons Tower, Suite 1200
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 503-5503
lsanchez@thelsfirm.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

JA87

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2022, I electronically filed the foregoing document with the Clerk of the U.S. District Court for the District of Columbia by using the CM/ECF system.  All participants registered through the Court's electronic filing system will be served by the CM/ECF system as required to be served by Federal Rule of Criminal Procedure 49(a)(3)(A).

Date: April 15, 2022

 */s/ Stephen A. Best*
Stephen A. Best
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005
Telephone: (202) 536-1737
sbest@brownrudnick.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

JA88

# EXHIBIT C

2879



REPÚBLICA
ORIENTAL DEL
URUGUAY
PODER JUDICIAL

Juzgado Letrado Penal Especializado
en Crimen Org. 1º T
Bartolomé Mitre 1275 2º Piso - Montevideo
Tel. 1907 Int. 8406 - 8402 y 8404

## OFICIO

Montevideo, 28 de Julio de 2020

**Oficio Nº 334/2020**

DIRECCIÓN GENERAL DE REPRESIÓN AL TRÁFICO ILÍCITO DE DROGAS

DEPTO. DE REGISTROS, ANTECEDENTES Y ESTADÍSTICAS

Presente

En autos caratulados "GONZÁLEZ VALENCIA, Gerardo y otros-UN DELITO DE LAVADO DE ACTIVOS", IUE 2-37467/2015, se libra a Ud. el presente, conforme a lo solicitado por oficio Nº 1506/K/2020/NVHC (ref.: solicitud de información de migración exp. Nº 2019-4-2-0019948), y a lo dispuesto por decreto Nº 504 de fecha 28/07/2020, a fin de comunicar que:

Gerardo González Valencia cumplió prisión preventiva por esta causa (IUE 2-37467/2015) desde el 22/4/16 al 27/6/18, y conforme a lo dispuesto por decreto Nº 545/2018, desde el 27/6/2018 hasta el 14/5/2020 cumplió arresto administrativo por proceso de extradición en la causa IUE 474-76/2016.

Saluda atte.,

Esc. ANDRES ROMANO TRINIDAD
ACTUARIO ADJUNTO

[hw:] *2879*



**ORIENTAL REPUBLIC OF
URUGUAY
JUDICIAL BRANCH**

Special Criminal Court

in Org. Crime. 1st R

Bartolomé Mitre 1275 2° Piso - Montevideo

Tel. 1907 Int. 8406 - 8402 and 8404

## <u>OFFICIAL LETTER</u>

Montevideo, July 28, 2020

**Official Letter No. 334/2020**

GENERAL DIRECTORATE FOR THE REPRESSION OF ILLICIT DRUG TRAFFICKING

DEPT. OF RECORDS, BACKGROUND AND STATISTICS

Hand Delivered

In the case captioned "GONZÁLEZ VALENCIA, Gerardo et al.-A MONEY LAUNDERING OFFENSE", IUE (*Identificación Unica de Expedientes* [Unique Case Identification]) 2-37467/2015, this letter is hereby delivered to you, pursuant to official letter No. 1506/K/2020/NVHC (ref.: request for migration information file No. 2019-4-2-0019948), and as provided by decree No. 504 dated 07/28/2020, in order to inform you that:

Gerardo González Valencia served pre-trial detention for this cause (IUE 2-37467/2015) from 4/22/16 to 6/27/18, and pursuant to the provisions of Decree No. 545/2018, <u>from 6/27/2018 to 5/14/2020, served administrative detention due to extradition in the case of</u> IUE 474-76/2016.

Best regards,

[signature]
[stamp:] Mr. ANDRES ROMANO TRINIDAD
DEPUTY CLERK

4



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Exhibit C**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.



Jacqueline Yorke

Sworn to before me this
April 12, 2022

Signature, Notary Public

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

JA92

# EXHIBIT G

**brown**rudnick

STEPHEN A. BEST
direct dial: 202.536.1737
fax: 212.938.2937
sbest@brownrudnick.com

March 2, 2022

**VIA ELECRONIC MAIL**

Kaitlin Sahni
Kate Naseef
Kirk Handrich
Trial Attorneys
Narcotic and Dangerous Drug Section
U.S. Department of Justice, Criminal Division
145 N Street NE, 2nd Floor East
Washington, D.C. 20530

**RE:   United States v. Gerardo Gonzalez-Valencia (Case No. 16-CR-065)**

Dear Counsel:

  I write on behalf of my client, Gerardo Gonzalez-Valencia, to request further clarity on your stated position that the Department of Justice had no involvement with the Department of State's July 16, 2019 response to the Uruguayan Court regarding the Court's specific requests for further information (the "Diplomatic Note").

  Specifically, I request clarity on your statement to Judge Howell that the "Diplomatic Note [was] drafted by Department of State personnel without the involvement of the Department of Justice." Please provide responses to the below questions:

1. Prior to the Department of State's July 16, 2019 written response to the Uruguayan Court, did you or any member of the Department of Justice, receive a copy of the November 20, 2018 or February 22, 2019 requests from the Uruguayan Court?
2. Regardless of whether or not you received a copy of either request, was any member of the Department of Justice made aware of said requests from the Uruguayan Court? If so, when? Please provide the specific details.
3. Did any member of the Department of Justice review the response by the Department of State before it was sent? If so, please provide any and all drafts and details of any comments or proposed edits.
4. How could the Department of State competently and substantively respond to this request without consulting with the Department of Justice? Did personnel at the Department of State have substantive knowledge of the facts and supporting documentation in the case?
5. Does the Department of Justice have any understanding of why it took nine months to respond to the Uruguayan Court's requests?



United States v. Gerardo Gonzalez-Valencia
March 2, 2022
Page 2

As a courtesy, I attach translations of the requests from the Uruguayan Court and the Diplomatic Note. Please accord me with the favor of a response on or before close of business on Monday, March 7, 2022.

If you have any questions, please do not hesitate to call me directly at (202) 536-1737.

Sincerely,

**BROWN RUDNICK LLP**

Stephen A. Best

Enclosures

# EXHIBIT H



**U.S. Department of Justice**

Criminal Division

_Narcotic and Dangerous Drug Section_                    _Washington, D.C. 20530_

March 7, 2022

**<u>VIA E-MAIL</u>**

Stephen A. Best
Brown Rudnick, LLP
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005

Lilly Ann Sanchez
Four Seasons Tower
Suite 1200
1441 Brickell Avenue
Miami, FL 33131

Re:   <u>**United States v. Gerardo Gonzalez Valencia**</u>
      **Criminal No. 16-CR-065 (BAH)**

Dear Counsel:

The Government is in receipt of your letter dated March 2, 2022, requesting responses to questions about a Diplomatic Note dated July 16, 2019 ("Diplomatic Note").

The Diplomatic Note was not written by the Department of Justice.  The Department of Justice did not adopt the Diplomatic Note as its own statement.  Nor does the Diplomatic Note purport to be a statement of the Department of Justice.

Furthermore, when read in context, the Diplomatic Note—which is responding to requests from the Uruguayan Court attached to your letter—is clearly confirming that the original extradition package contains all materials necessary to satisfy the United States' treaty obligations to request extradition and that the United States is declining to provide additional information.  Therefore, by its own terms, the Diplomatic Note is saying that the original

extradition package is sufficient and complete, and the Diplomatic Note is not an effort to amend or change any of the assertions made in the original extradition materials.

Very truly yours,

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
U.S. Department of Justice
Washington, D.C. 20530


_/s/_____
Kaitlin Sahni
Kate Naseef
Kirk Handrich
Trial Attorneys

# EXHIBIT I



**Sentencia Nro. 13/2017**                                                      IUE 474-76/2016

Montevideo, 28 de Agosto de 2017

**VISTOS:**

Para sentencia definitiva de primera instancia estos autos caratulados **"GONZÁLEZ VALENCIA, Gerardo.- EXTRADICIÓN IUE 474-76/2016,** con la intervención del sr. Fiscal Letrado Nacional en lo Penal Especializado en Crimen Organizado de Segundo Turno Dr. Luis Pacheco y la Defensa de Confianza Dr. Víctor Della Valle y Dr. Carlos Balbi.-

**RESULTANDO:**

1) El 16 de junio de 2016 se recibió en esta sede solicitud de extradición de Gerardo González Valencia remitida vía diplomática por el Departamento de Justicia de Estados Unidos de América (fs. 1-107).

Previa vista del Ministerio Público, por providencia nº 701/2016 del 27 de junio de 2016, la sede realizó objeción a la solicitud por inobservancia de presupuestos de admisibilidad dispuestos por el art. 10 numeral 5 literal a) del Tratado de Asistencia Mutua en materia Penal y Extradición (ley nº 15.476) y exigió al Estado requirente el cumplimiento de tales requisitos así como información complementaria de acuerdo al art. 11 primer párrafo in fine del mismo Tratado (fs. 108-114).

2) El 2 de febrero de 2017 se recibió documentación remitida vía diplomática por el Estado requirente (fs. 125-131).

Por dictamen nº 156/2017 del 23 de febrero de 2017, el representante del Ministerio Público entendió cumplidos los requisitos necesarios para dar trámite a la solicitud de extradición (fs. 132 vto.-135).

Por resolución nº 181/2017 del 3 de marzo de 2017 y de conformidad con el dictamen fiscal, se dio inicio al proceso de extradición de acuerdo a las previsiones de los Tratados de Montevideo, específicamente los arts. 33 a 37 del Tratado de Derecho Penal Internacional de 1940 -aplicables por analogía en el caso de acuerdo a los principios del debido proceso y reglas que informan el proceso en general, en lo que no estuviere expresamente previsto (fs. 136-137).

00054527



3) En audiencia convocada –la cual fuera prorrogada en dos oportunidades a solicitud del propio requerido- y en presencia de su defensor, Gerardo González Valencia no aceptó la extradición solicitada (fs. 141-160).

Conferida vista del requerimiento formulado por las autoridades estadounidenses, la Defensa de Confianza del requerido compareció a deducir oposición, por las razones que se exponen en fundado escrito presentado en tiempo y forma, con documentación adjunta (fs. 161-220).

4) Por su parte, por dictamen n° 682/2017 del 12 de junio de 2017 el representante del Ministerio Público abogó por acoger la solicitud de extradición supeditada a las condiciones que establece (fs. 222-227).

5) Por auto n° 682/2017 del 15 de junio de 2017 la Jueza subrogante de la sede citó a las partes para resolución, habiendo subido los autos al despacho con fecha 23 de junio de 2017 (fs. 228-230 vto.).

**CONSIDERANDO:**

1) Se sustancia en estos obrados el proceso de la extradición solicitada por las autoridades competentes de los Estados Unidos de América respecto de Gerardo González Valencia a fin de ser sometido a proceso penal en dicho país por cargos de narcotráfico.

La extradición constituye un instituto de cooperación jurídica penal internacional, entendida como "toda aquella actividad de naturaleza procesal realizada en un Estado al servicio de un proceso penal promovido o a promoverse ante extraña jurisdicción". Cooperación que se hace efectiva "cuando el aparato jurisdiccional de un Estado, que no tiene imperio sino dentro de su territorio, recurre a la colaboración que le pueden prestar otros Estados a través de su actividad jurisdiccional" (Vieira, M., García Altolaguirre, C.- Extradición, FCU, ps. 108-109). Por su parte, sostiene el Prof. Miguel Langón que la extradición es la máxima expresión del principio de cooperación jurídica internacional entre los Estados en la lucha contra la delincuencia, consagrándose una verdadera obligación del Estado requerido de acceder al pedimento respectivo, dentro de los límites convencionales y legales en su caso (Curso de Der. Penal y Procesal Penal, ed. Del Foro, año 2003, ps. 119-121; Cfme. Cairoli, M. La cooperación penal internacional, la asistencia mutua y la Extradición, FCU, año 2000, p. 59).

En el mismo sentido se ha pronunciado la jurisprudencia nacional, afirmando pacíficamente que "la extradición como tal instituto se ubica modernamente dentro de la cooperación judicial penal internacional, la cual necesariamente debe ser encarada como un estatuto global integrado de solidaridad y garantías y a su vez habilita a visualizar a aquélla como un estatuto global de auxilio interetático y de garantías" (Rev. Der. Penal, n° 20, c. 146. p. 574).

00054528

Estos principios han sido recogido por numerosos tratados, los que consagran la obligación de los Estados de conceder la extradición cuando se cumplan las condiciones que se establecen, a modo de ejemplo: el Tratado Modelo de Extradición aprobado por la Asamblea General de las Naciones Unidas el 3 de abril de 1991, la Convención de Viena de 1988 sobre tráfico internacional de drogas, el Tratado de Extradición y Cooperación en Materia Penal entre la República Oriental del Uruguay y los Estados Unidos de América ratificado por nuestro país por dec-ley n° 15.476, el Tratado de Extradición entre Argentina y Uruguay ratificado por nuestro país por ley n° 17.225, el Acuerdo de Extradición entre los Estados partes del Mercosur ratificado por Uruguay por ley n° 17.499.

En mérito a todo ello, es indiscutible que existe una obligación internacional de extraditar a las personas reclamadas que se encuentren en las condiciones previstas en la normativa aplicable y de acuerdo a los principios que rigen la extradición.

2) El régimen de la extradición se regula en primer lugar por los Tratados ratificados entre los países, los cuales son "ley entre las partes". En defecto de Tratado, nuestro ordenamiento interno prevé el régimen de extradición en el art. 13 del C.P. y el art. 32 del C.P.P (Langón, ob. cit., ed. 2003, p. 128-129).

En el caso de autos es de aplicación el Tratado de Extradición y Cooperación en Materia Penal entre la República Oriental del Uruguay y los Estados Unidos de América, suscrito en Washington el 6 de abril de 1973 y aprobado por nuestro país por el dec-ley n°15.476 del 26 de octubre de 1983. Ello sin perjuicio de la aplicación de los principios generales del debido proceso y específicamente los principios que rigen la extradición.

El Tratado no establece el procedimiento a seguir ante el pedido de extradición sino que éste se rige por la *lex fori*, esto es, la de la nacionalidad del juez que conoce en el asunto: en la especie, la legislación uruguaya. El Código del Proceso Penal vigente en nuestro ordenamiento tampoco regula el proceso de extradición, por lo cual la jurisprudencia, en forma prácticamente unánime, aplica el procedimiento previsto en los Tratados de Montevideo de 1989 y 1940, en vía analógica.

En mérito a ello, en estos obrados se dio cumplimiento al procedimiento establecido en el capítulo IV del Tratado de Montevideo de 1989, lo cual fue consentido por las partes quienes no formularon objeción al respecto.

Solamente cabe agregar que es actualmente unánime la jurisprudencia en entender que la sentencia a dictarse tiene naturaleza definitiva, desde que pone fin al proceso de extradición, proceso principal y único. Según expresara el Tribunal de Apelaciones de Primer Turno, "el juicio extraditorio configura un procedimiento contradictorio cuyo objeto principal y exclusivo es un fallo declarando la procedencia o improcedencia del requerimiento del país extranjero"

00054529

(Rev. Der. Penal, n°11, c. 453, p. 319). Por lo tanto, el plazo para su dictado es el previsto en el art. 90 inc. 2° lit. A del C.P.P.

3) El objeto del proceso extraditorio consiste en controlar la regularidad formal de la demanda, no correspondiendo al Tribunal del Estado requerido proceder a la valoración del fondo del asunto, lo cual constituiría una invasión de las atribuciones de la autoridad requirente –sin perjuicio del eventual análisis del cumplimiento del requisito *non bis in idem* si correspondiere. Como ha señalado reiteradamente nuestra doctrina y jurisprudencia, el proceso de extradición no valora las pruebas de culpabilidad, no decide la antijuridicidad de la conducta del requerido ni resuelve el fondo del asunto, sino que todo el examen se reduce a la simple verificación de la regularidad de la demanda de extradición, a la luz de las disposiciones internacionales y nacionales aplicables en cada caso.

Esta ha sido la posición constante de la Suprema Corte de Justicia, afirmando en sentencia n° 51/2010 que: "...En el procedimiento de extradición, lo único que debe valorarse es la legitimidad formal del pedido, puesto que toda otra consideración acerca del fondo, es decir de la tipicidad del o de los delitos por los que se cursa la solicitud, son absolutamente violatorias del principio de competencia de las autoridades requirentes. Los tribunales del país requerido que aceptan o no el pedido de extradición no son competentes para juzgar el mérito de la causa. En tal sentido De Olarte en su tratado sobre 'Extradición', pág. 49, afirmaba que el Juez que interviene no es convocado para declarar la inocencia o culpabilidad, porque 'la extradición no importa juicio ni castigo', limitándose su función a verificar si la solicitud es ajustada a las formalidades y exigencias sustanciales del Tratado Internacional ratificado por los dos Estados..." (Cf. sentencias de la Suprema Corte de Justicia n° 154/999, n° 184/001, n° 216/003, n° 191/005, n° 41/006, n° 219/007, n° 32/2010 entre otras).

En consecuencia, esta sentencia deberá pronunciarse exclusivamente respecto de la procedencia formal de la solicitud de extradición, analizándose para ello los Tratados aplicables en el caso.

4) Analizadas las resultancias de las presentes actuaciones a la luz del citado Tratado de Extradición y Cooperación en materia penal que vincula a nuestro país con Estados Unidos de América,resulta que la solicitud cumplió las formalidades exigidas por el art. 10, a saber:

a) se tramitó por vía diplomática, desde que González Valencia fue requerido formalmente por las correspondientes autoridades judiciales de losEstadosUnidosde América ante la Cancillería de nuestro País y la Suprema Corte de Justicia (fs. 1-8 y 100-107);

b) la petición contiene una relación circunstanciada del hecho incriminado (fs. 12-18 y fs. 32-35 y las respectivas traducciones a fs. 57-63 y fs. 77-80);

c) se adjunta la documentación necesaria para la identificación del requerido (fs. 46-53 y

traducción a fs. 91-99) y la normativa aplicable (fs. 20-30 y traducción a fs. 77-80);

c) se acompaña la orden de detención o de prisión dictada por la autoridad competente del Estado requirente (fs. 37 traducida a fs. 82).

d) se acompaña traducción al español de toda la documentación remitida, según se detallara en literales anteriores.

En relación a la previsión del art. 10.5 literal a del Tratado, los documentos se encuentran firmados por las autoridades competentes y cuentan con la certificación y el sello del Departamento de Estado de los Estados Unidos de América (fs. 9, traducido a fs. 54). Si bien no cuentan con la legalización por agente diplomático o consular de la República Oriental del Uruguay en los Estados Unidos de América, se entendió, de conformidad con el dictamen fiscal n° 156/2017, que dicho requisito no es exigible de acuerdo a lo dispuesto por el Convenio Suprimiendo la Exigencia de Legalización de Documentos Públicos Extranjeros, suscrito en la Haya en el año 1961 y aprobado por nuestro país por ley n° 18.836 del 15 de noviembre de 2011. Sin perjuicio de lo expuesto, cabe señalar que este punto no fue cuestionado por la Defensa del requerido.

5) Asimismo resulta de se cumplen los presupuestos exigidos en los arts. 1 y 2 del Tratado, que consagran los principios generales en materia de extradición: jurisdicción del Estado requirente, doble incriminación y gravedad de la pena. A saber:

a) Gerardo González Valencia es requerido por la comisión de delitos perpetrados en el país requirente (fs. 77-78), de acuerdo a lo previsto en el art. 1° del Tratado, por lo cual es indiscutible la jurisdicción de las autoridades competentes de dicho país.

b) El requerido es acusado por la comisión de delitos de narcotráfico, específicamente conspiración para introducir y distribuir sustancias que contenían cantidad detectable de cocaína y metanfetamina en Estados Unidos (fs. 77-78), lo que encuadra en la previsión del art. 2 n° 17 del Tratado. Delitos que también están previstos en nuestro ordenamiento nacional, de acuerdo a las tipificaciones establecidas en los arts. 31 a 33 y 59 del dec-ley n° 14.294 (en su actual redacción dada por la ley n° 17.016).

La condición referida en este literal consagra el principio de doble incriminación, el cual exige que "la imputación por la cual se solicita laextradición, esté también tipificada como delito, en el orden jurídico del Estado requerido, apreciándose ello con la debida flexibilidad y aun cuando no existiera el mismo *nomen iuris* en los tipos. Es decir, lo que lo exigible, es que el hecho y la forma de participación en el mismo, por el que la persona es reclamada, debe estar previsto como delito por la ley de las dos partes contratantes, aunque tengan distinta denominación y aunque el tipo delictivo tienda eventualmente a proteger distintos bienes jurídicos en ambas legislaciones



… la calificación de la conducta, debe realizarse en el marco de las disposiciones convencionales creadas por la voluntad de las partes, dicho de otra manera, *in ordinem* como enseñaba Alfonsín" (Viera y otro, ob. cit., p. 427).

c) Los delitos por los que se lo reclama son castigados en ambos países con pena mínima de prisión superior a un año, tal como exige el acápite del art. 2 del Tratado: en nuestro país, los arts. 31 y 34 del dec-ley nº 14.294; en el país requirente, se sanciona la conducta que se pretende imputar al requerido con penas no menores a diez años de privación de libertad (fs. 71-72). Se cumple así entonces el principio de gravedad de la pena.

6) Por último, la solicitud de extradición no encuadra en ninguna de las hipótesis previstas en el art. 5 del Tratado en las cuáles la extradición no es procedente.

En relación a la hipótesis prevista en el literal a del art. 5, la misma consagra el principio *ne bis in ídem*. Este principio significa que nadie puede ser juzgado ni condenado dos veces por el mismo delito. Así expresó el Dr. Armando Tommasino: "La disposición impide el doble enjuiciamiento, y aunque no lo expresa, naturalmente también … la condena reiterada a un mismo individuo, por atribución del mismo hecho penal" (Principios, Derechos y Garantías en el Proceso, p. 63). El mismo principio vigente en el Derecho Nacional ha sido recogido en los Tratados de Extradición y aun cuando así no sea, se ha entendido que está "implícitamente consagrado en las disposiciones del art. 14.7 del Pacto Universal de los Derechos Civiles y Políticos que expresa: 'nadie podrá ser juzgado o condenado ni sancionado por un delito por el cual haya sido condenado o absuelto, por una sentencia firme de acuerdo con la Ley y el procedimiento penal de cada país'. Norma que ha sido tomada, aunque con algunas variantes, en el Pacto de San José de Costa Rica (art. 8.4) y constituye en nuestra opinión el de ser una norma de *ius cogens* internacional (Viera-Altolaguirre, "Extradición", Pág. 200).

El Tratado de Extradición celebrado entre Estados Unidos y Uruguay recoge en el principio mencionado, al disponer que no se concederá la extradición: "a) cuando la persona cuya entrega se gestiona ya hubiera sido juzgada y condenada o absuelta o estuviere siendo juzgada en el territorio del Estado requerido por el delito por el cual se solicita la extradición".

Al respecto corresponde señalar que si bien Gerardo González Valencia registra causa penal abierta en nuestro país, la solicitud de extradición no incurre en violación del principio *ne bis in idem*, desde que no refiere a los mismos hechos por los cuales está siendo juzgado en nuestro país. En efecto, el requerido se encuentra sometido a proceso penal ante este Juzgado Letrado Penal Especializado en Crimen Organizado de Primer Turno en autos IUE 2-37467/2016, imputado de la comisión de un delito de Lavado de activos previsto en el art. 54 del dec-ley nº 14.294, en su actual redacción dada por el art. 2 de la ley nº 18.494. No se le imputa en dicho proceso la comisión de delito de narcotráfico en ninguna de sus modalidades. Por lo cual la hipótesis no encuadra en la previsión del art. 5 literal a del Tratado.

00054552

En relación a la previsión del art. 5 literal c, que dispone que no se concederá la extradición "cuando la acción o la pena haya prescrito según las leyes del Estado requerido o requirente", se comparten las consideraciones de la Fiscalía en cuanto entiende que no ha operado la prescripción de los delitos por los cuales se requiere a González Valencia. Sin perjuicio de lo que se dirá más adelante al analizar las objeciones formuladas por la Defensa del requerido.

Resulta claramente de autos que la solicitud de extradición de González Valencia no encuadra en ninguna de las restantes hipótesis previstas en el art. 5 ya citado.

7) En suma, entiende la sentenciante que la extradición solicitada reúne los requisitos formales exigidos por el Tratado de Extradición que vincula a nuestro país con el Estado requirente y no encuadra en ninguna de las hipótesis de improcedencia de la solicitud antes mencionadas.

Sin perjuicio de ello, esta sentencia deberá resolver las cuestiones planteadas en la oposición formulada por la Defensa de Confianza de González Valencia, que fueran claramente reseñadas en la contestación del Ministerio Público, a saber: a) que el Tratado de Extradición refiere a personas procesadas o condenadas, lo cual no se configura en la especie y se trata de un juicio en rebeldía; b) que la declaración jurada presentada por el país requirente está viciada; c) que la declaración jurada no presenta evidencia que respalde ningún delito ocurrido dentro de los cinco años de la fecha del procesamiento por lo que ha operado la prescripción; d) que la declaración jurada no presenta evidencia y solo contiene afirmaciones de dos testigos colaboradores, respecto de los cuales omite información sobre su credibilidad; e) que el requerido enfrenta riesgos de ser condenado a muerte o a cadena perpetua.

8) En primer lugar, tal como señala la Defensa, el art. 2 del Tratado dispone que "serán entregadas las personas procesadas o condenadas por cualquiera de los delitos siguientes …...". Por otra parte, el art. 10.3 establece, entre los requisitos exigidos a la solicitud de extradición, que "cuando el requerimiento se refiera a una persona que aún no ha sido condenada, deberá ser acompañado de una orden de detención o de prisión o del auto de procesamiento judicial equivalente, emanado de la autoridad competente de la Parte requirente".

En este sentido, se comparte la posición de la Fiscalía, entendiendo que es admisible la solicitud de extradición cuando la persona aún no se encuentra "procesada" desde que alcanza para su requisitoria la orden de detención y teniendo en cuenta que el término "procesado" puede tener significado diverso en cada sistema procesal.

También se discrepa con la Defensa desde que, a juicio de la suscrita, no se ha cumplido respecto del requerido un juicio en rebeldía en el país requirente. De la documentación recibida resulta que con fecha 19 de abril de 2016 un jurado indagatorio del Distrito de Columbia presentó una acusación contra González Valencia por el cargo de conspiración para la introducción y distribución de sustancias estupefacientes en Estados Unidos (fs. 77-80). En mérito a dicha

acusación, el Tribunal de Distrito de Estados Unidos para el Distrito de Columbia libró la orden de detención correspondiente (fs. 82).

La declaración jurada de la Fiscal Litigante de la Unidad contra Narcóticos y Drogas Peligrosas de la División Penal del Departamento de Justicia de Estados Unidos Amanda Liskamm reseña claramente cuál es el procedimiento a seguir por el jurado indagatorio: el mencionado jurado examina las pruebas presentadas por las autoridades del orden público y en caso de entender que existen indicios suficientes para determinar que el hecho delictivo se ha cometido y que el acusado es el autor, dicta una "resolución de acusación" (fs. 58 numeral I). Ese fue el procedimiento seguido respecto de González Valencia, de acuerdo a lo reseñado en el párrafo anterior.

Esto en modo alguno significa que se haya sustanciado un proceso penal contra el requerido, sino que como se especifica en la declaración de la Fiscal Litigante "para que se profiera una sentencia condenatoria en contra de González Valencia ...... Estados Unidos debe demostrar en el juicio que González Valencia llegó a un acuerdo ...." , esto es, el Estado deberá acreditar en juicio los hechos invocados en la acusación (fs. 61 nº 17). A fin de llevar a cabo el juicio es que se solicita la extradición (fs. 62 nº 20).

8) En segundo lugar, respecto de la declaración jurada del Agente Especial Kyle Mori de la Agencia de Control de Drogas, no es de relevancia en este proceso de extradición el control de las observaciones formales esgrimidas por la Defensa, tales como la competencia del Tribunal ante el cual se rindió la declaración. Por el contrario la declaración reseña las actividades delictivas que se pretenden imputar al requerido González Valencia y a las pruebas recolectadas a tal fin, siendo éstos sí los extremos relevantes para el dictado de la presente sentencia.

En este sentido, tampoco se comparte que la prueba mencionada por el Agente Especial Kyle Mori sea insuficiente para respaldar la acusación y que ésta se funde casi exclusivamente en la declaración de dos testigos colaboradores.

Cabe reiterar los conceptos vertidos en el considerando nº 3 de esta sentencia, según los cuales en materia de extradición el juez lo único que tiene que hacer es controlar la regularidad formal de la solicitud y el cumplimiento de los requisitos exigidos por el Tratado aplicable al caso.

No corresponde entonces valorar la prueba producida por el Estado requirente sino que únicamente apreciarla para determinar que el pedido de extradición y la orden de arresto no sean manifiestamente infundados, de acuerdo a lo previsto por el art. 10.3 in fine del Tratado, que establece que "la parte requerida podrá solicitar que la requirente presente pruebas suficientes para establecer *prima facie* que la persona reclamada ha cometido el delito por el cual la extradición se formula. La parte requerida puede denegar la extradición si un examen del caso demuestra que la orden de arresto es manifiestamente infundada".

En el caso, la solicitud de extradición adjunta recaudos a fin de acreditar los hechos que se imputan a González Valencia, a saber: declaración jurada de la Fiscal Litigante de la Unidad contra Narcóticos y Drogas Peligrosas de la División Penal del Departamento de Justicia de Estados Unidos, declaración del Agente Especial Kyle Mori y resolución de acusación del jurado indagatorio del Distrito de Columbia presentada ante el Tribunal de Distrito de Estados Unidos para el Distrito de Columbia. Los recaudos reseñan los hechos investigados y los medios de prueba recolectados, en mérito a lo cual el Tribunal mencionado libró la orden de detención correspondiente.

A juicio de la sentenciante, los elementos de convicción referidos alcanzan el estándar probatorio exigido por el Tratado, no pudiendo concluirse que la orden de arresto librada por el Tribunal del Estado requirente sea manifiestamente infundada. Tal como ha expresado la Suprema Corte de Justicia en consideraciones trasladables al caso de autos, "más allá del resultado que recaiga oportunamente en el proceso a llevarse a cabo en el Estado requirente, es evidente que el pedido de extradición no tiene, ni cercanamente, la nota de manifiestamente infundado que requiere la norma al no surgir de la documentación presentada ningún elemento de juicio que haga suponer que - en realidad - el requerido no cometió los delitos de los que se lo acusa" (Sentencia n° 145/2002).

9) En tercer lugar, en cuanto a la prescripción de los delitos invocada por la Defensa, la suscrita ya se ha pronunciado en el considerando n° 6 compartiendo la conclusión del Ministerio Público.

En efecto, de acuerdo a los hechos reseñados en los documentos remitidos, los hechos delictivos que se imputan a González Valencia en la resolución de acusación, habrían ocurrido desde enero de 2003 y de forma permanente hasta la presentación de dicha acusación, esto es, el 19 de abril de 2016 (fs. 77-80), lo cual resulta reiterado en los restantes recaudos adjuntos, de los que surge asimismo que en el año 2013 se detectó una llamada telefónica del requerido referida a una transacción de narcotráfico. En la misma fecha antes mencionada, el Tribunal competente libró la orden de detención correspondiente (fs. 82).

Atendiendo a los hechos referidos y de acuerdo a las normas que acompañan la solicitud (fs. 67-73), no ha operado la prescripción de los delitos en el Estado requirente.

Tampoco ha operado la prescripción de acuerdo a las normas de nuestro país, específicamente el art. 117 del Código Penal.

Por lo cual también corresponde desestimar la oposición de la Defensa en esta cuestión, desde que no se adecua a la previsión del art. 5 literal c, como se señalara anteriormente.

No obstante ello, cabe señalar que según ha entendido nuestra jurisprudencia, "por más que el derecho extranjero debe probarse y surge en el caso de la documentación remitida, no

00054533

corresponde a los tribunales del Estado requerido -Uruguay- profundizar sobre dicho extremo y considerar o no la procedencia del pedido en función de un instituto que a los ojos del Tratado es una cuestión de mérito" (sentencia n° 380/2008 del Tribunal de Apelaciones en lo Penal de Primer Turno).

10) Finalmente, la Defensa solicita el rechazo de la extradición desde que entiende que González Valencia corre el riesgo que las autoridades competentes del Estado requerido le impongan condenas de cadena perpetua o pena de muerte.

Asiste razón a la Defensa en cuanto las penas previstas en Estados Unidos para los delitos que se imputan al requerido son mucho más severas que las establecidas en nuestro país. Esta circunstancia queda a la vista ante la simple lectura de las normas que acompañan la solicitud de extradición, de las que resultan que los delitos por los cuales se lo requiere se sancionan con penas de "privación de libertad no menos de diez años y no mayor de pena de reclusión a perpetuidad" y pena de encarcelamiento de "no más de veinte años" (fs. 72). Penas notoriamente más gravosas que las previstas en los arts. 31 a 35 y 59 del dec-ley n° 14.294 (en la actual redacción dada por la ley n° 17.016), cuyos guarismos máximos no superan los dieciocho años de penitenciaría.

En relación al riesgo que plantea la Defensa, tal como señala la Fiscalía, el art. 7 del Tratado prevé que "cuando el delito por el que se solicita la extradición fuera punible con la pena de muerte según la legislación de la Parte requirente, y las leyes del Estado requerido no admitieren esa pena para ese delito, este último podrá supeditar el otorgamiento de la extradición a que la Parte requirente otorgue garantías consideradas suficientes por la Parte requerida en el sentido que no será impuesta dicha sanción o que, de ser impuesta, la misma no será aplicada".

De conformidad a lo dispuesto por el art. 26 de la Constitución de la República, según el cual "a nadie se le aplicará la pena de muerte", es indudable que nuestro país está habilitado para supeditar el otorgamiento de la extradición a que el requirente otorgue garantías suficientes que no será impuesta o aplicada la pena de muerte.

Por el contrario, nada dispone el Tratado en relación a la eventual condena a prisión perpetua, la cual está prevista como tope máximo en la normativa agregada por el requirente (fs. 72).

Sin perjuicio de ello y compartiendo la posición del Ministerio Público, entiende la sentenciante que es admisible imponer al Estado requirente la condición prevista en el art. 7 del Tratado también en relación a la pena de prisión perpetua, desde que la misma no está prevista en nuestro orden público interno y contraviene nuestro orden público internacional (Cfme. Sentencia n° 135/2003 de la Suprema Corte de Justicia).

En efecto, la Convención de Naciones Unidas contra la Tortura (aprobada por ley n° 15798) y la

00054556

Convención Interamericana para prevenir y sancionar la tortura (aprobada por ley n° 16.294) establecen que los Estados Partes tomarán medidas efectivas para prevenir y sancionar, todos aquellos actos que –sin llegar a la tortura- constituyan penas crueles, inhumanas o degradantes (art. 16 y 6 de las convenciones citadas, respectivamente). Puede concluirse que la prisión perpetua constituye una pena inhumana y por lo tanto inadmisible para nuestro orden público internacional. Asimismo, la reclusión a perpetuidad está consagrada como supuesto que excluye la extradición en otros instrumentos internacionales firmados por nuestro país, tales como el Tratado de Extradición entre Uruguay y España (aprobado por ley n° 16.799) y el Tratado de Extradición entre Uruguay y Argentina (aprobado por ley n° 17.225). Ambas tratados establecen que no procederá la extradición cuando los hechos en que se funda la solicitud estuvieren castigados con pena de muerte o pena privativa de libertad a perpetuidad en el Estado requirente, pudiendo concederse en caso que el Estado requirente otorgare seguridades suficientes que la pena a cumplir será la máxima admitida en la ley penal del Estado requerido (arts. 9 y 8 respectivamente).

Como se señalara en considerandos anteriores, la cooperación internacional constituye un deber entre los Estados en la lucha por el combate del delito –especialmente la delincuencia organizada trasnacional. Sin embargo, es pertinente en este punto recordar las palabras del Profesor Raúl Cervini quien expresa: "En ese frágil equilibrio dinámico entre eficacia de la prestación asistencial y garantías de los concernidos, se encuentra precisamente la funcionalidad legitimante de la moderna cooperación penal internacional, la cual debe ser concebida en base a un concepto de Derecho de raíz antropocéntrica y garantizador de los Derechos Humanos. Eso es así porque en el ámbito de la cooperación judicial penal internacional está superada la época en que se asociaba su funcionamiento con el poder negociador de los Estados, con la igualmente difusa cortesía internacional e inclusive más modernamente con la concepción meramente instrumental del respeto y continuidad del proceso. Hoy día, estas últimas fundamentaciones vinculadas al trato entre Estados Soberanos deben estar también acompañadas por el imperioso reconocimiento de los derechos del concernido (sujeto afectado por las medidas de cooperación). Con ello se estará observando la función legitimante del derecho penal, tal como deber ser inexorablemente comprendido a partir de la concepción del pensamiento garantista" (Cervini, Raúl.- Principios de cooperación judicial penal internacional en el MERCOSUR, p. 13, Publicaciones del Instituto de Derecho Penal, Facultad de Derecho, UDELAR).

En conclusión y compartiendo la posición sustentada por la Fiscalía, entiende la sentenciante que es procedente condicionar la entrega de González Valencia a que el Estado requirente preste garantías suficientes que en caso de resultar condenado en el proceso penal que se le pretende iniciar, no se le impondrá pena de muerte ni pena de prisión perpetua.

11) En el mismo sentido, por los mismos fundamentos expuestos en el considerando anterior en referencia a las garantías del extraditado que deben respetarse en la cooperación internacional y

de acuerdo a lo previsto en el art. 13 del Tratado, se accederá a la solicitud fiscal disponiendo que el Estado requirente deberá asegurar que no se juzgará ni condenará al requerido por delitos distintos a los que se refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del citado artículo.

12) Por todo lo expuesto, se concluye que la solicitud de extradición de Gerardo González Valencia ha cumplido los requisitos exigidos por el Tratado de Extradición suscrito entre Uruguay y Estados Unidos, así como los principios jurídicos que rigen la extradición (doble incriminación, especialidad, legalidad) y que corresponde desestimar la oposición formulada por la Defensa de Confianza, con la salvedad referida en el numeral anterior.

En su mérito, se procederá a conceder la extradición de Gerardo González Valencia para ser sometido a proceso penal ante las autoridades competentes de Estados Unidos por los delitos referidos en la solicitud, con las condiciones que se indicarán a continuación.

En primer lugar, de acuerdo a lo peticionado por el Ministerio Público, la entrega se hará efectiva una vez que el requerido obtenga su excarcelación provisional o libertad definitiva en la causa que se le sigue en Uruguay ante esta sede IUE 2-37467/2016.

A tales efectos, debe tenerse presente que la causa IUE 2-37467/2016 se encuentra en etapa de sumario y Gerardo González Valencia está recluido desde su procesamiento en prisión preventiva a disposición de la misma. Por tal razón no ha cumplido arresto administrativo en el presente proceso de extradición.

En segundo lugar, de acuerdo a lo previsto por el art. 13 del Tratado, se condiciona la extradición concedida a que las autoridades del Estado requirente aseguren que no se juzgará ni condenará al requerido por delitos distintos a los que se refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del citado artículo.

En tercer lugar, de acuerdo a lo previsto por el art. 7 del Tratado y de conformidad con nuestro orden público interno e internacional y el respeto de las garantías del requerido emergentes del derecho internacional de los derechos humanos, se condiciona la extradición concedida a que las autoridades requirentes otorguen garantías consideradas suficientes por las autoridades nacionales intervinientes en este proceso, que en caso que Gerardo González Valencia resulte condenado en el proceso penal que se le pretende iniciar en el país requirente, no se le impondrá pena de muerte ni pena de prisión perpetua.

Finalmente, se solicitará al Estado requirente que exprese si acepta las condiciones en que se admite la extradición dentro del plazo de cuarenta días a partir de la notificación de la presente sentencia.

**FALLO:**



Concédese la extradición de Gerardo González Valencia solicitada por las autoridades competentes de Estados Unidos, bajo las siguientes condiciones: I) se difiere la entrega hasta que el requerido obtenga su excarcelación provisional o libertad definitiva en la causa que se le sigue en Uruguay ante esta sede IUE 2-37467/2016; II) se condiciona la extradición concedida a que las autoridades del Estado requirente aseguren que no se juzgará ni condenará al requerido por delitos distintos a los que se refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del citado artículo; III) se condiciona la extradición concedida a que las autoridades requirentes otorguen garantías consideradas suficientes por las autoridades nacionales intervinientes en este proceso, que en caso que Gerardo González Valencia resulte condenado en el proceso penal que se le pretende iniciar en el país requirente, no se le impondrá pena de muerte ni pena de prisión perpetua; IV) las autoridades competentes del Estado requirente deberán expresar si aceptan las condiciones dispuestas en los numerales anteriores, dentro del plazo de cuarenta días a partir de la notificación del presente fallo.

Líbrense las comunicaciones correspondientes a la autoridad requirente vía diplomática, con las formalidades que correspondan.-

Notifíquese y ejecutoriada, cúmplase.-

Dra. Beatriz LARRIEU DE LAS CARRERAS
Juez Ldo.Capital

Esc. ANDRES ROMANO TRINIDAD
ACTUARIO ADJUNTO

JA112
00054559

# EXHIBIT L

# brownrudnick

STEPHEN A. BEST
direct dial: 202.536.1737
fax: 212.938.2937
sbest@brownrudnick.com

November 9, 2021

**VIA ELECRONIC MAIL**

Brett Reynolds
Kaitlin Sahni
Kate Naseef
Narcotic and Dangerous Drug Section
U.S. Department of Justice, Criminal Division
145 N Street NE, 2nd Floor East
Washington, D.C. 20530

**RE:    United States v. Gerardo Gonzalez-Valencia (Case No. 16-CR-065)**

Dear Counsel:

        We write on behalf our client, Mr. Gonzalez-Valencia in connection with the above-referenced matter. Based on our review of discovery produced by the Government thus far, we request disclosure of all additional documents and information about Mr. Gonzalez-Valencia's whereabouts while he resided in Argentina and Uruguay pursuant to Federal Rules of Criminal Procedure Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).

Specifically, we request the following:

- All witness statements made by any agent of the United States Government or other law enforcement agency, or any other person referencing Mr. Gonzalez-Valencia in any way including reference to Mr. Gonzalez-Valencia's whereabouts between 2009 and 2016.

- All transcripts of witness interviews conducted by the Argentine and Uruguayan Governments or any other law enforcement agency in Argentina and Uruguay, and now in the possession of the United States Government, that stipulate Mr. Gonzalez-Valencia was living in Argentina and/or Uruguay between 2009 and 2016, including all witness statements made by staff employed by Mr. Gonzalez-Valencia.

- All data obtained by the United States Government using surveillance tactics or any other reconnaissance activity used to establish Mr. Gonzalez-Valencia's whereabouts between 2009 and 2016.

JA114



Re: United States v. Gerardo Gonzalez-Valencia
November 9, 2021
Page 2

- All memoranda produced by or received by the United States Government containing information about Mr. Gonzalez-Valencia's whereabouts between 2009 and 2016.

- All photographs, video recordings and audio recordings containing information about Mr. Gonzalez-Valencia's whereabouts between 2009 and 2016.

- Any notification process in place to inform the United States Government or other law enforcement agency when Mr. Gonzalez-Valencia boarded a flight or otherwise traveled between 2009 and 2016 and the results of any such notification process.

- All Suspicious Activity Reports ("SARs") referencing Mr. Gonzalez-Valencia and issued to the United States Government or other law enforcement agency between 2009 and 2016 from any bank or financial institution located in Argentina, Uruguay and/or Mexico.

- All documents relating to immigration notifications placed on Mr. Gonzalez-Valencia that notified the United States Government or any other law enforcement agency or government of Mr. Gonzalez-Valencia's movements within Argentina and/or Uruguay and between Argentina and/or Uruguay and any other country, between 2009 and 2016.

- All Interpol notifications received by the United States Government or any other law enforcement agency or government related to Mr. Gonzalez Valencia's presence in Argentina and Uruguay between 2009 and 2016.

- All communication between the United States Government and any law enforcement agency, American embassy and/ or government in Argentina, Uruguay and/ or Mexico between 2009 and 2016.

- All other documents, exhibits, and productions that contain information pertinent to Mr. Gonzalez-Valencia's whereabouts between 2009 and 2016.

If you have any questions regarding the requests above, please do not hesitate to me call at (202) 536-1737.

Sincerely,

**BROWN RUDNICK LLP**

Stephen A. Best

# EXHIBIT M



**U.S. Department of Justice**

Criminal Division

---

*Narcotic and Dangerous Drug Section*                    *Washington, D.C. 20530*

April 12, 2022

**VIA Electronic Mail**

Stephen A. Best
Brown Rudnick, LLP
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005

Lilly Ann Sanchez
Four Seasons Tower
Suite 1200
1441 Brickell Avenue
Miami, FL 33131

   Re: **United States v. Gerardo Gonzalez Valencia**
     **Criminal No. 16-CR-065 (BAH)**

Dear Counsel:

  The Government is disclosing the following information as it is potentially discoverable pursuant to Rule 16 of the Federal Rules of Criminal Procedure and the Government's obligations under Brady v. Maryland, 373 U.S. 83, 87 (1963):

  In late October 2015, the Government obtained an assessment, based on information from sources unknown to the Government, that the Los Cuinis drug trafficking organization, made up of the Gonzalez Valencia siblings, was the financial arm of the Cartel de Jalisco Nueva Generacion (CJNG), but was not directly involved in the production, movement, or distribution of drugs. According to the assessment, Los Cuinis laundered money for CJNG and provided CJNG with funds that were used to purchase weapons, pay for logistical support, and recruit former paramilitary personnel to provide guerilla warfare training, which enabled CJNG to expand its drug trafficking activities. According to the assessment, CJNG attempted to distance the CJNG's drug trafficking activities from Los Cuinis to protect the drug trafficking organization and the family's fortune. The Government has information that not all of the Gonzalez Valencia siblings were involved in illicit activities.

The Government will furnish the defense before trial with information or material regarding payments, promises of immunity, leniency, or preferential treatment, if any, made to witnesses within the scope of Giglio v. United States, 405 U.S. 150 (1972) and Napue v. Illinois, 360 U.S. 264 (1959).  The Government will furnish before trial information or material regarding any prior convictions of any co-conspirator, accomplice or informant who will testify at trial for the Government.  The Government will also furnish before trial materials discoverable pursuant to Title 18, United States Code, Section 3500.

If at any time the Government no longer intends to call at trial the confidential informant or informants who provided the information summarized herein, at that time the Government will disclose their identities to the defendant.  *See* United States v. Glover, 583 F. Supp. 2d 5, 12 (D.D.C. 2008); United States v. Holland, 41 F. Supp. 3d 82, 104 (D.D.C. 2014); United States v. Ferguson, 498 F.2d 1001, 1003-05 (D.C. Cir. 1974).

The Defendant's Required Disclosures

The Government hereby requests reciprocal discovery under Rule 16(b) of the Federal Rules of Criminal Procedure.  The Government requests that the defendant allow inspection and copying of (1) any books, papers, documents, photographs, tapes, tangible objects, or copies or portions thereof, which are in the defendant's possession, custody or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial, and (2) any results of reports or physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, which are in the defendant's possession, custody, or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial or which were prepared by a witness whom the defendant intends to call at trial.

The Government also requests that the defendant disclose prior statements of witnesses who will be called by the defendant to testify.  See Fed. R. Crim. P. 26.2.  In order to avoid any unnecessary delay, we request that you have copies of these statements available for production to the Government no later than the commencement of trial.

The Government also requests that the defendant disclose a written summary of testimony the defendant intends to use under Rules 702, 703, and 705 of the Federal Rules of Evidence.  The summary should describe the opinions of the witnesses, the bases and reasons for those opinions, and the witnesses' qualifications.

Very truly yours,

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
U.S. Department of Justice
Washington, D.C. 20530

_/s/_____
Kaitlin Sahni
Kate Naseef
Kirk Handrich
Trial Attorneys

JA118

# EXHIBIT P



An official website of the United States government
<u>Here's how you know</u>

</> FULL MENU

## PUBLIC SAFETY ALERT

Sharp Increase in Fake Prescription Pills Containing Fentanyl and Meth
<node/202791> - Illegal, Dangerous, Potentially Deadly

# Drug Enforcement Administration

William Bodner
Special Agent in Charge

Los Angeles

@dealosangeles <https://twitter.com/dealosangeles>

**March 03, 2021**

**Contact:** Nicole Nishida

**Phone Number:** (571) 387-3136

**For Immediate Release**

---

# High-Level CJNG Associate Financially Sanctioned

**Los Angeles** – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated Mexican national Juan Manuel Abouzaid El Bayeh ("Abouzaid El Bayeh") as a Specially Designated Narcotics Trafficker pursuant to the Foreign Narcotics Kingpin Designation Act (Kingpin Act). OFAC designated Abouzaid El Bayeh for his high-level role in facilitating drug shipments and money laundering for the Cartel de Jalisco Nueva Generacion (CJNG), a violent Mexican drug trafficking organization that is responsible for trafficking a significant proportion of the fentanyl and other deadly drugs that enter the United States. Today's action is the result of OFAC's ongoing collaboration with the Drug Enforcement Administration (DEA) Los Angeles Field Division.

"Treasury's action against Abouzaid El Bayeh is a demonstration of the United States' continuing commitment to dismantling CJNG through the targeting of critical cogs in the organization's leadership structure," said Director of the Office of Foreign Assets Control Andrea M. Gacki.

"The CJNG is responsible for the majority of the fentanyl, methamphetamine and other illicit drugs that flood Los Angeles," said DEA Los Angeles Field Division Special Agent in Charge Bill Bodner. "Our unwavering mission to disrupt CJNG's operations was reflected by today's actions against those that aid and support this global criminal enterprise."

Abouzaid El Bayeh was designated today for materially assisting in, providing financial or technological support for or to, or providing goods or services in support of the international narcotics trafficking activities of CJNG. In June 2020, Mexican authorities blocked Abouzaid El Bayeh's Mexican bank accounts due to his relationship with CJNG. Previously, in October 2018, the U.S. Department of Justice identified Abouzaid El Bayeh as being linked to CJNG and unsealed a federal drug trafficking indictment filed against him in the U.S. District Court for the District of Columbia that was investigated by the DEA Los Angeles Field Division. Specifically,

Abouzaid El Bayeh was charged with conspiracy to distribute cocaine and methamphetamine, knowing and intending that it will be imported into the United States. The indictment alleges the activity began in or around 2012. Abouzaid El Bayeh, who remains a fugitive from these charges, maintains a close relationship with senior leaders of CJNG.

PREVIOUS U.S. GOVERNMENT ACTIONS ON CJNG AND LOS CUINIS

Today's Kingpin Act designation marks OFAC's twelfth action against CJNG, which was designated on April 8, 2015, along with its leader, Nemesio Ruben Oseguera Cervantes (a.k.a. "Mencho"), for playing a significant role in international narcotics trafficking. In previous actions, OFAC designated a wide range of businesses and individuals linked to CJNG and its close ally, the previously designated Los Cuinis Drug Trafficking Organization. The previously designated businesses in Mexico include shopping centers, real estate companies, agricultural companies, a music promotion business, and a luxury boutique hotel. Many of these Mexican entities have engaged in the laundering of drug proceeds and represent attempts by CJNG and Los Cuinis to integrate themselves into the legitimate economy. Among the previously designated individuals are those who play critical roles in CJNG's drug trafficking activities, including money laundering, and those who facilitate corruption activities on behalf of CJNG and Los Cuinis.

The U.S. Department of State's Narcotics Rewards Program <https://www.state.gov/narcotics-rewards-program-target-information-wanted/nemesio-ruben-oseguera-cervantes/> has issued a reward of up to $10 million for information leading to the arrest and/or conviction of Nemesio Ruben Oseguera Cervantes. Tips can be submitted to DEA by phone (+1-213-237-9990), through Twitter (@DEALosAngeles), and by email (MENCHOTIPS@usdoj.gov <https://my.treas.gov/collab/ofac/globaltargeting/pressreleases/press%20releases/menchotips@usdoj.gov>) for both fugitives, Nemesio Ruben Oseguera Cervantes and Abouzaid El Bayeh.

As a result of today's action, all property and interests in property of the designated individual that are in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC. OFAC's regulations generally prohibit all transactions by U.S. persons or persons within (or transiting) the United States that involve any property or interests in property of designated or otherwise blocked persons.

JA122

Since June 2000, more than 2,200 entities and individuals have been sanctioned pursuant to the Kingpin Act for their role in international narcotics trafficking. Penalties for violations of the Kingpin Act range from civil penalties of up to $1,503,470 per violation to more severe criminal penalties. Criminal penalties for corporate officers may include up to 30 years in prison and fines of up to $5 million. Criminal fines for corporations may reach $10 million. Other individuals could face up to 10 years in prison and fines pursuant to Title 18 of the United States Code for criminal violations of the Kingpin Act.

### 

Los Angeles Field Division is the 2nd largest division in DEA and responsible for the seven largest counties in Southern California — Los Angeles, Orange County, Ventura, Riverside, San Bernardino, San Luis Obispo, Santa Barbara, as well as the states of Nevada (Las Vegas/Reno), and Hawaii (Oahu/Maui), and the U. S. Territories of Guam and Saipan.

  

**SAMHSA Behavioral Health Treatment Locator**

Address, city, state or zip code

**Go**

**Who We Are** </who-we-are>

**What We Do** </what-we-do>

**Resources** </resources>

**Drug Information** </drug-information>

**Doing Business with the DEA** </resources/doing-business-dea>

About <https://www.dea.gov/who-we-are/about>

Domestic Divisions <https://www.dea.gov/divisions>

Foreign Offices <https://www.dea.gov/foreign-offices>

Contact Us <who-we-are/contact-us>

DEA Museum <https://www.deamuseum.org/>

Drug Prevention <what-we-do/education-and-prevention>

Law Enforcement </law-enforcement>

Diversion Control Division <https://www.deadiversion.usdoj.gov>

News </news>

Employee Assistance Program </resources/eap>

Equal Opportunity Employer </how-to-apply/equal-opportunity-employer>

FOIA <https://www.dea.gov/foia>

Publications

Media Galleries </resources/media-galleries>

VWAP <https://www.dea.gov/resources/vwap>

Overview </resources/doing-business-dea>

Current Vendors </doing-business-dea/current-vendors>

Prospective Vendors </doing-business-dea/prospective-vendors>

Security Clauses </doing-business/security-clauses>

Security Forms </doing-business-dea/security-forms>

Small Business Program </doing-business-dea/small-business>

**Policies** <>

Accessibility, Plug-ins & Policy </resources/accessibility-plug-ins-policy>

JA124

## Legal Policies & Disclaimers

<https://www.justice.gov/legalpolicies#disclaimer>

## No FEAR Act

<https://www.justice.gov/jmd/eeo-program-status-report>

## Privacy Policy

<https://www.justice.gov/doj/privacy-policy>

## U.S. Department of Justice EEO Policy

<https://www.justice.gov/jmd/file/790081/download>

## USA.gov

<https://www.usa.gov/>

## Whistleblower Protection

<https://www.justice.gov/pardon/whistleblower-protection-enhancement-act>



# United States Drug Enforcement Administration

DEA.gov is an official site of the U.S. Department of Justice <https://www.justice.gov/>

<https:/ /www.f aceboo k.com/ deahq/  <https:/ /www.t witter.c om/DE Ahq>  <https:/ /www.li nkedin. com/co mpany/ drug-enforce ment-admini stratio  <https:/ /www.i nstagra m.com/ deahq>

## DEA Contact Center

(202) 307-1000 info@dea.gov

Contact the Webmaster </contact-us>

Case 1:16-cr-00065-BAH    Document 97-7    Filed 04/28/22    Page 8 of 8

stratio
n>

JA126

# EXHIBIT Q

Case 6:16-cr-00065-BAH Document 97-8 Filed 04/28/22 Page 2 of 4

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

## WESTERN DISTRICT *of* VIRGINIA

U.S. Attorneys » Western District of Virginia » News

**Department of Justice**

U.S. Attorney's Office

Western District of Virginia

FOR IMMEDIATE RELEASE                                   Monday, March 25, 2019

# Federal Grand Jury Indicts 12 Members of Jalisco New Generation Cartel (CJNG)

Harrisonburg, VIRGINIA – A federal grand jury sitting in U.S. District Court in Harrisonburg has indicted 12 members of Jalisco New Generation Cartel (CJNG), a Mexican-based criminal organization considered by the Department of Justice to be one of the five most dangerous transnational organizations in the world, on federal drug conspiracy charges, United States Attorney Thomas T. Cullen announced today.

"CJNG is one of the most dangerous drug cartels in the world, and its members and associates are actively operating in the Shenandoah Valley and Southside Virginia," United States Attorney Cullen stated today. "Dismantling organized drug activity and staunching the flow of deadly substances like heroin and cocaine into our communities are among my top priorities as U.S. attorney. I am grateful that our federal, state, and local partners share this goal and for their hard work during the course of this investigation."

"This investigation demonstrates the extensive reach of Mexican drug cartels and the dangers posed by their presence and activities in the Western District of Virginia and across the Commonwealth," said Jesse R. Fong, Special Agent in Charge of DEA Washington Field Division. "The DEA will continue to work with our federal, state, and local law enforcement partners, as well as the U.S. Attorney's Office, to hold these powerful cartels accountable for the destruction they cause."

In an indictment returned under seal on March 5, 2019, and unsealed today following the initial court appearance of two defendants, the grand jury charges:

1. Ramon Carillo-Ruvalcaba, a.k.a. "The Barber" one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.
2. Eduardo Contreras-Devora, one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana and one count of possession of a firearm in furtherance of a drug trafficking crime.
3. Daniel Gomez-Barajas, one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.
4. Roman Idearte-Bolanos, one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.
5. Alberto Jijon, one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.

JA128

6. Miguel Angel Patricio-Cajero, one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.

7. Isdro Ramos-Bojorquez, a.k.a. "Chilo" one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.

8. Jesus Rogelio Ramirez, a.k.a. "Jesse" one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.

9. Jonathan Rocas-Osorio, a.k.a. "Oscar Osorio-Munoz" one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.

10. Ana Bella Sanchez-Rios, one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana and one count of money laundering.

11. Ritchie Triplett, one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.

12. Ernesto Valenzuela-Flores, a.k.a. "Juan Flores-Arrellano" one count of conspiracy to distribute and possess with the intent to distribute cocaine, heroin, and marijuana.

According to the indictment, between January 2015 and February 2019, the defendants trafficked multiple kilograms of cocaine, heroin and marijuana from Mexico into the United States. As part of the alleged conspiracy, CJNG members recruited individuals from Mexico to reside in Axton and Winchester, Virginia to facilitate the distribution of cocaine, heroin, and marijuana.

As part of the conspiracy, it is alleged that the defendants maintained a series of residential properties in and around Axton for the purpose of receiving, storing, packaging, and distributing multiple kilograms of cocaine and multiple pounds of marijuana which they had received directly from members of CJNG. These drugs were then allegedly shipped to Winchester, and elsewhere throughout the Mid-Atlantic region, for redistribution.

In addition, the indictment charges Sanchez-Rios, who owns and operates a money transmitting business, with money laundering.  Between May 2016 and September 2018, Sanchez-Rios transmitted funds that she knew had been derived from a criminal offense, specifically drug trafficking.

The investigation of the case was conducted by the Drug Enforcement Administration, the Department of Homeland Security-Homeland Security Investigations, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Federal Bureau of Investigations, the Northwest Virginia Regional Drug and Gang Task Force (NWVRDGTF), the Henry County Sheriff's Office, and the Virginia State Police.  Assistance was provided by the Winchester Sheriff's Office.  Assistant United States Attorneys Erin M. Kulpa and Sean Welsh are prosecuting the case for the United States.

This investigation was funded in part by the federal Organized Crime Drug Enforcement Task Force (OCDETF) Program. The OCDETF program supplies critical federal funding and coordination that allows federal and state agencies to work together to successfully identify, investigate, and prosecute major interstate and international drug trafficking organizations and other criminal enterprises.

The NWVRDGTF uses the combined efforts of local, state, and federal agencies to actively pursue those groups or individuals who manufacture, distribute, or sell illegal narcotics.  The NWVRDGTF is comprised of the Virginia State Police, the Winchester Police Department, the Front Royal Police Department, the Strasburg Police Department, the Frederick County Sheriff's Office, the Page County Sheriff's Office, the Warren County Sheriff's Office, the Shenandoah County Sheriff's Office, and the Clarke County Sheriff's Office.

A Grand Jury Indictment is only a charge and not evidence of guilt.  The defendants are entitled to a fair trial with the burden on the government to prove guilt beyond a reasonable doubt.

JA129

**Topic(s):**
Drug Trafficking

**Component(s):**
USAO - Virginia, Western

Updated March 25, 2019

# EXHIBIT R

4/15/22, 11:31 AM     Justice, Treasury, and State Departments Announce Coordinated Enforcement Efforts Against Cartel Jalisco Nueva Generacion | ...

Case 1:16-cr-00065-BAH Document 37-9 Filed 04/28/22 Page 2 of 5



🇺🇸 An official website of the United States government
<u>Here's how you know</u>

THE UNITED STATES
**DEPARTMENT** *of* **JUSTICE**
TICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                              Tuesday, October 16, 2018

## Justice, Treasury, and State Departments Announce Coordinated Enforcement Efforts Against Cartel Jalisco Nueva Generacion

The United States of America, through its Departments of Justice, Treasury, and State  announced today a series of measures to target and dismantle the Cartel Jalisco Nueva Generacion (CJNG) – one of the largest, most dangerous drug cartels currently operating in Mexico. These measures include the unsealing of 15 indictments, the State Department's approval of large rewards, the Department of the Treasury's Office of Foreign Assets Control (OFAC) designations, and the establishment of a citizen tip-line.

CJNG is one of the most powerful cartels in Mexico and the Department of Justice considers it to be one of the five most dangerous transnational criminal organizations in the world, responsible for trafficking many tons of cocaine, methamphetamine and fentanyl-laced heroin into the United States, as well as for violence and significant loss of life in Mexico.

Attorney General Jeff Sessions of the U.S. Department of Justice, Assistant Attorney General Brian A. Benczkowski of the Justice Department's Criminal Division, Acting Administrator Uttam Dhillon of the U.S. Drug Enforcement Administration (DEA), FBI Deputy Director David L. Bowdich, Director Andrea Gacki of OFAC, Assistant Secretary for International Narcotics and Law Enforcement Affairs Kirsten D. Madison of the U.S. Department of State, U.S. Immigration and Customs Enforcement's Homeland Security Investigations (HSI) Executive Associate Director Derek Benner and Chief Don Fort of IRS Criminal Investigation (IRS-CI), made the announcement.

**Background**

Founded in 2011, CJNG has grown in size and strength rapidly since its inception.  Today, the DEA estimates the CJNG exerts influence in 23 of 31 (75 percent) of Mexican states, including  key drug production and transportation corridors. CJNG is a powerful drug cartel in Mexico as a result of the organization's disciplined command and control, sophisticated money laundering techniques, efficient drug transportation routes, and extreme violence.  The cartel has also expanded globally, with significant presence and illicit business not only throughout the United States and Mexico, but also Europe, Asia, and Australia.

"We will continue to hammer transnational criminal organizations like the Cartel de San Jalisco Nueva Generacion, or CJNG," said Attorney General Sessions.  "The DEA has said for three years in a row that Mexican drug cartels are the single gravest drug threat that this country faces.  President Trump recognizes this, and the day I was sworn in as Attorney General, he ordered me to dismantle transnational criminal organizations, including the cartels.  We have been faithful to that order.  Today, I am announcing 15 indictments returned against the leaders of CJNG. These indictments are our next steps—but not our last.  We will continue following President Trump's order."

"DEA has a strong partnership with the Government of Mexico that is demonstrated in the relentless pursuit of the violent leadership of the CJNG cartel," said Acting Administrator Dhillon. "We will continue to work closely with our international partners to bring Nemiso Cervantes aka El Mencho to justice and dismantle drug cartels like CJNG."

JA132

**Unsealing of Indictments**

Today, the Department of Justice Criminal Division's Narcotic and Dangerous Drug Section, U.S. Attorney's Office in the Southern District of California, the Northern District of Illinois, the Southern District of Mississippi, and the Eastern District of Virginia are announcing 15 indictments, some recently unsealed, against the following CJNG leaders, financiers, transporters, and sources of drug supply:

Nemesio Oseguera Cervantes, aka "Mencho":  Oseguera Cervantes, 52, is the lead defendant in a three-count superseding indictment returned in the District of Columbia in 2017 alleging that he is the leader of a Continuing Criminal Enterprise, conspired to distribute significant quantities of narcotics for illegal importation into the United States, and has used a firearm during and in relation to these drug trafficking crimes.  In addition to the indictment in the District of Columbia, Oseguera Cervantes has also been charged with drug trafficking offenses in the Southern District of Mississippi (SDMS).  He is currently a fugitive and was designated as a "Kingpin" under the Foreign Narcotics Kingpin Designation Act by the Department of the Treasury in April 2015.

Ruben Oseguera Gonzalez, aka, "Menchito":  Oseguera Gonzalez, 28, Oseguera Cervantes' son, served as the CJNG's second in command until the time of his arrest by Mexican authorities in June 2015.  Oseguera Gonzalez is charged in a two-count indictment returned in the District of Columbia in 2017 alleging that between 2007 and February 2017, Oseguera Gonzalez engaged a conspiracy to distribute significant quantities of narcotics for illegal importation into the United States and that Oseguera Gonzalez engaged in the use of a firearm during and in relation to one or more drug trafficking crimes.  Oseguera Gonzalez remains in Mexican custody and is currently pending extradition to the United States.

Abigael Gonzalez Valencia: Gonzalez Valencia, 45, the head of the "Cuinis" organization, is charged in a three-count indictment returned in the District of Columbia in 2014 alleging that he was a leader in a Continuing Criminal Enterprise, conspired to distribute significant quantities of narcotics for illegal importation into the United States, and used a firearm during and in relation to one or more drug trafficking crimes.  The CJNG has flourished in significant part because of its close affiliation with the Cuinis organization, which is the primary financial support network of the CJNG drug trafficking efforts.  The Cuinis organization is composed of multiple members of the Gonzalez Valencia family.  The relationship between the Cuinis organization and the CJNG is cemented through both intertwined drug trafficking and money laundering dealings as well as familial relationships, including the marriage of one member of the Gonzalez Valencia family to CJNG leader Nemesio Oseguera Cervantes.  Gonzalez Valencia was designated as a "Kingpin" under the Foreign Narcotics Kingpin Designation Act by the Department of the Treasury in April 2015.  Gonzalez Valencia was arrested by Mexican authorities in February 2015 pursuant to his charges in the United States and is awaiting extradition.

Jesus Contreras Arceo, aka "Canasto":  Contreras Arceo, 41, is charged in a two-count indictment returned in the Eastern District of Virginia in 2017 alleging that between 2011 until March 2017, Contreras Arceo engaged in a conspiracy to distribute significant quantities of narcotics for illegal importation into the United States and that Contreras Arceo engaged in a conspiracy to commit money laundering.  Contreras Arceo was arrested by Mexican authorities in July 2018 pursuant to his charges in the United States and is awaiting extradition.

Erick Valencia Salazar, aka "El 85":  Valencia Salazar, 41, is charged in a one-count indictment returned in the District of Columbia in 2018 alleging that between 2003 until August 2018, Valencia Salazar engaged in a conspiracy to distribute significant quantities of narcotics for illegal importation into the United States.  Valencia Salazar is currently a fugitive and is believed to be in Mexico.

Juan Perez-Vargas, aka, "Piolin":  Perez-Vargas, 37, is charged in a two-count indictment returned in the Southern District of California in 2017 alleging that Perez-Vargas engaged in a conspiracy to distribute significant quantities of narcotics for illegal importation into the United States.  Perez-Vargas was arrested by Mexican authorities in September 2017 pursuant to his charges in the United States and is awaiting extradition.

Diego Pineda Sanchez, aka "Botas" and Carlos Parra-Pedroza:  Pineda Sanchez, 33, and Parra-Pedroza, 35, are charged with 28 others in a 63-count indictment returned in the Northern District of Illinois in 2015, alleging that between 2011 and September 2014, Pineda Sanchez and Parra-Pedroza led a Mexico-based conspiracy to launder more than $100 million in narcotics proceeds belonging to Mexico-based drug traffickers, through the purchase and

JA133

resale of gold. The evidence in the case established that Pineda Sanchez and Parra-Pedroza laundered most of these narcotics proceeds on behalf of CJNG and its leader, Nemesio Oseguera Cervantes aka "Mencho." Pineda Sanchez and Parra-Pedroza have pleaded guilty to the money laundering conspiracy charges, and are facing a statutory maximum sentence of 20 years in prison. On Oct. 5, Pineda Sanchez was sentenced to serve 15 years in prison by the U.S. District Court in Chicago. The Court will set a sentencing date for Parra-Pedroza at a status hearing on Nov. 1. All other charged and arrested members of the conspiracy have pleaded guilty and have either been sentenced or are awaiting sentencing.

The following individuals linked to the CJNG have also been indicted as a result of the coordinated efforts against the cartel:

- Oswaldo de Jesus Miramontes-Diaz, 44, was charged in the Central District of California in 2015. Miramontes-Diaz is currently serving a sentence pursuant to the charges in the United States;
- Gerardo Gonzalez Valencia, aka, "Lalo," 41, was charged in the District of Columbia in 2016. He was arrested by Uruguayan authorities in April 2016 on these charges, and is awaiting extradition;
- Jose Gonzalez Valencia, aka, "Chepa," 42, was charged in the District of Columbia in 2016. He was arrested by Brazilian authorities in December 2017 on these charges, and is awaiting extradition;
- Ulises Yovany Mora-Tapia, aka, "Yiyo," 33, was charged in the District of Columbia in 2016. Mora-Tapia is currently a fugitive and is believed to be in Mexico;
- Jorge Manuel Cobian-Gonzalez, 43, was charged in the Eastern District of Virginia in 2017. Cobian-Gonzalez is currently awaiting trial;
- Juan Manuel Abouzaid El Bayeh aka, "El Escorpion," 45, was charged in the District of Columbia in 2017. Abouzaid El Bayeh is currently a fugitive and is believed to be in Mexico; and
- Alfredo Galindo-Salazar aka, "Tucan," 47, was charged in the District of Columbia in 2018. Galindo-Salazar is currently a fugitive and is believed to be in Mexico.

## Treasury OFAC Designations

Since April 2015, OFAC has announced nine designation actions totaling 63 separate <u>individuals</u> and <u>entities</u> in Mexico tied to the CJNG and the Cuinis organization. In the initial 2015 designation action, both Nemesio Oseguera Cervantes and Abigael Gonzalez Valencia were designated by OFAC as Specially Designated Narcotics Traffickers under the Foreign Narcotics Kingpin Designation Act. These Kingpin Act designation actions targeting the CJNG and the Cuinis organization are among the most aggressive and targeted in OFAC's history against Mexican drug trafficking organizations. Based upon this series of OFAC designations, Mexican authorities were able to seize the Hotelito Desconocido, an exclusive boutique hotel on the Pacific coast of Mexico, which was controlled by members of Los Cuinis organization. OFAC designations have allowed U.S. and Mexican government officials to follow the money of the CJNG and the Cuinis organization in an effort to disrupt their money laundering activities.

"Treasury has strategically targeted leaders of CJNG and the Cuinis organizations, as well as complicit family members, criminal operatives, and businesses under their control," said OFAC Director Gacki. "Our goal is to disrupt the cartels' finances, which are overwhelmingly generated from drug sales that occur in the United States, and deny them access to the U.S. financial system. OFAC is committed to working with the Department of Justice and Mexican counterparts in order to apply economic pressure on CJNG and the Cuinis organizations until they are effectively dismantled."

## State Department Award and DEA Tip-Line

As part of continuing efforts to cripple the operations of the CJNG, the U.S. Department of State has previously issued a number of rewards through the Narcotics Rewards Program for information leading to the arrest of critical CJNG operatives. Previously, the Department of State issued rewards through the Narcotics Rewards Program for up to the amount of $5 million for information leading to the arrests of Nemesio Oseguera Cervantes, Abigael Gonzalez Valencia, and Jose Gonzalez Valencia. Effective immediately, the Department of State is announcing an increase to the Narcotics Rewards Program reward for information leading to the arrest of the leader of the CJNG, Nemesio Oseguera Cervantes aka, "El Mencho." Now $10 million, the reward is one of the largest ever approved for the Narcotics Rewards Program. Additionally, the Department of State is announcing a Narcotics Rewards Program reward for

information leading to the arrest of high ranking CJNG member Erick Valencia Salazar, aka, "El 85," in the amount of $5 million. Individuals with information about this organization should contact law enforcement authorities by calling 1-213-237-9990, via email at MENCHOTIPS@usdoj.gov, or via Twitter by contacting the handle, @DEALosAngeles.

"The $10 million reward for information leading to the arrest of "El Mencho" is among the highest the Narcotics Rewards Program currently offers," said Assistant Secretary for International Narcotics and Law Enforcement Affairs Madison. "This reflects the U.S. government's strong commitment to bringing Oseguera Cervantes to justice."

**Acknowledgments**

These cases are the result of the ongoing efforts by the Organized Crime Drug Enforcement Task Forces (OCDETF), and were significantly aided by coordination and support from the multi-agency Special Operations Division (SOD) near Washington, D.C. OCDETF is a partnership that brings together the combined expertise and unique abilities of federal, state, and local enforcement agencies. The principal mission of the OCDETF program is to identify, disrupt, dismantle and prosecute high-level members of drug trafficking, weapons trafficking, and money laundering organizations and enterprises.

These cases are being prosecuted by the Criminal Division's Narcotic and Dangerous Drug Section in conjunction with DEA Los Angeles Field Division, DEA Mexico City, DEA Guadalajara, DEA Chicago, FBI New York, FBI's Legal Attaché Office in Mexico City, Homeland Security Investigations (HSI) Chicago and HSI Riverside; the Southern District of California in conjunction with DEA San Diego, DEA Guadalajara and HSI San Ysidro; the Northern District of Illinois in conjunction with the IRS-CI Chicago; the Bureau of Alcohol, Tobacco, Firearms, and Explosives Chicago and HSI Chicago; the SDMS in conjunction with DEA Gulfport and the Eastern District of Virginia in conjunction with the DEA Bilateral Investigations Unit.

The United States would like to acknowledge the significant contributions of the Government of Mexico in their bilateral efforts to target and dismantle the CJNG. The daily coordination between the Government of Mexico with the U.S. Department of Justice, Treasury and State to target this violent drug cartel has a direct impact on the lives and livelihood of millions of citizens in the United States and Mexico.

Relevant Court documents and visuals can be found at: https://www.justice.gov/opa/documents-and-resources-october-16-2018-press-conference.

---

**Topic(s):**
Drug Trafficking
Firearms Offenses
Immigration
Violent Crime

**Component(s):**
Criminal Division
Drug Enforcement Administration (DEA)
Federal Bureau of Investigation (FBI)
Office of the Attorney General

**Press Release Number:**
18-1343

*Updated October 17, 2018*

# EXHIBIT S

BILATERAL EXTRADITION TREATIES

<u>URUGUAY</u>

Extradition Treaty signed at Washington April 6, 1973;
Transmitted by the President of the United States of America to the Senate May 21, 1973 (Ex. K, 93d Cong., 1st Sess.);
Reported favorably by the Senate Committee on Foreign Relations September 26, 1973 (S. Ex. Rept. No. 93-19, 93d Cong., 1st Sess.);
Advice and consent to ratification by the Senate October 1, 1973;
Ratified by the President November 21, 1973;
Ratified by Uruguay November 22, 1973;
Ratifications exchanged at Montevideo April 11, 1984;
Proclaimed by the President October 11, 1984;
Entered into force April 11, 1984.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition and Cooperation in Penal Matters between the United States of America and the Oriental Republic of Uruguay was signed at Washington on April 6, 1973, the text of which Treaty is hereto annexed;

The Senate of the United States of America by its resolution of October 1, 1973, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on November 21, 1973, in pursuance of the advice and consent of the Senate, and was duly ratified on the part of Uruguay;

It is provided in Article 20 of the Treaty that the Treaty shall enter into force upon the exchange of instruments of ratification;

The instruments of ratification of the Treaty were exchanged at Montevideo on April 11, 1984; and accordingly the Treaty entered into force on that date;

NOW, THEREFORE, I, Ronald Reagan, President of the United States of America, proclaim and make public the Treaty, to the end that it be observed and fulfilled with good faith on and after April 11, 1984, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this eleventh day of October in the year of our Lord one thousand nine

JA137

hundred eighty-four and of the Independence of the United States of America the two hundred ninth.

Ronald Reagan

[SEAL]

By the President:

George P. Shultz

Secretary of State

TREATY ON EXTRADITION AND COOPERATION IN PENAL MATTERS BETWEEN THE UNITED STATES OF AMERICA AND THE ORIENTAL REPUBLIC OF URUGUAY

The United States of America and the Oriental Republic of Uruguay, desiring to make more effective the cooperation of the two countries in the repression of crime, agree as follows:

ARTICLE 1

The Contracting Parties agree to extradite on a reciprocal basis to the other, in the circumstances and subject to the conditions established in this Treaty, persons found in the territory of one of the Parties who have been charged with or convicted by the judicial authorities of the other of the offenses mentioned in Article 2 of this Treaty committed within the territory of such other, or outside thereof under the conditions specified in Article 3.

ARTICLE 2

Persons shall be delivered up according to the provisions of this Treaty for any of the following offenses provided that these offenses are punishable by the laws of both Contracting Parties by deprivation of liberty for a maximum period exceeding one year:

1. Murder or manslaughter.

2. Abortion.

3. Aggravated injury or mutilation or assault.

4. Illegal use of arms.

5. Willful abandonment of a child or spouse when for that reason the life of that child or spouse is or is likely to be endangered or death results.

6. Rape; statutory rape; indecent assault; corruption of minors, including unlawful sexual acts with or upon minors under the age specified by the penal laws of both Contracting Parties.

7. Procuration; promoting or facilitating prostitution.

8. False imprisonment; abduction or child stealing; kidnapping.

9. Robbery or larceny or burglary.

JA138

10. Extortion or threats.

11. Bigamy.

12. Fraud; embezzlement or breach of fiduciary relationships; obtaining money, valuable securities or property, by false pretenses or by other fraudulent means including the use of the mails or other means of communication.

13. Unlawful manufacture, use, distribution, supply, acquisition or possession, or theft of bombs, apparatus capable of releasing nuclear energy, explosive or toxic materials, asphyxiating or flammable materials.

14. Offenses that endanger the safety of means of transportation or communication, including any act that endangers any person on a means of transportation.

15. Piracy and any act of mutiny or revolt on board an aircraft or vessel against the authority of the captain or commander of such aircraft or vessel, any seizure or exercise of control, by force or violence or threat of force or violence, of an aircraft or vessel.

16. Offenses against public health.

17. Unlawful introduction or importation, exportation, fabrication, production, preparation, sale, delivery or supply of narcotic drugs, psychotropic drugs, cocaine and its derivatives and other dangerous drugs including cannabis sativa L, and chemicals or substances injurious to health or of primary materials designed for such fabrication.

18. Introduction, export, fabrication, transportation, sale or transmission, use, possession or stockpiling of explosives, offensive chemicals or similar materials, substances or instruments designed for such fabrication, arms, munitions, nuclear elements and other materials considered war material, other than such acts legally provided for or properly authorized.

19. Bribery, including soliciting, offering and accepting.

20. Malversation.

21. False statements, accusations or testimony effected before a government agency or official.

22. Counterfeiting or forgery of money, bank bills, bonds, documents of credit, seals, stamps, marks, and public and private instruments. For the purpose of this offense, holographic wills, sealed wills, checks, letters of exchange and negotiable or bearer documents shall be considered public instruments.

23. Issuance, acceptance or endorsement of receipts which do not conform, totally or partially, to purchases and sales actually performed.

24. Execution or issuance of checks without sufficient funds.

25. Smuggling.

26. The acquisition, receipt or concealment of money, objects or valuables, knowing the article is the result of a crime, whether or not the receiver participated in such crime or intervened pursuant to an agreement preceding the offense.

27. Arson; malicious or willful injury to property.

28. An offense against any law relating to the protection of the life or health of persons from contaminated or poisoned water, substances or products.

29. Any offense against the bankruptcy laws.

30. Industrial or commercial fraud, including:

(a) The raising or lowering the price of merchandise, public funds or negotiable instruments through the use of false information, simulated negotiations, meetings or coalitions, for the purpose of not selling certain merchandise or of selling at a fixed price.

(b) The offering of public funds or stock or financial obligations of the corporations, companies, partnerships, or corporate bodies, dissimulating or concealing facts or true circumstances or affirming or expressing false statements or circumstances.

(c) The publishing or authorizing of false or incomplete inventories, accounts, profit and loss statements, reports or statements or informing a meeting of partners by falsehood or the withholding of information about important facts needed to understand the economic condition of a firm, for whatever end.

In the case of subparagraphs (a) and (b) of this item, the offense can be committed by any individual as well as by members of corporations or partnerships of any nature. In the supposition of subparagraph (c) of this item, the offense must necessarily have been committed by incorporators, directors, administrators, liquidators or trustees of incorporated entities, cooperatives or other joint companies.

31. Assault upon a public official.

32. Unlawful interference in any administrative or juridical proceeding by bribing, threatening, or injury by any means, any officer, juror, witness or duly authorized person.

Extradition shall also be granted for participation in any of the offenses mentioned in this Article, not only as principal or accomplices, but as accessories, as well as for attempt to commit or conspiracy to commit any of the aforementioned offenses, when such participation, attempt or conspiracy is subject, under the laws of both Parties, to a term of imprisonment exceeding one year.

If extradition is requested for any offense mentioned in the first or second paragraphs of this Article and that offense is punishable under the laws of both Contracting Parties by a term of imprisonment exceeding one year, such offense shall be extraditable under the provisions of this Treaty whether or not the laws of both Contracting Parties would place that offense within the same category of offenses made extraditable by the first or second paragraphs of this Article and whether or not the laws of the requested Party denominate the offense by the same terminology.

Extradition shall also be granted for any offense against a federal law of the United States in which one of the above-mentioned offenses is a substantial element, even if transporting, transportation, the use of the mails or interstate facilities are also elements of the specific offense.

In the case in which a person has already been sentenced, extradition will be granted only if the sentence imposed or remaining to be served is a minimum of one year of imprisonment.

ARTICLE 3

For the purposes of this Treaty, the territory of a Contracting Party shall include all the territory under the

JA140

jurisdiction of that Contracting Party, including airspace and territorial waters and vessels and aircraft registered in that Contracting Party if any such aircraft is in flight or if any such vessel is on the high seas when the offense is committed. For purposes of this Treaty an aircraft shall be considered to be in flight from the moment when power is applied for the purpose of take-off until the moment when the landing run ends. The aforementioned provisions do not exclude the application of penal jurisdiction exercised in accord with the legislation of the requested Party.

When the offense for which extradition has been requested has been committed outside the territory of the requesting Party, extradition may be granted if the laws of the requested Party provide for the punishment of such an offense committed in similar circumstances.

ARTICLE 4

A requested Party shall not decline to extradite a person sought because such person is a national of the requested Party.

ARTICLE 5

Extradition shall not be granted in any of the following circumstances:

1. When the person whose surrender is sought is being proceeded against or has been tried and discharged or punished in the territory of the requested Party for the offense for which his extradition is requested.

2. When the person whose surrender is sought has been tried and acquitted, or has undergone his punishment in a third State for the offense for which his extradition is requested.

3. When the prosecution or the enforcement of the penalty for the offense has become barred by lapse of time according to the laws of either of the Contracting Parties.

4. When the offense for which the extradition is requested is of a political character, or the person whose extradition has been requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of the above-mentioned character. In either case, the final judgment as to the application of this subparagraph shall rest with the requested Party.

The provisions of subparagraph 4 of this Article shall not be applicable to the following:

(a) An attempt, whether consummated or not, against the life, the physical integrity or the liberty of the Head of State of either Contracting Party or of a member of the Cabinet of the Government of the United States of America or a Minister of the Government of the Oriental Republic of Uruguay or a member of the respective family.

(b) A kidnapping, murder or other assault against the life or physical integrity of a person to whom a Contracting Party has the duty according to international law to give special protection, or any attempt to commit such an offense with respect to any such person.

(c) An offense committed by force or threat of force on board a commercial aircraft carrying passengers in scheduled air services or on a charter basis.

ARTICLE 6

When the person whose extradition is requested is, at the time of the presentation of the request for extradition, under the age of 18 years and has permanent residence in the requested Country and the

JA141

competent authorities of that Country determine that extradition would prejudice the social readjustment and rehabilitation of that person, the requested Party may suggest to the requesting Party that the request for extradition be withdrawn, specifying the reasons therefor.

The provisions of the preceding paragraph will be applicable only in the case in which the person sought is subject to prosecution in accordance with the laws of the requested Party.

ARTICLE 7

When the offense for which the extradition is requested is punishable by death under the laws of the requesting Party, and the laws of the requested Country do not permit the death penalty for that offense, extradition may be refused unless the requesting Party provides such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

ARTICE 8

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested Party for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and, in the case of a conviction, until the full execution of any punishment he may or may have been awarded.

ARTICLE 9

The determination that extradition should or should not be granted shall be made in accordance with this Treaty and the law of the requested Party. The person whose extradition is sought shall have the right to use such remedies and recourses as are provided by the law of the requested Party.

ARTICLE 10

1. The request for extradition shall be made through the diplomatic channel.

2. The request shall be accompanied by:

(a) A statement of the facts of the case.

(b) The data necessary to prove the identity of the person whose extradition is sought including, when possible, photographs and fingerprints.

(c) The text of the applicable laws, including the laws defining the offense, the law prescribing the punishment for the offense and the laws relating to the limitation of the legal proceedings or the enforcement of the legal penalty for the offense.

3. When the request relates to a person who has not yet been convicted, it must be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting Party.

The requested Party may require the requesting Party to produce evidence to establish probable cause that the person claimed has committed the offense for which extradition is requested. The requested Party may refuse the extradition request if an examination of the case in question shows that the warrant is manifestly ill-founded.

4. When the request relates to a person already convicted, it shall be accompanied by the following:

(a) When emanating from the United States of America, a copy of the judgment of conviction and of the sentence if it has been passed.

(b) When emanating from the Oriental Republic of Uruguay, a copy of the sentence.

In a case envisioned in this paragraph, a certification showing that the sentence has not been served or how much of the sentence has not been served shall also be sent to the requested Party.

5. The documents which, according to this Article, shall accompany the extradition request, shall be admitted in evidence when:

(a) In the case of a request emanating from the United States of America, they are signed by a judge, magistrate or officer of the United States of America, authenticated by the official seal of the Department of State and certified by the principal diplomatic or consular officer of the Oriental Republic of Uruguay in the United States of America.

(b) In the case of a request emanating from the Oriental Republic of Uruguay they are signed by a judge or other judicial authority and are Legalized by the principal diplomatic or consular officer of the United States of America in the Oriental Republic of Uruguay.

6. All the documents mentioned in this Article shall be accompanied by a translation into the language of the requested Party which will be at the expense of the requesting Party.

ARTICLE 11

In case of urgency the Contracting Parties may request, through their respective diplomatic agents or by direct communication between the Department of Justice of the United States and the Ministry of the Interior of the Oriental Republic of Uruguay, the provisional arrest of an accused as well as the seizure of objects relating to the offense of which he has been accused and which objects are in the possession of the accused or of his associate or representative, and the location of which has been identified by the requesting Party. The requesting Party shall support a request for objects by evidence showing the relationship of the objects to the offense charged. The requested Party may decline this request if it appears that the interest of innocent third parties has intervened.

The request for provisional arrest shall be granted if it contains a declaration of the existence of one of the documents enumerated in Article 10, paragraphs 3 and 4, the description of the person sought and the offense for which he has been charged.

If, within forty-five calendar days from the date of provisional arrest, the requesting Party fails to present the formal request for extradition to the Department of State in a request emanating from the Oriental Republic of Uruguay, or to the Ministry of Foreign Affairs in a request emanating from the United States of America, supported by the documents required by Article 10, the person claimed shall be released and a new request based on the same offense shall be admitted only if a formal request for extradition is presented with all the requirements enumerated in Article 10.

ARTICLE 12

If the requested Party requires additional evidence or information to enable it to decide on the request for extradition, such evidence or information shall be submitted to it within such time as that Party shall require.

If the person sought is under arrest and the additional evidence or information submitted as aforesaid is not

JA143

sufficient or if such evidence or information is not received within the period specified by the requested Party, he shall be discharged from custody. Such discharge shall not bar the requesting Party from submitting another request in due form in respect of the same or any other offense.

ARTICLE 13

A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted nor be extradited by that Party to a third State unless:

1. If, upon being released, he remains in the territory of the requesting Party for more than thirty days counting from the date his release was granted; or

2. When, having left the territory of the requesting Party after his extradition, he has voluntarily returned to it;

3. When the requested Party has manifested its consent to his detention, trial or punishment for an offense other than that for which extradition was granted or to his extradition to a third State provided such other offense is covered by Article 2.

For the purposes of subparagraphs 1 and 2 of this Article, the person extradited must be formally advised at the time he is released in the requesting Party of the possible consequences if he remains in the territory of that Party.

The stipulations of subparagraphs 1, 2 and 3 of this Article shall not apply to offenses committed after the extradition.

ARTICLE 14

The requested Party upon receiving two or more requests for the extradition of the same person, either for the same offense or for different offenses, shall determine to which of the requesting States it will grant extradition, taking into consideration all the circumstances of the case and, particularly, the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the nationality of the person sought, the dates upon which the requests were received and the provisions of any extradition agreements between the requested Party and the other requesting States.

ARTICLE 15

The requested Party shall promptly communicate to the requesting Party through the diplomatic channel the decision on the request for extradition.

If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested Party within thirty days from the date of said communication, he shall be set at liberty and the requested Party may subsequently refuse to extradite that person for the same offense.

ARTICLE 16

To the extent permitted under the law of the requested Party and subject to the rights of third Parties, which shall be duly respected, all articles, objects of value or documents relating to the offense, whether acquired as a result of the offense or used for its execution, or which in any other manner may be material evidence for the prosecution, shall, if found, be surrendered upon the granting of the extradition even when

JA144

extradition cannot be effected due to the death or disappearance of the accused.

ARTICLE 17

Transit through the territory of one of the Contracting Parties of a person surrendered to the other Contracting Party by a third State shall be granted on request made through the diplomatic channel, which request shall be accompanied by a copy of the warrant or order of extradition, provided that conditions are present which would warrant extradition of such person by the State of transit and reasons of public order are not opposed to the transit.

The requesting Party shall reimburse the State of transit for any expenses incurred in connection with such transportation.

ARTICLE 18

Expenses related to the translation of documents and to the transportation of the person sought shall be paid by the requesting Party. The appropriate legal officers of the country in which the extradition proceedings take place shall, by all legal means within their power, assist the requesting Party before the respective judges and magistrates.

No pecuniary claim arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty shall be made by the requested Party against the requesting Party.

ARTICLE 19

In order to cooperate in the prevention and repression of crime, subject to their respective national laws the Contracting Parties agree as follows:

1. To exchange information and to consider the most efficient administrative techniques for the prevention and repression of crime;

2. To expedite as rapidly as possible requests in connection with those offenses listed in this Treaty;

3. To exchange statistical data and the results of research in the field of criminology.

ARTICLE 20

This Treaty shall be ratified and shall enter into force upon the exchange of ratifications at Montevideo at the earliest possible date. [FN1]

FN1. Apr. 11, 1984.

End of Footnote(s).

It may be terminated at any time by either Contracting Party by prior notification to the other Contracting Party, and termination shall become effective six months after the date such notification is received.

This Treaty shall terminate and replace the Extradition Treaty between the United States of America and the Oriental Republic of Uruguay signed at Washington March 11, 1905; [FN2] however, the crimes listed in that Treaty and committed prior to the entry into force of this Treaty shall nevertheless be subject to extradition pursuant to the provisions of that Treaty, with the exception of the procedural provisions which will be, in all cases, those of this Treaty.

JA145

FN2. TS 501; 35 Stat. 2028.

End of Footnote(s).

35 U.S.T. 3197, 1983 WL 472072 (U.S. Treaty), T.I.A.S. No. 10,850

Back to top

# EXHIBIT T


Documento

Voces:
ESTADOS UNIDOS ~ EXTRADICION ~ PROCEDIMIENTO PENAL
Publicado en: LJU Tomo 104, 01/07/1992, 5
Cita Online: UY/JUR/15/1991

Sumarios:
1 . 1.    El Tratado de extradición que vincula nuestro país con Es-tados Unidos de Norte América no vulnera las garantías constitucionales del debido proceso, porque la extradición en sí misma no es un juicio, sino un procedimiento por el que se enjuiciará a un sujeto y se determinará la culpabi-lidad o inculpabilidad del extraditado.

2 . 2.    El agravio consistente en la posibilidad de que recaiga pe-na de prisión perpetua, que no existe en nuestro derecho, debe ser desechado porque no parece que eventualmente pueda recaer una pena de este tipo en la sentencia que se referirá sólo a algunos delitos y no a todos por los cuales se solicitó la extradición.La extradición se condiciona al cumplimiento de los pre-ceptos de orden público que están vigentes en nuestra Constitución.

3 . 3.    El procedimiento realizado en los Estados Unidos, donde un Gran Jurado determina que un sujeto debe ser juzgado por determinados delitos por lo que después solicita su extradición, no constituye un juicio en rebeldía.El estado requirente todavía no ha dado comienzo al juicio y la extradición se pide para poder llevar a cabo ese enjuiciamiento.

4 . 4.    Es correcta la prueba producida en un tribunal de los Es-tados Unidos de Norte América cuando ella se ha llevado a cabo en un procedimiento con respaldo jurídico penal y con autorización de un Magistrado judicial de ese país.

5 . 5.    Debe considerarse como prueba el memorándum policial, las declaraciones del Fiscal y demás investigadores del ca-so en el país requirente, que forman parte del Departa-mento de Justicia y son los funcionarios encargados de realizar la imputación. Estas deposiciones fueron estudia-das por el Gran Jurado norteamericano que intervino en el caso y consideradas como prueba a efectos de pedir el pro-cesamiento. Esto es perfectamente equivalente a nuestro concepto de "elementos de convicción suficientes" que equivalen a una prueba incompleta o semi plena.

6 . 6.    La conducta por la cual el imputado planificó y organizó un envío de cocaína a bordo de un buque de carga para in-troducirlo a EE.UU. cumple con el principio de la doble incriminación puesto que en nuestro país está tipificada como delito en el art. 31 del D.L. 14294.

7 . 7.    El núcleo verbal "importar" debe interpretarse en sentido amplio: como cualquier entrada o salida de las mercade-rías contenidas en las listas I y II de la Convención de Nueva York y I de la de Viena.

8 . 8.    Las operaciones tendientes a introducir cocaína en EE.UU. se adapta a nuestra forma tipo prevista en el art. 32 del decreto ley citado, uno de cuyos verbos es "organizar" que significa ordenar, distribuir, estructurar.

9 . 9.    Cabe suponer que se cumplió por parte del imputado alguna de las actividades castigadas por el art. 34 de la ci-tada normativa, puesto que sin duda la introducción de la droga fue para colocar comercialmente el producto su-ministrado, entregando, promoviendo, facilitando, que son todas formas típicas previstas en la disposición citada.

10 . 10.   No corresponde conceder la extradición por el delito de lavado de dinero porque fue creado por la ley norteameri-cana con fecha posterior a la suscripción del Tratado de Extradición con Uruguay.

11 . 11.   No configura el encubrimiento previsto en el art. 197 del C.P., participar en operaciones tendientes a limpiar el di-nero mal habido, a través de actividades delictivas en las que el imputado participaba con otras personas, lo que lo sindica como un codelincuente de otros tipos penales, en el caso, tráfico de cocaína.El encubrimiento es una figura autónoma que entre sus presupuestos requiere que el sujeto no haya participado en la actividad delictiva que se encubre y que no tuviera conocimiento de ella antes de prestar su colaboración encu-bridora.

12 . 12.   La forma en que según las autoridades requirentes el im-putado actuó con otros miembros de la organización cri-minal para importar cocaína desde un lugar ajeno a los EE.UU., participa de una simple codelincuencia y no de un delito de asociación para delinquir.Existió una reunión improvisada que es una forma de cons-piración. Esa forma del íter críminis no es penada en nues-tro derecho por lo menos para las actividades por las que se solicita la extradición en la especie.

13 . 13.   Frente a la concurrencia de pedidos se debe hacer lugar al pedido de EE.UU. porque la gravedad de los delitos por los que se requiere al imputado es evidentemente mayor que en la acusación formulada por las autoridades españolas, tanto desde el punto de vista punitivo como del concurso delictual y del volumen de la actividad desplegada.También utilizando el criterio subsidiario de la prelación, tiene preferencia el requerimiento de EE.UU. que intro-dujo el respectivo exhorto diplomático con anterioridad al de España (1a. instancia).

JA148

THOMSON REUTERS

14 . 14.   Aunque el Tratado de Extradición de Criminales celebra-do entre nuestro país y España no comprende entre los delitos extraditables el tráfico de estupefacientes, ello no es óbice para dar curso al pedido, pues la convención debe complementarse con lo dispuesto en la Convención Unica de Estupefacientes de 1961, ratificada por el D.L. 14222, art. 36 párrafo 2 (1a. instancia).

15 . 15.   No es válido el agravio referente a la ilegalidad de la inter-ceptación telefónica admitida en el Estado requirente y llevada a cabo con la debida autorización judicial.Por otra parte, aunque no es necesario que la prueba sea admitida por nuestro derecho adjetivo interno, la Sede admite la validez de dichas pruebas en virtud de lo estable-cido en el C.P.P., art. 212 (1a. instancia).

16 . 16.   Las Fiscalías Letradas Departamentales tienen ingerencia preceptiva en los diligenciamientos de exhortos de autori-dades extranjeras en materia penal dentro de su jurisdic-ción (1a. instancia).

Clasificación:

EXTRADICIÓN

+Solicitada por EE.UU. (Tratado aprobado 28/10/83)

+No vulnera garantías constitucionales

+Del de-bido proceso

+Porque extradición no es un juicio

+Prohibi-ción pena prisión perpetua

+No es probable porque sentencia deberá referirse sólo a delitos ley 14294, arts. 31, 32 y 34-

+Procedimiento estado requirente

+Actuación Gran Jurado

+No constituye juicio en rebeldía

+Prueba

+Validez

+Por ser realizada en procedimiento jurídico penal y con autorización de Magistrado

+La constituye

+Memorándum policial

+De-claraciones de funcionarios encargados de realizar imputación

+Procedencia

+Planificar y organizar envío de cocaína para in-troducirlo en EE.UU. (delitos arts. 31, 32 y 34 ley 14294)

+Improcedencia

+Delito de lavado de dinero

+Por ser creado con posterioridad a suscripción tratado

+Coparticipar en tráfi-co cocaína y luego coparticipar en lavado de dinero producto de esa actividad delictiva

+No configura encubrimiento

+Reunión improvisada de codelincuentes

+No configura aso-ciación para delinquir

+Concurrencia de pedidos

+Preferen-cia según gravedad delitos

+Aplicación criterio subsidiario de prelación

+Tratado con España

+Convención Unica de Estu-pefacientes de 1961

+Prueba

+Interceptación telefónica

+Validez

+Procedimiento

JA149

THOMSON REUTERS

Documento

+Fiscalía Letrada Departamental

+Ingerencia preceptiva.

DELITOS LEY 14294 (ESTUPEFACIENTES)

+"Importar" (art. 31)

+Interpretación amplia

+Cualquier entrada o salida mercaderías listas Convención N.Y. (I y II) y Viena (I)

+"Organizar" (art. 32)

+Significa ordenar, distribuir, estructurar.

1.     El Tratado de extradición que vincula nuestro país con Es-tados Unidos de Norte América no vulnera las garantías constitucionales del debido proceso, porque la extradición en sí misma no es un juicio, sino un procedimiento por el que se enjuiciará a un sujeto y se determinará la culpabi-lidad o inculpabilidad del extraditado.

2.     El agravio consistente en la posibilidad de que recaiga pe-na de prisión perpetua, que no existe en nuestro derecho, debe ser desechado porque no parece que eventualmente pueda recaer una pena de este tipo en la sentencia que se referirá sólo a algunos delitos y no a todos por los cuales se solicitó la extradición.

La extradición se condiciona al cumplimiento de los pre-ceptos de orden público que están vigentes en nuestra Constitución.

3.     El procedimiento realizado en los Estados Unidos, donde un Gran Jurado determina que un sujeto debe ser juzgado por determinados delitos por lo que después solicita su extradición, no constituye un juicio en rebeldía.

El estado requirente todavía no ha dado comienzo al juicio y la extradición se pide para poder llevar a cabo ese enjuiciamiento.

4.     Es correcta la prueba producida en un tribunal de los Es-tados Unidos de Norte América cuando ella se ha llevado a cabo en un procedimiento con respaldo jurídico penal y con autorización de un Magistrado judicial de ese país.

5.     Debe considerarse como prueba el memorándum policial, las declaraciones del Fiscal y demás investigadores del ca-so en el país requirente, que forman parte del Departa-mento de Justicia y son los funcionarios encargados de realizar la imputación. Estas deposiciones fueron estudia-das por el Gran Jurado norteamericano que intervino en el caso y consideradas como prueba a efectos de pedir el pro-cesamiento. Esto es perfectamente equivalente a nuestro concepto de "elementos de convicción suficientes" que equivalen a una prueba incompleta o semi plena.

6.     La conducta por la cual el imputado planificó y organizó un envío de cocaína a bordo de un buque de carga para in-troducirlo a EE.UU. cumple con el principio de la doble incriminación puesto que en nuestro país está tipificada como delito en el art. 31 del D.L. 14294.

7.     El núcleo verbal "importar" debe interpretarse en sentido amplio: como cualquier entrada o salida de las mercade-rías contenidas en las listas I y II de la Convención de Nueva York y I de la de Viena.

8.     Las operaciones tendientes a introducir cocaína en EE.UU. se adapta a nuestra forma tipo prevista en el art. 32 del decreto ley citado, uno de cuyos verbos es "organizar" que significa ordenar, distribuir, estructurar.

9.     Cabe suponer que se cumplió por parte del imputado alguna de las actividades castigadas por el art. 34 de la ci-tada normativa, puesto que sin duda la introducción de la droga fue para colocar comercialmente el producto su-ministrado, entregando, promoviendo, facilitando, que son todas formas típicas previstas en la disposición citada.

10.   No corresponde conceder la extradición por el delito de lavado de dinero porque fue creado por la ley norteameri-cana con fecha posterior a la suscripción del Tratado de Extradición con Uruguay.

11.   No configura el encubrimiento previsto en el art. 197 del C.P., participar en operaciones tendientes a limpiar el di-nero mal habido, a través de actividades delictivas en las que el imputado participaba con otras personas, lo que lo sindica como un codelincuente de otros tipos penales, en el caso, tráfico de cocaína.

El encubrimiento es una figura autónoma que entre sus presupuestos requiere que el sujeto no haya participado en la actividad delictiva que se encubre y que no tuviera conocimiento de ella antes de prestar su colaboración encu-bridora.

JA150

THOMSON
REUTERS

12.   La forma en que según las autoridades requirentes el im-putado actuó con otros miembros de la organización cri-minal para importar cocaína desde un lugar ajeno a los EE.UU., participa de una simple codelincuencia y no de un delito de asociación para delinquir.

Existió una reunión improvisada que es una forma de cons-piración. Esa forma del íter críminis no es penada en nues-tro derecho por lo menos para las actividades por las que se solicita la extradición en la especie.

13.   Frente a la concurrencia de pedidos se debe hacer lugar al pedido de EE.UU. porque la gravedad de los delitos por los que se requiere al imputado es evidentemente mayor que la acusación formulada por las autoridades españolas, tanto desde el punto de vista punitivo como del concurso delictual y del volumen de la actividad desplegada.

También utilizando el criterio subsidiario de la prelación, tiene preferencia el requerimiento de EE.UU. que intro-dujo el respectivo exhorto diplomático con anterioridad al de España (la instancia).

14.   Aunque el Tratado de Extradición de Criminales celebra-do entre nuestro país y España no comprende entre los delitos extraditables el tráfico de estupefacientes, ello no es óbice para dar curso al pedido, pues la convención debe complementarse con lo dispuesto en la Convención Unica de Estupefacientes de 1961, ratificada por el D.L. 14222, art. 36 párrafo 2 (1a. instancia).

15.   No es válido el agravio referente a la ilegalidad de la inter-ceptación telefónica admitida en el Estado requirente y llevada a cabo con la debida autorización judicial.

Por otra parte, aunque no es necesario que la prueba sea admitida por nuestro derecho adjetivo interno, la Sede admite la validez de dichas pruebas en virtud de lo estable-cido en el C.P.P., art. 212 (1a. instancia).

16.   Las Fiscalías Letradas Departamentales tienen ingerencia preceptiva en los diligenciamientos de exhortos de autori-dades extranjeras en materia penal dentro de su jurisdic-ción (1a. instancia).

Juzgado Letrado de 1ª Inst. de Maldonado de 4º Turno.

Tribunal de Apelaciones en lo Penal de 2º Turno.

Texto Completo:

PRIMERA INSTANCIA

Maldonado, 8 de mayo de 1991.

Vista:

Para sentencia de primera instancia estos autos referentes a las solicitudes de extradición de las autori-dades españolas y de los Estados Unidos de Norte

América, referentes a R.P., ficha P/42/91, seguidos con intervención del Sr. Fiscal Letrado Departamen-tal de Primer Turno, Dr. Carlos García Altolaguirre y con la participación del Sr. Defensor del requerido, Dr. Víctor Della Valle.

Resultando que:

I)   Con fecha 17 de febrero de 1991 se puso en conocimiento de la Sede que habrá sido detenido bajo el nombre de J.L.P. quien en realidad resultó ser R.P., cubano, de 54 años, nacido en M. del R., Cuba el 8 de diciembre de 1935, por hallarse requerido con miras a su extradición por parte de las autoridades españolas.

Con fecha 18 de febrero según surge de fs. 38 pres-tó declaración ante la Sede en presencia de la Sra. Fiscal Letrado subrogante y del Sr. Defensor de Ofi-cio, decretándose el 19 del mismo mes por auto No. 382 glosado a fs. 63 su arresto provisional.

A fs. 64 fue examinado por ambos médicos fo-renses del departamento.

A fs. 110 se agrega el formal pedido de extradi-ción de las autoridades españolas y a fs. 172 y 183 y ss. el de la estadounidense.

A fs. 333 con fecha 12 de abril se hizo compare-cer al requerido en presencia de su defensor donde se le impuso de los requerimientos referidos, negándose a formular declaraciones, admitiendo únicamente ser la persona requerida, y manifestando además su opo-sición a ser extraditado. En la misma audiencia se resolvió conceder a la Defensa un plazo de tres días para realizar sus descargos (fs. 333v.).

II)   A fs. 338 y ss. el Sr. Defensor en tiempo y forma se presenta deduciendo la nulidad de las ac-tuaciones por no haber intervenido en las mismas el Sr. Fiscal Letrado en lo Penal de la Capital y

JA151

oponién-dose a la extradición por los argumentos expuestos a fs. 341 y ss., solicitando la denegatoria a los pedidos.

De dichas peticiones se confirió vista al Ministerio Público por auto No. 2298 de fecha 18 de abril de 1991 a fs. 345v., la que es evacuada a fs. 513 en fun-dado dictamen por el cual se aconseja desestimar la nulidad invocada y hacer lugar al pedido de extradi-ción de los Estados Unidos de Norte América.

A fs. 489 los abogados de la Embajada de los Es-tados Unidos de Norte América agregan traducción del requerimiento por traductor público, fotocopia de la nota verbal ingresada al Ministerio de Relaciones Exteriores y ejemplares en español e inglés del Trata-do de Extradición entre Estados Unidos y España.

III)   Consta además que el pedido de los EE.UU. fue introducido en cancillería con fecha 15 de marzo de 1991 (fs. 337) y el de España con fecha 21 de mar-zo de 1991.

Que el detenido R.P. admitió ser tal y por lo tan-to la persona requerida en estos procedimientos.

Que devueltos los autos por el Sr. Fiscal se pusie-ron al Despacho con fecha 6 de mayo de 1991 para dictar sentencia.

Considerando que:

I)   (SOBRE EL PROCEDIMIENTO)

No habiendo procedimiento alguno en los trata-dos vinculantes en la especie, la Sede ha seguido en líneas generales el previsto en los Tratados de Mon-tevideo dando oportunidad ala Defensa para oponer-se al pedido y antes de resolver, oír al Ministerio Pú-blico, como lo prescribe nuestro derecho interno (art. 12 Nral. 5, D.L. 14365). En cuanto a lo que la De-fensa calificó de demanda incidental de nulidad la misma, por evidentes razones de economía procesal habrá de resolverse en este proveimiento. El proce-dimiento extradicionario no es más que la tramitación de un exhorto con preceptiva intervención del Minis-terio Público y en el cual se debe brindar al requerido la oportunidad de ser oído, por lo que se cumple aca-badamente su fin resolviendo en una única sentencia todos los tópicos y excepciones referentes al mismo (vide art. 14 inciso 1o. Código General del Proceso). De igual modo se han acumulado en el presente los pedidos que penden sobre el requerido, con el evidente fin de evitar sentencias contradictorias e inútiles elongaderas.

II)   (SOBRE LA NULIDAD INVOCADA)

La misma, glosada en escrito de fs. 338 339, revis-te el carácter de cuestión de previo y especial pronun-ciamiento pues de acogerse la referida excepción de-berá re encausarse el proceso respectivo obstando en esta etapa a dilucidar la cuestión principal. Pues bien, para la Sede el aludido vicio no es tal. El requerido funda su pretensión en que el numeral 2o. del art. 17 del D.L. 14365, al edictar la competencia funcional de los Sres. Fiscales Letrados Departamentales se remite a los cometidos detallados en los numerales 1, 2 y 4 del art. 12 del mismo cuerpo normativo, no incluyendo el numeral 5o. de la últimamente citada donde se comete a los Sres. Fiscales Letrados en lo Penal intervenir "en el diligenciamiento de exhortos extranjeros en materia penal". A juicio del suscrito sentenciante, y con los debidos respetos al distingui-do defensor, la referida interpretación bien puede ca-lificarse de piedeletrista, ya que ello importaría con-cluir también en que tampoco podrían intervenir en contiendas de competencia entre jueces con materia penal en el interior de la República, ni en los inciden-tes de recusación que se deduzcan contra dichos jue-ces ni tampoco en todo trámite en que las leyes pres-criban su intervención. Por otra parte, la más califi-cada jurisprudencia del país ha resuelto ya el tema en un sentido contrario al sostenido por el Sr. Defensor. Cabe transcribir aquí lo expuesto por el Dr. José Luis Barbagelata, a la sazón Fiscal Letrado en lo Penal de la Capital en vista No. 3149 de 1989, dictada en los autos "V., R. Extradición" (ficha 86/1989). Allí se dijo:

"El suscrito no tiene el honor de convenir con tan respetada opinión, porque tiene para sí este Fis-cal que frente a todo el andamiaje del razonamiento hecho por tan distinguido profesor, lo simple, sencillo y obvio que, por encima de todas las disquisiciones académicas, nos dice, que las Fiscalías Letradas De-partamentales tienen ingerencia preceptiva en los di-ligenciamientos de exhortos de autoridades extranje-ras en materia penal dentro de su jurisdicción, porque:

"a) el Decreto Ley No. 15365 (ley orgánica del Minis-terio Público y Fiscal) el enumerar las atribuciones de las Fiscalías Letradas Departamentales en materia penal en su a. 17 inciso 2o., determina las mismas por remisión alas funciones fijadas a las Fiscalías Letra-das Nacionales de lo Penal en el a. 12 incisos 1o., 2o. y 4o. y éste a su vez, por remito a lo establecido en los numerales 2o. y 3o. del a. 10 por lo que en fun-ción y atribución de las Fiscalías Letradas Departa-mentales ejercer respecto a los órganos jurisdic-ciona-les de la materia dentro de su jurisdicción la defensa de la jurisdicción de los Jueces y Tribunales siempre que sea

JA152



desconocida o menoscabada. Por lo que sien-do el fundamento de la intervención que se acuerda al Ministerio Público en el diligenciamiento de exhor-tos extranjeros la de vigilar si los mismos no contie-nen pretensiones que sean contrarias a nuestras leyes y que importen un desconocimiento o menoscabo de nuestra jurisdicción nacional defendiendo la juris-dicción de los Tribunales, resulta obvio que las Fis-calías Letradas Departamentales que por disposición expresa de la ley tienen ingerencia preceptiva en el diligenciamiento de exhortos extranjeros en materia penal dentro de su jurisdicción;

"b) porque convalidar la interpretación doctri-naria efectuada por el citado procesalista conllevaría a consecuencias que ni el legislador quiso ni los intér-pretes de la ley orgánica han sostenido como las de negar a los Fiscales Letrados Departamentales toda intervención en las contiendas sobre jurisdicción pe-nal entre los Jueces Letrados Departamentales de su jurisdicción, prohibir también su ingerencia en los ,incidentes de recusación que se promuevan contra los Jueces Letrados Departamentales actuando en mate-ria penal y de intervenir en todo trámite de la materia penal en que las leyes prescriban expresamente su intervención;

"c) porque ese ha sido el criterio aplicado por esa Corporación no discutido por la Fiscalía de Corte, al remitir el pedido de extradición al Juez Letrado Departamental de Maldonado y al conocer en la cali-ficación del recurso de casación descartó la existencia del vicio insanable denunciado;

"d) porque partiendo de las nociones básicas sobre nulidades absolutas y relativas estudiadas am-pliamente por Couture y Véscovi y referidas a las nor-mas del proceso penal encontramos nulidades absolu-tas y relativas o como prefería llamarlas sa-nables o insanables. Nuestro legislador no menciona el vocablo inexistencia. Las nulidades insanables es-tán especialmente previstas como nulidades absolu-tas. Un principio básico de nuestro sistema procesal es el de que no hay nulidad sin ley específica que lo establezca. Le compete al legislador regular el régimen de las nulidades (C.P.P. a. 97). La nulidad importa siempre violación de la ley y por tanto ella puede con toda libertad establecer las consecuencias de dicha violación. Por lo que aun cuando se entendiera que el Fiscal Letrado Departamental intervino excediendo sus atribuciones, dicha violación no aparece sancio-nada con nulidad absoluta por ley específica".

Sobre el mismo tópico y en los mismos autos, se pronunció también la Suprema Corte de Justicia en resolución No. 1 715 de 29 de noviembre de 1989, donde se expuso: "Sin perjuicio de los atendibles argumentos que ha expuesto el Sr. Fiscal Nacional en lo penal de tercer turno respecto de la competen-cia de los Sres. Fiscales Departamentales en estos asuntos (fojas 650 y siguientes), lo fundamental es que se pretende la declaración de una nulidad absolu-ta cuya naturaleza no se advierte. Porque para que así fuera, seria necesario que esa nulidad estuviera legal-mente prevista en forma expresa (principio de especi-ficidad, según el art. 97 del Código del Proceso Pe-nal), lo que no ocurre; que se hubiere infringido el principio de finalidad (art. 99 del mismo Código), lo que tampoco se aprecia, pues es evidente que la in-tervención del Sr. Fiscal Departamental ha cumplido la finalidad que hubiera tenido la del Sr. Fiscal Na-cional, sin que haya habido entonces agravio para el requerido; ni se ha procedido contrariando ley prohi-bitiva alguna (art. 100, ejusdem)".

Tales fundadas opiniones, que el sentenciante aco-ge y hace suyas, dan solución definitiva al punto al tenor de lo previsto en los arts. 97 y 99 del Código del Proceso Penal. En efecto, no se advierte la existen-cia de texto prohibitivo alguno que amerite sancionar con nulidad la intervención del Sr. Fiscal Letrado Departamental, pero además como lo destaca la sen-tencia citada, la actuación de dicho Magistrado cum-plió con la finalidad prevista por la ley, la defensa del orden jurídico nacional y evitar el menoscabo o desconocimiento de nuestra jurisdicción. Pero por si ello fuera poco, cabe traer a colación aquí lo previsto en el art. 110 del Código General del Proceso en cuanto dice que "la anulación no procede, aun en los casos establecidos precedentemente, si el acto, aunque irre-gular, ha logrado el fin a que estaba destinado, salvo que se hubiera provocado indefensión". Esta norma completa adecuadamente los arts. 97 y 99 del C.P.P. sin contradecir texto alguno de dicho cuerpo de nor-mas. Y ello es admisible, por cuanto como ya lo ha sostenido el sentenciante, determinadas normas del Código General del Proceso resultan aplicables a la materia penal, por supuesto que a modo de comple-mento de ésta y sin contradecir ninguno de sus prin-cipios específicos, lo que no sucede en el sub lite. Ello encuentra suficiente apoyatura en las palabras del co-dificador Dr. Gelsi Bidart en cuanto señala "debo de-cir que con este ante proyecto, hemos pretendido realizar un Código general del proceso, en el que se incluyan las principales disposiciones que pueden ser aplicadas en cualquier juicio, sea civil, laboral, penal, aduanero, etcétera, sin perjuicio de las peculiaridades que puedan tener algunos de ellos, de acuerdo con la materia de que se trata" (versión taquigráfica de la sesión de la Comisión de Constitución y Legislación de la Cámara de Senadores del día 28 de mayo de 1987, publicada en "Código General del Proceso"; ley No. 15982, ed. F.E.U.; col. "Texto y contexto", p. XXXVI). Y ello es así también porque el intérprete no puede separar tajantemente ambos órdenes adje-tivos sin atentar contra la plenitud hermética que ob-serva todo orden jurídico (Cfr., García Maynes: "In-troducción al estudio del derecho"; México, 1970; ed.

JA153

THOMSON REUTERS

Documento

Porrúa, p. 205). Por ello, debe también aplicarse en la especie el principio edictado en el art. 14 C.G.P., por el cual la norma procesal ha de interpretarse te-niendo en cuenta que el fin del proceso en la efecti-vidad de los derechos sustanciales, lo que en materia de extradición puede traducirse como el cumplimien-to de las obligaciones de los tratados internacionales y el cumplimiento del fin para el cual los mismos fue-ron suscritos. En la especie la intervención del Sr. Fis-cal Letrado ha cumplido la finalidad que la ley le im-pone, sin que haya además un texto expreso y la san-ción con nulidad insanable.

       III)    Aun si se entendiera que se está ante una nu-lidad relativa, ella habría sido subsanada por el trans-curso del tiempo necesario para ello. EL Sr. Fiscal Le-trado Departamental (su subrogante) intervino en la causa ab initio, fs. 32 a 47, y cumplidos los trámites de rigor la Sede decretó el arresto provisorio del re-querido (auto No. 382 del 19 de febrero de 1991 a fs. 63), el que se notificó al Sr. Defensor de Oficio con fecha 22 de febrero a fs. 76v., sin que éste dedu-jera nulidad por tal causa dentro de los cinco días de conocidos (art. 103 C.P.P.) norma aplicable por ser ley de foro. Puede admitirse que al asumir un nue-vo defensor, este particular, deben otorgársele los mis-mos derechos para hacer valer la defensa que conside-ra más adecuada. Pero véase que el actual patrocinan-te asume la defensa con fecha 1o. de marzo de 1991 (fs. 94v.) sin que dedujera a partir de ese entonces la nulidad que alega, lo que no hizo, por lo que de aceptarse que la misma existió, ha de tenérsele por subsanada. En la audiencia del 12 de abril el Sr. De-fensor tuvo formal conocimiento de los pedidos de extradición, pero es de destacar que la presunta nu-lidad incoada era muy anterior. Por ello, se rechazará también la pretensión invocada y se ingresará al aná-lisis de fondo, esto es, los respectivos pedidos de ex-tradición y el conflicto entre ambos.

       IV)    (LOS PEDIDOS DE EXTRADICION)

       La extradición es un instituto que atempera los rigorismos del territorialismo en materia penal, cons-tituyendo un acto de soberanía por el cual un Estado entrega a otro un sujeto acusado o condenado para que se lo enjuicie o se ejecute la pena (Cfr., Jiménez de Asúa: Tratado de Derecho Penal, T. II, ps. 771 y 892). La tendencia actual en materia de cooperación penal internacional finca en mitigar los rigores excesi-vos del territorialismo, cuya raíz ha de hallarse en la erección de las teorías del Estado Nación y en el exa-cerbamiento de la noción de soberanía, conceptos que hoy han entrado en franca crisis en un mundo donde los espacios regionales y la interdependencia entre los Estados han obtenido un lugar de privilegio. Ya Grocio había sostenido que "el deber de entregar un reo era una obligación jurídica independiente de los tratados", y Fauchille habló de una obligación impuesta por la Sociedad Internacional, en la medida que ella se ajusta a la ley universal, correspondiendo a cada nación, en virtud de su soberanía, apreciar la regularidad y justicia de la respectiva requisitoria (cit. por Urrutia Salas: "La extradición no requiere trata-dos internacionales", Revista de la Facultad de Dere-cho y Ciencias Sociales; Año XII, julio diciembre de 1961, Nos. 3 4, p. 807). En este marco, la comunidad internacional se ha dotado de instrumentos para la represión de los delincuentes interestatales entre los cuales hace particular acopio el derecho extradicio-nario. En un caso análogo, la Sede de 2o. turno de Maldonado dijo: "Corolario de lo anterior es que los tratados de extradición deben siempre interpretarse en forma que favorezca al fin para el cual fueron con-venidos. La posición del U. ha sido y es la colabora-ción en materia penal. Ya la Casación italiana en sen-tencia de 10 de marzo de 1914 había afirmado que teniendo la extradición su fundamento jurídico en las leyes naturales de las sociedades civiles, sus disposicio-nes deben ser ampliamente interpretadas en relación al espíritu que la informa, de tutela común de la so-ciedad; y desde el punto de vista doctrinario puede se-ñalarse que Travers (Le Droit Penal Internacional, T. IV, p. 383), critica también la interpretación restric-tiva y afirma que es el de asegurar el curso de la jus-ticia de la manera más completa (L.J.U., c. 3210; R.U.D.P., 2/88, c. 324 y Sent. No. 90/87 del Trib. Pen. 2o. Turno)."

       "En el mismo sentido: frente a las organizaciones dedicadas al tráfico de estupefacientes y a los medios materiales con que cuentan, son aplicables las ense-ñanzas de Quintano Ripolles (Trat. de Der. Penal In-ternacional e Internacional Penal, T. II, p. 116, Ma-drid, 1957) quien refiriéndose a la indispensable co-operación entre los países frente a tales casos, soste-nía que debía evitarse su frustración tolerando que mientras los criminales utilizaban aviones, los jueces viajen en diligencia." (L.J.U., Tomo CI, julio agosto 1990, c. 11475)

       V)    El objeto del proceso de extradición no es condenar o absolver al reo, no se procede a su juzga-miento, sino a apreciar las razones de la solicitud y su regularidad formal para luego acceder o denegar la entrega del requerido. Debe pues analizarse si se cumplieron los requisitos previstos en el tratado res-pectivo como condición principal para acoger el pe-dido. Por ello, por no tratarse de un proceso en el sentido atribuido por el derecho interno, no son ad-misibles en aplicación de los tratados respectivos co-mo agravios la inobservancia de principios de derecho patrio que en un proceso interno generarían nuli-dad de hallarse ausentes. La jurisprudencia de nues-tros Tribunales ha destacado esta regla con singular agudeza (L.J.U., T.

JA154

LXI, c. 7334, cit. en L.J.U., T. CI, c. 11475), exponiendo que: "La aplicación de las normas constitucionales que establecen algunas ba-ses para la formación del proceso, como la necesidad de acusación de parte o del acusador público (art. 22), o la prohibición del juicio por comisión (art. 19), a la asistencia forzosa de defensor (art. 16), vinculan al derecho interno procesal... pero no al derecho in-terno relativo a la extradición."

"No puede hablarse, como requisito esencial pa-ra reconocer efectos a la sentencia condenatoria ex-tranjera, de la conciabilidad con las vigencias de nues-tro orden público, pues ello llevaría a erigir que las normas procesales extranjeras coincidieran en múlti-ples aspectos con las nuestras, a dificultar el cumpli-miento de los tratados internacionales y a obstaculi-zar su colaboración, debiendo reconocerse, por el contrario, que cada Estado según sus tradiciones y peculiaridades jurídico sociales, organiza el proceso penal de modo diferente."

"En realidad, los requisitos de orden procesal válidos para dar curso a los pedidos de extradición, están contenidos en los Tratados y se refieren, en ge-neral, a la existencia de un proceso legal desarrolla-do, o de una condena legalmente dictada, de acuerdo con las normas locales, como no podía ser de otra manera, lo que cumple, por otra parte, la exigencia genérica y esencial de la Constitución (art. 12) de proceso y sentencia legal (debido proceso)."

"Aunque existiera en el derecho común interno una disposición específica, prohibiendo la extradi-ción del condenado en rebeldía, que no existe en mo-do alguno, no podría ésta prevalecer sobre lo dispues-to en el Tratado, que constituye ala vez la norma de derecho internacional y de derecho interno (por la aprobación legislativa) y que, como tal, por su enjun-dia internacional emanada de una convención y como norma especial, no puede ser invalidada por una de menor jerarquía, unilateral y, además de índole ge-neral."

"El precepto constitucional que prohibe el juicio criminal en rebeldía, está dirigido a proteger un dere-cho del individuo en nuestro país, no... en cualquier otro Estado; por tanto, si en éstos no se acepta, se rechaza o vulnera ese principio, ello nada tiene que ver con nuestra estructura institucional."

"De aceptarse la inconstitucionalidad que se pre-tende, nuestra justicia se expedirá respecto al juicio seguido en el extranjero contra determinado sujeto, no en función de la aplicabilidad de la ley del Estado requirente, sino de las normas que regulan el proce-dimiento penal en nuestro propio Estado ("La Jus-ticia Uruguaya", T. LXI, caso 7334)."

En consecuencia, debe hacerse una interpretación de los tratados como norma de derecho internacional, reguladora de un instituto específico con estricto ce-ñimiento al mismo y su finalidad y no con relación al ordenamiento constitucional y legal interno. Aco-ger esta última tesitura equivaldría a erigir vallas in-franqueables al derecho extradicionario, caminaría en sentido contrario a la finalidad manifiesta del mismo y a la tendencia de la Sociedad Internacional. Las ga-rantías con que cada derecho interno reviste al rito procesal de juzgamiento y ejecución de la pena perte-necen al fuero interno del Estado en cuestión, y no integran el elenco de excepciones al cumplimiento de los tratados vigentes en la materia, que por regla ge-neral deben ser interpretados "in ordine" y no "extra ordine". La vigencia de tales principios debe fundarse también en aventar toda posibilidad de confundirlos con la excepción de orden público internacional, por cuanto éste es una valla que se opone a la aplicación de determinada ley extranjera en un territorio dado, y cosa diferente resulta decidir la entrega o no de un individuo para que sea juzgado de acuerdo al derecho interno del Estado requirente.

En consonancia con lo expuesto no cabe exigir al Estado requirente para dictar auto de prisión o enjuiciamiento o deducir acusación formal observe los requisitos legales del Estado requerido, pues ello sig-nificaría sin más una indebida intromisión en un or-den jurídico soberano. Por otra parte, resultaría iló-gico y contrario a la recta razón exigir que el reque-rido haya prestado declaración en presencia de defen-sor como condición para su procesamiento u orden de prisión por cuanto el objeto de la extradición es precisamente el llevar al reo ante el tribunal requi-rente.

Pero aun cuando se aceptara que la inexistencia de tales requisitos vulneran el pedido, debería con-cluirse también en que desde el punto de vista del de-recho interno, no es requisito indispensable cumplir con el art. 126 C.P.P. para disponer auto de prisión preventiva u orden de arresto contra determinada per-sona, que no otra cosa han hecho las autoridades ju-diciales de los Estados requirentes. En efecto, técni-camente son deslindables el auto de procesamiento; que es la orden de iniciación penal contra determina-da persona con los efectos que la ley prescribe (art. 125 y ss. C.P.P.), para la cual debe existir una suje-ción fáctica del indagado al Tribunal, la que a través de la providencia de enjuiciamiento se traduce tam-bién y a la vez en sujeción jurídica. En nuestro dere-cho interno puede haber prisión preventiva sin pro-cesamiento (no más de 48 horas según los arts. 15 y 16 de la Constitución y 125 inc. 2o. C.P.P.) y proce-samiento sin prisión preventiva (art. 1o. Ley 15859 y 71 C.P.P.). Y como de suyo para dictar el encau-samiento debe existir una sujeción física del

JA155

indaga-do, aun cuando en caso de procesamiento sin prisión (argumento del inc. 1o. art. 147 C.P.P.), el Juez dic-ta orden de prisión preventiva aun sin darse los requi-sitos del art. 126 C.P.P., pues éstos son exigibles sólo para procesar pero no para librar orden de prisión, que se regirá por lo previsto en los arts. 118 y 119 C.P.P. Así, de suyo que si se dicta auto de procesamien-to contra un prófugo ello constituye una actuación en rebeldía y violatoria del art. 126 C.P.P., pero si en cambio se le decreta prisión preventiva y se libra orden de detención no acontece la situación descrip-ta, pues el objeto de ella es la aprehensión material del prófugo para proveer a su enjuiciamiento, el que habrá de dictarse según los requisitos que la ley pres-cribe una vez esté a disposición del Tribunal. Por ello, aun admitiendo la presente tesis, la resolución del Tribunal Español que a fs. 123 decreta la prisión provisional de R.P., en modo alguno vulnera nuestro derecho interno. De igual manera con la acusación del Gran Jurado de los Estados Unidos de Norte América y la orden de arresto librada por el Juez nor-teamericano. Todo ello, sin perjuicio de sostener que los requisitos establecidos por la ley del Estado reque-rido no son trasladables a la del Estado requirente.

VI)      (EL PEDIDO DE LAS AUTORIDADES ES-PAÑOLAS)

El mismo fue correctamente introducido por la vía diplomática que es lo que acredita suficientemen-te la autenticidad del mismo, sin que quepa exigir además, el requisito de la legalización (Cfr. L.J.U., T. CI, c. 11475). El mismo fue peticionado de go-bierno a gobierno y se funda en el Tratado de Ex-tradición de Criminales celebrado entre ambos paí-ses en 1885. Este tratado, sin embargo, contiene un listado de delitos por los cuales se habilita a pedir la extradición (art. 2), entre los cuales no se compren-de el tráfico de estupefacientes. Este sistema ha sido objeto de críticas en razón de las lagunas que puede provocar, más aun cuando el referido tratado no pre-vé una expresa disposición que consagre el carácter enunciativo y no limitativo de la lista, como sí sucede en el tratado con Italia de 1879. Ello sin embargo no es óbice para dar curso al pedido pues la conven-ción debe complementarse con lo dispuesto en la Convención Unica de Estupefacientes de 1961, ra-tificada por el D.L. No. 14222, cuyo art. 36 párrafo 2, expone que los delitos a que se refiere el texto "se considerarán incluidos entre los delitos que den lugar a extradición en todo tratado de extradición celebra-do entre las Partes...".

En cuanto ala prueba en que se funda el pedido, no debe ser evaluada de acuerdo a las normas de valo-ración exigidas por nuestro derecho interno para con-formar la noción de semiplena prueba hábil para dis-poner el enjuiciamiento de una persona. En ambos pedidos ha de bastar la verosimilitud de la misma, de-biendo acreditarse un "fumus bonis iuris" que por lo menos asegure que no se extraditará a la persona con probanzas inconducentes. Al respecto la declaración de C. de I.   que también posee profusas acusaciones por el Gran Jurado de los Estados Unidos  narra con detalle las actividades de R.P., al que obviamente co-noce por admisión del propio P. y al tenor de las con-versaciones telefónicas transcriptas en infolios. Por otra parte, no es de recibo el alegato de la Defensa en cuanto a la ilegalidad en nuestro derecho interno de la interceptación telefónica. Basta que dicha prueba sea admitida en el Estado requirente, en el cual se llevó a cabo aparentemente con la debida autorización judicial. Aun cuando con dicho argumento es bastan-te, la Sede admitirá también la validez de dichas prue-bas aun en nuestro derecho adjetivo interno al tenor de lo dispuesto por el art. 212 de nuestro Código del Proceso Penal, que habilita al Juez, por resolución fundada, interceptar la correspondencia postal o te-lefónica "o toda otra forma de comunicación en que el imputado intervenga...". Tan meridianamente clara disposición despeja toda duda en cuanto a que la interceptación de comunicaciones telefónicas resulta ilegal e inapta como prueba en nuestro derecho.

VII)      (EL PEDIDO DE LOS ESTADOS UNIDOS DE NORTE AMÉRICA)

También fue correctamente introducido por la vía diplomática, y se acreditó también su traducción por traductor público lo que debe admitirse pues na-da impide la subsanación de ciertas irregularidades formales aun durante el trámite de extradición, así como la agregación de nuevos elementos aun sin pe-dido de la Sede. En cuanto a las críticas de la Defen-sa acerca del pretenso procesamiento en rebeldía creemos deben desecharse de consuno con lo expues-to precedentemente.

En cuanto a la prueba aportada según las exi-gencias del Tratado vinculante en la especie (art. 10 Nral. 3o.) deberán justificar el requerimiento que el pedido y la orden de arresto no son manifiestamente infundadas. El tema ha sido estudiado en profundidad por el Tribunal de Ser. Turno en los autos "V., R. Ex-tradición", donde dicha Sala expuso: "Lo estableci-do, impone adoptar algún criterio para valorar las pruebas aportadas y dentro del marco normativo con-vencional, sin hacer prevalecer categorías jurídicas o sistema procesal de alguna de las partes, como ya se puntualizó; esto es, que si el Tratado no define una expresión o concepto, para determinar su alcance, no debe irse al sistema normativo de uno u otro Estado, pues ello supone encontrar una solución "extra ordi-ne" y no "in ordine", inaceptable y contraria al prin-cipio de igualdad que debe regir las relaciones entre estados soberanos (Cfr. Alfonsín: Teoría del Derecho Privado



Internacional, págs. 390 y 404/406)."

"Para no despojar de su especialidad a la norma de derecho internacional, la solución deberá encon-trarse por la averiguación de la voluntad común de las partes, dentro del contexto normativo y atendiendo la finalidad del instituto."

"La apreciación de las pruebas, no puede hacer-se, por lo indicado precedentemente, siguiendo las leyes y sistema de valoración del Estado requerido, como postula la Defensa."

"La exigencia del Tratado en este aspecto, no es de significación, puede decirse que de extrema rela-tividad, pues si por un lado  en el mismo artículo- se reclaman "pruebas suficientes", pero con el adita-mento de "prima faccie" que atempera la exigencia, vista desde otra perspectiva la exigencia probatoria se vuelve menor, ya que se impone el rechazo cuando es manifiestamente insuficiente".

"En mérito a ello, teniendo en cuenta algunas precisiones efectuadas sobre la interpretación de los tratados y la función cautelar del instituto de la ex-tradición, la exigencia probatoria del Tratado  en el máximo grado que puede asignársele  se ubica, vincu-la o aproxima al concepto de verosimilitud ("fumus bonis iuris"), esto es, probabilidad o verosimilitud de los hechos imputados o derechos aducidos."

"El contenido de la exigencia probatoria, por lo expuesto, naturalmente, no puede asimilarse a térmi-nos aplicables en el orden interno ("semiplena prue-ba" o "elementos de convicción suficientes", arts. 15 de la Constitución y 125 del C.P.P.), ya no sólo porque no se trata de establecer el presupuesto o los presupuestos para juzgar al requerido, sino porque también el exhorto proviene de un país con un sis-tema procesal acusatorio, distinto al que impera en el Uruguay." (L.J.U., T. CI, c. 11475)

La exigencia de la mera verosimilitud o fumus bonis iuris en la valoración de las pruebas interpre-tando los tratados, ha sido recogida también por la jurisprudencia en interpretación del tratado que nos vincula con la Gran Bretaña e Irlanda celebrado en 1874. Al respecto, ha dicho el Juzgado Letrado de Primera Instancia en lo Penal de 12o. Turno: "Los poderes del Juez requerido están perfectamente de-finidos en el artículo Sexto del Tratado: debe oír los descargos del fugitivo, al que debe traer ante sí y tomar en consideración "las pruebas de criminali-dad y establecer si "dichas pruebas son suficientes para sostener la acusación". No se trata  el texto es bien claro , de juzgar al requerido, sino de estable-cer si las pruebas son fundadas respecto de la acusa-ción que se formula, esto es, si los cargos son verosí-miles."

"Si se tiene en cuenta que estamos en el marco de un instituto con función cautelar, la exigencia que consideramos se vincula a la idea de verosimilitud del derecho en cuestión o del 'fumas bonis iuris'."

"Se trata de un proceso adjetivo, incidental, vincu-lado a otro principal, que no tendrá lugar en la Juris-dicción del Estado requerido, pero con el cual está funcionalmente vinculado. Como ha dicho Gelsi: "En términos generales, el proceso de extradición está al servicio del proceso penal que se sigue en el extran-jero; por ende, su objeto (su "tema") es incidental con relación al de aquél, en el sentido de 'accesorio' y, además, de calidad `complementaria', para posibi-litarlo, para hacer posible su prosecución (op. cit., pág. 7). Y en relación con este proceso principal, apa-rece, el de extradición, como un proceso con función cautelar."

"En armonía con estas ideas, es de toda coheren-cia entender la exigencia que comentamos como la verificación del fumus bonis juris."

"Esta fórmula es independiente, aunque no deje de tener alguna analogía, con los presupuestos sustan-tivos del procesamiento, puesto que no se trata de considerar todo lo actuado por el Juez solicitante; que ello sería lesivo para el Estado Requirente. Por otra parte, esta fórmula, con ligeras variantes ha sido incluida en todos los Tratados que sobre extradición ha celebrado el Reino Unido (una compulsa completa de los mismos puede verse en V.E. Harley Booth: "British Extradition Law and Procedure", Vol. II) y por tanto, provienen de un país de sistema procesal acusatorio, muy diferente al nuestro. De ahí que pue-de conducir a erróneas conclusiones, la asimilación de estas soluciones a nuestra categoría procesal del "enjuiciamiento, con su presupuesto material de la 'semi plena prueba'." (L.J.U., T. 96, c. 10952)

Las declaraciones juradas del Fiscal James Mac Adams III y de Vichy Duane, lo son de funcionarios que han llevado adelante las indagaciones del presen-te caso, y emerge con claridad la vinculación de P. a I.I. (alias "A."), el cual al parecer tenía activo papel en el tráfico de cocaína a los Estados Unidos. En con-secuencia se da el fumus bonis iuris necesario para es-tablecer que la petición no es "manifiestamente" in-fundada, dándose las condiciones para acceder a la misma.

VIII)      (EL PROBLEMA DE LA PRISION PERPE-TUA)

En el caso del requerimiento de las autoridades norteamericanas pende sobre el requerido la posibili-dad de ser condenado a reclusión perpetua, lo que  a criterio de la defensa  impide el acogimiento de la demanda por vulnerar ello nuestro orden público in-ternacional. Finca dicha prohibición según la Defen-sa en el art. 26 de la Carta Política de nuestro país, extrayendo la misma de su inciso 2o. No comparti-mos tal postura. La norma prohibe exclusivamente la pena de muerte, siendo del caso que si el constitu-yente hubiera requerido extender la prohibición al ergástulo lo habría dispuesto tal como lo hizo con la pena capital. No se infiere de la norma la referida pro-hibición con claridad tal y en forma manifiesta de modo que amerite el incumplimiento de las obliga-ciones internacionales asumidas por el Estado. La ju-risprudencia nacional por regla general no ha hecho caudal de esta pretensa prohibición a fin de evitar la entrega del requerido, fincando sí en la pena de muer-te el único obstáculo de esta índole, que ameritó pre-visiones expresas de conmutación en varios de los tra-tados suscritos por la República, sin que el país se haya preocupado del mismo modo por excluir tam-bién la prisión perpetua. Que en tal caso de la con-vención de Caracas  no ratificada aún por Uruguay- se haya variado esa clara línea de política  internacio-nal no evidencia que por ello deban desconocerse tratado celebrado con anterioridad. En consecuencia, la eventualidad de que por alguno de los delitos de que se lo acusa pueda el requerido sufrir prisión per-petua no impide su entrega al Estado requirente, co-mo así también lo tiene decidido la jurisprudencia en aplicación de este mismo tratado (Cfr. LJU; T. CI, c. 11475). Por otra parte, el art. 7 del Tratado lo único que veda es la aplicación de la pena de muerte, y cabe pensar que de haberlo querido las Partes... cuando a lo dispuesto en el art. 2 Nales. 17 y 26 del Tratado respectivo amerita acceder al requerimiento.

X)     El requerido alega ser inocente en su primera declaración (referente a la acusación de las autorida-des españolas), sin embargo, al imponérsele de los pe-didos respectivos de extradición rehusó contestar so-bre los cargos concretos de que se lo acusa y se opo-ne a ser extraditado, en lo que en primera instancia estuvo de acuerdo y así lo manifestó. Se probó su vinculación a personas sindicadas como importantes figuras del narcotráfico (I.I., M.A.) y admitió conocer tratantes, hubieran excluido también el ergástulo, lo que no aconteció, por lo que en mérito a una posible interpretación del art. 26 de la Constitución Nacional no puede evitarse el cumplimiento de la Convención amparando un requisito que ésta no exige. Por estos argumentos y los concordantes del Ministerio Públi-co, debe desecharse la oposición en este tópico.

IX)     En ambos pedidos se cumple con el llamado principio de "doble incriminación", por el cual ha de requerirse que la imputación por la cual se solicita la entrega del reo esté también tipificada como delito en el orden jurídico del Estado requerido, apreciado ello con la debida flexibilidad y sin exigir el mismo nomen iuris en los tipos. En los Estados Unidos de Norteamérica se acusa a R.P. de asociarse y conspirar con la finalidad de traficar y poseer cocaína (cargo I del Gran Jurado) y el lavado de instrumentos mone-tarios provenientes de dicho tráfico. En España se lo acusa de actos de tráfico y contrabando de estupe-facientes y receptación del provecho de dicho tráfico. De fs. 113 a 114v. se relacionan los hechos base de tal imputación previstos como delito en los arts. 344 y 344bis a) 3 y 6, 344bis b) y 546bis f) del Código Penal Español. Los delitos por los que se lo acusa en los Estados Unidos y en España encartan sin mayor hesitación en las previsiones del Decreto Ley 14294, ya sea en las modalidades de importación o introduc-ción y distribución (art. 31), debiendo tenerse pre-sen-te que al tenor del art. 32 se pena también al que or-ganizare o financiare las actividades descriptas aun cuando éstas no se cumplieren en el territorio nacio-nal. Por otra parte los cargos de asociación y conspira-ción formulados por el Gran Jurado, encuentran ca-lificación sin mayor obstáculo en la previsión del art. 150 de nuestro Código Penal ("Asociación para delin-quir").

En cuanto al "lavado"; esto es, la legitimación de instrumentos monetarios, la jurisprudencia ha deci-di-do que se trata de una hipótesis de encubrimiento de introducción o venta (arts. 197 C.P., 30 y 31 del D.L. 14294), figura extraditable al tenor de los arts. 2 Nal. 17 inciso 2o. del Tratado con los Estados Unidos de Norte América (Cfr. L.J.U., T. CI, c. 11475). Ello, a varios de los nombrados en la orden de prisión ema-nada del Magistrado Español (D., I., etc.). Emerge de autos (según su primera declaración en presencia de defensor) que se hallaba vinculado a importantes mo-vimientos de dinero en los que también participó M. A., y operaba en el país bajo un nombre supuesto y con documentación falsa, de cuya existencia no brin-dó una explicación satisfactoria, por lo que no cabe aludir a la falta de fundamento de la solicitud de los Estados Unidos, debiendo destacarse, como muy bien lo señala el Sr. Fiscal, que en el caso del Tratado con España éste se afilia al sistema de análisis de la juris-dicción y los requisitos formales, no pudiendo recha-zarse el pedido por la falta de fundamento probatorio (sistema belga holandés).

XI)     (LA CONCURRENCIA DE PEDIDOS)

En la sub causa, el Tratado con España siguió el sistema de la gravedad, y en caso de igualdad, los cri-terios subsidiarios de la nacionalidad del acusado y seguidamente el de la prioridad en la solicitud (art. 5)

THOMSON REUTERS

Documento

(Cfr. Vieira, Manuel Adolfo: "La Extradición en nuestro derecho positivo", en Revista de la Facultad de Derecho y Ciencias Sociales, Año XII, julio di-ciembre 1961, Nos. 3 4, p. 868).

Por su parte, el Tratado con los Estados Unidos establece como criterios el de la gravedad, seguida-mente el lugar de comisión del delito, la nacionalidad del acusado y las fechas de la solicitud (art. 14).

No parecen caber dudas al respecto de que la gravedad de los delitos por los que se requiere a P. en EE.UU. es evidentemente mayor que la acusación formulada por las autoridades españolas, tanto desde el punto de vista punitivo, como del concurso delic-tual y del volumen de la actividad desplegada. Al res-pecto, cabe remitirse a las certeras afirmaciones for-muladas en el excelente y ordenado dictamen del Sr. Fiscal en el numeral III de su vista. También utilizan-do el criterio subsidiario de la prelación posee prefe-rencia el requerimiento de los Estados Unidos de Norte América, que ingresó a Cancillería el 15 de marzo de 1991 mientras que el de España lo fue el 21 de marzo del mismo año. En los criterios principa-les y subsidiarios coinciden básicamente ambos tra-tados, por lo que no parece haber mayores dudas acerca de la solución arribada.

Tratándose del criterio de la gravedad debe aten-derse tanto a la ontología del bien jurídico tutelado, y tratándose de delitos homogéneos, a las razones ya aludidas de punición abstracta y concurso delictual. Tratándose de la prelación, a la introducción de los respectivos exhortos por vía diplomática, no pudién-dose tomar en cuenta la solicitud de arresto provi-sorio por vía diversa.

XII)        Finca también la precedente solución en la existencia de tratado entre ambos Estados requiren-tes, lo que abriría la instancia de una ulterior extra-dición al Estado Español, como así también al Uru-guay de comprobarse la acaecencia de ilícitos por par-te del requerido en nuestro país.

En cuanto a la gravedad de la acusación de las au-toridades norteamericanas consiste ella en cuatro car-gos (I, II, IV y VIII, vide fs. 252 y 253), de los cuales tres pueden comportar una pena máxima de prisión perpetua; siendo la actividad desplegada previa tam-bién a los hechos indagados por la Justicia Española. De la propia relación de hechos del Fiscal español se desprende lo expresado (fs. 118), alegándose incluso que es en Miami donde el requerido tiene establecida su infraestructura para el tráfico de drogas y el blan-queo de dinero (fs. 119). La solución que se postula, como se ha señalado al abrir este numeral, se funda también en la posibilidad de posterior extradición hacia España de acuerdo al Tratado vigente entre am-bos países, como asimismo hacia Uruguay en caso de requerirlo y emerger de las actuaciones pre sumariales llevadas a cabo en el país algún delito cometido por P. en territorio nacional. Esta última posibilidad reside en el fin de no obstaculizar la cooperación interna-cional y atender al fiel cumplimiento de las obliga-ciones asumidas por el Estado.

XIII)  La preferencia del pedido por el delito más grave ha sido también la solución adoptada en el art. 15 de la Convención de Caracas de 1981, remitiéndo-se ala ley del Estado requerido para efectuar dicha determinación. De analizarse al respecto la ley nacio-nal y tratándose como se dijo de delitos donde el bien jurídico tutelado es el mismo, el concurso delictual entre los arts. 150 y 197 C.P., 31, 32, 33 del D.L. 14294, hacen también prevalecer el pedido de los Estados Unidos de Norte América.

En cuanto al pedido español, se imputa a P. la participación en la remisión de dos transportes de co-caína a España, que al tenor del art. 31 del D.L. 14294 encartaría en el verbo importación, impután-dosele también una introducción de cocaína en Es-tados Unidos en 1983 y otra en 1986. Estos delitos habrían sido consumados en territorio norteamerica-no (importación).

En mérito a los cargos de uno y otro Estado se tiene que analizarlos a la luz de la legislación del Es-tado requerido, la penalidad mayor en atención a con-curso delictual, figuras imputadas y volumen de la actividad desplegados, resulta ser por los delitos que fundan el requerimiento norteamericano.

Aun no estando ratificada  sí suscripta  le es lícito al intérprete ocurrir a la Convención de Caracas a efectos de colmar vacíos o dudas, como doctrina más recibida en derecho extraordinario, siempre que con ello no se vulnere la letra ni el espíritu de los tratados suscriptos en anterioridad. Dicha recepción consagra y reafirma la solución a que se arribara ante la concurrencia de demandas.

Tampoco ha de verse entre este razonamiento y aquel por el cual se desechó que la posibilidad de re-caimiento de prisión perpetua obstara a la entrega una contradicción. En efecto, el art. 33 de la Conven-ción de Caracas declara que la misma no deja sin efecto tratados anteriores salvo expresa declaración de los Estados Partes, de ahí que aun en cambio en la política internacional seguida por el país no puede devenir en el incumplimiento de convenciones donde no se exigieron los requisitos que se plasmaron en la de Caracas, mucho menos cuando ésta se considera sólo como doctrina más recibida.

JA159

THOMSON REUTERS

XIV)        Las consideraciones precedentemente ex-puestas fundan la continuidad de la política criminal internacional del Estado Uruguayo de cooperar in-ternacional-mente a la represión del delito. Grotio veía el fundamento de la extradición en razones de "iustitia" y otros, como Mittermaier, en la utilidad que el instituto reporta. Su fundamento principal re-posa   no obstante  en la defensa socia (Cfr. Cuello Calón: "Derecho Penal", T. I, parte general; p. 217), lo que cobra especial relevancia cuando se trata, como en la sub causa, de reprimir el crimen organizado y el tráfico internacional de estupefacientes, y esto sin pronunciarse sobre la culpabilidad o inocencia del re-querido, que no es tal el objeto de estos procedimien-tos. La alta disposición de medios técnicos y de co-municaciones que el mundo moderno pone al alcance de la delincuencia internacional debe tener su contra-peso en una amplia cooperación extradicionaria en-tre Estados que, por los tratados que los vinculan, y por otros convenios y declaraciones, han compreme-tido su lucha contra el narcotráfico. Como ha señala-do Ottati Folle "el criterio, tantas veces invocado, de la impenetrabilidad del orden jurídico ha ido perdien-do su rigidez, tal como lo demuestran los textos de los numerosos tratados (bilaterales y multilaterales) suscritos en materia de extradición en los últimos años. Por otra parte, esta tendencia ...coincide con la necesidad de reducir las trabas y obstáculos de este instituto resultantes de un antiguo y feliz-mente superado enfoque nacionalista del derecho" ("Convención Interamericana sobre extradición. Pri-meras reflexiones acerca de su contenido", Rev. INU-DEP, Año II, No. 3, p. 127).

XV)        Por último, y habiéndose desestimado en mérito a los criterios precedentemente expuestos el pedido de las autoridades españolas, habrá de decla-rarse también que la documentación solicitada por dichas autoridades en fax glosado a fs. 98, debe en consecuencia, ser objeto de un pedido por vía de rogatoria en forma habitual, que habrá de considerarse oportunamente.

Y ello es así porque dicha documentación fue in-cautada por la policía uruguaya en allanamientos au-torizados a pedido de la misma y no en cumplimiento de medidas probatorias rogadas por un Tribunal ex-tranjero.

XVI)        Tampoco obsta a la entrega del requerido el uso de documentos o certificados falsos en nuestro país (art. 243 C. Penal Uruguayo) puesto que el tenor de su primera deposición el mismo participó en la fal-sificación, según la previsión del art. 61 inc. 1o. C. Penal, por lo que no habría adecuación típica el de-lito del art. 243, que sólo castiga al que hiciere uso de documento o certificado sin haber participado en la falsificación. Por otra parte, claras razones de política criminal imponen no obstaculizar la extradición del reo por una infracción que  si se hubiera configura-do, lo que no habría acaecido  sería únicamente muy menor a los delitos por los que lo piden los Tri-bunales extranjeros. Así lo han entendido las más mo-dernas legislaciones, como la alemana que postula que siempre que exista una desproporción evidente entre el delito por el que se lo reclama y el cometido en el Estado requerido, se prescinda o se difiera la perse-cución de este último con el fin de no obstaculizar el trámite de extradición. Se funda ello en la más mo-derna admisión de los principios de oportunidad y trascendencia, recogidos expresamente en el art. 49 del proyecto de Código del Proceso Penal a estudio del Parlamento. Las doctrinas más recibidas en mate-ria penal fincan en dicha dirección, y tratándose de derecho extradicionario pueden hacerse valer dejando de lado la necesidad de la acción, cuya prescripción sería sólo para casos exclusivamente de derecho in-terno, que no rocen la normativa internacional. Pese a lo expuesto, no se daría en autos el pretenso delito como se señaló precedentemente, sino que el mismo, al estar a su primera declaración estaría atrapado por la jurisdicción panameña, sin que se dieran en la es-pecie tampoco los requisitos del art. 10 del Código Penal Patrio, sin perjuicio de lo dispuesto en Nal. XII in fine.

Por los fundamentos vertidos, y las disposiciones legales y convencionales citadas, FALLO:

Desestímese la nulidad invocada y accédase a la extradición de R.P. a los Estados Unidos de Norte América a efectos de ser juzgado por los cargos de que se lo acusa. Caratúlese en forma, y ejecutoriada hágase saber por vía diplomática a los Estados requirentes y vuel-van.

Gabriel Adriasola

SEGUNDA INSTANCIA

Montevideo, 9 de setiembre de 1991.

Vistos:

Para sentencia en 2a. instancia este procedimiento por extradición de R.P.P., venido a conocimiento por apelación de la sentencia dictada por el Juzgado Le-trado de 1a. Instancia de Maldonado, de 4o. Turno (ficha 157/91). Resultando:

JA160



I)   La sentencia No. 62, de 8 de mayo de 1991, accedió a la extradición del titular de estos obrados a los Estados Unidos de Norte América, a efectos de que fuera juzgado por los cargos de que se le acusa.

II)   A fs. 553, la defensa interpuso recursos de reposición y apelación en subsidio contra el mencio-nado fallo. Sus argumentos pueden sintetizarse en los siguientes:

a) no es posible conceder la extradición a un re-quirente que ha tramitado un juicio en rebeldía del que va a ser extraditado.

b) la prueba en que se ha basado el Juez de pri-mer grado es irrelevante puesto que se trata del memorándum policial de las autoridades del país requi-rente.

c) que de muchos de los cargos imputados, P. fue absuelto, como ofrece probarlo la defensa.

d) uno de los delitos por los que se pide la ex-tradición y se concede en primera instancia, el lavado de dinero, fue creado por la legislación penal norte-americana como sección 1956 de su código represivo, por ley del 27 de octubre de 1988, mientras que el Tratado se suscribió el 8 de abril de 1973 y Uruguay lo aprobó el 28 de octubre de 1983.

Además, hay cargos que son de delitos estableci-dos por una ley previa a la firma del Tratado U.S.A. no empezó a incluir los delitos detallados en la llamada Ley R.I.C.O. (Racketeer Influenced Corrupt Or-ganization) en los tratados que se firmaron a partir de 1980, luego de la firma del tratado con Uruguay.

e) discrepa con la tesis del Juez respecto a que el lavado de dinero sea compatible con nuestro en-cubrimiento.

f) también respecto ala asimilación de la cons-piración con la asociación para delinquir.

g) no podrá recaer ninguna pena de cadena per-petua, lo que puede ocurrir según la legislación nor-teamericana.

En definitiva, pide que no se conceda la extradi-ción y en caso de que no se siga este criterio, que ella se condicione sólo a los cargos que se admitan como válidos por el Tribunal.

III)   El señor Fiscal Letrado Departamental de 1er. Turno, evacuó el traslado conferido a fs. 604, contestando en un extenso y fundado dictamen, las argumentaciones realizadas por la Defensa.

IV)   El Juez mantuvo su resolución en auto de fs. 625 y franqueó la alzada para ante este Tribunal donde se pasaron los autos a estudio por su orden, se citó para sentencia y se acordó ésta en forma legal.

Considerando:

I)   TANTUM APELLATUM QUANTUM DE-VOLLUTUM

Los efectos de la apelación son indudablemente dos: el devolutivo y el suspensivo. En la devolución, hay en realidad un envió para la revisión, la jurisdic-ción se pasa del Juez apelado al Juez superior que asu-me la facultad plena de revocación de la sentencia recurrida dentro de los límites del recurso.

Claro que este principio limitador de la instancia segunda no impide que se revise lo actuado en el gra-do introductorio del proceso, a efectos de ejercer un control integral del Tribunal sobre el desarrollo for-mal de aquél. Este es un procedimiento que se utiliza precisamente cuando ninguna de las partes ha expre-sado un agravio concreto en contra de la sentencia de primer grado. En esa situación, el Tribunal de alzada interviene haciendo uso de su natural facultad revisiva del proceso porque de no actuar de ese modo, la se-gunda instancia no tendría contenido prácticamente.

En la especie, la cuestión es distinta, existen agra-vios concretos en contra del fallo de primera instan-cia, por lo que, si bien la Sala dará como aceptados la relación de hechos y actos procesales contenidos en la sentencia apelada, pasará a examinar, por el efecto limitador, a que se hiciera referencia antes, cada uno de los agravios en que ha fundado su apela-ción la defensa.

II)   JUICIO EN REBELDIA

En primer término y como punto introductorio de este agravio es preciso examinar cual es la legisla-ción aplicable en esta materia propia del Derecho In-ternacional Privado.

Dice el Sr. Fiscal, a fs. 607 y vto., que en esta ma-teria rigen los Convenios Internacionales por encima del derecho interno de cada uno de los países. La Sala no discute esta afirmación, que en el ámbito del De-recho Internacional tiene plena validez, sin embargo, considera necesario precisar que no es posible que una

Documento

norma de carácter internacional, acordada entre par-tes, pase por alto el orden público de una de esas par-tes contratantes. No es posible admitir como incues-tionable un acuerdo entre países, por el cual se obli-guen a no respetar mecanismos de orden interno que hacen a la defensa de la seguridad de los ciudadanos y en especial al debido proceso legal a que cada uno de estos tiene derecho precisamente por tratarse de un habitante de esos países.

El problema, en su justo término, es el de diluci-dar si el Tratado de extradición que vincula a nuestro país con Estados Unidos de Norte América viola en ese punto el orden público interno uruguayo.

Precisamente es este el punto cuestionado por la Defensa: si el procesamiento en rebeldía de P. ha vul-nerado las garantías del debido proceso en el país re-querido.

La Sala entiende, como lo ha hecho en anterio-res oportunidades en que le ha tocado decidir sobre tema similar, que la cuestión debe ser examinada des-de el punto de vista del orden jurídico del Estado re-quirente, en la especie: los Estados Unidos de Norte América.

Esto no puede tener otra interpretación, puesto que ella le haría perder sentido práctico a la extradi-ción, la que se tornaría totalmente inoperante.

La cuestión es pues saber si en el Estado requi-rente se han respetado las normas del debido proceso legal. Para el examen de este punto, es necesario re-mitirse a la legislación norteamericana.

No existe en ese país, la institución de la Justi-cia de Instrucción, ésta es llevada a cabo por el De-partamento de Justicia, integrado por Fiscales, agen-tes de investigación y Policía, que son quienes reú-nen las pruebas para someter a un sujeto a un pro-ceso penal.

Entiende el Tribunal que no se violan las garantías constitucionales del debido proceso, puesto que la extradición en sí misma no es un juicio, sino un pro-cedimiento por el que se enjuiciará a un sujeto y se determinará la culpabilidad o inculpabilidad del ex-traditado. En ese momento, cuando comience el juicio, el indagado tendrá a su disposición todas las ga-rantías procesales pertinentes, es decir: el derecho a ser asistido por un abogado, el derecho a ser juzgado por un jurado, según la ley norteamericana y la garan-tía de un Juez que emitirá el fallo según la decisión del jurado. Negar la extradición porque las leyes del país requirente son distintas es impensable, puesto que con ese mismo criterio se debería negar la conce-sión de ella para un país que no tiene el mismo siste-ma de Justicia que el nuestro porque, por ejemplo, posee la institución del jurado, que no rige en Uru-guay.

Si no se accediera a este procedimiento de extra-dición por la circunstancia que se está examinando, no se hubiera justificado lo acordado en el artículo 10 3, del Tratado vigente entre Estados Unidos y nuestro país, que dice: "Cuando el requerimiento se refiera a una persona que aún no ha sido condena-da, deberá ser acompañado de una orden de deten-ción o dé prisión o del auto de procesamiento judicial equivalente, emanado de la autoridad competente de la Parte requirente". El procedimiento fue reali-zado en los Estados Unidos, donde un Gran Jurado determinó que P. debió ser juzgado por los delitos por los que después se solicitó su extradición.

Esto está de acuerdo con el marco constitucional uruguayo, que permite también el arresto de una per-sona cuando hay semiplena prueba de un delito y sin que medie auto de procesamiento. Y ello porque en nuestro régimen constitucional, el Juez luego posee 48 horas para decretar el sumario o dejar en libertad al imputado.

De este régimen constitucional, cohonestado por lo dispuesto en los arts. 118 y 119 del Código del Pro-ceso Penal, resulta que en nuestra legislación también es posible librar una orden de arresto "en rebeldía"; por tratarse de una persona que jamás declaró ante Juez y que muy seguramente estará prófuga. Nuestra jurisprudencia ha sido muy precisa y clara respecto a esta aseveración como surge de la sentencia del si-milar de 1er. Turno, No. 202, de fecha 20 de diciem-bre de 1990 (Cfr. T. 3o., sent. 80/82).

Quiere decir que en el Estado requirente todavía no ha dado comienzo al juicio de P. y que la extra-dición se pide para poder llevar a cabo ese enjuiciamien-to, donde el imputado no carecerá de ninguna de las garantías del debido proceso legal.

La claridad de las explicaciones que suministra el señor Fiscal Letrado actuante en este caso, concreta-mente a fs. 609/610vto. exime de todo otro comen-tario a este Tribunal, respecto al punto tratado en el presente Considerando.

En resumen pues, en lo atinente al agravio de la defensa respecto a que se ha seguido un juicio en

JA162

re-beldía de su patrocinado, el Tribunal concluye, por los argumentos expuestos en esta Considerando, que aquél no tiene relevancia y por ende no es aceptado.

### III)   PRUEBA SUFICIENTE

Se ha impugnado la valoración realizada por el señor Juez de primera instancia respecto de la prueba presentada en autos y que tiene relación con la culpa-bilidad de su cliente.

La Sala debe precisar que la jurisprudencia prác-tica de los Tribunales de Apelaciones ha evaluado co-mo correcta la prueba producida en un tribunal de los Estados Unidos de Norte América, cuando ella se ha llevado a cabo en un procedimiento con respal-do jurídico penal y con autorización de un Magistra-do judicial de ese país, lo que torna incuestionable. En ese sentido se ha pronunciado el similar de Ser. Turno, en sentencia de 28 de julio de 1989, que está publicada en La Justicia Uruguaya, Caso No. 11475.

Para calificar una relación jurídica extranacional, hay que atenerse al cuadro de categorías que ofrece el sistema de normas de derecho internacional, pues-to que es el sistema que rige a la relación. Y para pre-cisar la extensión de las categorías es preciso interpre-tar las normas de derecho internacional según la téc-nica del sistema jurídico al cual pertenecen las normas que se han de interpretar (Quintín Alfonsín: "Dos estudios de Derecho Privado Internacional", Montevi-deo 1946, pág. 67).

En puridad entonces, la apreciación de las pruebas no debe hacerse siguiendo lo que establece la ley uru-guaya, sino las que surgen de la interpretación de lo acordado en el Tratado respectivo, que es el sistema de normas internacionales a las que se refiere el autor indicado precedentemente. Esta es la mejor solución de derecho internacional, porque permite una inter-pretación acorde con las divergencias legislativas en-tre los Estados partes del Tratado de que se trate (So-lución a la que también arriba la sentencia citada publi-cada en La Justicia Uruguaya como Caso No. 11475).

En la especie, además, no es sólo el memorándum policial a que se refiere la defensa la única prueba pre-sentada, sino que también deben considerarse como tales las declaraciones del Fiscal y demás investigado-res encargados del caso en el país requirente, puesto que forman parte del Departamento de Justicia y son los funcionarios encargados de realizar la imputación. Esas deposiciones fueron estudiadas por el Gran Ju-rado norteamericano que intervino en el caso y con-sideradas como prueba a efectos de pedir el procesa-miento por los delitos por los que luego se requirió a P. Como bien dice el Fiscal letrado actuante, eso es algo perfectamente equivalente a nuestro concepto de "elementos de convicción suficientes" que equivalen a una prueba incompleta o semiplena.

En un caso como el que ha sido sometido a la consideración de esta Sala no se requiere la plena cer-teza, sino solamente una verosimilitud, un juicio de probabilidad, un "fumus bonis juris" (Cfr. Quintín Alfonsín: "Teoría del Derecho Privado Internacional" pág. 390, 404/406).

Además, el art. 10 del Tratado referido, dice que el requerido podrá solicitar que el requirente presente pruebas suficientes para establecer "prima facie" que el reclamado ha cometido el delito por el que se pide su extradición, pero también dice que el requerido puede negar la extradición en caso de que el arresto sea manifiestamente infundado. Obsérvese que sólo le otorga una simple facultad al Juez del Estado re-querido, no se trata de un deber, de lo que se infiere a fortiori, que si la prueba es suficiente para el reque-rido, puede también conceder la entrega.

### IV)   ABSOLUCION DE VARIOS CARGOS

De la documentación agregada en autos en esta misma instancia, se desprende que un tal F. de L.M. fue absuelto de un cargo y que en una causa seguida a un tal C.Q., la Corte no aceptó como pruebas las evidencias logradas por aparatos de vigilancia elec-trónica y en su mérito abandonó el proceso y retiró los cargos. Sin embargo, no surge de esa documenta-ción agregada, debidamente legalizada y traducida, una relación directa con el caso que se cuestiona en este expediente. Es más, el nombre de P. no aparece para nada en ninguno de los documentos presentados.

Pero no aparece en autos ninguna prueba que per-mita inferir que se han destruido algunos cargos, co-mo por ejemplo:

a) en mayo de 1985 P. se hizo socio y asesor de I.I. y su empresa que estaba destinada a introducir cocaína de contrabando en Estados Unidos y le acon-sejó que usara empresas de Panamá para ocular al verdadero propietario de los bienes que se adquirieran con ese tráfico ilícito.

b) posteriormente, en setiembre de 1987 rea-lizó operaciones tendientes a introducir 800 kilogra-mos de

JA163

cocaína a bordo del O.S.

Quiere decir que, en el primer caso (literal a) exis-tió un acuerdo de voluntades con un fin ilícito, que después será examinada a la luz de la legislación vi-gente en nuestro país. Y en el caso del literal b) hay sin duda, eventualmente una conducta sancionada muy severamente por nuestra ley 14294, la que tam-bién será objeto de examen exhaustivo en Consideran-do aparte.

### V) RETROACTIVIDAD DE NUEVOS DELI-TOS

Dice la defensa que el delito de lavado de dinero, que es uno de los ilícitos por los que se solicita la extradición, fue creado por la ley norteamericana con fecha posterior a la suscripción del Tratado de Extradición con Uruguay.

El caso es muy claro, uno de los principios más caros para el derecho penal es el de la irretroactivi-dad de las leyes que crean nuevos delitos. Si en el régimen del Tratado, el delito de lavado de dinero no se conoció, mal puede imputarse posteriormente, cuando una ley lo incorpore a la legislación interna de uno de los países firmantes del mencionado acuerdo. La regla es que debe privar el derecho del Tratado sobre los demás, pues es el que ha acorda-do una serie de conductas entre los firmantes. Pre-tender incorporar al Tratado un hecho delictivo que cuando aquél se firmó no estaba tipificado, es una clara violación a los principios del derecho penal li-beral.

Por esas razones, el Tribunal aceptará este agra-vio.

Esta razón provoca que el agravio respecto al de-lito de lavado de dinero y a su doble incriminación en nuestro derecho como encubrimiento, lo que no acep-ta la defensa, pierda razón de ser, aunque de todos modos la Sala lo examinará a mayor abundamiento en Considerando aparte.

### VI) EL DELITO DE LAVADO DE DINERO

Como muy claramente lo ha examinado el señor Fiscal actuante en este expediente, a fs. 621 y vto., la conducta por la que se le imputa el delito de lavado de instrumentos monetarios a P., no puede de ningu-na manera ser atrapada por el tipo penal de encubri-miento previsto en el art. 197 de nuestro código penal. En efecto, P. coparticipaba en una actividad delicti-va con otras personas lo que lo sindica como un co-delincuente de esos tipos penales, por ejemplo el trá-fico de cocaína. Aunque después hubiera participado de operaciones tendientes a limpiar ese dinero mal ha-bido a través de esas actividades delictivas, ello de nin-gún modo puede considerarse encubrimiento a la luz de nuestra ley. El encubrimiento es una figura autó-noma que entre sus presupuestos requiere que el su-jeto no haya participado en la actividad delictiva que se encubre y que no tuviera conocimiento de ella an-tes de prestar su colaboración encubridora.

De modo pues, que como el propio señor Fiscal admite, en la especie no se puede asimilar el delito de lavado de instrumentos monetarios a nuestro encu-brimiento.

El principio de la doble incriminación en los Es-tados miembros pues, no se cumple en este caso.

El Tribunal, en consecuencia, considera relevante el agravio expresado en este sentido por el apelante.

### VII) LA CONSPIRACION Y LA ASOCIACION PARA DELINQUIR

La forma en que según las autoridades requirentes se "asoció" P. con otros miembros de la organización criminal para cometer los hechos delictivos que se le imputan, en especial el de importación de cocaína desde un lugar ajeno a los Estados Unidos de Norte-américa, participa a juicio de la Sala de una simple codelincuencia y no de un delito de asociación para delinquir.

En efecto, las diferencias entre ambas formas de violar la ley penal son palmarias:

En primer lugar, codelincuencia supone un co-mienzo de ejecución, o sea un acuerdo para cometer un delito o varios, en grado de tentativa o de consu-mación. En cambio, la asociación para delinquir sig-nifica una simple intención de delito, sin que exista un comienzo de ejecución.

En segundo término, la codelincuencia es ocasio-nal, en cambio la asociación para delinquir es perma-nente. Es condición indispensable en esta última, que se constituya una organización coherente y durable, lo que permitirá identificar a sus integrantes como asociados antes que codelincuentes, a la vez que reconocer exteriormente al grupo, por la homogeneidad de sus fines, métodos utilizados y agentes de los eventos pro-yectados (Tribunal de Apelaciones en lo Penal de 1er. Turno, sentencia No. 159/77, publicada en Revista del Instituto Uruguayo de Derecho Penal, año I, No. 1, pág. 192).

JA164

Lo importante pues es que se trate de una plurali-dad de planes y que pueda de hecho afirmarse ese ele-mento de permanencia, y que caracteriza una asocia-ción verdadera, diferenciándola de un acuerdo crimi-nal referido a varios delitos, pero transitorio (Soler: "Derecho Penal Argentino", Tomo IV, pág. 550).

A juicio de la Sala no surge probado debidamente en autos que P. se hubiera asociado permanentemente con otros sujetos para realizar las conductas lesivas de la legislación sobre estupefacientes. Sólo aparece probado el hecho que en un lugar no determinado del territorio norteamericano, introdujeron cocaína en el buque ya mencionado.

No está probado que ese acuerdo de voluntades hubiera realizado otras actividades delictivas que ten-gan incriminación en nuestro derecho, salvo el lavado de dinero, que ya fuera rechazado por lo establecido en Considerandos anteriores. No está probado que ha-ya existido una organización con carácter estable, per-manente, que se haya dedicado a otras actividades de-lictivas o haya incurrido en la conducta lesiva de la legislación sobre drogas en alguna otra oportunidad. Todo hace suponer, por lo menos con la prueba que se ha reunido en estos autos, que existió una reunión improvisada, lo que sin duda es una forma de conspi-ración y no un delito de asociación para delinquir. Y si en alguna oportunidad se cometió el delito de introducción de cocaína al territorio de U.S.A. fue en una sola oportunidad, a estar a lo que resulta de au-tos. Se necesita la prueba de que ha habido un pacto criminoso con el fin de cometer delitos, sin el cual, la acción debe contenerse en cada manifestación de-lictuosa, dentro de los límites de un simple concurso de delincuentes en el delito especifico.

Aunque en el caso se diera por probado que ha existido una conspiración, esa forma del íter críminis no es penada en nuestro derecho, por lo menos para las actividades por las que se solicita la extradición en la especie.

VIII)        POSIBLE PENA DE ERGASTULO

La defensa se agravia también porque es posible que recaiga pena de cadena perpetua, la que no exis-te en nuestro país.

En principio, cabe desechar esta argumentación, porque no parece que eventualmente recaiga una pe-na de este tipo en la sentencia que se referirá sólo a algunos delitos y no todos por los cuales se solicitó la extradición.

Esta consideración es válida frente a la declara-ción que hará esta Sala respecto a que la extradición debe condicionarse únicamente a algunos de los car-gos solicitados y al cumplimiento de pautas de orden formal y procesal.

IX)        LOS DELITOS POR LOS QUE SE CONCE-DE LA EXTRADICION

De lo expuesto precedentemente resulta que sólo han quedado en pie algunos de los cargos que se han formulado contra P., por las autoridades requirentes.

En efecto, el Tribunal reconoce como válida la reclamación de los Estados Unidos de Norte América, respecto al siguiente hecho: desde una fecha desco-nocida, que se ubica aproximadamente en 1982, en forma continua hasta el 29 de noviembre de 1988, el requerido, junto con otras personas, se asociaron para importar cocaína al territorio de los Estados Uni-dos, desde un lugar fuera de él.

Puede darse por probado que P. por lo menos pla-nificó y organizó un envío de cocaína a borde de un buque de carga en el año 1985.

Esta conducta, que es ilícita según las leyes nor-teamericanas, cumple con el principio de la doble in-criminación, puesto que en nuestro país está tipifi-cada como delito en el artículo 31 del decreto ley 14294.

Uno de los núcleos verbales del art. 31 del citado decreto ley es el de "importar" y se ha interpretado por parte de la doctrina y de la jurisprudencia nacio-nales en sentido amplio: como cualquier entrada o sa-lida de las mercaderías contenidas en las listas I y II de la Convención de Nueva York y I de la de Viena. La sustancia "importada" por P. desde otro país (Co-lombia) es la cocaína, que está incluida en la lista I del convenio de Nueva York de 1961.

Pero además, según el cargo que se ha dado como probado y pasible de extradición, P. organizó las ope-raciones tendientes a introducir esa droga en los Es-tados Unidos, lo que se adapta también a nuestra for-ma tipo prevista en el art. 32 del decreto ley citado, uno de cuyos verbos es organizar, que significa orde-nar, distribuir, estructurar.

THOMSON REUTERS

Documento

También en esa norma se sanciona la forma ver-bal de financiar esas operaciones.

Cabe suponer asimismo, que se cumplió por par-te de P. alguna de las actividades castigadas por el art. 34 de la citada normativa, puesto que sin duda la in-troducción de la droga fue para colocar comercial-mente el producto suministrando, entregando, pro-moviendo, facilitando, que son todas formas típicas previstas en el art. 34 del mencionado decreto ley.

No cabe duda entonces, que cualquiera de esos cargos tienen doble incriminación en nuestro país y el requirente.

JA166

Opinion:
UNITED STATES ~ EXTRADITION ~ CRIMINAL PROCEDURE
Published in: LJU Volume 104, 7/1/1992, 5
Online Citation: UY/JUR/15/1991

Summaries:

1.1.     The Extradition Treaty binding our country to the United States does not violate the constitutional guarantees of due process, because extradition itself is not a trial, but rather a procedure by which a subject will be prosecuted and the guilt or inculpability of the extradited person will be determined.

2.2.     The grievance consisting of the possibility of a life sentence, which does not exist in our law, must be dismissed because it does not seem likely that a penalty of this type will be part of the judgment that will refer only to some offenses and not to all for which extradition was requested. Extradition is conditioned on the fulfillment of the precepts of public order that are in force in our Constitution.

3.3.     The proceeding in the United States, where a Grand Jury determines that a subject must be tried for certain crimes and then requests his extradition, does not constitute a trial in absentia. The requesting state has not yet begun the trial and the extradition is requested in order to carry out that prosecution.

4.4.     The evidence produced in a court in the United States is correct when it has been carried out in a proceeding with criminal legal support and with the authorization of a judicial magistrate in that country.

5.5.     The police report, the statements of the Prosecutor's and other investigators in the case in the requesting country, which are part of the Department of Justice and are the officials responsible for carrying out the accusation, must be considered as evidence. These depositions were studied by the American Grand Jury that intervened in the case and were considered as evidence for the purpose of requesting prosecution. This is perfectly equivalent to our concept of "sufficient evidence", which amount to partial or semi-complete proof.

6.6.     The conduct by which the accused planned and organized a shipment of cocaine on board a cargo vessel to bring it into the US complies with the principle of dual criminality since in our country it is classified as a crime under Article 31 of Law 14294.

7.7.     The core verb "import" must be interpreted broadly as any entry or exit of goods contained in lists I and II of the New York Convention and I of the Vienna Convention.

8.8.     The operations aimed at bringing cocaine into the United States are adapted to our criminal type provided for in Article 32 of the aforementioned law, one of whose verbs is to "organize", which means to order, distribute, structure.

9.9.     It should be assumed that any of the activities punished by Art. 34 of the aforementioned regulation were carried out on the part of the accused, since without a doubt the introduction of the drug was to commercially place the product supplied, delivering, promoting, facilitating, which are all typical forms provided for in the aforementioned provision.

10.10.   It is not appropriate to grant extradition for the crime of money laundering because it was created by American law after the signing of the Extradition Treaty with Uruguay.

11.11.   It does not form the cover-up provided for in Article 197 of the C.P., participating in operations aimed at laundering ill-gotten money through criminal activities in which the accused participated with other persons, which charges him as a co-delinquent in other criminal types, in this case, cocaine trafficking. Concealment is an autonomous concept that, among its presuppositions, requires that the subject not be a participant in the criminal activity that is concealed and was not aware of it before collaborating in its concealment.

12.12.   The way in which, according to the requesting authorities, the accused acted with other members of the criminal organization to import cocaine from somewhere outside the United States, is simple co-delinquency and not criminal association to commit a crime. There was an impromptu meeting that is a form of conspiracy. This form of the iter criminis is not penalized under our law, at least not for activities for which extradition is requested in this case.

13.13.   Faced with the concurrence of requests, the US request must be accommodated because the seriousness of the crimes for which the subject is being summoned for extradition is obviously greater than the accusation made by the Spanish authorities, both from a punitive point of view and the overlapping of offenses and the amount of activity carried out. Also using the subsidiary criterion of priority, the request of the US, which introduced the respective diplomatic warrant prior to that of Spain (1st instance), has preference.

14.14.   Although the Treaty of Extradition of Criminals between our country and Spain does not include the trafficking of narcotics among extraditable offences, this is not an obstacle to granting the request, since the

JA167

[logo] **THOMSON REUTERS**

*Document*

convention must be supplemented with the provisions of the Single Convention on Narcotic Drugs of 1961, ratified by D.L. 14222, Art. 36 paragraph 2 (1st instance).

15.15.   The grievance relating to the illegality of the telephone intercept allowed in the requesting State and carried out with due judicial authorization is not valid. Moreover, although it is not necessary that the evidence be admitted by our internal adjective law, the Court admits the validity of such evidence under the provisions of the C.P.P., Art. 212 (1st instance).

16.16. The Prosecutors' Offices must intervene in fulfilling requests in criminal matters from foreign authorities within their jurisdiction (1st instance).

Classification:

EXTRADITION

    +Requested by US (Treaty Approved 10/28/83)

    +Does not violate constitutional guarantees

    +There is due process

    +Because extradition is not a trial

    +Prohibition on life imprisonment

    +It is not probable because the judgment must only refer to crimes law 14294, arts. 31, 32 and 34

    +Requirement State Proceeding

    +Grand Jury

    +It is not trial in absentia

    +Evidence

    +Validity

    +By being carried out in criminal proceedings and with the authorization of the Magistrate +It is constituted +Police Report

    +Statements of officials in charge of carrying out imputation +Origin

    +Plan and organize shipment of cocaine to be brought into the U.S. (offenses Arts. 31, 32 and 34 law 14294)

    +Inadmissibility

    +Money Laundering

    +By occurring after the signing of the treaty

    +Co-participate in cocaine trafficking and then co-participate in money laundering as a result of this criminal activity

    +Does not constitute cover-up

    +Co-offenders improvised meeting

    +Does not constitute criminal association

    +Concurrence of requests

    +Preference by seriousness of offenses

    +Subsidiary priority criterion application

    +Treaty with Spain

    +Single Convention on Narcotic Drugs 1961 +Evidence

    +Telephone intercept

    +Validity

    +Procedure

    +Departmental Prosecutors' Offices

    +Prescriptive interference.

    OFFENSES LAW 14294 (NARCOTIC DRUGS)

    +"Import" (Art. 31) +Broad Interpretation

JA168

+Any entry or exit of goods listed, N.Y. Convention (I and II) and Vienna (I)

+"Organize" (Art. 32)

+It means arranging, distributing, structuring.

1.    The Extradition Treaty binding our country to the United States does not violate the constitutional guarantees of due process, because extradition itself is not a trial, but rather a procedure by which a subject will be prosecuted and the guilt or inculpability of the extradited person will be determined.

2.    The grievance consisting of the possibility of a life sentence, which does not exist in our law, must be dismissed because it does not seem likely that a penalty of this type will be part of the judgment that will refer only to some offenses and not to all for which extradition was requested.

1.    Extradition is conditioned on the fulfillment of the precepts of public order that are in force in our Constitution.

2.    The proceeding in the United States, where a Grand Jury determines that a subject must be tried for certain crimes and then requests extradition, does not constitute a trial in absentia.

3.    The requesting state has not yet begun the trial and extradition is requested in order to carry out this prosecution.

4.    The evidence produced in a court in the United States is correct when it has been carried out in a proceeding with criminal legal support and with the authorization of a judicial magistrate in that country.

5.    The police report, the statements of the Prosecutor's and other investigators in the case in the requesting country, which are part of the Department of Justice and are the officials responsible for carrying out the accusation, must be considered as evidence. These depositions were studied by the American Grand Jury that intervened in the case and were considered as evidence for the purpose of requesting prosecution. This is perfectly equivalent to our concept of "sufficient evidence", which amount to partial or semi-complete proof.

6.    The conduct by which the accused planned and organized a shipment of cocaine on board a cargo vessel to bring it into the US complies with the principle of dual criminality since in our country it is classified as a crime under Article 31 of Law 14294.

7.    The core verb "import" must be interpreted broadly as any entry or exit of goods contained in lists I and II of the New York Convention and I of the Vienna Convention.

8.    The operations aimed at bringing cocaine into the United States are adapted to our criminal type provided for in Article 32 of the aforementioned law, one of whose verbs is to "organize", which means to order, distribute, structure.

9.    It should be assumed that any of the activities punished by Art. 34 of the aforementioned regulation were carried out on the part of the accused, since without a doubt the introduction of the drug was to commercially place the product supplied, delivering, promoting, facilitating, which are all typical forms provided for in the aforementioned provision.

10.  It is not appropriate to grant extradition for the crime of money laundering because it was created by American law after the signing of the Extradition Treaty with Uruguay.

11.  It does not form the cover-up provided for in Article 197 of the C.P., participating in operations aimed at laundering ill-gotten money through criminal activities in which the accused participated with other persons, which charges him as a co-delinquent in other criminal types, in this case, cocaine trafficking.

Concealment is an autonomous concept that, among its presuppositions, requires that the subject not be a participant in the criminal activity that is concealed and was not aware of it before collaborating in its concealment.

JA169

12.  The way in which, according to the requesting authorities, the accused acted with other members of the criminal organization to import cocaine from somewhere outside the United States, is simple co-delinquency and not criminal association to commit a crime.

There was an impromptu meeting that is a form of conspiracy. This form of the *iter criminis* is not penalized under our law, at least not for activities for which extradition is requested in this case.

13.  Faced with the concurrence of requests, the US request must be accommodated because the seriousness of the crimes for which the subject being summoned for extradition is obviously greater than the accusation made by the Spanish authorities, both from a punitive point of view and the overlapping of offenses and the amount of activity carried out.

Also using the subsidiary criterion of priority, the request of the US, which introduced the respective diplomatic warrant prior to that of Spain (1st instance), has preference.

14.  Although the Treaty of Extradition of Criminals between our country and Spain does not include the trafficking of narcotics among extraditable offences, this is not an obstacle to granting the request, since the convention must be supplemented with the provisions of the Single Convention on Narcotic Drugs of 1961, ratified by D.L. 14222, Art. 36 paragraph 2 (1st instance).

15.  The grievance concerning the illegality of the telephone intercept allowed in the requesting State and carried out with due judicial authorization is not valid.

On the other hand, although it is not necessary that the evidence be admitted by our internal adjective law, the Court admits the validity of such evidence under the provisions of the C.P.P., Art. 212 (1st instance).

16.  The Prosecutors' Offices must intervene in fulfilling requests in criminal matters from foreign authorities within their jurisdiction (1st instance).

Customs and Criminal Court 1 Maldonado Inst. of 4th Rotation.

Criminal Court of Appeals 2nd Rotation

Full Text:

FIRST INSTANCE

Maldonado, May 8, 1991.

Hearing:

For judgment of first instance, these orders concerning the extradition requests from Spanish authorities and the United States of

America, referring to R.P., file P/42/91, followed by the intervention of the Departmental Prosecutor's Office of the First Rotation, Dr. Carlos García Altolaguirre and with the participation of the Public Defender of the subject being summoned for extradition, Dr. Víctor Della Valle.

Resulting in:

I)   On February 17, 1991, the Seat of Power was informed that R.P., Cuban, 54 years old, born in M. del R., Cuba on December 8, 1935, had been detained under the name of J.L.P. as he was wanted by the Spanish authorities for his extradition.

On February 18, according to page 38, he issued a statement to the Seat of Power in the presence of the Subrogated Prosecutor and the Public Defender, decreeing on the 19th of the same month by order No. 382 filed on page 63 of his provisional arrest.

On page 64 he was examined by both department forensic doctors.

The formal request for extradition of the Spanish authorities is included on page 110 and on pages 172 and 183 et seq. that of the United States.

On page 333 dated April 12, the party subject to the extradition request had to appear with his Public Defender where the aforementioned summons were imposed on him; he refused to make statements, admitting only that he was the party subject to the extradition request and also expressing his opposition to being extradited. At the same hearing, it was decided to grant the Defense a period of three days to make its rebuttals (p. 333v.).

II)     On page 338 et seq., the Public Defender in due time and form appears to present the defense of nullity since the Attorney General in Criminal Matters of the Capital had not participated in them, and opposing the extradition based on the arguments set forth on page 341 et seq., requesting the summons be denied.

JA170

From these petitions, the Attorney General was granted a hearing by order No. 2298 dated April 18, 1991, on page 345v., which is issued on page 513, in a founded opinion for which it is advised to dismiss the nullity invoked and admit the extradition request from the United States of America.

On page 489, the lawyers of the Embassy of the United States of America add translation of the request by sworn translator, with a photocopy of the note entered to the Ministry of Foreign Affairs and copies in Spanish and English of the Extradition Treaty between the United States and Spain.

III)     It also states that the US request was received by the Chancellery on March 15, 1991 (pages 337) and that of Spain on March 21, 1991.

The detainee R.P. admitted to be said person and therefore the party subject to the extradition request in these proceedings.

After the proceedings were returned by the Prosecutor, they were sent to the Office on May 6, 1991, for a judgment.

Whereas:

I)     (ABOUT THE PROCEDURE)

There being no procedure in the binding treaties in the case, the Court has generally followed that provided for in the Treaties of Montevideo, giving the Public Defender an opportunity to object to the summons and before resolving, hear the Attorney General as prescribed by our domestic law (Art. 12 No. 5, D.L. 14365). Regarding what the Public Defender considered an incidental claim for nullity, for obvious reasons of procedural economy, this provision must be resolved. The extradition procedure is nothing more than processing an appeal with mandatory intervention by the Attorney General's Office and, in which the party subject to the extradition request must be given the opportunity to be heard. Therefore, its purpose is completely fulfilled, resolving in a single judgment all the matters and exceptions referring to it (see Article 14, paragraph 1, General Code of Process). Similarly, the two requests that hang over the party subject to the extradition request have accumulated herein, in order to avoid contradictory and useless lengthy sentences.

II)     (ON THE NULLITY INVOKED)

Annotated in the brief on pg. 338 339, the nullity invoked is a matter of prior and special pronouncement since if the aforementioned exception is accepted, the respective process must be redirected, preventing the main issue from being explained at this stage. However, for the Court, the aforementioned defect is not such. The party subject to the extradition request bases his claim on the fact that number 2 of Art. 17 of D.L. 14365, when issuing the functional competence of District Public Prosecutors, refers to the tasks detailed in numbers 1, 2 and 4 of Art. 12 of the same regulatory body, not including number 5 of the section last cited where Prosecutors in Criminal Matters intervene "in fulfilling foreign warrants in criminal matters." In the opinion of the undersigned Court, and with due respect to the distinguished Public Defender, the aforementioned interpretation can well be considered as - literal , since it would also be important to conclude that they could not intervene in competencies between judges in criminal matters within the Republic, nor in incidents of recusal that are presented against said judges or in any procedure in which the laws prescribe their intervention. On the other hand, the country's most qualified case law has already resolved the matter in a manner contrary to that held by the Public Defender. It is worth transcribing here what was stated by Dr. José Luis Barbagelata at the time of the District Attorney in Capital Criminal Matters in hearing No. 3149 of 1989, issued in the "V., R. Extradition" case (record 86/1989). There he said:

"The undersigned does not have the honor of agreeing with such a respected opinion, because he has for himself this Prosecutor who, faced with all the scaffolding of reasoning done by such a distinguished professor, the simple, straightforward and obvious thing that, above all the academic disquisitions, tells us that the District Prosecutors' Office must interference in the processing of letters rogatory by foreign authorities in criminal matters within their jurisdiction, because

"a) Decree Law No. 15365 (organic law of the Attorney General and Prosecutor's Office) the listing of the powers of the District Prosecutors' Offices in criminal matters in a. 17 subsection 2, determines the same by reference to the functions set forth by the National Prosecutors' Offices in a. 12 subsections 1, 2 and 4 and this in turn, referencing the provisions of numbers 2. and 3 of a. 10 depending on the function and attribution of the Prosecutors' Office to exercise, with respect to the jurisdictional bodies of the matter within their jurisdiction, the defense of the jurisdiction of the Judges and Courts whenever it is unknown or detrimental.

JA171

Therefore, the basis of the intervention that is agreed upon by the Public Prosecutor's Office in fulfilling foreign warrants is to monitor whether they contain claims that are contrary to our laws and that amount to a lack of knowledge of or detriment to our national jurisdiction defending the jurisdiction of the Courts; it is obvious that the Prosecutors' Office which, by express provision of law, must intervene in fulfilling foreign warrants in criminal matters within their jurisdiction;

"b) because validating the doctrinal interpretation made by the aforementioned proceduralist would lead to consequences that neither the legislator wanted nor the interpreters of the organic law have sustained, such as denying the District Prosecutors' Office any intervention in disputes over criminal jurisdiction among the District Judges in their jurisdiction, and prohibit their intervention in incidents of recusal that are brought against the District Judges acting in criminal matters and intervening in all criminal proceedings, in which the laws expressly prescribe their intervention;

"c) because that has been the criterion applied by that Body not discussed by the Court Prosecutor's Office, by sending the request for extradition to the Maldonado District Judges and by hearing in the qualification of the appeal for cassation ruled out the existence of the denounced incurable defect;

"d) because starting from the basic notions about absolute and relative nullities extensively studied by Couture and Véscovi and referring to the rules of criminal procedure, we find absolute and relative nullities or, as he preferred to call them, curable or incurable nullities. Our legislator does not mention the word non-existence. Incurable nullities are especially foreseen as absolute nullities. A basic principle of our procedural system is that there is no nullity without a specific law to establish it. It is the responsibility of the legislator to regulate the system of nullities (C.P. a. 97). Nullity always amounts to a violation of the law and therefore can freely establish the consequences of such violation. Therefore, even if it is believed that the Departmental Prosecutor's Office intervened exceeding it powers, said violation is not sanctioned with absolute nullity by specific law."

On the same topic and in the same cases, the Supreme Court of Justice also ruled in resolution No. 1715 of November 29, 1989, where it stated: "Without prejudice to the compelling arguments that the National Prosecutor has made in the third rotation criminal case with respect to the jurisdiction of Public Prosecutors in these matters (pages 650 et seq.), the fundamental thing is that the declaration of an absolute nullity whose nature is not noticeable is intended. For this to be, it would be necessary that this nullity be expressly legally foreseen (principle of specificity, according to Art. 97 of the Criminal Procedure Code), which does not happen; the principle of finality has been violated (Art. 99 of the same Code), which is also not appreciated, since it is evident that the intervention of the Departmental Prosecutor has fulfilled the purpose that the National Prosecutor would have had, without there having been injury to the party subject to the extradition request; nor has it proceeded contrary to any prohibitive law (Art. 100, ejusdem)".

Such well-founded opinions, which the Court accepts and makes its own, give a definitive solution to the point in accordance with the provisions of Articles 97 and 99 of the Code of Criminal Procedure. In fact, there is no warning of the existence of any prohibitive text that merits sanctioning the intervention of District Attorney with nullity, but also, as highlighted in the cited ruling, the actions of said Magistrate fulfilled the purpose provided by law, the defense of the national legal order and avoiding the impairment or disregard of our jurisdiction. But, as if that were not enough, it is necessary to bring the provisions of Article 110 of the General Code of the Process up here when it says that "annulment is not appropriate, even in the previously established cases, if the act, although irregular, has achieved the end intended, unless it caused defenselessness." This standard adequately completes Articles 97 and 99 of the C.P.P. without contradicting any text of said body of standards. And this is admissible, since, as the Court has already held, certain rules of the General Process Code are applicable to criminal matters, of course, as a complement thereto and without contradicting any of its specific principles, which does not happen in the dispute. This finds sufficient support in the words of the encoder Dr. Gelsi Bidart when he points out that "I must say that with this project, we have sought to use a General Process Code, which includes the main provisions that can be applied in any trial, whether civil, labor, criminal, customs, etc. without prejudice to the peculiarities that some of them may have, in accordance with the subject matter" (shorthand version of the session of the Senate Constitution and Legislation Committee of May 28, 1987, published in "General Process Code"; Law No. 15982, ed. F.E.U.; col. "Text and context", p. XXXVI). This is also so because the interpreter cannot categorically separate both adjective orders without going against the hermetic fullness that all legal orders observe (Cf., García Maynes: "Introduction to the Study of Law"; Mexico, 1970; ed. Porrúa, p. 205).

Therefore, the principle issued in Art. 14 CGP, by which the procedural rule must be interpreted taking into account that the end of the process in the effectiveness of substantial rights, which in matters of extradition can be translated as fulfillment of the obligations of international treaties and of the purpose for which they were signed. In the case, the District Attorney's intervention has fulfilled the purpose imposed by law, without there also being an express text and the sanction with incurable nullity.

III)    Even if it were believed that there is relative nullity, it would have been remedied over the course of time necessary. District Attorney General (his deputy) intervened in the case ab initio, pages 32 to 47, and once the required procedures were completed, the Court order the provisional arrest of the party subject to the extradition request (rule No. 382 of February 19, 1991, pages 63), which was notified to the Public Defender by Official Letter dated February 22, pages 76v., without the latter presenting a defense for nullity for such cause within five days of becoming aware of the (Art. 103 C.P.P.) applicable rule for forum rule. It can be admitted that by assuming a new defender, he or she should be granted the same rights to assert the defense that he or she considers most appropriate. But note that the current attorney assumes the defense on March 1, 1991 (p. 94v.), without, from that time, presenting a defense for the alleged, so if it is agreed that it existed, it must be considered as remedied. At the hearing on April 12, the Public Defender was formally aware of the extradition warrants, but it should be noted that the alleged nullity initiated was much earlier. Therefore, the claim invoked will also be rejected and the merits analysis will be entered, that is, the respective requests for extradition and the conflict between the two.

IV)    (EXTRADITION ORDERS)

Extradition is an institute that tempers the rigors of territorialism in criminal matters, constituting an act of sovereignty by which a State hands to another an accused or convicted individual to be prosecuted or sentenced (Cf. Jiménez de Asúa: Treaty of Criminal Law, T. II, ps. 771 and 892). The current tendency in terms of international criminal cooperation is to mitigate the excessive rigors of territorialism, which must be rooted in constructing theories of the Nation State and exacerbating the notion of sovereignty, concepts that have now entered into an open crisis in a world where regional spaces and interdependence between States have gained a place of privilege. Grocio had already argued that "the duty to surrender a defendant was a legal obligation independent of treaties," and Fauchille spoke of an obligation imposed by the International Society to the extent that it conforms to universal law, corresponding to each nation, by virtue of its sovereignty, assess the regularity and fairness of the respective request (cited by Urrutia Salas: "Extradition does not require international treaties", Magazine of the Faculty of Law and Social Sciences; Year XII, July December 1961, Nos. 3, 4, p. 807). Within this framework, the international community has been equipped with instruments for controlling interstate criminals, among which extradition law is particularly added. In an analogous case, Maldonado's 2nd-rotation Court said: "Corollary of the foregoing is that extradition treaties must always be interpreted in a manner that favors the purpose for which they were agreed. The position of the U. has been and is collaboration in criminal matters. The Italian Cassation in judgment of March 10, 1914, affirmed that the extradition with its legal basis in the natural laws of civil societies, their provisions must be broadly interpreted in relation to how they are informed, the common guardianship of society; and from the doctrinal point of view, it can be pointed out that Travers (Le Droit Penal Internacional, T. IV, p. 383), also criticizes the restrictive interpretation and states that it is to ensure the course of justice in the most complete manner (L.J.U., c. 3210; R.U.D.P., 2/88, c. 324 and Sent. No. 90/87 of Trib. Pen. 2nd. Rotation)."

"In that regard, faced with organizations dedicated to the trafficking of narcotics and their material means, the teachings of Quintano Ripolles (Treaty of International and International Criminal Law, Vol. II, p. 116, Madrid, 1957) are applicable, who, referring to the indispensable cooperation between countries in the face of such cases, argued that their frustration should be avoided by tolerating that while criminals use planes, judges travel by stagecoach." (L.J.U., Volume CI, July August 1990, c. 11475)

V)    The purpose of the extradition process is not to sentence or absolve the accused, judging is not appropriate, but to assess the reasons for the request and its formal regularity to later agree to or deny the delivery of the party subject to the extradition request. It must therefore be analyzed whether the requirements set forth in the respective treaty were met as the main condition for accepting the request. Therefore, because it is not a process in the sense attributed by domestic law, the non-observance of principles of national law that in a domestic process would generate nullity if absent are not admissible under the respective treaties as torts. The case law of our Courts has emphasized this rule with singular acuity (L.J.U., T. LXI, c. 7334, cit. in L.J.U., T. CI, c. 11475), stating that:

JA173

"Applying the constitutional rules that establish some bases to develop the process, such as the need for prosecution by the public prosecutor (Art. 22), or the prohibition of trial by commission (Art. 19), to the forced assistance of a defense attorney (Art. 16), relate to internal procedural law... but not to internal law relating to extradition."

"It is not possible to speak, as an essential requirement to recognize the effects of the foreign sentence, of the compatibility with the validity of our public order, since this would lead to constructing foreign procedural norms that coincide in many aspects with ours, to make it difficult to comply with international treaties and hinder their collaboration, recognizing, on the contrary, that each State, according to its traditions and social legal peculiarities, arranges the criminal process differently."

"In reality, the requirements of a valid procedural order for the processing of extradition requests are contained in the Treaties and refer, in general, to the existence of a developed legal process or a legal judgment, in accordance with local rules, how could it be otherwise, which complies, on the other hand, with the generic and essential requirement of the Constitution (Art. 12) on legal process and judgment (due process)."

"Although there was a specific provision in domestic common law, prohibiting the extradition of the accused in absentia that does not exist any way, it could not prevail over the provisions of the Treaty, which constitutes the norm of international law and domestic law (by legislative approval) and which, as such, due to its international substance emanating from a convention and as a special norm, it cannot be invalidated by a lower-ranking, unilateral and, in addition, general one."

"The constitutional precept that prohibits the criminal trial in absentia is aimed at protecting an individual's right in our country, not in any other Country; therefore, if this principle is not accepted or is rejected or violated in those Countries, it has nothing to do with our institutional structure."

"If the alleged unconstitutionality is accepted, our justice will be issued with respect to the trial followed abroad against a certain individual, not based on the applicability of the law of the requesting State, but on the rules that regulate the criminal procedure in our own State ("Uruguayan Justice", T. LXI, case 7334)."

Consequently, an interpretation of the treaties must be made as a rule of international law, regulating a specific institute with strict adherence to it and its purpose and not in relation to the internal constitutional and legal order. Accepting this last position would be equivalent to building insurmountable fences to extradition law and be contrary to the manifest purpose of the law and the tendency of the International Society. The guarantees with which each domestic law covers the procedural ritual of trial and execution of the sentence belong to the internal jurisdiction of the State in question and are not part of the list of exceptions for compliance with the treaties in force on the matter, which generally must be interpreted "in ordine" and not "extra ordine". The validity of these principles must also be based on avoiding any possibility of confusing them with the exception of international public order since this is a wall that opposes the application of certain foreign law in a given territory, and it is a something different to determine the surrender or not of an individual to be judged according to the domestic law of the requesting State.

In accordance with the foregoing, the requesting State cannot be required to issue an arrest warrant or prosecution or present a formal accusation observing the legal requirements of the requested State, as this would simply be the undue interference in a sovereign legal order. On the other hand, it would be illogical and contrary to proper reasoning to require that the requesting party give a statement in the presence of the public defender as a condition for the prosecution or arrest warrant because the purpose of the extradition is precisely to bring the defendant before the requesting court.

But even if it was accepted that the non-existence of such requirements violated the request, from the point of view of domestic law, it should be concluded that it is not an indispensable requirement to comply with Article 126 C.P.P. to order a warrant for preventive detention or arrest warrant against a certain person, which have not otherwise been issued by the judicial authorities of the requesting States. Indeed, the order for prosecution is technically definable; it is the criminal initiation order against a certain person with the effects prescribed by law (Art. 125 et seq. C.P.P.), for which there must be a factual assumption of the defendant to the Court, which through the prosecution order also translates into legal assumption. In our domestic law, there may be preventive detention without prosecution (no more than 48 hours according to Articles 15 and 16 of the Constitution and 125 paragraph 2. C.P.P.) and prosecution without pretrial detention (Art. 1o. Law 15859 and 71 C.P.P.).

And, on its own, to issue the prosecution, there must be a physical presence of the defendant, even in the case of prosecution without imprisonment (argument of Article 1. 147 C.P.P.), the Judge ordered preventive detention even without the requirements of Art. 126 C.P.P., as these are only required to prosecute but not to issue a prison order, which will be governed by the provisions of Articles 118 and 119 C.P.P. Thus, it is true that if a prosecution order is issued against a fugitive, it constitutes in absentia and violates Article 126 CPP, but if instead, a preventive detention is order and an arrest warrant is issued, the situation described does not occur, since the purpose is the material apprehension of the fugitive to delivery for prosecution, which will have to be issued according to the requirements of the law once the accused is available to the Court. For this reason, even admitting this thesis, the Spanish Court's decision, on page 123 orders the pretrial detention of R.P., in no way violates our domestic law. Likewise with the indictment of the Grand Jury of the United States and the arrest warrant issued by the U.S. Judge. All of this, without prejudice to arguing that the requirements established by the law of the requested State are not transferable to that of the requesting State.

VI)   (THE REQUEST OF THE SPANISH AUTHORITIES)

It was properly submitted by diplomatic means, thus sufficiently accrediting the authenticity of the same, without the need for the authentication requirement (Cf. L.J.U., T. CI, c. 11475). It was requested between governments and is based on the Criminal Extradition Treaty concluded between both countries in 1885. This treaty, however, contains a list of crimes for which an extradition request is authorized (Art. 2), among which drug trafficking is not included. This system has been criticized for the omissions it may cause, even more so when the treaty does not have an express provision that encompass the enunciative and non-limiting nature of the list, like it does in the treaty of 1879 with Italy. This, however, is not an obstacle to giving effect to the request, since the convention must be supplemented by the provisions of the 1961 Single Convention on Narcotic Drugs, ratified by D.L. No. 14222, whose Article 36, paragraph 2, states that the offenses referred to in the text "shall be considered included among the offenses that give rise to extradition in any extradition treaty entered between the Parties...".

The evidence on which the order is based should not be evaluated in accordance with the assessment standards required by our domestic law to conform to the notion of partial evidence to prosecute an individual. In both requests, the plausibility thereof must be sufficient, and a "fumus bonis iuris" must be accredited that at least ensures that the individual will not be extradited with inconsequential evidence. In this regard, C. de I.'s statement that he also has profuse accusations by the United States Grand Jury narrates in detail the activities of R.P., which he evidently knows by admission of P. himself and according to the telephone conversations transcribed on folios. On the other hand, the Defense's allegation regarding the illegality of telephone intercept in our domestic law is not acceptable. It suffices that such evidence is admitted in the requesting State, in which it was apparently carried out with due judicial authorization. Even if this argument is sufficient, the Court will also admit the validity of such evidence even in our domestic adjective law as provided for in Article 212 of our Code of Criminal Procedure, which enables the Judge, by a founded decision, to intercept postal or telephone correspondence "or any other form of communication in which the accused may take part..." Such a very clear disposition eliminates any doubt as to whether the interception of telephone communications is illegal and inappropriate as evidence in our law.

VII)   (THE REQUEST OF THE UNITED STATES)

It was also correctly submitted by diplomatic means and its translation was also certified by a sworn translator, which must be admitted, since nothing prevents the correction of certain formal irregularities even during the extradition process, as well as addition of new elements even without the request of the Court. As for the criticism of the Defense about the alleged trial in absentia, we believe they should be dismissed together with what was stated above.

As for the evidence provided in accordance with the requirements of the binding Treaty in the case (Art. 10 No. 3.) they must justify the request and that the request and the arrest warrant are not manifestly unfounded. The subject has been studied in depth by the Court of Rotation in the "V., R. Extradition" case, where said Court stated: "What is established, requires adopting some criteria to assess the evidence provided and within the conventional regulatory framework, without the legal categories or procedural system of any of the parties prevailing, as already pointed out; in other words, if the Treaty does not define an expression or concept to determine its scope, one must not go to the regulatory system of one or another State since this means finding an "extra ordine" solution and not an "in ordine" solution, unacceptable and contrary to the principle of equality that must govern relations between sovereign states (cf. Alfonsín: Theory of Private International Law, pp. 390 and 404/406)."

JA175

*Document*

"In order not to deprive their specialty of the international law standard, the solution must be found through the investigation of common will of the parties, within the normative context and adhering to the purpose of the institute."

"The assessment of the evidence cannot be made, as indicated above, following the laws and assessment system of the requested State, as proposed by the Defense."

"The requirement of the Treaty in this respect is not of significance. It can be said that it is of extreme relativity, because if on the one hand, in the same article, "sufficient evidence" is claimed, but with the addition of "prima faccie" that tempers the requirement, on the other, the evidentiary requirement becomes less, since it is rejected when it is manifestly insufficient".

"In light of this, taking into account some clarifications made on the interpretation of the treaties and the precautionary function of the extradition institute, the evidentiary requirement of the Treaty, to the highest degree that can be assigned to it, is located, linked to or approximates the concept of plausibility ("fumus bonis iuris") that is, probability or plausibility of the alleged facts or alleged rights."

"The content of the evidentiary requirement, as naturally stated, cannot be assimilated to terms applicable in the domestic order ("partial evidence" or "elements of sufficient certainty", Articles 15 of the Constitution and 125 of the C.P.P.); not only because it is not a matter of establishing the presupposition or the presuppositions to try the party subject to the extradition request, but also because the warrant comes from a country with a different procedural system. (L.J.U., T. CI, c. 11475)

The requirement of mere plausibility or fumus bonis iuris in the assessment of the evidence interpreting the treaties has also been taken up by case law in the interpretation of the treaty of 1874 that binds us to Great Britain and Ireland. In this regard, the 12th Criminal Court of First Instance said, Rotation: "The powers of the requested Judge are perfectly defined in Article Six of the Treaty, he or she must hear the rebuttals from the fugitive, who must be brought before the Judge and consider "the criminal evidence and establish whether "such evidence is sufficient to uphold the prosecution." It is not a question of the text, judging the party subject to the extradition request, rather of establishing whether the evidence is founded on the accusation filed that is, whether the charges are plausible."

"If we consider that we are within a framework of an institute with a precautionary function, the requirement that we consider is linked to the idea of plausibility of the law in question or 'fumas bonis iuris'."

"This is an adjective, incidental process, linked to another principal, which will not take place in the Jurisdiction of the requested State, but with which it is functionally linked. As Gelsi said: "In general terms, the extradition process is at the service of the criminal process followed abroad; therefore, its object (its "topic") is incidental in relation to the former, in the sense of an "accessory" and, moreover, of a "complementary" quality, to make it possible; to make the prosecution possible (op. cit., p. 7). And, in relation to this main process, extradition appears as a process with a precautionary function."

"In harmony with these ideas, it is entirely coherent to understand the requirement we are discussing as the verification of fumus bonis juris."

"This formula is independent, although it is not without some analogy, with the substantive prosecution presuppositions, since it is not a matter of considering everything that the requesting Judge has done; that would be harmful to the Requesting State. On the other hand, this formula, with slight variations, has been included in all the Treaties that the United Kingdom has entered on extradition (a complete copy can be seen in V.E. Harley Booth: "British Extradition Law and Procedure", Vol. II) and therefore, come from a country with an accusatorial procedural system, very different from ours. Hence, it can lead to erroneous conclusions; the assimilation of these solutions to our procedural category of "trial, with its material presupposition of "partial evidence." (L.J.U., T. 96, c. 10952)

The affidavits of Attorney James Mac Adams III and Vichy Duane are from officials who conducted the investigations in this case, and the link between P. to I.I. (alias "A."), who apparently had an active role in cocaine trafficking in the United States, clearly emerges. As a result, there is the necessary fumus bonis iuris to establish that the petition is not "manifestly" unfounded, having the conditions to access it.

(VIII)  (THE PROBLEM WITH LIFE IMPRISONMENT)

JA176

In the case of the request from US authorities, the possibility of being sentenced to life in prison hangs over the party subject to the extradition request, which, in the opinion of the defense, prevents the lawsuit from being accepted since it violates our international public order. Said prohibition is found according to the Defense in Art. 26 of our country's Political Charter, extracting it from its 2nd paragraph. We do not share such a position. The rule exclusively prohibits the death penalty being the case that if the constituent had requested the extension of the prohibition to Ergastulum, it would have ordered it as it did with the capital punishment. The aforementioned prohibition is not clearly inferred from the standard in such a way as to merit a breach of international obligations assumed by the State. National case law, as a general rule, has not provided for this intentional prohibition to avoid the delivery of the person in question. However, the only obstacle of this nature is the death penalty, which merited express commutation provisions in several of the treaties signed by the Republic, without the country concerning itself the same way to also exclude life imprisonment. In the case of the Caracas convention not yet ratified by Uruguay, this clear line of international policy has changed, which does not show that a treaty previously concluded must be ignored. Consequently, the possibility that any of the offenses the person is accused of may be subjected to life imprisonment does not prevent the person from being delivered to the requesting State, as also decided by case law in application of this same treaty (cf. LJU; T. CI, c. 11475). On the other hand, Article 7 of the Treaty only forbids the application of the death penalty and it is conceivable that if the Parties wanted it... when it is provided for in Article 2 Nales 17 and 26 of the respective Treaty warrants agreeing to the request.

X)      The applicant alleges to be innocent in his first statement (in reference to the accusation by the Spanish authorities); however, when the respective extradition requests were imposed on him, he refused to reply to the specific charges that he is accused of and opposes being extradited, to which he agreed in the first instance and so stated. His link to people accused of being important figures in drug trafficking, M.A., was proved and he admitted to knowing dealers; they would have also excluded the Ergastulum, but did not, so in merit of a possible interpretation of Article 26 of the National Constitution, compliance with the Convention cannot be avoided by covering a requirement that is not requested. Because of these arguments and those of the Attorney General, the opposition to this matter must be dismissed.

IX)      Both requests comply with the so-called "double criminality" principle, which requires that the accusation for which the delivery of the accused is requested also be classified as a crime in the legal order of the requested State, with due flexibility and without requiring the same nomen iuris in the offense types. In the United States, R.P. is accused of associating and conspiring with the purpose of trafficking and possessing cocaine (grand jury charge I) and of laundering monetary instruments from such trafficking. In Spain, he is accused of trafficking and smuggling narcotics and receiving the benefit of such trafficking. From pages 113 to 114v, the facts of such accusation provided for as a crime are provided for in Articles 344 and 344bis a) 3 and 6, 344bis b) and 546bis f) of the Spanish Criminal Code. The crimes for which he is accused in the United States and in Spain are considered without further consideration in the provisions of Decree Law 14294, whether in the modalities of importation or introduction and distribution (Article 31), and it must be borne in mind that Article 32 also penalizes whoever organizes or finances the activities described even when they are not carried out in national territory. On the other hand, the charges of association and conspiracy issued by the Grand Jury, find qualification without further obstacle in the provision of Article 150 of our Criminal Code ("association to commit crime").

As for the "laundering"; in other words, the legitimation of monetary instruments, case law has decided that it is a concealment hypothesis of introduction or sale (arts. 197 C.P., 30 and 31 of D.L. 14294), extraditable in accordance with Arts. 2 Nal. 17(2) of the Treaty with the United States of America (Cf. L.J.U., T. CI, c. 11475). This is the case for several of those named in the prison order issued by the Spanish Magistrate (D., I., etc.). From the case, according to his first statement in the presence of a defense attorney, he was found to be linked to significant money movements in which M.A. also participated and operated in the country under an assumed name with false documentation of which he did not provide a satisfactory explanation. Therefore, the lack of grounds for the United States' request cannot be referred to, underlining, as the Prosecutor points out very well that in the case of the Treaty with Spain, it is associated with the jurisdiction analysis system and the formal requirements and the request cannot be rejected due to the lack of evidence (Dutch Belgian system).

XI)      (REQUEST CONCURRENCE)

In the sub-cause, the Treaty with Spain followed the seriousness system, and in the case of being the equivalent, the subsidiary criteria of the defendant's nationality and then the request's priority (Art. 5)

JA177

[logo] **THOMSON REUTERS**

(Cf. Vieira, Manuel Adolfo: "Extradition in our positive law", in Revista de la Facultad de Derecho y Ciencias Sociales, Year XII, July December 1961, Nos. 3 4, p. 868).

For its part, the Treaty with the United States establishes seriousness as criteria, followed by the place the crime was committed, the defendant's nationality and the request's date (Art. 14).

There seems to be no doubt that the seriousness of the crimes for which P. is subject to extradition to the US is greater than the accusation made by the Spanish authorities, both from the punitive point of view, as well as from the criminal competence and the amount of activity performed. In this regard, it is worth referring to the accurate statements made by the Prosecutor in his excellent and orderly opinion in number III of his hearing. Also, using the subsidiary criterion of the priority, the request from the United States has preference, which was recorded with the Foreign Ministry on March 15, 1991, while that of Spain was on March 21 of that same year. The main and subsidiary criteria basically coincide in both treaties, so there seems to be no further doubt about the solution.

In the case of the criterion of seriousness, both the ontology of the protected legal right must be taken into account, and, in the case of homogeneous crimes, the aforementioned reasons of non-specific punishment and criminal act. In the case of priority, the introduction of the respective warrants by diplomatic means, without taking into account the request for provisional arrest by different means.

XII)    Also build the precedent solution through the existence of a treaty between both requesting States, which would open an instance of another extradition to the Spanish State, as well as to Uruguay if the occurrence of illicit acts by the required in our country is verified.

The seriousness of the accusation by US authorities consists of four charges (I, II, IV and VIII, see pages 252 and 253), of which three may carry a maximum sentence of life imprisonment; the activity carried out before the events investigated by the Spanish Courts. From the Spanish Prosecutor's own list of facts, the statement is clear (pg. 118), even alleging that the party subject to the extradition request has established its infrastructure for drug trafficking and money laundering in Miami (pg. 119). The proposed solution, as pointed out at the beginning of this section, is also based on the possibility of subsequent extradition to Spain according to the Treaty in force between both countries as well as to Uruguay if necessary and emerging from the investigative proceedings conducted in the country where a crime is committed by P. in national territory. This last possibility lies in not hindering international cooperation and addressing the faithful fulfillment of the obligations assumed by the State.

XIII)    The preference of the request for the most serious offense has also been the solution adopted in Article 15 of the Caracas Convention of 1981, referring to the law of the requested State to make said determination. If the national law is analyzed in this regard and in the case, as was said, it deals with crimes where the protected legal right is the same, the overlapping of offenses between Articles 150 and 197 C.P., 31, 32, 33 of D.L. 14294, the request of the United States also prevails.

As for the Spanish request, P. is charged with participating in the transfer of two shipments of cocaine to Spain, which, according to Article 31 of D.L. 14294, would be included in the word import, and was also charged with bringing cocaine into the United States in 1983 and again in 1986. These crimes would have been occurred in United States territory (importation).

In light of the charges of both States, it is necessary to analyze them in light of legislation of the requesting State, the highest penalty in respect of overlapping of offenses, accusations and the amount of activity carried out, turns out to be for the crimes that underpin the United States' request.

Even if it is not ratified, if signed, it is lawful for the interpreter to refer to the Caracas Convention for the purpose of filling gaps or doubts as a doctrine most accepted in extraordinary law, provided that this does not violate the letter or spirit of the previously signed treaties. Said receipt establishes and reaffirms solution that was reached before the concurrence of demands.

Nor should this reasoning and that which was dismissed discard the possibility of life imprisonment hindering a contradiction. Indeed, Article 33 of the Caracas Convention declares that it does not render previous treaties null and void unless expressly stated by the Party States; hence, even in contrast to the international policy followed by the country, it cannot become a breach of conventions where the requirements set forth in the Caracas Convention were not required, much less when it is only considered as the most accepted doctrine.

JA178

XIV)   The foregoing considerations underpin the continuity of the Uruguayan State's international criminal policy of cooperating internationally to suppress crime. Grotio saw the foundation of extradition in terms of "iustitia" and others, such as Mittermaier, in the usefulness that the institute generates. Its main foundation lies, however, in the social defense (cf. Calón Neck: "Criminal Right", Vol. I, general part; p. 217), which becomes particularly relevant when it comes, as in the sub-cause, to suppressing organized crime and international drug trafficking, and this without ruling on the guilt or innocence of the requested party, which is not the object of these proceedings. The high availability of technical and communications media that the modern world puts within the reach of international crime must have its counterweight in a broad cooperation of extradition between States that, through the treaties binding them, and through other agreements and declarations, have committed them to the fight against drug trafficking. As Ottati Folle pointed out, "the criterion, so often invoked, of the impenetrability of the legal order has been losing its inflexibility, as demonstrated by the texts of the numerous treaties (bilateral and multilateral) signed in the subject matter of extradition in recent years. On the other hand, this tendency ... coincides with the need to reduce the hindrances and obstacles of this institute resulting from an antiquated and happily outdated nationalist approach to law" ("Inter-American Convention on Extradition. First reflections on its content", Rev. INUDEP, Year II, No. 3, p. 127).

XV)   Finally, and having rejected the request from the Spanish Authorities based on the aforementioned criteria, it must also be stated that the documentation requested by these authorities by fax record on page 98 must, therefore, be subject to a request by means of a regular letter rogatory, which will be considered in due course.

This is because the documentation was seized by Uruguayan police in authorized raids at the request of the police force and not by evidentiary measures requested by a foreign Court.

XVI)   Nor does the use of false documents or certificates in our country (Art. 243 Uruguayan Penal Code) prevent the delivery of the requested document, since from the content his first deposition he participated in the falsification according to the provision of Art. 61 inc. 1st. C. Criminal, therefore, there would be no appropriate typification of the crime in Article 243, which only punishes the person who makes use of a document or certificate without having participated in the forgery. On the other hand, clear reasons of criminal policy state not to hinder the extradition of the defendant for an offense that if established, what would not have happened would be ontically very minor compare to the crimes for which the foreign Courts request it. This is what the most modern legislations have understood. For example, the German legislation postulates that whenever there is an obvious disproportion between the crime for which it is accused and that committed in the requested State, the persecution of the latter is either withheld or deferred in order not to hinder the extradition process. This is based on the most modern admission of the principles of opportunity and transcendence, expressly set out in Art. 49 of the draft Code of Criminal Procedure for consideration by Parliament. The doctrines most accepted in criminal matters are in that direction and in the case of extradition law, they can be asserted setting aside the need for action, whose statute of limitations would only be in domestic law cases exclusively, which do not violate international regulation. In spite of the above, the alleged crime would not occur in the proceedings as indicated above, but rather at its first declaration, trapped by Panamanian jurisdiction, without the requirements of Art. 10 of the National Penal Code and without prejudice to the provisions of Nal. XII in fine.

Based on the grounds stated and the legal and conventional provisions cited, THE COURT RULED:

Let the nullity invoked be dismissed and let the extradition of R.P. to the United States be accessed for the purpose of being tried on the charges of which he is accused. Prepare a declarations page and let the requesting states know by diplomatic means and return it.

Gabriel Adriasola

SECOND INSTANCE

Montevideo, September 9, 1991.

RECITALS:

For judgment in 2nd instance, this extradition procedure for P.R.P., which came to hear the appeal of the judgment issued by the 1st Law Court. Instance of Maldonado, 4th. Rotation (File 157/91). RESULTING IN:

JA179

I)      Judgment No. 62, of May 8, 1991, granted the extradition of the person in the heading to the United States to be tried on the charges of which he is accused.

II)      On page 553, the defense filed appeals for reconsideration with a supplementary appeal against the aforementioned judgment. Their arguments can be summarized as follows:

a) it is not possible to grant extradition to an applicant who has filed a trial in absentia of the person who is to be extradited.

b) the evidence used by the first instance judge is irrelevant since it is a police report from the authorities of the requesting country.

c) P. was acquitted of many of the charges as the defense offers to prove.

d) one of the crimes for which extradition is sought and granted in the first instance, money laundering, was created by U.S. criminal law as section 1956 of its Law Enforcement Code, by law of October 27, 1988, while the Treaty was signed on April 8, 1973, and Uruguay approved it on October 28, 1983.

In addition, there are charges that are offenses established by a law prior to the signing of the Treaty, The U.S.A. did not begin to include the crimes described in the so-called R.I.C.O. (Racketeer Influenced Corrupt Organization) Act in the treaties signed in 1980 after the signing of the Uruguayan treaty.

e) It disagrees with the judge's opinion that money laundering is compatible with our concealment.

f) also with respect to the assimilation of the conspiracy with the association to commit crimes.

g) no sentence of life imprisonment may be imposed, which may occur according to US law.

In short, it asks that extradition not be granted and in the event that this criterion is not followed, it be conditioned only on the charges that are admitted as valid by the Court.

III)      The 1st Attorney General In turn, vacated the transfer conferred on page 604, responding to the arguments made by the Defense in an extensive and well-founded opinion.

IV)      The Judge kept his resolution in the order on page 625 and allowed the appeal before this Court where the proceedings were sent for review by his order, he was summoned for sentencing and it was legally agreed.

Whereas:

I)      [BILINGUAL TEXT:] TANTUM APELLATUM QUANTUM DEVOLLUTUM

There are undoubtedly two effects of the appeal: returnable effect and the suspensive effect. In the returnable effect, there is actually a submission for review, the jurisdiction is passed from the Appellate Judge to the Superior Judge, who assumes full power of revoking the appealed judgment within the limits of the appeal.

Of course, this limiting principle of the second instance does not prevent a review of the proceedings in the preliminary process to exercise comprehensive control of the Court over the formal development of the latter. This is a procedure that is used precisely when neither party has expressed a concrete grievance against the first instance judgment. In this situation, the Court of Appeals intervenes by using its natural process reviewing power because acting otherwise, the second instance would have practically no content.

In the case, the issue is different. There are specific grievances against the judgment of first instance. Therefore, although the Court will consider the facts and procedural acts contained in the appealed judgment, it will examine, by the restrictive effect referred to above, each of the grievances on which the defense has founded its appeal.

II)      TRIAL IN ABSENTIA

First and foremost, as an introductory point of this grievance, it is necessary to examine what is the applicable legislation in this matter in Private International Law.

The Prosecutor says, on pages 607 et. seq., that International Conventions govern before domestic law in each country. The Court does not dispute this assertion, which in the context of International Law, is fully valid; however, it considers it necessary to state that it is not possible for an international standard, agreed between parties, to overlook the public order of any of these contracting parties. It is not possible to admit as unquestionable an agreement between countries, by which they are obliged not to respect internal order mechanisms that defend the security of citizens and especially the due process of law to which each one of them has the right precisely because they are inhabitants of those countries.

The problem, in due time, is to clarify whether the extradition treaty binding our country to the United States of America violates Uruguayan internal public order in that area.

This is precisely the point questioned by the Defense; whether the prosecution in absentia of P. has violated the guarantees of due process in the requested country.

The Court believes, as it has on previous occasions when it has had to decide on a similar matter, that the question must be examined from the point of view of the legal order of the requesting State, in this case, the United States of America.

This cannot be interpreted in any other way since it would make extradition lose its practicality, which would become totally ineffective.

The question is, therefore, whether the rules of due process have been respected in the requesting State. To examine this point, it is necessary to refer to U.S. legislation.

There is no Instruction Court in that country. The Department of Justice, comprised of Prosecutors, investigators and Police, carries out that function and are the ones who gather evidence to bring a subject to criminal proceedings.

The Court believes that the constitutional guarantees of due process have not been violated, since extradition itself is not a trial, but a procedure by which a subject will be prosecuted and the extradited person will be determined to be guilty or not guilty. At that time, when the trial begins, the accused will have at his or her disposal all relevant procedural guarantees; In other words, the right to be an attorney, the right to be tried by a jury, according to U.S. law and the guarantee that the judge will pronounce judgment according to the jury's decision. Denying extradition because the laws of the requesting country are different is unthinkable, given that with that same criterion, it should not be granted to a country that does not have the same legal system as ours because, for example, it has the jury, which Uruguay does not.

If this extradition procedure had not been agreed based on the circumstance being examined, what was agreed in Article 10 3 of the Treaty in force between the United States and our country, would not have been justified, which reads: "When the request refers to a person who has not yet been convicted, it must be accompanied by a bench warrant or arrest warrant or an equivalent indictment issued by the competent authority of the requesting Party." The proceeding was conducted in the United States, where a Grand Jury determined that P. should be tried for the crimes for which his extradition was later requested.

This is in accordance with the Uruguayan constitutional framework, which also allows for the arrest of a person when there is partial evidence of a crime and without prosecution. This is because in our constitutional system, the Judge has 48 hours to make a summary ruling or release the accused.

From this constitutional system, covered by the provisions of Articles 118 and 119 of the Code of Criminal Procedure, finds that in our legislation, it is also possible to issue an arrest warrant "in absentia"; because it is a person who never declared before the Judge and who will most likely be a fugitive. Our case law has been very precise and clear regarding this assertion as it arises from the judgment of the similar 1st. Rotation, No. 202, dated December 20, 1990 (Cf. Vol. 3rd., sent. 80/82).

It means that in the requesting State, the trial of P. has not yet begun and that extradition is requested in order to carry out this prosecution, where the accused will not lack any guarantees of due process of law.

The clarity of the explanations provided by the Attorney General in this case, specifically on page 609/610 et. seq. exempts this Court from all other comments, with respect to the matter discussed in this Recital.

In summary, then, with regard to the defense's grievance that a trial has been carried out in absentia of its client, the Court concludes, based on the arguments presented in this Recital, that it is not relevant and therefore it is not accepted.

JA181

### III)   SUFFICIENT EVIDENCE

The assessment made by the Judge of First Instance has been challenged with respect to the evidence presented in the courts and that is related to the guilt of its client.

The Court must state that case law practiced in the Courts of Appeals has assessed as correct the evidence produced in a court in the United States of America, when it has been carried out in a procedure with criminal legal support and with the authorization of a judicial Magistrate of that country, which makes it unquestionable. In that sense, the same was pronounced by Rotation, in a judgment of July 28, 1989, which is published in La Justicia Uruguaya, Case No. 11475.

To determine an extranational legal relationship, we must abide by the category table offered by the system of international law standards, since it is the system that governs the relationship. Moreover, to specify the extent of the categories, it is necessary to interpret the regulations of international law according to the approach of the legal system to which the regulations to be interpreted belong (Quintín Alfonsín: "Two Studies on International Private Law", Montevideo 1946, p. 67).

Strictly speaking, then, the assessment of the evidence must not be done in accordance with Uruguayan law, but rather with those derived from the interpretation of what is agreed in the respective Treaty, which is the system of international standards referred to by the author indicated above. This is the best solution of international law, because it allows for an interpretation in accordance with the legislative divergences between the States, parties to the Treaty in question (a solution to which also the aforementioned sentence published in Uruguayan Justice as Case No. 11475 arrives).

In this case, moreover, the only evidence presented is not only the police memorandum to which the defense refers. The statements of the Prosecutor and other investigators in charge of the case in the requesting country should also be considered as such, since they are part of the Department of Justice and are the officials in charge of the indictment. These depositions were studied by the US Grand Jury that intervened in the case and considered as evidence in order to request the prosecution for the crimes for which P was later summoned. As the acting Attorney General rightly says, that is something perfectly equivalent to our concept of "sufficient conviction elements" that are equivalent to partial or incomplete evidence.

In a case like the one that has been subjected to the consideration of this Court, complete certainty is not required but only plausible, a judgment of probability, a "fumus bonis juris" (cf. Quintín Alfonsín: "Theory of Private International Law" p. 390, 404/406).

In addition, Article 10 of the aforementioned Treaty states that the requested party may ask that the requesting party provide sufficient evidence to establish "prima facie" that the accused has committed the crime for which his extradition is requested. He also states that the requested party may deny extradition in the event the arrest is manifestly unfounded. Note that it only grants a simple power to the Judge of the requested State. It is not a duty, which infers a fortiori. If the evidence is sufficient for the required party, it may also grant delivery.

### IV)   ACQUITTAL OF VARIOUS CHARGES

From the documentation added in the case in this same instance, it can be seen that a certain F. de L.M. was acquitted of a charge and in a following case of a certain C.Q., the Court did not accept the evidence obtained by electronic surveillance apparatus and on its merit, it abandoned the process and withdrew the charges. However, from this added documentation, duly legalized and translated, there is no direct relationship with the case that is questioned in this file. Moreover, the name of P. does not appear at all in any of the documents submitted.

But there is no evidence in case records that allows us to infer that some charges have been destroyed, such as:

a) in May 1985, P. became a partner and adviser to I.I. and his company whose purpose was to smuggle cocaine into the United States and he advised him to use Panamanian companies to hide the real owner of the goods acquired with that illegal trafficking.

b) subsequently, in September 1987, it carried out operations aimed at introducing 800 kilograms of cocaine aboard the O.S.

JA182

This means that, in the first case (letter a) there was an agreement of wills with an illegal purpose, which will then be examined in light of the legislation in force in our country. And in the case of letter b), there is, without a doubt, a conduct possibly punished very severely by our law 14294, which will also be subject extensive examination in a separate Recital.

V)      RETROACTIVITY OF NEW CRIMES

The defense says that the crime of money laundering, which is one of the illegal acts for which extradition is requested, was created by US law after the signing of the Extradition Treaty with Uruguay.

The case is very clear, one of the most expensive principles for criminal law is the non-retroactivity of laws that create new crimes. If the crime of money laundering is not acknowledge under the Treaty, the wrong can be charged later, when a law incorporates it into the domestic legislation of one of the signatory countries of the treaty. The rule is that it must deprive the right of the Treaty on others, since it is the one that has agreed to a series of behavior between the signatories. To attempt to incorporate a criminal act into the Treaty that, when it was signed, was not classified as a clear violation of the principles of liberal criminal law.

For these reasons, the Court will accept this grievance.

This reason results in the offense of money laundering and its double criminality in our law as concealment, which does not accept the defense, losing its reason of being, although the Court will examine it at greater length in a separate Recital.

VI)      THE CRIME OF MONEY LAUNDERING

As the Prosecutor in this case has very clearly examined, on pages 621 and reverse, the conduct for which P. is charge with the crime of laundering of monetary instruments cannot in any way be included in the criminal typification of concealment provided for in Article 197 of our penal code. Indeed, P. was involved in criminal activity with other people, which charges him as a co-delinquent in these types of crimes, for example, the trafficking of cocaine. Although he might have later participated in operations aimed at laundering this dirty money through these criminal activities, this cannot in any way be considered as concealment under our law. Concealment is an autonomous concept that, among its presuppositions, requires that the subject not be a participant in the criminal activity that is concealed and was not aware of it before collaborating in its concealment.

Thus, as the Prosecutor himself admits, the crime of laundering monetary instruments cannot be included under our concealment.

The principle of double criminality in the Member States is therefore not fulfilled in this case.

The Court, therefore, considers relevant the grievance expressed in this regard by the appellant.

VII)      CONSPIRACY AND CRIMINAL ASSOCIATION

The way in which, according to the requesting authorities, P. was "associated" with other members of the criminal organization to commit criminal acts he is charged with, especially that of importing cocaine from a place outside the United States of America, in the opinion of the Court, he participates in simple co-delinquency and not in criminal association to commit a crime.

Indeed, the differences between the two forms of violation of criminal law are plausible:

First of all, co-delinquency implies a beginning of execution, that is, an agreement to commit one or several crimes, in a degree of attempted or committed. Instead, the criminal association to commit crimes is simple criminal intent, without the execution.

Secondly, co-delinquency is occasional, while the criminal association to commit crime is permanent. The latter has an indispensable condition that a coherent and durable organization is constituted, which allows for the identification of its members as partners rather than co-delinquents, while at the same time recognizing the group externally, for the homogeneity of its purposes, methods used and agents anticipated acts (Criminal Court of Appeals 1st. Rotation, judgment No. 159/77, published in Revista del Instituto Uruguayo de Derecho Penal, Year I, No. 1, p. 192).

JA183

The important thing, then, is that it involves a plurality of plans and that this element of permanence can in fact be affirmed and that characterizes a true association, differentiating it from a criminal agreement referring to various crimes, but transitory (Soler: "Argentine Criminal Law" , Volume IV, page 550).

In the opinion of the Court, it is not duly proven in the court records that P. had permanently associated with other subjects to carry out harmful conduct in narcotics legislation. The only fact that appears proven is that in an undetermined place in US territory, they imported cocaine in the aforementioned ship.

It is not proven that this agreement of wills would have carried out other criminal activities which are crimes in our law, except for money laundering, which was already rejected by the provisions of previous Recitals. It is not proven that there is a stable permanent organization engaged in other criminal activities or that has engaged in harmful conduct under the drug law at any other time. Everything makes us suppose, at least with the evidence that has been presented in these cases, that there was an impromptu meeting, which is undoubtedly a form of conspiracy and not a criminal association to commit crimes. And, if at any time, the crime of importing cocaine into U.S. territory was committed on a single occasion based on court records. Evidence is needed that there has been a criminal agreement to commit crimes, without which, the action must be contained in every criminal manifestation, within the limits of a simple overlapping of offenses in the specific crime.

Although it was proven in the case that there was a conspiracy, this form of the iter criminis is not punishable under our law, at least for the activities for which extradition is requested in the case.

VIII)   POSSIBLE SENTENCE OF ERGASTULUM

The Defense is also aggravated because a life sentence is possible, which does not exist in our country.

In principle, this argument should be dismissed, because it does not appear that a sentence of this type will be ordered in the sentence that will refer only to some crimes and not all for which extradition was requested.

This consideration is valid faced with the declaration that this Court will make on the extradition being conditioned only on some of the charges requested and the fulfillment of formal and procedural order guidelines.

IX)   OFFENCES FOR WHICH EXTRADITION IS GRANTED

Based on the foregoing, only some of the charges brought against P. by the requesting authorities have been left standing.

Indeed, the Court recognizes as valid the United States' claim regarding the following fact, from an unknown date, sometime in 1982 continuing until November 29, 1988, the party subject to the extradition request, along with others, joined together to import cocaine into the territory of the United States from somewhere outside of it.

It can be proven that P. at least planned and organized a shipment of cocaine onboard a cargo ship in 1985.

This conduct, which is unlawful according to U.S. laws, complies with the principle of double criminality, since in our country, it is classified as a crime under Article 31 of Decree Law 14294.

One of the main parts of Article 31 of the aforementioned decree is that of "importing" and has been interpreted by national doctrine and extensive case law: as any entry or exit of the goods contained in lists I and II Conventions of New York and I Convention of Vienna. The substance "imported" by P. from another country (Colombia) is cocaine, which is included in list I of the 1961 New York Convention.

Moreover, according to the charge that has been proven and subject to extradition, P. organized the operations aimed at importing this drug into the United States, which also adapts to our standard type provided for in Art. 32 of the aforementioned decree law, one which includes the verbs to organize, which means ordering, distributing, structuring.

JA184

[logo]   **THOMSON
REUTERS**

Document

Also in that norm the financing of these operations is punishable.

It should also be assumed that P. carried out some of the activities punished by Art. 34 of the aforementioned regulations, since, undoubtedly, the importing of the drug was to market, supply, deliver, promote and facilitate the product, which are all typical offenses provided for in Art. 34 of the aforementioned decree law.

There is no doubt then that some of these charges have double criminality in our and the requesting party's country.

JA185



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Exhibit T**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Jacqueline Yorke

Sworn to before me this
April 15, 2022

Signature, Notary Public



Stamp, Notary Public

**LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS**
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

JA186

# EXHIBIT U

**Voces:** ESTADOS UNIDOS ~ EXTRADICION ~ PROCEDIMIENTO PENAL

**Publicado en:** LJU Tomo 101, 01/01/1990, 71
**Cita Online:** UY/JUR/27/1989

**Sumarios:**

1 . 1.    La exigencia de orden público interno es que exista en el estado peticionante las garantías del debido proceso le-gal, pero las características o modalidades concretas que en cada país asume esta esencialísima garantía, es propio de cada legislación y en ello no cabe inmiscuirse. De ahí que el interrogatorio previo del indagado, con asistencia profesional o constancia de su negativa a declarar, que es un presupuesto indispensable para procesamiento en nuestro derecho, no es trasladable a otros ordenamien-tos jurídicos.

2 . 2.    Cuando los documentos se introducen por vía diplomá-tica, no existe ninguna razón material o jurídica para ne-garle la debida autenticidad; lo contrario sería un agravio a un país con el cual Uruguay mantiene relaciones diplo-máticas. El requisito de la legalización no puede agregar ninguna nota mayor de autenticidad que los que ya están ínsitos en la introducción diplomática.

3 . 3.    Los defectos o vicios de forma que pueden afectar una so-licitud de extradición pueden ser reparados y una vez su-perados, no puede encontrar más obstáculos sobre tal aspecto.

4 . 4.    La traducción de los documentos aunque se hubiera com-pletado posteriormente con traducción de algunos textos y la correspondiente legalización, por disponerlo el Juez interviniente, la conclusión no puede variar en cuanto a que la petición es arreglada a derecho.

5 . 5.    Los tratados de extradición deben interpretarse en la for-ma que favorezca el fin por el que fueron convenidos, porque tienen su fundamento jurídico en las leyes natu-rales de las sociedades civiles y sus disposiciones, en rela-ción al espíritu que las informa, de tutela común a la so-ciedad, deben ser ampliamente interpretadas por ser lo más conforme al interés general que es el de asegurar el curso de la justicia de la manera más completa posible.

6 . 6.    Si el Tratado no define una expresión o concepto, para de-terminar su alcance, no debe irse al sistema normativo de uno u otro estado, sino que la solución deberá encon-trarse por la averiguación de la voluntad común de las par-tes, dentro del contexto y atendiendo la finalidad del instituto.

7 . 7.    Los cargos formulados son: conspiración para importar cocaína a los E.U., distribuirla y planear el cobro pro-veniente de la venta, delitos de droga, ocultamiento de dinero y delitos de conspiración, ayuda y participación en la comisión de un delito extraditable.No importa que ninguno de esos cargos se adecue típica-mente a las figuras delictivas previstas en el decreto?ley 14294, ni al resto del ordenamiento penal patrio, lo que importa es que el intérprete encuentre el sentido de una calificación jurídica en el marco general de las normas  creadas por la voluntad común de los Estados, suscrito-res del Tratado de Extradición y Cooperación en Materia Penal Uruguay y E.U., vigente desde el 11/4/84.

8 . 8.    Por otra parte, los hechos imputados se encuadran, sin vio-lencia, en una hipótesis de encubrimiento de introducción o venta, lo que claramente convierte a la imputación en una figura pasible de ser extraditada al tenor del Tratado.

9 . 9.    La conducta imputada, "lavado" (legitimación) de instru-mentos monetarios, es un delito susceptible de extradi-ción porque se trata de un delito a distancia (ejecutado fuera del territorio de E.U.) pero que cometido en si-milares circunstancias respecto del Uruguay, quedaría sometido a la jurisdicción nacional, como encubrimien-to de los tipos (figuras delictuales) establecidos en los arts. 32 a 33 del dec. ley 14294 ("organización o finan-ciación" o "introducción ilegal a países extranjeros").

10 . 10.    Desde una perspectiva interna o ya por la línea de polí-tica internacional seguida por el país en la materia, debe entenderse que la extradición de quien eventualmente pueda ser condenado a prisión perpetua por otro estado -pena que nunca nuestro país consideró inaplicable a los delitos por los que concedía la entrega? no es violatoria de la Constitución ni afecta el orden público interna-cional.

11 . 11.    La exigencia probatoria del Tratado ?en el máximo gra-do que puede asignársele?, se ubica, vincula o aproxima al concepto de verosimilitud ("fumus bonis juris"), es-to es, probabilidad o verosimilitud de los hechos impu-tados o derechos aducidos.

JA188

12 . 12.   Si bien se faculta al Estado requerido a solicitar la presen-tación de "pruebas suficientes" u otros "comprobantes o información adicional" (art. 10 No. 3o. in fine y art. 12), en modo alguno contraviene lo establecido en el Tra-tado la actitud de la parte requirente al presentar, sin serle solicitada, información adicional, la que, por lo demás, se inscribe en el espíritu de cooperación internacional con el cual fue suscrito y ratificado.

**Clasificación:**

EXTRADICIÓN

+ Procedimiento

+ Garantía de debido pro-ceso

+ Debe existir en Estado peticionante

+ Sus caracterís-ticas y modalidades son propias de cada país

+ Solicitud

+ Por vía diplomática

+ Es auténtica

+ Improcedencia de exigir legalización

+ Defectos o vicios de forma

+ Pueden ser subsana-dos

+ Traducción

+ Completada posteriormente

+ Es válida

+ Tratado

+ Interpretación

+ En forma que favorezca su finalidad

+ No definición de expresión o concepto

+ Debe averiguarse voluntad común de partos

+ De extradición y coopera-ción en materia penal con E. U. (vigencia: 1984)

+ Hechos imputados

+ No importa su adecuación a normas internas

+ Importan normas creadas por Tratado

+ Eventualidad de con-dena a prisión perpetua

+ No viola Constitución

+ Exigencia probatoria

+ Verosimilitud

+ Información adicional

+ Presen-tada sin requerimiento previo

+ Admisibilidad.

1.   La exigencia de orden público interno es que exista en el estado peticionante las garantías del debido proceso le-gal, pero las características o modalidades concretas que en cada país asume esta esencialísima garantía, es propio de cada legislación y en ello no cabe inmiscuirse. De ahí que el interrogatorio previo del indagado, con asistencia profesional o constancia de su negativa a declarar, que es un presupuesto indispensable

JA189

para procesamiento en nuestro derecho, no es trasladable a otros ordenamien-tos jurídicos.

2.    Cuando los documentos se introducen por vía diplomá-tica, no existe ninguna razón material o jurídica para ne-garle la debida autenticidad; lo contrario sería un agravio a un país con el cual Uruguay mantiene relaciones diplo-máticas. El requisito de la legalización no puede agregar ninguna nota mayor de autenticidad que los que ya están ínsitos en la introducción diplomática.

3.    Los defectos o vicios de forma que pueden afectar una so-licitud de extradición pueden ser reparados y una vez su-perados, no puede encontrar más obstáculos sobre tal aspecto.

4.    La traducción de los documentos aunque se hubiera com-pletado posteriormente con traducción de algunos textos y la correspondiente legalización, por disponerlo el Juez interviniente, la conclusión no puede variar en cuanto a que la petición es arreglada a derecho.

5.    Los tratados de extradición deben interpretarse en la for-ma que favorezca el fin por el que fueron convenidos, porque tienen su fundamento jurídico en las leyes natu-rales de las sociedades civiles y sus disposiciones, en rela-ción a su espíritu que las informa, de tutela común a la so-ciedad, deben ser ampliamente interpretadas por ser lo más conforme al interés general que es el de asegurar el curso de la justicia de la manera más completa posible.

6.    Si el Tratado no define una expresión o concepto, para de-terminar su alcance, no debe irse al sistema normativo de uno u otro estado, sino que la solución deberá encon-trarse por la averiguación de la voluntad común de las par-tes, dentro del contexto y atendiendo la finalidad del instituto.

7.    Los cargos formulados son: conspiración para importar cocaína a los E.U., distribuirla y planear el cobro pro-veniente de la venta, delitos de droga, ocultamiento de dinero y delitos de conspiración, ayuda y participación en la comisión de un delito extraditable.

No importa que ninguno de esos cargos se adecue típica-mente a las figuras delictivas previstas en el decreto ley 14294, ni al resto del ordenamiento penal patrio, lo que importa es que el intérprete encuentre el sentido de una calificación jurídica en el marco general de las normas  creadas por la voluntad común de los Estados, suscrito-res del Tratado de Extradición y Cooperación en Materia Penal Uruguay y E.U., vigente desde el 11/4/84.

8.    Por otra parte, los hechos imputados se encuadran, sin vio-lencia, en una hipótesis de encubrimiento de introducción o venta, lo que claramente convierte a la imputación en una figura pasible de ser extraditada al tenor del Tratado.

9.    La conducta imputada, "lavado" (legitimación) de instru-mentos monetarios, es un delito susceptible de extradi-ción porque se trata de un delito a distancia (ejecutado fuera del territorio de E.U.) pero que cometido en si-milares circunstancias respecto del Uruguay, quedaría sometido a la jurisdicción nacional, como encubrimien-to de los tipos (figuras delictuales) establecidos en los arts. 32 a 33 del dec. ley 14294 ("organización o finan-ciación" o "introducción ilegal a países extranjeros").

10.    Desde una perspectiva interna o ya por la línea de polí-tica internacional seguida por el país en la materia, debe entenderse que la extradición de quien eventualmente pueda ser condenado a prisión perpetua por otro estado -pena que nunca nuestro país consideró inaplicable a los delitos por los que concedía la entrega  no es violatoria de la Constitución ni afecta el orden público interna-cional.

11.    La exigencia probatoria del Tratado  en el máximo gra-do que puede asignársele , se ubica, vincula o aproxima al concepto de verosimilitud ("fumus bonis juris"), es-to es, probabilidad o verosimilitud de los hechos impu-tados o derechos aducidos.

12.    Si bien se faculta al Estado requerido a solicitar la presen-tación de "pruebas suficientes" u otros "comprobantes o información adicional" (art. 10 No. 3o. in fine y art. 12), en modo alguno contraviene lo establecido en el Tra-tado la actitud de la parte requirente al presentar, sin serle solicitada, información adicional, la que, por lo demás, se inscribe en el espíritu de cooperación internacional con el cual fue suscrito y ratificado.

Juzgado Letrado de 1ª Ins-tancia en lo Penal y de Menores de 2do. Turno de Maldonado.

Tribunal de Apelaciones en lo Penal de 3er. Turno.

**Texto Completo:**

PRIMERA INSTANCIA

Maldonado, 19 de mayo de 1989.

Visto:

Para sentencia este exhorto procedente de los E. U. de A. que solicita la extradición de R.S.V. (Ficha P/129/89), con intervención de la Sra. Fiscal Letrada Departamental de Segundo Turno, Dra. Cristina Gon-zález de Saldivia.

Resultando:

I.   Que el día 22 de febrero del corriente año (fs. 1, 7 y 11) fue detenido por personal de la Jefatu-ra de Policía de Maldonado, el ciudadano argentino R.S.V. al tener conocimiento que la Embajada de los E. U. de A. había solicitado el arresto con el propó-sito de extradición.

II.   Que el día siguiente (fs. 1 y 3) el Senten-ciante tuvo conocimiento de ese acto y ordenó que la persona privada de su libertad fuera conducido de inmediato con memorando explicativo. Llevado que fue al Juzgado, se le intimó la designación de Defen-sor que lo patrocinara, se le hizo saber el derecho a comunicarse libre y privadamente con éste (fs. 10) y se le informó detalladamente sobre los motivos de su detención.

III.   Que en la declaración (realizada asimismo con la presencia de la Sra. Representante del Minis-terio Público a quien se le había hecho saber la ini-ciación del trámite  fs. 8v. ) se lo indagó a fin de determinar si se trataba de la misma persona requeri-da y sobre los cargos que se le realizaban; resultó ser el individuo sindicado por las autoridades extranje-ras, declarándose inocente (fs. 11 15).

IV.   Que por resolución No. 393, también de fecha 23 de febrero de 1989 (fs. 16 16v.), conside-rando que: el pedido de detención provisoria estaba debidamente documentado; que el detenido era la persona requerida, que se mencionaban debidamente los presuntos delitos inculpados y que se recibió de-claración con las garantías de la Defensa Letrada, atento a lo normado en el art. 11 del Tratado de Ex-tradición y Cooperación en Materia Penal suscrito entre nuestro país y los E. U. de A. en W. el 6 de abril de 1973, se resolvió disponer el arresto provisorio de R.S.V, comunicándose a Jefatura de Policía la or-den respectiva. Además, se hizo saber al Juez requi-rente que había comenzado el plazo que prevé el inciso final del art. 11 del Tratado vinculante en la es-pecie, librándose exhorto al efecto y radiograma por medio de INTERPOL; se solicitó a Jefatura de Poli-cía que enviara los datos identificatorios del arrestado y se incautaran los documentos personales de identi-dad. Se mandó notificar al Ministerio Público; que se reservara y en su oportunidad, volviera al Despacho.

V.   El día 4 de abril del corriente (fs. 180) fue recibido en esta Sede el formal pedido de extradición enviado por vía diplomática (fs. 34 a 180)  el que había llegado al Ministerio de Relaciones Exteriores de nuestro país el día anterior  fs. 36.

La relación circunstanciada del hecho incrimina-do es en síntesis, la siguiente:

El primer procesamiento contra V., lo acusa de un cargo por conspiración para ayudar e instigar a obtener la posesión y realizar la distribución de co-caína (infringiendo las Secciones 841 (a) (1) y 846, Título 21, del Código de los E. U. y la Sección 2, Título 18, del Código de los E.U.) y por "lavado" de instrumentos monetarios (infringiendo las Secciones 371 y 1956, Título 18 del Código de los E.U.); un cargo de a sabiendas e intencionalmente ayudar e instigar a la obtención de la posesión de cocaína con la intención de distribuirla (infringiendo la Sección 841 (a) (1), Título 21, del Código de los E. U. y la Sección 2, Título 18, del Código de los E.U.); y doce cargos de "lavar" fondos producidos por la venta ile-gal de estupefacientes peligrosos (infringiendo las Secciones 2 y 1956 (a) (1), Título 18, del Código de los E.U.).

El segundo procesamiento dictado contra V., lo acusa de un cargo de conspiración para ayudar e

ins-tigar a obtener la posesión y realizar la distribución de cocaína (infringiendo las Secciones 841 (a) (1) y 846, Título 21 del Código de los E.U., y la Sección 2 Título 18, del Código de los E.U.), y de "lavar" ins-trumentos monetarios (infringiendo las Secciones 371 y 1956, Título 18, del Código de los E.U.); y once cargos de "lavar" los fondos producidos por la venta ilegal de estupefacientes peligrosos (infringiendo las Secciones 2 y 1956 (a) (1), Título 18, del Código de los E.U.).

Los procesamientos mantienen en substancia que aproximadamente entre 1985 y febrero de 1989, V. y sus co-acusados trabajaron para personas en C. y otros lugares en la A. del S. que tenían el negocio de importar grandes cantidades de cocaína en los E.U. y de hacer los arreglos para su distribución. Co-mo parte del conjunto de la operación de tráfico de estupefacientes, V. y algunos de sus co-acusados cobraron el cobro del producto de las ventas de la co-caína a los distribuidores en L.A., C., N.Y., N.Y. y en otros lugares de los E.U. Una vez cobrado el dine-ro, V. y otros supervisaban su transferencia y depósi-to en cuentas bancarias controladas por ellos, en L.A., desde las cuales era transferido por telégrafo o cable a cuentas en N.Y. y U., para su distribución final a los traficantes de cocaína de C.

Los cargos específicos contra V. incluyen que en 1986 compró un negocio de cambio de dinero y metales preciosos, en M., U., llamado C.I. o L.S.A., el cual utilizaba en beneficio de los traficantes de estu-pefacientes para los cuales trabajaba, como un medio de disfrazar el verdadero origen de grandes sumas de dinero transferidas a ellos desde los E.U. Usando C.I. y otros negocios en los E.U., se alega que V. y sus co-acusados se dedicaban a realizar ventas ficticias de oro, el que era cambiado por el dinero que habían cobrado los distribuidores de cocaína. Los registros de los bancos de los EE.UU. respecto a los negocios implicados indican que el dinero fue transferido a través de instituciones financieras de los E.U. a cuen-tas que incluían las cuentas uruguayas de C.I. y/o L.S.A. Las pruebas en que se basan los cargos contra V. indican además que cientos de millones de dólares del producto ilegal de estupefacientes se transfirie-ron a las cuentas del negocio de V. en U. y fueron remitidos luego a P., C. u otros lugares en beneficio de los traficantes de cocaína.

VI.    In continenti, se decretó (No. 933/181) practicar examen médico al arrestado por los dos Médicos Forenses de este Departamento y que se efectuara por odontólogo ficha dental con fines iden-tificatorios: asimismo, recibir declaración al Sr. V. fijando al efecto la audiencia del 5 de abril.

VII.   Se recabó declaración en la fecha fijada, la que prosiguió al día siguiente (fs. 187 198v.).

VIII.  Por auto No. 927 de fecha 7 de abril de 1989, de la demanda de extradición se confirió trasla-do a la Defensa por el término de seis días peren-torios.

IX.    El Sr. Defensor a fs. 210 240, se opuso a la solicitud del gobierno de los E. U. de A. por las si-guientes razones:

a) Que la cooperación internacional en materia penal es atípica y de excepción, por ello, si hay una sola carencia o irregularidad es suficiente para denegar la solicitud de asistencia.

b) Que la traducción del exhorto de autos ha sido hecha en el Departamento de Estado de los E.U., soslayándose lo que prevé el decreto ley 15441 que obliga a que ésta se realice por Traductor Públi-co matriculado en el país o en su defecto por el Agen-te Consular de la República en el país de origen de los documentos. Esta irregularidad es suficiente para rechazar la requisitoria.

c) Que el art. 10 del Tratado en su numeral 2 cuando expresa que la solicitud deberá ir acompaña-da de, entre otros requisitos esenciales "los textos legales que regulan la prescripción de la acción y de la pena" y en la especie, si bien se menciona que se agre-gan (fs. 84), no lo han hecho y simplemente el fir-mante dice que "he revisado acusio-sa-mente esta ley y doy fe de que la acción judicial contra R.V. en este asunto no ha prescripto". O sea se ha violado nueva-mente un requisito esencial, dejándose de enviar pre-meditadamente algo exigido claramente por el Tra-tado.

d) Que no se ha señalado la competencia del Tribunal o Juzgado que emite el pedido.

e) Que las pruebas acompañadas son franca-mente insuficientes, ilegales, no aceptadas por el De-recho positivo uruguayo, violatorias de la Constitu-ción Nacional y por lo tanto, violatorias de nuestra

Documento

soberanía por lo que deberían ser rechazadas en todos sus términos. La declaración jurada en la que se hace la síntesis de los cargos contra R.V. es una mera copia del memorando elevado por los investigadores (FBI y DEA) a la Fiscalía. Lías presuntas pruebas que deberían adjuntarse, no existen, sólo la declaración de un informante que puede ser tachada. El FBI rea-lizó una paciente investigación durante varios años en las que se recibieron cientos de testimonios, seguimientos, filmes en videos y grabaciones telefóni-cas contra los investigados; parte de esas pruebas fue-ron enviadas con este pedido y sin perjuicio de con-siderarlas pruebas ilegales, expresa que en ninguna de ellas se observa o se escucha a R.V. y ni siquiera se le menciona.

f) Que el trámite realizado en los E.U. (Tenien-te Fiscal da fe que V. es Culpable) colide con nuestra Constitución que prohibe el juicio en rebeldía.

g) Que no se adjuntó una sola factura, de las presuntas compras y ventas ficticias, ni cuentas co-rrientes de V. con grandes movimientos, ni facturas de las transportadoras de caudales investigadas, ni mucho menos contactos de V. con traficantes de cocaína.

h) Que los delitos por los cuales se solicita la extradición no están previstos en las 32 hipótesis que establece el tratado.

X.   Se corrió traslado a la Sra. Representante del Ministerio Público (No. 1021/241 241v.) y la Sra. Fiscal Letrada Departamental de Segundo Turno en fundado dictamen (fs. 243 254) abogó para que se es-timara la demanda al no advertir irregularidad alguna que obstara la concesión de la extradición.

XI.   Y se llamó para sentencia (No. 1231 de fecha 2 del corriente mes (fs. 254v.), subiendo la pieza al Despacho para dictarla.

XII.   Consta además en autos:

Que como medida para mejor proveer (No. 1269/255v.) dispuso que el Estado requirente presen-tara traducción del exhorto realizada por profesional habilitado en la República y asimismo que incorpo-rara relación de las normas sobre prescripción de la acción y de la pena;

Que la Embajada de los E. U. de A. con fecha 8 del presente mes cumplió con lo solicitado (fs. 256 311), mandándose (No. 1287/312) agregar los recaudos con noticia de la Defensa y del Ministerio Público;

Notificados que fueron personalmente las partes el 8 de mayo (fs. 313), el día 16 siguiente vol-vió el expediente al Despacho para sentencia (fs. 374);

En el ínterin, a fs. 314 344 se recibió (vía diplomática) exhorto donde se adjuntan tres páginas omitidas en la versión en inglés. Se dispuso tenerlo presente sin otro trámite (fs. 345). Asimismo, se pre-sentó otro exhorto (fs. 346 373) poniendo a dispo-sición información adicional (prueba testimonial de cargo). Se proveyó que se estuviera al auto No. 1287/312.

XIII.   Está probado en autos que el arrestado R.S.V. es la misma persona que requieren los E. U. de A. y de sus dichos surge que se trata de una perso-na que comercia con metales preciosos (en especial oro) a nivel internacional; que estuvo radicado en los E.U.; que conoce a la mayoría de las empresas sindi-cadas corro involucradas en actividades ilícitas, a sus titulares y también a quienes le acusan personal-mente.

Considerando:

I.   Que se irá a hacer lugar a la demanda de ex-tradición al configurarse los requisitos adjetivos y sustanciales normados en el Tratado de Extradición y Cooperación en Materia Penal suscrito entre la República O. del U. y los E. U. de A. en W. el 6 de abril de 1973, en vigencia desde el 11 de abril de 1984. Los fundamentos volcados por el Señor De-fensor carecen en concepto del Pretorio no sólo de virtualidad jurídica, sino de poder convictivo para dar cima a una solución diversa de la que aquí se adopta, siendo ello así, por lo que ha de expresarse seguidamente.

II.   La extradición es un acto de asistencia judi-cial interetático en materia penal que versa sobre el envío de un individuo penalmente inculpado o re-querido, de la esfera de soberanía de un Estado a la de otro.

JA193

Novda Monreal (Revue internacionale de droit pénal, 1969, p. 788) lo define como una medi-da destinada a salvaguardar los principios de derecho más fundamentales y generales reconocidos por el mundo civilizado y que consiste en entregar a una persona condenada o llamada a juicio a consecuencia de la violación de esos principios al Estado al cual pertenece el derecho de represión y en el cual la ac-ción será juzgada, ofrecidas todas las garantías de un Estado fundado sobre el derecho.

El derecho extradicional pertenece al género de la cooperación jurídica en materia internacional. De consumo con la concordante opinión del Ministerio Público, el punto de vista metodológico no ha de ser el restrictivo (que ve el alcance espacial del Derecho Penal en la esfera internacional desde una perspectiva territorialista, donde la extraterritorialidad consti-tuye un temperamento excepcional) como la pos-tula la Defensa.

En efecto, en conceptos trasladables de Vieira (El delito en el Espacio Derecho penal internacional y derecho internacional penal   Mont. FCU 1969 p. 17), las definiciones en materia jurídica están subor-dinadas a la posición a la cual se encuentra afiliado el jurista. Si nos encontramos ante un nacionalista, el acento de la definición se colocará en el aspecto nacional de Derecho Penal. Si por el contrario, nos encontramos frente a un internacionalista, resaltará la concepción solidarista y de cooperación interna-cional ante la ley penal.

Siempre que el Uruguay firmó un convenio bila-teral sobre cooperación jurídica en el último siglo, se incluyó a los exhortos en materia penal.

Véase:

1) Tratado U.B. para la Ejecución de Cartas Ro-gatorias (1879), Arts. 1 y 2 (Aprobado por Ley de 21 de mayo de 1879).

2) Tratado U.B., Protocolo sobre Cartas Roga-torias (1906), Art. 1 (Modifica y complementa el anterior).

3) Tratado U.E. Supresión de Legalizaciones en las comisiones rogatorias (Ley del 10 de junio de 1901).

4) Tratado U.A. Convenio ampliatorio del Tra-tado de Derecho Procesal de M. (1907). Arts. 1 y ss. (ley 3163 de 31 de mayo de 1907).

5) Tratado U.P. Convenio ampliatorio del Tratado de Derecho Procesal de M. (1915). Arts. 1 y ss. (ley del 18 de junio de 1920).

6) Tratado U.B. Convenio ampliatorio del Tra-tado de Derecho Procesal de M. (1918), Arts. 1 y ss. (ley 6189 de 16 de julio de 1918).

7) Tratado U.A.P. (1940) de Derecho Procesal. Art. 11 (ratificado por decreto ley del 12 de noviem-bre de 1942).

8) Tratado U.A. (1980 sobre Igualdad de Trato Procesal y Exhortos, Arts. 2 y ss. (Ley 15110 del 17 de marzo de 1981).

9) Tratado U.Ch. (1982) sobre Igualdad de Tra-to Procesal y Exhortos. Arts. 2 y ss. (decreto ley 15251 del 26 de marzo de 1982).

El auxilio judicial internacional en materia penal ofrece características similares al homónimo fenóme-no en materia civil (Werner Goldschmidt: Der. Int. Privado, 2a. Ed. Bs. As. 1974, p. 491).

Corolario de lo anterior es que los tratados de ex-tradición deben siempre interpretarse en forma que favorezca al fin para el cual fueron convenidos. La posición del U. ha sido y es la de colaboración en ma-teria penal. Ya la Casación italiana en sentencia de 10 de marzo de 1914 había afirmado que teniendo la extradición su fundamento jurídico en las leyes natu-rales de las sociedades civiles, sus disposiciones deben ser ampliamente interpretadas en relación al espíritu que las informa, de tutela común de la sociedad; y desde el punto de vista doctrinario puede señalarse que Travers (Le Droit Penal Internacional, T. IV p. 383), critica

Documento

también la interpretación restrictiva y afirma la amplia, por ser la más conforme al interés general que es el de asegurar el curso de la justicia de la manera más completa posible (LJU C. 3210, RUDP 2/88 c. 324 y Sent. No. 90/87 del Trib. Pen. 2o. Turno).

En el mismo sentido: frente a las organizaciones dedicadas al tráfico de estupefacientes y a los medios materiales con que cuentan, son aplicables las ense-ñanzas de Quintano Ripolles (Trat. de Der. Penal In-ternacional e Internacional Penal, T. II p. 116, Ma-drid, 1957) quien refiriéndose a la indispensable coo-peración entre los países frente a tales casos, sostenía que debía evitarse su frustración tolerando que mien-tras los criminales utilizaban aviones, los jueces viajen en diligencia.

El debate actual acerca de estas ideas en varios ámbitos, la preparación incluso en carpetas del Parla-mento de una ley sobre extradición, unido a los fun-damentos antes referidos, permiten concluir que la cooperación penal internacional no es atípica ni excepcional.

III.    Los fines de la extradición y el criterio antes expuesto son la guía para la interpretación del tratado vinculante entre nuestro país y los E. U. de A.

El presente trámite no constituye un juicio crimi-nal, sino un procedimiento extraordinario y sumario tendiente a que el requerido sea puesto a disposición del Juez o Tribunal a quien jurídicamente correspon-da entender en el caso. Al no tratarse de un juzga-miento, el método no puede ser restrictivo. Tampoco tiene cabida el principio "in dubio pro reo" (porque no rige para la interpretación de las leyes penales o procesales  RUDP 2/88 c. 327) y si el procedimien-to es manifiestamente intentado de buena fe, no se debe permitir que la no ejecución técnica de alguna formalidad de nuestro ordenamiento criminal se oponga a la ejecución leal de nuestras obligaciones (Cf. Piñeiro Chain en Extradición, Parte III, Olarte, p. 95).

IV.    La demanda presentada por el Gobierno de los E. U. de A. se adecua a lo que prevé el art. 10 del Tratado ya mencionado. Se ha acompañado relación circunstanciada de los hechos con los datos necesarios para la identificación de la persona y de los textos le-gales aplicables al caso. Consta la legalización y la traducción.

Las alongaderas o dilatorias opuestas por la De-fensa que fincan en la ausencia de traducción legal del exhorto y en que no se acompañaron las normas de prescripción exigidas, han sido adecuadamente inficionadas por el dictamen fiscal y en definitiva se salvaron por vía de las medidas para mejor proveer.

V.    En cuanto a que las autoridades estadouni-denses hayan omitido notoriamente acreditar su com-petencia internacional, no es objeción válida si se tiene en cuenta que sólo cabe exigir que el Estado requirente sea competente y que el órgano jurisdic-cional donde ha de efectuarse el proceso penal tenga jurisdicción en dicho Estado,

Vieira (L'Evolution recente de l'extradition dans le continent Americain. Recueil des cours, tome 185. Academie de Droit Internacional, pág. 201) con su singular penetración establece que para que un Es-tado pueda reclamar de otro la remisión de una perso-na con fines penales, es necesario que el delito sea de competencia de sus tribunales y que haya una orden de arresto, siendo el vocabulario utilizado muy varia-ble, tanto que algunos Estados se refieren a la jurisdic-ción del Estado requirente y otros tienen la tendencia a establecer que para poder presentar la demanda es necesario que el delito haya sido cometido dentro de su territorio.

Es de claridad meridiana que para nada debe con-siderarse la competencia interna del órgano (v. gr. si debe conocer un Tribunal del Estado de C. o el de otro Estado de la U.), Olarte (op. cit. T. I p. 87 88) siguiendo a Travers dice que el Estado requerido de-be verificar si el Estado peticionante es competente para juzgar el acto que da lugar a la demanda, pero dicha competencia entendida de modo general, es decir, que no se tratará de inquirir si tal o cual magis-trado o tribunal es el competente según la legislación interna. En el mismo sentido Alfonsín (Escritos Ju-rídicos, T. III p. 21) al poner el ejemplo de un caso civil, expresa que una vez establecido que cierta sen-tencia extranjera que pretende ser ejecutada en el U., proviene de cierto Estado que, según el art. 2401 de nuestro Código Civil, era competencia para el caso, no es menester para acceder a la ejecución controlar si el Juez extranjero gozaba además de competencia interna, teniendo en cuenta que el art. 2402 del

JA195

Có-digo Civil confiere a la ley del lugar donde radicó el juicio el régimen del proceso.

El problema está como lo señala el dictamen fiscal, en el marco de qué normas de Derecho Inter-nacional Privado hay que examinar la competencia internacional del requirente al no existir previsión ex-presa en el Tratado. Empero, ya sea en las normas de DIP de uno o de otro Estado, el lugar de comisión del delito ha de hacerse de acuerdo con la conocida teoría de la actividad.

Cabe agregar a este respecto que, teorías aparte, es un principio establecido (que incluso fue recogido en el Tratado de Derecho Penal de 1889 suscrito por nuestro país) que si el delito se ha consumado en más de un país, tendrá jurisdicción el Estado que hubiere tomado conocimiento judicial en primer término. Y si se considera que se trata de delitos conexos cometi-dos en el territorio de dos o más estados, sería compe-tente el Estado en cuyo territorio se ha ejecutado el delito más grave (Cf. Carreras: Régimen procesal de la extradición, Rev. La Ley T. 138 Sec. Doct. p. 1202).

Y si alguna duda persistiera aún sobre el punto, basta pensar que en nuestro país se podrían haber cometido eventuales delitos de encubrimiento, pero corno éste exige para configurarse no ser partícipe en el ilícito principal y según se ve por los hechos atribuidos así como por las normas penales norteame-ricanas, el requerido es considerado partícipe, la hipó-tesis manejada resulta fácilmente descartable.

VI.   La pretendida ausencia de pruebas.

El tratado de Extradición con los E. U. de A. en parte de su art. 10 dice: "La Parte requerida podrá solicitar que la requirente presente pruebas suficien-tes para establecer "Prima facie" que la persona re-clamada ha cometido el delito por el cual la extradi-ción se formula. La parte requerida puede denegar la extradición si un examen del caso demuestra que la orden de arresto es manifiestamente infundada".

El Sentenciante conceptúa que el requerimiento de prueba ampliatoria sólo corresponde cuando la de-manda es manifiestamente infundada (por ejemplo si en este caso se pidiera por idénticos fundamentos de hecho y de derecho la extradición de una persona que nunca hubiera realizado negociaciones como las expresadas, que nunca hubiera salido del país y que desconociera a las personas y empresas mencionadas). Aquí si sería de aplicación la norma que habilita a nuestro Estado para solicitar a la requirente que pre-sente pruebas suficientes para establecer "Prima fa-cie" que la persona reclamada ha cometido el delito, hipótesis que claramente no es la del sub examine. La improcedencia de la extradición que admite el Tratado vigente no es la que se refiere a la prueba de cargo habilitante del procesamiento, punto éste de re-sorte exclusivo del Estado requirente. Sólo al Juez competente pertenece la función instructoria que no puede ser usurpada por otro Magistrado (RUDP cit. c. 322). Se extrae de ello, sin hesitación alguna, que la misión del Juez requerido es la de verificar la existen-cia del "fumus bonis juris" (humo de buen derecho) que modernamente se traduce por probabilidad o ve-rosimilitud del derecho aducido.

Por último, debe tenerse presente que la aprecia-ción o valorización de las pruebas debe hacerse de acuerdo con las normas del lugar del proceso (lex fori) y aún para quien sostuviera que debe acudirse a nuestras normas, los elementos incorporados no co-liden manifiestamente con el conjunto de normas y principios de derecho en que nuestra sociedad asienta su individualidad. Véase que en cuanto a los testimo-nios, no obstante las consideraciones efectuadas, no se mencionan qué tachas previstas en nuestra legisla-ción serían aplicables a los mismos; respecto a la pre-sunta ilegalidad de las grabaciones y videos habría que acreditar que fueron efectuadas sin autorización de Juez competente (cuestión que no se hizo) y en este aspecto surge de la documentación acompañada que por lo menos algunas grabaciones de conversa-ciones telefónicas la fueron con autorización judi-cial. Tampoco es de recibo el argumento de que la DEA y el FBI ofrecen recompensas, protección e impunidad a los informantes cuando según dice la Defensa, el informante en este caso estaba sometido a la Justicia uruguaya y los agentes en nada podrán incidir frente a la misma.

VII.  Los delitos atribuidos y el principio de la identidad de norma o doble incriminación.

En el Tratado de extradición vinculante en la es-pecie se recoge el denominado principio de la doble incriminación o de la identidad de la norma. Este exi-ge que el hecho que la motive tenga carácter de delito en la legislación del estado requirente y en la legisla-ción del estado requerido. O sea que es necesario que el hecho

JA196

Documento

sea considerado delito en las dos legislacio-nes, aunque no tenga en las dos el mismo "nomen juris" o denominación jurídica. Está recogido en el art. 2, párrafo 1, al decir "siempre que sean puni-bles según las leyes de las partes contratantes" y en el mismo artículo, el parágrafo 3, al decir "y dicho delito es punible según la legislación de ambas par-tes contratantes". Y se descarta la exigencia del mis-mo "nomen juris" en el mismo párrafo citado al de-cir "la extradición será procedente cuando las leyes de ambas partes no consideren incluido el delito en la misma categoría de la lista o aunque no lo designen con la misma terminología" (Diario de Sec. del Cons. de Estado de fecha 18 de octubre de 1983 pág. 358).

La calificación hay que hacerla dentro del marco del Tratado porque como enseñaba el maestro Alfon-sín (Teoría del Derecho Privado Internacional; Mon-tevideo 1955, pág. 385) hay que calificar, esto, es ubicar la relación jurídica en una categoría del orden jurídico al cual pertenece la norma, por lo que volve-remos al Tratado.

Entonces, el fraude contra los E.U. se prevé en el art. 2 inc. 12 del Tratado; el lavado de instrumentos monetarios lo está en el inc. 26 porque el sindicado conocería el origen del dinero; la conspiración para ayudar e instigar a obtener la posesión y distribución de cocaína está incluido en el inc. 17 ya que "La ex-tradición será también concedida por la participación en los delitos mencionados, no sólo como autor, cóm-plice e instigador, sino también como encubridor, así como por la tentativa y la asociación ilícita para co-meter los mencionados delitos, siempre que estas cali-ficaciones resulten punibles por la legislación de las Partes Contratantes con penas privativas de libertad superiores a un año".

Del punto de vista criminológico, estamos en pre-sencia de típicos delitos de cuello blanco (S.), llama-do en los países anglosajones "occupational crime", o "criminalité d'affaire" del derecho francés. Es de toda evidencia que el derecho positivo los plasma en tipos penales prohibidos luego que las acciones son realiza-das y atento a ello, el Tratado debe ser interpretado con un criterio amplio, evolutivo.

VIII.  Los procesamientos dispuestos en el Estado requirente en ausencia del indagado y el orden públi-co internacional del Estado uruguayo.

Es principio elemental de derecho internacional que la excepción de orden público internacional funciona para desplazar las consecuencias lesivas que para un país produciría la aplicación de una ley ex-tranjera, no opera frente a una norma de un Tratado.

¿Qué sucede entonces con el orden público inter-nacional y los Tratados  Al celebrarse los mismos se suele incluir una cláusula de reserva de orden públi-co, pero aunque se haya incluido, enseñaba Alfonsín que los Estados no podían hacer uso de la cláusula de reserva para excluir las leyes extranjeras vigentes al tiempo de la aprobación del Tratado, puesto que se descuenta que los Estados no pueden prestar aproba-ción alas normas convencionales sin estudiar y calcu-lar sus repercusiones, habida cuenta de las institucio-nes que los demás Estados contratantes tienen esta-blecidas. Sólo pueden usar la cláusula para excluir la aplicación de las leyes extranjeras implantadas con posterioridad y cuya aplicación eventual no pudieron naturalmente prever en el momento de aprobación del Tratado (Alfonsín, Teoría cit. Mont. 1982 p. 579 580).

Las relaciones entre el Tratado y la Constitución han sido resueltas en el sentido de que las cortes de justicia carecen de competencia para pronunciarse, esto es, que no tienen jurisdicción para decretar la invalidez de un Tratado Internacional y la cuestión se remite a los mecanismos de derecho internacional. Así; Vieira (Recueil des cours, citado T. 185 p. 187) relata el caso de la Corte Suprema de P. que no decla-ró la invalidez de un tratado por estimar que ello su-peraba sus poderes y el de que en V., la Corte Supre-ma de Justicia ha puesto un "no ha lugar" a una de-manda de nulidad de la línea 14 del art. 3 de la ley de aprobación de un tratado de extradición suscrito entre V. y los E. U. de A. Y el fundamento radica en que ningún Estado detenta poder jurídico para ha-cer predominar su ley sobre las de otro y que existen otras vías en el Derecho Internacional para hacer cesar los efectos de un Tratado.

Que la persona requerida nunca haya declarado ante una autoridad judicial es una petición de prin-cipio, pues no se puede poner como condición lo que es precisamente el objeto del proceso de extra-dición y que ello sea un presupuesto del enjuiciamien-to en nuestro derecho, no cabe extenderlo a otras legislaciones.

JA197

Documento

El único requisito (y considerado al ra-tificar el Tratado) es que existan en el Estado peti-cionante, en su caso, las garantías del debido proce-so legal, pero las características o modalidades con-cretas que en cada país asume esta garantía es propio de cada Estado y en ello no cabe inmiscuirse.

IX.    En definitiva, debe otorgarse la extradición de R.S.V. por haberse cumplido los requisitos esta-blecidos en el Tratado vinculante con los E. U. de A., a los fines de su juzgamiento por las acusaciones rela-cionadas con el exhorto.

Y cabe rechazar las conclusiones de los profeso-res consultados por el Sr. Defensor, en cuanto a que el suscrito Juez incurriría en responsabilidades pre-vistas en distintas disposiciones de la Constitución si estimare la demanda. Sin perjuicio de que ya se ha ejercido el poder disciplinario correspondiente, de-be decirse que la extradición es extraconstitucional ya que los principios de ésta se refieren al orden ju-rídico nacional y las autoridades deben guiarse por las normas supranacionales contenidas en los Trata-dos que pertenecen a otro orden jurídico. En cam-bio si podría incurrirse en responsabilidad del Estado si se omitiera cumplir las obligaciones que asumió al ratificar el Tratado.

Por tales fundamentos; los concordantes del dic-tamen fiscal y preceptos que se incluyen, FALLO:

Hácese lugar a la demanda y en su mérito, concé-dese la extradición de R.S.V. Ejecutoriada, vuelvan.

Tabaré Sosa Aguirre

SEGUNDA INSTANCIA

Montevideo, julio 28 de 1989.

Vistos:

Para sentencia de segunda instancia estos autos caratulados "V., R. - Extradición" (Ficha No. 86/1989), elevados a conocimiento de este Tribunal en virtud del recurso de apelación interpuesto por los Sres. Defensores del requerido  en forma subsidia-ria del recurso de reposición , contra la sentencia No. 43 dictada el 19 de mayo de 1989 por el Sr. Juez Letrado de Primera Instancia en lo Penal y de Meno-res de Segundo Turno de Maldonado, Dr. Tabaré Sosa Aguirre.

Aceptando y dando por reproducida la relación de antecedentes, actos procesales y hechos dados por probados que contiene la decisión recurrida, por ajus-tarse a las resultancias de autos.

Resultando, además:

I.    Que, en base al Tratado de Extradición y Cooperación en Materia Penal, suscrito entre U. y los E. U. de A.  en W., el 6 de abril de 1973, aproba-do por decreto ley No. 15476, en vigencia desde el 11 de abril de 1984 , en extenso y fundado pro-nunciamiento el Sr. Juez de primera instancia conce-dió la extradición de R.S.V. (fs. 378/388).

II.    Los señores Defensores, Dres. V.D.V. y J.C.D.G., fundándose en las consultas de ilustrados especialistas en la materia -Dres, E.T.B., C.A.C. y M.A.V. (una ya agregada y otra que acompañan) -y lo que exponen con amplitud, entienden que co-rresponde revocar la sentencia impugnada, denegan-do la extradición (fs. 550/560).

Los argumentos manejados, apuntan a destacar lo que estiman incumplimiento de ciertos requisitos en el pedido de entrega, insuficiencia de la prueba con la que se enjuició a V., violación e inobservancia de normas del Tratado y violación de nuestro orden público internacional (orden de arresto manifiesta-mente infundada, defectos formales y sustantivos que resultan irredimibles, mal valorada la prueba, etc.).

Insisten, en que la persona requerida fue procesa-da en rebeldía, en violación a nuestra Constitución (art. 21); que no se cumplió con el requisito indis-pensable del interrogatorio previo del indagado (art. 126 del Código del Proceso Penal); que no se puede dejar de observar el artículo 14 numeral 2o. del Có-digo Penal y la Convención Americana sobre Dere-chos Humanos (art. 7.2) y que no se cumple con la exigencia de la doble incriminación", pues ninguno de los cargos formulados se adecua típicamente a las figuras delictivas previstas

JA198

Documento

en el decreto ley No. 14294 ni al resto del ordenamiento penal del país.

Sobre el delito de lavado o blanqueo de instru-mentos monetarios afirman que creado por la legis-lación del país requirente el 27 de octubre de 1986 , dicen que no figuró ni podía figurar en la lista taxa-tiva del art. 2 del Tratado, por lo cual V. no puede ser entregado para ser juzgado por tal delito y jamás podía ser juzgado por quien lo reclama (el delito no figura en la legislación uruguaya).

Observan a la documentación presentada, por fal-ta de traducción y legalización en forma (vicios in-sanables); que no se acompañaron textos relativos a "la prescripción de la acción y de la pena"; que la prueba en que se apoya el pedido (pruebas inhábiles, ilegales o prohibidas), conduce a desestimarlo y que no se puede entregar a una persona que pueda pasar-se el resto de su vida en prisión, pues se viola el or-den público internacional.

III.    La Fiscal Letrado Departamental de 2o. Turno de Maldonado, Dra. Cristina González de Sal-divia, al evacuar el traslado conferido de los recur-sos, luego de estudiar detenidamente los argumen-tos de la Defensa, los desestima y aboga por la con-firmación de la resolución impugnada (fs. 562/566).

IV.    Consta que la prueba que aporta la parte requirente, para sostener los cargos formulados con-tra V., está constituida por una extensa y detallada relación de los hechos, con precisas referencias a la fuente de información (fs. 121/162 y 383/389), las declaraciones juradas de: R.H., Teniente Fiscal en el Distrito Central de C. (fs. 113/118 y 279/281vta.); F.B.W. (fs. 171/178 y 304vta./308), que es Agente Especial (SA) de la Oficina Federal de Inves-tigación (FBI); W.G., persona que estuvo vinculada a V. (fs. 163/165 y 303/304) y S.H., estrechamen-te vinculado a V. y a su actividad (fs. 355/359 y 364/372), así como la ocupación de 640 libras de cocaína y una importante suma de dinero en dóla-res durante la investigación.

G., ciudadano uruguayo residente en E.U., explicó que conoció a V. en 1985, siendo presentado por su cuñado H. y que se discutieron planes futuros en relación al "lavado de dinero", viajando en julio de 1985 a B., a buscar clientes para la operación de dinero, conociendo en tal oportunidad a R.R., el que accedió utilizarlos en tal operación por lo que obte-nía de la cocaína en L.A.

Informó de ello a V. y H., quienes se pusieron en contacto con R. y dice estar en conocimiento que por tal modalidad de mover y distribuir el dinero re-cibieron comisiones del 2% cada uno, no así él, que fue eliminado de los tratos futuros.

Ellos continuaron en tal empresa y en abril de 1986 compraron el Cambio I. (en U.), cuyo nombre corporativo es L.S.A., aun cuando la conexión de V. con el aludido negocio no aparece en los registros, pero es socio comanditario y principal responsable de las transacciones financieras.

Refiere como continuó enterándose de las opera-ciones que en C.I. se realizaban para narcotraficantes que deseaban ocultar sus ganancias y las fuentes del dinero, destacando que se enviaban barras de oro a los E.U., las cuales se comprarían con dinero pro-veniente de la droga, para aparentar que el dinero se estaba utilizando en un comercio legítimo.

Menciona que el dinero era depositado en cuen-tas bancarias en N.Y. controladas por quienes inter-venían en "lavar" dinero y luego girado telegráfi-camente a cuentas mantenidas por C.I. en bancos de M., siendo V. y H. los que supervisaban estas cuentas y hacían las transferencias a las cuentas de narcotra-ficantes en P. y C., teniendo entendido que se lavaron decenas de millones de dólares, recibiendo comisio-nes que fluctuaban entre el 7% y el 12%.

Por su parte H., también ciudadano uruguayo re-sidente en E.U. y detenido por su participación en el lavado de dinero proveniente del narcotráfico, declara que proporcionó información detallada del negocio  lavado de dinero  al que se encuentra de-dicado V., a quien conoció en 1985.

Relata que en 1986 V. abrió el C.I., y lo nombró vicepresidente y a R.P. como presidente, por no que-rer V. figurar en los documentos, pero al ofrecerle V. un empleo en E.U. (industria del oro), viajó hacia allí; en julio de 1986 fue a L.A. al ser llamado por V., para trabajar en un negocio de joyería, pero su tarea era contar dinero que era traído en cajas y que V. en L.A. tenía un refinería de oro (hacía barras de oro) y al mismo tiempo

JA199

Documento

recibía del U. barras de plomo enchapadas en oro, que eran pesadas en la Aduana de los E.U. y quedaba documentada la procedencia y peso.

Procedía luego V. a vender las barras de oro real hechas en la refinería a los bancos  los cuales creían, basándose en los documentos, que provenían del U.- y con las instrucciones recibidas, tales importes terminaban en cuentas del C.I. u otras cuentas en el exterior.

Por indicación de V., se traslada en enero de 1987 a N.Y.  en un supuesto negocio de compra y venta de oro comienza a trabajar , refiriendo en las operaciones que interviene, terminando en junio de 1988 su asociación de negocios con V., al huir de la oficina en N.Y. ante la llegada de oficiales de la Poli-cía, circunstancia que abandonó una importante suma de dinero.

H., luego de mencionar las funciones que ha de-sempeñado y desempeña, alude a los procesamientos que se han decretado contra V., los cargos contra el mismo y numerosos co-acusados  que trabajaban para personas radicadas en C. y otros lugares  y la forma que operaban (introducción de grandes canti-dades de cocaína a los E.U., arreglos para su dis-tribución, cobro del producto de las ventas en L.A. y N.Y., cómo V. supervisaba las transferencias por te-légrafo o cable a U. y destino final a los traficantes).

El C.I., lo usaba V. en beneficio de los trafican-tes para los cuales trabajaba, siendo un medio para disfrazar el verdadero origen de las grandes sumas de dinero transferidas a ellos desde los EE.UU. (ventas ficticias de oro, al que era cambiado por dinero que habían pagado los distribuidores de cocaína).

Por el registro de los bancos de los E.U., que-dó de manifiesto, que ciento de millones de dólares fueron transferidos a través de otras instituciones financieras a cuentas que incluían las uruguayas de C.I. o L.S.A., para ser remitidos después a P., C. y otros lugares.

W., que intervino personalmente en la investiga-ción  con un grupo especializado de funcionarios y representantes de organismos estatales y locales , manifiesta que revisó los registros de negocios, ban-cos, cintas electrónicas de vigilancia (intercepción oral y de los alambres telefónicos, autorizada por los tribunales), registro de publicación de sociedades anónimas, informes que le propor-cionaron otros agen-tes del FBI y el resultado de la vigilancia y seguimien-to de personas, etc., lo que le permite dar por justi-ficado que las transferencias que se efectuaban a P. y U., respondían alas ventas ilegales de estupefacientes en los E.U., estando V. y otras personas inves-tigadas, dedicadas al lavado de los fondos producidos por el tráfico ilegal (alude también a información confidencial, decomiso de una importante suma de dinero y una gran cantidad de cocaína a las personas sospechosas).

De acuerdo con tales testimonios, minuciosa re-lación de los hechos que se atribuyen a V. y demás co-acusados, detallada relación de las cuentas de em-presas que estarían vinculadas al narcotráfico (perte-necientes a un mismo grupo de personas) en cuanto a las cantidades depositadas, procedencia de las remi-siones, fecha, titulares de las cuentas, etc., así como los decomisos aludidos, se puede concluir  en una apreciación primaria  que existieron un conjunto de maniobras tendientes a "ocultar la naturaleza, fuente, ubicación y propiedad de los fondos" producidos por la cocaína introducida ilegalmente a los E.U.

V.   Que el Sr. Juez interviniene mantuvo lo de-cidido y concedió la alzada (fs. 567 y vta.).

Recibidos los autos por este Tribunal, se citó para sentencia, la que previo pasaje a estudio se acordó en forma legal (fs. 570 y sgts.).

Considerando:

I.   Que, aun cuando pudiera plantearse alguna duda sobre si la decisión final, que pone término a un procedimiento jurisdiccional de extradición es una sentencia definitiva o interlocutoria, a los efectos de la recurrencia, la interposición hecha por la Defensa no puede ser motivo de invalidación alguna.

Es de pacífica aceptación que el recurso no se per-judica por su presentación errónea, ya que la Ley manda atender a lo principal  manifestación de vo-luntad, efectuada dentro del plazo legal, de apelar la sentencia  y no a lo secundario, tal como incluso se desprende de lo dispuesto en el artículo 658 inc. 2o. del Código de

JA200

Procedimiento Civil.

Por tanto, debe tenerse por bien concedido el recurso de apelación, que abrió legalmente la presen-te instancia.

II.    Que determinada la procedencia de la alza-da, corresponde ingresar al estudio de las numerosas objeciones planteadas por la Defensa y para la cual, la decisión de entregar a R. V., de ninguna manera puede prosperar.

Muchos de los argumentos esgrimidos ya habían sido formulados en la oposición a la solicitud de los E.U. (fs. 232/240) y desestimados con buenos fun-damentos, tanto por el Ministerio Público (fs. 243/ 254), como por el Sr. Juez "a quo", que la Sala, en general, comparte.

El Tribunal va a confirmar la sentencia apelada por lo que pasará a exponer.

III.    La extradición, como lo ha precisado el ilus-tre penalista Jiménez de Asúa, "consiste en la entrega que un Estado hace a otro Estado de un individuo acusado o condenado, que se encuentra en su territo-rio, para que en ese país se le enjuicie penalmente o se ejecute la pena" ("Tratado de Derecho Penal", Tomo II, pág. 771).

Es un instituto que posibilita la colaboración en-tre los Estados en materia penal, permitiendo según Bettiol, atemperar las consecuencias que se derivan necesariamente de la aceptación del criterio de la te-rritorialidad "y con el cual se vincula la cuestión de la eficacia de la ley penal en el espacio. Si tal cuestión se regulase sobre la base de criterios universales, no sería necesario crear un medio a través del cual los Estados colaborasen entre sí en la lucha contra la delincuencia" (G. Bettiol: "Derecho Penal", Parte General, pág. 135).

Y, es con ese espíritu de necesaria colaboración entre los estados, que subraya Bettiol, que se suscri-bió el Tratado, cuya interpretación ocupa la atención de la Sede, al establecer en su proemio: "la R. O. del U. y los E. U. de A., deseando hacer más eficaz la cooperación entre los dos países en la represión del delito, acuerdan...".

Es por ello de pleno recibo la prestigiosa jurispru-dencia y doctrina que cita el Sr. Juez de primera ins-tancia (fs. 383), determinando el criterio que debe guiar al intérprete de este tipo de tratados.

Los tratados de extradición, "deben interpretar-se en la forma que favorezca el fin por el que fueron convenidos", porque tiene su fundamento jurídico en las leyes naturales de las sociedades civiles y sus disposiciones, "en relación al espíritu que las informa, de tutela común de la sociedad" deben ser amplia-mente interpretadas, por ser la más conforme "al interés general que es el asegurar el curso de la justi-cia de la manera más completa posible..." (Conf. "La Justicia Uruguaya", T. XXI, caso 3210).

Interpretación ésta, que está de acuerdo con la posición y espíritu de cooperación internacional que ha sustentado siempre el Uruguay, como lo des-taca el Sr. Juez de primer grado.

Por ello y porque los tratados  al igual que el invocado por el país requirente  constituyen la fuen-te de obligaciones asumidas ("Las Partes Contratan-tes se comprometen a la entrega recíproca...", co-mienza disponiendo el art. 2) y "la ley entre las par-tes, o sea entre los estados...", como "el contrato es la ley entre los particulares", tiene cada estado el deber "de ajustarse a las previsiones del Tratado y, contra ellas, no puede invocarse normas internas" (los conceptos que se transcriben entre comillas fue-ron extraídos de la sentencia No. 344/1987, dictada por la Suprema Corte de Justicia; ver "L.J.U.", To-mo XCVIII, caso 11221).

En el mismo sentido, es muy ilustrativo lo que se-ñala Jiménez de Asúa, diciendo que las leyes inter-nas que coexisten con los tratados internacionales que "disciplinan la actividad de los órganos del Es-tado en orden a la extradición" y aunque concep-tualmente son distintas, existiendo entre ambas rela-ciones de indeclinable integración -sin que pueda hablarse de jerarquías , tanto el Código Penal, como las restantes leyes penales sustantivas "pierden su rango privilegiado como norma de directa aplicación cuando se trata de enjuiciar a delincuentes entregados por un Estado extranjero en virtud de un Convenio internacional, porque en este caso la ley fundamen-tal es el Convenio de extradición, al que debe subor-dinarse las restantes leyes penales"; y,

JA201

Documento

concluye el citado tratadista manifestando que "si una Conven-ción internacional ejecutiva regula una determinada materia, es ésa la que se aplica, aunque contraríe el derecho interno en la materia..." (Tratado citado, T. II, págs. 787 y 788).

IV.    Que, efectuadas las precedentes y breves consideraciones de carácter general, dará la Sala las razones por las cuales descarta las severas críticas a la decisión apelada, como los argumentos en que se sustenta la impugnación.

Frente a lo que puede calificarse como incumpli-miento de ciertos requisitos de orden formal en la so-licitud de extradición (no haberse acompañado tex-tos que establezcan "las normas que regulan la pres-cripción..." irregular e incompleta traducción de la documentación y falta de legalización), "brevitatis causae" se remite el Tribunal a lo que lúcidamente expusieron el Ministerio Público (último dictamen de fs. 563vta.) y el Sr, Juez (Considerando IV).

Sin perjuicio de ello, señala que los textos so-bre prescripción pueden consultarse a fs. 161 y 372 (Sección 3282 del Código de los E.U.), resultando de los mismos que nadie puede ser enjuiciado por ningún delito punible con pena capital "a no ser que se dicte el procesamiento o se establezca la acu-sación formal por el fiscal dentro del plazo de cinco años a partir de la comisión de dicho delito", por lo que en virtud de la documentación que acompaña el requerimiento, es evidente que no se ha operado la prescripción (los delitos los habría perpetrado V. en-tre 1986 y febrero de 1989).

La traducción de los documentos, "al idioma de la Parte requerida", fue un requisito satisfecho con la presentación de la solicitud, aunque se hubiera complementado posteriormente con traducción de algunos textos y la correspondiente legalización, por disponerlo el Juez interviniente, la conclusión no pue-de variar (fs. 296/311), en cuanto la petición es arreglada al Tratado.

En consecuencia, deben entenderse colmadas las exigencias del Tratado (art. 10) y sin relevancia las objeciones sobre tales puntos, en los que también se finca el rechazo de la demanda de extradición; jurisprudencia de gran significación, ha decidido que los defectos o vicios de forma, que pueden afectar una solicitud de extradición, pueden ser reparados; y, una vez superados, no puede encontrar más obs-táculos sobre tal aspecto (Cf. "La Justicia Urugua-ya", T. LXVII, caso No. 7947).

Como en la última consulta se reitera que los documentos no fueron legalizados en forma, se permi-tirá el Tribunal transcribir una decisión judicial que entiende, resuelve en forma definitiva toda discusión. Se sostuvo: "Cuando los documentos se introducen por la vía diplomática (situación de autos), no existe ninguna razón material o jurídica para negarle la de-bida autenticidad; lo contrario sería un agravio a un país con el cual U. mantiene relaciones diplomá-ticas."

"El requisito de la legalización no puede agregar ninguna nota mayor de autenticidad que los que ya están ínsitos en la introducción diplomática. Así lo ha reconocido el U. en los acuerdos de 1879, 1903, 1915 y 1917, ratificados los tres últimos por las leyes Nos. 3163 y 6189, concertados con B., A., P. y B., por los cuales los exhortos trasmitidos por las autoridades diplomáticas o consulares están exentos de legalización. En el Tratado con S. también la do-cumentación estará exenta de legalización cuando se utilice la vía diplomática (art. 9) (M. A. Vieira: "La extradición en nuestro derecho positivo", Rev. de la Fac. de Derecho, año XII, No. 3 y 4, pág. 872 y 873)" (Ver: "La Justicia Uruguaya", T, LXI, c. 7334).

V.    En cuanto a las violaciones de orden consti-tucional y legal  invocadas por la Defensa , por ha-berse dispuesto el procesamiento en rebeldía, sin oír al indagado (requerido) y sin asistencia letrada, la Sala se remite en primer término a lo que expone el Sr. Juez "a quo", por compartir sus fundamentos (Considerando VIII, págs. 386vta./387vta.), pero agrega que este procedimiento especial tiene objetivo verificar el cumplimiento de los requisitos estableci-dos en el Tratado; no es, en cambio, un proceso judi-cial para juzgar al requerido, como lo ha señalado la Suprema Corte de Justicia en reciente pronuncia-miento, ya citado, al decir que el instituto de la ex-tradición responde a principios de asistencia inter-judicial y a razones de colaboración dentro de la co-munidad internacional. El Juez requerido, en estos casos, a diferencia de lo que ocurre sólitamente en la actividad doméstica, no condena ni absuelve al im-putado, sino que se limita a apreciar las

JA202

Documento

razones de la solicitud del magistrado extranjero y los documen-tos que la acompañan, y luego concede o no la ex-tradición; la entrega a las autoridades del otro estado ("extradir" proviene, precisamente, del latín "ex", fuera y "tradire", entregar) (L.J.U., caso 11221).

Que el interrogatorio previo del indagado, con asistencia profesional o la constancia formal de su negativa a declarar sea un presupuesto indispensable para el procesamiento en nuestro derecho (art. 126 del C.P.P.), no es trasladable a otros ordenamientos jurídicos, que organizan su sistema procesal y de ga-rantías individuales según sus propias peculiaridades sociales, culturales, económicas, etc. y sus nece-sidades,

En elaborada resolución judicial, enteramente trasladable al sub caso se ha sostenido, que invocar que el requerido nunca ha declarado ante una autori-dad judicial, es "una petición de principio, pues no se puede poner como condición lo que es precisamen-te el objeto del proceso de extradición. Y que ello sea presupuesto del enjuiciamiento en nuestro derecho, no podemos extenderlo a otras legislaciones. Lo que se requiere y es exigencia de orden público interno, es que exista, en el Estado peticionante, las garantías del debido proceso legal, pero las características o modalidades concretas que en cada país asume esta esencialísima garantía, es propio de cada legislación y en ello no cabe inmiscuirse" ("L.J.U.", T, XCVI, caso No. 10952).

Pero, además de no constituir el procedimiento de extradición un juicio criminal (Cf. L.J.U. T. IV caso 692), tampoco éste se ha iniciado en el Estado requirente, pues como lo precisa en su declaración jurada H., de acuerdo al derecho federal de los E.U., "un veredicto de procesamiento por un gran jurado, no significa que se le haya encontrado culpa-ble al acusado de los delitos que se le acusa. Significa, en cambio, que el gran jurado ha encontrado que existe evidencia suficiente como para que se lleve al acusado ante el Tribunal, para que se le enjuicie por los cargos que haya contra él" (fs. 114 y 280).

La inconsistencia de los agravios, relacionados con supuestas violaciones de nuestro ordenamiento cons-titucional y legal, ha sido demostrada por uno de nuestros Tribunales, hace bastante tiempo (pronun-ciamiento del 11 de agosto de 1970). Se dijo, en lo sustancial: "El precepto constitucional que veda el juicio criminal en rebeldía, carece de aplicación en materia de extradición... La Constitución nacional sólo influye al derecho interno procesal, de modo que las leyes nacionales deben ajustarse a esas normas, y no al instituto de la extradición, de orden, inter-nacional ."

"La aplicación de las normas constitucionales, que establecen algunas bases para la formación del proceso, como la necesidad de acusación de parte o del acusador público (art. 22), o la prohibición del juicio por comisión (art. 19), a la asistencia forzosa del defensor (art. 16), vinculan al derecho interno procesal..., pero no al derecho interno relativo a la extradición."

"No puede hablarse, como requisito esencial para reconocer efectos a la sentencia condenatoria extran-jera, de la confiabilidad con las vigencias de nuestro orden público, pues ello llevaría a erigir que las nor-mas procesales extranjeras coincidieran en múltiples aspectos con las nuestras, o dificultar el cumplimiento de los tratados internacionales y a obstaculizar su colaboración, debiendo reconocerse, por el contrario, que cada Estado según sus tradiciones y peculiarida-des jurídico sociales, organiza el proceso penal de modo diferente".

"En realidad, los requisitos de orden procesal váli-dos para dar curso a los pedidos de extradición, están contenidos en los Tratados y se refieren, en general, a la existencia de un proceso legal desarrollado, o de una condena legalmente dictada, de acuerdo con las normas locales, como no podía ser de otra manera, lo que cumple, por otra parte, la exigencia genérica y esencial de la Constitución (art. 12) de "proceso y sentencia legal (debido proceso)."

"Aunque existiera en el derecho común interno una disposición específica, prohibiendo la extradición del condenado en rebeldía, que no existe en modo alguno, no podría ésta prevalecer sobre lo dispuesto en el Tratado, que constituye a la vez la norma de derecho internacional y de derecho interno (por la aprobación legislativa) y que, como tal, por su enjun-dia internacional emanada de una convención y como norma especial, no puede ser invalidada por una de menor jerarquía, unilateral y, además de índole general."

"El precepto constitucional que prohibe el jui-cio criminal en rebeldía, está dirigido a proteger un derecho del individuo en nuestro país, no... en cual-quier otro Estado; por tanto, si en éstos no se acep-ta, se

JA203

Documento

rechaza o vulnera ese principio, ello nada tiene que ver con nuestra estructura institucional."

"De aceptarse la inconstitucionalidad que se pre-tende, nuestra justicia se expediría respecto al juicio seguido en el extranjero contra determinado sujeto, no en función de la aplicabilidad de la ley del Estado requirente, sino de las normas que regulan el proce-dimiento penal en nuestro propio Estado." ("La Jus-ticia Uruguaya", T. LXI, caso 7334)

Con ello, queda también delimitada la aplicación que puede tener en un procedimiento de extradición, la Convención Americana sobre Derechos Humanos  invocada por la Defensa , pues tiene la misma je-rarquía que la ley, no su aprobación legislativa.

Corresponde, en consecuencia, desestimar los agravios en los aspectos analizados.

VI.    Por encontrarse el Tratado aplicable afilia-do al sistema anglo americano de extradición, el Es-tado requirente deberá presentar "pruebas suficien-tes" para establecer "prima facie" que la "persona, requerida ha cometido el delito por el cual la extra-dición se formula", pues de lo contrario ("si un exa-men del caso demuestra que la orden de arresto es manifiestamente infundada"), el Estado requerido va a denegar la entrega (art. 10 numeral 3o. in fine).

Lo establecido, impone adoptar algún criterio para valorar las pruebas aportadas y dentro del marco normativo convencional, sin hacer prevalecer catego-rías jurídicas o sistema procesal de alguna de las par-tes, como ya se puntualizó; esto es, que si el Tratado no define una expresión o concepto, para determinar su alcance, no debe irse al sistema normativo de uno u otro Estado, pues ello supone encontrar una solu-ción "extra ordine" y no "in ordine", inaceptable y contraria al principio de igualdad que debe regir las relaciones entre estados soberanos (Cf. Q. Alfonsín: "Teoría del Derecho Privado Internacional", págs. 390 y 404/406).

Para no despojar de su especialidad a la norma de derecho internacional, la solución deberá encontrar-se por la averiguación de la voluntad común de las partes, dentro del contexto normativo y atendiendo la finalidad del instituto.

La apreciación de las pruebas, no puede hacerse, por lo indicado precedentemente, siguiendo las leyes y sistema de valoración del Estado requerido, como postula la Defensa.

La exigencia del Tratado en este aspecto, no es de significación, puede decirse que de extrema relativi-dad, pues si por un lado  en el mismo artículo  se reclaman "pruebas suficientes", pero con el aditamen-to de "prima facie" que atempera la exigencia, vista desde otra perspectiva la exigencia probatoria se vuel-ve menor, ya que se impone el rechazo cuando es "manifiestamente insuficiente".

En mérito a ello, teniendo en cuenta algunas pre-cisiones efectuadas sobre la interpretación de los tratados y la función cautelar del instituto de la ex-tradición, la exigencia probatoria del Trabajo  en el máximo grado que puede asignársele , se ubica, vin-cula o aproxima al concepto de verosimilitud ("fumus bonis iuris"), esto es, probabilidad o verosimilitud de los hechos imputados o derechos aducidos.

El contenido de la exigencia probatoria, por lo expuesto, naturalmente, no puede asimilarse a térmi-nos aplicables en el orden interno ("semiplena prue-ba" o "elementos de convicción suficientes", arts. 15 de la Const. y 125 del C.P.P.), ya no sólo porque se trata de establecer el presupuesto o los presupues-tos para juzgar al requerido, sino porque también el exhorto proviene de un país con un sistema proce-sal acusatorio, distinto al que impera en el Uruguay.

La prueba que corresponde examinar, es la incor-porada a los autos de acuerdo a lo dispuesto en el Tratado  acompañada con la solicitud o agregada posteriormente, a petición del requerido o volunta-riamente por el Estado requirente , por no consi-derarse admisible la interpretación restrictiva de la Defensa, que cercena un derecho, facultad o prerro-gativa de la Parte requirente, como es la de presen-tar "información adicional" o prueba complementa-ria, sin que exista ninguna prohibición expresa en el acuerdo bilateral internacional.

Si bien se faculta al Estado requerido a solicitar la presentación de "pruebas suficientes" u otros "comprobantes o información adicional" (art. 10 numeral 3o. in fine y art. 12), en modo alguno con-traviene lo

JA204

Documento

establecido en el Tratado la actitud de la parte requirente al presentar, sin serle solicitada, información adicional; la que por lo demás, se ins-cribe en el espíritu de cooperación internacional con el cual fue suscrito y ratificado.

De acuerdo a las directivas u orientaciones aludi-das y que deben guiar al intérprete en la valoración de las pruebas ya reseñadas , el Tribunal estima que resultan suficientes para establecer "prima facie "que R.S.V. ha incurrido en los delitos por los cuales se le acusa y reclama para ser juzgado (de ninguna mane-ra resultan "manifiestamente infundada").

Las declaraciones juradas, proceden de personas habilitadas para deponer sobre los hechos imputados por haberlos percibido, intervenido o tener informa-ción de la forma en que ocurrieron, que motivan sus conocimientos en modo que impresiona como veraz y que se han prestado a declarar en forma voluntaria y sin ningún tipo de coacción.

Acrecienta la fuerza de convicción de tales testi-monios, los elementos de juicio manejados en la proli-ja articulación de los cargos contra V. y otro impor-tante número de sujetos, que resultaron también pro-cesados por los mismos o similares delitos, con varios de los cuales o sus empresas, admite haber tenido vinculación (fs. 191/198), así como otras circunstan-cias corroborantes indicadas (decomisos de sospecho-sos de actividades negociales con los narcotrafican-tes, en la misma investigación y vinculados a V.).

Revela G. en su testimonio, múltiples detalles de la vida y negocios de V., que sólo pueden conocer-se en una relación de cierta permanencia y no por dos encuentros accidentales y muy distanciados en el tiempo, como declara W. (fs. 187 y vta.), el que por otra parte comienza declarando -en presencia de su Defensor , que es socio capitalista en el C.I. y se está "por quedar con el 75% del mismo", lo que en alguna medida y en aspecto relevante, confirma los dichos de G. (fs. 11 y vta).

H. por su parte, mantuvo una extensa y estrecha vinculación con el requerido, aspecto que éste no desvirtúa, sino que por el contrario corrobora (fs. 189 y sgts.) y aparece conociendo, hasta en detalles, la actividad desarrollada por V. tanto en los E.U. como en el U. esta última a través del C.I. , bajo cuyas órdenes trabajó en L.A. (lo que acepta V.) y en N.Y. (lo que no acepta V., pues dice que en dicha ciudad estuvo asociado con personas de nacionalidad hebrea, para refinar oro).

La declaración de H. es la de un alto funcionario, que estuvo en contacto directo con toda la informa-ción en que se sustentan los cargos contra V., la que verificó en los registros que menciona.

W. a su vez, motiva sus dichos por la directa inter-vención que tuvo en la investigación y en la verifica-ción que afirma realizó de los informes de distinta índole y registros de empresas y bancos de los E.U.

El requerido V., que niega toda vinculación con personas procesadas por tráfico de estupefacientes y no encuentra explicación para las acusaciones (fs. 13) y anuncia que va a "llegar hasta el final" (fs. 13), no se allana, sin embargo, a ser extraditado (fs. 187vta.), pero descalifica al testigo G. cuando en-tra en conocimiento de que fue acusado por el testigo de estar en contacto con los narcotra-ficantes para ocultarle sus ganancias , tildándole de "extor-sionador"; "delirante" y "drogadicto" (fs. 187 y 187vta.).

El valor del testimonio de G., es para este proce-dimiento importante y de escasa significación los mo-tivos aducidos para disminuir su fuerza de convicción; ello, naturalmente, es sin perjuicio que tales tachas se deduzcan y prueben, en el lugar en que V. es re-querido para ser juzgado y de acuerdo con las normas imperantes en tal jurisdicción.

Que aún cuando el Tratado no admite una instan-cia probatoria o contraprueba, sobre la prueba apor-tada por el Estado requirente, señala la Sala que en la causa seguida a G. por encubrimiento, se ha agrega-do un informe psiquiátrico no una pericia , efec-tuado con urgencia (al día siguiente de recibido el ex-pediente) y con falta de datos (investigación social ex-haustiva), en el que se estima, "por el tipo de delitos que ha estado implicado, presenta trastornos caracte-riales con rasgos mitómanos" y por los mismos ante-cedentes, "demuestra una vulnerabilidad específica para este tipo de delitos que implican tramar un ar-did para engañar o perjudicar a terceros (fs. 469 y vta.; fotocopia del expediente mencionado, agregado por la Defensa al apelar).

JA205

Documento

Dadas las circunstancias en que se produjo el informe que el mismo informante reconoce y el tiempo transcurrido, en modo alguno puede prescin-dirse de tal testimonio, pues por ahora, no puede considerarse disminuida o destruida la fe del testigo.

La declaración jurada de S.H., que una vez recibida se agregó a los autos notificándose por nota lo proveído a su respecto, robustece la prueba de las incriminaciones que motivan el pedido de entrega.

Las circunstancias que aduce la Defensa, para que se prescinda de considerar el testimonio de H. pide su rechazo "in límine", no son de recibo.

No se alegó que lo declarado por H. fuera falso ni se invocó ningún hecho, motivo o circunstancia tendiente a invalidar o disminuir la veracidad de lo relatado por el calificado testigo, que habiliten a en-contrar otro sentido a la oposición de la Defensa, más allá de la deficiencia formal que invoca.

Los principios aplicables en todo proceso judi-cial atinentes a la producción y agregación de las pruebas, que se pretenden extender al procedi-miento de extradición, correspondería contemplar-los si se estuviera juzgando criminalmente al reque-rido; esto último, como se dijo, no es lo que ocurre en el sub caso, donde sólo se resuelve acerca de la en-trega al país requirente y para ser sometido a juicio por aquellas imputaciones que se entienda adecuadas a las previsiones del Tratado.

En consecuencia y dado lo ya expuesto sobre la agregación voluntaria por el Estado requirente, no procede excluir el testimonio de H.

Que si bien resulta importante el testimonio de H., no menos significación tiene el de F.B.W., por la tarea cumplida en la investigación de personas, movi-miento de cuentas bancarias y empresas, etc., que pu-so al descubierto un intrincado conjunto de operacio-nes, que tenían por finalidad última, hacer llegar a manos de los traficantes el producido de la cocaína, introducida y comercializada ilegalmente en los E.U., sin que fuera detectado por las autoridades.

La Defensa pide el rechazo de la prueba, porque habría sido obtenida "mediante intercepciones tele-fónicas y videos grabados clandestinamente, respecto a personas que, en base a tales elementos de cargo, son enjuiciados "en ausencia" (por considerarla ilícita), sin mencionar que fuera W. quien alude en su declaración jurada a tales medios de información.

Corresponde efectuar algunas precisiones, en tor-no a las afirmaciones antes señaladas, como las si-guientes: a) se engloba con la calificación de ilícita a toda la prueba, por las circunstancias que se refie-ren, que obviamente no pueden alcanzar a los testi-monios o declaraciones juradas, relacionadas en sus aspectos sustanciales y analizadas; b) no pueden tampoco ser alcanzados por las supuestas tachas, los decomisos de cocaína y dinero, realizados en el curso de los procedimientos; c) las verificaciones efectuadas en las cuentas de los bancos que corres-pondían a remisiones y transferencias de determina-das empresas, pertenecientes al mismo grupo de personas, tampoco puede considerarse inhábil o ilíci-to; d) las facturas falsas, en las que se instrumentaba -por los acusados, entre los que se encuentra V.- -la venta de grandes cantidades de oro a personas fic-ticias que supuestamente lo pagaban con dinero, pa-ra ocultar la verdadera fuente de los fondos (que se mencionan reiteradamente en toda la información), son medios de prueba, que escapa ala calificación hecha por la Defensa; e) no se distingue aunque la diferencia puede ser muy relativa, entre vía de in-formación y medio probatorio y f) W. alude en su declaración, a diversas vías de información entre las que se encuentran aquellas que la Defensa califica como ilícitas o prohibidas y a medios de prueba.

De acuerdo a las precedentes puntualizaciones, se advierte que lo que habría que desechar de se-guirse el criterio de la Defensa es relativamente es-caso y no tiene mayor significación, siendo suficien-te el, restante material probatorio incorporado a este procedimiento de extradición, para tener por verifi-cado, con holgura, en el grado requerido en el Trata-do, los cargos formulados contra R.S.V. (probabili-dad o verosimilitud de los hechos aducidos

).

JA206

© Thomson Reuters Información Legal

JA207

**Opinion:** UNITED STATES ~ EXTRADITION ~ CRIMINAL PROCEDURE

**Published in:** LJU Volume 101, 01/01/1990, 71
**Online Citation:** UY/JUR/27/1989

**Summaries:**

1 . 1.    The internal public order requirement is that there be guarantees of legal due process in the requesting state, but the specific characteristics or modalities assumed by this essential guarantee in each country are inherent to each legislation and one should not delve into it. Hence, the prior interrogation of the investigated party, with professional assistance or proof of his/her refusal to declare, which is an indispensable element for processing in our law, is not transferable to other legal systems.

2 . 2.    When the documents are entered through diplomatic channels, there is no material or legal reason to deny the due authenticity; otherwise, it would be an affront to a country with which Uruguay maintains diplomatic relations. The legalization requirement cannot add any greater notes of authenticity than those already inherent in diplomatic introduction.

3 . 3.    The defects or vices as regards form that may affect a request for extradition can be repaired and once overcome, it is not possible to find more obstacles to that aspect.

4 . 4.    In the translation of the documents, even if it had been subsequently completed with translation of some texts and the corresponding legalization, as established by the intervening Judge, the conclusion cannot vary since the request is pursuant to law.

5 . 5.    Extradition treaties must be interpreted in the form that favors the purpose for which they were agreed, because they have their legal basis in the natural laws of civil companies and their provisions, in relation to the spirit that informs them, of common protection to society, and must be broadly interpreted as being in accordance with the general interest that is to ensure the course of justice in the most complete way possible.

6 . 6.    If the Treaty does not define an expression or concept, in order to determine its scope, one must not resort to the regulatory system of one state or another, but rather the solution must be found by the inquiry of the common will of the parties, within the context and addressing the purpose of the legal concept.

7 . 7.    The charges brought are: conspiracy to import cocaine into the U.S., distribute it and plan for the collection of the sale, drug offenses, concealment of money and crimes of conspiracy, assistance and participation in the commission of an extraditable offense. It does not matter that none of these charges typically conform to the crimes provided for in the decree Law 14294, or the rest of the national criminal system, what matters is that the interpreter finds the meaning of a legal classification within the general framework of the rules created by the common will of the States, which signed the Treaty between the United States of America and Uruguay on Extradition and Mutual Legal Assistance in Criminal Matters, effective as from 4/11/84.

8 . 8.    On the other hand, the charged facts are framed, without violence, in a hypothesis of concealment of introduction or sale, which clearly turns the accusation into a figure liable to be extradited pursuant to the Treaty.

9 . 9.    The accused conduct, "laundering" (standing) of monetary instruments, is a crime susceptible to extradition because it is a remote crime (executed outside the territory of the U.S.) but that committed in similar circumstances with respect to Uruguay, would be subject to national jurisdiction, as concealment of the types (offenses) established in Arts. 32 to 33 of dec. law 14294 ("organization or financing" or "illegal introduction to foreign countries").

10 . 10.   From an internal perspective or already by the international policy line followed by the country on the subject, it should be understood that the extradition of whoever may eventually be sentenced to life imprisonment by another state -a penalty that our country never considered inapplicable to the crimes for which the delivery was granted- does not violate the Constitution nor does it affect the internal public order.

11 . 11.   The evidentiary requirement of the Treaty to the maximum extent that it can be assigned is found, linked to or approximates the concept of likelihood ("fumus bonis juris"), that is, probability or likelihood of the alleged facts or claimed rights.

12 . 12.   Although the requested State is empowered to request the submission of "sufficient evidence" or other

"proofs or additional information" (Art. 10 No. 3 in fine and Art. 12), the attitude of the requesting state in no way contravenes the provisions of the Treaty when submitting, without being requested, additional information, which is otherwise established in the spirit of international cooperation with which it was signed and ratified.

**Classification:**

EXTRADITION

+ Procedure

+ Guarantee of due process

+ Must exist in the requesting State

+ Its characteristics and modalities are specific to each country

+ Request

+ Through diplomatic channels

+ It is authentic

+ Inadmissibility of requiring legalization

+ Defects or vices as regards form

+ They can be remedied

+ Translation

+ Completed later

+ It is valid

+ Treaty

+ Interpretation

+ In a way that favors its purpose

+ No definition of expression or concept

+ Common will of the parties must be found out

+ On extradition and cooperation in criminal matters with the U.S. (validity: 1984)

+ Attributed facts

+ Its adequacy to internal rules does not matter

+ Rules created by Treaty matter

+ Possibility of life sentence

+ Does not violate the Constitution

+ Evidentiary requirement

+ Likelihood

+ Additional information

+ Submitted without prior requirement

+ Admissibility.

1.      The internal public order requirement is that there be guarantees of legal due process in the requesting state, but the specific characteristics or modalities assumed by this essential guarantee in each country are inherent to each legislation and one should not delve into it. Hence, the prior interrogation of the investigated party, with professional assistance or proof of his/her refusal to declare, which is an indispensable element for processing in our law, is not transferable to other legal systems.

2.      When the documents are entered through diplomatic channels, there is no material or legal reason to

JA209

deny the due authenticity; otherwise, it would be an affront to a country with which Uruguay maintains diplomatic relations. The legalization requirement cannot add any greater notes of authenticity than those already inherent in diplomatic introduction.

3.    The defects or vices as regards form that may affect a request for extradition can be repaired and once overcome, it is not possible to find more obstacles to that aspect.

4.    In the translation of the documents, even if it had been subsequently completed with translation of some texts and the corresponding legalization, as established by the intervening Judge, the conclusion cannot vary since the request is pursuant to law.

5.    Extradition treaties must be interpreted in the form that favors the purpose for which they were agreed, because they have their legal basis in the natural laws of civil companies and their provisions, in relation to the spirit that informs them, of common protection to society, and must be broadly interpreted as being in accordance with the general interest that is to ensure the course of justice in the most complete way possible.

6.    If the Treaty does not define an expression or concept, in order to determine its scope, one must not resort to the regulatory system of one state or another, but rather the solution must be found by the inquiry of the common will of the parties, within the context and addressing the purpose of the legal concept.

7.    The charges brought are: conspiracy to import cocaine into the U.S., distribute it and plan for the collection of the sale, drug offenses, concealment of money and crimes of conspiracy, assistance and participation in the commission of an extraditable offense.

It does not matter that none of these charges typically conform to the crimes provided for in the decree Law 14294, or the rest of the national criminal system, what matters is that the interpreter finds the meaning of a legal classification within the general framework of the rules created by the common will of the States, which signed the Treaty between the United States of America and Uruguay on Extradition and Mutual Legal Assistance in Criminal Matters, effective as from 4/11/84.

8.    On the other hand, the charged facts are framed, without violence, in a hypothesis of concealment of introduction or sale, which clearly turns the accusation into a figure liable to be extradited pursuant to the Treaty.

9.    The accused conduct, "laundering" (standing) of monetary instruments, is a crime susceptible to extradition because it is a remote crime (executed outside the territory of the U.S.) but that committed in similar circumstances with respect to Uruguay, would be subject to national jurisdiction, as concealment of the types (offenses) established in Arts. 32 to 33 of dec. law 14294 ("organization or financing" or "illegal introduction to foreign countries").

10.    From an internal perspective or already by the international policy line followed by the country on the subject, it should be understood that the extradition of whoever may eventually be sentenced to life imprisonment by another state -a penalty that our country never considered inapplicable to the crimes for which the delivery was granted- does not violate the Constitution nor does it affect the internal public order.

11.    The evidentiary requirement of the Treaty to the maximum extent that it can be assigned is found, linked to or approximates the concept of likelihood ("fumus bonis juris"), that is, probability or likelihood of the alleged facts or claimed rights.

12.    Although the requested State is empowered to request the submission of "sufficient evidence" or other "proofs or additional information" (Art. 10 No. 3 in fine and Art. 12), the attitude of the requesting state in no way contravenes the provisions of the Treaty when submitting, without being requested, additional information, which is otherwise established in the spirit of international cooperation with which it was signed and ratified.

Court of 1st Instance in Criminal and Juvenile Matters 2nd. Rotation of Maldonado.

Criminal Court of Appeals of the Third Rotation.

**Full Text:**

FIRST INSTANCE

Maldonado, May 19, 1989.

Having regard to:

For judgment, this letter rogatory from the U.S. requesting the extradition of R.S.V. (File P/129/89), with the intervention of the Departmental Attorney General of the Second Rotation, Dr. Cristina González de Saldivia.

RESULTING IN:

I.    That on February 22 of this year (pages 1, 7 and 11) personnel of the Office of the Chief of Police of Maldonado arrested the Argentine citizen R.S.V., upon becoming aware that the U.S. Embassy had requested the arrest with the purpose of extradition.

II.    That the following day (pages 1 and 3) the Judge became aware of that act and ordered that the person deprived of his freedom be brought to the case immediately with an explanatory memorandum. Upon taking him to the Court, he was informed of the appointment of a sponsoring Defense Attorney, he was informed of the right to communicate freely and privately with him (pages 10) and was informed in detail about the reasons for his arrest.

III.    That in the statement (also made in the presence of the Representative of the Public Prosecutor's Office who had been informed about the initiation of the procedure p. 8v.) he was examined in order to determine whether he was the same person required and as regards the charges that were made; he turned out to be the individual accused by the foreign authorities, declaring himself innocent (p. 11 15).

IV.    That by resolution No. 393, also dated February 23, 1989 (pg. 16 16v.), considering that: the temporary detention request was duly documented; that the detainee was the required person, that the alleged offenses indicted were duly mentioned and that declaration was received with the guarantees of the Counsel, in accordance with the provisions of Art. 11 of the Extradition and Mutual Legal Assistance in Criminal Matters Treaty signed between our country and the U.S. in W. on April 6, 1973, the interim arrest of R.S.V. was ordered, communicating to the Office of the Chief of Police the respective order. In addition, the requesting Judge was informed that the term provided for in the final paragraph of Art. 11 of the Binding Treaty in the matter had begun, issuing a letter rogatory for this purpose and a radiogram through INTERPOL; the Office of the Chief of Police was requested to send the identification data of the arrested and the personal identification documents were seized. Order was given to notify the Public Prosecutor's Office; that it be reserved and, at the time, returned to the Office.

V.    On April 4 of this year (page 180) this Court venue received the formal extradition request sent by diplomatic channels (pages 34 to 180), which had arrived at the Ministry of Foreign Affairs of our country on the previous day, p. 36.

The list of circumstances of the incriminating event is, in summary, the following:

The first indictment against V., accuses him with a charge for conspiracy to help and instigate to obtain possession and distribute cocaine (in violation of Sections 841 (a) (1) and 846, Title 21, of the U.S. Code and Section 2, Title 18, of the U.S. Code) and for "laundering" monetary instruments (in violation of Sections 371 and 1956, Title 18 of the U.S. Code); a charge for knowingly and intentionally assisting and instigating the obtaining of possession of cocaine with the intention to distribute it (in violation of Section 841 (a) (1), Title 21, of the U.S. Code and Section 2, Title 18, of the U.S. Code); and twelve charges for "laundering" funds resulting from the illegal sale of dangerous narcotics (in violation of Sections 2 and 1956 (a) (1), Title 18, of the U.S. Code).

The second indictment issued against V., accuses him with a charge for conspiracy to help and instigate to obtain possession and distribute cocaine (in violation of Sections 841 (a) (1) and 846, Title 21, of the U.S. Code and Section 2, Title 18, of the U.S. Code) and for "laundering" monetary instruments (in violation of

JA211

Sections 371 and 1956, Title 18 of the U.S. Code); and eleven charges for "laundering" funds resulting from the illegal sale of dangerous narcotics (in violation of Sections 2 and 1956 (a) (1), Title 18, of the U.S. Code).

The indictments argues in substance that approximately between 1985 and February 1989, V. and his co-defendants worked for people in C. and other places in A. of S. who had the business of importing large amounts of cocaine into the U.S. and arranging its distribution. As part of the whole operation of narcotic trafficking, V. and some of his co-defendants coordinated the collection of the proceeds from the sales of cocaine to distributors in L.A., C., N.Y., N.Y. and in other places in the U.S. Once the money had been collected, V. and others monitored its transfer and deposit into bank accounts controlled by them, in L.A., from which it was transferred by telegraph or cable to accounts in N.Y. and U., for final distribution to C cocaine traffickers.

The specific charges against V. include the fact that in 1986 he bought a precious metal and money exchange business, in M., U., known as C.I. or L.S.A., which he used for the benefit of the traffickers of narcotics for whom he worked, as a means of disguising the true origin of large sums of money transferred to them from the U.S. Using C.I. and other businesses in the U.S., it is alleged that V. and his co-defendants were engaged in making fictitious sales of gold, which was exchanged for the money that the cocaine distributors had collected. Records from U.S. banks regarding the businesses involved indicate that the money was transferred through U.S. financial institutions to accounts that included Uruguayan accounts of C.I. and/or L.S.A. The evidence on which the charges against V. are based further indicates that hundreds of millions of dollars of the illegal drug proceeds were transferred to accounts of V's business in U. and were then sent to P., C. or other places for the benefit of cocaine traffickers.

VI.    Immediately, it was decreed (No. 933/181) to carry out a medical examination on the arrested person by the two Forensic Physicians of this Department and that a dentist prepared a dental card for identification purposes: likewise, receive a declaration from Mr. V. establishing for this purpose the hearing of April 5.

VII.    A declaration was obtained on the established date, which continued the following day (pages 187 198v.).

VIII.    By order No. 927 dated April 7, 1989, notice was served of the claim for extradition to the Defense for the fixed term of six days.

IX.    The Defense Attorney, on pages 210 240, objected to the request of the U.S. government for the following reasons:

a) That international cooperation in criminal matters is atypical and exceptional, therefore, if there is only one deficiency or irregularity, it is sufficient to deny the request for assistance.

b) That the translation of the letter rogatory of the proceedings has been made in the U.S. Department of State, getting around what is provided for in Decree Law 15441 that requires it to be carried out by a Public Translator registered in the country or, failing that, by the Consular Agent of the Republic in the country of origin of the documents. This irregularity is sufficient to reject the requirement.

c) That Art. 10 of the Treaty in its section number 2 when it states that the request must be accompanied by, among other essential requirements, "the legal texts that regulate the statute of limitations of the action and the penalty" and in the case at hand, although it is mentioned that they are added (p. 84), they have not done so and the signatory simply says that "I have reviewed this law conscientiously and I attest that the legal action against R.V. in this matter has not been prescribed". In other words, an essential requirement has been violated once again, failing to send something clearly required by the Treaty.

d) That the jurisdiction of the Court or Tribunal issuing the order has not been indicated.

e) That the accompanying evidence is frankly insufficient, illegal, not accepted by the Uruguayan positive law, in violation of the National Constitution and, therefore, in violation of our sovereignty, so they should be rejected in all their terms. The sworn statement in which the summary of the charges against R.V. is

JA212

made is a mere copy of the memorandum sent by the investigators (FBI and DEA) to the Prosecutor's Office. The alleged evidence that should be attached does not exist, only the statement of an informant that can be crossed out. The FBI carried out a patient investigation for several years in which hundreds of testimonies, follow-ups, videotapes and telephone recordings were received against the investigated parties; part of that evidence was sent with this request and without prejudice to being considered illegal evidence, it states that in none of them it is possible to observe or hear R.V. and he is not even mentioned.

f) That the procedure carried out in the U.S. (Assistant Prosecutor attests that V. is Guilty) is in line with our Constitution that prohibits the open judgement.

g) That not even a single invoice was attached, of the alleged fictitious purchases and sales, nor V's checking accounts with large movements, nor invoices of the armored cars under investigation, nor less still contacts of V. with cocaine traffickers.

h) That the crimes for which extradition is requested are not provided for in the 32 hypotheses established by the treaty.

X.    The Representative of the Public Prosecutor's Office (No. 1021/241 241v.) was served notice and the Departmental Attorney General of the Second Rotation in a well-founded opinion (pages 243 254) advocated for the claim to be considered upon not noticing any irregularity whatsoever that would prevent the granting of extradition.

XI.    And the case was set for entering judgment (No. 1231 dated 2 of the current month (p. 254v.), raising the piece to the Office to issue it.

XII.    The proceedings also state for the record:

That as a measure to take further steps (No. 1269/255v.) it provided that the requesting State submits translation of the letter rogatory made by a professional authorized in the Republic and also that it included a list of the rules on the statute of limitations of the action and the penalty;

That the U.S. Embassy on the 8th of this month complied with the request (p. 256 311), ordering (No. 1287/312) to add the supporting documents with news from the Defense and the Public Prosecutor's Office;

Having personally notified the parties on May 8 (p. 313), on the following 16th, the file returned to the Office for judgment (p. 374);

In the meantime, on p. 314 344, a letter rogatory was received (through diplomatic channel) where three omitted pages in the English version are attached. It was arranged to keep it in mind without another procedure (p. 345). In addition, another letter rogatory (p. 346 373) was submitted, making available additional information (testimonial evidence for prosecution). It was provided to observe proceedings No. 1287/312.

XIII.   It is proven in the proceedings that the arrested person R.S.V. is the same person required by the U.S. and from his statements it is clear that he is a person who trades with precious metals (particularly gold) at an international level; that he was based in the U.S.; that he knows most of the aforementioned companies as involved in illicit activities, their owners and also those who personally accuse him.

Whereas:

I.    That the claim for extradition will be admitted upon existence of the adjective and substantial requirements regulated in the Treaty between the United States of America and Uruguay on Extradition and Mutual Legal Assistance in Criminal Matters in W. on April 6, 1973, effective as from April 11, 1984. The grounds set forth by the Defense Attorney lack, in the opinion of the Praetor, not only legal status, but also conviction power to raise a diverse solution to that adopted here, this being the reason why it must be expressed below.

II.    The extradition is an act of inter-State judicial assistance in criminal matters that deals with the sending of a criminally charged or requested individual, from the sphere of sovereignty of one State to that of

another. Novda Monreal (Revue internacionale de droit pénal, 1969, p. 788) defines it as a measure aimed at safeguarding the most fundamental and general principles of law recognized by the civilized world and consisting of delivering a person convicted or called to trial as a result of the violation of those principles to the State to which the right of repression belongs and in which the action will be judged, offering all the guarantees of a State based on the law.

Extradition law belongs to the gender of legal cooperation in international matters. By common consent with the concordant opinion of the Public Prosecutor's Office, the methodological point of view must not be restrictive (which sees the spatial scope of Criminal Law in the international sphere from a territoriality perspective, where extraterritoriality constitutes an exceptional temperament) such as established by the Defense.

Indeed, in transferable concepts of Vieira (The crime in the international criminal Law Sphere and international criminal law   Mont. FCU 1969 p. 17), the definitions in legal matters are subordinated to the position to which the juror is affiliated. If we are faced with a nationalist, the accent of the definition will be placed in the national aspect of Criminal Law. If, on the contrary, we face an internationalist, he or she will highlight the solidaristic and international cooperation conception regarding criminal law.

Whenever Uruguay signed a bilateral agreement on legal cooperation in the last century, the letters rogatory in criminal matters were included.

See:

1) U.B. Treaty for the Execution of Letters Rogatory (1879), Arts. 1 and 2 (Approved by Law of May 21, 1879).

2) U.B. Treaty, Protocol on Letters Rogatory (1906), Art. 1 (Modifies and supplements the previous one).

3) E.U. Treaty, Suppression of Legalizations in the rogatory commissions (Law of June 10, 1901).

4) U.A. Treaty, Convention extending the Treaty on Procedural Law of M. (1907). Arts. 1 et seq. (Law 3163 of 31 May 1907).

5) U.P. Treaty, Convention extending the Treaty on Procedural Law of M. (1915). Arts. 1 et seq. (law of June 18, 1920).

6) U.B. Treaty, Convention extending the Treaty on Procedural Law of M. (1918), Arts. 1 et seq. (Law 6189 of July 16, 1918).

7) U.A.P. Treaty (1940) on Procedural Law. Art. 11 (ratified by decree law of November 12, 1942).

8) U.A. Treaty (1980 on Equal Procedural Treatment and Letters Rogatory, Arts. 2 et seq. (Law 15110 of March 17, 1981).

9) U.Ch. Treaty (1982) on Equal Procedural Treatment and Letters Rogatory. Arts. 2 et seq. (Decree Law 15251 of March 26, 1982).

International judicial aid in criminal matters offers similar characteristics to the homonym phenomenon in civil matters (Werner Goldschmidt: Private Int. Law, 2nd. Ed. Bs. As. 1974, p. 491).

Corollary of the foregoing is that extradition treaties must always be interpreted in a manner that favors the purpose for which they were agreed. The position of U. has been and is collaboration in criminal matters. The Italian Cassation in judgment of March 10, 1914, had already affirmed that considering that the extradition has its legal basis in the natural laws of civil societies, their provisions must be broadly interpreted in relation to how they are informed, the common protection of society; and from the doctrinal point of view, it can be pointed out that Travers (Le Droit Penal Internacional, V. IV, p. 383), also criticizes the restrictive interpretation and affirms the broadest, since it is more consistent with the general interest that is to ensure the course of justice in the most complete manner possible (LJU C. 3210, RUDP 2/88 c. 324 and Judg. No. 90/87 of

the Crim. Crt. 2nd. Rotation).

In the same sense: faced with organizations dedicated to the trafficking of narcotics and the material means they have, the teachings of Quintano Ripolles (Treaty of International and International Criminal Law, Vol. II, p. 116, Madrid, 1957) are applicable, who, referring to the indispensable cooperation between countries in the face of such cases, argued that their frustration should be avoided by tolerating that while criminals use planes, judges travel by stagecoach.

The current debate as regards these ideas in various areas, the preparation even in the Parliament folders of a law on extradition, together with the aforementioned measures, make it possible to conclude that international criminal cooperation is not atypical or exceptional.

III.    The purposes of the extradition and the criterion set out above are the guidance for the interpretation of the binding treaty between our country and the U.S.

This procedure does not constitute a criminal trial, but rather an extraordinary and summary procedure aimed at making the requested one available to the Judge or Court that is legally responsible for hearing in the case. Since this is not a judgment, the method cannot be restrictive. Nor does the principle "in dubio pro reo" apply (because it does not govern for the interpretation of criminal or procedural laws   RUDP 2/88 c. 327) and if the procedure is manifestly attempted in good faith, the non-technical execution of any formality of our criminal system must not be allowed to oppose the fair execution of our obligations (Cf. Piñeiro Chain in Extradition, Part III, Olarte, p. 95).

IV.    The claim filed by the U.S. Government is in accordance with the provisions of Art. 10 of the aforementioned Treaty. A list of circumstances of the facts has been attached with the data necessary for the identification of the person and the legal texts applicable to the case. The legalization and translation are included for the record.

The dilatory defenses opposed by the Defense that they place in the absence of a legal translation of the letter rogatory and in the fact that the required rules on statutes of limitations were not attached, have been adequately contaminated by the prosecutor's opinion and were ultimately remedied through the measures to provide additional evidence.

V.    Insofar as the United States authorities have notably omitted to prove their international competence, it is not a valid objection if it is taken into account that it is only necessary to require that the requesting State be competent and that the jurisdictional body where the criminal process is to be carried out has jurisdiction in said State,

Vieira (L'Evolution recente de l'extradition dans le continent Americain. Recueil des cours, volume 185. Academie de Droit Internacional, p. 201) with its unique penetration establishes that in order for a State to be able to claim from another the delivery of a person for criminal purposes, the offence must be within the jurisdiction of its courts and there must be an arrest warrant, the vocabulary used being very varied, so much so that some States refer to the jurisdiction of the requesting State and others have a tendency to establish that in order to file the claim it is necessary for the crime to have been committed within their territory.

It is crystal clear that, in no way, should the internal competence of the body be considered (e.g. if a Court of the State of C. or that of another State of the U. must hear), Olarte (op. cit. V. I p. 87 88) following Travers says that the requested State must verify whether the requesting State is competent to judge the act giving rise to the claim, but said competence being generally understood, that is, that it will not be attempted to inquire if such or such judge or court is competent according to internal legislation. In the same sense, Alfonsin (Legal Documents, T. III p. 21) upon setting the example of a civil case, states that once it has been established that a certain foreign sentence intended to be executed in U., comes from a certain State that, according to Art. 2401 of our Civil Code, was competence for the case, it is not necessary to access the enforcement to control whether the foreign Judge enjoyed in addition to internal competence, taking into account that Art. 2402 of the Civil Code confers on the law of the place where the trial was filed the regime of the process.

© Thomson Reuters Legal Information                                                                8

JA215

The problem is as indicated in the prosecutor's opinion, within the framework of which rules of Private International Law must the international competence of the petitioner be examined as there is no express provision in the Treaty. However, either in the DIP rules of one or another State, the place of commission of the crime must be made in accordance with the known theory of activity.

It should be added in this regard that, leaving theories aside, it is an established principle (which was even included in the 1889 Treaty on International Penal Law signed by our country) that if the crime has been perpetrated in more than one country, the State that has first become judicially aware will have jurisdiction. And if it is considered that these are related offenses committed in the territory of two or more states, the State in which territory the most serious offense has been executed would be competent (Cf. Carreras: Extradition procedural regime, La Ley Mag. V. 138 Sec. Doc. p. 1202).

And if any doubt persists even on the point, it is sufficient to think that possible crimes of concealment could have been committed in our country, but since it requires to establish this not to be a participant in the main illicit act and as seen by the facts attributed as well as by the North American criminal rules, the requested is considered a participant, the hypothesis handled is easily ruled out.

VI.   The alleged absence of evidence.

The Extradition Treaty with the U.S. in part of its Art. 10 reads: "The requested state may request that the requesting state submits sufficient evidence to establish "Prima facie" that the person claimed has committed the offense for which the extradition is raised. The requested state may deny extradition if an examination of the case shows that the arrest warrant is manifestly unfounded".

The Judge considers that the request for additional evidence only corresponds when the claim is manifestly unfounded (for example, if in this case the extradition of a person who had never carried out negotiations such as those expressed, who had never left the country and who did not know the aforementioned persons and companies was requested by identical grounds of fact and law). Here, the rule that enables our State to request the petitioner to submit sufficient evidence to establish "Prima facie" that the person claimed has committed the crime would be applicable, a hypothesis that is clearly not that in the instant case. The inadmissibility of the extradition admitted by the current Treaty is not the one that refers to the evidence for the prosecution enabling the processing, this being an exclusive spring point of the requesting State. The preliminary investigation function that cannot be usurped by another Magistrate belongs only to the competent Judge (RUDP cit. c. 322). It is extracted from this, without any hesitation, that the mission of the required Judge is to verify the existence of the "fumus bonis juris" (smoke of a good right) that modernly translates by probability or likelihood of the law argued.

Finally, it should be kept in mind that the assessment or evaluation of the evidence must be done in accordance with the rules of the place of the process (lex fori) and even for those who argue that our rules must be used, the incorporated elements are not clearly consistent with the set of rules and principles of law in which our society establishes its individuality. See that in terms of the testimonials, notwithstanding the considerations made, they do not mention which grounds for disqualification provided for in our legislation would be applicable thereto; regarding the alleged illegality of the recordings and videos, it would be necessary to prove that they were carried out without the authorization of the competent Judge (something that was not done) and in this regard it arises from the accompanying documentation that at least some recordings of telephone conversations were performed with judicial authorization. Nor is the argument accepted that the DEA and the FBI offer rewards, protection and impunity to the informants when, according to the Defense, the informant in this case was subject to Uruguayan Justice and the agents will not be able to affect it at all.

VII.   Attributed crimes and the principle of identity of norm or double jeopardy.

The Treaty of binding extradition in the case at hand includes the so-called principle of double jeopardy or the identity of the norm. This requires that the fact that motivates it is a crime in the legislation of the requesting state and in the legislation of the requested state. In other words, it is necessary for the fact to be considered a crime in the two legislations. even if it does not have the same "nomen juris" or legal name in both

legislations. It is included in Art. 2, paragraph 1, when saying "provided that they are punishable under the laws of the contracting parties" and in the same article, paragraph 3, when saying "and said crime is punishable according to the laws of both contracting parties". And the requirement of the "nomen juris" itself in the same paragraph cited upon stating "extradition will be appropriate when the laws of both parties do not consider the crime included in the same category of the list or even if they do not designate it with the same terminology" (Journal of the Sec. of the State Coun. dated October 18, 1983 p. 358) is ruled out.

The classification must be made within the framework of the Treaty because, as teacher Alfonsín taught (Theory of International Private Law; Montevideo 1955, p. 385) it is necessary to qualify, this is, to place the legal relationship in a category of the legal system to which the rule belongs, reason why we will return to the Treaty.

So, fraud against the U.S. is provided for in Art. 2 Sec. 12 of the Treaty; laundering of monetary instruments is provided for in Sec. 26 because the accused would know the origin of the money; conspiracy to help and instigate to obtain the possession and distribution of cocaine is included in Sec. 17 since "The extradition will also be granted for the participation in the aforementioned crimes, not just as an author, accomplice and instigator, but also as an accessory, as well as for the attempt and illicit association to commit the aforementioned crimes, provided that these classifications are punishable by the legislation of the Contracting Parties with imprisonment of more than one year".

From a criminological point of view, we are in the presence of typical white collar (S.) crimes, known in English countries as "occupational crime", or "criminalité d'affaire" in French law. It is clear from all evidence that the positive law sets them in prohibited criminal types after the actions are carried out and, pursuant to that, the Treaty must be interpreted with a broad, evolutionary criterion.

VIII.  The proceedings provided in the requesting State in the absence of the investigated party and the international public order of the Uruguayan State.

It is an elementary principle of international law that the exception of international public order works to displace the harmful consequences that the application of a foreign law would cause to a country and is not applicable against a rule of a Treaty.

What happens then to the international public order and the Treaties? When they are entered into, a public order reserve clause is usually included, but even if it was included, Alfonsín taught that the States could not make use of the reserve clause to exclude foreign laws in effect at the time of the approval of the Treaty, since it is taken for granted that the States cannot approve conventional rules without studying and calculating their impacts, taking into account the institutions that the other contracting States have established. They can only use the clause to exclude the application of foreign laws implemented later and which eventual application they could not naturally foresee at the time of approval of the Treaty (Alfonsín, Theory cit. Mont. 1982 p. 579 580).

The relations between the Treaty and the Constitution have been resolved in the sense that the courts of justice lack jurisdiction to rule, this is, that they have no jurisdiction to decree the invalidity of an International Treaty and the issue is referred to mechanisms of international law. Thus; Vieira (Recueil des cours, cit. V. 185 p. 187) describes the case of the Supreme Court of P. that did not declare the invalidity of a treaty for considering that it went beyond its powers and that in V's., the Supreme Court of Justice has established an "inadmissibility" on a claim for annulment of line 14 of Art. 3 of the law to approve an extradition treaty signed between V. and the U.S. And the basis lies in the fact that no State has the legal power to prioritize its law over those of another and that there are other avenues in International Law to cease the effects of a Treaty.

That the requested person has never declared before a judicial authority is a petition for principle, since what is precisely the object of the extradition process cannot be established as a condition and that this is a trial requirement in our law, it is not possible to extend it to other legislations. The only requirement (and considered when ratifying the Treaty) is the existence in the requesting State, if applicable, of the guarantees of

JA217

due process of law, but the specific characteristics or modalities that this guarantee assumes in each country is a matter of each State and it is not possible to interfere with this.

IX.     Ultimately, the extradition of R.S.V. must be granted because the requirements established in the binding Treaty with the U.S. have been met, for the purposes of his trial for the accusations related to the letter rogatory.

And it is worth rejecting the conclusions of the professors consulted by the Defense Attorney, insofar as the undersigned Judge would incur in liabilities established in different provisions of the Constitution if he admitted the claim. Without prejudice to the fact that the corresponding disciplinary power has already been exercised, it should be said that the extradition is extraconstitutional since the principles of this refer to the national legal system and the authorities must be guided by the supranational rules contained in the Treaties belonging to another legal system. On the other hand, the State could incur liability if it were to omit to comply with the obligations it assumed when ratifying the Treaty.

For these reasons, the concordant provisions of the prosecutor's report and the precepts included, I RULE:

To admit the claim and on its merits, grant the extradition of R.S.V. Final, set.

Tabaré Sosa Aguirre

SECOND INSTANCE

Montevideo, July 28, 1989.

RECITALS:

For second instance judgment, these proceedings entitled "V., R. - Extradition" (File No. 86/1989), submitted for hearing of this Court by virtue of the appeal filed by the Defense Attorneys of the requested person in a subsidiary manner to the appeal for reconsideration against judgment No. 43 issued on May 19, 1989 by the Attorney Judge of First Instance in Criminal and Juvenile Matters of the Second Rotation of Maldonado, Dr. Tabaré Sosa Aguirre.

Accepting and incorporating by reference the list of background facts, procedural acts and facts considered proven contained in the decision under appeal, due to the fact that they are consistent with the outcome of the proceedings.

Also resulting in:

I.     That, based on the Treaty on Extradition and Mutual Legal Assistance in Criminal Matters signed between the United States of America and Uruguay in W., on April 6, 1973, approved by decree law No. 15476, in force since April 11, 1984, in extensive and well-founded pronouncement, the Judge of first instance granted the extradition of R.S.V. (p. 378/388).

II.     The Defense Attorneys, Dr. V.D.V. and J.C.D.G., based on the consultations of illustrated specialists in the field -Dr., E.T.B., C.A.C. and M.A.V. (one already added and one accompanying) and what they set forth broadly, understand that it is appropriate to revoke the contested judgment, denying the extradition (p. 550/560).

The arguments handled aim at highlighting what they consider to be non-compliance with certain requirements in the delivery order, insufficiency of the evidence with which V. was prosecuted, violation and failure to observe the Treaty rules and violation of our international public order (manifestly unfounded arrest warrant, formal and substantive defects that are irredeemable, evidence poorly assessed, etc.).

They insist that the requested person was prosecuted in absentia, in violation of our Constitution (Art. 21); that the essential requirement of the prior examination of the defendant was not met (Art. 126 of the Code of Criminal Procedure); that it is not possible to fail to observe Article 14, section number 2 of the Criminal Code and the American Convention on Human Rights (Art. 7.2) and that the requirement for double jeopardy is

not met", since none of the charges filed typically conform to the criminal figures provided for in Decree Law No. 14294 or the rest of the country's criminal system.

Regarding the crime of laundering or whitewashing of monetary instruments, they state that created by the law of the requesting country on October 27, 1986, they say that it did not appear nor could it appear on the restricted list of Article 2 of the Treaty, reason why V. cannot be delivered to be prosecuted for such a crime and could never be prosecuted by the party claiming it (the crime does not appear in Uruguayan legislation).

They make observations as regards the documentation submitted, due to lack of translation and legalization in form (irremediable defects); that no texts related to "the statute of limitations of the action and the penalty" were attached; that the evidence on which the request relies (inadequate, illegal or prohibited evidence), leads to dismissal and that it is not possible to deliver a person who can spend the rest of his/her life in prison, since the international public order is violated.

III.    The Departmental Attorney General of the Second Rotation of Maldonado, Dr. Cristina González de Saldivia, upon making the record available as ordered, after carefully studying the arguments of the Defense, dismisses them and advocates for the confirmation of the contested resolution (p. 562/566).

IV.    It is stated for the record that the evidence provided by the requesting state to support the charges filed against V. is constituted by an extensive and detailed description of the facts, with precise references to the source of information (p. 121/162 and 383/389), the sworn statements of: R.H., Assistant Prosecutor in the Central District of C. (p. 113/118 and 279/281rev.); F.B.W. (p. 171/178 and 304rev./308), who is Special Agent (SA) of the Federal Bureau of Investigation (FBI); W.G., a person who was related to V. (p. 163/165 and 303/304) and S.H., closely related to V. and his activity (p. 355/359 and 364/372), as well as the occupation of 640 pounds of cocaine and a significant sum of money in dollars during the investigation.

G., a Uruguayan citizen residing in the U.S., explained that he met V. in 1985, being introduced by his brother-in-law H. and that future plans were discussed in relation to "money laundering", traveling in July 1985 to B., to search for clients for the money transaction, meeting at that time R.R., who agreed to use them in such transaction for what he obtained from cocaine in L.A.

He informed V. and H. of it, who contacted R. and said he was aware that because of this modality of moving and distributing the money they received commissions of 2% each, not him, who was eliminated from future deals.

They continued in that company and in April 1986 they bought Cambio I. (in U.), which corporate name is L.S.A., even when V's connection to the aforementioned business is not on record, but is a limited partner and principal responsible for financial transactions.

He reports how he continued to find out about the transactions that were made in C.I. for drug traffickers who wanted to hide their profits and the sources of the money, highlighting that gold bars were sent to the U.S., which would be bought with money from the drug, to show that the money was being used in a legitimate trade.

He mentions that the money was deposited in bank accounts in N.Y. controlled by those who intervened in the "laundering" of money and then wire transferred to accounts held by C.I. in banks of M., with V. and H. being the ones who supervised these accounts and made the transfers to the drug trafficker accounts in P. and C., with the understanding that tens of millions of dollars were laundered, receiving commissions ranging from 7% to 12%.

For his part, H., also a Uruguayan citizen residing in the U.S. and arrested for his participation in money laundering from drug trafficking, declares that he provided detailed information about the money laundering business to which V is dedicated, who he met in 1985.

He declares that in 1986 V. opened the C.I., and appointed him as vice president and R.P. as president, because V. did not want to appear in the documents, but upon V. offering him a job in the U.S. (gold industry), he traveled there; in July 1986 he went to L.A. when he was called by V. to work in a jewelry

business, but his task was to count money that was brought in boxes and that V. in L.A. had a gold refinery (making gold bars) and at the same time received from U. gold plated lead bars, which were weighed in U.S. Customs and the origin and weight were documented.

Then, V. proceeded to sell the real gold bars made in the refinery to the banks which believed, based on the documents, that they came from U.- and with the instructions received, such amounts ended up in C.I. accounts or other accounts abroad.

By indication of V., in January 1987, he moves to N.Y., he starts to work in an alleged business of purchase and sale of gold, referring to the operations involved, ending his business association with V. in June 1988, when escaping from the office in N.Y. upon the arrival of Police officers, a circumstance that made him abandon a significant amount of money.

H., after mentioning the functions that he has performed and performs, refers to the prosecutions that have been decreed against V., the charges against him and numerous co-defendants who worked for people based in C. and other places and the way they operated (introduction of large quantities of cocaine to the U.S., arrangements for its distribution, collection of the proceeds from sales in L.A. and N.Y., how V. supervised transfers by telegraph or cable to U. and final destination to traffickers).

V. used the C.I. for the benefit of the traffickers for whom he worked, being a means to disguise the true origin of the large sums of money transferred to them from the U.S. (fictitious sales of gold sales, which was exchanged for money that had been paid by the distributors of cocaine).

Through U.S. bank records, it became clear that hundreds of million dollars were transferred through other financial institutions to accounts that included the Uruguayan C.I. or L.S.A., to be later sent to P., C. and other places.

W., who personally participated in the investigation with a specialized group of officials and representatives of state and local bodies, declares that he reviewed the business, bank records, electronic surveillance tapes (oral and telephone wire interception, authorized by the courts), public record of corporations, reports provided to him by other FBI agents and the outcome of the surveillance and follow-up of people, etc. which allows him to justify that the transfers made to P. and U. responded to illicit sales of narcotics in the U.S., V. and other persons under investigation being devoted to the laundering of funds produced by illegal trafficking (also refers to confidential information, seizure of a large amount of money and a large amount of cocaine from suspicious people).

According to such testimonies, thorough description of the facts attributed to V. and other co-defendants, detailed description of the accounts of companies that would be linked to the drug trafficking (belonging to the same group of people) in terms of the amounts deposited, source of the remittances, date, account holders, etc. as well as the aforementioned seizures, it can be concluded in a primary assessment that there was a set of maneuvers aimed at "hiding the nature, source, location and ownership of funds" produced by cocaine illegally introduced into the U.S.

V.    That the intervening Judge maintained the decision and granted the appeal (p. 567 and rev.).

Once the proceedings were received, there was a judgment summons, which, after being admitted to examination, was legally agreed (p. 570 et seq.).

Whereas:

I.    That, even if any doubt could be raised as to whether the final decision, which terminates a jurisdictional extradition procedure is a final or interlocutory judgment, for the purposes of the recurrence, the filing made by the Defense cannot be grounds for any invalidation whatsoever.

It is peacefully accepted that the appeal is not harmed by its erroneous presentation, since the Law addresses the main issue and manifestation of will, made within the legal term, to appeal the judgment and not the secondary one, as it is also clear from the provisions of Article 658 section 2 of the Code of Civil Procedure.

JA220

Therefore, the appeal that legally opened this instance must be considered to be well granted.

II.    That, having determined the admissibility of the appeal, it is appropriate to include in the study the numerous objections raised by the Defense and for which, the decision to deliver R.V. in no way can succeed.

Many of the arguments put forward had already been raised in opposition to the request of the U.S. (p. 232/240) and dismissed with good grounds, both by the Public Prosecutor's Office (p. 243/254), and by the "a quo" Judge, which the Chamber, in general, shares.

The Court is going to confirm the sentence under appeal for what it will state below.

III.    The extradition, as specified by the illustrious criminal attorney Jiménez de Asúa, "consists of the delivery that one State makes to another State of an accused or convicted person, who is in its territory, so that in that country he/she can be prosecuted criminally or the penalty can be executed" ("Criminal Law Treaty", Volume II, p. 771).

It is a legal concept that enables collaboration between the States in criminal matters, allowing, according to Bettiol, the moderation of the consequences that necessarily derive from the acceptance of the criterion of territoriality "and with which the question of the effectiveness of criminal law in space is related. If such a matter were regulated on the basis of universal criteria, it would not be necessary to create a means by which States collaborate with each other in the fight against crime" (G. Bettiol: "Criminal Law", General Part, p. 135).

And, it is with that spirit of necessary collaboration between the states, that Bettiol underlines, that the Treaty was signed, which interpretation occupies the attention of the Court venue, upon establishing in its prologue: "the O. R. of U. and the U.S., desiring to make cooperation between the two countries in the repression of crime more effective, agree...".

That is why the prestigious case law and academic legal opinion cited by the Judge of First Instance (p. 383) is fully received, determining the criterion that must guide the interpreter of this type of treaties.

Extradition treaties, "must be interpreted in the manner that favors the purpose for which they were agreed", because they have their legal basis in the natural laws of civil societies and their provisions, "in relation to the spirit that informs them, of common protection of society" must be broadly interpreted, because they are the most in accordance "with the general interest that is to ensure the course of justice in the most complete way possible..." (Conf. "The Uruguayan Justice", V. XXI, case 3210).

This interpretation is in accordance with the position and spirit of international cooperation that Uruguay has always supported, as the First Degree Judge specifies.

Therefore, and because the treaties as well as the one invoked by the requesting country constitute the source of obligations assumed ("The Contracting Parties undertake the reciprocal delivery...", Art. 2 starts providing) and "the law between the parties, that is, between the states...", as "the contract is the law between private individuals", each state has a duty "to conform to the provisions of the Treaty and, against them, no internal rules can be invoked" (the concepts transcribed in quotation marks were taken from judgment No. 344/1987, issued by the Supreme Court of Justice; see "L.J.U.", Volume XCVIII, case 11221).

In the same sense, what Jiménez de Asúa points out is very illustrative, when stating that the internal laws that coexist with the international treaties that "discipline the activity of the bodies of the State in order of extradition" and even though they are conceptually different, there being between the two relations of indeclinable integration -without being able to talk about hierarchies, both the Criminal Code, and the remaining substantive criminal laws "lose their privileged rank as a rule of direct application when it comes to prosecuting offenders delivered by a foreign State under an International Convention, because in this case, the fundamental law is the Extradition Convention, to which the remaining criminal laws must be subordinated"; and, the aforementioned treatise writer concludes by stating that "if an International Executive Convention regulates a certain matter, that's the one that applies, even if it contradicts internal law in the matter..." (cited Treaty, V. II,

p. 787 and 788).

IV.    That, having made the foregoing and brief general considerations, the Chamber will give the reasons why it dismisses the severe criticism of the decision under appeal, as well as the arguments on which the challenge is based.

In view of what may be classified as failure to comply with certain formal order requirements in the extradition request (not having attached texts that establish "the rules that regulate the statute of limitations..." irregular and incomplete translation of the documentation and lack of legalization), "brevitatis causae" the Court refers to what the Public Prosecutor's Office (last opinion on p. 563rev.) and the Judge (Recital IV) clearly stated.

Without prejudice to this, it points out that the texts on statute of limitations can be consulted on p. 161 and 372 (Section 3282 of the U.S. Code), resulting therefrom that no one can be prosecuted for any crime punishable with a capital penalty "unless the prosecution is issued or formal accusation is established by the prosecutor within the term of five years from the commission of said crime", so by virtue of the documentation that accompanies the request, it is clear that the statute of limitations has not been applied (the crimes would have been perpetrated by V. between 1986 and February 1989).

The translation of the documents, "into the language of the Requested State", was a requirement satisfied with the submission of the request, even if it had subsequently been supplemented with the translation of some texts and the corresponding legalization, as the Intervening Judge ordered, the conclusion cannot vary (p. 296/311), as the request is pursuant to the Treaty.

Consequently, it should be understood that the requirements of the Treaty (Art. 10) have been complied with and that the objections on such points are irrelevant, points in which the rejection of the claim for extradition is also pursued; jurisprudence of great significance has decided that the defects or vices in form, which may affect a request for extradition, can be repaired; and, once overcome, it cannot find any more obstacles on such aspect (Cf. "Uruguayan Justice", V. LXVII, case No. 7947).

As in the last consultation it is reiterated that the documents were not duly legalized, the Court will allow itself to transcribe a judicial decision that, it understands, it definitively resolves any discussion. It was argued: "When the documents are entered through diplomatic channels (proceedings situation), there is no material or legal reason to deny the due authenticity; otherwise, it would be a grievance to a country with which U. maintains diplomatic relations."

"The requirement of legalization cannot add any greater note of authenticity than those already included in the diplomatic introduction. This has been recognized by U. in the agreements of 1879, 1903, 1915 and 1917, the last three ratified by laws No. 3163 and 6189, entered into with B., A., P. and B., by which the letters rogatory transmitted by the diplomatic or consular authorities are exempt from legalization. In the Treaty with S. the documentation shall also be exempt from legalization when the diplomatic channel is used (Art. 9) (M. A. Vieira: "Extradition in our positive law", Mag. of the Fac. of Law, year XII, No. 3 and 4, p. 872 and 873)" (See: "Uruguayan Justice", V, LXI, c. 7334).

V.    As regards the violations of a constitutional and legal order invoked by the Defense, because the prosecution in absentia has been established, without hearing the inquired (requested) and without legal assistance, the Chamber first refers to what the Judge "a quo" states, for sharing his fundamentals (Recital VIII, p. 386rev./387rev.), but adds that this special procedure aims to verify compliance with the requirements established in the Treaty; it is not, instead, a judicial process to judge the requested, as the Supreme Court of Justice has pointed out in a recent pronouncement. already cited, upon saying that the legal concept of the extradition responds to principles of legal assistance and to reasons for collaboration within the international community. The requested Judge, in these cases, unlike what occurs exclusively in the domestic activity, does not condemn or acquit the accused, but is limited to appreciating the reasons for the request of the foreign magistrate and the documents that accompany it, and then grants or not the extradition; the delivery to the authorities of the other state ("extradite" comes, precisely, from the Latin "ex", out and "tradire", deliver)

(L.J.U., case 11221).

That the prior questioning of the investigated party, with professional assistance or the formal proof of his refusal to declare is an indispensable condition for prosecution in our law (Art. 126 of the C.C.P.), is not transferable to other legal systems, which organize their procedural system and individual guarantees according to their own social, cultural, economic peculiarities, etc. and their needs,

In an elaborate judicial decision, entirely transferable to the sub-case, it has been held that invoking that the requested has never declared before a judicial authority, is "a request of principle, since one cannot put as a condition what the object of the extradition process precisely is. And the fact that this is a condition of the trial in our law, we cannot extend it to other legislations. What is required and is a requirement of the internal public order is that there are, in the requesting State, the guarantees of legal due process in the requesting State, but the specific characteristics or modalities assumed by this essential guarantee in each country are inherent to each legislation and one should not delve into it" ("L.J.U.", V, XCVI, case No. 10952).

But, in addition to the fact that the extradition procedure does not constitute a criminal trial (Cf. L.J.U. V. IV case 692), it has not been initiated in the requesting State either, since as specified in his affidavit H., according to U.S. federal law, "a verdict of prosecution by a grand jury does not mean that the accused has been found guilty of the crimes accused of. It means, on the other hand, that the grand jury has found that there is sufficient evidence for the defendant to be brought before the Court, to be prosecuted for the charges against him" (p. 114 and 280).

The inconsistency of the grievances, related to alleged violations of our constitutional and legal order, has been demonstrated by one of our Courts, quite a while ago (pronouncement of August 11, 1970). Substantially it was said: "The constitutional precept that prohibits criminal trial in absentia, lacks application in matters of extradition... The national Constitution only influences procedural internal law, so national laws must conform to those rules, and not to the legal concept of extradition, of international order ."

"Applying the constitutional rules that establish some bases to develop the process, such as the need for accusation of a party or the prosecuting attorney (Art. 22), or the prohibition of trial by commission (Art. 19), to the forced assistance of a defense attorney (Art. 16), relate to internal procedural law..., but not to internal law relating to extradition."

"It is not possible to speak, as an essential requirement to recognize the effects of the foreign conviction, of the reliability with the validities of our public order, since this would lead to constructing foreign procedural norms that coincide in many aspects with ours, or to make it difficult to comply with international treaties and hinder their collaboration, having to recognize, on the contrary, that each State, according to its traditions and social legal peculiarities, organizes the criminal process differently".

"In reality, the valid requirements of procedural order for the processing of extradition requests are contained in the Treaties and refer, in general, to the existence of a developed legal process or a legal judgment, in accordance with local rules, as it could not be otherwise, which complies, on the other hand, with the generic and essential requirement of the Constitution (Art. 12) on "legal process and judgment (due process)."

"Even if there was a specific provision in domestic common law, prohibiting the extradition of the accused in absentia that does not exist in any way whatsoever, it could not prevail over the provisions of the Treaty, which constitutes, at the same time, the norm of international law and domestic law (by legislative approval) and which, as such, due to its international substance emanating from a convention and as a special norm, it cannot be invalidated by a lower-ranking, unilateral and, in addition, general one."

"The constitutional precept that prohibits the criminal trial in absentia is aimed at protecting an individual's right in our country, not in any other State; therefore, if in these this principle is not accepted or is rejected or violated, it has nothing to do with our institutional structure."

"If the intended unconstitutionality is accepted, our justice would rule with respect to the trial followed abroad against a certain individual, not based on the applicability of the law of the requesting State,

JA223

but of the rules that regulate the criminal procedure in our own State." ("Uruguayan Justice", V. LXI, case 7334)

With this, the application that the American Convention on Human Rights invoked by the Defense may have in an extradition procedure is also defined, since it has the same hierarchy as the law, for the legislative approval.

It is therefore appropriate to dismiss the grievances in the aspects analyzed.

VI.    As the applicable Treaty is affiliated with the Anglo–American extradition system, the requesting State must submit "sufficient evidence" to establish "prima facie" that the "requested person has committed the crime for which the extradition is raised", because otherwise ("if an examination on the case shows that the arrest warrant is manifestly unfounded"), the requested State will deny the delivery (Art. 10 section number 3 in fine).

What is established, requires adopting some criteria to assess the evidence provided and within the conventional regulatory framework, without the legal categories or procedural system of any of the parties prevailing, as already pointed out; in other words, if the Treaty does not define an expression or concept to determine its scope, one must not go to the regulatory system of one or another State since this means finding an "extra ordine" and not an "in ordine" solution, unacceptable and contrary to the principle of equality that must govern relations between sovereign states (Cf. Q. Alfonsín: "Theory of Private International Law", p. 390 and 404/406).

In order not to deprive the international law standard of its specialty, the solution must be found through the investigation of common will of the parties, within the normative context and adhering to the purpose of the legal concept.

The assessment of the evidence cannot be made, for what was indicated above, following the laws and assessment system of the requested State, as proposed by the Defense.

The requirement of the Treaty in this respect is not of significance; it can be said that it is of extreme relativity, because if on the one hand, in the same article, "sufficient evidence" is claimed, but with the addition of "prima facie" that moderates the requirement, from another perspective, the evidentiary requirement becomes less, since rejection is imposed when it is "manifestly insufficient".

In light of this, taking into account some clarifications made on the interpretation of the treaties and the precautionary function of the extradition legal concept, the evidentiary requirement of the Treaty to the maximum extent that it can be assigned is found, linked to or approximates the concept of likelihood ("fumus bonis juris"), that is, probability or likelihood of the alleged facts or claimed rights.

The content of the evidentiary requirement, naturally, for the aforementioned, cannot be assimilated to terms applicable in the domestic order ("partial evidence" or "sufficient evidential elements", Articles 15 of the Constitution and 125 of the C.P.C.), not only because it is not a matter of establishing the condition or the conditions to try the requested person, but also because the warrant comes from a country with an adversarial procedural system that is different to the one prevailing in Uruguay.

The evidence to be examined is that incorporated into the proceedings in accordance with the provisions of the Treaty accompanied by the request or added subsequently, at the request of the requested state or voluntary by the requesting state, for not considering admissible the restrictive interpretation of the Defense that impairs a right, power or prerogative of the requesting person, such as that of submitting "additional information" or complementary evidence, without any express prohibition in the international bilateral agreement.

Although the requested State is empowered to request the submission of "sufficient evidence" or other "proof or additional information" (Art. 10 section number 3 in fine and Art. 12), the attitude of the requesting state in no way contravenes the provisions of the Treaty when submitting, without being requested, additional information, which is otherwise established in the spirit of international cooperation with which it

JA224

was signed and ratified.

In accordance with the directives or guidelines referred to above and which must guide the interpreter in the assessment of the evidence already mentioned, the Court considers that it is sufficient to establish "prima facie" that R.S.V. has incurred in the crimes for which he is accused and claims to be tried (in no way are they "manifestly unfounded").

The sworn statements come from persons authorized to depose on the facts accused of having received them, intervened in them or having information on the way they occurred, which motivate their knowledge in a way that comes out as truthful and that they have appeared to declare voluntarily and without any kind of coercion.

The strength of conviction of such testimonies increases, the elements of judgement handled in the tidy articulation of the charges against V. and another important number of subjects, who were also prosecuted for the same or similar crimes, with several of which or their companies, he admits to having been linked (p. 191/198), as well as other corroborating circumstances indicated (seizures of those suspected of business activities with drug traffickers, in the same investigation and linked to V.).

G. reveals in his testimony, multiple details of the life and business of V., which can only be known in a relationship of a certain permanence and not by two accidental and very distant encounters in time, as W. declares (p. 187 and rev.), who on the other hand begins by declaring - in the presence of his Defense Attorney, that he is a capitalist partner in the C.I. and is "about to keep 75% thereof", which to some extent and in a relevant aspect, confirms the statements of G. (p. 11 and rev.).

H., on the other hand, maintained an extensive and close relationship with the requested person, an aspect that he does not undermine, but rather corroborates (p. 189 et seq.) and appears knowing, in detail, the activity carried out by V. both in the U.S. and in U. the latter through the C.I. , under whose orders he worked in L.A. (which V. accepts) and in N.Y. (which V. does not accept, since he says that in said city he was associated with people of Hebrew nationality, to refine gold).

H's statement is that of a senior official, who was in direct contact with all the information on which the charges against V. are based, which he verified in the records mentioned.

W., in turn, bases his statements by the direct intervention he had in the investigation and in the verification performed of the reports of a different nature and records of companies and banks of the U.S.

The requested V., who denies any relationship with people prosecuted for drug trafficking and finds no explanation for the allegations (p. 13) and announces that he will "get to the end" (p. 13), does not acquiesce, however, to be extradited (p. 187rev.), but disqualifies witness G. when he became aware that he was accused by the witness of being in contact with the drug traffickers to hide his profits, considering him a "blackmailer"; "delirious" and "drug addict" (p. 187 and 187rev.).

The value of G's testimony is important for this procedure and the reasons alleged to reduce its force of conviction is of little significance; this, of course, is without prejudice to the fact that such grounds for disqualification are deduced and proven, in the place where V. is requested to be tried and in accordance with the rules prevailing in such jurisdiction.

That even when the Treaty does not admit an evidentiary instance or counter-evidence, on the evidence provided by the requesting State, the Chamber points out that in the case against G. for concealment, a psychiatric report not an expert report has been added that was made urgently (the day after receipt of the file) and with lack of data (thorough social investigation). in which it is estimated, "for the type of crimes in which he has been involved, he shows character disorders with mythomaniacal features" and for the same precedents, "he demonstrates a specific vulnerability for these types of crimes that involve planning a scheme to deceive or harm third parties (p. 469 and rev.; photocopy of the aforementioned file, added by the Defense upon appealing).

Given the circumstances in which the report occurred that the same informant acknowledges and the

time elapsed, in no way can such testimony be waived, since for now, the witness's faith cannot be considered diminished or destroyed.

The sworn statement of S.H., which, once received, was added to the proceedings notifying by note what was provided in this regard, strengthens the evidence of the incriminations that motivate the request for delivery.

The circumstances alleged by the Defense, so that it does not consider the testimony of H. who requests its rejection "in limine", are not received.

It was not alleged that what H. declared was false nor was any fact, reason or circumstance invoked aimed at invalidating or reducing the veracity of what was reported by the qualified witness, which enable finding another sense to the opposition to the Defense, beyond the formal deficiency invoked.

The principles applicable in all judicial proceedings related to the production and addition of evidence, which are intended to extend to the extradition procedure, should be contemplated if the requested was being criminally judged; the latter, as said, is not what happens in the sub-case, where it is only decided on the delivery to the requesting country and to be subject to trial for those allegations that are deemed appropriate to the provisions of the Treaty.

Consequently, and given the foregoing on voluntary addition by the requesting State, it is not appropriate to exclude the testimony of H.

That while the testimony of H. is important, that of F.B.W. is no less significant, due to the task carried out in the investigation of people, movement of bank accounts and companies, etc., that unveiled an intricate set of operations, which had the ultimate purpose of providing to the traffickers the proceeds of cocaine, illegally introduced and marketed in the U.S., without being detected by the authorities.

The Defense requests the rejection of the evidence, because it would have been obtained "by means of telephone interceptions and videos recorded clandestinely, with respect to persons who, based on such elements for prosecution, are prosecuted "in absentia" (for considering it illegal), without mentioning that it was W. who refers in his sworn statement to such means of information.

It is appropriate to make some clarifications, as regards the abovementioned statements, like the following: a) all the evidence is classed as illicit, for the circumstances referred to, that obviously cannot reach testimonies or sworn statements, related in their substantial aspects and analyzed; b) the seizures of cocaine and money, performed in the course of procedures cannot also be reached by the alleged grounds for disqualification; c) the verifications made on the accounts of the banks that corresponded to remittances and transfers of certain companies, belonging to the same group of people, also cannot be considered incompetent or illicit; d) the false invoices, which were prepared -by the accused, among them V.- for the sale of large amounts of gold to fictitious individuals who allegedly paid for it with money, to hide the true source of the funds (repeatedly mentioned in all the information), are means of proof, beyond the qualification made by the Defense; e) there is no distinction, although the difference can be very relative, between information channel and means of evidence and f) W. refers to in his statement, to various information channels including those that the Defense qualifies as illegal or prohibited and to means of proof.

In accordance with the preceding points, it is noted that what would have to be discarded if the criterion of the Defense were to be followed is relatively scarce and it is not of greater significance, the remaining evidentiary material incorporated into this extradition procedure being sufficient in order to easily consider as verified and in the degree required in the Treaty, the charges made against R.S.V. (probability or likelihood of the facts alleged

).

JA226

Document

JA227



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Exhibit U**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Jacqueline Yorke

Sworn to before me this
April 15, 2022

Signature, Notary Public

WENDY POON
STATE
OF NEW YORK
NOTARY PUBLIC
Qualified in
Queens County
01PO6356754
MY COMMISSION EXPIRES 04-03-2025

Stamp, Notary Public

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **CRIMINAL NO.: 16-CR-065** |
| | ) |
| **GERARDO GONZALEZ-VALENCIA,** | ) |
| **also known as "Lalo," "Flaco,"** | ) |
| **"Silver," "Silverio," "Eduardo," and** | ) |
| **"Laline,"** | ) |
| | ) |
| **Defendant.** | ) |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

The United States respectfully submits this Opposition to Defendant Gerardo Gonzalez Valencia's Motion to Dismiss [Dkt. No.97] ("Motion" or "Mot.").  The Defendant alleges that the Government "knowingly or, with willful ignorance, violated the constitutional rights of [the Defendant], a U.S. citizen, by unlawfully seizing, detaining for years, and extraditing him from Uruguay without probable cause," and asks the Court to exercise its supervisory powers to dismiss the Indictment.  Mot. at 1.  The Defendant's Motion is unsupported by the facts and unfounded in law.  The Motion should be denied.

A grand jury in the District of Columbia returned an indictment, finding probable cause to believe the Defendant committed the crimes charged, and a magistrate judge in this District issued an arrest warrant based on the indictment.  The Government submitted an extradition request to Uruguay pursuant to a bilateral treaty between the United States and Uruguay, and three Uruguayan courts, including the Supreme Court of Justice in Uruguay, all found that the extradition request satisfied the requirements of the treaty and Uruguayan law and ordered the Defendant's extradition.

1

JA229

The Defendant now asks this Court to find, to the contrary, that the Uruguayan courts improperly granted the U.S. extradition request because the extradition request was not supported by probable cause and, therefore, moves to dismiss the indictment.  In the alternative, the Defendant again makes unfounded allegations of the Government's "misconduct" during the extradition proceedings that, he argues, requires dismissal.  Finally, the Defendant argues that the Court should conduct an *in camera* review of the grand jury record, despite the fact that he has failed to show a particularized need for such a review of the grand jury materials.  For the reasons that follow, the Defendant's claims rest on a mischaracterization of the facts and procedural history of this case and a misunderstanding of the law.  The Defendant's Motion should be denied in its entirety.

## I.      BACKGROUND

On April 19, 2016, a federal grand jury sitting in the District of Columbia returned an indictment charging the Defendant with conspiracy to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, and five hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine, knowing and intending that such substances would be unlawfully imported into the United States from a place outside thereof, in violation of 21 U.S.C. §§ 959(a), 963, and 960 and 18 U.S.C. § 2.  *See* Dkt. No. 1 (the "Indictment").

Based on the charges, the United States District Court for the District of Columbia issued a warrant for the Defendant's arrest on April 19, 2016.  The Defendant was arrested on local money-laundering charges in Uruguay on April 21, 2016, and, following lengthy and contested extradition proceedings, was extradited from Uruguay to the District of Columbia on May 14, 2020.  The Defendant made his initial appearance and was arraigned on May 15, 2020.  The

Defendant remains detained pending trial, jointly with co-defendant and brother Jose Gonzalez-Valencia, currently scheduled to begin on September 12, 2022.

### A.  History of the Investigation

The Indictment in this case is the product of an extensive, long-term and ongoing investigation conducted by the Drug Enforcement Administration ("DEA") into the operations of two, interrelated large-scale drug-trafficking organizations ("DTOs") based in Jalisco, Mexico known as the Cartel de Jalisco Nueva Generacion ("CJNG"), headed by Nemesio Oseguera Cervantes, also known as "Mencho" ("Mencho"), and Los Cuinis Drug Trafficking Organization ("Los Cuinis"), of which the Defendant was a leader.  Co-defendant Jose Gonzalez-Valencia and other members of Defendant's family make up the core of Los Cuinis.  Los Cuinis and CJNG routinely operate together under a close alliance.  The close alliance between Los Cuinis and CJNG is further strengthened by familial ties between the criminal organizations:  Mencho, the leader of the CJNG, is married to Rosalinda Gonzalez Valencia, who is the sister of the Defendant and co-defendant Jose Gonzalez-Valencia.  Together, Los Cuinis and CJNG form one of the largest, most dangerous, and prolific drug cartels in the world.  They are responsible for trafficking ton quantities of illegal drugs into the United States and employing extreme violence to further that objective.

The Government intends to prove at trial that the Defendant was a high-ranking leader of Los Cuinis, whose drug trafficking activities spanned over a decade and extended from South America, through Mexico, and into the United States.  The ultimate objective of the conspiracy was to import illegal drugs, namely cocaine and methamphetamine, into the United States and repatriate drug proceeds to the Defendant and his associates in Mexico.  The Government's evidence at trial, which has been disclosed to the Defendant in discovery, will include lawfully intercepted communications from 2013 to 2014, including communications in which the

Defendant reveals his participation in drug trafficking activities; and testimony from law enforcement officers about the seizure of a cocaine shipment that the Defendant helped to organize and in which the Defendant invested.  Additionally, the Government will present testimony from numerous cooperating witnesses regarding the Defendant's drug and weapons trafficking activities and his involvement in acts of violence in furtherance of the drug trafficking conspiracy alleged in the indictment.

### B.   Extradition Proceedings in Uruguay

The Government submitted a request for the Defendant's extradition from Uruguay on June 1, 2016.  As required by the Treaty on Extradition and Cooperation on Penal Matters between the United States and Uruguay (dated April 6, 1973) (the "Treaty"), the extradition package included a statement of the facts of the case in the form of affidavits signed by a Department of Justice prosecutor and a DEA agent, as well as excerpts of the relevant statutes, the Indictment, the arrest warrant, and other supporting documentation of the Defendant's identity.  Mot. At Ex. A.  On August 28, 2017, the First Instance Special Criminal Court for Organized Crime 1st Rotation ("Special Criminal Court") ordered the extradition of the Defendant and issued a written opinion finding that "the extradition request of Gerardo Gonzalez Valencia has met the requirements of the Treaty signed between Uruguay and the United States, as well as the legal principles governing extradition."  Mot. at Ex. I at 26.  The Defendant, represented by counsel, appealed the extradition pursuant to Uruguayan law, and on October 2, 2018, the Criminal Court of Appeals 4th Rotation ("Criminal Court of Appeals") affirmed the Special Criminal Court's extradition order.

After both the Special Criminal Court and the Criminal Court of Appeals had already ruled on the Defendant's extradition, the Special Criminal Court sent two official letters to the United States Embassy on November 20, 2018 and February 22, 2019.  However, these letters were

4

requesting information for use in the then ongoing money laundering case in Uruguay which was not related to the extradition proceeding. These letters requested "everything related to the evidence in your possession for the alleged crimes for which the extradition of Gerardo Gonzalez Valencia was requested, including the text of the alleged messages linking him to the offense of drug trafficking" for the case captioned "Gonzalez Valencia, Gerardo et al." with Uruguayan case number IUE 2-37467/2015. Mot. at Ex. D and E. The Uruguayan case number for the extradition proceedings before the Special Criminal Court was IUE 474-76/2016. Mot. at Ex. I at 1. Further, the Special Criminal Court, in its written opinion granting an extradition order references the separate Uruguayan charges pending before that court: "Gerardo Gonzalez Valencia has a criminal case open in our country … the party subject to the extradition request is subject to criminal proceedings before this Criminal Trial Court Specialized in Organized Crime of the First Rotation in proceedings IUE 2-37467/2016 [sic], charged with the commission of an offense of Money Laundering." *Id*. at 20. At the time these letters were submitted, the Department of Justice Office of International Affairs and the Department of State sought clarity from Uruguayan officials as to the purpose of these requests but did not receive an explanation.[1] Therefore, assuming incorrectly that the requests were related to the extradition matter, on July 16, 2019, the United States Embassy responded via Diplomatic Note affirming "that the extradition request provided to the Government of Uruguay on June 1, 2016 includes all requirements enumerated in Article 10 of the Treaty." Mot. at Ex. F at 7.

---

[1] Further confusing the matter, Uruguay never submitted a mutual legal assistance request for the information through the proper channels specified by treaty, according to the Office of International Affairs.

5

JA233

On February 11, 2020, the Supreme Court of Justice in Uruguay upheld the lower courts' decisions to extradite the Defendant and issued a lengthy written opinion dismissing the Defendant's grievances with regards to the extradition.  *See* Mot. at Ex. J.  In proceedings before both the Special Criminal Court and the Supreme Court of Justice, the Defendant raised the same objections to his extradition that he now raises in the instant Motion.  The Defendant argued that the affidavits submitted by the United States were defective, did not show evidence supporting a crime occurring within the statute of limitations, and that they did not contain sufficient evidence to demonstrate probable cause that the Defendant committed the offense for which extradition was requested, as required by the Treaty and due process.  *See* Mot. at Ex. I at 21 and Ex. J at 13, 17.

Both the Special Criminal Court and the Supreme Court of Justice addressed and dismissed these objections in written opinions.  *See* Mot. at Ex. I at 22-23 and Ex. J at 17-22.  After summarizing the Defendant's grievances, the Supreme Court of Justice rejected the Defendant's arguments and held that "[a] reading of the 1973 Treaty does not reveal a departure from the system that, as a rule, operates in our country in extradition matters, which is the so-called 'Belgian-Dutch system,' according to which only a formal analysis of the extradition request can be made, without requiring an analysis of the merits of the matter, or proof of the facts attributed to the party subject to the extradition request."  Mot. at Ex. J at 18-19 (citing seven previous Supreme Court of Justice judgments).  The Supreme Court of Justice further stated:

> Uruguayan case law, in relation to the production of evidence in extradition proceedings, is clear and uniform in the sense of maintaining that in the civil law system to which our legal system is affiliated, the admission of evidence aimed at disproving or verifying the facts stated in the extradition request is not admissible.  This means that in the extradition process it is not possible to judge the offense for which the defendant is requested, nor to carry out jurisdictional control over the consistency of the evidence on which the extradition request is based.

6

*Id.* at 19 (quoting Judgement No. 283/2000 of TAP 2nd R., published in LJU, Case No. 14,131, p. 430).

The Supreme Court of Justice went on to analyze the language in the Treaty upon which the Defendant based his grievance.  "In any case, as the [Uruguayan] Federal prosecutor correctly points out in his response to the appeal, the Treaty authorizes, but does not require, that the requesting State present sufficient evidence to establish, 'prima facie,'[2] that the person sought has committed the offense for which the extradition is being sought.  In effect, the request for evidence under Article 10 of the 1973 Treaty is a power granted to the Judge when using the verb 'may.'" *Id.* at 18.  The Supreme Court of Justice also found that "the appellant's argument that the criminal action is time-barred by the statute of limitations is groundless." *Id.* at 21.  The Supreme Court of Justice upheld the lower courts' decisions and granted the Government's request for extradition.

## II.    LEGAL STANDARD

The District of Columbia Circuit has held that U.S. courts have jurisdiction to review a foreign country's extradition decision, but that the review is "highly deferential." *United States v. Trabelsi*, 845 F. 3d 1181, 1186 (D.C. Cir. 2017).  "Where an individual has been extradited pursuant to a treaty, we defer to the extradition decision of the extraditing country.  In light of this deference, we presume, absent evidence to the contrary, that the extraditing nation has complied with its obligation under the treaty and that the extradition is lawful." *Id.*; s*ee also United States v. Casey*, 980 F.2d 1472, 1477 (D.C. Cir. 1992) ("[A]n American court must give great deference to the determination of the foreign court in an extradition proceeding.").

---

[2] The translation at Mot. at Ex. J at 18 translates this phrase as "prima facie."  The English language text of the same language in the Treaty, Mot. at Ex. S at Art. 10(3), uses the phrase "probable cause."

JA235

The Defendant acknowledges the *Trabelsi* opinion in his Motion, but mischaracterizes the D.C. Circuit's opinion in *United States v. Sensi*, 879 F. 2d 888 (1989), to argue that the Court should review Uruguay's decision to extradite *de novo*.  The D.C. Circuit in *Sensi* was not reviewing the foreign court's decision to extradite; the D.C. Circuit was addressing the rule of specialty and its application to Sensi's prosecution once he arrived in the United States.[3]  "What the doctrine of specialty requires is that the prosecution be 'based on the same facts as those set forth in the request for extradition.'"  *Sensi*, 879 F. 2d at 895 (quoting Restatement (Third) of Foreign Relations Law of the United States § 477, comment a).  This is why the D.C. Circuit in *Sensi* sought "to determine whether the evidence submitted with the Unites States' request for extradition sufficiently established the facts underlying Sensi's prosecution." *Id*. at 896.  The D.C. Circuit was not assessing whether the foreign court had probable cause to extradite the defendant; the D.C. Circuit was ensuring that the U.S. government had prosecuted Sensi for the same offenses for which the foreign government had extradited him.[4]

The Defendant is not arguing in his Motion that the Government is proceeding on a charge for which extradition was not requested, therefore, the *Sensi* case is inapposite.  *Trabelsi* is the governing case law in this Circuit and establishes a deferential standard of review with regards to reviewing a foreign country's extradition order.

---

[3] The D.C. Circuit also addressed the dual criminality principle as it relates to the rule of specialty, but the language that the Defendant relies on to argue for *de novo* review is drawn from the portion of the opinion discussing the rule of specialty.

[4] The rule of specialty, dual criminality, and probable cause are all entirely separate issues within extradition proceedings and are found in separate articles of the Treaty.  *See* Mot. at Ex. S, Art. 2 (dual criminality), Art. 10(3) (probable cause), and Art. 13 (rule of specialty).

III.     **THE EXTRADITION WAS PROPER**

The Court should deny the Defendant's Motion because the Treaty does not require Uruguay to find sufficient evidence of probable cause in order to extradite, and therefore Uruguay applied the correct legal standard in granting extradition.  Furthermore, the Defendant's due process rights were guaranteed by a grand jury in this District determining that there was probable cause to indict and a magistrate judge issuing a warrant based on that indictment.  A foreign court's probable cause determination—or lack thereof—therefore has no bearing on due process.  Even if a probable cause determination were required, the extradition request provided sufficient evidence. Finally, the relief requested by the Defendant is unprecedented and unwarranted.  The Defendant's allegations of Government misconduct are entirely baseless, and the Defendant has failed to meet his burden to demonstrate that there is particularized need for a review of the grand jury.

A.     *Uruguay Applied the Correct Legal Standard in Granting Extradition*

Under a plain reading of the language of the Treaty, the Government is not required to produce evidence to establish probable cause, and Uruguay is not required to assess the evidence to determine probable cause before ordering extradition.  Article 10 of the Treaty clearly lays out the requirements for extradition:

1.  The request for extradition shall be made through diplomatic channel.

2.  The request shall be accompanied by:
(a)  A statement of the facts of the case.
(b) The data necessary to prove the identity of the person whose extradition is sought…
(c) The text of the applicable laws…

3. When the request relates to a person who has not yet been convicted, it must be accompanied by a warrant of arrest issued by a judge or judicial officer of the requesting Party.

> The requested Party may require the requesting Party to produce evidence to establish probable cause that the person claimed has committed the offense for which extradition is requested. The requested Party may refuse the extradition request if an examination of the case in question shows that the warrant is manifestly ill-founded.

> *Id*.

When Article 10 is read in its entirety, it is clear that the provision of the Treaty related to probable cause is discretionary, not mandatory. *See S.C. Pub. Serv. Auth. v. F.E.R.C.*, 762 F.3d 41, 55 (D.C. Cir. 2014) (per curiam) ("In addressing issues of statutory interpretation, the court must begin with the text, turning as need be to the structure, purpose, and context of the statute."). The word "may" is typically interpreted as permissive rather than mandatory. *See, e.g., United States v. Rogers*, 461 U.S. 677, 706 (1983) ("The word 'may'... usually implies some degree of discretion."); *Vo v. Benov*, 447 F.3d 1235, 1246 n.13 (9th Cir. 2006) ("The use of 'may' language in a treaty indicates a provision constitutes a discretionary exception."). This is the same conclusion that was reached by the Supreme Court of Justice in Uruguay: "In effect, the request for evidence under Article 10 of the 1973 Treaty is a power granted to the Judge when using the verb 'may.'" Mot. at Ex. J at 18.

This interpretation of the probable cause provision is supported by the context and structure of the Treaty. Even within Article 10 itself, the Treaty uses the verbs "shall" or "must" to indicate the mandatory nature of other requirements for extradition. The juxtaposition of the term "may" with "shall" is a long-recognized basis for interpreting "may" as discretionary. *See, e.g., Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion. That connotation is particularly apt where, as here, 'may' is used in contraposition to the word 'shall.'"); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' in § 3621(e)(2)(B) contrasts with the legislators' use of a mandatory 'shall' in the very same

10

section."); *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) ("[W]hen the same Rule uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense—the one act being permissive, the other mandatory.").

Article 10(3) also states that the requested party (here, Uruguay) "may refuse the extradition request if an examination of the case in question shows that the warrant is manifestly ill-founded."  The Defendant argues that "[t]he Uruguayan courts' determination that the extradition request was 'not manifestly unfounded' does not satisfy the requirements of the Treaty."  Mot. at 38.  However, the Treaty, by its own terms—and using the same discretionary language that is used with regards to the probable cause provision—gives the requested party the authority to refuse an extradition request if the warrant is manifestly ill-founded.  The Defendant goes on to state that "'not manifestly unfounded' is not a standard of proof in American jurisprudence…."  *Id*.  That may be true, but it is clearly a permissible standard for reviewing an extradition request under the Treaty and the correct standard under Uruguayan law, based on the written opinions of the Uruguayan courts.  *See* Mot. at Ex. I and Ex. J.  This is significant because Article 9 of the Treaty clearly states: "The determination that extradition should or should not be granted shall be made in accordance with this Treaty and the law of the requested Party.  The person whose extradition is sought shall have the right to use such remedies and recourses as are provided by the law of the requested Party."  Mot. at Ex. S at 7.  Therefore, in Article 10(3) the drafters of the bilateral Treaty provided two alternative and permissible legal standards—probable cause and manifestly unfounded—allowing the United States and Uruguay, respectively, to apply their respective legal standard when acting as the requested party.

In this case, Uruguay was the requested party, the Defendant availed himself of Uruguayan law in contesting the extradition in Uruguayan courts, and, therefore, the decision to extradite was

11

JA239

made in accordance with the Treaty and the laws of Uruguay.  The opinion of the Special Criminal

Court clearly outlines the requirements of the Treaty and the legal standard in Uruguay.   In

addressing the Defendant's objection that the affidavits are insufficient to support the extradition,

the Special Criminal Court wrote:

> It is then not appropriate to assess the evidence produced by the requesting
> State, but rather only to assess it to determine that the extradition request
> and the arrest warrant are not manifestly unfounded, in accordance with the
> provisions of Art. 10.3 of the Treaty…   In the opinion of the judge, the
> evidential elements referred to reaches the evidentiary standard required by
> the Treaty, and it cannot be concluded that the arrest warrant issued by the
> requesting State Court is clearly unfounded.  As the Supreme Court of
> Justice has expressed in recitals transferable to the case at hand, "beyond
> the outcome achieved in the process to be carried out in the requesting State,
> it is evident that the extradition request does not have, even remotely, the
> note of being manifestly unfounded, which the rule requires, since no
> element of judgment arises from the documentation presented that makes it
> assume that – in reality – the party subject to the request did not commit the
> offenses of which he is accused."

Mot. at Ex. I at 22-23 (quoting Judgment No. 145/2002).

The Defendant then appealed the extradition order twice, first to the Criminal Court of

Appeals and then to the Supreme Court of Justice, which issued a lengthy opinion, applying the

same legal standard, rejecting the same claims that the Defendant makes here, and ordering

extradition.  As detailed above in Section I.B, the Supreme Court of Justice explained in detail that

Uruguay follows the "Belgian-Dutch system" in extradition matters, under which "only a formal

analysis of the extradition request can be made, without requiring an analysis of the merits of the

matter, or proof of the facts attributed to the party subject to the extradition request."  Mot. at Ex.

J. at 18.  The Supreme Court of Justice held that "it is not possible to observe, from the examination

of the extradition request, that the arrest warrant issued by the authorities of the requesting State

is 'manifestly unfounded', and therefore there is no illegitimacy in the actions of the merit bodies in having granted the extradition in question." *Id.*

As part of his argument that Uruguay applied the wrong legal standard, the Defendant repeatedly alleges that the Government's delay in responding to requests for evidence, and the substance of its eventual response, demonstrates misconduct and that the Uruguayan courts were strong-armed into extraditing the Defendant by the United States by this alleged misconduct.[5] But the Special Criminal Court, and the intermediary Criminal Court of Appeals, both found the extradition request compliant with the Treaty obligations and issued orders to extradite before the requests for evidence were transmitted to the United States Embassy.  And, in any event, as explained above, those requests for evidence were related to the Uruguayan money laundering charges—not the extradition proceedings—and are therefore irrelevant to the extradition proceedings and, consequently, to the Defendant's Motion.  Mot. at Ex. D and E; *see also supra* at p.5.  Furthermore, the factual findings and legal conclusions of the opinions issued by both the Special Criminal Court and the Supreme Court of Justice make it clear that neither court was influenced in any way by the Government's response to these requests, and that additional evidence was not only unnecessary for the courts' considerations, but irrelevant under their legal standard.  *See* Mot. at Ex. J. at 19 ("[I]n the civil law system, to which our legal system is affiliated,

---

[5] *See* Mot. at 50 ("The Government effectively strong-armed Uruguay by submitting affidavits from self-described experts…."); Mot. at 3 ("[T]he Uruguayan court succumbed to the pressure of the Government and reviewed the Government's offering of proof only to make sure the charge was not 'manifestly unfounded.'"); Mot. at 10 ("Despite the Government's refusal to provide any additional evidence to support the charge as requested, Uruguay's highest judicial body deferred to the Government and entered a final judgment in favor of extradition…without analyzing the sufficiency of the evidence to support a probable cause determination.")

13

the admission of evidence aimed at disproving or verifying the facts stated in the extradition request is not admissible.").

As a corollary of this false aspersion that the Government engaged in misconduct and strong-armed Uruguay to extradite, the Defendant argues that the "Uruguayan court succumbed to the Government even though Uruguayan courts had previously recognized their obligation to assess the evidence to determine probable cause." Mot. at 39. However, the opinions of both the Special Criminal Court and the Supreme Court of Justice, Mot. at Ex. I and J, lay out a long history of Uruguayan case law, citing more than a dozen cases, all holding that Uruguay's system for extradition proceedings not only does not require a determination of probable cause, but "limits the powers of the requested State by preventing it from ruling upon the probability or plausibility of the alleged facts." Mot. at Ex. J at 19.[6] By contrast, the Defendant has cited two cases from the Uruguay Criminal Court of Appeals from 1990 and 1991 that on close reading also do not hold that Uruguayan courts are required to find probable cause in order to make an extradition determination.[7] Even without delving into the intricacies of Uruguayan law or the Belgian-Dutch system, the case law cited by the Uruguayan courts in this case demonstrates that the analysis they conducted was consistent with their rulings in a great number of other extradition proceedings.

---

[6] *See* Mot. at Ex. J at 18 and Ex. I at 18 for citations to previous Supreme Court of Justice cases cited by the Special Criminal Court and the Supreme Court of Justice.

[7] *See* Mot. at Ex. T at 31 ("Therefore, the lack of grounds for the United States' request cannot be referred to…it is associated with the jurisdictional analysis system and the formal requirements and the request cannot be rejected due to the lack of evidence (Dutch Belgian system)."); Mot. at Ex. U at 30 ("[The] Judge considers that the request for additional evidence only corresponds when the claim is manifestly unfounded…."). Furthermore, as the Defendant himself notes, "[i]n the Uruguayan legal system, decisions by Uruguayan courts do not constitute legal precedent." Mot. at 95.

14

Therefore, the Defendant's argument that the Uruguayan courts' determination was unprecedented or influenced by misconduct is clearly unfounded.

The Defendant has failed to rebut the presumption that "the extraditing nation has complied with its obligation under the treaty and that the extradition is lawful," therefore the Motion should be denied.  *Trabelsi*, 845 F. 3d at 1186.

> B.    *Case Law Does Not Require that the Requested Country Make a Probable Cause Determination*

The Defendant also argues that U.S. courts have found that extradition treaties in general, and this Treaty in particular, require the requesting party to demonstrate probable cause.  Mot. at 35-36 (citing *Caltagirone v. Grant*, 629 F.2d 739 (2d Cir. 1980); *United States v. Puentes*, 50 F. 3d 1567 (11th Cir. 1995); *United States v. Duarte*, No. 15-20540-CR, 2018 WL 310025, at *3 (S.D. Fla. Jan. 4, 2018)).  However, the cases upon which the Defendant relies involve issues that are inapplicable here.

First, *Caltagirone* is a case reviewing an extradition *from* the United States *to* a foreign country, under a different treaty, and the court therefore appropriately analyzed that treaty and U.S. law (as the United States was the requested party).  629 F.2d at 745 ("[W]e cannot suppose that the drafters intended that an official of the requesting state would make a final determination of the law of the requested party.  We proceed, therefore, to the application of United States standards for arrest and detention.").  The court in *Caltagirone* does not even address, much less hold, what is required when the requested party is a foreign country.

As to *Puentes* and *Duarte*, both of these cases—like *Sensi*—addressed claimed violations of the rule of specialty with respect to the government's prosecution, not the validity of the underlying foreign extradition orders or whether they were supported by probable cause.  Rather, in *Puentes* and *Duarte*, the courts reviewed the evidence presented to the foreign court in the U.S.

15

JA243

extradition request to determine whether the U.S. prosecution was consistent with the factual allegations set forth in the request for extradition. *See Puentes*, 50 F. 3d at 1576 ("Puentes argues that a foreign court may limit the quantum of proof used to secure a conviction in an American court. This court previously rejected that argument when it held that 'the doctrine of specialty does not purport to regulate the scope of proof admissible in the judicial forum of the requisitioning state.'… Additionally, we do not believe that the superseding indictment materially altered the substance of the offense for which Puentes has been extradited."). The Defendant is not arguing in his Motion that the Government is proceeding on a charge for which extradition was not requested; therefore, *Puentes* and *Duarte* are inapposite.

Accordingly, the Defendant fails to demonstrate that there is any requirement that the Uruguayan courts make an explicit factual probable cause determination.

> C.   *Defendant's Due Process Rights Are Guaranteed by a Grand Jury Finding of Probable Cause to Indict*

The Defendant next claims that his due process rights were violated because he was illegally detained without probable cause. *See, e.g.,* Mot. at 12. The Defendant claims that his "lengthy detention for nearly two years based solely on the Government's deficient Extradition Package is de facto prejudice warranting dismissal of the Indictment." Mot. at 44. This argument demonstrates a complete misunderstanding of due process as it relates to the Defendant's pretrial detention. It is the valid Indictment and arrest warrant, and not the extradition package, that brings the Defendant before this Court for trial. The Defendant's due process rights were upheld by a grand jury in this District determining that there was probable cause to charge the Defendant with a federal offense and returning the indictment and a magistrate judge issuing a warrant for his arrest based on that indictment and probable cause finding. *See* U.S. CONST. amend V ("No person

shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury…") and amend IV ("[N]o Warrants shall issue, but upon probable cause…").[8]

To the extent that the Defendant claims that the Government did not obtain an indictment supported by probable cause, such a claim is completely without merit.  First, the Defendant appears to assume, inaccurately, that the affidavits submitted in support of the U.S. extradition package, *see* Mot. at Ex. A, contain all of the evidence presented to the grand jury.  Neither of the affidavits, which were sworn to under oath by the prosecutor and agent, purport to include all of the evidence gathered during the investigation or presented to the grand jury.  Both affidavits state that the evidence against the Defendant includes "various types of evidence, including witness testimony, physical and documentary evidence, and other evidence."  Mot. at Ex. A at 19 and 41.  Furthermore, the prosecutor affidavit expressly states: "I have reviewed the affidavit of DEA Special Agent Kyle J. Mori *and the evidence in this case*.  I attest that the *evidence* indicates that Gonzalez-Valencia is guilty of the offense for which extradition is sought."  Mot. at Ex. A at 19 (emphasis added).  This attestation is intended to show that the prosecutor has reviewed all the underlying evidence in the case that was in her possession, and the prosecutor believes that there is sufficient evidence to prove the defendant's guilt.

---

[8] The Uruguayan Supreme Court of Justice, in its order authorizing the Defendant's extradition, also acknowledged that it is the U.S. legal system that guarantees the Defendant's due process rights.  *See* Mot. at Ex. J at 16.  ("The only requirement (and considered when ratifying the Treaty) is the existence in the requesting State, if applicable, of the guarantees of due process of law, but the specific characteristics or modalities that this guarantee assumes in each country is a matter for each State and cannot be interfered with."); and Ex. J at 18 ("Granting extradition in no way means that the extradited person will be sentenced, but only that he will be tried with all the guarantees of due process with all the assurances that this entails.") (quoting Judgment No. 283/2000 of TAP 2nd R., published in LJU, Case No. 14,131).

Furthermore, the Diplomatic Note, which the Defendant relies on to further his argument that his due process rights require a probable cause finding, reaffirms that "the extradition request provided to the Government of Uruguay on June 1, 2016 includes all requirements enumerated in Article 10 of the Treaty." Mot. at Ex. F at 7. The Diplomatic Note does not indicate that the extradition affidavits include all of the evidence gathered during the investigation or all of the evidence presented to the grand jury. Nor would the Department of State be privy to that information.

D.   <em>The Extradition Request Established Probable Cause</em>

Even assuming *arguendo* that the evidence outlined in the agent affidavit was the same evidence presented to the grand jury, the affidavit contains sufficient evidence for a reasonable person to find probable cause for the Indictment. The test for probable cause, is not reducible to "precise definition or quantification." *Florida v. Harris*, 568 U.S. 237, 763-64 (2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence … have no place in the [probable cause] decision." *Id*. at 243-44 (alteration to original) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). "All we have required is the kind of 'fair probability' on which 'reasonable and prudent [people] not legal technicians act.'" *Id*. at 244 (citing *Gates*, 462 U.S. at 238, 231). To establish probable cause, the evidence must be "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C. Cir. 1976).

The indictment is itself persuasive evidence that there is probable cause for the charges. As the government explained in the prosecutor affidavit, the grand jury independently viewed the evidence, determined that there was probable cause to believe that a crime had been committed

18

JA246

and that the Defendant committed the crime, and approved and filed an indictment.  Mot. at Ex. A at 15-16.

In the agent affidavit, Special Agent Mori describes four types of evidence that support the U.S. indictment and prosecution of the Defendant: (1) the testimony of CW-1, a co-conspirator and a "former leader of a Mexico-based DTO," who described the Defendant as "a significant drug trafficker"; (2) the testimony of CW-2, a co-conspirator, who worked directly with the Defendant and his family on numerous drug deals; (3) a United States Coast Guard seizure of approximately 280 kilograms of cocaine on August 20, 2007; and (4) intercepted communications, including but not limited to, a BlackBerry Messenger communication from June 26, 2013 in which the Defendant and a co-conspirator discussed the shipment of narcotics "up there," which is coded language for the United States.  Mot. at Ex. A at 40-46.  The testimony of the cooperating witnesses includes descriptions of repeated meetings from 2006 to 2009, during which they discussed cocaine and methamphetamine deals with the Defendant and his brothers, using multiple methods of transportation and various routes for moving the drugs and precursor chemicals from Colombia, Costa Rica, China, and Honduras to Mexico.  Mot. at Ex. A at 42-44.  The Defendant also told the cooperating witnesses on multiple occasions that he and his family-controlled drug transportation routes from Mexico to the United States.  *Id.*  The BlackBerry message described in the affidavit demonstrates that the overall drug trafficking conspiracy amongst the conspirators was still in operation in the summer of 2013.  Mot. at Ex. A at 44-45.[9]

---

[9] Contrary to the allegations of the Defendant, neither the affidavit nor any representations made by the Government indicate that this single BlackBerry communication was "the sole evidence adduced before the grand jury."  Mot. at 50.  However, the clear meaning of defense counsel's own purportedly "near verbatim" notes of the phone conversation they cite to support this proposition contradict the allegation:

The affidavit clearly demonstrates a longstanding conspiracy between the Defendant, other members of his family, and various other co-conspirators.  The conduct described in the affidavit demonstrates that the Defendant and his siblings ran an organization, and the primary goal was to reap the profits of selling drugs in the United States.  The affidavit further describes how the Defendant's organization moved drugs, including cocaine and methamphetamine, from locations in South America and Mexico to the United States.  This Circuit has held that a conspiracy can be proven where strong evidence establishes that a main player coordinates the narcotics importation and distribution enterprise, such as the enterprise described in the agent affidavit.  *See United States v. Tarantino*, 846 F.2d 1384, 1393-94 (D.C. Cir. 1988); *United States v. Childress*, 58 F.3d 693, 709-10.

Many pages of the Defendant's Motion are devoted to dissecting whether there was sufficient evidence of the particular drugs involved in the conspiracy during the statute of

---

[Ms. Sanchez:] But [the Government] need[s] to show that the conspiracy continued and GGV was part of it after 2009 -- removing the wire.
[Mr. Best:] You haven't given us any evidence on that point. To your point, if that is your understanding of the law we can tell you discovery to date doesn't give us any evidence that there is a continuation of the conspiracy past 2009-2010—even if with other people.
[Mr. Reynolds:] Some of that may come from witnesses. I don't think is going to be huge surprise that Cuinis and CJNG as organizations continued a broad drug conspiracy past 2009 and 2010.

Mot. at Ex. K at 3.  Nowhere did the Government's attorney, Mr. Reynolds, claim that the evidence of conduct that occurred within the statute of limitations period came from one, single BlackBerry message.  In fact, Ms. Sanchez begins this exchange by "removing the wire" from the discussion of evidence within the statute of limitations period.  The Defendant possesses, through discovery in this case, the entire Title III wiretap investigation, which contains thousands of messages between various members of the conspiracy from 2013 and 2014.  Furthermore, Mr. Reynolds says that some post-2009 evidence may come from witnesses, as the Cuinis—the DTO that the Defendant leads—continued to engage in a broad drug conspiracy after that date.  Finally, the parties were not discussing what evidence was presented to the grand jury in 2016 during the conversation, but what evidence may be introduced at a future trial.

20

limitations period.  *See e.g.* Mot. at 29-31.  But "[t]he law is well-established that '[c]onspiracy is a crime that presumes continuity until accomplishment or termination; once a defendant becomes a member of a conspiracy, he remains a member until he affirmatively withdraws or the conspiracy ends.'" *United States v. Apodaca*, 275 F. Supp. 3d 123, 134 (D.D.C. 2017) (quoting *United States v. Moore*, 651 F.3d 30, 90 (D.C. Cir. 2011)).  As a result, "once the government proves that a defendant was a member of an ongoing conspiracy, it has proven the defendant's continuous membership in that conspiracy unless and until the defendant withdraws." *Id.*

Thus, even if a probable cause determination was required, the evidence outlined in the extradition request is sufficient for a factfinder to reach a reasonable belief that the Defendant participated in a conspiracy to distribute cocaine and methamphetamine for importation into the United States and that the conspiracy continued into the statute of limitations period.

> E.    The Remedy Requested—Dismissal of the Indictment—is Unprecedented and Unwarranted

Generally, courts "will not engage in Monday-morning quarterbacking of a grand jury that has returned otherwise facially valid charges." *United States v. Quinn,* 401 F. Supp. 2d 80, 102 (D.D.C. 2005).  A technically sufficient indictment handed down by a grand jury "is enough to call for trial of the charge on the merits.'" *Costello v. United States*, 350 U.S. 359, 363 (1956).  As the District of Columbia Circuit has observed, courts should dismiss an indictment only in unusual circumstances, as dismissal "directly encroaches upon the fundamental role of the grand jury." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015) (citing *Whitehouse v. U.S. Dist. Ct. for Dist. of R.I.*, 53 F.3d 1349, 1360 (1st Cir. 1995)).  "[T]he mere suspicion that the grand jury may not have been properly instructed … is insufficient to establish that [the defendant is] entitled either to dismissal of the indictment or disclosure of grand jury materials." *United States*

21

*v. Singhal*, 876 F. Supp. 2d 82, 99 (D.D.C. 2012) (quoting *United States v. Trie*, 23 F. Supp. 2d 55, 62 (D.D.C. 1998)) (denying motion to dismiss indictment based on the defendant's speculation about the grand jury proceedings because the indictment was facially valid).

The Defendant implicitly acknowledges that dismissal would be extraordinary, conceding that the request for dismissal makes this a case of "first impression," Mot. 40, but nonetheless he invites the Court to invoke its "supervisory powers" to dismiss the grand jury's indictment anyway. But the case law the Defendant cites to support this extraordinary exercise of supervisory powers, none of which is precedential here, does not support his argument for dismissal.

The Ninth Circuit in *United States v. Matta-Ballesteros*, held that courts may dismiss an indictment under their supervisory powers: "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." 71 F.3d 754, 763 (9th Cir. 1995) (citing *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)); *see also United States v. Hasting*, 461 U.S. 499, 505 (1983). The Defendant argues that his "lengthy detention without a probable cause determination" was a violation of his constitutional right to due process and "was sufficiently severe to warrant dismissal of the indictment"—but the Defendant was never detained without a probable cause determination. Mot. at 44. As explained *supra* in Section III.C, a grand jury found probable cause to return the indictment charging the Defendant with a federal offense, and an arrest warrant was issued based on that Indictment.

The Defendant's case bears no resemblance to the cases that he cites in support of dismissal, where courts have ordered relief when a defendant or plaintiff was detained without a probable cause hearing. For example, in *United States v. Osunde*, the court dismissed the

22

JA250

indictment where the defendant was arrested and detained for 106 days before he was charged by complaint and brought before a magistrate for the first time since his arrest, and another 12 days elapsed before the defendant was indicted. 638 F. Supp. 171, 175-77 (N.D. Cal. 1986). In contrast, the Defendant in the instant case was indicted by a grand jury two days *before* his arrest on local charges in Uruguay, and 43 days before the United States submitted an extradition request to Uruguay.[10]  In even starker contrast to the Defendant, the plaintiff in *Meshal v. Higgenbotham*, was allegedly detained, interrogated, and tortured by and at the direction of U.S. government officials while traveling in Africa. 47 F. Supp. 3d 115, 116 (D.D.C. 2014). By the second sentence of the opinion in *Meshal*, it is clear that Meshal and the Defendant are not similarly situated: "After four months of mistreatment, Mr. Meshal was returned home to New Jersey. He was never charged with a crime." *Id*. Dismissal in *Osunde* and *Meshal*, therefore, remedied egregious misconduct by government officials in detaining (and worse) individuals without any indictment, charge, or criminal complaint. Here, there is no government misconduct to remedy, but there was a probable cause determination, indictment, and validly issued arrest warrant prior to detention.

Finally, the Defendant's argument that dismissal is required under the doctrine of international comity is unsupportable. Contrary to the Defendant's assertions, dismissing the Indictment will not "restore the delicate balance of international comity and the integrity of the Government in prospective requests from Uruguay and other sovereigns." Mot. at 3. Such a dismissal would have the opposite effect. It would instead subvert Uruguayan legal standards, in

---

[10] The Defendant was detained pending local money laundering charges in Uruguay from April 22, 2016 until June 27, 2018. Mot. at Ex. C at 3. He was detained administratively pending the extradition proceedings from June 27, 2018 until his extradition on May 14, 2020. *Id*. By the time the Defendant's pretrial detention on the Uruguayan money laundering charge terminated, the extradition proceeding was already on appeal before the Criminal Court of Appeals.

defiance of the terms of the bilateral Treaty, as explained *supra* in Section III.A, and would overturn the findings and orders of three Uruguayan courts.  Dismissal thus would not "show respect for a foreign country's legal system," Mot. at 57, and is in fact contrary to the doctrine of international comity.

## IV.  *IN CAMERA* REVIEW OF GRAND JURY RECORD IS NOT WARRANTED

The Defendant also claims that a "detailed showing" has been made that insufficient evidence of conduct within the statute of limitations period was presented to the grand jury and urges the Court to conduct *in camera* review of the grand jury record.  Mot. at 49.  But rather than presenting any evidence demonstrating a need for disclosure, or its relevance in the context of a motion to dismiss based on faulty extradition proceedings, the Defendant relies upon unsupported assertions.  To pierce grand jury secrecy, the burden rests with the Defendant and cannot be met with allegations alone.[11]  For the reasons that follow, the Defendant has proffered nothing beyond mere allegations and thus has not made the requisite showing for *in camera* review of the grand jury record.

Federal courts "consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.  In particular, we have noted several distinct interests served by safeguarding the confidentiality of grand jury proceedings."  *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424 (1983); *see also In re Grand Jury Testimony*, 832 F.2d 60, 62 (5th Cir. 1987) ("Federal courts long have recognized that secrecy is essential to

---

[11] In *Douglas Oil Co.*, the Supreme Court found "[t]he [district] court based its decision largely upon the unsupported assertions of counsel during oral argument before it, supplemented only by the criminal indictment returned by the grand jury, the civil complaints, and petitioners' response to a single interrogatory that appeared to be inconsistent with petitioners' nolo contendere plea in the criminal case."  441 U.S. at 229.

24

maintaining the integrity of the grand jury system.").  As such, "grand jury testimony is generally not discoverable on pretrial motion."  *United States v. Pelton*, 578 F.2d 701, 709 (8th Cir. 1978).

The Federal Rules of Criminal Procedure provide that a court may authorize disclosure of grand jury materials only in limited circumstances, including at the request of a defendant who "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  Given the importance of grand jury secrecy, federal courts have consistently construed Rule 6(e) to require a strong showing of "particularized need" for grand jury materials before any disclosure will be allowed.  *Sells Eng'g, Inc.*, 463 U.S. at 443*; Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 223-24 (1979) (citing *Procter & Gamble*, 356 U.S. 677, 682-83 (1958)) (requiring "particularized need" for the materials that outweighs the policy underlying grand jury secrecy); *In re Grand Jury Testimony*, 832 F.2d 60, 62 (5th Cir. 1987) (citations omitted) (noting the requirements of "particularity" and "compelling necessity").  To demonstrate a "particularized need," the defendant must show that: (1) the desired material will avoid a possible injustice; (2) the need for disclosure is greater than the need for continued secrecy; and (3) the request is structured to cover only material so needed.  *Douglas Oil Co.*, 441 U.S. at 222.

The Defendant has not met this burden for review or disclosure of any grand jury material in his Motion.  As discussed *supra* in Section III.C, the Defendant's argument that the Government failed to present sufficient evidence to the grand jury falls apart due to his misunderstanding of the purpose of the extradition affidavits and the language they contain.  The affidavits are simply a summary of the evidence, as required by Article 10 of the Treaty, and not the entirety of the evidence against the Defendant.  Mot. at Ex. S at 7 ("The request shall be accompanied by [a] statement of the facts of the case.").  Nor do the affidavits purport to be coextensive with the

25

evidence presented to the grand jury.  Nor do the government's purported statements to defense counsel by phone support Defendant's assumption that the single BlackBerry Messenger communication included in the extradition affidavit was the sole evidence from the statute of limitations period adduced before the grand jury.  *See supra* at n. 9.  The Government has never said that the single BlackBerry Messenger communication in question was the only evidence within the statute of limitations period presented to the grand jury.

The Defendant also argues that "[i]t can be presumed that the Government lacked sufficient evidence that [the Defendant] conspired to distribute methamphetamine and so it dropped the charge" and that "the government apparently assessed fundamental concerns relating to the strength of its evidence only after [the Defendant] had been extradited to the United States."  Mot. at 3.  In making these allegations, as he has in previous filings with the Court, the Defendant is distorting the Government's efforts to be transparent about its trial strategy during plea negotiations.[12]  *See* Dkt. No. 47 at 2 and 6; Dkt. No. 80 at 2; Dkt. No. 83 at 11.  Therefore, it bears repeating, that the Government's decision not to pursue the methamphetamine charge is in no way

---

[12] While communicating by letter and by phone about potential plea negotiations on September 15, 2021, the Government informed defense counsel in writing and verbally that, at that time, it did not intend to proceed on the methamphetamine aspect of the single count of the indictment, regardless of the Defendant's response to the plea offer.  The letter went on to state that "[a]lthough that is our current intention, however, we reserve the right to pursue the methamphetamine charge unless and until we voluntarily dismiss it."  Because the letter was exchanged in the course of Rule 11 plea communications, the Government is not attaching it as an exhibit.  The Government's preliminary decision about the methamphetamine charge was not contingent on the Defendant's response to the plea offer, so the quotation of it here does not reflect a communication otherwise protected by Fed. R. Crim. P. 11(f).  In the letter, the Government agreed to promptly notify defense counsel if it decided to pursue the methamphetamine charge at trial.  On November 19, 2021, after the Defendant's case was joined with that of his brother, Jose Gonzalez Valencia, the government notified the Court and the Defendant that it did not intend to pursue the methamphetamine portion of the charge at trial.

based on an assessment of sufficiency of the evidence presented to the grand jury.  It reflects a strategic decision regarding the case to be presented to the petit jury and is within the government's prosecutorial discretion.

Even assuming *arguendo* that the agent affidavit in the extradition package and the grand jury testimony were coextensive, which they are not, the agent affidavit contains sufficient evidence for a factfinder to reach a reasonable belief that the Defendant participated in a conspiracy to distribute cocaine and methamphetamine for importation into the United States and that the conspiracy continued into the statute of limitations period.  *See supra* Section III.D.

The Defendant has failed to meet his burden to demonstrate a "particularized" need to pierce the veil of the grand jury, *see Douglas Oil Co.*, 441 U.S. at 222, and thus *in camera* review of the grand jury transcript is not warranted.

## V.     CONCLUSION

For the foregoing reasons, the Defendant's extradition was proper under U.S. and Uruguayan law, was consistent with the requirements of the Treaty, and did not violate his due process rights.  Nor has the Defendant made the requisite showing to warrant *in camera* review of

27

JA255

the grand jury transcript.  The United States, therefore, respectfully requests that the Court deny

the Defendant's Motion in its entirety.


Respectfully submitted this 29th day of April, 2022.

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

By:     /s/

Kate Naseef, Trial Attorney
Kaitlin Sahni, Trial Attorney
Kirk Handrich, Trial Attorney
United States Department of Justice
Criminal Division
Narcotic and Dangerous Drug Section
145 N Street, Northeast
East Wing, Second Floor
Washington, D.C. 20530
(202) 514-0917

28

JA256

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via ECF to counsel of record for the

Defendant, this 29th day of April, 2022.


By:  _____/s/_____
Kate Naseef
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

JA257

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**JOSE GONZALEZ-VALENCIA &**<br>**GERARDO GONZALEZ-VALENCIA,**<br><br>Defendants. | **CRIMINAL NO. 16-CR-065**<br>**(BAH)** |

**DEFENDANT GERARDO GONZALEZ-VALENCIA'S REPLY IN FURTHER SUPPORT OF HIS MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR *IN CAMERA* REVIEW, AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES**

## TABLE OF CONTENTS

**Page**

I.      Legal Standard ...................................................................................................6

II.     Article 10 of the Treaty Requires Sufficient Proof to Support Probable Cause..............9

        A.      The United States' Interpretation of the Treaty.......................................9

        B.      Uruguay's Interpretation of the Treaty ......................................10

        C.      The United States and Uruguayan Governments' Interpretation and
                Application of the Treaty.......................................................12

        D.      Judicial Interpretation of the Treaty .................................................15

III.    Accepting the Interpretation that Probable Cause is Not Required Would
        Invalidate the Treaty.................................................................................17

IV.     No Probable Cause...............................................................................19

V.      Manifestly Ill-Founded............................................................................22

VI.     Dismissal is Appropriate.............................................................................22

VII.    Dismissal, Either Before or After *In Camera Review*, is Appropriate..........................26

        A.      There is a Particularized Need for *In Camera* Review of the Grand Jury
                Transcripts...............................................................................28

        B.      The Particularized Need Outweighs any Need to Maintain Secrecy of the
                Grand Jury...............................................................................30

        C.      An *In Camera* Review of the Grand Jury Transcripts is Appropriate...............31

VIII.   Conclusion...........................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Balzan v. United States*,
  702 F.3d 220 (5th Cir. 2012) .......................................................................... 10

*Berger v. United States*,
  285 U.S. 78 (1935) .................................................................................23, 25

*BG Grp., PLC v. Republic of Argentina*,
  572 U.S. 25 (2014) ......................................................................................... 17

*Brady v. Maryland*,
  373 U.S. 83 (1963) ....................................................................................27, 28

*Caltagirone v. Grant*,
  629 F.2d 739 (2d Cir. 1980) ........................................................................... 18

*Collins v. Loisel*,
  259 U.S. 309 (1922) .....................................................................................3, 10

*Coppedge v. United States*,
  311 F.2d 128 (D.C. Cir. 1962) ........................................................................ 26

*Davis v. Wakelee*,
  156 U.S. 680 (1895) ........................................................................................ 29

*Dennis v United States*,
  384 U.S. 855 (1966) ........................................................................................ 31

*Douglas Oil Co. v. Petrol Stops Northwest*,
  441 U.S. 211 (1979) ....................................................................................30, 31

*E. Airlines, Inc. v. Floyd*,
  499 U.S. 530 (1991) ........................................................................................ 17

*Elcock v. United States*,
  80 F. Supp. 2d 70 (E.D.N.Y. 2000) ............................................................... 18

*\*In re Extradition of Basso*,
  No. 06-21277-civ-Bandstra (S.D. Fla. Sept. 11, 2006) ..........................12, 13, 16

*In re Extradition of Kraiselburd*,
  786 F.2d 1395 (9th Cir. 1986) ........................................................................ 10

JA260

*Frederick v. New York City,*
    No. 11 CIV. 469 JPO, 2012 WL 4947806 (S.D.N.Y. Oct. 11, 2012)............................30, 31

*In re Gambino,*
    421 F. Supp. 2d 283 (D. Mass. 2006)................................................................ 10

*In the Matter of the Extradition of Roberto Guillermo Bravo,*
    No. 10-20559-MCDUBÉ (S.D. Fla., 2010)........................................................ 10

*United States v. Butler,*
    792 F.2d 1528 (11th Cir. 1986) ...................................................................... 21

*United States v. Ho,*
    No. 08-00337-JMS, 2009 WL 2591345 (D. Haw. Aug. 20, 2009)...................... 30

*United States v. Laughlin,*
    226 F. Supp. 112 (D.D.C. 1964) ..................................................................... 26

*United States v. Proctor & Gamble,*
    356 U.S. 677 (1958)..................................................................................... 31

*United States v. Puentes,*
    50 F.3d 1567 (11th Cir.) *cert. denied*, 116 S. Ct. 341 (1995)............................ 16

*United States v. Seher,*
    562 F.3d 1344 (11th Cir. 2009) ...................................................................... 21

*United States v Sells Eng'g, Inc.,*
    463 U.S. 418 (1983)..................................................................................... 28

*United States v. Sensi,*
    879 F.2d 888 (D.C. Cir. 1989).....................................................................6, 7

*United States v. Shabani,*
    513 U.S. 10 (1994).................................................................................... 21

*United States v. Sitzmann,*
    74 F. Supp. 3d 96 (D.D.C. 2014), *aff'd,* 893 F.3d 811 (D.C. Cir. 2018).........................21, 22

*United States v. Sumner,*
    No. CR 00-383-01 (CKK), 2022 WL 951374 (D.D.C. Mar. 30, 2022) ............................ 29

*United States v. Torres-Garcia,*
    No. CR.A.05 267 RMC, 2007 WL 1207204 (D.D.C. Apr. 24, 2007)................................ 7

*United States v. Trabelsi,*
    845 F.3d 1181 (D.C. Cir. 2017)....................................................................6, 7, 9

*United States v. Wolff,*
   840 F. Supp. 322 (M.D. Pa. 1993) ................................................................. 26

*Vila Garcia Sordo, Ruben,* IUE 573-460/2017 ....................................................... 16

*In re Zhenley Ye Gon*,
   768 F. Supp. 2d 69 (D.D.C. 2011) .................................................................. 7

## Statutes

18 U.S.C. § 3184 ................................................................................................... 14

21 U.S.C. § 846 ..................................................................................................... 21

*Restatement (Third) of Foreign Relations Law* § 115(3) (Am. Law Inst. 1987) ....... 18

## Other Authorities

Bruce Zagaris, *A U.S. Trial Court Denies Extradition Request on Murder
   Charges*, 27 No. 1 Int'l Enforcement L. Rep. 512 (2011) ................................ 10

Fed. R. Crim. P. 6(e)(3)(E)(i) ................................................................................ 26

Fed. R. Crim. P. 6(e)(3)(E)(ii) ........................................................................26, 28

Griffin B. Bell, An Address by the Hon. Griffin B. Bell, Att'y Gen. of the United
   States, Before Dep't of Just. Lawyers (Sept. 6, 1978) (transcript available at
   https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/09-06-
   1978b.pdf) ..................................................................................................... 22

Jeffery M. Olson, *Gauging an Adequate Probable Cause Standard for
   Provisional Arrest in Light of Parretti v. United States*, 48 Catholic Univ. L.
   Rev. 161 (1998) ............................................................................................ 17

Model Rules of Pro. Conduct R. 3.8(a) (Am. Bar Ass'n 2020) ............................... 23

Model Rules of Pro. Conduct R. 3.8, comment 1 (Am. Bar Ass'n 2020) ...........22, 23

Ricardo Perciballe López, *Estudios sobre el Codigo de Proceso Penal* (FCU 1st
   ed. 2017) ....................................................................................................... 11

*Sen. Rep. No. 93-19 (1973) ................................................................................... 9

Defendant Gerardo Gonzalez-Valencia respectfully submits this Reply in Further Support of his Motion to Dismiss, or in the Alternative, for *In Camera* Review prior to this Court's ruling on his Motion to Dismiss [Dkt. No. 97] ("Motion" or "Mot.").[1]   Mr. Gonzalez-Valencia was illegally extradited by Uruguay to the United States in violation of the terms of the bilateral Treaty. The Government caused this violation by:

1) submitting a statement of the facts of the case without any competent evidence within the limitations period, in violation of Section 2(a) and Section 3 of Article 10 of the Treaty;

2) submitting a false sworn statement that the evidence in the extradition package demonstrated not only probable cause but Mr. Gonzalez-Valencia's guilt, in violation of Section 2(a) and Section 3 of Article 10 of the Treaty;[2] and

3) submitting a false sworn statement that the statement of the facts of the case, by and through Agent Mori's extradition affidavit, did not present a limitations bar to the prosecution, in violation of Section 2(c) of Article 10 and Section 3 of Article 5 of the Treaty.[3]

The Government's Opposition [Dkt. No. 99] ("Opposition" or "Opp.") conclusively demonstrates the Government is attempting to win at any cost rather than seek justice.   The Government has failed to offer any grounded rebuttal for its failures and misrepresentations because none exists.   Instead, the Government says it did nothing wrong, that the Extradition Affidavit indeed supports probable cause, that the Treaty does not require proof of probable cause for a grant of extradition, and that Uruguay reasonably interpreted the obligations under the Treaty in granting extradition.   Incredibly, the Government states that because Mr. Gonzalez-Valencia was indicted, it cannot be held accountable for any violations of due process in securing his extradition.

---

[1] Mr. Gonzalez-Valencia hereby incorporates all arguments made and authorities relied on in the Motion, whether or not specifically mentioned.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[2] Mot. at Ex. A at 17–18 ¶ 23.

[3] *Id.* at 12, 15, 17–18 ¶¶ 4, 13, 23.

In practical terms, the Government concedes it did not provide the requisite evidence within the limitations period but, contrary to legislative history and long-established case law, states it was not necessary. (If it was not necessary, then why did the Government take the requisite steps in Jose Gonzalez-Valencia's extradition affidavit?)[4]   The Government submitted an Extradition Affidavit to Uruguay that contained no competent evidence within the limitations period relating to the charge.   The Government also submitted an affidavit from DOJ Trial Attorney Amanda Liskamm ("DOJ Attorney Liskamm") who, under oath, stated that she reviewed the Extradition Package and it established not only probable cause but Mr. Gonzalez-Valencia's guilt.   She also stated that she reviewed the Extradition Affidavit and that there was not a time-bar to the prosecution.  Both sworn statements were false.  Uruguay relied on these sworn statements in granting Mr. Gonzalez-Valencia's extradition.

The Government mirrors the Uruguayan courts' erroneous and flawed reasoning in stating that the Treaty does not require proof to support probable cause.  Both focus on the permissive language of "may" in Article 10 as controlling that the Requested Party is not required to conduct any assessment of the evidence.   The Government and the Uruguayan courts also ignored the legislative history showing that both sovereigns understood Article 10 of the Treaty to require that the statement of the facts of the case be sufficient to establish probable guilt.   The Uruguayan courts and the Government also ignored that Article 10 of the Treaty mandates that a statement of the facts of the case, along with the relevant statutes to demonstrate that the charge is not time-barred, be submitted with the extradition request and be admitted into evidence when properly authenticated.   The Government, itself, adopted this position in an earlier filing in another case. Per the Government's brief in a 2006 case, the Uruguayan courts were required under Article 10

---

[4] As discussed *infra* Section IV.

of the Treaty to (i) assess the submitted evidence to determine probable cause to believe Mr.

Gonzalez-Valencia had committed the crime charged and (ii) make a legal determination under

Articles 5 and 10 of the Treaty that the prosecution was not barred by the statute of limitations.

For the past forty-nine years since the 1973 enactment of the Treaty, the Government has

consistently interpreted the bilateral Treaty as requiring proof of probable cause where an arrest

warrant is issued for an individual who has yet to be convicted.[5]  In the present matter, the

Government submitted as the "statement of the facts of the case" Agent Mori's affidavit and an

affidavit from DOJ Attorney Liskamm believing proof of probable cause was required under the

Treaty.  Critically, the Government twice articulated its belief in writing to Uruguay that it was

required to submit proof to support probable cause with its request for Mr. Gonzalez-Valencia's

extradition.[6]

    The Uruguayan Supreme Court of Justice's decision granted extradition and, in so doing,

declared that the Treaty does not require proof to support probable cause.  The court conceded it

had not assessed the evidence or the law regarding the statute of limitations, except to determine

whether the charges were manifestly ill-founded.  The Uruguayan court further admitted that it

relied on the Government's representation that there was not a statute of limitations bar and did

not assess whether Mr. Gonzalez-Valencia had a valid limitations defense, as required under

Articles 5 and 10 of the Treaty.  Undersigned counsel performed an extensive search of published

judicial decisions by courts in both the United States and Uruguay relating to the Treaty.  For forty-

---

[5] For 100 years, bilateral U.S. extradition treaties have been interpreted as requiring evidence sufficient to, at a minimum, support a finding of probable cause that the individual is guilty of the charged pending in the requested state. *See Collins v. Loisel*, 259 U.S. 309, 316 (1922) (The U.S. Supreme Court has described this standard as requiring "competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.")

[6] First, DOJ Attorney Liskamm's affidavit, which stated that *the Extradition Package demonstrated not only probable cause, but Mr. Gonzalez-Valencia's "guilt"* and second in Diplomatic Note No. 273, which stated that the Government had "attached *all evidentiary documentation to*" its Extradition Package "*that establishes probable cause.*" Mot. at Exs. A at 17–18 ¶ 23, F at 2–3.

nine years since the enactment of the Treaty until the Uruguayan courts' decision here, both the United States and Uruguay have consistently held that evidence establishing probable cause is required to support an extradition request under the Treaty.

Either (i) the Uruguayan court's decision granting extradition without an appropriate assessment of the evidence and law is incorrect or (ii) there is no meeting of the minds as to the material terms of the Treaty, thereby rendering the Treaty invalid. Moreover, if the Uruguayan court is not shown to be wrong, then the Treaty is unconstitutional in its application. Under any theory, Mr. Gonzalez-Valencia was illegally extradited to the United States, either because of Uruguay's improper grant of extradition or because it was pursuant to an invalid Treaty.

We further submit in the alternative that, whether the Court reviews the sufficiency of the evidence under the appropriate standard requiring probable cause or through the contorted spectrum of whether the extradition request was manifestly unfounded, the result is the same—the Government failed to meet its burden under Article 10 of the Treaty because it offered no competent evidence within the limitations period and then misrepresented both the strength of the offering of proof and the application of U.S. law in a sworn affidavit which Uruguay relied upon in granting extradition. Indeed, since the filing of the Motion, undersigned counsel obtained a copy of Agent Mori's extradition affidavit for co-defendant Jose Gonzalez-Valencia. A comparative analysis clearly demonstrates that when he possessed relevant facts in a particular text communication, Agent Mori unequivocally gives his opinion as to the type of drugs being discussed. In the extradition affidavit for Jose Gonzalez-Valencia, Agent Mori purportedly had the requisite facts to give his opinion that the text exchange at issue within the limitations period involved cocaine. In Agent Mori's extradition affidavit for Gerardo Gonzalez-Valencia, he clearly did not. The Government now contends, contrary to established law, that this information is not

necessary since all that is necessary is that proof of a conspiracy be advanced.  Opp. at 21.  The comparative analysis again confirms that the Government failed to offer any competent evidence that Mr. Gonzalez-Valencia acted in furtherance of the conspiracy to distribute cocaine or methamphetamine within five years of the date of the indictment.  Since no competent evidence was offered within the limitations period, the Government failed to even demonstrate that evidence was sufficient to support the determination that the charge was not manifestly unfounded.

The Court is faced with determining the appropriate remedy where, in this case, Mr. Gonzalez-Valencia was illegally seized, detained for years, and extradited to the United States in violation of the Treaty.  We respectfully submit that dismissal is appropriate, for simply granting Mr. Gonzalez-Valencia's immediate release and safe passage from the United States does not adequately remedy the harm done to Mr. Gonzalez-Valencia.  Moreover, it offers no sanction for the Government's misconduct because the Government can simply push the reset button and begin anew with another extradition request.  The necessary question before this Court is whether the Government ever had any competent evidence within the limitations period that Mr. Gonzalez-Valencia engaged in a conspiracy to distribute cocaine or methamphetamine.

Furthermore, an *in camera* review of the limited portion of the grand jury record relating solely to those alleged acts by Mr. Gonzalez-Valencia within the limitations period, namely whether the Government presented any evidence of a conspiracy to distribute cocaine or methamphetamine during the limitations period, is appropriate to determine the reaches of the Government's misconduct surrounding this extradition request.[7]  This review will lead to one of two possible conclusions, either of which further supports dismissal of the Indictment.  Either the

---

[7] The comparative review of Jose Gonzalez-Valencia's extradition affidavit also provides further support for the Court conducting an *in camera* review to determine whether the Government, while before the grand jury, adduced any competent evidence within the limitations period.  *See infra* Section IV.

Government presented no competent evidence within the limitations period to the grand jury, or there is competent evidence within the limitations period and the Government's failure to provide this evidence to Uruguay was by design and not by mistake. Again, whether by mandate or through the Court's exercise of its supervisory powers, dismissal is appropriate.

## I.    **Legal Standard**

The Government concedes that this Court has jurisdiction to review the Uruguayan court's decision to extradite Mr. Gonzalez-Valencia. Opp. at 7. However, it argues that the Court should not review the sufficiency of the evidence *de novo*, as the court did in *United States v. Sensi*, 879 F.2d 888 (D.C. Cir. 1989), but rather should apply a more deferential standard pursuant to *United States v. Trabelsi*, 845 F.3d 1181 (D.C. Cir. 2017). Opp. at 7. This argument is largely misplaced insofar as Mr. Gonzalez-Valencia prevails under either standard. Nevertheless, the Government is wrong and the Court should conduct a *de novo* review.

In *Sensi*, the D.C. Circuit conducted a *de novo* review of "whether the evidence submitted with the United States' request for extradition ***sufficiently established the facts underlying Sensi's prosecution***." 879 F.2d at 896 (emphasis added). It reviewed the extradition materials and found that there was "***sufficient evidence*** to conclude that Sensi had committed theft and receipt of stolen property." *Id.* (emphasis added). The Government's effort to distinguish *Sensi* because it concerned the rule of specialty is a red herring. Whether for purposes of specialty or otherwise, the court conducted an independent review of the evidence supporting extradition before the foreign court. The Government has not cited any authority suggesting that *de novo* review of the sufficiency of evidence is limited to specialty cases. *See generally* Opp. at 8.

*Trabelsi*, by comparison, did not involve a review of the sufficiency of the evidence. Instead, the case involved a challenge to the Belgian court's *legal determination* regarding whether the charges in the U.S. indictment for which extradition was sought were the same as the

defendant's convictions in Belgium.  845 F.3d at 1183.  While it may be appropriate for a U.S. court to defer, absent contravening evidence, to a foreign court's legal determination, particularly when such determination implicates foreign law, that is irrelevant as to whether a U.S. court should conduct a *de novo* review of the sufficiency of the evidence supporting a defendant's extradition.

This application of *Sensi* and *Trabelsi* is consistent with general principles of international extradition.  It is well-established that when a foreign government such as Uruguay requests extradition of an individual detained in the United States, the court is required to conduct a *de novo* review to determine whether the evidence supporting extradition is sufficient to establish probable cause.  *See, e.g.*, *In re Zhenley Ye Gon*, 768 F. Supp. 2d 69, 72 (D.D.C. 2011) ("When presented with a complaint for extradition, by statute, a judge or magistrate judge must hold a hearing to consider the evidence of criminality presented by the requesting country and to determine whether it is 'sufficient to sustain the charge[s] under the provisions of the proper treaty or convention.'" (citing 18 U.S.C. § 3184)) (alternation in original).  The U.S. court issues an extradition order if the court determines, *inter alia*, that "there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought." *Id.* at 73.  It is therefore consistent with the bilateral nature of extradition treaties for the Court to conduct a *de novo* review with respect to the sufficiency of the evidence provided to a foreign government when the Government requests extradition to the United States.  *See, e.g.*, *United States v. Torres-Garcia*, No. CR.A.05 267 RMC, 2007 WL 1207204, at *3 (D.D.C. Apr. 24, 2007) ("[W]hen one government chooses to proceed via extradition, and invokes the treaty's provisions, the person sought shall not be delivered absent an adequate showing of evidence (e.g., probable cause).").

The Government's misconduct in this case underscores the need for *de novo* review.  In its Extradition Package, the Government submitted the deficient Extradition Affidavit, which would

not be found to support probable cause in any court in this country, yet nonetheless represented to Uruguay that "[t]he prosecution of the charge in this case is . . . not barred by the statute of limitations" and that the Extradition Package demonstrated Mr. Gonzalez-Valencia's **guilt**.[8] Uruguay is not expected to know that, under U.S. law, even for purposes of establishing probable cause, the BBM Exchange referenced in Agent Mori's Extradition Affidavit does not amount to competent evidence.   The Uruguayan Supreme Court of Justice expressly relied on these misrepresentations in ordering Mr. Gonzalez-Valencia's extradition, stating that "[i]t appears from the affidavit -in support of the extradition request- given by the Trial Attorney of the Narcotic and Dangerous Drug Section of the Criminal Division of the U.S. Department of Justice that . . . the statute of limitations does not prohibit criminal prosecution in this case."[9]   The Uruguayan courts (and foreign courts more generally), which are unfamiliar with U.S. law, rely on the Government to be truthful and forthcoming in its extradition requests, but here the Government misrepresented to Uruguay the strength of its evidence and the fact that the charge was not time-barred.   The Court cannot give deference to a foreign court's decision when that decision was procured through the Government's malfeasance.[10]

The Government effectively argues that it has *carte blanche* to make intentional misrepresentations to Uruguay regarding the sufficiency of the evidence against the accused, that Uruguay must blindly rely on the Government's representations regarding the sufficiency of the evidence because it does not need to determine probable cause, and that a defendant is left with no recourse in U.S. courts because they must blindly accept the foreign court's ruling.   That proposition is untenable and necessitates a *de novo* review.

---

[8] Mot. at Ex. A at 12, 15, 17–18 ¶¶ 4, 13, 23.

[9] Mot. at Ex. J at 18–19.

[10] As stated *infra*, since there was no offer of proof of competent evidence within the limitations period, the extradition warrant was indeed manifestly ill-founded.

8
JA270

In any event, even if *Trabelsi* was applicable, any presumption in favor of the Uruguayan court's determination has been rebutted here. *Trabelsi* provides that the presumption can be rebutted by, *inter alia*, (i) "misconduct on the part of the United States in procuring an extradition," (ii) "the absence of review of the extradition request by the requested party," or (iii) "a showing that the requested state or party did not apply the correct legal standard adopted in the [t]reaty." *Trabelsi*, 845 F.3d at 1189–90. All of these occurred here.

## II.   Article 10 of the Treaty Requires Sufficient Proof to Support Probable Cause.

The Treaty's legislative history makes it clear that the United States and Uruguay executed the Treaty with the understanding that Article 10 requires sufficient proof to support probable cause. Further, in the last forty-nine years, both countries have uniformly interpreted Article 10 of the Treaty as requiring the requesting party to submit proof sufficient to support probable cause and have acted accordingly in extradition requests. Finally, an exhaustive review of judicial actions taken by both countries surrounding extradition requests pursuant to the Treaty demonstrates that the courts in both the United States and Uruguay have, until this case, uniformly interpreted the Treaty to require the requesting party to submit proof sufficient to support probable cause.

### A.   The United States' Interpretation of the Treaty

On September 25, 1973, the United States Senate Committee on Foreign Relations conducted a hearing and, one day later, issued a published Report ratifying the Extradition Treaty executed on April 6, 1973 by and between the United States and Uruguay.[11] At the committee hearing, the Assistant Legal Adviser for Management and Consular Affairs for the United States testified and issued a written statement regarding the extradition treaties with Italy, Paraguay and

---

[11] Ex. V (Sen. Rep. No. 93-19 (1973)).

Uruguay.[12]   There were several paragraphs evidencing the legislative intent in this written statement:

> Each of these treaties follows closely the organization and content of the comprehensive treaties considered by the committee in the past few years, the most recent being the treaty with Argentina. . . . The procedural requirements for extradition are found in Articles 8 . . . through 16. These are similar to those in our other recent treaties.[13]

The Argentinian treaty, which the Treaty follows closely, and the other treaties addressed by this Report all require sufficient evidence to demonstrate probable cause.[14]  Moreover, in ratifying the Treaty, the Senate specifically addressed the standard of proof requirement in Article 10:

> Article 10 (for Paraguay and Uruguay) and Article XI (for Italy). *Requests for extradition* will be made through diplomatic channels and *must be accompanied by* a statement of facts, positive identification of the individual, texts of applicable law, an arrest warrant, ***and sufficient evidence to establish probable guilt.***[15]

The legislative history follows 100 years of Supreme Court precedent.  In *Collins v. Liosel,* 259 U.S. 309 (1922), the Supreme Court equated the "sufficient evidence standard" for extradition to that of a probable cause standard.[16]

## B.   Uruguay's Interpretation of the Treaty

The Uruguayan court in this case mistakenly applied the Dutch-Belgian or Continental System (the "Dutch-Belgian System"), rather than the Anglo-American System, to interpret the

---

[12] *Id.* at 6–8.

[13] *Id.* at 6.

[14] *See Balzan v. United States*, 702 F.3d 220, 223 (5th Cir. 2012) (considering extradition under U.S.-Argentina treaty and analyzing "whether there is any competent evidence tending to show probable cause"); *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1399 (9th Cir. 1986) (finding evidence at extradition hearing pursuant to U.S.-Argentina treaty supported finding of probable cause); Bruce Zagaris, *A U.S. Trial Court Denies Extradition Request on Murder Charges*, 27 No. 1 Int'l Enforcement L. Rep. 512 (2011) (finding that denial of extradition under U.S.-Argentina treaty in *In the Matter of the Extradition of Roberto Guillermo Bravo*, No. 10-20559-MCDUBÉ (S.D. Fla., 2010), "illustrate[d] the breadth of the requirement in the U.S. that the Requesting State show probable cause"); *In re Gambino*, 421 F. Supp. 2d 283, 315 (D. Mass. 2006) (citing S. Exec. Rep. No. 98-33, 98th Cong., 2nd Sess. (1984)) (stating art. X, § 3 of the U.S.-Italy treaty requires "sufficient documentation to demonstrate probable cause").

[15] Ex. V at 3 (emphasis added).

[16] *See Collins*, 259 U.S. at 315–16 (explaining that the magistrate's role is to determine the competency of the evidence to justify holding the accused and that the accused was allowed to present evidence on the issue of probable cause);

Treaty and erred in finding that the Treaty required only analysis of the formalities of the extradition request to determine whether extradition should be granted. The Government contends that the Uruguayan court relied on cases "holding that Uruguay's system for extradition proceedings . . . does not require a determination of probable cause," Opp. at 14, but *none of those underlying cases involved the Treaty, or any other treaty that requires application of the Anglo-American System*.[17] Instead, those cases applied the Dutch-Belgian System, rendering those cases inapposite to the construction of the Treaty. Had the Uruguayan court correctly applied the Anglo-American System, it would have been required to substantially examine the request and conclude that the evidence available did *not* establish probable cause that an offense had been committed, contrary to what the Government represented to Uruguay in Diplomatic Note 273.[18]

In Uruguay, there are two systems underpinning the interpretation of extradition treaties: (1) the Dutch-Belgian System[19] and (2) the Anglo-American System.[20] According to established Uruguayan case law and doctrine, the Treaty follows the so-called Anglo-American System. Under the Anglo-American System, the court in the requested state must carry out a formal *and substantial* analysis of an extradition request.[21] This substantial analysis allows the court to assess the incriminating evidence put forward by the requesting state to support the extradition request.[22] Perciballe López, a respected Uruguayan prosecutor and author, states that the Treaty is subject to the Anglo-American System:

---

[17] *See* Mot. at Ex. J at 5–6 (citing Judgment Nos. 216/2003 (Uruguay-Argentina treaty), 191/2005 (Uruguay-Paraguay treaty), 341/2006 (Uruguay-Chile treaty), 219/2007 (Uruguay-Paraguay treaty), 640/2012 (Uruguay-Argentina treaty), 769/2012 (Uruguay-Brazil treaty) and 125/2015 (Uruguay-Argentina treaty)).

[18] Diplomatic Note 273 states: "*[ . . . ] the Embassy of the United States attached all evidentiary documentation to this Diplomatic Note that establishes probable cause [ . . . ]*". Mot. at Ex. F at 2–3.

[19] Under the Dutch-Belgian System, the Requested Party need not consider the sufficiency of the evidence. Ex. W (Ricardo Perciballe López, *Estudios sobre el Codigo de Proceso Penal* (FCU 1st ed. 2017)) at 210.

[20] *Id.* at 209–10.

[21] *Id.* at 210.

[22] *Id.*

> In the Anglo-American System, the court being requested may and **should** carry out a formal and thorough monitoring of the request, since, in addition to analyzing if the request, in and of itself, complies with the formal requirements … it also has the power to verify if there is evidence regarding the culpability of the person whose extradition is being requested.

> This is very clearly shown in . . . **article 10.3 of the treaty with the United States**.[23]

As explained in the subsequent sections, Mr. López's position is clearly supported by other Uruguayan authority and jurisprudence.

### C.   The United States and Uruguayan Governments' Interpretation and Application of the Treaty

In 2006, Uruguay made a formal request to the United States for the extradition of Juan Peirano Basso.[24]  In that case, Uruguay acknowledged its obligation as the Requesting Party to submit a statement of the facts of the case with sufficient detail to establish probable cause in support of the extradition request.  Moreover, the United States Attorney's Office for the Southern District of Florida appeared before the United States District Court on behalf of Uruguay and filed a Memorandum of Law and Review of Evidence in Support of Extradition (the "Memo") specifically detailing the requirement of the Requesting Party to submit sufficient proof for a probable cause determination.[25]   In the Memo, the Government articulated in detail its interpretation of the relevant requirements under the Treaty.

Uruguay acknowledged its obligations under Section 2(a) of Article 10 of the Treaty, which requires a statement of the facts of the case, by submitting an approximately twenty page affidavit from Uruguayan Judge Graciela Gatti ("Judge Gatti") detailing the evidence in support of extradition.[26]

---

[23] *Id.* at 209–10 (emphasis added).
[24] *See* Ex. X (Mem. Of Law and Review of Evid. in Supp. of Extradition, *In re Extradition of Basso*, No. 06-21277-civ-Bandstra (S.D. Fla. Sept. 11, 2006)) at 1.
[25] *Id.* at 7–8.
[26] *Id.* at 12.

Contrary to the Government's present position, the Government in *Basso* stated in the Memo that Article 10 of the Treaty requires a Requesting Party to submit proof that supports a probable cause determination.[27]  The Government reasoned that Section 2(a) of Article 10 requires the Requesting Party to submit a statement of the facts of the case which constitutes the evidence supporting probable cause relating to the request for extradition.[28]  The Government emphasized that, pursuant to Section 5 of Article 10 of the Treaty, the statement of the facts of the case:

> *shall* be admitted into evidence when:... (b) In the case of a request emanating from the Oriental Republic of Uruguay they are signed by a judge or other judicial authority and are legalized by the principal diplomatic or consular officer of the United States of America in the Oriental Republic of Uruguay."[29]

The Government repeatedly acknowledged that Judge Gatti's extradition affidavit, the documents submitted by Uruguay as the statement of the facts of the case, are the documents "which will constitute the evidence presented at the extradition hearing [to support a probable cause determination]:"[30]

> At the actual extradition hearing which is presently set for October 24, 2006, the government will submit the detailed documentary evidence submitted by Uruguay into evidence.[31]

The Government unequivocally acknowledged the Requesting Party's obligation to provide sufficient evidence to establish probable cause when making an extradition request:[32]

> In essence, the Court must determine that the following conditions are present: 1) That the hearing court has jurisdiction to conduct the extradition hearing, and proper jurisdiction over the fugitive; 2) That the fugitive is being sought for offenses for which the applicable treaty permits extradition; and 3) ***That there is sufficient evidence to establish probable cause that the individual appearing in***

---

[27] *Id.* at 7–8.

[28] *Id.* at 3, 7–8, 12.

[29] *Id.* at 16 (emphasis in original).

[30] *Id.* at 3.  "Judge Gatti's Extradition Affidavit . . . sets forth a recitation of the facts which constitute the offenses involved and the extraditee's personal criminal involvement in it." *Id.* at 12 (citation omitted).

[31] *Id.* at 16.

[32] Indeed, the Government either stated or cited authority no less than four times in its Memo that the Requesting Party was required to submit sufficient proof to support probable cause.

***court is the fugitive sought, and committed the offense charged***.[33]

The Government further stated, in its capacity representing the United States, that Judge Gatti's affidavit submitted by Uruguay in support of extradition was sufficient proof to support probable cause and recommended the court grant extradition:

> Upon review of the materials provided by Uruguay, the requesting country, it is the government's position that Uruguay has provided the materials ***required by law and the applicable Treaty*** and as such it is requested that this Court order the fugitive, Juan Peirano Basso extradited to Uruguay to face fraud charges there.[34]

In the present matter, the Government has likewise acknowledged that it is required to submit sufficient evidence to support probable cause in its extradition request to Uruguay.

Specifically, the Government purported to comply with Section 2(a) of Article 10 of the Treaty by submitting Agent Mori's Extradition Affidavit as the evidence to demonstrate probable cause in support of extradition. In her accompanying affidavit, DOJ Attorney Liskamm swore that she is "particularly knowledgeable in the area of law relating to violations of the federal narcotics statutes," that "[she had] reviewed the affidavit of DEA Special Agent Kyle J. Mori and the evidence in this case," and that "the prosecution of the charge in this case is . . . not barred by the statute of limitations."[35] She then continued that the Extradition Package demonstrated ***not only probable cause, but Mr. Gonzalez-Valencia's guilt.***[36]

Moreover, on July 16, 2019, in response to Uruguay's requests for ***all evidence*** supporting the drug trafficking charge,[37] the Government notified Uruguay that (i) the Government had

---

[33] Ex. X at 8 (collecting cases) (emphasis added). Importantly, for further support to the legislative history, the Government cited numerous authorities predating the enactment of 18 U.S.C. § 3184 as requiring the Requesting Party to provide sufficient evidence to establish probable cause. *Id.*

[34] *Id.* at 1 (emphasis added).

[35] Mot. at Ex. A at 12, 15, 17–18 ¶¶ 4, 13, 23.

[36] *Id.* at 17–18 ¶ 23.

[37] Mot. at Exs. D, E. The Government concedes that it believed "the requests were related to the extradition matter." Opp. at 5.

"attached *all evidentiary documentation to*" its extradition request provided to the government of Uruguay on June 1, 2016 "*that establishes probable cause*," and (ii) "*the [June 1, 2016] extradition request includes all evidence supporting the narcotics charge*."[38]

Thus, by its own words, the Government refused Uruguay's request for the entirety of the evidence and represented that Agent Mori's Extradition Affidavit was all the evidentiary documentation required to establish probable cause. Uruguay asked for all evidence supporting the alleged crime underlying the Government's extradition request and the Government responded that the appropriate standard for a review of the sufficiency of the evidence was probable cause and that Agent Mori's Extradition Affidavit satisfied that requirement.

### D.   Judicial Interpretation of the Treaty

The extradition of Ramon Puentes demonstrates that both the Uruguayan courts and U.S. courts interpret the Treaty as requiring probable cause. In approving the United States' request to extradite Mr. Puentes from Uruguay, the Uruguayan Court of First Instance found that "[t]he evidence on which the order is based should not be evaluated in accordance with the assessment standards required by our domestic law to conform to the notion of partial evidence to prosecute an individual. . . . [T]he plausibility thereof must be sufficient, and a 'fumus bonis iuris' must be accredited that at least ensures that the individual will not be extradited with inconsequential evidence."[39] On appeal, the Uruguayan Court of Appeals reiterated that:

> [C]omplete certainty is not required but only plausible, a judgment of probability, a "fumus bonis juris."
>
> In addition, Article 10 of the aforementioned Treaty states that the requested party may ask that the requesting party provide sufficient evidence to establish "prima facie" that the accused has committed the crime for which his extradition is

---

[38] Mot. at Ex. F at 2–3 (emphasis added).
[39] Mot. at Ex. T at 9.

requested. [It] also states that the requested party may deny extradition in the event the arrest is manifestly unfounded.[40]

Once extradited to the United States, Mr. Puentes appealed his extradition, claiming a violation of the Treaty. *United States v. Puentes*, 50 F.3d 1567, 1571 (11th Cir.) *cert. denied*, 116 S. Ct. 341 (1995).[41]  In affirming extradition, the Eleventh Circuit reiterated the Treaty's probable cause requirement and explained that the Uruguayan court had independently determined that the United States had in fact "submitted sufficient evidence to establish probable cause to believe that Puentes had committed the offense" for which he had been charged. *Id.* at 1576.  Furthermore, and as discussed further in section II.C above, in *In re Extradition of Basso*, the Government in *Puentes* took the position that Article 10 of the Treaty requires a Requesting Party to submit proof that supports a probable cause determination.[42]

The Uruguayan courts have likewise interpreted the Treaty as requiring sufficient evidence of probable cause in accordance with the Anglo-American System.  In *Vila Garcia Sordo, Ruben, IUE 573-460/2017,* the Uruguayan court compared the Treaty with the extradition treaty between Uruguay and Mexico and found that the court was required to verify whether there was incriminating evidence before extraditing the requested person:

> The Treaty with Mexico – *as well as those agreed to with the United States (law 15.476)* and Great Britain (year 1884) – adhere to the intervenor system call[ed] [A]nglo American which requires that the Petitioned State verifies if there is evidence to charge and accuse the extraditable. *This position implies an exception to the Belgian Dutch or continental systems*, traditionally followed by our legislation, and regarding which our country parted with these instruments in order to reach agreements with these nations.[43]

---

[40] *Id.* at 16 (citing "Quintín Alfonsín: 'Theory of Private International Law' p. 390, 404/406").

[41] The Government argues that *Puentes* is "inapposite" because it involved the rule of specialty.  Opp. at 15–16. Again, the Government offers no support for the proposition that sufficient evidence of probable cause is only required in specialty cases.

[42] Ex. X at 8.

[43] Ex. Y (IUE 573-460/2017) at 7 (emphasis added).

Similarly, in another case from 1989, the Uruguayan Court of Appeal interpreted the Treaty and found: "As the applicable Treaty *is affiliated with the Anglo-American extradition system*, the requesting State must submit 'sufficient evidence' to establish 'prima facie' that the 'requested person has committed the crime for which the extradition is raised.'"[44]  The court explained that "*the evidentiary requirement of the Treaty* to the maximum extent that it can be assigned is found, *linked to or approximates the concept of likelihood ('fumus bonis juris'), that is, probability or likelihood of the alleged facts or claimed rights.*"[45]

## III.    Accepting the Interpretation that Probable Cause is Not Required Would Invalidate the Treaty.

The Court cannot accept the Government's contorted interpretation of the Treaty that proof of probable cause is not required because to do so would entirely invalidate the Treaty.[46]

U.S. courts view a treaty as a contract between nations, and thus "[i]ts interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent." *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014).  When determining the intent of the parties, courts begin with the treaty's text and context. *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991). However, courts may also "look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Id.* at 535 (citations omitted).

If, as the Government suggests, the United States and Uruguay now have disparate views as to whether the Treaty requires probable cause, there would be no "meeting of the minds" between the sovereigns on a material term of the Treaty and, thus, no enforceable Treaty would

---

[44] Mot. at Ex. U at 17 (emphasis added).

[45] *Id.* (emphasis added).  As explained in the Motion, "fumus bonus juris" is the equivalent of probable cause. Mot. at 35–36.

[46] *See* Jeffery M. Olson, *Gauging an Adequate Probable Cause Standard for Provisional Arrest in Light of Parretti v. United States*, 48 Catholic Univ. L. Rev. 161, 179 (1998) ("Like statutes, treaties are subject to limitation by the Constitution.").

exist.  *Cf. Elcock v. United States*, 80 F. Supp. 2d 70, 82 (E.D.N.Y. 2000) ("Were this an ordinary contract action, the court could potentially find that no contract had been formed between the United States and Germany because there was no meeting of the minds as to the meaning of Article 8.").

Moreover, the Government's interpretation would render the Treaty unconstitutional.  The Due Process Clause of the Fifth Amendment, which incorporates the Fourth Amendment right against unlawful seizure, is superior to any federal statute or treaty.  *See Restatement (Third) of Foreign Relations Law* § 115(3) (Am. Law Inst. 1987) ("A rule of international law or a provision of an international agreement of the United States will not be given effect as law in the United States if it is inconsistent with the United States Constitution."); *see also* Mot. at 43 n.105. Accordingly, the Treaty cannot be interpreted in such a way that would deprive a U.S. citizen of their constitutional rights.  *See Caltagirone v. Grant*, 629 F.2d 739, 747–48 (2d Cir. 1980) (rejecting the government's argument that the treaty at issue did not require showing of probable cause because "the Government's view raises grave questions concerning the constitutional proprietary of any interpretation of [the treaty] which does not require a showing of probable cause").

As discussed throughout, while the process and procedures for a review of the sufficiency of the evidence vary from country to country, both the United States and Uruguay require a review of the sufficiency of the evidence and a finding of probable cause before a fugitive can be legally extradited between the two countries.  Here, both the Government and Uruguay deprived Mr. Gonzalez-Valencia of his constitutional rights during this process.  The Government deprived Mr. Gonzalez-Valencia of due process and caused him to be unlawfully detained by falsely representing to the court in Uruguay that it had provided sufficient evidence to establish probable

cause and refusing to provide such evidence as required by the Treaty.[47]  Then, Uruguay deprived Mr. Gonzalez-Valencia of his constitutional rights by failing in its duty under the Anglo-American System to substantially examine the evidence provided in connection with the extradition request to establish probable cause.

The Government argues in its Opposition that the indictment is "persuasive evidence that there is probable cause for the charges," (Opp. at 18), but that argument is not consistent with the requirements of the Treaty and the process and procedures required for an independent review in both countries of the sufficiency of the evidence to establish probable cause before an individual is extradited between Uruguay and the United States.  If an indictment alone was enough to establish probable cause, there would be no need to provide "[a] statement of the facts of the case" or any other documentation as required by the Treaty; the Government could simply hand Uruguay an indictment and demand extradition.  As explained above, the Government itself understands that more is required to afford the accused due process in extraditions pursuant to the Treaty.  To suggest that the Treaty does not require the establishment of probable cause to support the charges invalidates the Treaty on constitutional grounds because it would result in the deprivation of the constitutional rights of a U.S. citizen.

Accordingly, for the Court to now take the view that the Treaty does not require a showing of probable cause would invalidate the Treaty both for lacking a "meeting of the minds" and on constitutional grounds.  It would also render Mr. Gonzalez-Valencia's extradition illegal.

IV.   **No Probable Cause**

As explained in detail in the Motion, the Government is required to offer competent proof that Mr. Gonzalez-Valencia conspired to distribute cocaine and methamphetamine within the

---

[47] Diplomatic Note 273 states: "*[...] the Embassy of the United States attached all evidentiary documentation to this Diplomatic Note that establishes probable cause [...]*".  Mot. at Ex. F at 2–3 (emphasis added).

limitations period, but the Government's *sole* offer of proof within the limitations period to support probable cause is the BBM Exchange which, on its face, is so vague that Agent Mori could not state in his affidavit that this exchange involved **cocaine, methamphetamine, a Schedule I controlled substance, or even illegal drugs.**

As indicated in the Motion, when the facts allow, Agent Mori includes in his narrative the specific type of drug at issue.  Mot. at 22–24.  Indeed, in paragraph 11 of the affidavit supporting the extradition of Jose Gonzalez-Valencia, *the co-defendant in this case*, Agent Mori detailed intercepted communications *around the same time frame* where the parties purportedly spoke in code regarding a drug transaction and was able to identify the drug being discussed as cocaine.[48]

In the extradition affidavit for co-defendant Jose Gonzalez-Valencia, Agent Mori was able to articulate his belief that the discussion involved cocaine because the exchange included an additional key fact: the purported drugs referenced a price Agent Mori knew to be the common price for a kilogram of cocaine at that time in the United States.[49]  By contrast, in the present case, there are no predicate facts in the native BBM Exchange or in any of the Government's evidence that would allow Agent Mori to state in his affidavit that this exchange involved **cocaine, methamphetamine, a Schedule I controlled substance, or even illegal drugs.**  And for that reason, Agent Mori did not identify in the Extradition Affidavit any particular drug being discussed within the limitations period.

As further argued in the Motion, the Government is required to establish that acts within the limitations period connect to the original overarching conspiracy alleged, yet here, there was no discussion of evidence relating back to earlier alleged acts.  Moreover, it is also black letter law

---

[48] Ex. Z (*Aff. In Supp. of Req. for Extradition*, signed by Kyle J. Mori (Apr. 7, 2017)) at ¶ 11.
[49] *Id.*

that the Government must allege sufficient predicate facts, even at probable cause, to establish identity, but nothing in the native format of the BBM Exchange identifies Mr. Gonzalez-Valencia as a participant.  Equally unsupported was Agent Mori's conclusory assertion regarding the unnamed "co-conspirator."  Each of these deficiencies proves fatal to the Government's assertion that the Extradition Affidavit provided sufficient evidence of probable cause within the limitations period.

The Government does not dispute that Agent Mori failed to cite the specific type of drug in the BBM Exchange or any of the other defects in the Extradition Affidavit.  Instead, the Government only argues is that it is not required to provide evidence during the limitations period and "once the government proves that a defendant was a member of an ongoing conspiracy, it has proven the defendant's continuous membership in that conspiracy unless and until the defendant withdraws." Opp. at 21.  But that argument misses the mark.  Unlike the general conspiracy statute, it is true that 21 U.S.C. § 846 does not require charge of an overt act.  *United States v. Shabani*, 513 U.S. 10, 11 (1994).  However, this does not, as the Government contends, absolve the Government of any responsibility to show that the conspiracy continued into the five-year limitations period.  "[O]n a non-overt-act conspiracy charge, the indictment satisfies the requirements of the statute of limitations if the government alleges and proves . . . *that the conspiracy continued into the limitations period*."  *United States v. Butler*, 792 F.2d 1528, 1532–33 (11th Cir. 1986) (emphasis added); *see also United States v. Sitzmann*, 74 F. Supp. 3d 96, 107 (D.D.C. 2014) ("In a prosecution for conspiracy under 21 U.S.C. § 846, the government must prove that the conspiracy continued into the five-year statute of limitations period."), *aff'd*, 893 F.3d 811 (D.C. Cir. 2018); *United States v. Seher*, 562 F.3d 1344, 1364 (11th Cir. 2009) ("The government satisfies the requirements of the statute of limitations for a non-overt act conspiracy

if it alleges and proves that the conspiracy continued into the limitations period.") (citation omitted). Thus, in order for probable cause to exist, the Government must adduce some evidence that the conspiracy itself continued into the limitations period. *Sitzmann*, 74 F. Supp. 3d at 108 (government provided evidence that the conspiracy continued into the limitations period). No such evidence was included in the Extradition Affidavit.

## V.   Manifestly Ill-Founded

Even under the standard improperly used by the Uruguayan court in extraditing Mr. Gonzalez-Valencia, a review of the sufficiency of the evidence conclusively demonstrates that the extradition request and accompanying arrest warrant were manifestly ill-founded. As has been shown, the Government adduced no competent evidence within the limitations period to support the charge. The Government, as the Requesting Party, was required to adduce competent evidence to demonstrate that the charge was not time barred and failed to do so. Worse, the Government made false sworn representations to Uruguay stating that the evidence was sufficient and that the case was not time-barred, which Uruguay relied upon in granting extradition. Accordingly, even under this erroneous standard, Mr. Gonzalez-Valencia should not have been extradited.

## VI.   Dismissal is Appropriate

As U.S. Attorney General Griffin B. Bell said in 1978, the DOJ is "the acknowledged guardian and keeper of the law."[50] For over 100 years, state and federal courts have distinguished the roles of prosecutors from defense counsel or civil attorneys. *The role of a prosecutor is to seek justice and not win at any cost.*[51]

In the context of criticizing a prosecutor's conduct, the Supreme Court has observed:

---

[50] Griffin B. Bell, An Address by the Hon. Griffin B. Bell, Att'y Gen. of the United States, Before Dep't of Just. Lawyers (Sept. 6, 1978) (transcript available at https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/09-06-1978b.pdf) at 13.

[51] *See* Model Rules of Pro. Conduct R. 3.8, comment 1 (Am. Bar Ass'n 2020).

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor - indeed, he should do so. *But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.*[52]

The Model Rules of Professional Conduct also make clear the Government must adhere to a higher level of standards in the goal of seeking justice, which often differs from zealous advocacy:

A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. *This responsibility carries with it the specific obligations to see that the defendant is accorded procedural justice,* that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons.[53]

How possibly can it be said that the Government took precautions to see that Mr. Gonzalez-Valencia was accorded procedural justice? *At every point through the extradition process where the Government was required to act, the Government ensured that Mr. Gonzalez-Valencia was **not** accorded procedural justice.* The Government ignored or declined every opportunity for years to reassess the offering of proof and take corrective action. Not only did it fail to do so, but it made material misrepresentations to defend its original Extradition Package.

Moreover, Rule 3.8(a) provides that "[t]he prosecutor in a criminal case shall . . . refrain from prosecuting a charge that the prosecutor ***knows is not supported by probable cause***."[54] How possibly can it be said that the Government did ***not*** violate this rule? The errors in the Extradition

---

[52] *Berger v. United States*, 285 U.S. 78, 88 (1935) (emphasis added).

[53] *See* Model Rules of Pro. Conduct R. 3.8, comment 1 (Am. Bar Ass'n 2020).

[54] Model Rules of Pro. Conduct R. 3.8(a) (Am. Bar Ass'n 2020) (emphasis added).

Affidavit are so basic, yet so fundamental, that it can and should be presumed the Government knew when it submitted its Extradition Package that there was insufficient evidence to determine probable cause.

The Government itself framed the statute of limitations issue now before the Court and, in so doing, framed its own bad faith.  The Government, on its own, swore under penalty of perjury that it had reviewed the facts and Agent Mori's Extradition Affidavit and that there were no deficiencies in the offering of proof.  In the accompanying affidavit, DOJ Attorney Liskamm stated she is "particularly knowledgeable in the area of law relating to violations of the federal narcotics statutes," that "[she had] reviewed the affidavit of DEA Special Agent Kyle J. Mori and the evidence in this case," and that "the prosecution of the charge in this case is . . . not barred by the statute of limitations."[55]  The Uruguayan Supreme Court of Justice expressly stated that it relied on this misrepresentation in ordering Mr. Gonzalez-Valencia's extradition.[56]  It is difficult, if not impossible, to reconcile that the Government unintentionally missed the deficiencies in its offering of proof when the Government itself affirmed it had specifically examined this issue.

The Government did not conduct a further assessment of the evidence in support of probable cause as it should have.  Indeed, it made a false statement to Uruguay without reassessing the sufficiency of the evidence and despite possessing the specific BBM Exchange requested by the Uruguayan court (i.e., "the text of the alleged message linking him to the offense of drug trafficking").  If there was anything that should have triggered the Government to assess the sufficiency of its proof, it was Uruguay's repeated requests for documentary evidence, including the BBM Exchange.  The Government's attempt in its Opposition to defend the indefensible proves

---

[55] Mot. at Ex. A at 12, 15, 17–18 ¶¶ 4, 13, 23.

[56] Mot. at Ex. J at 19–20 ("It appears from the affidavit -in support of the extradition request- given by the Trial Attorney of the Narcotic and Dangerous Drug Section of the Criminal Division of the U.S. Department of Justice that . . . the statute of limitations does not prohibit criminal prosecution in this case.").

that the Government is not concerned with adherence to the Model Rules of Professional Conduct but instead is blindly advocating with a "win at any costs" mentality.

As the Supreme Court stated, "while [the Government] may strike hard blows, [it] is not at liberty to strike foul ones" because "its interest . . . is [in ensuring] not that it shall win a case, but that justice shall be done."[57] Here, the Government struck the following foul blows by (i) submitting a woefully deficient Extradition Affidavit to a foreign sovereign that would never support probable cause in the United States; (ii) submitting an accompanying affidavit to a foreign sovereign swearing under penalty of perjury that there is not a statute of limitations concern, when one clearly exists; (iii) stating in the same affidavit that the evidence against Mr. Gonzalez-Valencia supports not only probable cause, but his guilt when the Government, to date, has offered no competent evidence of conduct within the limitations period supporting the charge; (iv) ignoring the Uruguayan court's pointed request for the BBM Exchange for five months while Mr. Gonzalez-Valencia was detained; (v) refusing the Uruguayan court's renewed and *urgent* request for the BBM Exchange after another three months; (vi) never stopping to assess the strength of the offering of proof to Uruguay and take corrective action; (vii) arguing to this Court that the Extradition Affidavit provides evidentiary support for a judicial determination of probable cause when it is clear, as a matter of law, the evidentiary proof falls woefully short; and (viii) telling the Court that the Treaty does not require probable cause without informing this Court that it argued the exact opposite in a brief to another United States District Court in 2006.[58]

---

[57] *Berger*, 295 U.S. at 88.

[58] As detailed in the Motion, sending undersigned counsel a letter that unequivocally said that the DOJ played no role in the review or response to the Uruguayan court's repeated requests for information and then informing this Court that the DOJ did receive the request and it was a miscommunication over an unrelated concern is a foul blow. Who knows the actual truth? Respectfully, given all of the Government's misrepresentations here including those under oath, the Government's representations are circumspect.

**VII.**   **Dismissal, Either Before or After *In Camera Review*, is Appropriate**

We respectfully submit that dismissal is appropriate for the reasons articulated above and in the Motion, and because simply granting Mr. Gonzalez-Valencia's immediate relief and safe passage from the United States does not adequately remedy the harm done to Mr. Gonzalez-Valencia.   Moreover, it offers no condemnation for the Government's misconduct because the Government can simply push the reset button and begin anew with another extradition request. International comity demands this Court to ensure that the Government never engage in this manner again and be above reproach in making extradition requests.   If this Court wishes to further examine the record, then it should conduct an *in camera* review to assess whether the Government ever had any competent evidence within the limitations period.

This request is narrowly tailored to the limited portion of the grand jury record within the limitations period and on the narrow issue of whether there was any competent evidence pursuant to Rules 6(e)(3)(E)(i) and (ii) of the Federal Rules of Criminal Procedure.   *See Coppedge v. United States*, 311 F.2d 128, 131–32 (D.C. Cir. 1962) (holding that there must be at least some evidence to support the charge); *United States v. Laughlin*, 226 F. Supp. 112, 114 (D.D.C. 1964) (holding that an indictment without competent evidence must be dismissed); *United States v. Wolff*, 840 F. Supp. 322, 323 (M.D. Pa. 1993) (dismissing an indictment because there was no evidentiary basis on which the grand jury could have found probable cause to indict the defendant).

The focus of the *in camera* review is *not* to determine the sufficiency of the evidence; it is to determine whether there is **any** competent evidence of Mr. Gonzalez-Valencia's conduct within the limitations period to sustain the charge. *See Coppedge*, 311 F.2d at 131–32. Specifically, the Court must determine whether the Government presented to the grand jury **any** evidence

identifying the drug being distributed as part of the alleged conspiracy as **_cocaine or methamphetatmine_** during the limitations period.[59]

The grand jury returned an Indictment as against Mr. Gonzalez-Valencia on April 19, 2016. [Dkt. No. 1].  On May 5, 2016, a mere two weeks later, Agent Mori executed his sworn affidavit citing to the BBM Exchange as the sole evidence of purported conduct within the limitations period to support probable cause.  Absent evidence to the contrary, we presume that the substance of Agent Mori's testimony before the grand jury is consistent with his summary in the Extradition Affidavit.  Indeed, the Government affirmatively represented to Uruguay that the Extradition Package, which included the Extradition Affidavit as the sole substantive evidence, constituted "**_all evidentiary documentation . . . supporting probable cause_**."[60]  There is therefore no basis to assume Agent Mori testified any differently than what he committed to in writing under penalty of perjury a mere two weeks later and which does not identify the units in the BBM Exchange as cocaine or methamphetamine.  There is no factual basis for anyone to reasonably conclude the discussion involved cocaine or methamphetamine and Agent Mori himself did not conclude that the BBM Exchange concerned cocaine or methamphetamine.  Importantly, had Agent Mori testified at the grand jury that, in his opinion, the operative text exchange involved a discussion of cocaine, this would be inconsistent with his sworn affidavit, call into question his credibility and thus, constitute evidence requiring disclosure under _Brady v. Maryland_, 373 U.S. 83 (1963).

---

[59] An _in camera_ review is further needed due to the Government dropping the methamphetamine component of the charge against Mr. Gonzalez-Valencia.  Despite the Government's contention that this was "trial strategy" (Opp. at 26), the fact remains that if the Government had sufficient evidence to establish probable cause of a conspiracy to distribute methamphetamine, the Government would never have dropped this component of the charge.  This fact alone calls into question the sufficiency of the evidence presented to the grand jury and, accordingly, necessitates an _in camera_ review of the grand jury proceedings.

[60] Mot. at Ex. F at 2–3 (emphasis added).

An *in camera* review will lead to one of two possible conclusions—either the Government provided the same evidence to the grand jury that it provided to Uruguay, which does not demonstrate probable cause; or the Government's failure to provide to Uruguay sufficient evidence to establish probable cause and subsequent failure to provide *Brady* material to Mr. Gonzalez-Valencia was by design and not by mistake, providing the Court further justification to conduct a show cause hearing regarding the extent of the discovered misconduct. If the Government failed to adduce competent evidence within the limitations period before the grand jury, then, respectfully, dismissal is mandated. If there is indeed competent evidence within the limitations period before the grand jury (which undersigned counsel still to this day does not know and, thus, cannot defend against), then the Court should inquire why a mere two weeks later this competent evidence was intentionally omitted from Agent Mori's Extradition Affidavit.

### A.    There is a Particularized Need for *In Camera* Review of the Grand Jury Transcripts

The law allows for this Court's *in camera* review of the grand jury transcripts under these circumstances. As explained in the Motion and in more detail below, Mr. Gonzalez-Valencia has a "particularized need" to warrant disclosure of the grand jury transcripts under Fed. R. Crim. P. 6(e)(3)(E)(ii). *See United States v Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983).

This is not an instance, as the Government claims, where the defendant relies on "unsupported assertions" that do not support a particularized need for *in camera* review. Opp. at 24. Rather, the Government's flagrant and documented misconduct in this matter to date supports a particularized need for *in camera* review of the grand jury transcripts. The Government now takes the position that probable cause is not required under the Treaty despite the fact that in both the Liskamm Affidavit and the Diplomatic Note, the Government conceded that a probable cause showing was required by the Treaty. Moreover, as explained above in Section II.C, the

Government has previously conceded to another United States District Court that probable cause was required under the Treaty. The Government cannot now take an opposite position simply because it is convenient for its argument. *See Davis v. Wakelee*, 156 U.S. 680, 689 (1895). ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."). The Government's inconsistent positions on the interpretation of the Treaty cannot stand. Indeed, it is additional evidence of the Government's misconduct in this case. *See United States v. Sumner*, No. CR 00-383-01 (CKK), 2022 WL 951374, at *18 n.13 (D.D.C. Mar. 30, 2022) ("[S]erious questions are raised when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens.") (alteration in original) (quoting *Bradshaw v. Stumpf*, 545 U.S. 175, 189 (2005) (Souter, J. & Ginsburg, J., concurring)).

The Government's opposition attempts to whitewash the significance of its response to the Uruguayan court's requests for more information by focusing on which case file Uruguay intended its requests fall under. Opp. at 4–5. This is another red herring. Critically, the Government concedes that it believed it was responding to a request from the extradition proceeding. Opp. at 5. While believing that it was responding to a request for more evidence concerning Mr. Gonzalez-Valencia's extradition, the Government responded that (i) the Government had "***attached all evidentiary documentation to***" its extradition request provided to the government of Uruguay on June 1, 2016 "***that establishes probable cause***," and (ii) "***the [June 1, 2016] extradition request includes all evidence supporting the narcotics charge.***"[61] Egregiously, the Government made

---

[61] Mot. at Ex. F at 2–3 (emphasis added).

this statement despite possessing the BBM Exchange requested by the Uruguayan court (*i.e.*, "the text of the alleged message linking him to the offense of drug trafficking").[62]

The Government argues that the extradition affidavits do not "purport to be coextensive with the evidence presented to the grand jury." Opp. at 25–26. However, it fails to acknowledge the plain meaning of its representation to Uruguay that it attached all evidence supporting probable cause to its extradition request and its parallel failure to attach the BBM Exchange to the Extradition Package or subsequent Diplomatic Note. This misrepresentation alone demonstrates a particularized need for an *in camera* review of the grand jury transcripts to determine what evidence was before the grand jury. The Government's consistent misconduct regarding key facts in this case further supports Mr. Gonzalez-Valencia's particularized need for an *in camera* review. *See United States v. Ho*, No. 08-00337-JMS, 2009 WL 2591345 at *3 (D. Haw. Aug. 20, 2009) (holding that a particularized need existed because the prosecutor's misstatement to the court may have also been made to the grand jury).

### B.    The Particularized Need Outweighs any Need to Maintain Secrecy of the Grand Jury

The particularized need evidenced by the Government's misconduct in this case outweighs any need for secrecy of the grand jury. The Supreme Court has explained that "as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 223 (1979). The need for secrecy is not the same in all cases and courts customarily review whether and to what extent the purposes that justify grand jury secrecy are present in each case. *Frederick v. New York City*, No. 11 CIV. 469 JPO, 2012 WL 4947806, at *12 (S.D.N.Y. Oct. 11, 2012). The grand jury is no longer impaneled, and its deliberations

---

[62] *Id.*

occurred more than five years ago. *See Dennis v United States*, 384 U.S. 855, 872 (1966); *see also Douglas Oil Co.*, 441 U.S. at 222–23 (holding that because the grand jury deliberated three years prior, the "interest in secrecy" is reduced upon dissolution.).  Moreover, the identities of the grand jury's members will remain confidential even if this Court conducts an *in camera* review of the requested materials, thus "deliberative freedom and the prevention of grand juror harassment are irrelevant." *Frederick*, 2012 WL 4947806 at *13.  Nor is there any interest to "encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes." *United States v. Proctor & Gamble*, 356 U.S. 677, 681 n.6 (1958).  The materials Mr. Gonzalez-Valencia requests this Court to review are limited to testimony from Special Agent Mori, who is not a private citizen and almost certainly will testify publicly against Mr. Gonzalez-Valencia at trial.  See *Frederick*, 2012 WL 4947806, at *12–13 (reasoning that the strength of this factor was "undeniably diminished" when an individual whose grand jury testimony was sought would have "almost certainly have testified [in] the criminal case . . . thereby necessitating disclosure of his grand jury minutes").  Accordingly, the need for disclosure far outweighs any need for continued secrecy.

## C.      An *In Camera* Review of the Grand Jury Transcripts is Appropriate

The Government has failed to present any evidence, to counsel or this Court, that the conspiracy at issue continued into the limitations period.  The Government mistakenly argues that it does not need to make any such showing.  Opp. at 20–21.  While the Government correctly states conspiracy is an ongoing crime, and correctly states the law of withdrawal, *i.e.*, that a conspirator remains a member of a conspiracy until he affirmatively withdrawals or the conspiracy ends, the Government fails to correctly identify what is needed to charge Mr. Gonzalez-Valencia with conspiracy in the first place.

As explained above in Section IV, the Government is required to provide evidence that the alleged conspiracy continued into the limitations period, yet the only evidence in the Extradition Package (and therefore the only purported evidence of probable cause) during the limitations period is the BBM Exchange. Here, the Government's statement to Uruguay that "the prosecution of the charge in this case . . . is not barred by the statute of limitations"[63] and its statement that its extradition request "includes all evidence supporting the narcotics charge"[64] directly contradict the fact that the extradition request fails to contain any evidence (whether involving Mr. Gonzalez-Valencia or not) that the alleged conspiracy to distribute cocaine continued into the limitations period. This inconsistency, coupled with the Government's conduct during this case which can be characterized as inaccurate, at best, and deceitful, at worst, necessitates this Court to conduct an *in camera* review of the grand jury transcripts. This Court must do so to ensure that evidence was presented to the grand jury that the alleged conspiracy to distribute cocaine continued into the limitations period, and thus, determine whether Mr. Gonzalez-Valencia was properly indicted.

## VIII.   Conclusion

For the foregoing reasons and the reasons further detailed in the Motion, we respectfully ask this Court to dismiss this case with prejudice or, alternatively, to conduct an *in camera* review of the grand jury record, or any further relief the Court deems just and proper.

---

[63] Mot. at Ex. A at 15, 17 ¶ 13, 23.
[64] Mot. at Ex. F at 2–3.

Dated: May 6, 2022

Respectfully submitted,

 /s/ Stephen A. Best

**BROWN RUDNICK LLP**

Stephen A. Best (DC Bar No. 428447)
Tiffany B. Lietz (admitted *pro hac vice*)
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005
Telephone: (202) 536-1737
sbest@brownrudnick.com

-and-

**The L●S LAW FIRM**

Lilly Ann Sanchez (admitted *pro hac vice*)
Four Seasons Tower, Suite 1200
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 503-5503
lsanchez@thelsfirm.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

33

JA295

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2022, I electronically filed the foregoing document with the

Clerk of the U.S. District Court for the District of Columbia by using the CM/ECF system.  All

participants registered through the Court's electronic filing system will be served by the CM/ECF

system as required to be served by Federal Rule of Criminal Procedure 49(a)(3)(A).

Date: May 6, 2022

  */s/ Stephen A. Best*
Stephen A. Best
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005
Telephone: (202) 536-1737
sbest@brownrudnick.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*