RECORD NO. 23-3126
[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]

In The

# United States Court Of Appeals
## For The D.C. Circuit

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

### GERARDO GONZALEZ VALENCIA,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

PUBLIC APPENDIX
Volume II of VII

_____

Devin Burstein
WARREN &
BURSTEIN
501 W. Broadway,
Ste. 240
San Diego, CA
92101
(619) 234-8467
db@wabulaw.com

*Counsel for
Appellant*

Chrisellen R. Kolb U.S.
ATTORNEY'S OFFICE
(USA) Appellate Division
Room 8104 555 4th Street,
NW Washington, DC 20530
(202) 252-6833
Chrisellen.R.Kolb@usdoj.gov

*Counsel for Appellee*

Kaitlin J. Sahni U.S.
DEPARTMENT OF
JUSTICE (DOJ)
Criminal Division 145
N Street, NE Second
Floor, East Wing
Washington, DC 20530
(202) 598-2493
kaitlin.sahni@usdoj.gov

*Counsel for Appellee*

# TABLE OF CONTENTS

**Volume I**

Indictment (April 19, 2016) [DE1] ........................................................ iv

Transcript of Motion Hearing (January 11, 2022) .................................. 5

Motion to Dismiss (April 28, 2022) (DE97) ........................................... 26

Government's Opposition to Defendant's Motion to Dismiss (April 29, 2022) (DE99) .......................................................................................... 229

Defendant's Reply in Further Support of his Motion to Dismiss (May 12, 2022) (DE103) ........................................................................................ 258

**Volume II**

Exhibits in Support of Defendant's Reply in Further Support of his Motion to Dismiss (May 12, 2022) (DE103) ......................................... 297

Memorandum and Order (July 5, 2022) (DE108) ................................. 367

Memorandum Opinion and Order (September 1, 2022) (DE120) ........ 376

Plea Agreement (December 1, 2022) (DE134) ..................................... 389

Joint Statement of Stipulated Facts (December 1, 2022) (DE135) ...... 398

Joint Submission Regarding Sentencing Guidelines (December 16, 2022) (DE138) ...................................................................................... 403

Defendant's Statement of Facts (December 16, 2022) (DE139) .......... 409

Transcript of Plea Colloquy (December 22, 2022) ............................... 412

Government's Sentencing Memorandum (March 23, 2023) (DE153) .. 439

Defendant's Memorandum in Aid of Sentencing (April 6, 2023) (DE159). ...................................................................................................... 480

## Volume III

Continued Exhibits in Support of Defendant's Memorandum in Aid of Sentencing (April 6, 2023) (DE159) .................................................... 593

Notice of Filing of Letter in Support (April 10, 2023) (DE160) ........... 656

Stipulation (April 18, 2023) (DE161) ................................................. 672

Transcript of Hearing (May 2, 2023) .................................................. 674

## Volume IV

Transcript of Hearing (May 3, 2023) .................................................. 787

## Volume V

Transcript of Hearing (May 4, 2023) .................................................. 978

Government's Supplemental Sentencing Memorandum (June 16, 2023) (DE170) ............................................................................................ 1179

Defendant's Post-Hearing Response Brief (July 7, 2023) (DE179) .... 1201

## Volume VI

Exhibits in Support of Defendant's Post-Hearing Response Brief (July 7, 2023) (DE179) .................................................................................. 1247

Government's Reply in Support of Supplemental Sentencing Memorandum (July 12, 2023) (DE180) ................................................ 1443

Transcript of Sentencing Hearing (July 21, 2023) ............................ 1459

## Volume VII

Notice of Appeal (July 26, 2023) (DE186) .......................................... 1551

Amended Judgment (September 1, 2023) (DE188) ............................. 1552

Reason for Amendment (September 1, 2023) (DE189) ...................... 1560

Docket Report ....................................................................... 1561

# EXHIBIT V

| 93D CONGRESS<br>*1st Session* } | SENATE | { EXECUTIVE REPT.<br>No. 93–19 |
| --- | --- | --- |

# EXTRADITION TREATIES WITH ITALY, PARAGUAY, AND URUGUAY

---

SEPTEMBER 26, 1973.—Ordered to be printed

---

Mr. FULBRIGHT, from the Committee on Foreign Relations, submitted the following

# REPORT

[To accompany Ex. M, 93–1 ; Ex. S, 93–1 ; and Ex. K, 93–1]

The Committee on Foreign Relations, to which was referred the Treaty on Extradition between the United States of America and Italy, signed at Rome on January 18, 1973; the Treaty on Extradition between the United States of America and the Republic of Paraguay, signed at Asunción on May 24, 1973; and the Treaty on Extradition and Cooperation in Penal Matters between the United States of America and the Oriental Republic of Uruguay, signed at Washington on April 6, 1973, having considered the same, reports favorably thereon without reservation and recommends that the Senate give its advice and consent to ratification thereof.

## TREATY WITH ITALY

The Extradition Treaty with Italy was signed at Rome on January 18, 1973, and transmitted to the Senate on June 27. It will terminate and replace the extradition treaty between the United States and Italy signed at Washington on March 23, 1868, as amended and supplemented by the conventions signed on January 21, 1869, and June 11, 1884, respectively, as well as the agreement effected by an exchange of notes dated April 16 and 17, 1946.

## TREATY WITH PARAGUAY

The treaty with Paraguay was signed at Asunción on May 24, 1973, and transmitted to the Senate on September 12. It will terminate and supersede the extradition treaty between the United States and Paraguay done at Asunción on March 26, 1913.

99–119

**2**

## TREATY WITH URUGUAY

The Extradition Treaty with Uruguay was signed at Washington on April 6, 1973, and transmitted to the Senate on May 21. It will terminate the treaty between the United States and Uruguay signed at Washington on March 11, 1905, but extraditable offenses committed prior to the entry into force to the present treaty will continue to be subject to extradition pursuant to the provisions of the earlier treaty.

### PROVISIONS OF TREATIES

According to the Administration, the provisions of these treaties follow generally the form and content of extradition treaties recently concluded by the U.S. Government. The most significant offenses included in these treaties are those relating to narcotics, including psychotropic drugs and other dangerous drugs, and the offense of aircraft hijacking. The treaties also include a provision in Article II which enables extradition to be granted in case of conspiracy to commit any of the extraditable offenses.

Set forth below is a comparative analysis of the provisions contained in all three treaties:

*Article I.* Persons found in the territory of the other country, charged with crimes listed in Article II, are subject to extradition.

*Article II* sets forth the extraditable offenses. They include: murder, assault, arson, rape, prostitution, the manufacture of bombs, piracy, dealing in narcotics, bigamy, larceny, offenses against public health, smuggling, counterfeiting, malversation, bribery, interference with judicial procedures, receipt of stolen goods, offenses against bankruptcy, industrial or commercial fraud, or conspiracy to commit any of those offenses. The Italian treaty defines "conspiracy" as being committed when evidence is produced "establishing probable cause that two or more persons have conspired to commit any offense . . . and when one or more of such persons have done any act to effect the object of the conspiracy." The Italian treaty places the offense under U.S. federal jurisdiction when transportation from one state to another is involved. Paraguay and Uruguay will grant extradition for "any offense against a federal law of the United States."

*Article III* defines the territorial application of each treaty to include all territory under the jurisdiction of either party including territorial waters and airspace and has been extended to include registered aircraft in flight, meaning from takeoff to landing as defined by the Tokyo Convention of September 14, 1963. The purpose is to extend jurisdiction to aircraft piracy whether committed over national territory or not.

The treaties with Italy (*Article IV*) and Uruguay (*Article 4*) provide that persons can be extradited even though they are nationals of the requested party. The Paraguayan treaty says "the Contracting Parties shall not be bound to grant extradition of their own nationals," and allows each to determine "the status of nationality." However, each can permit extradition if it believes it is proper to do so. If denied, the accused shall be tried locally under domestic laws, if they apply.

*Article V* requires, in the case of Italy, sufficient evidence that the accused has been properly identified and actually committed the crime.

3

*Article 5* (for Paraguay and Uruguay) and *Article VI* (for Italy) provide that extradition will not be granted if contrary to the legal principles of double jeopardy, prior imprisonment for the same offense either locally or in a third country and, if the statute of limitations has run. It also excludes offenses of a political nature, although not in cases involving attempted homicide, kidnapping and threats to the safety of commercial aircraft. The Italian treaty also excepts infractions of military law which are not an offense under ordinary criminal law.

Under the provisions of *Article 6* (for Paraguay and Uruguay) and *Article VII* (for Italy), a party may refuse extradition of a person under 18 with permanent residence in its country if it is determined that extradition would disrupt the social readjustment and rehabilitation of that person.

*Article 7* (for Paraguay and Uruguay) and *Article VIII* (for Italy) provide that, if the death penalty is possible under the laws of the requesting party but not that of the requested party, the latter may refuse extradition unless given assurances the death penalty will not be imposed. All recent treaties have carried a similar article so as to avoid judicial delays of extradition arising from claims of "cruel and unusual punishment."

*Article 8* (for Paraguay and Uruguay) and *Article IX* (for Italy). The surrender of a fugitive may be delayed, if he is on trial or serving a sentence for a criminal act other than that cited in the extradition request, until either the trial or sentence is completed.

*Article 9* (for Paraguay and Uruguay) and *Article X* (for Italy). The requested party shall determine if extradition should be granted according to the terms of the treaty and its own domestic laws. The accused may take all legal remedies to prevent extradition which are allowed under the laws of the requested party.

*Article 10* (for Paraguay and Uruguay) *Article XI* (for Italy). Requests for extradition will be made through diplomatic channels and must be accompanied by a statement of the facts, positive identification of the individual, texts of applicable law, an arrest warrant, and sufficient evidence to establish probable guilt. For persons already convicted, the judgment and sentence shall be provided. Translations and proper authentication of documents are required. The text of the Italian convention differs, but it has substantially the same meaning.

*Article XII* of the treaty with Italy provides that the competent authorities of either country have the power to grant extradition of persons in cases of conviction in absentia or for willful contempt of court (contumacy) if the safeguards cited in the article are fulfilled.

*Article 11* (for Paraguay and Uruguay) and *Article XIII* (for Italy). Provisional arrest and seizure of evidence may be requested through diplomatic channels or, in cases of urgency, through the appropriate departments of justice accompanied by appropriate supporting evidence. Provisional arrest must be followed within 45 days by a formal request for extradition or the accused may be released.

*Article 12* (for Paraguay and Uruguay) and *Article XIV* (for Italy). If the evidence submitted is not deemed sufficient, the requested party may demand additional proof and specify the time for its submission. If the additional evidence is delayed beyond that time

Ex. Rept. 03–19

4

or is still considered insufficient, the accused may be released. However, if this is done, another request for the same or other offense may be submitted later.

*Article 13* (for Paraguay and Uruguay) and *Article XV* (for Italy). A person may not be detained, tried or punished in the country to which extradited for other than the offense named in the request unless: (a) he remains in that country more than 30 days after being released (15 days for Italy); (b) returns to it voluntarily, or (c) the requested party consents to other charges being added. In the treaties with Paraguay and Uruguay, the person must receive due warning of the conditions set forth in (a) and (b). That stipulation is not included in the Italian treaty. Crimes committed after extradition are excepted.

*Article 14* (for Paraguay and Uruguay) and *Article XVI* (for Italy). If two or more states request extradition of the same person, the requested party will determine which request to honor, taking into consideration the seriousness of the crimes, the nationality of the accused, the dates the requests were received, and provisions of extradition treaties of the requesting parties and itself.

*Article 15* (for Paraguay and Uruguay) and *Article XVII* (for Italy). The requested party shall promptly communicate through diplomatic channels its decision on the extradition request. If within 30 days thereafter a properly executed warrant has not been issued and the accused has not been removed, the requested party may release him and subsequently refuse to extradite him for the same offense.

*Article 16* (for Paraguay and Uruguay) and *Article XVIII* (for Italy). If extradition is granted, all supporting material evidence for the prosecution must be surrendered, subject to the rights of third persons, even if the accused escapes or dies.

*Article 17* (for Paraguay and Uruguay) and *Article XIX* (for Italy). The transit of arresting officers and a person under extradition order from a third country will be granted provided a request is made through diplomatic channels and the requesting party reimburses the other for any expenses incurred in the transit.

*Article 18* (for Paraguay and Uruguay) and *Article XX* (for Italy). Each party shall assist the other in the presentation of extradition cases before its respective judges and magistrates, but the expenses involved in the translation of documents and the transportation of a person shall be paid by the requesting state. This clause, which has become normal in recent conventions, is included because the costs of presentation have been a hindrance to the making of extradition requests.

*Article 19 for Uruguay*. Both parties will exchange information dealing with the prevention and repression of crime, including statistical data and results of research in the field of criminology. This clause accounts for the difference in title between the treaty with Uruguay and those with Italy and Paraguay where the article is not included.

*Article 19* (for Paraguay), *Article 20* (for Uruguay), and *Article XXI* (for Italy). The treaties apply to offenses specified in Article II committed before as well as after the date of ratification if the offense was illegal under the laws of both parties. In the case of Uruguay,

Ex. Rept. 93–19

5

crimes listed in the treaty of 1905, and committed prior to the entry into force of the present treaty, will continue to be subject to extradition pursuant to that treaty. With that exception, this article terminates the former treaty.

## DATE OF ENTRY INTO FORCE

The Extradition Treaties with Italy, Paraguay and Uruguay will enter into force on the day instruments of ratification are obtained. Each treaty may be terminated by either party by giving six months' notice.

## COMMITTEE ACTION

The Committee on Foreign Relations received testimony on the Extradition Treaties with Italy, Paraguay and Uruguay on September 25, 1973. At that time, Mr. Knute E. Malmborg, Assistant Legal Adviser for Management and Consular Affairs, Department of State, testified in support of the treaties. His prepared statement is reprinted below.

During an executive session held later the same day, the Committee ordered the treaties favorably reported with the recommendation that the Senate give its advice and consent to ratification.

## STATEMENT REGARDING EXTRADITION TREATIES WITH ITALY, PARAGUAY AND URUGUAY

My name is Knute E. Malmborg. I am the Assistant Legal Adviser for Management and Consular Affairs, and my responsibilities include international extradition.

The three treaties before this committee are those with:

Italy, signed January 18, 1973, Executive M;
Paraguay, signed May 24, 1973, Executive S; and
Uruguay, signed April 6, 1973, Executive K.

Each of these treaties follows closely the organization and content of the comprehensive treaties considered by the committee in the past few years, the most recent being the treaty with Argentina. There are, however, a number of differences between any one of these three treaties and the other two. For the most part these differences reflect different requirements or negotiating approaches of the three countries. In the case of the treaty with Italy some of the differences are attributable to the fact that the basic negotiations were conducted two years ago. A few minor textual points took a long time to resolve, so the treaty was not signed until early this year. In the interim the United States negotiated a number of other treaties and evolved a somewhat different negotiating model which was used with Paraguay and Uruguay. Also in that interim, international terrorism became a major threat, particularly in Latin America, so the treaties with Paraguay and Uruguay (Article 5, clauses (a) and (b) following subparagraph 4) contain special provisions to facilitate extradition of those who assault heads of state, diplomats and similarly situated persons. These provisions were not raised in the Italian negotiations.

The Italian treaty does contain a provision, not found in the other two, which addresses a long standing problem in the extradition relations between our two countries. Under Italian law, a person may be convicted under certain circumstances *in absentia*. In the past, the United States refused to accept such convictions as convictions in the usual sense and, since the Italians could not retry these persons, extradition failed. During the negotiation of the new treaty, the United States delegation, including representatives of the Department of Justice, satisfied themselves that Italian trials *in absentia* included adequate provisions for notice to the accused and representation by counsel, and, together with the provisions of Article XII for submission of evidence of probable cause, this has permitted inclusion of authority to extradite in such cases. Each such case will be thoroughly reviewed by the Department of State and Department of Justice, and there is discretion to refuse extradition.

Article 19 of the treaty with Uruguay on law enforcement cooperation is novel. Uruguay recently concluded a treaty with Italy containing a similar provision and did not wish to give the impression that

(6)

7

there was less cooperation between United States and Uruguayan law enforcement authorities. The Article does not commit the United States to a greater degree of cooperation than presently exists informally.

I would like to turn now to the significant provisions all three treaties have in common.

Article 2, which contains the list of offenses, consists of 30 or more items covering those offenses of greatest concern to the United States which are also crimes in Italy, Paraguay or Uruguay respectively. It also includes some offenses which were of special concern to the other country and which are also crimes in the United States. An example is the comprehensive provision of Article 2, item 18 of the treaty with Uruguay on explosives and similar materials.

As in all of the bilateral extradition treaties now in negotiation by the United States, these treaties include the offense of hijacking. They also include narcotics offenses, which were not covered by any of the treaties now in force. Also significant is the provision in this article which enables extradition to be granted in the case of conspiracy to commit any of the offenses mentioned.

I should note that both Italy and Paraguay have extradited narcotics offenders to the United States under their laws, even though such offenses were not in the old treaty. The United States, however, could not reciprocate.

Article 3 defines territory to include registered aircraft in flight, with flight being defined in accordance with what is generally known as the Tokyo Convention.

In addition, the second paragraph of Article 3 provides for extradition for offenses committed outside the territory of either party if the offense so committed would be punishable under the laws of both parties. This provision is significant in its applicability to narcotics offenses, particularly conspiracy to import narcotics into the United States when the individual may not have ever entered the United States.

Article 5, Article VI of the Italian treaty, contains most of the substantive defenses to extradition—double jeopardy, political offense and the like. In each case, there is a restriction on the application of the political offense exception to aircraft hijacking (clause (e) following subparagraph 4).

Article 6, Article VII of the Italian treaty, contains a provision which permits a country receiving a request for extradition of a minor resident in its territory to recommend withdrawal of the request if extradition would disrupt the social readjustment and rehabilitation of the minor.

The procedural requirements for extradition are found in Articles 8, Article IX for Italy, through 16. These are similar to those in our other recent treaties.

All three treaties state that no pecuniary claim arising out of the arrest, detention, examination and surrender of the person sought under the treaty shall be made by the requested party. Title 18 of the United States Code, section 3195, would otherwise require that the requesting authority pay "all costs or expenses incurred in the extradition proceeding in apprehending, security, and transmitting a fugi-

Ex. Rept. 63-19

8

tive." As indicated in connection with prior treaties where there are similar provisions the inevitable delays in processing payments under 18 U.S.C. 3195 have created great exasperation on the part of the persons furnishing these services, and the whole process has been an irritant in our extradition relations with a number of countries. We would benefit from the other countries bearing such costs for our requests under the present treaty in any event.

This concludes my prepared statement on these three treaties. I will be glad to answer any questions.

## TEXTS OF RESOLUTIONS OF RATIFICATION

*Resolved*, (*Two-thirds of the Senators present concurring therein*), That the Senate advise and consent to the ratification of the Treaty on Extradition between the United States of America and Italy, signed at Rome on January 18, 1973 (Ex. M, 93-1).

*Resolved*, (*Two-thirds of the Senators present concurring therein*), That the Senate advise and consent to the ratification of the Treaty on Extradition between the United States of America and the Republic of Paraguay, signed a Asuncion on May 24, 1973 (Ex. S, 93-1).

*Resolved*, (*Two-thirds of the Senators present concurring therein*), That the Senate advise and consent to the ratification of the Treaty on Extradition and Cooperation in Penal Matters between the United States of America and the Oriental Republic of Uruguay, signed at Washington on April 6, 1973 (Ex. K, 93-1).

# EXHIBIT W

JA306

**Ricardo Perciballe López**

# *Estudios*
# *sobre el C.P.P.*
### *y Estándares del Sistema*
### *Interamericano de Derechos Humanos*



FUNDACIÓN DE CULTURA UNIVERSITARIA

*1ª edición, octubre de 2017*

© FUNDACIÓN DE CULTURA UNIVERSITARIA
25 de Mayo 583 - Tel. 2916 11 52
C.P. 11.000 Montevideo - Uruguay
ventas@fcu.com.uy /www.fcu.com.uy

DERECHOS RESERVADOS
Queda prohibida cualquier forma de reproducción, transmisión o archivo en sistemas
recuperables, sea para uso privado o público por medios mecánicos, electrónicos, fotocopiadoras,
grabaciones o cualquier otro, total o parcial, del presente ejemplar, con o sin finalidad de lucro,
sin la autorización expresa del editor.

Case 1:16-cr-00065-BAH Document 103-2 Filed 05/12/22 Page 4 of 12
USCA Case #23-3126 Document #2057130 Filed: 05/30/2024 Page 00 of 90

Finalmente, el mixto, es decir el gubernativo-judicial, es el que parece adherirse el nuevo Código, donde se da una predominancia judicial, empero con ciertas prerrogativas políticas por parte del Ejecutivo.

Generalmente se entiende (sobre todo en aquellos ordenamientos jurídicos donde se estatuye una relevante participación al Ejecutivo en la decisión) que la extradición es un instrumento de naturaleza bi-dimensional, ora de carácter político, ora jurídico.[6]

Pues, por un lado se participa de la idea que al ser la extradición un acto de soberanía, resulta atinado que cada Estado valore si la entrega es políticamente pertinente o no. En tanto que también, y fundamentalmente, posee naturaleza jurídica en la medida que representa un acto de asistencia jurídica internacional al servicio del ordenamiento jurídico reclamante.

El nuevo código reafirma el criterio inveterado en la cultura jurídica nacional, conforme al cual es competencia excluyente de los Tribunales patrios el decidir si procede o no la extradición.

Ello surge en forma meridiana de diversos artículos perlados: a saber el art. 330 que refiere a los "tribunales competentes de la República"; el 340 que destaca "Recibido el pedido de extradición, el Poder Ejecutivo con intervención de la Autoridad Central, lo cursará a la Suprema Corte de Justicia..."; así como los arts. 343 y 344.

No obstante, mediante el art. 335 se da una suerte de atemperamento de dicho principio, puesto que se habilita la posibilidad de que el Poder Ejecutivo permita efectuar un rechazo in límine de la solicitud, cuando existan razones políticas, del mayor nivel para denegar el reclamo.

A poco que se analice la misma, se advertirá que dicha facultad, pese a su esencia política, se encuentra acotada a determinadas circunstancias.

En primer lugar, dicho rechazo es de carácter excepcional, así lo indica el propio nomen iuris del artículo, ("Rechazo excepcional por el Poder Ejecutivo").

El texto también es muy claro al reafirmar que viable únicamente en "casos extraordinarios", y además lo acota doblemente, desde que deben obrar "razones fundadas" para sostener que su mera tramitación, o eventual entrega, conlleven "consecuencias seriamente perjudiciales" para:

a. "El orden y la tranquilidad interna de la República", a guisa de ejemplo ello puede acontecer cuando el país se enfrente o pueda enfrentarse a un conflicto diplomático con el país reclamante.

b. "Normal desenvolvimiento de las relaciones internacionales", verbi gracia, cuando se reclame a un científico por parte de un país que se encuentra inmerso en un proceso de creación de armas de destrucción masiva, y aquel vaya a colaborar en el mismo; o de un alto militar de un país en conflicto bélico; o el de un espía, etc.

c. Finalmente, a éste primer grupo de excepciones taxativas, el Código aduna la posibilidad de rechazo por el Poder Ejecutivo, cuando "la legislación y/o prácticas en la materia" del país reclamante no guarde similitud con el nuestro.

Aquí también hay claras acotaciones por parte del legislador, desde que la posibilidad de verificar la normativa y/o las actuaciones previas del país reclamante, refiere únicamente al instituto de la Extradición, puesto que precisa "en la materia".

Parecería que cuando refiere a "prácticas en la materia", se estaría refiriendo a la reiteración de denegatorias a la entrega por parte del país reclamante, o a la falta de cooperación jurídica en materia penal.

En tanto que, cuando refiere a la "legislación" parecería referirse en primer lugar al manido tema de la nacionalidad, desde que existen diversos países que deniegan la entrega de sus nacionales.

En ambas situaciones, nos encontraríamos frente al inveterado principio de la Reciprocidad, que conforme a éste artículo podrá ser utilizado por el Poder Ejecutivo.

Pero se reitera que, únicamente en estas hipótesis, el Poder Ejecutivo podrá atribuirse la facultad de denegar la cooperación.

Por tanto, la regla sigue siendo que el Poder Ejecutivo, frente a todo pedido de Extradición, deba dar curso inmediato al Judicial.

Asimismo, el rechazo del Ejecutivo solo puede acontecer en forma previa a la intervención de los Tribunales nacionales.

Pues, una vez que se da ingreso a la solicitud y se envía la misma al Poder Judicial, la resolución queda únicamente en manos de éste.

En tanto, lo determinado por los Tribunales patrios resulta vinculante para el Estado uruguayo, por lo que el Poder Ejecutivo, solo se limitará a cumplimentar la orden judicial.

Ello surge en forma meridiana de lo establecido en el artículo 346 inc.1°, desde que una vez resuelta favorablemente la extradición, se comunicará en forma inmediata la resolución al Poder Ejecutivo, a los efectos que éste "provea lo necesario para la entrega del reclamado al Estado requerente"



## Sistema de contralor

Respecto al análisis de la demanda de Extradición, se ha formulado a nivel internacional dos grandes sistemas; el Belga Holandés o Continental Europeo, y el Sistema Anglo Americano.[7]

En el Sistema Anglo-Americano, el Tribunal requerido puede y debe realizar un contralor formal y sustancial del requerimiento, pues amén de analizar la si

---

[6] La Ley Argentina 24.767 de Cooperación internacional en materia penal es un claro ejemplo de ello desde que en sus arts. 20 a 22 le da primacía al Poder Ejecutivo sobre el Judicial al viabilizar que éste solo actúe una vez realizado el análisis político previo. En igual sentido art. 9 de la Ley 4/1985 española sobre extradición pasiva.

[7] Ver al respecto Sentencia del 25/9/1953 M. Izcua Barbat (redactor), L.E Piñeiro Chain y J.C. De Gregorio publicada en el segundo semestre del año 1962 en la Rev. Penal y Penitenciaria. Año I. N° 3, págs. 209 a 213 y Carlos Curbelo Tammaro. La Extradición en el Código del Proceso Penal en Rev. Derecho Penal. N° 3, año 1981, pág. 30.

demanda cumple en sí con las exigencias formales (atinentes a la documentación, a la jurisdicción del reclamante, que no se trate de delitos políticos, ni se impongan penas inhumanas o degradantes, etc.) también tiene la facultad de verificar si existen pruebas de cargo respecto a la culpabilidad del solicitado.

Ello surge en forma clara de los arts. 6 y 7 del Tratado que nos une con Gran Bretaña del año 1884, del Art. 10.3 del Tratado con Estados Unidos aprobado por el Dec. Ley 15.476 de fecha 26/10/1983,[8] y del art. 4 del suscrito con el Estado de México aprobado por Ley 17.822 del 7/9/2004.[9]

El **Sistema Belga Holandés o continental europeo**, es el seguido en la mayoría de los Tratados bi y multilaterales suscritos por el Uruguay.

Por el contrario al anterior, el Tribunal requerido, solo debe realizar un análisis formal tendiente a saber si:

1) El Estado requirente tiene Jurisdicción;
2) La documentación acreditada se encuentra traducida y en su caso legalizada;
3) Si se acompaña la normativa a aplicar, así como una copia autentica del auto de procesamiento y/o de la sentencia de condena;
4) La verificación de la identidad del reclamado; y
5) Si la reclamación no contradice los grandes principios reconocidos en materia extradicional, especialidad, doble incriminación; inextraditabilidad por delitos políticos o para cumplir penas crueles, inhumanas o degradantes, etc.

No corresponde al Tribunal requerido, ingresar al estudio particular de las pruebas que determinan la persecución de la persona, ni efectuar un pronunciamiento sobre el fondo de lo debatido.

Luego, solo deberá detenerse frente al contralor de formalidad de la solicitud.

Ir más allá significaría una invasión de las atribuciones de la autoridad extranjera.[10]

En otras palabras, el Tribunal del Estado requerido no decide si el sujeto es culpable o no (cosa que se hará en el de origen) desde que el procedimiento realizado en Uruguay es accesorio e incidental, de naturaleza auxiliar respecto del juicio principal.

[8] "La Parte requerida podrá solicitar que la requirente presente pruebas suficientes para establecer "Prima facie" que la persona reclamada ha cometido el delito por el cual la extradición se formula. La Parte requerida puede denegar la extradición si un examen del caso demuestra que la orden de arresto es manifiestamente infundada".
[9] "Sólo se concederá la extradición si se determina que las pruebas son suficientes, conforme a las leyes de la Parte Requerida, para justificar el enjuiciamiento del reclamado como si el delito por el cual se le acusa hubiese sido cometido en ese lugar; o bien para probar que se trata de la persona condenada por los tribunales de la Parte Requirente".
[10] Ver Sentencia de Marcelino Izcua Barbat, Enrique Piñeiro Chain y J.C. de Gregorio, pág. 214 y 215 en Revista Penal y Penitenciaria. Año I. N°3. Montevideo, 1962; Enrique Piñeiro Chain en L.J.U. caso 1548, pág. 48.

Aún cuando las exigencias en la documentación requeridas en el art. 336 lit a y b podrían dar mérito a interpretar que nos encontramos ante el reconocimiento del Sistema Anglo Americano, lo cierto es que de conformidad a lo previsto en el art. 344.6 se puede colegir sin hesitación, que el título en consideración se afilia al Sistema Belga Holandés.

Pues, pese a que entre la documentación requerida se exige la presentación de "copia de las piezas procesales en que se funda la resolución" (art. 336 lit. a) y entre otras exigencias "los elementos de prueba correspondientes" lo real es que en la audiencia de resolución de situación del reclamado (art. 344. 7), a diferencia de lo que ocurre en los Tratados con Gran Bretaña, Estados Unidos y México no está prevista la posibilidad de considerar la prueba de cargo existente en el país requirente.

A fortiori, la oposición a la solicitud de extradición, solo puede fundarse en las causales previstas expresamente en el art. 344.6, donde claro está, no se habilita el reexamen de la responsabilidad del extraditus.

En tanto, el análisis sobre el fondo solo podría sostenerse desde el literal c de dicha norma cuando refiere a "improcedencia del pedido". Empero, ello se corresponde con las exigencias del art. 331, donde dable es resaltar, no se menciona la posibilidad de cuestionar las pruebas para la condena (o para la requisitoria) tomadas en consideración por el Estado reclamante.

De ello se extrae que el Tribunal nacional solamente deberá limitarse a cotejar que:

a. El Estado reclamante posea Jurisdicción (art. 330.2).

b. La persona reclamada se corresponda con la ubicada en el país (art. 336 lit d).

c. La demanda de extradición ingrese por los carriles normales, cumpla con los requerimientos formales exigidos y se encuentre acompaña de la documentación pertinente (arts. 334 y 336).

d. Si conforme a las exigencias de los arts. 331, 332 y 348, el requerimiento resulta procedente desde el punto de vista sustancial. En otras palabras si no conculca el cúmulo de principios que gobiernan dicho instituto.

Finalmente, controlado lo anterior, el Tribunal se encuentra no solo facultado sino obligado a condicionar la entrega para que: 

a. La persona sea juzgada, condenada o cumpla pena únicamente por él o los delitos por el cual se viabiliza la extradición. Principio de Especialidad (art. 349).

b. Se efectúe un nuevo juicio en caso de condena en rebeldía (art. 331 lit. h.).

c. Para el caso de estar prevista en el país reclamante la pena de muerte o la de prisión perpetua, se imponga en definitiva la máxima prevista en nuestro país (art. 332).

d. Se descuente el tiempo de la detención sufrida en Uruguay de la futura pena a cumplir en el exterior (art. 350).

En definitiva, se realiza un control de los aspectos formales de la solicitud, sin incursionar en aspectos probatorios referentes a la responsabilidad del reclamado en el país solicitante.

En materia probatoria, la única excepción posible es la atinente a constatar los extremos que permitan determinar la procedencia o no de la extradición. En especial en aquellos casos en los que pudiere presumirse una finalidad política o meramente persecutoria por motivos raciales, religiosos, nacionales, etc.

### Delitos alcanzables

En el ámbito extradicional existen dos sistemas para la inclusión de delitos a ser pasibles de extradición.

Generalmente los Tratados suscritos en el Siglo XIX, se afiliaban al sistema cerrado, de *numerus clausus* (incluyente/excluyente) donde se determinaban expresamente los delitos que habilitaban la posibilidad de conceder la extradición (incluyente) o por el contrario los que vedaban la misma.

Entre los primeros (incluyente) se destaca el antiguo Tratado de Extradición que nos unía con el Reino de España de 1885, que en su art. II establecía taxativamente los delitos que daban mérito a la extradición.

Entre los segundos (excluyentes) el Tratado Internacional de Derecho Penal de 1889 que en su art. 22 excluía expresamente diversos delitos.

A diferencia de ello, en el Siglo XX se adoptó el sistema contrario, es decir el criterio amplio o abierto, de *numerus apertus*, conforme al cual no se establecen expresamente los delitos por los cuales se puede otorgar o negar la extradición.

En tal sentido, las únicas limitaciones provienen del Principio de doble identidad normativa o de doble incriminación, así como del Principio de entidad o gravedad del delito.

Luego, lo determinante es que las conductas que den mérito al reclamo se encuentren alcanzadas por tipos penales en ambos ordenamientos jurídicos y a su vez que la eventual pena a recaer o la ya adscripta en el proceso llevado a cabo en el Estado requirente, sea de cierta entidad.

Éste es el criterio adoptado por Uruguay en los distintos tratados bilaterales y multilaterales suscritos en la materia en los últimos años.

Obviamente, también en el Título en consideración se afilia a éste sistema, en la medida que no establece taxativamente los delitos que permitan incluir o excluir la extradición.

Por tanto, la resolución de la concesión del requerimiento, únicamente se encuentra determinado por los principio de gravedad y doble incriminación.

### Derogaciones

Hasta el presente, el instituto de la Extradición de base extraconvencional, se encontraba regulado por los arts. 13 y 14 del Código Penal. y los arts. 32 y 130 del C.P.P. (Dec. Ley 15.032) Valga aclarar que el art. 130 del C.P.P. regulaba lo referente a la extradición activa, en tanto que los restantes lo atinente a la pasiva.

Como señaláramos supra, el presente título se detiene únicamente en la extradición pasiva, en tanto que no prevé norma alguna respecto de la activa. Luego, de conformidad a las previsiones del art. 402 del presente código, se debe colegir que a partir de su vigencia el art. 130 se encuentra derogado y que por tanto no existe norma que prevea lo referente a la extradición activa en caso de inexistencia de tratado.

Por su parte, en lo que refiere a la extradición pasiva, es dable recordar que el art. 32 de la Ley 15.032 supuso una derogación tácita del art. 14 del C. Penal. En tanto que, dicho art. 32 del C.P.P. conforme al art. 402 del presente código, ha sido derogado expresamente.

Por su parte, en lo que refiere al art. 13 del C. Penal, se debe inferir que ha sido tácitamente derogado a partir de lo establecido en el presente Título, y en especial del art. 331 literales d y f que regulan explícitamente las previsiones contenidas en aquél.

## PRINCIPIOS QUE INFORMAN LA EXTRADICIÓN

### Principio de norma más favorable

Del mismo modo que lo hace en forma parcial el art. XXIII inc. 2° del Tratado Internacional de Derecho Penal de Montevideo de 1889 (en materia de calificación de los delitos políticos) el Código también reconoce el Principio de aplicación de la norma más favorable.

A diferencia del acuerdo internacional, lo hace sin distinción alguna, por lo que, conforme a lo genérico del texto utilizado y su ubicación, es dable inferir que alcanza a todos los puntos sometidos a debate.

En efecto, dicho principio es reconocido en el art. 344.7, una vez concluida la audiencia de debate y al momento de la decisión final. Resolución, que conforme al texto deberá efectuarse irremediablemente *con arreglo a la ley más favorable para el requerido".*

Obviamente, éste principio determinante en materia de aplicación de la ley se ha de verificar cuando existan conflictos entre las propias normas del país requirente y las estatuidas en el presente Código.

Pero anejo a ello, con las de todo el ordenamiento jurídico patrio y fundamentalmente de los tratados suscritos por Uruguay en la materia. Habida cuenta que en general todas las normas en materia penal y procesal penal forman parte de nuestro orden público, luego alcanzadas por la excepción de orden público como se verá infra.[11]

Dable es resaltar que, en aquellos puntos no alcanzados en el presente Título se podrá acudir a los tratados de extradición, por cuanto los mismos constituyen en esencia normas análogas latentes a ser aplicadas en caso de vacío.

---

[11] Ver al respecto lo desarrollado en ocasión de estudiar el Principio de excepción de orden público cuando se desarrolla lo atinente a las solicitudes de extradición derivada de una condena en rebeldía.

**Ricardo Perciballe López**

## *Studies on the C.P.P.*

[Código del Proceso Penal (Code of Criminal Procedure)]
*and Standards of the Interamerican Human Rights System*

[logo:] fcu

UNIVERSITY CULTURE FOUNDATION

1st edition, October 2017

© UNIVERSITY CULTURE FOUNDATION
25 de Mayo 583 – Phone: 2916 11 52
P.C. 11000 Montevideo – Uruguay
ventas@fcu.com.uy / www.fcu.com.uy

RIGHTS RESERVED
Any form of reproduction, transmission, or filing in recoverable systems, whether for
private or public use, by mechanical or electronic media, photocopiers, recorders, or any
other, either totally or partially, of this copy, with or without purposes of profit, is
prohibited without the express authorization of the editor.

JA313

Finally, the mix, that is to say the government-judicial, is what appears to adhere to the new Code, where there is judicial predominance, although with certain political prerogatives from the Executive.

Generally, it is understood (above all in those legal systems that provide for the relevant participation of the Executive in the decision) that extradition is an instrument of a bidimensional nature, at times of a political nature, at times of a judicial nature.[6]

Well, on the one hand, it is associated with the idea that, since extradition is an act involving sovereignty, it is attuned to each State evaluating if delivery is politically pertinent or not. While, at the same time and fundamentally, it possesses a legal nature to the degree that it represents an act involving international judicial assistance in the service of the legal system that is requesting it.

The new Code reaffirms the inveterate criterion in the national judicial culture, in accordance to which it is the exclusive competency of the national courts to decide if extradition proceeds or not.

Such arises in a meridian way from different pearly articles, such as Article 330, which refers to the *"competent courts of the Republic,"* Article 340, which points out, *"Once a request for extradition is received, the Executive Power, with the intervention of the Central Authority, shall direct it to the Supreme Court of Justice...,"* as well as Articles 343 and 344.

Notwithstanding, by means of Article 335, a sort of tempering of that principal is given, due to the fact that it enables the possibility of the Executive Power rejecting the request *in limine*, when there are political reasons of the highest level to deny the request.

Soon after analyzing such a power, it may be seen that, despite its political essence, it must be in adherence to certain circumstances.

In the first place, such a rejection is of an exceptional nature, as indicated by the selfsame *nomen iuris* of the article (*"Exceptional Rejection by the Executive Power"*).

The text is also very clear in reaffirming that such a rejection is only viable in *"extraordinary cases"* and, in addition, it is doubly limited, since there must be *"grounded reasons"* just to sustain its being processed or eventually delivered and involves *"seriously prejudicial consequences"* for the following:

a.   *"The internal order and tranquility of the Republic,"* by way of example, it may happen when the country is faced or may be faced with a diplomatic dispute with the requesting country.

b.   *"The normal development of international relations,"* verbi gratia, when a request for a scientist by a country involved in the process of creating weapons of mass destruction, and the scientist is going to collaborate with that activity, or a top military officer of a country in a war, or of a spy, etc.

c.   Finally, to this first group of limited exceptions, the Code adds the possibility of rejection by the Executive Power when *"the legislation and/or practices on the matter"* of the requesting country has no similarity with our own.

Here, also, there are clear limitations established by lawmakers, ranging from the possibility of verifying the regulations and/or previous actions of the requesting country, which refers solely to the institution of extradition, given the fact that it is needed *"in the matter."*

It would appear that when *"practices in the matter"* are referred to, it would be referring to the reiteration of refusals by the requesting country to extradite or a lack of judicial cooperation in criminal matters.

Whenever it refers to *"legislation,"* it would appear to refer, first of all, to the overused subject of nationality, since there are different countries that refuse to extradite their nationals.

In both situations, we find ourselves with the inveterate principle of reciprocity, which, according to this article, could be used by the Executive Power.

But it is reiterated that, only under these hypotheses, could the Executive Power be attributed the power of refusing cooperation.

Therefore, the rule continues to be that the Executive Power must immediately give way to the Judicial Power in all requests for extradition.

In addition, rejection by the Executive can only occur prior to the intervention of the national courts.

Well, once a request has been filed and has been sent to the Judicial Power, the decision remains solely with the latter.

Therefore, whatever is determined by the national courts is binding on the Uruguayan State. Therefore, the Executive Power will be limited to complying with any judicial order.

This arises in a meridian way from what is set forth in Article 346, subparagraph 1, since, once an extradition is favorably resolved, the decision will be immediately communicated to the Executive Power, so that the latter *"may provide the necessary means for delivering the subject to the requesting State."*

**Comptroller System**

With regard to the analysis of the request for extradition, two large systems have been developed on an international level: the Dutch-Belgian or Continental European system and the Anglo-American system.

In the **Anglo-American System**, the court being requested may and should carry out a formal and thorough monitoring of the request, since, in addition to analyzing if the

---

[6] Argentine Law No. 24,767 on international cooperation in criminal matters is a clear example of it, since from its Articles 20 to 22, it gives priority to the Executive Power over the Judicial Power, by stating that the latter make only act, once prior political analysis has been carried out. Likewise, Article 9 of Spanish Law No. 4/1985 on passive extradition.

[7] See in this regard, Judgment of 9/25/1953, M. Izcua Barbat (editor), L.E. Piñeiro Chain, and J.C. de Gregorio published in the second half of 1962 in the journal Penal and Penitentiary, Year I, No. 3, pages 209 to 213 and Carlos Curbelo Tammaro, Extradition in the Code of Criminal Procedure in the journal Criminal Law, No. 3, Year 1981, page 30.

request, in and of itself, complies with the formal requirements (relating to the documentation and the jurisdiction of the requesting party, as well as verifying that it is not a matter of political crimes and that inhuman or degrading penalties will not be imposed, etc.) it also has the power to verify if there is evidence regarding the culpability of the person whose extradition is being requested.

This is very clearly shown in Articles 6 and 7 of the treaty we entered into with Great Britain in 1884, in Article 10.3 of the treaty with the United States, approved by Decree Law No. 15,476 dated 10/26/1983,[8] and in Article 4 of the treaty signed with the State of Mexico, approved by Law No. 17.822 of 9/7/2004.[9]

The **Dutch-Belgian or Continental European System** is followed in most of the bilateral and multilateral treaties signed by Uruguay.

Contrary to the preceding, the court being requested must only make a formal analysis with the intent to know the following:

1) The requesting State has jurisdiction.
2) The accredited documentation has been translated and, if applicable, legalized.
3) The standard to be applied is attached to the request, as well as an authentic copy of the legal proceedings and/or judgment and sentencing.
4) The verification of the identity of the person whose extradition is being requested.
5) The request does not contradict the great principles recognized in matters involving extradition, specialization, and double incrimination, as well as nonextradition for political crimes or those involving cruel, inhuman, or degrading penalties, etc.

It is not the responsibility of the court being requested to delve into the particular study of the evidence that determines the prosecution of the person, nor to make a judgment about the basis of the case.

Afterward, the request must be placed before the comptroller for formalizing the request.

To go beyond that would mean an invasion of the powers of the foreign authority.[10]

In other words, the court of the State where extradition is being requested does not decide if the subject is guilty or not (something that will be done in the original court), due to the fact that the procedure carried out in Uruguay is an accessory or incidental one of an auxiliary nature with regard to the main trial.

[8] *"The party being requested may ask the requesting party to present sufficient evidence to establish "prima facie" that the person whose extradition is being requested has committed the crime for which extradition is being requested. The party being requested may deny extradition if an examination of the case shows that the arrest warrant is manifestly without grounds."*
[9] *"Extradition will only be granted if it is determined that the evidence is sufficient (according to the laws of the State where extradition is being requested) to justify trying the person, if the crime he or she is accused of would have been committed in that place, or, in fact, to prove that it is a matter of the person being condemned by the courts of the requesting State."*
[10] See: Judgment of Marcelino Izcua Barbat, Enrique Piñeiro Chain, and J.C. de Gregorio pages 214 and 215 in the journal Penal and Penitentiary, Year I, No. 3, Montevideo, 1962; Enrique Piñeiro Chain in L.J.U. Case 1548, page 48.

Even when the requirements for documentation shown in Article 336, paragraphs "a" and "b" could give merit for interpreting that we are dealing with recognition of the Anglo-American System, what is true is that, in accordance with what is provided for in Article 344.6, the fact that title under consideration is in line with the Dutch-Belgian System can be inferred without hesitation.

Well, despite the fact that, among the documentation required, the presentation of *"a copy of the pieces of the evidence from the trial that the decision is based on"* is required (Article 336, paragraph "a"), and among other requirements *"the elements of the corresponding evidence."* The fact is that, in a hearing for a decision about the situation of the person whose extradition is being requested (Article 344.7), as opposed to what occurs in the treaties with Great Britain, the United States, and Mexico, the possibility of considering the evidence in the case existing in the requesting country is not provided for.

*A fortiori*, any opposition to the request for extradition may only be founded on the causes expressly provided for in Article 344.6, where it is clear that any reexamination of the responsibility of the person whose extradition is being requested is not authorized.

Therefore, any analysis about the basis may only be sustained under paragraph "c" of said standard when it refers to the *"inadmissibility of the request."* Nevertheless, it corresponds to the requirements of Article 331, where it is possible to highlight the possibility of questioning the evidence for the sentence (or for the requesting document) taken into consideration by the requesting State is not mentioned.

From the preceding, we learn that the national court must only limit itself to verifying the following:

a. The requesting State has jurisdiction (Article 330.2).
b. The person whose extradition is being requested corresponds to the person located in the country (Article 336, paragraph "d").
c. The request for extradition is filed through the normal channels, complies with the formal requirements, and is accompanied by the pertinent documentation (Articles 334 and 336).
d. If, in accordance with the requirements of Articles 331, 332, and 348, the request is admissible from a substantial point of view. In other words, if it does not violate the group of principles that govern that institute.

Finally, the preceding having been monitored, the court is not only empowered but obligated to condition extradition on the following:

a. The person will be tried, convicted, and/or pay a penalty only for the crime or crimes for which extradition was sought. Principle of Specialization (Article 349).
b. A new trial is carried out in the event of a judgment by default (Article 331, paragraph "h").
c. In the event the death penalty or life in prison is provided for in the requesting country, that, finally, the maximum penalty provided for in our country be imposed (Article 332).
d. The period of detention the person was subjected to in Uruguay be deducted from any future penalty to be paid abroad (Article 350).

Finally, a control of the formal aspects of the request are carried out, without intruding on aspects of evidence referring to the responsibility of the person whose extradition is being requested in the requesting country.

On the subject of evidence, the only possible exception is that having to do with certifying the extremes that permit determining whether or not extradition is admissible, especially in those cases in which a political or merely persecutorial purpose for reasons of race, religion, nationality, etc. could be presumed.

**Included Crimes**

In the area of extradition, there are two systems for the inclusion of crimes that are subject to extradition.

Generally, the treaties signed in the 19th century aligned themselves with the closed system of **numerus clausus** (inclusive/exclusive) in which the crimes subject to the possibility of extradition (inclusive) or, on the other hand, those that forbade extradition were expressly determined.

Among the former (inclusive), we see the old Extradition Treaty we had with the Kingdom of Spain in 1885, which, in its Article II, exhaustively sets forth the crimes that merited extradition.

Among the latter (exclusive) is the Treaty on International Penal Law of 1889, which, in its Article 22, expressly excluded different crimes.

As opposed to that, in the 20th century, the contrary system was adopted, that is to say, the broad and open criterion of **numerus apertus**, in which the crimes for which extradition may be granted or denied are not expressly set forth.

In that regard, the only limitations come from the principle of double regulatory identity or double incrimination, as well as the principle of entity or seriousness of the crime.

Afterward, the determinant is that conduct providing merit to a request is achievable by criminal provisions in both legal systems and, at the same time, the eventual penalty to be given, or the one already given in the legal proceedings carried out in the requesting State, be of a certain entity.

This is the criteria adopted by Uruguay in the different bilateral and multilateral treaties signed on this subject in the last number of years.

Obviously, the title under consideration is also affiliated with this system to the degree that it does not set forth an exhaustive list of crimes that make it possible to include or exclude extradition.

Therefore, any decision for granting a request is only determined by the principles of seriousness [of the crime] and double incrimination.

**Derogations**

Until now, the institution of extradition based on an *ad hoc* method was regulated by Articles 13 and 14 of the Penal Code and Articles 32 and 130 of the C.P.P. (Decree Law No. 15.032). It is worth noting that Article 130 of the C.P.P. regulated what refers to active extradition, while the rest of the articles refer to passive extradition.

As we pointed out, *supra*, this title deals only with passive extradition, in that it does not provide any kind of standard with regard to active extradition. Afterward, according to the provisions of Article 402 of this Code, it must be concluded that, beginning with the latter becoming effective, Article 130 is derogated and, therefore, there is no standard that provides for what is referred to as active extradition in the event of a treaty not existing.

For its part, in what refers to passive extradition, it is possible to remember that Article 32 of Law No. 15.032 involved a tacit derogation of Article 14 of the Criminal Code. Whereas, said Article 32 of the C.P.P., according to Article 402 of this Code, has been expressly derogated.

For its part, in what refers to Article 13 of the Criminal Code, it must be inferred that it has been tacitly derogated beginning with what is set forth in this title and especially from Article 331, paragraphs "d" and "f", which explicitly regulate the provisions contained in the former.

**PRINCIPLES APPLIED TO EXTRADITION**

**Most Favorable Standard Principle**

In the same way that Article XXIII, paragraph 2, of the Treaty on International Penal Law of Montevideo of 1889 does in a partial way (on the subject of classification of political crimes), the Code also recognizes the principle of applying the most favorable standard.

As opposed to the international agreement, it does it without any kind of distinction. Therefore, according to the generic language of the text used and its placement, it is possible to infer that it reaches all of the points subjected to debate.

In effect, that principle is recognized in Article 344.7, once debate in the hearing has concluded and at the moment of the final decision. A resolution that, according to the text, must inevitably be done *"in accordance to the law most favorable to the person for whom extradition is being requested."*

Obviously, this determinate principal on the subject of applying the law must be verified when there are conflicts between the selfsame standards of the requesting country and those appearing as statutes in this Code.

Together with that, with those of the entire national legal system and fundamentally of the treaties signed by Uruguay on the subject, it has been seen that, in general, all of the standards on criminal matters and criminal proceedings form a part of our public order, later achieved by the exception of public order, as will be seen, *infra*.[11]

It is feasible to highlight that, in those points not achieved in this title, one could refer to the extradition treaties, inasmuch as they, in essence, constitute latent, similar standards to be applied in the absence of others.

---

[11] See what was developed in that regard at the time of studying the public order exception principle, when it is developed in adherence to a request for extradition coming from a judgment by default.



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Estudios sobre el Código del Proceso Penal y Estándares del Sistema In...**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Jacqueline Yorke

Sworn to before me this
April 29, 2022

Signature, Notary Public



Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.400.8840 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# EXHIBIT X

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-21277-CIV-BANDSTRA

IN THE MATTER OF THE EXTRADITION

OF

JUAN PEIRANO BASSO
a/k/a John P. Vasso,
a/k/a John P. Vazzo.
_____/



## MEMORANDUM OF LAW
## AND REVIEW OF EVIDENCE IN SUPPORT OF EXTRADITION

**COMES NOW** the United States of America, through its undersigned Assistant United
States Attorney, appearing in this matter on behalf of the Oriental Republic of Uruguay (hereinafter
"Uruguay"), and files this memorandum of law and review of evidence in support of the extradition
to Uruguay of fugitive Juan Peirano Basso a/k/a John P. Vasso a/k/a John P. Vazzo (hereinafter
"Peirano Basso" or the "fugitive").

Upon review of the materials provided by Uruguay, the requesting country, it is the
government's position that Uruguay has provided the materials required by law and the applicable
Treaty and as such it is requested that this Court order the fugitive, Juan Peirano Basso extradited
to Uruguay to face fraud charges there.

### Introduction

Peirano Basso was provisionally arrested on May 19, 2006, at the request of Uruguay,
pursuant to the Extradition Treaty between the United States and Uruguay (hereinafter "Treaty").
Pursuant to the Treaty, the requesting country is obliged to present a formal request for Peirano
Basso's surrender, supported by appropriate documentation. Thereafter, pursuant to Title 18, United



States Code, Section 3184, this Court must hold a hearing to consider the "evidence of criminality presented" and determine whether Peirano Basso should be extradited.

The law regulating extradition differs from ordinary criminal or civil proceedings so much that it is often referred to as *sui generis*. Consequently, the United States offers this memorandum as a guide to the nature of the extradition process, with identification and discussion of the documents submitted by the requesting country, followed by a discussion of the extradition hearing itself, and a description of its distinctive features.[1]

This brief will identify, describe and when appropriate summarize the evidence contained in the materials submitted by the United States vis-a-vis the requirements under the Treaty. As specific extradition legal requirements are listed and discussed *infra*, this pleading will identify the submitted materials supporting that requirement, note the location of that evidence per the pre-marked exhibit number, and finally, describe and summarize that evidence within the context of the law of extradition.

### The Evidentiary Submissions of the Requesting Country

The Oriental Republic of Uruguay has submitted two sets of documents required by the Treaty which support their request for the extradition of Peirano Basso. The first was the requesting country's formal request through diplomatic channels for Peirano Basso's provisional arrest. Shortly thereafter, Uruguay timely provided the documents supporting the extradition itself. Only the latter submission shall be discussed here.

---

[1]Portions of this submission are duplicated from an earlier submission by the government. Duplicated portions are resubmitted herein for completeness and for the Court's convenience.

On approximately June 20, 2006, the undersigned received three complete sets of documents for submission in these extradition proceedings.  It is these documents which will constitute the evidence presented at the extradition hearing.

One set of documents consisted of all the original documentary evidence provided by the requesting country in support of its formal extradition request.  This set of original documents is now located in the court file, having been filed with the Clerk of the Court, June 23, 2006, with the Government Notice of Filing of Original Extradition Documents. DE 13.[2]  The other two sets were almost identical copies of the original documents, varying only insofar as some portions used double-sided duplication.  Of these copy sets, one complete set was provided to counsel for Peirano Basso.  One complete set was retained by the government.

The original extradition documents consisted of four bundles of related documents and have been pre-marked by the undersigned on each (Court, defendant and government) set with the typical amber government exhibit stickers used in this district.  The exhibit stickers themselves have also pre-marked by the undersigned with this case number, and numbered one through four.

### Contents of the Documents Submitted in Support of Extradition

The four "bundles" submitted in support of extradition contain the following:

### [GX 1] The Declaration of Haley D. Collums

A.    GX 1 is gold ribbon bound and affixed with an embossed gold seal of the United States Department of State.  The gold ribbon is unbroken and intact.  The gold seal is affixed and attaches the ribbon ends onto the second sheet of GX 1, which is the Department of State authentication.

_____

[2]DE refers to Docket Entry in Case No. 06-21277-CIV-BANDSTRA.

-3-

B.     GX 1 contains, in order, the declaration of Haley D. Collums; the Department of State authorization containing the name of United States Secretary of State Condoleezza Rice, subscribed by the Assistant Authentication Officer; a copy of Uruguay diplomatic note 116/06 from Uruguay to the United States, dated May 25, 2006; and a copy of the April 6, 1973, Treaty between the United States and Uruguay.

## [GX 2] *Ministerio de Relaciones Exteriores* - American Foreign Service

A.     GX 2 is bound with a red ribbon and the red seal of the Embassy of the United States of America in Montevideo, Uruguay. The ribbon is unbroken and intact. The red seal is affixed and attaches both ends of the red ribbon to the second sheet of GX 2, which is an American Foreign Service document.

B.     GX 2 contains some of the documents requesting and supporting the request for the extradition of fugitive Peirano Basso. It is bound at the upper left hand corner and consists of both the original Spanish and English translation of those documents.

C.     GX 2 contains (more specifically):

1) Certification of the original documents by the United States Embassy in Uruguay ;
2) Anexo I: Spanish text of statutes;
3) Anexo II:    a. Spanish copy of Judge's August 9, 2002, order reiterating the Court's interest in the arrest of Peirano Basso;
              b. Spanish copy of the April 18, 2006, letter from INTERPOL to the Uruguayan Judge notifying the Court of Peirano Basso's location in the United States;
4) Anexo III: Photographs and Fingerprints of Peirano Basso;
5) Anexo IV: Spanish portion of the Manual of Credits of the Banco Montevideo stating that Peirano Basso was required to personally authorize all transactions in excess of one million U.S. dollars;
6) Anexo V: Spanish version of the Report of the Central Bank of Uruguay outlining prohibited financial transactions;
7) English translation of Annex I (pp. 1-11);
8) English translation of Annex II (pp. 11-16);
9) English translation of Annex III (p. 17);
10) English translation of Annex IV (pp. 18-19);
11) English translation of Annex V (pp. 20-35);
12) Spanish version of Judge Graciela Gatti's Original Extradition Affidavit (pp. 1-20); and
13) English translation of Judge Gatti's Extradition Affidavit.

-4-

JA322

**[GX 3] Original Diplomatic Note 129/06 dated June 13, 2006, from Uruguay to the United States enclosing supplemental extradition documents.**

**[GX 4]** *Ministerio de Relaciones Exteriores* **- American Foreign Service**

A.   GX 4 is bound with a red ribbon and the red seal of the Embassy of the United States of America in Montevideo, Uruguay. The ribbon is unbroken and intact. The ribbon is affixed and attached to the left upper corner of the front page of the document and both ribbon ends are affixed by the red seal to the second sheet of GX 4, which is an American Foreign Service document.

B.   GX 4 consists of additional documents requesting and supporting the request for the extradition of fugitive PEIRANO BASSO. It is bound at the upper left hand corner and consists of both the original Spanish and English translations of the documents.

C.   GX 4 contains (more specifically):

1) Certification of supplemental documents by the United States Embassy in Uruguay ;
2) Spanish version of Judge Graciela Gatti's Supplemental Extradition Affidavit (pp. 1-2);
3) Documento 1: Certified Copy of August 5, 2002, Arrest Warrant for Peirano Basso;
4) Documento 2: Certified Copy of Uruguayan Judge's August 5, 2002, Notification to Interpol of the Issuance of the Arrest Warrant for Peirano Basso;
5) Spanish Letter from Uruguayan Clerk of the Criminal Court explaining the validity of the certification stamps on Documentos 1 and 2; and
6) English translation of Judge Gatti's Supplemental Extradition Affidavit, Documentos 1 and 2, and Clerk Guillermo Pujol Bloise's Letter regarding certification of the documents.

**Summary of the Extraditee's Alleged Criminal Acts[3]**

In order to maintain a level of economic stability, Uruguay had developed a system of banking and financial regulations which was administered and managed by a regulatory body known as the Central Bank of Uruguay (abbreviated from Spanish as "BCU"). Page 8. BCU had administrative and regulatory authority over all the banking institutions in Uruguay and, in fact, all banks were legally subject to BCU regulations and authority. Pages 8 - 9. In order to permit BCU

---

[3]All references in this section are to GX 2, Judge Gatti's Extradition Affidavit.

-5-

to carry out its function, Uruguayan law required all banks to provide BCU truthful information about their operations. Page 8. BCU had authority to inspect bank operations at will, conduct audits and even intervene in bank activities, including displacing or disqualifying chosen bank directors.

Article 18 of Law No. 15,322 prohibits banks from granting credits to natural or legal persons related to the granting bank. Page 9.

Juan Peirano Basso, was the leader of "The Peirano Group", an economic entity which owned several financial institutions in Uruguay, Argentina, and Paraguay between 1993 and 2002. The Peirano Group owned and controlled Banco Montevideo, BM Fondos, Indumex, Banco Velox, Velox Investment, Banco Aleman Paraguay, Financiera Guarani, and Trade and Commerce Bank - Cayman Islands (TCB). Page 9. Although it was made to appear as if the banks were owned and controlled by different persons, the banks were all controlled by Juan Peirano Basso, in essence, working through his straw owners and operators, and directly manipulating the operations of the banks for his own purposes. Pages 8, 10, 12, 16, 17, 18 and 20.

In his role as a hidden owner, he oversaw a large number of fraudulent and illegal financial transactions, in direct violation of general banking policy and specific instructions and notices of the BCU, including the orders of a BCU-appointed examiner who was specifically appointed to oversee all transactions of Banco Montevideo and any financial entity related to the Peirano Group. Those transactions included bypassing the Banco Montevideo's Credit Committee to grant credits in the total amount of U.S. $130,000,000 to Peirano Basso, personally, and to financial institutions managed by him, continuing to engage in financial transactions which increased the financial risk of Peirano Group entities. This was in direct violation of BCU orders, after Peirano Basso was expressly directed not to. This then caused the making of false statements to investors and account

-6-

holders regarding the profitability and reliability of Peirano Group operations. Pages 10 - 16. These fraudulent and illegal transactions ultimately led to several of the Peirano Group entities being placed into liquidation. Page 12.

Uruguayan authorities also confirmed that Peirano Basso, who managed the overall operations of the Peirano Group, was aware of, and directly participated in, the illegal and fraudulent conduct. Pages 16 - 18, 20 - 22. The Uruguyan investigators identified at least eight specific illegal transactions conducted by Peirano Basso in contravention of the BCU regulations and which personally benefitted either himself or one of the banks controlled by him. Pages 18 - 20. Additionally, based on Peirano Group policy, Peirano Basso's personal permission was required to issue credits which exceeded U.S. $1,000,000. Numerous illegal and fraudulent transactions involved credits exceeding that amount. Additionally, several witnesses and co-defendants, including former directors and managers of Peirano Group entities, stated that Peirano Basso personally instructed them and other officials, contrary to written BCU instructions, to draw checks on behalf of Peirano Basso's co-defendants and other related financial institutions. Pages 13 - 22.

An audit conducted by BCU revealed that it was Peirano Basso's actions which caused the various banks to fail. Many actions were in essence "self-loans" where one of Peirano Basso's banks "loaned" another one of his banks credits which did not exist in order to give the appearance the receiving bank was in better financial shape than it actually was. Pages 21 - 22.

### The Purpose of Extradition Hearing

At the extradition hearing presently set for October 24, 2006, pursuant to 18 U.S.C. § 3184, this Court must establish that the person arrested is subject to surrender to the foreign country under the terms of the applicable treaty, as well as under the relevant statutes (e.g. 18 U.S.C. 3184 et seq.)

-7-

and caselaw. In essence, the Court must determine that the following conditions are present: 1) That the hearing court has jurisdiction to conduct the extradition hearing, and proper jurisdiction over the fugitive; 2) That the fugitive is being sought for offenses for which the applicable treaty permits extradition; and 3) That there is sufficient evidence to establish probable cause that the individual appearing in court is the fugitive sought, and committed the offense charged. See, Bingham v. Bradley, 241 U.S. 511, 516-517 (1916); McNamara v. Henkel, 226 U.S. 520, 523 (1913); Ornelas v. Ruiz, 161 U.S. 502, 508, 509 (1896); Zanazanian v. United States, 729 F.2d 624, 625-626 (9th Cir. 1984); Gallina v. Fraser, 177 F. Supp. 856, 860 (D. Conn.), aff'd 278 F.2d 77 (2d Cir. 1959), cert. denied 364 U.S. 851 (1960).

1.    **Authority of the Judicial Officer**

This court has authority to hear this extradition matter.

The statute, 18 U.S.C. §3184, authorizes a broad class of judicial officers to hear extradition cases. The authority of the judicial officer to hold an extradition hearing was a more contentious issue in the law's early days when cases were brought by private counsel before various different types of courts. Federal judges are clearly authorized by the statute to hear and decide extradition cases; the statute provides that magistrates may do so if permitted by rule of their court. *See, Ward v. Rutherford*, No. 89-5413, (D.C.Cir. decided December 7, 1990) (rejecting constitutional challenge to magistrate's authority).

2.    **Jurisdiction of the Court and Over the Extraditee**

This Court has jurisdiction over the defendant.

A magistrate or judge may certify an extradition only after having received a "complaint made under oath, charging any person found within his jurisdiction" with having committed any of

-8-

JA326

the crimes provided for by the governing treaty in the country requesting extradition.  18 U.S.C.

3184.

Although the Supreme Court included personal jurisdiction as an essential element for

reasons of analytic completeness, the question of jurisdiction has not been a decisive issue in an

extradition case in modern times.  If the fugitive is before the court, the court has personal

jurisdiction. *See, In re Pazienza*, 619 F.Supp. 611 (S.D.N.Y. 1985).

3.      **Applicability of the Extradition Treaty**

The Treaty between the Oriental Republic of Uruguay and the United States is in full force

and effect.

The statute, 18 U.S.C. § 3184, limits extradition to instances in which a treaty is in force

between the requesting state, in this case Uruguay, and the requested state, in this case, the United

States, and several cases have so held. *See, e.g., Argento v. Horn*, 241 F.2d 258 (6th Cir. 1957).

As part of its proof, the government  has submitted a declaration from an attorney in the Office of

the Legal Adviser of the Department of State attesting that the treaty is in full force and effect.

GX 1 contains the Declaration of Haley D. Collums, an attorney advisor in the State

Department office responsible for extradition requests.  In his capacity as a State Department

Official, he attested to the fact that there was a treaty in full force and effect between the United

States and Uruguay when Uruguay made its formal extradition request in this case.  The Treaty was

in full force on April 11, 1984.  GX 1, page 1.

The Department of State's opinion in this sphere is entitled to deference from the court.

*Galanis v. Pallanck*, 568 F.2d 234 (2nd Cir. 1977); *Sayne v. Shipley*, 418 F.2d 679 (5th Cir. 1969)

*cert. denied*, 398 U.S. 903 (1970).

-9-

JA327

4.    **There Must Be an Extraditable Offense**

The crimes for which the defendant is sought are extraditable under the Treaty.

The court must establish that the offenses alleged in the extradition request are extraditable by examining the relevant treaty's list of extraditable crimes. Quinn v. Robinson, supra, at 783 F.2d 782-783. Moreover, in the case at bar, Article 2 of the Extradition Treaty requires that the offenses for which extradition is sought be criminal under the laws of both the United States and Uruguay. This "double criminality" requirement does not require that the crimes be identical to the American offense which would have been charged. All that is required is that the underlying acts be punishable under both legal systems. See, Collins v. Loisel, 259 U.S. 309, 312 (1922) ("[T]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of liability be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions"). Accord, Kelly v. Griffin, 241 U.S. 6, 15 (1916), United States v. Sensi, 979 F.2d 888, 893-894 (D.C. Cir. 1989); Cucuzzella v. Keliikoa, 638 F.2d 105 (9th Cir. 1981); Hu Yau-Leung v. Soscia, 649 F.2d 914, 918 (2d. Cir.), cert. denied 454 U.S. 971 (1981) (either a violation of federal or state law suffices); Brauch v. Raiche, 618 F.2d 843, 851 (1st Cir. 1980) (same); United States ex rel. Rauch v. Stockinger, 269 F.2d 681, 686-687 (2d Cir. 1959); Matter of Extradition of Prushinowski, 574 F. Supp 1439, 1446 (E.D.N.C. 1983); Matter of Sindona, 584 F. Supp. 1437, 1447 (E.D.N.Y. 1984).

When interpreting the treaty, the extradition court must construe its provisions liberally, in a manner favoring extradition. Factor v. Laubenheimer, 290 U.S. 276, 283, 293-294 (1933); United States v. Wiebe, 733 F.2d 549, 554 (8th Cir. 1984). More specifically, since there is an overriding interest in carrying out the United States's treaty obligation to surrender the fugitive to be tried for

-10-

his alleged offenses, the treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure."[4] Factor v. Laubenheimer, supra, at 290 U.S. 298; United States v. Wiebe, supra; McElvy v. Civiletti, 523 F. Supp. 42, 47-49 (S.D.Fla. 1981). Accordingly, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." Fernandez v. Phillips, 268 U.S. 311, 312 (1925); United States ex rel Rauch v. Stockinger, supra, at 269 F.2d 687.[5]

In the case before this Court, the fraud offenses described by the extradition request and the evidence submitted by Uruguay are felony criminal offenses in both countries.  GX 1, Treaty, Article 2.  The described facts support prosecution under Article 2 as listed in its Numbers 12, 20,[6] 21, 23, 24 and 29.  See Also, GX 2, Judge Gatti Extradition Affidavit, page 7 (handwritten 77).

The Treaty also indicates that participation as a conspirator or simply acting as an accessory in one of the above offenses would also subject one to extradition.

> Extradition shall also be granted for participation in any of the offenses mentioned in this Article, not only as principal or accomplices, but as accessories, as well as for attempt to commit or conspiracy to commit any of the aforementioned offenses, when such participation, attempt or conspiracy is subject, under the laws of both Parties, to a term of imprisonment exceeding one year.

Treaty, Article 2, Paragraph 2.

_____

[3] Statements by the United States Department of State as to the interpretation of treaties are to be given great weight by American courts.  Factor v. Laubenheimer, supra, at 290 U.S. 295; Sayne v. Shipley, 418 F.2d 679, 684 (5th Cir. 1969), cert. denied 398 U.S. 903 (1970).

[5] This liberal construction is based in part upon the recognition that foreign governments should not be expected to be versed in our Criminal laws and procedures.  Grin v. Shine, 187 U.S. 181, 184-185 (1902).

[6] "Malversation" in the English version of the Treaty reads *Malversacion de caudales publicos* in the Spanish version, which translates into "corruption of public wealth".  It is a general public corruption-type offense.

-11-

JA329

Consequently, if the evidence were to suggest that the extraditee, rather than being a principal, was simply an accomplice or conspirator in one of the listed offenses, so too under those circumstances would the defendant be extraditable.

### Article 10:  What the Treaty Requires

Article 10 of the Treaty lists requirements for the request for extradition.

**1**      **The request must be made through diplomatic channels.**  Treaty, Article 10, 1

As evidenced by the seals, unbroken ribbons, stamps and certifications on the four bundles which constitute the evidence supporting the extradition, all documents received from Uruguay were transmitted through diplomatic channels.

**2a**    **The request must contain a statement of facts of the case.**  Treaty, Article 10, 2a.

Judge Gatti's Extradition Affidavit at the end of GX 2 sets forth a recitation of the facts which constitute the offenses involved and the extraditee's personal criminal involvement in it.  GX 2, Judge Gatti's Extradition Affidavit, pages 1-23 (handwritten 74 - 85).

**2b**    **The request must contain identifying data, including photographs and fingerprints.** Treaty, Article 10, 2a.

The extraditee's photograph and fingerprints appear at GX 2, Annex 3.  The extraditee is further identified at GX 2, in Judge Gatti's Extradition Affidavit at pages 7 - 8.

**2c**    **The request must contain the text of applicable laws, with elements of the offenses, the prescribed sentences and the applicable statutes of limitations.**  Treaty, Article 10, 2c.

GX 2, Annex 1 contains the English translations of the texts of the applicable statutes.  The first five pages of Annex 1 contain their Rules of Procedure.  Annex 1, pages 5 - 7 contain criminal statutes having to do with culpability, conspiracy, accessory and sentencing aggravators.  Their

-12-

complex statute of limitations statutes appear at pages 7 - 9. See Also, GX 2, Judge Gatti's Extradition Affidavit, pages 2 - 7.

GX 2, Gatti's Extradition Affidavit lists the offenses the defendant may be formally charged with at pages 4 - 7, along with the elements necessary to prove each one, and the applicable sentence for each offense. They include what they refer to as "Swindling" akin to what U.S. federal law would refer to as a general scheme to defraud; "Misappropriation" similar to common law embezzlement; "Fraudulent Corporate Insolvency" and "Art. 76 of Law No. 2230".

**3    The request must contain an arrest warrant when the extradition request is for an un-convicted defendant.** Treaty, Article 10, 3.

The arrest warrant relevant to this extraditee appears at GX 4.

### The Extradition Hearing Itself

**1.     Standard of Proof**

The extradition hearing is not intended to determine whether the evidence is sufficient to justify conviction, Collins v. Loisel, supra at 259 U.S. 316, for that determination will be made by the foreign court which ultimately tries the defendant. Jhirad v. Ferrandina, 536 F.2d 478, 484-485 (2d Cir.) cert. denied 429 U.S. 833 (1976). Rather, the probable cause standard is utilized. Fernandez v. Phillips, 268 U.S. 311, 312 (1925); Glucksman v. Henkel, 221 U.S. 508, 511 (1910); Marchandi v. United States, 836 F.2d 1223, 1226 (9th Cir. 1988); Sindona v. Grant, 619 F.2d 167, 175 (2d. Cir. 1980); Peroff v. Hylton, 542 F.2d 1247, 1249 (4th Cir. 1976); Merino v. United States Marshal, 326 F.2d 5, 11 (9th Cir. 1963), cert. denied 397 U.S. 872 (1964); Jiminez v. Aristeguieta, 311 F.2d 547, 562 (5th Cir. 1962); In re Ryan, 360 F. Supp. 270, 273 (E.D.N.Y.), aff'd 478 F.2d 1397 (2d Cir. 1973). In determining whether sufficient factual allegations have been made to justify

-13-

extradition, the court must engage in a liberal reading of the supporting documents, in a manner

favoring extradition. United States v. Manzi, 888 F.2d 204 (1st Cir. 1989); Brauch v. Raiche, supra,

at 628 F.2d 847.[7]

2.      **Procedural Requirements**

An extradition hearing is not a criminal proceeding. Neely v. Henkel, 180 U.S. 109, 122

(1901); Sabatier v. Dabrowski, 586 F.2d 866, 869 (1st Cir. 1978); United States ex rel. Oppenheim

v. Hecht, 16 F.2d 955 (2d Cir. 1927); United States v. Galanis, supra, at 429 F. Supp. 1224. Thus

the Federal Rules of Criminal Procedure are not applicable [See, F.R.Crim.P. 54(b)(5)], and there

is no provision for discovery. Messina v. United States, 728 F.2d 77, 80 (2d Cir. 1984); Matter of

Singh, 123 F.R.D. 109, 115 (D. N.J. 1987) (in extensive analysis, court rejects defense motion for

discovery); but see, Matter of Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir 1986)

(limited discovery permitted in court's discretion); Jhirad v. Ferrandina, 377 F. Supp. 34, 37

(S.D.N.Y. 1974), aff'd, 536 F.2d 478 (2d Cir.), cert. denied, 429 U.S. 883 (1976) (same).[8]  The

Federal Rules of Evidence are also inapplicable. See, F.R.E. 1101(d)(3); Melia v. United States, 667

F.2d 300, 302 (2d Cir. 1981).

---

[7]  Thus, in Jhirad v. Ferrandina, supra at 536 F.2d 484-485, the court noted:
    It is well to remember that Jhirad's culpability will not be determined in the
United States.  It is not the business of the courts to assume the responsibility for
supervising the integrity of the judicial system of another sovereign nation.  Such an
assumption would directly conflict with the principle of comity upon which
extradition is based.

[8]  Because discovery occasions unnecessary delays, it is not contemplated by extradition
treaties.  See, Bingham v. Bradley, supra at 241 U.S. 517.  Discovery is especially improper
when directed towards legal issues governing the Extradition Treaty.  Sabatier v. Dambrowski,
453 F. Supp. 1250 (D.R.I. 1978), aff'd 586 F.2d 866 (1st Cir. 1978).

-14-

In addition, the Fourth, Fifth and Sixth Amendments have no application to extradition hearings; consequently no indictment is required, the accused has no right to confront the witnesses against him, has no right to a speedy trial, and cannot claim a double jeopardy bar to prosecution. See generally, Neely v. Henkel, supra at 180 U.S. 122; see also, Jhirad v. Ferrandina, supra at 536 F.2d 485, n. 9 (speedy trial); United States ex rel. Bloomfield v. Gengler, 507 F.2d 925, 928-929 (2d Cir. 1974) (double jeopardy); Simmons v. Braun, 627 F.2d 635, 636 (2d Cir. 1980) (confrontation and cross-examination).

### 3.    The Rules As They Relate to the Admissibility of Evidence

#### a.    The Government's Proof

"Unique rules of wide latitude govern reception of evidence in Section 3184 hearings." Sayne v. Shipley, 418 F.2d 679, 685, cert. denied, 398 U.S. 903 (1970); accord O'Brien v. Rozman, 554 F.2d 780, 783 (6th Cir. 1977).  For example, extradition treaties do not contemplate the introduction of testimony of live witnesses, for to do so "would defeat the whole object of the treaty." Bingham v. Bradley, supra at 241 U.S. 517.  Accordingly, a finding of extraditability may be based entirely on documentary evidence.[9]  See, Shapiro v. Ferrandina, 478 F.2d 894, 902-903 (2d Cir. 1973); O'Brien v. Rozman, supra.[10]

Hearsay is permitted.  Collins v. Loisel, supra at 259 U.S. 317; O'Brien v. Rozman, supra; Sayne v. Shipley, supra.  Indeed "a determination of probable cause in an extradition proceeding may rest entirely upon hearsay." In re Ryan, 360 F. Supp. 270, 273 (E.D.N.Y.), aff'd 478 F.2d 1397 (2d

---

[9] This evidence must be properly certified.  See, 18 U.S.C. 3190; Cucuzzelli v. Keliikoa, 638 F.2d 105 (9th Cir. 1981); United States v. Galanis, supra, at 429 F. Supp. 1227-1228.

[10] Of course, a magistrate may, in his discretion, accept live testimony.  Hooker v. Klein, 573 F.2d 1360, 1369 (9th Cir.), cert. denied 439 U.S. 932 (1978).

-15-

JA333

Cir. 1973); see, also, United States v. Zananzanian, 729 F.2d 624, 626-627 (9th Cir 1980) (unsworn

written statements may properly form the basis for extradition); Simmons v. Braun, supra, at 627

F.2d 636 (same).[11]

### b.    The Nature of the Government's Proof

At the actual extradition hearing which is presently set for October 24, 2006, the government

will submit the detailed documentary evidence submitted by Uruguay into evidence. GXs 1 - 4.

Under a specific provision of the Treaty, the Court should admit the exhibits as the evidence in the

case.

> 5. The documents which, according to this Article, shall accompany the extradition request, *shall* be admitted into evidence when: . . . (b) In the case of a request emanating from the Oriental Republic of Uruguay they are signed by a judge or other judicial authority and are legalized by the principal diplomatic or consular officer of the United States of America in the Oriental Republic of Uruguay.

Treaty, Article 10[emphasis added].

### c.    Defense Evidence

The fugitive's grounds for opposing an extradition request are severely limited. He is not

entitled to introduce evidence which conflicts with the evidence submitted by the requesting state,

establishes an alibi or presents a defense such as insanity. Hooker v. Klein, supra at 573 F.2d 1368-

1369. See also, Collins v. Loisel, supra at 259 U.S. 316 (permitting the introduction of defense

evidence "would be in plain contravention of the intent and meaning of the extradition treaties"); Hu

Yau-Leung v. Soscia, supra, at 649 F.2d 917 (alibi); Shapiro v. Ferrandina, 478 F.2d 894, 901 (2d

---

[11] Uncorroborated statements of an accomplice, made against his own penal interest, are sufficient to establish probable cause in an extradition hearing. Ibid. See, also, Eain v. Wilkes, 641 F.2d 504, 510 (7th Cir.), cert. denied, 450 U.S. 894 (1981).

-16-

Cir.), <u>cert. dismissed</u>, 414 U.S. 884 (1973); <u>Eain v. Wilkes</u>, 641 F.2d 504, 511 (7th Cir.), <u>cert.</u>

<u>denied</u>, 454 U.S. 894 (1981) (attempt to impeach credibility of requesting country's witnesses not

permitted); <u>In re Locatelli</u>, 468 F. Supp 568 (S.D.N.Y. 1979) (same). Moreover, procedural defenses

are not permitted. <u>Bingham v. Bradley</u>, <u>supra</u> at 241 U.S. 517; <u>Glucksman v. Henkel</u>, <u>supra</u> at 221

U.S. 513-514 (variance between charges pending in the foreign country and the complaint filed in

federal court not a valid defense to surrender); <u>In re Edmondson</u>, 352 F. Supp. 22, 24-26 (D. Minn.

1972) (minor variance between pleadings and proof no bar to extradition). Instead, a fugitive's right

to controvert the evidence introduced against him is "limited to testimony which explains rather than

contradicts the demanding country's proof . . ." <u>Collins v. Loisel</u>, <u>supra</u>, at 259 U.S. 315-317;

<u>United States ex rel. Petrushansky v. Marasco</u>, 325 F.2d 562, 567 (2d Cir.), <u>cert. denied</u>, 376 U.S.

952 (1963); <u>accord</u>, <u>Hooker v. Klein</u>, <u>supra</u>; <u>Matter of Sindona</u>, 450 F. Supp. 672, 685 (S.D.N.Y.

1978), <u>aff'd sub nom</u> <u>Sindonna v. Grant</u>, 619 F.2d 167 (2d Cir. 1980).[12]

     In a similar manner, the defendant may not challenge the motives of the requesting

government for bringing charges against him, nor may he assert that the procedures to be utilized in

the requesting state's trial-in-chief will not comport with due process, nor that he will not receive the

protections in the foreign country which he would have in the United States. Where such issues are

raised, the extradition court must reject them, based upon the well settled "rule of non-inquiry." <u>See</u>,

<u>Bingham v. Bradley</u>, <u>supra</u> (U.S. courts will presume that the accused will receive a fair trial);

<u>Glucksman v. Henkel</u>, <u>supra</u> at 221 U.S. 512 (same); <u>Jhirad v. Ferrandina</u>, <u>supra</u> at 536 F.2d 484-

485; <u>Holmes v. Laird</u>, 459 F.2d 1211, 1219 (D.C. Cir. 1972), <u>cert. denied</u> 409 U.S. 869 (1972)

---

[12] Testimony of defense witnesses, called pursuant to 18 U.S.C. 3191, will be permitted only if the subject matter of that testimony conforms to this standard. <u>Matter of Demjanjuk</u>, 603 F. Supp. 1463, 1465 (E.D. Ohio 1984), <u>appeal dismissed</u>, 762 F.2d 1012 (6th Cir. 1985).

-17-

JA335

(claim that foreign justice system did not comport with American due process irrelevant); In re Locatelli, supra at 468 F. Supp. 574 (alleged political motives behind extradition request will not be examined by American court); In re Gonzalez, 217 F.Supp. 717, 722 n. 15 (S.D.N.Y. 1963) (extradition court has no authority to inquire into matters other than the facial validity of the extradition documents).  Instead, the resolution of these issues is for the consideration of the Secretary of State, who has the power to refuse to extradite a prisoner, despite the fact that he is properly extraditable under Title 18 of the United States Code. See, Quinn v. Robinson, supra at 783 F.2d 789; Sindona v. Grant, supra at 619 F.2d 174; In re Lincoln, 228 F. 70, 74 (E.D.N.Y. 1915), aff'd per curiam 241 U.S. 651 (1916).[13]

Additionally, the defendant may not attempt to argue that he did not flee from the justice system of the country now seeking extradition and is thus not a "fugitive" under 18 U.S.C. 3484; rather the nature of his departure from that country is immaterial and his mere presence in this country renders him a "fugitive" subject to extradition.  Vardy v. United States, 529 F.2d 404, 407 (5th Cir. 1976); In re Chan Kam-Shu, 477 F.2d 333, 338-339 (5th Cir.), cert. denied 414 U.S. 847 (1973).

---

[13] Pursuant to 18 U.S.C. 3188, the Department of State is required to surrender the defendant within two months of the last judicial act.  However, once the defendant has been certified extraditable and has exhausted or has not utilized his habeas corpus remedies, he may administratively petition the Department of State for an exemption from extradition. See, In re Lincoln, supra at 228 F. 74; accord United States v. Manzi, supra at 888 F.2d 206; Eain v. Wilkes, supra at 641 F.2d 516-517; Sindona v. Grant, supra; Jhirad v. Ferrandina, supra; Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971); Laubenheimer v. Factor, 61 F.2d 626 (7th Cir 1932), aff'd 290 U.S. 276 (1933); Matter of Extradition of Atta, 706 F. Supp. 1032, 1031 (E.D.N.Y. 1989).

-18-

### d.     Supplemental Evidence

Finally, if the extradition court requires additional evidence in order to arrive at a finding of extraditability, it should permit supplemental documents to be submitted by the foreign government. See, e.g., Greci v. Birknes, 527 F.2d 956, 960-961 (1st Cir. 1976).[14]

### Conclusion

Extradition hearings are sui generis [Jhirad v. Ferrandina, supra, at 536 F.2d 482], and do not follow the rules of evidence or procedure applicable to domestic criminal offenses.  The principles of liberal construction of treaties and proof, as well as those rules which limit the testimony necessary to support a finding of extraditability and which prohibit defenses from being offered, exist both because the defendant will receive a full trial on the merits in the country to which he is extradited, and because there is an overwhelming governmental interest in fulfilling American treaty obligations to other sovereign states.

The Oriental Republic of Uruguay has fully complied with what the law and Treaty between our two countries require.  It has timely submitted evidence, through diplomatic channels, supporting their request for extradition for an extraditable offense.  As a result, the government would respectfully request this Court find Juan Peirano Basso extraditable and order his extradition to face

---

[14] Were the court to instead dismiss the complaint, another complaint could be brought immediately, for res judicata does not apply to extradition proceedings.  Collins v. Loisel, supra, 262 U.S. 426; Hooker v. Klein, supra, 573 F.2d 1360.

-19-

fraud charges there.

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

By: _____
Luis M. Pérez
Assistant United States Attorney
Florida Bar No. 501395
99 N.E. 4th Street, Fourth Floor
Miami, FL 33132-2111
Tel.    305-961-9428
FAX    305-530-6168
Luis.Perez@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was mailed and faxed, to 305-536-1116, pursuant to local rule, this 11th day of September, 2006 to: Joseph A. DeMaria, Esq., and Jonathan Etra, Esq., Tew Cardenas LLP, Four Seasons Tower - 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131.

_____
Luis M. Pérez
Assistant United States Attorney

-20-

# EXHIBIT Y

*Esc. Alejandro Menoni Casas*
*Actuario Adjunto*

IUE 573-460/2017

En la ciudad de Montevideo , el día 1 de marzo de dos mil dieciocho, siendo la hora 15: 14 ,
estando en Audiencia el Sr. Juez Letrado de Primera Instancia en lo Penal de 43° Turno, Dr.
Marcelo Malvar Juncal, en autos caratulados: Audiencia VILA GARCÍA SORDO , RUBEN
EXTRADICIÓN.-IUE 573- 460 /2017 " comparecen el Dr/a. E. Rodríguez Fiscalía de Delitos
económicos y complejos 1° turno y correo electrónico
sippaul@notificaciones.poderjudicial.gub.uy, en representación del Gobierno Mexicano el Sr
Cónsul Francisco Hernández N° carné consular CC557, asistido por el Dr Dotta ,por la defensa
el Dr Sarries y los siguientes datos del imputado: RUBEN VILA GARCIA SORDO, todos
filiados en autos
La presente Audiencia será registrada en audio en el sistema Audire y quedará incorporada al
sistema de gestión. Se deja constancia asimismo que los proveídos que haya de disponer este
Magistrado en el curso de la Audiencia serán debidamente registrados en Audio y en soporte
papel, formando parte integral de esta.

**DECRETO Nro. 233/2018-**
A LOS RECAUDOS DE FS 84/87 TENGASE PRESENTE .-

**SENTENCIA Nro. 20/2018-VISTO:**
Para sentencia definitiva de primera instancia estos autos VILA GARCÍA SORDO, RUBEN.
EXTRADICIÓN, IUE 573-460/2017, seguidos contra Ruben Vila García Sordo, con
intervención del Sr. Fiscal Letrado Dr. Enrique Rodríguez, el Estado Requirente Est..los Unidos
Mexicanos y la Defensa Dr. J. Andrés Sarries.

**RESULTANDO:**
1.- Los Estados Unidos Mexicanos deducen formal pedido de extradición contra Ruben Vila
García Sordo, en escrito presentado ante el Ministerio de Relaciones Exteriores de nuestro país el
6 de febrero de 2018 (fs. 32 y 41) y remitido para ante esta Sede el día 7 de febrero de 2018 (fs.
42).

*Esc. Alejandro Menoni Casas*
*Actuario Adjunto*

El pedido de extradición y los documentos que lo acompañan, debidamente apostillados, lucen agregados por cuerda a estos obrados.

En resumen, la extradición se solicita contra el ciudadano mexicano Ruben Vila García Sordo por su probable responsabilidad en un delito de fraude, cometido contra la persona moral denominada Immobiliser Distribuidor de México S.A. de C.V. a título de dolo y en calidad de autor material. Funda su derecho en los arts. 27 y 39 fracción I, y art. 385 fracción III del Código Penal del Estado de Nuevo León (fs. 137 y ss. del legajo).

En cuanto a la narración fáctica, el pedido se remite a lo que surge de la documentación que se acompaña, se indica la filiación del *extraditus* – incluyendo fotografía –, referencia a la orden de aprehensión, posible fecha de prescripción, pena potencial a recaer no menor de dos años, prueba en que basa el pedido e indicación del derecho mexicano y bilateral aplicable (Tratado de Extradición ratificado por ley 17.822).

2.- Con fecha 9 de febrero de 2018 (fs. 64) se celebra la audiencia de debate, y en tal oportunidad se informa al interesado del pedido de extradición en su contra (pista 1. 1.00 minutos y ss.), se concede la prórroga por el tiempo que solicita la Defensa, y retomada la audiencia, se interroga a Ruben Vila García Sordo sobre si consiente la extradición, a lo cuál éste se niega (pista 6. 2.00 minutos) (arts. 344.1 a 344.5 del C.P.P.).

3.- Acto seguido, se cede la palabra a la Defensa del extraditable – Dr. J. Andrés Sarries – quien deduce oposición al pedido, en base a los siguientes hechos y fundamentos de derecho, ofreciendo prueba documental que presenta en dicho acto (pista 6 y 8).

Conforme la documentación de extradición -- expresa en su oposición –, no están dados los supuestos en virtud de lo dispuesto por el art. 4 y 10.3 del Tratado, esto quiere decir, que las pruebas no son suficientes de acuerdo a las leyes de la parte requerida, agregando a posteriori que el coimputado de Ruben Vila García Sordo – su propio padre – habría sido sobreseído, resaltando que el objeto de la extradición es más una cuestión civil que penal.

Por otra parte, la Defensa alega que el extraditable fue emplazado irregularmente en el proceso ante el tribunal mexicano, siendo un vicio de forma que invalida las actuaciones.

Y culmina su oposición invocando la comparecencia irregular del Estado requirente por no hacerlo a través de abogado matriculado en nuestro país.

4.- Cumplida la oposición, se prescinde del traslado al Estado Requirente – quien no puede

Esc. Alejandro Menoni Casas
Actuario Adjunto

cumplir actos procesales por no comparecer con Letrado patrocinante – y se requiere el dictamen del Ministerio Público.

La Sra. Fiscal actuante en dicha oportunidad – Dra. Adriana Di Giovanni – expresa en resumen lo siguiente (pista 9). Este proceso debe regirse por el Tratado, y en autos se cumple con los requisitos que él establece – doble incriminación, pena, narración de hechos, textos legales, no prescripción, etc. - no verificándose los obstáculos que el propio instrumento señala.

La Fiscalía entiende que la prueba agregada es efectivamente suficiente (transferencias de dinero, testigos, falta de registro de aeronaves a nombre del extraditable, etc.), pero además por tratarse de un proceso de cooperación judicial internacional, sólo es necesario el control formal, porque tal es el criterio de interpretación que debe seguirse atento a la naturaleza colaborativa del proceso de autos.

En cuanto a la incomparecencia del requirente, el Tratado no lo exige expresamente y en todo caso, no implica nulidad; y respecto a la irregularidad de la notificación en el tribunal mexicano, su análisis no es resorte de nuestros tribunales.

5.- Por decreto 146/2018 se intima al extraditable la subsanación de los defectos formales de su prueba documental, y se convoca para la continuación de la audiencia en el día 27 de febrero de 2018.

6.- Llegada esta fecha, se continúa con la audiencia. Se fijan el objeto del proceso y de la prueba, se rechaza la prueba documental presentada por el extraditable por razones de forma, y no existiendo más prueba para diligenciar que la que surge del pedido de extradición, de reciben los alegatos de cierre de la Defensa, del Estado requirente – quien compareció asistido por Letrado – y del Ministerio Público, prorrogándose la audiencia para el día de hoy para el dictado de sentencia y a pedido de las partes.

7.- Arresto administrativo: Se deja constancia que el extraditable Rubén Vila García Sordo se encuentra en arresto administrativo desde su aprehensión el 10 de diciembre de 2017, y hasta la fecha (fs. 7).

**CONSIDERANDO**:

1.- Que se hará lugar al pedido de extradición, rechazándose la oposición del extraditable, en base a los siguientes fundamentos.

2.- Comparecencia irregular – o incomparecencia – del Estado requirente: Por tratarse de una típica cuestión previa, corresponde abocarse a su tratamiento inicial, anunciando desde ya el

JA342

Esc. Alejandro Mugnoni Cassi
Actuario Adjunto

rechazo de esta cuestión formal.

Como bien señala la Defensa, el 341.1 CPP dice que el Estado requirente deberá designar abogado-apoderado; sin embargo, la norma no dice qué sanción existe si lo omite. Luego, el art. 344.2 dice que *deberá* comparecer a audiencia, pero nuevamente el código evade expresar la consecuencia de su incomparecencia.

Nótese en este aspecto la diferencia con la regulación de las audiencias que hace el C.P.P. en lo general – cuando expresamente establece que la incomparecencia de una de las partes es causa de nulidad de la audiencia (art. 134.2 y 379 del C.P.P.) – mientras que aquí, en lo particular, no establece esa sanción tan severa. Tratándose justamente de una sanción, no es admisible su extensión analógica por lo que a falta de remisión expresa de las audiencias de extradición a las audiencias generales, no es posible trasladar esa consecuencia tan rigurosa, máxime que el Estado Requirente no está en ninguna parte *asimilado* al Ministerio Público – vale decir, en ninguna parte el código dice que el abogado del Estado requirente hará las veces de fiscalía –, como para que la ausencia de aquél tenga la misma consecuencia que la ausencia de éste.

Téngase presente además que por reenvío del art. 378 del CPP, opera en materia de nulidades el art. 110 del C.G.P., por lo cual no existe nulidad sin ley que la establezca... Esta nulidad está a texto expreso para el Ministerio Público (art. 379 lit. d C.P.P.), pero no para el Estado requirente en un proceso de extradición.

El 341.2 expresa, refiriéndose al abogado del Estado requirente, que su función es de contralor de actos procesales, no exigiéndose en ninguna norma que deba ratificar el pedido de extradición, al estilo del art. 341 del C.G.P., ni tampoco se dice que pueda disponer del pedido. No existe ninguna norma que exija una reiteración o confirmación de la voluntad de extraditar, de forma que su omisión implique un decaimiento o desistimiento del pedido.

Por último y siguiendo a la incipiente doctrina sobre el punto, la no comparecencia del Estado requirente no debe obstar la prosecución del proceso de extradición porque es una obligación legal e internacional del Estado uruguayo proceder a la entrega de los requeridos (art. 330.1 C.P.P.); y como la extradición es un proceso de cooperación jurídica internacional y en la medida que la no participación del requirente no vulnera ningún principio ni de nuestro orden público, ni tampoco otros de derecho internacional, la incomparecencia del requirente no acarrea ninguna invalidez1.

Es cierto que según lo dispuesto en el art. 13 del Tratado – que la extradición debe tramitarse según la legislación de la parte requerida –, parecería que el instrumento realizara una remisión genérica a nuestra normativa. No obstante, ella debe interpretarse respetando el principio de

JA343

*Esc. Alejandro Menoni Casas*
*Actuario Adjunto*

buena fe en el cumplimiento de los Tratados, la no oponibilidad de las normas de derecho interno y el principio del Pacta Sunt Servanda (art. 26, 27 y 31 de la Convención de Viena sobre el Derecho de los Tratados). Esto significa que una modificación reciente del derecho interno, que obviamente no estaba presente al tiempo de acordarse el convenio, y que tiene inferior jerarquía, no puede servir de causa o eximente para el incumplimiento del Tratado, puesto que sería una manera indirecta de denunciar el instrumento y evadir las obligaciones internacionales asumidas por el país.

Por último, el suscrito se permite señalar que en realidad el Estado requirente compareció en la persona del cónsul, cuya representación en calidad de tal no fue controvertida. De esta forma, la parte sustancial – ya que el abogado es parte *formal* (art. 341.2) – compareció, ratificando con su presencia, el interés en la pretensión. Pretender la nulidad de la audiencia – o el decaimiento de la extradición – sin norma específica y habiéndose apersonado el Estado requirente, alegando tan sólo una falta de procuración letrada, implica una consecuencia demasiado gravosa que por lo menos exigiría una disposición clara y contundente, como lo es el art. 340.2 del C.G.P. o el ya citado art. 134.2 de este código, que en este caso no existe.

3.- <u>Contralor formal de los requisitos de la extradición</u>: Previo a ingresar sobre las consideraciones de fondo realizadas por la Defensa, corresponde analizar si el pedido cumple con las condiciones formales (sistema Belga – Holandés), aunque este punto no fue objeto de controversia concreta.

En este sentido, el Tratado exige orden de aprehensión (art. 1º y 10º num. 3º), doble incriminación, pena privativa de libertad que no sea potencialmente inferior a dos años (art. 3º) y que el delito no se halle prescripto (art. 8º).

La orden de aprehensión luce a fs. 113 del legajo e impresiona debidamente fundamentada, tanto por la enumeración de las evidencias como por la valoración que hace de ellas.

La tipificación inicial que hace el tribunal del requirente – delito de fraude (art. 385 fracción III C.P. Nuevo León) – implica que un sujeto indeterminado (no calificado o simple) mediante engaño, o aprovechándose del error de otro, se haga ilícitamente de una cosa o lucro indebido. La descripción guarda razonable equivalencia con nuestro delito de estafa, que también señala un sujeto activo no calificado, habla de inducción en error a otro, de medios típicos como el *engaño artificioso,* y la obtención de un provecho injusto. La única diferencia que se puede notar es que en nuestra legislación se hace hincapié en la naturaleza de los medios típicos, calificando el engaño como *artificioso,* o como *estratagema.* Esta circunstancia ha sido interpretada como la necesidad de una puesta en escena por parte del sujeto activo, una exteriorización de actos, una *mise-en-scène2.*

Esc. Alejandro Menoni Casas
Actuario Adjunto

Si bien en la tipificación del código del requirente no se adjetiva el engaño, la descripción de los hechos que hace la Sra. Juez interviniente, y su valoración, implica que *prima facie* el extraditable armó una representación para lograr la inducción en error: reuniones con las víctimas, exhibición de documentos y folletos, comunicaciones varias, etc., que en todo caso exceden la simple *mentira,* por lo que de acuerdo a lo narrado por el tribunal requirente, más allá de que el tipo penal de su Estado lo requiera o no, habría existido un engaño artificioso, por lo que cumple los requisitos formales de nuestro tipo penal, verificándose en este sentido la doble incriminación requerida por el Tratado.

En cuanto a la pena, tanto en el ordenamiento mexicano como en el nuestro, el delito admite una pena potencial superior a dos años – de cinco a doce años en aquél y hasta cuatro años en éste – teniéndose presente que según la doctrina y la Jurisprudencia, para este análisis se debe tomar el máximo de la pena, ya que tal guarismo es el que por lo menos en teoría, o sea potencialmente, puede recaer.

Y finalmente, en cuanto a la prescripción – y sin perjuicio del *dies a quo* para el cómputo del plazo (setiembre, octubre o diciembre de 2015) – ni con la norma mexicana, ni con la nuestra, el delito se hallaría extinguido.

México informa que la prescripción es de entre cinco y doce años (se estima el 20 de diciembre de 2025, fs. 2 y 125 del legajo), mientras que nuestra ley prevé para el caso de estos delitos una prescripción de diez años (art. 117 C.P.), por lo que desde 2015 a la fecha de la extradición o aprehensión no han transcurrido ninguno de dichos términos.

En conclusión, tanto desde el punto de vista de la ley extranjera como de la nuestra, se cumple con todos los requisitos formales para hacer lugar a la medida solicitada por los Estados Unidos de México.

Por otra parte, no se alegó delito político o militar, falta de jurisdicción, ni que se fuera a juzgar por un tribunal *ad hoc* o de excepción, ni litispendencia, cosa juzgada (*non bis in idem*), rebeldía, o que se corriera peligro de imposición de una pena capital, perpetua, cruel, inhumana o degradante, no existiendo obstáculo de forma para acceder al pedido.

3.- Contralor sustancial de los requisitos para la extradición: El Tratado con México – al igual que los celebrados con Estados Unidos (ley 15.476) y con Gran Bretaña (año 1884) – se adhiere al sistema de contralor llamado *anglo americano* que exige que el Estado requerido verifique si existen pruebas de cargo para la imputación del solicitado3. Esta posición implica una excepción al sistema Belga Holandés o continental, tradicionalmente seguido por nuestra legislación, y

*Esc. Alejandro Menoni Cosas
Actuario Adjunto*

respecto del cual nuestro país se apartó en estos instrumentos en aras de poder llegar a un acuerdo con estas naciones*4*.

En este sentido, el Tratado con México establece textualmente en su artículo cuarto (y reiterado parcialmente en el art. 10.3): *sólo se concederá la extradición si se determina que las pruebas son suficientes, conforme a las leyes de la Parte Requerida, para justificar el enjuiciamiento del reclamado como si el delito por el cual se le acusa hubiese sido cometido en ese lugar...,* por lo que, a diferencia del Tratado con los Estados Unidos, aquí la apreciación de la prueba de cargo no sería facultativa, sino necesaria como reza el acápite de la cláusula citada.

La interpretación de la norma es compleja, ya que por tratarse de un sistema de excepción, no existe demasiada Jurisprudencia vernácula al respecto; no obstante, una interpretación al pie de la letra no es posible ya que en nuestro país, nadie puede ser enjuiciado – ni procesado, ni formalizado – sin su previa comparecencia al proceso, cosa que obviamente no puede exigirse en este caso ya que por un motivo o por otro, el extraditable por definición se sustrae al proceso, se coloca en rebeldía, de tal forma que exigir el mismo estándar en este aspecto sería volver inaplicable el Tratado, que sólo funcionaría respecto de aquellos requeridos con sentencia firme, cuando el propio instrumento habilita la extradición de personas a cuyo respecto exista sólo orden de aprehensión, la llamada extradición instructiva (art. 1º del Tratado)... Como se ha establecido en un fallo al respecto, y es de Pero Grullo, ... *que el detenido nunca declaró ante una autoridad judicial no se puede poner como condición lo que es precisamente el objeto del proceso de extradición...5*

Por consiguiente, la interpretación ajustada al espíritu del Tratado implica entender que la suficiencia de la prueba de cargo debe medirse con nuestro rasero sí, pero al momento en que por razones no imputables al Estado requirente, el extraditable se sustrajo al proceso, ya sea por fuga, ya sea por no comparecencia: en otras palabras, si con la prueba reunida al momento del dictado de la orden de aprehensión – y de haber estado presente el extraditable – hubiera podido ser enjuiciado de acuerdo a los criterios probatorios de nuestro país.

En este sentido, la Jurisprudencia ya citada y en relación a un caso juzgado de acuerdo al Tratado con Gran Bretaña que sigue el mismo principio, ha entendido que la expresión de que las pruebas sean suficientes para sostener la acusación, si bien obliga a ingresar al examen de fondo, no lo hace para juzgar al fugitivo – que es competencia siempre de requirente – sino para decidir la procedencia de la extradición, y bajo el principio rector de la cooperación penal internacional, ello implica determinar si las pruebas son fundadas, si los cargos son verosímiles o probables, en grado propio de un proceso cautelar y no principal... En otras palabras, basta que el examen de las pruebas de cargo revele un *fumus bonis iuris* para que se demuestre en grado de probabilidad la culpabilidad y se acceda de esta forma, a la extradición solicitada6.

*Esc. Alejandro Menoni Casas*
*Actuario Adjunto*

Por lo tanto, el criterio a seguir en estos casos es el de valorar la prueba de cargo al momento en que el proceso se suspendió en el país requerido – por incomparecencia del extraditable, presupuesto lógico de la extradición – y con el criterio de la verosimilitud, la apariencia, la probabilidad y nunca con el grado de certeza que puede ser propio de una sentencia definitiva, o aun de un proceso seguido ante el tribunal competente, ya que eso invadiría la competencia jurisdiccional del Estado requirente.

4.- El caso concreto y sus pruebas: El pedido se basa en los siguientes hechos.

Entre setiembre y diciembre de 2015, el extraditable y su padre – Ramón Vila Cid – presentándose como socios de la empresa Estilo VR, S.A. de C.V., y mediante engaño, hicieron creer a la víctima que ofrecían servicio de taxi aéreo y venta de horas jet para viajes ejecutivos nacionales e internacionales, pagando ésta última por tal servicio inexistente la suma de $5.042.491,79. Según la imputación, el extraditable y su padre, quienes había conocido a los representantes de la sociedad víctima en agosto de 2015, propusieron sus servicios y en una reunión celebrada en setiembre de ese mismo año, les hicieron la oferta concreta y les exhibieron documentación varia, entre las que figuraba el contrato constitutivo de la sociedad que prestaría el servicio.

Los directivos de la sociedad damnificada decidieron adquirir un total de 120 horas de vuelo al precio conveniente que se les había ofrecido, y el extraditable y su padre les pidieron el depósito del dinero en sus cuentas personales. Así se hizo mediante transferencia bancaria y por el total de dinero ya mencionado, y se agendó el primer vuelo para el 22 de diciembre de 2015.

El extraditable y su padre comunicaron a la víctima Immobiliser Distribuidor de México S.A. de C.V. que el vuelo ya estaba coordinado para esa fecha, pero al acercarse el día comenzaron a tener dificultades para comunicarse con aquéllos, luego expresaron que habían surgido inconvenientes con la aeronave y finalmente, según la víctima, se perdió toda comunicación con los imputados. Las autoridades del Aeropuerto por su parte manifestaron a los representantes de la sociedad damnificada que desconocían a la empresa, así como a Rubén Vila García Sordo y su padre.

La prueba que se acompaña con el pedido de extradición – y que se considera relevante para la presente sentencia – es la siguiente:

- Contrato social de la sociedad del extraditable Estilo VR Sociedad Anónima de Capital Variable (fs. 29 y ss. del legajo acordonado)
- Comprobantes fiscales de recibos de honorarios asimilables a salarios (fs. 55 a 58).
- Oficio de la Comandancia del Aeropuerto Internacional del Norte (fs. 66).

JA347

*Esc. Alejandro Menoni Casas*
*Actuario Adjunto*

- Declaración de José Miguel Rodríguez (fs. 71) y Diego Rodrigo Sánchez (fs. 73).
- Inspección policial negativa (fs. 77 y ss.)

¿Que se extrae de estas evidencias? En primer lugar, las declaraciones de los representantes de la parte denunciante – José Miguel Rodríguez y Diego Rodrigo Sánchez – resultan verosímiles y coinciden en los detalles más importantes. Así el primero de ellos declara: ...*más o menos en setiembre del año 2015 estas personas se reportaron a mis oficinas con la finalidad de ofrecerme servicios de horas vuelo de avión (...) a la semana siguiente acudieron a nuestras oficinas (...) y nos ofrecieron dichos servicios con aviones propios (...) nos mostraron el acta constitutiva de dicha empresa Estilo VR, S.A. de C.V. (...) nos refirieron que por estrategias fiscales y procedimiento de agilización de trámites se depositaran en sus cuentas personales (...) al llegar ese día, nos presentamos en el aeropuerto, y esperábamos la atención de primera que nos habían prometido y para sorpresa de nosotros el personal del aeropuerto nos señaló desconocer a dicha empresa (...) al señor Ruben Vila García Sordo (...) y que no sabían de servicios de taxi aéreo (...) no hemos podido localizarlas por ningún medio (fs. 71 y 72).*

Diego Rodrigo Sánchez por su parte expresó: ...*siendo todavía el mes de setiembre acudieron a mis oficinas (...) con la finalidad de justificar que se dedicaban a dicho giro me lo justificaron con el acta constitutiva de dicha empresa Estilo VR, S.A. de C.V., de la cual observamos que Rubén Vila García Sordo aparecía como socio de la misma (...) (depositamos) en sus cuentas personales (...) ya que nos refirieron que por estrategias fiscales y para agilizar el trámite... (...) personal del aeropuerto nos señaló desconocer a dicha empresa... (...) hasta el momento no sabemos de dichos personajes, pues en el aeropuerto no tienen idea de quienes son... (fs. 73 y 74).*

Como se puede apreciar, estas declaraciones tomadas ante la Procuraduría General son contestes en varios aspectos claves de la maniobra que se imputa *prima facie*: coinciden en la oportunidad en que se celebró la reunión en las oficinas de la sociedad damnificada (setiembre de 2015), en que exhibieron el estatuto social de Estilo VR, S.A. de C.V., en el que el extraditable y su padre solicitaron que el dinero se girara a sus cuentas personales por razones *fiscales* y de *agilización* de los trámites, y por último, también coinciden en cuanto al hecho de que comparecieron al aeropuerto y en dicho lugar no se conocía ni a la empresa, ni a sus titulares.

Las declaraciones de estas personas pueden asimilarse a la declaración de las víctimas – ya que representan a la sociedad damnificada – pero ello no les quita valor porque según nuestra Jurisprudencia la víctima o damnificado es testigo hábil, sin perjuicio de la valoración de sus testimonios conforme a las reglas de la sana crítica[7]. Pero además de ello, las declaraciones son creíbles pues coinciden en elementos fundamentales, que como se verá, son además verificados por otros elementos obrantes en el legajo.

En efecto, el contrato social de Estilo VR S.A. de C.V. contiene en la descripción de su objeto la prestación de servicios de transporte aéreo, como los denunciantes manifiestan tanto en su escrito de denuncia como en sus testimonios (fs. 29). Esto quiere decir que la verosimilitud crece en la medida que el documento que dicen les fue exhibido existe, y tiene las cláusulas que los denunciantes señalan.

Luego, también figuran agregadas las transferencias o depósitos bancarios a título personal del extraditable y su padre, que sumados dan la cifra en la que estiman el perjuicio económico. Una vez más, la existencia de estos documentos – reitero, depósitos en cuentas personales y no de la empresa – refuerzan la credibilidad del testimonio de los deponentes.

Y por último, dos evidencias de indudable valor indiciario: la inexistencia de las oficinas de la empresa en la dirección que habrían dado los implicados (fs. 23, 77 y ss.) y tal vez la más importante de todas, la constancia de la Comandancia del Aeropuerto Internacional del Norte de que ni Estilo VR, S.A. de C.V., ni el extraditable o su padre tienen aeronaves registradas a su nombre ni servicio de taxi aéreo (fs. 66), informe que viene a confirmar la declaración de los representantes de la damnificada respecto a que llegaron al aeropuerto y nadie conocía, ni a la sociedad, ni Rubén Vila García Sordo.

Los extremos que vienen de señalarse, si se miran aisladamente pueden parecer hechos sin intención dolosa, pero como dice nuestra Jurisprudencia, la división de los medios de prueba, *"...la deliberada desarticulación del conjunto probatorio con el evidente propósito de debilitar individualmente los elementos de juicio, constituye una estrategia defensista que, una vez advertida, ninguna eficacia tiene en la fuerza conviccional del material considerado..."8*. Por lo tanto, la correcta valoración implica una análisis individual sí, pero contextual también, y visto desde esta perspectiva, las ofertas económicamente muy beneficiosas – precio rebajado por paquete y cotización privilegiada del dólar – el pedido del depósito por adelantado y de forma irregular – no a nombre de la empresa, sino de particulares – la ausencia de un lugar físico asiento de la sociedad, carencia de aeronaves para cumplir con el negocio y lo que es peor, ignorancia de parte de los agentes aeroportuarios de la existencia de Estilos VR S.A. de C.V. y sus representantes, indican que se trató de una maniobra deliberada para inducir en error a la víctima y obtener un provecho injusto, mediante el engaño de presentarse como operadores de una empresa de taxi y transporte aéreo inexistente en los hechos, mediante la exhibición por lo menos del contrato social y la realización de reuniones y múltiples comunicaciones en tal sentido, lo que implica una exteriorización de actos que perfectamente ingresan – conforme nuestro derecho – en los medios típicos de las estratagemas y engaños artificiosos.

Naturalmente que falta prueba por diligenciar, naturalmente que falta la declaración de los

JA349

imputados, naturalmente que éstos pueden destruir el valor de convicción de los elementos señalados mediante documentos o testigos, pero conforme al criterio señalado, al momento de dictarse la orden de aprehensión – oportunidad en que el proceso en México debió suspenderse por incomparecencia de los implicados – existían y existen elementos que hacen verosímil la prueba de cargo, que describen un delito en razonable grado de probabilidad que configura la apariencia del derecho necesario y suficiente, si bien no para condenar – que no es tarea de nuestros tribunales – sí para dar por bien fundada la extradición, para entender que al momento del dictado de la orden existían datos suficientes para *enjuiciar,* o sea, formalizar o vincular a proceso, por lo que debe rechazarse la oposición y hacer lugar al pedido de los Estados Unidos Mexicanos.

En términos de la ley mexicana, existían *datos de prueba,* esto es la referencia a un medio de convicción que se haya señalado en la carpeta de investigación de la Fiscalía, que pese a no haber sido diligenciado ante un tribunal – *desahogado* – es no obstante suficiente tanto para el dictado del auto de vinculación al proceso, o como en este caso, para la orden de aprehensión (art. 141 y ss. de CNPP). Y téngase presente que la idoneidad del *dato de prueba* que requiere la ley mexicana – que pueda establecer razonablemente la existencia de un hecho delictivo y la probable participación del imputado (art. 261 C.N.P.P.9) – es muy similar a la idoneidad que nuestra ley exige para que el Ministerio Público ejerza el poder deber de solicitar la formalización, esto es, que cuente en su carpeta de investigación con elementos objetivos suficientes que den cuenta de la comisión de un delito y la identificación de los presuntos responsables (art. 266 C.P.P.).

Naturalmente, el nivel de certeza del *dato de prueba10* como de las evidencias en nuestro derecho es necesariamente menor al que se requiere para el dictado de sentencia definitiva, y es con tal criterio entonces – probabilidad, verosimilitud, apariencia, etc. – que debe medirse la *prueba de cargo* para el enjuiciamiento, en el mismo sentido que la sentencia ya citada y referida a la extradición con el Reino Unido.

Por último, la omisión de una notificación que alega el extraditable no se ha acreditado, pero en todo caso – conforme éste está al tanto del pedido en su contra – no parece ser un vicio de tal entidad como para desvirtuar el pedido de extradición, sin perjuicio claro está, de las consecuencias que pueda tener ante las autoridades judiciales de su país.

El alegado *sobreseimiento* señalado por la Defensa, que se habría verificado en los procesos de amparo, amén de no referirse al extraditable, sino a su padre, no fue incorporado a proceso, por lo que no existe prueba de tal circunstancia.

En conclusión, el suscrito Magistrado entiende que al momento del dictado de la orden de

aprehensión – que funda la extradición – existían pruebas suficientes, entendidas como datos de prueba o evidencias en atención a la etapa en que se encontraba la investigación, para que conforme la legislación de Uruguay se pudiera enjuiciar – hoy por hoy, *formalizar* – al extraditable, ya que señalan con razonable probabilidad, verosimilitud y objetividad la conducta delictiva, y la participación del extraditable.

Asimismo, se cumplen los requisitos formales ya indicados *supra* por lo cual no corresponde otra consecuencia que la de hacer lugar al pedido.

5.- Prevenciones: Sírvase tener presente el Estado requirente lo dispuesto por el art. 17º del Tratado de Extradición – principio de especialidad –, los gastos del transporte (art. 18º), así como el plazo de sesenta días para hacer efectiva la entrega (art. 14º).

**FALLO**:

*Por los fundamentos expuestos, fallo:*

*1.- Desestímase la oposición del extraditable Rubén Vila García Sordo y en su mérito, concédase su extradición para ante el Estado requirente Estados Unidos Mexicanos.*

*2.- Sírvase tener presente el Estado requirente las prevenciones efectuadas en el considerando 5º que antecede.*

*3.- Consentida o ejecutoriada, comuníquese al Estado requirente a través de exhorto internacional, notificación a la Embajada y a Interpol, y póngase al extraditable y a los efectos que se le incautaron, a disposición del requirente para que haga efectivo el traslado en el plazo señalado por el Tratado de Extradición.*

1 Perciballe López, Ricardo: Estudios sobre el Código del Proceso Penal. F.C.U. 2017, pág 237 y 238.

2 Tabarez Maiz: Análisis del Delito de Estafa. En Estudios de la Parte Especial del Derecho Penal Uruguayo. 1999. Págs. 176 y ss.

3Perciballe López, Ricardo: Estudios sobre el Código del Proceso Penal. F.C.U. 2017, pág. 209.

4 Matteo Terra, Vivien: Jurisprudencia Sistematizada de Derecho Internacional Privado. Sección Extradición. CADE 215. 11 de junio de 2009.

5L.J.U. Caso 10.952. Tomo 96. Año 1988.

6L.J.U. Caso 10.952. Ibídem.

7 Sent. 392/07. T.A.P. 2º Rev. de D. Penal Nº 19, caso 429.

8 Sent. 226/08. T.A.P. 1º. BJN y Sent. 141/03 del T.A.P. 1º, Rev. de D. Penal Nº 15, caso 470.

9 Código Nacional de Procedimientos Penales. México.

10Zeferín Hernández, Iván Aarón: La Prueba Libre y Lógica. Sistema Penal Acusatorio Mexicano. Noviembre de 2016. Pág. 38.

JA351

Esc. Alejandro Menoni Casas
Actuario Adjunto

2 Tabarez Maiz: Análisis del Delito de Estafa. En Estudios de la Parte Especial del Derecho Penal Uruguayo. 1999. Págs. 176 y ss.

3Perciballe López, Ricardo: Estudios sobre el Código del Proceso Penal. F.C.U. 2017, pág. 209.

4 Matteo Terra, Vivien: Jurisprudencia Sistematizada de Derecho Internacional Privado. Sección Extradición. CADE 215. 11 de junio de 2009.

5L.J.U. Caso 10.952. Tomo 96. Año 1988.

6L.J.U. Caso 10.952. Ibídem.

7 Sent. 392/07. T.A.P. 2° Rev. de D. Penal N° 19, caso 429.

8 Sent. 226/08. T.A.P. 1°. BJN y Sent. 141/03 del T.A.P. 1°, Rev. de D. Penal N° 15, caso 470.

9 Código Nacional de Procedimientos Penales. México.

10Zeferín Hernández, Iván Aarón: La Prueba Libre y Lógica. Sistema Penal Acusatorio Mexicano. Noviembre de 2016. Pág. 38.

2 Tabarez Maiz: Análisis del Delito de Estafa. En Estudios de la Parte Especial del Derecho Penal Uruguayo. 1999. Págs. 176 y ss.

3Perciballe López, Ricardo: Estudios sobre el Código del Proceso Penal. F.C.U. 2017, pág. 209.

4 Matteo Terra, Vivien: Jurisprudencia Sistematizada de Derecho Internacional Privado. Sección Extradición. CADE 215. 11 de junio de 2009.

5L.J.U. Caso 10.952. Tomo 96. Año 1988.

6L.J.U. Caso 10.952. Ibídem.

7 Sent. 392/07. T.A.P. 2° Rev. de D. Penal N° 19, caso 429.

8 Sent. 226/08. T.A.P. 1°. BJN y Sent. 141/03 del T.A.P. 1°, Rev. de D. Penal N° 15, caso 470.

9 Código Nacional de Procedimientos Penales. México.

10Zeferín Hernández, Iván Aarón: La Prueba Libre y Lógica. Sistema Penal Acusatorio Mexicano. Noviembre de 2016. Pág. 38.

2 Tabarez Maiz: Análisis del Delito de Estafa. En Estudios de la Parte Especial del Derecho Penal Uruguayo. 1999. Págs. 176 y ss.

3Perciballe López, Ricardo: Estudios sobre el Código del Proceso Penal. F.C.U. 2017, pág. 209.

4 Matteo Terra, Vivien: Jurisprudencia Sistematizada de Derecho Internacional Privado. Sección Extradición. CADE 215. 11 de junio de 2009.

5L.J.U. Caso 10.952. Tomo 96. Año 1988.

6L.J.U. Caso 10.952. Ibídem.

7 Sent. 392/07. T.A.P. 2° Rev. de D. Penal N° 19, caso 429.

8 Sent. 226/08. T.A.P. 1°. BJN y Sent. 141/03 del T.A.P. 1°, Rev. de D. Penal N° 15, caso 470.

9 Código Nacional de Procedimientos Penales. México.

10Zeferín Hernández, Iván Aarón: La Prueba Libre y Lógica. Sistema Penal Acusatorio Mexicano. Noviembre de 2016. Pág. 38.

JA352

IUE 573-460/2017

In the city of Montevideo, on March 1st of two thousand eighteenth, at 15:14, with First Instance Criminal Judge of the 43rd Shift, Dr. Marcelo Malvar Juncal, in the matter of the Hearing of VILA GARCIA SORDO, RUBEN EXTRADITION -IUE 573-460 /2017, in which Dr/a. E. Rodriguez appears on behalf of the prosecution of financial and complex crimes, first shift and email of sippau1@notificaciones.poderjudicial.gub.uy; representing the Mexican Government appears consul Francisco Hernandez with consular identification card CC557, assisted by Dr. Dotta, on behalf of the defense Dr. Sarries and the following facts about the accused: RUBEN VILA GARCIA SORDO, all of which are part of the record of this matter.

The audio of the Hearing at hand will be recorded in the Audire system and will become part of the record. It is made clear that the decisions reached by this Magistrate during the Hearing will be duly audio recorded and transcribed on paper, as an integral part of the decisions reached on this matter.


**DECREE Num. 233/2018-**

BROUGHT TO THE ATTENTION OF THE COLLECTIONS OF FS 84/87

**SENTENCE Num. 20/2018-CONSIDERED:**

The final sentence of first instance in the matter VILA GARCIA SORDO, RUBEN EXTRADITION, IUE 573-460/2017, initiated against Ruben Vila Garcia Sordo, as prosecuted by District Attorney Dr. Enrique Rodriguez, the Petitioner State of the United States of Mexico and the Defense by Dr. J. Andres Sarries.


**<u>AS A RESULT</u>:**

1-The United States of Mexico formally request the extradition of Ruben Vila Garcia Sordo, by presenting a written petition before the Ministry of Foreign Relations of our country on February 6, 2018 (pgs. 32 and 41) and addressed to this Forum on February 7, 2018 (pg. 42).

1

The petition for extradition and the accompanying documents, dully certified by government authorities, appear to be incorporated to the record.

In summary, the requested extradition against Mexican citizen Ruben Vila Garcia Sordo for his probable responsibility in the crime of fraud, committed against the corporate entity by the name of Immobiliser Distribuidor de Mexico S.A. de C.V., on the basis of fraud and in the capacity of author. The petition is premised on articles 27 and 39 fraction I, and art. 385 fraction III of the Criminal Code of the State of Nuevo Leon (pgs. 137 and subsequent of the document). Regarding the facts, the petition is premised on the accompanying documentation, the affiliation of the *extraditus* is specified –including his picture—reference is made to the arrest order, possible date the statute of limitation expires, potential sentencing of no less than two years, evidence supporting the request and specification of Mexican and bilateral applicable laws (Treaty on Extradition ratified by law 17,822).

2-On February 9, 2018 (pg. 64) a contentious hearing is held, in which the party interested in the extradition is informed that against it (recording 1. 1.00 minutes and ss) the defense has been granted the requested extension of time, the hearing goes on with the interrogation of Ruben Vila Garcia Sordo where is asked if he consents to his extradition, to which he is opposed (recording 6. 200 minutes) (arts 344.1 a 344.5 of C.P.P.).

3-Immediately afterwards, the Defense of the extraditable -Dr. J. Andres Sarries—who argues his opposition to the extradition, premised on the following facts and legal arguments, offering documentary evidence which he presents in said hearing (recording 6 and 8).
In accordance with the documentation for extradition -he expresses in opposition—that the requirements are not met as established in art. 4 and 10.3 of the Treaty, meaning that the evidence is not sufficient as established by the laws of the extraditable, adding that the co-accused of Ruben Vila Garcia Sordo –his own father—would have been dismissed, emphasizing that the object of the extradition is rather civil in nature than criminal.

On the other hand, the Defense argues that the extraditable was summoned in an irregular fashion before the Mexican court, being this a technical fault that voids the procedures undertaken.

The Defense ends its opposition raising the irregular appearance of the petitioning State by not appearing through license attorney from our country.

2

4-Once the opposition was presented, the Petitioner State is prescinded of complying with procedural formalities for not appearing with a a licensed attorney, the Prosecution is asked for its stance on the matter.

In summary, Prosecutor –Dr. Adriana Di Giovanni—expresses that (Recording 9) this matter should be governed by the Treaty, and the procedures comply with the requirements it establishes –double processing, sentencing, factual narration, legal authorities, compliance with statute of limitations, etc—finding none of the faults established by the Treaty.

The Prosecution is of the understanding that the evidence offered is in fact sufficient (transfers of money, witnesses, lack of registration of the airplane on behalf of the extraditable, etc.), in addition to the proceedings being a matter of international judicial cooperation, it only requires control formalities, because that is the interpretation criteria that should be followed given the cooperative nature of the process in this matter.

Regarding the absence of the petitioner, the Treaty does not require it expressly, and in any case it does not imply the process is void; in regards to the irregularities in the notification to the Mexican court, its analysis is not an issue for our courts.

5-Decree 146/2018 allows the extraditable to fix the formal defects in its documentary evidence, and he was summoned for the continuation of the hearing on February 27, 2018.

6-Upon the arrival of this date, the hearing is continued. The objective of the process and the evidence is established, and the documentary evidence presented by the extraditable is rejected due to defects in its formalities: given the absence of further evidence in the petition to extradite, the closing arguments of the Defense are received, and also those of the Petitioner State –which appeared represented by a license attorney—and the Prosecution, establishing the sentencing hearing for today in response to all parties.

7-<u>Administrative Arrest</u>: It is verified that the extraditable Ruben Vila Garcia Sordo is under administrative arrest since he was captured on December 10, 2017 to this day (pg. 7).

**CONSIDERING:**

1-The petition for extradition will be granted, rejecting the arguments of the extraditable, given the following premises:

3

2-<u>Irregular Appearance – no appearance – of the Petitioner State</u>: given that this has been previously addressed, it will receive the same treatment as before, rejecting this formal issue at the threshold.

As the Defense clearly establishes, 341.1 CPP says that the State shall designate an attorney with faculties to represent it; however, the rule does not establish a sanction to the contrary. Afterwards, art. 344.2 says it should appear at the hearing, but once again the code does not establish a consequence for failing to do so.

Note the difference established by C.P.P. in general terms and particular terms between hearings –it expressly established that not appearing at a hearing is reason enough to void the hearing (art. 134.2 and 379 C.P.P), while particularly this severe sanction is not established. Given the nature of a sanction, it cannot be treated in an analogous fashion, and in the absence of an express exclusion of the extradition hearings, is not possible to transfer that rigorous consequence, considering that the Petitioner State is in no way similar to the Prosecution –in other words, nowhere in the code it is said that the attorney of the Petitioner State is the same as the Prosecution—as if the absence of the first has the same consequences as the absence of the last.

Keep in mind that under the direction of art. 378 of C.P.P., in matters of nullity art. 110 of C.G.P. operates, reason why there are no grounds for nullity unless a statute establishes it. This nullity is specifically addressed to the Prosecution (art. 379.lit d C.P.P.), but not to the Petitioner State in extradition proceedings.

[Art.] 341.2 establishes, regarding the attorney for the Petitioner State, that his functions relate to that of an intervenor of procedural acts, at no time having the obligation to ratify the petition for extradition, as provided by art. 341 of C.G.P., and in the same way not having to dispose of the petition. There is no statutory requirement to reiterate or confirm the will to extradite, so that its omission is not a lapse or withdrawal of the petition.

Last, and according to the doctrine related to this point, the absence of the Petitioner State is not an obstacle to the prosecution of the extradition process because it is a legal and international obligation of the Uruguayan State to proceed to the deliverance of those who are extraditable (art. 330.1 C.P.P.); given that extraditions are a process of international legal cooperation, and in the measure that the lack of participation by the petitioner does neither

4

attempt against any principle nor our public order, or any other of international law, the lack of appearance of the petitioner carries no weight to nullify the proceedings.

It is true that art. 13 of the Treaty states that the extradition should be governed in accordance with the legislation of the petitioned party, which appears as if the Treaty is generically referring to our legal framework. However, this should be interpreted considering the principle of good faith in compliance with Treatises, the no opposability of the norms of internal statutory frameworks, and the principle of Pacta Sunt Servanda (art. 26, 27 and 31 of the Vienna Convention on the Right of Treatises). This means that a recent modification to an internal norm, which obviously was not present at the time the Treaty was agreed to, and has inferior hierarchy, cannot serve as a pretext or excuse to compliance with a Treaty, given that it would be an indirect way to denounce the instrument and evade international obligations agreed to by the state.

Last, the undersigned allows himself to point out that in fact the Petitioner State appeared in the person of the consul, whose representation in that quality was not opposed. In this way, the substantial part –given that the attorney is the *formal* part (art. 341.2)—appeared, ratifying with his presence, the interest in the claim. Pretending the hearing is void –or the withdrawal of the extradition—without a specific norm and having the Petitioner State appeared, alleging the absence of a licensed attorney, implies terrible consequences which at least require a specific and overwhelming instruction, as that of art. 340.4 of C.G.P. or already cited art. 134.2 of this code, which in this case does not exist.

3-<u>Formal intervenor of the requirements for extradition</u>: Before considering the merits of the arguments of the Defense, it must be determined if the petition complies with the formal conditions (Belgic system – Dutch), despite the fact that it was not an issue in controversy.

In this sense, the Treaty requires an arrest order (art. 1 and 10 num. 3), double processing, imprisonment of no less than two years (art. 3) and that the statute of limitations has not expired (art. 8).

The arrest order appears on page 133 of the brief and appears to be duly established because of the enumeration of the evidence as well as its analysis.

The typification of the crime by the Petitioner State –crime of fraud (art. 385 fraction III C.P. Nuevo Leon) –implies that an undetermined subject (unqualifed or simple) through deceit, or taking advantage of another one's error, seizes something or unduly profits. This description is

5

similar to that of our crime of "estafa" [another word for "fraud"], which also points to an unqualified active subject, speaks of deception of another one, by typical means of artificial deception, to acquire an unjust gain. The only difference worth mentioning is that our legislation makes an emphasis on the nature of the typical means, qualifying the deceit as artificial, or as stratagem. This circumstance has been interpreted as the need to create a scene on the part of the active subject, exteriorizing acts, a *mise-en-scene2.*

If the Petitioner's code does not describe deceit, the description of the facts done by the intervening Judge, and his assessment, implies that *prima facie* the extraditable created a stage to achieve the inducement of error: meetings with the victims, display of documents and booklets, various communications, etc., which in every way go beyond a mere lie, reason why in accordance with the narration of petitioner court, and whether the criminal legislation of the State requires it or not, there was artificial deceit, which meets the requirements of our criminal system, verifying in this way the double processing required by the Treaty.

Regarding the penalty, both in the Mexican system as in ours, the crime allows a maximum potential penalty greater than two years –from five to twelve years in the first, and four years in the last— having present that for this analysis the doctrine and caselaw establish that the maximum penalty should be considered, given that this figure at least in theory, or potentially, could be imposed.

Finally, regarding the statute of limitations –and without having an effect on the *dies a quo* for the computation of the time (September, October or December of 2015) –neither with the Mexican provisions nor the Uruguayan provisions the crime has prescribed.

Mexico reports that the statute of limitations is between five and twelve years (approximately on December 20th, 2025, pgs. 2 and 125 of the brief), while our statutory system provides for these crimes a statute of limitations of ten years (art. 117 C.P.), reason why since 2015 to the date of extradition or arrest none of said terms has transpired.

In conclusion, from the perspective of foreign law as well as local law, all the formal requirements are met to grant the petition of the United States of Mexico.

On the other hand, no political or military crime was alleged, lack of jurisdiction, or judgment by an *ad hoc* or exception court, *lis pendens*, estoppel (*non bis in idem*), default, or the risk of death penalty, life in prison, cruel or inhumane or degrading punishment, absent the presence of an obstacle to grant the petition.

JA358

3-<u>Substantial Intervenor of the requirements for extradition</u>: The Treaty with Mexico –as well as those agreed to with the United States (law 15.476) and Great Britain (year 1884) – adhere to the intervenor system call *anglo American* which requires that the Petitioned State verifies if there is evidence to charge and accuse the extraditable. This position implies an exception to the Belgian Dutch or continental systems, traditionally followed by our legislation, and regarding which our country parted with these instruments in order to reach agreements with these nations.

In this sense, the Treaty with Mexico in its fourth article textually established (and partially reiterated in art. 10.3) that *extradition shall only be granted if evidence is sufficient to establish that in accordance with the laws the of Petitioned Party it is fair to process the extraditable as if the crime for which s/he is accused has happened in this place…*, differing from the Treaty with the United States, the assessment of the evidence to accuse is not facultative, but necessary as the cited portion states.

The interpretation of the rule is complex, because given that it is an exception-based system, not much explanatory caselaw exists; however, a literal interpretation is not possible, because in our country no one can be either prosecuted or sentenced without his/her appearance at the proceedings, element which cannot be required in this case because for one reason or another, by definition the extraditable is subtracted from the process, is found in default, which explains why applying this standard would make the Treaty inapplicable, and would only apply to those that are petitioned who have a final sentence, when the Treaty itself allows the extradition of persons who only have an arrest order, the so called "instructive extradition" (art. 1 of the Treaty)… It has been established in an opinion by Pero Grullo, … [that] *the detainee who has not appeared before judicial authority cannot be imposed a condition that is precisely the object of the extradition proceedings…*5

Consequently, the interpretation that agrees with the spirit of the Treaty implies the understanding that the sufficiency of the evidence should be measured with the same rigor, but at the time that for reasons not attributable to the Petitioner State, the extraditable was subtracted from the process, due to flight, or due to lack of appearance: in other words, if with the evidence gathered at the time the arrest order is issued –and the extraditable was present—s/he could have been processed in accordance with the evidentiary criteria of our country.

7

JA359

In this sense, the cited caselaw and in relation to estoppel in accordance with the Treaty with Great Britain which follows the same principle, it is understood that the expression on the sufficiency of the evidence to sustain the accusation, requires thorough analysis, but not in order to judge the fugitive –which is always under the authority of the petitioner state—but to decide on the viability of the extradition, under the guiding principle of international criminal cooperation, implies and requires a determination of whether the evidence is well founded, if the charges are credible or probable, on itself in a precautionary and not principal process. In other words, it is enough that an analysis of the evidence brought by the prosecution reveals a *fumus bonis iuris* to demonstrate the degree of probability of culpability, and in this way proceed to the requested extradition.

Therefore, the criteria to follow in these cases is the assessment of the evidence brought by the prosecution at the time the proceedings were suspended in the petitioned country –for failure to appear, logical presumption of the extradition—through the criteria of truthfulness, appearance, probability, and never to the degree of certainty of a final verdict, or even before the proceedings of a competent judge, because it would void the jurisdictional competence of the Petitioner State.

4-The specific case and its evidence: The petition is based on the following facts: Between September and December 2015, the extraditable and his father –Ramon Vila Cid— appearing as partners in the corporation of Estilo VR, S.A. de C.V., through fraud, deceived the victim corporation and made it believe that they offered aerial taxi services and the sale of jet travel hours for national and international executive trips, for which the victim paid for the inexistent service the amount of $5,042,492.79. According to the accusation, the extraditable and his father, who had met the representative of the victim corporation in August 2015, offered their services and in a meeting held in September 2015, they made the offer and showed various documents, among which were the articles of incorporation of the entity that would render the services.

The governance of the harmed corporation decided to acquire a total of 120 hours of air travel at the price that was offered, and the extraditable and his father asked for a deposit in their personal accounts. The bank transfer was completed for the amount mentioned, and the first trip was schedule for December 22, 2015.

8

The extraditable and his father told the victim Immobiliser Distribuidor de Mexico S.A. de C.V. that the trip was already scheduled for that date, but when the day arrived they started to experience difficulties communicating with them, who later expressed they had problems with the airplane, and finally, according to the victim, all communication with the accused was lost. The authorities of the Airport expressed to the harmed corporation that they did not know the service corporation, neither Ruben Vila Garcia Sordo nor his father.

The evidence that accompanies the extradition petition –and which is consider relevant for the sentence at hand—is the following:

- Articles of Incorporation of the extraditable corporation Estilo VR Sociedad Anonima de Capital Variable (pgs. 29 and subsequent of the filed brief)
- Tax payment receipts for paid salaries (pgs. 55-58)
- Official Statement of the Command of the International Airport of the North (pg.66)
- Declaration of Jose Miguel Rodriguez (pg.71) and Diego Rodrigo Sanchez (pg. 73)
- Negative Police Inspection (pg. 77 and subsequent)

What conclusion can be reached from this evidence? First, the declarations of the claimants –Jose Miguel Rodriguez and Diego Rodrigo Sanchez—are credible and coincide in the most important details. In this way the first one of them declares: … *close to September 2015 these persons showed up at our offices with the purpose of offering the services of air travel (...) the next week they showed up at our offices (...) and offered said services with their own airplanes (...) they showed us the articles of incorporation of Estilo VR, S.A. de C.V. (...) and explained that for tax treatment purposes, and to speed up procedures [payments] should be deposited in their personal accounts (...) when the day arrived, we showed up at the airport, and we expected the first class service we were promised, and to our surprise airport personnel said they did not know that corporation (...) nor Mr. Ruben Vila Garcia Sordo (...) and that they did not know of air taxi service (...) we have not been able to locate them by any means (pgs. 71 and 72).*

Diego Rodrigo Sanchez expressed on his part: *during the month of September they showed up at our offices (...) with the goal of showing that they were engaged* [in said business] *which they justified with the articles of incorporation of Estilo VR, S.A. de C. V., which we observed had Ruben Vila Garcia Sordo appeared as its partner (...) we deposited in their personal accounts (...) which we were told it was done for tax purposes and to facilitates proceedings (...)*

9

*airport personnel told us they did not know that corporation (…) so far we do not know about
those individuals, because at the airport they do not know who they are (pgs. 73 and 74).*

As can be seen, these declarations were taken before the Office of the Solicitor General and
are consistent in important points of the scheme that is imputed *prima facie*: they coincide on the
time the meeting was held at the office of the harmed corporation (September 2015), in that they
showed the articles of incorporation of Estilo VR, S.A. de C.V., [meeting] in which the
extraditable and his father required the money paid on their behalf be deposited in their personal
accounts for tax purposes and to facilitates proceedings, and last, they coincide with the fact that
they showed up at the airport, and neither the corporation nor its directors were known there.

The declarations of these persons are similar to those of the victims –who represent the
harmed corporation—which does not subtract value because in our caselaw the victim or harmed
entity is a capable witness, without detriment of the assessment of their testimonies in
accordance with the rules of sound judgment. In addition, the declarations are credible because
they coincide in fundamental elements, which will be seen confirmed by other elements
appearing in the brief.

In effect, the articles of incorporation of Estilo VR S.A. de C.V. have the description of its
purpose, providing air transportation, as the complainants express in their complaint as well as in
their testimonies (pg. 29). This means that the truthfulness grows in the measure that the
document they were shown in fact does exist, and has the clauses that the complainants specify.
In addition, the bank transfer or deposits figure on behalf of the extraditable and his father, which
add up approximately to the financial damages. Once again, the existence of these documents –
specifically, deposits in personal accounts and not those of the corporation –strengthens the
credibility of the testimony of the complainants.

Last, two pieces of evidence of undoubtable indicative value: the inexistence of the
offices of the corporation as provided by the accused (pgs. 23, 77 and subsequent), and probably
the most important of all, the testimony of the Command of the International Airport of the
North that neither Estilo VR, S.A. de C.V., nor the extraditable or his father have airplanes
registered on their behalf nor air taxi service (pg. 66), report which confirms the declaration of
the representatives of the harmed corporation in relation to the day they arrived to the airport and
nobody knew the corporation nor Ruben Vila Garcia Sordo.

10

JA362

It is worth mentioning, that if the facts are looked at in an isolated fashion they do not seem to have a fraudulent intention, but as the caselaw establishes, the isolation of the pieces of evidence *"if deliberately disarticulated from the whole of the evidence with the obvious purpose of weakening the elements of judgement, constitutes a defense strategy, which once identified, has no effectiveness in the convictional strength of the considered material…"8.* Therefore, the proper valuation implies an individual analysis, yes, but within its context, and seen from this perspective, the beneficial financial offers –reduced price per package and privileged quote for dollars –the requested advanced deposit and in irregular fashion –not on behalf of the corporation, but of individuals—the absence of a physical place of business, lack of airplanes to fulfill the offered services, and what is worst, ignorance of the airport agents of the existence of Estilos VR S.A. and its representatives, indicate that it was a deliberate feat to deceive its victim and obtain an unjust gain, through the deception of portraying themselves as managers of an air taxi and transporation corporation inexistent at the time, through the display of at least its articles of incorporation, which implies the portrayal of acts that seem to be congruent –according to our legal system—with the typical means of stratagem and artful deception.

Naturally there is evidence to be assessed, naturally the declarations of the accused are missing, naturally they can destroy the conviction value of the mentioned elements through documents or witnesses, but as the discussed criteria points out, at the time the arrest order is issued –opportunity to suspend the process in Mexico for failure to appear by the accused –there are elements that existed then and exist now that can make truthful the evidence of the prosecution, and describe the crime with a reasonable degree of probability which creates the necessary and sufficient appearance in law, if not enough to convict –which is not the duty of our courts—but to sufficiently justify the extradition, to understand that at the time the order is issued there are enough facts to prosecute, or "*formalizer",* or connect to the events, reason why the opposition should be rejected and the petition of the United States of Mexico should be granted.

In terms of Mexican law, there exists *factual data*, this refers to a way of convicting which is found in the investigation file of the Prosecution, that although was not raised to the judge, it is sufficient to connect the accused to the process, or as in this case, to issue the arrest order (art. 141 and subsequent of CNPP). It should be clear that the suitability of the *factual data* that Mexican law requires –to be able to reasonably establish the existence of a criminal act and

11

the probable participation of the accused (art. 261 C.N.P.P.9)—is similar to the suitability that our law demands for the Prosecution to request the "formalizacion", that is in the investigation record there are sufficient objective elements that establish the commission of a criminal act and the identification of the presumed perpetrators (art. 266 C.P.P.).

Naturally, the level of certainty of the *factual data10* as well as the evidence in our legal system is necessarily less than the one needed to issue a final verdict, it is with this criteria that – probability, truthfulness, appearance, etc—that the evidence from the Prosecution should be assessed for trial, in the same way with the cited judgment and referred to the extradition with the United Kingdom.

Last, the omission of notification alleged by the extraditable has not been verified, nonetheless -he is aware of the petition against him at all times—is not a vice from such entity to the degree of invalidating the petition of extradition, without harming the consequences he could face in his country.

The alleged *dismissal* mentioned by the Defense, which could have been confirmed in the *"amparo"* proceedings, without referring to the extraditable, but to his father, was not made part of the process, reason why there is no evidence of such circumstance.

In conclusion, the undersigned Magistrate Judge understands that at the time the arrest order was issued –basis for the extradition—there was sufficient evidence, seen as factual data or evidence corresponding to the stage of the investigation, so that in accordance with Uruguayan legislation the extraditable could be processed –as of today *"formalizar"*—because they show reasonable probability, truthfulness, and objectivity of the criminal conduct, and the participation of the extraditable.

Likewise, the formal requirements already mentioned *supra* are met, reason why there is no other consequence than to grant the petitioned extradition.

5-<u>Preventions</u>: The Petitioner State shall have present art. 17 of the Extradition Treaty – principle of specialty--, transportation expenses (art. 18), as well as the 60-day time frame to make delivery effective (art. 14).


**<u>DECISION</u>:**

*For the aforementioned reasons, I decide:*

12

JA364

*1-The opposition of extraditable Ruben Vila Garcia Sordo is dismissed and the extradition is granted on its merits to the Petitioner State of the United States of Mexico.*

*2-The Petitioner State shall have present the specified preventions mentioned in point 5 above.*

*3-Consented or executed, communicate to the Petitioner State through international exhortation, notification to the Embassy and Interpol, and make available to the Petitioner the extraditable and his confiscated articles, in order to make effective the transfer within the specified timeframe by the Treaty of Extradition.*

13

JA365



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Penal 43 t Sentencia 20 2018 Extradición MX**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Jacqueline Yorke

Sworn to before me this
April 4, 2022

_____
Signature, Notary Public

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

JA366

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

UNITED STATES OF AMERICA

v.

GERARDO GONZÁLEZ-VALENCIA,

Defendant.

</td><td>

Criminal Action No. 16-65-1 (BAH)

Chief Judge Beryl A. Howell

</td></tr>
</table>

## MEMORANDUM AND ORDER

Pending before the Court is defendant Gerardo González-Valencia's motion to dismiss the single-count indictment charging him with conspiracy to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963 and 18 U.S.C. § 2, on grounds that his extradition from Uruguay to the United States was unlawful. *See generally* Def.'s Mot. to Dismiss and Mem. of Points and Authorities ("Def.'s Mem."), ECF No. 95.[1]  Specifically, defendant argues that the government "presented no evidence to support a probable cause determination for extradition" and that "the uncontroverted Uruguayan court record shows that the foreign court applied the wrong legal standard in determining to grant extradition." *Id.* at 13-14.  This argument is without basis and defendant's motion must be denied, as further explained below.[2]

---

[1]    All references to the parties' briefs and associated exhibits reflect the enumeration generated automatically by the Court's Case Management/Electronic Case Filing ("CM/ECF") system.

[2]    Defendant alternatively requests "an evidentiary hearing to determine the true extent of the Government's misconduct and to perform an *in camera* review of the evidentiary proof . . . submitted to the grand jury" in the event "the Court wishes to review the entire record before ruling on this Motion."  Def.'s Mem. at 3-4; *see also* Def.'s Request for Oral Argument or *In Camera* Review, ECF No. 106.  This alternative request is denied as moot since defendant has adduced no evidence of any government misconduct and nothing precludes adjudication, on the papers, of defendant's pending motion to dismiss the indictment.

1

I.    **BACKGROUND**

Defendant, who faces trial on January 23, 2023 alongside his brother and co-defendant José González-Valencia, was indicted by a grand jury sitting in this District on April 19, 2016, *see* Indictment, ECF No. 1, and an arrest warrant issued that same day by another Judge of this Court, *see* Min. Entry (April 19, 2016).  Defendant's indictment resulted from "an extensive, long-term . . . investigation conducted by the Drug Enforcement Administration ('DEA') into the operations of two, interrelated large-scale drug trafficking organizations ('DTOs') based in Jalisco, Mexico known as the Cartel de Jalisco Nueva Generaci[ó]n ['CJNG'] . . . and Los Cuinis Drug Trafficking Organization," which the government alleges was headed by defendant, his co-defendant brother, and other members of their family.  Gov't's Mem. Opp'n Def.'s Mot. to Dismiss ("Gov't's Opp'n"), at 3, ECF No. 99.  According to the government, CJNG and Los Cuinis "operate together under a close alliance[,] . . . form[ing] one of the largest, most dangerous, and prolific drug cartels in the world," and "are responsible for trafficking ton quantities of illegal drugs into the United States and employing extreme violence to further that objective." *Id.*

On June 1, 2016, the government requested that defendant be extradited from Uruguay pursuant to a bilateral treaty between that country and the United States.  *See* Treaty on Extradition and Cooperation in Penal Matters ("Extradition Treaty"), U.S.-Uruguay, Apr. 6, 1973, T.I.A.S. No. 10850.  This request was supported by a 51-page extradition package, which included, *inter alia*, copies of the indictment returned and arrest warrant issued in this Court; excerpts of relevant statutes; and two affidavits executed by a Department of Justice prosecutor and a DEA agent, respectively, explaining the grand jury process and providing a summary of the facts of the case.  *See generally* Def.'s Mem., Ex. A, Extradition Package, ECF No. 95-1.

JA368

Defendant, with the assistance of counsel, spent the next four years vigorously and unsuccessfully contesting the government's extradition request before the Uruguayan courts.

Between 2017 and 2020, three different Uruguayan courts, all the way up to Uruguay's highest court, the Supreme Court of Justice, examined defendant's challenges to the government's request and each authorized his extradition.  *See* Def.'s Mem., Ex. I, August 28, 2017 Uruguay First Instance Special Criminal Court Judgment ("Uruguay Criminal Court Decision"), ECF No. 95-9; Ex. J, February 11, 2020 Uruguay Supreme Court of Justice Judgment ("Uruguay Supreme Court Decision"), ECF No. 95-10; *id.* at 13 (noting that, on October 2, 2018, "the Criminal Court of Appeals 4th Rotation" affirmed the First Instance Special Criminal Court's August 2017 judgment authorizing defendant's extradition); *see also* Gov't's Opp'n at 24 (noting that granting defendant's motion "would overturn the findings and orders of three Uruguayan courts").  Notably, both the Uruguay Criminal Court and the Uruguay Supreme Court considered—and rejected—the same argument, raised again by defendant in the instant motion to dismiss the indictment: that the government's extradition request was not supported by probable cause.  In this regard, the Uruguay Criminal Court found that "the evidential elements referred to reach[] the evidentiary standard required by the Treaty."  Uruguay Criminal Court Decision at 23.  The Uruguay Supreme Court likewise rejected defendant's argument that the extradition package did "not satisfy the requirements of the Treaty in order to prove probable cause for extradition."  *See* Uruguay Supreme Court Decision at 17-22.[3]

After exhaustion of judicial review in Uruguay, defendant was extradited to the United States on May 14, 2020, *see* Min. Entry (May 14, 2020), and arraigned the next day, *see* Min. Entry (May 15, 2020).

_____

[3]      As explained *infra*, the government's extradition request was based on probable cause and, in any event, the Extradition Treaty did not require the Uruguayan courts to make any probable cause determination.

## II.    DISCUSSION

Under its supervisory powers, a district court generally retains authority to dismiss an indictment, but because doing so "'directly encroaches upon the fundamental role of the grand jury,' dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015) (quoting *Whitehouse v. U.S. Dist. Court*, 53 F.3d 1349, 1360 (1st Cir. 1995)).  The D.C. Circuit has had "no occasion" to determine "whether dismissal would be an appropriate remedy" when a defendant succeeds in establishing that his extradition was unlawful.  *United States v. Trabelsi*, 845 F.3d 1181, 1193 (D.C. Cir. 2017).  Nevertheless, the Circuit has held that once "an individual has been extradited pursuant to a treaty," United States courts can only engage in a "highly deferential" review and must "defer to the extradition decision of the extraditing country."  *Id.* at 1186; *see also Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992) ("[A]n American court must give great deference to the determination of the foreign court in an extradition proceeding.").[4]  This "narrow" review, *Trabelsi*, 845 F.3d at 1188, requires a court, "absent evidence to the contrary," to "presume . . . that the extraditing nation has complied with its obligations under the treaty and that the extradition is lawful," *id* at 1186.  This presumption of lawful extradition "is not irrebuttable" and may be rebutted through: (1) "[e]vidence [of] . . . misconduct on the part of the United States in procuring an extradition;" (2) "the absence of review of the extradition request by the requested party;" (3) or a "showing that the requested state or party did not apply the correct legal standard adopted in the Treaty." *Id.* at 1189.

---

[4]    In *Trabelsi*, the D.C. Circuit also held, as a threshold matter, that federal courts retain jurisdiction to review a foreign sovereign's extradition decision although "extradition implicates the sovereignty of a nation to control its borders and to enforce its treaties" and thus "judicial review of such a decision could implicate concerns of international comity."  845 F.3d at 1187 (cleaned up).  The government does not dispute the Court's jurisdiction to review defendant's extradition from Uruguay.  *See* Gov't's Opp'n at 7-8.

JA370

Here, after "his objections to extradition received multiple layers of review by" Uruguayan courts, defendant does not—and cannot—argue that the government's extradition request was insufficiently reviewed "by the requested party." *See id.* Defendant instead contends, first, that "the [g]overnment engaged in misconduct in procuring [his] extradition," Def.'s Mem. at 15, because the government "knew when it submitted its Extradition Package that there was insufficient evidence to determine probable cause," Def.'s Reply Supp. Mot. to Dismiss ("Def.'s Reply"), at 24, ECF No. 102, and, second, that "the record is unequivocal that the Uruguayan court did not comply with its obligations under the Treaty insofar as it did not apply the correct legal standard adopted by the Treaty with respect to probable cause," Def.'s Mem. at 15; *see also* Def.'s Mem. at 37 ("Uruguay failed to apply the correct legal standard by granting the Government's extradition request without assessing the evidence to determine probable cause. Accordingly, any presumption under *Trabelsi* that the extradition is lawful is clearly and conclusively rebutted."). Both challenges to the extradition are unavailing.

To begin, the government's extradition request was indisputably predicated on probable cause, as reflected in the indictment returned by a grand jury sitting in this District upon determining that there was probable cause to charge defendant with committing the conspiracy charged. This is hornbook law. *See Kaley* v. *United States*, 571 U.S. 320, 328 (2014) ("The grand jury gets to say—without any review, oversight, or second-guessing— whether probable cause exists to think that a person committed a crime"). The extradition package that the government submitted to Uruguay included copies of this indictment and the arrest warrant issued based on that indictment. *See* Extradition Package at 33-36 (copy of indictment), 38 (copy of arrest warrant). Defendant's first argument suggesting that the

JA371

government engaged in some form of misconduct by seeking his extradition without a probable

cause determination, *see* Def.'s Reply at 24, is thus made up out of whole cloth.

Defendant's second argument is also without merit.  The multiple Uruguayan courts that

reviewed defendant's challenge to his extradition correctly applied the controlling standard under

the Extradition Treaty.  "The interpretation of a treaty, like the interpretation of a statute, begins

with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008).  Article 10 of the Extradition Treaty

outlines the requirements for extraditions between the United States and Uruguay.  *See generally*

Extradition Treaty, art. X.

As relevant here, Article 10 commands that an extradition request relating "to a person

who has not yet been convicted . . . *must be* accompanied by a warrant of arrest issued by a judge

or other judicial officer of the requesting Party." *Id.*, art. X, ¶ 3 (emphasis added).  Next, it

provides that the "requested Party *may* require the requesting Party to produce evidence to

establish probable cause that the person claimed has committed the offense for which extradition

is requested." *Id.* (emphasis added).  Finally, the Extradition Treaty contemplates that the

"requested Party *may* refuse the extradition request if an examination of the case in question

shows that the warrant is manifestly ill-founded." *Id.* (emphasis added).  The text of Article

10—through its use of *may*—therefore makes plain that the Extradition Treaty does not require

the courts of Uruguay to make a probable cause determination before ordering extradition.  *See*

Gov't's Opp'n at 10 ("When Article 10 is read in its entirety, it is clear that the provision of the

Treaty related to probable cause is discretionary, not mandatory.").[5]  In considering—and

---

[5]     Under Article 10 of the Extradition Treaty, the government was also required to make its request for
extradition "through diplomatic channel" and to include in its extradition package: a "statement of the facts of the
case;" "[t]he data necessary to prove the identity of the person whose extradition is sought;" and the "text of the
applicable laws."  Extradition Treaty, art. X, ¶¶ 1-2.  The government's compliance with these additional
requirements before securing defendant's extradition from Uruguay is undisputed.

JA372

rejecting—defendant's challenge to his extradition on this basis, the Uruguayan courts reached the same conclusion and determined that the government had fulfilled its obligations under Article 10 while requesting defendant's extradition.  *See* Uruguay Criminal Court Decision at 22 ("It is then not appropriate to assess the evidence produced by the requesting State, but rather only to assess it to determine that the extradition request and the arrest warrant are not manifestly unfounded, in accordance with the provisions of Art. 10.3 . . . of the Treaty."); *id.* at 23 ("[T]he evidential elements referred to reach[] the evidentiary standard required by the Treaty, and it cannot be concluded that the arrest warrant issued by the requesting State Court is clearly unfounded."); Uruguay Supreme Court Decision at 18 (defendant "seeks to ignore that [his] arguments concerning the sufficiency of the evidentiary elements, in order to prove the commission of the offense, are the subject of the trial to be held in the United States of America, but outside the scope of this jurisdictional proceeding"); *id.* ("[I]t is not possible to observe, from the examination of the extradition request, that the arrest warrant issued by the authorities of the requesting State is 'manifestly unfounded.'").

In short, no basis has been presented by defendant to rebut the presumption of lawful extradition that generally applies, *see Trabelsi*, 845 F.3d at 1186, or to depart from the reasoned judgment of the three Uruguayan courts, including that country's Supreme Court, which consecutively reviewed the government's extradition package and approved defendant's extradition to the United States.

## III.   CONCLUSION AND ORDER

For the foregoing reasons, defendant has proffered no evidence sufficient to rebut the presumption that Uruguay complied "with its obligations under the treaty and that the extradition is lawful," *id.*, and it is hereby

JA373

**ORDERED** that defendant's Motion to Dismiss the Indictment, ECF No. 95, is

**DENIED**; and it is further

**ORDERED** that defendant's Motion for Oral Argument or *In Camera* Review, ECF No.

106, is **DENIED AS MOOT.**

**SO ORDERED.**

Date:  July 5, 2022

_____
BERYL A. HOWELL
Chief Judge

8

JA374

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. 16-65-1 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| GERARDO GONZÁLEZ-VALENCIA, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendant Gerardo González-Valencia's emergency motion to stay proceedings in this case, Def. Gerardo González-Valencia's Emergency Mot. to Stay Proceedings and Incorporated Mem. of Points & Authorities ("Def.'s Mem."), ECF No. 111, pending resolution of his appeal of this Court's denial of his Motion to Dismiss, Mem. and Order Denying Def.'s Mot. to Dismiss ("MTD Denial Decision"), ECF No. 108. *See generally* Def.'s Mem. at 1, 41.[1]  If defendant's requested stay were granted, defendant's trial with his co-defendant, currently scheduled for January 23, 2023—a date this defendant did not previously oppose, *see* Def. Jose González-Valencia Unopposed Motion to Continue Trial at 1, ECF No. 104—would be indefinitely suspended.

Despite defendant's pending appeal, the Court will retain jurisdiction because denial of defendant's Motion to Dismiss does not meet the requirements of the collateral order doctrine to permit appellate jurisdiction over his interlocutory challenge.  Defendant also has not met the high threshold to warrant a stay of proceedings.  He is highly unlikely to succeed on the merits of his extradition challenge before the D.C. Circuit, he has not shown that he will be irreparably

---

[1]     All references to the parties' briefs and associated exhibits reflect the enumeration generated automatically by the Court's Case Management/Electronic Case Filing ("CM/ECF") system.

harmed without a stay while the risk of harm to other parties in this matter is significant, and public interest weighs against further delaying his trial. As explained below, this emergency motion to stay proceedings is denied.

## I. BACKGROUND

The history underlying this litigation has been recounted in the denial of defendant's Motion to Dismiss. *See* MTD Denial Decision at 2–3. Only the factual and procedural developments relevant to resolving defendant's instant motion are addressed here.

On April 18, 2022, defendant moved to dismiss the single count indictment charging him with conspiracy to distribute cocaine and methamphetamine for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963, and 18 U.S.C. § 2, on grounds that his extradition from Uruguay to the United States was unlawful. *See generally* Def.'s Mot. to Dismiss and Mem. of Points and Authorities ("Def.'s MTD Mem."), ECF No. 95; Indictment, ECF No. 1. The Court found those challenges to be without basis. *See generally* MTD Denial Decision.

On July 19, 2022, defendant filed a notice of interlocutory appeal from the denial of his motion to dismiss, arguing, *inter alia*, that his extradition was not proper. Notice of Appeal at 1, ECF No. 110. The government plans to oppose that appeal. *Id.* at 1 n.1. Defendant now requests a stay, which would result in delaying his January trial date, pending disposition of his appeal. Def.'s Mem. at 1. The government opposes defendant's request. *See generally* Gov't Opp'n to Def. Gerardo Gonzalez-Valencia's Mot. to Stay Proceedings ("Gov't Opp'n"), ECF No. 118. Defendant's request is now ripe.

## II. LEGAL STANDARD

"[T]he filing of a notice of appeal, including interlocutory appeal, confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case

involved in the appeal" except when a party "frivolously appeals . . . or takes an interlocutory appeal from a non-appealable order." *United States v. DeFries*, 129 F.3d 1293, 1302–03 (D.C. Cir. 1997) (internal citations omitted).  Only "final decisions" of district courts, which include "a judgment of guilt, that terminates a criminal proceeding," *Sell v. United States*, 539 U.S. 166, 176 (2003), are reviewable and thus appealable, 28 U.S.C. § 1291.  The Supreme Court, however, crafted an exception to finality that allows a party to appeal "a preliminary or interim decision" when that decision "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Sell*, 539 U.S. at 176 (cleaned up).  That exception deemed the collateral order doctrine is interpreted "with the utmost strictness" in criminal cases.  *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (internal citations omitted).

## III.   DISCUSSION

Defendant claims that the D.C. Circuit has jurisdiction over his appeal because, although no final judgment has issued in this case, the challenge to his extradition is collateral to the offenses at issue in the trial.  Def.'s Mem. at 2–3, 17–21.  That argument fails because defendant's appeal does not meet the second and third requirements for collateral review. Setting aside the un-appealability of the denial of dismissal, the Court, in its discretion, sees no reason to grant defendant's stay request.

### A.    Jurisdiction over the Interlocutory Appeal

While the denial of defendant's motion to dismiss was a conclusive determination on defendant's extradition, MTD Denial Decision at 5–7; Def.'s Mem. at 18, this decision did not resolve an important issue of the lawfulness of the extradition separate from the drug trafficking charges defendant faces at trial.  Instead, defendant's challenge to his extradition rests on the

argument that no probable cause sufficient to support the charges brought against him by the U.S. government was presented. *Id.* at 17–39. Such a challenge before the appellate court would trigger a fact-intensive inquiry that is not just intertwined with but is at the heart of determining whether defendant committed various drug trafficking crimes. *Cf. Midland Asphalt Corp.*, 489 U.S. at 800 (holding that district court's order denying plaintiff's motion to dismiss an indictment was "not immediately appealable" because it "involve[d] considerations enmeshed in the merits of the dispute . . . and [such order] would affect or be affected by the decision on the merits of the case") (cleaned up). The D.C. Circuit does not engage in such interlocutory inquiries when the facts are not yet established or are of controlling relevance. *See U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017).

Furthermore, defendant's challenge is reviewable on appeal. The Supreme Court has permitted collateral review for motions raising "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial," such as motions to reduce bail, motions to dismiss on double jeopardy grounds, and motions to dismiss under the Speech or Debate Clause. *Midland Asphalt Corp.*, 489 U.S. at 799; *see also Sell*, 530 U.S. at 175–77 (permitting interlocutory review to decide whether "forced administration of antipsychotic drugs to render Sell competent to stand trial unconstitutionally deprive[s] him of his 'liberty' to reject medical treatment" under the Fifth Amendment). Acknowledging that this case does not involve any of those motions, defendant asks the Court to extend collateral review to his extradition challenge because this context, too, "rel[ies] on a specific constitutional guarantee, [] that the right in question must be vindicated before trial." Def.'s Mem. at 19; *see also id.* at 20–21. That right, he argues, is his "constitutional due process right" and his "right under the Treaty not to be extradited." *Id.* at 20. Defendant asserts that his "due process right to an extradition based on probable cause is directly analogous to the right of a defendant against double jeopardy that this

Circuit already recognizes supports interlocutory appeal in an extradition case," citing *United States v. Trabelsi*, 845 F.3d 1181 (D.C. Cir. 2017).  Def.'s Mem. at 21.  That argument is unavailing.

The "right not to be tried" that defendant creates ventures into the category of "word games" that the Supreme Court cautioned against—that virtually "any legal rule can be said to give rise to a 'right not to be tried' if failure to observe it requires the trial court to dismiss the indictment or terminate the trial." *Midland Asphalt Corp.*, 489 U.S. at 801.  As the Court in *Midland Asphalt Corp.* further explained, the "right not to be tried" must hinge on a "statutory or constitutional guarantee that trial will not occur," *id.* at 801, and neither the U.S.-Uruguay treaty implicated in this case nor the Fourth Amendment's Due Process Clause offers that kind of protection.  *Trabelsi* is distinguishable on this ground.  Trabelsi moved to dismiss his indictment for violating a provision of the U.S.-Belgium treaty that promises not to extradite "when the person sought has been found guilty, convicted or acquitted in the Requested State for the offense for which extradition is requested."  845 F.3d at 1184 (quoting the treaty directly).  The district court denied the motion, holding that Trabelsi was not charged and convicted with the same offenses in the United States and in Belgium after applying the *Blockburger* test.  *Id.* at 1185.  The D.C. Circuit permitted interlocutory review because the treaty's prior-prosecution provision that guards against "being twice put in jeopardy" fulfilled the requirements for collateral review.  *Id.* at 1185–86.  Absent a similar treaty provision here, defendant points to no other constitutional or statutory hook on which a "right not to be tried" attaches.  Consequently, defendant may assert his extradition challenge on appeal following trial, as the defendant did in *United States v. Sensi*, 879 F.2d 888 (D.C. Cir. 1989), in which the Circuit decided on the validity of Sensi's indictment that supported his extradition from the United Kingdom following Sensi's trial and jury verdict of guilt on the underlying offenses.  *Id.* at 892.

The absence of a final order of this Court and thus the inapplicability of the collateral order doctrine results in the D.C. Circuit lacking jurisdiction over defendant's pending interlocutory appeal.  The Court thus retains jurisdiction over defendant's case and may proceed to consider whether a discretionary stay of proceedings is warranted.

## B.   Consideration of a Stay

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  "'A stay is not a matter of right, even if irreparable injury might otherwise result,'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)), and "[a] stay pending appeal is always an extraordinary remedy, and it is no less so when extraordinary jurisdiction must be asserted as a prerequisite," *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966).

Courts considering a stay request pending an appeal must "'weigh competing interests,'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Landis*, 299 U.S. at 254–55), by balancing the following factors as applied to the specific facts of the case: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies," *Nken*, 556 U.S. at 434 (internal citations omitted).  The third and fourth factors "merge" when the stay applicant so moves against the government. *Id.* at 435.  The party seeking the stay bears the burden of "mak[ing] out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*, 299 U.S. at 255.

(Page 88 of Total)

To support his stay request, defendant argues that he is likely to succeed on the merits of his appeal because of "reversible error[s]" in the Court's denial of his Motion to Dismiss.  Def.'s Mem. at 4–5.  Defendant then fears irreparable injury if trial proceeds at this stage while his co-defendant and the U.S. government, he argues, face no similar risk, and he adds that the public has an interest in conserving the judicial resources of a potentially unnecessary trial.  *Id*. at 3–4.  These arguments are not persuasive.

### 1.      *Likelihood of Success on the Merits*

In support of his instant motion, defendant merely regurgitates his arguments challenging his extradition that he provided in his Motion to Dismiss.  *Compare* Def.'s Mem. at 21–39, *with* Def.'s MTD Mem. at 13–39.  Defendant's lengthy stay request provides no reason to change the disposition denying dismissal of the indictment, *see* MTD Denial Decision at 4–7, and as this is not a motion for reconsideration, the Court has no obligation to reengage in that analysis.  Nonetheless specific arguments in defendant's extradition challenge are addressed to demonstrate further the lack of merit in the original motion and confirm the unlikelihood of defendant's appeal on the merits.

Defendant's stay request faults the Court for "failing to apply the correct standard of review by not reviewing *de novo* the sufficiency of the evidence to establish probable cause to support extradition as required by *Sensi*."  Def.'s Mem. at 22.  Defendant then argues that the Court should not have deferred to the Uruguayan courts, including the Uruguayan Supreme Court of Justice—the country's highest court—in its extradition decision because those bodies failed to require probable cause for extradition as the treaty mandates and the U.S. government provided misleading information to support extradition on which the Uruguayan courts should not have relied.  *Id*. at 25.  Both positions are plainly incorrect.

First, defendant's extradition was supported by probable cause.  The 51-page package of documentation the U.S. government sent to Uruguay supporting defendant's extradition included, among other things, "copies of the indictment returned and arrest warrant issued in this Court" and "two affidavits executed by a Department of Justice prosecutor and a DEA agent, respectively, explaining the grand jury process and providing a summary of the facts of the case."  MTD Denial Decision at 2; *see also* Def.'s MTD Mem., Ex. A, Extradition Package at 33–36 (copy of indictment), 38 (copy of arrest warrant), ECF No. 95-1.  "[T]he indictment [was] returned by a grand jury sitting in this District upon determining that there was probable cause to charge defendant with committing the conspiracy charged."  MTD Denial Decision at 5.  It is "hornbook law" that federal grand juries determine whether there is probable cause to indict individuals for criminal felonies.  *Id.* (citing *Kaley v. United States*, 571 U.S. 320, 328 (2014)); *see also United States v. Scantlebury*, 921 F.3d 241, 250 (D.C. Cir. 2019) (quoting *Kaley*).

Defendant's request for *de novo* review suggests that the Court must second-guess the grand jury's finding of probable cause undergirding its return of the indictment and a magistrate judge's issuance of an arrest warrant.  Def.'s Mem. at 21–25.  That is clearly impermissible.  *See Kaley*, 571 U.S. at 328 ("The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime.").  *Sensi* is not to the contrary.  At the outset, nowhere in *Sensi* does the Circuit demand *de novo* review of extradition materials.  Rather, the treaty at play in *Sensi* was between the United States and the United Kingdom and that treaty included a specific provision geared towards the doctrine of specialty "set[ting] out the two requirements that must be met for each count of the indictment" submitted in support of extradition.  879 F.2d at 895.  The latter requirement was that the criminal charge described in the indictment "must be established by the facts in respect of which the defendant's extradition has been granted."  *Id.* (cleaned up).  In analyzing this requirement,

the D.C. Circuit considered "whether the evidence submitted with the United States' request for extradition sufficiently established the facts underlying Sensi's prosecution." *Id.* at 896. The Circuit then only performed a factual review of the indictment because such review is what the U.S.-U.K. treaty mandated under its doctrine of specialty provision. The U.S.-Uruguay treaty contains no such a requirement, rendering defendant's reliance on *Sensi* to support *de novo* review, with no other persuasive authority, inapposite.

Second, defendant's evidence challenging the Uruguayan courts' review of his extradition is conclusory, insufficient, and misleading. Courts' review of extradition decisions made pursuant to a treaty must be "highly deferential." *Trabelsi*, 845 F.3d at 1186. "In light of this deference, [the D.C. Circuit] presume[s], absent evidence to the contrary, that the extraditing nation has complied with its obligations under the treaty and that the extradition is lawful." *Id.* (citing *United States v. Campbell*, 300 F.3d 202, 209–10 (2d Cir. 2002)). A party may rebut the presumption of deference with evidence showing "misconduct on the part of the United States in procuring an extradition" or "that the requested state or party did not apply the correct legal standard adopted in the Treaty." *Id.* at 1189.

Defendant's evidence that the U.S. government engaged in misconduct to procure his extradition falls flat. In seeking dismissal and a stay, defendant claims that the U.S. government made "intentional misrepresentations" stating that the charges against defendant are not barred by the statute of limitations period and the Uruguayan courts' reliance on those statements was in error. Def.'s Mem. at 24–25; *see also* Def.'s MTD Mem. at 2, 47–48. Not only are defendant's statements regarding the U.S. government's intent wholly conclusory, but his claim of reliance is also incorrect: In upholding the lower court decisions to extradite defendant, the Uruguayan Supreme Court of Justice held that defendant's statute of limitations argument was "groundless" after its careful review of defendant's communications regarding drug trafficking occurring

during the limitations period.  Def.'s MTD Mem., Ex. J, February 11, 2020 Uruguay Supreme

Court of Justice Judgment ("Uruguay Supreme Court Decision") at 20, ECF No. 95-10.[2]  In

short, defendant has not shown that any alleged government misconduct rebuts the deference

owed to the Uruguayan courts.

Uruguay also applied the correct legal standards.  Despite defendant's arguments to the

contrary, Def.'s Mem. at 25–39, which this Court already rejected, MTD Denial Decision at 6–7,

the fact bears repeating that, according to the plain text of the treaty, probable cause *may* suffice

for extradition, but is not required.  *See* Treaty on Extradition and Cooperation in Penal Matters,

U.S.-Uruguay ("Extradition Treaty"), art. X, ¶ 3, Apr. 6, 1973, T.I.A.S. No. 10850 ("[The]

requested Party *may* require the requesting Party to produce evidence to establish probable cause

that the person claimed has committed the offense for which extradition is requested.")

(emphasis added); *see also Trabelsi*, 845 F.3d at 1189 ("The interpretation of a treaty, like the

interpretation of a statute, begins with its text." (quoting *Medellin v. Texas*, 522 U.S. 491, 506

(2008)).  While defendant may cite cases in which courts reviewing extraditions mentioned the

probable cause standard, nothing in the U.S.-Uruguay treaty would prevent those courts from

requiring something more or less than probable cause to support extradition.[3]   Regardless, that is

---

[2]       Defendant asserts two related arguments that are both dispelled by this excerpt of the Supreme Court of Justice Decision.  First, he argues that the Uruguayan courts did not independently assess whether he "had a valid limitations period."  Def.'s Mem. at 28–29.  Second, he claims, as he did in his Motion to Dismiss, that a 2013 Blackberry Messenger exchange used by the government as its "sole evidence," *id.* at 6, to support probable cause within the limitations period was insufficient and thus is proof of the government's "misconduct" rebutting the high deference owed to the Uruguayan courts' extradition decision, *id.* at 24; *see also* Def.'s MTD Mem. at 22.  The Uruguay Supreme Court Decision plainly shows otherwise on both scores, *see* Uruguay Supreme Court Decision at 20, and so they are not grounds to rebut the presumption of deference.

[3]       Defendant also cites legislative history of the U.S.-Uruguay treaty and interpretations of the U.S.-Argentina treaty that he claims show that the treaty at issue requires probable cause.  *See* Def.'s Mem. at 32–39.  That argument is unpersuasive because it, like defendant's other arguments, does not overcome the text of the U.S.-Uruguay treaty, *see Medellin v. Texas*, 522 U.S. at 506, which definitively states that the Uruguayan courts "*may*" consider probable cause.

JA384

not at issue here because defendant's extradition was based on probable cause.  *See supra* p. 8–9.[4]

Defendant then accuses the Uruguayan courts of wrongly applying the "'manifestly unfounded' standard."  Def.'s Mem. at 25, 31.  This argument is likewise meritless.  The treaty states that the "requested Party," here Uruguay, *may* refuse the extradition request if an examination of the case in question shows that the warrant is *manifestly ill-founded*."  Extradition Treaty, art. X, ¶ 3 (emphasis added).  That inquiry is separate from the country's consideration of whether there is probable cause to support extradition.  *Id.*  According to the treaty, Uruguayan courts may consider both whether the extradition materials support probable cause *and* whether the "warrant of arrest issued by a judge or other judicial officer of the requesting party" is "manifestly ill-founded."  *Id.*  The two inquiries are not mutually exclusive, and the Uruguay courts, including the highest court in that country, were satisfied that granting the U.S. extradition request comported with the laws in that country.

Defendant has now challenged his extradition twice before this Court, and neither time presented more than bald assertions and claims out of whole cloth.  At the core of defendant's arguments is an assertion of innocence—that the existing facts are insufficient to prove beyond a reasonable doubt that he is guilty of the charged offenses—and disposition of such an argument is the purpose of trial.  As such, defendants' claims are unlikely to succeed before the D.C. Circuit and weigh against his stay request.

---

[4]     In asserting another challenge to this Court's interpretation of the treaty, defendant argues that the interpretation violates the Fourth Amendment's right against unlawful seizure, incorporated through the Fifth Amendment, which supersedes the treaty.  Def.'s Mem. at 30–31.  This argument need not be addressed because defendant's extradition was predicated on an indictment and therefore supported by probable cause and, because his Fourth Amendments rights were not injured, he lacks standing to assert a Fourth Amendment challenge.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563–64 (1992) (describing the injury-in-fact requirement for standing).

11

JA385

### 2.     *Irreparable Harm to Defendant*

Defendant next argues that he will be irreparably harmed without a stay because "he will be forced to go to trial" before his appeal on violations of his constitutional rights is heard. Def.'s Mem. at 39.  The government counters that defendant may properly raise his objections on appeal after his trial without waiving any constitutional rights, and so he faces no irreparable harm.  Gov't's Opp'n at 11.  The government is correct.

A showing of irreparable harm sufficient to stay proceedings requires an injury "both certain and great" that is "actual and not theoretical."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  "[S]imply showing some possibility of irreparable injury fails to satisfy" this test.  *Nken*, 556 U.S. at 434–35.   "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough" and the possibility of "corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm."  *Wis. Gas Co.*, 758 F.2d at 674 (citing *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Irreparable harm is far from "certain" or "actual" in defendant's case.  As discussed, defendant may challenge his extradition on appeal after trial without waiving any Fifth Amendment rights.  *See, e.g.*, *Sensi*, 879 F.2d at 892.  While defendant alleges that review of his constitutional rights cannot wait, *see* Def.'s Mem. at 39, he has not come to terms with the fact that denial of his Motion to Dismiss is an un-appealable order.[5]  Preparing for trial also does not

---

[5]       Defendant cites *Gilliam v. Foster*, 61 F.3d 1070 (4th Cir. 1995) (en banc), to argue that "issuance of a stay is the only means available to protect [his] constitutional right." *Id.* at 1074.  That case is inapposite because it concerns a criminal defendant's request to temporarily enjoin state criminal proceedings that would otherwise violate his double jeopardy rights.  *Id.* at 1073.  Motions to dismiss on double jeopardy grounds are one such motion for which the collateral order exception applies, *see Midland Asphalt Corp.*, 489 U.S. at 799, but as explained above, defendant's extradition challenge does not raise similar rights not to be tried for which collateral review is appropriate.

suffice as grounds for delay.  Defendant has not proven that irreparable harm is certain, or even possible, at this junction.

### 3.   *Irreparable Harm to Others and Public Interest*

Defendant finally contends that the "possibility of harm faced by the government or co-defendant Jose Gonzalez-Valencia does not outweigh the potential harm faced by [defendant] if he is forced to face trial."  Def.'s Mem. at 40.  He also posits that public interest favors a stay because the public seeks to "protect[]" defendant's constitutional and treaty rights.  *Id.* Defendant adds that "it is a waste of public resources and time to begin a trial when there is a substantial likelihood of success on the issues being raised on interlocutory appeal."  *Id.* at 41. He is incorrect on all points.

As proffered by the government, Govt's Opp'n at 11–12, co-defendant Jose González-Valencia has been detained since December 2017 waiting adjudication of his charges, *see United States v. González-Valencia*, No. 16-192, Gov't's Mot. for Pretrial Detention at 3, ECF No. 11, and delaying this trial pending defendant Gerardo González-Valencia's meritless appeal risks certain, great, actual, and imminent harm to co-defendant Jose González-Valencia, who is entitled to a speedy trial.  U.S. CONST. amend. VI.  The government also faces irreparable harm because, as more time passes, the government's almost decade-old evidence continues to age, which hurts witnesses' ability to recollect those events clearly at trial.  Public interest also favors speedy trials and does not favor wasting judicial resources with meritless appeals, let alone appeals on constitutional issues that could be raised after trial.  Coupled with the highly unlikely chance of defendant's success on the merits, a review of irreparable harm to the co-defendant and the government as well as the public interest heavily weighs against a stay.

JA387

## IV.   CONCLUSION AND ORDER

The Court's denial of defendant's Motion to Dismiss is a non-appealable order that does not divest the Court of jurisdiction.  Furthermore, competing interests do not weigh in favor of a stay of proceedings and defendant has failed to prove significant hardship for such relief.  For the foregoing reasons, it is hereby

**ORDERED** that defendant Gerardo González-Valencia's Emergency Motion to Stay Proceedings, ECF No. 111, is **DENIED**.

**SO ORDERED.**

Date:  September 1, 2022

_____
BERYL A. HOWELL
Chief Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

DEC 1 - 2022

Clerk, U.S. District and
Bankruptcy Courts

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 16-CR-0065 |
| | ) |
| JOSE GONZALEZ VALENCIA, | ) |
| also known as | ) |
| "Jafett Arias-Becerra," "Chepa," | ) |
| "Camaron," and "Santy," | ) |
| | ) |
| | ) |
| Defendant. | ) |

## PLEA AGREEMENT

The United States of America, through the Narcotic and Dangerous Drug Section of the Criminal Division, United States Department of Justice (hereinafter referred to as the "United States" or the "Government") and Jose Gonzalez Valencia (hereinafter referred to as the "Defendant") enter into the following agreement ("Plea Agreement"):

### Defendant's Obligations, Acknowledgments, Waivers

1.   **Charges.**  The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with knowingly and intentionally conspiring with others to commit certain offenses against the United States, namely conspiracy to knowingly and intentionally distribute five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, knowing and intending that such substance would be unlawfully imported into the United States form a place outside thereof, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(2)(B)(ii), and 963 and 18 U.S.C. § 2.

The Defendant acknowledges and will reaffirm at the time of the plea of guilty the truth of the facts set forth in the Statement of Facts signed by him, which is attached to this Plea Agreement and incorporated herein.  As it pertains to the Defendant's plea of guilty, the Defendant hereby waives any and all affirmative defenses that may have been presented if this matter had proceeded to trial.

2.   **Potential penalties, assessments, and restitution.**  The Defendant understands that the offense to which the Defendant is pleading guilty carries the following potential penalties: a statutory minimum term of imprisonment of ten (10) years and a maximum term of life imprisonment, a fine not to exceed $10,000,000, and a period of supervised release of at least five (5) years, pursuant to 21 U.S.C. § 960(b)(1).

1

In addition, the Defendant agrees to pay a special assessment of $100 per felony conviction to the Clerk of the United States District Court before the date of sentencing, pursuant to Title 18, United States Code, Section 3013. The Defendant also understands that pursuant to Title 18, United States Code, Section 3571 and Section 5E1.2 of the United States Sentencing Guidelines Manual ("Sentencing Guidelines"), the Court may also impose a fine that is sufficient to pay the federal Government the costs of any imprisonment, term of supervised release and period of probation.

3.    **Sentencing Guidelines.**  The Defendant understands that he will be sentenced according to 18 U.S.C. § 3553(a), upon consideration of the Sentencing Guidelines, which will apply to determine the Defendant's guideline range.

Although not binding on the Court or the U.S. Probation Office, the parties agree that the following Sentencing Guideline calculations, at minimum, apply in this case:

a.    the Defendant is accountable for importation and distribution of cocaine, in the amount of 450 kilograms or more and that, pursuant to Section 2D1.1(c)(1) of the Sentencing Guidelines, the base offense level without adjustments for the crime to which the Defendant is pleading guilty is a **38**;

b.    the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, pursuant to Section 3B1.1 of the Sentencing Guidelines, increasing the offense level by **4 levels**;

c.    the Defendant is accountable for the importation of a controlled substance under circumstances in which a semi-submersible, as defined in 18 U.S.C. § 2285, was used, pursuant to Section 2D1.1(b)(3)(B) of the Sentencing Guidelines, increasing the offense level by **2 levels**;

d.    the Defendant possessed a firearm, pursuant to Section 2D1.1(b)(1) of the Sentencing Guidelines, increasing the offense level by **2 levels**;

e.    the Defendant used violence, made a credible threat to use violence, or directed the use of violence, pursuant to Section 2D1.1(b)(2) of the Sentencing Guidelines, increasing the offense level by **2 levels**;

f.    the Defendant acknowledges that factors consistent with *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994), as they may apply to the Defendant, have been considered by the Government in its agreement to these sentencing guidelines, but the Government acknowledges that the Defendant may ask for additional consideration under these factors; and

g.    the parties agree that the Defendant's conduct renders him ineligible for relief under the safety valve provision set forth in 18 U.S.C. § 3553(f) and Section 5C1.2 of the Sentencing Guidelines.

2

Assuming the Defendant clearly demonstrates acceptance of responsibility to the satisfaction of the Government, through his allocution and subsequent conduct following the signing of this Plea Agreement prior to the imposition of sentence, the Government agrees that a **2-level** reduction would be appropriate, pursuant Section 3E1.1(a) of the Sentencing Guidelines. Furthermore, assuming the Defendant has accepted responsibility as described in the previous sentence, the Government agrees that an additional **1-level** reduction would be appropriate, pursuant to Section 3E1.1(b) of the Sentencing Guidelines, because the Defendant has assisted authorities by providing timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. At a Criminal History Category I and an adjusted offense level of **45**, the Sentencing Guidelines' range is **life** imprisonment. Consistent with the conditions of the Defendant's extradition, the Government specifically agrees to recommend to the Court at sentencing that the Defendant be given a sentence no greater than 30 years' (360 months') imprisonment. The Defendant understands that the Court will make any Sentencing Guidelines determinations.

Moreover, the Defendant understands that pursuant to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the federal courts are not bound by the Sentencing Guidelines, but must consult those Guidelines and take them into account when sentencing. The Defendant understands further that this means the Court may impose a sentence that is either more severe or less severe than the advisory guideline range. The Defendant thus understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the Defendant may not withdraw the plea if his sentence is at or below the statutory maximum sentence.

The Defendant is aware that the sentence has not yet been determined by the Court. The Defendant also is aware that any estimate of the probable sentencing range or sentence that the Defendant may receive, whether that estimate comes from the Defendant's attorney, or the Government, is a prediction, not a promise, and is not binding on the Government or the Court. The Defendant understands further that any recommendation that the Government makes to the Court as to sentencing, whether pursuant to this Plea Agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The Defendant understands and acknowledges that the Defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the Defendant, the Government, or a recommendation made jointly by both the Defendant and the Government.

The Defendant understands that the failure of the Court or the U.S. Probation Office to determine the guideline range in accordance with the above calculations will not void this Plea Agreement or serve as a basis for the withdrawal of the Defendant's plea. The Defendant understands and agrees that he will not be allowed to withdraw the guilty plea entered pursuant to this Plea Agreement solely because of the harshness of any sentence recommended by the U.S. Probation Office or imposed by the Court, and that a motion to withdraw the plea on that basis may be treated by the United States as a breach of this Plea Agreement.

3

JA391

The Defendant further understands that the sentence to be imposed is a matter solely within the discretion of the Court. The Defendant acknowledges that the Court is not obligated to follow any recommendation of the Government at the time of sentencing.

The Government reserves the right to dispute sentencing factors or facts material to sentencing and to use any information or material, whether or not obtained from the Defendant pursuant to this Plea Agreement, to correct factual errors asserted by the Defendant.

Should the Defendant commit any conduct after the date of this Plea Agreement that would form the basis for an increase in his base offense level or justify an upward departure (examples of which include but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to any law enforcement agent, probation officer or Court) the Government is free under this Plea Agreement to seek an increase in the base offense level or an upward departure based on that post-agreement conduct.

4.    **Removal.** The Defendant recognizes that pleading guilty may have consequences with respect to the Defendant's immigration status if the Defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the Defendant is pleading guilty. Because removal and other immigration consequences are the subjects of a separate proceeding, the Defendant understands that no one, including the Defendant's attorney or the District Court, can predict to a certainty the effect of the Defendant's conviction on the Defendant's immigration status. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any immigration consequences that the Defendant's plea may entail, even if the consequence is the Defendant's automatic removal from the United States.

5.    **Criminal Forfeiture.** The Defendant acknowledges that he received money and property that is subject to forfeiture as a result of his violation of 21 U.S.C. §§ 959(a), 960(a)(3), and 963 as alleged in Count One of the Indictment. The Defendant agrees to forfeit and give to the United States prior to the date of sentencing any right, title and interest which the Defendant may have in any asset that constitutes or is traceable to proceeds of his narcotics trafficking, or that was involved in, used in, or intended for use in narcotics violations. These assets may be located within the jurisdiction of the United States or elsewhere, and could include but are not limited to: cash assets, negotiable instruments, securities, property, or other things of value, including any and all property which has been transferred or sold to or deposited with any third party, known or unknown by the Defendant for a period of less than 10 years prior to the date of the signing of this Plea Agreement, as well as any asset, interest, or proceeds the Defendant received or could receive or cause to be received by a third party in the future, directly or indirectly, in whole or in part, from the Defendant's illegal activities.[1]

---

[1] This includes, but is not limited to, property subject to forfeiture proceedings in Mexico, Brazil, or other foreign countries.

4

The Defendant further agrees to submit to interviews whenever and wherever requested by law enforcement authorities, domestic or foreign, regarding all assets within his possession or those assets transferred or sold to or deposited with any third party as outlined within the preceding paragraph. It is also understood that the Defendant will fully cooperate in providing any and all financial information and documentation and agrees to voluntarily execute a complete and thorough Financial Statement, Form OBD-500.

The Defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding. The Defendant acknowledges that all property covered by this Plea Agreement is subject to forfeiture as proceeds of illegal conduct.

The Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The Government also reserves the right to seek a Forfeiture Money Judgment at the time of the Defendant's sentencing. Payments made by the Defendant towards the Forfeiture Money Judgment shall be made by certified or bank check payable to the "United States Marshals Service" and sent by overnight delivery to 255 E. Temple St., Los Angeles, CA 90012, with the criminal docket number noted on the face of the check.

The Defendant acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the Court to advise him of this, pursuant to Rule 11(b)(1)(J) of the Federal Rules of Criminal Procedure, at the time his guilty plea is accepted. The Defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of monies and properties forfeited hereunder, including notice set forth in an indictment or information.

The Defendant further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. In addition, the Defendant knowingly and voluntarily waives his right, if any, to a jury trial on the forfeiture of said monies and properties, and waives all constitutional, legal and equitable defenses to the forfeiture of said monies and properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto clause of the Constitution, the statute of limitations, venue or any defense under the Eighth Amendment, including a claim of excessive fines. The Defendant further agrees to waive all interest in any such asset in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal.

The Defendant agrees that the forfeiture of any properties or the payment of the Forfeiture Money Judgement are not to be considered a fine or a payment on any income taxes that may be due.

JA393

The failure of the Defendant to forfeit any monies and/or properties as required under this Plea Agreement, including the failure of the Defendant to execute any document to accomplish same on timely notice to do so, shall constitute a material breach of this Plea Agreement. Upon such a breach, the Defendant will not be entitled to withdraw the plea, but the Government may bring additional criminal charges against the Defendant. The Government may also execute the Forfeiture Money Judgment upon any other assets of the Defendant, up to the outstanding balance, pursuant to 21 U.S.C. § 853(p), the Federal Debt Collection Procedure Act, or any other applicable law.

6.  **Waiver of Constitutional and Statutory Rights.**  The Defendant understands that by pleading guilty in this case he agrees to waive certain rights afforded by the Constitution of the United States and/or by statute, including the right to plead not guilty, the right to a jury trial, and the right to effective assistance of counsel. At trial, the Defendant would have the right to be represented by counsel, to confront and cross-examine witnesses against him, to compel witnesses to appear for the purpose of testifying and presenting other evidence on the Defendant's behalf, and to choose whether to testify himself. If the Defendant chose not to testify at a jury trial, he would have the right to have the jury instructed that his failure to testify could not be held against him. The Defendant would further have the right to have the jury instructed that he is presumed innocent until proven guilty, and that the burden would be on the United States to prove his guilt beyond a reasonable doubt. If the Defendant were found guilty after a trial, he would have the right to appeal the conviction. Additionally, the Defendant waives any right to have facts that determine his sentence under the Guidelines alleged in the Indictment or found by a jury beyond a reasonable doubt.

The Defendant understands that the Fifth Amendment to the Constitution of the United States protects him from the use of self-incriminating statements in a criminal prosecution. By entering this plea of guilty, the Defendant knowingly and voluntarily waives or gives up this right against self-incrimination.

The Defendant agrees that with respect to the charge referred to in paragraph 1, he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A, and will not file any claim under that law. The Defendant waives any right to additional disclosure from the Government in connection with the guilty plea.

7.  **Appeal Waiver.**  The Defendant is aware that federal law, specifically 18 U.S.C. § 3742, affords the Defendant the right to appeal his sentence. The Defendant is aware that the Government's factual stipulations and predictions about the calculation of the sentencing guidelines are not binding on the sentencing judge. Knowing that, the Defendant waives any argument, insofar as such waiver is permitted by law, that the statute to which the Defendant is pleading guilty is unconstitutional; any argument that his admitted conduct does not fall within the scope of the statute; and waives the right to appeal his sentence or the manner in which it was determined pursuant to 18 U.S.C. § 3742, except to the extent that (a) the Court sentences the Defendant to a period of imprisonment longer than the statutory maximum, or (b) the Court departs upward from the applicable Sentencing Guidelines range pursuant to the provisions of

6

JA394

Section 5K2.0 of the Sentencing Guidelines or based on a consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a). Further, the Defendant reserves the right to make a collateral attack upon the Defendant's sentence pursuant to 28 U.S.C. § 2255, if new and currently unavailable information becomes known to him. In agreeing to this waiver, the Defendant is aware that his sentence has yet to be determined by the Court. Realizing the uncertainty in estimating what sentence the Court ultimately will impose, the Defendant knowingly and willingly waives his right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Plea Agreement.

8.     **Pre-Sentencing Detention.** The Defendant further agrees not to object to the Government's recommendation to the Court at the time of the guilty plea in this case that, pursuant to 18 U.S.C. § 3143, the Defendant be detained without bond pending the Defendant's sentencing in this case.

9.     **Reservation of Allocution.** The Defendant understands that the United States reserves its full right of allocution for purposes of sentencing in this matter. The United States further reserves the right to describe fully, both orally and in writing, to the sentencing judge the nature and seriousness of the Defendant's misconduct, including any misconduct not described in the charges to which the Defendant is pleading guilty. The United States also reserves the right to inform the presentence report writer and the Court of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Plea Agreement.

The Defendant also understands that the United States retains its full right of allocution in connection with any post-sentence motion which may be filed in this matter and/or any proceeding before the Bureau of Prisons. The United States reserves the right to appeal the sentence in this case. The Government and the Defendant agree, in accordance with Section 1B1.8 of the Sentencing Guidelines, that the Government will be free to use against the Defendant for any purpose at the sentencing in this case any self-incriminating information provided by the Defendant pursuant to this Plea Agreement.

10.     **Notification to Court and U.S. Probation Office.** The United States will inform the Court and the U.S. Probation Office of all facts pertinent to the sentencing process, including all relevant information and conduct concerning the offenses committed, whether charged or not, as well as concerning the Defendant and the Defendant's background.

## General Conditions

11.     **Prosecution by Other Agencies/Jurisdictions.** This Plea Agreement only binds the Narcotic and Dangerous Drug Section, Criminal Division of the Department of Justice. It does not bind any other United States Attorney's Office or any other office or agency of the United States Government, or any state or local prosecutor. These individuals and agencies remain free to prosecute the Defendant for any offense(s) committed within their respective jurisdictions.

7

JA395

12.   **No Other Agreements.**  No other agreements, promises, understandings, or representations have been made by the parties other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by the Defendant, the Defendant's counsel, and a prosecutor in this case, or made by the parties on the record before the Court.

13.   **Voluntariness.**  The Defendant represents to the Court that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is in fact guilty, and represents to the Court that he is fully satisfied with the legal advice, guidance and representation he has received from his attorney.

ARTHUR G. WYATT
CHIEF, NARCOTIC & DANGEROUS DRUG SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

Date: 11|8|22          By: _Kaitlin J. Sahni_
                                   KAITLIN J. SAHNI
                                   KIRK HANDRICH
                                   KATE NASEEF
                                   Trial Attorneys

Approved by:

Date: 11|8|22          By: _Katharine A. Wagner_
                                   KATHARINE A. WAGNER
                                   Acting Deputy Chief of Litigation

8

## DEFENDANT'S ACCEPTANCE

I have reviewed this Plea Agreement with the assistance of an English-Spanish interpreter, and have discussed it at length with my attorney, Robert Feitel, Esq., who speaks fluent Spanish. This Plea Agreement has been translated into Spanish for me. I understand that the English version controls. Furthermore, I have discussed this Plea Agreement at length with my attorney. I fully understand this Plea Agreement and agree to the information contained within it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Plea Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in paragraph one (1).

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Plea Agreement. I am satisfied with the legal services provided by my attorneys in connection with this Plea Agreement, the accompanying Statement of Facts, and all matters related to it.

_José Gonzalez Valencia_          _11 15 22_
_____          _____
JOSE GONZALEZ VALENCIA                Date
Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I am the Defendant's attorney. I have fully explained to the Defendant, through an English-Spanish interpreter, the Defendant's rights and the applicable provisions of the Sentencing Guidelines. I have carefully reviewed every part of this Plea Agreement with the Defendant, through an English-Spanish interpreter. The Defendant is entering into this Plea Agreement voluntarily, intelligently and with full knowledge of all consequences of the Defendant's plea of guilty.

_____          _11/15/22_
_____          _____
ROBERT FEITEL, ESQ.                   Date
Attorney for Defendant

9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

DEC 1 - 2022

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES OF AMERICA )
)
v. ) Case No. 16-CR-0065
)
JOSE GONZALEZ VALENCIA, )
also known as )
"Jafett Arias-Becerra," "Chepa," )
"Camaron," and "Santy," )
)
)
Defendant. )

## JOINT STATEMENT OF STIPULATED FACTS

The statement of facts does not purport to include all of the Defendant's illegal conduct

during the course of his charged offense. Nor does it purport to be an inclusive recitation of all

that the Defendant heard, knew, or witnessed concerning the illegal activities of himself or those

of his conspirators. It represents sufficient information for the Court to find a factual basis for

accepting the Defendant's guilty plea in the above-captioned matter and is not intended to

represent all of the Defendant's relevant conduct for sentencing purposes. Had the Defendant

proceeded to trial, the Defendant agrees that the Government's evidence would show the

following beyond a reasonable doubt:

1.      From at least in or about 2006 and continuing thereafter up to and including

October 26, 2016, within the countries of Mexico, the United States, and elsewhere, the

Defendant, JOSE GONZALEZ VALENCIA, did unlawfully, knowingly, willfully, and

intentionally combine, conspire, confederate and agree with other conspirators, both known and

unknown, to commit the following offense against the United States, to wit to distribute at least

four hundred fifty (450) kilograms or more of cocaine, a Schedule II controlled substance,

intending and knowing that it would unlawfully be imported into the United States in violation of

21 U.S.C. §§ 959, 960(a)(3), 960(b)(1)(B)(ii), and 963 and 18 U.S.C. § 2.

2.      During the course and in furtherance of the conspiracy, the Defendant was a

leader of a drug trafficking organization ("DTO") known as "Los Cuinis," which, from in or

about January 2006 and continuing thereafter up to and including October 26, 2016, regularly

purchased bulk quantities of cocaine from Colombia, transported the cocaine to Central America

and Mexico by aircraft and maritime vessels, and illegally imported the cocaine into the United

States and Europe for further distribution.

3.      From approximately 2010 through at least October 26, 2016, Los Cuinis worked

closely with the Cartel de Jalisco Nueva Generacion (CJNG), a Mexico-based DTO, and

financed the CJNG's drug trafficking operations.

4.      The drug trafficking operations of Los Cuinis were extensive, and the DTO had

more than five participants.

5.      The Defendant agrees that he was responsible for arranging the transportation of

cocaine from Central America into Mexico on behalf of Los Cuinis.  The Defendant also

personally invested in multi-hundred- and multi-thousand-kilogram shipments of cocaine

transported from Colombia to Central America and Mexico for unlawful importation into the

United States for further distribution.

6.      The Defendant agrees that, in approximately 2007, he and others invested in a

shipment of at least 4,000 kilograms of cocaine that the Defendant knew would be transported

from Colombia to a location off the coast of Guatemala in the Pacific Ocean using a semi-

submersible vessel.  The Defendant understood that the cocaine would be transported from the

semi-submersible to Mexico via go-fast boats.  The Defendant further agrees that the U.S. Coast

Guard interdicted the semi-submersible carrying the shipment of at least 4,000 kilograms of cocaine in which he invested in the Pacific Ocean on or about August 21, 2007. The Defendant agrees that the crew scuttled the semi-submersible, and the U.S. Coast Guard recovered approximately 280 kilograms of cocaine from the water in the location where the semi-submersible sank. The Defendant agrees that the 280 kilograms of cocaine recovered by the U.S. Coast Guard were only part of the semi-submersible shipment in which he invested. The Defendant knew and intended that the cocaine on board the semi-submersible ultimately would be imported into the United States

7.      The Defendant admits that he communicated with co-conspirators via BlackBerry Messenger (BBM) using the screen name "Santy." In BBM communications, the Defendant arranged the sale of multi-kilogram quantities of cocaine with payment in U.S. dollars.

8.      The Defendant admits that, in approximately 2005, as part of the conspiracy and during his participation in it, he directed the use of violence against an individual who allegedly stole a shipment of approximately 1,000 kilograms of cocaine belonging to Los Cuinis.

9.      The Defendant admits that, from approximately 2002 to 2004, while attending meetings in Chiapas and Tabasco, Mexico, to arrange the receipt of cocaine shipments and during his participation in the conspiracy, and for the purpose of protecting himself and the cocaine shipment, the Defendant carried a pistol on his person.

10.     The Defendant further admits that in approximately October of 2013, he supplied rifles and ammunition to a co-conspirator who was a member of the CJNG.

11.     The Defendant admits that the total amount of cocaine involved in this conspiracy for which he had actual knowledge and involvement was well over 450 kilograms.

12.     The Defendant admits that he was aware that more than 450 kilograms of the

JA400

cocaine was going to be illegally imported into the United States for further distribution. The Defendant agrees venue and jurisdiction lie with this Court pursuant to 18 U.S.C. § 3238.

13.     The Defendant also agrees that his participation as a conspirator in the above-described acts were in all respects knowing, intentional, and willful, reflecting an intention and deliberation to do something the law forbids, and were not in any way the product of any accident, mistake of law or fact, duress, entrapment, or public authority.

14.     With his signature below and that of his counsel, the Defendant agrees that he has fully adopted this statement of facts as his own statement. The Defendant is adopting this statement of facts because it is a true and correct summary of the Defendant's own conduct.

15.     The Defendant is pleading guilty because the Defendant is in fact guilty.

Respectfully submitted,

ARTHUR WYATT
CHIEF, NARCOTIC & DANGEROUS DRUG SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

Date: 11/8/22        By: _Kaitlin J. Sahni_
                         KAITLIN J. SAHNI
                         KIRK HANDRICH
                         KATE NASEEF
                         Trial Attorneys

Approved by:

Date: 11/8/22        By: _Kahuy_
                         KATHARINE A. WAGNER
                         Acting Deputy Chief of Litigation

## DEFENDANT'S ACKNOWLEDGMENT

I have reviewed this Statement of Facts with the assistance of an English-Spanish interpreter, and have discussed it at length with my attorney, Robert Feitel, Esq., who speaks fluent Spanish. This Statement of Facts has been translated into Spanish for me. I understand that the English version controls. I fully understand this Statement of Facts and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of Facts fully.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in the accompanying Plea Agreement dated November 8, 2022. I am satisfied with the legal services provided by my attorney in connection with this Statement of Facts, the accompanying Plea Agreement, and all matters related to it.

_José Gonzalez Valencia_         _11 15 22_
_____          _____
JOSE GONZALEZ VALENCIA                    Date
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I am the Defendant's attorney. I am fluent in Spanish and I have fully explained to the Defendant, his rights and the applicable provisions of the Sentencing Guidelines. I have carefully reviewed every part of this Statement of Facts with the Defendant. The Defendant is agreeing to this Statement of Facts voluntarily, intelligently, and with full knowledge of all consequences of the Defendant's plea of guilty.

_____          _11 15 22_
ROBERT FEITEL, ESQ.                       Date
Attorney for Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO.: 16-CR-065 |
| | ) |
| GERARDO GONZALEZ-VALENCIA, | ) |
| also known as "Lalo," "Flaco," | ) |
| "Silver," "Silverio," "Eduardo," and | ) |
| "Laline," | ) |
| | ) |
| Defendant. | ) |

## JOINT SUBMISSION REGARDING SENTENCING GUIDELINES

The United States and Defendant Gerardo Gonzalez-Valencia, through undersigned counsel, respectfully submit this filing regarding the Defendant's applicable Sentencing Guidelines. The Defendant is charged in the above-captioned matter with conspiracy to distribute five kilograms or more of cocaine knowing and intending that the cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1), and 963 (hereinafter, the "narcotics case").[1] The Defendant is also charged with escape from an institution in which he was lawfully confined at the direction of the Attorney General, in violation of 18 U.S.C. § 751(a), in Case No. CR06-00106 in the U.S. District Court for the Northern District of California, which will be transferred to this District pursuant to Rule 20 of the Federal Rules of Criminal Procedure (hereinafter, the "escape case"). The Defendant is scheduled to plead guilty to both charges on December 22, 2022. In anticipation of the change of plea hearing, the parties submit their respective positions regarding the Defendant's applicable

---

[1] The Government will move to dismiss the methamphetamine aspect of the single count indictment in the narcotics case at the plea hearing.

guidelines range pursuant to the U.S. Sentencing Guidelines Manual (hereinafter, the "Sentencing Guidelines").

Although not binding on the Court or the U.S. Probation Office, the Government takes the position that the following base offense level and additional specific offense characteristic enhancements and adjustments apply to the narcotics case and will present evidence to support them at sentencing:

a.   the Defendant is accountable for importation and distribution of cocaine, in the amount of 450 kilograms or more and that, pursuant to Section 2D1.1(c)(1) of the Sentencing Guidelines, the base offense level without adjustments for the crime to which the Defendant is pleading guilty is a **38**;

b.   the Defendant is accountable for the importation of a controlled substance under circumstances in which a semi-submersible, as defined in 18 U.S.C. § 2285, was used, pursuant to Section 2D1.1(b)(3)(B) of the Sentencing Guidelines, increasing the offense level by **2 levels**;

c.   the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, pursuant to Section 3B1.1 of the Sentencing Guidelines, increasing the offense level by **4 levels;**

d.   the Defendant possessed a firearm, pursuant to Section 2D1.1(b)(1) of the Sentencing Guidelines, increasing the offense level by **2 levels**; and

e.   the Defendant used violence, made a credible threat to use violence, or directed the use of violence, pursuant to Section 2D1.1(b)(2) of the Sentencing Guidelines, increasing the offense level by **2 levels**.

JA404

It is the government's position that the Defendant's conduct renders him ineligible for relief under the safety valve provision set forth in 18 U.S.C. § 3553(f) and Section 5C1.2 of the Sentencing Guidelines.

Assuming the Defendant clearly demonstrates acceptance of responsibility to the satisfaction of the Government, through his allocution and subsequent conduct following his plea of guilty and prior to the imposition of sentence, the Government agrees that a **2-level** reduction would be appropriate, pursuant to Section 3E1.1(a) of the Sentencing Guidelines. Furthermore, assuming the Defendant has accepted responsibility as described in the previous sentence, the Government agrees that an additional **1-level** reduction would be appropriate, pursuant to Section 3E1.1(b) of the Sentencing Guidelines, because the Defendant has assisted authorities by providing timely notice of his intention to enter pleas of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Based on a Criminal History Category III,[2] and assuming the 3-level reduction for timely acceptance of responsibility for purposes of this calculation, the Government's position is that the Defendant's applicable Guidelines range is life in prison.

---

[2] Pursuant to Section 4A1.1 of the Sentencing Guidelines, criminal history points are calculated as 3 points for a prior sentence of imprisonment exceeding one year and one month, plus 2 points for committing the offense while under escape status from his prior incarceration, which puts the Defendant in Category III of the Sentencing Table.

JA405

Although not binding on the Court or the U.S. Probation Office, the Defendant takes the position that the following base offense level and additional specific offense characteristic enhancements and adjustments apply to the narcotics case:

    a.    The Defendant is accountable for the importation and distribution of cocaine, in the amount of between 150 and 450 kilograms, pursuant to Section 2D1.1(c) of the Sentencing Guidelines, the base offense level without adjustments for the crime to which Defendant is pleading guilty is a **36**; and

    b.    The Defendant is accountable for the importation of a controlled substance under circumstances in which a semi-submersible, as defined in 18 U.S.C. section 2285, was used pursuant to Section 2D1.1(b)(3)(B) of the Sentencing Guidelines, increasing the offense level by **2 levels.**

The Defendant takes the position that his criminal history puts him at a Criminal History Category II.  The Defendant bases this position on the fact that in determining the appropriate Criminal History Category, the Defendant receives three points for pleading guilty to his prior 1998 drug-trafficking offense that resulted in a sentence of more than one year and one month and the Defendant was incarcerated for this offense within fifteen years of the alleged instant offense.  *See* Section 4A1.2(e).  These three points for the prior 1998 drug offense, however, would only raise his Criminal History Category from Category I to Category II.  The Defendant understands that the Government is taking the position that Criminal History Category III applies because the Defendant should also receive two additional points for committing the offense while on escape status pursuant to Section 4A1.1(d).  However, if the Court were to accept the Defendant's position that a base offense level with adjustments of level 35 is appropriate, moving the Defendant from Criminal History Category II to Category III would significantly

JA406

raise the applicable Sentencing Guideline range for Defendant from 188 months to 235 months for Category II, to 210 to 262 months for Category III.  Defendant argues that in circumstances where the Defendant in his early twenties left the halfway house a few months before the expiration of his sentence, it is grossly unfair that he should now have his sentencing guideline range for the current offense raised by more than two to three years.  Defendant argues that it is precisely this kind of severe disparity between the impact of the Criminal History Categories in the Sentencing Guidelines that caused the guidelines to be changed from mandatory to discretionary because in cases like this one, a formulaic approach to determining the Criminal History Category ignores key mitigating factors.  According to the Defendant, and assuming a 3-point reduction for timely acceptance of responsibility, the resulting Guidelines range would be 188 to 235 months.

Although not binding on the Court or the U.S. Probation Office, the parties agree that the following Sentencing Guideline calculations, at minimum, apply in the escape case:

a.    The Defendant's custody or confinement was by virtue of a conviction, and therefore, pursuant to Section 2P1.1(a)(1) of the Sentencing Guidelines, the base offense level without adjustments for the crime to which the Defendant is pleading guilty is a **13**.

The Government takes the position that, with a Criminal History Category III and assuming a 2-point reduction for acceptance of responsibility, the Defendant's applicable guidelines range for the escape case would be 12 to 18 months.  The Defendant takes the position that, with a Criminal History Category I and assuming a 2-point reduction for acceptance of responsibility, the Defendant's applicable guidelines range for the escape case would be 8 to 14

5

JA407

months.  The parties agree that the sentence for the escape case should run concurrently with the

sentence for the narcotics case.


Respectfully submitted this 16th day of December, 2022.


\_\_\_\_\_*/s/*_____
Stephen Best, Esq.
Brown Rudnick LLP
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005
202-536-1732
sbest@brownrudnick.com

Lilly Ann Sanchez, Esq (admitted *pro hac vice*)
The LS Law Firm
Four Seasons Tower, Suite 1200
1441 Brickell Avenue
Miami, FL 33131
305-503-5503
lsanchez@thelsfirm.com

Counsel for the Defendant

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

\_\_\_\_\_*/s/*_____
Kaitlin Sahni
Acting Assistant Deptuty Chief
Kate Naseef
Kirk Handrich
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice
Washington, D.C. 20530
202-514-0917
Kaitlin.Sahni@usdoj.gov

Counsel for the Government

JA408

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 16-CR-065 (BAH)** |
| **v.** | |
| **GERARDO GONZALEZ-VALENCIA,** | |
| Defendant. | |

**DEFENDANT GERARDO GONZALEZ-VALENCIA'S**
**STATEMENT OF FACTS**

This statement of facts represents sufficient information for the Court to find a factual basis for accepting the Defendant's guilty plea in the above-captioned matter. Had the Defendant proceeded to trial, the Defendant agrees that the Government's evidence would show the following beyond a reasonable doubt:

1.      From at least in or about 2003 and continuing thereafter up to and including April 19, 2016, within the countries of Mexico, the United States, and elsewhere, the Defendant, GERARDO GONZALEZ-VALENCIA, did unlawfully, knowingly, willfully, and intentionally combine, conspire, confederate and agree with other conspirators, both known and unknown, to commit the following offense against the United States, to wit to distribute more than five kilograms of cocaine, a Schedule II controlled substance, intending and knowing that it would unlawfully be imported into the United States in violation of 21 U.S.C. §§ 959, 960(a)(3), 960(b)(1)(B)(ii), and 963 and 18 U.S.C. § 2.

2.      During the course and in furtherance of the conspiracy, the Defendant personally invested his own funds in connection with the purchase of more than five kilograms of cocaine

from Colombia, and the transportation of cocaine to Central America and Mexico, and the illegal importation of the cocaine into the United States and Europe for further distribution.

3.      The Defendant agrees that, in approximately 2007, he and others invested in a shipment of cocaine that the Defendant knew would be transported from Columbia to a location off the coast of Guatamala in the Pacific Ocean using a semi-submersible vessel.  The Defendant understood that the cocaine would be transported from the semi-submersible to Mexico via go-fast boats.  The Defendant further agrees that the U.S. Coast Guard interdicted the semi-submersible carrying the shipment in which he invested in the Pacific Ocean on or about August 21, 2007.  The Defendant agrees that the crew scuttled the semi-submersible, and the U.S. Coast Guard recovered approximately 280 kilograms of cocaine from the water in the location where the semi-submersible sank.  The Defendant knew and intended that the cocaine on board the semi-submersible ultimately would be imported into the United States.

4.      The Defendant agrees that his participation in the conspiracy continued through April 19, 2016.

5.      The Defendant also agrees that his participation as a conspirator in the above-described acts were in all respects knowing, intentional, and willful, reflecting an intention and deliberation to do something the law forbids, and were not in any way the product of any accident, mistake of law or fact, duress, entrapment, or public authority.

6.      The Defendant is making this statement of facts because it is a true and correct summary of the Defendant's own conduct.

7.      The Defendant is pleading guilty because the Defendant is in fact guilty.

JA410

Dated: December 16, 2022

Respectfully submitted,
*/s/ Stephen A. Best*

**BROWN RUDNICK LLP**

Stephen A. Best (DC Bar No. 428447)
Tiffany B. Lietz (admitted *pro hac vice*)
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005
Telephone: (202) 536-1737
sbest@brownrudnick.com

-and-

**The L●S LAW FIRM**

Lilly Ann Sanchez (admitted *pro hac vice*)

Four Seasons Tower, Suite 1200
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 503-5503
lsanchez@thelsfirm.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

JA411

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action |
| | ) | No. 16-65-1 |
| vs. | ) | |
| | ) | |
| GERARDO GONZALEZ-VALENCIA, | ) | December 22, 2022 |
| Defendant. | ) | 1:33 p.m. |
| | ) | Washington, D.C. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF PLEA COLLOQUY**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**APPEARANCES**:

FOR THE GOVERNMENT:
             KAITLIN SAHNI
             KIRK HANDRICH
             U.S. Department of Justice
             145 N Street NE
             Two Constitution Square
             Washington, DC 20530
             (202) 598-2950
             Email:  kaitlin.sahni@usdoj.gov


FOR THE DEFENDANT:
             STEPHEN A. BEST
             RACHEL WOLKINSON
             GEOFFREY COLL
             Brown Rudnick
             601 Thirteenth Street, NW, Suite 600
             Washington, DC 20005
             (202) 536-1737
             Email:  sbest@brownrudnick.com


ALSO PRESENT:  TERESA SALAZAR,
             Spanish Language Interpreter


Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
             Official Court Reporter

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

JA412

2

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  Matter before the Court,

3     Criminal Case No. 16-65-1, United States of America versus

4     Gerardo Gonzalez-Valencia.

5          Counsel, please come forward and state your names

6     for the record.

7          MS. SAHNI:  Good afternoon, Your Honor.

8     Kaitlin Sahni for the United States.  I am joined by my

9     co-counsel, Kirk Handrich.

10         THE COURT:  Good afternoon.

11         MR. BEST:  Good afternoon, Your Honor.

12    Stephen Best on behalf of Mr. Gonzalez-Valencia.  Along with

13    me is Ms. Rachel Wolkinson and Mr. Geoffrey Coll, C-O-L-L.

14         THE COURT:  All right.  Good afternoon.

15         Good afternoon, Mr. Gonzalez-Valencia.

16         Are you able to hear?

17         THE INTERPRETER:  Your Honor, the defendant needs

18    to use the microphone, otherwise the interpreter can't hear

19    him.  Those are only receivers.

20         THE COURT:  Is that right?

21         Well, can you move the microphone over to him?

22         THE DEFENDANT:  Hello.  I say good afternoon.

23         THE COURT:  Okay.  Thank you.

24         All right.  So I understand that the purpose of

25    Mr. Gonzalez-Valencia's appearance here today is to enter a

JA413

1    plea of guilty to Count 1 of the indictment that charges him

2    with conspiracy to distribute five kilograms or more of

3    cocaine for importation into the United States, in violation

4    of 21 U.S.C. Sections 959, 960, and 963.

5              Is that correct, Mr. Best?

6              MR. BEST:  Yes, Your Honor.

7              THE COURT:  All right.  So I am just going to have

8    you sit there, close to the microphone.  That keeps us all

9    away from each other as COVID continues to spread.

10              Mr. Gonzalez-Valencia, I have to ask you a number

11    of questions during this hearing.  I have to assure myself

12    that you understand what you are doing by entering a plea of

13    guilty today, that your entry of a plea of guilty is knowing

14    and voluntary, you understand the penalties you are facing,

15    the nature of the charges, and so on.  And, also, I have to

16    assure myself that you understand the rights that you are

17    giving up.

18              Do you understand all of that?

19              THE DEFENDANT:  Yes.  I understand that perfectly.

20              THE COURT:  So if at any time I ask you a question

21    that you want me to repeat before you respond or if you want

22    to talk to one of your lawyers before you respond, just let

23    me know; I will either repeat it or I will give you time to

24    talk to your lawyers.

25              Do you understand?

```
1                   THE DEFENDANT:  Okay.  That's fine.

2                   THE COURT:  All right.

3                   (Whereupon, the Court and staff confer.)

4                   (Whereupon, GERARDO GONZALEZ-VALENCIA, sworn.)

5                   THE DEFENDANT:  I so swear.

6                   THE COURT:  All right.  Thank you.

7                   Mr. Gonzalez-Valencia, you are now under oath.

8        This means if you do not answer my questions truthfully --

9        you can put your hand down -- you can be prosecuted for

10       perjury or for making a false statement, and any false

11       answers you give to me can be used against you in that

12       prosecution.

13                  Do you understand?

14                  THE DEFENDANT:  Yes, I understand.

15                  THE COURT:  All right.  Mr. Gonzalez-Valencia,

16       what is your full name?

17                  THE DEFENDANT:  Gerardo Gonzalez-Valencia.

18                  THE COURT:  How old are you, Mr. Gonzalez-Valencia?

19                  THE DEFENDANT:  45.

20                  THE COURT:  How far did you go in school?

21                  THE DEFENDANT:  Preparatory school, high school.

22                  THE COURT:  And do you have any difficulty reading

23       or writing?

24                  THE DEFENDANT:  No, none.

25                  THE COURT:  Okay.  He is sort of responding in
```

5

```
 1    English, I think.  But I can't hear you because you are not
 2    speaking very loudly into the microphone.
 3               Could you speak up.
 4               THE DEFENDANT:  Okay.
 5               THE COURT:  Just say "test, test, test."
 6               THE DEFENDANT:  Test, test, test.
 7               THE COURT:  That I could hear.  Perfect.  Okay.
 8               Mr. Gonzalez-Valencia, where were you born?
 9               THE DEFENDANT:  In Santa Clara County, in
10    California.
11               THE COURT:  In California?
12               THE INTERPRETER:  In Santa Clara County,
13    California.
14               That was in English, Your Honor.
15               THE COURT:  Thank you.  You are hearing better
16    than I am.
17               If you are not a U.S. citizen, do you understand
18    that conviction of this offense may result in your
19    deportation, exclusion from the United States, or denial of
20    citizenship under our immigration laws?
21               THE DEFENDANT:  Yes.  I understand.
22               THE COURT:  Have you taken any alcohol or drugs in
23    the last 48 hours or any medicine that could affect your
24    ability to understand what you are doing here today?
25               THE DEFENDANT:  No.
```

JA416

```
 1              THE COURT:  Have you received any treatment
 2    recently for any type of mental illness or emotional
 3    disturbance or addiction to narcotic drugs of any kind?
 4              THE DEFENDANT:  No.
 5              THE COURT:  Are you completely satisfied with the
 6    services of your attorneys in this case?
 7              THE DEFENDANT:  Yes.
 8              THE COURT:  Have you had enough time to talk to
 9    your attorneys and discuss the case, the evidence against
10    you, the plea agreement, and whether or not you should
11    accept the plea agreement and plead guilty?
12              THE DEFENDANT:  Yes.  I've reviewed everything
13    with them.
14              THE COURT:  Is there a plea agreement in this case?
15              MR. BEST:  No, Your Honor.
16              THE COURT:  No plea agreement.
17              Okay.  I'm sorry.  That's typically -- there is
18    usually a plea agreement in the case, but there isn't a plea
19    agreement in this case.
20              Is that right, Mr. Best?
21              MR. BEST:  That is correct, Your Honor.  There
22    isn't.  It's a plea straight up.
23              THE COURT:  Right.  He's pleading straight up to
24    the sole count in the indictment, correct?
25              MR. BEST:  Yes, Your Honor.
```

JA417

```
 1              There is some agreement on a joint stipulation of
 2      facts.  There is an agreement that there is going to be a
 3      two-point enhancement for the use of a submarine device.
 4      Other than that, there is no agreement to any other
 5      enhancements.  There is an agreement, a two-point reduction,
 6      and a possible three-point reduction.  But past that, there
 7      is -- it's just a plea straight up.
 8              THE COURT:  Okay.  Well, that is -- I think that
 9      that -- I knew that there was some sort of estimated
10      guideline --
11              MR. BEST:  Correct.
12              THE COURT:  -- workout or -- I don't know whether
13      it's a full agreement, and I wanted to flesh that out here.
14              MR. BEST:  I don't know what to characterize it as
15      either.
16              THE COURT:  I wasn't sure how to characterize it,
17      but we're going to get into the details of that shortly.
18              MR. BEST:  Yes.
19              THE COURT:  Mr. Best, do you have any question as
20      to Mr. Gonzalez-Valencia's competency to enter a guilty plea
21      today?
22              MR. BEST:  No, Your Honor.
23              THE COURT:  Does the government have any issue or
24      question about his competency to enter a plea today?
25              MS. SAHNI:  No, Your Honor.
```

JA418

```
 1              THE COURT:  Well, Mr. Gonzalez-Valencia appears to
 2    be following my questions and responding appropriately.  He
 3    appears capable and competent of entering an informed plea
 4    today, so I will proceed with the rest of the hearing.
 5              At the next part of this hearing,
 6    Mr. Gonzalez-Valencia, I am going to be explaining to you
 7    certain rights that you hold under our Constitution and
 8    laws.  Some of these questions may sound a bit legalistic,
 9    and so I want to remind you that:  If you would like me to
10    repeat any question, just let me know and I will do so; or,
11    if you want a moment to speak to Mr. Best or one of your
12    other lawyers before you respond, I will give you that
13    opportunity.
14              Do you understand?
15              THE DEFENDANT:  Yes, Your Honor.
16              THE COURT:  Now, you have a right to plead not
17    guilty and to have a jury trial on the charge in this case.
18    And that would mean that 12 citizens from the District of
19    Columbia would sit in the jury box to my left and listen to
20    the evidence presented by the government and decide your
21    guilt or innocence based on that evidence.
22              Do you understand that you have a right to a jury
23    trial in this case?
24              THE DEFENDANT:  Yes, I do understand the
25    proceedings.
```

JA419

1          THE COURT:  If you had a trial, you would have a

2     right to be represented by your lawyer at the trial and at

3     every other stage of the proceedings and, if necessary, have

4     the Court appoint counsel for you.

5          Do you understand that?

6          THE DEFENDANT:  Yes, Your Honor.  I do understand.

7          THE COURT:  Thank you.

8          If you had a trial, you would have a right through

9     your lawyer to confront, meaning to cross-examine, any

10     witnesses against you.

11          Do you understand that?

12          THE DEFENDANT:  Yes.  I do understand that, Your

13     Honor.

14          THE COURT:  If you had a trial, you would also

15     have a right to present your own witnesses and the right to

16     subpoena witnesses, requiring them to come to court to

17     testify in your defense.

18          You would also have the right to testify and

19     present evidence on your own behalf if you wanted to.

20          Do you understand that?

21          THE DEFENDANT:  Yes, Your Honor.  I do understand

22     that.

23          THE COURT:  You would not have to testify or

24     present any evidence at the trial if you did not want to

25     because you cannot be forced to incriminate yourself or

1    present evidence of your own guilt, and that cannot be used

2    against you.

3                Do you understand that?

4                THE DEFENDANT:  I understand that, Your Honor.

5                THE COURT:  You are presumed by the law to be

6    innocent.  And if you chose to go to trial, it would be the

7    government's burden alone to prove your guilt beyond a

8    reasonable doubt.

9                Do you understand that?

10               THE DEFENDANT:  Yes.  I do understand that, Your

11   Honor.

12               THE COURT:  If you went to trial on the charge in

13   the indictment against you and were convicted, you would

14   have the right to appeal your conviction of guilt to the

15   Court of Appeals and to have your lawyer help you prepare

16   your appeal.

17               Do you understand that?

18               THE DEFENDANT:  Yes.  I do understand that, Your

19   Honor.

20               THE COURT:  Do you understand that by entering a

21   plea of guilty to the offense in the indictment against you,

22   you are giving up your right to appeal your conviction of

23   guilt in this case except in some very limited

24   circumstances, such as if you claim ineffective assistance

25   of counsel in entering your guilty plea.

```
 1              Do you understand that?
 2              THE DEFENDANT:  Yes.  I do understand that, Your
 3    Honor.
 4              THE COURT:  Now, the offense to which you are
 5    pleading guilty is a felony offense.  If I accept your
 6    guilty plea and find you guilty of that offense, it may
 7    deprive you not just of the constitutional rights I have
 8    just reviewed with you, but also valuable civil rights, such
 9    as:  The right to vote, the right to hold public office, the
10    right to serve on a jury, and the right to possess a firearm
11    in this country.
12              Do you understand that?
13              THE DEFENDANT:  Yes.  I do understand that, Your
14    Honor.
15              THE COURT:  Do you understand that by entering a
16    plea of guilty and being convicted of this felony offense
17    you may also face enhanced or increased punishment if you
18    are convicted of another crime in the future?
19              THE DEFENDANT:  Yes.  I understand that, Your Honor.
20              THE COURT:  Okay.  So I have reviewed the
21    statement of facts that's been provided -- I have been
22    provided with a statement of facts, and it's docketed at
23    139; it's not stipulated to or signed by the government, and
24    it's not signed by the defendant.
25              Just by counsel for Mr. Gonzalez-Valencia, what
```

1       kind of stipulation or statement of facts is this?  Can

2       somebody explain this to me?

3               Is the government agreeing to this statement of

4       facts?  And, if so, why isn't it signed by the government?

5               MS. SAHNI:  Your Honor, the government is agreeing

6       to this statement of facts.  However, the government intends

7       to produce more evidence at sentencing that goes beyond what

8       is in this joint statement of facts -- in this defendant's

9       statement of facts.  Excuse me.

10              THE COURT:  I see.  So the government is not

11      signing off on this because the government doesn't want to

12      be criticized -- if not by this Court, by the Court of

13      Appeals -- for presenting evidence beyond what's in a

14      signed statement of facts?

15              MS. SAHNI:  Your Honor, the government has

16      reviewed this and believes that it is legally sufficient for

17      what the defendant intends to plead to today.

18              THE COURT:  Okay.  So I have on the record that

19      the government agrees to this statement of facts.

20              Okay.  Is there any reason why you didn't just say

21      that in a signed document so I could avoid going through

22      this at the plea hearing?

23              MS. SAHNI:  No, Your Honor.  There is no reason.

24              THE COURT:  I mean, this is a little bit unusual

25      enough because there is no plea agreement that lays out

 1    fully all of the terms.  Okay.

 2            Now I'm going to turn to Mr. Best.  Why isn't

 3    Mr. Gonzalez-Valencia's acknowledgment that everything in

 4    this statement of facts is true and accurate -- why hasn't

 5    he signed off on this?

 6            This is -- I mean, it's all fine and good for you,

 7    Mr. Best, to have signed off on it.  But what I really need

 8    is the defendant's signature.

 9            MR. BEST:  I have no explanation.  My co-counsel

10    is not here.  I apologize.

11            He was moved from the Alexandria detention

12    facility to Rappahannock, and we have not had access to him;

13    that may have been part of the confusion.

14            THE COURT:  All right.  Well, I am just going to --

15            MR. BEST:  He has reviewed it.

16            THE COURT:  Well, I am just going to have to go

17    through each of these on the record --

18            MR. BEST:  I understand.

19            THE COURT:  -- and he is under oath.

20            Okay.  Mr. Gonzalez-Valencia, I am looking at the

21    document with the number at the top, document 139.

22            MR. BEST:  For the record, he has the document in

23    front of him.

24            THE COURT:  Okay.  Good.  Thank you, Mr. Best.

25            Mr. Gonzalez-Valencia, have you reviewed this

1    document with your lawyer?

2             THE DEFENDANT:  Yes.  I reviewed everything.

3             THE COURT:  And does this document truly and

4    accurately reflect what you did in this case?

5             THE DEFENDANT:  Yes, ma'am.

6             THE COURT:  From, at least, in or about 2003, and

7    continuing up to and including April 19th, 2016, within

8    Mexico, the United States, and elsewhere, did you

9    unlawfully, knowingly, willfully, and intentionally conspire

10   and agree with others, both known and unknown, to commit the

11   offense against the United States of distribution more than

12   five kilograms of cocaine, which is a Schedule II controlled

13   substance, intending and knowing that it would be unlawfully

14   imported into the United States?

15            THE DEFENDANT:  Yes, Your Honor.

16            THE COURT:  And in furtherance, and during the

17   course of this conspiracy, did you personally invest your

18   own funds in connection with the purchase of more than five

19   kilograms of cocaine from Colombia and the transportation of

20   cocaine to Central America and Mexico, and the illegal

21   importation of the cocaine into the United States and Europe

22   for further distribution?

23            THE DEFENDANT:  Yes, Your Honor.

24            THE COURT:  And do you agree that in,

25   approximately, 2007 you invested in a shipment of cocaine

1    that you knew would be transported from Colombia to a

2    location off the coast of Guatemala, in the Pacific Ocean

3    using a semi-submersible vessel?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Did you understand that that cocaine

6    would be transported from the semi-submersible vessel to

7    Mexico via go-fast boats?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Do you also understand or know that

10   the U.S. Coast Guard interdicted the semi-submersible vessel

11   carrying the cocaine in which you invested in the Pacific

12   Ocean on about August 21, 2007?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  And do you know that the crew scuttled

15   the semi-submersible vessel and the Coast Guard then

16   recovered from the water where the semi-submersible vessel

17   sank, about 280 kilograms of cocaine?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  And did you know and intend that the

20   cocaine on board the semi-submersible vessel would be

21   imported into the United States?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  And did you participate in this

24   conspiracy through at least April 19, 2016?

25             THE DEFENDANT:  Yes, Your Honor.

JA426

```
 1                THE COURT:  Was your participation in the
 2      conspiracy in the acts that I have just reviewed with you
 3      knowing, intention, and willful, reflecting an intention and
 4      deliberation to do something the law forbids that was not,
 5      in any way, the product of any accident, mistake of law or
 6      fact, duress, entrapment, or public authority?
 7                THE DEFENDANT:  Yes, Your Honor.
 8                THE COURT:  And are you pleading guilty because
 9      you are, in fact, guilty?
10                THE DEFENDANT:  Yes, Your Honor.  That is so.
11                THE COURT:  Could the government please state the
12      elements of the charge against Mr. Gonzalez-Valencia?
13                MS. SAHNI:  Yes, Your Honor.
14                First, from at least January 2003 through
15      April 19, 2016, the defendant agreed with one or more
16      persons to accomplish a common and unlawful plan, namely, to
17      distribute five kilograms or more of a mixture or substance
18      containing a detectable amount of cocaine; second, the
19      defendant knew or intended that the cocaine would be
20      unlawfully imported into the United States; and, third, the
21      defendant joined the agreement with the intent to further
22      its unlawful purpose.
23                THE COURT:  Mr. Best, do you agree that those are
24      the elements of the offense?
25                MR. BEST:  Yes, Your Honor.
```

JA427

```
 1              THE COURT:  Mr. Gonzalez-Valencia, do you have any
 2      questions about the charge against you, or do you fully
 3      understand it?
 4              THE DEFENDANT:  I understand it completely, Your
 5      Honor.  I have no doubt.
 6              THE COURT:  All right.  Mr. Gonzalez-Valencia, I
 7      know you have reviewed -- I am sure quite thoroughly with
 8      your lawyers -- what the penalties are that you are facing
 9      if I accept your guilty plea here today.  But this is such
10      an important part of what I have to make sure you
11      understand, I am obligated to review with you the penalties
12      you may face if I accept your guilty plea today.
13              So the statutes to which you are entering a plea
14      of guilty set the penalty you could receive as a maximum
15      sentence of life imprisonment, a mandatory minimum sentence
16      of ten years, a supervised release term of at least five
17      years, a maximum fine of $10 million; a special assessment
18      of $100, and a fine sufficient to pay the federal government
19      the cost of any imprisonment, term of supervised release, or
20      period of probation.
21              Do you understand that those are the statutory
22      penalties that apply in your case?
23              THE DEFENDANT:  Yes.  I do understand that, Your
24      Honor.
25              THE COURT:  And you understand that you have no
```

1       option of a probationary sentence in this case?

2                   THE DEFENDANT:  Yes.  I do understand that, Your

3       Honor.

4                   THE COURT:  Do you understand that because of your

5       conviction you may be subject to forfeiture of any property

6       that is sufficiently connected to your offense or proceeds

7       derived from your offense?

8                   THE DEFENDANT:  Yes.  I do understand that.

9                   THE COURT:  Now, in determining your sentence, in

10      addition to considering the statutory penalties that apply

11      in your case, I am also obligated to consider how the

12      federal guidelines manual applies in your case for a person

13      with your criminal history and your offense conduct.

14                  I understand that the parties do dispute how to

15      calculate the guidelines here with the government's position

16      that the guidelines provide a more severe sentence for you

17      than what, on your behalf, your lawyers say should apply

18      under the guidelines, and some of that may depend on facts

19      that are not presented to me in the statement of facts that

20      the government is going to be prepared to prove at the time

21      of sentencing.

22                  I am going to review with you the government's

23      position about what the most severe sentencing range may be

24      and that the government is going to argue before me at the

25      time of sentencing that applies in your case.

```
1          I want you to understand that, in making any
2   necessary findings of fact about how the guidelines apply in
3   your case, the government must establish those facts by what
4   is called the preponderance of the evidence, which is a
5   lower standard of proof than beyond a reasonable doubt that
6   would apply if the government had to prove facts at trial.
7          Do you understand that?
8          THE DEFENDANT:  Yes.  I do understand that, Your
9   Honor.
10         THE COURT:  So the government's position as to how
11  the guidelines should apply in your case is that your
12  Criminal History Category is III because you have one prior
13  felony conviction, which gives you three criminal history
14  points, plus you committed the instant -- the offense to
15  which you are pleading guilty today while on escape status,
16  which would add another two points, which results in a
17  criminal history score of 5, which puts you in a Criminal
18  History Category III.  There may be some dispute about that,
19  I don't know, but that's what the government's position is
20  going to be.
21         As to your estimated guidelines offense level, the
22  government's position is that your offense conduct, as part
23  of the conspiracy to which you are entering a guilty plea,
24  would be that you imported -- the conspiracy imported over
25  450 kilograms of cocaine, 450 kilograms or more of cocaine
```

20

1    which would, under the applicable guideline at 2D1.1(c)(1),

2    give you a starting point of 38 offense levels.  This

3    base-offense level could be increased by various specific

4    offense characteristics including two offense levels because

5    you unlawfully imported a controlled substance under

6    circumstances in which a semi-submersible vessel, as

7    described in 18 U.S.C. Section 2285, was used.  That's under

8    the guideline at 2D1.1(b)(3)(B); another four offense levels

9    because the government will seek to prove that you were an

10   organizer or a leader in the criminal activity, which

11   involved five or more participants under the guideline at

12   3B1.1 B; another two offense levels for possession of a

13   firearm in connection with the offense under the guideline

14   at Section 2D1.1(b)(1), and two offense levels for using

15   violence and making a credible threat to use violence or

16   directing the use of violence, under the guideline at

17   2D1.1(b)(2), with a decrease of three offense levels for

18   acceptance of responsibility and entering a plea of guilty

19   under Section 3E1.1.

20           The government's estimation is that this would

21   result in a total offense level of 45, which would be

22   reduced to a total offense level of 43 because that's the

23   cap which, in combination with a Criminal History Category

24   of III, would result in an advisory guideline range of life

25   imprisonment.

JA431

1          Do you understand that this is only an estimate of

2     how the guidelines will apply to your case, and that this

3     estimate is what the government has already said it's going

4     to urge me to adopt?

5          Do you understand that?

6          THE DEFENDANT:  Yes, Your Honor, I understand

7     that.  But, nevertheless, we are not in agreement with that

8     which the prosecution is saying; I believe it's ridiculous

9     and unjustified.

10          THE COURT:  And do you understand that the

11     sentence imposed may be different from any estimate that

12     your attorney or the government has said it may be?

13          THE DEFENDANT:  Yes.  I do understand that, Your

14     Honor.

15          THE COURT:  So in addition to looking at what the

16     statutory penalties are and what the sentencing guidelines

17     recommend, I am also required to consider certain sentencing

18     factors that are set out in a statute codified at 18 U.S.C.

19     Section 3553(a).  And that statute requires that I consider:

20     The nature and circumstances of the offense; your history

21     and characteristics, Mr. Gonzalez-Valencia; the need for the

22     sentence imposed to reflect the seriousness of the offense;

23     promote respect for the law; provide just punishment; afford

24     adequate deterrence; the kinds of sentences available; the

25     need to avoid unwarranted sentence disparities among

1    defendants found guilty of similar conduct with similar

2    criminal history, and the need to provide restitution.

3              Do you understand that I have to consider all of

4    those sentencing factors in determining the appropriate

5    sentence in your case?

6              THE DEFENDANT:  Yes, that's right.  The attorneys

7    explained that all to me.

8              THE COURT:  Now, has anyone including your

9    attorney, any law enforcement officers, the prosecutor, any

10   other person with whom you have come into contact since your

11   arrest promised or suggested to you that merely because you

12   are pleading guilty that I will give you a lighter sentence?

13             THE DEFENDANT:  No.  No one.

14             THE COURT:  Has anyone forced, threatened, or

15   coerced you in any way into entering a plea of guilty?

16             THE DEFENDANT:  No, no one.

17             THE COURT:  Are you entering this plea of guilty

18   voluntarily and of your own free will because you are guilty

19   and for no other reason?

20             THE DEFENDANT:  Yes.  That's right, Your Honor.

21             THE COURT:  Mr. Gonzalez-Valencia, how do you now

22   plead to the charge in Count 1 of conspiring to distribute

23   five kilograms or more of cocaine, knowing and intending

24   that the cocaine would be unlawfully imported into the

25   United States; guilty or not guilty?

```
 1                THE DEFENDANT:  I plead guilty.
 2                THE COURT:  All right.  I am satisfied that
 3      Mr. Gonzalez-Valencia appears to be fully competent and
 4      capable of entering an informed plea today.  He understands
 5      the nature of the charge, the consequences of the plea, and
 6      there does appear to be a factual basis for the plea and,
 7      therefore, I do accept his plea.  He is now adjudged guilty
 8      of the offense, Count 1 of the indictment.
 9                So, Counsel, I would suggest for a sentencing
10      date:  Friday, March 17th, at 9:30.  Could you check your
11      calendars as to whether that's convenient for you?
12                MR. BEST:  Can I beg your indulgence for a date in
13      April?
14                THE COURT:  Of course.
15                MR. BEST:  Thank you.  It's my kid's last spring
16      break.
17                THE COURT:  That's special.
18                Ms. Gumiel, I didn't bring my calendar, of course.
19                Give me a date in April.
20                THE COURTROOM DEPUTY:  April 1 or April 8, Your
21      Honor.
22                THE COURT:  Both are Fridays?
23                THE COURTROOM DEPUTY:  Yes.
24                THE COURT:  We can do Friday, April 8, at 9:30.
25                MR. BEST:  That's great.
```

```
1                    THE COURT:  Does that work?

2                    How about for the government?

3                    MS. SAHNI:  Yes, Your Honor.  Yes, Your Honor.

4                    THE COURT:  I will set that down then for the

5       sentencing date.

6                    Is there anything further to address today?

7                    MR. BEST:  I believe April 8th is a Saturday.

8                    THE COURT:  Is it?  Ms. Gumiel?

9                    THE COURTROOM DEPUTY:  Sorry, Your Honor.

10                   MR. BEST:  April 7 is a Friday.

11                   THE COURT:  Let me see what my schedule is like

12      that day.

13                   April 7, 2023?  We're almost there.

14                   Okay.  We'll set it down for April 7, at 9:30.

15                   MR. HANDRICH:  If I may.

16                   THE COURT:  Yes.

17                   MR. HANDRICH:  That is a good date for the

18      government.

19                   I think we just want to make you aware, there is a

20      possibility it could take more than a full day.  We are

21      calling several witnesses.  Obviously, I can't speak to what

22      the defense may want to present, Your Honor.  So we just

23      wanted to make the Court aware of that, that it is possible.

24                   THE COURT:  So maybe we should have the sentencing

25      hearing then --
```

1          THE COURTROOM DEPUTY:  On the 6th?

2          THE COURT:  Why don't we do it on a Thursday?

3          THE COURTROOM DEPUTY:  On the 6th?

4          (Whereupon, the Court and staff confer.)

5          THE COURT:  Let's set it for April 6th, which is a

6     Thursday.  That way, I won't have lots of other matters

7     backed up.

8          MR. BEST:  That is great.

9          MR. HANDRICH:  That works for the government.

10          MR. BEST:  Speaking through you, we don't have any

11     documentary evidence of any conduct that is at issue, other

12     than the submarine which he just pled to.  So if we can have

13     some guidance from the Court as to discovery before that,

14     that would be great.

15          THE COURT:  All right.  Why don't we say at least

16     a month before the sentencing hearing the government will

17     produce to the defense information about what you are

18     planning on presenting.  And at least two weeks before the

19     hearing -- I hope my law clerk is writing all this down so

20     she can enter a scheduling order -- two weeks beforehand, I

21     am going to want from the government a witness list and a

22     summary of what the witnesses are testifying to.

23          MR. HANDRICH:  Yes.

24          THE COURT:  And that would be helpful, I think, to

25     all of us.  Two weeks before the sentencing hearing I will

```
 1        want the same from the defense.

 2                   MR. BEST:  Yes, Your Honor.

 3                   THE COURT:  All right.  Do you need more of a

 4        schedule than that?

 5                   MR. BEST:  That's great.

 6                   THE COURT:  I am here to schedule.

 7                   MR. BEST:  We're good.

 8                   THE COURT:  All right.  If there is nothing

 9        further, you are all excused.

10                   THE COURTROOM DEPUTY:  Your Honor, vacate the

11        trial date?

12                   THE COURT:  I will vacate the trial date in this

13        case, and any pretrial motions scheduled.

14                   MR. BEST:  Thank you, Your Honor.

15                   MS. SAHNI:  Your Honor, if I may.

16                   Just one thing so the record is clear.  I know the

17        government has indicated before that it did not intend to

18        pursue the methamphetamine portion of Count 1, but I would

19        just like to formally move to dismiss that portion of Count 1.

20                   THE COURT:  Granted.

21                   MS. SAHNI:  Thank you.

22                   MR. BEST:  The last housekeeping matter is:  When

23        the Northern District of California sends its files, we

24        can -- we're on the Court's convenience to come back and

25        address that.
```

1          THE COURT:  Well, you will just let me know.  But

2     I think there was an extradition treaty issue with that.  I

3     think he was extradited on one charge, and that's a totally

4     different charge.

5          MR. BEST:  Yes.

6          THE COURT:  You know that's Northern District of

7     California's particular issue; they didn't piggyback on your

8     extradition request.

9          MS. SAHNI:  No, they did not, Your Honor.

10          MR. BEST:  Okay.

11          THE COURT:  So we're moving forward.

12          MR. BEST:  Sounds great.

13          THE COURT:  Okay.

14          MR. BEST:  Happy holidays.

15          THE COURT:  Okay.  Same to you.

16          (Whereupon, the proceeding concludes, 2:12 p.m.)

17                         *  *  *  *  *

18                         **CERTIFICATE**

19          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
      certify that the foregoing constitutes a true and accurate
20     transcript of my stenographic notes, and is a full, true,
      and complete transcript of the proceedings to the best of my
21     ability.
              This certificate shall be considered null and void
22     if the transcript is disassembled and/or photocopied in any
      manner by any party without authorization of the signatory
23     below.

24     Dated this 14th day of February, 2023.

25     /s/ Elizabeth Saint-Loth, RPR, FCRR
      Official Court Reporter

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO. 16-065 (BAH)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GERARDO GONZALEZ-VALENCIA,** | ) | |
| also known as "Lalo," "Flaco," | ) | |
| "Silver," "Silverio," "Eduardo," | ) | |
| and "Laline," | ) | |
| | ) | |
| **Defendant.** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully submits this Sentencing Memorandum in the case of Defendant Gerardo Gonzalez-Valencia (hereafter the "Defendant"), whose contested sentencing is currently scheduled for 9:30 a.m. on April 6, 2023.  On December 22, 2022, the Defendant pleaded guilty to conspiracy to distribute five kilograms or more of cocaine knowing and intending that such substance would be unlawfully imported into the United States.  *See* Min. Entry 12/22/22.  In pleading guilty absent a plea agreement, the Defendant submitted a barebones Statement of Facts, *see* Dkt. No. 139, and proposed Sentencing Guidelines, *see* Dkt. No. 138, that grossly understate the extent of the Defendant's involvement in the drug trafficking conspiracy and the scope and nature of that conspiracy.

At the sentencing hearing, the Government will present evidence that the Defendant was the leader of a powerful Mexican drug trafficking organization (DTO), known as Los Cuinis, and, in that capacity, the Defendant conspired to distribute thousands of kilograms of cocaine for importation into the United States and Europe.  The evidence will further show that while the Defendant safely profited from the sale of a dangerous narcotic, he enlisted others to carry out acts of violence and risk their lives for his personal gain and in furtherance of the DTO.

1

JA439

There are no mitigating circumstances in this case to justify a variance below the Guidelines range.  *See* 18 U.S.C. § 3553(b)(1).  Accordingly, the Court should impose the Guideline sentence—life imprisonment—to reflect the nature, circumstances, and seriousness of the Defendant's unlawful conduct.

I.   Background

    a.   Procedural History

On April 19, 2016, the Defendant was charged in a one-count Indictment with conspiracy to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine and 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, Schedule II controlled substances, knowing and intending that such substances would be unlawfully imported into the United States, in violation of in violation of 21 U.S.C. §§ 959(a), 960, 963, and 18 U.S.C. § 2.  Dkt. No. 1.  The Defendant was arrested on local money laundering charges in Uruguay on April 21, 2016.  Following highly contested extradition proceedings, the Defendant was extradited from Uruguay to the District of Columbia on May 14, 2020, to face the charges in this case.

On December 22, 2022, the Defendant pleaded guilty to Count One of the Indictment, and the Government voluntarily dismissed the methamphetamine charge.  *See* Min. Entry 12/22/22.  The Defendant admitted in the Statement of Facts and on the record at the change of plea hearing that from approximately 2003 through April 19, 2016, he "personally invested his own funds in connection with the purchase of more than five kilograms of cocaine from Colombia, and the transportation of cocaine to Central America and Mexico, and the illegal importation of the cocaine into the United States and Europe for further distribution."  Dkt. No 139 ¶¶ 2, 4.  The Defendant also admitted to his involvement in one specific cocaine shipment on

JA440

a semi-submersible vessel that was interdicted by the U.S. Coast Guard in the Pacific Ocean on or about August 21, 2007.  *Id.* ¶ 3.  The Defendant agreed that after the crew scuttled the vessel, the U.S. Coast Guard recovered approximately 280 kilograms of cocaine from the water in the location where the semi-submersible sank.  *Id.*

      b.  <u>Anticipated Testimony</u>

At the sentencing hearing, the Government will present evidence from multiple cooperating witnesses and a Special Agent with the Drug Enforcement Administration (DEA). The anticipated witness testimony will show that the Defendant and two of his brothers, Abigael and Jose, were the leaders of Los Cuinis, a Mexican DTO responsible for transporting ton quantities of cocaine from South America to Central America and Mexico for importation into the United States and Europe.  Los Cuinis is closely aligned with the Cartel de Jalisco Nueva Generacion (CJNG), one of the largest and most violent DTOs currently operating in Mexico, due in part to the familial relationship with the leader of the CJNG, Nemesio Oseguera Cervantes, also known as "El Mencho," who is the Defendant's brother-in-law.

Witness testimony will show that the Defendant participated in the distribution of thousands of kilograms of cocaine for importation into the United States.  The Defendant has already admitted to investing in the cocaine shipment on the semi-submersible interdicted by the U.S. Coast Guard on or about August 21, 2007, and witness testimony will establish that the semi-submersible contained at least 4,000 kilograms of cocaine before it was scuttled by the crew in the Pacific Ocean.  Evidence presented at the hearing also will establish that the Defendant was an investor in a cocaine shipment that was seized on or about June 16, 2009, at the Port of Progresso in Mexico and contained approximately 750 kilograms of cocaine hidden in frozen shark carcasses, which was destined for the United States.  One witness will describe

delivering 500 to 700 kilograms of cocaine, approximately once a month, to the Defendant and his brothers, Abigael and Jose, for more than a year.  Other witnesses will testify regarding the Defendant's investment in a 2,000-kilogram cocaine shipment by land from Central America to Mexico for importation into the United States, as well as regular hundred-kilogram quantity shipments loaded onto commercial aircraft destined for the United States.

The Defendant's BlackBerry Messenger (BBM) communications that will be introduced at the hearing show that the Defendant arranged shipments of cocaine in hundred-kilogram quantities for importation into the United States through at least 2013, when interception terminated.  In a series of communications in the summer of 2013, for example, the Defendant and his brother Abigael arranged to purchase and transport 500 kilograms of cocaine from Brazil, bring the cocaine to a stash house, and position their workers to assist with the distribution.

Evidence presented at the hearing also will show that the Defendant and his co-conspirators used violence and firearms to exact vengeance on rival drug traffickers and to make an example of those who owed Los Cuinis a drug debt.  Specifically, witnesses will testify that the Defendant ordered the murder of at least three individuals who stole cocaine from the Defendant, owed him a drug debt, and/or were members of a rival cartel.  Witnesses also will testify that the Defendant provided weapons, including assault rifles, and money to support allies of Los Cuinis in bloody wars against rival DTOs.  Additionally, witnesses will testify that the Defendant carried a pistol while attending meetings to discuss drug shipments.

In total, the evidence at the hearing will establish that, as a leader of Los Cuinis, the Defendant invested in ton quantities of cocaine and arranged for the distribution and sale of tons of cocaine for importation to the United States, used extraordinary methods to conceal those

(Page 150 of Total)

shipments, used violence and intimidation to control territory and collect debts, carried and

supplied weapons in furtherance of his drug trafficking activity, and earned substantial profits as

a result.

II.    Objections to the Presentence Investigation Report

On March 6, 2023, the U.S. Probation Office issued a Presentence Investigation Report

("PSR") for the Defendant.  Relying on the Defendant's sparse Statement of Facts and without

yet having the opportunity to hear witness testimony at the evidentiary hearing, the U.S.

Probation Office concluded in the PSR that the Defendant's overall Guideline imprisonment

range is 188 to 235 months.  PSR ¶ 68 (Level 35, Criminal History II).  The U.S. Probation

Office determined that the Defendant's Base Offense Level is 36, based solely on the 280

kilograms of cocaine seized from the water where the semi-submersible sank.  *Id.* ¶ 16.

Additionally, the U.S. Probation Office applied a two-point enhancement for use of a

submersible vessel or semi-submersible vessel to import a controlled substance, pursuant to

U.S.S.G. § 2D1.1(b)(3)(B).  *Id.* ¶ 17.

The Government asserts that the Base Offense Level is 38, pursuant to U.S.S.G. §

2D1.1(a)(2) and (c)(1), as the evidence at the sentencing hearing will show that the Defendant

personally coordinated and invested in shipments totaling well over 450 kilograms of cocaine

during his participation in the conspiracy.  The Government further asserts that the evidence

presented at the hearing will establish that the following additional enhancements apply: the

Defendant possessed a firearm, resulting in a two-level adjustment pursuant to U.S.S.G. §

2D1.1(b)(1); used violence, made a credible threat to use violence, or directed the use of

violence, resulting in a two-level adjustment pursuant to U.S.S.G. § 2D1.1(b)(2); and was an

organizer or leader of criminal activity that involved five or participants or was otherwise

JA443

extensive, resulting in a four-level adjustment pursuant to U.S.S.G. § 3B1.1(a).  Thus, the

adjusted offense level is 48, and with a three-point reduction for acceptance of responsibility, the

total offense level is 45, which is treated as an offense level of 43 pursuant to Chapter 5, Part A

(comment n.2).

      a.   <u>Organizer-Leader</u>

    The Court should apply a four-level increase pursuant to U.S.S.G. § 3B1.1(a) because

the Defendant was an organizer and leader of a criminal activity that involved five or more

participants and was extensive.  The anticipated evidence at the sentencing hearing will establish

that the Defendant was a top-tier leader of Los Cuinis, a DTO aligned with the CJNG.

Application Note four to U.S.S.G. § 3B1.1 identifies the following factors the Court should

consider in distinguishing leadership from mere management: exercise of decision-making

authority, nature of participation, recruitment of accomplices, claimed right to a larger share of

the fruits of the crime, degree of participation in planning or organizing the offense, nature and

scope of illegal activity, and the degree of control and authority exercised over others.  U.S.S.G.

§ 3B1.1, cmt. n.4.  Witness testimony and the Defendant's own BBM communications will show

that the Defendant and his two brothers were the leaders of Los Cuinis, had final decision-

making authority in the DTO, personally organized cocaine shipments across continents,

recruited and employed subordinates to send and receive the cocaine, and profited most from

their cocaine investments.  Accordingly, a four-level increase for leadership applies.

      b.   <u>Use, Direction, or Threats of Violence</u>

    The Court should also apply a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(2)

because the Defendant used violence, made a credible threat to use violence, or directed the use

of violence during his involvement in the conspiracy.  This enhancement may apply to acts

6

JA444

committed in Mexico against Mexican victims where such conduct served to protect the DTO's

lucrative drug routes to the United States.  *United States v. Flores*, 995 F.3d 214, 222 (D.C. Cir.

2021) (applying U.S.S.G. § 2D1.1(b)(2) in RICO case).  Additionally, the violence enhancement

in Section 2D1.1(b)(2) may be applied cumulatively with the firearm enhancement in Section

2D1.1(b)(1).  U.S.S.G. § 2D1.1, cmt. n.11(b).  At the sentencing hearing, witnesses will testify

that the Defendant directed the murder of at least three individuals because those individuals

stole cocaine from Los Cuinis, owed them a drug debt, and/or were affiliated with a rival cartel.

Witness testimony will also establish that the Defendant provided funding and weapons,

including assault rifles, to allies of Los Cuinis to fight for control of drug trafficking routes in

Mexico.  Because the purpose of the violence was to maintain control of territory used by the

Defendant and his co-conspirators to traffic cocaine to the United States, eliminate or instill fear

in competing DTOs, and recover drug debts owed to the Defendant and his DTO, the violence

was plainly to further the objectives of the drug trafficking conspiracy.  Consequently, a two-

level enhancement for violence applies.

      c.  <u>Possession of a Dangerous Weapon</u>

      The Court should apply a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(1) for

possession of a dangerous weapon in furtherance of the Defendant's drug trafficking activities.

Section 2D1.1(b) "reflects the increased danger of violence when drug traffickers possess

weapons." U.S.S.G. § 2D1.1, cmt. n.11.  Notably, the enhancement does not require a "showing

that the defendant used the firearm or would have used the firearm to advance the commission of

the underlying drug offense."  *United States v. Burke*, 888 F.2d 862, 869 (D.C. Cir. 1989).

Rather, the enhancement should be imposed "so long as 'the weapon was present, unless it is

JA445

*clearly improbable* that the weapon was connected with the offense.'" *Id.* (quoting U.S.S.G. §
2D1.1(b)(1), cmt. n.3) (emphasis in original).

At the sentencing hearing, witnesses will testify that the Defendant carried a pistol while
attending meetings to negotiate drug transactions.  The Defendant's purpose for carrying a pistol
was plainly for his safety and protection while meeting with other drug traffickers to negotiate
and coordinate drug transactions.  Thus, a two-level increase for firearm possession is warranted.

     d.  <u>Criminal History Category</u>

The Government objects to the U.S. Probation Office's calculation of the Defendant's
criminal history score and asserts that the Defendant's Criminal History Category should be III.
The Defendant was sentenced on December 18, 1998, to 48 months in custody and one year of
supervised release for a methamphetamine conviction in the Northern District of Georgia.  *See*
Ex. 1; PSR ¶ 27.  In calculating a criminal history score, three points apply "for each prior
sentence of imprisonment exceeding one year and one month."  U.S.S.G. § 4A1.1(a).  "Any prior
sentence of imprisonment exceeding one year and one month that was imposed within fifteen
years of the Defendant's commencement of the instant offense is counted."  U.S.S.G. §
4A1.2(e)(1).  The instant offense began in January 2003, which is within fifteen years of the
imposition of the 1998 sentence; therefore, three points apply for the Defendant's prior felony
drug conviction.  PSR ¶ 27

Additionally, the Defendant committed the instant offense while on escape status, for
which two additional points apply.  U.S.S.G. § 4A1.1(d).  On January 31, 2001, while serving
the 48-month sentence for the methamphetamine conviction, the Defendant signed out of a
halfway house, under the pretense that he was searching for employment, and never returned.
*See* Ex. 2.  Where, as here, the Defendant committed the instant offense while on escape status,

JA446

two points are added.  U.S.S.G. § 4A1.1(d).  With a criminal history score of 5, the Defendant's

Criminal History Category is III.  U.S.S.G. § 4A1.1.

Accordingly, the Government asserts that the total offense level under the Guidelines

should be Level 45, and the Criminal History Category should be III.  The corresponding

Guidelines' range is life imprisonment.

III.    Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

The Sentencing Guidelines are advisory, not mandatory.  *United States v. Booker*, 543

U.S. 220, 258–60 (2005).  However, the Supreme Court held in *Booker* that sentencing courts

must consider the Guidelines in formulating an appropriate sentence.  *Id.*  In *Gall v. United*

*States*, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to

follow in light of *Booker*:

> [A] district court should begin all sentencing proceedings by
> correctly calculating the applicable Guidelines range. As a matter of
> administration and to secure nationwide consistency, the Guidelines
> should be the starting point and the initial benchmark.

*Gall*, 552 U.S. at 49 (citation omitted).  Next, a district court should "consider all of the §

3553(a) factors to determine whether they support the sentence requested by a party.  In so

doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district

court] must make an individualized assessment based on the facts presented."  *Id.* at 49–50

(citation and footnote omitted).

In determining the appropriate sentence, the statute directs courts to consider the nature

and circumstances of the offense and the history and characteristics of the defendant.  18 U.S.C.

§ 3553(a)(1).  Further, courts are also directed to "impose a sentence sufficient, but not greater

than necessary, to comply with the purposes" of sentencing, which are:

JA447

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.   The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.   To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

    a.   <u>Nature and Circumstances of the Offense, and Need for the Sentence to Reflect the Severity of the Offense</u>

The Defendant committed a serious crime against the United States, having been convicted of conspiring to distribute large quantities of cocaine for importation into this country.

10

Although the Defendant has only admitted to a drug quantity less than 450 kilograms, the evidence at sentencing will show that the Defendant conspired to distribute several thousand kilograms of cocaine.  The quantity of cocaine on the seized semi-submersible in which Defendant admitted to investing alone was at least 4,000 kilograms according to Government witnesses with first-hand knowledge.  The Defendant's drug-trafficking network spanned at least three continents and transported cocaine by air, land, and sea.  The staggering quantity of cocaine that the Defendant distributed, by itself, would make the Defendant's offense serious.

More alarming, however, is that the Defendant directed and supported the use of violence to strengthen his drug-trafficking enterprise.  The Defendant directed the murder of at least three individuals because they stole cocaine from Los Cuinis, owed them a drug debt, and/or were affiliated with a rival cartel.  The Defendant also provided firearms and funding to his allies to advance their bloody battles for control of territory in Mexico, putting others' lives at risk while he safely reaped the benefits.  Notably, the Defendant and his brothers were key financiers of the CJNG, a DTO known for its brazenness and brutality, including public executions, ostentatious displays of sophisticated weaponry, murders of Mexican public officials, and expansion by force.  *See* June S. Beittel, Cong. Rsch. Serv., R41576, *Mexico: Organized Crime and Drug Trafficking Organizations* 33–34 (June 7, 2022).  The Defendant's willingness to resort to violence to further his criminal objectives makes his conduct particularly serious.

As the Court is well aware, cocaine is a dangerous and destructive substance.  From 2019 to 2021, cocaine-involved deaths in the United States rose nearly 54 percent to 24,486 deaths.  *See* National Institute on Drug Abuse, *Drug Overdose Death Rates* (Feb. 9, 2023), https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates.  Cocaine abuse has devastated communities in the United States, Mexico, Colombia, and elsewhere, ruining lives,

(Page 157 of Total)

splitting families apart, inflicting violence on innocent by-standers, and wreaking havoc on society at large.  It is also a highly destabilizing and corruptive force in countries throughout the region that do not have strong enough law enforcement institutions to combat it, such as Mexico, further adding to the destructive nature of the crime.  As the Government witnesses will testify, battles for control of territory for the purpose of distributing cocaine and other controlled substances resulted in the loss of many lives, including innocent victims.  The social cost of cocaine distribution is massive.  The Defendant's unlawful conduct played a significant role in perpetuating drug abuse and addiction in the United States and its corrosive effects on communities in multiple countries.

Ultimately, the Defendant's goal was to make as much money as possible by distributing drugs.  The Defendant acted without concern for the individuals suffering from addiction or the associated harms of drug abuse.  He acted without concern for the lives lost in securing territory for his drug-trafficking operation or the families of the individuals he ordered to be killed. Accordingly, the Court should impose a life sentence to reflect the nature and seriousness of the crime he committed.

b.  History and Characteristics of the Defendant

The Defendant's history and characteristics also warrant a sentence of life in prison, as the Defendant has repeatedly shown disregard for the law.  The drug conviction in this case is not the Defendant's first.  In 1998, the Defendant was convicted of use of a communication facility in committing possession with the intent to distribute methamphetamine in the Northern District of Georgia.  *See* Ex. 1.  On January 31, 2001, while serving a 48-month sentence for the methamphetamine conviction, the Defendant signed out of a halfway house, under the pretense that he was searching for employment, and never returned.  *See* Ex. 2.  The Defendant's

JA450

projected release date was not until July 10, 2001.  *Id.*  The Defendant returned to Mexico and,

wasting little time, resumed drug trafficking by at least 2003, resulting in the charges in this case.

By the Defendant's own admission, his involvement in the charged drug trafficking conspiracy

continued through his arrest on April 19, 2016.  Dkt. 139 ¶ 4.

The Defendant's misconduct continued at the time of his arrest.  The Defendant smashed

his iPhone so that Uruguayan law enforcement could not access the contents of the device, as a

witness will testify at the sentencing hearing.  The Defendant also was in possession of multiple

false identification documents.  He possessed a Mexican passport bearing his photograph but the

false name Alonso Ibarra Torres.  He also had a Mexican "IFE" card in the name of Ibarra

Torres, which is a Federal Elections Institute card commonly used as identification in Mexico.

Additionally, the Defendant had two birth certificates—one stating in that he was born in the

State of California and the other stating that he was born in the State of Michoacan, Mexico.

The Defendant's misconduct even continued while he was detained in Uruguay.  As was

widely reported in the Uruguayan press, the Defendant, upset with his conditions of confinement,

signed a statement identifying Uruguayan Minister of the Interior Eduardo Bonomi by name, and

asserting, "If Interior Minister [Eduardo] Bonomi continues to send his guards to torture me, let

him look for the highest bridge in Uruguay, and I am going to hang him from it."  *See* Ex. 3.

Documents provided by the Uruguayan government via Mutual Legal Assistance Treaty

(MLAT) indicate that, in October 2019, the Defendant took advantage of an electronic lock

malfunction to leave his cell, and upon being returned to his cell, he told the two guards who had

secured him, "tonight I'll kill you both."  Then in February 2020, the Defendant threw bleach at

another guard who was making a routine check of the unit.  The guard had to be referred to an

ophthalmologist for possible injury to his eyes.  A few days later, the Defendant threatened to

choke another guard using his handcuffs.  The Defendant's long history of drug trafficking and
repeated disregard for the rule of law, even while incarcerated, warrant a serious sentence.

      The Defendant's inability to take responsibility for his conduct is further reflected in the
minimalist statement of facts submitted at his Rule 11 hearing.  As the testimony at the
sentencing hearing will demonstrate, his proffered statement of facts falls well short of his
conduct.  His experience with the justice system in this country and elsewhere demonstrates that
jail time alone is not an adequate deterrent.  His history since his initial arrest and escape
demonstrates that the Defendant has avoided both taking responsibility and accepting
accountability for his criminal conduct.  A life sentence is therefore appropriate.

      c.  <u>Adequate Deterrence</u>

      Given the adverse impact that drug trafficking has on society and the serious detrimental
effects of cocaine in communities in the United States and abroad, it is important that the Court
impose a sentence that deters others from undermining the rule of law.  Importation of controlled
substances from South and Central America and Mexico into the United States still occurs in
large quantities.  In 2022, the DEA seized approximately 201,395 kilograms of cocaine,
accounting for only a portion of the cocaine imported into the United States.  *See* DEA, *Drug
Enforcement Administration Announces the Seizure of Over 379 million Deadly Doses of
Fentanyl in 2022* (Dec. 20, 2022), https://www.dea.gov/press-releases/2022/12/20/drug-
enforcement-administration-announces-seizure-over-379-million-deadly.  A life sentence
provides critical general deterrence to other DTO leaders that their participation in narcotics
importation into the United States and use of violence to achieve their drug-trafficking objectives
will result in substantial prison sentences.

14

d.  <u>Protect the Public from Further Crimes of the Defendant</u>

Prior to his arrest, the Defendant and his brothers led a DTO with significant ties to the CJNG for many years.  Upon serving his sentence, the Defendant could conceivably return to the same criminal conduct, regardless of whether he remains in the United States or relocates to another country, such as Mexico, where has substantial familial ties.  As the testimony at the sentencing hearing will show, the Defendant's extensive drug-trafficking network operated in many countries, including the United States and Mexico, and the CJNG maintains a strong presence in both countries today.  The CJNG reportedly maintained a presence in 27 of the 32 Mexican states as of 2020, and it currently has operations throughout the Americas, Asia, and Europe.  *See* June S. Beittel, Cong. Rsch. Serv., R41576, *Mexico: Organized Crime and Drug Trafficking Organizations* 33–34 (June 7, 2022).  Through his connection to the CJNG, the Defendant has ample opportunity to resume drug trafficking upon his release.  Further, the Defendant's BBM communications, many of which occurred while the Defendant was in Uruguay, show that he is capable of directing drug trafficking activity even when physically far removed from Mexico, where his DTO was based.

The Defendant also maintains the ability to carry out additional acts of violence.  The CJNG remains one of Mexico's most dangerous and well-armed criminal organizations, and its "reputation for extreme and intimidating violence continues."  *Id.*  As the testimony at the sentencing hearing will show, the Defendant did not hesitate to order murders and resort to violence as part of his drug-trafficking operation.  Only a life sentence, as recommended by the Guidelines, will be sufficient to protect the public from the Defendant returning to criminal activity.

15

JA453

e. <u>Need for Sentence Imposed to Avoid Unwarranted Sentence Disparities Among
Similarly Situated Defendants</u>

Section 3553(a)(6) articulates "the need to avoid *unwarranted sentence* disparities among
defendants with similar records who have been found guilty of *similar conduct*." 18 U.S.C. §
3553(a)(6) (emphasis added). When determining whether a sentence creates an unwarranted
disparity, the Court should consider a defendant's acceptance of responsibility, the nature and
extent of a defendant's participation in the criminal activity, a defendant's criminal history and
whether and to what extent a defendant cooperated. *See, e.g.*, *United States v. Mejia*, 597 F. 3d
1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" by
co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's
"harsher" sentence was not unwarranted). A defendant is only entitled to "a weighing of the
section 3553(a) factors that are relevant to his case, not to a particular result." *United States v.
Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).[1]

As set forth above, the Defendant engaged in drug trafficking activities for over a decade
and conspired to distribute ton quantities of cocaine into the United States. In arriving at its
sentencing recommendation, the Government has evaluated the Defendant's role within the
conspiracy and the length and extent of his criminal conduct. The Government's
recommendation of a Guideline sentence of life is consistent with sentences received by
defendants engaged in similar conduct and holding similar positions within international DTOs.

---

[1] Section 3553(a)(6) does not require that the sentencing judge engage in a case-by-case
comparison. This sentencing provision is aimed at national disparities; and courts have held that
"the guidelines themselves are almost certainly the best indication of ordinary practice since
most sentences are within the guidelines." *United States v. Saez*, 444 F.3d 15, 18–19 (1st Cir.
2006); *see also United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006); *United States v.
Gallegos*, 129 F.3d 1140, 1143 (10th Cir. 1997); *United States v. Hall*, 977 F.2d 861, 863–64 &
n.4 (4th Cir. 1992); *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir. 1991); *United States v.
Joyner*, 924 F.2d 454, 460–61 (2d Cir. 1991).

(Page 162 of Total)

JA454

In *United States v. Alfredo Beltran Leyva*, for example, the defendant received a life sentence after pleading guilty without a plea agreement and following a contested sentencing hearing. 916 F.3d 14, 20–21 (D.C. Cir. 2019). Like the Defendant, Beltran Leyva and his two brothers ran the Beltran Leyva Organization, a Mexico-based DTO closely allied with the Sinaloa Cartel until after Beltran Leyva's arrest in 2008, from the early 2000s to the 2010s. *Id.* at 19. As with Los Cuinis, "[t]he DTO's cocaine business purchased cocaine from Colombian manufacturers through brokers and then shipped the drugs via land, air, or water for sale throughout Mexico; the cartel also imported some of that cocaine to the United States . . . ." *Id.* The DTO also "engaged gunmen to kill members of rival cartels." *Id.* As here, Beltran Leyva's base offense level was 38, based upon the quantity of drugs involved. *Id.* at 20. The court found that five enhancements applied, including a four-level enhancement because the defendant was an organizer or leader and two-level enhancements each for possession of a dangerous weapon, violence, bribing a law enforcement official, and being a leader or organizer directly involved in the importation of a controlled substance. *Id.* at 20–21. Beltran Leyva's total offense level prior to any acceptance of responsibility was 50, two points higher than the Defendant's, but unlike the Defendant, Beltran Leyva had a criminal history score of zero, resulting in a criminal history category I.[2] *Id.* at 21. After considering the factors in 18 U.S.C. § 3553, the court found no basis for a downward departure and imposed a life sentence. *Id.*

In *United States v. Eliu and Waldemar Lorenzana-Cordon*, brothers and co-defendants Eliu and Waldemar Lorenzana were leaders of a Guatemala-based DTO and conspired for 13 years to distribute thousands of kilograms of cocaine from cartels in Colombia to Mexican

---

[2] Prior to sentencing, Beltran Leyva unsuccessfully attempted to withdraw his guilty plea. *Id.* at 21. The court ultimately held the defendant did not qualify for a downward adjustment for acceptance of responsibility. *Id.*

17

buyers for importation into the United States.  Dkt. No. 1002 at 44 & Dkt. No. 1018 at 30–31, Case. No. 03-cr-00331-CKK (D.D.C.).  Following a jury trial, both brothers were convicted of conspiracy to import five kilograms or more of cocaine into the United States and conspiracy to manufacture and distribute five kilograms or more of cocaine intending and knowing cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 952, 959, 960, 963, and 18 U.S.C. § 2.  Dkt. Nos. 998 & 1010, Case. No. 03-cr-00331-CKK (D.D.C.).  Both brothers had a base offense level of 38, and a total offense level of 46 with enhancements for possession of a firearm, use of a non-commercial aircraft, and being a leader or organizer of the criminal activity.  Dkt. No. 1002 at 7–8 & Dkt. No. 1018 at 6, Case. No. 03-cr-00331-CKK (D.D.C.).  Unlike the Defendant, Eliu and Waldemar Lorenzana-Cordon did not have any prior U.S. convictions or enhancements for use of violence.  *See id.*  Given the seriousness of the drug trafficking offense, the court sentenced both brothers to life imprisonment.  Dkt. No. 1002 at 50–51 & Dkt. No. 1018 at 34–35, Case. No. 03-cr-00331-CKK (D.D.C.).

In *United States v. Sergio Mejia Duarte*, the defendant was sentenced to life imprisonment following a conviction at trial of conspiracy to distribute five kilograms or more of cocaine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963.  Dkt. No. 87, Case No. 15-CR-20540 (S.D.F.L.).  At trial, the Government presented evidence that the Defendant operated in Honduras and Guatemala as the leader of a large-scale narcotics transportation organization spanning from Colombia to Mexico and the United States.  Dkt. No. 71 at 2, Case No. 15-CR-20540 (S.D.F.L.).  The defendant had a base offense level of 38 based on drug quantity; a total offense level of 50 after enhancements for leadership, possession of a dangerous weapon, violence, obstruction, and use of a non-commercial aircraft;

18

JA456

and a criminal history category of I.  *Id.* at 3–4; Dkt. No. 92 at 15, Case No. 15-CR-20540

(S.D.F.L.).  The court found a life sentence appropriate for such conduct.

　　　　Finally, a life sentence will not create an unwarranted sentencing disparity between the

Defendant and his brother and co-defendant, Jose Gonzalez-Valencia.  The Government

provided assurances to the Government of Brazil that it would not recommend a sentence greater

than 30 years for Jose Gonzalez-Valencia.  This assurance was a necessary precondition imposed

by Brazil to secure Jose Gonzalez-Valencia's extradition to the United States to face the charges

to which he ultimately pleaded guilty.  The Government made no such assurance to the

Government of Uruguay to secure the Defendant's extradition.  Moreover, the Government's

assurances do not bind the Court, and at the time of Jose Gonzalez-Valencia's sentencing, the

Court is free to impose a sentence that is greater than the Government's recommendation.

　　　　The Defendant and his brother Jose also vary substantially in the extent to which they

have accepted responsibility for their criminal conduct.  Upon his extradition to the United

States, Jose Gonzalez-Valencia pleaded guilty relatively quickly and fully admitted to the

applicable drug quantity and sentencing enhancements.  *See* Dkt. Nos. 134 & 135.  The

Defendant, in contrast, waited two and a half years before pleading guilty, and, even then, has

admitted only to the bare minimum conduct necessary to enter a guilty plea.  As the evidence

will show, he has not fully accepted responsibility for the full nature and scope of his conduct.

The applicable Guideline sentence of life is therefore appropriate for the Defendant and would

not cause an unwarranted sentencing disparity with his brother or similarly situated defendants.

IV.　　Conclusion

　　　　For the reasons set forth above, the Government respectfully requests that the Court

impose a Guideline range sentence of life imprisonment which is reasonable, appropriate, and

JA457

matches the severity of the crime committed by the Defendant.  A life sentence is sufficient, but

not greater than necessary, to hold the Defendant accountable for his crimes, promote respect for

the law, deter the Defendant and others from committing similar serious crimes and protect the

public.

                              Respectfully Submitted,
                              ARTHUR G. WYATT
                              Chief, Narcotic and Dangerous Drug Section
                              Criminal Division
                              U.S. Department of Justice


                    By:    */s/ Kaitlin Sahni*
                           Kaitlin Sahni
                           Acting Assistant Deputy Chief
                           Kate Naseef
                           Kirk Handrich
                           Trial Attorneys
                           Narcotic and Dangerous Drug Section
                           Criminal Division, U.S. Department of Justice
                           Washington, D.C.  20530
                           Telephone: (202) 514-0917

JA458

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing

(ECF) system with the United States District Court for the District of Columbia to counsel of

record for the Defendant, this 23rd day of March, 2023.


By:     /s/  *Kaitlin Sahni*
        Kaitlin Sahni
        Acting Assistant Deputy Chief
        Narcotic and Dangerous Drug Section
        Criminal Division
        U.S. Department of Justice

21

JA459

ORIGINAL

Page 1 of 4

FILED IN CHAMBERS
12/22/98
Luther D. Thomas, Clerk
By: Wilford
Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**UNITED STATES OF AMERICA**

-vs-

**Case No. 1:98-cr-404-01-JOF**

**GERARDO VALENCIA-GONZALEZ**

Defendant's Attorney:
L. Burton Finlayson, Esquire

### JUDGMENT IN A CRIMINAL CASE
#### (For Offenses Committed On or After November 1, 1987)

The defendant plead guilty to Count(s) one of the Information.

Accordingly, the defendant is adjudged guilty of such count(s) which involves the following offense:

| Title & Section | Nature of Offense | Count No. |
|---|---|---|
| 21:843(b) | Use of Communication Facility in Committing Possession with the Intent To Distribute Methamphetamine | one |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant shall pay the special assessment of **$ 100.00** which shall be due immediately.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States attorney for this district within thirty days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.    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
Defendant's Date of Birth:   May 11, 1977
Defendant's Mailing Address:
Atlanta Pretrial Detention Center
Atlanta, Georgia

Date of Imposition of Sentence:
December 18, 1998

Signed this the 22nd day of December, 1998.

ATTEST : A TRUE COPY
CERTIFIED THIS

**JUN 1 3 2022**

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

J. OWEN FORRESTER
UNITED STATES DISTRICT JUDGE

 

Page 2 of 4

1:98-cr-404-01-JOF : GERARDO VALENCIA-GONZALEZ
**IMPRISONMENT**

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **48 months**.

The defendant is remanded to the custody of the United States Marshal.

The Court recommends the Bureau of Prisons designate a Camp in the State of California near the defendant's home as place of service of the sentence imposed this date by this Court.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at_____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By:_____
Deputy U.S. Marshal

JA461

 

Page 3 of  4

1:98-cr-404-01-JOF : GERARDO VALENCIA-GONZALEZ
## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **1 Year.**

While on supervised release, the defendant shall not commit another federal, state or local crime and shall not illegally possess a controlled substance. The defendant shall comply with the standard and special conditions that have been adopted by this court (set forth below). If this judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release. The defendant shall comply with the following additional conditions:

The defendant shall not possess a firearm as defined in 18 U.S.C. § 921.

The defendant shall report in person to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of placement on supervised release and at least two periodic drug tests thereafter as directed by the probation officer.

Defendant shall participate as directed in a program approved by the Probation Officer for treatment or narcotic addiction or drug or alcohol dependency which may include testing for the detection of substance use or abuse. Further, the defendant shall be required to contribute to the costs of services for such treatment not to exceed an amount determined reasonable by the Probation Officer based on ability to pay or availability of third party payment and in conformance with the Probation Office's Sliding Scale for Substance Abuse Treatment Services.

JA462

 

Page 4 of 4

1:98-cr-404-01-JOF : GERARDO VALENCIA-GONZALEZ
## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this judgment, the defendant shall not commit another federal, state or local crime.  In addition:

1. The defendant shall not leave the judicial district without the permission of the court or probation officer;

2. The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

3. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4. The defendant shall support his or her dependents and meet other family responsibilities;

5. The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6. The defendant shall notify the probation officer within **72** hours of any change in residence or employment;

7. The defendant shall refrain from the excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician, and shall submit to periodic urinalysis tests as directed by the probation officer to determine the use of any controlled substance;

8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9. The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11. The defendant shall notify the probation officer within **72** hours of being arrested or questioned by a law enforcement officer;

12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**NORTHERN**                    **DISTRICT OF**                    **CALIFORNIA**

FILED

MAY 2 5 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

V.

GERALDO VALENCIA-GONZALEZ

**CRIMINAL COMPLAINT**

CASE NUMBER:

<u>OAKLAND VENUE</u>  **4 . 05 - 70364**

WDF

(Name and Address of Defendant)

VDB

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about _____January 31, 2001_____ in _____Alameda_____ county, in the _____Northern_____ District of _____California_____ defendant(s) did, (Track Statutory Language of Offense)

Please see Attachment "A" incorporated herein by reference.

in violation of Title_____18_____ United States Code, Section(s) _751_____

I further state that I am a(n)_____Deputy U.S. Marshal_____ and that this complaint is based on the following
                                            Official Title
facts:

Please see Attached Affidavit of David S. Zanca

Continued on the attached sheet and made a part hereof:         ☒ Yes         ☐ No

Approved
As To
Form:                    _[signature]_
          AUSA: JAMES E. KELLER

_[signature]_
Name/Signature of Complainant:    DAVID S. ZANCA

Sworn to before me and subscribed in my presence,

_May 25, 2005_                    at        San Francisco, California
Date                                              City and State

ELIZABETH D. LAPORTE                    _[signature]_
Name & Title of Judicial Officer                    Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

JA464

00005501

## ATTACHMENT A

**18 U.S.C. § 751: Escape**

Elements:

     The defendant, while in custody of the Attorney General of the United States, or his authorized representative (namely, the United States Bureau of Prisons), knowingly and voluntarily left and failed to return to the Cornell Corrections Institution, a designated facility of the United States Bureau of Prisons, without permission to do so.

Maximum Penalties:

     Five years imprisonment; $250,000 fine; 3 years supervised release; and $100 special assessment fee.

JA465

## AFFIDAVIT

I, David S. Zanca, first being duly sworn, depose and state that:

1. I have been employed with the United States Marshals Service ("USMS") since February 11, 2002. Prior to my current employment, I served in the United States Army for seven years as a Military Police Officer. I received a Bachelors Degree in General Studies from Louisiana Tech University. I am a graduate of the USMS Law Enforcement Training Academy and the Federal Law Enforcement Training Center in Glynco, Georgia.

2. This affidavit is submitted in support of a criminal complaint against Geraldo Valencia-Gonzalez ("Valencia-Gonzalez"), inmate registration no. 11457-112, charging that he knowingly and voluntarily left and failed to return to the custody of the Cornell Corrections Institution ("CCC") in Oakland, California, a designated facility of the United States Bureau of Prisons, on or about January 31, 2001, without permission to do so, in violation of 18 U.S.C. § 751 (Escape). The facts set forth in this affidavit are based upon information obtained from my investigation, including interviews with staff members at the CCC, and my review of pertinent documents supplied by the Bureau of Prisons as well as documents pertaining to Valencia-Gonzalez's court proceeding in the Northern District of Georgia.

3. On March 25, 1998, Valencia-Gonzalez was arrested for Use of Communication Facility in Committing Possession with the Intent to Distribute Methamphetamine. On December 22, 1998, in the Northern District of Georgia, Valencia-Gonzalez was convicted on count one, Title 21 USC 843(b): Use of Communication Facility in Committing Possession with the Intent to Distribute Methamphetamine. Upon his conviction, Valencia-Gonzalez was sentenced to the custody of the Attorney General of the United States, namely to the custody of the United States Bureau of Prisons ("Bureau of Prisons"), for a term of 48 months, with one year supervised release and a $100 special assessment.

4. On March 23, 1999, Valencia-Gonzalez was designated by the Bureau of Prisons to the Latuna Federal Correction Institution, Anthony, New Mexico-Texas.

5. On January 12, 2001, Valencia-Gonzalez was transferred from the Latuna Federal Correctional Institution, Anthony, New Mexico-Texas, to CCC in Oakland, California.

6. On January 31, 2001, the Office of U.S. Marshal of the Northern District of California, Oakland was notified of an escape of inmate (Valencia-Gonzalez, Geraldo REG # 11457-112) that occurred at the CCC in Oakland. At about 9:00 a.m. on January 31, 2001, Valencia-Gonzalez voluntarily signed out of the CCC to search for employment, on condition that he return at 5:00 pm the same day.

JA466

00603563

The CCC began Escape Procedures when Valencia-Gonzalez did not return to the facility at the designated time. Valencia-Gonzalez was officially placed on Escape status at 10:20 p.m. on January 31, 2001. Valencia-Gonzalez did not have permission to leave and not return to the CCC that day. Furthermore, Valencia-Gonzalez's projected release date was not until July 10, 2001.

7.  At an *in absentia* disciplinary committee hearing conducted by Bureau of Prisons on February 2, 2001, Valencia-Gonzalez was found guilty of "Prohibited Act Code 200: Escape." At this hearing it was concluded that Valencia-Gonzalez could not be located, and Valencia-Gonzalez had not returned to the CCC.

8.  The foregoing events at CCC involving Valencia-Gonzalez and his failure to return to CCC were further confirmed in my interview of CCC Program Director Howard Tu.

9.  Based on the facts and information presented above, I have probable cause to believe that Valencia-Gonzalez is in violation of 18 U.S.C. § 751 (Escape). Accordingly, based upon the foregoing, I respectfully request an arrest warrant be issued for Gerardo Valencia-Gonzalez for violating 18 U.S.C. § 751 (Escape).

I swear under penalty of perjury that the above facts are true and correct to the best of my belief.

David S. Zanca
Deputy United States Marshal

Subscribed and sworn to before me on this 25 day of May, 2005, in San Francisco, California.

ELIZABTH D. LAPORTE
UNITED STATES MAGISTRATE JUDGE

JA467

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT
☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

FILED

---

## OFFENSE CHARGED

18 U.S.C. Section 751(a) - Escape

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:
5 yrs. imprisonment; $250,000 fine, 3 yrs. supervised release; $100 special assessment

---

**DEFENDANT - U.S.** 2006 FEB 16 PM 5:57

▶ GERARDO VALENCIA GONZALEZ WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DISTRICT COURT NUMBER

CR06-00106 DLJ

---

## PROCEEDING

Name of Complainant Agency, or Person (&Title, if any)

U.S. MARSHALL SERVICE

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. Att'y ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

SHOW DOCKET NO.

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on THIS FORM    KEVIN V. RYAN
☒ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned)    SAUSA VINEET GAURI

---

## DEFENDANT

### IS NOT IN CUSTODY

1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges

2) ☒ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

### IS IN CUSTODY

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution
} ☐ Fed'l ☐ State

Has detainer been filed?
☐ Yes
☒ No
} If "Yes" give date filed

DATE OF ARREST ▶    Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶    Month/Day/Year

☐ This report amends AO 257 previously submitted

---

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT    Bail Amount: No Bail

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:

Before Judge:

Comments:

00603585

# United States District Court

FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
### CRIMINAL DIVISION
VENUE: OAKLAND

FILED

2006 FEB 16  PM 5: 57

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

### UNITED STATES OF AMERICA,

## V.

### GERARDO VALENCIA-GONZALEZ,

## CR06-00106 DL

### DEFENDANT.

# INDICTMENT

VIOLATION:  18 U.S.C. Section 751(a) - Escape

A true bill.

_____
Foreman

Filed in open court this _____ day of
_____.

_____
Clerk

Bail. $ *No bail / arrest warrant.*

*2/16/06.*

JA469

00003560

1  KEVIN V. RYAN (CASBN 118321)
   United States Attorney

2

3                                                   FILED

4                                            2006 FEB 16  PM 5: 57

                                             RICHARD W. WIEKING
                                             CLERK, U.S. DISTRICT COURT
                                             NORTHERN DISTRICT OF CALIFORNIA
5

6

7

8                      UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10                           OAKLAND DIVISION

11                                        CR06-00106 DL

12  UNITED STATES OF AMERICA,          )  No.
                                       )
13         Plaintiff,                  )  VIOLATION: 18 U.S.C. § 751(a) – Escape
                                       )
14     v.                              )
                                       )
15                                     )
    Gerardo VALENCIA-GONZALEZ          )  OAKLAND VENUE
16  (aka Geraldo Valencia-Gonzalez),   )
                                       )
17         Defendant.                  )
                                       )
18  _____)

19                          I N D I C T M E N T

20  The Grand Jury charges:

21         On or about January 31, 2001, in the Northern District of California, the defendant,

22                          Gerardo VALENCIA-GONZALEZ
23                          (aka Geraldo Valencia-Gonzalez),

24  did knowingly escape from the custody of the Cornell Community Corrections Center in

25  Oakland, California, in which he was confined by direction of the Attorney General by virtue of a

26  //

27  //

28  //

    INDICTMENT                              1

                              JA470
                              00003567

1  conviction on an offense, in violation of Title 18, United States Code, Section 751(a).

2  //

3  DATED:        February 16, 2006               A TRUE BILL.

4

5                                               FOREPERSON

6  KEVIN V. RYAN
   United States Attorney

7

8

9  W. DOUGLAS SPRAGUE
   Chief, Oakland Branch

10

11 (Approved as to form: _____ )
                    SAUSA Gauri

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT                        2

JA471

1/MAR/23, 9:24 AM

[*Fecha de descarga del artículo para traducción*]

## INFOBAE

# Mexican drug trafficker threatened to hang a Uruguayan cabinet minister from a bridge

Under arrest in the South American country, Los Cuinis cartel member Gerardo González Valencia threatened Eduardo Bonomi in a statement.

June 2, 2016



Interior Minister of Uruguay **Eduardo Bonomi's life was threatened** by Mexican drug trafficker **Gerardo Gonzalez Valencia,** who is in preventive custody in a Uruguayan jail for alleged money laundering.

During a routine inspection of the Los Cuini's cartel member's prison cell, guards found culinary condiments.  When asked by the guards about the origin of the products, the prisoner claimed that he had been tortured, according to a story published this Thursday in local daily paper *Búsqueda*.

[NOTE: Only the text of the article is translated, extraneous content such as website page headers, links to other articles, etc., was omitted.]

JA472

00095807

**"They had me naked in below zero temperatures**. If Interior Minister (Eduardo) Bonomi continues to send his guards to torture me, have him find the highest bridge in Uruguay, and **I am going to hang him from it**," notes the statement signed by González Valencia.

Based on this threat, the Interior Minister filed a **criminal complaint** and a permanent security detail was assigned to Bonomi. When contacted by the *EFE* news agency, [Uruguayan] State Department sources **declined to comment** or offer clarifications about this incident.

"Have Bonomi find the highest bridge in Uruguay, and I am going to hang him from it"

The drug trafficker laundered drug trafficking proceeds through real estate transactions in the city of Punta del Este, for which he has been in preventive custody since late April.

The transactions were carried out through a limited company with ties to the Panamanian firm **Mossack Fonseca**, whose activities sparked the episode known as the Panama Papers; in addition to Gonzalez Valencia, there are five other defendants from this case.

*READ MORE:*

New Collection

The United States Department of Justice **requested the drug trafficker's extradition**, although for Uruguay to send him to the requesting country, he would first have to be convicted and serve a sentence [on the Uruguayan charges]. However, based on bilateral international agreements, the latter requirement may be transferred to the North American country, according to Uruguayan Attorney General, **Jorge Díaz.**

Sources on the case consulted by *Búsqueda* confirmed **that the prisoner has consented to this option**, which is necessary if he is to serve his sentence outside of Uruguay, as it would allow him to be closer to his family.

JA473

There was also a concern that the drug trafficker's presence in a Uruguayan prison could **spread the use of criminal methods** among Uruguayan prisoners, and therefore the government position supposedly favors activating this legal mechanism.

**RELATED CONTENT**
Eduardo Bonomi

**[END OF ARTICLE]**

**[PHOTOS AND LINKS RELATING TO OTHER CONTENT]**

| **Infobae** | **Contact Us** |
|---|---|
| Argentina | Contact |
| América | Editorial Desk |
| México | Business Contact |
| Colombia | Media Kit |
| RSS | Employment |
| Perú | |
| Breaking News | |
| **Social Media** | **Contact Us** |
| Facebook | **Terms and Conditions** |
| Twitter | Privacy Policy |
| Instagram | |

All Rights Reserved © 2021 Infobae

JA474
00095809

Case 1:16-cr-00065-BAH Document 153-3 Filed 03/23/23 Page 4 of 8
USCA Case #23-3126    Document #2057130    Filed: 05/30/2024    Page 183 of 300





**INFOBAE**

## Narcotraficante mexicano amenazó con colgar de un puente a un ministro de Uruguay

Gerardo González Valencia, integrante del cártel de Los Cuinis, detenido en el país sudamericano, advirtió a Eduardo Bonomi a través de un comunicado

2 de Junio de 2016



**Eduardo Bonomi**, ministro del Interior de Uruguay, **fue amenazado de muerte** por el narcotraficante mexicano **Gerardo González Valencia**, quien cumple prisión preventiva en una cárcel uruguaya por presunto lavado de activos.

En un control de rutina en la celda del miembro **del cártel de Los Cuinis**, los guardias encontraron condimentos culinarios y al indagar sobre el origen de estos productos, el reo denunció haber sido torturado, publicó este jueves el diario local *Búsqueda*.

**"Me tuvieron desnudo con temperaturas bajo cero**. Si el ministro del Interior (Eduardo) Bonomi sigue mandando a sus guardias a torturarme, que busque el puente más alto del Uruguay, **donde lo voy a colgar"**, señala el acta firmada por González Valencia.

A partir de esta amenaza, el Ministerio del Interior **presentó una denuncia penal** y asignó una escolta de seguridad permanente para Bonomi. Consultadas por la agencia *EFE*, fuentes de la Secretaría de Estado prefirieron **no realizar comentarios o aclaraciones** sobre este episodio.

"Que Bonomi busque el puente más alto del Uruguay, donde lo voy a colgar"

El narcotraficante realizaba **lavado de activos provenientes del narcotráfico** mediante operaciones inmobiliarias en la ciudad de Punta del Este, por lo que permanece en prisión preventiva desde finales de abril.

Los negocios fueron realizados a través de una sociedad anónima vinculada al estudio panameño **Mossack Fonseca**, cuya actividad dio origen al episodio conocido como Papeles de Panamá, y por el caso hay otros cinco procesados además de González Valencia.

*LEA MÁS:*

New Collection

La Justicia de los Estados Unidos **pidió la extradición del narcotraficante**, aunque para que Uruguay lo envíe a ese país debe existir primero una sentencia y un cumplimiento de la pena, aunque con base en convenios internacionales suscriptos por ambos países, este último requerimiento se puede trasladar al país norteamericano, según el procurador general de Uruguay, **Jorge Díaz.**

Fuentes del caso consultadas por *Búsqueda* afirmaron que esta posibilidad **cuenta con el consentimiento del encarcelado**, que es necesario para que pueda descontar su pena fuera de Uruguay, ya que le permitiría una mayor cercanía con su familia.

También existe preocupación de que la presencia del narco en una cárcel uruguaya pueda **extender la aplicación de técnicas criminales** entre los presos uruguayos, por lo que desde el gobierno existe supuestamente el beneplácito para que este mecanismo legal se active.

🏷 **TEMAS RELACIONADOS**

Eduardo Bonomi

infobae          Últimas Noticias   Política   Sociedad   Deportes   Tecno   Economía   Qué puedo ver   Esports   Educación   Campo   Tendencias



**Apertura de sesiones ordinarias en el Congreso: el discurso de Alberto Fernández en vivo**

Finalmente los movimientos sociales oficialistas se movilizaron al Congreso para respaldar a Alberto Fernández

El Carnegie Hall retoma el programa completo anterior a la pandemia en la temporada 23-24

Galería de fotos: el discurso de Alberto Fernández ante la Asamblea Legislativa

Debido a la sequía el aporte de dólares del agro se desplomó 74% en febrero

**INFOBAE AMÉRICA**

Case 1:16-cr-00065-BAH Document 153-3 Filed 03/23/23 Page 6 of 8
USCA Case #23-3126    Document #2057130    Filed: 05/30/2024    Page 185 of 300



**El Carnegie Hall retoma el programa completo anterior a la pandemia en la temporada 23-24**

Crecen los ataques a los colegios de mujeres en Irán: más de un centenar de alumnas fueron envenenadas

15 postales históricas de Río de Janeiro, la "Ciudad Maravillosa" que cumple 458 años

Quién es Rodrigo Valdés, el chileno que será el nuevo director para América Latina del FMI

Trabajadores hispanos lograron un acuerdo por 1,17 millones de dólares en un caso de discriminación y uso excesivo de la fuerza

**TELESHOW**

00095722

Case 1:16-cr-00065-BAH   Document 153-3   Filed 03/23/23   Page 7 of 8
USCA Case #23-3126        Document #2057130        Filed: 05/30/2024        Page 186 of 300



**Cuándo será la final de Gran Hermano: dónde se realizaría y qué sucederá con el ganador**

Fede Bal contó la historia detrás del lavarropas que destapó su escandalosa separación de Sofía Aldrey

Lali presentó Cómprame un brishito, el tema pedido por sus fans: el famoso que sorprendió con sus pasos de baile

Camila Morrone y Gigi Hadid instalaron el gris en sus looks: celebrities en un click

50 años de El lado oscuro de la luna, el disco con el que Pink Floyd marcó un antes y un después en la historia de la música

**DEPORTES**

Case 1:16-cr-00065-BAH Document 153-3 Filed 03/23/23 Page 8 of 8
USCA Case #23-3126    Document #2057130    Filed: 05/30/2024    Page 187 of 300

infobae

Últimas Noticias    Política    Sociedad    Deportes    Tecno    Economía    Qué puedo ver    Esports    Educación    Campo    Tendencias



**"Va a ser uno de los mejores arqueros de la historia": el increíble presagio de una leyenda del fútbol en un difícil momento de Dibu Martínez**

**Así quedó la tabla de clubes con más títulos internacionales luego del título del Real Madrid**

**La número uno del mundo, Iga Swiatek, cayó ante Elena Rybakina en los octavos de final del Australian Open**

**Un sitio de apuestas será el principal auspiciante de la liga chilena de fútbol y hay polémica**

**Messi, el Gordo de Navidad del becario y el asombroso vaticinio del hombre de las dos bodas**

infobae

**Infobae**

Argentina

América

México

Colombia

RSS

Perú

Últimas Noticias

**Redes Sociales**

Facebook

Twitter

Instagram

**Contáctenos**

Contacto

Redacción

Contacto comercial

Media Kit

Empleo

**Contáctenos**

Términos y Condiciones

Política de Privacidad

Todos Los Derechos Reservados © 2021 Infobae

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>**v.**<br><br>GERARDO GONZALEZ-VALENCIA,<br><br>Defendant. | CRIMINAL NO. 16-CR-065<br>(BAH) |

**GERARDO GONZALEZ-VALENCIA'S MEMORANDUM IN AID OF SENTENCING AND
INCORPORATED POSITION REGARDING SENTENCING FACTORS**

In accordance with Rule 32(i)(1)(C) of the Federal Rules of Criminal Procedure and Section 6A1.2 of the United States Sentencing Guidelines and Policy Statements ("USSG" or the "Guidelines"), Gerardo Gonzalez-Valencia, through counsel, respectfully submits this memorandum to aid the Court in determining an appropriate sentence in this case.

## I.     INTRODUCTION

On April 16, 2016, a federal grand jury returned a one-count indictment charging Mr. Gonzalez-Valencia with Conspiracy to Distribute Five Kilograms or More of Cocaine, and 500 Grams or more of Methamphetamine, for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1) and 963, and 18 U.S.C. § 2 (the "Indictment").

On December 22, 2022, the Government first motioned the Court to dismiss the methamphetamine portion of Count 1, which was granted. Mr. Gonzalez-Valencia then pleaded guilty to Conspiracy to Distribute Five Kilograms or More of Cocaine, for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1) and 963, and 18 U.S.C. § 2.

There is no plea agreement between Mr. Gonzalez-Valencia and the Government, but Mr.

Gonzalez-Valencia acknowledged at the plea hearing before this Court that he personally invested his own funds in connection with the purchase of more than five kilograms of cocaine from Colombia, the transportation of cocaine to Central America and Mexico, and the illegal importation of the cocaine into the United States and Europe for further distribution.  Tr. of Plea Colloquy at 14:16-23.  Specifically, Mr. Gonzalez-Valencia acknowledged that, in approximately 2007, he and others invested in a shipment of cocaine that he knew would be transported from Colombia to a location off the coast of Guatemala using a semi-submersible vessel.  *Id.* at 14:23-15:4.  The U.S. Coast Guard interdicted the semi-submersible vessel in August 2007, recovering 280 kilograms of cocaine from the water in the location where the semi-submersible sank, and making Mr. Gonzalez-Valencia accountable for 280 kilograms of cocaine.  *Id.* at 15:14-18

Mr. Gonzalez-Valencia played a financial role in the conspiracy to distribute more than 5 kilograms of cocaine and he used his own funds to invest in purchasing the cocaine and arranging its transport on the semi-submersible to Mexico.  While he knew that some part of the shipment was destined for the United States (and Europe), his responsibility for the cocaine (and knowledge of what would happen to the shipment if it reached Mexico) ended at the Mexican border.  He would be paid only when the cocaine arrived in Mexico and would receive no payment if the cocaine did not reach Mexico.  Mr. Gonzalez-Valencia was not a part of any organization controlling the narcotics within Mexico.  Mr. Gonzalez-Valencia believes that that group controlled the pickup, transportation, repackaging, cutting and further distribution of the cocaine, but he was not involved in such activity and did not have detailed knowledge or control of the process within Mexico.  His limited financial role in the conspiracy was confirmed by a 2015 Intelligence Report produced as *Brady* material that also underscored that by then "not all of the Gonzalez Valencia siblings were involved in illicit activities."  Ex. 1 (Letter from A. Wyatt to S. Best and L. Sanchez (Apr. 12, 2022)

2

JA481

(Doc. No. 97-6)).

Neither counsel nor Mr. Gonzalez-Valencia offers any excuse for his wrongdoing.  In 2009, however, Mr. Gonzalez-Valencia withdrew himself from any further involvement in illegal activities and began a new life by moving to Argentina and opening a retail convenience store business.  By 2011, Mr. Gonzalez-Valencia relocated his wife and children to Argentina (and later Uruguay) because of concerns he had about the safety of his family residing Mexico.  Following his departure from Mexico to Argentina and Uruguay, Mr. Gonzalez-Valencia was no longer involved in any aspect of the conspiracy to distribute cocaine, including on the financial side.  Mr. Gonzalez-Valencia never carried or used a firearm (other than when he hunted in Africa and elsewhere, a sport he legally enjoys), never threatened anyone with violence at any relevant period in time, and was never a leader of a group engaging in such illegal activities.

Mr. Gonzalez-Valencia accepts that his crimes are serious.  Consistent with the seriousness of his crimes, Mr. Gonzalez-Valencia and his counsel agree with the United States Probation Office's ("USPO") Sentencing Recommendation of 188 months (15 years, 8 months).  *See* Ex. 2, Sentencing Recommendation, at 1 (Doc. No. 150) (hereinafter "Sentencing Recommendation"); Ex. 3, Presentence Investigation Report, at ¶¶ 15-25 (Doc. No. 149) (hereinafter "PSR").  As detailed below, a sentence of 188 months (15 years, 8 months) comports with the appropriate Guidelines range, consideration of the history and characteristics of the defendant, the need to avoid unwarranted sentence disparities, and the purposes of the Sentencing Reform Act (18 U.S.C. § 3553(a)(2)).

## II.   **LEGAL STANDARD**

Section 3553 of Title 18 of the United States Code is the statutory basis of the Federal sentencing structure. Section 3553(a) requires sentencing courts "to impose a sentence

3

<u>sufficient, but not greater than necessary</u>, to comply with the purposes set forth" in the Sentencing Reform Act of 1984 ("SRA" or the "Sentencing Reform Act") (emphasis added). Those purposes are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2).

In determining the sentence minimally sufficient to comply with Section 3553(a)(2), the sentencing court must consider several factors listed in Section 3553(a), including: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the kinds of sentences available;" (3) the Guidelines and policy statements issued by the Sentencing Commission, including the Guidelines range; (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" and (5) "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(1), (a)(3)-(a)(7).

In *United States v. Booker*, 543 U.S. 220, 226-27 (2005), the Supreme Court ruled that the Sixth Amendment, as interpreted by the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), mandates that the Guidelines can no longer operate as mandatory sentencing rules.   The *Booker* Court held that two provisions of the Sentencing Reform Act, 18 U.S.C. § 3553(b)(1) (requiring sentencing courts to impose a sentence within the applicable Guidelines

range, absent a basis for departure) and 18 U.S.C. § 3742(e) (establishing standards for appellate review), must be severed and excised. *See Booker*, 543 U.S. 220 at 259.

Thus, after *Booker*, the Guidelines are only advisory in nature. *See United States v. McKeever*, 824 F.3d 1113, 1119 (D.C. Cir. 2016). Subsequent cases decided by the Supreme Court have affirmed the authority of the district courts to sentence defendants within the range of choice dictated by the facts and circumstances of the case before the Court. In *Rita v. United States*, 551 U.S. 338, 351 (2007), the Supreme Court made clear that a district court may consider arguments that a "Guidelines sentence itself fails to properly reflect [18 U.S.C.] § 3553(a) considerations." While the Court must respectfully consider the Guidelines in determining a sufficient sentence, *Gall v. United States*, 552 U.S. 38, 49-50 (2007), it may not presume that a Guidelines sentence is a correct one. *Rita*, 551 U.S. at 351; *See also Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (noting that sentencing courts may vary from the advisory Guidelines range based solely on policy considerations, including disagreement with the policy underlying the Guidelines in a case); *United States v. Terrell*, 696 F.3d 1257, 1261 (D.C. Cir. 2012) ("A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence.") (quoting *Unites States v. Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007)).

The result of this change in the federal sentencing scheme is that district courts may "take account of" the advisory Guidelines range as part of all the sentencing goals and factors enumerated in 18 U.S.C. § 3553(a), but are no longer bound by the sentencing range indicated by the applicable range in the case. *Cunningham v. California*, 549 U.S. 270, 286 (2007). The advisory Guidelines are, therefore, only "the starting point and the initial benchmark" in determining a sentence and not the only consideration. *Gall*, 552 U.S. at 49. Sentencing judges "must make an individualized assessment based on the facts presented." *Id.* at 50.

5

III.  **DISCUSSION**

In accordance with the direction provided by the Supreme Court in *Gall* and the United States Court of Appeals for the District of Columbia Circuit in *United States v. Akhigbe*, 642 F.3d 1078 (D.C. Cir. 2011), we first address the appropriate Guidelines range, recognizing, again, that the Supreme Court has made clear that a district court may not presume that a Guidelines sentence is substantively reasonable.  *Rita*, 551 U.S. at 351; *Terrell*, 696 F.3d at 1261.  We then discuss the remaining sentencing factors set forth in Section 3553(a).  After examining the facts in this case and applying all of the Section 3553(a) factors, we ask the Court to impose a sentence of 188 months (15 years, 8 months), as recommended by the USPO.  *See* Sentencing Recommendation, at 1.  Such a sentence is not greater than necessary to achieve the goals of the SRA.

A.  **Guidelines Range (18 U.S.C. § 3553(a)(4) & (a)(5)).**

1.  **USPO Position on Guidelines Ranges and Recommended Sentence**

Mr. Gonzalez-Valencia and his counsel agree with both the guidelines range and calculations contained in the USPO's Presentencing Investigation Report ("PSR") and the USPO's Sentencing Recommendation of 188 months (15 years, 8 months).  *See* Sentencing Recommendation at 1;  PSR at ¶¶ 15-25**.**

The USPO calculates Mr. Gonzalez-Valencia's base offense level at thirty-six.  PSR at ¶ 16.  The USPO proposes that the offense level be decreased by 2 levels, under U.S.S.G. § 3E1.1(a), because Mr. Gonzalez-Valencia ███████████████████████████████████ ██████████████  *Id.* at ¶ 23.   The USPO also proposes that the offense level be decreased by 1 level, under U.S.S.G. §3E1.1(b), because Mr. Gonzalez-Valencia ████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████  *Id.* at ¶ 24.  Because a semi-submersible vessel as described

6

in 18 U.S.C. § 2285 was used in the commission of the offense, the USPO also found that a two-level increase is merited.  Thus, the USPO recommends a total offense level of 35. *Id.* at ¶ 25.

In determining Mr. Gonzalez-Valencia's Criminal History Category, the USPO pointed to a prior conviction in the US District Court for the Northern District of Georgia, at the age of 20, for possession with intent to distribute methamphetamine, resulting in a total criminal history score of three, which establishes a ███████████████████████ *Id.* at ¶ 28.  Given that the Government has acknowledged that Mr. Gonzalez-Valencia cannot be charged for leaving a half-way house without permission because of the rule of Specialty, the USPO was correct in concluding that Criminal History Category II properly applies, not Criminal History Category III as the Government has argued.  The applicable Guidelines range, according to the USPO, is 188 to 235 months. *Id.* at ¶ 68.  The USPO's recommended sentence is 188 months (15 years, 8 months), to which Mr. Gonzalez-Valencia and his counsel concur. Sentencing Recommendation, at 1.

### 2.  Government's Position on Guidelines Ranges

The Government filed written objections to the PSR, including certain objections to the USPO's Guidelines calculations. *See* Ex. 4, Addendum to the PSR, at 19-20 (Doc. No. 149).  The Government objected that the defendant is accountable for 450 kilograms or more of cocaine, which would establish a base offense level of 38, not 36 as found by the USPO. *Id.*  The Government also objected that the USPO failed to add two points for the specific offense characteristics for possessing a firearm and using violence, making a credible threat to use violence, or directing the use of violence during the commission of the offense, pursuant to U.S.S.G. § 2D1.1(b)(1) and (2), which the USPO declined to add because ██████████

██████████████████████████████████████████████████████

7

 *Id.* at 19-20.  The Government also objected that a four-level increase for organizer or leader was not imposed, pursuant to U.S.S.G. § 3B1.1(a), which the USPO also declined to add because *Id.* at 20.  Finally, the Government objected that the Adjusted Offense Level should be 48 and the Total Offense Level 45, but the USPO concluded that *Id.*

We understand that the Government intends to offer testimony and other evidence in support of their position on enhancements at the Sentencing Hearing, that Mr. Gonzalez-Valencia and his counsel will contest.

### a.  **Government's Position on Weight of Cocaine is Without Merit**

As discussed above, the Government objected to the USPO's Guidelines calculations by arguing that Mr. Gonzalez-Valencia is accountable for being involved in a conspiracy to distribute 450 kilograms or more of cocaine, which would establish a base offense level of 38, not 36 as found by the USPO.  It is uncontested that the Government charged and indicted Mr. Gonzalez-Valencia for conspiracy to distribute five or more kilograms of cocaine, not 450 kilograms.  To date, the Government has offered no explanation for why it only charged and indicted Mr. Gonzalez-Valencia for the lesser charge of a conspiracy to distribute five or more kilograms of cocaine.  Had the Government had the evidence to show that Mr. Gonzalez-Valencia was involved in a conspiracy to distribute the greater amount of 450 kilograms or more of cocaine, it surely would have charged and indicted him accordingly.  There is also no evidence that Mr. Gonzalez-Valencia had any involvement in the importation of cocaine into the United States hidden inside frozen sharks, as alleged by the Government.

8

Not only is the Government's attempt to now assert that Mr. Gonzalez-Valencia should receive a sentence enhancement for 450 kilograms of cocaine without evidentiary support, but it is also inconsistent with the Government's previous positions regarding the weight of the drugs. This is illustrated by the case brought against defendants Arley Olaya-Cuero, Arturo Gonzalez-Quinones, Dagoberto Sarrias-Boya, and David Galindo-Perez in the Middle District of Florida in connection with the same 2007 cocaine seizure involving the semi-submersible.  In *United States v. Gonzalez-Quinones*, these four defendants were charged with conspiring to "possess with the intent to distribute ***five kilograms (5) or more*** of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, on board a vessel subject to the jurisdiction of the United States" and (2) aiding and abetting and possessing "with the intent to distribute ***five (5) kilograms or more*** of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, on board a vessel subject to the jurisdiction of the United States[.]"  *See* Indictment at 1-2 (Doc. No. 1), No. 8:07-cr-00334-EAK-TBM (M.D. Fla. 2007) (emphasis added); Superseding Indictment at 1-2 (Doc. No. 25).  Notably, no other charges were brought for a weight of 450 or more kilograms of cocaine based on the same underlying facts that are at issue in the present case.

Moreover, each of the four defendants in *Gonzalez-Quinones* pleaded guilty to one or both of the offenses set forth in the superseding indictment for five or more kilograms of cocaine. Defendant Olaya-Cuero (the semi-submersible's mechanic), pursuant to a plea agreement, pleaded guilty to one count of conspiracy to possess with intent to distribute five or more kilograms of cocaine on board a vessel subject to the jurisdiction of the United States and was sentenced to 108 months in prison and 60 months supervised release.  *See* Transcript of Guilty Plea at 14:17-16:1 (Doc. No. 157); Minute Entry (Doc. 67).  Likewise, defendant Gonzalez-Quinones (the semi-

9

JA488

submersible's captain) pleaded guilty to the same conspiracy charge and was sentenced to 168 months in prison and 60 months supervised release.  *See* Acceptance of Plea (Doc. No. 90); Minute Entry (Doc. 70).   A guilty plea was also entered for defendants Galindo-Perez (the semi-submersible's load guard) and Sarrias-Boya (the semi-submersible's crewman) on both counts of the superseding indictment.  *See* Minute Entry at 1 (Doc. No. 93); Transcript of Sentencing at 3:18-3:20 (Doc. No. 130).  Both were sentenced to 135 months in prison and 60 months supervised release.  Minute Entry (Doc. 93); Minute Entry (Doc. 106).  In sum, these defendants all pleaded guilty to only five or more kilograms of cocaine based on the very same semi-submersible and drug-related facts that form the basis of Mr. Gonzalez-Valencia's drug conspiracy charge and received sentences significantly lower than the Government's recommended guidelines range for Mr. Gonzalez-Valencia.  This is clearly at odds with the Government's position that more than the 280 kilograms of cocaine recovered from the semi-submersible is attributable to Mr. Gonzalez-Valencia.

**b. <u>Government's Position on Firearms and Threat of Violence is Without Merit</u>**

The Government also objected that the USPO failed to add two points for the specific offense characteristics for possessing a firearm and using violence, making a credible threat to use violence, or directing the use of violence during the commission of the offense, pursuant to U.S.S.G. § 2D1.1(b)(1) and (2).  This objection is also without merit.

With respect to the firearm enhancement, "[i]n order to justify imposing a two-level enhancement for possession of a 'dangerous weapon,' the Government must show that the 'weapon (including a firearm) was possessed' *in connection* with a drug offense."  *United States v. Leyva*, 916 F.3d 14, 26-27 (D.C. Cir. 2019) (quoting U.S.S.G. § 2D1.1(b)(1)) (emphasis added).  "[T]here must be something more than mere presence [of the firearm] at the scene of a criminal transaction.

10

JA489

There must be some action, some word, or some conduct that links the individual to the [contraband]." *See United States v. Bagcho*, 923 F.3d 1131, 1138-40 (D.C. Cir. 2019) (second alteration in original) (quoting *United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980)).  The violence enhancement may be applied under §2D1.1(b)(2) only where "violence or credible threats of violence are used *in furtherance* of a narcotics conspiracy." *United States v. Fernandez*, 636 F.App'x 71, 74 (2d Cir. 2016) (citation omitted) (emphasis added).  Importantly, the Government provided Mr. Gonzalez-Valencia's counsel with copies of all information obtained from hard drives, cell phones, and cameras seized when Mr. Gonzalez-Valencia was arrested in 2016 in Uruguay.  All of his electronic devices were searched at the time of his arrest, and all information located on those devices was captured.  The Government has, to date, not provided any data captured from those devices to support its claims that Mr. González-Valencia was continuing to engage in narco-trafficking activity similar to that alleged in the indictment following his 2009 move to Argentina and later Uruguay, that he used firearms (other than legally while hunting), or used violence or the threat of violence, at any time.  Further, there was no evidence in any of the data provided from those searches, including hundreds of pictures dating back to at least 2008, to support the Government's claim of Mr. Gonzalez-Valencia's use of any firearms during his admitted earlier involvement in a conspiracy to distribute more than 5 Kilograms of cocaine, or at any time.  Finally, while Mr. Gonzalez-Valencia contests the Government's assertions that he was a participant in any of the Blackberry Messenger ("BBM") exchanges that were recorded in 2012 and 2013 as part of a government wiretap, it is uncontested that none of the BBM wiretaps provided by the Government to counsel for Mr. Gonzalez-Valencia as evidence of his alleged continuing narco-trafficking activity would reasonably illustrate the use of a firearm by Mr. Gonzalez-Valencia or anyone else in the commission of any alleged offenses.

11

JA490

3.  **Government's Position on Leadership is Without Merit**

The Government also objected that a four-level increase for organizer or leader was not

imposed, pursuant to U.S.S.G. § 3B1.1(a), which the USPO also declined to add because ███

███████████████████████████████████████████████████████████████████████

██████████████        *Id.* at 20.  When assessing whether a defendant was an "organizer or leader" courts

should consider certain factors such as the exercise of decision-making authority, the nature of the

defendant's participation in the commission of the offense, the recruitment of accomplices and the

claimed right to a larger share of the fruits of the crime.  U.S.S.G. § 3B1.1(a), cmt. 4.  The D.C.

Circuit has focused mainly on the extent of the defendant's decision-making authority and control

to determine if he was an "organizer or leader" under Section 3B1.1(a). *See*, *e.g.*, *United States v.*

*Carter*, 449 F.3d 1287, 1299 (D.C. Cir 2006) (holding that the district court's findings did not

support a four-level enhancement for the defendant's role as an "organizer or leader" because the

lower court found only that the defendant was a "point of contact for heroin for several people," not

that he "exercised authority over others or was hierarchically superior to them") (internal quotations

omitted).  For example, in *United States v. Bras*, 483 F.3d 103 (D.C. Cir. 2007), the D.C. Circuit

held that the lower court's categorization of the defendant as a "leader" was appropriate because he

"had a leadership role and an organizational one in the sense that he had to organize [the conspiracy]

to make it work," handled bribes, and "certainly had substantial operational authority." *Id.* at 114

(alteration in original) (internal quotations omitted). When Mr. Gonzalez-Valencia was involved in

the conspiracy to distribute five or more kilograms of cocaine, before his 2009 withdrawal when he

moved his permanent residence from Mexico to Argentina, he played a limited financial role by

investing his own money.  Such a financial role does not support a four-level increase for being an

organizer or leader, as the USPO found.  *Id.*

12

In addition, as discussed *infra*, Mr. Gonzalez-Valencia's lifestyle, specifically his routine international travel with his family, is inconsistent with the conduct of someone acting at the time as a leader or organizer of a criminal organization.

Furthermore, even assuming arguendo that Mr. Gonzalez-Valencia was "Silverio" there is no evidence in the BBM messages that supports the Government's argument that Silverio was an organizer or leader. Rather, the BBM wiretaps show that Silverio only messages "Boss" and "El Escorpion," evidencing his limited role in the conspiracy.

### B.   History and Characteristics of Ms. Gonzalez-Valencia (18 U.S.C. § 3553(a)(1)).

Under Section 3553(a)(1), a sentencing judge must consider the "history and characteristics of the defendant." Mr. Gonzalez-Valencia understands and accepts that his crimes are serious. His move with his family to Argentina and later Uruguay was an effort to withdraw from his involvement in the financial aspect of drug trafficking and start a new life with his wife and family away from Mexico and the dangers of drug trafficking.[1] The letters of support written by Mr. Gonzalez-Valencia's 18 year old son on behalf of himself and his younger siblings and by his ex-wife and the mother of his children presented below, demonstrate Mr. Gonzalez-Valencia's true

---

[1] The legal standard for an effective and complete withdrawal from a conspiracy requires an affirmative step to notify either the government or co-conspirators of an intention to withdraw. *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015) ("To withdraw from a conspiracy, an individual must come clean to the authorities or communicate his or her abandonment in a manner reasonably calculated to reach co-conspirators.") (internal quotations omitted) (quoting *United States v. Thomas*, 114 F. 3d 228, 267 (D.C. Cir. 1997)). Here, Mr. Gonzalez-Valencia's move away from Mexico with his family to Argentina and later Uruguay to no longer engage in narco-trafficking was a withdrawal from the conspiracy, but not to the extent necessary to satisfy the legal requirements for a withdrawal defense under U.S. law. Nonetheless, we respectfully request that Mr. Gonzalez-Valencia's withdrawal from the conspiracy by moving his family out of Mexico, starting a new life for himself and his family, and importantly ceasing all criminal activity still be considered by the Court as a mitigating factor at the time of his sentencing, supporting the USPO's recommended sentence of 188 months, not more.

13

JA492

character and supports the USPO recommended sentence of 188 months:

Dear Judge Howell,

I'm writing you this letter as first a hello and second as a third perspective point of view.  My name is [G.G.A.] I'm 18 years old and I'm the oldest son, I take care of my mother and my siblings because of the hole that my father left, is not something that I chose to happen but I see it as a learning experience and something positive because its teaching me and my family a lot of lessons, I don't like to see it from a negative perspective but I obviously wish it was different, and I don't blame my father or anybody I just understand that things happen in life and God rewards the people who help and work hard.  Now on the other hand my brother [G.A.] he's just a little boy he recently turned 10 years old he's very creative and unique if I was to describe him in one word its warrior and also we have my sister [V.G.A.] also a beautiful girl with a very good heart and of course my beautiful mother who will put her life in the line when it comes to her family a true lioness, and the thing that I would like you to understand is that my father built a great family through distance, problems and chaos and I believe that's a something hard to do but it shows and tells a lot about his character and I do believe he is perhaps a changed men and anybody can feel his true inner piece if you have the time to meet him.  I will always feel his support and love even if it has to be platonic I do not have to see him or talk to him because I know and feel his unconditional love, and know Judge Howell I truly ask for compassion on my father and I hope that you can see that there's two young kids, wife and a young man who need their father and husband back in their life.

With the best regards I send my letter.
[G.G.A.]

Ex. 5 (Letter from G.G.A. (Mar. 23, 2023)).

---

Dear Honorable Judge:

I'm so grateful to have this opportunity. Please allow me to introduce myself.

 My name is Wendy Amaral.  I am Gerardo Gonzalez's former wife. We have been together since 2002.

Before I met Gerardo, I wanted to study, travel and work as an architect or designer, that's the area I felt I can develop better than any other.  At 22 years old getting married wasn't in my priorities at all.  Mostly because I was raised by my four aunts who are professional, hard workers and independent women.

14

JA493

Then I met Gerardo.  Please Let me introduce you the love of my life. Gerardo as a young person was very easy going. What you see is what it is.

He loves history, books, and a good conversation rather than going out.  He loves having meals at home and cooking. He has always been very curious, he is always seeking all kinds of knowledge.  He used to laugh a lot.  I remember laughing a lot back then together, he had this contagious energy.

I don't think Gerardo is the kind of person who can be categorized as any specific type of person.  He has always been very genuine.  He speaks always with the truth and with so much respect to others.  He is very close to God, a good friend, and a good son.  He lives in the present.  He is extremely wise.  He has a really good heart and he is a free spirit.  He taught me that what matters is what is in your mind, your wisdom, and your knowledge.

Then he became a father, and that is when I started admiring him the most.

We have three beautiful, healthy and strong children, [G.G.A., V.G.A., and G.A.]. We were really happy.  We moved away from Mexico and Gerardo's family to Argentina and Uruguay to live in a healthy environment away from the violence in Mexico and to start a new life.  We chose to live by ourselves, away from everything we had known in Mexico, with the purpose of giving our daughter and two sons a different life than we had.

Sometimes we would travel to Mexico for family vacations and to visit Hotelito Desconocido.  I remember we had a birthday party for my oldest son there in February 2013.

Then suddenly Gerardo, the most important member or our little family, was arrested picking up my kids from school.

We have experienced in a short time what he is going through. The five of us are at the bottom together. After Gerard's arrest, we had to learn how to live and deal with others who view us as repulsive for over eight years now.

I remember Gerardo just three weeks before his extradition, he was very skinny and he wasn't getting any sleep. We went to see him at the prison and he couldn't walk properly, because of the shackles.  While at the prison we were always surrounded by this angry energy even we after we had addressed everyone working there with respect.  But I remember that once Gerardo hugged us, he brought peace and calm to our family, just like he always has.  Even in the worst environment, he used to tell my kids that it was their job to be peaceful and calm.  Even in the worst situation, Gerardo never takes anything personally.  This is just one example, but he has gone through so much.

15

JA494

We want to look forward and leave everything in the past, but we have not healed our hearts yet.  But I'm sure we will, because our family members have become better individuals.  We are more mature and more aware of our responsibilities and actions.  All we need is an opportunity to amend our lives.  I'm 42 years old, Your Honor, please let us, me and my kids have our family back together.

I promise with all my heart Gerardo has learned his lesson.  I will lead my family through good, with the hand of God.

Sincerely,

Wendy Amaral

Ex. 6, (Letter from Wendy Amaral (Mar. 23, 2023)).  Other members of Mr. Gonzalez-Valencia's family wrote letters in support of his true character.  They described Mr. Gonzalez-Valencia as an "excellent father" a "key person to successfully support the healthy growth of [his] family," "hardworking," and "a respectful, responsible, affectionate, and dedicated person." *See* Ex. 29 (letter from Hector Alonso Amaral Arevalo (Mar. 8, 2023)); Ex. 30A (translation of letter from Jorge Amaral Arevalo (Mar. 9, 2023)); Ex. 30B; (Letter from Jorge Amaral Arevalo (Mar. 9, 2023)) Ex. 31A (translation of letter from Martha Arevalo (Mar. 23, 2023)); Ex. 31B (letter from Martha Arevalo (Mar. 23, 2023)).[2]

Mr. Gonzalez-Valencia's kindness and true character has not gone unnoticed by others, even during his incarceration.  On February 7, 2023, counsel for Mr. Gonzalez-Valencia received the following voicemail from an attorney thanking Mr. Gonzalez-Valencia for being so kind to his young client at the Alexandria Detention Center, which further demonstrates Mr. Gonzalez-Valencia's true character in support of the USPO's recommended sentence of 188 months:

---

[2] Due to time constraints between receiving Exhibit 31B and the deadline for this Memorandum, Exhibit 31A, the English translation of Exhibit 31B, was drafted by an attorney for Mr. Gonzalez-Valencia who is fluent in Spanish. Counsel will submit a replacement Exhibit 31A with a certified translation.

Yeah, Mr. Best, You don't know me, My name is ███████. I am an attorney in D.C. but I wanted to take 30 seconds of your time. You have a client, Gerardo Gonzalez-Valencia, who showed great kindness to a client of mine in Alexandria jail and I just wanted to tell him thank you or for you to let him know. My client was a kid, very scared, got put in jail, he was one of these January 6 guys, but Mr. Gonzalez-Valencia showed real kindness to him and I just wanted to let you know he had done sort of a quiet act of good charity to a kid that was very scared being in prison for the first time so I wanted to pass that along and say thank you. My name again is ████ ████. Thanks again.

Ex. 7 (transcript of voicemail from ████ to S. Best (Feb. 7, 2023)).

   1. **Early Years**

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

   2. **Imprisonment at Age 20**

In February 1998, at the age of 20, Mr. Gonzalez-Valencia was arrested in Atlanta, Georgia, for Possession with Intent to Distribute Methamphetamine. *Id.* at ¶ 27. He was found

17

guilty and sentenced on December 18, 1998, to 48 months of custody, and one year of supervised

release.  *Id.*  After serving two and a half years of this sentence in a federal correction institution,

on January 12, 2001, the BOP designated Mr. Gonzalez-Valencia to the Cornell Corrections

Institute in Oakland, California, which was a facility that permitted Mr. Gonzalez-Valencia to sign-

out each day to work on the condition that he return by 5:00 PM the same day.  With a projected

release date from the BOP of July 10, 2001, Mr. Gonzalez-Valencia signed out of the Cornell

Corrections Institute on January 31, 2001, but did not return.

As a result, Mr. Gonzalez-Valencia was charged with knowingly escaping from the Cornell

Corrections Institute in violation of 18 U.S.C. § 751(a), in a case originally filed as Case No. CR06-

00106 in the U.S. District Court for the Northern District of California, and the Government

initially informed counsel for Mr. Gonzalez-Valencia that they would transfer the case to this

District pursuant to Rule 20 of the Federal Rules of Criminal Procedure.  *Id.* at ¶ 31.  However,

the Government has now informed counsel to Mr. Gonzalez-Valencia that due to the Rule of

Specialty, the Government will not be prosecuting Mr. Gonzalez-Valencia for allegedly escaping

the correctional facility.  The Government has explained that:

> Docket No. CR06-00106, charging escape is no longer being transferred to the District of
> Columbia because the defendant cannot be detained, tried, or punished for an offense other
> than that for which extradition was granted, except in accordance with the Treaty on
> Extradition and Cooperation in Penal Matters Between the United States of America and
> the Oriental Republic of Uruguay ("the Treaty"). Article 13 of the Treaty regarding the
> Rule of Specialty states:
>
> A person extradited under the present Treaty shall not be detained, tried or punished in the
> territory of the requesting Party for an offense other than that for which extradition has
> been granted…unless…when the requested Party has manifested its consent to his
> detention, trial or punishment for an offense other than that for which extradition was
> granted…provided such other offense is covered by Article 2. Escape from a correctional
> facility is not on the list of extraditable offenses in Article 2 of the Treaty; therefore, the
> government cannot seek a waiver of the Rule of Specialty.

*Id.*

18

### 3.  Life in Mexico from 2001 to 2009

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████ Beginning in 2007, his wife, along with her mother and sister, purchased Hotelito Desconocido, a boutique hotel located in Tomatlán, Jalisco, Mexico.

During this period in Mexico, Mr. Gonzalez-Valencia became involved in the financial side of drug trafficking.  *Id.* at ¶ 14.  From at least in or about 2003, Mr. Gonzalez-Valencia invested his own funds in connection with the purchase of more than five kilograms of cocaine from Colombia, and the transportation of cocaine to Central America and Mexico, and the illegal importation of cocaine into the United States and Europe for further distribution.  *Id.* In 2007, Mr. Gonzalez-Valencia invested his own funds with others in a shipment of cocaine from Colombia to a location off the coast of Guatemala in the Pacific Ocean using a semi-submersible vehicle.  *Id.* The U.S. Coast Guard interdicted the semi-submersible carrying the shipment of cocaine in which Mr. Gonzalez-Valencia had invested and recovered approximately 280 kilograms of cocaine from the water in the location where the semi-submersible sank.  *Id.*

Mr. Gonzalez-Valencia's role in the conspiracy to distribute more than five kilograms of cocaine to which he pleaded guilty was a financial role insofar as he invested his own funds in purchasing the cocaine.  *Id.*  His investment was to finance and arrange transportation of the cocaine to the border of Mexico.  *Id.*  While he knew that some part of the cocaine was destined ultimately for the United States and Europe, Mr. Gonzalez-Valencia was paid if and when the

19

shipment arrived in Mexico.  He was paid nothing if the cocaine did not arrive in Mexico.  *Id.*  Mr.

Gonzalez-Valencia was never part of the organization within Mexico that controlled the pick-up,

transportation, repackaging, cutting and further distribution of the cocaine and he did not have

detailed knowledge or control of the process within Mexico.  *Id.*  Mr. Gonzalez-Valencia never

carried or used a firearm and never threatened anyone with violence when he played this financial

role in the conspiracy to import drugs into the United States, or at anytime after he withdrew from

illegal activities and moved to Argentina and Uruguay.

Pursuant to its obligation to disclose potentially discoverable information pursuant to Rule

16 of the Federal Rules of Criminal Procedure and the Government's obligations under *Brady v.

Maryland*, 373 U.S. 83, 87 (1963), the Government informed Mr. Gonzalez-Valencia's counsel of

information confirming this limited financial role, and also underscoring by then that "the

Government has information that not all of the Gonzalez Valencia siblings were involved in illicit

activities."  Specifically, the Government informed Mr. Gonzalez-Valencia's counsel that:

> [i]n late October 2015, the Government obtained an assessment, based on information
> from sources unknown to the Government, that the Los Cuinis drug trafficking
> organization, made up of the Gonzalez-Valencia siblings, was the financial arm of the
> Cartel de Jalisco Nueva Generacion (CJNG), but was not directly involved in the
> production, movement, or distribution of drugs.  According to the assessment, Los
> Cuinis laundered money for CJNG and provided CJNG with funds that were used to
> purchase weapons, pay for logistical support, and recruit former paramilitary
> personnel to provide guerilla warfare training, which enabled CJNG to expand its
> drug trafficking activities.  According to the assessment, CJNG attempted to distance
> the CJNG's trafficking activities from Los Cuinis to protect the drug trafficking
> organization and the family's fortune.  The Government has information that not all
> of the Gonzalez-Valencia siblings were involved in illicit activities."

Ex. 1 (letter from A. Wyatt to S. Best and L. Sanchez (Apr. 12, 2022) (Doc. No. 97-6)).

### 4.  2009 Move to Argentina and later Uruguay

In 2009, Mr. Gonzalez-Valencia sold his hygienic products business in Mexico and began

his new life by reinvesting the proceeds into opening a 24/7 convenience store operating under the name of "Corner Store" in Buenos Aires, Argentina.  *See* Ex. 8, GGV-00000052 (photograph of the exterior of the Corner Store);  Ex. 9, GGV-000000051 (photograph of the interior of the corner store).  By the fall of 2011, Mr. Gonzalez-Valencia opened an additional Corner Store and sales at the Corner Stores reached as high as $30,000 per day, servicing over 1,750 customers.  Ex. 10, GGV-000000033 (translation of email dated Sept. 7, 2011); Ex. 11, GGV-000000034 (email dated Sept. 7, 2011);  Ex. 12, GGV-00000035 (translation of email dated Sept. 26, 2011);  Ex. 13, GGV-000000036 (email dated Sept. 26, 2011);  Ex. 14, GGV-000000037 (translation of email dated Oct. 15, 2011); Ex. 15, GGV-000000038 (email dated Oct. 15, 2011).

After securing a place to live in downtown Buenos Aires, his then-wife, Wendy Dalaithy Amaral Arevalo, and their two children (G.G.A. and V.G.A.) followed Mr. Gonzalez-Valencia to Buenos Aires while he ran his retail business.  Mr. Gonzalez-Valencia's oldest son, G.G.A., was enrolled in a kindergarten school in Buenos Aires in the spring of 2011, as confirmed by the school's admissions registrar.  Ex. 16, GGV-000000013-22 (translation of email dated Mar. 21, 2011); Ex. 17, GGV-000000023-32 (email dated Mar. 21, 2011).  Then, in early 2012, Mr. Gonzalez-Valencia and his family moved to Punta del Este, Uruguay, where they lived in the same community as his wife's parents.  There, they became members of the local community.  For example, Mr. Gonzalez-Valencia and his family were members of a local church and Mr. Gonzalez-Valencia's children attended school full-time where they were enrolled in classes and engaged in traditional extracurricular activities, such as soccer.  Mr. Gonzalez-Valencia moved his family to Argentina, and later Uruguay, because of his concerns about their safety in Mexico and as part of Mr. Gonzalez-Valencia's withdrawal from any further involvement in illegal activities. PSR at ¶ 14.

21

With large families and Wendy's hotel remaining back in Mexico, Mr. Gonzalez-Valencia and his wife Wendy and children made regular trips together back to Mexico every year after their move to Argentina and Uruguay.  Ex. 18, 00095803-00095806 (travel records)**.**  For example, in February 2013, Mr. Gonzalez-Valencia and his wife hosted a birthday party for their eldest son at the hotel in Mexico.  Ex. 19, GGV-000000053 (photograph of Mr. Gonzalez-Valencia at the party).  They also took vacation trips to Europe and Brazil, traveling together to watch the 2014 World Cup matches in Brazil, for example.  *See* Ex. 20, GGV-000000045-47 (translation of email dated May 22, 2014); Ex. 21, GGV-000000048-50 (email dated May 22, 2014).  The frequency of this routine family travel to and from Mexico and around South America and the world is clearly inconsistent with the conduct of someone whom the Government alleges was acting at the time as a leader in a criminal organization.

Mr. Gonzalez-Valencia was also an avid sportsman and hunter, and he continued to pursue this sport after his move to Argentina and Uruguay.  In July 2013, Mr. Gonzalez-Valencia traveled with his wife Wendy Amaral, his oldest son G.G.A., and his daughter V.G.A., to Africa on a big game shoot in Botswana.   Ex. 22, GGV-000000054 (photograph of hunting trip);  Ex. 23, 00095615 (Botswana travel records).  In accordance with local laws, the trip organizers obtained export licenses from the Botswana government in Mr. Gonzalez-Valencia's name to permit him to bring back specific trophies from the shoot, a standard part of any recreational hunting safari.  Ex. 24, 00095609-10 (Botswana hunting trophy records).  *See e.g*., Ex. 25, (Botswana Hunting Guide, Chapungu-Kambako Safaris) ("Each hunter requires a hunting licen[s]e. No trophy may be shot without a valid license.  Licenses are issued in accordance with available quota in the specific hunting area and it is important to clarify which species of animals are required.  Additional CITES and/or TOPS permits are required for certain species such as elephant, leopard etc.  We obtain this

22

JA501

on our client's behalf."); Ex. 26 (Botswana, Johan Calitz Safaris) ("Please ensure that you bring

sufficient trophy tags of your preferred Shipping Agent/Taxidermy agent with you.  CITES export

permits (where applicable), will be issued by our Maun shipping agent, Mochaba Developments.

The professional hunter can, upon request, arrange a meeting with Mochaba in order to discuss

trophy shipment requirements, prior to departure from Maun.").  This was not Mr. Gonzalez-

Valencia's first hunting trip to Africa with his family—photos from his first hunting trip to Africa

in 2008 or 2009 with his wife Wendy and oldest son G.G.A. are also attached.  Attachment Ex.

27, 00012400 (photograph of hunting trip);  Ex. 28, 00012406 (photograph in Africa).

Any suggestion by the Government that Mr. Gonzalez-Valencia's travel to Mexico and

Brazil, and his hunting trips to Africa, are somehow evidence of Mr. Gonzalez-Valencia's

continued involvement in the financial side of drug trafficking is without any merit.

### C.      The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3)).

Since the Guidelines are now advisory, the sentencing table and the restrictions on

probationary sentences, sentences of home confinement, and split sentences in U.S.S.G. §§ 5A,

5B1 and 5C1 are also advisory.

### D.      Pertinent Policy Statements (18 U.S.C. § 3553(a)(5)).

We are unaware of any pertinent policy statements issued by the Sentencing Commission

that should be specially considered in determining Ms. Gonzalez's sentence.

### E.      The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct (18 U.S.C. § 3553(a)(6)).

Section 3553(a)(6) directs sentencing judges to consider "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."   As set forth below, the recommended sentence by the USPO of 188 months

23

will avoid these unwarranted sentencing disparities.

    1.    **Legal Analysis**

       A sentence of life in prison, as demanded by the Government, is inconsistent with the sentence recommended by the USPO, and would result in Mr. Gonzalez-Valencia receiving a disparately longer sentence than his similarly situated defendants.  As demonstrated by the ten cases analyzed below,[3] numerous comparably situated defendants have received sentences that are *significantly* shorter than life imprisonment for similar conduct in drug trafficking offenses.  Indeed, all of the defendants discussed in the forthcoming cases were sentenced to 30 or fewer years in prison, with 80 percent of the defendants receiving a sentence of 25 years or less.[4]  *See, e.g.*, *United States v. Lerma-Plata*, 11-CR-238 (D.D.C. 2011) (defendant received 151 months' imprisonment for

---

[3] In the D.C. Circuit, when assessing unwarranted sentencing disparities, courts frequently look to the sentences of co-defendants, rather than draw comparisons with defendants in unrelated cases. *See, e.g.*, *United States v. Joseph*, 399 F.App'x 599, 600-01 (D.C. Cir. 2010); *Gall*, 552 U.S. at 56. Here, however, Mr. Gonzalez-Valencia's sole co-defendant—his brother Jose Gonzalez-Valencia—will not be sentenced until September 18, 2023, per this Court's scheduling order dated January 19, 2023.  *See* Notice of Rescheduled Hearing (Jan. 19, 2023).  In any event, a comparison of the appropriate sentence for Mr. Gonzalez-Valencia with that of his brother would be of little use to the Court in light of the fact that there is a limit imposed on Jose's sentence due to his extradition from Brazil and the corresponding extradition requirements of that country.  Thus, given that no sentence comparison may be properly drawn with the only co-defendant in this matter, the cases set forth *infra* are therefore appropriate benchmarks for assessing the sentences of similarly situated defendants.

[4] The only two sentences to exceed 25 years were imposed in cases where the defendant not only trafficked illegal drugs but also committed more serious criminal acts.  In the first instance, where the court imposed a 28-year sentence, the defendant was convicted for conspiracy to distribute methamphetamine *and* was believed to have solicited a hit on the government's witness while was incarcerated.  *See United States v. Beltran Leon*, 9-CR-383 (N.D. Ill. 2009).  Likewise, in the second case, the conduct of the defendant who received a 30-year sentence went beyond drug trafficking—he admitted to leading the drug cartel in question that, under his direction, used violence, threats, and brutality, and employed a terrorist group.  *See United States v. Gomez Bustamente*, 2-CR-1188 (E.D.N.Y. 2002).  Mr. Gonzalez-Valencia's conduct does not rise to this level of violence and, thus, he should not receive a sentence greater than the one received by the aforementioned defendants.

conspiracy to distribute five or more kilograms of cocaine and 1,000 or more kilograms of marijuana);  *United States v. Lopez-Falcon*, 8-CR-57 (D.D.C. 2008) (defendant received 216 months' imprisonment for conspiracy to manufacture and distribute five or more kilograms of cocaine and 1,000 or more kilograms of marijuana);  *United States v. Fernando-Borda*, 7-CR-65 (D.D.C. 2007) (defendant with criminal history Category III received 300 months' imprisonment for conspiracy to distribute five or more kilograms of cocaine).

These cases further reflect that, in almost every instance, the district court imposed a sentence that was either below the advisory range set forth in the Guidelines, or shorter than the sentence recommended by the government, or both.  *See, e.g.*, *United States v. Lerma-Plata*, 11-CR-238 (D.D.C. 2011) (high-ranking Mexican police commander pleaded guilty to helping a drug cartel traffic multiple tons of cocaine and marijuana into the United States; USPO recommended a Guidelines range of 151 to 188 months; D.C. District Court sentenced defendant to 151 months in prison);  *United States v. Uribe-Jimenez*, 12-CR-603 (E.D.N.Y. 2012) (international drug smuggler with a criminal history Category IV pleaded guilty to, *inter alia*, multiple drug-distribution conspiracy charges; government and USPO recommended 35-year sentence;  district court sentenced defendant to 20 years in prison).  In line with these cases, this Court should also impose a sentence well below what the Government has requested.

It is also worth further underscoring that some of these other defendants' actions—such as supporting terrorist organizations and orchestrating a murder—were far more egregious than the conduct underlying Mr. Gonzalez-Valencia's crime of conviction.  Yet, these defendants did not receive life in prison, or anything resembling such a sentence.  One illustrative case is *United States v. Enrique-Palomera*, 14-CR-5394 (W.D. Wash. 2014), wherein the defendant was a high-ranking cartel member who was extradited to the United States on charges of trafficking drugs and weapons

25

from Mexico; ultimately, he pleaded guilty to two counts of conspiracy to distribute methamphetamine (and a related firearm charge). *See Enrique-Palomera*, Minute Entry (Doc. No. 46). Notably, this defendant used fear to operate and control his drug trafficking network and was strongly suspected of having one of his co-conspirators beaten and killed; this murder was documented and proliferated to further exercise control over individuals in the defendant's circle. *See Enrique-Palomera*, Gov't's Sentencing Mem., at 2 (Doc. No. 61). Despite the violent nature of his conduct, the district court sentenced the defendant to 240 months in prison. *See Enrique-Palomera*, Minute Entry (Doc. No. 76). Mr. Gonzalez-Valencia has not been accused of ordering the brutal murder of a co-conspirator, yet he seeks a sentence that is only 52 months shorter than the one received by the defendant in the *Enrique-Palomera* case.

Moreover, the Government's request for a life sentence far exceeds even the sentences imposed upon similarly situated defendants whose cases were resolved *at trial*. For example, in *United States v. Celaya Valenzuela*, 11-CR-84 (D.N.H. 2011), the defendant—a senior member of the Sinaloa cartel who bragged about his drug-trafficking connections—was convicted of drug conspiracy charges by a jury at trial. *See Celaya Valenzuela*, Jury Verdict (Doc. No. 194). Nevertheless, the district court sentenced the defendant to only 210 months in prison. *See Celaya Valenzuela*, Judgment (Doc. No. 268). In contrast, here, Mr. Gonzalez-Valencia has pleaded to the Indictment, thereby conserving judicial resources and saving the Government the time and expense of preparing for and putting on a trial; he has also demonstrated acceptance of responsibility. Given these circumstances, the sentence requested by Mr. Gonzalez-Valencia of 188 months is appropriate.

Finally, even assuming *arguendo* that the Government proves, by a preponderance of the evidence, that the Guidelines calculation reached by the USPO should be adjusted per their requested sentencing enhancements (*e.g.*, possession of a firearm), a life sentence remains a severe deviation

from the sentences imposed by other courts on comparably situated defendants. *See, e.g.*, *United States v. Fernando-Borda*, 7-CR-65 (D.D.C. 2007) (sentencing defendant to 25 years in prison after being convicted for conspiracy to distribute five or more kilograms of cocaine into the United States where the government sought enhancements for leader/organizer role in the offense and possession of a firearm). A life sentence is therefore unwarranted under the circumstances of this case and should be rejected out of hand as inconsistent with the sentences received by similarly situated defendants or defendants who were tried for far more egregious criminal activity. Accordingly, Mr. Gonzalez-Valencia should receive a sentence that aligns with the USPO's recommendation and reflects the seriousness of his offenses: 188 months' imprisonment.

| Case Name | Key Facts | Sentence Requested | Sentence Imposed |
|---|---|---|---|
| **United States v. Gilberto Lerma-Plata 1:11-cr-238-001 (D.D.C)** | • High-ranking Mexican Police Commander<br>• Used position to help a cartel traffic multi-ton quantity of cocaine and marijuana into the United States<br>• Obtained AK-47s, AR-15s, and pistols for cartel<br>• 50 years old<br>• Criminal History Category I<br>• Assistance to the government: unknown | USPO recommended 151-188 months<br><br>Government and defense counsel agreed to sentence of 12 years & 7 months | **12 years & 7 months (151 months)**<br><br>Pleaded guilty<br><br>Charges:<br>- Conspiracy to distribute ≥5kg cocaine and ≥1,000kg of marijuana for importation to US |

27

JA506

| | | | |
|---|---|---|---|
| **United States v. Jose Maria Corredor-Ibague 1:09-cr-00156-GK-1 (D.D.C.)** | • Leader of drug transportation network that trafficked 1000s of kg of cocaine into the United States<br>• Provided weapons, arms, and uniforms to a Colombian terrorist org.<br>• His cocaine trafficking was supported and protected by a Colombian terrorist org.<br>• Criminal history category: unknown<br>• Assistance to the government: unknown | Unknown | **16 years & 2 months (194 months)**<br><br>Pleaded guilty to guilty to charge of Conspiracy to Distribute Cocaine Intending and Knowing that the Cocaine will be Imported into the United States; Aiding and Abetting.<br><br>Charges:<br>- Engaging in drug trafficking offense with knowledge/intent to provide something of pecuniary value to a terrorist org.<br>- Conspiracy to provide material support/resources to a terrorist org. |
| **United States v. Ediel Lopez-Falcon 1:08-cr-00057-BJR-25 (D.D.C.)** | • Member of the Mexican drug cartel "The Company" who worked directly under a high-ranking member<br>• Involved in trafficking cocaine and marijuana into the United States<br>• Acquired weapons for the cartel<br>• Bribed law enforcement officials<br>• Criminal History Category I<br>• Assistance to the government: unknown | USPO recommended 262-327 months<br><br>Government and defense counsel agreed to sentence of 216 months | **18 years (216 months)**<br><br>Pleaded guilty<br><br>Charges:<br>- Conspiracy to manufacture/distribute ≥5kg of cocaine and ≥1,000kg of marijuana for importation into US |
| **United States v. Christian Fernando-Borda 1:07-cr-00065-EGS-1 (D.D.C.)** | • Trafficked cocaine for Autodefensas Unidas de Colombia, a paramilitary and drug trafficking group<br>• Held an organizer and leader role<br>• Responsible for potentially more than 4,500kg of cocaine trafficked into the United States<br>• Bribed paramilitary groups and Colombian law enforcement officials<br>• Carried a firearm and kept other weapons at multiple residences<br>• Used threats of violence to deter others from cooperating with the authorities<br>• Criminal History Category III<br>• Assistance to the government: no acceptance of responsibility | Government recommended 35 years<br><br>Defendant recommended 20 years | **25 years (300 months)**<br><br>Convicted by a jury<br><br>Charges:<br>- Conspiracy to distribute ≥5kg of cocaine knowing it would be imported into US |

28

| United States v. Salvador Uribe-Jimenez 12-CR-603 (RJD) (E.D.N.Y) | • Continued criminal enterprise while on probation from previous conviction<br>• Smuggled 1000s of kgs of cocaine into the United States from Central and South America<br>• 52 years old at time of conviction<br>• Pleaded guilty but later moved to withdraw his guilty plea<br>• Criminal History Category IV<br>• Prior conviction for drug trafficking (46 months)<br>• Assistance to the government: none | Government and USPO recommended 35 years<br><br>Defendant requested sentence < 35 years | **20 years**<br>**(240 months)**<br><br>Pleaded guilty<br><br>Charges:<br>- International cocaine distribution conspiracy<br>- International narcotics distribution conspiracy<br>- Narcotics distribution conspiracy<br>- Money laundering conspiracy |
| United States v. Luis Hernando Gomez Bustamente 2:02-cr-01188-JS-1 (E.D.N.Y) | • One of the (admitted) leaders of Norte Valle Cartel; also led his own organization within the cartel<br>• Norte Valle Cartel was responsible for exporting ≥500,000kg of cocaine from Colombia into the United States<br>• Norte Valle Cartel used violence and brutality, and employed a terrorist group<br>• Criminal history category: unknown<br>• Assistance to the government: unknown | Unknown | **30 years**<br>**(360 months)**<br><br>Pleaded guilty<br><br>Charges:<br>- International distribution conspiracy and racketeering |
| United States v. Rafael Humberto Celaya Valenzuela 1:11-cr-00084-JL-4 (D.N.H.) | • Senior member of Sinaloa Cartel<br>• Held a leadership role<br>• Participated in a conspiracy responsible for trafficking 1000s of kgs of cocaine into the United States<br>• Engaged in money laundering and organized shipping arrangements<br>• Bragged about connections to influential drug traffickers<br>• 40 years old at time of conviction<br>• Criminal History Category I<br>• Assistance to the government: unknown | Government requested 30 years & 5 months<br><br>Defendant requested 10 years | **17 years & 6 months**<br>**(210 months)**<br><br>Convicted by jury<br><br>Charges:<br>- Conspiracy to distribute and possess with intent to distribute a controlled substance |
| United States v. Reymundo Villareal–Arelis SA-16-CR-254 XR (W.D. Tex.) | • Member of Los Piojos drug trafficking organization<br>• Trafficked drugs for various Mexican cartels<br>• Engaged in money laundering<br>• Approximately 46 years old at time of conviction<br>• Criminal history category: unknown<br>• Assistance to the government: unknown | Unknown | **20 years**<br>**(240 months)**<br><br>Convicted by jury<br><br>Offenses:<br>- Conspiracy to possess with intent to distribute ≥5kg of Cocaine<br>- Conspiracy to launder monetary instruments |

| | | | |
|---|---|---|---|
| **United States v. Jesus Enrique Palomera 3:14-cr-05394-RJB (W.D. Wash. (Tacoma))** | • High-ranking cartel member<br>• Extradited to the United States for trafficking drugs and weapons from Mexico to Washington<br>• Used fear to control trafficking network<br>• Suspected of killing co-conspirator<br>• Fled to Mexico after co-conspirators were arrested<br>• 39 years old at time of sentencing<br>• Criminal History Category I<br>• Assistance to the government: unknown | Guidelines range of life sentence<br><br>Government requested 25 years | **20 years**<br>(240 months)<br><br>Pleaded guilty<br><br>Offenses:<br>-2 counts of conspiracy to distribute methamphetamine<br>- Illegal alien in possession of a firearm |
| **United States v. Jesus Raul Beltran Leon No. 09 CR 383 (N.D. Ill.)** | • Smuggled 100s of kgs of drugs into the United States<br>• Sought to acquire drugs imported into the United States by other cartels to further distribute to his own customers in Chicago and elsewhere in the United States<br>• Carried firearm on multiple occasions, including golden AK-47<br>• Solicited hit on government witness while in custody<br>• Attempted to bribe Mexican government officials in connection with drug dealing<br>• Criminal history category: unknown<br>• Assistance to the government: unknown | Guidelines range of life sentence<br><br>Government requested minimum of 35 years | **28 years**<br>(336 months)<br><br>Pleaded guilty to indictment<br><br>Charges:<br>- Conspiracy to distribute a controlled substance |

**F.      A Sentence of 188 months Complies with the Purposes of the Sentencing Reform Act (18 U.S.C. § 3553(a)(2)).**

As stated above, Section 3553(a) directs the Court to impose a sentence that is "not greater than necessary" to: (a) reflect the seriousness of the offense; (b) afford adequate deterrence to criminal conduct; (c) protect the public from further crimes of the defendant; and (d) provide correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).   Here, each of these factors—just punishment, deterrence, incapacitation, and rehabilitation—would be achieved by the USPO recommended sentence of 188 months.

30

JA509

1.    **Just Punishment**

A sentence of 188 months is sufficient—but not greater than necessary—to achieve the goal of just punishment.    Mr. Gonzalez-Valencia will bear the weight of the negative consequences of a felony conviction and through serving a lengthy prison sentence.    Having already served close to seven years in prison since his 2016 arrest in Uruguay, followed by his 2020 extradition from Uruguay to the United States, Mr. Gonzalez-Valencia has already lost the precious years of his three childrens' upbringing.  Even after receiving credit for the last seven years of imprisonment, a 188 month sentence means he will remain in prison for close to another eight years, leaving him 55 years old upon his release, his three children already grown into adulthood in his absence.  Mr. Gonzalez-Valencia's reputation will be diminished in the eyes of persons who do not know him well.  His ability to secure employment will likely be negatively impacted by his criminal record.

Mr. Gonzalez-Valencia's actions are deserving of incarceration.  The offense for which Mr. Gonzalez-Valencia has been convicted is serious, but a sentence of 188 months is a meaningful sentence, and a just punishment.

2.    **Deterrence**

A sentence of 188 months also readily achieves the goal of deterrence.  *See United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaaid, J. dissenting) (stating that the "disutility of being in prison at all and the stigma and loss of earning power may depend relatively  little  on the *length* of imprisonment") (emphasis in original) (citing A. Mitchell Polinsky & Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 38 J. Legal Stud. 1, 12 (1999)).

(Page 218 of Total)          JA510

### 3.  **Incapacitation**

Section 3553(a)(2) also requires the Court to consider the need to "protect the public  from further crimes of the defendant."   No period of additional incarceration is necessary to protect the public from further crimes of Mr. Gonzalez-Valencia—there is no reason to believe there will be further crimes.   The effect that this case has had on Mr. Gonzalez-Valencia's life and the lives of his children is a sufficient guarantee that he will not reoffend.

### 4.  **Rehabilitation**

A further period of incarceration is not necessary to provide rehabilitation in this case. Where a prison sentence is not necessary for purposes of rehabilitation, a sentence that is less than the range advised by the Guidelines is appropriate. *Gall*, 552 U.S. at 57-59.

### G.  **The Need to Provide Restitution to Any Victims of the Offense (18 U.S.C. § 3553(a)(7)).**

Section 3553(a)(7) directs sentencing judges to consider "the need to provide restitution to any victims of the offense."   As the USPO stated:



PSR at ¶ 86.  As detailed below, Mr. Gonzalez-Valencia has no financial resources and demonstrated an inability to pay any community restitution under these provisions.  With respect to the guideline provisions governing restitution, as the USPO stated

32



████████████████████████████████████████ *Id.* at ¶ 87.  Here, Mr. Gonzalez-

Valencia has no financial resources that would support paying a fine under U.S.S.G. §5E1.2.

### IV.     **FINANCIAL INABILITY TO PAY A FINE**

Mr. Gonzalez-Valencia has demonstrated an inability to pay a fine under U.S.S.G. § 5E1.2.

The USPO correctly concluded that ████████████████████████████████████

████████████████████████████████████ *Id.* at ¶ 66.

### V.     **CONCLUSION**

For all of the foregoing reasons, Mr. Gonzalez-Valencia and his counsel respectfully request

that this Court follow the USPO's recommendation and impose a sentence of 188 months (15 years,

8 months).


Dated: March 23, 2023


            Respectfully submitted,

            */s/ Stephen A. Best*
            BROWN RUDNICK LLP
            Stephen A. Best (DC Bar No. 428447)
            Rachel O. Wolkinson (DC Bar No. 975548)
            Tiffany B. Lietz (admitted pro hac vice)
            601 Thirteenth Street, NW, Suite 600
            Washington, DC 20005
            Telephone:  (202) 536-1700
            sbest@brownrudnick.com

              and

            The L●S LAW FIRM
            Lilly Ann Sanchez (admitted pro hac vice)
            Four Seasons Tower, Suite 1200
            1441 Brickell Avenue
            Miami, Florida 33131

Telephone: (305) 503-5503
lsanchez@thelsfirm.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

JA513

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2023, I electronically filed the foregoing document under seal with the Clerk of the U.S. District Court for the District of Columbia by using the CM/ECF system. All participants registered through the Court's electronic filing system will be served by electronic mail.

Dated: March 23, 2023

*/s/ Stephen A. Best*
BROWN RUDNICK LLP
Stephen A. Best (DC Bar No. 428447)
601 Thirteenth Street, NW, Suite 600
Washington, DC 20005
Telephone:  (202) 536-1700
sbest@brownrudnick.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

35

JA514

# **EXHIBIT 1**

JA515

**U.S. Department of Justice**

Criminal Division

_____

*Narcotic and Dangerous Drug Section*                    *Washington, D.C. 20530*

April 12, 2022

**VIA Electronic Mail**

Stephen A. Best
Brown Rudnick, LLP
601 Thirteenth Street, NW
Suite 600
Washington, DC 20005

Lilly Ann Sanchez
Four Seasons Tower
Suite 1200
1441 Brickell Avenue
Miami, FL 33131

      Re:    **United States v. Gerardo Gonzalez Valencia**
             **Criminal No. 16-CR-065 (BAH)**

Dear Counsel:

    The Government is disclosing the following information as it is potentially discoverable pursuant to Rule 16 of the Federal Rules of Criminal Procedure and the Government's obligations under Brady v. Maryland, 373 U.S. 83, 87 (1963):

    In late October 2015, the Government obtained an assessment, based on information from sources unknown to the Government, that the Los Cuinis drug trafficking organization, made up of the Gonzalez Valencia siblings, was the financial arm of the Cartel de Jalisco Nueva Generacion (CJNG), but was not directly involved in the production, movement, or distribution of drugs. According to the assessment, Los Cuinis laundered money for CJNG and provided CJNG with funds that were used to purchase weapons, pay for logistical support, and recruit former paramilitary personnel to provide guerilla warfare training, which enabled CJNG to expand its drug trafficking activities. According to the assessment, CJNG attempted to distance the CJNG's drug trafficking activities from Los Cuinis to protect the drug trafficking organization and the family's fortune. The Government has information that not all of the Gonzalez Valencia siblings were involved in illicit activities.

JA516

The Government will furnish the defense before trial with information or material regarding payments, promises of immunity, leniency, or preferential treatment, if any, made to witnesses within the scope of <u>Giglio v. United States</u>, 405 U.S. 150 (1972) and <u>Napue v. Illinois</u>, 360 U.S. 264 (1959). The Government will furnish before trial information or material regarding any prior convictions of any co-conspirator, accomplice or informant who will testify at trial for the Government. The Government will also furnish before trial materials discoverable pursuant to Title 18, United States Code, Section 3500.

If at any time the Government no longer intends to call at trial the confidential informant or informants who provided the information summarized herein, at that time the Government will disclose their identities to the defendant. *See* <u>United States v. Glover</u>, 583 F. Supp. 2d 5, 12 (D.D.C. 2008); <u>United States v. Holland</u>, 41 F. Supp. 3d 82, 104 (D.D.C. 2014); <u>United States v. Ferguson</u>, 498 F.2d 1001, 1003-05 (D.C. Cir. 1974).

<u>The Defendant's Required Disclosures</u>

The Government hereby requests reciprocal discovery under Rule 16(b) of the Federal Rules of Criminal Procedure. The Government requests that the defendant allow inspection and copying of (1) any books, papers, documents, photographs, tapes, tangible objects, or copies or portions thereof, which are in the defendant's possession, custody or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial, and (2) any results of reports or physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, which are in the defendant's possession, custody, or control, and which the defendant intends to introduce as evidence or otherwise rely on at trial or which were prepared by a witness whom the defendant intends to call at trial.

The Government also requests that the defendant disclose prior statements of witnesses who will be called by the defendant to testify. <u>See</u> Fed. R. Crim. P. 26.2. In order to avoid any unnecessary delay, we request that you have copies of these statements available for production to the Government no later than the commencement of trial.

The Government also requests that the defendant disclose a written summary of testimony the defendant intends to use under Rules 702, 703, and 705 of the Federal Rules of Evidence. The summary should describe the opinions of the witnesses, the bases and reasons for those opinions, and the witnesses' qualifications.

Very truly yours,

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
U.S. Department of Justice
Washington, D.C. 20530


_/s/_____
Kaitlin Sahni
Kate Naseef
Kirk Handrich
Trial Attorneys

# **EXHIBIT 2**

JA518



JA519

JA520



JA521

JA522



JA523

# **EXHIBIT 3**

JA524



JA526



JA527

JA528





JA531

JA532

USCA Case #23-3126    Document #2057130    Filed: 05/30/2024    Page 242 of 300

JA534

(Page 243 of Total)

JA535

JA536

(Page 246 of Total)

JA538

JA540

JA542

(Page 251 of Total)

JA544

# **EXHIBIT 4**

JA546

# **EXHIBIT 5**

JA548

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, March 23, 2023 2:34 PM
**To:** Lietz, Tiffany B. <TLietz@brownrudnick.com>
**Subject:** My letter

> **CAUTION: External E-mail. Use caution accessing links or attachments.**

Dear Judge Howell,

I'm writing you this letter as first a hello and second as a third perspective point of view.  My name is ▮▮▮▮. I'm 18 years old and I'm the oldest son, I take care of my mother and my siblings because of the hole that my father left, is not something that I chose to happen but I see it as a learning experience and something positive because its teaching me and my family a lot of lessons, I don't like to see it from a negative perspective but I obviously wish it was different, and I don't blame my father or anybody I just understand that things happen in life and God rewards the people who help and work hard.  Now on the other hand my brother ▮▮▮ he's just a little boy he recently turned 10 years old he's very creative and unique if I was to describe him in one word its warrior and also we have my sister ▮▮▮ also a beautiful girl with a very good heart and of course my beautiful mother who will put her life in the line when it comes to her family a true lioness, and the thing that I would like you to understand is that my father built a great family through distance, problems and chaos and I believe that's a something hard to do but it shows and tells a lot about his character and I do believe he is perhaps a changed men and anybody can feel his true inner piece if you have the time to meet him.  I will always feel his support and love even if it has to be platonic I do not have to see him or talk to him because I know and feel his unconditional love, and know Judge Howell I truly ask for compassion on my father and I hope that you can see that there's two young kids, wife and a young man who need their father and husband back in their life.

With the best regards I send my letter.

▮▮▮▮▮▮▮

--

# **EXHIBIT 6**

JA550

| | |
|---|---|
| **From:** | Wen Arevalo ███████████████ |
| **Sent:** | Thursday, March 23, 2023 11:50 AM |
| **To:** | lsanchez@thelsfirm.com; Lietz, Tiffany B. |
| **Subject:** | From Wendy |

> **CAUTION:** External E-mail. Use caution accessing links or attachments.

Dear Honorable Judge:

I'm so grateful to have this opportunity. Please allow me to introduce myself.

My name is Wendy Amaral. I am Gerardo Gonzalez's former wife. We have been together since 2002.

Before I met Gerardo, I wanted to study, travel and work as an architect or designer, that's the area I felt I can develop better than any other. At 22 years old getting married wasn't in my priorities at all. Mostly because I was raised by my four aunts who are professional, hard workers and independent women.

Then I met Gerardo. Please Let me introduce you the love of my life. Gerardo as a young person was very easy going. What you see is what it is.

He loves history, books, and a good conversation rather than going out. He loves having meals at home and cooking. He has always been very curious, he is always seeking all kinds of knowledge. He used to laugh a lot. I remember laughing a lot back then together, he had this contagious energy.

I don't think Gerardo is the kind of person who can be categorized as any specific type of person. He has always been very genuine. He speaks always with the truth and with so much respect to others. He is very close to God, a good friend, and a good son. He lives in the present. He is extremely wise. He has a really good heart and he is a free spirit. He taught me that what matters is what is in your mind, your wisdom and mostly been in peace.

Then he became a father, and that is when I started admiring him the most. We have three beautiful, healthy and strong children, █████ , █████ and ███ . We were really happy. We moved away from Mexico and and our families to live in a healthy environment away from the caos in Mexico and to start a new life. We chose to live by ourselves, away from everything we had known , with the purpose of giving our daughter and two sons a different life than we had.

Then suddenly Gerardo, the most important member or our little family, was arrested picking up my kids from school.

We have experienced in a short time what he is going through. I spend a few months in prison also. The five of us are at the bottom together. After Gerardo's arrest, we had to learn how to live and deal with others who view us as repulsive for over eight years now.

I remember Gerardo just three weeks before his extradition, he was very skinny and he wasn't getting any sleep. We went to see him at the prison and he couldn't walk properly, because of the shackles. While at the prison we were always surrounded by this angry energy even we after we had addressed everyone working there with respect. But I remember that once Gerardo hugged us, he brought peace and calm to our family, just like he always has. Even in the worst environment, he used to tell my kids that all the people who work in prison developed that personality it was their

1

JA551

job. Even in the worst situation, Gerardo never takes anything personally. This is just one example, but he has gone through so much.

 We want to look forward and leave everything in the past, but we have not healed our hearts yet. But I'm sure we will, because our family members have become better individuals. We are more mature and more aware of our responsibilities and actions. All we need is an opportunity to amend our lives. I'm 42 years old, Your Honor, please let us, me and my kids have our family back together.

I promise with all my heart Gerardo has learned his lesson. I will lead my family through good, with the hand of God.

I do believe that people should be given second chances in life and my family is one of them.

Sincerely,

Wendy Amaral

2
JA552

# **EXHIBIT 7**

Transcript of Voicemail from ▆▆▆▆▆ to Steve Best on February 7, 2023


Yeah, Mr. Best, You don't know me, My name is ▆▆▆▆▆.  I am an attorney in D.C. but I wanted to take 30 seconds of your time.  You have a client, Gerardo Gonzalez-Valencia, who showed great kindness to a client of mine in Alexandria jail and I just wanted to tell him thank you or for you to let him know.  My client was a kid, very scared, got put in jail, he was one of these January 6 guys, but Mr. Gonzalez-Valencia showed real kindness to him and I just wanted to let you know he had done sort of a quiet act of good charity to a kid that was very scared being in prison for the first time so I wanted to pass that along and say thank you.  My name again is ▆▆▆▆▆.  Thanks again.

JA554

# **EXHIBIT 8**

JA555



JA556

GGV-000000052

# **EXHIBIT 9**



JA558

GGV-000000051

# **EXHIBIT 10**

JA559

From:
Sent:       Wed 9/07/2011 2:03 PM (GMT-00:00)
To:         Gerardo Gonzalez; Wendy
Cc:
Bcc:
Subject:
Record...


Yesterday -9/6/2011- the stores broke sales records: $24,063
Mission accomplished ahead of time...!
Hugs
Message sent from my BlackBerry from Nextel

GGV-000000033

# **<u>EXHIBIT 11</u>**

From:
Sent:     Wed 9/07/2011 2:03 PM (GMT-00:00)
To:       Gerardo Gonzalez; Wendy
Cc:
Bcc:
Subject: Record...


Ayer -6/9/2011- las tiendas batieron record de ventas: $24.063
Objetivo cumplido antes de tiempo...!
Un abrazo
Mensaje enviado desde mi BlackBerry de Nextel

JA562

GGV-000000034

# **EXHIBIT 12**

From:
Sent:        Mon 9/26/2011 3:07 PM (GMT-00:00)
To:          Gerardo Gonzalez; Wendy
Cc:
Bcc:
Subject:     Sunday record

Hi...! Good morning.
We have had a very good earnings weekend. Yesterday, Sunday, sales from both stores totaled
$30,000. We've never earned so much on a holiday.
Hugs
Message sent from my BlackBerry from Nextel

JA564

GGV-000000035

# **EXHIBIT 13**

From:
Sent:     Mon 9/26/2011 3:07 PM (GMT-00:00)
To:       Gerardo Gonzalez; Wendy
Cc:
Bcc:
Subject: Domingo record

Hola...! Buen día
Hemos tenido un muy buen fin de semana en recaudación. Ayer, domingo, las ventas de ambos locales
sumaron $ 30,000 Nunca se recaudo tan do en un día. festivo.
Un abrazo
Mensaje enviado desde mi BlackBerry de Nextel

JA566

GGV-000000036

# **EXHIBIT 14**

JA567

From:
Sent:       Sat 10/15/2011 6:48 PM (GMT-00:00)
To:         Wendy; Gerardo González
Cc:
Bcc:
Subject:    Fwd.: Sharing…

Hi...!

Completing the information that I sent you yesterday (copy below), I wanted to tell you that we ended Friday with a sales total of $28,800 and 1,750 people served.

Today, Saturday, as of 3:30 p.m. we had served more than 900 customers and sales, up to that time, were $15,000.

Please, Wendy, I need the jackets for the employees. Thanks

Have a great weekend!

Hugs

Message sent from my BlackBerry from Nextel

----Original Message----
From:
Date: Fri, 14Oct2011 21:40:13
To: Wendy                              Gerardo Gonzalez-
Reply-To:
Subject:    Sharing…

Hi...! In the hopes you are well, I want to tell you that today, Friday the 14th, with 5 hours to go until M1 closes, we passed the $25,000 sales mark...and we have served more than 1,500 people...
Hugs
Message sent from my BlackBerry from Nextel

GGV-000000037

# **EXHIBIT 15**

JA569

From:
Sent:      Sat 10/15/2011 6:48 PM (GMT-00:00)
To:        Wendy; Gerardo Gonzalez
Cc:
Bcc:
Subject: RV: Compartiendo...


Hola...!
Completando la información que les envié ayer (copia aquí debajo), les comento que finalizamos el Viernes con un total de ventas de $28,800 y 1,750 personas atendidas.
Hoy, Sábado, a las 15:30hs. llevábamos atendidos más de 900 clientes y las ventas, hasta ese momento, fueron de $15,000.
Por favor, Wendy, necesito las chaquetas para los empleados. Gracias
Qué tengan un buen fin de semana...!
Un abrazo

Mensaje enviado desde mi BlackBerry de Nextel


-----Original Message-----
From:
Date: Fri, 14 Oct 2011 21:40:13
To: Wendy                       ; Gerardo Gonzalez
Reply-To:
Subject: Compartiendo...


Hola...! A la espera estén muy bien, les comento que hoy, viernes 14, faltando 5 horas para el cierre de M1, pasamos la marca de ventas de $25,000...y llevamos atendidas a más de 1,500 personas...
Un abrazo
Mensaje enviado desde mi BlackBerry de Nextel

GGV-000000038

# **EXHIBIT 16**



From: ████████████████████
Date: On Fri., September 29, 2017 at 11:37 p.m.
Subject: Fwd: Admission of ████████████████
To: ████████████████████

Sent from my iPhone

Begin forwarded message:

> **From:** ██████████████████
> **Date:** March 21, 2011, 07:23:14 a.m. GMT-3
> **To:** ████████████████████████
> **Subject: Re: Admission of** ████████████████████
> **Respond to:** ██████████████████
>
> Hi ████
>
> The reason for my email is to inform you that my son, ████████████████████ does
> not want to attend minisports   on Mondays and Tuesdays.   He's just staying in soccer on
> Thursdays and swimming on Fridays.
>
> So he would come home in the school bus today.   I'll wait for your comments to send the
> relevant email to the school transportation.
>
> Thanks a lot for your time!   Have a good morning.
>
> Regards,
>
> Wendy Amaral
>
> Sent from my BlackBerry®

GGV-000000013

**From:** ███████████████████████
**Date:** Wed, 9 Mar 2011 14:48:11 -0300
**To:** ███████████████
**Cc:** ████████████████████████
**Subject:** RE: Admission of ████████████ - bus.

I sent it to the person in charge of this. I'm a physical education teacher and After School coordinator.

Best regards,

████

IMPORTANT: As of March 11th 2011 my e-mail address will change to :

████████████████████

Lic. ██████████

Asociacion Escuelas Lincoln

P.E teacher
Elementary After School Activities Coordinator

Tel. ██████████

---

**From:** ███████████████████████
**Sent:** Wednesday, March 09, 2011 2:46 PM
**To:** ██████████
**Subject:** Re: Admission of █████████████ - bus.

Hi ████

Can you confirm by email what time the school bus will pass by for ████ in the mornings?

Thanks a lot,

Wendy.

Sent from my BlackBerry®

**From:** ████████████████████████████

JA573

GGV-000000014

**Date:** Thu, 3 Mar 2011 15:16:37 -0300

**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Subject:** RE: Admission of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ - bus, after school and something else

Physical education clothing for mini sports and soccer; for swimming, a bathing suit, cap, towel and flip flops, all with his name; if he wants to wear goggles he can bring them.

▮▮▮▮

IMPORTANT: As of March 11th 2011 my e-mail address will change to :

▮▮▮▮▮▮▮▮▮▮▮▮▮

Lic.▮▮▮▮▮▮▮▮▮▮

Asociacion Escuelas Lincoln

P.E teacher

Elementary After School Activities Coordinator

Tel ▮▮▮▮▮▮▮▮▮▮▮▮

---

**From** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  **Sent:** Thursday, March 03, 2011 3:13 PM
**To:** ▮▮▮▮▮▮▮▮
**Subject:** Re: Admission of ▮▮▮▮▮▮▮▮▮▮▮ - bus, after school and something else

Hi ▮▮▮▮ ,

Thanks a lot, every day except Wednesday seems perfect to me.

Could you please tell me the dress code for these activities?

Thanks and have a good day,

Wendy Amaral

Sent from my Claro Argentina BlackBerry®

---

JA574

GGV-000000015

**From:** ███████████████████████████

**Date:** Thu, 3 Mar 2011 14:59:17 -0300

**To** ███████████████████ WeN ████████████████

**Cc:** ███████████████████████████

**Subject:** RE: Admission of ████████████████ bus, after school and something else

Hello Wendy and welcome, there is space for all the activities except swimming on Wednesdays, where there is no more space, so we will mark him down for 4 days; the departure is from the auditorium at 4:45.

Best regards,

██████████

IMPORTANT: As of March 11th 2011 my e-mail address will change to :

███████████████████████

Lic ████████████████

Asociacion Escuelas Lincoln

P.E teacher

Elementary After School Activities Coordinator

Tel. ████████████████

---

**From:** ████████████
**Sent:** Thursday, March 03, 2011 1:46 PM
**To:** 'WeN .'
**Cc:** █████████████████████
**Subject:** RE: Admission of ███████████████████ - bus, after school and something else

Wendy,

I am listing here and copying ██████ so that she can confirm if ████████ can participate in the activities that you requested for Kindergarten 5:

JA575

GGV-000000016

Monday Mini Sports

Tuesday Mini Sports

Wednesday Swimming

Thursday Soccer

Friday Swimming.

█████ will let you know if there's space in all of them...

See you Wednesday!

████████████

Admissions Registrar

Asociacion Escuelas Lincoln

Tel █████████████████████████

FAX ██████████████████

Website: www.lincoln.edu.ar

**IMPORTANT: As of March 11th 2011 my e-mail address will change to**

████████████████████

---

**From:** WeN ████████████████████████
**Sent:** Thursday, March 03, 2011 1:37 PM
**To:** ████████████
**Subject:** Re: Admission of █████████████████ - bus, after school and something else

Hi ██████,

Yes, the document that we put is for March, since he will be the person in charge of making the payments on time.

GGV-000000017

Company address

Buenos Aires.


Yes, the payment will be by semester, including bus and lunch in the same invoice.


Thanks a lot.


Wendy Amaral.





On March 3, 2011 at 10:18 a.m.                                                        wrote:

Hi Wendy,

In the form can you please put the family name below and the contact information?

The document you sent me is from March, right?


What is the company's address?


Do you want to pay by semester? They don't pay for enrollment, just the Capital
Assessment and the tuition. So do we include the bus and lunch in the same invoice, and
per semester? The family number will be on the invoice. Once the billing info data is
completed and we receive it, we will prepare it.


I am copying            so she can find out about the bus…

JA577

GGV-000000018

I am copying ▮▮▮▮▮▮ who is in charge of the after school activities, to confirm if there is a place in the 3 activities that you registered: Soccer, tennis and chess...

On activity days they're picked up at 4:45 p.m., and on the other days at 3:30 p.m. They can only take the return bus on days they do not have activities. School hours are from 8 a.m. to 3:30 p.m.

Let me know if you have any other questions.

Regards,

▮▮▮▮▮▮

Admissions Registrar

Asociacion Escuelas Lincoln

Tel: ▮▮▮▮▮▮▮

FAX ▮▮▮▮▮

Website: www.lincoln.edu.ar

**IMPORTANT: As of March 11th 2011 my e-mail address will change to**

▮▮▮▮▮▮▮

---

**From:** WeN▮▮▮▮▮▮▮
**Sent:** Thursday, March 03, 2011 1:05 PM
**To:** ▮▮▮▮
**Subject:** Admission of ▮▮▮▮▮▮

--

Hi ▮▮▮,

GGV-000000019

Thanks a lot! I'm attaching the file for you. I hope it's right. I have a question about the payments we have to make:

Payment per semester   5,750

Annual enrollment       1,530

One time fee            6,000

- I also wanted to know what our Family Number is, to make whatever payments you tell me.
- The address where the school bus will stop is as follows:



I also have a concern about which activities <span>will be registered for, and the exact times for the start and end of school.

Thanks in advance,

Wendy Amaral

JA579

GGV-000000020

2011/3/3 ██████████████████████████

Dear Gonzalez family,

At this time I want to confirm that ████████ has been accepted for enrollment at
ASOCIACION ESCUELAS LINCOLN in Kindergarten 5 for the second semester of
the 2010-11 school year.

████████ is welcome to start school next Wednesday, March 9 at 8:00 am. He has been
placed in Kinder 5 C and his homeroom teacher will be ████████████ She is
CCed here. Her email is ████████████████

I have attached a billing info form you should fill out ASAP to prepare the invoice,
school calendar, current school fees; ES uniform policy, and info on a Transitions
Workshop for parents.

Please see attached welcome letter from the Elementary School department. I am
CCing ████████████████ our Elementary School Counselor. Her email is
████████████████

Please email me back and give your exact address as we need to check on the bus
service.

The Supply Lists are posted on our website www.lincoln.edu.ar in the ES section
(teacher websites).

Don't hesitate to contact me if I can be of further assistance.

Best regards,

████████████████
Admissions Registrar
Asociacion Escuelas Lincoln
Tel: ██████████████████████
FAX ██████
Website: www.lincoln.edu.ar
IMPORTANT: As of March 11th 2011 my e-mail address will change to
██████████████████████████

JA580

GGV-000000021

--



--



--



JA581

GGV-000000022

# **EXHIBIT 17**



---------- Mensaje reenviado ---------
De:
Fecha: El vie, 29 de septiembre de 2017 a la(s) 23:37
Asunto: Fwd: Admission of                            .
Para:

Enviado desde mi iPhone

Inicio del mensaje reenviado:

**De:**
**Fecha:** 21 de marzo de 2011, 07:23:14 GMT-3
**Para:**
**Asunto: Re: Admission of**
**Responder a:**

Hola

El motivo de mi correo es para informarte que mi hijo                            .
No desea asistir a minisports. Lunes y martes. Solo se queda en soccer jueves y
natación viernes.

Por lo que hoy regresaría a casa en el transporte escolar . Quedo en espera de sus
comentarios para enviar el mail correspondiente á el transporte escolar

Le agradezco muchísimo sus atenciones ! Buen día

Saludos,

Wendy Amaral

Enviado desde mi BlackBerry®

---

JA583

GGV-000000023

**From:** ███████████████████
**Date:** Wed, 9 Mar 2011 14:48:11 -0300
**To:** ███████████████
**Cc:** ██████████████████████████
**Subject:** RE: Admission of ████████████████ - bus.

Le envió a la persona encargada de esto, yo soy profesora de educación física y coordinadora de After School.

Saludos cordiales

███████

**IMPORTANT: As of March 11th 2011 my e-mail address will change to :** ████████████████

Lic. ████████████

Asociacion Escuelas Lincoln

P.E teacher

Elementary After School Activities Coordinator

Tel ████████████

---

**From:** ███████████████████
**Sent:** Wednesday, March 09, 2011 2:46 PM
**To:** █████████
**Subject:** Re: Admission of ████████████ - bus.

Hola ██████

Me puedes confirmar por este medio , la hora en que estará pasando el transporte escolar por ██████ en las mañanas.

Muchisimas Gracias,

Wendy.

Enviado desde mi BlackBerry®

---

**From:** ████████████████████████

JA584

GGV-000000024

**Date:** Thu, 3 Mar 2011 15:16:37 -0300

**To** ▮▮▮▮▮▮▮▮▮▮▮▮

**Subject:** RE: Admission of ▮▮▮▮▮▮▮▮▮▮▮ - bus, after school y algo mas

Para mini sports y soccer ropa de educación física, para swimming, traje de bano, gorra , toalla y ojotas todo con nombre, si quiere usar antiparras puede traer.

▮▮▮▮▮

IMPORTANT: As of March 11th 2011 my e-mail address will change to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Lic. ▮▮▮▮▮▮▮

Asociacion Escuelas Lincoln

P.E teacher

Elementary After School Activities Coordinator

Tel. ▮▮▮▮▮▮▮

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, March 03, 2011 3:13 PM
**To:** ▮▮▮▮▮▮
**Subject:** Re: Admission of ▮▮▮▮▮▮▮▮▮ - bus, after school y algo mas

Hola ▮▮▮ ,

Muchas gracias, me parece perfecto todos los días excepto el miércoles.

Porfavor me podrías decir el código de vestuario para estas actividades .

Gracias y buen día

Wendy Amaral

Enviado desde mi BlackBerry® de Claro Argentina

---

JA585

GGV-000000025

**From** ████████████████████████████

**Date:** Thu, 3 Mar 2011 14:59:17 -0300

**To:** ██████████████████████ WeN ▪ ████████████████████

**Cc:** ████████████████████████

**Subject:** RE: Admission of ████████████████ - bus, after school y algo mas

Hola Wendy y bienvenida, hay lugar en todas las actividades excepto swimming de los miercoles que no hay mas cupo, lo anotamos entonces en 4 dias, la salida es por el auditórium a las 4:45.

Saludos cordiales

████████

IMPORTANT: As of March 11th 2011 my e-mail address will change to : ████████████████████████

Lic. ████████████████

Asociacion Escuelas Lincoln

P.E teacher

Elementary After School Activities Coordinator

Tel. ████████████████

---

**From:** ████████████
**Sent:** Thursday, March 03, 2011 1:46 PM
**To:** 'WeN .'
**Cc:** ████████████████
**Subject:** RE: Admission of ████████████████ - bus, after school y algo mas

Wendy,

Detallo aqui y copio a ████ para que pueda confirmar s ████████ puede participar de las actividades que solicitaste a saber para Kinder 5:

GGV-000000026

Lunes Mini Sports

Martes Mini Sports

Miercoles Swimming

Jueves Soccer

Viernes Swimming.

█████ te avisara si hay cupo en todas...

Hasta el miercoles!

████████

Admissions Registrar

Asociacion Escuelas Lincoln

Tel: ██████████████

FAX ████████████

Website: www.lincoln.edu.ar

**IMPORTANT: As of March 11th 2011 my e-mail address will change to**

████████████████

---

**From:** WeN . ██████████████████
**Sent:** Thursday, March 03, 2011 1:37 PM
**To:** █████████
**Subject:** Re: Admission of ██████████████ - bus, after school y algo mas

Hola ██████

Si el Documento que pusimos es el de Marzio, Ya que el va a Ser la persona
encargada de Realizar los Pagos a tiempo.

JA587

GGV-000000027



Si el pago sera Semestral incluyendo Bus y Lunch en la misma Factura.

Muchas Gracias.

Wendy Amaral.

El 3 de marzo de 2011 10:18 ███████████████████ escribió:

Hola Wendy,

Por favor en el form deben poner nombre de familia abajo y contacto

El documento que pusieron es el de Marzio verdad?

Cual es la direccion de la empresa?

Como quieren pagar por semestre? Matricula no pagan solo Capital Assessment y el tuition. Incluiremos entonces bus y lunch tambien en la misma factura y semestral?? El numero de familia lo tendran en la factura una vez qeu completen los datos del billing info y los recibamos la prepararemos.

Copio a ████ para que pueda averiguar el bus...

JA588

GGV-000000028

Copio a ███████████ encargada de los after school activities para que te confirme si
hay lugar en las 3 actividades qeu lo inscribiste:  Soccer, tennis y chess…

Los dias de las actividades se retira 16:45 hs y lso otros dias 15:30 hs. solo puede tomar
el bus de vuelta los dias que no tiene actividades. El horario del colegio es de 8 a 1530
hs.

Avisame si tienes alguna otra duda.

Saludos,

███████████

Admissions Registrar

Asociacion Escuelas Lincoln

Tel: ███████████████

FAX ██████████

Website: www.lincoln.edu.ar

**IMPORTANT: As of March 11th 2011 my e-mail address will change to**

████████████████

---

**From:** WeN J. ████████████████
**Sent:** Thursday, March 03, 2011 1:05 PM
**To:** ██████████
**Subject:** Admission of ██████████████

-

Hola ██████

JA589

GGV-000000029

Muchas Gracias! Te adjunto el archivo, Espero este correcto, Tengo una duda sobre los Pagos que tenemos que realizar:

El pago semestral 5,750

Matricula Anual     1,530

One time fee       6,000

- También Quisiera saber cual es nuestro Family Number #. Para Hacer los Pagos Que me indiques.

- La dirección  donde Pasaría El Transporte Escolar es la siguiente:



También Tengo inquietud en que actividades va a quedar        Inscrito y los horarios exactos. De entrada y Salida de el Colegio.

Te agradezco,

Wendy Amaral

JA590

GGV-000000030

2011/3/3 ████████████████████████████

Dear Gonzalez family,

At this time I want to confirm that █████████ has been accepted for
enrollment at ASOCIACION ESCUELAS LINCOLN in Kindergarten 5 for the
second semester of the 2010-11 school year.

████████ is welcome to start school next Wednesday, March 9 at 8:00 am.
He has been placed in Kinder 5 C and his homeroom teacher will be █████
█████████████ She is CCied here. Her email is ███████████████████

I have attached a billing info form you should fill out ASAP to prepare
the invoice, school calendar, current school fees; ES uniform policy,
and info on a Transitions Workshop for parents.

Please see attached welcome letter from the Elementary School
department. I am CCing ████████████████ our Elementary School
Counselor. Her email is ████████████████████

Please email me back and give your exact address as we need to check on
the bus service.

The Supply Lists are posted on our website www.lincoln.edu.ar in the ES
section (teacher websites).

Don't hesitate to contact me if I can be of further assistance.


Best regards,

████████████████
Admissions Registrar
Asociacion Escuelas Lincoln
Tel: ████████████████████████
FAX ████████████████████
Website: www.lincoln.edu.ar
IMPORTANT: As of March 11th 2011 my e-mail address will change to
████████████████████████████████

JA591

GGV-000000031

--





--



--



JA592

GGV-000000032