RECORD NO. 23-3126
**[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]**

In The

# United States Court Of Appeals
## For The D.C. Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

**v.**

**GERARDO GONZALEZ VALENCIA,**

*Defendant-Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

**PUBLIC APPENDIX**
**Volume V of VII**

_____

**Devin Burstein**
**WARREN &
BURSTEIN**
**501 W. Broadway,
Ste. 240**
**San Diego, CA
92101**
**(619) 234-8467**
**db@wabulaw.com**

**Chrisellen R. Kolb U.S.
ATTORNEY'S OFFICE
(USA) Appellate Division
Room 8104 555 4th Street,
NW Washington, DC 20530**
**(202) 252-6833**
**Chrisellen.R.Kolb@usdoj.gov**

**Kaitlin J. Sahni U.S.
DEPARTMENT OF
JUSTICE (DOJ)
Criminal Division 145
N Street, NE Second
Floor, East Wing
Washington, DC 20530**
**(202) 598-2493**
**kaitlin.sahni@usdoj.gov**

*Counsel for
Appellant*

*Counsel for Appellee*

*Counsel for Appellee*

# TABLE OF CONTENTS

**Volume I**

Indictment (April 19, 2016) [DE1] ............................................................. iv

Transcript of Motion Hearing (January 11, 2022) ................................. 5

Motion to Dismiss (April 28, 2022) (DE97) ............................................. 26

Government's Opposition to Defendant's Motion to Dismiss (April 29, 2022) (DE99) ................................................................................................ 229

Defendant's Reply in Further Support of his Motion to Dismiss (May 12, 2022) (DE103) ............................................................................................. 258

**Volume II**

Exhibits in Support of Defendant's Reply in Further Support of his Motion to Dismiss (May 12, 2022) (DE103) .......................................... 297

Memorandum and Order (July 5, 2022) (DE108) ................................. 367

Memorandum Opinion and Order (September 1, 2022) (DE120) ........ 376

Plea Agreement (December 1, 2022) (DE134) ...................................... 389

Joint Statement of Stipulated Facts (December 1, 2022) (DE135) ...... 398

Joint Submission Regarding Sentencing Guidelines (December 16, 2022) (DE138) ...................................................................................................... 403

Defendant's Statement of Facts (December 16, 2022) (DE139) ........... 409

Transcript of Plea Colloquy (December 22, 2022) ............................... 412

Government's Sentencing Memorandum (March 23, 2023) (DE153) .. 439

Defendant's Memorandum in Aid of Sentencing (April 6, 2023) (DE159). ................................................................................................................... 480

ii

## Volume III

Continued Exhibits in Support of Defendant's Memorandum in Aid of Sentencing (April 6, 2023) (DE159) ....................................................593

Notice of Filing of Letter in Support (April 10, 2023) (DE160)............656

Stipulation (April 18, 2023) (DE161)....................................................672

Transcript of Hearing (May 2, 2023) ....................................................674

## Volume IV

Transcript of Hearing (May 3, 2023) ....................................................787

## Volume V

Transcript of Hearing (May 4, 2023) ....................................................978

Government's Supplemental Sentencing Memorandum (June 16, 2023) (DE170)................................................................................................1179

Defendant's Post-Hearing Response Brief (July 7, 2023) (DE179)....1201

## Volume VI

Exhibits in Support of Defendant's Post-Hearing Response Brief (July 7, 2023) (DE179)................................................................................1247

Government's Reply in Support of Supplemental Sentencing Memorandum (July 12, 2023) (DE180)................................................1443

Transcript of Sentencing Hearing (July 21, 2023) ............................1459

## Volume VII

Notice of Appeal (July 26, 2023) (DE186)..........................................1551

Amended Judgment (September 1, 2023) (DE188) ............................1552

Reason for Amendment (September 1, 2023) (DE189) ..................... 1560

Docket Report ........................................................................ 1561

iv

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action |
| | ) | No. 16-65-1 |
| vs. | ) | |
| | ) | May 4, 2023 |
| GERARDO GONZALEZ VALENCIA, | ) | 9:05 a.m. |
| Defendant. | ) | Washington, D.C. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**


**APPEARANCES:**

FOR THE GOVERNMENT:
        KATE NASEEF
        KAITLIN SAHNI
        KIRK HANDRICH
        U.S. Department of Justice
        145 N Street NE
        Two Constitution Square
        Washington, DC 20530
        (202) 598-2950
        Email:  kate.naseef@usdoj.gov


FOR THE DEFENDANT:
        STEPHEN A. BEST
        GEOFFREY COLL
        LILLY SANCHEZ
        NATASHA ERTZBISCHOFF
        RACHEL WILKINSON
        Brown Rudnick
        601 13th Street, NW, Suite 600
        Washington, DC 20005
        (202) 536-1737
        Email:  sbest@brownrudnick.com


ALSO PRESENT:  KYLE MORI, Special Agent
        ANGELA ANCALLE-JIMENEZ, AUSA, Paralegal
        VANESSA TORO, Brown Rudnick
        KATHERINE RAFTOPOULOS,
        VICTORIA DOPAZO,
        Spanish Language Interpreters


Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
        Official Court Reporter


Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

1    THE COURTROOM DEPUTY:  Matter before the Court,

2    Criminal Case No. 16-65, United States of America versus

3    Gerardo Gonzalez Valencia.

4    Counsel, please come forward and state your names

5    for the record, starting with the government.

6    MS. SAHNI:  Good morning.

7    Kaitlin Sahni, joined with Kate Naseef and Kirk

8    Handrich, for the United States, and Paralegal Angela

9    Ancalle-Jimenez is also at counsel table.

10   THE COURT:  Thank you.  Good morning.

11   MR. BEST:  Good morning, Your Honor.

12   Stephen Best on behalf of Gerardo Gonzalez

13   Valencia.  Along with me is Lilly Sanchez, Geoff Coll,

14   Rachel Wilkinson, Natasha Ertzbischoff, and Vanessa --

15   THE COURT:  Even I have learned her name,

16   Mr. Best.

17   MR. BEST:  -- Toro.

18   Yes.  I am getting there.  I appreciate -- she

19   gets dinners for each time I mess up.  Thank you very much.

20   THE COURT:  All right.  Is the government ready to

21   call its next witness?

22   MS. SAHNI:  Yes, Your Honor.

23   The government calls Special Agent Kevin Novick.

24   THE COURT:  Good morning.

3

```
 1              THE WITNESS:  Good morning, Your Honor.
 2              (KEVIN NOVICK, Government's witness, sworn.)
 3                          DIRECT EXAMINATION
 4   BY MS. SAHNI:
 5   Q.  Special Agent Novick, are you feeling okay today?
 6   A.  I am, yes.
 7   Q.  Are you also vaccinated?
 8   A.  I am.
 9              MS. SAHNI:  Your Honor, is it all right if --
10              THE COURT:  Yes.  You may remove your mask.  And
11   just move the microphone closer to you.
12   BY MS. SAHNI:
13   Q.  Could you please state your name for the record.
14   A.  My name is Kevin Novick, N-O-V-I-C-K.
15   Q.  Where are you employed?
16   A.  I am currently employed as a special agent with the Drug
17   Enforcement Administration assigned to the Los Angeles field
18   division; and within Los Angeles field division, assigned to
19   the special investigations group.
20   Q.  How long have you been a DEA agent?
21   A.  I have been a DEA agent since the end of March of 2017.
22   Q.  Did you receive special training on narcotics
23   investigations upon joining the DEA?
24   A.  I did.  I attended basic agent training located at
25   Quantico, Virginia, where we learned different investigative
```

1    techniques, how to conduct a narcotics investigation,

2    conduct undercover operations, surveillance, things of that

3    nature.

4    Q.  Have you received additional training in narcotics

5    investigations as well?

6    A.  I have.  You know, after graduating Quantico, I

7    continued training with DEA and then, also, my previous

8    career as well.

9    Q.  And you mentioned your previous career.  What did you do

10    before joining the DEA?

11    A.  Prior to joining DEA I was a commissioned officer in the

12    United States Coast Guard.

13    Q.  What were your duties in the Coast Guard?

14    A.  As a commissioned officer in the United States Coast

15    Guard, I conducted various operations in support of search

16    and rescue operations; homeland defense; national security

17    operations, as well as maritime law enforcement and,

18    specifically, counter-drug operations.

19    Q.  Do you speak any languages other than English?

20    A.  I do.  I speak Spanish.  I wouldn't say I am fluent, but

21    I'm able to maintain a conversation, read newspaper

22    articles, things of that nature, as well as conduct

23    interviews and debriefs; I feel comfortable doing that.

24    Q.  As a DEA agent, what types of crimes do you investigate?

25    And, specifically, whether they're domestic, international,

```
 1    or both?

 2    A.  As a DEA agent, we investigate violations of the

 3    Controlled Substances Act for both -- offenders, both

 4    domestic and internationally.

 5    Q.  As a DEA agent, have you reviewed, intercepted, and

 6    consensually recorded communications?

 7    A.  I have, yes.

 8    Q.  Approximately how many?

 9    A.  Dozens, if not hundreds.

10    Q.  Through reviewing those communications, have you become

11    familiar with common terminology used by Mexican drug

12    trafficking organizations?

13    A.  Yes.

14    Q.  Were you involved in the investigation of the defendant

15    Gerardo Gonzalez Valencia?

16    A.  I am, yes.

17    Q.  And what was your role in that investigation?

18    A.  I am one of the case agents assigned to the case.

19    Q.  In the investigation, what types of investigative

20    techniques were used?

21    A.  There's been, you know, physical and electronic

22    surveillance, debriefing of informants, confidential

23    sources, coordinating with counterparts in foreign

24    countries.

25    Q.  Have there been seizures?
```

1    A.  Yes.

2    Q.  Very generally, what did this evidence tell you about

3    the defendant?

4    A.  That the defendant was a member of the Cuinis drug

5    trafficking organization and was involved in trafficking

6    large quantities of cocaine from South America into Mexico,

7    the United States, and elsewhere.

8    Q.  Could you explain what the Los Cuinis drug trafficking

9    organization is?

10   A.  De los Cuinis drug trafficking organization is comprised

11   of members of the Gonzalez Valencia family.  They're

12   involved in trafficking large quantities of drugs, like I

13   said, from South America to Mexico, the United States, and

14   elsewhere.

15        They are also involved in the revenue [sic] of

16   drug trafficking proceeds and provide financial support,

17   serve as financiers for the cartel de Jalisco Nuevo

18   Generacion or the New Generation cartel of Jalisco.  But by

19   "financiers," I don't necessarily mean only involved in the

20   money laundering side or supporting financial operations.  I

21   mean utilizing their own drug trafficking networks to

22   provide revenue to support CJNG.

23   Q.  Is there any familial relationship between Los Cuinis

24   and the leader of the CJNG?

25   A.  There is.  The leader of CJNG, Nemecio Oseguera

1   Cervantes, also known as "el Mencho," is married into the

2   Gonzalez Valencia family, so the members of the Gonzalez

3   Valencia family are in-laws to Mencho.

4   Q.  How long has the Los Angeles field division been

5   investigating Los Cuinis and the CJNG?

6   A.  Over ten years.

7   Q.  Over the course of the investigation, approximately how

8   many people has your group interviewed about Los Cuinis and

9   the CJNG?

10  A.  At least dozens.

11  Q.  When working with cooperating witnesses is it common for

12  law enforcement to begin by addressing broad topics and then

13  later focusing in on specific details?

14  A.  Yes.

15  Q.  Who decides what topics to cover during the proffer?

16  A.  Both agents and prosecutors.

17  Q.  In a long-running investigation, such as this one, do

18  new targets naturally become the focus over time?

19  A.  Yes.

20  Q.  Does an agent typically take notes during proffers with

21  cooperating witnesses?

22  A.  Yes.  They do.

23  Q.  Are the notes intended to be a verbatim transcript of

24  what the witness said during the proffer?

25  A.  No.

1    Q.  Based on your training and experience, when both [sic]

2    quantities of cocaine are transported to Tijuana

3    specifically, what normally happens to the drugs after that?

4    A.  Upon reaching Tijuana, they're typically crossed into

5    the United States through different methods.

6    Q.  Are Tijuana and San Diego, California, essentially right

7    across the border from each other?

8    A.  Yes, they are.

9    Q.  As a DEA agent, have you become familiar with the price

10   of cocaine in Mexico and the United States over

11   approximately the last 15 years?

12   A.  Yes.

13   Q.  Approximately how much did a kilogram of cocaine cost in

14   Mexico from 20- -- excuse me, in 2003 to 2009?

15   A.  In Mexico, between 6 and $10,000.

16   Q.  What was the approximate price of a kilogram of cocaine

17   in the Los Angeles area during that time period, from 2003

18   to 2009?

19   A.  In Los Angeles, during that same time frame, for a

20   kilogram, approximately 20 to $26,000.

21   Q.  Approximately how much did a kilogram of cocaine cost in

22   Mexico in 2013?

23   A.  For a kilogram of cocaine in Mexico between that time

24   frame, approximately 8 to $13,000.

25   Q.  What was the approximate price of a kilogram of cocaine

```
 1    in the Los Angeles area in 2013?

 2    A.  Approximately 25,000, 26,000.

 3    Q.  When the price of a kilogram of cocaine is in U.S.

 4    dollars, is there any significance to the payment of the

 5    cocaine in U.S. dollars?

 6    A.  Yes.

 7    Q.  What is that significance?

 8    A.  That the cocaine was sold in the United States because

 9    of the currency here.

10    Q.  Could it also be intended to be sold in the

11    United States in the future?

12    A.  Yes.

13    Q.  As part of your investigation into the defendant and Los

14    Cuinis, did you learn about any seizures of cocaine by law

15    enforcement?

16    A.  I did, yes.

17    Q.  I want to direct your attention to August 21st, 2007.

18    Did you learn about a seizure by the U.S. Coast Guard that

19    happened that day?

20    A.  I did, yes.

21    Q.  How are you familiar with that seizure?

22    A.  I read reports related to that seizure, interviewed some

23    of the boarding team members and boarding officers involved

24    in that seizure.

25    Q.  Can you please describe for us what happened that day?
```

USCA Case #23-3126    Document #2057130    Filed: 05/30/2024    Page 14 of 273

1    A.   Yes.  So on or about August 20, 2007, a maritime patrol

2    aircraft, or MPA, identified what appeared to be a SPSS, or

3    self-propelled semisubmersible, relayed that information to

4    a U.S. Navy ship with embarked law enforcement attachment

5    from the U.S. Coast Guard.

6         The U.S. Navy ship then proceeded to close the

7    distance, launched a small boat with a U.S. Coast Guard

8    boarding team and attempted to interdict the SPSS.  When the

9    Coast Guard boarding team showed up on scene, or the last

10    known position of the SPSS, they noticed four individuals in

11    the water, but the SPSS had been scuttled.

12    Q.   And approximately how much cocaine was seized?

13    A.   Approximately 280 kilograms.

14    Q.   And where was that cocaine found?

15    A.   It was found in a debris field in the vicinity of the

16    last known position of the SPSS.

17         MS. SAHNI:  Ms. Ancalle, can we please pull up --

18         THE COURT:  Do you know how the semisubmersible

19    vessel had been scuttled?

20         THE WITNESS:  The reports did not say.  But from

21    my training and experience in the Coast Guard, typically,

22    there is, like, a scuttle valve located inside the SPSS

23    because they're designed if -- if detected by law

24    enforcement, the standard operating procedure is to scuttle

25    the vessel; and so they'll either cut that valve open,

```
 1    allowing sea water to flow in, and thereby having the vessel
 2    sink.
 3                THE COURT:  Okay.  But it's not like it exploded?
 4                THE WITNESS:  No, Your Honor.  Not that I am aware
 5    of.
 6                THE COURT:  Have you actually seen a scuttle
 7    switch on one of these?
 8                THE WITNESS:  I have.  I have actually interdicted
 9    an SPSS while I was in the Coast Guard.
10                THE COURT:  Okay.  Go ahead.
11                MS. SAHNI:  Thank you, Your Honor.
12                We're just trying to get Government Exhibit 2 up
13    on the screen.
14                Court's indulgence with our technical
15    difficulties.
16                THE COURT:  That's all right.
17                We'll call our IT expert.
18                MS. SAHNI:  Thank you.
19                THE COURT:  I think it's in the book.
20                MS. SAHNI:  It is, Your Honor.
21                THE COURT:  Why don't we just do that, and you can
22    give the witness the photograph if you have an extra copy.
23                MR. HANDRICH:  I think, Judge, the witness has a
24    copy as well.
25                THE COURT:  Perfect.  So all just look -- we'll go
```

JA988

```
 1    back to old-fashioned ways of doing this.  Sorry for the
 2    people in the gallery, you won't be able to see it.  But
 3    there you go.
 4    BY MS. SAHNI:
 5    Q.  Special Agent Novick, can you please identify what is in
 6    Government's Exhibit 2?
 7    A.  Exhibit 2.  Exhibit 2 is a photo of the SPSS.
 8    Q.  And you are referring to the SPSS that was seized on,
 9    approximately, August 21st, 2007?
10    A.  Correct, yes.
11    Q.  Based on your training and experience, including the
12    interdiction of a semisubmersible, approximately how much
13    cocaine could a semisubmersible of this size carry?
14    A.  More than two metric tons, 2000 kilograms.
15              MR. BEST:  More than --
16              THE COURT:   Two metric tons.
17              THE WITNESS:  Two metric tons, 2000 kilograms.
18    BY MS. SAHNI:
19    Q.  Was the cocaine that was seized on this day photographed
20    and tested?
21    A.  Yes.
22    Q.  Have you reviewed the lab reports from those tests?
23    A.  I have.
24    Q.  What were the results of the lab tests?
25    A.  It tested positive for cocaine.
```

13

1    Q.  Can you please look at Government Exhibits 3 and 4.

2         Do you recognize these exhibits?

3    A.  I do, yes.

4    Q.  What are these exhibits?

5    A.  Exhibit 3 are photos of the bulk seizure of the cocaine

6    that was seized from the SPSS.

7    Q.  And what is Exhibit 4?

8    A.  Exhibit 4 are photos from the representative sample.

9    Q.  What is the purpose of taking a representative sample?

10   A.  A representative sample is used to maintain some of the

11   contraband that was seized as opposed to having to maintain

12   the entire bulk seizure of whatever large quantity it is

13   that takes up a lot of space, so a representative sample is

14   used instead.

15   Q.  Were the photos in Government Exhibits 3 and 4 taken by

16   the lab that tested them?

17   A.  Yes, they were.

18   Q.  Were the crew members on the semisubmersible ultimately

19   charged for their involvement in the shipment?

20   A.  Yes.

21   Q.  Where were they charged?

22   A.  In the Middle District of Florida.

23   Q.  What were the dispositions of their cases?

24   A.  All four pled guilty.

25   Q.  Did they specifically plead guilty to cocaine offenses?

```
 1    A.  They did, yes.

 2    Q.  In those proceedings were the nationalities of the crew

 3    members established?

 4    A.  Yes.

 5    Q.  What were the nationalities of the crew members?

 6    A.  There were three Colombian nationals and one Mexican

 7    national.

 8    Q.  Now I would like to direct your attention to June 16,

 9    2009.  Did you learn about a seizure by Mexican law

10    enforcement that happened that day?

11    A.  I did, yes.

12    Q.  How are you familiar with that seizure?

13    A.  From reading reports, talking with CSs and informants.

14    Q.  Could you explain what a CS is?

15    A.  A confidential source.

16    Q.  Can you briefly describe what happened on that day?

17    A.  Mexican law enforcement seized over 700 kilograms of

18    cocaine that was secreted in shark carcasses located in a

19    shipping container.

20    Q.  Where did the seizure occur?

21    A.  In Mexico, in Porto Progreso [sic].

22    Q.  Could you please look at Government Exhibit 6A, page 1.

23    What is this exhibit?

24    A.  It is a news article.  A news article related to the

25    seizure of that shipment.
```

15

1    Q.  Does the article state the flag that was flown by the

2    vessel carrying the shark carcasses?

3    A.  It does.  It says it's a Marshall Islands flag.

4    Q.  Does it state the location from which the vessel

5    departed?

6    A.  Yes.  Houston, Texas.

7    Q.  Is there a picture on that page?

8    A.  Yes.

9    Q.  What does it show?

10   A.  It shows Mexican Marines inspecting -- searching a

11   shipping container and then, on the ground, both inside and

12   outside the container there are frozen shark carcasses.

13   Q.  I would now like to direct your attention to March 3rd,

14   2007.  Are you familiar with an incident that occurred at a

15   racetrack that day?

16   A.  I am, yes.

17   Q.  How are you aware of this incident?

18   A.  Both from debriefing, confidential sources, reading

19   reports.

20            THE COURT:  What kind of reports?

21            THE WITNESS:  Reports from debrief CSs.

22            THE COURT:  Okay.

23   BY MS. SAHNI:

24   Q.  Special Agent Novick, have you been in the courtroom

25   listening to the testimony of other witnesses --

JA992

1    MR. BEST:  Excuse me, Your Honor.  If he's going

2   to testify about debriefing reports, I would like to know if

3   we have all of them.

4    MS. SAHNI:  Your Honor, we're just talking very

5   generally about what has happened.  The defense team does

6   have many debriefing reports about this incident --

7    THE COURT:  Agent Novick, when you say that you

8   have learned about the racetrack incident from reading

9   reports of debriefings of confidential sources, have you

10   looked at debriefing reports from interviews of people other

11   than the cooperating witnesses who have testified here

12   today?

13    THE WITNESS:  I mean, I am referring to reports

14   from Oscar Nava Valencia and Pilo.

15    THE COURT:  So both who testified here today --

16    THE WITNESS:  Yes, previously.

17    THE COURT:  -- or during the course of the week?

18   All right.

19    MR. BEST:  Thank you, Your Honor.

20   BY MS. SAHNI:

21   Q.  Can you briefly explain your understanding of what

22   happened on March 3rd, 2007?

23   A.  Z14 was killed in a shootout at a racetrack in Veracruz.

24   Q.  I think we were, maybe, interrupted in our last

25   question, so I am not sure that I got the answer.

17

```
 1              But have you been in the courtroom listening to
 2    the testimony of other witnesses during these proceedings?
 3    A.  No, I have not.
 4    Q.  Could you please look at Government's Exhibit 7A.
 5              What is this exhibit?
 6    A.  It's a news article that talks about the shooting that
 7    occurred.
 8    Q.  On page 2, in the paragraph starting "two people," does
 9    the article identify who was killed?
10    A.  It does.  It says Efrain Teodoro Torres, or Z14, and
11    another as of yet unidentified hit man.
12    Q.  In the investigation into the defendant, did the DEA
13    conduct a wiretap?
14    A.  They did, yes.
15    Q.  Were the interceptions authorized by Court order in the
16    Central District of California?
17    A.  Yes.
18    Q.  When did the wiretap occur?
19    A.  Between 2013 and 2014.
20    Q.  What type of communications did DEA intercept during
21    this wiretap investigation?
22    A.  BBM, or Blackberry Messenger communications.
23    Q.  Can you please explain what Blackberry Messenger, or BBM
24    is?
25    A.  Sure.  BBM, or Blackberry messenger, was -- started off
```

JA994

18

1     as a proprietary text message communication system within

2     the Blackberry network where you could talk to other members

3     who had Blackberrys.  It evolved into being able to -- you

4     could download a Blackberry Messenger app on an iPhone or an

5     Android, and then use that.  It was believed to be secure or

6     safe to talk on, or more secure than regular text messages.

7     Q.  Was it?

8     A.  No.

9     Q.  What kind of information did Blackberry provide to DEA

10    in response to the court order?

11    A.  The content of the message that was sent, photographs,

12    time stamps.

13    Q.  In what language were these communications primarily?

14    A.  Spanish.

15    Q.  Were some of those communications translated into

16    English by a certified interpreter?

17    A.  Yes.

18          MS. SAHNI:  For the record, those translations are

19    Government Exhibits 9 through 23, and 49, which have

20    previously been admitted.

21    BY MS. SAHNI:

22    Q.  Did DEA intercept communications from multiple BBM pins

23    during the wiretap investigation?

24    A.  They did, yes.

25    Q.  What is a BBM pin?

JA995

19

1    A.  A "pin" is a unique alphanumeric identifier that's

2    associated with a Blackberry device.

3    Q.  Is a screen name also typically associated with a pin?

4    A.  Yes.

5    Q.  Who chooses the screen name?

6    A.  The user.

7    Q.  And can the user easily switch their pin on the same

8    device?

9    A.  No.  The pin is unique to that specific device so, in

10   order to change a pin, you would have to change the device.

11   Q.  Did DEA target one of the BBM pins believed to be used

12   by the defendant?

13   A.  Yes.

14   Q.  What was intercepted from the defendant's pin when it

15   was targeted?

16   A.  I believe there was a photograph, and that was about it.

17   Q.  What happened to the pin after DEA began intercepting

18   it?

19   A.  It was dropped.

20   Q.  Did targets of this wiretap investigation frequently

21   change pins?

22   A.  Yes.

23   Q.  Is that common?

24   A.  Yes, it is.

25   Q.  Why?

JA996

20

```
1    A.  In order to not allow law enforcement to be able to

2    intercept those pins or to continuously change the device

3    they're using.

4    Q.  Did DEA target the pins of other people who were

5    communicating with the defendant?

6    A.  Yes.

7    Q.  Were the defendants' communications intercepted while

8    communicating with those other people DEA was targeting?

9    A.  Yes.

10   Q.  Could you please look at Government's Exhibit 24?

11          What is this exhibit?

12   A.  It is the pins and screen names that were associated

13   with the defendant.

14   Q.  Does it accurately reflect the pins the DEA identified

15   as the defendant?

16   A.  Yes.

17   Q.  How many of the defendants' pins were intercepted

18   communicating with other target devices?

19   A.  I mean, there was one that was targeted and there were

20   two total that were intercepted.

21   Q.  What screen name was associated with those pins?

22   A.  Silverio.

23   Q.  How did DEA initially identify the defendant as the user

24   of those two pins?

25   A.  Through the content of the conversations.
```

JA997

1    Q.  Do you recall any specific examples?

2    A.  Talking about travel, and then being able to verify that

3    the defendant did travel to locations.

4         THE COURT:  I'm sorry.  You first identified the

5    pin to target with a wiretap by the content of the

6    communications you had not yet intercepted.  I am not

7    following that.  How did you identify these pins as

8    associated with this defendant?

9         THE WITNESS:  From our understanding, the pins

10   were intercept -- the pin was intercepted over other devices

11   that were targeted and then, through the contents of those

12   conversations, DEA was able to target one of the pins that

13   was believed to be associated to the defendant, and then

14   that was one was dropped.  And subsequent conversations were

15   intercepted by other pins --

16        THE COURT:  I see.  Okay.

17        So it's not as if you had some kind of

18   confidential source or informant who said:  I am

19   communicating with this defendant using this device number,

20   and so on.

21        THE WITNESS:  For the defendant, not to my

22   knowledge, no.

23        THE COURT:  Okay.

24   BY MS. SAHNI:

25   Q.  Do you recall any notable examples of the content of

1  communications helping to identify the defendant as the user

2  of the Silverio devices?

3  A.  Yes.  There was a conversation where the defendant's

4  brother Abigael was telling the Silverio pin that he needed

5  to go to the hospital because their father had a stroke.

6  And then, a separate conversation that was intercepted over

7  Abigael's device with another member of the Gonzalez

8  Valencia family, Abigael was intercepted saying Lalo is on

9  his way to the hospital at almost the same exact time that

10  Silverio had said:  I am on my way.

11  Q.  In order to identify the defendant as the user of the

12  Silverio devices, was it helpful to understand the

13  identity -- excuse me -- the identities of some of the other

14  people he was communicating with?

15  A.  Yes.

16  Q.  Did one of those individuals use the screen name "Boss"?

17  A.  Yes.

18  Q.  Who did DEA identify as the user of the screen name

19  "Boss"?

20  A.  The defendant's brother Abigael Gonzalez Valencia.

21  Q.  Can you please make sure to keep your voice up.  It's

22  hard to hear.

23  A.  I'm sorry.

24  Q.  Did Abigael identify himself in photos that were

25  intercepted in the communications -- intercepted

23

1    communications?

2    A.  Yes.

3    Q.  Can you please look at Government Exhibits 25 and 26?

4          What are these exhibits?

5    A.  They were photos -- they're photos of -- one is Abigael

6    Gonzalez Valencia; and then the other are -- the other is

7    the Cuinis -- members of the Cuinis.

8    Q.  Can you please just identify which number is which?

9    A.  Yes.  I'm sorry.

10         So 25 is a photo of Abigael, and 26 is a photo of

11    members of the Cuinis.

12    Q.  Can you please look at Government Exhibit 9 in the

13    binder.  Were the photos in Government Exhibits 25 and 26

14    sent around the same time as the communications in

15    Government Exhibit 9?

16    A.  Yes.

17    Q.  Did Abigael also send photos of himself over the Boss

18    devices that were intercepted?

19    A.  Yes.

20    Q.  Would you please look at Government Exhibits 27 to 35.

21         What are these exhibits?

22    A.  Photos of Abigael.

23    Q.  Were they intercepted from the Boss devices during the

24    wiretap investigation?

25    A.  Yes.

JA1000

1    Q.  Did DEA also identify the user of the screen name:  Aqui

2    a la orden su amigo [sic]?

3    A.  Yes.

4    Q.  Who is that?

5    A.  Mencho.

6    Q.  Did DEA identify the user of the screen name JR?

7    A.  Yes.

8    Q.  Who was that?

9    A.  Menchito.

10   Q.  Who is Menchito?

11   A.  Mencho's biological son Ruben Oseguera Gonzalez.

12             THE COURT:  Can you say that again.

13             THE WITNESS:  The alias is Menchito, and the name

14   is Ruben Oseguera Gonzalez.

15   BY MS. SAHNI:

16   Q.  Did DEA identify the user of the screen name Santy?

17   A.  Yes.

18   Q.  Who is that?

19   A.  That is the defendant's brother Jose Gonzalez Valencia.

20   Q.  Did Jose Gonzalez Valencia plead guilty to a

21   drug-trafficking offense in this District?

22   A.  Yes.

23   Q.  Did he admit to being the user of the Santy device in

24   the statement of facts, which is Government's Exhibit 52?

25   A.  Yes.

1    Q.  In paragraph 2 of Government's Exhibit 52, did Jose

2    Gonzalez Valencia also admit in the statement of facts that

3    he was one of the leaders of Los Cuinis?

4    A.  Yes.  It says the defendant was a leader of a drug

5    trafficking organization known as Los Cuinis.

6    Q.  Earlier you mentioned travel records.  As part of your

7    investigation did law enforcement obtain records of the

8    defendant's entry and exit from Uruguay, Mexico, and

9    Botswana?

10   A.  Yes.

11   Q.  Could you please look at Government's Exhibits 36 and

12   36A?

13            Special Agent Novick, can you please identify

14   Government Exhibits 36 and 36A?

15   A.  Yes.  36 is the travel records of the defendant from the

16   government in Mexico, and then 36A is the translated copy of

17   that.

18            MS. SAHNI:  Would you please pull up Government's

19   Exhibit 37 and 37A.

20   Q.  What are these exhibits?

21   A.  37 is the travel records for the defendant from the

22   government of Uruguay, and then 37A is the translated copy

23   of that.

24   Q.  Can you please look at Government Exhibit 38?

25            What is this exhibit?

JA1002

1    A.  It is the travel records for the defendant from the

2    government of Botswana.

3    Q.  Were Government's Exhibit 36, 37, and 38 obtained via

4    MLAT and accompanied by a certificate of authenticity from

5    their respective country?

6    A.  Yes.

7    Q.  Would you please look at Government's Exhibit 39?

8            What is this exhibit?

9    A.  It is the Mexican passport for the defendant.

10           MS. SAHNI:  For the record, we just have page 1 on

11   the screen now.

12   Q.  How was this exhibit obtained?

13   A.  It was obtained by law enforcement following his arrest

14   in Uruguay.

15   Q.  Are these accurate copies of the passport that was

16   seized incident to the defendant's arrest?

17   A.  Yes.

18   Q.  How do you know that?

19   A.  From talking with the law enforcement officers that were

20   involved.

21   Q.  Would you please look at Government's Exhibit 40,

22   page 1.

23           What is this exhibit?

24   A.  It is the travel records for the defendant in 2013, or a

25   visual of his travel.

1    Q.  Starting on what date?

2    A.  April 20th of 2013.

3    Q.  What is the end date of the travel in the summary chart?

4    A.  December 4th, 2013.

5    Q.  Where is the information in this exhibit derived from?

6    A.  It's derived from the stamps located in the defendant's

7    passport, as well as the travel records obtained from

8    Uruguay, Botswana, and Mexico.

9    Q.  Also Mexico?

10   A.  Also Mexico, yes.

11   Q.  Did the user of the Silverio devices discuss travel that

12   corresponds with the travel listed in this chart?

13   A.  I'm sorry.  Say that again.

14   Q.  Did the user of the Silverio devices discuss travel that

15   corresponds with the travel that's listed in this chart?

16   A.  Yes.

17   Q.  According to this chart, what did the defendant do on

18   July 5th, 2013?

19   A.  He entered into Uruguay.

20   Q.  Did DEA intercept communications sent by the Silverio

21   device on July 5th, 2013?

22   A.  Yes.

23   Q.  Could we please look at Government's Exhibit 16.

24       What is this exhibit?

25   A.  It is a transcript of intercepted communications on

1    July 5th of 2013 between Abigael and the defendant.

2    Q.  Would you please look at line 17?

3         When Silverio says:  I'm already here in E.U.,

4    What do you understand that to mean?

5    A.  In Uruguay or someplace located within Uruguay.

6    Q.  Why do you think it means that and not, say, European

7    Union or United States in Spanish?

8    A.  Based off of the travel records of the defendant, as

9    well as where he said he departed out of.

10   Q.  If we look at lines 22 through 24 on that page, what is

11   the discussion, if any, about where he departed from?

12   A.  He says that he left through de efe [sic], which would

13   be Mexico City.

14   Q.  What is el humo?

15   A.  I believe el humo is code for Mexico City.  Mexico City

16   has poor air quality.  El humo is, like, smoke, is my

17   understanding.

18   Q.  Is that a common term used for Mexico City?

19   A.  Yes.

20   Q.  What do you understand "pana" to be?

21   A.  Pana to be short for Panama.

22   Q.  Can you explain why that leads you to believe that is

23   not the European Union or the United States?

24   A.  Well, if he was going to the United States it wouldn't

25   necessarily make sense to travel to Panama first to go

1    north.  If you are already in Mexico, you could just take a

2    flight from Mexico to the United States.

3    Q.  Looking at line 28, when Silverio says:  I'm going to

4    bring my black, it works on the hunting trip, too, what do

5    you understand that to mean?

6    A.  That he's going to take his Blackberry with him on a

7    hunting trip.

8    Q.  And the next line, line 29, when Silverio says:  But on

9    Monday I am going to be here in E.U., can you tell what date

10   that Monday was?

11   A.  This intercept occurred on Friday, July 5th, so Monday

12   would have been July 8th.

13            MS. SAHNI:  Could we please go back to

14   Government's Exhibit 40, page 1.

15   Q.  Looking at the fourth marker there, what did the

16   defendant do on July 8, 2013?

17   A.  On July 8, 2013, he departed Uruguay.

18   Q.  Which countries did the defendant visit following -- in

19   the following days?

20   A.  Brazil, Namibia, South Africa, and then Botswana.

21   Q.  When did the defendant return to Uruguay from this trip?

22   A.  July 30th of 2013.

23   Q.  Could we please look at Government's Exhibit 41.

24            What is this exhibit?

25   A.  It's an export log for game that was hunted and has

1   hunting tags as well.

2   Q.  What exactly is documented as being exported in these

3   records?

4   A.  Skulls, femurs, you know, different bones, different

5   pieces of animals that you would export if you were hunting.

6   Q.  Is it fair to call these hunting trophies?

7   A.  Yes.

8   Q.  Were these records obtained via MLAT and accompanied by

9   certificate of authenticity from Botswana?

10  A.  Yes.

11  Q.  Who is listed as the exporter in these records, or

12  importer?

13  A.  The importer is the defendant.

14  Q.  Is a tag number listed for these items?

15  A.  It is, yes.

16  Q.  What is a tag number?

17  A.  A tag number is, like, a license allowing an individual

18  to hunt a certain type of game.

19  Q.  Do the tag numbers on the chart indicate where the tags

20  were issued?

21  A.  Yes.

22  Q.  Where?

23  A.  Botswana.

24  Q.  Is that the BW in the tag number?

25  A.  Yes.

USCA Case #23-3126    Document #2057130        Filed: 05/30/2024    Page 35 of 273

1   Q.  Do the tag numbers also include the year when they were

2   issued?

3   A.  Yes.

4   Q.  When were these tags issued?

5   A.  Most were issued in 2013, and it looks like there were a

6   few that was 2010.

7   Q.  Could we please look at Government's Exhibit 17.

8           What is this exhibit?

9   A.  It is an intercepted communication between the defendant

10  and Abigael on August 2nd of 2013.

11  Q.  Could you please just review to yourself lines 9 through

12  39 in the exhibit binder, and let me know when you are

13  finished?

14  A.  Nine through?

15  Q.  Thirty-nine.  I'm sorry.

16          What do you understand this portion of the

17  conversation to be about?

18  A.  The defendant and Abigael were discussing purchasing 500

19  kilograms of cocaine in Brazil.

20  Q.  Is there also a discussion of transportation from

21  Brazil, perhaps in later lines?

22  A.  Yeah.  They talk about picking up and then also -- like,

23  take care of the sales.

24  Q.  Can we please look at lines 12 through 14, which are

25  also on the screen.

1            Based on these communications, who was going to

2   provide the cocaine?

3   A.  Negro.

4   Q.  And line 16 on the next page.

5            What do you understand "quinela" [sic] to mean

6   here?

7   A.  Coded language for 500 -- 500 kilograms of cocaine.  500

8   in Spanish is quinientos, so kind of a play on words.

9   Q.  Would you please look at lines 50 to 51.

10           In line 50, what do you understand the defendant

11  to be saying here?

12  A.  On line 50, telling his brother Abigael to basically

13  help with the logistics, getting things set up in Brazil.

14  Q.  In line 51, what do you understand him to be saying

15  here?

16  A.  That the defendant already has two people down there

17  working, but it's only really to get things started.

18  Q.  Can we please look at line 67.

19           What do you understand the defendant to be saying

20  in this line?

21  A.  That they're going to sell it for $26,000, but they need

22  cash upon delivery of the drugs.

23  Q.  Is there any significance to the number $26,000?

24  A.  Yes.  It's the price of a kilogram of cocaine in Los

25  Angeles.

1    Q.  In 2013, how did the price of a kilogram of cocaine in

2    Europe compare to the price in the Los Angeles area?

3    A.  Europe would be higher than in Los Angeles.

4    Q.  And focusing on methamphetamine, in what unit of weight

5    is methamphetamine typically transported in bulk?

6    A.  Pounds.

7    Q.  In 2013, how did the price of a pound of methamphetamine

8    compare to that of a price of a kilogram of cocaine in the

9    United States?

10    A.  Significantly lower.

11    Q.  Could we please look at line 71.

12            What do you understand Silverio to mean by:  There

13    are 96?

14    A.  That there are 96 kilograms.

15    Q.  Which drug do Mexican drug trafficking organizations

16    typically get from South America?

17    A.  Cocaine.

18    Q.  Do Mexican drug trafficking organizations typically

19    import methamphetamine from South America?

20    A.  No.

21    Q.  In 2013, where was most of the methamphetamine being

22    distributed by drug trafficking organizations produced?

23    A.  Mexico.

24    Q.  Could we please look at Government's Exhibit 49?

25            What is this exhibit?

1    A.  It's an intercepted communication between Abigael and

2    the defendant on September 13th of 2013, or starting on

3    September 13th, 2013.

4    Q.  Does this message appear to relate to the last exhibit

5    we just viewed, which was Government's Exhibit 17?

6    A.  Yes.

7    Q.  Would you please read lines 1 and 2 from Boss?

8    A.  Boss says:  Hey, Negro tells me -- and, line 2, is that

9    he has 500 right now over in the samba.

10   Q.  What do you understand Boss -- or as you've identified

11   him as Abigael -- to be saying here?

12   A.  That Negro has 500 kilograms of cocaine ready for them

13   in Brazil.

14   Q.  And is there any significance to la samba?

15   A.  Yes.  I believe it's a type of dance in Brazil.

16   Q.  Can we please look at Government's Exhibit 18.  What is

17   this exhibit?

18   A.  It is an intercepted communication between the defendant

19   and Abigael that starts on June 26 of 2013.

20   Q.  Looking at lines 5 and 6 -- in line 5, in the context of

21   this communication and all of the other Blackberry

22   communications that you have reviewed as part of this

23   wiretap investigation, what do you understand Silverio to be

24   talking about here?

25   A.  In lines 5 and 6?

1    Q.  Yes.

2    A.  Silverio is telling his brother that he has 85, plus 15,

3    so 100 kilograms ready -- or that he's going to give to him.

4    And then Abigael talks about getting a sample to somebody.

5    Q.  And you mentioned kilos.  Kilos of what?

6    A.  Cocaine.

7    Q.  And with regard to the old man and wanting a sample, is

8    it common for cocaine traffickers to request a sample of

9    cocaine before purchasing a larger quantity of cocaine?

10   A.  Yes.

11   Q.  Looking at line 8, where was the defendant at the time

12   of this communication based on his travel records?

13   A.  He was in Mexico.

14   Q.  In line 8, what do you understand "up there" to be

15   referring to?

16   A.  The United States.

17   Q.  In all of the wiretap and consensually recorded

18   communications that you have reviewed as a DEA agent, have

19   you ever seen or heard a drug trafficker in Mexico refer to

20   Europe as "up there"?

21   A.  No.

22   Q.  Could we please look at Exhibit 19?

23        What is this exhibit?

24   A.  It's intercepted communication between Abigael and the

25   defendant that starts on July 3rd, 2013.

36

1   Q.  Looking at line 4, in the context of this full

2   communication and the other Blackberry messages you reviewed

3   as part of this wiretap investigation, what do you

4   understand Boss to mean by:  The old man does want the 200?

5   A.  That he wants 200 kilograms of cocaine.

6   Q.  Could we please look at Government's Exhibit 20.

7           What is this exhibit?

8   A.  Intercepted communication between Abigael and the

9   defendant that starts on July 1st of 2013.

10  Q.  Looking at line 3, when Boss says:  The old man wants

11  100 S 50 and 50, but it works for him at 26, what do you

12  understand that to mean?

13  A.  That an individual wants 100 kilograms of cocaine but

14  not delivered all at once; rather, 50 kilograms and then 50

15  kilograms, and -- for the price of $26,000.

16  Q.  Why do you believe that it's cocaine?

17  A.  Based off of the price.

18  Q.  Is there any significance to breaking up the 100

19  kilograms into 50 and 50?

20  A.  Yes.

21  Q.  What is that?

22  A.  It could be for -- to not put 100 out at one time and,

23  then, if it's interdicted or seized by law enforcement you

24  are out all 100; and then, also depending on the means of

25  transportation, it may only be able to transport 50 at a

JA1013

37

```
 1    time.

 2    Q.  In line 5, when Silverio says:  Tell him yes at 26, what

 3    does that mean?

 4    A.  That he's agreeing to the price of $26,000.

 5    Q.  Is that per kilogram of cocaine?

 6    A.  Yes.

 7    Q.  Could we please look at Government's Exhibit 21?

 8        What is this exhibit?

 9    A.  This is intercepted communication between Abigael and

10    another one of the defendant's brothers, Jose, on June 18 of

11    2013.

12    Q.  Looking at lines 4 and 5, is there a reference to a

13    person named "Mingo"?

14    A.  Yes.

15    Q.  Who is Mingo?

16    A.  Mingo is an associate of the defendant.

17    Q.  Was there any familial relationship that you recall?

18    A.  I believe brother-in-laws.

19    Q.  Generally speaking, what do these messages appear to be

20    about?  Feel free to take your time reviewing if you need

21    to.

22        What is this conversation about?

23    A.  They're discussing trying to locate Mingo so that they

24    can notify a brother-in-law to get the drop on him or

25    essentially, kill him.
```

JA1014

38

1    Q.  And if we could look at line 16.

2          Is that the message you were referring to with

3    getting the drop on Mingo?

4    A.  Yes.

5    Q.  In context, who do you understand Boss to be referring

6    to when he says:  My brother-in-law?

7    A.  Mencho.

8    Q.  Could we please look at Government's Exhibit 23.

9          What is this exhibit?

10   A.  It's intercepted communication between Mencho and Nano

11   on October 30th of 2013.

12   Q.  Looking at line 1, when Mencho says:  Minjo [sic] is

13   going to arrive there to see the house.  Have the guys be

14   ready so that when the dude arrives they hit him, and don't

15   screw it up, please.

16         Who do you believe Minjo to be referring to based

17   on the context of this and the other communications?

18   A.  Mingo.

19   Q.  Now, I would like to direct your attention to

20   April 21st, 2016.  What happened that day?

21   A.  The defendant was arrested in Uruguay.

22   Q.  Are you familiar with how that arrest occurred?

23   A.  I am, yes.

24   Q.  How are you aware?

25   A.  I've read reports related to the arrest and talked to

JA1015

1    some of the officers involved.

2    Q.  Why were Uruguayan officials attempting to arrest the

3    defendant?

4    A.  There was an arrest order that they were carrying out

5    for DEA, an international arrest warrant, as well as part of

6    their own Uruguayan investigation that they had.

7    Q.  Do you know what kind of investigation they had in

8    Uruguay?

9    A.  It was related to money laundering.

10   Q.  Can you explain how the arrest occurred?

11   A.  Yes.  So several days -- a few days before the arrest

12   occurred Uruguayan law enforcement believed their

13   surveillance had been made, so they pulled back a little

14   bit.  And they believed, around the 21st, the defendant was

15   going to flee to another country so they attempted to locate

16   his whereabouts.  They located him in the vicinity of the

17   school where his children went and then, once having enough

18   officers, moved in to effect the arrest.

19   Q.  When the Uruguayan officers moved in, did they observe

20   anything notable?

21   A.  Yes.  So they were wearing plainclothes.  As they

22   approached, they saw the defendant kind of shield his body

23   away and, in doing so, at least one of the officers

24   identified himself as law enforcement and drew his weapon.

25   And then, when the defendant turned back towards him fully,

```
1    they said there was a phone that was broken in half.

2    Q.  Did Uruguayan law enforcement seize that phone incident

3    to arrest?

4    A.  They did, yes.

5    Q.  Could we please look at Government's Exhibit 42.  It's

6    also on the screen.  That's easier.

7             What is this exhibit?

8    A.  That was the phone that was broken in half.

9    Q.  Was law enforcement able to image this device?

10   A.  No.  They were not.

11   Q.  Why not?

12   A.  Because of it being broken.

13   Q.  Did Uruguayan law enforcement seize any other items at

14   the time of arrest?

15   A.  They did, yes.

16   Q.  In the binder, could you please look at exhibit --

17   Government's Exhibit 43 to 47?

18             MR. BEST:  Exhibits?

19             MS. SAHNI:  43 to 47.

20   BY MS. SAHNI:

21   Q.  Are these photographs of items that were seized incident

22   to the defendant's arrest?

23   A.  They are, yes.

24   Q.  How do you know that?

25   A.  From talking with law enforcement that was involved.
```

1   Q.  Did you also read Uruguayan law enforcement reports

2   about the items that were seized?

3   A.  I did, yes.

4   Q.  Can we please look at Government's Exhibit 43.

5          What is this exhibit?

6   A.  It is a fraudulent voter credential card under the name

7   of Alonso Torres Ibarra [sic], with a photo of the defendant

8   on it.

9   Q.  Can we please pull up Government's Exhibit 44.

10          What is this exhibit?

11  A.  The left -- on the left-hand side is the Mexican

12  passport of the defendant under his name.  And then, on the

13  right-hand side is a fraudulent passport under the same

14  alias as the voter credential card, Alonso Torres Ibarra.

15  Q.  Can we please look at Government Exhibit 45.

16          What is this exhibit?

17  A.  It is a birth certificate from the Mexican state of

18  Michoacan.

19  Q.  For whom?

20  A.  For the defendant.

21  Q.  Where does this document say the defendant was born?

22  A.  Naranjo Viejo Aguililla.

23  Q.  Can we please look at Government's Exhibit 46?

24          What is this exhibit?

25  A.  It is a birth certificate from the state of California

```
 1    for the defendant.
 2    Q.  Where does this document say the defendant was born?
 3    A.  San Jose, California.
 4    Q.  Could we please pull up Government's Exhibit 47?
 5              THE COURT:  Do you know which of these birth
 6    certificates is accurate or not?
 7              THE WITNESS:  I do not know.
 8              I mean -- I mean, I know they both have his name
 9    on it.  But as far as whether sole Mexican citizen or sole
10    U.S. citizen, I don't recall.
11              THE COURT:  Okay.
12    BY MS. SAHNI:
13    Q.  Can we please look at page 7 of Exhibit 47.
14              Who is this individual in this photo that was
15    seized incident to the defendant's arrest?
16    A.  I'm sorry.  Say that again.
17    Q.  Who is this individual in the photo that was seized
18    incident to the defendant's arrest?
19    A.  It's the defendant in the photo.
20    Q.  And what are the other pages in Exhibit 47, just
21    generally?
22    A.  Photos from a hunting trip with the defendant and his
23    family.
24    Q.  What happened to the defendant following his arrest?
25    A.  He was in the custody of Uruguayan law enforcement, in
```

JA1019

1    Uruguayan jails, prisons, until he was extradited.

2    Q.  Are you aware of any incidents that occurred during the

3    defendant's detention in Uruguay?

4    A.  Yes.

5    Q.  Did you review official reports from Uruguay about these

6    incidents?

7    A.  I did, yes.

8    Q.  In May of 2016, was there an incident regarding a threat

9    that was made?

10   A.  Yes.

11   Q.  What happened during that incident?

12   A.  Around May of 2016 the defendant made a threat towards a

13   minister of interior for the government of Uruguay,

14   threatening to hang him off the highest bridge in Uruguay.

15   Q.  Can we please look at Government's Exhibit 48A.

16          What is this exhibit?

17   A.  It is the -- it is a translation of a news article

18   pertaining to that incident, that threat.

19   Q.  Can we please look at the top of page 2.

20          Does this news article include the defendant's

21   statement?

22   A.  Yes, it does.

23   Q.  And could you please read it?

24   A.  They had me naked in below zero temperatures.  If

25   Interior Minister Eduardo Bonomi continues to send his

1    guards to torture me, have them find the highest bridge in

2    Uruguay, and I am going to hang him from it.

3    Q.   What kind of statement was it?

4    A.   It was a signed statement.

5    Q.   In October of 2019, was there another incident involving

6    attempted escape?

7    A.   Yes.

8    Q.   What happened in that incident?

9    A.   There were guards that were on duty -- somehow, the cell

10    doors in the defendant's cell, and several of the cells

11    surrounding the defendant, opened.  One of the guards went

12    to, basically, block or stop or try and close the cell door

13    where the defendant was at and, eventually, they were able

14    to get the cell doors closed and locked.

15    Q.   And what happened after that?

16    A.   After that, the defendant made a threat to the guards

17    saying that he was going to kill them.

18    Q.   In February of 2020 was there another incident where a

19    guard had to receive medical attention?

20    A.   There was, yes.

21    Q.   What happened in that incident?

22    A.   A guard was walking past the cell where the defendant

23    was housed and, as he was doing so, the defendant took

24    bleach and threw it, and it got into the defendant's eyes --

25    sorry, the guard's eyes.

1    Q.  A few days later, did the defendant make another threat?

2    A.  He did, yes.

3    Q.  What was that threat?

4    A.  The threat was that he was going to choke or strangle

5    the guards with his handcuffs.

6            MS. NASEEF:  Your Honor, may I have one moment to

7    confer with counsel?

8            THE COURT:  Yes.

9    Q.  Special Agent Novick, going back to the items that were

10   seized incident to arrest, particularly the documents and

11   photographs, where exactly were those items seized from?

12   A.  Some were seized in the vehicle that the defendant was

13   driving or that was there and others were seized from the

14   different locations where search warrants were conducted.

15   Q.  And is there anything notable about how the car was

16   packed that the defendant was driving?

17   A.  There was luggage.  There was the passports and other

18   sort of important documents, as well as some jewelry; things

19   like that.

20   Q.  Based on your training and experience, what does that

21   indicate to you is about to happen?

22   A.  Somebody was trying to leave the country.

23           MS. NASEEF:  Thank you.

24           THE COURT:  In the documents recovered from the

25   execution of all of these search warrants, was a ticket or

```
1    airplane, or boat travel ticket located?

2              THE WITNESS:  Not that I am aware of, Your Honor.

3    But from talking with the law enforcement officers that were

4    involved in the total operation and the investigation, they

5    believed that the defendant was going to cross a land border

6    into Brazil.

7              THE COURT:  Okay.

8                        CROSS-EXAMINATION

9    BY MR. BEST:

10   Q.  Any reason to believe it wasn't just to go on vacation

11   since he had been to Brazil any number of times on the

12   passport stamps?

13   A.  Well, with talking with them, sir, they said that,

14   during the course of their investigation, the defendant had

15   started to move around quite a bit in relation to -- I

16   believe there were some documents that were leaked, or

17   something like that.  And then, they also had a wiretap

18   going on.  And from what they told me -- based on the

19   conversations that they intercepted, felt that the defendant

20   was going to flee.

21   Q.  Does the government have that wiretap?

22             MS. SAHNI:  No, it does not.

23             MR. BEST:  I am going to ask that that be

24   stricken.

25             THE COURT:  This is a sentencing hearing.  Denied.
```

```
 1              MR. BEST:  I understand.

 2    BY MR. BEST:

 3    Q.  Nice to meet you.

 4    A.  Likewise, sir.

 5    Q.  Thank you for what you do.

 6              I have worked with many of your colleagues many

 7    moons ago when I was at the major narcotics section.

 8              You started with the DEA in 2017, correct?

 9    A.  Yes, sir.

10    Q.  Okay.  So everything you have testified about here today

11    in your review of the BBMs was a retrospective review,

12    correct?

13    A.  Correct.

14    Q.  The BBMs occurred years before?

15    A.  Correct.

16    Q.  And you weren't part of the investigation in 2013 which

17    led to the search warrant application, correct?

18    A.  The search warrant application for?

19    Q.  For the BBMs, for the Blackberry messenger?

20    A.  No.  I was not hired by the DEA at that point.  I was

21    still in the Coast Guard, yes, sir.

22    Q.  And all of the matters that you spoke to Oscar Nava

23    Valencia about and other individuals, that was part of your

24    investigation after you joined the DEA in 2017, correct?

25    A.  The ones that I was physically present for or involved
```

48

1     in, yes.  I have read reports from other debriefings or

2     proffers that have occurred before.

3     Q.  You have no personal knowledge of the events, obviously,

4     like Special Agent Mori would from 2005 to 2009, correct?

5     A.  Correct.  Yeah, I was not employed by DEA at that time.

6     Q.  Let's just start kind of in Uruguay, and work backwards.

7              At the time of Mr. Gonzalez Valencia's arrest, he

8     was living in a house in Punta del Este, Uruguay?

9     A.  Yes, sir.  That sounds correct, yes.

10    Q.  And the house was fully furnished, correct?

11    A.  At the time of his arrest he had the residence.  But

12    from my conversation with the officers that were involved in

13    the investigation, he had been moving to several different

14    places to stay -- hotels, and things like that; but he still

15    had that residence, yes, sir.

16    Q.  He still had furnishings in the house, correct?

17    A.  To my knowledge, yes, sir.

18    Q.  Did you hear any differently?  Anything different?

19    Strike that.

20    A.  Excuse --

21    Q.  Your knowledge is based on what Uruguayan police told

22    you, correct?

23    A.  Correct.  Yes.

24    Q.  And his kids were still enrolled in school in Punta del

25    Este, Uruguay, correct?

JA1025

1      A.  Yes.

2      Q.  And his whole family was still in Punta del Este,

3      Uruguay, correct?

4      A.  Yes.  Both -- immediate family.

5      Q.  And that would be his wife, correct?

6      A.  I mean, she was residing there, yes.  At the time of the

7      arrest, I don't think she was actually in the country,

8      but...

9      Q.  She wasn't in the country.  So he was taking care of his

10     kids alone?

11     A.  Well, I mean, from talking with the Uruguayan law

12     enforcement, they also had, I believe, his father-in-law and

13     several other employees who helped with things around the

14     house and took care of the kids as well.

15     Q.  Okay.  But if they were intending on fleeing, he was

16     with his children at that time, correct?

17     A.  All I know is that he --

18     Q.  He was physically present with his children?  It's an

19     easy question.

20     A.  I mean, were they -- at the time of the arrest or --

21     Q.  Yes.  He was at -- the arrest occurred at the child's

22     school, correct?

23     A.  I can't recall if they were -- if the children were in

24     his presence, but the arrest occurred in the vicinity of the

25     school.

JA1026

1   Q.  Was there any other reason that he would be at the

2   children's school, that you know of?

3   A.  I know there was, I believe, two other people that were

4   with him or that he met with there, I think; but outside of

5   that, no.

6   Q.  Okay.  Were the children in Uruguay at the time of his

7   arrest, to the best of your knowledge?

8   A.  To the best of my knowledge, yes, or from what I know,

9   yes, sir.

10   Q.  Thank you.

11          Let's talk about the phone that was seized off his

12   person that was cracked.  Did DEA or the Department of

13   Justice ask for that phone to do forensic testing on?

14   A.  I can't recall if it was for that specific phone.  But I

15   know for other phones and devices that were -- electronic

16   devices that were seized, they did request to try and

17   conduct -- extract whatever information they could.

18   Q.  Okay.  Indeed, on those phones and every electronic

19   device that was seized, there were searches of those phones,

20   correct?

21   A.  I know we sent them off to get searched.  I can't recall

22   if the search was carried out or not.  But I know we sent

23   them off to our lab to have whatever devices that DEA took

24   custody of to try and get them searched.

25   Q.  To be clear, from the time that those devices were

1    seized in Uruguay and under the control of the Uruguayan

2    police, they somehow were turned over to U.S. DEA, correct?

3    A.  Yes.  Some of the devices, yes.

4    Q.  Were some of the devices reviewed in Uruguay as well

5    forensically?

6    A.  I think, from what I recall, they attempted to.  To the

7    best of my knowledge, I don't know what those results

8    yielded.

9    Q.  You weren't given any information off of any electronic

10    device from Uruguay that you felt to be useful in this case

11    here, correct?

12    A.  That I don't know.

13    Q.  You don't know the results of forensic review of Gerardo

14    Gonzalez Valencia's devices that were taken from Uruguay?

15    A.  Well, for the devices that were -- like I said, I know

16    that the Uruguayans attempted to try and extract some

17    information.  I don't know if -- what the results of that

18    search yielded.

19            MR. BEST:  Court's indulgence.

20            (Whereupon, counsel confer.)

21            MS. SAHNI:  Your Honor, the government previously

22    stipulated that there was nothing on those devices that were

23    forensically searched that we intended to use as evidence at

24    trial or the sentencing.

25    BY MR. BEST:

1    Q.  The devices that then were turned over to DEA, was one

2    of those devices the cracked iPhone that you have talked

3    about here?

4    A.  That I am unsure of.  I know that there were several --

5    like I said, I know there were several devices that DEA took

6    custody of; I don't know if that iPhone that was cracked was

7    one of them.

8    Q.  And you have been working this case since -- when did

9    you start working this case?

10   A.  Around 2017.

11   Q.  Okay.  And he was arrested in 2016?

12   A.  Yes, sir.

13   Q.  So you have had six some-odd years to request that

14   cracked iPhone from Uruguay and do a forensic search of that

15   phone -- the DEA has, correct?

16   A.  Yes.

17   Q.  And you don't know whether that ask has ever been made

18   to Uruguay?

19   A.  That I know of, no.  It may have been, and I am not

20   aware of that, but --

21   Q.  And so whether it was forensically imaged or not, you

22   have no information -- strike that.

23          Is it important -- because in your testimony in

24   front of Her Honor you talked about the fact that upon his

25   arrest that he cracked on iPhone, right?

1    A.  Yes.

2    Q.  And you said that because purportedly that was relevant

3    to this testimony here that maybe there was something on

4    that iPhone that he wanted to conceal, correct?

5    A.  Yes.

6    Q.  Come on.  I mean, of course.  That's why that testimony

7    was elicited, right?

8    A.  I mean, I was just stating some of the facts that they

9    had provided to me, the Uruguayan law enforcement.

10    Q.  And this is a major narcotics enforcement investigation,

11    correct?

12    A.  Yes.

13    Q.  In the allegations you are alleging that he continued

14    narco trafficking up through the time of his arrest,

15    correct?

16    A.  Yes, sir.  That I am aware of.

17          THE COURT:  Mr. Best, he didn't get any

18    information off that cracked phone.  He didn't even say that

19    this defendant folded that phone in half.  I don't know --

20    even know how -- even a really strong man can take a phone

21    and fold it like that.  Can we just move on?

22          This is not a trial.

23          He's already admitted he is a major narcotics

24    trafficker to the tune of 280 kilograms of cocaine.  Really,

25    do we need to do this?

1          MR. BEST:  Yes.  I am just crossing; it was

2     brought up.

3          THE COURT:  The government didn't get any forensic

4     information off of a bunch of devices.  Okay, let's move on.

5     It's not that they don't have other evidence.

6     BY MR. BEST:

7     Q.  I am going to show you what is going to be marked as

8     defendant's -- you can take it down.

9          Do you remember how many devices were taken in the

10    seizures, either on his person or in the car or in the

11    house?

12    A.  I don't know the exact number.  I can't recall the exact

13    number.  I just know that there are multiple phones, hard

14    drives, and other electronic devices that were seized from

15    various locations, as well as the vehicle.

16    Q.  Okay.  In your experience as a DEA agent, while narco

17    traffickers like to keep as little electronic footprint as

18    possible, invariably, you searched those devices for an

19    electronic footprint for illicit activities, correct?

20    A.  Which devices?

21    Q.  All of the devices that were seized.  When they were

22    imaged and reviewed, they were looking for evidence for

23    illicit activity?

24    A.  Well, I can't say all of -- like I said, I know that

25    some of the devices that were seized were handed over to DEA

1   to attempt to analyze or extract information.  I don't

2   know -- I can't recall how many of those devices were handed

3   over, but I know that there were several that were handed

4   over.  And, like I said, I don't know the results of

5   those -- that search.

6   Q.  All right.  And then, when he was taken into custody in

7   Uruguay, in the statement that you read to Her Honor, he was

8   clearly upset that he was being tortured -- by his own

9   words -- correct?

10  A.  I mean, that's what he alleged, yes.

11  Q.  Do you have any reason to dispute that?

12  A.  I mean, regarding him being tortured?

13  Q.  Correct.  In Uruguay.

14          Did you follow up on his claims of being tortured

15  and being required to sleep naked in 40-degree weather, and

16  whatever other allegations he made of hardship?  Did you

17  follow up?

18  A.  I personally did not.  I don't know if other agents did

19  or not.

20  Q.  So he was being held in jail.  He, by his own words, was

21  freezing and being tortured.  And he is upset, and he made a

22  statement of how angry he was to the head of the prison

23  system, correct?

24  A.  I mean, it was the Ministry -- the Minister of Interior.

25  I don't know how Uruguayan government is set up regarding

```
 1    what that person oversees, but it was the Minister of

 2    Interior.

 3    Q.  Okay.  You-all don't have any evidence he acted on that

 4    threat?

 5    A.  I mean, not that I am aware of, no.

 6    Q.  It would be hard to since he was in prison, correct?

 7    A.  Correct.

 8    Q.  Can we -- now, the only evidence that you have of narco

 9    trafficking concerns regarding Mr. Gonzalez Valencia past

10    2009 or '10 is this BBM exchange, correct?

11    A.  I believe there were -- there was -- yes.  That I can

12    recall right now.

13    Q.  Okay.  For instance, the shark carcass incident is the

14    2009 timeframe, correct?

15    A.  The shark -- yes.  June of 2009.

16    Q.  I wouldn't trick you.  Okay.

17              You know that he moved to Argentina with his

18    family, correct?

19    A.  At some point, yes.

20    Q.  You don't know when?

21    A.  I can't recall the exact date offhand, but I know he

22    did, yes.

23              MR. BEST:  We have a stipulation for the Court,

24    Your Honor; it's marked as Defendant's 34.

25              Can we put it up on the screen?
```

1           THE COURT:  Yes, of course.

2    BY MR. BEST:

3    Q.  This has clarified the stipulation with the government

4    that Mr. Gonzalez Valencia relocated his primary residence

5    to Argentina in 2009.  That's -- basically, the government

6    admits that that is what happened?

7    A.  I mean, is it signed?  Can I see --

8    Q.  Yes, of course.  The next page -- you don't trust me?

9    Come on.

10   A.  I do.  Trust, but verify.

11   Q.  All right.  Do you see -- that is a perfect signature by

12   Ms. Sahni.  And I promise you this:  If she didn't sign it,

13   we'd hear from her right now.

14   A.  Yes.  It appears, yes, sir.

15   Q.  And then, do you know when Mr. Gonzalez Valencia moved

16   to Uruguay from Argentina?

17   A.  I do not, no.

18   Q.  Do you see that the government has stipulated that that

19   occurred in 2012?

20   A.  Yes.  In or around early 2012.

21   Q.  Yes.  I'm sorry, in or around.

22           In the last paragraph do you see that the

23   government has stipulated that between 2009 and 2016, the

24   day of his arrest, his primary residence was not Mexico?

25   A.  Yes, sir.

1    Q.  Thank you.

2             So let me go through some of the evidence that has

3    been adduced in the last two days, please.  Let's start with

4    the submarine interdiction -- by the way, that was 2007.

5    Were you with the Coast Guard then?

6    A.  I was a cadet at the Coast Guard academy at that time,

7    sir.

8    Q.  You weren't part of the interdiction of that submarine,

9    though?

10   A.  I was not part of that boarding team that did that

11   interdiction, no, sir.

12   Q.  You know that 280 kilos was seized -- was taken from

13   that interdiction, correct?

14   A.  It was approximately 280 found, yes, sir, in the debris

15   field.

16   Q.  If there were more, they weren't found, correct?

17   A.  To my knowledge, approximately 280 is what was found.

18   Q.  Let me turn to -- let me ask you this.  In your

19   investigation of the submarine incident in 2007,

20   Mr. Gonzalez Valencia was described as an investor to that

21   particular submarine incident, let's call it, correct?

22   A.  To my knowledge, yes, sir.

23   Q.  Can you tell Her Honor what you understand from your

24   training and experience what an investor is?

25   A.  Sure.  An investor in a drug load is somebody who owns a

1    portion of a drug load, typically bought at a price [sic]

2    located within the source country.

3            So, for example, if there was a thousand-kilogram

4    drug load that was going to be moved and I was an investor

5    and I purchased 250 kilograms of it, when that drug load

6    arrived at its destination or midway point -- let's say

7    Mexico -- I would be able to take my 250 kilograms that I

8    invested and then be able to continue trafficking it or

9    moving it along my own trafficking routes to make profit for

10   myself; I owned part of a larger drug load.

11   Q.  Okay.  An "investor" is different than a person who

12   plans the event though?  They can be the same, but an

13   investor typically is somebody who invests in the shipment,

14   takes the monetary risk?

15   A.  I would say an investor has knowledge of the shipment.

16   Depending on the relationship with other investors, that

17   individual may have knowledge of the total investment or

18   not.

19   Q.  Did you ever hear that -- strike that.

20           Your investigation revealed that Mr. Gonzalez

21   Valencia did not organize any part of the transportation of

22   that product from Colombia to wherever its final destination

23   was going to be, correct?

24   A.  Related to the transportation, I can't recall.  As far

25   as if he organized or coordinated any of the logistics for

60

1    the transportation, I can't recall.

2    Q.  And you can't obviously recall whether he was a leader

3    in that one shipment, that he was the master planner,

4    correct?

5    A.  I would say, as an investor, you typically hold a

6    leadership or a higher level drug trafficker to be able to

7    invest in a shipment.  Typically, lower level people aren't

8    going to be able to purchase or participate in a larger

9    shipment or investment.

10   Q.  I promise I am not trying to get you to say he is one of

11   the low guys on the submarine sweating it out or a lower

12   level guy there.

13          But if he played more of a substantive role than

14   simply financially backing the shipment, you don't know of

15   it, correct?

16   A.  Not that I can -- not that I can recall right now.

17   Q.  Okay.  Thank you.

18          Let's turn to the shark carcasses.

19          Do you know -- so the Mexican press covered that

20   interdiction in 2009 at -- it was a port in the Yucatan, I

21   don't remember -- Port Progreso [sic], correct?

22   A.  Yes, sir.  There was press on it.

23   Q.  Do you recall seeing the Mexican press -- the Mexican

24   press plays a role at reporting the events as they

25   understand them, correct?

JA1037

1    A.  I think they report the facts that they know at that

2    time.

3    Q.  Yes.  Have you seen numerous reports on this exact

4    interdiction, an arrest, that the Sinaloa cartel was

5    responsible?

6    A.  Reports or news articles?

7    Q.  News articles?

8    A.  I mean, I have seen the news articles that were listed

9    here, and a few others.  And I think, in one of them, it

10   mentions -- it talks about Sinaloa, but not necessarily that

11   they were the people that were -- talks about Chapo, but not

12   invested in the load.  It talks about Mexican drug

13   trafficking in general and how Chapo played a role in drug

14   trafficking.

15   Q.  Are you aware -- you may not be; but are you aware that

16   a number of Mexican news articles blame the Sinaloan cartel

17   for this drug interdiction at Porto Progreso in 2009 where

18   the shark carcasses were recovered?

19   A.  I am unaware of that, but it did occur in 2009 which,

20   from my knowledge, is still around the time when the Milenio

21   cartel was around, and the Milenio cartel was aligned with

22   Sinaloa.

23   Q.  The Milenio cartel?

24   A.  I'm sorry?

25   Q.  I'm sorry.  I couldn't hear you.  You said the Milenio

JA1038

```
 1    cartel was aligned with Sinaloa?

 2    A.  At some point in time, if I recall it correctly, yes.

 3    Around that time they were aligned or close to Sinaloa.

 4    Q.  You have no personal knowledge of, obviously, this event

 5    since it occurred eight years before you joined the DEA,

 6    right?

 7    A.  Correct.

 8    Q.  So your investigation of this event occurred certainly

 9    after 2017 when you joined the DEA, correct?

10    A.  Any work that I have done related to this investigation

11    has been after I joined the DEA in 2017.

12    Q.  Similar to the submarine incident, it was your

13    understanding that, as regards the shark carcasses, if there

14    was involvement by Mr. Gonzalez Valencia it was only as an

15    investor, correct?

16    A.  From my recollection, yes, an investor.

17    Q.  Okay.  Again, your investigation doesn't have any

18    evidence that he played any role in organizing in any of the

19    boats or shark carcasses or anything like that, correct?

20    A.  That I can recall right now, he was an investor.  And

21    like I said, investors typically have some sort of say as

22    far as -- be able -- if an investor did not want to -- did

23    not like the manner in which something was going to be

24    transported, why would they invest in that load?  You could

25    find --
```

```
1    Q.  I get it.  We're going to use that for the rest of the
2    discussion.  I will accept that, okay.
3            Beyond that, you have absolutely no evidence from
4    your years of investigation on this case that he played any
5    role -- you don't have any direct evidence he played any
6    role in telling people what to do and how to transport it
7    and which sharks to put it in, correct?
8    A.  I mean, as far as the specific sharks, I mean, no, not
9    that I can recall.  Not that I know of.  Yeah.
10   Q.  So you can't tell Her Honor he had a leadership role in
11   the shark carcasses' shipments with any degree of confidence
12   other than the caveat you just made regarding an investor?
13   A.  From what I can recall from some of the notes that I
14   have read or reports that I have read, the Cuinis, as a
15   whole, were involved in the load and played a role in
16   organizing and orchestrating that role or that load.
17   Q.  All right.  Importantly, in any of your proffer sessions
18   or in any memory here today, did anybody say Gerardo
19   Gonzalez Valencia played a role other than a strict
20   investor?  Because I haven't seen it.
21   A.  I am trying to remember.
22   Q.  Take your time.
23   A.  I remember -- I remember him being involved in the load
24   from the reports that I can recall right now and, like I
25   said, that the Cuinis were involved in planning that load.
```

1    Q.  Okay.  Again, I am going to say it because it's

2    important here.  Irrespective of Cuinis, has anybody said

3    Gerardo Gonzalez Valencia specifically played any role in

4    the transportation of these shark carcasses other than being

5    an investor?

6    A.  That I recall, like I said, he was an investor in the

7    load and the Cuinis, as a whole, tried -- orchestrated or

8    were involved in the planning of it.

9            MR. BEST:  Court's indulgence.  Can we take a

10    five-minute break?

11            THE COURT:  Yes.  We can take a five-minute break.

12            MR. BEST:  Thank you, Your Honor.

13            (Whereupon, a recess was taken.)

14            THE COURT:  Mr. Best?

15    BY MR. BEST:

16    Q.  Do you remember being the special agent -- and the one,

17    I assume, that took notes of a proffer session with Oscar

18    Nava Valencia -- on December 3rd, 2021, in North Carolina?

19    A.  Yes.  I mean, I have been involved in several proffers

20    with him.  I can't remember the exact dates.  It's possible,

21    yes.

22            MR. BEST:  Okay.  If I can publish Government's

23    3500-ONV-44.

24    BY MR. BEST:

25    Q.  See if this refreshes your recollection.

1    MS. SAHNI:  Your Honor, we would ask that the

2    proffer notes not be published --

3    THE COURT:  Right.  We will just use the paper

4    copies.

5    MR. BEST:  May I approach?

6    THE COURT:  You may.

7    BY MR. BEST:

8    Q.  Does this refresh your recollection?

9    A.  Yes.  I mean, I was present, yes.

10   Q.  Were you the note-taker that day?  Do you recall?

11   A.  No.  I don't think I was the note-taker that day.

12   Q.  Did you have a chance to review a draft of the write-up

13   before it went from handwritten notes to typed notes?

14   A.  Yes.

15   Q.  Okay.  And if there were any concerns or issues needing

16   clarity -- if there was any dispute as to what your

17   recollection was, you would have had that discussion before

18   it was reduced to a final typed copy?

19   A.  At that time?

20   Q.  At that time.

21   A.  Yes.

22   MR. BEST:  Okay.

23   THE COURT:  Agent Novick, usually -- when you are

24   the agent participating in the proffer session, are you

25   usually the person who takes notes?

1          THE WITNESS:  It just depends on who is there.

2    Sometimes it will be the agent.  Other times, in this

3    instance, it looks like Intel Analyst Diana Wu was there,

4    and I believe she took the notes.

5          THE COURT:  I see.

6          THE WITNESS:  It will be either the analyst or the

7    agent, Your Honor.

8          THE COURT:  And Intel Analyst Diana Wu, is that

9    person a DEA analyst?

10         THE WITNESS:  Yes, Your Honor.

11         THE COURT:  I see.  Thank you.

12    BY MR. BEST:

13    Q.  So I want to turn your attention to the first page, and

14    midway down.  Do you see where the typed notes say -- strike

15    that -- second page.  I apologize.

16         Down to the bottom of the page, second to last

17    paragraph.  Do you see that there is a note of the

18    conversation with Oseguera Nava Valencia regarding the shark

19    carcasses?

20    A.  Yeah.  I see that portion of the notes.

21    Q.  Okay.  And if Mr. Oscar Nava Valencia said to Her Honor,

22    in the past day or two, that Mr. Gerardo Gonzalez Valencia

23    invested in all loads regarding the shark carcasses, that

24    would be inconsistent with your recollection of the events

25    that were described to you and the rest of your team on

1    December 3rd, 2021, correct?

2    A.  I mean --

3    Q.  It's not a trick question.

4    A.  What was the question again?

5    Q.  If he said that Mr. Gonzalez Valencia, Gerardo Gonzalez

6    Valencia, investigated in all of the loads involving shark

7    carcasses during this period of time, that would be

8    inconsistent with his statement to you in 2021, correct?

9    A.  Well, it's -- what is here in the notes is a summation

10   used for documenting what was discussed at that meeting, not

11   necessarily his words verbatim.  So, I mean --

12   Q.  Come on, sir.  Look at the sentence that's written that

13   you had an opportunity to review and correct where it says:

14   Nava Valencia stated that Flaco, which is -- purported to be

15   Mr. Gonzalez Valencia here -- would sometimes invest in

16   loads, and sometimes he would not.

17        Do you see that?

18   A.  Yes.  I see that there.

19   Q.  And that is inconsistent with a statement that may have

20   been made that said he invested in all loads, correct?

21   A.  Like I said, I wasn't here for his testimony.

22   Q.  I am just asking you to assume that that statement was

23   made.  If it was made, it would be inconsistent with what

24   was told to you in December 2021, correct?

25   A.  I mean, I guess that I would say that the notes are a

1    tool that we use to help document what was talked about and

2    to refresh -- keep track of topics discussed.  But, at the

3    end of the day, it's what the person we're interviewing --

4    it's their testimony that -- they lived it, as opposed to us

5    transcribing through an interpreter after asking a lot of

6    questions about what is going on.

7    Q.  We have one of two choices based on your answer.  We

8    have a choice as to believing an admitted killer and narco

9    trafficker that he's told you that consistently and that

10   these notes are worthless, completely worthless, or --

11            THE COURT:  Mr. Best, you are making argument.  I

12   am giving you an opportunity to do supplemental briefing;

13   save your arguments for that.

14            MR. BEST:  Okay.

15            THE COURT:  I don't know what you are talking

16   about, quite frankly, in terms of this; maybe the agent

17   does.  It makes pretty clear Nava Valencia said that Flaco

18   was an investor in these loads but eventually this route was

19   lost.  I am presuming that this load means the shark

20   carcasses --

21            MR. BEST:  Would sometimes invest.

22            THE COURT:  Then he goes on to the last part of

23   the sentence saying:  Sometimes he would invest in loads and

24   sometimes he wouldn't.

25            MR. BEST:  Which is --

1    THE COURT:  Which is not necessarily referring to

2    the shark carcasses.  It might be other loads that Nava

3    Valencia was investing in, sometimes he invested in them

4    with Flaco, sometimes he didn't.  So, really, I don't want

5    to spend another 15 minutes on a point that makes no sense

6    based on what I am reading.  You can make whatever arguments

7    you want.  You can make your arguments:  It's all in the

8    same paragraph so he must have been talking about the shark

9    loads -- that's a stretch, I am telling you right now.  But

10   make whatever arguments you want.  Let's move on.

11   BY MR. BEST:

12   Q.  In anywhere where --

13        THE COURT:  If you have a jury trial in front of

14   me, you will realize I am not able to say all of this.  But

15   I think, at a sentencing hearing, this is really -- you

16   should just move on.

17   BY MR. BEST:

18   Q.  In anywhere where he's speaking about the shark

19   carcasses does he say that Mr. Gonzalez Valencia is an

20   organizer, leader, or manager of any of the events regarding

21   the shark carcasses?

22   A.  No.  He says he was an investor, but -- like I

23   previously stated that...

24   Q.  In any part of this proffer session regarding the shark

25   carcasses, did Mr. Oscar Nava Valencia say where the

1    ultimate destination of the cocaine was to go?

2           MS. SAHNI:  Your Honor, these notes are already in

3    evidence.

4           THE COURT:  Well, he can ask his question about

5    what is in the notes; he was there.  Maybe he also remembers

6    if anything was said about it at the proffer session itself.

7           THE WITNESS:  In that one paragraph where -- on

8    page 2, at the bottom -- second paragraph on the bottom

9    where they are talking about the shark load there, I don't

10   see anything that refers to a final destination.  But also

11   from my training and experience I know, typically, if

12   they're shipped to Mexico, the next logical place they would

13   go would be the United States.

14   Q.  In fact, you have testified -- let's hit that point

15   right now.  You have testified in the grand jury it's super

16   rare for drugs to be shipped, particularly cocaine, to be

17   shipped from Mexico to Europe, correct?

18   A.  It is -- yes.  For -- if drugs are shipped from South

19   America to Mexico, the next logical place for them to go

20   would be to the United States.

21   Q.  Right.  And you have testified to that in a grand jury,

22   correct?

23   A.  I believe so.  I mean, it depends on --

24   Q.  But in this case your investigation revealed that

25   Mr. Gerardo Gonzalez Valencia shipped numerous loads to

USCA Case #23-3126    Document #2057130    Filed: 05/30/2024    Page 75 of 273

1    Europe, correct?

2    A.  I am aware that he did ship loads to Europe, yes.

3    Q.  Do you have any reason to doubt that there were

4    significant shipments of cocaine from Mexico to Europe and

5    that Mr. Gonzalez Valencia was involved based upon what you

6    have heard in this investigation?

7    A.  That shipments went from Mexico to Europe of cocaine?

8    Q.  Yes.  Yes.

9    A.  I mean, I am not aware of any that went -- that I can

10    recall -- from Mexico to Europe directly.

11    Q.  You don't recall Oscar Nava Valencia saying that

12    15,000 -- of 15,000 kilos, a substantial -- that were either

13    sold or given to Gerardo Gonzalez Valencia at least 10,000

14    kilos were shipped to Europe?

15    A.  I mean, is there -- are you referring to something in

16    the notes here or --

17    Q.  No.  You have been part of this investigation for six

18    years.  Do you recall Oscar Nava Valencia ever saying that

19    he and Gerardo Gonzalez Valencia shipped numerous kilos on

20    numerous times from Mexico to Europe?

21    A.  I remember them talking about shipments to Europe, but I

22    can't recall where they stopped in between, not without

23    something to refresh my memory.  I have had a lot of

24    conversations with proffers, interviews with him, if there

25    is a specific one...

```
 1   Q.  In your -- you reviewed all of your notes before
 2   testifying, right?
 3   A.  Yes.
 4   Q.  And you reviewed proffer statements by Oscar Nava
 5   Valencia, correct?
 6   A.  Yes.  It would be a lot of material, yes, sir.
 7           MR. BEST:  I am going to try to speed it up.
 8   BY MR. BEST:
 9   Q.  I am going to show you what's already in evidence as
10   Government's Exhibit 3500-ONV-62.
11           MR. BEST:  May I approach?
12           THE COURT:  Yes, you may.
13   BY MR. BEST:
14   Q.  Do you see towards the bottom of the first page where
15   the proffer notes of Oscar Nava Valencia says that of 15,000
16   kilos that Mr. Nava Valencia and Mr. Gerardo Valencia
17   shipped, 10,000 of those kilos went to Europe and only 5,000
18   of the kilos went to the United States?
19   A.  Yes.  I see that towards the bottom of the paragraph.
20   Q.  Okay.  Do you have any reason to dispute that?  Do you
21   have any reason to dispute that last sentence?
22   A.  That statement -- based off -- I wasn't involved in this
23   proffer.  But based on the fact that it's there, not that I
24   am aware of, no.
25           MR. BEST:  May I approach?
```

```
 1                    THE COURT:  Yes.

 2                    MR. BEST:  Thank you very much.

 3       BY MR. BEST:

 4       Q.  Do you know what the price per kilo wholesale in Europe

 5       was in or around 2013 for cocaine?

 6       A.  Per kilo in Europe in 2013, it depends on where it's

 7       going, but I would say --

 8       Q.  Higher than the U.S.?

 9       A.  Yes, sir, it is.

10       Q.  Thirty-five, $40,000 sound about right?

11       A.  Yeah.  2013?  Europe, I would say 35 to high 40s, yes,

12       sir.

13                    MR. BEST:  Okay.  I am going to speed this up as

14       much as possible, Your Honor.

15                    Do you remember talking in your direct examination

16       about the Blackberry messages where there was a number of 26

17       cited in the Blackberry texts?

18       A.  Yes.  I remember that.

19       Q.  It didn't say what denomination currency, correct?

20       A.  Specifically in that BBM message it did not, no.

21       Q.  Okay.  Do you know what the currency exchange rate was

22       between a euro and a dollar in 2013?

23       A.  No.

24       Q.  Would you assume, for the purposes of this testimony, it

25       was almost 1.4 dollars to the euro?
```

1          MS. SAHNI:  Objection, Your Honor.  The witness

2     says he doesn't have a basis of knowledge for this.

3          MR. BEST:  And I said:  For the purposes of this

4     exercise, would you assume that the conversion price was

5     approximately 1.4 dollars per euro?

6          THE COURT:  The objection is overruled, so the

7     record is clean.

8     BY MR. BEST:

9     Q.  Would you assume for that -- so if you multiply 26,000

10    times the assumed exchange rate of 1.3 or 1.38 -- let me get

11    my --

12         MR. BEST:  May I approach the witness, Your Honor?

13         THE COURT:  Yes, or you could just do the math

14    yourself.

15    BY MR. BEST:

16    Q.  I will make it easy.  If you take 26,000 and times it by

17    1.35 -- I don't care -- I will be conservative, 1.35 as

18    opposed to 1.38 -- do you see the number is 35,100?

19    A.  Yeah.  But, I mean, do you have anything that shows that

20    that was the conversion rate at that time?

21    Q.  So I am just -- you are assuming that the 26 -- when you

22    testified in your direct, you assumed that the whole

23    conversation was about U.S. dollars, correct?

24    A.  Based off the totality of the investigation?

25    Q.  Yes.

```
 1    A.  Yes, I believed it to be U.S. dollars.

 2    Q.  You have no particular -- there was nothing in the text

 3    that said U.S. dollars, correct?

 4    A.  In that specific BBM intercept, right where it says 26,

 5    no, from what -- no, it does not say U.S. dollars.

 6    Q.  In any of the BBMs talking about this transaction, did

 7    it say it was going to be in U.S. dollars?

 8    A.  Like I said, from the totality of the circumstances, I

 9    do not -- when I am -- when we're conducting our

10    investigation, we don't just look at one specific intercept,

11    we're looking at the totality of the circumstances over

12    time.  And based off the investigation, that cocaine was

13    going to the United States.

14    Q.  That wasn't my question.

15         My question was:  In any of those exchanges did it

16    say the denomination of the currency?

17    A.  In those specific BBM conversations --

18    Q.  Yes.

19    A.  -- that I talked about?

20         Not that I can recall, no.

21    Q.  Okay.  And you have already agreed that you have no

22    reason to dispute that Mr. Gonzalez Valencia was shipping

23    mass quantities of cocaine during certain periods of time to

24    Europe, right?

25    A.  Correct.
```

 1    Q.  Okay.  You would agree that if you take 26 and times --

 2    26 times the assumed exchange rate, it gets pretty close or

 3    exactly what the wholesale price of cocaine in Europe was

 4    per kilo, correct?

 5    A.  I mean, do you have something that can show me the exact

 6    conversion at that time?

 7    Q.  I do, actually.  Defendant's 56.

 8              MR. BEST:  May I approach, Your Honor?

 9              THE COURT:  Yes.  But do you really think it makes

10    a difference --

11              MR. BEST:  No.  Well, he wanted to see it.

12              THE COURT:  -- in terms of counting up the number

13    of kilos for what is at issue at this sentencing hearing,

14    which is the amount of drug quantity and whether it's under

15    450 kilograms involved in the conspiracy or above, and

16    whether it's a 36 or a 38?

17              MR. BEST:  To that, no.

18              THE COURT:  Do you think that the amount that may

19    have been shipped to Europe is going to make such a big dent

20    given the testimony that it's going to bring the quantity

21    below 450 kilograms?  Is that what the whole point of this

22    is?

23              MR. BEST:  The whole point --

24              THE COURT:  Why is it, as a legal matter, I can't

25    count any amount of cocaine involved in the conspiracy,

1    whether it was going to Europe or to the United States, when

2    a chunk of the conspiracy of the cocaine was going to the

3    United States?

4          I mean, I am just saying.

5          Really, we're going to get involved in euro

6    conversions in 2013?  I am not sure, as a legal matter, it's

7    going to make that much of a significant dent in the simple

8    legal query before me, which is:  Was the amount of cocaine

9    involved in this conspiracy below 450 kilograms to put him

10   at a drug quantity table offense level of 36 or was it over

11   450 kilograms, which puts him at a drug quantity level of --

12   offense level of 38?

13         Do you see what I mean?

14         MR. BEST:  I do, Your Honor; and I totally get it.

15         THE COURT:  I mean, I have given you a lot of

16   leeway to go into euros and conversions, and these questions

17   about the BBM.  But, in the end, I am not sure how much

18   longer we need to dwell on this as a legal matter in terms

19   of trying to isolate how much of it went to Europe.

20         MR. BEST:  I totally understand.

21         It's important from an equitable standpoint

22   because the defendant's position is he had nothing to do

23   with narco trafficking in the United States past 2010, and

24   he moved to Argentina; and I am just starting to poke holes.

25         I was going to get into the fact that it's not

```
 1    even him on the Blackberry messages.  But if you tell me, as
 2    a legal matter, it doesn't matter from the calculation --
 3                THE COURT:  I am raising the question.
 4                MR. BEST:  Yes.  I will move on to identity.  I
 5    think I have made my point.
 6    BY MR. BEST:
 7    Q.  Sir, you testified that before trying to identify that
 8    the person on the text exchange was Mr. Gonzalez Valencia --
 9    you testified that there were some important -- specific
10    texts that you analyzed to determine it was, in fact,
11    Mr. Gonzalez Valencia as Silverio on the BBM exchange,
12    correct?
13    A.  Yes.
14    Q.  One of them was the text between somebody on the
15    exchange saying:  Boss, and somebody on the exchange --
16    excuse me -- named Boss and somebody named Silverio saying:
17    My father is in the hospital.
18                Do you remember that?
19    A.  Yes.  I recall that conversation.
20                MR. BEST:  Indulgence, one second, Your Honor,
21    while I get to it.  I believe it's Government Exhibit 11.
22    BY MR. BEST:
23    Q.  Okay.  Do you see Government's Exhibit 11, tab 3?
24    A.  Is that page 3?  I have it --
25                THE COURT:  Line 3.
```

JA1055

```
 1                MR. BEST:  No, line 3.
 2                THE WITNESS:  Line 3.  Yes.  I see it.
 3     BY MR. BEST:
 4     Q.  Okay.  Again, for Her Honor's benefit, you are alleging
 5     that "Boss" is Abigael Gonzalez Valencia?
 6     A.  Yes.
 7     Q.  The brother of Gerardo Gonzalez Valencia, correct?
 8     A.  Yes.
 9     Q.  And you are alleging that Silverio is Gerardo Gonzalez
10     Valencia, right?
11     A.  Yes.
12     Q.  Okay.  Do you see the exchange which translated
13     specifically says:  My dad is having a stroke, like mine?
14     A.  Yes.  I see that.
15     Q.  Do you see that -- do you think it's odd that one
16     brother is telling another that "his" dad versus the use of
17     a pronoun "our" dad is having a stroke?
18                Do you think that's odd?
19     A.  Not really, no.
20     Q.  But it does say "my" as a pronoun, right?
21     A.  Right.  It says "my" there; but I don't think that's
22     necessarily odd.
23     Q.  That's Abigael telling his brother that:  My dad is
24     having a stroke, right?
25     A.  Yes.  And I have heard other family members, you know,
```

80

1    relatives in the U.S., when they're talking with their

2    family, they say "my dad" when they are saying that to their

3    brother as well.  I don't think that is --

4    Q.  Okay.  To you, correct?

5    A.  To me, and how I interpret --

6    Q.  It's not unusual?

7    A.  That box says -- read like that, it does not.

8    Q.  But that's your personal opinion?

9    A.  That's from me having heard other people refer to --

10   they're talking to their sibling and refer to the same

11   parent as "my dad" when they're talking to their sibling.

12          Also, it could also -- it's also coded language.

13   If law enforcement was listening in and, you know, they

14   didn't want to let on, in fact, that they were brothers,

15   that's another way that they could say, hey -- try and throw

16   off law enforcement to make them think that they weren't

17   related.

18   Q.  If we were brothers and our father was having a stroke,

19   and you called me, would you say:  My dad is having a

20   stroke?

21   A.  I mean, I don't know what I would tell you.  Like I

22   said, I have heard other people that I know refer -- talking

23   to their siblings say:  My parents, my dad, my mom -- when

24   it's the same mother or father for the sibling.

25   Q.  Next point.

JA1057

1          Do you remember saying "E.U." is Uruguay?

2    A.  I do, yes.

3    Q.  Have you done a search online as to whether or not

4    "E.U." is identified as Uruguay in any way, shape, or form

5    in the world?

6    A.  Have I done a search specifically for that?

7    Q.  Yes.

8    A.  No.

9    Q.  "E.U." does stand for European Union, one, correct?

10   A.  Correct.

11   Q.  And "E.U.," in Spanish, stands for "États-Unis," [sic]

12   correct?

13   A.  I'm sorry?

14   Q.  What is the Spanish translation -- in Spanish, "E.U."

15   stands for the United States, correct?

16   A.  Yes.  Los Estados Unidos.

17   Q.  That was my, unfortunately, my old French coming out,

18   bad French, at that.

19          "E.U." does stand for the United States, correct?

20   A.  Yes, in Spanish.

21   Q.  But you pointed to that as being one of the points --

22   important points for identifying Mr. Gonzalez Valencia that,

23   in fact, E.U. is Uruguay.

24          At any point, if you find any reference -- and I

25   ask you:  If you truly do find any reference online that

1    "E.U." does stand for Uruguay, I'd ask you to bring it to

2    the Court's attention.  Okay?

3    A.  Okay.

4    Q.  Do you remember a photograph -- you got photographs off

5    these Blackberrys, correct?

6    A.  Yes.  There were photographs that were intercepted.

7    Q.  And Gerardo Gonzalez Valencia wasn't the only Mexican on

8    the hunting trip to Africa, correct?

9    A.  I mean, I -- I don't know.  I believe his wife went with

10   him, but I can't say for sure, off the top of my head.

11   Q.  How about a Mr. Molina?

12   A.  That I am unaware of.

13   Q.  Let me show you what's marked as Defendant's 30.

14          MR. BEST:  May I approach, Your Honor?

15          THE COURT:  Yes, you may.

16   BY MR. BEST:

17   Q.  Do you see the photograph marked as Defendant's 30?

18   A.  Yes, I do.

19   Q.  Do you recognize that as the one photograph that was

20   taken off the Blackberry machine that -- pursuant to the

21   search warrant that refers to "Silverio," correct?

22   A.  Yes.  I believe it is, yes.

23   Q.  Is that Gerardo Gonzalez Valencia in the picture?

24   A.  Not that I can tell, no.

25   Q.  Okay.  Do you know who Mr. Molina is?

83

```
1    A.  No, I do not.
2              MR. BEST:  I am going to offer that in as
3    Defendant's 30, I believe.
4    BY MR. BEST:
5    Q.  Do you know, sir, that when you go hunting and you get
6    all of the hunting licenses that under -- do you know that
7    under Botswana or African law that, once you secure a
8    license in one person's name, you may be able to hunt for
9    the party with that?
10   A.  I am unaware of that.  I don't know.
11   Q.  You don't know the rules one way or the other?
12   A.  Regarding hunting in Africa, no.  Other than that --
13   yeah.
14   Q.  Do you have any reason to doubt that the person in that
15   picture was on that same hunting trip?
16   A.  I mean, do you have a time stamp from when that picture
17   was taken or sent?
18   Q.  It's the government's evidence, I only have what you-all
19   have.
20   A.  I don't remember the time stamp for that picture so I
21   can't say with certainty.
22             MR. BEST:  Okay.  Court's indulgence.
23             I am going to move on from the Blackberry
24   messaging.
25   BY MR. BEST:
```

JA1060

1    Q.  During the course of your review, did you hear about a

2    murder or a supposed murder of a family in Michoacan -- and

3    I just tortured the pronunciation, it's probably so much

4    that you don't even understand --

5    A.  No, I didn't understand that, sir.

6              MR. BEST:  Hold on one second.

7              THE COURT:  I am sure Ms. Sanchez can give you a

8    lesson in how to pronounce it.

9              MS. SANCHEZ:  Michoacan.

10             MR. BEST:  I am going to -- I am sure I will be

11   sent to sensitivity training, too, after this.

12   BY MR. BEST:

13   Q.  M-I-C-H-O-A-C-A-N.

14   A.  Okay.

15   Q.  In the course of your investigation, did you hear about

16   a supposed killing of a Michoacan family in the 2007 to 2009

17   time frame?

18   A.  I mean, I have heard of a -- I have debriefed people on

19   a lot of different killings that have happened.  I can't --

20   I mean, is there a specific one?

21   Q.  You know, it's interesting.  There may be, but nobody

22   has any information about a specific one other than a family

23   being murdered.

24             MS. SAHNI:  Your Honor, Mr. Best is offering facts

25   into the record.  It's not a question.

```
1              THE COURT:  Well, we have heard a lot about the
2    murder of a family in this area of Mexico.  But --
3    BY MR. BEST:
4    Q.  Did the DEA do any independent investigation of a
5    possible killing of a Michoacan family on a farm between
6    2007 and 2009 involving Mr. Gonzalez Valencia or him having
7    any role in it?
8    A.  Not that I am aware of or that I can recall; but,
9    obviously, there are a lot of murders that take place in
10   Mexico, unfortunately.
11   Q.  In the preparation of today's -- and the past couple
12   days' hearing, and even before when you were investigating
13   it -- did anybody tell you or any of your colleagues to
14   investigate whether or not claims of a killing of a
15   Michoacan family on a farm in 2007 or 2009 have any factual
16   validity?
17   A.  I mean, short of -- like I said, not that I am aware of.
18   Other agents or other people that have worked with might,
19   but I am not aware of that right now.
20   Q.  But you were the agent that was chosen to absorb
21   everybody's collective knowledge and testify about events
22   for this hearing, correct?
23   A.  Yes, sir.
24              MR. BEST:  All right.  I don't have anything
25   further.
```

1          Thank you.

2              THE COURT:  Any redirect?

3              MS. SAHNI:  Yes, Your Honor.

4              MR. BEST:  Thank you for your indulgence, sir.

5                      CROSS-EXAMINATION

6    BY MS. SAHNI:

7    Q.  Special Agent Novick, in the Blackberry messages that

8    were intercepted, did Abigael refer to other relatives as

9    "my brother-in-law" or "my aunt" when speaking to his other

10   siblings?

11   A.  I believe so, but I can't remember off the top of my

12   head.

13   Q.  Can we please look at Government Exhibit 21?

14   A.  Okay.

15   Q.  What is this exhibit?

16   A.  This is a BBM intercept between Abigael and another

17   Gonzalez Valencia, Jose, on June 18th of 2013.

18   Q.  Are Abigael and Jose Gonzalez Valencia brothers?

19   A.  They are, yes.

20   Q.  And on line 4, does Abigael refer to "my aunt" when

21   speaking to his brother?

22   A.  Yes.  He says "with my aunt," that was told to take care

23   of Mingo.

24   Q.  And in line 8, does Abigael also refer to "my

25   brother-in-law" when speaking to his brother?

JA1063

1    A.  Yes, he does.

2    Q.  Mr. Best asked you about the photo of Molina that was

3    seized from the defendant's device, correct?

4    A.  That was seized -- yes.

5    Q.  Were other photos of Molina seized from many of the

6    devices that were intercepted?

7    A.  To my knowledge, yes.

8    Q.  You talked about the Blackberry messages where the

9    defendant's father was in the hospital, correct?

10   A.  Yes.

11   Q.  Can we please pull up Government's Exhibit 12, and look

12   at line 23.

13           THE COURT:  When you refer to seized devices, do

14   you mean devices that were seized in Uruguay at the time of

15   this defendant's arrest?

16           MS. SAHNI:  Clarification, Your Honor.

17           THE COURT:  What are we talking about here?

18           MS. SAHNI:  Intercepted devices on the Blackberry

19   messenger wiretap investigation.

20           THE COURT:  Okay.  So I thought you asked:  Were

21   many photos of Mr. Molina seized on other -- many photos of

22   Mr. Molina also recovered from other seized devices, but

23   that's not what you said?

24           MS. SAHNI:  That's not what I intended to say, if

25   it was.

JA1064

88

1    THE COURT:  Okay.  So, Agent, was this, Defense

2    Exhibit 30, which purports to be a picture of Mr. Molina,

3    have you seen pictures of Mr. Molina in connection with

4    other devices seized from the defendant in connection with

5    this arrest or through intercepted communications?

6    THE WITNESS:  Through the intercepted

7    communications I have seen a couple of pictures that were

8    labeled A. Molina or of A. Molina.

9    THE COURT:  Okay.

10   BY MS. SAHNI:

11   Q.  In looking at Government's Exhibit 12, line 23 --

12   A.  12.

13   Q.  -- could you please read that message from Boss?

14   A.  Yes.  Line 23 says:  Lalo is on his way to the emergency

15   room, have her take him to San Javier.

16   Q.  Could we please flip to Government's Exhibit 11.

17   What is this exhibit?

18   A.  11 is an intercepted communication between Abigael and

19   the defendant on -- that starts on Thursday, June 27, 2013.

20   Q.  Did this communication -- series of communications occur

21   around the same time as the communications in Government's

22   Exhibit 12?

23   A.  Yes.  They were around the same time.  Same date and

24   time frame.

25   Q.  And could we please look at line 14.

JA1065

```
 1              Could you please read that line from the Silverio?
 2   A.  He says:  Yes, I am on my way.
 3   Q.  What is this conversation about?
 4   A.  This was in regards to their father having a stroke and
 5   having to be taken to the hospital.
 6   Q.  Can we look at line 17.
 7              What does that message state?
 8   A.  It says:  Yes, I am on my way.
 9   Q.  If we could please look at page 4 of this exhibit,
10   lines 29 to 30.
11              Are there references to Edith and Erika in these
12   lines?
13   A.  Yes.
14   Q.  Does the defendant have sisters named Edith and Erika?
15   A.  Yes.
16              MS. SAHNI:  May I have one moment to confer with
17   counsel?
18              THE COURT:  Yes.
19              MS. SAHNI:  No further questions, Your Honor.
20              THE COURT:  Agent Novick, you are excused.
21              Does the government have any further witnesses?
22              MS. SAHNI:  No, Your Honor.
23              THE COURT:  All right.  And does the defense have
24   another witness?
25              MR. BEST:  Yes, Your Honor.  One witness.
```

```
1              THE COURT:  Okay.  Thank you.

2              (JOSEPH K. SMITH, Defense witness, sworn.)

3              THE COURT:  Good afternoon.

4              THE WITNESS:  Good afternoon, ma'am.

5              THE COURT:  What is your name?

6              THE WITNESS:  My name is Joseph Kenneth Smith.

7              THE COURT:  Joseph --

8              THE WITNESS:  Kenneth Smith.

9                          DIRECT EXAMINATION

10    BY MR. BEST:

11    Q.  Sir, thank you for being here.

12              Can you tell Her Honor a little bit about your

13    work experience?

14              THE COURT:  I am going to interrupt you for just a

15    moment.

16              Are you fully vaccinated?

17              THE WITNESS:  Yes, ma'am, I am.

18              THE COURT:  Are you feeling good today?

19              THE WITNESS:  I feel well.  I have been coughing,

20    but I will take it off.  If I start coughing again, may I

21    have your permission to put it back on again?

22              THE COURT:  Absolutely.

23              MR. BEST:  Thank you.

24    BY MR. BEST:

25    Q.  Starting around early 2000 time frame, can you tell Her
```

JA1067

1    Honor a bit -- and then going forward to present -- about

2    your work experience that's relevant here today?

3    A.  Excuse me.  Starting what time frame again, sir, you

4    said?

5    Q.  2002.

6    A.  2002.  Yes, sir.

7            I am a retired military intelligence officer by

8    trade.  I spent 28 and a half years on active duty.  I have

9    spent tours in the Middle East; I have spent tours in

10   Europe; and twice in Central America and South America,

11   specifically, in El Salvador, with a focus as an advisor to

12   an infantry battalion with focus on antiterrorism and

13   counterinsurgency.

14           In 2002 and 2003, I was in -- assigned to Colombia

15   as a senior intelligence officer at the United States Mill

16   Group [sic], as a liaison officer to all of the Colombian

17   military intelligence entities.  I also worked with all of

18   the intelligence agencies assigned to the embassy of the

19   U.S. country team in Colombia.  Our focus at that point was

20   primarily counterinsurgency and counter-narco-terrorism.

21   Q.  Okay.  Past that period of time, have you worked for

22   various intelligence agencies in the United States -- worked

23   with various intelligence agencies in the United States?

24   A.  Yes, sir.  Until my retirement in 2015, I worked with --

25   from the 2002 time frame, I have worked at U.S. Central

1    Command, with all -- has a responsibility for everything in

2    the Middle East.

3            I have been assigned to the Department of the

4    Army, so my perspective at that point was global.  I had --

5    one of the positions I had was as a Director of Army Foreign

6    Liaison.  I served as a liaison officer for all of the

7    foreign military attachés assigned to the United States.  At

8    that time, it was about 110 countries.  I am their liaison,

9    their entrypoint, if you would, to the army staff,

10   Department of the Army staff, and to the Army Secretariat.

11   Q.  Do you have a security clearance -- or did you have a

12   security clearance?

13   A.  Yes, sir.  From the time -- in 1987, when I was first

14   commissioned as a military intelligence officer, until I

15   retired in 2015, I had a top secret clearance with an SCI,

16   Secret Compartmental Information clearance.

17   Q.  Did you work for a period of time at the National

18   Security Agency?

19   A.  Yes, sir.  I spent two tours at the National Security

20   Agency.

21   Q.  Okay.  Obviously, I don't want -- and I am sure you are

22   not going to tell me -- any classified information.

23   A.  That is not going to happen, sir.

24   Q.  In your periods of work commands and duties, did you

25   have a chance to work -- did your work occasion you to have

93

1    to analyze and investigate narco trafficking into Mexico?

2    A.  Yes, sir.

3         Primarily from my time down in Colombia and

4    coordinating with the Colombia security forces, and also

5    with the U.S. agencies.  We looked at not only reports, but

6    multiple operations ongoing between -- as drugs flowed

7    forward from Colombia at that time, 2002 to 2003, a lot of

8    the emphasis was on -- moving away from the Cali and

9    Medellin cartels, if you would, that had already started to

10   fall apart, and the FARC, and the AUC -- the Autodefensas,

11   as they call them in Spanish -- they primarily became the

12   drug cartels.  And since then -- since then, those

13   cartels -- well, the FARC has quote-unquote become a

14   political party; they have disbanded after a 50, 60-year

15   civil war, and the AUC are no longer fully operational in

16   Colombia.

17   Q.  When you were an intelligence officer, can you tell Her

18   Honor a little bit about your duties and responsibilities

19   and what you did?

20   A.  Is there --

21   Q.  Did you analyze data?

22        Did you investigate and gather data?

23        Did you analyze data, or did you do both?

24   A.  Depending on where it was, I had to do both, sir.

25   Especially as a junior officer, you are actually

JA1070

1    conducting -- I wouldn't say "investigations," per se, but

2    you are conducting an analysis.  You are looking at reports

3    that are coming in from the field, whoever that may be;

4    multiple sources of intelligence.  I try to stay away from

5    single-source intelligence, as that is an easy way to make

6    mistakes.

7              I try to look at multiple sources of intelligence,

8    whether it be human intelligence, signals intelligence,

9    tactical intelligence; anything you will potentially come

10   across.  You analyze or look at analysts' work that they

11   have performed, that they have put out, and looked to see if

12   there is alignments or misalignments along the way.

13   Q.  And we have had occasion to get to know each other for

14   many years, correct?

15   A.  Yes, sir, we have.

16   Q.  I have retained your former company to assist with

17   another investigation and representation, correct?

18   A.  Yes, sir, you did.

19   Q.  And then I asked you to assist with the Mr. Gonzalez

20   Valencia matter, correct --

21   A.  Yes, sir, that is correct.

22   Q.  -- Gerardo Gonzalez Valencia?

23              Specifically, did I ask anything of you that can

24   be considered an advocacy role?

25   A.  No, sir.  What you started me -- the very first thing

1    you told me -- when you called me and brought me in, you

2    said:  Here is the situation; I want to find out as much

3    information as possible using all of the sources available

4    to you, and come back to me.

5    Q.  Okay.  And was one of the tasks that I charged you with

6    to use all of your available sources to investigate the

7    supposed death or killings of a Michoacan family in around

8    2007 to 2009?

9    A.  Yes, sir.  You did.

10   Q.  All right.  Can you tell Her Honor the results of your

11   investigation?

12   A.  Yes, ma'am.  As well -- Your Honor, I apologize.

13             THE COURT:  That's all right.

14             THE WITNESS:  As part of the process, I reviewed

15   all of the 3500 material that was presented -- that was

16   presented.  I also noted in that material that there was a

17   specific town that was identified as where the killings

18   were; it's a place called Naranjo de Chila and Chila de San

19   Jose.  These are two small towns that are split by a river.

20   The 2020 census shows that Naranjo de Chila had about, I

21   think, 347, 387 people in the town; so these were very, very

22   small towns.

23             Looking specifically at -- I actually looked at

24   the time frame from 2000 to 2010 for any kind of killings,

25   disappearances, atrocities that would have happened during

1    that time frame.  I found nothing on any kind of social

2    media, any kind of open-source material that was available.

3         With my understanding of how the Mexican media and

4    how Mexican -- not only reporters, but also authors, how

5    they write specifically about the drug cartel activity and

6    the different details, drug trafficking organizations --

7    they are very, very detailed, and they always report.

8    Reporters are some of the most persecuted reporters in the

9    world.  They constantly face threats, yet they continue to

10   produce and write about these types of stories.

11        I did not see anything in any of the reporting

12   that was there specifically from that time frame that

13   reflected a family of any number of people being killed

14   and/or targeted by a drug trafficking organization.

15        THE COURT:  Is there a local newspaper in that

16   area?

17        THE WITNESS:  There is not, ma'am.

18        Michoacan, if you would, is the state.  Aguililla,

19   which you have heard, is the city, the municipality; and,

20   then, these two towns are actually a couple of hours away.

21   We're talking about small farming towns.  Like I said, one

22   of them has 340 people, the other one has even fewer.  And

23   the town, which is maybe 12 to 15 minutes away from there,

24   has less than 100.  So we're talking about very, very small

25   farming villages, ma'am.

1           I did -- I actually did look as well at the

2     municipalities' web page to look at, from their specific

3     perspective, what they were tracking from reports from that

4     era.

5     BY MR. BEST:

6     Q.   Was there anything of note?

7     A.   No, sir.  I did not see anything.

8     Q.   What is the region -- did a cartel control this region

9     of Mexico?

10    A.   Sir, that specific region is a very contested area.

11    There are multiple cartels -- and especially if you are

12    looking at media reports from today, there are multiple

13    cartels fighting for control of that region, and it's not --

14    there are just multiple cartels fighting for it.

15    Q.   Okay.  How would the information flow of a supposed

16    murder like this that work with the various cartels?

17    A.   It would definitely flow within the news; I mean, that's

18    one of the mechanisms that would definitely happen because

19    those reports get out.  Small communities like that, the

20    information is going to get out and it's going to flow

21    through media, some sort of media.

22           It possibly could also flow through

23    organizational -- organization to organization.  If there

24    are organizations that are combating against each other in

25    that zone.

98

1    Q.  Would you have expected to also see a retaliatory action

2    from a cartel that would -- or cartels that controlled that

3    region if they believed that they were wrong because of

4    this?

5    A.  Yes, sir.  There is always a possibility of that, of

6    that occurrence.

7    Q.  Did you see or hear of any retaliatory action for any

8    events in Michoacan involving the death of a family?

9    A.  No, sir.

10   Q.  Let me ask you if another one of the tasks that I gave

11   to you was to investigate whether or not there was factual

12   validity to the story that Gerardo Gonzalez Valencia left

13   his residency of Mexico and moved to Argentina and Uruguay

14   with his family?

15   A.  Yes, sir, you did.

16   Q.  As part of that investigation, did you speak to

17   Mr. Gerardo Gonzalez Valencia?

18   A.  Yes, sir, I did.

19   Q.  At length?

20   A.  Yes, sir.

21        I visited him on three separate occasions down at

22   the detention facility where he's currently being housed.

23   Our conversations were primarily in Spanish.  I lived in

24   Spain for 23 years, it's my first language; English is the

25   second.  It was easier for us to communicate in Spanish.

JA1075

1    And we spoke at length specifically about the time from his

2    departure in 2009 from Mexico to the time of his arrest in

3    2016 in Uruguay.

4    Q.  Did you also speak to his wife, Wendy Amaral?

5    A.  Yes, I did.  On multiple occasions.

6    Q.  In your conversations with Mr. Gonzalez Valencia, that

7    was with an attorney present as well, correct?

8    A.  Yes, sir.  It was.

9    Q.  Either me or Mr. Coll --

10    A.  Yes, sir.

11    Q.  What did you learn about the facts surrounding what was

12    happening in Mexico immediately prior to their exiting and

13    then their exiting of Mexico.

14         Let's go through the journey with Her Honor.

15    A.  Yes, ma'am.

16         At that time, the 2009 time frame, the cartels in

17    Mexico, there was an increase in violence.  There was a

18    destabilization, if you would, of the security situation.

19         Mr. Gonzalez Valencia has spoken to me and talked

20    about a trip to Argentina as early as 2006; saw Argentina as

21    a location that was geographically distant, it's about 5,000

22    miles between Buenos Aires to Guadalajara.  He wanted to

23    move himself and his family to a safe location.

24         At that time, Argentina was relatively stable

25    politically and economically.  From a cultural

1    perspective -- obviously, the Spanish language.  There is a

2    huge difference in accent, but it is still a

3    Spanish-speaking country so, culturally, they had those

4    ties.

5         And the primary reason for him wanting to leave,

6    in speaking to him and to his wife, was they wanted to leave

7    the narco trafficking business; they wanted to just distance

8    themselves completely from the business.

9    Q.  Were there threats and actual violence to their

10   immediate family?

11   A.  There were -- I don't know if there were direct threats

12   to the family.

13        I do know of some incidents where the family was

14   pursued -- members of the family were pursued while in

15   Mexico City before -- and I can't remember the exact date,

16   but I do know that they were pursued.  They did not know who

17   it was that was pursuing them inside of Mexico City.

18   Q.  How many children do they have together -- at the time,

19   in 2009?

20   A.  In 2009, they had two children.  And they --

21   Mr. Valencia moved in 2009 to Buenos Aires.  And I think --

22   I am pretty -- fairly sure that his family joined him in

23   early 2011, his wife and two kids.

24   Q.  Okay.  If I can show you on the screen what is

25   Defendant's 9, and see if you recognize this.

```
1    A.  Yes, sir.  I do.

2    Q.  Okay.  Is this part of the photographs -- well, strike

3    that.

4              What is this photograph?

5    A.  This is a photo of the inside of one of the convenience

6    stores that he established upon moving to Buenos Aires.

7    Q.  Okay.  Was this store in Buenos Aires?

8    A.  Yes, sir.  It is.

9              MR. BEST:  I move it in as Defendant's 9, please.

10             THE COURT:  It will be admitted.

11             (Defense Exhibit 9 admitted.)

12             MR. BEST:  I will show you what's marked as

13   Defendant's 10.

14             THE COURT:  These are photographs provided to you

15   by the defendant or his family?

16             THE WITNESS:  That's right.  Yes, ma'am.

17             MR. BEST:  Yes.

18   BY MR. BEST:

19   Q.  Do you recognize Defendant's 10?

20   A.  Yes, sir.  I do.

21   Q.  Okay.  As Her Honor said, did Ms. Amaral provide you

22   with these pictures -- or one of my team?

23   A.  Yes, sir.

24   Q.  Okay.  In speaking to Mr. Gonzalez Valencia and

25   Ms. Amaral, did they speak about this being the front of at
```

1    least one of their convenience stores?

2    A.  Yes, sir.  They did.

3            MR. BEST:  I am going to offer that in as

4    Defendant's 10.

5            THE COURT:  All right.  It can be admitted.

6            (Defense Exhibit 10 admitted.)

7            THE COURT:  Is this the front of the same store

8    reflected in Defense Exhibit 9?

9            THE WITNESS:  Yes, ma'am.

10           MR. BEST:  I am going to move it on, I promise.

11   BY MR. BEST:

12   Q.  How many stores did they open in Argentina?

13   A.  Sir, when they first moved, the intent was to open a

14   total of five stores.  They started with two stores.

15           Ma'am, just to put things in context a little bit,

16   these stores were an attempt to put a 24/7, 7-Eleven-type

17   convenience store in Buenos Aires.  Based on his visit in

18   2006, he did not see that type of store present in Buenos

19   Aires, and he wanted to look at that as a potential

20   business.

21           He went down -- they were able to open up two

22   stores.  They were in the process of opening a third store

23   when Argentina started having a financial and economic

24   problem.

25   Q.  Did they speak to you about their life outside of the

1   store in Buenos Aires with the kids?

2   A.  They did somewhat.  They lived -- so, first, Mr. Gerardo

3   Gonzalez Valencia moved down, like I said, in 2009,

4   established a store.  He had two acquaintances that helped

5   him run the Spanish stores; these were people who had

6   managed 7-Eleven stores elsewhere.

7         They helped him establish these stores.  He had an

8   apartment in Puerto Madero, which is a nice part of Buenos

9   Aires, but it's also an area that's patrolled a lot by

10   military.  So he had a one-bedroom -- I think, it was

11   one-bedroom, two-bath apartment that he resided in while he

12   was there.  And one of the reasons he moved there and they

13   specifically liked that area is because of the security it

14   provided.

15   Q.  Did there come a time that Argentinian economy

16   collapsed?

17   A.  Yes, sir.  Around the 2000 -- late 2011, 2012 time there

18   was some hyperinflation, as high as 300 percent at times;

19   and Mr. Valencia decided that it was a time to move their

20   family.  By this time, in Argentina, he's already enrolled

21   his kids in school.  They signed -- the older child --

22   correction.  They signed him up for school and already

23   involved him in extracurricular activities.

24         And they looked at -- when the situation in

25   Argentina started to decline, he looked at Uruguay and

1   Montevideo, and Punta del Este.  Punta del Este is a small

2   area on the outskirts of Montevideo.  Montevideo is the

3   capital of Uruguay; it is about, I believe, 200 miles

4   geographically away.  It was an opportunity for him to

5   remain geographically distant from the cartel activity,

6   still be in a Spanish-speaking environment culturally,

7   linguistically, and continue to be removed from the narco

8   trafficking business.

9   Q.  Where did they live in Uruguay?

10  A.  They lived in an area called Punta del Este.

11  Q.  Were the children enrolled in a school nearby their

12  house?

13  A.  Yes, sir.

14  Q.  Punta del Este is on the coast of Uruguay?  It's on the

15  beach?  It's a beach town?

16  A.  Yes.  It is close to -- you said Punta del Este?

17  Q.  Punta del Este is a beach town?

18  A.  Yes, it is.

19  Q.  Okay.  Did there come a time where I asked you to

20  investigate the -- I asked you questions about if there was

21  any significance of no electronic data on the various

22  machines seized at the time of the arrest of Mr. Gonzalez

23  Valencia, correct?

24  A.  Yes, sir, you did.

25  Q.  All right.  Do you have an opinion as to whether or not

105

1    that's significant?

2    A.  I do.  One, if Mr. Valencia were still involved in drug

3    trafficking, specifically with organizations within Mexico

4    or in Mexico, there would have to be some type of

5    communication trail present for him to be able to do that.

6    Geographically distant is just not going to -- it would be

7    very, very difficult.  Almost impossible.  So you would have

8    to have some kind of a digital footprint, as I would call

9    it.

10          From everything that I saw, whether it was a

11   review of the information -- I heard the comment earlier

12   that there was no information that was found on the devices

13   that were going to be used in this proceeding.  I thought

14   that would be -- I thought that was significant, that there

15   was just nothing specifically on those devices that they

16   found.

17   Q.  Okay.  Let me show you what is going to be marked --

18   what is marked as Defendant's 59.

19          MR. BEST:  I would ask that it be published.

20   Q.  Do you see the letter that's before you and Her Honor

21   dated April 12, 2022, directed to me and Ms. Sanchez?

22   A.  Yes, sir.  I do.

23   Q.  And was this letter one of the documents that you

24   reviewed as part of your investigation and review?

25   A.  I believe so, sir.  Yes, sir.

JA1082

```
 1              MR. BEST:  I am going to offer in Defendant's 59.
 2              THE COURT:  Thank you.
 3   BY MR. BEST:
 4   Q.  Do you see that this is Brady information given to us by
 5   the government pursuant to Brady versus Maryland, which
 6   purportedly could be exculpatory information?
 7   A.  Yes, sir.  I do see that.
 8   Q.  And do you see the subparagraph indented is the
 9   information that the government provided?
10              Did you review that information?
11   A.  Yes, sir, I did.
12   Q.  Was that information relevant to you in any way in your
13   review?
14   A.  If I can just take a minute to read it.
15   Q.  Sure.  Of course.
16   A.  Could you repeat the question, please, sir?
17   Q.  Did you review this in the course of your investigation?
18   A.  Yes, sir, I did.
19   Q.  Did this information -- did you find this information
20   relevant or important to you, in any way, in the course of
21   your investigation?
22   A.  Yes, sir, I did.
23   Q.  And what was that?
24   A.  In one of -- the primary piece on here identifying the
25   Cuinis' DTO -- sorry, drug trafficking organization -- made
```

JA1083

1     up of the Gonzalez Valencia siblings was the financial arm

2     of the CJNG, Cartel del Jalisco Nuevo Generacion, but was

3     not directly involved in the production, movement, or

4     distribution of drugs.

5              During my investigation, when I looked --

6     especially across all open-source activity, the Cuinis --

7     when they were labeled -- they weren't always labeled as a

8     "DTO."  But when they were labeled as a DTO they were

9     labeled as the financial arm of the CJNG and not as a direct

10    drug trafficking organization.

11             MR. BEST:  Okay.

12             THE COURT:  Do you know when the CJNG came into

13    existence?

14             THE WITNESS:  I believe it was around 2010, ma'am,

15    when the cartel Milenio split, and it formed La Resitencia,

16    and then the Cartel del Jalisco Nuevo Generacion came into

17    power.  I don't know if it was that specific year, but it

18    was around that time frame, I believe.

19             THE COURT:  And do you have information about what

20    Los Cuinis was doing before CJNG came into existence, and

21    this information about whether or not -- how they were using

22    Los Cuinis then, after CJNG came into existence, what its

23    role may have differed from its prior role?

24             THE WITNESS:  I do not, ma'am.

25    BY MR. BEST:

1    Q.  And, finally, did I ask you to review a series of

2    Blackberry exchanges that the government had provided?

3    A.  Yes, sir.  You did.

4    Q.  Before we get into those, in your years of being an

5    analyst, have you had an occasion to review coded messaging?

6    A.  Yes, sir.  I have.

7    Q.  How many times?

8    A.  Multiple times, sir, while stationed at certain

9    intelligence agencies and also while in Colombia.

10   Q.  Particularly with regard to narco trafficking, have you,

11   in the course of your vast years of experience being an

12   analyst, had occasion to review messages in code that

13   purportedly were narco trafficking messages?

14   A.  Yes, sir.  I have.

15   Q.  Did you review the Blackberry text messages from -- that

16   the government provided by and between a purported

17   "Silverio" and a purported "Boss" between June 26, 2013 and

18   September 2013?

19   A.  I believe I did, sir.

20           MR. BEST:  Okay.  Can we get government's -- is it

21   easier to publish it as the government's exhibit?

22           THE COURT:  Is it already in the government's

23   exhibit book?

24           MR. BEST:  It is, yeah.

25           THE COURT:  Why don't we just use that.  Those are

 1    already admitted, so that would be easiest.

 2            While Mr. Best is looking for this, when you were

 3    doing an investigation as to whether you could find any

 4    verification of the family in Michoacan being murdered,

 5    doesn't Mexico -- it has birth certificates.  Does it have

 6    death certificates?

 7            THE WITNESS:  They do have death certificates,

 8    ma'am.

 9            THE COURT:  And are those easily available without

10    having to go to this difficult, dangerous area?

11            THE WITNESS:  I don't know, ma'am.

12            My first -- my next step would be to go to the

13    city of Aguililla -- the municipality of Aguililla and ask

14    them for those death certificates.  I don't know if I'm

15    privy to those death certificates as an ordinary civilian or

16    if I would have to have a specific request to have those.

17            THE COURT:  Okay.  But that's not something that

18    would be available online for you to do that kind of search?

19            THE WITNESS:  No, ma'am.  As far as I know, it's

20    definitely not online; I did look.

21    BY MR. BEST:

22    Q.  You would need a name to start with first, right?

23    A.  Yes, sir.  I would probably need names.

24            MR. BEST:  Publishing Government's Exhibit 19 -- I

25    apologize -- 18.

1    BY MR. BEST:

2    Q.  Okay.  Do you see what's already in evidence as

3    Government's Exhibit 18?

4    A.  Yes, sir.  I do.

5    Q.  Do you see line 5 or tab 5, on Government's 18 that's

6    published, which says:  Yours are 85, plus the 15 that I was

7    going to keep for you -- translated in English?

8    A.  Yes, sir, I do.

9    Q.  Since you are a native -- since, actually, you are

10   fluent in Spanish, is that an accurate translation of the

11   original Spanish format?

12   A.  Yes.

13   Q.  In the original Spanish format does it say -- give you

14   any description of what the 85 or 15 stand for?

15   A.  It does not.  No, sir.

16   Q.  Okay.  At the time -- I asked did you investigate and

17   analyze whether in the 2007 -- '5 to '13 time frame whether

18   any of these various drug organizations trafficked in

19   anything other than cocaine, did I not?

20   A.  Yes, sir, you did.

21   Q.  What did your research and investigation reveal?

22   A.  The cartels were trafficking in cocaine, marijuana,

23   methamphetamines -- those are the primary ones.

24   Q.  In fact, in this case, Gerardo Gonzalez Valencia was

25   charged with conspiracy to distribute methamphetamine which

1    was later dismissed, correct?

2    A.  Yes, sir.

3    Q.  Okay.  Did I ask you to look at that text -- let's keep

4    going on to the next.  I asked you to review all of the

5    texts between June 26 and September of 2013, correct?

6    A.  Yes, sir.  You did.

7    Q.  Was there anything in any of the texts between those

8    dates that gave you any context to be able to surmise what

9    was being discussed -- what the subject matter that was

10   being discussed was?

11   A.  No, sir.

12   Q.  There was some discussion as to a number 26 that was

13   later in the conversations; I believe it's Government's

14   Exhibit 20.

15           MR. BEST:  Can we see that?

16   Q.  Do you see, on Government's Exhibit 20 -- again, line

17   5 -- where it says:  Yes.  Tell him yes, at 26?

18   A.  Yes, sir.

19   Q.  Okay.  And does that give you sufficient information

20   that the subject matter being discussed was cocaine because

21   the price of a kilo of cocaine at that time to the

22   United States was $26,000 a kilo?

23   A.  No, sir.  Even putting things in context, I would have

24   to look through everything in context.  But just looking at

25   this and remembering from what I read through here, I could

1     not make that assessment, that they are specifically talking

2     about cocaine.

3     Q.  I asked you to also become smart on what the prices per

4     kilo to both the U.S. and Europe at this time were, did I

5     not?

6     A.  Yes, sir.

7     Q.  Okay.  During this time frame, in 2013, what was the

8     average price of a kilo of cocaine wholesale to Europe?

9     A.  I believe it was around 40, close to $40,000.

10     Q.  Okay.  And with the analysis here, could -- if it was,

11     in fact, cocaine and if it was, in fact, talking about a

12     kilo price of 26, could it just as easily have been 26,000

13     euro?

14     A.  Yes, sir.

15     Q.  All right.  That would be consistent with the wholesale

16     price of cocaine in Europe?

17     A.  Yes, sir.

18     Q.  Okay.  But, again, other than that, we're really

19     guessing our way through this, correct?

20     A.  Yes, sir.  There are a lot of assumptions based off

21     trying to compile a lot of the information, trying to put

22     the pieces together, aligning them, and seeing if there are

23     common touchpoints.

24     Q.  And was there anything that you derived from any of

25     these texts that the transaction actually consummated, that

```
 1    there had been an actual transaction?

 2    A.  No, sir.  I did not.

 3    Q.  And then, finally, there was -- it's been --

 4              MR. BEST:  Can we go back to 18, Government's

 5    Exhibit 18; and then the second page of it.

 6              Okay.  Go back please.  There we go.

 7    BY MR. BEST:

 8    Q.  Do you see the -- lines 7 and 8?

 9    A.  Yes, sir.  I do.

10    Q.  I have asked you to read these, probably, 150 times?

11    A.  Yes, sir.

12    Q.  And I have asked you to read them and put them down and

13    come back to them, and look at them over and over again,

14    correct?

15    A.  Yes, sir, you have.

16    Q.  I have also asked you to look at this in relation to

17    everything else you have read to see if you could reasonably

18    say that this conversation involved distributing cocaine

19    into the United States, did I not?

20    A.  Yes, sir.  You did.

21    Q.  Are you able to state that with any reasonable degree of

22    certainty?

23    A.  I could not say that.

24    Q.  And why is that?

25    A.  There is no way to know -- it says "up there."
```

JA1090

1       The numbers that are there -- you don't know if

2    it's a substance, if it's an amount of currency, and there

3    is no geographic location identity -- identification at all.

4    Q.  And you knew at this period of time that -- from your

5    investigation and from what you have heard the past day and

6    a half, two days, that there's been allegations that

7    Mr. Gonzalez Valencia was trafficking a substantial amount

8    of narcotics to Europe?

9    A.  Yes, sir, I have.

10   Q.  So is there any way you can discern if it is -- strike

11   that.

12       I asked you to look at every possible source on

13   the web for what the abbreviation "E.U." stands for, did I

14   not?

15   A.  Yes, sir.

16   Q.  Did you find anything on the web that even remotely

17   suggests that "E.U." is Uruguay?

18   A.  No, sir.

19       And on that point, ma'am, if I may.

20       The Spanish abbreviation for Estados Unidos is

21   double E, period, double U.  Not the letter "W," but two

22   "U"s.

23       And in some places of Latin America, they will

24   refer to Estados Unidos using a diagraph as opposed to all

25   four letters.  Any identification of Uruguay, any diagraph

115

1    that I have seen internationally or domestically is either

2    UR or UY; those are the only two letters that I have seen to

3    identify Uruguay as -- in a diagraph.

4            MR. BEST:  Okay.  Court's indulgence.  I may be

5    done.

6            (Whereupon, defense counsel confer.)

7            MR. BEST:  No further questions, Your Honor.

8            THE COURT:  Is the government ready for cross?

9            MR. HANDRICH:  Yes.

10           Was there a particular time Your Honor wanted to

11   break?

12           THE COURT:  Well, I have a matter at 2; so I was

13   going to break at 1, and then you-all can come back at 2:15

14   and, maybe, you will be done by 1.

15           MR. BEST:  Hopefully before.

16                       CROSS-EXAMINATION

17   BY MR. HANDRICH:

18   Q.  Good afternoon.

19   A.  Good afternoon, sir.

20   Q.  Sir, your working career has been in the military, for

21   the most part?

22   A.  Primarily, yes, sir.

23   Q.  You have never served in Mexico in any capacity,

24   correct?

25   A.  I have never served in Mexico, no, sir.

JA1092

1    Q.  And, in fact, the -- absent one occasion that you were

2    stationed in El Salvador, and another occasion you were

3    stationed in Colombia -- your time in the military had

4    nothing to do with the area or the activities occurring in

5    and around Mexico; isn't that correct?

6    A.  That would be incorrect.

7            As part of my time as a Director of Army Foreign

8    Liaison, where I dealt with, as I said, 110 countries, I did

9    spend time working with the Mexicans because of their

10   relationship with the United States with Army North.  And so

11   I have done work with them specifically to figure out what

12   their military and law enforcement officers could do with

13   relation to some of the activities in the United States in

14   coordination with U.S. military organizations.

15   Q.  And what years was this?

16   A.  That was between 2010 and 2014.

17   Q.  So I noticed -- I will direct your attention to what I

18   believe is Defense Exhibit 17, which is your resume.  I am

19   sure you are familiar with that exhibit, correct?

20   A.  Sure.

21   Q.  Did you type it?

22   A.  I am pretty sure I did.

23   Q.  When you were working as a Director of the Army Foreign

24   Liaison, you don't go out of your way to talk about anything

25   related to any activity or work you did with Mexico in the

JA1093

```
1    resume, correct?

2    A.  Are you asking me if I went out of my way on my resume?

3    Q.  Yeah.

4    A.  I don't think so, sir.

5    Q.  Right.  Because it wasn't important because you had very

6    minimal experience, or that wasn't a big part of your job at

7    the time; isn't that correct?

8    A.  It was not a large part of my job, no, sir.

9    Q.  Right.  And so in any given week how many hours did you

10   spend dealing with something happening in Mexico?

11   A.  Maybe four to five.

12   Q.  As you said, you were responsible for over 180

13   countries?

14   A.  110, sir.

15   Q.  Okay.  You were also responsible for 180 foreign

16   military attachés which covered 100 countries?

17   A.  Yes, sir.

18   Q.  Right.  So you're only spending a little bit of time on

19   any given week on any particular country?

20   A.  Not necessarily, sir.

21         When you go -- when you have that many countries,

22   some countries are going to spend -- take up a lot more of

23   your time than others.  For example, during the Egyptian

24   overthrow of Morsi, I spent a lot of time that week with the

25   Egyptians; so it does vary.  Some countries will get a lot
```

JA1094

1   of time, some countries will get very little of my personal

2   time.

3   Q.  Right.  So going back to Colombia, you would agree --

4   based on -- whether it's your review of the internet or

5   social media, or anything that you learned while you were in

6   the government, that Colombian drug traffickers and the

7   organizations there were completely different than Mexican

8   cartels; you are aware of that?

9   A.  Yes.

10  Q.  Right?  So the less than a year you spent in Colombia

11  has no relevance to the evidence or the testimony that you

12  heard here today -- not just here today -- you have been

13  here all week?  Am I correct about that?

14  A.  Well, I think some of the testimony has been -- has

15  talked about the flow of the drugs from Colombia -- the

16  sourcing of those drugs from Colombia to and through Central

17  America and to Mexico.

18  Q.  Right.  But I am specifically asking you about the

19  testimony concerning what was happening in Mexico related to

20  the cartel activity in Mexico that has nothing to do with

21  anything you may have learned or experienced while you were

22  in Colombia?

23  A.  I disagree, sir.  I mean, part of what I had to do in

24  Colombia was look at those links between Colombian drug flow

25  north to whatever entities it was going.

JA1095

 1            Was I doing a thorough search at that point and a

 2      thorough understanding of the multiple Mexican cartels and

 3      where they were headed?  The answer would be no.

 4      Q.  Just looking at Exhibit 17 again, when you describe, on

 5      the resume that you typed up, what your actual experience

 6      was for that less than a year you spent in Colombia, the

 7      first two items you list which -- you tell me; were you

 8      listing the things that you spent the most time on first in

 9      the resume?

10      A.  Could I see -- if someone can pull up the resume for me,

11      I would appreciate it.

12      Q.  Well, let me just read -- I will read you the first

13      couple -- two sentences.

14            "Served as a senior intelligence officer and

15      supervised synchronized and coordinated all

16      intelligence-related training to the COL MIL and the

17      CMP," which would be the Colombian military and the

18      Colombian national police, right?

19            Is that what you typed?

20      A.  Yes, sir.

21      Q.  Right.  So you were involved with training?

22      A.  Yes, sir.

23      Q.  Next line, "Supervised all intelligence security

24      assistant initiatives with COL MIL and CMP.  Served as the

25      U.S. military GRP representative to all country team

1    intelligence organizations, coordinated with those entities

2    to ensure that training requirements and programs were

3    synchronized"?

4    A.  Yes, sir.

5    Q.  Now, in your time in the military, had you ever worked

6    hand in hand on a law enforcement-based investigation done

7    by the Drug Enforcement Administration, the Federal Bureau

8    of Investigation, or Homeland Security?

9    A.  No, sir.

10   Q.  And based on the description of your background, you

11   have never served as a sworn law enforcement officer; is

12   that correct?

13   A.  That is correct.

14   Q.  Fair to say you have never analyzed -- or sat down --

15   beyond your review in this particular case, a judicialized

16   wiretap?

17   A.  No, sir.

18   Q.  Okay.  Now, would you agree with me that -- when you're

19   looking at and reviewing any particular set of messages that

20   may have been sent between two drug traffickers, are you

21   just going to rely in figuring out what's going on and who

22   is who on just the messages themselves?

23   A.  No.

24   Q.  And is it correct -- did I hear you correctly that you

25   reviewed all of the discovery provided by the government to

1    the defense in preparation for your testimony?

2    A.  I think I said I believe I did.

3    Q.  Why the caveat on "I believe I did"?

4    A.  There was a lot of -- there was a lot of messages I

5    reviewed, so I don't know that I reviewed every single

6    message; that's why I am saying that.

7    Q.  And you also had other materials beyond just the

8    messages themselves, correct?

9    A.  Yes, sir.

10   Q.  Do you have any dispute based on your review of the

11   identifications of the defendant's family members and

12   in-laws as participating and talking about drug trafficking,

13   murder, and violence in these messages that were turned over

14   in discovery?

15   A.  In the Blackberry messages?

16   Q.  Correct.

17   A.  I don't know.

18   Q.  Well, do you have any dispute that Mencho was correctly

19   identified over the BBM wire?

20   A.  I don't have any dispute to that.

21   Q.  Okay.  Do you have any dispute as to the defendant's

22   brother Jose Gonzalez Valencia, also known as Chepa, with

23   the user name Santy?

24   A.  I don't have any dispute to that.

25   Q.  I am certain you wouldn't have a dispute, right? -- you

JA1098

1    are aware that Jose Gonzalez has pled guilty and

2    acknowledged that he used the username "Santy"?

3    A.  I do not know that he had pled and had used that name;

4    but if you say so, then I have to believe you.

5    Q.  Right.  And then we have been talking today about the

6    username "Boss" that's been identified through photographs

7    and conversations, that it's the defendant's other brother

8    Abigael?

9    A.  Yes.  I have seen that.

10   Q.  Do you dispute that identification?

11   A.  I have no reason to dispute that.

12   Q.  You also heard the testimony from three separate

13   witnesses, two witnesses who had worked together in the

14   Milenio cartel and another witness who had worked in a

15   cartel that ultimately was at war with portions of the

16   Milenio cartel.  You heard all of that testimony?

17   A.  I heard most of it, yes, sir.

18   Q.  All right.  Would you agree with me, when you have

19   witnesses who had no contact with each other and at certain

20   times may have wanted to kill each other -- each described

21   that the defendant, when he was involved in drug

22   trafficking, worked hand in hand with both of his brother

23   Abigael and Jose?

24   A.  Could you ask the question -- what is the question, sir?

25   Q.  Yes.  You heard testimony from witnesses who had no

1    contact with each other and were, in fact, at one point in

2    time in the past -- most likely, if they were in a room

3    together may have tried to kill each other -- but in those

4    experiences which were very different, they all described

5    that the defendant worked hand in hand with his brothers

6    Abigael; and then you also heard about him working hand in

7    hand with his brother Jose?

8              MR. BEST:  I am going to object.  I don't think

9    there is any evidence that they had no contact with each

10   other but if that's --

11             THE COURT:  It's overruled.

12             THE WITNESS:  I did hear that testimony, yes.

13   BY MR. HANDRICH:

14   Q.  So let's take a look, if we can, at Government

15   Exhibit 10, which is a BBM message from April 11, 2013.

16             So in your review -- are you aware that on these

17   messages on April 11, that it appears that a son or another

18   relative of Abigael is using his device "Boss" to let

19   another person know that Abigael had a stroke or a problem

20   and had to go to the hospital?  Were you aware of that in

21   your review of the discovery?

22   A.  I may have been.  I am just reading what you have up

23   here, sir.

24             Okay.  It appears to be so, sir.  Yes, sir.

25   Q.  Now, if we could look at the summary chart.  So this is

1    the defendant's brother Abigael, one half of the Los Cuinis

2    who has an issue serious enough that it sends him to the

3    hospital there in Guadalajara.

4              MR. HANDRICH:  Court's indulgence for one moment.

5              Can we go to Exhibit 40?  Government Exhibit 40.

6    BY MR. HANDRICH:

7    Q.  Did you have a chance to review both the summary

8    document prepared for the Court hearing but also the

9    underlying passport documents and travel records?

10   A.  Yes, sir, I did.

11   Q.  You don't dispute the travel that's depicted in this

12   summary, do you?

13   A.  I saw nothing to dispute the travel reflected here.

14   Q.  So we just saw a message, April 11, 2013.  What does the

15   defendant do on April 21st, 2013?

16   A.  It appears he entered Mexico in April, on the 21st of

17   April.

18   Q.  Right.  So he flies to Mexico ten days after his brother

19   gets sick?

20   A.  I guess so.  I mean, I would have to go back and look at

21   the other document to see if it's exactly ten days.  If you

22   are saying it's ten days, I believe you.  I will say if

23   that's -- if you are telling me the truth, then yes.

24   Q.  And then he doesn't leave Mexico until July 5th.

25              I am not asking you to look at the chart.  I don't

JA1101

1  think the date that he leaves is on it.  It says:  Entered

2  Uruguay on July 5th but, obviously, to enter Uruguay he'd

3  have to leave Mexico?

4  A.  Yes, sir.

5  Q.  So it appears, by all accounts on the travel records,

6  the defendant enters Mexico in April, doesn't leave until

7  July 5th, which means that he would be in Mexico after his

8  brother goes to the hospital, and also in Mexico when his

9  father and Abigael's father and Jose's father has a similar

10  medical issue and a stroke and ends up in the hospital in

11  June?

12  A.  I'm sorry.  Can you just say it one more time, a little

13  bit slower?

14  Q.  Yes.  So after April 21st, after the defendant has

15  arrived approximately ten days after his brother goes to the

16  hospital, he is in Mexico for the next two and a half months

17  which coincides with the time that his father, who is also

18  Abigael's father and Jose's father, has a stroke in a

19  similar fashion as described in the BBMs and also has to go

20  to the hospital?

21  A.  So the question you are asking me is:  Did he go into

22  Uruguay?

23  Q.  No.  The question just is:  Is he in Mexico during the

24  time period that those events occur?

25  A.  The reality is I could never answer that question.  I

1    have no way of verifying that he was in Mexico that whole

2    time.

3                All I know is that he entered Mexico on 4/21 and

4    entered Uruguay on the 7th of July [sic], but I have no way

5    of knowing when -- if he did leave Mexico between those

6    dates, when he left.

7    Q.  Now, if we could go to Government Exhibit 11, a BBM

8    message from June 27, 2013.  If we can hone in on line 17.

9    I'm sorry.  Before we get to -- sorry, start at line 3.

10               We'll just take it from line 1 since it's very

11   short.

12               Line 1:  Boss, user name identified as Abigael.

13   Silver, question mark.  Silverio, identified as the

14   defendant, responds:  Go ahead.

15               Could you read for us line 3 what Abigael

16   responds?

17   A.  In English or Spanish?

18   Q.  In English, please.

19   A.  Okay.  Listen, la Negra called -- you said line 3?

20   Q.  Yes.

21   A.  Listen, la Negra called me, and my dad is having a

22   stroke, like mine.

23   Q.  So I asked you those questions earlier.  It appears that

24   Abigael is saying:  My father is having the exact same sort

25   of thing that just happened to me two months ago, correct?

1    A.  It appears to be so.

2    Q.  Okay.  Let's go to line 14 on the next page.

3         Further in the conversation, the defendant

4    Silverio says -- well, you read it for us; line 14.

5    A.  Yes, I am on my way.

6    Q.  What about line 15?

7    A.  I'm here close by.

8    Q.  Let's look at Government Exhibit 12.

9         This is Abigael sending a message to a different

10   user name which -- I won't read it out, but what we're

11   translating as "Erika," although there is symbols within the

12   name.  You heard the testimony that the defendant has a

13   sister by the name of Erika, correct?

14   A.  I did hear that testimony, yes, sir.

15   Q.  Right.  So if the Erika that Abigael is texting here is

16   Erika the same sister, that would also be the defendant's

17   sister, correct?

18   A.  That is correct.

19   Q.  Line 1, Abigael writes:  Did they tell you if it was a

20   big stroke?  And line 2:  Or where it is?

21        What did she respond, in line 3?

22   A.  In his brain.

23   Q.  Just using your own life experience, would it be fair to

24   say that she would either have to be with him or speaking to

25   someone with knowledge of what occurred?

1    A.  I would probably make that assessment.

2    Q.  So let's go to line 23.  Further -- and this

3    conversation, obviously, goes back and forth,

4    understandably, right?

5         Your father is potentially sick enough that he is

6    going to die, you want to know everything that is going on,

7    correct?

8    A.  I would, yes.

9    Q.  Line 23, could you read that for us, what Abigael writes

10   to Erika?

11   A.  Yes.  Lalo is on his way to the emergency room.  Have

12   to -- have her take him -- I can't see what is in

13   parentheses, San Javier.

14   Q.  So based on your extensive investigation and your

15   interviews in person with the defendant, I presume you have

16   also had access to family members of his that you could

17   speak to if you needed to?

18   A.  I have.

19   Q.  Okay.  Is there another Lalo in the family?

20   A.  Not that I know of.

21   Q.  Let's look at Government Exhibit 13.

22        These are a series of messages from June 16, 2013,

23   so 11 days earlier, between Silverio, identified as the

24   defendant, and another member of the cartel, el Scorpion.

25        Would it be fair to say, in these series of

1    messages, the two people communicating are talking about

2    meeting up, going to the same place?

3    A.  It does appear so, yes, sir.

4    Q.  So let's go to Government Exhibit 14.

5            Right.  So the same day, June 16, 2013.  It's now

6    el Scorpion talking to another user name of M-A-O, right?

7    So we're on the same day but, now, if we look at the time

8    stamp we are about five hours later.

9            Would you agree with me so far?

10   A.  Yes, sir.  I don't have them side by side, but I believe

11   you.

12   Q.  Okay.  I will just read the first time stamp from

13   Government Exhibit 13; sic].  It says 14:50:33, so that

14   would be military time, right?

15   A.  I think I know what military time is.  I got it.

16   Q.  And then -- so now we're at 19:47:19 is the first time

17   now.  So later in the day or in the evening?

18   A.  Right.

19   Q.  Could you read line 4 for me, what el Scorpion writes to

20   M-A-O?

21   A.  Here, brother.  We came to get out of the city.  Lalo

22   and I are here watching the game, too, at a very cool little

23   country house.  We came out to celebrate on our day,

24   brother.

25   Q.  Once again, any -- did you identify anyone else in the

 1    Gonzalez Valencia family named "Lalo"?

 2    A.  I did not.

 3    Q.  Now, let's go to Government Exhibit 16.

 4         You were already shown this exhibit, so I am sure

 5    you are familiar with it; is that correct?  This is another

 6    set of BBM messages between Boss and Silverio?

 7    A.  I believe so.

 8         THE COURT:  Can we take this up at -- after

 9    lunch --

10         MR. HANDRICH:  Sure.

11         THE COURT:  -- because you have a bunch more to go

12    through?

13         We're going to take a break now.  I have a matter

14    at 2, so I will see you all back at 2:15.

15         MR. BEST:  Your Honor.

16         MS. SANCHEZ:  Your Honor, can I ask how long the

17    government thinks they're going to take because of travel

18    plans?

19         MR. HANDRICH:  Yes.

20         THE COURT:  I am curious, too.

21         MR. HANDRICH:  I am not sure how long, but I am

22    half -- halfway finished.

23         THE COURT:  All right.  Thank you.

24         See you all at 2:15.

25         MR. BEST:  Your Honor, I have to leave.

1    Ms. Sanchez is going to take over.  I just wanted to thank

2    Your Honor and let you know when I am not here, and the

3    reason.  Thank you.

4              THE COURT:  All right.

5              (Whereupon, a luncheon recess was taken.)

6              THE COURT:  All right.  Mr. Handrich.

7                        CROSS-EXAMINATION

8    BY MR. HANDRICH:

9    Q.  Thank you.  Good afternoon, sir.

10   A.  Sir.

11   Q.  Obviously, you know you are still under oath?

12   A.  I do.

13   Q.  So let's go back to Government Exhibit 40.

14             So we have established in your testimony before

15   lunch that the defendant entered Mexico April 21st of 2013.

16   Clearly, he didn't come back to Uruguay until July 5th; is

17   that correct?

18   A.  According to the documents, yes, sir.

19   Q.  Right.  But going back, you reviewed all of the passport

20   records, the travel records, all of the discovery, and you

21   are familiar with all of that, correct?

22   A.  Yes, sir.  According to the documents I reviewed, he did

23   not go back into Uruguay before that date, that is correct.

24   Q.  Now, clearly, he was not in Uruguay for very long, am I

25   correct about that -- from July 5th?

JA1108

1    A.  Okay.  No, sir.  He was not.

2    Q.  So, in fact -- I know you testified earlier that he had

3    moved first to Argentina and then to Uruguay, and the

4    alleged reason was safety concerns?

5    A.  That was one of them, yes, sir.

6    Q.  Okay.  Presuming that he had stayed in Mexico from April

7    to July, he clearly didn't have any security concerns coming

8    back to Mexico in the spring of 2013, correct?

9    A.  I would not make that assumption, sir.  I would

10   understand that if he leaves because he has safety concerns,

11   he may or may not come back for vacation; he may or may not

12   come back for business.  I am not going to assume that he

13   was comfortable and did not have any security concerns in

14   that time frame.

15   Q.  Well, you don't have to assume, right?  You could have

16   asked him?

17   A.  I'm sorry?

18   Q.  You could have asked him?

19   A.  I could have asked him, yes, sir.

20   Q.  Let's look at Government Exhibit 16, another BBM

21   message.

22         So this is a series of messages between Abigael,

23   Boss, and Silverio, the defendant.  This is July 5th, 2013.

24   And the time -- the very first message is 14:33, so that

25   would be 2:33 in whatever time zone this is.

1          Would you agree with me?

2    A.  Yes, sir.

3    Q.  In your review of the discovery, did you make yourself

4    aware or did you learn through any outside sources of what

5    time zone the BBM messages are in?

6    A.  I did not, sir.

7    Q.  Do you think that's important?

8    A.  It could be.

9    Q.  So looking at line 1, are you familiar from -- when Boss

10   says "PING," have you seen that in other messages?

11   A.  I have, yes, sir.

12   Q.  And what does that indicate to you?

13   A.  It usually indicates "I am on."  That's my read of what

14   it means.

15   Q.  Okay.  So I want to go now -- on Exhibit 16, line 17, if

16   we could zoom in starting at line 17, and we will get a

17   couple lines down.

18          Silverio writes:  I'm already here in E.U.

19          Did I read that correctly?

20   A.  I think so, yes, sir.

21   Q.  Then writes another message:  My black is working.

22   A.  Yes, sir.

23   Q.  Are you able to say from your review that you agree with

24   the statement that when the word "black" is written there

25   it's referring to Blackberry messenger device?

1    A.  I assumed that it was a Blackberry.

2    Q.  Abigael responds, on line 19:  Oh, okay, alright.  It

3    further says on line 20:  They didn't give you any trouble?

4          So if we can go back for a moment to the travel

5    record, Exhibit 40.

6          MR. HANDRICH:  We'll go to a different exhibit.

7    We'll go to the Uruguayan travel records, Exhibit 37A, the

8    translated version.

9    BY MR. HANDRICH:

10   Q.  Are you familiar with this?

11   A.  I am, sir.

12   Q.  You have had a chance to review it in discovery?

13   A.  I have, sir.

14   Q.  So this would be the country Uruguay, whatever agency

15   takes care of people coming in and out of the country.  We

16   have records that show when he came in and came out with a

17   passport; is that correct?

18   A.  Yes, sir.  It looks like that is the document.

19   Q.  And so we see an entry about halfway down, the date is

20   July 5th, 2013.  The checkpoint is at the Carrasco

21   International Airport.  It lists the airline as Copa

22   Airlines.

23          Do you see where I'm at?

24   A.  Yes, sir.

25   Q.  Are you familiar with the Carrasco International

135

1    Airport?

2    A.  I have not physically been to that airport, no.

3    Q.  Do you know where it's located?

4    A.  I believe it's the airport in Montevideo, Uruguay.

5    Q.  Which is the capitol, a major city in the country?

6    A.  Montevideo is the capitol city of Uruguay, yes, sir.

7    Q.  Are you familiar with Copa Airlines?

8    A.  Yes, sir.  I am.

9    Q.  And you know Copa Airlines runs routes every day from

10   Mexico City to Montevideo?

11   A.  I am not aware that they ran daily routes to Montevideo,

12   but that is possible.

13   Q.  Okay.  You are familiar enough with them that they're an

14   airline that operates out of Mexico and flies in and out of

15   Mexico?

16   A.  My understanding of Copa Airlines is that it is

17   Panamanian based, maybe, or somewhere in Central America

18   based, not North America, not Mexico based.  But they do fly

19   routes throughout Central and South America, that I am

20   aware of.

21   Q.  Going back to Exhibit 16, line 20, Abigael writes:  They

22   didn't give you any trouble?  Is that based on the nature of

23   the conversation leading up to you -- appears that Abigael

24   is asking about, "did you have any trouble either leaving

25   the country or getting into Uruguay on your trip back?"

JA1112

1                Trouble like the defendant has absconded from a

2    halfway house or a sentence here in the United States, may

3    have warrants in the system, anything like that?

4    A.  I don't know.  I don't even know -- looking at the

5    Spanish portion of it, I don't know that that is a question

6    or a statement -- whether it's a question or a statement, so

7    that's why I hesitated when you asked me the question.

8    Q.  Okay.  So then going down to line 22, Abigael writes:

9    Did you leave through Pana or el Humo?

10                Do you see where I'm at?

11    A.  Is it on this page here?

12                Yes.  Yes, sir.  I do see it.

13    Q.  And although any shorthand or moniker could mean

14    different things, is it fair that "Pana" may mean Panama?

15    A.  That is definitely possible, yes, sir.

16    Q.  And Humo may mean Mexico City?

17    A.  Humo could mean Mexico City, that is correct.

18    Q.  Now, let's go down to line 24.  The defendant writes

19    back through D.F.  You are familiar that D.F. is a moniker

20    for what city?

21    A.  Distrito Federal.  Federal District, Mexico City, that's

22    what I understand it as.

23             THE COURT:  Can you say that again?

24             THE WITNESS:  Distrito Federal is Federal District

25    for Mexico City.

USCA Case #23-3126    Document #2057130        Filed: 05/30/2024    Page 141 of 273

```
1              So my understanding is when Mexicans -- a lot of
2     Mexicans refer to el de efe [sic] -- the D.F. -- they're
3     talking about Mexico City.
4     BY MR. HANDRICH:
5     Q.  Right.  So that is a common term that both Mexican
6     citizens, people in the U.S. military, people in law
7     enforcement, people who travel -- a lot of people called
8     Mexico City "D.F."?
9     A.  I would not say that American military uses that.  I
10    would say that some Spanish speakers, specifically Mexicans,
11    might use it.  But I would not assume that American military
12    uses that.  We would use "Mexico City."  My personal
13    experience would be Mexico City, not D.F. at all.
14    Q.  Let me rephrase the question.
15             People in the military who are familiar with
16    Mexico and Central America, if someone says to someone in
17    the military:  I went through D.F., is someone in the
18    military going to know exactly what they mean?
19    A.  If you say it in Spanish, yes.  If you were to say that
20    in English, I would not automatically assume it's D.F.
21    Q.  Now, let's go to line 28.  I'm sorry.  Same exhibit.
22    We'll stay here.
23             Now, I want you to look closely at what the
24    defendant writes on July 5th, three days before he's flying
25    out of Uruguay to Africa.
```

```
 1              Could you read line 28 for us?
 2    A.  I am going to bring my black, it works on the hunting
 3    trip too.
 4    Q.  Okay.  We have established through your testimony a few
 5    minutes ago that even you, based on your review, agree with
 6    the DEA and the witness who testified earlier that "black"
 7    refers to Blackberry?
 8    A.  My read is that it would be a Blackberry.  I am not
 9    agreeing or disagreeing with anybody.  My read is that it
10    would be a Blackberry.
11    Q.  When we're talking about a hunting trip, obviously that
12    speaks for itself, correct?
13    A.  Yes.  I had to read the Spanish portion first.  But,
14    yes, it does appear to be.
15    Q.  Let's go down to the next line.
16              So this -- July 5th, 2013, is a Friday.  So the
17    defendant just flew in on Copa Airlines through the D.F.,
18    Mexico City, into Montevideo, the airport there.
19              Could you read for us what he writes in line 29?
20    A.  But on Monday I'm going to be here in E.U.
21              MR. HANDRICH:  If we can go back to Exhibit 37A.
22    Q.  So we're still in the middle of the document, just one
23    line before the July 5th entry that we looked at earlier.
24              Where do we see that the defendant was at on
25    Monday, July 8, 2013?
```

1    A.  It looks like he is departing the airport in Montevideo.

2    Q.  Same place that he was at on July 5th, 2013?

3    A.  It looks like the same airport, yes, sir.

4    Q.  Right.  So it says:  It's Friday.  I am already here in

5    E.U., Monday I will be back in E.U.

6            Both those statements are made in the messages?

7    A.  Those messages do reflect that message, yes, sir, they

8    do.

9            MR. HANDRICH:  This may be -- don't hold me to it.

10   But I think this may be the last BBM we're going to look at.

11           This is an additional exhibit.  Judge, I will pass

12   a copy up.  It's Government Exhibit 85.  Defense does have a

13   copy.  I have other copies here.

14           If I may approach the witness?

15           THE COURT:  Yes.

16           MR. HANDRICH:  He will have it up on the screen,

17   in case.

18           THE WITNESS:  Thank you.

19           THE COURT:  This is not an exhibit that's in the

20   exhibit book.  So are you going to pass --

21           MR. HANDRICH:  We have an updated list.

22           THE COURT:  Okay.  Is there a copy for the Court?

23           MR. HANDRICH:  I'm sorry.

24           THE COURT:  I have to be the factfinder here, so I

25   sort of need the evidence.  Thank you.

```
 1    BY MR. HANDRICH:

 2    Q.  Just take a moment --

 3              THE COURT:  No objection to admitting this, I take

 4    it?

 5              MS. SANCHEZ:  No, Your Honor.

 6              THE COURT:  Government Exhibit 85 will be

 7    admitted.

 8              Now.  Go on.

 9              (Government's 85 admitted.)

10    BY MR. HANDRICH:

11    Q.  If you could just read the first page, that's all we're

12    going to look at.  I am going to pull up another exhibit and

13    give you a moment to look at that.

14              In the meantime, we'll just go back to Exhibit --

15              MS. SANCHEZ:  Do you have a copy for us?

16              MR. HANDRICH:  Of course.

17    BY MR. HANDRICH:

18    Q.  Did you have a chance to review the first page?

19    A.  Yes, sir, I did.

20    Q.  We'll come back to that in a moment.  Let's look at

21    Exhibit 40 again, which you have seen.  Once again, this is

22    based on all of the travel records and the passport stamps.

23              Where is the defendant on July 10, 2013?

24    A.  Entering Zambia.

25    Q.  I think -- I'm sorry.  It's not spelled out there.  I
```

1    believe it's actually South Africa.

2    A.  Sorry.

3    Q.  You are correct.  It does say ZA.  I believe that the

4    flag is representative of South Africa?

5    A.  I think South Africa is the --

6    Q.  Nonetheless, he has now flown from South America and he

7    is now on the continent of Africa?

8    A.  That's what it appears, yes, sir.

9    Q.  Obviously, working in the military, you understand how

10    the time zones change?

11    A.  A little bit.  Sure.

12    Q.  So at this point, if he is in Africa, he is going to be

13    a period of time five to six hours ahead of South America

14    or -- depending on where at in Mexico, correct?

15    A.  Yes, sir.

16            MR. HANDRICH:  If we can go back to Exhibit 85.

17    BY MR. HANDRICH:

18    Q.  Go to line 4.  Could you read that for us, the message

19    on July 10, 2013?

20            Military time is 9:22:44.  Before I have you read

21    that, though, let me ask you another question.

22            Are you aware that this BBM is kept in Greenwich

23    meridian time?

24    A.  If you tell me that, then I believe that.

25    Q.  Okay.  I am just asking if you know that independently?

1    A.  I do not know that independently.  But thank you.

2    Q.  So, obviously, that would be a separate time zone from

3    Africa or a separate time zone from Montevideo and a

4    separate time zone from Guadalajara?

5    A.  Right.

6    Q.  Is that correct?

7    A.  That is correct.  Yes.  I think so.

8    Q.  So could you read line 4 for us?

9    A.  It's almost down here, Botero is the one who is going to

10   see them.

11   Q.  Let me read that first line and see if you misspoke, or

12   just the way you said it.  "It's almost dawn here"?

13   A.  Did I say "down"?

14   Q.  I know it may be hard to see on the screen.

15   A.  That's what it is on here as well, if you want to look

16   at this document in my hand.

17            It says:  It's almost dawn here.  Yes.

18            It's almost dawn here.  Botero is the one who is

19   going to see them.

20   Q.  What does "dawn" mean to you?

21   A.  Early morning.

22   Q.  We saw the messages earlier, right?

23            No one is talking about differences in time zones

24   or anything like that in the messages from just a couple of

25   days earlier, correct?

1    A.  I don't remember seeing any of those indications.

2    Q.  So this message -- just this one message alone indicates

3    that Silverio might be in a different part of the world on

4    July 10 than he was on July 8 or July 5th or June 27?

5    A.  It could be.  Yes, sir.

6    Q.  I just want to look at one more thing, and then we will

7    move on.

8            Could you go to line 9 on the next page?

9    A.  I do see it.

10   Q.  Could you read what the defendant wrote to his brother

11   Abigael?

12   A.  It says -- I am making an assumption that you are

13   automatically assuming Silverio is his brother.

14   Q.  Yes.

15   A.  So what time is it there?

16   Q.  Once again, it indicates that the person sending that

17   message is in a different part of the world?

18   A.  It does appear that way, yes, sir.

19   Q.  Okay.  I just want to ask you a couple of questions

20   about the very beginning of your testimony.

21           You talked about doing research on the murders of

22   a family in Michoacan.  Do you recall your testimony?

23   A.  Yes, sir, I did.

24           It was more specific to a specific town.  But,

25   yes, it was a Michoacan family.

1    Q.  If I understood you correctly, that consisted of

2    Internet searches?

3    A.  Primarily open source searches, yes, sir.

4    Q.  Well, tell me if "open source" means something beyond

5    going on the internet and using a search engine?

6    A.  Open sources.

7            Internet, looking at books, magazines, even if

8    they're not on the Internet, yes.

9    Q.  What books or magazines did you look at?

10   A.  I don't have a list of the books.  They are books that

11   are written specifically by Mexican writers so specifically

12   look at the drug trafficking organizations in Mexico.

13   Q.  Approximately, how many murders were there in Mexico in

14   2022?

15   A.  I don't know that number.  In 2022?

16   Q.  Yes.

17   A.  I don't know.

18   Q.  Around or over 30,000, documented?

19   A.  I think it was probably higher than that.

20   Q.  You are also aware that there is a problem in Mexico of

21   people who are, quote-unquote, disappeared or missing --

22   A.  Yes, I am.

23   Q.  -- right? -- which may substantially undercount the

24   official murder rate or death toll?

25   A.  That is possible, yes, sir.

1   Q.  You weren't attempting to tell the Court earlier today

2   that the Mexican media or the Mexican government reports on

3   every one of the 30,000-plus people who are killed or

4   disappeared?  That's not your testimony, correct?

5   A.  No, sir.

6             I believe my testimony was that the Mexican media

7   is very aggressive about the reporting.  And, specifically,

8   when it comes to drug trafficking organizations

9   throughout -- in this instance, that was asked of me earlier

10  today, they were talking about a very specific small town

11  and not Michoacan, which is a state, or the country of

12  Mexico.

13  Q.  So you said there was fighting going on right now in

14  Michoacan, and it's a dangerous area.  Who is fighting

15  there?

16  A.  Actually, in Michoacan and, specifically, in the area

17  where these villages are.  It identifies multiple cartels --

18  Q.  Right.  I'm asking you which ones.

19  A.  -- to include the CJNG and other organizations that are

20  fighting for control of those areas.

21  Q.  So, obviously, CJNG is based -- started in the Jalisco

22  area and the surrounding states and towns, correct?

23  A.  That is correct, sir.

24  Q.  And they're attempting to increase their territory in

25  that area, correct?

1    A.  I believe so, yes, sir.

2    Q.  And you said you spent a lot of time researching this,

3    correct?

4    A.  I have, yes, sir.

5    Q.  So who are they fighting with?

6    A.  They were -- right now they're fighting primarily

7    against the government, the Mexican government is one of the

8    organizations they're fighting against.  They were fighting

9    against the Zetas for a very long time; those -- they have

10   primarily disbanded.  But members of the Sinaloa cartel that

11   still exists, that is one of the organizations that they're

12   also fighting against.

13   Q.  So in your answer, sir, are you aware that you didn't

14   name any of the cartels that have controlled the area of

15   Michoacan for the last 20 years?

16   A.  I am.

17   Q.  You are aware that you didn't name any of them?

18   A.  I am.

19   Q.  Is that because you just don't know what they are?

20   A.  I don't recall them off the top of my head.  I mean, if

21   I go back I can tell you, yes, here is the list, whether it

22   be -- it's not just the CJNG that is involved in the

23   control, specifically, in Michoacan.

24   Q.  So you didn't mention la Familia Michoacan, the Nights

25   of Templar, the United Cartels, the los Reyes cartel --

1    A.  The Gulf Cartel.  Some of those are not as apparent

2    today or as active today as they were back in this time

3    frame.

4    Q.  Well, are you aware the Gulf Cartel operates just south

5    of the border in Texas, not in the state of Michoacan?

6    A.  I am aware that almost all of the cartels are expanding

7    their footprint, sir.

8    Q.  Last two questions about this topic.

9         You have seen, based on your research, I am sure,

10   some of the reporting over the last five years in Mexico of

11   mass graves being found.  And the government -- both the

12   federal government and the local government having an

13   extremely difficult time identifying who they're actually

14   finding in these graves.  Have you seen any of that

15   reporting?

16   A.  Yes, sir.

17   Q.  Right.  And it would be fair to say there is a high

18   likelihood that none of those people who were murdered were

19   ever reported on at the time they were kidnapped or killed?

20   A.  I could not make that assessment, sir.

21   Q.  You described for us a background in military

22   intelligence, correct?

23   A.  Yes, sir.

24   Q.  Would you describe yourself as having a lot of

25   experience in the intelligence area or as an intelligence

1    analyst?

2    A.  In what?  There are multiple facets of intelligence,

3    sir.

4    Q.  Well, in the methods.  Not so much as subject matter,

5    just in the methods I am asking you about.

6    A.  Methods of --

7    Q.  Proper methods of collection and dissemination?

8    A.  Yes, sir.

9    Q.  And then analysis?

10    A.  Yes, sir.  I would say that I have pretty good

11    experience with that.

12    Q.  Okay.  Would you agree with the statement that when you

13    make an analytic judgment it's based only on the

14    intelligence that is before you at that particular time?

15    A.  I would, with a caveat.  The caveat being that:  If it

16    is single source, I would identify it as such, and confirm

17    it as many times as possible so that there is redundancy in

18    my reporting.

19    Q.  So you actually answered my next question.  Thank you.

20            Putting aside the single source part for the

21    moment, I am sure you have seen this happen hundreds, if not

22    thousands of times, that the intelligence changes as

23    additional information is gathered and analyzed, correct?

24    A.  That is correct.

25    Q.  And, in fact, that may mean the original analysis done

1    completely changes by the time additional information is

2    gathered?

3    A.  That is possible, yes, sir.

4    Q.  And so let me ask you a question about your time working

5    at the NSA, obviously not getting into any specifics.

6        But if you were looking at intercepted

7    communications, would you just rely on those -- what's

8    stated in the communications or would you try and make an

9    analysis or a judgment, gather outside information that

10    either corroborates or proves or directs to what the person

11    may be speaking about or communicating about in the message?

12        THE WITNESS:  Ma'am, I don't know that I can

13    answer any questions related to my time at the National

14    Security Agency, especially when he's talking about

15    methods -- asking me about tactics and procedures,

16    methodology.  Everything I did with the NSA was at a TS/SCI

17    level.

18    BY MR. HANDRICH:

19    Q.  Okay.  Let me rephrase the question.

20        THE COURT:  I don't think it has to be at the

21    NSA -- at the National Security Council.  I think you can

22    talk just generally about methodology because I think that's

23    where you're going.  I am not sure why you tied it to the

24    National Security Council.

25        MR. HANDRICH:  Fair enough.  Yes.

JA1126

1      BY MR. HANDRICH:

2      Q.  So putting aside your work at the NSA.  I am talking

3      about just in terms of doing analysis, if you're dealing

4      with intercepted communications --

5              THE COURT:  Was he at the NSA or the National

6      Security Council --

7              THE WITNESS:  The NSA, ma'am.

8              THE COURT:  The NSA.  Well, either one you would

9      have to keep it pretty confidential.  There you go.  NSA,

10     the agency that doesn't exist.  Okay.  Got it.

11     BY MR. HANDRICH:

12     Q.  If you have those communications -- let's talk about

13     your time in the military in the Middle East, right.  And if

14     the military intercepts communications, are you only going

15     to try to rely on those communications or are you going to

16     try to gather additional information so you can properly

17     interpret or determine what is actually being talked about

18     in the communications?

19     A.  I would try to gather additional information.

20     Q.  And if you have a series of communications over ten

21     minutes or a half a day, that may not tell you much,

22     correct?

23              If you don't have outside information, you may not

24     be able to learn a whole lot about what the people in the

25     communications are actually speaking about; is that a fair

1    statement -- if they're using coded language?

2    A.  So we're talking about electronically intercepted

3    messages?

4    Q.  Yes.  Let's say you only have an hour's worth, so five

5    conversations, and that's all you have?

6    A.  So the question is -- I want to verify -- I want to

7    answer your question.

8           What is the question?

9    Q.  Is it difficult to determine if -- in an example where

10   coded language is being used to determine what any people

11   are actually talking about, if that's all you have?

12   A.  It would be difficult.  It could be difficult.  I mean,

13   it depends on the training.

14          Am I targeting a specific device?  Do I have it

15   geo located?  Have I gone through the extra steps of geo

16   locating that device, knowing exactly where it is?  Have I

17   seen patterns with it?  All of the above.

18   Q.  Right.  If you compare that situation to a situation

19   where you potentially have, like, in this case, a year and a

20   half of communications amongst many people who work in the

21   same cartel, it would be a lot easier to interpret what

22   people are saying, talking about, for all of the reasons you

23   just laid out, correct?

24   A.  That is correct.  Probably so.

25   Q.  Now, I know you told us earlier you don't work in law

1  enforcement.  But you are familiar with -- and I am sure you

2  have seen it in the field, in the military -- that flight

3  and destruction of evidence is often termed "consciousness

4  of guilt"?

5  A.  I am hearing that term right now for the first time.

6  Q.  Okay.  Is that -- is my description correct that fits

7  with your life experience or prior things you have seen or

8  done?

9  A.  I would have to agree.

10  Q.  Okay.  So going back to the evidence of his arrest in

11  Uruguay, right? -- you are familiar with the circumstances

12  of that arrest, correct?

13  A.  Yes, sir.  I am.

14  Q.  And you are familiar that not only did the defendant

15  have two passports -- one in his name and one in another

16  name, correct?

17  A.  That is correct.

18  Q.  Is that anything -- does that tell you anything, just

19  that fact alone?

20  A.  That would raise some flags, yes, sir.

21  Q.  What kind of flags?

22  A.  The possibility of doing something -- not necessarily

23  travel, but using specific documentation -- even if it's

24  internal to a specific country, I would not necessarily look

25  at it as a flight risk or possibility of flight.  I would

JA1129

1    look at it as just I have another documentation of

2    nationality.

3    Q.  Right.  So it may not be evidence of flight but it could

4    be evidence of criminal activity?

5    A.  Or it could not be.

6           THE COURT:  Merely having a passport with your

7    picture on it and a false name is not evidence of some kind

8    of criminal activity on its face?

9           THE WITNESS:  On its face, yes, ma'am, it would

10   be.  Not that -- if you are not using it, or if you are

11   using it for -- I mean, I don't even know what I would use

12   an additional passport for other than any travel or I am

13   using it to measure something in a specific location.

14   BY MR. HANDRICH:

15   Q.  But I asked you -- I think your answer is fair because I

16   asked you to consider that fact alone, but let us now

17   consider some more facts.  Okay?

18   A.  Okay.

19   Q.  How about when law enforcement officers dressed in

20   plainclothes identify themselves as police, and you turn and

21   figure out a way to smash an iPhone in half; what does that

22   fact tell you?

23   A.  That I don't want the information on the phone released.

24   Q.  Right.  And the destruction of the phone actually -- if

25   the hardware inside that has the data on it is actually

1    broken, it may not be recoverable?

2    A.  That is possible.

3    Q.  Let's go to another fact.  There was a car -- he parked

4    his car right outside of the school and was standing next to

5    it at the time, right?  Are you aware of that?

6    A.  I am aware of that, sir.

7    Q.  Okay.  Are you aware of what was in the trunk?

8    A.  I think I have seen reports of what was in the vehicle.

9    I don't remember specifically what was in there.

10   Q.  Right.  So in the vehicle was every piece of

11   identification the defendant had, including real

12   identification and false identification.  You are aware of

13   that?

14   A.  I am now of that, sir.

15   Q.  You are aware that his wife's identification, including

16   her birth certificate, was in the trunk of the car?  Are you

17   aware of that?

18   A.  I am.

19   Q.  Are you aware that his children's passports,

20   identifications, birth certificates were in the trunk of the

21   car?

22   A.  I am.

23   Q.  Are you aware that there was over 75 pieces of jewelry

24   and watches in the trunk of the car?

25   A.  I am.

1    Q.  Are you aware there were multiple pieces of electronic

2    equipment in the trunk of the car, including video cameras

3    and cameras, and other devices?

4    A.  I am.

5    Q.  Are you aware there was luggage in the back of the car?

6    A.  I am now.

7    Q.  What do all of these facts put together tell you?

8    A.  I would take the electronic stuff out only because

9    previously you said that there was no -- no information that

10   was derived from those electronic devices that's being used

11   for this purpose, so I am going to remove that from the

12   equation.

13   Q.  I don't want you to.

14   A.  Okay.

15   Q.  I am talking about someone packing up every important

16   item that you would need and you wouldn't want to fall into

17   the hands of law enforcement -- and it's all packed in your

18   car while you're trying to pick your kids up; what do all

19   those facts together tell you?

20   A.  That you are probably moving from one location to

21   another, whether it be across an international border or

22   protecting those documents, keeping those documents

23   protected.

24   Q.  Are you moving or are you fleeing?

25   A.  I don't know.  I don't know what the individual was

JA1132

1   doing, if they're moving or fleeing.  You asked me what I

2   thought.

3         It indicates to me -- it means you are, one,

4   either securing those documents and/or moving.  It could

5   potentially be fleeing.  It could potentially be --

6   Q.  You interviewed his wife as part of your investigation,

7   correct?

8   A.  Interviewed -- I'm sorry?

9   Q.  His wife?

10  A.  I did.

11  Q.  Did you ask her if they were fleeing?

12  A.  I don't know if I ever asked her that; but that never

13  came up as an issue, fleeing, trying to run from the

14  country.

15  Q.  You weren't at all inquisitive about why someone would

16  take a 6 or $700 phone, smash it in half, have every

17  important item in the trunk of a car while trying to pick

18  your kids up in the middle of the school day -- trying to

19  figure out what was going on, that wasn't important to you

20  in your investigation?

21  A.  Yes, it was.

22  Q.  But you didn't ask anyone about it?

23  A.  I didn't ask the question, again -- the biggest piece

24  for me was looking at the digital footprint, electronics.

25  Q.  So the last thing I want to look at is the travel

1    records for the defendant's wife, Wendy.  Are you familiar

2    with those?

3    A.  I believe I have seen most of them or some of them, yes,

4    sir.

5    Q.  So let's look at --

6         THE COURT:  But this is in 2016?

7         MR. HANDRICH:  The incident we just talked about

8    was in 2016, correct.

9         THE COURT:  I thought the defendant was divorced

10    from his wife in 2014.

11         MR. HANDRICH:  I think that's a question for --

12         THE WITNESS:  I mean, I didn't --

13         THE COURT:  Colonel Smith, when you interviewed

14    her most recently did they talk about the fact that they

15    were divorced?

16         THE WITNESS:  They have never talked to me about

17    being divorced.  Neither side has talked to me about being

18    divorced.  I believe there was a document --

19         THE COURT:  Let me just make sure it's the same

20    person, the same wife.

21         Because the PSR, paragraph 50, says he was married

22    to Wendy Dalaithy Amaral Arévalo, and there was a divorce

23    decree entered -- effective August 11, 2014.

24         Were you aware of that?

25         THE WITNESS:  I was not aware of it.  Initially, I

1    was made aware during this part of the investigation.  It

2    had never been identified to me that they were divorced.

3                THE COURT:  And neither one of them mentioned that

4    they were divorced?  So they're not married anymore.

5                THE WITNESS:  Neither one of them mentioned it to

6    me until I started, I think a few weeks ago, looking at all

7    of the 3300 material, or -- I think it's --

8                THE COURT:  I just want to make sure we're talking

9    about the same person.

10   BY MR. HANDRICH:

11   Q.  And we are -- based on the judge's question, we are

12   talking about the same person, right?  There is only one

13   Wendy that he's ever been involved with?

14   A.  As far as I know.  As far as I know, yes, sir.

15   Q.  And to follow up on another question the judge just

16   asked, until you were just made aware of it, based on all of

17   the conversations you have had with the defendant and other

18   family members, including Wendy, is they're still a couple?

19   A.  It appears to me that they are -- they still maintain

20   some type of relationship, yes, sir.

21   Q.  Okay.  So if there is an active or official divorce

22   decree it's for some other reason than they don't want to be

23   in a relationship?

24   A.  Sir, I am not going to make that assumption.

25   Q.  Let's look at Exhibit 36A.

1        If we go to the third page, these are the

2   translated travel records from Mexico.  I apologize that

3   it's small.

4        Going back to your testimony this morning.  You

5   gave us the impression that Mexico was extremely dangerous

6   for the defendant and his family, and that's why they moved

7   thousands of miles to Argentina and, then, not quite as far

8   as Uruguay.

9        Have you reviewed Wendy's travel records?

10  A.  I looked at them some, not a lot in depth.  I am aware

11  that there was travel back and forth to Mexico.

12  Q.  By my count -- and I may be off by one or two -- it

13  looks like there are 19 trips between 2011 and October of

14  2020.  Is that the behavior of someone who is in danger,

15  traveling to the place that you testified the danger came

16  from?

17  A.  I am just kind of looking through dates real quick.

18  Q.  Take your time.

19  A.  I think you said it was 19 visits over a period of nine

20  years; two to three visits a year max.

21       When I look at it like that -- based on the way

22  you asked me the question, I would say -- have I seen this

23  type of behavior before?

24       Absolutely.

25       People go in and out of Afghanistan in the middle

1    of the war.  They are going to go home.  They are going to

2    go visit people; they are going to go visit family members.

3    I don't know if you have been to Afghanistan, it is not a

4    very safe place to be, especially in certain time frames.

5            So do people go back home and do they travel back

6    to the place where they're from, I believe so.  I don't know

7    specifically why she traveled back to Mexico on these

8    specific dates; I just don't have that information.

9    Q.  You mentioned Afghanistan, right?  It's a dangerous

10   place.  There are people that have left Afghanistan for that

11   reason.  Are they still in the modern age, post, let's say,

12   2010 -- are they still able to conduct business even though

13   they don't live there -- conduct business in Afghanistan?

14           MS. SANCHEZ:  Your Honor, I would object to the

15   relevance at this point.

16           THE COURT:  I am going to sustain that objection.

17   We don't really need to -- we're all through South America.

18   Let's just stay on one continent.

19           MR. HANDRICH:  Okay.  We'll take that question

20   back to Mexico.

21   BY MR. HANDRICH:

22   Q.  Is there anything prohibiting a drug trafficker who

23   lived in Jalisco from moving to South America and conducting

24   his business over telephone and in-person visits when

25   necessary?

1    A.  My view is it would be extremely difficult to do for a

2    number of reasons.

3    Q.  What are those reasons?

4    A.  Well, the geographic portion of it -- just the

5    geographic piece.  Going back once or twice a year, even

6    three times a year, if you are talking about -- as I've

7    heard in testimony, tons and tons of cocaine moving back and

8    forth, being broken up, distributed in different places --

9    it would be very, very difficult to manage and oversee that.

10            Also, I just haven't seen -- I have seen a lot of

11    Blackberry messages, but I haven't seen a lot of a digital

12    footprint that identifies computer imaging or phone imaging

13    that shows that there are a lot of phone calls and other

14    types of messages that the defendant is accused of making --

15    or the spouse, as you have shown here.

16    Q.  So you are saying it would be difficult even in a

17    situation like the defendants where his family has aligned

18    themselves with one of the two most powerful cartels in

19    Mexico and his brothers and other family members and

20    brother-in-law Mencho are in Mexico, he would need to be

21    there to oversee everything; is that what your testimony is?

22    A.  No.  I'm saying it would be difficult for him to still

23    be involved in the drug trafficking business from that

24    distance.  I believe it would be difficult.

25    Q.  Has the defendant ever had a tax-paying job?

1    MS. SANCHEZ:  I am going to object, Your Honor

2    again.  Beyond the scope.

3    THE COURT:  It's overruled.  Overruled.

4    THE WITNESS:  Has he ever had a tax-paying job?

5    BY MR. HANDRICH:

6    Q.  You know, like flipping burgers in high school,

7    delivering a newspaper as a kid, working at the car wash,

8    being an office manager -- all of the types of jobs that

9    young people start with and then graduate to careers?

10   A.  I don't know because I don't know what constitutes a

11   tax-paying job in Mexico; that's my answer, sir.

12   Q.  Okay.  What about nontax-paying jobs in Mexico?

13   A.  I don't know what constitutes a nontax-paying job in

14   Mexico.

15   Q.  You didn't ask him at any point?

16   A.  I did not ask him that question, no, sir.

17   Q.  You would agree with me that at one point -- maybe not

18   today as we sit here -- he had a lot of financial assets?

19   A.  I don't know that I ever saw anything that showed he had

20   extravagant wealth as I use that term.  He didn't use that

21   term.  I don't remember ever seeing anything that indicated

22   that he had a lot of money.

23   THE COURT:  Colonel, if I could just -- because I

24   was curious about whether this was going to come out on

25   direct, maybe it's going to come out on redirect.  But in

1  your conversations with him about the convenience stores

2  that he built in Argentina --

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  -- did you get information from him

5  about what he was doing to make a living in Uruguay?

6              And did you get any financial information from him

7  about how much money he was making either on the convenience

8  stores in Uruguay -- in Argentina or in Uruguay?

9              THE WITNESS:  With Argentina, yes, ma'am, Your

10  Honor.

11             When he moved from Mexico to Argentina, he had a

12  store -- not a convenience store, a business, sold beauty

13  products, license -- had a Disney license as well as other

14  licenses; took the proceeds -- my understanding is the

15  proceeds for that sale were the beginning of the

16  establishment of those two stores and looking to build

17  additional corner stores, the convenience stores --

18             THE COURT:  Do you have financial numbers

19  associated with that?

20             THE WITNESS:  I do not have that, ma'am.  I do not

21  have -- that's why I said it's based on my conversation with

22  him.

23             There is also -- I have seen some documentation

24  that showed that while he was in Argentina those stores --

25  the two stores that were open -- some of them, on certain

1    days, were making up to $30,000, these two convenience

2    stores, between the two of them.

3         I do not know what income was coming in when he

4    was in Uruguay.  That I do not know.

5    BY MR. HANDRICH:

6    Q.  In your 20 some years of experience now, and based on

7    your review of the discovery in this case and being here for

8    the testimony, fair to say drug traffickers often buy

9    legitimate businesses to launder their money?

10   A.  I have seen that, yes, sir.

11   Q.  And, in fact, the Uruguayan government had an active

12   money-laundering case against him at the time of his arrest?

13   A.  I am aware of that, sir.

14         MR. HANDRICH:  No further questions.

15         THE COURT:  Any redirect?

16                    REDIRECT EXAMINATION

17   BY MS. SANCHEZ:

18   Q.  Good afternoon.

19   A.  Good afternoon, ma'am.

20   Q.  Colonel, why did Gerardo Gonzalez Valencia leave Mexico

21   in 2009 and move to Argentina and start a new life?

22   A.  To remove himself from the violence, the rise in crime,

23   the decline of the security situation in Mexico,

24   specifically in Jalisco and Guadalajara.  He wanted to move

25   his family to a safe location -- safer than what was in

1  Guadalajara, one that had a Spanish-speaking -- a

2  Spanish-speaking place, distant -- geographically distant as

3  well.  But, more importantly, in talking to him, that was

4  the number one reason, was to separate himself -- remove

5  himself from the business.

6  Q.  Once he was established, did Wendy and his kids follow?

7  A.  Yes, ma'am, they did.

8       In early 2011 Wendy and the older son -- and both

9  kids went to Argentina.  And upon arrival there, they did

10  what I believe normal families do.  They enrolled their

11  oldest son in school, they also enrolled him in

12  extracurricular activities at the school there.

13  Q.  And even by the government's own stipulation,

14  Mr. Gonzalez Valencia left in 2009 and stayed in Argentina

15  and then Uruguay until his arrest in April of 2016; isn't

16  that correct?

17  A.  Yes, ma'am, it is.

18  Q.  And there were some safety concerns, as there would be

19  with anybody who was involved with a drug trafficking

20  organization; is that correct?

21  A.  Yes, ma'am.

22  Q.  And from the point that he left in 2009 until April of

23  2013, that the government made a point about allegedly --

24  about him going back to Mexico because of the travel

25  records -- four years had passed?

1    A.  Yes, ma'am.

2    Q.  And he had not been in the -- in Mexico, in any kind of

3    drug -- active drug trafficking during that period of four

4    years, correct?  He was in Buenos Aires and then Uruguay?

5    A.  As far as I know, that is correct, ma'am.

6         THE COURT:  As far as you know, based on your

7    conversations with him and with his ex-wife, Wendy?

8         THE WITNESS:  Yes, ma'am.  And reporting open

9    source -- looking at open source.  There was nothing that

10   tied him specifically to any activity associated with the

11   Cuinis or CJNG at that time.

12        THE COURT:  Okay.  And if it was based on a

13   conversation -- I mean, did you ask him specifically about

14   that?

15        THE WITNESS:  I don't remember, ma'am.  I say "I

16   don't remember" because I don't know if I asked him

17   specifically that question --

18        THE COURT:  Were you involved in drug dealing in

19   2009 --

20        THE WITNESS:  Right.  I don't know if I asked that

21   specific question.

22        We did talk about what he was doing, why he

23   moved -- specifically why he moved, and understanding what

24   the family was doing at that time.  Both of them relayed to

25   me that:  Our intent -- our idea was to move away and remain

1    distant from the drug trafficking --

2            THE COURT:  You have said that, and that's all

3    fair; and that's the information you have relayed.

4            But the question was:  Was he involved in drug

5    dealing?  What do you know about that?  I was curious how

6    you can answer unless you actually interview him about that

7    specifically.

8            THE WITNESS:  I did not ask that specific

9    question.

10           THE COURT:  Okay.  So I am going to understand

11   that context in understanding your answer to that specific

12   question about drug dealing.

13           Proceed Ms. Sanchez.

14   BY MS. SANCHEZ:

15   Q.  You had an opportunity to review what amounts to, I

16   think, somewhere around 22 to 2400 pages of wiretap BBM; is

17   that correct?

18   A.  Yes, ma'am, I did.

19   Q.  That was turned over.

20           And out of those 2400 pages of wiretap BBMs that

21   were turned over, with numerous and numerous BBM entries in

22   each one of those pages, there were significant amounts of

23   entries for Abigael, which is "Boss"?

24   A.  Yes, ma'am.

25   Q.  And for Chepa, Santy, Jose Gonzalez Valencia?

```
 1   A.  Yes, ma'am.

 2   Q.  And for Mencho, and for his son Menchito?

 3   A.  Yes, ma'am.

 4   Q.  And numerous other individuals?

 5   A.  Yes, ma'am.

 6   Q.  In the hundreds and thousands of entries, correct?

 7   A.  That is correct.

 8   Q.  But when you looked at what the government is alleging

 9   is my client, Gonzalez Valencia, Gerardo, there was only a

10   handful of entries; isn't that correct?

11   A.  I believe that's correct.

12   Q.  For a short period of time -- I believe from April to

13   maybe September are the ones that they're alleging?

14   A.  Yes, ma'am.

15   Q.  And I think they total something like maybe 30 entries

16   or 40 entries at most?

17   A.  I don't recall the number, but that appears to be

18   correct.

19   Q.  A very short number?

20   A.  Yes, ma'am.

21   Q.  A small number?

22            Let me not say "short."  A small number?

23   A.  Of the volume -- it was about that thick (indicating).

24   Yes, ma'am.

25   Q.  And they allege that a Silverio is the person on there
```

JA1145

1    that is my client, Mr. Gonzalez Valencia; isn't that

2    correct?

3    A.  Yes, ma'am, it is.

4    Q.  But we have already shown through direct examination and

5    the exhibits that have come in, that -- it's questionable

6    whether Silverio is my client, Mr. Gonzalez Valencia; isn't

7    that correct?

8    A.  Yes, ma'am.

9    Q.  And just to even show the example of the Silverio

10   regarding the travel to Uruguay and then Africa, and then

11   we're also speaking about the E.U. that's in those text

12   messages -- do you remember that?

13   A.  I do.  Yes, ma'am.

14   Q.  So my client went to Africa with another gentleman from

15   Mexico by the name of Molina, and Molina's son.  I believe

16   you were shown his picture earlier today; it was Defense

17   Exhibit 30.

18   A.  Yes.  I did see it earlier.

19          THE COURT:  Did you know that that was Mr. Molina?

20          THE WITNESS:  I do not specifically know -- I know

21   there was a picture that was referred --

22          THE COURT:  Ms. Sanchez, this is making your

23   closing argument --

24          MR. HANDRICH:  I am going to object to the form of

25   the question only because I think there was evidence within

1    the question that wasn't before us today yet.  And so it's

2    hard --

3               THE COURT:  Before us today yet?  Aren't we at the

4    end?

5               MR. HANDRICH:  Yes.  No, I am saying that's why

6    the question -- it's not based on any evidence before the

7    Court.

8               THE COURT:  This is the last witness, as I

9    understand it.

10              Ms. Sanchez, he doesn't know who Mr. Molina is.  I

11   don't know who Mr. Molina is.  You have an ability and an

12   opportunity to submit supplemental briefing; you can save

13   your arguments for that.

14   BY MS. SANCHEZ:

15   Q.  Assuming that --

16              THE COURT:  And maybe somebody will tell me who

17   Mr. Molina is.  I don't know.

18   BY MS. SANCHEZ:

19   Q.  Assuming that the gentleman in Defense Exhibit No. 30

20   was traveling as well to Africa from Mexico --

21              MR. HANDRICH:  I am going to object.  He can't

22   assume.

23              MS. SANCHEZ:  For my hypothetical he can.

24              MR. HANDRICH:  Objection.

25              THE COURT:  Objection to the hypothetical?

1    BY MS. SANCHEZ:

2    Q.  Let me ask it like this:  If you were flying from Mexico

3    to Africa, would you not fly through the United States or

4    Europe to connect to Africa?

5    A.  Yes.  More than likely to one of those two countries.

6    Q.  And E.U. stands for either the United States or for

7    Europe, correct?

8    A.  That's how I would interpret it based off of the

9    Blackberry messages.

10   Q.  And if Silverio was not Mr. Gonzalez Valencia, he would

11   be another individual that traveled to Africa as well.  In

12   the earlier texts it would make sense that Abigael, Boss,

13   would say that:  My father had a stroke -- instead of "our

14   father," correct?

15   A.  I'm sorry.  Could you ask the question one more time,

16   please?

17   Q.  All right.  If Silverio was not my client and he was

18   another individual that traveled to Africa as well, would it

19   then make more sense that Boss would have referred, when

20   speaking to him, by saying it was "my father" who had an

21   incident, not -- a stroke, not "our father"?  Wouldn't that

22   explain "my father," quote, from Boss?

23   A.  If it were not a sibling, absolutely.

24   Q.  Okay.  As far as -- you were asked questions about two

25   passports.  If somebody was nervous about being found out

1    because they had previously been in a drug trafficking

2    organization, would that also explain why one would travel

3    with a different named passport, to protect themselves?

4    A.  That is possible.

5    Q.  And as far as the consciousness of guilt of breaking the

6    cell phone or the Apple phone -- and I agree with you that

7    that could look like it's a consciousness of guilt.

8    However, could it be the consciousness of guilt because the

9    person didn't want to find out that -- for his wife to find

10   out that he was having an affair, for instance?

11   A.  That is a possibility.

12   Q.  Or that he had some sort of illicit photos on that phone

13   that he didn't want someone to find out or see?

14   A.  That is possible, yes, ma'am.

15   Q.  And as far as having all of the items in the trunk of

16   the car, that could mean anything from going on vacation

17   versus being concerned, as the Uruguayans had already noted,

18   that he had spotted -- that he was being surveilled for

19   several days, correct?

20   A.  Yes, ma'am, that is.

21   Q.  So there is no way for Mr. Gonzalez Valencia to know if

22   he was being surveilled by police officers or from people

23   that were looking at him trying to get vengeance on him for

24   something that he might have done in the past?

25   A.  That is correct.

JA1149

1    Q.  As far as Wendy traveling back to Mexico, you are aware

2    that her entire family lives there?

3    A.  Yes, ma'am, I am.

4    Q.  And she is actually living there even currently with her

5    children?

6    A.  Yes, ma'am, she is.

7                MS. SANCHEZ:  I have nothing further, Your Honor.

8                THE COURT:  Okay.  You are excused.  Thank you.

9                THE WITNESS:  Thank you, ma'am.

10                THE COURT:  Any other witnesses?

11                MS. SANCHEZ:  No, Your Honor.

12                THE COURT:  And no rebuttal witnesses I take it?

13                MS. NASEEF:  No.

14                I just want to admit the 3500 material from

15    yesterday that we discussed.  We added exhibit numbers to

16    everything, if I can pass that up.

17                THE COURT:  Okay.  And we already have the post

18    hearing brief schedule which -- all of those post hearing

19    briefs are going to be ripe by June 23.  We have the

20    sentencing date for July 13th.

21                I would ask --

22                MS. SANCHEZ:  I believe the sentencing date got

23    changed to July 21st.

24                THE COURT:  It's July 21st?

25                THE COURTROOM DEPUTY:  Yes, Your Honor.

1          THE COURT:  Okay.  I am here at everybody's

2     convenience since I am here every day.

3          So we have the schedule.

4          Let me just keep you-all focused on the specific

5     issues in front of me at sentencing that are disputed:

6     Criminal history score, and probation has informed me that

7     it has revised its Criminal History Category from II to III,

8     having looked at the documentation and me puzzling over how

9     they could get to II and not III.  They agree, it is

10    Criminal History Category III, but I will hear further

11    arguments on that if the defense wants to continue

12    contesting the criminal history category.

13          Then we have to focus on whether or not this

14    hearing evidence has established that the defendant's

15    conspiracy involved more or less than 450 kilograms of

16    cocaine, whether he was an organizer or leader under

17    Section 3B1.1(a) of the guidelines and whether he possessed

18    a dangerous weapon during the course of his conspiracy under

19    2D1.1(b)(1), and two offense levels are disputed about

20    directing the use of violence under the guideline at

21    2D1.1(b)(2).

22          Based on the testimony of the witnesses here,

23    those are the specific issues I am focusing on.  So if you

24    can take each of those issues one by one and tell me what

25    the evidence has elicited at this hearing or in the 3500

1    material or the other exhibits that goes to prove by a

2    preponderance of the evidence each of those points, that

3    would be helpful.

4            I know the defense is going to say none of that

5    evidence is believable for various reasons, but that's what

6    I am looking forward to and, also, the analysis of the 3500

7    notebook in terms of what was missing or not missing.  But

8    perhaps you will be able to focus on that analysis in your

9    supplemental briefing based on what you hear from the

10   defendant's brief.

11           MS. NASEEF:  Your Honor, we will also be

12   supplementing the forfeiture briefing as well, so we will

13   file supplemental --

14           THE COURT:  For the $250 million forfeiture

15   judgment?

16           MS. NASEEF:  Yes.  Because usually those are

17   submitted after the evidence is already in.  So we will

18   amend that to reflect the evidence that was admitted into

19   evidence during this hearing.  And by the rules, it requires

20   a preliminary forfeiture finding before the actual

21   sentencing date on the 21st, so that will all be in the

22   additional supplemental briefing.

23           THE COURT:  Right.  Which is a timing thing.  It's

24   almost as if the rules were written by people who don't

25   actually litigate, but there you go.

1          Yes.  Part of the government's briefing, I think,

2     should demonstrate the $250 million.  And I know you are

3     using a conservative amount per kilo based on what the price

4     was in Mexico.  I don't know why.  If that's really what you

5     are insisting on as opposed to the price in L.A. or

6     New York, anywhere in the United States -- explain to me why

7     I should use one version or the other based on -- you know,

8     you've listed in your papers 11 different shipments.  The

9     shipments and loads of cocaine that are corroborated by both

10    seizures and multiple witnesses seems like where the focus

11    should be, and everything -- all of the other loads seem to

12    be beside the point.  But you will do your own math and how

13    you get to your 250 million, plus the 450 or more kilograms

14    of cocaine beyond the 280 that the defendant has already

15    admitted to.

16          Focused briefing.

17          All right.  Anything further from the government

18    today other than that --

19          MS. NASEEF:  No.  I just want to hand this up.

20          THE COURT:  -- which Ms. Gumiel will accept.

21          Anything further from the defense?

22          MS. SANCHEZ:  No, Your Honor.  Thank you very

23    much.

24          THE COURT:  All right.  You are all excused.

25          MS. SANCHEZ:  Thank you very much for your

JA1153

1     patience.

2              THE COURT:   Thank you.

3              (Whereupon, the proceeding concludes, 3:26 p.m.)

4                         * * * * *

5                         **CERTIFICATE**

6

7              I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

8     certify that the foregoing constitutes a true and accurate

9     transcript of my stenographic notes, and is a full, true,

10    and complete transcript of the proceedings to the best of my

11    ability.

12             This certificate shall be considered null and void

13    if the transcript is disassembled and/or photocopied in any

14    manner by any party without authorization of the signatory

15    below.

16

17       Dated this 19th day of May, 2023.

18
         /s/ Elizabeth Saint-Loth, RPR, FCRR
19       Official Court Reporter

20

21

22

23

24

25

1

**$**

**$10,000** [1] - 8:15
**$13,000** [1] - 8:24
**$250** [2] - 175:14, 176:2
**$26,000** [6] - 8:20, 32:21, 32:23, 36:15, 37:4, 111:22
**$30,000** [1] - 164:1
**$40,000** [2] - 73:10, 112:9
**$700** [1] - 156:16

**'**

**'10** [1] - 56:10
**'13** [1] - 110:17

**/**

**/s** [1] - 177:18

**1**

**1** [12] - 14:22, 26:10, 26:22, 29:14, 34:7, 38:12, 115:13, 115:14, 126:10, 126:12, 127:19, 133:9
**1.3** [1] - 74:10
**1.35** [2] - 74:17
**1.38** [2] - 74:10, 74:18
**1.4** [2] - 73:25, 74:5
**10** [8] - 101:13, 101:19, 102:4, 102:6, 123:15, 140:23, 141:19, 143:4
**10,000** [2] - 71:13, 72:17
**100** [8] - 35:3, 36:11, 36:13, 36:18, 36:22, 36:24, 96:24, 117:16
**11** [11] - 78:21, 78:23, 88:16, 88:18, 123:15, 123:17, 124:14, 126:7, 128:23, 157:23, 176:8
**110** [3] - 92:8, 116:8, 117:14
**12** [8] - 31:24, 87:11, 88:11, 88:12, 88:22, 96:23, 105:21, 127:8
**13** [2] - 128:21, 129:13
**13th** [4] - 1:17, 34:2, 34:3, 173:20
**14** [5] - 31:24, 88:25,

127:2, 127:4, 129:4
**145** [1] - 1:11
**14:33** [1] - 132:24
**14:50:33** [1] - 129:13
**15** [7] - 8:11, 35:2, 69:5, 96:23, 110:6, 110:14, 127:6
**15,000** [3] - 71:12, 72:15
**150** [1] - 113:10
**16** [10] - 14:8, 27:23, 32:4, 38:1, 128:22, 129:5, 130:3, 132:20, 133:15, 135:21
**16-65** [1] - 2:3
**16-65-1** [1] - 1:3
**17** [9] - 28:2, 31:7, 34:5, 89:6, 116:18, 119:4, 126:8, 133:15, 133:16
**18** [7] - 34:16, 37:10, 109:25, 110:3, 110:5, 113:4, 113:5
**180** [2] - 117:12, 117:15
**18th** [1] - 86:17
**19** [5] - 35:22, 109:24, 134:2, 159:13, 159:19
**1987** [1] - 92:13
**19:47:19** [1] - 129:16
**19th** [1] - 177:17
**1st** [1] - 36:9

**2**

**2** [13] - 11:12, 12:6, 12:7, 17:8, 25:1, 34:7, 34:8, 43:19, 70:8, 115:12, 127:20, 130:14
**20** [10] - 8:14, 8:20, 10:1, 36:6, 111:14, 111:16, 134:3, 135:21, 146:15, 164:6
**200** [3] - 36:4, 36:5, 104:3
**2000** [5] - 12:14, 12:17, 90:25, 95:24, 103:17
**20005** [1] - 1:18
**2002** [5] - 91:5, 91:6, 91:14, 91:25, 93:7
**2003** [4] - 8:14, 8:17, 91:14, 93:7
**2005** [1] - 48:4
**2006** [2] - 99:20, 102:18

**2007** [12] - 9:17, 10:1, 12:9, 15:14, 16:22, 58:4, 58:19, 84:16, 85:6, 85:15, 95:8, 110:17
**2009** [26] - 8:14, 8:18, 14:9, 48:4, 56:10, 56:14, 56:15, 57:5, 57:23, 60:20, 61:17, 61:19, 84:16, 85:6, 85:15, 95:8, 99:2, 99:16, 100:19, 100:20, 100:21, 103:3, 164:21, 165:14, 165:22, 166:19
**2010** [6] - 31:6, 77:23, 95:24, 107:14, 116:16, 160:12
**2011** [4] - 100:23, 103:17, 159:13, 165:8
**2012** [3] - 57:19, 57:20, 103:17
**2013** [52] - 8:22, 9:1, 17:19, 26:24, 27:2, 27:4, 27:18, 27:21, 28:1, 29:16, 29:17, 29:22, 31:5, 31:10, 33:1, 33:7, 33:21, 34:2, 34:3, 34:19, 35:25, 36:9, 37:11, 38:11, 47:16, 73:5, 73:6, 73:11, 73:22, 77:6, 86:17, 88:19, 108:17, 108:18, 111:5, 112:7, 123:15, 124:14, 124:15, 126:8, 128:22, 129:5, 131:15, 132:8, 132:23, 134:20, 138:16, 138:25, 139:2, 140:23, 141:19, 165:23
**2014** [4] - 17:19, 116:16, 157:10, 157:23
**2015** [2] - 91:24, 92:15
**2016** [9] - 38:20, 43:8, 43:12, 52:11, 57:23, 99:3, 157:6, 157:8, 165:15
**2017** [6] - 3:21, 47:8, 47:24, 52:10, 62:9, 62:11
**2019** [1] - 44:5
**202** [2] - 1:12, 1:18
**2020** [3] - 44:18, 95:20, 159:14

**2021** [4] - 64:18, 67:1, 67:8, 67:24
**2022** [3] - 105:21, 144:14, 144:15
**2023** [2] - 1:4, 177:17
**20530** [1] - 1:12
**20th** [1] - 27:2
**21** [2] - 37:7, 86:13
**21st** [7] - 9:17, 12:9, 38:20, 39:14, 124:15, 124:16, 125:14, 131:15, 173:23, 173:24, 175:21
**22** [3] - 28:10, 136:8, 167:16
**23** [9] - 18:19, 38:8, 87:12, 88:11, 88:14, 98:24, 128:2, 128:9, 173:19
**24** [3] - 20:10, 28:10, 136:18
**24/7** [1] - 102:16
**2400** [2] - 167:16, 167:20
**25** [3] - 23:3, 23:10, 23:13
**25,000** [1] - 9:2
**250** [3] - 59:5, 59:7, 176:13
**26** [16] - 23:3, 23:10, 23:13, 34:19, 36:11, 37:2, 73:16, 74:21, 75:4, 76:1, 76:2, 108:17, 111:5, 111:12, 111:17, 112:12
**26,000** [4] - 9:2, 74:9, 74:16, 112:12
**27** [4] - 23:20, 88:19, 126:8, 143:4
**28** [4] - 29:3, 91:8, 137:21, 138:1
**280** [6] - 10:13, 53:24, 58:12, 58:14, 58:17, 176:14
**29** [3] - 29:8, 89:10, 138:19
**2:15** [3] - 115:13, 130:14, 130:24
**2:33** [1] - 132:25
**2D1.1(b)(1** [1] - 174:19
**2D1.1(b)(2)** [1] - 174:21
**2nd** [1] - 31:10

**3**

**3** [13] - 13:1, 13:5, 13:15, 36:10, 78:23,

78:24, 78:25, 79:1, 79:2, 126:9, 126:15, 126:19, 127:21
**30** [8] - 82:13, 82:17, 83:3, 88:2, 89:10, 168:15, 169:17, 170:19
**30,000** [1] - 144:18
**30,000-plus** [1] - 145:3
**300** [1] - 103:18
**30th** [2] - 29:22, 38:11
**3300** [1] - 158:7
**34** [1] - 56:24
**340** [1] - 96:22
**347** [1] - 95:21
**35** [2] - 23:20, 73:11
**35,100** [1] - 74:18
**3500** [4] - 95:15, 173:14, 174:25, 175:6
**3500-ONV-44** [1] - 64:23
**3500-ONV-62** [1] - 72:10
**36** [6] - 25:11, 25:14, 25:15, 26:3, 76:16, 77:10
**36A** [4] - 25:12, 25:14, 25:16, 158:25
**37** [3] - 25:19, 25:21, 26:3
**37A** [4] - 25:19, 25:22, 134:7, 138:21
**38** [4] - 25:24, 26:3, 76:16, 77:12
**387** [1] - 95:21
**39** [2] - 26:7, 31:12
**3:26** [1] - 177:3
**3B1.1(a** [1] - 174:17
**3rd** [5] - 15:13, 16:22, 35:25, 64:18, 67:1

**4**

**4** [12] - 1:4, 13:1, 13:7, 13:8, 13:15, 36:1, 37:12, 86:20, 89:9, 129:19, 141:18, 142:8
**4/21** [1] - 126:3
**40** [9] - 26:21, 29:14, 112:9, 124:5, 131:13, 134:5, 140:21, 168:16
**40-degree** [1] - 55:15
**40s** [1] - 73:11
**41** [1] - 29:23
**42** [1] - 40:5
**43** [3] - 40:17, 40:19,

41:4
**44** [1] - 41:9
**45** [1] - 41:15
**450** [6] - 76:15, 76:21, 77:9, 77:11, 174:15, 176:13
**46** [1] - 41:23
**47** [5] - 40:17, 40:19, 42:4, 42:13, 42:20
**48A** [1] - 43:15
**49** [2] - 18:19, 33:24
**4th** [1] - 27:4

## 5

**5** [9] - 34:20, 34:25, 37:2, 37:12, 110:5, 110:17, 111:17
**5,000** [2] - 72:17, 99:21
**50** [12] - 32:9, 32:10, 32:12, 36:11, 36:14, 36:19, 36:25, 93:14, 157:21
**500** [6] - 31:18, 32:7, 34:9, 34:12
**51** [2] - 32:9, 32:14
**52** [2] - 24:24, 25:1
**536-1737** [1] - 1:18
**56** [1] - 76:7
**59** [2] - 105:18, 106:1
**598-2950** [1] - 1:12
**5th** [16] - 27:18, 27:21, 28:1, 29:11, 124:24, 125:2, 125:7, 131:16, 131:25, 132:23, 134:20, 137:24, 138:16, 138:23, 139:2, 143:4

## 6

**6** [4] - 8:15, 34:20, 34:25, 156:16
**60-year** [1] - 93:14
**600** [1] - 1:17
**601** [1] - 1:17
**67** [1] - 32:18
**6A** [1] - 14:22

## 7

**7** [2] - 42:13, 113:8
**7-Eleven** [1] - 103:6
**7-Eleven-type** [1] - 102:16
**700** [1] - 14:17
**71** [1] - 33:11
**75** [1] - 154:23
**7A** [1] - 17:4

**7th** [1] - 126:4

## 8

**8** [9] - 8:24, 29:16, 29:17, 35:11, 35:14, 86:24, 113:8, 138:25, 143:4
**85** [7] - 35:2, 110:6, 110:14, 139:12, 140:6, 140:9, 141:16
**8th** [1] - 29:12

## 9

**9** [9] - 18:19, 23:12, 23:15, 31:11, 100:25, 101:9, 101:11, 102:8, 143:8
**96** [2] - 33:13, 33:14
**9:05** [1] - 1:4
**9:22:44** [1] - 141:20

## A

**a.m** [1] - 1:4
**abbreviation** [2] - 114:13, 114:20
**Abigail** [48] - 22:4, 22:8, 22:20, 22:24, 23:5, 23:10, 23:17, 23:22, 28:1, 31:10, 31:18, 32:12, 34:1, 34:11, 34:19, 35:4, 35:24, 36:8, 37:9, 79:5, 79:23, 86:8, 86:16, 86:18, 86:20, 86:24, 88:18, 122:8, 122:23, 123:6, 123:18, 123:19, 124:1, 126:12, 126:15, 126:24, 127:9, 127:15, 127:19, 128:9, 132:22, 134:2, 135:21, 135:23, 136:8, 143:11, 167:23, 171:12
**Abigail's** [3] - 22:7, 125:9, 125:18
**ability** [2] - 170:11, 177:11
**able** [24] - 4:21, 12:2, 18:3, 20:1, 21:2, 21:12, 36:25, 40:9, 44:13, 59:7, 59:8, 60:6, 60:8, 62:22, 69:14, 83:8, 102:21, 105:5, 111:8, 113:21, 133:23, 150:24, 160:12,

175:8
**absconded** [1] - 136:1
**absent** [1] - 116:1
**Absolutely** [1] - 90:22
**absolutely** [3] - 63:3, 159:24, 171:23
**absorb** [1] - 85:20
**academy** [1] - 58:6
**accent** [1] - 100:2
**accept** [2] - 63:2, 176:20
**access** [1] - 128:16
**accompanied** [2] - 26:4, 30:8
**according** [3] - 27:17, 131:18, 131:22
**accounts** [1] - 125:5
**accurate** [4] - 26:15, 42:6, 110:10, 177:8
**accurately** [1] - 20:14
**accused** [1] - 161:14
**acknowledged** [1] - 122:2
**acquaintances** [1] - 103:4
**Act** [1] - 5:3
**acted** [1] - 56:3
**Action** [1] - 1:2
**action** [2] - 98:1, 98:7
**active** [5] - 91:8, 147:2, 158:21, 164:11, 166:3
**activities** [5] - 54:19, 103:23, 116:4, 116:13, 165:12
**activity** [9] - 54:23, 96:5, 104:5, 107:6, 116:25, 118:20, 153:4, 153:8, 166:10
**actual** [4] - 100:9, 113:1, 119:5, 175:20
**added** [1] - 173:15
**additional** [9] - 4:4, 139:11, 148:23, 149:1, 150:16, 150:19, 153:12, 163:17, 175:22
**addressing** [1] - 7:12
**adduced** [1] - 58:3
**Administration** [2] - 3:17, 120:7
**admit** [3] - 24:23, 25:2, 173:14
**admits** [1] - 57:6
**admitted** [12] - 18:20, 53:23, 68:8, 100:10, 101:11, 102:5, 102:6, 109:1, 140:7, 140:9, 175:18, 176:15

**admitting** [1] - 140:3
**advisor** [1] - 91:11
**advocacy** [1] - 94:24
**affair** [1] - 172:10
**Afghanistan** [5] - 159:25, 160:3, 160:9, 160:10, 160:13
**Africa** [17] - 29:20, 82:8, 83:12, 137:25, 141:1, 141:4, 141:5, 141:7, 141:12, 142:3, 169:10, 169:14, 170:20, 171:3, 171:4, 171:11, 171:18
**African** [1] - 83:7
**afternoon** [7] - 90:3, 90:4, 115:18, 115:19, 131:9, 164:18, 164:19
**age** [1] - 160:11
**agencies** [5] - 91:18, 91:22, 91:23, 93:5, 108:9
**agency** [2] - 134:14, 150:10
**Agency** [3] - 92:18, 92:20, 149:14
**agent** [17] - 3:16, 3:20, 3:21, 3:24, 4:24, 5:2, 5:5, 7:20, 8:9, 35:18, 54:16, 64:16, 65:24, 66:2, 66:7, 68:16, 85:20
**Agent** [13] - 1:20, 2:24, 3:5, 12:5, 15:24, 16:7, 25:13, 45:9, 48:4, 65:23, 86:7, 88:1, 89:20
**agents** [4] - 5:18, 7:16, 55:18, 85:18
**aggressive** [1] - 145:7
**ago** [4] - 47:7, 126:25, 138:5, 158:6
**agree** [13] - 76:1, 118:3, 120:18, 122:18, 129:9, 133:1, 133:23, 138:5, 148:12, 152:9, 162:17, 172:6, 174:9
**agreed** [1] - 75:21
**agreeing** [2] - 37:4, 138:9
**Aguililla** [4] - 41:22, 96:18, 109:13
**ahead** [3] - 11:10, 126:14, 141:13
**aided** [1] - 1:25

**air** [1] - 28:16
**aircraft** [1] - 10:2
**Aires** [9] - 99:22, 100:21, 101:6, 101:7, 102:17, 102:19, 103:1, 103:9, 166:4
**airline** [2] - 134:21, 135:14
**Airlines** [5] - 134:22, 135:7, 135:9, 135:16, 138:17
**airplane** [1] - 46:1
**airport** [5] - 135:2, 135:4, 138:18, 139:1, 139:3
**Airport** [2] - 134:21, 135:1
**alias** [2] - 24:13, 41:14
**aligned** [4] - 61:21, 62:1, 62:3, 161:17
**aligning** [1] - 112:22
**alignments** [1] - 94:12
**allegations** [3] - 53:13, 55:16, 114:6
**allege** [1] - 168:25
**alleged** [2] - 55:10, 132:4
**allegedly** [1] - 165:23
**alleging** [5] - 53:13, 79:4, 79:9, 168:8, 168:13
**allow** [1] - 20:1
**allowing** [2] - 11:1, 30:17
**almost** [9] - 22:9, 73:25, 105:7, 142:9, 142:12, 142:17, 142:18, 147:6, 175:24
**alone** [4] - 49:10, 143:2, 152:19, 153:16
**Alonso** [2] - 41:7, 41:14
**alphanumeric** [1] - 19:1
**alright** [1] - 134:2
**ALSO** [1] - 1:20
**Amaral** [4] - 99:4, 101:21, 101:25, 157:22
**amend** [1] - 175:18
**AMERICA** [1] - 1:2
**America** [18] - 2:3, 6:6, 6:13, 33:16, 33:19, 70:19, 91:10, 114:23, 118:17, 135:17, 135:18, 135:19, 137:16,

141:6, 141:13, 160:17, 160:23
**American** [2] - 137:9, 137:11
**amigo** [1] - 24:2
**amount** [7] - 76:14, 76:18, 76:25, 77:8, 114:2, 114:7, 176:3
**amounts** [2] - 167:15, 167:22
**analysis** [8] - 94:2, 112:10, 148:9, 148:25, 149:9, 150:3, 175:6, 175:8
**Analyst** [2] - 66:3, 66:8
**analyst** [5] - 66:6, 66:9, 108:5, 108:12, 148:1
**analysts'** [1] - 94:10
**analytic** [1] - 148:13
**analyze** [6] - 55:1, 93:1, 93:21, 93:23, 94:10, 110:17
**analyzed** [3] - 78:10, 120:14, 148:23
**ANCALLE** [1] - 1:20
**Ancalle** [2] - 2:10, 10:17
**ANCALLE-JIMENEZ** [1] - 1:20
**Ancalle-Jimenez** [1] - 2:10
**Android** [1] - 18:5
**Angela** [1] - 2:9
**ANGELA** [1] - 1:20
**Angeles** [9] - 3:17, 3:18, 7:4, 8:17, 8:19, 9:1, 32:25, 33:2, 33:3
**angry** [1] - 55:22
**animals** [1] - 30:5
**answer** [11] - 16:25, 68:7, 119:3, 125:25, 146:13, 149:13, 151:7, 153:15, 162:11, 167:6, 167:11
**answered** [1] - 148:19
**antiterrorism** [1] - 91:12
**apart** [1] - 93:10
**apartment** [2] - 103:8, 103:11
**apologize** [4] - 66:15, 95:12, 109:25, 159:2
**app** [1] - 18:4
**apparent** [1] - 147:1
**appear** [5] - 34:4, 37:19, 129:3,

138:14, 143:18
**APPEARANCES** [1] - 1:8
**appeared** [1] - 10:2
**Apple** [1] - 172:6
**application** [2] - 47:17, 47:18
**appreciate** [2] - 2:19, 119:11
**approach** [7] - 65:5, 72:11, 72:25, 74:12, 76:8, 82:14, 139:14
**approached** [1] - 39:22
**approximate** [2] - 8:16, 8:25
**April** [16] - 27:2, 38:20, 105:21, 123:15, 123:17, 124:14, 124:15, 124:16, 124:17, 125:6, 125:14, 131:15, 132:6, 165:15, 165:22, 168:12
**aqui** [1] - 24:1
**area** [18] - 8:17, 9:1, 33:2, 85:2, 96:16, 97:10, 103:9, 103:13, 104:2, 104:10, 109:10, 116:4, 145:14, 145:16, 145:22, 145:25, 146:14, 147:25
**areas** [1] - 145:20
**Argentina** [22] - 56:17, 57:5, 57:16, 77:24, 98:13, 99:20, 99:24, 102:12, 102:23, 103:20, 103:25, 132:3, 159:7, 163:2, 163:8, 163:9, 163:11, 163:24, 164:21, 165:9, 165:14
**Argentinian** [1] - 103:15
**argument** [2] - 68:11, 169:23
**arguments** [6] - 68:13, 69:6, 69:7, 69:10, 170:13, 174:11
**arm** [2] - 107:1, 107:9
**Army** [7] - 92:4, 92:5, 92:10, 116:7, 116:10, 116:23
**army** [1] - 92:9
**arrest** [36] - 26:13, 26:16, 38:22, 38:25,

39:2, 39:4, 39:5, 39:10, 39:11, 39:18, 40:3, 40:14, 40:22, 42:15, 42:18, 42:24, 45:10, 48:7, 48:11, 49:7, 49:20, 49:21, 49:24, 50:7, 52:25, 53:14, 57:24, 61:4, 87:15, 88:5, 99:2, 104:22, 152:10, 152:12, 164:12, 165:15
**arrested** [2] - 38:21, 52:11
**arrival** [1] - 165:9
**arrive** [1] - 38:13
**arrived** [2] - 59:6, 125:15
**arrives** [1] - 38:14
**article** [7] - 14:24, 15:1, 17:6, 17:9, 43:17, 43:20
**articles** [4] - 4:22, 61:6, 61:7, 61:8, 61:16
**Arévalo** [1] - 157:22
**aside** [1] - 148:20, 150:2
**assessment** [3] - 112:1, 128:1, 147:20
**assets** [1] - 162:18
**assigned** [7] - 3:17, 3:18, 5:18, 91:14, 91:18, 92:3, 92:7
**assist** [2] - 94:16, 94:19
**assistant** [1] - 119:24
**associate** [1] - 30:16
**associated** [8] - 19:2, 19:3, 20:12, 20:21, 21:8, 21:13, 163:19, 166:10
**assume** [10] - 64:17, 67:22, 73:24, 74:4, 74:9, 132:12, 132:15, 137:11, 137:20, 170:22
**assumed** [4] - 74:10, 74:22, 76:2, 134:1
**assuming** [4] - 74:21, 143:13, 170:15, 170:19
**assumption** [3] - 132:9, 143:12, 158:24
**assumptions** [1] - 112:20
**atrocities** [1] - 95:25
**attachment** [1] - 10:4
**attachés** [2] - 92:7,

117:16
**attempt** [2] - 55:1, 102:16
**attempted** [5] - 10:8, 39:15, 44:6, 51:6, 51:16
**attempting** [3] - 39:2, 145:1, 145:24
**attended** [1] - 3:24
**attention** [8] - 9:17, 14:8, 15:13, 38:19, 44:19, 66:13, 82:2, 116:17
**attorney** [1] - 99:7
**AUC** [2] - 93:10, 93:15
**August** [5] - 9:17, 10:1, 12:9, 31:10, 157:23
**aunt** [3] - 86:9, 86:20, 86:22
**AUSA** [1] - 1:20
**authenticity** [2] - 26:4, 30:9
**authorization** [1] - 177:14
**authorized** [1] - 17:15
**authors** [1] - 96:4
**Autodefensas** [1] - 93:10
**automatically** [2] - 137:20, 143:13
**available** [5] - 95:3, 95:6, 96:2, 109:9, 109:18
**average** [1] - 112:8
**aware** [46] - 11:4, 15:17, 38:24, 43:2, 46:2, 52:20, 53:16, 56:5, 61:15, 71:2, 71:9, 72:24, 85:8, 85:17, 85:19, 118:8, 122:1, 123:16, 123:20, 133:4, 135:11, 135:20, 141:22, 144:20, 146:13, 146:17, 147:4, 147:6, 154:5, 154:6, 154:7, 154:12, 154:15, 154:17, 154:19, 154:23, 155:1, 155:5, 157:24, 157:25, 158:1, 158:16, 159:10, 164:13, 173:1

**B**

**background** [2] - 120:10, 147:21

**backing** [1] - 60:14
**backwards** [1] - 48:6
**bad** [1] - 81:18
**based** [46] - 8:1, 12:11, 28:8, 32:1, 35:12, 36:17, 38:16, 45:20, 46:18, 48:21, 68:7, 69:6, 71:5, 72:22, 72:23, 74:24, 75:12, 102:17, 112:20, 118:4, 120:6, 120:10, 121:10, 128:14, 135:17, 135:18, 135:22, 138:5, 140:22, 145:21, 147:9, 148:13, 158:11, 158:16, 159:21, 163:21, 164:6, 166:6, 166:12, 170:6, 171:8, 174:22, 175:9, 176:3, 176:7
**basic** [1] - 3:24
**basis** [1] - 74:2
**bath** [1] - 103:11
**battalion** [1] - 91:12
**BBM** [23] - 17:22, 17:23, 17:25, 18:22, 18:25, 19:11, 56:10, 73:20, 75:4, 75:17, 77:17, 78:11, 86:16, 121:19, 123:15, 126:7, 130:6, 132:20, 133:5, 139:10, 141:22, 167:16, 167:21
**BBMs** [6] - 47:11, 47:14, 47:19, 75:6, 125:19, 167:20
**beach** [3] - 104:15, 104:17
**beauty** [1] - 163:12
**became** [1] - 93:11
**become** [5] - 5:10, 7:18, 8:9, 93:13, 112:3
**bedroom** [2] - 103:10, 103:11
**BEFORE** [1] - 1:6
**began** [1] - 19:17
**begin** [1] - 7:12
**beginning** [2] - 143:20, 163:15
**behalf** [2] - 2:13
**behavior** [2] - 159:14, 159:23
**believable** [1] - 175:5
**below** [4] - 43:24, 76:21, 77:9, 177:15

**benefit** [1] - 79:4
**BERYL** [1] - 1:6
**beside** [1] - 176:12
**Best** [1] - 2:13
**BEST** [98] - 1:14, 2:12, 2:18, 12:15, 16:1, 16:19, 40:18, 46:9, 46:23, 47:1, 47:2, 51:19, 51:25, 54:1, 54:6, 56:23, 57:2, 64:9, 64:12, 64:15, 64:22, 64:24, 65:5, 65:7, 65:22, 66:12, 68:14, 68:21, 68:25, 69:11, 69:17, 72:7, 72:8, 72:11, 72:13, 72:25, 73:2, 73:3, 73:13, 74:3, 74:8, 74:12, 74:15, 76:8, 76:11, 76:17, 76:23, 77:14, 77:20, 78:4, 78:6, 78:20, 78:22, 79:1, 79:3, 82:14, 82:16, 83:2, 83:4, 83:22, 83:25, 84:6, 84:10, 84:12, 85:3, 85:24, 86:4, 89:25, 90:10, 90:23, 90:24, 97:5, 101:9, 101:12, 101:17, 101:18, 102:3, 102:10, 102:11, 105:19, 106:1, 106:3, 107:11, 107:25, 108:20, 108:24, 109:21, 109:24, 110:1, 111:15, 113:4, 113:7, 115:4, 115:7, 115:15, 123:8, 130:15, 130:25
**best** [11] - 2:17, 50:7, 50:8, 51:7, 53:17, 64:14, 68:11, 84:24, 87:2, 109:2, 177:10
**between** [34] - 6:23, 8:15, 8:23, 17:19, 28:1, 31:9, 34:1, 34:18, 35:24, 36:8, 37:9, 38:10, 57:23, 71:22, 73:22, 78:14, 85:5, 86:16, 88:18, 93:6, 99:22, 108:16, 108:17, 111:5, 111:7, 116:16, 118:24, 120:20, 126:5, 128:23, 130:6, 132:22, 159:13, 164:2
**beyond** [6] - 63:3,

120:15, 121:7, 144:4, 162:2, 176:14
**big** [3] - 76:19, 117:6, 127:20
**biggest** [1] - 156:23
**binder** [3] - 23:13, 31:12, 40:16
**biological** [1] - 24:11
**birth** [6] - 41:17, 41:25, 42:5, 109:5, 154:16, 154:20
**bit** [9] - 39:14, 46:15, 90:12, 91:1, 93:18, 102:15, 117:18, 125:13, 141:11
**black** [5] - 29:4, 133:21, 133:24, 138:2, 138:6
**Blackberry** [29] - 17:22, 17:23, 17:25, 18:2, 18:4, 18:9, 19:2, 29:6, 34:21, 36:2, 47:19, 73:16, 73:17, 78:1, 82:20, 83:23, 86:7, 87:8, 87:18, 108:2, 108:15, 121:15, 133:25, 134:1, 138:7, 138:8, 138:10, 161:11, 171:9
**Blackberrys** [2] - 18:3, 82:5
**blame** [1] - 61:16
**bleach** [1] - 44:24
**block** [1] - 44:12
**boarding** [5] - 9:23, 10:8, 10:9, 58:10
**boat** [2] - 10:7, 46:1
**boats** [1] - 62:19
**body** [1] - 39:22
**bones** [1] - 30:4
**Bonomi** [1] - 43:25
**book** [3] - 11:19, 108:23, 139:20
**books** [4] - 144:7, 144:9, 144:10
**border** [4] - 8:7, 46:5, 147:5, 155:21
**born** [2] - 41:21, 42:2
**Boss** [23] - 22:16, 22:19, 23:17, 23:23, 34:7, 34:10, 36:4, 36:10, 38:5, 78:16, 79:5, 88:13, 108:17, 122:6, 123:18, 126:12, 130:6, 132:23, 133:9, 167:23, 171:12, 171:19, 171:22

**boss** [2] - 34:8, 78:15
**Botero** [2] - 142:9, 142:18
**Botswana** [7] - 25:9, 26:2, 27:8, 29:20, 30:9, 30:23, 83:7
**bottom** [5] - 66:16, 70:8, 72:14, 72:19
**bought** [1] - 59:1
**box** [1] - 80:7
**Brady** [2] - 106:4, 106:5
**brain** [1] - 127:22
**Brazil** [8] - 29:20, 31:19, 31:21, 32:13, 34:13, 34:15, 46:6, 46:11
**break** [5] - 64:10, 64:11, 115:11, 115:13, 130:13
**breaking** [2] - 36:18, 172:5
**bridge** [2] - 43:14, 44:1
**brief** [2] - 173:18, 175:10
**briefing** [7] - 68:12, 170:12, 175:9, 175:12, 175:22, 176:1, 176:16
**briefly** [2] - 14:16, 16:21
**briefs** [1] - 173:19
**bring** [4] - 29:4, 76:20, 82:1, 138:2
**broad** [1] - 7:12
**broken** [5] - 40:1, 40:8, 40:12, 154:1, 161:8
**brother** [29] - 22:4, 22:20, 24:19, 32:12, 35:2, 37:18, 37:24, 38:6, 79:7, 79:16, 79:23, 80:3, 86:9, 86:21, 86:25, 121:22, 122:7, 122:22, 123:7, 124:1, 124:18, 125:8, 125:15, 129:21, 129:24, 143:10, 143:13, 161:20
**brother-in-law** [5] - 37:24, 38:6, 86:9, 86:25, 161:20
**brother-in-laws** [1] - 37:18
**brothers** [6] - 37:10, 80:14, 80:18, 86:18, 123:5, 161:19

**brought** [2] - 54:2, 95:1
**Brown** [2] - 1:17, 1:21
**Buenos** [9] - 99:22, 100:21, 101:6, 101:7, 102:17, 102:18, 103:1, 103:8, 166:4
**build** [1] - 163:16
**built** [1] - 163:2
**bulk** [3] - 13:5, 13:12, 33:5
**bunch** [2] - 54:4, 130:11
**Bureau** [1] - 120:7
**burgers** [1] - 162:6
**business** [11] - 100:7, 100:8, 102:20, 104:8, 132:12, 160:12, 160:13, 160:24, 161:23, 163:12, 165:5
**businesses** [1] - 164:9
**but..** [1] - 49:8
**buy** [1] - 164:8
**BW** [1] - 30:24
**BY** [70] - 3:4, 3:12, 12:4, 12:18, 15:23, 16:20, 18:21, 21:24, 24:15, 40:20, 42:12, 46:9, 47:2, 51:25, 54:6, 57:2, 64:15, 64:24, 65:7, 66:12, 69:11, 69:17, 72:8, 72:13, 73:3, 74:8, 74:15, 78:6, 78:22, 79:3, 82:16, 83:4, 83:25, 84:12, 85:3, 86:6, 88:10, 90:10, 90:24, 97:5, 101:18, 102:11, 106:3, 107:25, 109:21, 110:1, 113:7, 115:17, 123:13, 124:6, 131:8, 134:9, 137:4, 140:1, 140:10, 140:17, 141:17, 149:18, 150:1, 150:11, 153:14, 158:10, 160:21, 162:5, 164:5, 164:17, 167:14, 170:14, 170:18, 171:1

**C**

**cadet** [1] - 58:6
**calculation** [1] - 78:2

**Cali** [1] - 93:8
**California** [4] - 8:6, 17:16, 41:25, 42:3
**cameras** [2] - 155:2, 155:3
**capacity** [1] - 115:23
**capital** [1] - 104:3
**capitol** [2] - 135:5, 135:6
**car** [13] - 45:15, 54:10, 154:3, 154:4, 154:16, 154:21, 154:24, 155:2, 155:5, 155:18, 156:17, 162:7, 172:16
**carcass** [1] - 56:13
**carcasses** [16] - 14:18, 15:2, 15:12, 60:18, 61:18, 62:13, 62:19, 64:4, 66:19, 66:23, 67:7, 68:20, 69:2, 69:19, 69:21, 69:25
**carcasses'** [1] - 63:11
**card** [2] - 41:6, 41:14
**care** [6] - 31:23, 49:9, 49:14, 74:17, 86:22, 134:15
**career** [3] - 4:8, 4:9, 115:20
**careers** [1] - 162:9
**Carolina** [1] - 64:18
**Carrasco** [2] - 134:20, 134:25
**carried** [1] - 50:22
**carry** [1] - 12:13
**carrying** [2] - 15:2, 39:4
**Cartel** [4] - 107:2, 107:16, 147:1, 147:4
**cartel** [21] - 6:17, 6:18, 61:4, 61:16, 61:21, 61:23, 62:1, 96:5, 97:8, 98:2, 104:5, 107:15, 118:20, 122:14, 122:15, 122:16, 128:24, 146:10, 146:25, 151:21
**cartels** [16] - 93:9, 93:12, 93:13, 97:11, 97:13, 97:14, 97:16, 98:2, 99:16, 110:22, 118:8, 119:2, 145:17, 146:14, 147:6, 161:18
**Cartels** [1] - 146:25
**Case** [1] - 2:3
**case** [13] - 5:18, 51:10,

52:8, 52:9, 63:4, 70:24, 110:24, 120:15, 139:17, 151:19, 164:7, 164:12
**cases** [1] - 13:23
**cash** [1] - 32:22
**Category** [2] - 174:7, 174:10
**category** [1] - 174:12
**caveat** [4] - 63:12, 121:3, 148:15
**celebrate** [1] - 129:23
**cell** [6] - 44:9, 44:10, 44:12, 44:14, 44:22, 172:6
**cells** [1] - 44:10
**census** [1] - 95:20
**Central** [7] - 17:16, 91:10, 91:25, 118:16, 135:17, 135:19, 137:16
**certain** [7] - 30:18, 75:23, 108:8, 121:25, 122:19, 160:4, 163:25
**certainly** [1] - 62:8
**certainty** [2] - 83:21, 113:22
**CERTIFICATE** [1] - 177:5
**certificate** [6] - 26:4, 30:9, 41:17, 41:25, 154:16, 177:12
**certificates** [7] - 42:6, 109:5, 109:6, 109:7, 109:14, 109:15, 154:20
**certified** [1] - 18:16
**certify** [1] - 177:8
**Cervantes** [1] - 7:1
**chance** [5] - 65:12, 92:25, 124:7, 134:12, 140:18
**change** [5] - 19:10, 19:21, 20:2, 141:10
**changed** [1] - 173:23
**changes** [2] - 148:22, 149:1
**Chapo** [2] - 61:11, 61:13
**charged** [4] - 13:19, 13:21, 95:5, 110:25
**chart** [7] - 27:3, 27:12, 27:15, 27:17, 30:19, 123:25, 124:25
**checkpoint** [1] - 134:20
**Chepa** [2] - 121:22, 167:25

**Chila** [3] - 95:18, 95:20
**child** [1] - 103:21
**child's** [1] - 49:21
**children** [9] - 39:17, 49:16, 49:18, 49:23, 50:6, 100:18, 100:20, 104:11, 173:5
**children's** [2] - 50:2, 154:19
**choice** [1] - 68:8
**choices** [1] - 68:7
**choke** [1] - 45:4
**chooses** [1] - 19:5
**chosen** [1] - 85:20
**chunk** [1] - 77:2
**circumstances** [3] - 75:8, 75:11, 152:11
**cited** [1] - 73:17
**citizen** [2] - 42:9, 42:10
**citizens** [1] - 137:6
**city** [6] - 96:19, 109:13, 129:21, 135:5, 135:6, 136:20
**City** [16] - 28:13, 28:15, 28:18, 100:15, 100:17, 135:10, 136:16, 136:17, 136:21, 136:25, 137:3, 137:8, 137:12, 137:13, 138:18
**civil** [1] - 93:15
**civilian** [1] - 109:15
**CJNG** [14] - 6:22, 6:24, 6:25, 7:5, 7:9, 107:2, 107:9, 107:12, 107:20, 107:22, 145:19, 145:21, 146:22, 166:11
**claims** [2] - 55:14, 85:14
**clarification** [1] - 87:16
**clarified** [1] - 57:3
**clarity** [1] - 65:16
**classified** [1] - 92:22
**clean** [1] - 74:7
**clear** [2] - 50:25, 68:17
**clearance** [4] - 92:11, 92:12, 92:15, 92:16
**clearly** [4] - 55:8, 131:16, 131:24, 132:7
**client** [5] - 168:9, 169:1, 169:6, 169:14, 171:17
**close** [7] - 10:6, 44:12,

62:3, 76:2, 104:16, 112:9, 127:7
**closed** [1] - 44:14
**closely** [1] - 137:23
**closer** [1] - 3:11
**closing** [1] - 169:23
**CMP** [2] - 119:17, 119:24
**Coast** [12] - 4:12, 4:13, 4:14, 9:18, 10:5, 10:7, 10:9, 10:21, 11:9, 47:21, 58:5, 58:6
**coast** [1] - 104:14
**cocaine** [61] - 6:6, 8:2, 8:10, 8:13, 8:16, 8:21, 8:23, 8:25, 9:3, 9:5, 9:8, 9:14, 10:12, 10:14, 12:13, 12:19, 12:25, 13:5, 13:25, 14:18, 31:19, 32:2, 32:7, 32:24, 33:1, 33:8, 33:17, 34:12, 35:6, 35:8, 35:9, 36:5, 36:13, 36:16, 37:5, 53:24, 70:1, 70:16, 71:4, 71:7, 73:5, 75:12, 75:23, 76:3, 76:25, 77:2, 77:8, 110:19, 110:22, 111:20, 111:21, 112:2, 112:8, 112:11, 112:16, 113:18, 161:7, 174:16, 176:9, 176:14
**code** [2] - 28:15, 108:12
**coded** [5] - 32:7, 80:12, 108:5, 151:1, 151:10
**coincides** [1] - 125:17
**COL** [2] - 119:16, 119:24
**COLL** [1] - 1:15
**Coll** [2] - 2:14, 99:9
**collapsed** [1] - 103:16
**colleagues** [2] - 47:6, 85:13
**collection** [1] - 148:7
**collective** [1] - 85:21
**Colombia** [16] - 59:22, 91:14, 91:19, 93:3, 93:4, 93:7, 93:16, 108:9, 116:3, 118:3, 118:10, 118:15, 118:16, 118:22, 118:24, 119:6
**Colombian** [6] - 14:6, 91:16, 118:6,

118:24, 119:17, 119:18
**Colonel** [3] - 157:13, 162:23, 164:20
**COLUMBIA** [1] - 1:1
**combating** [1] - 97:24
**comfortable** [2] - 4:23, 132:13
**coming** [5] - 81:17, 94:3, 132:7, 134:15, 164:3
**Command** [1] - 92:1
**commands** [1] - 92:1
**comment** [1] - 105:11
**commissioned** [3] - 4:11, 4:14, 92:14
**common** [7] - 5:11, 7:11, 19:23, 28:18, 35:8, 112:23, 137:5
**communicate** [1] - 98:25
**communicating** [7] - 20:5, 20:8, 20:18, 21:19, 22:14, 129:1, 149:11
**communication** [14] - 18:1, 31:9, 34:1, 34:18, 34:21, 35:12, 35:24, 36:2, 36:8, 37:9, 38:10, 88:18, 88:20, 105:5
**communications** [33] - 5:6, 5:10, 17:20, 17:22, 18:13, 18:15, 18:22, 20:7, 21:6, 22:1, 22:25, 23:1, 23:14, 27:20, 27:25, 32:1, 34:22, 35:18, 38:17, 88:5, 88:7, 88:20, 88:21, 149:7, 149:8, 150:4, 150:12, 150:14, 150:15, 150:18, 150:20, 150:25, 151:20
**communities** [1] - 97:19
**company** [1] - 94:16
**compare** [3] - 33:2, 33:8, 151:18
**Compartmental** [1] - 92:16
**compile** [1] - 112:21
**complete** [1] - 177:10
**completely** [4] - 68:10, 100:8, 118:7, 149:1
**comprised** [1] - 6:10
**computer** [2] - 1:25, 161:12

**computer-aided** [1] - 1:25
**conceal** [1] - 53:4
**concerned** [1] - 172:17
**concerning** [1] - 118:19
**concerns** [7] - 56:9, 65:15, 132:4, 132:7, 132:10, 132:13, 165:18
**concludes** [1] - 177:3
**conduct** [7] - 4:1, 4:2, 4:22, 17:13, 50:17, 160:12, 160:13
**conducted** [2] - 4:15, 45:14
**conducting** [4] - 75:9, 94:1, 94:2, 160:23
**confer** [4] - 45:7, 51:20, 89:16, 115:6
**confidence** [1] - 63:11
**confidential** [6] - 5:22, 14:15, 15:18, 16:9, 21:18, 150:9
**confirm** [1] - 148:16
**connect** [1] - 171:4
**connection** [2] - 88:3, 88:4
**consciousness** [4] - 152:3, 172:5, 172:7, 172:8
**consensually** [2] - 5:6, 35:17
**conservative** [2] - 74:17, 176:3
**consider** [2] - 153:16, 153:17
**considered** [2] - 94:24, 177:12
**consisted** [1] - 144:1
**consistent** [1] - 112:15
**consistently** [1] - 68:9
**conspiracy** [7] - 76:15, 76:25, 77:2, 77:9, 110:25, 174:15, 174:18
**constantly** [1] - 96:9
**constitutes** [3] - 162:10, 162:13, 177:8
**Constitution** [1] - 1:11
**consummated** [1] - 112:25
**contact** [3] - 122:19, 123:1, 123:9
**container** [3] - 14:19, 15:11, 15:12
**content** [4] - 18:11,

6

20:25, 21:5, 21:25
**contents** [1] - 21:11
**contested** [1] - 97:10
**contesting** [1] - 174:12
**context** [9] - 34:20, 36:1, 38:5, 38:17, 102:15, 111:8, 111:23, 111:24, 167:11
**continent** [2] - 141:7, 160:18
**continue** [4] - 59:8, 96:9, 104:7, 174:11
**continued** [2] - 4:7, 53:13
**continues** [1] - 43:25
**continuously** [1] - 20:2
**contraband** [1] - 13:11
**control** [5] - 51:1, 97:8, 97:13, 145:20, 146:23
**controlled** [2] - 98:2, 146:14
**Controlled** [1] - 5:3
**convenience** [9] - 101:5, 102:1, 102:17, 163:1, 163:7, 163:12, 163:17, 164:1, 174:2
**conversation** [16] - 4:21, 22:3, 22:6, 31:17, 37:22, 48:12, 66:18, 74:23, 78:19, 89:3, 113:18, 127:3, 128:3, 135:23, 163:21, 166:13
**conversations** [14] - 20:25, 21:12, 21:14, 46:19, 71:24, 75:17, 98:23, 99:6, 111:13, 122:7, 151:5, 158:17, 163:1, 166:7
**conversion** [3] - 74:4, 74:20, 76:6
**conversions** [2] - 77:6, 77:16
**cool** [1] - 129:22
**cooperating** [3] - 7:11, 7:21, 16:11
**coordinated** [3] - 59:25, 119:15, 120:1
**coordinating** [2] - 5:23, 93:4
**coordination** [1] - 116:14
**Copa** [5] - 134:21, 135:7, 135:9,

135:16, 138:17
**copies** [3] - 26:15, 65:4, 139:13
**copy** [9] - 11:22, 11:24, 25:16, 25:22, 65:18, 139:12, 139:13, 139:22, 140:15
**corner** [1] - 163:17
**correct** [149] - 12:10, 47:8, 47:12, 47:13, 47:15, 47:17, 47:24, 48:4, 48:5, 48:9, 48:10, 48:16, 48:22, 48:23, 48:25, 49:3, 49:5, 49:16, 49:22, 50:20, 51:2, 51:11, 52:15, 53:4, 53:11, 53:15, 54:19, 55:9, 55:13, 55:23, 56:6, 56:7, 56:10, 56:14, 56:18, 58:13, 58:16, 58:21, 59:23, 60:4, 60:15, 60:21, 60:25, 62:7, 62:9, 62:15, 62:19, 63:7, 67:1, 67:8, 67:13, 67:20, 67:24, 70:17, 70:22, 71:1, 72:5, 73:19, 74:23, 75:3, 75:25, 76:4, 78:12, 79:7, 80:4, 81:9, 81:10, 81:12, 81:15, 81:19, 82:5, 82:8, 82:21, 85:22, 87:3, 87:9, 94:14, 94:17, 94:20, 94:21, 99:7, 104:23, 111:1, 111:5, 112:19, 113:14, 115:24, 116:5, 116:19, 117:1, 117:7, 118:13, 120:12, 120:13, 120:24, 121:8, 121:16, 126:25, 127:13, 127:17, 127:18, 128:7, 130:5, 131:17, 131:21, 131:23, 131:25, 132:8, 134:17, 136:17, 138:12, 141:3, 141:14, 142:6, 142:7, 142:25, 145:4, 145:22, 145:23, 145:25, 146:3, 147:22, 148:23, 148:24, 150:22, 151:23, 151:24, 152:6, 152:12, 152:16,

152:17, 156:7, 157:8, 165:16, 165:20, 166:4, 166:5, 167:17, 168:6, 168:7, 168:10, 168:11, 168:18, 169:2, 169:7, 171:7, 171:14, 172:19, 172:25
**correction** [1] - 103:22
**correctly** [5] - 62:2, 120:24, 121:18, 133:19, 144:1
**corresponds** [2] - 27:12, 27:15
**corroborated** [1] - 176:9
**corroborates** [1] - 149:10
**cost** [2] - 8:13, 8:21
**coughing** [2] - 90:19, 90:20
**Council** [3] - 149:21, 149:24, 150:6
**counsel** [6] - 2:5, 2:10, 45:7, 51:20, 89:17, 115:6
**count** [2] - 76:25, 159:12
**counter** [2] - 4:18, 91:20
**counter-drug** [1] - 4:18
**counter-narco-terrorism** [1] - 91:20
**counterinsurgency** [2] - 91:13, 91:20
**counterparts** [1] - 5:23
**counting** [1] - 76:12
**countries** [11] - 5:24, 29:18, 92:8, 116:8, 117:13, 117:16, 117:21, 117:22, 117:25, 118:1, 171:5
**country** [18] - 26:5, 39:15, 45:22, 49:7, 49:9, 59:2, 91:19, 100:3, 117:19, 119:25, 129:23, 134:14, 134:15, 135:5, 135:25, 145:11, 152:24, 156:14
**couple** [8] - 85:11, 88:7, 96:20, 119:13, 133:17, 142:24, 143:19, 158:18
**course** [14] - 7:7,

16:17, 46:14, 53:6, 57:1, 57:8, 84:1, 84:15, 106:15, 106:17, 106:20, 108:11, 140:16, 174:18
**Court** [10] - 1:23, 1:24, 2:2, 17:15, 56:23, 124:8, 139:22, 145:1, 170:7, 177:19
**court** [1] - 18:10
**COURT** [145] - 1:1, 1:7, 2:11, 2:16, 2:21, 2:25, 3:10, 10:18, 11:3, 11:6, 11:10, 11:16, 11:19, 11:21, 11:25, 12:16, 15:20, 15:22, 16:7, 16:15, 16:17, 21:4, 21:16, 21:23, 24:12, 42:5, 42:11, 45:8, 45:24, 46:7, 46:25, 53:17, 54:3, 57:1, 64:11, 64:14, 65:3, 65:6, 65:23, 66:5, 66:8, 66:11, 68:11, 68:15, 68:22, 69:1, 69:13, 70:4, 72:12, 73:1, 74:6, 74:13, 76:9, 76:12, 76:18, 76:24, 77:15, 78:3, 78:25, 82:15, 84:7, 85:1, 86:2, 87:13, 87:17, 87:20, 88:1, 88:9, 89:18, 89:20, 89:23, 90:1, 90:3, 90:5, 90:7, 90:14, 90:18, 90:22, 95:13, 96:15, 101:10, 101:14, 102:5, 102:7, 106:2, 107:12, 107:19, 108:22, 108:25, 109:9, 109:17, 115:8, 115:12, 123:11, 130:8, 130:11, 130:20, 130:23, 131:4, 131:6, 136:23, 139:15, 139:19, 139:22, 139:24, 140:3, 140:6, 149:20, 150:5, 150:8, 153:6, 157:6, 157:9, 157:13, 157:19, 158:3, 158:8, 160:16, 162:3, 162:23, 163:4, 163:18, 164:15, 166:6, 166:12, 166:18, 167:2, 167:10,

169:19, 169:22, 170:3, 170:8, 170:16, 170:25, 173:8, 173:10, 173:12, 173:17, 173:24, 174:1, 175:14, 175:23, 176:20, 176:24, 177:2
**Court's** [7] - 11:14, 51:19, 64:9, 82:2, 83:22, 115:4, 124:4
**courtroom** [2] - 15:24, 17:1
**COURTROOM** [2] - 2:2, 173:25
**cover** [1] - 7:15
**covered** [2] - 60:19, 117:16
**cracked** [6] - 50:12, 52:2, 52:6, 52:14, 52:25, 53:18
**credential** [2] - 41:6, 41:14
**crew** [3] - 13:18, 14:2, 14:5
**crime** [1] - 164:22
**crimes** [1] - 4:24
**criminal** [4] - 153:4, 153:8, 174:6, 174:12
**Criminal** [4] - 1:2, 2:3, 174:7, 174:10
**cross** [2] - 46:5, 115:8
**CROSS** [4] - 46:8, 86:5, 115:16, 131:7
**CROSS-EXAMINATION** [4] - 46:8, 86:5, 115:16, 131:7
**crossed** [1] - 8:4
**crossing** [1] - 54:1
**CS** [1] - 14:14
**CSs** [2] - 14:13, 15:21
**Cuinis** [12] - 6:4, 6:8, 6:10, 6:23, 7:5, 7:8, 9:14, 23:7, 23:11, 25:3, 25:5, 63:14, 63:25, 64:2, 64:7, 107:6, 107:20, 107:22, 124:1, 166:11
**Cuinis'** [1] - 106:25
**cultural** [1] - 99:25
**culturally** [2] - 100:3, 104:6
**curious** [3] - 130:20, 162:24, 167:5
**currency** [5] - 9:9, 73:19, 73:21, 75:16, 114:2

7

**custody** [4] - 42:25, 50:24, 52:6, 55:6
**cut** [1] - 10:25

# D

**D.C** [1] - 1:5
**D.F** [8] - 136:19, 137:2, 137:8, 137:13, 137:17, 137:20, 138:17
**dad** [9] - 79:13, 79:16, 79:17, 79:23, 80:2, 80:11, 80:19, 80:23, 126:21
**daily** [1] - 135:11
**Dalaithy** [1] - 157:22
**dance** [1] - 34:15
**danger** [2] - 159:14, 159:15
**dangerous** [5] - 109:10, 145:14, 159:5, 160:9, 174:18
**data** [5] - 93:21, 93:22, 93:23, 104:21, 153:25
**date** [12] - 27:1, 27:3, 29:9, 56:21, 88:23, 100:15, 125:1, 131:23, 134:19, 173:20, 173:22, 175:21
**dated** [1] - 105:21
**Dated** [1] - 177:17
**dates** [5] - 64:20, 111:8, 126:6, 159:17, 160:8
**dawn** [4] - 142:12, 142:17, 142:18, 142:20
**days** [15] - 29:19, 39:11, 45:1, 58:3, 114:6, 124:18, 124:21, 124:22, 125:15, 128:23, 137:24, 142:25, 164:1, 172:19
**days'** [1] - 85:12
**DC** [2] - 1:12, 1:18
**De** [1] - 6:10
**de** [6] - 6:17, 28:12, 95:18, 95:20, 137:2
**DEA** [46] - 3:20, 3:21, 3:23, 4:7, 4:10, 4:11, 4:24, 5:2, 5:5, 8:9, 17:12, 17:20, 18:9, 18:22, 19:11, 19:17, 20:4, 20:8, 20:14, 20:23, 21:12, 22:18, 24:1, 24:6, 24:16,

27:20, 35:18, 39:5, 47:8, 47:20, 47:24, 48:5, 50:12, 50:23, 51:2, 52:1, 52:5, 52:15, 54:16, 54:25, 62:5, 62:9, 62:11, 66:9, 85:4, 138:6
**dealing** [5] - 117:10, 150:3, 166:18, 167:5, 167:12
**dealt** [1] - 116:8
**death** [5] - 95:7, 98:8, 109:6, 109:7, 109:14, 109:15, 144:24
**debrief** [1] - 15:21
**debriefed** [1] - 84:18
**debriefing** [5] - 5:22, 15:18, 16:2, 16:6, 16:10
**debriefings** [2] - 16:9, 48:1
**debriefs** [1] - 4:23
**debris** [2] - 10:15, 58:14
**December** [4] - 27:4, 64:18, 67:1, 67:24
**decided** [1] - 103:19
**decides** [1] - 7:15
**decline** [2] - 103:25, 164:23
**decree** [2] - 157:23, 158:22
**Defendant** [1] - 1:5
**defendant** [99] - 5:14, 6:3, 6:4, 9:13, 17:12, 19:12, 20:5, 20:13, 20:15, 20:23, 21:3, 21:8, 21:13, 21:19, 21:21, 22:1, 22:11, 25:4, 25:15, 25:21, 26:1, 26:9, 26:24, 27:17, 28:1, 28:8, 29:16, 29:18, 29:21, 30:13, 31:9, 31:18, 32:10, 32:16, 32:19, 34:2, 34:18, 35:11, 35:25, 36:9, 37:16, 38:21, 39:3, 39:14, 39:22, 39:25, 41:7, 41:12, 41:20, 41:21, 42:1, 42:2, 42:19, 42:22, 42:24, 43:12, 44:11, 44:13, 44:16, 44:22, 44:23, 45:1, 45:12, 45:16, 46:5, 46:14, 46:19, 53:19, 88:4, 88:19, 89:14, 101:15, 122:21, 123:5, 124:15,

125:6, 125:14, 126:14, 127:3, 127:12, 128:15, 128:24, 131:15, 132:23, 136:1, 136:18, 137:24, 138:17, 138:24, 140:23, 143:10, 152:14, 154:11, 157:9, 158:17, 159:6, 161:14, 161:25, 176:14
**DEFENDANT** [1] - 1:14
**defendant's** [29] - 19:14, 22:3, 22:20, 24:19, 25:8, 26:16, 27:6, 37:10, 40:22, 42:15, 42:18, 43:3, 43:20, 44:10, 44:24, 54:8, 76:7, 77:22, 87:3, 87:9, 87:15, 121:11, 121:21, 122:7, 124:1, 127:16, 157:1, 174:14, 175:10
**Defendant's** [11] - 56:24, 82:13, 82:17, 83:3, 100:25, 101:9, 101:13, 101:19, 102:4, 105:18, 106:1
**defendants** [1] - 161:17
**defendants'** [2] - 20:7, 20:17
**Defense** [8] - 88:1, 90:2, 101:11, 102:6, 102:8, 116:18, 169:16, 170:19
**defense** [9] - 4:16, 16:5, 89:23, 115:6, 121:1, 139:12, 174:11, 175:4, 176:21
**definitely** [4] - 97:17, 97:18, 109:20, 136:15
**degree** [2] - 63:11, 113:21
**del** [11] - 48:8, 48:24, 49:2, 104:1, 104:10, 104:14, 104:16, 104:17, 107:2, 107:16
**delivered** [1] - 36:14
**delivering** [1] - 162:7
**delivery** [1] - 32:22
**demonstrate** [1] - 176:2
**denied** [1] - 46:25

**denomination** [2] - 73:19, 75:16
**dent** [2] - 76:19, 77:7
**departed** [4] - 15:5, 28:9, 28:11, 29:17
**departing** [1] - 139:1
**Department** [4] - 1:10, 50:12, 92:3, 92:10
**departure** [1] - 99:2
**depicted** [1] - 124:11
**depth** [1] - 159:10
**DEPUTY** [2] - 2:2, 173:25
**derived** [4] - 27:5, 27:6, 112:24, 155:10
**describe** [4] - 9:25, 14:16, 119:4, 147:24
**described** [6] - 58:20, 66:25, 122:20, 123:4, 125:19, 147:21
**description** [3] - 110:14, 120:10, 152:6
**designed** [1] - 10:23
**destabilization** [1] - 99:18
**destination** [4] - 59:6, 59:22, 70:1, 70:10
**destruction** [2] - 152:3, 153:24
**detailed** [1] - 96:7
**details** [2] - 7:13, 96:6
**detected** [1] - 10:23
**detention** [2] - 43:3, 98:22
**determine** [4] - 78:10, 150:17, 151:9, 151:10
**device** [17] - 19:2, 19:8, 19:9, 19:10, 20:2, 21:19, 22:7, 24:23, 27:21, 40:9, 50:19, 51:10, 87:3, 123:18, 133:25, 151:14, 151:16
**devices** [38] - 20:18, 21:10, 22:2, 22:12, 23:18, 23:23, 27:11, 27:14, 50:15, 50:16, 50:23, 50:25, 51:3, 51:4, 51:14, 51:15, 51:22, 52:1, 52:2, 52:5, 54:4, 54:9, 54:14, 54:18, 54:20, 54:21, 54:25, 55:2, 87:6, 87:13, 87:14, 87:18, 87:22, 88:4, 105:12, 105:15, 155:3, 155:10

**diagraph** [3] - 114:24, 114:25, 115:3
**Diana** [2] - 66:3, 66:8
**die** [1] - 128:6
**Diego** [1] - 8:6
**differed** [1] - 107:23
**difference** [2] - 76:10, 100:2
**differences** [1] - 142:23
**different** [20] - 3:25, 8:5, 30:4, 45:14, 48:13, 48:18, 59:11, 84:19, 96:6, 118:7, 123:4, 127:9, 134:6, 136:14, 143:3, 143:17, 161:8, 172:3, 176:8
**differently** [1] - 48:18
**difficult** [11] - 105:7, 109:10, 147:13, 151:9, 151:12, 161:1, 161:9, 161:16, 161:22, 161:24
**difficulties** [1] - 11:15
**digital** [3] - 105:8, 156:24, 161:11
**dinners** [1] - 2:20
**direct** [12] - 9:17, 14:8, 15:13, 38:19, 63:5, 73:15, 74:22, 100:11, 107:9, 116:17, 162:25, 169:4
**DIRECT** [2] - 3:3, 90:9
**directed** [1] - 105:21
**directing** [1] - 174:20
**directly** [2] - 71:10, 107:3
**Director** [3] - 92:5, 116:7, 116:23
**directs** [1] - 149:10
**disagree** [1] - 118:23
**disagreeing** [1] - 138:9
**disappearances** [1] - 95:25
**disappeared** [2] - 144:21, 145:4
**disassembled** [1] - 177:13
**disbanded** [2] - 93:14, 146:10
**discern** [1] - 114:10
**discovery** [7] - 120:25, 121:14, 123:21, 131:20, 133:3, 134:12, 164:7
**discuss** [2] - 27:11,

27:14

**discussed** [6] - 67:10, 68:2, 111:9, 111:10, 111:20, 173:15

**discussing** [2] - 31:18, 37:23

**discussion** [5] - 28:11, 31:20, 63:2, 65:17, 111:12

**dismissed** [1] - 111:1

**Disney** [1] - 163:13

**dispositions** [1] - 13:23

**dispute** [15] - 55:11, 65:16, 72:20, 72:21, 75:22, 121:10, 121:18, 121:20, 121:21, 121:24, 121:25, 122:10, 122:11, 124:11, 124:13

**disputed** [2] - 174:5, 174:19

**dissemination** [1] - 148:7

**distance** [3] - 10:7, 100:7, 161:24

**distant** [6] - 99:21, 104:5, 105:6, 165:2, 167:1

**distribute** [1] - 110:25

**distributed** [2] - 33:22, 161:8

**distributing** [1] - 113:18

**distribution** [1] - 107:4

**DISTRICT** [3] - 1:1, 1:1, 1:7

**District** [5] - 13:22, 17:16, 24:21, 136:21, 136:24

**Distrito** [2] - 136:21, 136:24

**division** [3] - 3:18, 7:4

**divorce** [2] - 157:22, 158:21

**divorced** [6] - 157:9, 157:15, 157:17, 157:18, 158:2, 158:4

**document** [9] - 41:21, 42:2, 68:1, 124:8, 124:21, 134:18, 138:22, 142:16, 157:18

**documentation** [4] - 152:23, 153:1, 163:23, 174:8

**documented** [2] - 30:2, 144:18

**documenting** [1] - 67:10

**documents** [11] - 45:10, 45:18, 45:24, 46:16, 105:23, 124:9, 131:18, 131:22, 155:22, 156:4

**dollar** [1] - 73:22

**dollars** [9] - 9:4, 9:5, 73:25, 74:5, 74:23, 75:1, 75:3, 75:5, 75:7

**domestic** [2] - 4:25, 5:4

**domestically** [1] - 115:1

**done** [10] - 62:10, 81:3, 81:6, 115:5, 115:14, 116:11, 120:6, 148:25, 152:8, 172:24

**door** [1] - 44:12

**doors** [2] - 44:10, 44:14

**DOPAZO** [1] - 1:22

**double** [2] - 114:21

**doubt** [2] - 71:3, 83:14

**down** [17] - 32:16, 54:8, 66:14, 66:16, 93:3, 98:21, 102:21, 103:3, 113:12, 120:14, 133:17, 134:19, 136:8, 136:18, 138:15, 142:9, 142:13

**download** [1] - 18:4

**dozens** [2] - 5:9, 7:10

**draft** [1] - 65:12

**dressed** [1] - 153:19

**drew** [1] - 39:24

**drives** [1] - 54:14

**driving** [2] - 45:13, 45:16

**drop** [2] - 37:24, 38:3

**dropped** [2] - 19:19, 21:14

**Drug** [2] - 3:16, 120:7

**drug** [52] - 4:18, 5:11, 6:4, 6:8, 6:10, 6:16, 6:21, 24:21, 25:4, 33:15, 33:18, 33:22, 35:19, 58:25, 59:1, 59:4, 59:5, 59:10, 60:6, 61:12, 61:13, 61:17, 76:14, 77:10, 77:11, 93:12, 96:5, 96:6, 96:14, 105:2, 106:25, 107:10, 110:18, 118:6,

118:24, 120:20, 121:12, 122:21, 144:12, 145:8, 160:22, 161:23, 164:8, 165:19, 166:3, 166:18, 167:1, 167:4, 167:12, 172:1

**drug-trafficking** [1] - 24:21

**drugs** [9] - 6:12, 8:3, 32:22, 70:16, 70:18, 93:6, 107:4, 118:15, 118:16

**DTO** [3] - 106:25, 107:8

**dude** [1] - 38:14

**during** [25] - 7:15, 7:20, 7:24, 8:17, 8:19, 16:17, 17:2, 17:20, 18:23, 23:23, 43:2, 43:11, 46:14, 67:7, 75:23, 84:1, 95:25, 107:5, 112:7, 117:23, 125:23, 158:1, 166:3, 174:18, 175:19

**duties** [3] - 4:13, 92:24, 93:18

**duty** [2] - 44:9, 91:8

**dwell** [1] - 77:18

**E**

**E.U** [18] - 28:3, 29:9, 81:1, 81:4, 81:9, 81:11, 81:14, 81:19, 81:23, 82:1, 114:13, 114:17, 133:18, 138:20, 139:5, 169:11, 171:6

**early** [6] - 57:20, 90:25, 99:20, 100:23, 142:21, 165:8

**easier** [4] - 40:6, 98:25, 108:21, 151:21

**easiest** [1] - 109:1

**easily** [3] - 19:7, 109:9, 112:12

**East** [3] - 91:9, 92:2, 150:13

**easy** [3] - 49:19, 74:16, 94:5

**economic** [1] - 102:23

**economically** [1] - 99:25

**economy** [1] - 103:15

**Edith** [2] - 89:11,

89:14

**Eduardo** [1] - 43:25

**efe** [2] - 28:12, 137:2

**effect** [1] - 39:18

**effective** [1] - 157:23

**Efrain** [1] - 17:10

**Egyptian** [1] - 117:23

**Egyptians** [1] - 117:25

**eight** [1] - 62:5

**either** [13] - 10:25, 54:10, 66:6, 71:12, 99:9, 115:1, 127:24, 135:24, 149:10, 150:8, 156:4, 163:7, 171:6

**El** [2] - 91:11, 116:2

**el** [9] - 7:1, 28:14, 28:15, 28:16, 128:24, 129:6, 129:19, 136:9, 137:2

**electronic** [5] - 5:21, 50:15, 50:18, 51:9, 54:14, 54:17, 54:19, 104:21, 155:1, 155:8, 155:10

**electronically** [1] - 151:2

**electronics** [1] - 156:24

**elicited** [2] - 53:7, 174:25

**ELIZABETH** [1] - 177:7

**Elizabeth** [2] - 1:23, 177:18

**elsewhere** [3] - 6:7, 6:14, 103:6

**Email** [2] - 1:13, 1:19

**embarked** [1] - 10:4

**embassy** [1] - 91:18

**emergency** [2] - 88:14, 128:11

**emphasis** [1] - 93:8

**employed** [3] - 3:15, 3:16, 48:5

**employees** [1] - 49:13

**end** [5] - 3:21, 27:3, 68:3, 77:17, 170:4

**ends** [1] - 125:10

**Enforcement** [2] - 3:17, 120:7

**enforcement** [33] - 4:17, 7:12, 9:15, 10:4, 10:24, 14:10, 14:17, 20:1, 25:7, 26:13, 26:19, 36:23, 39:12, 39:24, 40:2, 40:9, 40:13, 40:25, 41:1, 42:25, 46:3, 49:12, 53:9, 53:10,

89:14

**enforcement-based** [1] - 120:6

**engine** [1] - 144:5

**English** [7] - 4:19, 18:16, 98:24, 110:7, 126:17, 126:18, 137:20

**enrolled** [5] - 48:24, 103:20, 104:11, 165:10, 165:11

**ensure** [1] - 120:2

**enter** [1] - 125:2

**entered** [7] - 27:19, 124:16, 125:1, 126:3, 126:4, 131:15, 157:23

**entering** [1] - 140:24

**enters** [1] - 125:6

**entire** [2] - 13:12, 173:2

**entities** [3] - 91:17, 118:25, 120:1

**entries** [6] - 167:21, 167:23, 168:6, 168:10, 168:15, 168:16

**entry** [3] - 25:8, 134:19, 138:23

**entrypoint** [1] - 92:9

**environment** [1] - 104:6

**equation** [1] - 155:12

**equipment** [1] - 155:2

**equitable** [1] - 77:21

**era** [1] - 97:4

**Erika** [7] - 89:11, 89:14, 127:11, 127:13, 127:15, 127:16, 128:10

**ERTZBISCHOFF** [1] - 1:16

**Ertzbischoff** [1] - 2:15

**escape** [1] - 44:6

**especially** [5] - 93:25, 97:11, 107:6, 149:14, 160:4

**essentially** [2] - 8:6, 37:25

**establish** [1] - 103:7

**established** [7] - 14:3, 101:6, 103:4, 131:14, 138:4, 165:6, 174:14

**establishment** [1] - 163:16

**enforcement-based**

**Estados** [3] - 81:16, 114:20, 114:24
**Este** [9] - 48:8, 48:25, 49:2, 104:1, 104:10, 104:14, 104:16, 104:17
**euro** [5] - 73:22, 73:25, 74:5, 77:5, 112:13
**Europe** [28] - 33:2, 33:3, 35:20, 70:17, 71:1, 71:2, 71:4, 71:7, 71:10, 71:14, 71:20, 71:21, 72:17, 73:4, 73:6, 73:11, 75:24, 76:3, 76:19, 77:1, 77:19, 91:10, 112:4, 112:8, 112:16, 114:8, 171:4, 171:7
**European** [3] - 28:6, 28:23, 81:9
**euros** [1] - 77:16
**evening** [1] - 129:17
**event** [3] - 59:12, 62:4, 62:8
**events** [7] - 48:3, 60:24, 66:24, 69:20, 85:21, 98:8, 125:24
**eventually** [2] - 44:13, 68:18
**evidence** [31] - 6:2, 51:23, 54:5, 54:22, 56:3, 56:8, 58:2, 62:18, 63:3, 63:5, 70:3, 72:9, 83:18, 110:2, 118:11, 123:9, 139:25, 152:3, 152:10, 153:3, 153:4, 153:7, 169:25, 170:6, 174:14, 174:25, 175:2, 175:5, 175:17, 175:18, 175:19
**evolved** [1] - 18:3
**ex** [1] - 166:7
**ex-wife** [1] - 166:7
**exact** [9] - 22:9, 54:12, 56:21, 61:3, 64:20, 76:5, 100:15, 126:24
**exactly** [6] - 30:2, 45:11, 76:3, 124:21, 137:18, 151:16
**EXAMINATION** [7] - 3:3, 46:8, 86:5, 90:9, 115:16, 131:7, 164:16
**examination** [2] - 73:15, 169:4

**example** [4] - 59:3, 117:23, 151:9, 169:9
**examples** [2] - 21:1, 21:25
**exchange** [9] - 56:10, 73:21, 74:10, 76:2, 78:8, 78:11, 78:15, 79:12
**exchanges** [2] - 75:15, 108:2
**exculpatory** [1] - 106:6
**excuse** [6] - 8:14, 16:1, 22:13, 48:20, 78:16, 91:3
**excused** [3] - 89:20, 173:8, 176:24
**execution** [1] - 45:25
**exercise** [1] - 74:4
**Exhibit** [82] - 11:12, 12:6, 12:7, 13:7, 13:8, 14:22, 17:4, 20:10, 23:12, 23:15, 24:24, 25:1, 25:19, 25:24, 26:3, 26:7, 26:21, 27:23, 29:14, 29:23, 31:7, 33:24, 34:5, 34:16, 35:22, 36:6, 37:7, 38:8, 40:5, 40:17, 41:4, 41:9, 41:15, 41:23, 42:4, 42:13, 42:20, 43:15, 72:10, 78:21, 78:23, 86:13, 87:11, 88:2, 88:11, 88:16, 88:22, 101:11, 102:6, 102:8, 109:24, 110:3, 111:14, 111:16, 113:5, 116:18, 119:4, 123:15, 124:5, 126:7, 127:8, 128:21, 129:4, 129:13, 130:3, 131:13, 132:20, 133:15, 134:5, 134:7, 135:21, 138:21, 139:12, 140:6, 140:14, 140:21, 141:16, 158:25, 169:17, 170:19
**exhibit** [41] - 13:5, 14:23, 17:5, 20:11, 25:25, 26:8, 26:12, 26:23, 27:5, 27:24, 29:24, 31:8, 31:12, 33:25, 34:4, 34:17, 35:23, 36:7, 37:8, 38:9, 40:7, 40:16,

41:5, 41:10, 41:16, 41:24, 43:16, 86:15, 88:17, 89:9, 108:21, 108:23, 116:19, 130:4, 134:6, 137:21, 139:11, 139:19, 139:20, 140:12, 173:15
**Exhibits** [8] - 13:1, 13:15, 18:19, 23:3, 23:13, 23:20, 25:11, 25:14
**exhibits** [8] - 13:2, 13:4, 23:4, 23:21, 25:20, 40:18, 169:5, 175:1
**exist** [1] - 150:10
**existence** [3] - 107:13, 107:20, 107:22
**exists** [1] - 146:11
**exit** [1] - 25:8
**exiting** [2] - 99:12, 99:13
**expanding** [1] - 147:6
**expected** [1] - 98:1
**experience** [18] - 8:1, 10:21, 12:11, 45:20, 54:16, 58:24, 70:11, 90:13, 91:2, 108:11, 117:6, 119:5, 127:23, 137:13, 147:25, 148:11, 152:7, 164:6
**experienced** [1] - 118:21
**experiences** [1] - 123:4
**expert** [1] - 11:17
**explain** [9] - 6:8, 14:14, 16:21, 17:23, 28:22, 39:10, 171:22, 172:2, 176:6
**exploded** [1] - 11:3
**export** [2] - 29:25, 30:5
**exported** [1] - 30:2
**exporter** [1] - 30:11
**extensive** [1] - 128:14
**extra** [2] - 11:22, 151:15
**extract** [3] - 50:17, 51:16, 55:1
**extracurricular** [2] - 103:23, 165:12
**extradited** [1] - 43:1
**extravagant** [1] - 162:20
**extremely** [3] - 147:13, 159:5, 161:1
**eyes** [2] - 44:24, 44:25

**F**

**face** [3] - 96:9, 153:8, 153:9
**facets** [1] - 148:2
**facility** [1] - 98:22
**fact** [20] - 52:24, 70:14, 72:23, 77:25, 78:10, 80:14, 81:23, 110:24, 112:11, 116:1, 123:1, 132:2, 148:25, 152:19, 153:16, 153:22, 154:3, 157:14, 164:11
**factfinder** [1] - 139:24
**facts** [9] - 24:24, 25:2, 53:8, 61:1, 84:24, 99:11, 153:17, 155:7, 155:19
**factual** [2] - 85:15, 98:11
**fair** [11] - 30:6, 120:14, 127:23, 128:25, 136:14, 147:17, 149:25, 150:25, 153:15, 164:8, 167:3
**fairly** [1] - 100:22
**fall** [2] - 93:10, 155:16
**false** [2] - 153:7, 154:12
**Familia** [1] - 146:24
**familial** [2] - 6:23, 37:17
**familiar** [20] - 5:11, 8:9, 9:21, 14:12, 15:14, 38:22, 116:19, 130:5, 131:21, 133:9, 134:10, 134:25, 135:7, 135:13, 136:19, 137:15, 152:1, 152:11, 152:14, 157:1
**families** [1] - 165:10
**family** [43] - 6:11, 7:2, 7:3, 22:8, 42:23, 49:2, 49:4, 56:18, 79:25, 80:2, 84:2, 84:16, 84:22, 85:2, 85:5, 85:15, 95:7, 96:13, 98:8, 98:14, 99:23, 100:10, 100:12, 100:13, 100:14, 100:22, 101:15, 103:20, 109:4, 121:11, 128:16, 128:19, 130:1, 143:22, 143:25, 158:18,

159:6, 160:2, 161:17, 161:19, 164:25, 166:24, 173:2
**far** [15] - 42:9, 59:24, 62:22, 63:8, 109:19, 129:9, 158:14, 159:7, 166:5, 166:6, 171:24, 172:5, 172:15, 173:1
**FARC** [2] - 93:10, 93:13
**farm** [2] - 85:5, 85:15
**farming** [2] - 96:21, 96:25
**fashion** [1] - 125:19
**fashioned** [1] - 12:1
**father** [20] - 22:5, 49:12, 78:17, 80:18, 80:24, 87:9, 89:4, 125:9, 125:17, 125:18, 126:24, 128:5, 171:13, 171:14, 171:20, 171:21, 171:22
**father-in-law** [1] - 49:12
**FCRR** [3] - 1:23, 177:7, 177:18
**February** [1] - 44:18
**Federal** [2] - 120:7, 136:21, 136:24
**federal** [1] - 147:12
**felt** [2] - 46:19, 51:10
**femurs** [1] - 30:4
**few** [6] - 31:6, 39:11, 45:1, 61:9, 138:4, 158:6
**fewer** [1] - 96:22
**field** [7] - 3:17, 3:18, 7:4, 10:15, 58:15, 94:3, 152:2
**fighting** [10] - 97:13, 97:14, 145:13, 145:14, 145:20, 146:5, 146:6, 146:8, 146:12
**figure** [3] - 116:11, 153:21, 156:19
**figuring** [1] - 120:21
**file** [1] - 175:13
**final** [3] - 59:22, 65:18, 70:10
**finally** [2] - 108:1, 113:3
**financial** [8] - 6:16, 6:20, 102:23, 107:1, 107:9, 162:18, 163:6, 163:18
**financially** [1] - 60:14

**financiers** [2] - 6:17, 6:19
**finished** [2] - 31:13, 130:22
**first** [23] - 21:4, 28:25, 66:13, 72:14, 92:13, 94:25, 98:24, 102:13, 103:2, 109:12, 109:22, 119:7, 119:8, 119:12, 129:12, 129:16, 132:3, 132:24, 138:13, 140:11, 140:18, 142:11, 152:5
**fits** [1] - 152:6
**five** [9] - 64:10, 64:11, 73:10, 102:14, 117:11, 129:8, 141:13, 147:10, 151:4
**five-minute** [2] - 64:10, 64:11
**Flaco** [3] - 67:14, 68:17, 69:4
**flag** [3] - 15:1, 15:3, 141:4
**flags** [2] - 152:20, 152:21
**flee** [2] - 39:15, 46:20
**fleeing** [6] - 49:15, 155:24, 156:1, 156:5, 156:11, 156:13
**flew** [1] - 138:17
**flies** [2] - 124:18, 135:14
**flight** [5] - 29:2, 152:2, 152:25, 153:3
**flip** [1] - 88:16
**flipping** [1] - 162:6
**Florida** [1] - 13:22
**flow** [7] - 11:1, 97:15, 97:17, 97:20, 97:22, 118:15, 118:24
**flowed** [1] - 93:6
**flown** [2] - 15:1, 146:24
**fluent** [2] - 4:20, 110:10
**fly** [2] - 135:18, 171:3
**flying** [2] - 137:24, 171:2
**focus** [7] - 7:18, 91:11, 91:12, 91:19, 174:13, 175:8, 176:10
**focused** [2] - 174:4, 176:16
**focusing** [3] - 7:13, 33:4, 174:23

**fold** [1] - 53:21
**folded** [1] - 53:19
**follow** [4] - 55:14, 55:17, 158:15, 165:6
**following** [5] - 21:7, 26:13, 29:18, 29:19, 42:24
**footprint** [6] - 54:17, 54:19, 105:8, 147:7, 156:24, 161:12
**FOR** [3] - 1:1, 1:8, 1:14
**forces** [1] - 93:4
**foregoing** [1] - 177:8
**Foreign** [3] - 92:5, 116:7, 116:23
**foreign** [5] - 5:23, 92:7, 117:15
**forensic** [4] - 50:13, 51:13, 52:14, 54:3
**forensically** [3] - 51:5, 51:23, 52:21
**forfeiture** [3] - 175:12, 175:14, 175:20
**form** [2] - 81:4, 169:24
**format** [2] - 110:11, 110:13
**formed** [1] - 107:15
**former** [1] - 94:16
**forth** [3] - 128:3, 159:11, 161:8
**forward** [4] - 2:5, 91:1, 93:7, 175:6
**four** [6] - 10:10, 13:24, 114:25, 117:11, 165:25, 166:3
**fourth** [1] - 29:15
**frame** [16] - 8:19, 8:24, 84:17, 88:24, 90:25, 91:3, 91:25, 95:24, 96:1, 96:12, 99:16, 107:18, 110:17, 112:7, 132:14, 147:3
**frames** [1] - 160:4
**frankly** [1] - 68:16
**fraudulent** [2] - 41:6, 41:13
**free** [1] - 37:20
**freezing** [1] - 55:21
**French** [2] - 81:17, 81:18
**frequently** [1] - 19:20
**Friday** [3] - 29:11, 138:16, 139:4
**front** [5] - 52:24, 69:13, 101:25, 102:7, 174:5
**frozen** [1] - 15:12
**full** [2] - 36:1, 177:9
**fully** [4] - 39:25, 48:10,

90:16, 93:15
**furnished** [1] - 48:10
**furnishings** [1] - 48:16
**future** [1] - 9:11

## G

**gallery** [1] - 12:2
**game** [3] - 29:25, 30:18, 129:22
**gather** [4] - 93:22, 149:9, 150:16, 150:19
**gathered** [2] - 148:23, 149:2
**Generacion** [3] - 6:18, 107:2, 107:16
**general** [1] - 61:13
**generally** [5] - 6:2, 16:5, 37:19, 42:21, 149:22
**Generation** [1] - 6:18
**gentleman** [2] - 169:14, 170:19
**geo** [2] - 151:15
**Geoff** [1] - 2:14
**GEOFFREY** [1] - 1:15
**geographic** [3] - 114:3, 161:4, 161:5
**geographically** [5] - 99:21, 104:4, 104:5, 105:6, 165:2
**Gerardo** [23] - 2:4, 2:13, 5:15, 51:13, 63:18, 64:3, 66:22, 67:5, 70:25, 71:13, 71:19, 72:16, 79:7, 79:9, 82:7, 82:23, 94:22, 98:12, 98:17, 103:2, 110:24, 164:20, 168:9
**GERARDO** [1] - 1:4
**given** [7] - 51:9, 71:13, 76:20, 77:15, 106:4, 117:9, 117:19
**global** [1] - 92:4
**GONZALEZ** [1] - 1:4
**Gonzalez** [68] - 2:4, 2:13, 5:15, 6:11, 7:2, 22:7, 22:20, 23:6, 24:11, 24:14, 24:19, 24:20, 25:2, 48:7, 51:14, 56:9, 57:4, 57:15, 58:20, 59:20, 62:14, 63:19, 64:3, 66:22, 67:5, 67:15, 69:19, 70:25, 71:5, 71:13, 71:19, 75:22, 78:8, 78:11, 79:5,

79:7, 79:9, 81:22, 82:7, 82:23, 85:6, 86:17, 86:18, 94:19, 94:22, 98:12, 98:17, 99:6, 99:19, 101:24, 103:3, 104:22, 107:1, 110:24, 114:7, 121:22, 122:1, 130:1, 164:20, 165:14, 167:25, 168:9, 169:1, 169:6, 171:10, 172:21
**Government** [27] - 11:12, 13:1, 13:15, 14:22, 18:19, 23:3, 23:12, 23:13, 23:15, 23:20, 25:14, 25:24, 41:15, 78:21, 86:13, 123:14, 124:5, 126:7, 127:8, 128:21, 129:4, 129:13, 130:3, 131:13, 132:20, 139:12, 140:6
**GOVERNMENT** [1] - 1:8
**government** [34] - 2:6, 2:21, 2:24, 25:16, 25:22, 26:2, 43:13, 46:21, 51:21, 54:3, 55:25, 57:3, 57:5, 57:18, 57:23, 89:21, 106:5, 106:9, 108:2, 108:16, 115:8, 118:6, 120:25, 130:17, 145:2, 146:7, 147:11, 147:12, 164:11, 165:23, 168:8, 176:17
**government's** [6] - 83:18, 108:20, 108:21, 108:22, 165:13, 176:1
**Government's** [42] - 3:2, 12:6, 17:4, 20:10, 24:24, 25:1, 25:11, 25:18, 26:3, 26:7, 26:21, 27:23, 29:14, 29:23, 31:7, 33:24, 34:5, 34:16, 36:6, 37:7, 38:8, 40:5, 40:17, 41:4, 41:9, 41:23, 42:4, 43:15, 64:22, 72:10, 78:23, 87:11, 88:11, 88:16, 88:21, 109:24, 110:3, 110:5, 111:13,

111:16, 113:4, 140:9
**graduate** [1] - 162:9
**graduating** [1] - 4:6
**grand** [2] - 70:15, 70:21
**graves** [2] - 147:11, 147:14
**Greenwich** [1] - 141:22
**ground** [1] - 15:11
**Group** [1] - 91:16
**group** [2] - 3:19, 7:8
**GRP** [1] - 119:25
**Guadalajara** [5] - 99:22, 124:3, 142:4, 164:24, 165:1
**guard** [2] - 44:19, 44:22
**Guard** [12] - 4:12, 4:13, 4:15, 9:18, 10:5, 10:7, 10:9, 10:21, 11:9, 47:21, 58:5, 58:6
**guard's** [1] - 44:25
**guards** [5] - 44:1, 44:9, 44:11, 44:16, 45:5
**guess** [2] - 67:25, 124:20
**guessing** [1] - 112:19
**guideline** [1] - 174:20
**guidelines** [1] - 174:17
**guilt** [1] - 152:4, 172:5, 172:7, 172:8
**guilty** [4] - 13:24, 13:25, 24:20, 122:1
**Gulf** [2] - 147:1, 147:4
**Gumiel** [1] - 176:20
**guy** [1] - 60:12
**guys** [2] - 38:13, 60:11

## H

**half** [12] - 40:1, 40:8, 53:19, 91:8, 114:6, 124:1, 125:16, 130:22, 150:21, 151:20, 153:21, 156:16
**halfway** [3] - 130:22, 134:19, 136:2
**hand** [12] - 41:11, 41:13, 120:6, 122:22, 123:5, 123:6, 123:7, 142:16, 176:19
**handcuffs** [1] - 45:5
**handed** [3] - 54:25, 55:2, 55:3

**handful** [1] - 168:10
**HANDRICH** [42] -
1:10, 11:23, 115:9,
115:17, 123:13,
124:4, 124:6,
130:10, 130:19,
130:21, 131:8,
134:6, 134:9, 137:4,
138:21, 139:9,
139:16, 139:21,
139:23, 140:1,
140:10, 140:16,
140:17, 141:16,
141:17, 149:18,
149:25, 150:1,
150:11, 153:14,
157:7, 157:11,
158:10, 160:19,
160:21, 162:5,
164:5, 164:14,
169:24, 170:5,
170:21, 170:24
**Handrich** [2] - 2:9,
131:6
**hands** [1] - 155:17
**handwritten** [1] -
65:13
**hang** [2] - 43:14, 44:2
**hard** [5] - 22:22,
54:13, 56:6, 142:14,
170:2
**hardship** [1] - 55:16
**hardware** [1] - 153:25
**head** [4] - 55:22,
82:10, 86:12, 146:20
**headed** [1] - 119:3
**hear** [13] - 22:22,
48:18, 57:13, 59:19,
61:25, 84:1, 84:15,
98:7, 120:24,
123:12, 127:14,
174:10, 175:9
**heard** [18] - 35:19,
71:6, 79:25, 80:9,
80:22, 84:18, 85:1,
96:19, 105:11,
114:5, 118:12,
122:12, 122:16,
122:17, 122:25,
123:6, 127:12, 161:7
**hearing** [12] - 46:25,
69:15, 76:13, 85:12,
85:22, 124:8, 152:5,
173:18, 174:14,
174:25, 175:19
**HEARING** [1] - 1:6
**held** [1] - 55:20
**help** [2] - 32:13, 68:1
**helped** [3] - 49:13,
103:4, 103:7

**helpful** [2] - 22:12,
175:3
**helping** [1] - 22:1
**hereby** [1] - 177:7
**hesitated** [1] - 136:7
**high** [4] - 73:11,
103:18, 147:17,
162:6
**higher** [4] - 33:3, 60:6,
73:8, 144:19
**highest** [2] - 43:14,
44:1
**himself** [7] - 22:24,
23:17, 39:24, 99:23,
164:22, 165:4, 165:5
**hired** [1] - 47:20
**history** [2] - 174:6,
174:12
**History** [2] - 174:7,
174:10
**hit** [3] - 17:11, 38:14,
70:14
**hold** [3] - 60:5, 84:6,
139:9
**holes** [1] - 77:24
**home** [2] - 160:1,
160:5
**homeland** [1] - 4:16
**Homeland** [1] - 120:8
**hone** [1] - 126:8
**Honor** [60] - 2:12,
2:23, 3:1, 3:9, 11:4,
11:11, 11:20, 16:1,
16:4, 16:19, 45:6,
46:2, 51:21, 52:24,
55:7, 56:24, 58:23,
63:10, 64:12, 65:1,
66:7, 66:10, 66:21,
70:2, 73:14, 74:1,
74:12, 76:8, 77:14,
78:20, 82:14, 84:24,
86:3, 87:16, 89:19,
89:22, 89:25, 90:12,
91:1, 93:18, 95:10,
95:12, 99:14,
101:21, 105:20,
115:7, 115:10,
130:15, 130:16,
130:25, 131:2,
140:5, 160:14,
162:1, 163:10,
173:7, 173:11,
173:25, 175:11,
176:22
**Honor's** [1] - 79:4
**HONORABLE** [1] - 1:6
**Hopefully** [1] - 115:15
**hospital** [11] - 22:5,
22:9, 78:17, 87:9,
89:5, 123:20, 124:3,

125:8, 125:10,
125:16, 125:20
**hotels** [1] - 48:14
**hour's** [1] - 151:4
**hours** [4] - 96:20,
117:9, 129:8, 141:13
**house** [9] - 38:13,
48:8, 48:10, 48:16,
49:14, 54:11,
104:12, 129:23,
136:2
**housed** [2] - 44:23,
98:22
**Houston** [1] - 15:6
**HOWELL** [1] - 1:6
**huge** [1] - 100:2
**human** [1] - 94:8
**humo** [3] - 28:14,
28:15, 28:16
**Humo** [3] - 136:9,
136:16, 136:17
**hundreds** [3] - 5:9,
148:21, 168:6
**hunt** [2] - 30:18, 83:8
**hunted** [1] - 29:25
**hunting** [13] - 29:4,
29:7, 30:1, 30:5,
30:6, 42:22, 82:8,
83:5, 83:6, 83:12,
83:15, 138:2, 138:11
**hyperinflation** [1] -
103:18
**hypothetical** [2] -
170:23, 170:25

**I**

**Ibarra** [2] - 41:7, 41:14
**idea** [1] - 166:25
**identification** [7] -
114:3, 114:25,
122:10, 154:11,
154:12, 154:15
**identifications** [2] -
121:11, 154:20
**identified** [13] - 10:2,
20:14, 21:4, 34:10,
39:24, 81:4, 95:17,
121:19, 122:6,
126:12, 126:13,
128:23, 158:2
**identifier** [1] - 19:1
**identifies** [2] - 145:17,
161:12
**identify** [18] - 12:5,
17:9, 20:23, 21:7,
22:1, 22:11, 22:18,
22:24, 23:8, 24:1,
24:6, 24:16, 25:13,
78:7, 115:3, 129:25,

148:16, 153:20
**identifying** [3] - 81:22,
106:24, 147:13
**identities** [1] - 22:13
**identity** [3] - 22:13,
78:4, 114:3
**II** [2] - 174:7, 174:9
**III** [3] - 174:7, 174:9,
174:10
**illicit** [3] - 54:19,
54:23, 172:12
**image** [1] - 40:9
**imaged** [2] - 52:21,
54:22
**imaging** [2] - 161:12
**immediate** [2] - 49:4,
100:10
**immediately** [1] -
99:12
**import** [1] - 33:19
**important** [12] - 45:18,
52:23, 64:2, 77:21,
78:9, 81:22, 106:20,
117:5, 133:7,
155:15, 156:17,
156:19
**importantly** [2] -
63:17, 165:3
**importer** [2] - 30:12,
30:13
**impossible** [1] - 105:7
**impression** [1] - 159:5
**in-laws** [2] - 7:3,
121:12
**in-person** [1] - 160:24
**incident** [23] - 15:14,
15:17, 16:6, 16:8,
26:16, 40:2, 40:21,
42:15, 42:18, 43:8,
43:11, 43:18, 44:5,
44:8, 44:18, 44:21,
45:10, 56:13, 58:19,
58:21, 62:12, 157:7,
171:21
**incidents** [3] - 43:2,
43:6, 100:13
**include** [3] - 31:1,
43:20, 145:19
**including** [5] - 12:11,
154:11, 154:15,
155:2, 158:18
**income** [1] - 164:3
**inconsistent** [4] -
66:24, 67:8, 67:19,
67:23
**incorrect** [1] - 116:6
**increase** [2] - 99:17,
145:24
**indeed** [1] - 50:18
**indented** [1] - 106:8

**independent** [1] - 85:4
**independently** [2] -
141:25, 142:1
**indicate** [3] - 30:19,
45:21, 133:12
**indicated** [1] - 162:21
**indicates** [4] - 133:13,
143:2, 143:16, 156:3
**indicating)** [1] -
168:23
**indications** [1] - 143:1
**individual** [8] - 30:17,
36:13, 42:14, 42:17,
59:17, 155:25,
171:11, 171:18
**individuals** [4] -
10:10, 22:16, 47:23,
168:4
**indulgence** [8] -
11:14, 51:19, 64:9,
78:20, 83:22, 86:4,
115:4, 124:4
**infantry** [1] - 91:12
**informant** [1] - 21:18
**informants** [2] - 5:22,
14:13
**information** [40] -
10:3, 18:9, 27:5,
50:17, 51:9, 51:17,
52:22, 53:18, 54:4,
55:1, 84:22, 92:22,
95:3, 97:15, 97:20,
105:11, 105:12,
106:4, 106:6, 106:9,
106:10, 106:12,
106:19, 107:19,
107:21, 111:19,
112:21, 148:23,
149:1, 149:9,
150:16, 150:19,
150:23, 153:23,
155:9, 160:8, 163:4,
163:6, 167:3
**Information** [1] -
92:16
**informed** [1] - 174:6
**initiatives** [1] - 119:24
**inquisitive** [1] -
156:15
**inside** [5] - 10:22,
15:11, 100:17,
101:5, 153:25
**insisting** [1] - 176:5
**inspecting** [1] - 15:10
**instance** [4] - 56:13,
66:3, 145:9, 172:10
**instead** [2] - 13:14,
171:13
**Intel** [2] - 66:3, 66:8
**intelligence** [25] -

91:7, 91:15, 91:17, 91:18, 91:22, 91:23, 92:14, 93:17, 94:4, 94:5, 94:7, 94:8, 94:9, 108:9, 119:14, 119:16, 119:23, 120:1, 147:22, 147:25, 148:2, 148:14, 148:22

**intelligence-related** [1] - 119:16

**intended** [4] - 7:23, 9:10, 51:23, 87:24

**intending** [1] - 49:15

**intent** [2] - 102:13, 166:25

**intercept** [9] - 17:20, 18:22, 20:2, 21:10, 27:20, 29:11, 75:4, 75:10, 86:16

**intercepted** [33] - 5:5, 19:14, 20:7, 20:17, 20:20, 21:6, 21:10, 21:15, 22:6, 22:8, 22:25, 23:18, 23:23, 27:25, 31:9, 34:1, 34:18, 35:24, 36:8, 37:9, 38:10, 46:19, 82:6, 86:8, 87:6, 87:18, 88:5, 88:6, 88:18, 149:6, 150:4, 151:2

**intercepting** [1] - 19:17

**interceptions** [1] - 17:15

**intercepts** [1] - 150:14

**interdict** [1] - 10:8

**interdicted** [2] - 11:8, 36:23

**interdiction** [8] - 12:12, 58:4, 58:8, 58:11, 58:13, 60:20, 61:4, 61:17

**interesting** [1] - 84:21

**interior** [1] - 43:13

**Interior** [3] - 43:25, 55:24, 56:2

**internal** [1] - 152:24

**International** [2] - 134:21, 134:25

**international** [3] - 4:25, 39:5, 155:21

**internationally** [2] - 5:4, 115:1

**Internet** [2] - 144:2, 144:8

**internet** [3] - 118:4, 144:5, 144:7

**interpret** [4] - 80:5,

150:17, 151:21, 171:8

**interpreter** [2] - 18:16, 68:5

**Interpreters** [1] - 1:22

**interrupt** [1] - 90:14

**interrupted** [1] - 16:24

**interview** [1] - 167:6

**interviewed** [5] - 7:8, 9:22, 156:6, 156:8, 157:13

**interviewing** [1] - 68:3

**interviews** [4] - 4:23, 16:10, 71:24, 128:15

**invariably** [1] - 54:18

**invest** [5] - 60:7, 62:24, 67:15, 68:21, 68:23

**invested** [5] - 59:8, 61:12, 66:23, 67:20, 69:3

**investigate** [9] - 4:24, 5:2, 85:14, 93:1, 93:22, 95:6, 98:11, 104:20, 110:16

**investigated** [1] - 67:6

**investigating** [2] - 7:5, 85:12

**Investigation** [1] - 120:8

**investigation** [53] - 4:1, 5:14, 5:17, 5:19, 7:7, 7:17, 9:13, 17:12, 17:21, 18:23, 19:20, 23:24, 25:7, 34:23, 36:3, 39:6, 39:7, 46:4, 46:14, 47:16, 47:24, 48:13, 53:10, 58:19, 59:20, 62:8, 62:10, 62:17, 63:4, 70:24, 71:6, 71:17, 74:24, 75:10, 75:12, 84:15, 85:4, 87:19, 94:17, 95:11, 98:16, 105:24, 106:17, 106:21, 107:5, 109:3, 110:21, 114:5, 120:6, 128:14, 156:6, 156:20, 158:1

**investigations** [4] - 3:19, 3:23, 4:5, 94:1

**investigative** [2] - 3:25, 5:19

**investing** [1] - 69:3

**investment** [2] - 59:17, 60:9

**investor** [3] - 58:20, 58:24, 58:25, 59:4, 59:11, 59:13, 59:15,

60:5, 62:15, 62:16, 62:20, 62:22, 63:12, 63:20, 64:5, 64:6, 68:18, 69:22

**investors** [2] - 59:16, 62:21

**invests** [1] - 59:13

**involved** [36] - 5:14, 6:5, 6:12, 6:15, 6:19, 9:23, 26:20, 39:1, 40:25, 46:4, 47:25, 48:12, 63:15, 63:23, 63:25, 64:8, 64:19, 71:5, 72:22, 76:15, 76:25, 77:5, 77:9, 103:23, 105:2, 107:3, 113:18, 119:21, 122:21, 146:22, 158:13, 161:23, 165:19, 166:18, 167:4, 174:15

**involvement** [2] - 13:19, 62:14

**involving** [4] - 44:5, 67:6, 85:6, 98:8

**iPhone** [7] - 18:4, 52:2, 52:6, 52:14, 52:25, 53:4, 153:21

**irrespective** [1] - 64:2

**Islands** [1] - 15:3

**isolate** [1] - 77:19

**issue** [4] - 76:13, 124:2, 125:10, 156:13

**issued** [4] - 30:20, 31:2, 31:4, 31:5

**issues** [4] - 65:15, 174:5, 174:23, 174:24

**IT** [1] - 11:17

**item** [2] - 155:16, 156:17

**items** [8] - 30:14, 40:13, 40:21, 41:2, 45:9, 45:11, 119:7, 172:15

**itself** [2] - 70:6, 138:12

**J**

**jail** [1] - 55:20

**jails** [1] - 43:1

**Jalisco** [7] - 6:17, 6:18, 107:2, 107:16, 145:21, 160:23, 164:24

**Javier** [2] - 88:15, 128:13

**jewelry** [2] - 45:18,

154:23

**Jimenez** [1] - 2:10

**JIMENEZ** [1] - 1:20

**job** [6] - 117:6, 117:8, 161:25, 162:4, 162:11, 162:13

**jobs** [2] - 162:8, 162:12

**joined** [6] - 2:8, 47:24, 62:5, 62:9, 62:11, 100:22

**joining** [3] - 3:23, 4:10, 4:11

**Jose** [13] - 24:19, 24:20, 25:1, 37:10, 42:3, 86:17, 86:18, 95:19, 121:22, 122:1, 122:23, 123:7, 167:25

**Jose's** [2] - 125:9, 125:18

**JOSEPH** [1] - 90:2

**Joseph** [2] - 90:6, 90:7

**journey** [1] - 99:14

**JR** [1] - 24:6

**JUDGE** [1] - 1:7

**judge** [1] - 158:15

**Judge** [2] - 11:23, 139:11

**judge's** [1] - 158:11

**judgment** [3] - 148:13, 149:9, 175:15

**judicialized** [1] - 120:15

**July** [32] - 27:18, 27:21, 28:1, 29:11, 29:12, 29:16, 29:17, 29:22, 35:25, 36:9, 125:7, 126:4, 131:16, 131:25, 132:7, 132:23, 134:20, 137:24, 138:16, 138:23, 138:25, 139:2, 140:23, 141:19, 143:4, 173:20, 173:23, 173:24

**June** [14] - 14:8, 34:19, 37:10, 56:15, 86:17, 88:19, 108:17, 111:5, 125:11, 126:8, 128:22, 129:5, 143:4, 173:19

**junior** [1] - 93:25

**jury** [3] - 69:13, 70:15, 70:21

**Justice** [2] - 1:10,

50:13

**K**

**Kaitlin** [1] - 2:8

**KAITLIN** [1] - 1:9

**Kate** [1] - 2:8

**KATE** [1] - 1:9

**kate.naseef@usdoj. gov** [1] - 1:13

**KATHERINE** [1] - 1:21

**keep** [7] - 22:21, 54:17, 68:2, 110:7, 111:3, 150:9, 174:4

**keeping** [1] - 155:22

**Kenneth** [2] - 90:6, 90:8

**kept** [1] - 141:22

**Kevin** [2] - 2:24, 3:14

**KEVIN** [1] - 3:2

**kid** [1] - 162:7

**kidnapped** [1] - 147:19

**kids** [10] - 48:24, 49:10, 49:14, 100:23, 103:1, 103:21, 155:18, 156:18, 165:6, 165:9

**kill** [4] - 37:25, 44:17, 122:20, 123:3

**killed** [5] - 16:23, 17:9, 96:13, 145:3, 147:19

**killer** [1] - 68:8

**killing** [3] - 84:16, 85:5, 85:14

**killings** [4] - 84:19, 95:7, 95:17, 95:24

**kilo** [9] - 73:4, 73:6, 76:4, 111:21, 111:22, 112:4, 112:8, 112:12, 176:3

**kilogram** [12] - 8:13, 8:16, 8:20, 8:21, 8:23, 8:25, 9:3, 32:24, 33:1, 33:8, 37:5, 59:3

**kilograms** [23] - 10:13, 12:14, 12:17, 14:17, 31:19, 32:7, 33:14, 34:12, 35:3, 36:5, 36:13, 36:14, 36:15, 36:19, 53:24, 59:5, 59:7, 76:15, 76:21, 77:9, 77:11, 174:15, 176:13

**kilos** [10] - 35:5, 58:12, 71:12, 71:14, 71:19, 72:16, 72:17, 72:18, 76:13

**kind** [17] - 15:20, 18:9,

21:17, 32:8, 39:7, 39:22, 44:3, 48:6, 95:24, 96:1, 96:2, 105:8, 109:18, 152:21, 153:7, 159:17, 166:2
**KIRK** [1] - 1:10
**Kirk** [1] - 2:8
**knowing** [2] - 126:5, 151:16
**knowledge** [17] - 21:22, 48:3, 48:17, 48:21, 50:7, 50:8, 51:7, 58:17, 58:22, 59:15, 59:17, 61:20, 62:4, 74:2, 85:21, 87:7, 127:25
**known** [5] - 7:1, 10:10, 10:16, 25:5, 121:22
**KYLE** [1] - 1:20

**L**

**L.A** [1] - 176:5
**lab** [4] - 12:22, 12:24, 13:16, 50:23
**labeled** [5] - 88:8, 107:7, 107:8, 107:9
**laid** [1] - 151:23
**Lalo** [6] - 22:8, 88:14, 128:11, 128:19, 129:21, 130:1
**land** [1] - 46:5
**language** [7] - 18:13, 32:7, 80:12, 98:24, 100:1, 151:1, 151:10
**Language** [1] - 1:22
**languages** [1] - 4:19
**large** [4] - 6:6, 6:12, 13:12, 117:8
**larger** [3] - 35:9, 59:10, 60:8
**last** [16] - 8:11, 10:9, 10:16, 16:24, 34:4, 57:22, 58:3, 66:16, 68:22, 72:21, 139:10, 146:15, 147:8, 147:10, 156:25, 170:8
**late** [1] - 103:17
**Latin** [1] - 114:23
**launched** [1] - 10:7
**launder** [1] - 164:9
**laundering** [3] - 6:20, 39:9, 164:12
**law** [39] - 4:17, 7:12, 9:14, 10:4, 10:23, 14:9, 14:17, 20:1, 25:7, 26:13, 26:19, 36:23, 37:24, 38:6,

39:12, 39:24, 40:2, 40:9, 40:13, 40:25, 41:1, 42:25, 46:3, 49:11, 49:12, 53:9, 80:13, 80:16, 83:7, 86:9, 86:25, 116:12, 120:6, 120:11, 137:6, 151:25, 153:19, 155:17, 161:20
**laws** [4] - 7:3, 37:18, 121:12
**leader** [6] - 6:24, 6:25, 25:4, 60:2, 69:20, 174:16
**leaders** [1] - 25:3
**leadership** [2] - 60:6, 63:10
**leading** [1] - 135:23
**leads** [1] - 28:22
**leaked** [1] - 46:16
**learn** [6] - 9:14, 9:18, 14:9, 99:11, 133:4, 150:24
**learned** [5] - 2:16, 3:25, 16:8, 118:5, 118:21
**least** [4] - 7:10, 39:23, 71:13, 102:1
**leave** [10] - 45:22, 100:5, 100:6, 124:24, 125:3, 125:6, 126:5, 130:25, 136:9, 164:20
**leaves** [2] - 125:1, 132:10
**leaving** [1] - 135:24
**led** [1] - 47:17
**leeway** [1] - 77:16
**left** [8] - 28:12, 41:11, 98:12, 126:6, 160:10, 165:14, 165:22
**left-hand** [1] - 41:11
**legal** [5] - 76:24, 77:6, 77:8, 77:18, 78:2
**legitimate** [1] - 164:9
**length** [2] - 98:19, 99:1
**less** [4] - 96:24, 118:10, 119:6, 174:15
**lesson** [1] - 84:8
**letter** [3] - 105:20, 105:23, 114:21
**letters** [2] - 114:25, 115:2
**level** [7] - 60:6, 60:7, 60:12, 77:10, 77:11,

77:12, 149:17
**levels** [1] - 174:19
**liaison** [3] - 91:16, 92:6, 92:8
**Liaison** [3] - 92:6, 116:8, 116:24
**license** [4] - 30:17, 83:8, 163:13
**licenses** [2] - 83:6, 163:14
**life** [4] - 102:25, 127:23, 152:7, 164:21
**likelihood** [1] - 147:18
**likely** [2] - 123:2, 171:5
**likewise** [1] - 47:4
**Lilly** [1] - 2:14
**LILLY** [1] - 1:15
**line** [66] - 28:2, 29:3, 29:8, 32:4, 32:10, 32:12, 32:14, 32:18, 32:20, 33:11, 34:8, 34:20, 35:11, 35:14, 36:1, 36:10, 37:2, 38:1, 38:12, 78:25, 79:1, 79:2, 86:20, 86:24, 87:12, 88:11, 88:14, 88:25, 89:1, 89:6, 110:5, 111:16, 119:23, 126:8, 126:9, 126:10, 126:12, 126:15, 126:19, 127:2, 127:4, 127:6, 127:19, 127:20, 127:21, 128:2, 128:9, 129:19, 133:9, 133:15, 133:16, 134:2, 134:3, 135:21, 136:8, 136:18, 137:21, 138:1, 138:15, 138:19, 138:23, 141:18, 142:8, 142:11, 143:8
**lines** [13] - 28:10, 31:11, 31:21, 31:24, 32:9, 34:7, 34:20, 34:25, 37:12, 89:10, 89:12, 113:8, 133:17
**linguistically** [1] - 104:7
**links** [1] - 118:24
**list** [4] - 119:7, 139:21, 144:10, 146:21
**listed** [6] - 27:12, 27:15, 30:11, 30:14, 61:8, 176:8
**listen** [2] - 126:19,

126:21
**listening** [3] - 15:25, 17:1, 80:13
**listing** [1] - 119:8
**lists** [1] - 134:21
**litigate** [1] - 175:25
**live** [2] - 104:9, 160:13
**lived** [5] - 68:4, 98:23, 103:2, 104:10, 160:23
**lives** [1] - 173:2
**living** [3] - 48:8, 163:5, 173:4
**load** [14] - 58:25, 59:1, 59:4, 59:5, 59:10, 61:12, 62:24, 63:15, 63:16, 63:23, 63:25, 64:7, 68:19, 70:9
**loads** [12] - 66:23, 67:6, 67:16, 67:20, 68:18, 68:23, 69:2, 69:9, 70:25, 71:2, 176:9, 176:11
**local** [2] - 96:15, 147:12
**locate** [2] - 37:23, 39:15
**located** [10] - 3:24, 10:22, 14:18, 27:6, 28:5, 39:16, 46:1, 59:2, 135:3, 151:15
**locating** [1] - 151:16
**location** [7] - 15:4, 99:21, 99:23, 114:3, 153:13, 155:20, 164:25
**locations** [3] - 21:3, 45:14, 54:15
**locked** [1] - 44:14
**log** [1] - 29:25
**logical** [2] - 70:12, 70:19
**logistics** [2] - 32:13, 59:25
**long-running** [1] - 7:17
**look** [79] - 11:25, 13:1, 14:22, 17:4, 20:10, 23:3, 23:12, 23:20, 25:11, 25:24, 26:7, 26:21, 27:23, 28:2, 28:10, 29:23, 31:7, 31:24, 32:9, 32:18, 33:11, 33:24, 34:16, 35:22, 36:6, 37:7, 38:1, 38:8, 40:5, 40:16, 41:4, 41:15, 41:23, 42:13, 43:15, 43:19, 67:12, 75:10, 86:13, 87:11, 88:25,

89:6, 89:9, 94:7, 94:10, 97:1, 97:2, 102:19, 109:20, 111:3, 111:24, 113:13, 113:16, 114:12, 118:24, 123:14, 123:25, 124:20, 124:25, 127:8, 128:21, 129:7, 132:20, 137:23, 139:10, 140:12, 140:13, 140:20, 142:15, 143:6, 144:9, 144:12, 152:24, 153:1, 156:25, 157:5, 158:25, 159:21, 172:7
**looked** [11] - 16:10, 93:5, 94:11, 95:23, 103:24, 103:25, 107:5, 138:23, 159:10, 168:8, 174:8
**looking** [29] - 29:3, 29:15, 34:20, 35:11, 36:1, 36:10, 37:12, 38:12, 54:22, 75:11, 88:11, 94:2, 95:23, 97:12, 109:2, 111:24, 119:4, 120:19, 133:9, 136:4, 144:7, 149:6, 156:24, 158:6, 159:17, 163:16, 166:9, 172:23, 175:6
**looks** [6] - 31:5, 66:3, 134:18, 139:1, 139:3, 159:13
**Los** [19] - 3:17, 3:18, 6:8, 6:23, 7:4, 7:5, 7:8, 8:17, 8:19, 9:1, 9:13, 25:3, 25:5, 32:24, 33:2, 33:3, 107:20, 107:22, 124:1
**los** [3] - 6:10, 81:16, 146:25
**lost** [1] - 68:19
**LOTH** [1] - 177:7
**Loth** [2] - 1:23, 177:18
**low** [1] - 60:11
**lower** [3] - 33:10, 60:7, 60:11
**luggage** [2] - 45:17, 155:5
**lunch** [2] - 130:9, 131:15
**luncheon** [1] - 131:5

# M

**M-I-C-H-O-A-C-A-N** [1] - 84:13
**ma'am** [45] - 90:4, 90:17, 95:12, 96:17, 96:25, 99:15, 101:16, 102:9, 102:15, 107:14, 107:24, 109:8, 109:11, 109:19, 114:19, 149:12, 150:7, 153:9, 163:3, 163:9, 163:20, 164:19, 165:7, 165:17, 165:21, 166:1, 166:5, 166:8, 166:15, 167:18, 167:24, 168:1, 168:3, 168:5, 168:14, 168:20, 168:24, 169:3, 169:8, 169:13, 172:14, 172:20, 173:3, 173:6, 173:9
**machine** [1] - 1:25, 82:20
**machines** [1] - 104:22
**Madero** [1] - 103:8
**magazines** [2] - 144:7, 144:9
**maintain** [4] - 4:21, 13:10, 13:11, 158:19
**major** [4] - 47:7, 53:10, 53:23, 135:5
**man** [5] - 17:11, 35:7, 36:4, 36:10, 53:20
**manage** [1] - 161:9
**managed** [1] - 103:6
**manager** [2] - 69:20, 162:8
**manner** [2] - 62:23, 177:14
**MAO** [2] - 129:6, 129:20
**March** [3] - 3:21, 15:13, 16:22
**marijuana** [1] - 110:22
**Marines** [1] - 15:10
**maritime** [2] - 4:17, 10:1
**mark** [1] - 126:13
**marked** [7] - 54:7, 56:24, 82:13, 82:17, 101:12, 105:17, 105:18
**marker** [1] - 29:15
**married** [3] - 7:1, 157:21, 158:4
**Marshall** [1] - 15:3

**Maryland** [1] - 106:5
**mask** [1] - 3:10
**mass** [2] - 75:23, 147:11
**master** [1] - 60:3
**material** [7] - 72:6, 95:15, 95:16, 96:2, 158:7, 173:14, 175:1
**materials** [1] - 121:7
**math** [2] - 74:13, 176:12
**matter** [12] - 2:2, 76:24, 77:6, 77:18, 78:2, 94:20, 111:9, 111:20, 115:12, 130:13, 148:4
**matters** [1] - 47:22
**max** [1] - 159:20
**mean** [62] - 6:19, 6:21, 16:13, 20:19, 28:4, 29:5, 32:5, 33:12, 36:4, 36:12, 37:3, 42:8, 49:6, 49:11, 49:20, 53:6, 53:8, 55:10, 55:12, 55:24, 56:5, 57:7, 61:8, 63:8, 64:19, 65:9, 67:2, 67:11, 67:25, 70:23, 71:9, 71:15, 74:19, 76:5, 77:4, 77:13, 77:15, 80:21, 82:9, 83:16, 84:18, 84:20, 85:17, 87:14, 97:17, 118:23, 124:20, 136:13, 136:14, 136:16, 136:17, 137:18, 142:20, 146:20, 148:25, 151:12, 153:11, 157:12, 166:13, 172:16
**means** [7] - 28:6, 36:24, 68:19, 125:7, 133:14, 144:4, 156:3
**meantime** [1] - 140:14
**measure** [1] - 153:13
**mechanisms** [1] - 97:18
**Medellin** [1] - 93:9
**media** [6] - 96:2, 96:3, 97:12, 97:21, 118:5, 145:2, 145:6
**medical** [2] - 44:19, 125:10
**meet** [1] - 47:3
**meeting** [2] - 67:10, 129:2
**member** [3] - 6:4, 22:7, 128:24
**members** [17] - 6:11,

7:2, 9:23, 13:18, 14:3, 14:5, 18:2, 23:7, 23:11, 79:25, 100:14, 121:11, 128:16, 146:10, 158:18, 160:2, 161:19
**memory** [2] - 63:18, 71:23
**Menchito** [4] - 24:9, 24:10, 24:13, 168:2
**Mencho** [9] - 7:1, 7:3, 24:5, 38:7, 38:10, 38:12, 121:18, 161:20, 168:2
**Mencho's** [1] - 24:11
**mention** [1] - 146:24
**mentioned** [6] - 4:9, 25:6, 35:5, 158:3, 158:5, 160:9
**mentions** [1] - 61:10
**merely** [1] - 153:6
**meridian** [1] - 141:23
**mess** [1] - 2:20
**message** [21] - 18:1, 18:11, 34:4, 38:2, 73:20, 88:13, 89:7, 121:6, 123:15, 124:14, 126:8, 127:9, 132:21, 132:24, 133:21, 139:7, 141:18, 143:2, 143:17, 149:11
**messages** [32] - 18:6, 36:2, 37:19, 73:16, 78:1, 86:7, 87:8, 108:12, 108:13, 108:15, 120:19, 120:22, 121:4, 121:8, 121:13, 121:15, 123:17, 128:22, 129:1, 130:6, 132:22, 133:5, 133:10, 139:6, 139:7, 142:22, 142:24, 151:3, 161:11, 161:14, 169:12, 171:9
**messaging** [2] - 83:24, 108:5
**Messenger** [3] - 17:22, 17:23, 18:4
**messenger** [4] - 17:25, 47:19, 87:19, 133:25
**met** [1] - 50:4
**methamphetamine** [6] - 33:4, 33:5, 33:7,

33:19, 33:21, 110:25
**methamphetamines** [1] - 110:23
**methodology** [2] - 149:16, 149:22
**methods** [6] - 8:5, 148:4, 148:5, 148:6, 148:7, 149:15
**metric** [3] - 12:14, 12:16, 12:17
**Mexican** [27] - 5:11, 14:6, 14:9, 14:17, 15:10, 26:9, 33:15, 33:18, 41:11, 41:17, 42:9, 60:19, 60:23, 61:12, 61:16, 82:7, 96:3, 96:4, 118:7, 119:2, 137:5, 144:11, 145:2, 145:6, 146:7
**Mexicans** [4] - 116:9, 137:1, 137:2, 137:10
**Mexico** [108] - 6:6, 6:13, 8:10, 8:14, 8:15, 8:22, 8:23, 14:21, 25:8, 25:16, 27:8, 27:9, 27:10, 28:13, 28:15, 28:18, 29:1, 29:2, 33:23, 35:13, 35:19, 57:24, 59:7, 70:12, 70:17, 70:19, 71:4, 71:7, 71:10, 71:20, 85:2, 85:10, 93:1, 97:9, 98:13, 99:2, 99:12, 99:13, 99:17, 100:15, 100:17, 105:3, 105:4, 109:5, 115:23, 115:25, 116:5, 116:25, 117:10, 118:17, 118:19, 118:20, 124:16, 124:18, 124:24, 125:3, 125:6, 125:7, 125:8, 125:16, 125:23, 126:1, 126:3, 126:5, 131:15, 132:6, 132:8, 135:10, 135:14, 135:15, 135:18, 136:16, 136:17, 136:21, 136:25, 137:3, 137:8, 137:12, 137:13, 137:16, 138:18, 141:14, 144:12, 144:13, 144:20, 145:12, 147:10, 159:2, 159:5, 159:11,

160:7, 160:20, 161:19, 161:20, 162:11, 162:12, 162:14, 163:11, 164:20, 164:23, 165:24, 166:2, 169:15, 170:20, 171:2, 173:1, 176:4
**Michoacan** [19] - 41:18, 84:2, 84:9, 84:16, 85:5, 85:15, 95:7, 96:18, 98:8, 109:4, 143:22, 143:25, 145:11, 145:14, 145:16, 146:15, 146:23, 146:24, 147:5
**microphone** [1] - 3:11
**middle** [3] - 138:22, 156:18, 159:25
**Middle** [4] - 13:22, 91:9, 92:2, 150:13
**midway** [2] - 59:6, 66:14
**might** [5] - 69:2, 85:18, 137:11, 143:3, 172:24
**MIL** [2] - 119:16, 119:24
**Milenio** [7] - 61:20, 61:21, 61:23, 61:25, 107:15, 122:14, 122:16
**miles** [3] - 99:22, 104:3, 159:7
**military** [27] - 91:7, 91:17, 92:7, 92:14, 103:10, 115:20, 116:3, 116:12, 116:14, 117:16, 119:17, 119:25, 120:5, 129:14, 129:15, 137:6, 137:9, 137:11, 137:15, 137:17, 137:18, 141:9, 141:20, 147:21, 150:13, 150:14, 152:2
**Mill** [1] - 91:15
**million** [3] - 175:14, 176:2, 176:13
**mine** [2] - 79:13, 126:22
**Mingo** [7] - 37:13, 37:15, 37:16, 37:23, 38:3, 38:18, 86:23
**minimal** [1] - 117:6
**minister** [1] - 43:13
**Minister** [3] - 43:25,

55:24, 56:1
**Ministry** [1] - 55:24
**Minjo** [2] - 38:12, 38:16
**minute** [3] - 64:10, 64:11, 106:14
**minutes** [4] - 69:5, 96:23, 138:5, 150:21
**misalignments** [1] - 94:12
**missing** [3] - 144:21, 175:7
**misspoke** [1] - 142:11
**mistakes** [1] - 94:6
**MLAT** [2] - 26:4, 30:8
**modern** [1] - 160:11
**Molina** [15] - 82:11, 82:25, 87:2, 87:5, 87:21, 87:22, 88:2, 88:3, 88:8, 169:15, 169:19, 170:10, 170:11, 170:17
**Molina's** [1] - 169:15
**mom** [1] - 80:23
**moment** [9] - 45:6, 89:16, 90:15, 124:4, 134:4, 140:2, 140:13, 140:20, 148:21
**Monday** [6] - 29:9, 29:10, 29:11, 138:20, 138:25, 139:5
**monetary** [1] - 59:14
**money** [6] - 6:20, 39:9, 162:22, 163:7, 164:9, 164:12
**money-laundering** [1] - 164:12
**moniker** [2] - 136:13, 136:19
**Montevideo** [10] - 104:1, 104:2, 135:4, 135:6, 135:10, 135:11, 138:18, 139:1, 142:3
**months** [2] - 125:16, 126:25
**moons** [1] - 47:7
**MORI** [1] - 1:20
**Mori** [1] - 48:4
**morning** [7] - 2:7, 2:11, 2:12, 2:25, 3:1, 142:21, 159:4
**Morsi** [1] - 117:24
**most** [11] - 31:5, 33:21, 96:8, 115:21, 119:8, 122:17, 123:2, 157:3, 157:14, 161:18,

168:16
**mother** [1] - 80:24
**move** [16] - 3:11, 46:15, 53:21, 54:4, 69:10, 69:16, 78:4, 83:23, 99:23, 101:9, 102:10, 103:19, 143:7, 164:21, 164:24, 166:25
**moved** [16] - 39:18, 39:19, 56:17, 57:15, 59:4, 77:24, 98:13, 100:21, 102:13, 103:3, 103:12, 132:3, 159:6, 163:11, 166:23
**movement** [1] - 107:3
**moving** [10] - 48:13, 59:9, 93:8, 101:6, 155:20, 155:24, 156:1, 156:4, 160:23, 161:7
**MPA** [1] - 10:2
**MR** [138] - 2:12, 2:18, 11:23, 12:15, 16:1, 16:19, 40:18, 46:9, 46:23, 47:1, 47:2, 51:9, 51:25, 54:1, 54:6, 56:23, 57:2, 64:9, 64:12, 64:15, 64:22, 64:24, 65:5, 65:7, 65:22, 66:12, 68:14, 68:21, 68:25, 69:11, 69:17, 72:7, 72:8, 72:11, 72:13, 72:25, 73:2, 73:3, 73:13, 74:3, 74:8, 74:12, 74:15, 76:8, 76:11, 76:17, 76:23, 77:14, 77:20, 78:4, 78:6, 78:20, 78:22, 79:1, 79:3, 82:14, 82:16, 83:2, 83:4, 83:22, 83:25, 84:6, 84:10, 84:12, 85:3, 85:24, 86:4, 89:25, 90:10, 90:23, 90:24, 97:5, 101:9, 101:12, 101:17, 101:18, 102:3, 102:10, 102:11, 105:19, 106:1, 106:3, 107:11, 107:25, 108:20, 108:24, 109:21, 109:24, 110:1, 111:15, 113:4, 113:7, 115:4, 115:7, 115:9, 115:15, 115:17, 123:8, 123:13,

124:4, 124:6, 130:10, 130:15, 130:19, 130:21, 130:25, 131:8, 134:6, 134:9, 137:4, 138:21, 139:9, 139:16, 139:21, 139:23, 140:1, 140:10, 140:16, 140:17, 141:16, 141:17, 149:18, 149:25, 150:1, 150:11, 153:14, 157:7, 157:11, 158:10, 160:19, 160:21, 162:5, 164:5, 164:14, 169:24, 170:5, 170:21, 170:24
**MS** [62] - 2:7, 2:23, 3:4, 3:9, 3:12, 10:17, 11:11, 11:18, 11:20, 12:4, 12:18, 15:23, 16:4, 16:20, 18:18, 18:21, 21:24, 24:15, 25:18, 26:10, 29:13, 40:19, 40:20, 42:12, 45:6, 45:23, 46:22, 51:21, 65:1, 70:2, 74:1, 84:9, 84:24, 86:3, 86:6, 87:16, 87:18, 87:24, 88:10, 89:16, 89:19, 89:22, 130:16, 140:5, 140:15, 160:14, 162:1, 164:17, 167:14, 170:14, 170:18, 170:23, 171:1, 173:7, 173:11, 173:13, 173:22, 175:11, 175:16, 176:19, 176:22, 176:25
**multiple** [15] - 18:22, 54:13, 93:6, 94:4, 94:7, 97:11, 97:12, 97:14, 99:5, 108:8, 119:2, 145:17, 148:2, 155:1, 176:10
**multiply** [1] - 74:9
**municipalities'** [1] - 97:2
**municipality** [2] - 96:19, 109:13
**murder** [6] - 84:2, 85:2, 97:16, 121:13, 144:24
**murdered** [3] - 84:23, 109:4, 147:18
**murders** [3] - 85:9,

143:21, 144:13
**must** [1] - 69:8

## N

**N-O-V-I-C-K** [1] - 3:14
**naked** [2] - 43:24, 55:15
**name** [32] - 2:16, 3:13, 3:14, 19:3, 19:5, 20:21, 22:16, 22:18, 24:1, 24:6, 24:13, 24:16, 41:6, 41:12, 42:8, 83:8, 90:5, 90:6, 109:22, 121:23, 122:3, 126:12, 127:10, 127:12, 127:13, 129:6, 146:14, 146:17, 152:15, 152:16, 153:7, 169:15
**named** [6] - 37:13, 78:16, 89:14, 130:1, 172:3
**names** [3] - 2:5, 20:12, 109:23
**Namibia** [1] - 29:20
**Nano** [1] - 38:10
**Naranjo** [3] - 41:22, 95:18, 95:20
**narco** [11] - 53:14, 54:16, 56:8, 68:8, 77:23, 91:20, 93:1, 100:7, 104:7, 108:10, 108:13
**narcotics** [7] - 3:22, 4:1, 4:4, 47:7, 53:10, 53:23, 114:8
**NASEEF** [7] - 1:9, 45:6, 45:23, 173:13, 175:11, 175:16, 176:19
**Naseef** [1] - 2:8
**NATASHA** [1] - 1:16
**Natasha** [1] - 2:15
**national** [3] - 4:16, 14:7, 119:18
**National** [6] - 92:17, 92:19, 149:13, 149:21, 149:24, 150:5
**nationalities** [2] - 14:2, 14:5
**nationality** [1] - 153:2
**nationals** [1] - 14:6
**native** [1] - 110:9
**naturally** [1] - 7:18
**nature** [3] - 4:3, 4:22, 135:22

**Nava** [14] - 16:14, 47:22, 64:18, 66:18, 66:21, 67:14, 68:17, 69:2, 69:25, 71:11, 71:18, 72:4, 72:15, 72:16
**Navy** [2] - 10:4, 10:6
**NE** [1] - 1:11
**nearby** [1] - 104:11
**necessarily** [9] - 6:19, 28:25, 61:10, 67:11, 69:1, 79:22, 117:20, 152:22, 152:24
**necessary** [1] - 160:25
**need** [10] - 32:21, 37:20, 53:25, 77:18, 109:22, 109:23, 139:25, 155:16, 160:17, 161:20
**needed** [2] - 22:4, 128:17
**needing** [1] - 65:15
**Negra** [2] - 126:19, 126:21
**Negro** [3] - 32:3, 34:8, 34:12
**Nemecio** [1] - 6:25
**nervous** [1] - 171:25
**network** [1] - 18:2
**networks** [1] - 6:21
**never** [8] - 115:23, 115:25, 120:11, 120:14, 125:25, 156:12, 157:16, 158:2
**new** [2] - 7:18, 164:21
**New** [2] - 6:18, 176:6
**news** [10] - 14:24, 17:6, 43:17, 43:20, 61:6, 61:7, 61:8, 61:16, 97:17
**newspaper** [3] - 4:21, 96:15, 162:7
**next** [16] - 2:22, 29:8, 32:4, 57:8, 70:12, 70:19, 80:25, 109:12, 111:4, 119:23, 125:16, 127:2, 138:15, 143:8, 148:19, 154:4
**nice** [2] - 47:3, 103:8
**Nights** [1] - 146:24
**nine** [3] - 31:14, 31:15, 159:19
**nobody** [1] - 84:21
**none** [2] - 147:18, 175:4
**nonetheless** [1] - 141:6
**nontax** [2] - 162:12,

162:13

**nontax-paying** [2] - 162:12, 162:13

**normal** [1] - 165:10

**normally** [1] - 8:3

**north** [2] - 29:1, 118:25

**North** [3] - 64:18, 116:10, 135:18

**notable** [3] - 21:25, 39:20, 45:15

**note** [4] - 65:10, 65:11, 66:17, 97:6

**note-taker** [2] - 65:10, 65:11

**notebook** [1] - 175:7

**noted** [2] - 95:16, 172:17

**notes** [20] - 7:20, 7:23, 63:13, 64:17, 65:2, 65:13, 65:25, 66:4, 66:14, 66:20, 67:9, 67:25, 68:10, 70:2, 70:5, 71:16, 72:1, 72:15, 177:9

**nothing** [10] - 51:22, 75:2, 77:22, 96:1, 105:15, 116:4, 118:20, 124:13, 166:9, 173:7

**noticed** [2] - 10:10, 116:17

**notify** [1] - 37:24

**Novick** [11] - 2:24, 3:5, 3:14, 12:5, 15:24, 16:7, 25:13, 45:9, 65:23, 86:7, 89:20

**NOVICK** [1] - 3:2

**NSA** [8] - 149:5, 149:16, 149:21, 150:2, 150:5, 150:7, 150:8, 150:9

**Nuevo** [3] - 6:17, 107:2, 107:16

**null** [1] - 177:12

**number** [23] - 21:19, 23:8, 30:14, 30:16, 30:17, 30:24, 32:23, 46:11, 54:12, 54:13, 61:16, 73:16, 74:18, 76:12, 96:13, 111:12, 144:15, 161:2, 165:4, 168:17, 168:19, 168:21, 168:22

**numbers** [5] - 30:19, 31:1, 114:1, 163:18, 173:15

**numerous** [7] - 61:3, 70:25, 71:19, 71:20,

---

167:21, 168:4

**NW** [1] - 1:17

## O

**oath** [1] - 131:11

**object** [5] - 123:8, 160:14, 162:1, 169:24, 170:21

**objection** [6] - 74:1, 74:6, 140:3, 160:16, 170:24, 170:25

**observe** [1] - 39:19

**obtain** [1] - 25:7

**obtained** [5] - 26:3, 26:12, 26:13, 27:7, 30:8

**obviously** [14] - 48:3, 60:2, 62:4, 85:9, 92:21, 100:1, 125:2, 128:3, 131:11, 138:11, 141:9, 142:2, 145:21, 149:5

**occasion** [6] - 92:25, 94:13, 108:5, 108:12, 116:1, 116:2

**occasions** [2] - 98:21, 99:5

**occur** [5] - 14:20, 17:18, 61:19, 88:20, 125:24

**occurred** [15] - 15:14, 17:7, 29:11, 38:22, 39:10, 39:12, 43:2, 47:14, 48:2, 49:21, 49:24, 57:19, 62:5, 62:8, 127:25

**occurrence** [1] - 98:6

**occurring** [1] - 116:4

**October** [3] - 38:11, 44:5, 159:13

**odd** [4] - 52:13, 79:15, 79:18, 79:22

**OF** [3] - 1:1, 1:2, 1:6

**offenders** [1] - 5:3

**offense** [4] - 24:21, 77:10, 77:12, 174:19

**offenses** [1] - 13:25

**offer** [3] - 83:2, 102:3, 106:1

**offering** [1] - 84:24

**offhand** [1] - 56:21

**office** [1] - 162:8

**officer** [11] - 4:11, 4:14, 91:7, 91:15, 91:16, 92:6, 92:14, 93:17, 93:25, 119:14, 120:11

**officers** [11] - 9:23, 26:19, 39:1, 39:18,

---

39:19, 39:23, 46:3, 48:12, 116:12, 153:19, 172:22

**Official** [1] - 1:24

**official** [4] - 43:5, 144:24, 158:21, 177:19

**officials** [1] - 39:2

**often** [2] - 152:3, 164:8

**old** [5] - 12:1, 35:7, 36:4, 36:10, 81:17

**old-fashioned** [1] - 12:1

**older** [2] - 103:21, 165:8

**oldest** [1] - 165:11

**once** [8] - 36:14, 39:17, 83:7, 129:25, 140:21, 143:16, 161:5, 165:6

**one** [89] - 5:18, 7:17, 11:7, 14:6, 19:11, 20:19, 21:12, 21:14, 22:16, 23:5, 25:3, 36:22, 37:10, 39:23, 44:11, 45:6, 52:1, 52:7, 60:3, 60:10, 61:9, 64:16, 68:7, 70:7, 75:10, 78:14, 78:20, 79:15, 81:9, 81:21, 82:19, 83:8, 83:11, 84:6, 84:20, 84:22, 89:16, 89:25, 92:5, 95:5, 96:21, 96:22, 97:18, 98:10, 101:5, 101:22, 102:1, 103:10, 103:11, 103:12, 105:2, 105:23, 106:24, 116:1, 123:1, 124:1, 124:4, 125:12, 132:5, 138:22, 142:9, 142:18, 142:23, 143:2, 143:6, 145:3, 146:7, 146:11, 150:8, 152:15, 155:20, 156:3, 158:3, 158:5, 158:12, 159:12, 160:18, 161:18, 162:17, 165:1, 165:4, 167:22, 171:5, 171:15, 172:2, 174:24, 176:7

**one-bedroom** [2] - 103:10, 103:11

**one..** [1] - 71:25

**ones** [4] - 47:25,

---

110:23, 145:18, 168:13

**ongoing** [1] - 93:6

**online** [4] - 81:3, 81:25, 109:18, 109:20

**open** [12] - 10:25, 96:2, 102:12, 102:13, 102:21, 107:6, 144:3, 144:4, 144:6, 163:25, 166:8, 166:9

**open-source** [2] - 96:2, 107:6

**opened** [1] - 44:11

**opening** [1] - 102:22

**operates** [2] - 135:14, 147:4

**operating** [1] - 10:24

**operation** [1] - 46:4

**operational** [1] - 93:15

**operations** [7] - 4:2, 4:15, 4:16, 4:17, 4:18, 6:20, 93:6

**opinion** [2] - 80:8, 104:25

**opportunity** [5] - 67:13, 68:12, 104:4, 167:15, 170:12

**opposed** [5] - 13:11, 68:4, 74:18, 114:24, 176:5

**orchestrated** [1] - 64:7

**orchestrating** [1] - 63:16

**orden** [1] - 24:2

**order** [6] - 17:15, 18:10, 19:10, 20:1, 22:11, 39:4

**ordinary** [1] - 109:15

**organization** [11] - 6:5, 6:9, 6:10, 25:5, 96:14, 97:23, 106:25, 107:10, 165:20, 172:2

**organizational** [1] - 97:23

**organizations** [16] - 5:12, 33:15, 33:18, 33:22, 96:6, 97:24, 105:3, 110:18, 116:14, 118:7, 120:1, 144:12, 145:8, 145:19, 146:8, 146:11

**organize** [1] - 59:21

**organized** [1] - 59:25

**organizer** [2] - 69:20, 174:16

---

**organizing** [2] - 62:18, 63:16

**original** [3] - 110:11, 110:13, 148:25

**Oscar** [9] - 16:14, 47:22, 64:17, 66:21, 69:25, 71:11, 71:18, 72:4, 72:15

**Oseguera** [4] - 6:25, 24:11, 24:14, 66:18

**outside** [7] - 15:12, 50:4, 102:25, 133:4, 149:9, 150:23, 154:4

**outskirts** [1] - 104:2

**overruled** [4] - 74:6, 123:11, 162:3

**oversee** [2] - 161:9, 161:21

**oversees** [1] - 56:1

**overthrow** [1] - 117:24

**own** [8] - 6:21, 39:6, 55:8, 55:20, 59:9, 127:23, 165:13, 176:12

**owned** [1] - 59:10

**owns** [1] - 58:25

## P

**p.m** [1] - 177:3

**packed** [2] - 45:16, 155:17

**packing** [1] - 155:15

**page** [26] - 14:22, 15:7, 17:8, 26:10, 26:22, 28:10, 29:14, 32:4, 42:13, 43:19, 57:8, 66:13, 66:15, 66:16, 70:8, 72:14, 78:24, 89:9, 97:2, 113:5, 127:2, 136:11, 140:11, 140:18, 143:8, 159:1

**pages** [4] - 42:20, 167:16, 167:20, 167:22

**pana** [2] - 28:20, 28:21

**Pana** [2] - 136:9, 136:14

**Panama** [3] - 28:21, 28:25, 136:14

**Panamanian** [1] - 135:17

**paper** [1] - 65:3

**papers** [1] - 176:8

**paragraph** [9] - 17:8, 25:1, 57:22, 66:17, 69:8, 70:7, 70:8, 72:19, 157:21

**Paralegal** [2] - 1:20,

2:9
**parent** [1] - 80:11
**parentheses** [1] -
128:13
**parents** [1] - 80:23
**parked** [1] - 154:3
**part** [30] - 9:13, 25:6,
34:22, 36:3, 39:5,
47:16, 47:23, 58:8,
58:10, 59:10, 59:21,
68:22, 69:24, 71:17,
95:14, 98:16, 101:2,
103:8, 105:24,
115:21, 116:7,
117:6, 117:8,
118:23, 143:3,
143:17, 148:20,
156:6, 158:1, 176:1
**participate** [1] - 60:8
**participating** [2] -
65:24, 121:12
**particular** [7] - 58:21,
75:2, 115:10,
117:19, 120:15,
120:19, 148:14
**particularly** [3] -
45:10, 70:16, 108:10
**party** [3] - 83:9, 93:14,
177:14
**pass** [3] - 139:11,
139:20, 173:16
**passed** [1] - 165:25
**passport** [13] - 26:9,
26:15, 27:7, 41:12,
41:13, 46:12, 124:9,
131:19, 134:17,
140:22, 153:6,
153:12, 172:3
**passports** [4] - 45:17,
152:15, 154:19,
171:25
**past** [9] - 44:22, 56:9,
66:22, 77:23, 85:11,
91:21, 114:5, 123:2,
172:24
**patience** [1] - 177:1
**patrol** [1] - 10:1
**patrolled** [1] - 103:9
**patterns** [1] - 151:17
**paying** [5] - 161:25,
162:4, 162:11,
162:12, 162:13
**payment** [1] - 9:4
**people** [41] - 7:8, 12:2,
16:10, 17:8, 20:4,
20:8, 22:14, 32:16,
50:3, 60:7, 61:11,
63:6, 80:9, 80:22,
84:18, 85:18, 95:21,
96:13, 96:22, 103:5,

129:1, 134:15,
137:6, 137:7,
137:15, 144:21,
145:3, 147:18,
150:24, 151:10,
151:20, 151:22,
159:25, 160:2,
160:5, 160:10,
162:9, 172:22,
175:24
**per** [8] - 37:5, 73:4,
73:6, 74:5, 76:4,
94:1, 112:3, 176:3
**percent** [1] - 103:18
**perfect** [2] - 11:25,
57:11
**performed** [1] - 94:11
**perhaps** [2] - 31:21,
175:8
**period** [11] - 8:17,
67:7, 91:21, 92:17,
114:4, 114:21,
125:24, 141:13,
159:19, 166:3,
168:12
**periods** [2] - 75:23,
92:24
**permission** [1] - 90:21
**persecuted** [1] - 96:8
**person** [20] - 37:13,
50:12, 54:10, 56:1,
59:11, 65:25, 66:9,
68:3, 78:8, 83:14,
123:19, 128:15,
143:16, 149:10,
157:20, 158:9,
158:12, 160:24,
168:25, 172:9
**person's** [1] - 83:8
**personal** [5] - 48:3,
62:4, 80:8, 118:1,
137:12
**personally** [1] - 55:18
**perspective** [3] - 92:4,
97:3, 100:1
**pertaining** [1] - 43:18
**phone** [18] - 40:1,
40:2, 40:8, 50:11,
50:13, 50:14, 52:15,
53:18, 53:19, 53:20,
153:23, 153:24,
156:16, 161:12,
161:13, 172:6,
172:12
**phones** [4] - 50:15,
50:18, 50:19, 54:13
**photo** [9] - 12:7,
23:10, 41:7, 42:14,
42:17, 42:19, 87:2,
101:5

**photocopied** [1] -
177:13
**photograph** [6] -
11:22, 19:16, 82:4,
82:17, 82:19, 101:4
**photographed** [1] -
12:19
**photographs** [8] -
18:11, 40:21, 45:11,
82:4, 82:6, 101:2,
101:14, 122:6
**photos** [14] - 13:5,
13:8, 13:15, 22:24,
23:5, 23:13, 23:17,
23:22, 42:22, 87:5,
87:21, 172:12
**physical** [1] - 5:21
**physically** [3] - 47:25,
49:18, 135:2
**pick** [2] - 155:18,
156:17
**picking** [1] - 31:22
**picture** [9] - 15:7,
82:23, 83:15, 83:16,
83:20, 88:2, 153:7,
169:16, 169:21
**pictures** [3] - 88:3,
88:7, 101:22
**piece** [4] - 106:24,
154:10, 156:23,
161:5
**pieces** [4] - 30:5,
112:22, 154:23,
155:1
**Pilo** [1] - 16:14
**pin** [11] - 18:25, 19:1,
19:3, 19:7, 19:9,
19:10, 19:14, 19:17,
21:5, 21:10, 22:4
**PING** [1] - 133:10
**pins** [14] - 18:22,
19:11, 19:21, 20:2,
20:4, 20:12, 20:14,
20:17, 20:21, 20:24,
21:7, 21:9, 21:12,
21:15
**place** [11] - 70:12,
70:19, 85:9, 95:18,
129:2, 139:2,
159:15, 160:4,
160:6, 160:10, 165:2
**places** [3] - 48:14,
114:23, 161:8
**plainclothes** [2] -
39:21, 153:20
**planner** [1] - 60:3
**planning** [2] - 63:25,
64:8
**plans** [2] - 59:12,
130:18

**play** [1] - 32:8
**played** [8] - 60:13,
61:13, 62:18, 63:4,
63:5, 63:15, 63:19,
64:3
**plays** [1] - 60:24
**plead** [2] - 13:25,
24:20
**pled** [3] - 13:24, 122:1,
122:3
**plus** [3] - 35:2, 110:6,
176:13
**point** [23] - 47:20,
56:19, 59:6, 62:2,
69:5, 70:14, 76:21,
76:23, 78:5, 80:25,
81:24, 91:19, 92:4,
114:19, 119:1,
123:1, 141:12,
160:15, 162:15,
162:17, 165:22,
165:23, 176:12
**pointed** [1] - 81:21
**points** [3] - 81:21,
81:22, 175:2
**poke** [1] - 77:24
**police** [5] - 48:21,
51:2, 119:18,
153:20, 172:22
**political** [1] - 93:14
**politically** [1] - 99:25
**poor** [1] - 28:16
**port** [1] - 60:20
**Port** [1] - 60:21
**portion** [6] - 31:16,
59:1, 66:20, 136:5,
138:13, 161:4
**portions** [1] - 122:15
**Porto** [2] - 14:21,
61:17
**position** [3] - 10:10,
10:16, 77:22
**positions** [1] - 92:5
**positive** [1] - 12:25
**possessed** [1] -
174:17
**possibility** [4] - 98:5,
152:22, 152:25,
172:11
**possible** [14] - 54:18,
64:20, 73:14, 85:5,
95:3, 114:12,
135:12, 136:15,
144:25, 148:17,
149:3, 154:2, 172:4,
172:14
**possibly** [1] - 97:22
**post** [3] - 160:11,
173:17, 173:18
**potential** [1] - 102:19

**potentially** [5] - 94:9,
128:5, 151:19, 156:5
**pound** [1] - 33:7
**pounds** [1] - 33:6
**power** [1] - 107:17
**powerful** [1] - 161:18
**preliminary** [1] -
175:20
**preparation** [2] -
85:11, 121:1
**prepared** [1] - 124:8
**preponderance** [1] -
175:2
**presence** [1] - 49:24
**present** [7] - 47:25,
49:18, 65:9, 91:1,
99:7, 102:18, 105:5
**PRESENT** [1] - 1:20
**presented** [2] - 95:15,
95:16
**press** [4] - 60:19,
60:22, 60:23, 60:24
**presume** [1] - 128:15
**presuming** [2] - 68:19,
132:6
**pretty** [6] - 68:17,
76:2, 100:22,
116:22, 148:10,
150:9
**previous** [2] - 4:7, 4:9
**previously** [6] - 16:16,
18:20, 51:21, 69:23,
155:9, 172:1
**price** [22] - 8:9, 8:16,
8:25, 9:3, 32:24,
33:1, 33:2, 33:7,
33:8, 36:15, 36:17,
37:4, 59:1, 73:4,
74:4, 76:3, 111:21,
112:8, 112:12,
112:16, 176:3, 176:5
**prices** [1] - 112:3
**primarily** [9] - 18:13,
91:20, 93:3, 93:11,
98:23, 115:22,
144:3, 146:6, 146:10
**primary** [5] - 57:4,
57:24, 100:5,
106:24, 110:23
**prison** [2] - 55:22,
56:6
**prisons** [1] - 43:1
**privy** [1] - 109:15
**probation** [1] - 174:6
**problem** [3] - 102:24,
123:19, 144:20
**procedure** [1] - 10:24
**procedures** [1] -
149:15
**proceed** [1] - 167:13

**proceeded** [1] - 10:6
**proceeding** [2] - 105:13, 177:3
**proceedings** [3] - 14:2, 17:2, 177:10
**Proceedings** [1] - 1:25
**proceeds** [3] - 6:16, 163:14, 163:15
**process** [2] - 95:14, 102:22
**produce** [1] - 96:10
**produced** [2] - 1:25, 33:22
**product** [1] - 59:22
**production** [1] - 107:3
**products** [1] - 163:13
**proffer** [11] - 7:15, 7:24, 63:17, 64:17, 65:2, 65:24, 69:24, 70:6, 72:4, 72:15, 72:23
**proffers** [4] - 7:20, 48:2, 64:19, 71:24
**profit** [1] - 59:9
**programs** [1] - 120:2
**Progreso** [3] - 14:21, 60:21, 61:17
**prohibiting** [1] - 160:22
**promise** [3] - 57:12, 60:10, 102:10
**pronoun** [2] - 79:17, 79:20
**pronounce** [1] - 84:8
**pronunciation** [1] - 84:3
**propelled** [1] - 10:3
**proper** [1] - 148:7
**properly** [1] - 150:16
**proprietary** [1] - 18:1
**prosecutors** [1] - 7:16
**protect** [1] - 172:3
**protected** [1] - 155:23
**protecting** [1] - 155:22
**prove** [1] - 175:1
**proves** [1] - 149:10
**provide** [5] - 6:16, 6:22, 18:9, 32:2, 101:21
**provided** [7] - 53:9, 101:14, 103:14, 106:9, 108:2, 108:16, 120:25
**PSR** [1] - 157:21
**publish** [2] - 64:22, 108:21
**published** [3] - 65:2, 105:19, 110:6

**publishing** [1] - 109:24
**Puerto** [1] - 103:8
**pull** [7] - 10:17, 25:18, 41:9, 42:4, 87:11, 119:10, 140:12
**pulled** [1] - 39:13
**Punta** [9] - 48:8, 48:24, 49:2, 104:1, 104:10, 104:14, 104:16, 104:17
**purchase** [1] - 60:8
**purchased** [1] - 59:5
**purchasing** [2] - 31:18, 35:9
**purported** [3] - 67:14, 108:16, 108:17
**purportedly** [3] - 53:2, 106:6, 108:13
**purports** [1] - 88:2
**purpose** [2] - 13:9, 155:11
**purposes** [2] - 73:24, 74:3
**pursuant** [2] - 82:20, 106:5
**pursued** [1] - 100:14, 100:16
**pursuing** [1] - 100:17
**put** [11] - 36:22, 56:25, 63:7, 77:9, 90:21, 94:11, 102:15, 102:16, 112:21, 113:12, 155:7
**puts** [1] - 77:11
**putting** [3] - 111:23, 148:20, 150:2
**puzzling** [1] - 174:8

## Q

**quality** [1] - 28:16
**Quantico** [2] - 3:25, 4:6
**quantities** [4] - 6:6, 6:12, 8:2, 75:23
**quantity** [6] - 13:12, 35:9, 76:14, 76:20, 77:10, 77:11
**query** [1] - 77:8
**questionable** [1] - 169:5
**questions** [11] - 68:6, 77:16, 89:19, 104:20, 115:7, 126:23, 143:19, 147:8, 149:13, 164:14, 171:24
**quick** [1] - 159:17
**quinela** [1] - 32:5

**quinientos** [1] - 32:8
**quite** [3] - 46:15, 68:16, 159:7
**quote** [3] - 93:13, 144:21, 171:22
**quote-unquote** [2] - 93:13, 144:21

## R

**racetrack** [3] - 15:15, 16:8, 16:23
**RACHEL** [1] - 1:16
**Rachel** [1] - 2:15
**RAFTOPOULOS** [1] - 1:21
**raise** [1] - 152:20
**raising** [1] - 78:3
**ran** [1] - 135:11
**rare** [1] - 70:16
**rate** [5] - 73:21, 74:10, 74:20, 76:2, 144:24
**rather** [1] - 36:14
**reaching** [1] - 8:4
**read** [39] - 4:21, 9:22, 34:7, 38:25, 41:1, 43:23, 48:1, 55:7, 63:14, 80:7, 88:13, 89:1, 106:14, 111:25, 113:10, 113:12, 113:17, 119:12, 126:15, 127:4, 127:10, 128:9, 129:12, 129:19, 133:13, 133:19, 138:1, 138:8, 138:9, 138:13, 138:19, 140:11, 141:18, 141:20, 142:8, 142:11, 143:10
**reading** [5] - 14:13, 15:18, 16:8, 69:6, 123:22
**ready** [5] - 2:21, 34:12, 35:3, 38:14, 115:8
**real** [2] - 154:11, 159:17
**reality** [1] - 125:25
**realize** [1] - 69:14
**really** [11] - 32:17, 53:20, 53:24, 69:4, 69:15, 76:9, 77:5, 79:19, 112:18, 160:17, 176:4
**reason** [15] - 46:10, 50:1, 55:11, 71:3, 72:20, 72:21, 75:22, 83:14, 100:5, 122:11, 131:3,

132:4, 158:22, 160:11, 165:4
**reasonable** [1] - 113:21
**reasonably** [1] - 113:17
**reasons** [5] - 103:12, 151:22, 161:2, 161:3, 175:5
**rebuttal** [1] - 173:12
**receive** [2] - 3:22, 44:19
**received** [1] - 4:4
**recently** [1] - 157:14
**recess** [2] - 64:13, 131:5
**recognize** [4] - 13:2, 82:19, 100:25, 101:19
**recollection** [5] - 62:16, 64:25, 65:8, 65:17, 66:24
**record** [7] - 2:6, 3:13, 18:18, 26:10, 74:7, 84:25, 134:5
**recorded** [2] - 5:6, 35:17
**records** [23] - 25:6, 25:7, 25:15, 25:21, 26:1, 26:24, 27:7, 28:8, 30:3, 30:8, 30:11, 35:12, 124:9, 125:5, 131:20, 134:7, 134:16, 140:22, 157:1, 159:2, 159:9, 165:25
**recoverable** [1] - 154:1
**recovered** [3] - 45:24, 61:18, 87:22
**REDIRECT** [1] - 164:16
**redirect** [3] - 86:2, 162:25, 164:15
**reduced** [1] - 65:18
**redundancy** [1] - 148:17
**refer** [10] - 35:19, 80:9, 80:10, 80:22, 86:8, 86:20, 86:24, 87:13, 114:24, 137:2
**reference** [3] - 37:12, 81:24, 81:25
**references** [1] - 89:11
**referred** [2] - 169:21, 171:19
**referring** [9] - 12:8, 16:13, 35:15, 38:2, 38:5, 38:16, 69:1, 71:15, 133:25

**refers** [3] - 70:10, 82:21, 138:7
**reflect** [3] - 20:14, 139:7, 175:18
**reflected** [3] - 96:13, 102:8, 124:13
**refresh** [3] - 65:8, 68:2, 71:23
**refreshes** [1] - 64:25
**regard** [2] - 35:7, 108:10
**regarding** [11] - 43:8, 55:12, 55:25, 56:9, 63:12, 66:18, 66:23, 69:20, 69:24, 83:12, 169:10
**regards** [2] - 62:13, 89:4
**region** [5] - 97:8, 97:10, 97:13, 98:3
**regular** [1] - 18:6
**relate** [1] - 34:4
**related** [11] - 9:22, 14:24, 38:25, 39:9, 59:24, 62:10, 80:17, 116:25, 118:19, 119:16, 149:13
**relation** [4] - 46:15, 113:16, 116:13
**relationship** [6] - 6:23, 37:17, 59:16, 116:10, 158:20, 158:23
**relative** [1] - 123:18
**relatively** [1] - 99:24
**relatives** [2] - 80:1, 86:8
**relayed** [3] - 10:3, 166:24, 167:3
**released** [1] - 153:23
**relevance** [2] - 118:11, 160:15
**relevant** [4] - 53:2, 91:2, 106:12, 106:20
**relocated** [1] - 57:4
**rely** [3] - 120:21, 149:7, 150:15
**remain** [2] - 104:5, 166:25
**remember** [22] - 54:9, 60:21, 63:21, 63:23, 64:16, 64:20, 71:21, 73:15, 73:18, 78:18, 81:1, 82:4, 83:20, 86:11, 100:15, 143:1, 154:9, 162:21, 166:15, 166:16, 169:12
**remembering** [1] - 111:25

remembers [1] - 70:5
remotely [1] - 114:16
remove [4] - 3:10,
155:11, 164:22,
165:4
removed [1] - 104:7
repeat [1] - 106:16
rephrase [2] - 137:14,
149:19
report [2] - 61:1, 96:7
reported [2] - 1:25,
147:19
Reporter [3] - 1:23,
1:24, 177:19
reporters [3] - 96:4,
96:8
reporting [7] - 60:24,
96:11, 145:7,
147:10, 147:15,
148:18, 166:8
reports [27] - 9:22,
10:20, 12:22, 14:13,
15:19, 15:20, 15:21,
16:2, 16:6, 16:9,
16:10, 16:13, 38:25,
41:1, 43:5, 48:1,
61:3, 61:6, 63:14,
63:24, 93:5, 94:2,
97:3, 97:12, 97:19,
145:2, 154:8
representation [1] -
94:17
representative [6] -
13:8, 13:9, 13:10,
13:13, 119:25, 141:4
request [4] - 35:8,
50:16, 52:13, 109:16
required [1] - 55:15
requirements [1] -
120:2
requires [1] - 175:19
rescue [1] - 4:16
research [3] - 110:21,
143:21, 147:9
researching [1] -
146:2
resided [1] - 103:11
residence [4] - 48:11,
48:15, 57:4, 57:24
residency [1] - 98:13
residing [1] - 49:6
Resitencia [1] -
107:15
respective [1] - 26:5
respond [1] - 127:21
responds [3] - 126:14,
126:16, 134:2
response [1] - 18:10
responsibilities [1] -
93:18

responsibility [1] -
92:1
responsible [3] - 61:5,
117:12, 117:15
rest [2] - 63:1, 66:25
results [6] - 12:24,
51:7, 51:13, 51:17,
55:4, 95:10
resume [6] - 116:18,
117:1, 117:2, 119:5,
119:9, 119:10
retained [1] - 94:16
retaliatory [2] - 98:1,
98:7
retired [2] - 91:7,
92:15
retirement [1] - 91:24
retrospective [1] -
47:11
return [1] - 29:21
reveal [1] - 110:21
revealed [2] - 59:20,
70:24
revenue [2] - 6:15,
6:22
review [31] - 31:11,
43:5, 47:11, 51:13,
65:12, 67:13, 84:1,
105:11, 105:24,
106:10, 106:13,
106:17, 108:1,
108:5, 108:12,
108:15, 111:4,
118:4, 120:15,
121:10, 123:16,
123:21, 124:7,
133:3, 133:23,
134:12, 138:5,
140:18, 164:7,
167:15
reviewed [17] - 5:5,
12:22, 34:22, 35:18,
36:2, 51:4, 54:22,
72:1, 72:4, 95:14,
105:24, 120:25,
121:5, 131:19,
131:22, 159:9
reviewing [3] - 5:10,
37:20, 120:19
revised [1] - 174:7
Reyes [1] - 146:25
right-hand [1] - 41:13
ripe [1] - 173:19
rise [1] - 164:22
risk [2] - 59:14, 152:25
river [1] - 95:19
role [16] - 5:17, 60:13,
60:24, 61:13, 62:18,
63:5, 63:6, 63:10,
63:15, 63:16, 63:19,

64:3, 85:7, 94:24,
107:23
room [3] - 88:15,
123:2, 128:11
route [1] - 68:18
routes [4] - 59:9,
135:9, 135:11,
135:19
RPR [3] - 1:23, 177:7,
177:18
Ruben [2] - 24:11,
24:14
Rudnick [2] - 1:17,
1:21
rules [3] - 83:11,
175:19, 175:24
run [2] - 103:5, 156:13
running [1] - 7:17
runs [1] - 135:9

S

safe [4] - 18:6, 99:23,
160:4, 164:25
safer [1] - 164:25
safety [3] - 132:4,
132:10, 165:18
SAHNI [40] - 1:9, 2:7,
2:23, 3:4, 3:9, 3:12,
10:17, 11:11, 11:18,
11:20, 12:4, 12:18,
15:23, 16:4, 16:20,
18:18, 18:21, 21:24,
24:15, 25:18, 26:10,
29:13, 40:19, 40:20,
42:12, 46:22, 51:21,
65:1, 70:2, 74:1,
84:24, 86:3, 86:6,
87:16, 87:18, 87:24,
88:10, 89:16, 89:19,
89:22
Sahni [2] - 2:8, 57:12
SAINT [1] - 177:7
Saint [2] - 1:23,
177:18
SAINT-LOTH [1] -
177:7
Saint-Loth [2] - 1:23,
177:18
sale [1] - 163:15
sales [1] - 31:23
Salvador [2] - 91:11,
116:2
samba [2] - 34:9,
34:14
sample [7] - 13:8,
13:9, 13:10, 13:13,
35:4, 35:7, 35:8
San [3] - 8:6, 42:3,
88:15, 95:18, 128:13

SANCHEZ [18] - 1:15,
84:9, 130:16, 140:5,
140:15, 160:14,
162:1, 164:17,
167:14, 170:14,
170:18, 170:23,
171:1, 173:7,
173:11, 173:22,
176:22, 176:25
Sanchez [7] - 2:14,
84:7, 105:21, 131:1,
167:13, 169:22,
170:10
Santy [5] - 24:16,
24:23, 121:23,
122:2, 167:25
sat [1] - 120:14
save [2] - 68:13,
170:12
saw [7] - 39:22, 99:20,
105:10, 124:13,
124:14, 142:22,
162:19
sbest@
brownrudnick.com
[1] - 1:19
scene [1] - 10:9
schedule [2] - 173:18,
174:3
school [13] - 39:17,
48:24, 49:22, 49:25,
50:2, 103:21,
103:22, 104:11,
154:4, 156:18,
162:6, 165:11,
165:12
SCI [2] - 92:15
scope [1] - 162:2
score [1] - 174:6
Scorpion [3] - 128:24,
129:6, 129:19
screen [17] - 11:13,
19:3, 19:5, 20:12,
20:21, 22:16, 22:18,
24:1, 24:6, 24:16,
26:11, 31:25, 40:6,
56:25, 100:24,
139:16, 142:14
screw [1] - 38:15
scuttle [3] - 10:22,
10:24, 11:6
scuttled [2] - 10:11,
10:19
se [1] - 94:1
sea [1] - 11:1
search [15] - 4:15,
45:14, 45:25, 47:17,
47:18, 50:22, 51:18,
52:14, 55:5, 81:3,
81:6, 82:21, 109:18,

119:1, 144:5
searched [4] - 50:21,
50:24, 51:23, 54:18
searches [3] - 50:19,
144:2, 144:3
searching [1] - 15:10
second [7] - 66:15,
66:16, 70:8, 78:20,
84:6, 98:25, 113:5
secret [1] - 92:15
Secret [1] - 92:16
Secretariat [1] - 92:10
secreted [1] - 14:18
Section [1] - 174:17
section [1] - 47:7
secure [3] - 18:5,
18:6, 83:7
securing [1] - 156:4
security [10] - 4:16,
92:11, 92:12, 93:4,
99:18, 103:13,
119:23, 132:7,
132:13, 164:23
Security [7] - 92:18,
92:19, 120:8,
149:14, 149:21,
149:24, 150:6
see [40] - 12:2, 21:16,
38:13, 57:7, 57:11,
57:18, 57:22, 64:25,
66:5, 66:11, 66:14,
66:17, 66:20, 67:17,
67:18, 70:10, 72:14,
72:19, 74:18, 76:11,
77:13, 78:23, 79:2,
79:12, 79:14, 79:15,
82:17, 94:11, 96:11,
97:7, 98:1, 98:7,
100:25, 102:18,
105:20, 106:4,
106:7, 106:8, 110:2,
110:5, 111:15,
111:16, 113:8,
113:17, 119:10,
124:21, 128:12,
130:14, 130:24,
134:19, 134:23,
136:10, 136:12,
138:24, 142:10,
142:11, 142:14,
142:19, 143:9,
169:18, 172:13
seeing [4] - 60:23,
112:22, 143:1,
162:21
seem [1] - 176:11
seize [2] - 40:2, 40:13
seized [33] - 10:12,
12:8, 12:19, 13:6,
13:11, 14:17, 26:16,

20

36:23, 40:21, 41:2,
42:15, 42:17, 45:10,
45:11, 45:12, 45:13,
50:11, 50:16, 50:19,
51:1, 54:14, 54:21,
54:25, 58:12, 87:3,
87:4, 87:5, 87:13,
87:14, 87:21, 87:22,
88:4, 104:22
**seizure** [10] - 9:18,
9:21, 9:22, 9:24,
13:5, 13:12, 14:9,
14:12, 14:20, 14:25
**seizures** [4] - 5:25,
9:14, 54:10, 176:10
**self** [1] - 10:3
**self-propelled** [1] -
10:3
**sell** [1] - 32:21
**semisubmersible** [5] -
10:3, 10:18, 12:12,
12:13, 13:18
**send** [2] - 23:17, 43:25
**sending** [2] - 127:9,
143:16
**sends** [1] - 124:2
**senior** [2] - 91:15,
119:14
**sense** [4] - 28:25,
69:5, 171:12, 171:19
**sensitivity** [1] - 84:11
**sent** [8] - 18:11, 23:14,
27:20, 50:21, 50:22,
83:17, 84:11, 120:20
**sentence** [4] - 67:12,
68:23, 72:21, 136:2
**sentences** [1] - 119:13
**sentencing** [8] -
46:25, 51:24, 69:15,
76:13, 173:20,
173:22, 174:5,
175:21
**separate** [7] - 22:6,
98:21, 122:12,
142:2, 142:3, 142:4,
165:4
**September** [5] - 34:2,
34:3, 108:18, 111:5,
168:13
**series** [6] - 88:20,
108:1, 128:22,
128:25, 132:22,
150:20
**serious** [1] - 124:2
**serve** [1] - 6:17
**served** [6] - 92:6,
115:23, 115:25,
119:14, 119:24,
120:11
**session** [4] - 64:17,

65:24, 69:24, 70:6
**sessions** [1] - 63:17
**set** [4] - 32:13, 55:25,
120:19, 130:6
**several** [9] - 39:11,
44:10, 48:13, 49:13,
52:4, 52:5, 55:3,
64:19, 172:19
**shall** [1] - 177:12
**shape** [1] - 81:4
**shark** [21] - 14:18,
15:2, 15:12, 56:13,
56:15, 60:18, 61:18,
62:13, 62:19, 63:11,
64:4, 66:18, 66:23,
67:6, 68:19, 69:2,
69:8, 69:18, 69:21,
69:24, 70:9
**sharks** [2] - 63:7, 63:8
**shield** [1] - 39:22
**ship** [3] - 10:4, 10:6,
71:2
**shipment** [8] - 13:19,
14:25, 59:13, 59:15,
60:3, 60:7, 60:9,
60:14
**shipments** [6] - 63:11,
71:4, 71:7, 71:21,
176:8, 176:9
**shipped** [9] - 70:12,
70:16, 70:17, 70:18,
70:25, 71:14, 71:19,
72:17, 76:19
**shipping** [3] - 14:19,
15:11, 75:22
**shooting** [1] - 17:6
**shootout** [1] - 16:23
**short** [6] - 28:21,
85:17, 126:11,
168:12, 168:19,
168:22
**shorthand** [2] - 1:25,
136:13
**show** [10] - 15:9, 54:7,
72:9, 76:5, 82:13,
100:24, 101:12,
105:17, 134:16,
169:9
**showed** [3] - 10:9,
162:19, 163:24
**shown** [4] - 130:4,
161:15, 169:4,
169:16
**shows** [4] - 15:10,
74:19, 95:20, 161:13
**sibling** [4] - 80:10,
80:11, 80:24, 171:23
**siblings** [3] - 80:23,
86:10, 107:1
**sic** [13] - 6:15, 8:1,

24:2, 28:12, 32:5,
38:12, 41:7, 59:1,
60:21, 81:11, 91:16,
126:4, 137:2
**sic]** [2] - 14:21, 129:13
**sick** [2] - 124:19,
128:5
**side** [6] - 6:20, 41:11,
41:13, 129:10,
157:17
**sign** [1] - 57:12
**signals** [1] - 94:8
**signatory** [1] - 177:14
**signature** [1] - 57:11
**signed** [4] - 44:4,
57:7, 103:21, 103:22
**significance** [6] - 9:4,
9:7, 32:23, 34:14,
36:18, 104:21
**significant** [5] - 71:4,
77:7, 105:1, 105:14,
167:22
**significantly** [1] -
33:10
**silver** [1] - 126:13
**Silverio** [34] - 20:22,
22:2, 22:4, 22:10,
22:12, 27:11, 27:14,
27:20, 28:3, 29:3,
29:8, 33:12, 34:23,
35:2, 37:2, 78:11,
78:16, 79:9, 82:21,
89:1, 108:17,
126:13, 127:4,
128:23, 130:6,
132:23, 133:18,
143:3, 143:13,
168:25, 169:6,
169:9, 171:10,
171:17
**similar** [3] - 62:12,
125:9, 125:19
**simple** [1] - 77:7
**simply** [1] - 60:14
**Sinaloa** [6] - 61:4,
61:10, 61:22, 62:1,
62:3, 146:10
**Sinaloan** [1] - 61:16
**single** [4] - 94:5,
121:5, 148:16,
148:20
**single-source** [1] -
94:5
**sink** [1] - 11:2
**sister** [3] - 127:13,
127:16, 127:17
**sisters** [1] - 89:14
**sit** [1] - 162:18
**situation** [7] - 95:2,
99:18, 103:24,

151:18, 161:17,
164:23
**six** [3] - 52:13, 71:17,
141:13
**size** [1] - 12:13
**skulls** [1] - 30:4
**sleep** [1] - 55:15
**slower** [1] - 125:13
**small** [11] - 10:7,
95:19, 95:22, 96:21,
96:24, 97:19, 104:1,
145:10, 159:3,
168:21, 168:22
**smart** [1] - 112:3
**smash** [2] - 153:21,
156:16
**Smith** [3] - 90:6, 90:8,
157:13
**SMITH** [1] - 90:2
**smoke** [1] - 28:16
**social** [2] - 96:1, 118:5
**sold** [4] - 9:8, 9:10,
71:13, 163:12
**sole** [2] - 42:9
**some-odd** [1] - 52:13
**someone** [9] - 119:10,
127:25, 137:16,
137:17, 155:15,
156:15, 159:14,
172:13
**someplace** [1] - 28:5
**sometimes** [8] - 66:2,
67:15, 67:16, 68:21,
68:23, 68:24, 69:3,
69:4
**somewhat** [1] - 103:2
**somewhere** [2] -
135:17, 167:16
**son** [6] - 24:11,
123:17, 165:8,
165:11, 168:2,
169:15
**sorry** [23] - 12:1, 21:4,
22:23, 23:9, 27:13,
31:15, 42:16, 44:25,
57:21, 61:24, 61:25,
81:13, 106:25,
125:12, 126:9,
132:17, 137:21,
139:23, 140:25,
141:2, 156:8, 171:15
**sort** [6] - 45:18, 62:21,
97:21, 126:24,
139:25, 172:12
**sound** [1] - 73:10
**sounds** [1] - 48:9
**source** [13] - 14:15,
21:18, 59:2, 94:5,
96:2, 107:6, 114:12,
144:3, 144:4,

148:16, 148:20,
166:9
**sources** [9] - 5:23,
15:18, 16:9, 94:4,
94:7, 95:3, 95:6,
133:4, 144:6
**sourcing** [1] - 118:16
**South** [15] - 6:6, 6:13,
39:20, 33:16, 33:19,
70:18, 91:10,
135:19, 141:1,
141:4, 141:5, 141:6,
141:13, 160:17,
160:23
**south** [1] - 147:4
**space** [1] - 13:13
**Spain** [1] - 98:24
**Spanish** [27] - 1:22,
4:20, 18:14, 28:7,
32:8, 81:11, 81:14,
81:20, 93:11, 98:23,
98:25, 100:1, 100:3,
103:5, 104:6,
110:10, 110:11,
110:13, 114:20,
126:17, 136:5,
137:10, 137:19,
138:13, 165:1, 165:2
**Spanish-speaking** [4]
- 100:3, 104:6,
165:1, 165:2
**speakers** [1] - 137:10
**speaking** [16] - 37:19,
69:18, 86:9, 86:21,
86:25, 100:3, 100:6,
101:24, 104:6,
127:24, 149:11,
150:25, 165:1,
165:2, 169:11,
171:20
**speaks** [1] - 138:12
**special** [4] - 3:16,
3:19, 3:22, 64:16
**Special** [9] - 1:20,
2:24, 3:5, 12:5,
15:24, 25:13, 45:9,
48:4, 86:7
**specific** [30] - 7:13,
19:9, 21:1, 50:14,
63:8, 71:25, 75:4,
75:10, 75:17, 78:9,
84:20, 84:22, 95:17,
97:2, 97:10, 107:17,
109:16, 143:24,
145:10, 151:14,
152:23, 152:24,
153:13, 160:8,
166:21, 167:8,
167:11, 174:4,
174:23

JA1174

**specifically** [35] - 4:18, 4:25, 8:3, 13:25, 64:3, 73:20, 79:13, 81:6, 91:11, 94:23, 95:23, 96:5, 96:12, 99:1, 103:13, 105:3, 105:15, 112:1, 116:11, 118:18, 137:10, 144:11, 145:7, 145:16, 146:23, 154:9, 160:7, 164:24, 166:10, 166:13, 166:17, 166:23, 167:7, 169:20

**specifics** [1] - 149:5
**speed** [2] - 72:7, 73:13
**spelled** [1] - 140:25
**spend** [4] - 69:5, 116:9, 117:10, 117:22
**spending** [1] - 117:18
**spent** [9] - 91:8, 91:9, 92:19, 117:24, 118:10, 119:6, 119:8, 146:2
**split** [2] - 95:19, 107:15
**spoken** [1] - 99:19
**spotted** [1] - 172:18
**spouse** [1] - 161:15
**spring** [1] - 132:8
**SPSS** [10] - 10:2, 10:8, 10:10, 10:11, 10:16, 10:22, 11:9, 12:7, 12:8, 13:6
**Square** [1] - 1:11
**stable** [1] - 99:24
**staff** [2] - 92:9, 92:10
**stamp** [4] - 83:16, 83:20, 129:8, 129:12
**stamps** [4] - 18:12, 27:6, 46:12, 140:22
**stand** [4] - 81:9, 81:19, 82:1, 110:14
**standard** [1] - 10:24
**standing** [1] - 154:4
**standpoint** [1] - 77:21
**stands** [4] - 81:11, 81:15, 114:13, 171:6
**start** [8] - 48:6, 52:9, 58:3, 90:20, 109:22, 126:9, 162:9, 164:21
**started** [11] - 17:25, 32:17, 46:15, 47:8, 93:9, 94:25, 102:14, 102:23, 103:25, 145:21, 158:6
**starting** [8] - 2:6, 17:8,

27:1, 34:2, 77:24, 90:25, 91:3, 133:16
**starts** [4] - 34:19, 35:25, 36:9, 88:19
**state** [11] - 2:5, 3:13, 15:1, 15:4, 41:17, 41:25, 89:7, 96:18, 113:21, 145:11, 147:5
**statement** [16] - 24:24, 25:2, 43:21, 44:3, 44:4, 55:7, 55:22, 67:8, 67:19, 67:22, 72:22, 133:24, 136:6, 148:12, 151:1
**statements** [2] - 72:4, 139:6
**STATES** [3] - 1:1, 1:2, 1:7
**states** [1] - 145:22
**States** [37] - 2:3, 2:9, 4:12, 4:14, 6:7, 6:13, 8:5, 8:10, 9:8, 9:11, 28:7, 28:23, 28:24, 29:2, 33:9, 35:16, 70:13, 70:20, 72:18, 75:13, 77:1, 77:3, 77:23, 81:15, 81:19, 91:15, 91:22, 91:23, 92:7, 111:22, 113:19, 116:10, 116:13, 136:2, 171:3, 171:6, 176:6
**stating** [1] - 53:8
**stationed** [3] - 108:8, 116:2, 116:3
**stay** [4] - 48:14, 94:4, 137:22, 160:18
**stayed** [2] - 132:6, 165:14
**stenographic** [1] - 177:9
**step** [1] - 109:12
**Stephen** [1] - 2:13
**STEPHEN** [1] - 1:14
**steps** [1] - 151:15
**still** [17] - 47:21, 48:14, 48:16, 48:24, 49:2, 61:20, 100:2, 104:6, 105:2, 131:11, 138:22, 146:11, 158:18, 158:19, 160:11, 160:12, 161:22
**stipulated** [3] - 51:22, 57:18, 57:23
**stipulation** [3] - 56:23, 57:3, 165:13
**stop** [1] - 44:12
**stopped** [1] - 71:22

**store** [9] - 101:7, 102:7, 102:17, 102:18, 102:22, 103:1, 103:4, 163:12
**stores** [18] - 101:6, 102:1, 102:12, 102:14, 102:16, 102:22, 103:5, 103:6, 103:7, 163:1, 163:8, 163:16, 163:17, 163:24, 163:25, 164:2
**stories** [1] - 96:10
**story** [1] - 98:12
**strangle** [1] - 45:4
**Street** [2] - 1:11, 1:17
**stretch** [1] - 69:9
**stricken** [1] - 46:24
**strict** [1] - 63:19
**strike** [6] - 48:19, 52:22, 59:19, 66:14, 101:2, 114:10
**stroke** [14] - 22:5, 79:13, 79:17, 79:24, 80:18, 80:20, 89:4, 123:19, 125:10, 125:18, 126:22, 127:20, 171:13, 171:21
**strong** [1] - 53:20
**stuff** [1] - 155:8
**su** [1] - 24:2
**subject** [3] - 111:9, 111:20, 148:4
**submarine** [6] - 58:4, 58:8, 58:19, 58:21, 60:11, 62:12
**submit** [1] - 170:12
**submitted** [1] - 175:17
**subparagraph** [1] - 106:8
**subsequent** [1] - 21:14
**substance** [1] - 114:2
**Substances** [1] - 5:3
**substantial** [2] - 71:12, 114:7
**substantially** [1] - 144:23
**substantive** [1] - 60:13
**sufficient** [1] - 111:19
**suggests** [1] - 114:17
**Suite** [1] - 1:17
**summary** [4] - 27:3, 123:25, 124:7, 124:12
**summation** [1] - 67:9
**super** [1] - 70:15
**supervised** [1] -

119:15
**Supervised** [1] - 119:23
**supplemental** [5] - 68:12, 170:12, 175:9, 175:13, 175:22
**supplementing** [1] - 175:12
**support** [3] - 4:15, 6:16, 6:22
**supporting** [1] - 6:20
**supposed** [4] - 84:2, 84:16, 95:7, 97:15
**surmise** [1] - 111:8
**surrounding** [3] - 44:11, 99:11, 145:22
**surveillance** [3] - 4:2, 5:22, 39:13
**surveilled** [2] - 172:18, 172:22
**sustain** [1] - 160:16
**sweating** [1] - 60:11
**switch** [2] - 11:7, 19:7
**sworn** [3] - 3:2, 90:2, 120:11
**symbols** [1] - 127:11
**synchronized** [2] - 119:15, 120:3
**system** [3] - 18:1, 55:23, 136:3

**T**

**tab** [2] - 78:23, 110:5
**table** [2] - 2:10, 77:10
**tactical** [1] - 94:9
**tactics** [1] - 149:15
**tag** [6] - 30:14, 30:16, 30:17, 30:19, 30:24, 31:1
**tags** [3] - 30:1, 30:19, 31:4
**taker** [2] - 65:10, 65:11
**talks** [5] - 17:6, 35:4, 61:10, 61:11, 61:12
**target** [5] - 19:11, 20:4, 20:18, 21:5, 21:12
**targeted** [4] - 19:15, 20:19, 21:11, 96:14
**targeting** [2] - 20:8, 151:14
**targets** [2] - 7:18, 19:20
**tasks** [2] - 95:5, 98:10
**tax** [3] - 161:25, 162:4, 162:11
**tax-paying** [3] - 161:25, 162:4,

162:11
**team** [9] - 9:23, 10:8, 10:9, 16:5, 58:10, 66:25, 91:19, 101:22, 119:25
**technical** [1] - 11:14
**techniques** [2] - 4:1, 5:20
**telephone** [1] - 160:24
**temperatures** [1] - 43:24
**Templar** [1] - 146:25
**ten** [6] - 7:6, 124:18, 124:21, 124:22, 125:15, 150:20
**Teodoro** [1] - 17:10
**term** [5] - 28:18, 137:5, 152:5, 162:20, 162:21
**termed** [1] - 152:3
**terminology** [1] - 5:11
**terms** [5] - 68:16, 76:12, 77:18, 150:3, 175:7
**territory** [1] - 145:24
**terrorism** [1] - 91:20
**tested** [3] - 12:20, 12:25, 13:16
**testified** [12] - 16:11, 16:15, 47:10, 70:14, 70:15, 70:21, 74:22, 78:7, 78:9, 132:2, 138:6, 159:15
**testify** [2] - 16:2, 85:21
**testifying** [1] - 72:2
**testimony** [30] - 15:25, 17:2, 52:23, 53:3, 53:6, 67:21, 68:4, 73:24, 76:20, 118:11, 118:14, 118:19, 121:1, 122:12, 122:16, 122:25, 123:12, 127:12, 127:14, 131:14, 138:4, 143:20, 143:22, 145:4, 145:6, 159:4, 161:7, 161:21, 164:8, 174:22
**testing** [1] - 50:13
**tests** [2] - 12:22, 12:24
**Texas** [2] - 15:6, 147:5
**text** [8] - 18:1, 18:6, 75:2, 78:8, 78:14, 108:15, 111:3, 169:11
**texting** [1] - 127:15
**texts** [6] - 73:17, 78:10, 111:5, 111:7, 112:25, 171:12

22

**that..** [1] - 69:23
**THE** [202] - 1:1, 1:6, 1:8, 1:14, 2:2, 2:11, 2:16, 2:21, 2:25, 3:1, 3:10, 10:18, 10:20, 11:3, 11:4, 11:6, 11:8, 11:10, 11:16, 11:19, 11:21, 11:25, 12:16, 12:17, 15:20, 15:21, 15:22, 16:7, 16:13, 16:15, 16:16, 16:17, 21:4, 21:9, 21:16, 21:21, 21:23, 24:12, 24:13, 42:5, 42:7, 42:11, 45:8, 45:24, 46:2, 46:7, 46:25, 53:17, 54:3, 57:1, 64:11, 64:14, 65:3, 65:6, 65:23, 66:1, 66:5, 66:6, 66:8, 66:10, 66:11, 68:11, 68:15, 68:22, 69:1, 69:13, 70:4, 70:7, 72:12, 73:1, 74:6, 74:13, 76:9, 76:12, 76:18, 76:24, 77:15, 78:3, 78:25, 79:2, 82:15, 84:7, 85:1, 86:2, 87:13, 87:17, 87:20, 88:1, 88:6, 88:9, 89:18, 89:20, 89:23, 90:1, 90:3, 90:4, 90:5, 90:6, 90:7, 90:8, 90:14, 90:17, 90:18, 90:19, 90:22, 95:13, 95:14, 96:15, 96:17, 101:10, 101:14, 101:16, 102:5, 102:7, 102:9, 106:2, 107:12, 107:14, 107:19, 107:24, 108:22, 108:25, 109:7, 109:9, 109:11, 109:17, 109:19, 115:8, 115:12, 123:11, 123:12, 130:8, 130:11, 130:20, 130:23, 131:4, 131:6, 136:23, 136:24, 139:15, 139:18, 139:19, 139:22, 139:24, 140:3, 140:6, 149:12, 149:20, 150:5, 150:7, 150:8, 153:6, 153:9, 157:6, 157:9, 157:12, 157:13, 157:16, 157:19, 157:25,

158:3, 158:5, 158:8, 160:16, 162:3, 162:4, 162:23, 163:3, 163:4, 163:9, 163:18, 163:20, 164:15, 166:6, 166:8, 166:12, 166:15, 166:18, 166:20, 167:2, 167:8, 167:10, 169:19, 169:20, 169:22, 170:3, 170:8, 170:16, 170:25, 173:8, 173:9, 173:10, 173:12, 173:17, 173:24, 173:25, 174:1, 175:14, 175:23, 176:20, 176:24, 177:2
**themselves** [6] - 100:8, 120:22, 121:8, 153:20, 161:18, 172:3
**thereby** [1] - 11:1
**thick** [1] - 168:23
**thinks** [1] - 130:17
**third** [2] - 102:22, 159:1
**thirty** [2] - 31:15, 73:10
**thirty-five** [1] - 73:10
**thirty-nine** [1] - 31:15
**thorough** [2] - 119:1, 119:2
**thousand** [1] - 59:3
**thousand-kilogram** [1] - 59:3
**thousands** [3] - 148:22, 159:7, 168:6
**threat** [8] - 43:8, 43:12, 43:18, 44:16, 45:1, 45:3, 45:4, 56:4
**threatening** [1] - 43:14
**threats** [3] - 96:9, 100:9, 100:11
**three** [6] - 14:6, 98:21, 122:12, 137:24, 159:20, 161:6
**threw** [1] - 44:24
**throughout** [2] - 135:19, 145:9
**throw** [1] - 80:15
**Thursday** [1] - 88:19
**ticket** [2] - 45:25, 46:1
**tied** [2] - 149:23, 166:10
**ties** [1] - 100:4

**Tijuana** [3] - 8:2, 8:4, 8:6
**timeframe** [1] - 56:14
**timing** [1] - 175:23
**today** [20] - 3:5, 16:12, 16:15, 47:10, 63:18, 90:18, 91:2, 97:12, 118:12, 122:5, 145:1, 145:10, 147:2, 162:18, 169:16, 170:1, 170:3, 176:18
**today's** [1] - 85:11
**together** [6] - 100:18, 112:22, 122:13, 123:3, 155:7, 155:19
**toll** [1] - 144:24
**tons** [5] - 12:14, 12:16, 12:17, 161:7
**took** [7] - 44:23, 49:14, 50:23, 52:5, 64:17, 66:4, 163:14
**tool** [1] - 68:1
**top** [5] - 43:19, 82:10, 86:11, 92:15, 146:20
**topic** [1] - 147:8
**topics** [3] - 7:12, 7:15, 68:2
**Toro** [1] - 2:18
**TORO** [1] - 1:21
**Torres** [3] - 17:10, 41:7, 41:14
**torture** [1] - 44:1
**tortured** [5] - 55:8, 55:12, 55:14, 55:21, 84:3
**total** [5] - 20:20, 46:4, 59:17, 102:14, 168:15
**totality** [3] - 74:24, 75:8, 75:11
**totally** [2] - 77:14, 77:20
**touchpoints** [1] - 112:23
**tours** [3] - 91:9, 92:19
**towards** [4] - 39:25, 43:12, 72:14, 72:19
**town** [7] - 95:17, 95:21, 96:23, 104:15, 104:17, 143:24, 145:10
**towns** [5] - 95:19, 95:22, 96:20, 96:21, 145:22
**track** [1] - 68:2
**tracking** [1] - 97:3
**trade** [1] - 91:8
**trafficked** [1] - 110:18
**trafficker** [5] - 35:19,

53:24, 60:6, 68:9, 160:22
**traffickers** [5] - 35:8, 54:17, 118:6, 120:20, 164:8
**trafficking** [41] - 5:12, 6:5, 6:8, 6:10, 6:12, 6:16, 6:21, 24:21, 25:5, 33:15, 33:18, 33:22, 53:14, 56:9, 59:8, 59:9, 61:13, 61:14, 77:23, 93:1, 96:6, 96:14, 100:7, 104:8, 105:3, 106:25, 107:10, 108:10, 108:13, 110:22, 114:7, 121:12, 122:22, 144:12, 145:8, 161:23, 165:19, 166:3, 167:1, 172:1
**trail** [1] - 105:5
**training** [15] - 3:22, 3:24, 4:4, 4:7, 8:1, 10:21, 12:11, 45:20, 58:24, 70:11, 84:11, 119:16, 119:21, 120:2, 151:13
**transaction** [3] - 75:6, 112:25, 113:1
**transcribing** [1] - 68:5
**TRANSCRIPT** [1] - 1:6
**transcript** [6] - 1:25, 7:23, 27:25, 177:9, 177:10, 177:13
**transcription** [1] - 1:25
**translated** [7] - 18:15, 25:16, 25:22, 79:12, 110:7, 134:8, 159:2
**translating** [1] - 127:11
**translation** [3] - 43:17, 81:14, 110:10
**translations** [1] - 18:18
**transport** [2] - 36:25, 63:6
**transportation** [6] - 31:20, 36:25, 59:21, 59:24, 60:1, 64:4
**transported** [3] - 8:2, 33:5, 62:24
**travel** [38] - 21:2, 21:3, 25:6, 25:15, 25:21, 26:1, 26:24, 26:25, 27:3, 27:7, 27:11, 27:12, 27:14, 27:15, 28:8, 28:25, 35:12, 46:1, 124:9, 124:11,

124:13, 125:5, 130:17, 131:20, 134:4, 134:7, 137:7, 140:22, 152:23, 153:12, 156:25, 159:2, 159:9, 159:11, 160:5, 165:24, 169:10, 172:2
**traveled** [3] - 160:7, 171:11, 171:18
**traveling** [3] - 159:15, 170:20, 173:1
**trial** [3] - 51:24, 53:22, 69:13
**trick** [2] - 56:16, 67:3
**tried** [2] - 64:7, 123:3
**trip** [10] - 29:4, 29:7, 29:21, 42:22, 82:8, 83:15, 99:20, 135:25, 138:3, 138:11
**trips** [1] - 159:13
**trophies** [1] - 30:6
**trouble** [4] - 134:3, 135:22, 135:24, 136:1
**true** [2] - 177:8, 177:9
**truly** [1] - 81:25
**trunk** [7] - 154:7, 154:16, 154:20, 154:24, 155:2, 156:17, 172:15
**trust** [2] - 57:8, 57:10
**truth** [1] - 124:23
**try** [12] - 44:12, 50:16, 50:24, 51:16, 72:7, 80:15, 94:4, 94:7, 149:8, 150:15, 150:16, 150:19
**trying** [14] - 11:12, 37:23, 45:22, 60:10, 63:21, 77:19, 78:7, 112:21, 155:18, 156:13, 156:17, 156:18, 172:23
**TS/SCI** [1] - 149:16
**tune** [1] - 53:24
**turn** [4] - 58:18, 60:18, 66:13, 153:20
**turned** [6] - 39:25, 51:2, 52:1, 121:13, 167:19, 167:21
**twice** [2] - 91:10, 161:5
**two** [42] - 12:14, 12:16, 12:17, 17:8, 20:20, 20:24, 32:16, 50:3, 58:3, 66:22, 68:7, 92:19, 95:19,

JA1176

96:20, 100:20, 100:23, 102:14, 102:21, 103:4, 103:11, 114:6, 114:21, 115:2, 119:7, 119:13, 120:20, 122:13, 125:16, 126:25, 129:1, 147:8, 152:15, 159:12, 159:20, 161:18, 163:16, 163:25, 164:1, 164:2, 171:5, 171:24, 174:19
**Two** [1] - 1:11
**two-bath** [1] - 103:11
**type** [8] - 17:20, 30:18, 34:15, 102:18, 105:4, 116:21, 158:20, 159:23
**typed** [5] - 65:13, 65:18, 66:14, 119:5, 119:19
**types** [5] - 4:24, 5:19, 96:10, 161:14, 162:8
**typically** [13] - 7:20, 8:4, 10:21, 19:3, 33:5, 33:16, 33:18, 59:1, 59:13, 60:5, 60:7, 62:21, 70:11

### U

**U"s** [1] - 114:22
**U.S** [24] - 1:10, 9:3, 9:5, 9:18, 10:4, 10:5, 10:6, 10:7, 42:10, 51:2, 73:8, 74:23, 75:1, 75:3, 75:5, 75:7, 80:1, 91:19, 91:25, 93:5, 112:4, 116:14, 119:25, 137:6
**ultimate** [1] - 70:1
**ultimately** [2] - 13:18, 122:15
**unaware** [3] - 61:19, 82:12, 83:10
**under** [11] - 41:6, 41:12, 41:13, 51:1, 76:14, 83:6, 83:7, 131:11, 174:16, 174:18, 174:20
**undercount** [1] - 144:23
**undercover** [1] - 4:2
**underlying** [1] - 124:9
**understandably** [1] - 128:4
**understood** [1] -

144:1
**unfortunately** [2] - 81:17, 85:10
**unidentified** [1] - 17:11
**Unidos** [3] - 81:16, 114:20, 114:24
**Union** [3] - 28:7, 28:23, 81:9
**unique** [2] - 19:1, 19:9
**Unis** [1] - 81:11
**unit** [1] - 33:4
**United** [38] - 2:3, 2:9, 4:12, 4:14, 6:7, 6:13, 8:5, 8:10, 9:8, 9:11, 28:7, 28:23, 28:24, 29:2, 33:9, 35:16, 70:13, 70:20, 72:18, 75:13, 77:1, 77:3, 77:23, 81:15, 81:19, 91:15, 91:22, 91:23, 92:7, 111:22, 113:19, 116:10, 116:13, 136:2, 146:25, 171:3, 171:6, 176:6
**UNITED** [3] - 1:1, 1:2, 1:7
**unless** [1] - 167:6
**unquote** [2] - 93:13, 144:21
**unsure** [1] - 52:4
**unusual** [1] - 80:6
**up** [50] - 2:20, 10:9, 10:17, 11:12, 13:13, 22:21, 25:18, 31:22, 32:13, 35:14, 35:20, 36:18, 38:15, 41:9, 42:4, 53:14, 54:2, 55:14, 55:17, 55:25, 56:25, 65:12, 72:7, 73:13, 76:12, 87:11, 102:21, 103:22, 107:1, 113:25, 117:22, 119:5, 119:10, 123:22, 125:10, 129:2, 130:8, 135:23, 139:12, 139:16, 140:12, 155:15, 155:18, 156:13, 156:18, 158:15, 161:8, 164:1, 173:16, 176:19
**updated** [1] - 139:21
**upset** [2] - 55:8, 55:21
**UR** [1] - 115:2
**Uruguay** [66] - 25:8, 25:22, 26:14, 27:8, 27:19, 28:5, 29:17,

29:21, 38:21, 39:8, 43:3, 43:5, 43:13, 43:14, 44:2, 48:6, 48:8, 48:25, 49:3, 50:6, 51:1, 51:4, 51:10, 51:14, 52:14, 52:18, 55:7, 55:13, 57:16, 81:1, 81:4, 81:23, 82:1, 87:14, 98:13, 99:3, 103:25, 104:3, 104:9, 104:14, 114:17, 114:25, 115:3, 125:2, 125:22, 126:4, 131:16, 131:23, 131:24, 132:3, 134:14, 135:4, 135:6, 135:25, 137:25, 152:11, 159:8, 163:5, 163:8, 164:4, 165:15, 166:4, 169:10
**Uruguayan** [16] - 39:2, 39:6, 39:12, 39:19, 40:2, 40:13, 41:1, 42:25, 43:1, 48:21, 49:11, 51:1, 53:9, 55:25, 134:7, 164:11
**Uruguayans** [2] - 51:16, 172:17
**useful** [1] - 51:10
**user** [16] - 19:6, 19:7, 20:23, 22:1, 22:11, 22:18, 24:1, 24:6, 24:16, 24:23, 27:11, 27:14, 121:23, 126:12, 127:10, 129:6
**username** [2] - 122:2, 122:6
**uses** [2] - 137:9, 137:12
**utilizing** [1] - 6:21
**UY** [1] - 115:2

### V

**vacation** [3] - 46:10, 132:11, 172:16
**vaccinated** [2] - 3:7, 90:16
**Valencia** [81] - 2:4, 2:14, 5:15, 6:11, 7:2, 7:3, 16:14, 22:8, 22:20, 23:6, 24:19, 24:20, 25:2, 47:23, 56:9, 57:4, 57:15, 58:20, 59:21, 62:14, 63:19, 64:3, 64:18,

66:18, 66:21, 66:22, 67:5, 67:6, 67:14, 67:15, 68:17, 69:3, 69:19, 69:25, 70:25, 71:5, 71:11, 71:13, 71:18, 71:19, 72:5, 72:15, 72:16, 75:22, 78:8, 78:11, 79:5, 79:7, 79:10, 81:22, 82:7, 82:23, 85:6, 86:17, 86:18, 94:20, 94:22, 98:12, 98:17, 99:6, 99:19, 100:21, 101:24, 103:3, 103:19, 104:23, 105:2, 107:1, 110:24, 114:7, 121:22, 130:1, 164:20, 165:14, 167:25, 168:9, 169:1, 169:6, 171:10, 172:21
**VALENCIA** [1] - 1:4
**Valencia's** [2] - 48:7, 51:14
**validity** [2] - 85:16, 98:12
**valve** [2] - 10:22, 10:25
**VANESSA** [1] - 1:21
**Vanessa** [1] - 2:15
**various** [8] - 4:15, 54:15, 91:22, 91:23, 97:16, 104:21, 110:18, 175:5
**vary** [1] - 117:25
**vast** [1] - 108:11
**vehicle** [4] - 45:12, 54:15, 154:8, 154:10
**vengeance** [1] - 172:23
**Veracruz** [1] - 16:23
**verbatim** [2] - 7:23, 67:11
**verification** [1] - 109:4
**verify** [3] - 21:2, 57:10, 151:6
**verifying** [1] - 126:1
**version** [2] - 134:8, 176:7
**versus** [4] - 2:3, 79:16, 106:5, 172:17
**vessel** [5] - 10:19, 10:25, 11:1, 15:2, 15:4
**via** [2] - 26:3, 30:8
**vicinity** [3] - 10:15, 39:16, 49:24
**VICTORIA** [1] - 1:22
**video** [1] - 155:2

**Viejo** [1] - 41:22
**view** [1] - 161:1
**viewed** [1] - 34:5
**villages** [2] - 96:25, 145:17
**violations** [1] - 5:2
**violence** [5] - 99:17, 100:9, 121:13, 164:22, 174:20
**Virginia** [1] - 3:25
**visit** [4] - 29:18, 102:17, 160:2
**visited** [1] - 98:21
**visits** [3] - 159:19, 159:20, 160:24
**visual** [1] - 26:25
**voice** [1] - 22:21
**void** [1] - 177:12
**volume** [1] - 168:23
**voter** [2] - 41:6, 41:14
**vs** [1] - 1:3

### W

**walking** [1] - 44:22
**wants** [4] - 36:5, 36:10, 36:13, 174:11
**war** [3] - 93:15, 122:15, 160:1
**warrant** [4] - 39:5, 47:17, 47:18, 82:21
**warrants** [3] - 45:14, 45:25, 136:3
**wash** [1] - 162:7
**Washington** [3] - 1:5, 1:12, 1:18
**watches** [1] - 154:24
**watching** [1] - 129:22
**water** [2] - 10:11, 11:1
**ways** [1] - 12:1
**wealth** [1] - 162:20
**weapon** [2] - 39:24, 174:18
**wearing** [1] - 39:21
**weather** [1] - 55:15
**web** [3] - 97:2, 114:13, 114:16
**week** [5] - 16:17, 117:9, 117:19, 117:24, 118:13
**weeks** [1] - 158:6
**weight** [1] - 33:4
**Wendy** [9] - 99:4, 157:1, 157:22, 158:13, 158:18, 165:6, 165:8, 166:7, 173:1
**Wendy's** [1] - 159:9
**whereabouts** [1] - 39:16

24

**whole** [8] - 49:2, 63:15, 64:7, 74:22, 76:21, 76:23, 126:1, 150:24
**wholesale** [4] - 73:4, 76:3, 112:8, 112:15
**wife** [12] - 49:5, 82:9, 99:4, 100:6, 100:23, 156:6, 156:9, 157:1, 157:10, 157:20, 166:7, 172:9
**wife's** [1] - 154:15
**Wilkinson** [1] - 2:15
**WILKINSON** [1] - 1:16
**wire** [1] - 121:19
**wiretap** [16] - 17:13, 17:18, 17:21, 18:23, 19:20, 21:5, 23:24, 34:23, 35:17, 36:3, 46:17, 46:21, 87:19, 120:16, 167:16, 167:20
**witness** [14] - 2:22, 3:2, 7:24, 11:22, 11:23, 74:1, 74:12, 89:24, 89:25, 90:2, 122:14, 138:6, 139:14, 170:8
**WITNESS** [53] - 3:1, 10:20, 11:4, 11:8, 12:17, 15:21, 16:13, 16:16, 21:9, 21:21, 24:13, 42:7, 46:2, 66:1, 66:6, 66:10, 70:7, 79:2, 88:6, 90:4, 90:6, 90:8, 90:17, 90:19, 95:14, 96:17, 101:16, 102:9, 107:14, 107:24, 109:7, 109:11, 109:19, 123:12, 136:24, 139:18, 149:12, 150:7, 153:9, 157:12, 157:16, 157:25, 158:5, 162:4, 163:3, 163:9, 163:20, 166:8, 166:15, 166:20, 167:8, 169:20, 173:9
**witnesses** [14] - 7:11, 7:21, 15:25, 16:11, 17:2, 89:21, 122:13, 122:19, 122:25, 173:10, 173:12, 174:22, 176:10
**word** [1] - 133:24
**words** [4] - 32:8, 55:9, 55:20, 67:11
**works** [3] - 29:4,

36:11, 138:2
**world** [4] - 81:5, 96:9, 143:3, 143:17
**worth** [1] - 151:4
**worthless** [2] - 68:10
**write** [3] - 65:12, 96:5, 96:10
**write-up** [1] - 65:12
**writers** [1] - 144:11
**writes** [10] - 127:19, 128:9, 129:19, 133:18, 133:21, 135:21, 136:8, 136:18, 137:24, 138:19
**written** [4] - 67:12, 133:24, 144:11, 175:24
**wrote** [1] - 143:10
**Wu** [2] - 66:3, 66:8

**Y**

**year** [8] - 31:1, 107:17, 118:10, 119:6, 151:19, 159:20, 161:5, 161:6
**years** [19] - 7:6, 8:11, 47:14, 52:13, 62:5, 63:4, 71:18, 91:8, 94:14, 98:24, 108:4, 108:11, 116:15, 146:15, 147:10, 159:20, 164:6, 165:25, 166:4
**yesterday** [1] - 173:15
**yielded** [2] - 51:8, 51:18
**York** [1] - 176:6
**you-all** [4] - 56:3, 83:18, 115:13, 174:4
**young** [1] - 162:9
**yourself** [4] - 31:11, 74:14, 133:3, 147:24
**Yucatan** [1] - 60:20

**Z**

**Z14** [2] - 16:23, 17:10
**ZA** [1] - 141:3
**Zambia** [1] - 140:24
**zero** [1] - 43:24
**Zetas** [1] - 146:9
**zone** [6] - 97:25, 132:25, 133:5, 142:2, 142:3, 142:4
**zones** [2] - 141:10, 142:23
**zoom** [1] - 133:16

**É**

**États** [1] - 81:11
**États-Unis** [1] - 81:11

JA1178

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) **CRIMINAL NO. 16-065 (BAH)** |
| | ) |
| **v.** | ) |
| | ) |
| **GERARDO GONZALEZ-VALENCIA,** | ) |
| also known as "Lalo," "Flaco," | ) |
| "Silver," "Silverio," "Eduardo," | ) |
| and "Laline," | ) |
| | ) |
| **Defendant.** | ) |

### GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

The United States respectfully submits this Supplemental Sentencing Memorandum in the case of Defendant Gerardo Gonzalez-Valencia (hereafter the "Defendant"), following an evidentiary hearing held May 2 through 4, 2023. On December 22, 2022, the Defendant pleaded guilty, absent a plea agreement, to conspiracy to distribute five kilograms or more of cocaine knowing and intending that such substance would be unlawfully imported into the United States. *See* Min. Entry 12/22/22.[1] For purposes of calculating the Defendant's applicable Sentencing Guidelines, the parties agreed that a two-level enhancement applies for use of a submersible vessel or semi-submersible vessel to import a controlled substance, pursuant to U.S.S.G. § 2D1.1(b)(3)(B). However, the parties dispute: (1) the applicable drug quantity pursuant to U.S.S.G. § 2D1.1; (2) application of a four-point leadership enhancement under U.S.S.G. § 3B1.1(a); (3) application of a two-point enhancement for use of violence under U.S.S.G. § 2D1.1(b)(2); (4) application of a two-point enhancement for possession of a dangerous weapon under U.S.S.G. § 2D1.1(b)(1); and (5) the Defendant's Criminal History Category. This

---

[1] A summary of the procedural history is included in the Government's Sentencing Memorandum, Dkt. No. 153, which is incorporated herein by reference.

Supplemental Memorandum demonstrates that the evidence presented during the evidentiary hearing and already on the record in this matter support the application of the disputed enhancements and establish that the Defendant's criminal history warrants a Criminal History Category III.

At the evidentiary hearing, the Government presented extensive evidence from three cooperating witnesses, Oscar Nava Valencia,[2] Elpidio Mojarro Ramirez, and Jose Maria Guizar Valencia, and one law enforcement witness, Drug Enforcement Administration (DEA) Special Agent Kevin Novick.  The Government's evidence showed that the Defendant was a leader of a powerful Mexican drug trafficking organization (DTO), known as the Los Cuinis DTO, and, in that capacity, the Defendant conspired to distribute tens of thousands of kilograms of cocaine for importation into the United States and Europe.  Through witness testimony, intercepted BlackBerry Messenger (BBM) communications of the Defendant and his co-conspirators, evidence of cocaine seizures, and corroborating documents, the Government established by a preponderance of the evidence that the Defendant conspired to distribute well over 450 kilograms of cocaine, directed the murders of multiple rival DTO members and their relatives, personally carried a pistol and brought armed bodyguards while arranging drug transactions, supplied firearms to allied drug traffickers, and employed dozens of workers who took direction from the Defendant.

Accordingly, with a base offense level of 38 determined by drug quantity, a four-level enhancement for leadership, and a two-level enhancement each for use of a semi-submersible, violence, and firearms, the Defendant's adjusted offense level is 48.  With a three-point

---

[2] An analysis of Nava Valencia's 18 U.S.C. § 3500 material, Gov. Ex. 53-81, is attached, as requested by the Court at the Sentencing Hearing.  Evid. Hr'g Tr., 84, May 2, 2023.

reduction for acceptance of responsibility, the total offense level is 45, which is treated as an offense level of 43 pursuant to Chapter 5, Part A (comment n.2).  With a Criminal History Category III and an effective offense level of 43, the Defendant's Guideline sentence is life imprisonment.  There are no mitigating circumstances in this case to justify a variance below the Guidelines range.  *See* 18 U.S.C. § 3553(b)(1).  Accordingly, the Court should impose the Guideline sentence—life imprisonment—to reflect the nature, circumstances, and seriousness of the Defendant's unlawful conduct.

I.   **Sentencing Guidelines**

a.   Drug Quantity

The Defendant and his brothers, Abigael Gonzalez-Valencia (Abigael) and Jose Gonzalez-Valencia (Jose), who were collectively referred to as "Los Cuinis," ran a well-funded and extensive cocaine distribution operation responsible for transporting ton quantities of cocaine from South America to Central America and Mexico for importation into the United States and Europe.  *See* Evid. Hr'g Tr., 32-49, May 2, 2023 (hereinafter, "Hr'g Tr. 5/2/23"); Evid. Hr'g Tr., 60-68, May 3, 2023 (hereinafter, "Hr'g Tr. 5/3/23"); Hr'g Tr. 5/3/23 at 137-144; Evid. Hr'g Tr., 31-37, May 4, 2023 (hereinafter, "Hr'g Tr. 5/4/23"); U.S.S.G. § 2D1.1.

Oscar Nava Valencia testified that he sold 30,000 kilograms of cocaine to Los Cuinis between 2004 and 2009, and that more than half of that cocaine was sold to the Defendant personally.  Hr'g Tr. 5/2/23 at 33.  About 70 percent of the cocaine that Nava Valencia sold to Los Cuinis was sent to the United States, with the remainder going to Europe.  *Id.* at 34.  In addition to the cocaine that Nava Valencia got from his source of supply in South America and sold to Los Cuinis, Nava Valencia testified that he also invested in other cocaine shipments where Los Cuinis were responsible for getting the cocaine from their source of supply in

JA1181

Colombia, known as "Rastrojo." *Id*. at 35.  Nava Valencia, Los Cuinis, and Rastrojo invested in three shipments, each containing at least 1,500 kilograms of cocaine, that were transported from Colombia to Mexico via single-use, go-fast boats in 2006. *Id*. at 35-38.  The shipments were divided into three equal parts—one for Rastrojo, one for Nava Valencia, and one for Los Cuinis, specifically the Defendant and Abigael. *Id*.  Then, in 2007, Nava Valencia invested in a 5,000-kilogram shipment with Los Cuinis and Rastrojo—again divided equally in thirds—that was transported from Colombia via semisubmersible to the Pacific Ocean off the coast of Chiapas, Mexico. *Id*. at 39-40.  The shipment was interdicted by the U.S. Coast Guard and the crew of the semisubmersible scuttled the vessel before it could be seized. *Id*. at 40-41; Hr'g Tr. 5/4/23 at 9-12.  The Coast Guard seized 280 kilograms of cocaine from the debris field in the vicinity of the last known position of the semisubmersible.  Hr'g Tr. 5/4/23 at 10, 12.

The Defendant was an investor in shipments of cocaine that were hidden in shark carcasses, television trucks, and commercial flights from Guadalajara to Tijuana and Guadalajara to Chicago.  Los Cuinis had a 50-percent stake in the shark carcass shipments, which each contained 500 to 700 kilograms of cocaine and were transported to Porto Progresso, Yucatan, Mexico.  Hr'g Tr. 5/2/23 at 43-44.  The final shipment was seized by law enforcement at Porto Progresso in 2009.  Hr'g Tr. 5/2/23 at 45; Hr'g Tr. 5/3/23 at 49, 143; Gov. Ex. 5.  Los Cuinis also used the television trucks of a Mexican news station, Televisa, to transport 2,000-kilogram shipments of cocaine from Central America to Mexico in 2007 to 2008.  Hr'g Tr. 5/2/23 at 46-48; Hr'g Tr. 5/3/23 at 138-40.  From 2004 to 2009, Los Cuinis used commercial aircraft to transport the cocaine from Guadalajara to Tijuana, near the U.S.-Mexico border.  Hr'g Tr. 5/2/23 at 48-49; Hr'g Tr. 5/3/23 at 143-44.  And, in 2006 to 2007, Los Cuinis used commercial aircraft

4

JA1182

to transport cocaine from Guadalajara directly into the United States, 200 kilograms at a time. *Id*.

Guizar Valencia testified that the Defendant personally came to pick-up cocaine shipments from him on six or seven occasions between 2003 and 2005.  Hr'g Tr. 5/3/23 at 64. Guizar Valencia would hand over the amount that his brother Antonio told him to turn over to the Defendant, which was always 900 to 1,200 kilograms of cocaine.  *Id*. at 65.  The Defendant always arrived with his brother Jose, and several other people to pick up the cocaine, and the Defendant was the one making the decisions for the group.  *Id*. at 65–66.  The Defendant was present at these exchanges for the purpose of giving orders, according to Guizar Valencia.  *Id*. at 93.

The Defendant's Blackberry Messenger (BBM) communications, using the screen name "Silverio," also show the Defendant's active participation in arranging multiple cocaine shipments and setting the terms of sales with his brother Abigael.  *See,* Hr'g Tr. 5/4/23 at 31-37; Gov. Ex. 17 (Aug. 2, 2013 communications coordinating logistics for a 500-kilgram cocaine shipment from "Negro" in Brazil); Gov. Ex. 18 (June 26, 2013 communications discussing providing 100 kilograms of cocaine to Abigael to give to the "old man"); Gov. Ex. 20 (July 1, 2013 communications approving sale of 100 kilograms of cocaine to the "old man" and setting price at $26,000 per kilogram); Gov. Ex. 19 (July 3, 2013 communications discussing the sale of 200 kilograms of cocaine to the "old man" with Abigael).

Based on this evidence, the Defendant's base offense level is 38, as he was responsible for distributing far more than 450 kilograms of cocaine for importation into the United States. U.S.S.G. § 2D1.1(c)(1).

b.  <u>Leadership</u>

The Defendant and his brothers ran the Los Cuinis DTO and aligned themselves with other powerful Mexican DTOs.  Hr'g Tr. 5/3/23 at 134–35, 145, 167; Hr'g Tr. 5/4/23 at 25.  The Defendant was a leader, if not the primary leader, of the Los Cuinis DTO, as Nava Valencia, Guizar Valencia, and Mojarro Ramirez all testified.[3]  Hr'g Tr. 5/2/23 at 31; Hr'g Tr. 5/3/23 at 92, 135.  As a high-ranking member of Los Cuinis, the Defendant exercised decision-making authority, was an active participant in planning and organizing cocaine shipments as part of an extensive distribution network, exercised control and authority over at minimum dozens of subordinates, and amassed substantial wealth, all of which are relevant factors in determining leadership.  *See* U.S.S.G. § 3B1.1, cmt. n.4.

From at least 2000 through approximately 2010, Los Cuinis were part of the Milenio Cartel and later partnered with the Cartel de Jalisco Nueva Generacion (CJNG), led by the Defendant's brother-in-law, Nemesio Oseguera Cervantes, also known as El Mencho.  Hr'g Tr. 5/2/23 at 27; Hr'g Tr. 5/3/23 at 153, 166–67.  Los Cuinis held positions of power within the Milenio Cartel, were well known within the Mexican drug-trafficking world, and had songs, or *corridos*, written about them, which is a sign of status.  Hr'g Tr. 5/2/23 at 92.  The Defendant negotiated and coordinated cocaine shipments directly with Nava Valencia, the top leader of the Milenio Cartel at the time, Hr'g Tr. 5/2/23 at 28, 31, 36, and the Defendant was seen as a partner of Nava Valencia, not a subordinate, Hr'g Tr. 5/3/23 at 137.  During the rise of the CJNG, Los Cuinis partnered with Oseguera Cervantes, providing the substantial money and resources needed for Oseguera Cervantes to run a drug cartel.  Hr'g Tr. 5/3/23 at 167; Hr'g Tr. 5/4/23 at 6.

---

[3] Notably, Guizar Valencia was a member Los Zetas, and Nava Valencia and Mojarro Ramirez were members of the Milenio Cartel.  Hr'g Tr. 5/3/23 at 71.

6

JA1184

The Defendant, Abigael, and Jose had between 50 and 200 workers at a time, who were responsible for distributing and receiving cocaine, transporting money, and working as an "armed side" responsible for security and enforcement. Hr'g Tr. 5/2/23 at 31; Hr'g Tr. 5/3/23 at 135. Guizar Valencia stated that when the Defendant came to receive cocaine shipments from him on six or seven occasions between 2003 and 2005, the Defendant always arrived with six or seven people and was the one making the decisions for the group. Hr'g Tr. 5/3/23 at 64–66. The Defendant was present at these exchanges for the purpose of giving orders, according to Guizar Valencia. *Id*. at 93. Both Guizar Valencia and Nava Valencia saw the Defendant give orders to individuals who worked for him. Hr'g Tr. 5/2/23 at 31; Hr'g Tr. 5/3/23 at 66, 93.

The Defendant not only gave orders to subordinates but also held decision-making authority within Los Cuinis leadership. Although Abigael and Jose held leadership positions as well, Mojarro Ramirez explained that the Defendant's brothers often would ask the Defendant for his permission or approval prior to making decisions related to their cocaine-trafficking operation. Hr'g Tr. 5/3/23 at 135–37. Additionally, the Defendant's BBM communications, using the screen name "Silverio," show the Defendant's active participation in arranging multi-hundred-kilogram cocaine shipments and setting the terms of sales with his brother Abigael. *See, e.g.,* Hr'g Tr. 5/4/23 at 31–37; Gov. Ex. 17 (coordinating logistics for a 500-kilgram cocaine shipment from Brazil); Gov. Ex. 18 (discussing providing 100 kilograms of cocaine to Abigael); Gov. Ex. 19 (discussing the sale of 200 kilograms of cocaine with Abigael); Gov. Ex. 20 (approving sale of 100 kilograms of cocaine and setting price).

Accordingly, the four-point enhancement for being an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," applies to the Defendant. U.S.S.G. § 3B1.1(a).

7

c.  Violence

The Defendant ordered numerous murders of rival cartel members and their families, as recounted by witnesses with firsthand knowledge.  Because the Defendant "used violence, made a credible threat to use violence, or directed the use of violence" as part of the cocaine conspiracy, a two-point sentencing enhancement applies.  U.S.S.G. § 2D1.1(b)(2).[4]

i.  *Antonio Guizar Valencia*

One of the Defendant's victims was Antonio Guizar Valencia (Antonio).  As Nava Valencia and Mojarro Ramirez both testified, the Defendant, Abigael, and Jose asked Nava Valencia at an in-person meeting for gunmen to find Antonio and make him "pay" for stealing a shipment of cocaine belonging to Los Cuinis.  Hr'g Tr. 5/2/23 at 51–52; Hr'g Tr. 5/3/23 at 19, 48, 133, 145.  On January 22, 2005, the group sent by Nava Valencia at the Defendant's request found Antonio at his ranch in Ostuacan, Chiapas, Mexico, and executed Antonio and six other people.[5]  Hr'g Tr. 5/2/23 at 52; Hr'g Tr. 5/3/23 at 68–69.  Nava Valencia and Mojarro Ramirez testified that the Defendant and Abigael paid the gunmen who carried out the execution, Hr'g Tr. 5/2/23 at 52, Hr'g Tr. 5/3/23 at 146, and Mojarro Ramirez, who was the accountant for the Milenio Cartel at the time, personally collected the money from Los Cuinis to pay the group that carried out Antonio's murder, Hr'g Tr. 5/3/23 at 146–47.  Nava Valencia stated that the Defendant also provided Nava Valencia's group of gunmen with gear and weapons to carry out the attack.  Hr'g Tr. 5/2/23 at 52.

---

[4] This enhancement may apply to acts committed in Mexico against Mexican victims where such conduct served to protect the DTO's lucrative drug routes to the United States.  *See United States v. Flores*, 995 F.3d 214, 222 (D.C. Cir. 2021) (applying U.S.S.G. § 2D1.1(b)(2) in RICO case).

[5] Nava Valencia recalled the ranch being in Tabasco, Mexico. Hr'g Tr. 5/2/23 at 52. Ostuacan, Chiapas, is near the border between the Mexican States of Chiapas and Tabasco.  *See* Gov. Ex. 50.

8

Guizar Valencia, who is Antonio's brother, corroborated Nava Valencia's and Mojarro Ramirez's testimonies regarding Antonio's murder.  Guizar Valencia knew from two of his uncles, who were present and survived the ambush, that gunmen had murdered six people, including Antonio, at Antonio's ranch.  Hr'g Tr. 5/3/23 at 68.  Guizar Valencia testified that while he was at the wake of his brother Antonio, the Defendant called Guizar Valencia's Uncle Beto, who put the call on speakerphone.  *Id.* at 69, 95.  Guizar Valencia heard the Defendant bluntly state that the Defendant had ordered Antonio killed because the Defendant believed Antonio had stolen a ton of cocaine from Los Cuinis.  *Id.* at 69, 95.  In the same call, the Defendant said that he wanted $12 million from the Guizar Valencia to resolve the dispute over the missing cocaine.  *Id.* at 69, 95.  Guizar Valencia heard his Uncle Beto tell the Defendant that he would not agree to make the payment because the Defendant had killed Antonio, and the harm had already been done.  *Id.* at 69.

Further, Guizar Valencia testified that, while Guizar Valencia and the Defendant's brother Abigael were detained in adjoining cells at the Altiplano prison in Juarez, Mexico, for eight months in 2018, Abigael told Guizar Valencia that the Defendant was responsible for the murder of Antonio, as well as the murders of Efrain Teodoro Torres and Guizar Valencia's father, discussed below.  *Id.* at 80–85.

### ii.   *Efrain Teodoro Torres*

Another individual killed at the Defendant's direction was Los Zetas member Efrain Teodoro Torres, also known as "Chispa" and "Zeta 14."  In March 2007, the Defendant and Abigael coordinated the killing of Teodoro Torres at a horse race in Veracruz, Mexico, as retribution for Los Zetas sending gunmen to throw grenades at Los Cuinis during a rooster fight. Hr'g Tr. 5/2/23 at 54–57; Hr'g Tr. 5/3/23 at 29, 71–72, 74–75; Gov. Ex. 7A (describing

9

JA1187

shooting). Guizar Valencia, who was present at the racetrack the day of the attack, recounted the

chaos as a lone kamikaze gunman ran yelling and shooting at Teodoro Torres, killing Teodoro

Torres and injuring others until the assassin was himself shot and killed by some of Teodoro

Torres's 50 to 80 gunmen who were present. Hr'g Tr. 5/3/23 at 72–73. After Guizar Valencia

and others who had been with Teodoro Torres took the cell phone of the slain assassin, a person

called on the assassin's cell phone and identified himself as "La Barbie," who Guizar Valencia

knew to be a member of the Arturo Beltran Leyva DTO, which was aligned with the Milenio

Cartel at the time. *Id*. at 73–74.

Nava Valencia was aware that the Defendant ordered the murder because Nava Valencia

discussed the incident with La Barbie and another member of the Arturo Beltran Leyva DTO

who went by the nickname "El Indio." Hr'g Tr. 5/2/23 at 56–57. Nava Valencia stated that La

Barbie and El Indio were supporting the effort to kill Teodoro Torres, and they told Nava

Valencia that they were present in Mexico City with the Defendant as the events unfolded. *Id*. at

56–57. Nava Valencia was also aware from La Barbie and El Indio that the Defendant asked

them to contribute money for the $2 million needed to pay the assassin and the other gunmen

involved in carrying out Teodoro Torres' murder. *Id*. at 58.

Although there may have been rumors that Miguel Trevino Morales, also known as "Zeta

40" and "Z40," ordered the murder of Teodoro Torres, *see* Def. Ex. 22 at 130, Guizar Valencia

confidently testified that those rumors were not true, Hr'g Tr. 5/3/23 at 78–80. Guizar Valencia

worked directly with Trevino Morales from March of 2007 through 2012 and was often with

Trevino Morales for weeks or months on end. *Id*. at 77. Despite all of this time spent in the

company of Trevino Morales and other top leaders of Los Zetas, at no point did Guizar Valencia

obtain any information indicating that Trevino Morales participated in or ordered the murder of

10

JA1188

Teodoro Torres. *Id.* at 79. To the contrary, the top leadership of Los Zetas was aware that the Defendant and Los Cuinis ordered the murder. *Id.* Guizar Valencia recalled that after the death of Teodoro Torres, the leaders of Los Zetas, which included Trevino Morales, gathered at a baseball field in Tampico, Tamaulipas, to unite against Los Cuinis and the Milenio Cartel in response to the murder. *Id.* at 77, 79–80. Moreover, the Defendant pointed to no evidence to support his claim that Trevino Morales was responsible for the murder other than prior testimony from Jose Hinojosa in which Hinojosa repeated the rumor that "[s]upposedly, it was Zeta 40" who killed Teodoro Torres, without having any independent basis of knowledge. Def. Ex. 22 at 130; Def. Ex. 57.

### iii. Domingo Mendoza Sandoval

The Defendant ordered the murder of his brother-in-law, Domingo Mendoza Sandoval, also known as "Mingo," who worked as the Defendant's secretary receiving cocaine in Europe. Hr'g Tr. 5/2/23 at 34; Hr'g Tr. 5/3/23 at 147–48. Mojarro Ramirez testified that, in 2011, Mendoza Sandoval asked Mojarro Ramirez for help because the Defendant had ordered Mendoza Sandoval murdered over an accounting dispute. Hr'g Tr. 5/3/23 at 148. Mendoza Sandoval explained to Mojarro Ramirez that the Defendant's brother-in-law, Oseguera Cervantes, arrived at Mendoza Sandoval's ranch with three or four trucks full of people; Mendoza Sandoval hid; and when Oseguera Cervantes and his people could not find Mendoza Sandoval, they killed Mendoza Sandoval's brother and three workers. *Id.* at 148–49.

Intercepted BBM communications document that in 2013, Oseguera Cervantes and Los Cuinis were still actively looking for Mendoza Sandoval in order to kill him. Hr'g Tr. 5/4/23 at 37–38; Gov. Ex. 21 (Abigael states, "Mingo is in Colima …. And you give my brother-in-law the information and have them get the drop on that punk."); Gov. Ex. 22 (Abigael states, "Yes,

tell him that what we want is to find that dumbass Mingo."); Gov. Ex. 23 (Oseguera Cervantes states, "Minjo [*sic.*] is going to arrive there to see the house. Have the guys be ready so that when the dude arrives, they hit him, and don't screw it up, please."). Not long after the exchange of these BBM messages, Mendoza Sandoval was killed. Hr'g Tr. 5/3/23 at 149.

### iv.  *Family in Aguililla*

Nava Valencia testified that, in 2007, the Defendant personally ordered the murder of an innocent couple and their minor children in the Aguililla region of Michoacan, Mexico, because the individuals were related to members of La Familia Michoacana, a DTO that had been at war with the Milenio Cartel and Los Cuinis. Hr'g Tr. 5/2/23 at 60–61; Hr'g Tr. 5/3/23 at 36–37. Nava Valencia learned about the murders when La Familia Michoacana members complained to Nava Valencia because La Familia Michoacana thought they had a truce with the Milenio Cartel, and this act of violence was a clear violation of their agreement. Hr'g Tr. 5/2/23 at 60–61; Hr'g Tr. 5/3/23 at 38. When Nava Valencia confronted the Defendant, the Defendant admitted that he had been drinking and ordered the murders without concern for the consequences. Hr'g Tr. 5/2/23 at 61. Nava Valencia testified that during meetings with La Familia Michoacan members, the Defendant admitted that he ordered the murder and apologized for what had happened. Hr'g Tr. 5/3/23 at 49–50.

### v.  *Additional Violence*

Guizar Valencia testified that as revenge for the grenade attack at the rooster fight, the Defendant sent a group of gunmen to kill Guizar Valencia's father, in addition to ordering the murder of Teodoro Torres. Hr'g Tr. 5/3/23 at 74–75. Guizar Valencia stated that the group captured and decapitated Guizar Valencia's father and other family members in Chiapas, Mexico. *Id*. at 74–75.

12

JA1190

Given the numerous acts of violence directed by the Defendant, which were proven by a preponderance of the evidence, a two-point enhancement pursuant to U.S.S.G. § 2D1.1(b)(2) applies.

### d.  Dangerous Weapons

The Defendant regularly carried a pistol during meetings to negotiate and receive cocaine shipments.  This alone warrants a two-point enhancement for possession of a dangerous weapon pursuant to U.S.S.G. § 2D1.1(b)(1).[6]  The Defendant also caused others to carry firearms in furtherance of the cocaine conspiracy.

Multiple witnesses testified that the Defendant personally carried a firearm during drug-related meetings.  Nava Valencia recalled that when he met with the Defendant to discuss drug trafficking, the Defendant would carry a .38 super or a 9mm pistol.  Hr'g Tr. 5/2/23 at 54.  Similarly, Guizar Valencia stated that on the six or seven occasions when the Defendant personally received cocaine from Guizar Valencia, the Defendant was always armed with a .38 super pistol.  Hr'g Tr. 5/3/23 at 66.

Witnesses testified that the Defendant's workers sometimes carried rifles to these meetings as well.  Guizar Valencia testified that when the Defendant met with Guizar Valencia to receive cocaine, the Defendant's workers had AK-47 rifles in their vehicles for additional protection.  *Id*. at 66.  Nava Valencia also testified that the Defendant would sometimes arrive at meetings to discuss drug trafficking with armed bodyguards who looked after him, particularly after the grenade attack at the rooster fight.  Hr'g Tr. 5/2/23 at 54.

---

[6] The violence enhancement in Section 2D1.1(b)(2) may be applied cumulatively with the firearm enhancement in Section 2D1.1(b)(1).  U.S.S.G. § 2D1.1, cmt. n.11(b).

13

JA1191

Furthermore, the Defendant supplied weapons to help the Milenio Cartel gain control of territory and power.  Nava Valencia testified that in 2008, the Defendant provided Nava Valencia with approximately 200 rifles, AK-47s, and AR-15s, as well as gear, at no cost to Nava Valencia in order to support the Milenio Cartel in its war against rival cartels.  *Id*. at 59–60.  The Defendant also gave the Milenio Cartel "weapons, people, supplies, money, [and] information" on a regular basis for years.  Hr'g Tr. 5/3/23 at 14.

Together, this conduct warrants a two-level enhancement for use of a dangerous weapon pursuant to U.S.S.G. § 2D1.1(b)(1).

    e.  <u>Criminal History</u>

The Defendant's Criminal History Category is III.  Although the U.S. Probation Office determined in the Presentence Investigation Report (PSR) that the Defendant's Criminal History Category was II, PSR ¶ 28, the Court advised the parties during the evidentiary hearing that the U.S. Probation Office had revised its Criminal History Category determination to align with the Government's position that the Defendant's applicable Criminal History Category is III.  Hr'g Tr. 5/4/23 at 174.

As the U.S. Probation Office noted in the PSR, three points apply for the Defendant's prior felony methamphetamine conviction in the Northern District of Georgia.  PSR ¶ 27.  The Defendant does not contest that those three points apply.  *See* PSR ¶ 6.

However, an additional two criminal history points apply because the Defendant committed the instant offense while on escape status.  U.S.S.G. § 4A1.1(d).  Specifically, on January 31, 2001, while serving the 48-month sentence for the methamphetamine conviction, the Defendant signed out of a halfway house, under the pretense that he was searching for

14

JA1192

employment, and never returned. *See* Dkt. No. 153-2. Where, as here, the defendant committed

the instant offense while on escape status, two points are added. U.S.S.G. § 4A1.1(d).

With a criminal history score of 5, the Defendant's Criminal History Category is III.

U.S.S.G. § 4A1.1. With a total offense level of 45, treated as 43 for purposes of calculating the

sentence, and the Criminal History Category of III, the Defendant's Guidelines' sentence is life

imprisonment.

**II.**     **Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)**

The Government's Sentencing Memorandum, Dkt. No. 153, which is incorporated herein

by reference, includes a statement of law regarding the Court's consideration of the applicable

Sentencing Guidelines and 18 U.S.C. § 3553(a) factors, as well as facts relevant to the Court's

analysis of the § 3553(a) factors in this case. Dkt. No. 153 at 9–19. The following is intended to

supplement the information provided in the Government's Sentencing Memorandum.

A. Nature and Circumstances of the Offense, and Need for the Sentence to Reflect the
Severity of the Offense

The Defendant was a leader of an extensive cocaine trafficking network for many years,

and his involvement in cocaine trafficking continued long after his claimed withdrawal from the

conspiracy in 2009. Although the Defendant told the U.S. Probation Office that when he moved

to Argentina in 2009, he started a new life and was no longer involved in drug trafficking, PSR ¶

14, that story is contradicted by the Defendant's own admission in his statement of facts and to

the Court at his change of plea hearing "that his participation in the conspiracy continued

through April 19, 2016," Dkt. No. 139 ¶ 4; Change of Plea Hr'g Tr., 15, Dec. 22, 2022.

Moreover, the Defendant's withdrawal from the conspiracy is contradicted by the

evidence. The Defendant's own BBM communications from 2013 show the Defendant

arranging cocaine shipments, setting the prices of cocaine for sale, discussing transportation

routes and logistics, and providing a sample kilogram of cocaine in furtherance of a larger

cocaine sale.  Gov. Exs. 17–20.  Although the Defendant disputes that he was the user of the

BBM devices with the "Silverio" screen name, the Government presented ample evidence that

the Defendant's passport, travel records, and hunting trophy records match the personal travel

discussed by the user of the Silverio device, confirming that the Defendant is Silverio.  Hr'g Tr.

5/4/23 at 21, 25–31, 131–43; *Compare* Gov. Ex. 40 & 41 *with* Gov. Exs. 11–16, 85.

Furthermore, the Defendant's brother Abigael referred to the user of the Silverio device as

"Lalo" in a discussion among siblings about who was at the hospital with their father.  Hr'g Tr.

5/4/23 at 88–89, 124–28; Gov. Exs. 11 & 12.  As Mojarro Ramirez and Nava Valencia testified,

the Defendant was the only Gonzalez-Valencia sibling who went by the nickname Lalo.  Hr'g

Tr. 5/3/23 at 134; Hr'g Tr. 5/2/23 at 29; *see also* Hr'g Tr. 5/4/23 at 128 (Investigator Joseph

Smith testifying that he was not aware of a "Lalo" in the Defendant's family other than the

Defendant).

The Defendant's evidence to support his claimed withdrawal included little more than the

photographs of a convenience store and self-serving statements of the Defendant and his partner,

Wendy Amaral, in an interview with defense investigator Smith.  *See* Def. Ex. 9–10.  Notably,

the Defendant and Amaral also represented to Smith that Amaral was the Defendant's wife, even

though the Defendant represented to the U.S. Probation Office that he and Amaral were

divorced.  Hr'g Tr. 5/4/23 at 99, 157–58; *see also* PSR ¶ 50 (describing divorce decree provided

by the Defendant).  The Defendant also provided no financial records to establish that he was

running a legitimate business with legitimate income after 2009.  Hr'g Tr. 5/4/23 at 162–64.  His

actions at the time of his arrest, including apparent intended flight and destruction of his

cellphone, also strongly suggest that his criminal conduct continued to the date of his arrest. Hr'g Tr. 5/4/23 at 39–40, 45–46, 154–55; Gov. Ex. 42.

The nature and circumstances of the offense—including its duration, the massive quantities of cocaine involved, and the violence the Defendant employed—warrant a Guideline sentence of life.

B.  <u>History and Characteristics of the Defendant</u>

The Defendant's history and characteristics also warrant a sentence of life in prison, as the Defendant has repeatedly shown disregard for the law.  The Defendant has a prior methamphetamine conviction, PSR ¶ 27, and escaped from a halfway house while serving his sentence on that conviction, PSR ¶ 31; Dkt. Nos. 153-1 & 153-2.  Following the Defendant's escape, he returned to Mexico and, wasting little time, resumed drug trafficking by at least 2003, resulting in the charges in this case.

The Defendant's attempt to evade the law continued during his arrest.  As Uruguayan law enforcement approached the Defendant to arrest him, the Defendant smashed his iPhone so that Uruguayan law enforcement could not access the contents of the device.  Hr'g Tr. 5/4/23 at 39–40; Gov. Ex. 42.  Uruguayan law enforcement searched the Defendant's vehicle and discovered that it was full of luggage, important documents, multiple pieces of electronic equipment, and over 75 pieces of jewelry and watches, indicating that the Defendant was attempting to flee the country.  Hr'g Tr. 5/4/23 at 45–46, 154–55.  At the time of his arrest, the Defendant was in possession of multiple false identification documents, including a fraudulent Mexican passport bearing the Defendant's photo but the name "Alonso Ibarra Torres," a fraudulent Mexican identification card in the name of Ibarra Torres, and two birth certificates bearing the

17

JA1195

Defendant's name—one stating he was born in Mexico and the other stating that he was born in California.  Hr'g Tr. 5/4/23 at 40–42; Gov. Exs. 43–46.

The Defendant's disregard for the law continued even after his arrest.  Upset with his conditions of confinement, the Defendant signed a statement threatening Uruguayan Minister of the Interior Eduardo Bonomi asserting, "If Interior Minister Bonomi continues to send his guards to torture me, let him look for the highest bridge in Uruguay, and I am going to hang him from it."  Hr'g Tr. 5/4/23 at 43–44; Gov. Ex. 48A.  In October 2019, the Defendant took advantage of a lock malfunction to leave his cell, and upon being returned to his cell, he told the two guards who had secured him that he was going to kill the guards.  Hr'g Tr. 5/4/23 at 44.  In February 2020, the Defendant threw bleach at another guard who was walking by the Defendant's cell, requiring the guard to receive medical attention.  Hr'g Tr. 5/4/23 at 44.  A few days later, the Defendant threatened to strangle another guard using his handcuffs.  Hr'g Tr. 5/4/23 at 45.  The Defendant's long history of drug trafficking and repeated disregard for the rule of law, even while incarcerated, warrant a serious sentence.

Following his extradition to the United States, the Defendant has continued to minimize his involvement in the charged conspiracy and avoid accountability.  The Defendant's refusal to take responsibility for his conduct is reflected in the minimalist statement of facts he submitted at his Rule 11 hearing, Dkt. No. 139, his statement to the U.S. Probation Office downplaying his involvement in the conspiracy, PSR ¶ 14, and the evidence the Defendant presented at the evidentiary hearing attempting to establish, inaccurately, that he had fully removed himself from any involvement in drug trafficking in 2009.  As the testimony established, the Defendant's criminal conduct far exceeded that for which the Defendant was willing to take responsibility.  The Defendant's conduct since his initial arrest and escape demonstrates that the Defendant has

avoided both taking responsibility and accepting accountability for his criminal conduct.  A life sentence is therefore appropriate.

  b. <u>Adequate Deterrence</u>

  Given the adverse impact that drug trafficking has on society and the serious detrimental effects of cocaine in communities in the United States and abroad, it is important that the Court impose a sentence that deters others from undermining the rule of law.  A life sentence provides critical general deterrence to other DTO leaders that their participation in narcotics importation into the United States and use of violence to achieve their drug-trafficking objectives will result in substantial prison sentences.

  b. <u>Protect the Public from Further Crimes of the Defendant</u>

  As explained in the Government's Sentencing Memorandum, the Defendant has the means and connections to return to the same criminal conduct, regardless of whether he remains in the United States or relocates to another country, such as Mexico, where he has substantial familial ties.  Through his connection to his brother-in-law Oseguera Cervantes and the CJNG, the Defendant has ample opportunity to resume drug trafficking and carry out acts of violence upon his release.  Only a life sentence, as recommended by the Guidelines, will be sufficient to protect the public from the Defendant returning to criminal activity.

  e. <u>Need for Sentence Imposed to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants</u>

  For the reasons set forth in the Government's Sentencing Memorandum, the Government's recommendation of a Guideline sentence of life is consistent with sentences received by defendants engaged in similar conduct and holding similar positions within international DTOs.  Dkt. No. 153 at 16–19.

JA1197

During the evidentiary hearing, defense counsel emphasized the sentences that Nava Valencia and Guizar Valencia received, seemingly comparing those sentences to the Guidelines sentence that the Government recommends for the Defendant.  *See* Hr'g Tr. 5/2/23 at 62–64; Hr'g Tr. 5/3/23 at 100–02.  However, Nava Valencia and Guizar Valencia are not similarly situated to the Defendant and therefore are not apt comparators under Section 3553(a)(6).  Unlike the Defendant, Nava Valencia and Guizar Valencia entered into cooperation plea agreements with the Government, and the judges who sentenced them were aware of their cooperation at the time of sentencing.  Hr'g Tr. at 5/2/23 at 62–64; Hr'g Tr. at 5/3/23 at 100–02.  Also unlike the Defendant, Nava Valencia and Guizar Valencia took full responsibility for their criminal conduct.  As demonstrated by their testimony, Nava Valencia and Guizar Valencia have admitted their criminal culpability, including their leadership positions within DTOs, the large quantities of illegal drugs that they trafficked, and their use of violence and weapons.  In contrast, the Defendant has admitted to little more than investing in and arranging transportation for a shipment of 280 kilograms of cocaine on a semi-submersible, and he staunchly denies much of his other criminal conduct.  Dkt. No. 139 ¶¶ 2–3; PSR ¶ 14 (Defendant stating, "I never carried or used a firearm and never threatened anyone with violence during the period that I played a financial role in the conspiracy . . . nor was I ever a leader of any such illegal activities.").

As the evidence at the hearing showed, the Defendant has not fully accepted responsibility for the full nature and scope of his conduct.  The applicable Guideline sentence of life is therefore appropriate for the Defendant and would not cause an unwarranted sentencing disparity with other similarly situated defendants.

JA1198

IV.   **Conclusion**

For the reasons set forth above and in the Government's Sentencing Memorandum, the

Government respectfully requests that the Court impose a Guideline range sentence of life

imprisonment which is reasonable, appropriate, and matches the severity of the crime committed

by the Defendant.  A life sentence is sufficient, but not greater than necessary, to hold the

Defendant accountable for his crimes, promote respect for the law, deter the Defendant and

others from committing similar serious crimes and protect the public.


Respectfully Submitted,
MARLON COBAR
Acting Chief, Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice


By:   */s/ Kate Naseef*
Kate Naseef
Kirk Handrich
Trial Attorneys
Kaitlin Sahni
Acting Assistant Deputy Chief
Narcotic and Dangerous Drug Section
Criminal Division, U.S. Department of Justice
Washington, D.C.  20530
Telephone: (202) 514-0917

JA1199

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing

(ECF) system with the United States District Court for the District of Columbia to counsel of

record for the Defendant, this 16th day of June, 2023.


By:   /s/ *Kate Naseef*
    Kate Naseef
    Trial Attorney
    Narcotic and Dangerous Drug Section
    Criminal Division
    U.S. Department of Justice

JA1200

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 16-CR-065 (BAH)** |
| **v.** | |
| **GERARDO GONZALEZ-VALENCIA,** | |
| Defendant. | |

**GERARDO GONZALEZ-VALENCIA'S POST-HEARING**
**RESPONSE BRIEF IN AID OF SENTENCING**

In accordance with Rule 32(i)(1)(C) of the Federal Rules of Criminal Procedure and Section 6A1.2 of the U.S. Sentencing Guidelines and Policy Statements ("U.S.S.G." or "Guidelines"), and following the evidentiary hearing held on May 2-4, 2023 (the "Evidentiary Hearing"), defendant Gerardo Gonzalez-Valencia, through counsel, respectfully submits this Post-Hearing Response Brief in Aid of Sentencing in response to the Government's Supplemental Sentencing Memorandum [ECF No. 170] and to aid the Court in determining an appropriate sentence in this case.[1]

**I.     PRELIMINARY STATEMENT**

The defendant, Mr. Gonzalez-Valencia, was born into the Gonzalez-Valencia family, which allegedly runs a powerful drug trafficking organization ("DTO"), known as Los Cuinis.  This undisputed familial relationship, however, is not enough to send Mr. Gonzalez-Valencia away to life imprisonment, as the Government seeks.  The Government still has the burden of demonstrating by a preponderance of the credible and reliable evidence that Mr. Gonzalez-Valencia himself

---

[1] Mr. Gonzalez-Valencia hereby incorporates all arguments previously raised in his March 23, 2023 Memorandum in Aid of Sentencing and Incorporated Position Regarding Sentencing Factors [ECF No. 159] ("Sentencing Memorandum").

participated in the myriad drug transactions of which we heard testimony, that he himself was responsible for the threats and acts of violence against rival DTOs, that he himself possessed a firearm in connection to these illegal activities, that he himself was an "organizer or leader" of Los Cuinis, and that he himself performed any significant role at all in Los Cuinis, other than as an investor in the 2007 load of cocaine that was intercepted from a semi-submersible, a role which Mr. Gonzalez-Valencia admitted to in pleading guilty.  The Government failed to meet its burden.

At the Evidentiary Hearing, the Government's three cooperating witnesses all testified that Mr. Gerardo Gonzalez-Valencia was a leader of Los Cuinis, and that Mr. Gonzalez-Valencia himself participated in, or was responsible for, these myriad drug transactions or threats and acts of violence, but as detailed below, the notes of more than a decade of the cooperating witnesses' prior proffer sessions belie their testimony against Mr. Gonzalez-Valencia.  These proffer notes, when carefully analyzed as the Court requested (but as the Government failed to do),[2] instead show that these same cooperators consistently named the generic "Los Cuinis," or Mr. Gonzalez-Valencia's brothers, Abigael Gonzalez-Valencia ("El Cuini") or Jose Gonzalez-Valencia ("La Chepa"), as the responsible actors for these same drug transactions, or acts of violence against rival Mexican DTOs, while *not* identifying the defendant Gerardo Gonzalez-Valencia himself during a decade or more of cooperation.  It was not until just weeks before the Evidentiary Hearing, when suddenly—if these cooperating witnesses are to be believed—the defendant Mr. Gonzalez-Valencia was the one

---

[2] During the Evidentiary Hearing, the Court ordered the Government to submit an analysis of the 18 U.S.C. § 3500 material for all of the cooperating witnesses.  Evid. Hr'g Tr. at 84:1-10, May 2, 2023.  The Government's analysis included only the § 3500 material pertaining to Oscar Nava Valencia (attached to their Supplemental Sentencing Memorandum), which failed to identify any of the many contradictions between his Evidentiary Hearing testimony and his prior statements during proffer sessions and debriefings.  To remedy this, attached as Exhibit A is the defendant's analysis of the § 3500 materials—specifically, the proffer notes and debriefings—for all three cooperating witnesses.

responsible for and involved in virtually everything Los Cuinis allegedly has ever done.  More than a few times, critical testimony against Mr. Gonzalez-Valencia that is *never* present in even the most recent proffer notes, was delivered at the Evidentiary Hearing against Mr. Gonzalez-Valencia for the very first time.  Moreover, the testimony of the three cooperators is rife with unreliable allegations, hearsay, double hearsay, and implausible testimony that lacks the required *indicia* of reliability to support the additional enhancements that the Government presently seeks.

For these reasons and more, as detailed in Section III, the Government failed to meet its burden of showing by a preponderance of the evidence that Mr. Gonzalez-Valencia conspired to distribute more than 450 kilograms of cocaine to the United States, thereby keeping the base offense level at 36, not 38.  The Government also failed to establish that additional enhancements are warranted for threatening or using violence under U.S.S.G. § 2D1.1(b)(2), using a firearm under U.S.S.G. § 2D1.1(b)(1), or acting as an "organizer or leader" under U.S.S.G. § 3B1.1.  Furthermore, Mr. Gonzalez-Valencia respectfully requests that in the interests of fairness and justice, the Court use its discretion to apply Criminal History Category II to his sentencing, given that the Government concedes that he cannot be sentenced on an escape charge for the conduct that resulted in his being treated as under "escape status."

As further detailed in Sections IV and V, and in the defendant's Sentencing Memorandum, a sentence of 188 months (15 years, 8 months) as recommended by the U.S. Probation Office ("USPO") comports with the appropriate Guidelines range, the appropriate consideration of the history and characteristics of the defendant, the need to avoid unwarranted sentence disparities, and the purposes of the Sentencing Reform Act, 18 U.S.C. § 3553(a)(2).[3]

---

[3] *See* Ex. B, Sent'g Recommendation at 1, ECF No. 150; Ex. C, Presentence Investigation Report ¶¶ 15-25, ECF No. 149.

Finally, as detailed in Section VI, the Court cannot impose life imprisonment on Mr. Gonzalez-Valencia (as requested by the Government) because the Uruguayan Extradition Order (the "Extradition Order") that brought Mr. Gonzalez-Valencia to the United States imposed the condition that he not be sentenced to life imprisonment, instead limiting his potential maximum sentence to thirty years' imprisonment.  This Court is required to honor this condition of the Extradition Order under the principle of international comity.  *See Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992) (explaining that deference to foreign courts "is necessary to further international comity—a goal the Supreme Court has emphasized in a variety of contexts").

## II.    THE COURT SHOULD USE ITS DISCRETION TO FIND CRIMINAL HISTORY CATEGORY II APPLIES, NOT CATEGORY III.

Under the Guidelines, the Court may depart from an otherwise applicable criminal history category where "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history[.]" U.S.S.G. § 4A1.3(b).  This Court should exercise its discretion to depart downward and apply Criminal History Category II to Mr. Gonzalez-Valencia's sentencing because Category III over-represents the seriousness of his criminal history and unfairly penalizes him.

In calculating his criminal history category, the offense that moves Mr. Gonzalez-Valencia from Category II into Category III is his failure to return to a halfway house while serving his sentence for a 1998 conviction.  In 1998, at the age of twenty, Mr. Gonzalez-Valencia was convicted of use of a communication facility to facilitate a drug-trafficking offense and, after pleading guilty, was sentenced to four years in prison.  *United States v. Gerardo Valencia Gonzalez [sic]*, No. 1:98–CR–404-JOF (N.D. Ga. Oct. 7, 1998).  His projected date of release was July 10, 2001.  On January 31, 2001, with approximately six months left on his sentence, Mr. Gonzalez-Valencia voluntarily

signed out of the Cornell Corrections Institution (where he was residing) for the day to work but did not return. As a result of this lapse in judgment, Mr. Gonzalez-Valencia was on "escape status" within the meaning of U.S.S.G. § 4A1.1(d) at the time he committed the instant offense, thereby adding two points to his score and yielding a Criminal History Category of III, not II.

If the Court accepts the USPO's recommendation (and Mr. Gonzalez-Valencia's request) that the appropriate Guidelines score is 35, under Criminal History Category II the applicable range is 188 to 235 months, which results in the USPO's recommended sentence of 188 months (15 years, 8 months). Ex. B at 1. In contrast, the applicable Guidelines range under *Criminal History Category III* is 210 to 262 months—representing an increase of almost two years at the bottom of the range and two years and three months at the top of the range. Indeed, the disparity between Criminal History Category II and III becomes even greater as the applicable offense level increases. It is unjust to add years to Mr. Gonzalez-Valencia's sentence, potentially even subjecting him to life imprisonment at higher scores, for the poor decision he made in his twenties to leave his halfway house just six months before the end of his sentence after having already served three and a-half years.

Moreover, the Government has already informed the Court that, under the Rule of Specialty, Mr. Gonzalez-Valencia can *never* be convicted for his escape from the halfway house because that offense was not included as part of his extradition from Uruguay. As such, his escape would not constitute a "criminal justice sentence" that would permit a two-point increase. U.S.S.G. § 4A1.1(d). The fact that Mr. Gonzalez-Valencia cannot be charged or ever receive a sentence for this conduct also highlights why it would be fundamentally unfair to use his "escape status" to increase his Criminal History Category from II to III.

III.   **THE GOVERNMENT HAS NOT MET ITS BURDEN OF ESTABLISHING THE REQUESTED ENHANCEMENTS.**

The Government primarily relies on the testimony of three cooperating witnesses in support of its position on the requested enhancements.  Each of these cooperators has been convicted of criminal offenses and two are currently serving sentences substantially lower than the life imprisonment term that the Government seeks for Mr. Gonzalez-Valencia.  All three cooperators will likely serve even shorter sentences than what they originally received through cooperating testimony.  *See infra* Section V.

Moreover, all three cooperators have admitted to extraordinarily violent and heinous prior misconduct.  For example, cooperator Oscar Nava Valencia told the Court that he has "ordered or directed the murders of over 100 people," and tortured an untold number of people before killing them.  Evid. Hr'g Tr. at 62:17-63:24, May 2, 2023.  Cooperator Jose Maria Guizar Valencia testified to another court that he spent four and a half years in the daily company of Los Zetas cartel leader Miguel Trevino (a.k.a. "Z40"), who "killed people every day and [] experimented" with killing methods and was characterized as a "a psychopath . . . [that] would take [a] gun, a knife, or some item," to murder his victims and then have their bodies burned in 200-liter containers.  Ex. D (3500-JMGV-3, Tr. of Sent'g Hr'g, *United States v. Roman-Chavarria*, No. 4:11-cr-00079-15 (E.D. Tex. Aug. 4, 2021)) at JMGV00000044-47.



6
JA1206

The testimony of cooperators should be "considered with caution." *See* D.C. Crim. Jury Instr. Nos. 2.202, 2.202a, 2.205 (5th ed. 2008). While the Court may consider hearsay evidence from cooperators at sentencing, that evidence must still have some *indicia* of reliability. *See United States v. Bras*, 483 F.3d 103, 108 (D.C. Cir. 2007). The Guidelines provide that "[u]nreliable allegations shall not be considered." U.S.S.G. § 6A1.3, cmt. (citations omitted).

As detailed below, the testimony of the three cooperators is rife with unreliable allegations, hearsay, double hearsay, and implausible testimony that lacks the required *indicia* of reliability to support the additional enhancements that the Government seeks. In many instances, the cooperators waited ten years or longer before raising new allegations against Mr. Gonzalez-Valencia to the Government in a proffer session. Often, the cooperators waited until just *weeks* before the Evidentiary Hearing to share these new allegations. The warning that the testimony of cooperators should be "considered with caution" is especially pertinent where the cooperator suddenly makes new allegations that they failed to raise during a decade or more of prior debriefings with government agents, as is the case here.

**A.** **The Testimony of the Three Cooperators Should Be Disregarded Because of Prior Perjury or the Absence of the Identification of Mr. Gonzalez-Valencia.**

At the outset, each of the three cooperators' testimony should be disregarded in its entirety,[4] or at least treated with a great deal of circumspection because (1) Mr. Nava Valencia admittedly made false statements to the Government in another case; (2) Mr. Mojarro Ramirez misidentified

---

[4] The Government argues that these cooperators are believable because they had no contact with each other while incarcerated and had previous disagreements amongst their DTOs. *See* Evid. Hr'g Tr. at 122:12-23, May 4, 2023. However, this overlooks two of the cooperators' long history of having worked together toward common criminal objectives—a fact that would readily explain their sometimes-congruous testimony. *See* Evid. Hr'g Tr. at 132:4-22, May 3, 2023 (Mr. Mojarro Ramirez testifying that he worked for the Milenio DTO and that his boss was cooperator Mr. Nava Valencia).

Mr. Gonzalez-Valencia's photograph, despite claiming to have met him "twenty times"; and (3) the Government deliberately failed to even show Mr. Guizar Valencia a photograph of Mr. Gonzalez-Valencia because they feared that he also could not accurately identify him.

1.   **Cooperator Oscar Nava Valencia Perjured Himself by Making False Statements to the Government in Another Case.**

Just months before the Evidentiary Hearing, Mr. Nava Valencia perjured himself by making false statements to the Government in another federal case.  Mr. Nava Valencia was a key witness in the Government's recent trial against Genaro Garcia Luna, former Mexico Secretary of Public Security, who was charged with drug trafficking and taking bribes from drug cartels.  At a proffer session on ██████████, Mr. Nava Valencia stated that he wanted to change his prior statements to government agents that he had met Mr. Garcia Luna in person and instead "indicated that he had not met GARCIA-Luna in person." Ex. E (3500-ONV-51, Proffer Notes, ██████████) at ONV00000349.  Following an intervention by DEA agents, Mr. Nava Valencia changed his story again, claiming that his statement in prior proffer sessions that he had met Mr. Garcia Luna in person was in fact the truth. *Id.*  In doing so, Mr. Nava Valencia perjured himself, either by recanting his prior statements or by changing his story following the DEA intervention.  This recent perjury is a strong indicator that Mr. Nava Valencia is not trustworthy, and his testimony against Mr. Gonzalez-Valencia should be disregarded, or at a minimum treated with extreme caution and skepticism.

2.   **Cooperator Elpidio Mojarro Ramirez Misidentified a Photo of the Defendant as a Photo of His Brother, Jose Gonzalez-Valencia.**

Mr. Mojarro Ramirez testified that he first met Mr. Gonzalez-Valencia "around 2004, 2005," and saw him in person "around 20 times" while they were both working with the Milenio DTO. Evid. Hr'g. Tr. at 133:18-134:5-8, May 3, 2023.  On ██████████, on the third day of a proffer session, Mr. Mojarro Ramirez was shown the following photo of Gerardo Gonzalez-Valencia:



Ex. F (3500-EMR-5, Proffer Notes, ▮▮▮▮▮▮) at EMR00000071; Ex. G (3500-EMR-54, Photo #28 of Gerardo Gonzalez-Valencia) at EMR00000231.

Rather than identify the photo as being the defendant Gerardo Gonzalez-Valencia, Mr. Mojarro Ramirez misidentified the photo as "possibly" being Mr. Gonzalez-Valencia's brother and co-defendant Jose Gonzalez-Valencia (a.k.a. "La Chepa"). Ex. F at EMR00000071. If Mr. Mojarro Ramirez is to be believed (as he testified) that he met Mr. Gonzalez-Valencia in person "20 times," it is not possible that rather than promptly identify the photo as being the defendant, he instead misidentified the photo as "possibly LA CHEPA." *Id.* On cross-examination, when confronted, Mr. Mojarro Ramirez tried to refute this fact saying that "because I know the three of them well . . . [i]t's impossible for me to have said this was Chepa." Evid. Hr'g Tr. at 161:22-162:17, May 3, 2023. Of course, it is not "impossible" that Mr. Mojarro Ramirez did not recognize the photo of the defendant Gerardo Gonzalez-Valencia in ▮▮▮—particularly if Mr. Mojarro Ramirez fabricated his testimony and had not met Mr. Gonzalez-Valencia in person "20 times." This misidentification should cast significant doubt as to whether Mr. Mojarro Ramirez knew Gerardo Gonzalez-Valencia and accurately testified about his conduct. *See, e.g.*, *United States v. Morgan*, 248 F.Supp.3d 208, 214 (D.D.C. 2017) (demonstrating that while a witness's misidentification of a photo of the defendant before trial "does not automatically render that witness's subsequent in-court identification inadmissible . . . such an in-court identification 'may not [be] especially

convincing[.]'" (first alteration in original) (quoting *Johnson v. McCaughtry*, 92 F.3d 585, 597 (7th Cir. 1996))).

### 3.   The Government Failed to Show Any Photos of the Defendant or His Brothers to Cooperator Jose Maria Guizar Valencia.

Mr. Guizar Valencia participated in three proffer sessions with government agents on ██ ████████████████████████████, respectively.  Not once during these sessions was Mr. Guizar Valencia shown a photograph of the defendant Gerardo Gonzalez-Valencia, his brothers, or other family members.  This failure is directly contrary to normal investigative practices and underscores the Government's own doubts that if shown a photograph of the defendant Gerardo Gonzalez-Valencia, Mr. Guizar Valencia could not have correctly identified him, despite Mr. Guizar Valencia's testimony that he allegedly met the defendant in person "six and [sic] seven times."  Evid. Hr'g Tr. at 64:14-16, May 3, 2023.   The Government's failure to show Mr. Guizar Valencia a photograph of Gerardo Gonzalez-Valencia for identification purposes in advance of his testimony creates the presumption that Mr. Guizar Valencia could not have identified Mr. Gonzalez-Valencia, undermining the truthfulness of his testimony at the Evidentiary Hearing.

### B.   The Government Has Not Met its Burden to Support Two Additional Points for Drug Quantity.

As a reminder, this dispute over drug quantity could have been avoided.  At the outset of the Evidentiary Hearing, at the Court's invitation, Mr. Gonzalez-Valencia, through counsel, made an offer to the Government to accept responsibility for more than the 280 kilograms of cocaine that the U.S. Coast Guard recovered from the semi-submersible—enough to exceed 450 kilograms and to establish a base offense level of 38.  After all, Mr. Gonzalez-Valencia's brother Jose Gonzalez-Valencia had previously pleaded guilty before this Court to being an investor in the same 2007 semi-submersible drug transaction, and in doing so accepted responsibility for a higher weight.  But the

Government wanted it all.  Instead of agreeing to the offered compromise on drug quantity to shorten the Evidentiary Hearing, the Government insisted on presenting all of the evidence they had already planned to present.  When analyzed in detail, however, as we do below, the preponderance of the evidence presented of these myriad drug transactions does not show that Mr. Gonzalez-Valencia himself was involved in any of them, as opposed to his brother Abigael or Los Cuinis generally.  The evidence also does not establish that any of the drugs being shipped from Colombia or Central America to Mexico were ultimately bound for the United States, as opposed to Europe or Mexico.

To the contrary, DEA Special Agent Kevin Novick testified that his own investigation revealed that Mr. Gonzalez-Valencia "shipped numerous loads [of cocaine] to Europe."  Evid. Hr'g Tr. at 70:24-71:6, May 4, 2023.  Mr. Nava Valencia testified that he "invested with Gerardo Gonzalez Valencia in a lot of shipments to Europe," and "that a very large majority of the cocaine that [he] trafficked with Gerardo Gonzalez Valencia went to Europe."  Evid. Hr'g Tr. at 91:3-91:17, May 2, 2023.  Mr. Nava Valencia further testified that Mr. Gonzalez-Valencia preferred shipping drugs to Europe because the price was higher, shipments were paid in Euros, and "[they] never lost a shipment that was sent to Europe."  *Id.* at 91:24-92:21.  This unequivocal testimony Europe was the destination for the majority of Mr. Gonzalez-Valencia's drug trafficking means that these transactions cannot be used for purposes of calculating Mr. Gonzalez-Valencia's sentence because they were *not* "part of the same course of conduct or part of a common scheme or plan as the count of conviction"—*i.e.*, conspiracy to distribute cocaine to the *United States*.  *See United States v. Kipp*, 10 F.3d 1463, 1465 (9th Cir. 1993) ("The guidelines instruct the district court to calculate the base offense level using only the quantity of drugs involved in the count of conviction and quantities that were 'part of the same course of conduct or part of a common scheme or plan as the count of conviction.'") (quoting U.S.S.G. § 1B1.3(a)(2)).

The Government relies on Mr. Nava Valencia's broad assertion that he sold 30,000 kilograms of cocaine to Los Cuinis between 2004 and 2009, and that more than half of that cocaine was sold to Mr. Gonzalez-Valencia personally, of which allegedly seventy percent went to the United States and the rest to Europe, to argue they have met their burden of proving by a preponderance of the evidence that Mr. Gonzalez-Valencia was responsible for distributing more than 450 kilograms of cocaine for importation to the United States.  Gov't Suppl. Sent'g Mem. at 3-5.  The Government also alleges, based on the Evidentiary Hearing testimony, that Mr. Gonzalez-Valencia invested in cocaine shipments with Mr. Nava Valencia that were transported on "go-fast" boats in 2006, in a semi-submersible that was seized by the U.S. Coast Guard in 2007, hidden in frozen shark carcass shipments, hidden in Televisa television crew trucks, and hidden on commercial airline flights within Mexico to Tijuana, and commercial airline flights directly into Chicago, Illinois.  *Id.*  They also allege that Mr. Gonzalez-Valencia, using the screen name "Silverio," was a participant in 2013 Blackberry Messenger ("BBM") exchanges with his brother Abigael, allegedly discussing the sale of cocaine in Brazil.  *Id.*  Finally, they allege based on the testimony of Mr. Guizar Valencia that Mr. Gonzalez-Valencia personally picked up loads of cocaine between 2003 and 2005.  *Id.*

With respect, the devil is in the details of these allegations, which are decidedly lacking in the Government's Supplemental Sentencing Memorandum, which is high on rhetoric, but low on analyzing the details of the evidence presented.  As discussed below, the evidence shows: (1) the 2013 BBM exchanges do not evidence a discussion of shipments of cocaine, and there is insufficient evidence that Mr. Gonzalez-Valencia is the counter-party "Silverio" in these exchanges, or that if drug transactions were being discussed, they were bound for the United States; (2) apart from the 280 kilograms recovered from the semi-submersible to which Mr. Gonzalez-Valencia admits he was an investor in, the preponderance of the evidence shows that he was not responsible for any cocaine

shipments on "go-fast" boats or hidden in shark carcasses, Televisa television trucks, or commercial airline flights to Tijuana or Chicago; and (3) Mr. Gonzalez-Valencia was never involved in personally picking up cocaine loads in 2003 to 2005.  The Government wanted it all, but at the Evidentiary Hearing presented nothing with the required *indicia* of reliability specifically proving Mr. Gonzalez-Valencia's involvement in any of these drug transactions, or that the drugs were bound to the United States, not Europe.

1.   **The 2013 BBM Exchanges Do Not Evidence Cocaine Transactions or Support the Allegation that Mr. Gonzalez-Valencia is "Silverio."**

In its Supplemental Sentencing Memorandum, the Government points to three specific BBM exchanges on August 2, 2013, June 26, 2013, and July 1, 2013 as evidence of cocaine transactions. All three of these exchanges are between a BBM user with the screen name "Boss" (who the parties agree is Abigael Gonzalez-Valencia) and a BBM user with the screen name "Silverio" who the Government alleges is the defendant Gerardo Gonzalez-Valencia.  Gov't Suppl Sent'g Mem. at 5. The Government argues that these alleged 500-kilogram, 100-kilogram, and 200-kilogram cocaine transactions in Brazil purportedly discussed on the BBM exchanges support their claim that Mr. Gonzalez-Valencia is responsible for a conspiracy to distribute more than 450 kilograms of cocaine, thereby adding two additional points to his offense level.

The BBM wiretaps conducted in 2013 are the only evidence offered by the Government against Mr. Gonzalez-Valencia in support of the Government's allegation that he continued to engage in narco-trafficking after his move to Argentina in 2009.  Moreover, before one can analyze the BBM exchanges for clues as to what they are discussing, and the identity of "Silverio," the Government has no corroborating evidence to support their claims that the BBM exchanges are about cocaine transactions or that Mr. Gonzalez-Valencia is "Silverio."  No confidential informant or other witness

13

JA1213

has come forward to identify Mr. Gonzalez-Valencia as "Silverio" or offer evidence that the exchanges were about cocaine transactions.  *See* Evid. Hr'g Tr. at 21:17-22, May 4, 2023 (the Court asked, "So it's not as if you had some kind of confidential source or informant who said: I am communicating with this defendant using this device number, and so on[,]" to which Special Agent Novick said, "For the Defendant, not to my knowledge, no").  In addition, neither counterparty in the exchange has come forward to offer such evidence.

The BBM exchanges have also been shown to offer nothing relevant to the charges against Mr. Gonzalez-Valencia.  The content of the BBM exchanges themselves offer insufficient evidence to conclude that the subject of the messages was cocaine or that Mr. Gonzalez-Valencia was "Silverio."  Defense witness James Holohan, an experienced veteran of N.Y.C. Narcotics Unit, after reviewing the entirety of the BBM exchanges, testified that he could not identify the subject matter of the BBM exchanges "[b]ecause it's coded language, and I don't know what drug they're speaking about."  Evid. Hr'g Tr. at 116:4-10, May 3, 2023.  Mr. Holohan explained that, to determine the subject of the messages, one needs "[u]nits of measurements, weight, whether they use the term kilograms, pounds, grams and the like," as well as "pricing," and "where the drug in question originated from."  *Id.* at 116:21-117:3.  Based on his review of the "entirety of the text exchanges through September [2013]," Mr. Holohan testified that there was nothing in the exchanges that gave him "any context to help [him] decipher what's being discussed."  *Id.* at 117:4-8.  In addition, nothing in the exchanges gave Mr. Holohan any confidence that, even assuming that some kind of drug was being discussed, that the shipments were going to the United States, as opposed to Europe or elsewhere, or that there was "any consummation" of a transaction.  *Id.* 117:22-119:3.  Defense witness Joseph Smith, a native Spanish speaker, also testified that he reviewed the complete BBM exchanges in the original Spanish versions and there was nothing "that gave you any context to be

able to surmise what was being discussed"; he also testified that there was insufficient information to conclude that a cocaine transaction was being discussed in any amount or at any price. Evid. Hr'g Tr. at 110:2-114:8, May 4, 2023.

When another DEA Special Agent, Kyle Mori, analyzed the same June 26, 2013 BBM exchange—which states, "Yours are 85, plus the 15 that I was going to keep for you," Gov't Ex. 18 (June 26, 2013 BBM Exchange) at 00095744—that Special Agent Novick and the Government now argue is evidence of a "100 Kilogram cocaine transaction," Special Agent Mori signed a sworn May 5, 2016, affidavit: "Gonzalez-Valencia and his co-conspirator discussed 85 **units of drugs** which belonged to the co-conspirator as well as 15 more **units** that Gonzalez-Valencia was saving[,]" Def. Ex. 60 (Extradition Aff., May 5, 2016) at GGV 000001041 (emphasis added). Special Agent Mori's use of "units of drugs," rather than "100 kilograms of cocaine" (*i.e.*, what the Government alleges), to describe the same BBM exchange that Special Agent Novick now relies upon underscores that Special Agent Mori concurs with defense witness Mr. Holohan—it is impossible to conclude that the BBM messages are discussing cocaine, or methamphetamine, or marijuana, and that it is equally impossible to know that the unit of measurement discussed is kilograms, pounds or grams, or some other unit.

Special Agent Novick's other efforts to prove that the person using the screen name "Silverio" is Mr. Gonzalez-Valencia are equally without merit. For example, he testified that Mr. Gonzalez-Valencia's travel records show that he entered Uruguay (where it is undisputed the defendant was living in 2013) on July 5, 2013. Evid. Hr'g Tr. at 27:17-19, May 4, 2023. In a July 5, 2013 BBM exchange between "Boss" (Abigael Gonzalez-Valencia) and "Silverio," the latter writes, "I'm already here in EU." Gov't Ex. 16 (July 5, 2023 BBM Exchange) at 00095768. Special Agent Novick testified that he interpreted "I'm already here in E.U." to mean that Silverio was "[i]n

Uruguay or someplace located within Uruguay."  Evid. Hr'g Tr. at 28:3-5, May 4, 2023.  On cross-examination, Special Agent Novick admitted that in Spanish—the language in which the BBM exchanges are written—"EU" stands for "Estados Unidos," or even possibly "European Union," but not Uruguay.  *Id.* at 81:3-23.  Defense witness Mr. Smith, who, again, is a native Spanish speaker, confirmed that *in Spanish*, "EU" could stand for "Estados Unidos" (*i.e.*, the United States) or the European Union, but would never be used to reference Uruguay, which is only abbreviated in Spanish as either "UR" or "UY."  *Id.* at 114:12-115:3.

Special Agent Novick also testified that the BBM exchanges between Boss and Silverio about visiting Mr. Gonzalez-Valencia's father at a hospital after he had suffered a stroke were evidence that "Silverio" was the defendant.  *Id.* at 22:3-10.  This assertion is far less convincing considering that Mr. Gonzalez-Valencia has thirteen siblings all born to this same father, living in Guadalajara, any one of whom may have been communicating with Abigael.  Therefore, when Silverio wrote, "I am on my way," around the same time that Abigael was also letting another sister know that "Lalo" (Gerardo Gonzalez-Valencia) was also on his way to the hospital does not support the conclusion that the defendant is Silverio.  Gov't Ex. 11 (June 27, 2013 BBM Exchange) at 00095758-53.

In addition, as was established on cross-examination, in one of the BBM exchanges, "Boss" (Abigael) informed "Silverio" about Abigael's father's stroke by stating, "**My Dad** is having a stroke, like mine."  *Id.* at 79:12- 80:24.  Obviously, in Spanish or English, one child would never use the article "**my**" to tell their sibling that their shared father just had a stroke—they would say "**our** Dad," or just "Dad."  Special Agent Novick, in acknowledgment of the strength of this textual proof that "Silverio" is not the defendant Mr. Gonzalez-Valencia, testified on cross-examination that the use of "**my** Dad" was "coded language" because "they didn't want to let on, in fact, that they were brothers,"

16

and this was a way to "try and throw off law enforcement to make them think that they weren't related."  *Id.* at 80:12-17.  This interpretation clearly defies logic.

Moreover, if we accept *arguendo* the Government's unproven assumption that the BBM exchanges included a discussion of cocaine transactions, Special Agent Novick testified that the BBM exchanges were discussing alleged drug transactions in Brazil, not the United States.  *Id.* at 31:18-23.  There is no basis for Special Agent Novick's assumption that a reference to "up there" in another of the exchanges is a reference to the United States, as opposed to Europe, or even Mexico, given his testimony that the alleged drug transactions being discussed were in Brazil.  *Id.* at 35:13-16.  Finally, Special Agent Novick pointed to a reference to the number twenty-six in another exchange as a reference to the $26,000 sale price for a kilogram of cocaine in Los Angeles.  *Id.* at 32:19-25.  On cross examination, however, he acknowledged that there was no reference to what currency—Dollar or Euro—was being referenced in the exchange, and that by applying the 2013 conversion rate of Euros to Dollars, the number 26 could just have equally been a reference to the price of a kilogram of cocaine in Europe in 2013, rather than a reference to the price of a kilogram of cocaine in Los Angeles.  *Id.* at 74:3-75:20.

### 2.  Cocaine in Semi-submersible

Mr. Gonzalez-Valencia acknowledged to this Court that he invested in the 2007 semi-submersible cocaine shipment.  Plea Hr'g Tr. at 14:16-15:8, ECF No. 144.  The U.S. Coast Guard interdicted the semi-submersible vessel and recovered 280 kilograms of cocaine.  *Id.* at 15:14-18; Evid. Hr'g Tr at 58:17, May 4, 2023 (Special Agent Novick testifying that, "[t]o my knowledge, approximately 280 is what was found.").

The Government charged and indicted Mr. Gonzalez-Valencia for conspiracy to distribute five or more kilograms of cocaine, *not 450 kilograms*, with full knowledge of the facts related to the

2007 cocaine seizure by the U.S. Coast Guard of just 280 kilograms of cocaine.  Moreover, the four crew members on the same semi-submersible were also only charged with conspiring to possess and/or aiding and abetting and possessing "with the intent to distribute *five kilograms (5) or more* of a mixture and substance containing a detectable amount of cocaine . . . on board a vessel subject to the jurisdiction of the United States," and each pleaded guilty on that basis.[5]

### 3.   Cocaine Shipments by "Go-Fast" Boats

The Government alleges that in 2006, Mr. Gonzalez-Valencia, with his brother Abigael, invested in three loads of 1,500 kilograms of cocaine transported on "go-fast" boats from Colombia to Chiapas, Mexico.  Gov't Suppl. Sent'g Mem. at 4.

While Mr. Nava Valencia first informed the Government about these "go-fast" boat shipments on ▮▮▮▮▮▮▮▮, he never said that Mr. Gonzalez-Valencia was involved, instead mentioning only Abigael.  *See* Ex. H (3500-ONV-30, Proffer Notes, ▮▮▮▮▮▮▮) at ONV00000188-189; Evid. Hr'g Tr. at 74:12-80:5, May 2, 2023.  Later during the same proffer, Mr. Nava Valencia explained that the cocaine he "sold to Lalo [defendant Gerardo Gonzalez-Valencia] . . . was provided to [Mr. Nava Valencia] and came from Colombia, but *was separate than loads* [*Mr. Nava Valencia*] *did with Abigael.*"  Ex. H at ONV00000191 (emphasis added).  When Mr. Nava Valencia later met with the Government on ▮▮▮▮▮▮▮, just weeks before the Evidentiary Hearing, he said that these "go-fast" boat loads were divided between himself, Los Cuinis, and a Colombian, again with no mention of Gerardo Gonzalez-Valencia.  Ex. I (3500-ONV-62, Proffer Notes, ▮▮▮▮▮▮) at ONV00000551; Evid. Hr'g Tr. at 84:15-89:7, May 2, 2023.

---

[5] *See* Indictment at 1-2, *United States v. Gonzalez-Quinones, et al.*, No. 8:07-cr-00334-EAK-TBM (M.D. Fla. 2007), ECF No. 1 (emphasis added); Superseding Indictment at 1-2, ECF No. 25; s*ee* Tr. of Guilty Plea at 14:17-16:1, ECF No. 157; Acceptance of Plea, ECF No. 90; Minute Entry at 1, ECF No. 93; Tr. at 3:18-3:14, ECF No. 130.

Mr. Nava Valencia waited until the Evidentiary Hearing to mention for the first time that Mr. Gerardo Gonzalez-Valencia was involved at all in the 2006 "go-fast" boat shipments from Colombia to Chiapas, Mexico.  In addition, none of the evidence related to these "go-fast" boat shipments established that the cocaine was bound for the United States, as opposed to Europe.

### 4.     Cocaine in Frozen Shark Carcasses

The Government also alleges, based on testimony by Mr. Nava Valencia and Mr. Mojarro Ramirez, that Mr. Gonzalez-Valencia was an investor in 2009 shark carcass shipments of cocaine, each of which contained 500 to 700 kilograms, and the final shipment was seized in 2009.  Gov't Suppl. Sent'g Mem. at 4.  None of the evidence related to these shark carcass shipments established that the cocaine was bound for the United States, as opposed to Europe.  Moreover, for over ten years of his cooperation, Mr. Nava Valencia never said that Mr. Gonzalez-Valencia or anyone in Los Cuinis ever invested in shipments of cocaine in frozen shark carcasses.  *See* Ex. A.  It was only in ████████████ that he first claimed that Mr. Gonzalez-Valencia was an investor in cocaine hidden in frozen shark carcasses.  Ex. J (3500-ONV-44, Proffer Notes, ████████) at ONV00000313.

Mr. Mojarro Ramirez first informed the Government about the involvement of Abigael Gonzalez-Valencia, not the defendant, in a load of cocaine hidden in a shark carcass at a proffer session in ████████.  *See* Ex. F at EMR00000057.  In fact, Mr. Mojarro Ramirez told the Government in ████████ that the only cocaine "load [Mr. Mojarro Ramirez] knew specifically belonged to ALL THREE brothers was the 2000 kilos" shipment he had previously described in an earlier part of his statement, *not* the seized load of 1,400 kilos hidden in shark meat.  *Id.*  Mr. Mojarro Ramirez repeated again in ████████████ that "Abigael was going to get 1,400 kilos in Progresso for PILO to transport," with no mention of Gerardo Gonzalez-Valencia or even Los Cuinis, more broadly.  *See* Ex. K (3500-EMR-26, Proffer Notes, ████████████ at EMR00000126; Ex. L

(3500-EMR-48, Proffer Notes, ███████) at EMR00000219; Ex. M (3500-EMR-47, Proffer Notes, ███████) at EMR00000214.  Finally, according to the Government's notes for a ███████ ███ proffer session, just weeks before the Evidentiary Hearing, Mr. Mojarro Ramirez again only recalled Abigael discussing the loads in shark carcasses, not Gerardo Gonzalez-Valencia.  Ex. N (3500-EMR-50, Proffer Notes, ███████) at EMR00000222.

Two recent investigative articles published in 2020 in Mexican newspapers reported that the Sinaloa cartel and its leader El Chapo Guzman, not Los Cuinis, was responsible for the smuggling of cocaine by hiding it in frozen shark carcasses.  *See* Def. Exs. 18A-C (News Article, *"Los 'Narco-tiburones' del Chapo Guzman,"* Oct. 24, 2020) at GGV000000063-69; Def. Exs. 19A-C (News Article, *"Así Traficaba 'El Chapo' Guzman Cocaína en Tiburones Congelados,"* Oct. 25, 2020) at GGV000000070-74.  Both articles reported that the Sinaloa cartel continued to traffic cocaine using this method from the first seizure in 2009 until 2019, by collaborating with the fishing company Corporativo Pesquero Velazquez, whose CEO was arrested after the Mexican government discovered that the fishing company had withdrawn illicit profits of $85 million over the same period while aiding the Sinaloa cartel.  *Id.*  There is no mention in either article of any involvement by Mr. Gonzalez-Valencia, Los Cuinis, or the Cartel de Jalisco Nueva Generacion in the smuggling of cocaine in frozen shark carcasses.

### 5.   Cocaine in Televisa Trucks

The Government also alleges based on the testimony of Mr. Nava Valencia and Mr. Mojarro Ramirez that in 2007 or 2008, Los Cuinis used Televisa television crew trucks to transport 2,000-kilogram loads from Central America to Mexico.  Gov't Suppl. Sent'g Mem. at 4.  In more than a dozen proffer sessions spanning from ████ until ████, Mr. Nava Valencia never *once* mentioned that Mr. Gonzalez-Valencia, or even Los Cuinis, used Televisa truck transportation.  *See* Ex. A.

In fact, according to the proffer notes, the first time that Mr. Nava Valencia mentioned the Televisa cocaine route was on ██████████, just weeks before the Evidentiary Hearing.  Mr. Nava Valencia claimed that he was "familiar" with the Televisa cocaine route and that "L[os] Cuinis also invested in the Televisa route and provided cocaine in Panama."  Ex. I at ONV00000552.  Moreover, while Mr. Nava Valencia recalled that Los Cuinis used the Televisa trucks to transport cocaine from Panama, Mr. Mojarro Ramirez testified at the Evidentiary Hearing that he knew "that the Cuinis used this route" to transport cocaine because Mr. Nava Valencia "called them because he knew they had merchandise in *Costa Rica*," not Panama as he previously stated.  Evid. Hr'g. Tr. at 138:1-140:14, May 3, 2023 (emphasis added).  In addition, none of the evidence related to these Televisa truck shipments established that the cocaine was bound for the United States, as opposed to Europe.

### 6.        Cocaine on Flights to Chicago and Tijuana

The Government relies on Mr. Nava Valencia's testimony to support its allegation that Los Cuinis used commercial airline flights for drug shipments in 2004 to 2009 between Guadalajara and Tijuana, Mexico, and for drug shipments directly into Chicago, Illinois between 2006 and 2007.  Gov't Suppl. Sent'g Mem. at 4-5.  Again, like the cocaine in shark carcasses and Televisa trucks, Mr. Nava Valencia never once mentioned during ten plus years of cooperation that Mr. Gonzalez-Valencia, or even Los Cuinis, used commercial airlines to ship cocaine.  *See* Ex. A.  The first time that Mr. Nava Valencia ever mentioned flying cocaine on commercial airplanes to Chicago or Tijuana was on ██████████, just weeks before the Evidentiary Hearing.  *See* Ex. I at ONV00000552.  The notes from this proffer state, "[a]s a means of accomplishing this, [Mr. Nava Valencia] had to pay the police a percentage, depending on the amount they were sending.  Prior to the cocaine being loaded into the planes, it was stored in different warehouses which were managed by PILO [Mr. Mojarro Ramirez]."  *Id.*  The Government, however, failed to elicit any corroborating

testimony at the Evidentiary Hearing from Mr. Mojarro Ramirez concerning these alleged commercial airline flights to Tijuana and Chicago, even though Mr. Mojarro Ramirez was supposedly managing the warehouses where the drugs were stored before the flights. *Id.* In addition, it is implausible to believe that a direct commercial flight from Guadalajara to Chicago would not be thoroughly searched enough by U.S. Customs and DEA agents to detect the 200-kilogram loads of cocaine hidden on at least one of these flights.

Given the sheer volume of the cocaine allegedly sent by Los Cuinis by commercial airline on these two routes, Mr. Nava Valencia's failure to mention these shipments during ten years of cooperation until the very eve of the Evidentiary Hearing raises serious questions about their truthfulness—and his overall credibility.

### 7.   Cocaine Delivered by Jose Maria Guizar Valencia in 2003 to 2005

The Government also alleges, based on Mr. Guizar Valencia's testimony, that in 2003 to 2005, that Mr. Gonzalez-Valencia personally came to pick-up cocaine from him on six or seven occasions, and that Mr. Guizar Valencia was ordered to hand over the cocaine to Mr. Gonzalez-Valencia by Mr. Guizar Valencia's brother Antonio. Gov't Suppl. Sent'g Mem. at 5. As discussed below, if Mr. Guizar Valencia really met Mr. Gonzalez-Valencia in person six or seven times as alleged, why did the Government fail to show Mr. Guizar Valencia a photo of the defendant or his brothers for identification purposes during any of his proffer sessions? *See supra* Section III.A.3. In any event, if the Government is to be believed that Mr. Gonzalez-Valencia "ran a well-funded and extensive cocaine distribution operation responsible for transporting ton quantities of cocaine from South America to Central America and Mexico for importation into the United States and Europe," it is not credible to believe that he would personally make cocaine pick-ups in Guadalajara, Mexico, where Los Cuinis allegedly had hundreds of members at their disposal. Gov't Suppl. Sent'g Mem.

at 3 (citations omitted).  In addition, none of the evidence related to these alleged pick-ups established that the cocaine was bound for the United States, as opposed to Europe.

In sum, the Government has not met its burden of establishing by a preponderance of the evidence that Mr. Gonzalez-Valencia conspired to distribute more than 450 kilograms of cocaine—the applicable base offense lever remains 36, not 38.

**C.     The Government Has Not Met its Burden on Threat or Use of Violence.**

The Government points to four acts of violence or threats of violence that were allegedly ordered by Mr. Gonzalez-Valencia to support their request for a two-point enhancement under section 2D1.1(b)(2): (1) the shooting of Los Zetas leader Efrain Teodoro Torres (a.k.a. "Chispa" or "Z14") at a racetrack in March 2007; (2) the killing of an unknown family at an unknown time in two small villages in Michoacán province; (3) the January 2005 shooting of Antonio Guizar Valencia; and (4) a threat to Mr. Gonzalez-Valencia's brother-in-law Domingo Mendoza Sandoval that also involved the killing of other family members at Mr. Sandoval's ranch.  *Id.* at 8-12.

**1.     Mr. Gonzalez-Valencia Did Not Commit Any Acts of Violence.**

It is undisputed that Mr. Gonzalez-Valencia himself did not commit any of these alleged acts of violence.  It is also undisputed that no witness testified that Mr. Gonzalez-Valencia himself was present in the place where these acts of violence or threats of violence allegedly occurred.  Instead, as detailed below, the Government's witnesses testified based on unreliable hearsay—and even double hearsay—that Mr. Gonzalez-Valencia ordered these acts of violence.  Moreover, in the case of the 2007 shooting of Efrain Teodoro Torres at a racetrack, the Government withheld *Brady* material from the defense that shows that other prosecutors in the same Justice Department presented credible sworn testimony from another Los Zetas cooperating witness that it was actually now-Los Zetas leader Miguel Trevino (a.k.a. "Z40"), who was responsible for the shooting of Mr. Teodoro

Torres, not Los Cuinis or Mr. Gonzalez-Valencia.  In the case of the alleged unknown family killed

at an unknown time, the Government chose not even to investigate whether there had ever been such

a family murdered; by contrast, when defense witness Joseph Smith searched for any trace of such a

killing in all available media and other sources, there was no evidence that such a killing had ever

occurred.  Evid. Hr'g. Tr. at 95:10-98:15, May 4, 2023.  With respect to Antonio Guizar Valencia's

murder, the Government's own cooperating witness, Mr. Mojarro Ramirez, told agents on ███████

███, that Jose Gonzalez-Valencia, *not* Gerardo Gonzalez-Valencia, was responsible for and ordered

Antonio's murder.  Ex. O (3500-EMR-14, Proffer Notes, █████████) at EMR00000100; *see also*

Evid. Hr'g. Tr. at 162:18-164:10, May 3, 2023.  In the case of the alleged threat made against Mingo

Mendoza Sandoval, the Government again relies on unreliable hearsay from a single witness who

never mentioned this alleged threat during over ten years of debriefings.  *See* Ex. M at

EMR00000216.

> **2.**   **The Government's Witness in Another Case Testified that Los Zetas
> Leader Efrain Teodoro Torres Was Killed in 2007 by Another Zeta, not
> Mr. Gonzalez-Valencia.**

For more than a decade, the Government has advanced the position that a rival senior Los

Zetas leader Miguel Trevino (a.k.a. "Z40") ordered the killing of the then-leader of Los Zetas Efrain

Teodoro Torres in 2007 at a racetrack in Veracruz, Mexico.  The Government failed to produce to

the defense prior sworn testimony elicited by prosecutors in 2013 and 2015 from another cooperating

witness—Jose Carlos Hinojosa—in two trials in federal court in Texas that states Mr. Trevino—in a

power grab over money—was responsible for the shooting of Mr. Teodoro Torres in 2007 at the

racetrack, *not* Mr. Gonzalez-Valencia or even Los Cuinis.  This prior testimony is obvious *Brady*

material that was never produced by the Government as required, but instead only discovered by the

research efforts of defense counsel.  Now here, in this case, the Government wants to advance a

completely different theory that Los Cuinis was responsible for the Teodoro Torres shooting, yet the Government has done nothing to alert defense counsel or the court in these other two trials that their cooperating witness, who these Texas federal prosecutors obviously believed, was mistaken about who killed Mr. Teodoro Torres, as is their clear obligation.

Mr. Hinojosa is currently serving a 24-year sentence in the United States for conspiracy to distribute cocaine and money laundering in connection with his long-time association with Los Zetas DTO.  Def. Ex. 58 (Tr., *United States v. Jose Trevino-Morales, et al.*, No. A-12-CR-210 (W.D. Tex. Apr. 18, 2013)) at GGV-000000950.  From 2004 until his arrest in 2008, Mr. Hinojosa was the "accountant to the Zetas," who worked very closely with the then-Los Zetas leader Mr. Teodoro Torres.  *Id.* at GGV-000000955-56.  In 2013, Mr. Hinojosa first testified against another Los Zetas member Francisco Antonio Colorado-Cessa in a money laundering case providing information that Mr. Colorado-Cessa owed approximately $18 million to Mr. Teodoro Torres before he was murdered in March 2007.  *Id.* at GGV-000000989.  The money was owed by Mr. Colorado-Cessa to Mr. Teodoro Torres for the purchase of business machinery and racehorses using drug proceeds from Los Zetas that was part of the money laundering case against Mr. Colorado-Cessa.  *Id.*

Then, in 2015, in a continuation of the same trial, Mr. Hinojosa again testified about his close relationship with Mr. Teodoro Torres.  Def. Ex. 22 (Tr., *United States v. Francisco Antonio Colorado-Cessa*, No. A-12-CR-210 (W.D. Tex. Dec. 1, 2015)) at GGV-000000204.  Mr. Hinojosa further testified that it was Mr. Trevino who had his boss Mr. Teodoro Torres killed in March 2007 at the racetrack in Veracruz.  *Id.* at GGV-000000212.  Mr. Hinojosa also testified that the day after Mr. Teodoro Torres' shooting, a meeting was called by Heriberto Lazcano and Mr. Trevino, who both assumed the leadership of Los Zetas following the Mr. Teodoro Torres' murder, to do an accounting of all of the money under the control of Mr. Teodoro Torres before his death.  *Id.* at GGV-

25

000000237.  Mr. Hinojosa further testified that it was determined at the meeting that Mr. Colorado-Cessa owed the most money to Mr. Teodoro Torres and Los Zetas of anyone.  *Id.* at GGV-000000238.  Mr. Hinojosa testified that shortly after the meeting he received a phone call from Mr. Trevino, during which he was instructed by Mr. Trevino that he "shouldn't be looking for [Mr. Colorado-Cessa] anymore to try and get payment on the accounts, that the account had been settled." *Id.* at GGV-000000240.  This testimony underscores that Mr. Trevino had two clear motives to order the shooting of his former boss Mr. Teodoro Torres, as testified to by Mr. Hinojosa: (1) a financial motive related to the $18 million that Mr. Colorado-Cessa owed Mr. Teodoro Torres and Los Zetas at the time of Mr. Teodoro Torres' murder—a debt that Mr. Trevino promptly forgave after Mr. Teodoro Torres' murder; and (2) a "power grab" motive by Mr. Trevino to kill his boss Mr. Teodoro Torres and thereby assume greater power within Los Zetas.

After discovering this exculpatory testimony, defense counsel inquired whether the Government truly believed that Mr. Gonzalez-Valencia was somehow responsible for the murder of Mr. Teodoro Torres.  Rather than withdraw their cooperating witness's compromised testimony, the Government provided the following email from DEA Special Agent Anthony Lewis in Texas after he apparently contacted Mr. Hinojosa (while incarcerated) for clarification, per the Government's request.  Special Agent Lewis's email states:

> Mr. Hinojosa recalled testifying that he believed that Miguel Angel Trevino Morales aka 40 was responsible for the killing of Efrain Torres aka Z14. Mr. Hinojosa's belief was based on his observations that several high-ranking original Zetas had been arrested . . . at the time of the trial. These original Zetas were ranked higher than 40 and Mr. Hinojosa believed that the killing of Z14 was a power grab by 40. According to the conversation I had with Mr. Hinojosa this morning, Mr. Hinojosa had no evidence or proof that 40 had any responsibility or role in the murder of Z14. **Mr. Hinojosa added that he has since heard rumors from others that Oscar Nava Valencia . . . and members of the Cuinis were responsible for the murder of Z14.**

Def. Ex. 57 (Email from K. Sahni to S. Best (May 1, 2023)) (emphasis added).  This email was also the first time that the Government's own cooperating witness Mr. Nava Valencia was accused of sharing responsibility for the murder of Mr. Teodoro Torres with Los Cuinis, giving Mr. Nava Valencia his own personal motive for throwing blame for Mr. Teodoro Torres' murder on Los Cuinis. Given Mr. Hinojosa's sworn testimony that Mr. Trevino—who had a clear motive and the opportunity—is responsible for the murder of Mr. Teodoro Torres, this Court should disregard Mr. Nava Valencia's discredited testimony that Mr. Gonzalez-Valencia and Los Cuinis ordered Mr. Teodoro Torres' murder.

**3.** **Testimony Concerning Defendant's Alleged Responsibility for the Killing of Unknown Family from Small Town in Michoacán Province is Not Credible and Not Sufficient to Support Enhancement.**

The Government further alleges that Mr. Gonzalez-Valencia ordered the murder of an unknown family in Michoacán province, including two children, based *solely* on the uncredible testimony of Mr. Nava Valencia.  Gov't Suppl. Sent'g Mem. at 12.  Specifically, Mr. Nava Valencia testified that he was informed of the killings by a rival DTO—"members of the familia Michoacan – Chio, Chuey, Kike – that started talking to us about what the Cuinis had done."  Evid. Hr'g Tr. at 60:24-61:1, May 2, 2023.  During the Evidentiary Hearing, the Court reasonably inquired as to how many family members were killed and Mr. Nava Valencia responded "[i]t was a married couple and their children."  *Id.* at 61:12-15.  The Court further asked, "how old were the children[,]" and Mr. Nava Valencia responded that he did not know their age.  *Id.* at 61:16-18.

On cross-examination, Mr. Nava Valencia admitted that he did not remember the names of *any* of the family members that were killed.  Evid. Hr'g Tr. at 37:22-23, May 3, 2023.  He vaguely identified the date of the murders as sometime in 2007 or 2008, after a temporary truce had been reached among various DTOs in the region.  *Id.* at 37:3-6.  Notably, he was not present at the killings,

JA1227

and claims to have been told about the murders by members of the La Familia Michoacana DTO, who were also not present during the event. *Id.* at 38:1-11.

Further casting doubt on the reliability of his testimony is the fact that Mr. Nava Valencia failed to mention this murder during the first eleven years that he was being debriefed by government agents. The first mention of this alleged murder was not until ████████ . *See* Ex. P (3500-ONV-48, Proffer Notes, ████████ ) at ONV00000343. The corresponding proffer notes conflict with Mr. Nava Valencia's testimony at the Evidentiary Hearing. While he testified that four people were killed, including children, the proffer notes indicate that Mr. Nava Valencia previously communicated that "6-7 people in that family were killed," without any mention of children. *Compare* Ex. P at ONV00000344, *with* Evid. Hr'g Tr. at 61:12-18, May 2, 2023. Then, at the next debriefing on ████████ , in describing how Mr. Nava Valencia learned of the killings, the proffer notes state: "VALENCIA discovered the family was ordered to be executed after CHAGO and CHAMULLAS began calling him to find out what had happened." Ex. I at ONV00000554. At the Evidentiary Hearing, however, Nava Valencia named the persons who had told him about this murder as "members of the familia Michoacan – Chio, Chuey, Kike," not Chago or Chamullas. Evid. Hr'g Tr. at 60:24-61:1, May 2, 2023. While Mr. Nava Valencia referred to the victims as a "family," he again failed to mention that two children were among the alleged victims. Ex. I at ONV00000554. His trial testimony before the Court was the first time that Mr. Nava Valencia ever stated that two children were among the victims of this alleged murder of a family in the Michoacán province.

The allegation that Mr. Gonzalez-Valencia is responsible for this murder is even weaker in light of Special Agent Novick's testimony during the Evidentiary Hearing. Special Agent Novick acknowledged that the DEA thought so little of the allegation that they never bothered to investigate. Evid. Hr'g Tr. at 84:15-85:23, May 4, 2023. By contrast, defense witness Joseph Smith testified that

28

he searched all open sources (Spanish and English language) "for any kind of killings, disappearances, atrocities that would have happened" between 2000 and 2010 and found nothing "that reflected a family of any number of people being killed and/or targeted by a [DTO]" in that area. *Id.* at 95:14-98:9.

**4.**    **<u>Government Witness Elpidio Mojarro Ramirez Said that "Chepa" (Jose Gonzalez-Valencia) Ordered Antonio Guizar Valencia's Killing, Not the Defendant.</u>**

The Government also alleges "that one of [Mr. Gonzalez-Valencia's] victims was Antonio Guizar Valencia," the brother of cooperator Jose Maria Guizar Valencia. Gov't Suppl. Sent'g Mem. at 8-9. Mr. Nava Valencia testified that he was asked for help in locating Antonio who had stolen a load of cocaine from Los Cuinis, that he organized the team that went to kill Antonio Guizar Valencia, and that Los Cuinis paid the gunmen who killed him. Evid. Hr'g Tr. at 51:15-52:23, May 2, 2023. Mr. Mojarro Ramirez also testified that he was present when "Los Cuinis" asked the Milenio Cartel for help in locating Antonio, and that Los Cuinis "paid the gunmen who carried out the killing." Evid. Hr'g Tr. at 144:15-147:11, May 3, 2023. At a debriefing with government agents on ▮▮▮▮, however, Mr. Mojarro Ramirez stated that "[t]his hit was ordered by **CHEPA [Jose Gonzalez-Valencia]** and CHEPA told PILO [Mojarro Ramirez] all of this." Ex. O at EMR00000100 (emphasis added); *see also* Evid. Hr'g Tr. at 162:18-164:10, May 3, 2023.

Then, during his testimony at the Evidentiary Hearing, Mr. Guizar Valencia admitted that he "wasn't there" but allegedly one of his uncles witnessed the murder and told him about it; based on this, Mr. Guizar Valencia's impression was that "gunmen showed up and executed and murdered or shot down six people, including [his] brother Antonio." Evid. Hr'g Tr. at 68:11-23, May 3, 2022. When confronted with the fact that Mr. Guizar Valencia had no personal knowledge of these events, he for the first time testified that his uncle received a phone call from Mr. Gonzalez-Valencia during

Antonio's wake to announce his responsibility for the killing and to demand $12 million.  *Id.* at 69:11-18.  On cross examination, when counsel asked Mr. Guizar Valencia how he knew the identity of the caller, Mr. Guizar Valencia suddenly proclaimed, "[m]y Uncle put the phone on loudspeaker and we heard everything."  *Id.* at 95:12-13.  Clearly, the Court should be skeptical of Mr. Guizar Valencia's last-minute explanation of the basis of his knowledge about this call and its details.

Further casting doubt on his testimony, Mr. Guizar Valencia was first debriefed by government agents on ████████, and there is no mention of Antonio Guizar Valencia's killing, and no indication that the defendant Mr. Gonzalez-Valencia was involved or responsible.  *See* Ex. A. When Mr. Guizar Valencia was debriefed again on ████████, in discussing the murder of his brother Antonio, the notes state, "Guizar-Valencia stated that he knew Lalo [allegedly Gerardo Gonzalez-Valencia] was involved because Guizar-Valencia's uncles Beto and Miguel were there and escaped." Ex. Q (3500-JMGV-8, Proffer Notes, ████████) at JMG00000090.  Importantly, there is no mention in these notes of a telephone call made by Mr. Gonzalez-Valencia during his brother's wake that was put on loudspeaker, during which Mr. Gonzalez-Valencia announced his responsibility for the killing.  *Id.*  Mr. Guizar Valencia was debriefed a third time on ████████, where again the notes show that while he discussed the murder of his brother Antonio, and the resultant retaliation against Los Cuinis, there is no mention of a telephone call by Mr. Gonzalez-Valencia during the wake of his brother that was put on loudspeaker.  *See* Ex. A.

Mr. Guizar Valencia also testified that in 2018, he was placed in a prison cell in Mexico directly next to Mr. Gonzalez-Valencia's brother Abigael, and claims that they both "ended up trusting each other."  Evid. Hr'g Tr. 84:17-20, May 3, 2023.  Allegedly, Abigael, the head of Los Cuinis, and Mr. Guizar Valencia, a high-ranking member of Los Zetas—two DTOs that were at open war with each other in 2018—opened their hearts to each other during their time together in adjoining

JA1230

jail cells.  Allegedly, Abigael, the hardened leader of Los Cuinis, "trusted" his sworn enemy Mr. Guizar Valencia so much so that he apologized for his family's killing of Mr. Guizar Valencia's father and brother and also confessed to Los Cuinis' responsibility for killing Mr. Teodoro Torres at the racetrack—ultimately blaming "his brothers for everything." *Id.* at 85:12.  Further casting doubt on this alleged confession is Mr. Guizar Valencia's statement during a ▮▮▮▮▮▮ proffer that Abigael previously discussed having him killed.  Ex. Z (3500-JMGV-10, Proffer Notes, ▮▮▮▮▮) at JMGV00000107 ("40 [*i.e.*, Miguel Trevino] AND ABIGAL WERE NEIGHBORS AND DISCUSSED KILLING CARLOS [*i.e.*, Mr. Guizar Valencia] WHILE IN ALTIPLANO ACCORDING TO ABIGAL.").  Respectfully, this alleged jailhouse confession by Mr. Gonzalez-Valencia's brother Abigael would never happen.

**5.      Testimony Concerning Defendant's Alleged Threat Against His Brother-in-Law Domingo Mendoza Sandoval is Not Credible.**

Finally, the Government alleges that Mr. Gonzalez-Valencia "ordered the murder of his brother-in-law, Domingo [a.k.a. 'Mingo'] Mendoza Sandoval," based on the testimony of Mr. Mojarro Ramirez, who claims that Mr. Sandoval asked for his help.  Evid. Hr'g Tr. at 147:25-148:1, May 3, 2023.  Mr. Mojarro Ramirez testified that Mr. Gonzalez-Valencia was in a dispute with Mr. Sandoval over an accounting issue, and when it could not be resolved, Mr. Gonzalez-Valencia allegedly ordered El Mencho (Mr. Gonzalez-Valencia's brother-in-law) to have him killed.  *Id.* at 147:12-149:21.  According to Mr. Mojarro Ramirez, Mr. Sandoval hid when El Mencho and his men arrived, and not finding him, El Mencho and his men "killed a brother and three workers in front of Mingo's mom and his sister."  *Id.* at 149:13-15.

By his own testimony, Mr. Mojarro Ramirez was *not* present when Mr. Gonzalez-Valencia allegedly threatened Mr. Sandoval in late 2010 or 2011.  *Id.*  In addition, neither Mr. Mojarro Ramirez

nor Mr. Gonzalez-Valencia were present when El Mencho allegedly carried through on the threat by visiting Mr. Sandoval's farm and allegedly killing his family members while he escaped.  *Id.*  Mr. Mojarro Ramirez's testimony is unreliable hearsay based on what he was allegedly told by Mr. Sandoval after the fact.

Moreover, when Mr. Mojarro Ramirez was first debriefed by government agents for three days in ████████, he spoke extensively about Los Cuinis but failed to mention this alleged threat to Mr. Sandoval or the killings of his relatives by El Mencho.  *See generally* Ex. F.  Over the next *eight* proffers of Mr. Mojarro Ramirez, the corresponding notes show that, again, there was no mention of any threat against Mr. Sandoval or the killings of his relatives by El Mencho.  *See* Ex. A.  Mr. Mojarro Ramirez did not tell government agents about the alleged threat and killings until ████████ ████, almost seven years after he began cooperating.  *See* Ex. M at EMR00000216.

In sum, for the foregoing reasons, the Government has failed to meet its burden of establishing by a preponderance of the evidence a two-point enhancement for violence or threat of violence under section 2D1.1(b)(2) is warranted.

**D.**     **The Government Has Not Met its Burden on Possession of a Firearm.**

Mr. Nava Valencia testified that beginning in 2007, Mr. Gonzalez-Valencia began carrying both "a 38 super and a 9 mm" handgun and he was also accompanied during drug transactions with Mr. Nava Valencia by armed security. Evid. Hr'g Tr. at 54:2-19, May 2, 2023.  Mr. Nava Valencia explained that Mr. Gonzalez-Valencia only began arming himself and increased his security after having grenades thrown at him and other members of Los Cuinis at a rooster fight in 2007.  *Id.*  In contrast, while Mr. Nava Valencia testified that Mr. Gonzalez-Valencia only armed himself after the rooster fight incident in 2007, Mr. Guizar Valencia testified that on the handful of occasions that he allegedly delivered cocaine directly to Mr. Gonzalez-Valencia before his brother's killing in January

2005, Mr. Gonzalez-Valencia was armed with a handgun.  Evid. Hr'g Tr. at 66:9-21, May 3, 2023.

Mr. Mojarro Ramirez, who testified that he saw Mr. Gonzalez-Valencia "[a]round 20 times," did not

testify that he ever saw Mr. Gonzalez-Valencia with a firearm.  *Id.* at 134:8.

There were many other inconsistencies in the cooperating witnesses' statements.  Mr. Nava

Valencia testified that in 2008, Mr. Gonzalez-Valencia provided him with rifles, specifically AK-

47s and AR-15s.  Evid. Hr'g Tr. at 59:16-60:6, May 2, 2023.  He testified that he "went over to

[Mr. Gonzalez-Valencia's] apartment, and we got this big cache of weapons, 150—more like 200

rifles."  *Id.* at 59:24-25.  Mr. Nava Valencia testified that these 200 AK-47 and AR-15 rifles were

provided by Mr. Gonzalez-Valencia without charge because they were to be used in fighting rival

Mexican DTOs.  *Id.* at 60:1-6.  During an early ████████, proffer session, however, the notes

show that Mr. Nava Valencia told the Government that "[i]n 2007, [he] *purchased* 100 AK 47 rifles

from Lalo [alleged to be Mr. Gerardo Gonzalez-Valencia ]," not that the automatic rifles were gifted

to him.  Ex. H at ONV00000191 (emphasis added).  In addition, the notes reflect that Mr. Nava

Valencia originally told the Government that he received *100* AK-47s, not *200* AK-47 and AR-15

rifles.  *Id.*  Finally, Mr. Nava Valencia's testimony that he "went over to [Mr. Gonzalez-Valencia's]

apartment" to pick-up 200 assault weapons is on its face implausible.  Evid. Hr'g Tr. at 59:24-25,

May 2, 2023.  The sheer size and weight of 200 assault rifles does not allow for easy storage in an

apartment, and the effort to pick them up would require a forklift or dozens of men.

Moreover, the Evidentiary Hearing testimony detailed above that Mr. Gonzalez-Valencia

allegedly wore a handgun at meetings is not sufficient to support a two-point enhancement under

U.S.S.G. § 2D1.1(b)(1) because "there must be something more than mere presence [of the firearm]

at the scene of a criminal transaction.  There must be some action, some word, or some conduct that

links the individual to the [contraband]."  *See United States v. Bagcho*, 923 F.3d 1131, 1138-40 (D.C.

Cir. 2019) (second alteration in original) (quoting *United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980)).

**E.**     **The Government Has Not Met its Burden on Leadership Because Mr. Gonzalez-Valencia was an Investor, with No Operational Role.**

The Government seeks a four-level Guidelines enhancement, alleging that Mr. Gonzalez-Valencia was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a); *see* Gov't Suppl. Sent'g Mem. at 6-7.  However, the consistent testimony of the Government's witnesses at the Evidentiary Hearing, and their statements during prior proffer sessions, was that Mr. Gonzalez-Valencia was *at most* an "investor" in various drug transactions, with no operational role in leading or directing the transactions that would qualify him as an "organizer or leader" under U.S.S.G. § 3B1.1(a).  As an investor, Mr. Gonzalez-Valencia never had "a leadership role and an  organizational one in the sense that he had to organize [the conspiracy] to make it work," handled bribes, or had "substantial operational authority." *Bras*, 483 F.3d at 114 (citations omitted).  The Government acknowledges that '[t]he Defendant was an *investor* in shipments of cocaine that were hidden in shark carcasses, television trucks, and commercial flights from Guadalajara to Tijuana and Guadalajara to Chicago." Gov't. Suppl. Sent'g Mem. at 4 (emphasis added).  Based on his role as an investor, Mr. Gonzalez-Valencia does not qualify as an "organizer or leader" subject to a four-point enhancement under U.S.S.G. § 3B1.1(a).

By pleading guilty to the 2007 cocaine seizure from a semi-submersible, Mr. Gonzalez-Valencia admits he was an "investor" in that transaction.  Special Agent Novick's testimony corroborates this point, as he stated during the Evidentiary Hearing that Mr. Gonzalez-Valencia was only "described as an investor to that particular submarine incident" and he could not recall that Mr. Gonzalez-Valencia "organize[d] any part of the transportation of that product from Colombia to

wherever its final destination was going to be[.]"  Evid. Hr'g Tr. at 58:18-22; 59:20-60:1, May 4, 2023.  Similarly, Special Agent Novick testified that Mr. Gonzalez-Valencia's alleged involvement in the cocaine in frozen shark carcasses was also "only as an investor," with no operational role.  *Id.* at 62:12-25.  Mr. Nava Valencia also testified that Mr. Gonzalez-Valencia's alleged role in the shark carcasses shipments was only as an investor.  Evid. Hr'g Tr. at 44:12-20, May 2, 2023.

With respect to the three "go-fast" boat shipments in 2007 (as discussed above), Mr. Nava Valencia did not mention Mr. Gonzalez-Valencia when discussing these shipments with government agents in ██; rather the notes stating that it was Abigael Gonzalez-Valencia who "arranged for all the transport and completely facilitated the load in Colombia," not the defendant.  *See* Ex. H at ONV00000188-189; Evid. Hr'g Tr. at 74:5-80:3, May 2, 2023.  Moreover, as discussed above, according to the notes documenting Mr. Nava Valencia's ████████ proffer session, when he first mentioned the Televisa truck route just weeks before the Evidentiary Hearing, he told the Government that "L[os] Cuinis also *invested* in the Televisa route," again playing no operational role.  *See* Ex. I at ONV00000552 (emphasis added).  Similarly, the same proffer notes state that Mr. Nava Valencia claimed that Los Cuinis was merely an investor in the alleged cocaine shipments on commercial airline flights to Chicago and Tijuana, with the operational roles played by Mr. Nava Valencia who would "pay the [airport] police a percentage," and by Mr. Mojarro Ramirez, who stored the cocaine prior to the flights.  *Id*.

Conclusory testimony from Mr. Nava Valencia that "Lalo and Abigael were leaders," Evid. Hr'g Tr. at 31:12, May 2, 2023, and from Mr. Mojarro Ramirez that "the one that was the real boss was Lalo," Evid. Hr'g Tr. at 135:18-20, May 3, 2023, and from Mr. Guizar Valencia that Lalo "in particular appear[ed] to be in charge or making decisions," *id.* at 66:6-9, is not sufficient evidence to support an "organizer or leader" enhancement under U.S.S.G. § 3B1.1(a), *see* Gov't Suppl. Sent'g

Mem. at 6.   As has been detailed in Section III.C, there is insufficient evidence to show that Mr. Gonzalez-Valencia ever directed or ordered any of the killings or threats of violence as the cooperating witnesses alleged.   As detailed in Section III.B, the 2013 BBM exchanges also do not support the Government's claim that Mr. Gonzalez-Valencia was an "organizer or leader" based on "the Defendant's active participation in arranging multi-hundred-kilogram cocaine shipments and setting the terms of sales with his brother Abigael."   *See* Gov't Suppl. Sent'g Mem. at 7.

Finally, Mr. Guizar Valencia's testimony that Mr. Gonzalez-Valencia received cocaine shipments from him six or seven times between 2003 and 2005, "always arriv[ing] with six or seven people and [the defendant] was the one making the decisions for the group," does not support a four-point enhancement for "organizer or leader" under U.S.S.G. § 3B1.1(a).  Gov't Suppl. Sent'g Mem. at 7; Evid. Hr'g Tr. at 64:1-66:9, May 3, 2023.   The performance of low-level functionary duties, such as picking-up a load of cocaine, does not rise to the level of a four-level increase as an "organizer or leader" under U.S.S.G. § 3B1.1(a).  *See, e.g.*, *United States v. Carter*, 449 F.3d 1287, 1299 (D.C. Cir. 2006) (holding that the district court's findings did not support a four-level enhancement for the defendant's role as an "organizer or leader" because the lower court found only that the defendant was a "point of contact for several heroin for several people," not that he "exercised authority over others or was hierarchically superior to them" (internal quotations omitted)).   Such a minor level of operational control such as picking up a load of cocaine is not even enough to warrant a three-point enhancement for being a "manager or supervisor" under U.S.S.G. § 3B1.1(b).  *See, e.g.*, *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998) ("One's status as a middleman in a drug distribution chain does not, standing alone, make one a manager or supervisor," and "being an essential participant in a conspiracy is not alone sufficient to trigger [a manager or supervisor enhancement.]" (citations omitted)).

36

IV. **MR. GONZALEZ-VALECNIA'S WITHDRAWAL FROM THE CONSPIRACY BY MOVING WITH HIS FAMILY TO SOUTH AMERICA SHOULD BE GIVEN WEIGHT IN SENTENCING.**

Under section 3553(a)(1), a sentencing judge must consider the "history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Mr. Gonzalez-Valencia refers the Court back to the discussion of his history and characteristics in his Sentencing Memorandum, including the letters of support from his son, his ex-wife,[6] and others that demonstrate his true character.  Sent'g Mem. at Ex. 5 (Letter from Mr. Gonzalez-Valencia's Son); *id.* at Ex. 6 (Letter from Wendy Amaral).

The Government argues in relation to the defendant's history and characteristics that a serious sentence is warranted because of Mr. Gonzalez-Valencia's "disregard for the law" in Uruguay, including his threat against the Uruguayan Minister in charge of prisons.  Gov't Suppl. Sent'g Mem. at 18; Evid. Hr'g Tr. at 43:2-44:4, May 4, 2023; Gov't Ex. 48A.  On cross-examination, Special Agent Novick acknowledged that he never followed up on Mr. Gonzalez-Valencia's claim in the statement against the Minister that he was being tortured—"[t]hey had me naked in below zero temperatures"—by his Uruguayan prison guards.  *Id.* at 55:18-19 ("I personally did not [follow up]. I don't know if other agents did or not.").  However, reports regarding Uruguayan prison conditions support the veracity of Mr. Gonzalez-Valencia's claim.  For example, the U.S. Department of State Country Report on Human Rights in 2017 for Uruguay states "[p]rison and detention center conditions continued to be poor and potentially life threatening in some facilities.  In addition, a 2016

---

[6] Mr. Gonzalez-Valencia and Ms. Amaral are legally divorced (as accurately reflected in the USPO's Presentencing Report), but Mr. Smith's testimony that "they still maintain some type of relationship" is very strongly bolstered by Ms. Amaral's letter.  *See* Evid. Hr'g Tr. at 158:19-20, May 4, 2023; Sent'g Mem. at Ex. 6.

(Page 264 of Total)

report to parliament classified 26 percent of prisons as having conditions of cruel, inhuman, or degrading treatment[.]"[7]

At the Sentencing Hearing, defense witness Joseph Smith testified that based on his conversations with Mr. Gonzalez-Valencia and Ms. Amaral, and his own investigation, the move to Argentina, and later Uruguay, was motivated by the increasingly violent and dangerous environment for his family in Mexico, and a desire to leave the narco-trafficking business for the safety of his family. Evid. Hr'g Tr. at 98:10-100:23, May 4, 2023. As discussed in Section III.B, contrary to the Government's assertions, the BBM exchanges do not establish that Mr. Gonzalez-Valencia continued to participate in narco-trafficking following his move to Argentina, and later Uruguay. Moreover, the testimony of the three cooperators against Mr. Gonzalez-Valencia is limited to alleged events in 2009 or earlier that occurred prior to his move with his family to South America.

Here, Mr. Gonzalez-Valencia's decision to leave Mexico with his family to Argentina and later Uruguay to no longer engage in narco-trafficking was a withdrawal from the conspiracy, but not to the extent necessary to satisfy the legal requirements for a withdrawal defense under U.S. law.[8] Nonetheless, we respectfully request that Mr. Gonzalez-Valencia's withdrawal from the conspiracy by moving his family out of Mexico, starting a new life for himself and his family, and importantly ceasing all criminal activity still be considered by the Court as a mitigating factor at the time of his sentencing, supporting the USPO's recommended sentence of 188 months, not more.

---

[7] Def. Ex. 1 (Excerpt from the U.S. State Dep't's Country Reports on Human Rights Practices for 2017, Uruguay) at GGV0000000010.
[8] The legal standard for an effective and complete withdrawal from a conspiracy requires an affirmative step to notify either the government or co-conspirators of an intention to withdraw. *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015).

**V.** **THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDCUCT.**

For the reasons set forth below, as well as in Mr. Gonzalez-Valencia's Sentencing Memorandum, a life sentence would result in unwarranted sentencing disparities between Mr. Gonzalez-Valencia and other similarly situated defendants. The Court should therefore reject the Government's recommendation of life imprisonment and instead impose the recommended and reasonable sentence of 188 months.

**A.** **A Life Sentence Would Result in Sentencing Disparities with the Government's Witnesses.**

The Government argues that this Court should not consider the sentences imposed on Mr. Nava Valencia and Mr. Guizar Valencia because they are "not similarly situated to [Mr. Gonzalez-Valencia] and therefore are not apt comparators under Section 3553(a)(6)." Gov't Suppl. Sent'g Mem. at 20. Mr. Nava Valencia—the former leader of the Milenio Cartel—pleaded guilty to conspiracy to distribute more than five kilograms of cocaine for the purpose of unlawful importation, *i.e.*, the same crime to which Mr. Gonzalez-Valencia pleaded guilty. *See* Evid. Hr'g Tr. at 62:2-16, May 2, 2023. However, *unlike* Mr. Gonzalez-Valencia, Mr. Nava Valencia ordered the murders of more than *100 people* and directed the torture of countless others—a fact which he testified to on May 2, 2023. *See id.* at 62:17-63:18. Nevertheless, Mr. Nava Valencia was sentenced to just *25 years* in prison, not a life sentence. *See id.* at 63:19-24.

Similarly, Mr. Guizar Valencia, a high-ranking member of Los Zetas DTO, pleaded guilty to conspiracy to possess with intent to distribute five kilograms or more of cocaine. *See* Ex. R (3500-JMGV-9, Judgement, *United States v. Guizar-Valencia*, No. 4:12-CR-000019-RAS-KLJ(4) (E.D. Tex. Nov. 22, 2022)) at JMGV00000092. Like the Government's other witness, Mr. Guizar Valencia

admitted to having "participated" in unfathomable violence, specifically *500 to 800 murder*s.  *See* Evid. Hr'g Tr. at 102:5-10, May 3, 2023.  Still, as defense counsel pointed out on cross-examination, Mr. Guizar Valencia received 480 months' imprisonment—a sentence that he will likely not serve in full due to his cooperation agreement, despite his involvement in such prolific violent conduct. *See* Ex. R at JMGV00000093.

The Government argues that Mr. Nava Valencia and Mr. Guizar Valencia's sentences can be readily explained by the fact that the presiding judges were aware of their cooperation at the time of sentencing.  *See* Gov't Suppl. Sent'g Mem. at 20.  Notably, neither Mr. Nava Valencia nor Mr. Guizar Valencia were given credit for any cooperation at the time of their sentencing hearings. *See* Evid. Hr'g Tr. at 62:7-9, May 2, 2023; Evid. Hr'g Tr. at 101:3-9, May 3, 2023.

## B.   <u>Judges in this District and Other Courts Have Imposed Lesser Sentences for Similarly Situated Defendants and Defendants Charged with Worse Conduct.</u>

The Sentencing Reform Act requires that the district judge consider "the need to avoid unwarranted sentence disparities among defendants with *similar* records who have been found guilty of *similar* conduct[,]"  18 U.S.C. § 3553(a)(6) (emphasis added).  Mr. Gonzalez-Valencia has presented multiple examples of sentences in other cases that support his assertion that a life sentence here would result in an unwarranted sentencing disparity.  In his Sentencing Memorandum, Mr. Gonzalez-Valencia provided the Court with a chart analyzing ten cases in which numerous comparably situated defendants received sentences significantly shorter than life imprisonment for *very* similar conduct in drug trafficking cases, including ones in this District.  *See* Sent'g Mem. at 27-30.  One example worth highlighting again is *United States v. Fernando-Borda*, in which the defendant was convicted *by a jury* of conspiracy to distribute five or more kilograms of cocaine knowing that it would be imported into the United States.  *See id.* at 28.  Notably, the defendant in

40

*Fernando-Borda* had a Criminal History Category III, did not accept responsibility and went to trial, held an organizer/leader role, bribed law enforcement, and carried multiple weapons. *See id.* Even given these factors, another judge in this District, the Honorable Emmet G. Sullivan, sentenced Fernando-Borda to only *25 years* in prison. *See* Minute Entry, *United States v. Fernando-Borda*, No. 1:07-cr-00065-EGS-1 (D.D.C. Aug. 5, 2013).

Two very recent cases in the Second Circuit illustrate why imposing a life sentence for Mr. Gonzalez-Valencia would be fundamentally unfair and result in sentencing disparities. In June 2023, two Sinaloa cartel members—Cornelio Cazarez Madrid and Sinohe Antonio Arajuo Meza—were sentenced to 38 and 30 years in prison, respectively. *See generally* Judgment, *United States v. Madrid*, No. 1:16-cr-00680-GHW (S.D.N.Y. June 6, 2023), ECF No. 137; Judgment, *United States v. Madrid*, No. 1:16-cr-00680-GHW (S.D.N.Y. June 5, 2023), ECF No. 135. These two defendants trafficked more than 2,000 kilograms of cocaine, 130 kilograms of heroin, and 300 pounds of methamphetamine into the United States in a *single year*; they also bragged about their ruthless violence, boasting that they had shot and killed two victims who were deemed "snitches." *See generally* Gov't Consolidated Sent'g Submission, *United States v. Madrid*, No. 1:16-cr-00680-GHW (S.D.N.Y. May 29, 2023), ECF No. 129. Mr. Gonzalez-Valencia, whose conduct never reached this level, should not be given a sentence equal to or greater than defendants who trafficked greater amounts (and more types) of drugs into the United States, and who directly engaged in such violence.

In sum, to avoid unwarranted sentencing disparities, the Court should reject the Government's demand that Mr. Gonzalez-Valencia be sentenced to life imprisonment.

VI. **MR. GONZALEZ-VALENCIA'S EXTRADITION WAS CONDITIONED ON HIS NOT RECEIVING LIFE IMPRISONMENT, BUT ONLY AT MOST THIRTY YEARS OF IMPRISONMENT.**

Mr. Gonzalez-Valencia's Extradition Order included a condition imposed by the Uruguayan courts that when extradited to the United States, Mr. Gonzalez-Valencia would not be sentenced to life imprisonment. This Court is bound by this condition of the original Extradition Order under principles of international comity recognized by this Circuit and other circuits, and therefore cannot accede to the Government's request that Mr. Gonzalez-Valencia be sentenced to life imprisonment. *See Casey v. Dep't of State*, 980 F.2d 1472, 1477 (D.C. Cir. 1992) (deference to foreign courts "is necessary to further international comity—a goal the Supreme Court has emphasized in a variety of contexts"); *see also United States v. Van Cauwenberghe*, 827 F.2d 424, 429 (9th Cir. 1987) ("deference [is] to be accorded a surrendering country's decision on extraditability"); *United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2002) ("deference to that [extraditing] country's decision seems essential to the maintenance of cordial international relations").

In approving the Extradition Order, the Uruguayan Court of First Instance stated, in part:

> It is ordered to grant the extradition of Gerardo Gonzalez Valencia [as] requested by the competent authorities of the United States, under the following conditions: . . . (III) the extradition granted is made upon the conditions that [the United States] granting guarantees considered sufficient by the national authorities [in Uruguay] involved in this process, that, in the event that Gerardo Gonzalez Valencia is convicted in the criminal proceedings that are intended to be initiated in [the United States], he shall not be punished with the death penalty *or a life in prison sentence*[.]

Ex. S (Sentencia Nro. 13/2017, Aug. 28, 2017) at 00054539 (emphasis added).

In advance of the issuance of the Extradition Order, on June 23, 2016, the Prosecutor underscored to the Uruguayan Court that "[the United States] must accept as a penalty the longest provided for in our law, that is: *30 years of prison* and 15 more years of probatory measures, if applicable." Ex. T (Vista No. 613, June 23, 2016) at 00054286 (emphasis added).

42

JA1242

In placing the condition that the United States "shall not" seek life imprisonment for Mr. Gonzalez-Valencia, the Court of First Instance reasoned that while Article 7 of the United States-Uruguay Extradition Treaty (the "Treaty") prohibits extradition that results in a punishment of the death penalty, and the Treaty "does not have any provisions in relation to the eventual sentence to life in prison . . . it is admissible to impose on the requesting [United States] the condition provided for in Article 7 of the Treaty *also in relation to the sentence of life in prison,* since it is not provided for in our internal public order and contravenes our international public order[.]" Ex. S at 00054536 (emphasis added). The Court of First Instance further supported its decision to prohibit life imprisonment, notwithstanding the absence of such a prohibition in the Treaty, by pointing to numerous international public conventions and treaties to which Uruguay is a signatory that prohibit life imprisonment as a "cruel, inhumane or degrading" punishment. *Id.* This condition of the Extradition Order prohibiting a punishment of life imprisonment was expressly affirmed on appeal to both the Uruguayan intermediate appellate court and by the Uruguayan Supreme Court, their court of last resort. *See* Ex. U (Sentencia Nro. 208, Oct. 2, 2018) at 00053245-55; Ex. V (Sentencia Nro. 18, Feb. 11, 2020) at 00053800-38.

In response to the Uruguayan Supreme Court's decision affirming the Extradition Order, Uruguay formally wrote to the Embassy of the United States, informing them that with the expiration of his final appeal, the extradition of Mr. Gonzalez-Valencia could proceed, subject to the condition that "in the event Gerardo Gonzalez Valencia is convicted in the criminal proceeding that is intended to be initiated in your country, he will not receive the death penalty *or a sentence of life imprisonment*." Ex. W (Oficio No. 82/2020, Feb. 18, 2020) at 00053874 (emphasis added). The U.S. Embassy replied, "regarding the requested life sentence assurance, the United States notes that the Treaty does not provide a basis for conditioning extradition on the provision of the assurances

JA1243

requested by the Government of the Republic of Uruguay.  Therefore, the United States is under no

obligation to provide such an assurance[.]"  Ex. X (Letter No. 53, Mar. 19, 2020) at 00052046.

Mr. Gonzalez-Valencia's Uruguayan lawyers immediately appealed to the Uruguayan

Prosecutor and to the Court of First Instance that the United States' response should result in

Mr. Gonzalez-Valencia's immediate release on the ground that the condition of the Extradition Order

of the Court of First Instance was not being met.  In response, both the Uruguayan Prosecutor argued

that, and the Court of First Instance ordered, that Mr. Gonzalez-Valencia's extradition could still

proceed, based on the Prosecutor's and Court's following understanding of the U.S. Embassy's letter:

> If the note from the Embassy of the United States of America is read carefully, it does
> not express that the petitioning State does not accept the imposed condition, nor that
> it refuses to provide the required guarantees, but it claims verbatim that "the United
> States does not have the obligation to give such guarantee," a position that - as
> discussed - has a basis in the rules of the Treaty and it is only possible to conclude
> that it has legal reason for this. In other words, *the note does not say that the United
> States will not comply with the condition or with the provision of guarantees* - as the
> Defense alleges - but rather it says that it is not obliged to do so, which is substantially
> different.

Ex. Y (Vista No. 84/2020, Mar. 27, 2020) at 00052484-85 (emphasis added).  On the basis of that

understanding, Mr. Gonzalez-Valencia's conditional extradition to the United States proceeded

under the terms of the Extradition Order.

The fact that U.S. Embassy's letter correctly states that the Treaty does not preclude the

United States from seeking life imprisonment misses the point.  In imposing the condition prohibiting

life imprisonment, the Court of First Instance was fully aware that that condition was not found in

the Extradition Treaty between Uruguay and the United States, but nevertheless imposed the

condition because the Court found life imprisonment to be inconsistent with Uruguay's own internal

laws and obligations under other international treaties.  Under these circumstances, out of respect for

the decision of the Uruguayan Court under the principle of international comity, this Court is bound

by the condition of the Extradition Order that Mr. Gonzalez-Valencia not be sentenced to life imprisonment, but at most be sentenced to thirty years. *United States v. Jurado-Rodriguez*, 907 F.Supp. 568, 574, 577 (E.D.N.Y. 1995) (holding that the United States "must abide by the terms and limitations [the surrendering country] has explicitly included in its extradition decree" because "[l]anguage in extradition orders are binding extensions of treaty obligations").

## VII.   <u>CONCLUSION</u>

For all of the foregoing reasons, Mr. Gonzalez-Valencia respectfully requests that this Court follow the USPO's recommendation and impose a sentence of 188 months (15 years, 8 months).

Dated: June 30, 2023

Respectfully submitted,

*/s/ Stephen A. Best*
BROWN RUDNICK LLP
Stephen A. Best (DC Bar No. 428447)
Rachel O. Wolkinson (DC Bar No. 975548)
Geoffrey H. Coll (DC Bar No. 427232)
Tiffany B. Lietz (admitted pro hac vice)
Natasha Ertzbischoff (admitted pro hac vice)
601 Thirteenth Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 536-1700
sbest@brownrudnick.com

and

The L●S LAW FIRM
Lilly Ann Sanchez (admitted pro hac vice)
Four Seasons Tower, Suite 1200
1441 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 503-5503
lsanchez@thelsfirm.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 30, 2023, I electronically filed the foregoing document with the

Clerk of the U.S. District Court for the District of Columbia by using the CM/ECF system.  All

participants registered through the Court's electronic filing system will be served by electronic mail.


Date: June 30, 2023

*/s/ Stephen A. Best*
BROWN RUDNICK LLP
Stephen A. Best (DC Bar No. 428447)
601 Thirteenth Street, NW Suite 600
Washington, DC 20005
Telephone: (202) 536-1700
sbest@brownrudnick.com

*Counsel for Defendant Gerardo Gonzalez-Valencia*

JA1246