**RECORD NO. 23-3126**
**[ORAL ARGUMENT HAS NOT BEEN SCHEDULED]**

In The

# United States Court Of Appeals
## For The D.C. Circuit

### UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

### GERARDO GONZALEZ VALENCIA,

*Defendant-Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

**PUBLIC APPENDIX**
**Volume VI of VII**

_____

| | | |
|---|---|---|
| **Devin Burstein** **WARREN & BURSTEIN** **501 W. Broadway, Ste. 240** **San Diego, CA 92101** **(619) 234-8467** **db@wabulaw.com** | **Chrisellen R. Kolb U.S. ATTORNEY'S OFFICE (USA) Appellate Division Room 8104 555 4th Street, NW Washington, DC 20530** **(202) 252-6833** **Chrisellen.R.Kolb@usdoj.gov** | **Kaitlin J. Sahni U.S. DEPARTMENT OF JUSTICE (DOJ) Criminal Division 145 N Street, NE Second Floor, East Wing Washington, DC 20530** **(202) 598-2493** **kaitlin.sahni@usdoj.gov** |
| *Counsel for Appellant* | *Counsel for Appellee* | *Counsel for Appellee* |

# TABLE OF CONTENTS

**Volume I**

Indictment (April 19, 2016) [DE1] ........................................................ iv

Transcript of Motion Hearing (January 11, 2022) ................................... 5

Motion to Dismiss (April 28, 2022) (DE97) ........................................... 26

Government's Opposition to Defendant's Motion to Dismiss (April 29, 2022) (DE99) ........................................................................................ 229

Defendant's Reply in Further Support of his Motion to Dismiss (May 12, 2022) (DE103) ...................................................................................... 258

**Volume II**

Exhibits in Support of Defendant's Reply in Further Support of his Motion to Dismiss (May 12, 2022) (DE103) ........................................... 297

Memorandum and Order (July 5, 2022) (DE108) .................................. 367

Memorandum Opinion and Order (September 1, 2022) (DE120) ........ 376

Plea Agreement (December 1, 2022) (DE134) ...................................... 389

Joint Statement of Stipulated Facts (December 1, 2022) (DE135) ...... 398

Joint Submission Regarding Sentencing Guidelines (December 16, 2022) (DE138) ............................................................................................... 403

Defendant's Statement of Facts (December 16, 2022) (DE139) ........... 409

Transcript of Plea Colloquy (December 22, 2022) .............................. 412

Government's Sentencing Memorandum (March 23, 2023) (DE153) .. 439

Defendant's Memorandum in Aid of Sentencing (April 6, 2023) (DE159). ............................................................................................................ 480

**Volume III**

Continued Exhibits in Support of Defendant's Memorandum in Aid of Sentencing (April 6, 2023) (DE159) ....................................................593

Notice of Filing of Letter in Support (April 10, 2023) (DE160)............656

Stipulation (April 18, 2023) (DE161)....................................................672

Transcript of Hearing (May 2, 2023) ....................................................674

**Volume IV**

Transcript of Hearing (May 3, 2023) ....................................................787

**Volume V**

Transcript of Hearing (May 4, 2023) ....................................................978

Government's Supplemental Sentencing Memorandum (June 16, 2023) (DE170)....................................................................................................1179

Defendant's Post-Hearing Response Brief (July 7, 2023) (DE179)....1201

**Volume VI**

Exhibits in Support of Defendant's Post-Hearing Response Brief (July 7, 2023) (DE179)...................................................................................1247

Government's Reply in Support of Supplemental Sentencing Memorandum (July 12, 2023) (DE180).............................................1443

Transcript of Sentencing Hearing (July 21, 2023) .............................1459

**Volume VII**

Notice of Appeal (July 26, 2023) (DE186).........................................1551

Amended Judgment (September 1, 2023) (DE188) ...........................1552

Reason for Amendment (September 1, 2023) (DE189) ...................... 1560

Docket Report ................................................................................. 1561

# **EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

UNITED STATES OF AMERICA,                §
                                         §
                Plaintiff,               §   Case No.:
                                         §   4:11-cr-00079-15
        vs.                              §
                                         §   Volume 1
HUGO CESAR ROMAN-CHAVARRIA,              §   Page 1 - 293
                                         §
                Defendant.               §


            TRANSCRIPT OF SENTENCING HEARING
        BEFORE THE HONORABLE SEAN D.  ORDAN
            UNITED STATES DISTRICT JUDGE

            Wednesday, August 4  2021; 9:05 a.m.
                    Plano, Texas


APPEARANCES OF COUNSEL:

FOR THE UNITED STATES:

  Ernest Gonzalez
  Colleen Elizabeth Bloss
  U.S. ATTORNEY'S OFFICE - Plano
  101 East Park Boulevard Suite 500
  Plano, Texas 75074

FOR THE DEFENDANT:

  Micah Shawn Belden
  MICAH BELDEN
  711 N  Travis
  Sherman, Texas 75090


        *****************************************

            GAYLE WEAR, RPR, CRR
        Federal Official Court Reporter
            7940 Preston Road
            Plano, Texas 75024
                214.872.4867

PROTECTED MATERIAL
JMGV00000030

Case 1:16-cr-00065-BAH   Document 179-1   Filed 07/07/23   Page 3 of 47
USCA Case #23-3126   Document #2057130      Filed: 05/30/2024    Page 7 of 308

2

ALSO PRESENT:

Agent Richard Clough
Agent Daniel Padilla
Patrick Madrigal, Litigation Tech

Patricia Doerr, Legal Assistant
Gilberto Torrez, Investigator

Nikki Gray, Probation
Courtney Matheny, Probation

*    *    *

JMGV00000031

212



The government can call its next witness.

MR. GONZALEZ:  The government calls -- the government calls Jose Maria Guizar Valencia.

(Pause in the proceedings.)

THE COURT:  Let's have Mr. Guizar Valencia sworn.

(Witness sworn.)

THE COURT:  You can be seated.

JMGV00000032

Case 1:16-cr-00065-BAH   Document 179-1   Filed 07/07/23   Page 5 of 47
USCA Case #23-3126   Document #2057130      Filed: 05/30/2024      Page 9 of 308

213

Mr. Gonzalez, you can begin when you're ready.

MR. GONZALEZ:  Thank you, Your Honor.

JOSE MARIA GUIZAR VALENCIA,

first having been duly sworn by the courtroom deputy

testifies under oath as follows:

DIRECT EXAMINATION

BY MR. GONZALEZ:

Q.    Sir, would you please state your full name for the Court and the record.

A.    Jose Maria Guizar Valencia.

Q.    Do you go by any other name?  Or do you have any aliases?

A.    Carlos and Zeta -- Z-43.

Q.    Are you also known as Carlitos, Carlos or Z-43?

A.    Excuse me?

Q.    Are you also known as Carlitos, Carlos, or Z-43?

A.    Yes.

Q.    And you are a high-ranking member of the Zeta cartel.

A    Yes, I am.

Q.    And were you in fact in the top tier of the Zeta cartel?

A.    Yes.

Q.    And in regards to your position in the Zeta cartel, you were in the top tier along with Heriberto Lazcano Lazcano, Miguel Trevino, Omar Trevino, and Ivan Velasquez Caballero;

JMGV00000033

Case 1:16-cr-00065-BAH   Document 179-1   Filed 07/07/23   Page 6 of 47
USCA Case #23-3126   Document #2057130   Filed: 05/30/2024   Page 10 of 308

214

correct?

A.   Yes, sir.

Q.   And you are a United States citizen?

A.   Yes, Your Honor.

Q.   And you were -- what's the highest level of education that you have attained?

A.   High school.

Q.   And you are pending charges here in th  Eastern District of Texas; correct?

A.   Yes.

Q.   What types of charges are you pending?

A.   Well, it is my understanding that there's another proceeding in Laredo, Texas.

Q.   So you have charges both in the Eastern District as well as the Southern District; correct?

A.   Yes.

Q.   And that's for the distribution of cocaine.

A.   Yes

Q   How is it that you got involved in the distribution of cocaine?

A.   After the death of my older brother, I moved to Veracruz, and that's where I got involved with the Zetas.

Q.   When your brother passed away, was there a debt owed to the cartel?

A.   Yes.  My older brother had a debt to a man known as La

JMGV00000034

Chispa.

Q.    And because of that debt of your brother, you got involved to try to pay off that debt.

A.    Yes.  I went to collect the debt, and that's when I started to get involved with the Zetas.

Q.    And again that's when Lazcano Lazcano was in charge of the Zetas.

A.    That is true.

Q.    And you became or you were given certain responsibilities in the Chiapas Gua emalan region.

A.    Yes, sir.

Q.    What responsibilities were you given?

A.    To buy all of the kilos of cocaine in Guatemala for the Zetas.

Q.    And did you have other individuals working with you to accomplish that task?

A.    Yes, William De Jesus Torres Solorzano.

Q.    And is that Comandante W.?

A    That is true.

Q.    What about Overdick?  Horst Overdick?

A.    Overdick and other Guatemalans.

Q.    And were Comandante W. and Overdick purchasing all the cocaine that made it to Guatemala in order to deliver it to you and the Zetas?

A.    Yes.  They would send it to him at the border of

JMGV00000035

Coahuila with the United States.

Q.    The drugs would arrive from Guatemala, and from there would then be shipped to the border; correct?

A.    Yes, that's how it happened.

Q.    And you were communicating directly with Miguel and Omar Trevino?

A.    Yes.  I was always with 40, in the same truck.

Q.    And 40 is Miguel Trevino.

A.    Miguel Trevino Morales, Z-40.

Q.    And once you entered this organization, you became familiar with the structure; co rect?

A.    Yes --

Q.    And you became familiar with the military camps that they operated.

A.    -- with Lazcano, with 40, with 42.

Q.    And you became familiar with the military camps they were operating; correct?

A.    Yes  yes.  Omar and 40 liked to go there and train.  An  sinc  I was always with them, that's how I got involved in that.

Q.    And you, yourself, attended these training camps?

A.    Yes.  I went to train with them, with all of them.

Q.    What kind of training did you receive at these camps?

A.    Sniper shooting.  Getting out of trucks.  Breaching homes.  How not to crash against each other.  How to place

JMGV00000036

each other so that we wouldn't shoot each other.

Q.    Was this live ammo training?

A.    Real ammo with R-15 and R -- AK-47s.

Q.    And when you say *cuerno de chivo*, are you referring to extended magazine ammunition?  Magazines?

A.    When I refer to cuerno de chivo, I mean AK-47s.

Q.    So those were the firearms that were being used at these particular camps.  Where were those firearms being purchased?

A.    Yes.  All those arms were supplied by Poncho Cuellar and the defendant that is sitting right here.

Q.    And the defendant that is sitting right here, you said "Vecino," is that the name you know about?

A.    Yes.  I met him in the State of Coahuila, the Cinco Manantiales.  It's a b rder on -- in Texas, Eagle Pass.

Q.    And was the defendant that you've identified as Vecino, was he partners with Poncho Cuellar?

A.    Yes  He is a partner and right-hand man.  He is one of th  clos st people to him.  I can identify him very well. It's him.

Q.    Now, we'll come back to the defendant here in a bit.

So you worked closely with Comandante W. and Overdick; correct?

A.    Yes, that's true.

Q.    And you had other people that were working beneath you

JMGV00000037

that you supervised.

A.    Yes.

Q.    And in regards to the quantities of cocaine that were being smuggled in from Guatemala, what quantities were Overdick and Comandante W. getting there in Guatemala?

A.    Between 1500 to 3,000 kilos.  I couldn't tell you around how often because it was -- it was a lot of work.

Q.    And all of those drugs were being sent through the border for importation to the United S ates?

A.    Yes.  A large portion of those wer  delivered.  The greater part of them were of th  better clients of Omar Trevino and Zeta -- Z-42.  And since they were his preferred ones, those ar  the ones who got the most kilos.

Q.    When you say they were the preferred ones, are you referring to the defendant and Mario Poncho Cuellar?

A.    Poncho Cuellar and El Vecino.

Q.    And they were the ones that were preferred by 40 and 42 because of the quantities that they were distributing.

A     Because of the quantities.  Because they were the ones who were distributing the most drugs here in Texas.

Q.    And you were present and you were with 40 and 42, so you got to see that and hear that from them.

A.    Yes, of course.  And I saw it.

Q.    Now, when the Zetas first started, they were the security arm for the Gulf cartel; correct?

JA1256
JMGV00000038

Case 1:16-cr-00065-BAH   Document 179-1   Filed 07/07/23   Page 11 of 47
USCA Case #23-3126   Document #2057130   Filed: 05/30/2024   Page 15 of 308

219

A.    Yes.   They were the armed part of the Gulf, but they were the executioners.

Q.    And then they went off on their own and became their own cartel.

A.    Yes.   Lazcano opted to separate, and he made his own cartel.

Q.    And then that's when Miguel Trevino is elevated to being one of the top commanders.

A.    Yes.   Actually, he became the top because Lazcano was already taken, and he took all the   rritory.

Q.    So Lazcano may have been  he boss as a figurehead, but really Miguel Trevino operated the Zeta cartel.

A.    He was the one who gave the orders, who put people in charge and then took out people in charge.

Q.    Okay.   And could anyone communicate with Miguel Trevino?  Or did you have to be pretty high up in the organization in order to do that?

A.    You had to have a place of honor to be able to speak wi h him

Q.    And you indicated that initially they had put you in the Chiapas, Guatemala, area; correct?

A.    Yes.

Q.    And that was because of your contacts in Guatemala?

A.    Yes.

Q.    Were you familiar with the drug traffickers who were

JMGV00000039

220

operating in Guatemala when you first started there?

A.    Yes, that's true.

Q.    Do you remember an individual by the name of "Juan Jose Leon" or "Pacho Leon"?

A.    Yes.  I met him in person.

Q.    Who is Poncho Leon?  Who is Juan Jose Leon, or Poncho Leon?

A.    Poncho Leon was one of the top -- he w s the top narco trafficker in Guatemala in 2000 -- 2007  - 2005 to -- until the day he was killed in 2008.

Q.    And who killed Poncho Leon?

A.    Miguel Angel Trevino Morales killed him personally.

Q.    And were you there for that particular killing?

A.    I went to one of the meetings because they were going to come up with a pric  f r -- a price for the kilos.  And in that meeting  Miguel stood up and killed him.

Q.    So he had called the meeting with this other Guatemalan narco to set a price.

A    Yes.  It was a peaceful meeting to set a price.  And he changed his mind in the meeting and stood up and killed him.

Q.    And you were present.

A.    Yes.

Q.    And after -- how many people were killed in that particular meeting?

A.    Of ours, there were about seven.  And of theirs, about

JMGV00000040

twelve.

Q.    And did you and Miguel Trevino have to go into hiding for that reason?

A.    Yes, because the U.S. government knew that we were there and they knew that Miguel Angel Trevino Morales was there.  So they knew that we were there.

Q.    And having been in that area and worked in that area, were you also aware that Miguel Angel Trevin had corrupted the government of Guatemala?  The president specifically?

A.    Yes.  At the highest levels, even the president.

Q.    And did Miguel Angel Trev no believe that he could kill with impunity there in Guatemala?

A.    Yes.  He moved aro nd like a politician with armored vehicles and with a caravan.

Q.    And did he under stimate the outcry after the killing of Poncho Leon in Guatemala?

A.    Yes.  Yes, he stayed there and he didn't want to leave since he had everything paid for.

Q    But did the government continue to support him?

A.    Well, more or less.

Q.    And were you a part of, or were you aware how much money was being paid to the former president of Guatemala?

A.    Yes.  They gave me the order to pay $24 million to the campaign, the political campaign, of Alvaro Colom.

Q.    And what was that $24 million supposedly going to buy

JMGV00000041

Case 1:16-cr-00065-BAH   Document 179-1   Filed 07/07/23   Page 14 of 47
USCA Case #23-3126   Document #2057130      Filed: 05/30/2024   Page 18 of 308

222

the Zeta cartel in Guatemala?

A.    Well, the deal was to get out containers, to unload containers that came from Colombia that were filled with cocaine.  And if he won the presidency with those funds, that they would be able to work -- we would be able to work in Guatemala with no problems -- airports, with flights, with a flight plan, customs agents that were bribed -- to work with no problems and to move around as if we were politicians with permits and everything.

Q.    And as politicians, you were not -

A.    With weapons and everything  They gave us, actually, effectively, they gave us 50 permits for -- as citizens, as Guatemala citizens, as G atemalans, and to move around freely with permission with arms permits.  So that if we were stopped by the law, we could just show our permits and they would let us go.

Q.    And did that all change once this killing occurred?

A.    Yes  President Alvaro Colom sent a message to Z-40 th ough  man named "Manuelito," and told him to go and hide, into hiding, until the country calmed down.

Q.    And that is what you did; correct?

A.    Yes.

Q.    And then was there another massacre that occurred in Guatemala that caused problems for the cartel in Guatemala?

A.    Yes.  The murder of 49 people in a ranch.

JA1260

223

MR. GONZALEZ:  Can we have Government's Exhibit's 81-001 through 81 -- please.  The Guatemala.  Sorry, next.

BY MR. GONZALEZ:

Q.    Is this the massacre that you were referring to wh re some farm workers were killed by Zeta members?

A.    Yes.  I saw it on the news.  I was actually in the State of Coahuila.

Q.    Were you present with Miguel Angel Tre ino when he gave the order for this to happen?

A.    Yes.

Q.    And not only was there vi lence in foreign countries in Guatemala, but there was violence in Mexico.  Are you familiar with the killing of an SSI Agent, Special Agent, in Mexico?

A.    Yes, yes.  Pepit  Zarabia gave the order.  He's somebody from the Zetas.  He is the child's father -- godfather of Trevino Morales.

Q.    And that was an ambush of a special agent in Mexico; co rect?

A.    Yes, yes.  I saw that on the news, but -- yes, but I know it was Pepito Zarabia because Lazcano called him to scold him for it, and Z-40, too -- Z-40, also.  And I was there when they scolded him.

Q.    Not only was that killing, there was another killing of a jet skier on Falcon Lake.  Are you familiar with that one?

PROTECTED MATERIAL

JA1261

224

A.   Some American tourists?

Q.   Yes.

A.   Yes.  In a Lake Falcon?

MR. GONZALEZ:  Can we have 81-011, please?

BY MR. GONZALEZ:

Q.   And do you recognize the individual that's next on the left-hand side?

A.   Yes, I recognize him.

Q.   Who is he?

A.   I know him as The Squirrel, Ardilla.  He's also a member of the cartel that I bel ng to

Q.   And he was held responsible for the killing of this American citizen in this particular lake.

A.   Yes.  I knew it through 40 and Lazcano -- I was there -- and 42, that he had killed the tourists.

Q.   And being present with Miguel Trevino as you were, how many years were you by his side?

A.   I was next to that person for four and a half years of my life, day and night.

Q.   And being with him for that period of time, you obviously saw him kill people; correct?

A.   Very many people.

Q.   If you had to estimate the total number of people that you saw him kill, what would that number be?

A.   It is so many that I couldn't give you an estimate.

JMGV00000044

225

Q.    More than 300?

A.    More than 300.

Q.    More than 500?

A.    It could be.

Q.    And --

A.    Personally.  Him, personally.  So that he would take the gun, a knife, or some item, sometimes baseball bats.  Hangings, draggings, squashing them with tru ks.  All kinds.

Q.    Are you familiar with the term that they use in the Mexico cartels as "el guiso," spell d G-U-I-S-O?

A.    Yes.  When they would burn the bodies in containers, 200-litre containers.

Q.    And would the indi iduals be cut apart and put into these drums and then set afire?

A.    Without cutting them up, just the whole bodies would be put in there and lit up.

Q.    What would they use to burn them?

A.    They would mix gasoline with diesel.

Q    Why would they mix those two things together?

A.    Well, since the cooks were very experienced, they realized that that mixture would help burn the bodies quicker.  It was a process of many years to find out that that was the best combination, the best process to cook them.

Q.    And did you personally witness those burnings or those killings?

JMGV00000045

226

A.   Yes.   Yes, I saw it twice.

MR. GONZALEZ:  If we can go to Government's 93, please.

BY MR. GONZALEZ:

Q.   Here, in Government's 93, it talks about that.  It says Zeta's Z-40 Tops Target List, and then it refers to, it says -- it says that by stuffing them into oil drums, dousing them with gasoline and setting them on fire, a practice known as el Guiso, or the cookout, that that was a common practice used by the Zeta cartel.  Is that a curate?

A.   Yes.  That's the method that they would use to disappear the bodies and the government wouldn't find them, with the intention that  here not be any proceedings against the members of the cartel, of the Zetas.

Q.   And who were som  of the people that were being killed and disposed of this way?

A.   Well, I wasn't in charge of that.  The only times I saw those was because Miguel would go to the cookouts.

Q   And when you say "the cookouts," did you have multiple locations, or did the Zeta cartel have multiple locations where this was occurring?

A.   Every city had their own kitchen.  Nuevo Laredo, Monclova, Piedras Negras, Allende, Nava.  Every city had their own kitchen to cook their own detainees.

Every day they detained people, and people

JA1264

JMGV00000046

227

disappeared every day.  It was a horrible war where not a thousand people died, but a hundred thousand people.

Q.    And did Miguel Trevino kill people on a daily basis?

A.    Daily, yes.

Q.    And by different means, as you just said, by machete, by knifing, by bullet, any possible means possible.

A.    He was a person who had no emotion.  He had no emotion. He had no empathy.  He killed people every d y and he experimented.  He was a psychopath.  H  was sick.

Q.    What was the most violent way that you saw him kill someone?

A.    I saw a case of an 18-year-old girl with her mother. This girl had -- was dating one of the Zeta soldiers and one of the military soldiers  T ey took her to Allende, Coahuila, where these people are from.  They took her behind a hotel and they took off her nose.  First, they killed her mother in front of her because she was taking information to the soldiers as in the movements of the Zetas.

And they blew her nose off with an MP5.  Then they hit her on the ears.  They hit her face, her cheeks.  And the girl begged for them to kill her already because it hurt her. And she screamed out of pain.

And the mother, who was supposedly dead by that point, got up and went and fought him and said, *dog, leave my daughter alone*.  And we all got scared because she was

JA1265

Case 1:16-cr-00065-BAH   Document 179-1   Filed 07/07/23   Page 20 of 47
USCA Case #23-3126   Document #2057130   Filed: 05/30/2024   Page 24 of 308

228

supposedly dead.

And Miguel Angel Trevino said *Did you see that?* And he put the MP5 -- put it in automatic and shot her to see what would happen.  And she fell.  At this point, he kept on playing with the girl, shooting her in the legs.  She was screaming for them to just take her life.

And Miguel, instead of feeling empathy  r sadness, despite from seeing a person like this, he w s showing off to all of us that he had really good aim.  He had a hard time empathizing with people.  He has no  motion.

And the girl fell to the ground and she said *I can't move anymore.*  And he was yelling at her, telling her to stand up.  And when the lady tried to stand up and she tried to push herself up and say *I can't get up any more. Please just kill me.  I can't do it.*

Q.    Did he eventually kill her?

A.    Yes.

Q.    How long did it take?

A     She would faint and then she would wake up.  And he had her playing like that for a while.  Until he finally shot her in the head.

Q.    And you said that he experimented with ways to kill people.  Did he have doctors working for him?

A.    Yes, many, and in all his cities.  They were all corrupt.

JA1266

JMGV00000048

Q.   They were working for him.  Those were the doctors that would tend to the wounded of his war against the other cartels; correct?

A.   Yes, in the war that was in Miguel Aleman, Tamaulipas, against the ones with El Golfo.

Q.   He also had them experimenting with them trying to find drugs that would kill other individuals without leaving a trace.

A.   Yes.  In an autopsy, the doctors told him that the Botox would not show trace.  It was  ty e of Botox.  I don't know which kind it is.  I don't really understand much about that.

Q.   Did he have the do tors experimenting with Botox and injections of Botox to inject individuals so that he could kill people with ut th re being a trace?

A.   So that they would die of a heart attack.  And when they were diagnosed, it would diagnose as having died of a heart attack.

Q   Did you ever see him experiment on that with live individuals?

A.   Yes, with the detainees.  They arrested and detained people all the time for being drunk at the discos.  And he told the chief or the head of the plaza -- his name was "El Flaco 24" -- and he told him to bring -- bring me the one that you don't like the most of the detainees.  And when he

JMGV00000049

230

PROTECTED MATERIAL

finally arrived, he injected him under the arm.

Q.    And did that individual die immediately?

A.    No, no.  He -- he -- he gave him an injection with a large quantity.  And there were a lot of people who were picking him up by the arm.  And he personally injected him because he liked to do them directly personally.  He loved killing people.

Q.    And he injected this detainee.  And ho  long did he linger before he passed away?

A.    About 40 minutes.

Q.    And was he happy that it  as taking that long?

A.    Yes.  He would like to see people suffer.  And more than anything, for peopl  who were really close to him, to cause fear and psychosis wit in us so that we would not betray him in the future.  Like giving us a warning that if we were to betray him, that that would happen to us, or worse.

Q.    And he was willing to kill just about anyone; correct?

A     Any of us.  He would kill all of us.  He was above everybody, at the highest of the highest level.

Q.    What about his own personal family members?

A.    Miguel's family?

Q.    Or his wife's family.

A.    Oh, yes.  When he did this experiment with the Botox, he didn't like it, and he called the doctor and he started

JMGV00000050

asking questions as to what they could do to make it faster. And before that he had also experimented with another judge from Tamaulipas. That judge would not release his nephew, Rolis, from the jail, and he had him picked up by Flaco 24. And he did the same experiment of the Botox, but it was more evolved so that he could die quicker, supposedly.

After he killed the judge, we all go dressed as PFP. He killed the judge in 2009. And ther were like seven cloned trucks of the PFP.

Q.    When you say "PFP," that's the fed ral police.

A.    The federal police people who were assigned by the president, Alvaro Colom. It was a group that was formed to combat us, the Zetas.

Q.    Anyway, so you dress up as them, you have vehicles that are similar to theirs, and what do you do?

A.    Yeah. They were identical. And we went dressed all the way to Reynosa, Tamaulipas. Because Zetas, we already had problems with the Gulf, and we went dressed that way so th t the ones from El Golfo would not stop us. They were our mortal enemies.

Arriving there, he arrived to a family member's home and busted in. And they all stayed. There were around 80 people of us that were dressed like PFP. And he gave us the order of the ones that were closest to him to go into that home.

And in the house there were a lady, and a man in a -- the wheelchair.  A 50-year-old woman.  The man was about 58 or 60.  The man couldn't move.  He couldn't even speak. He was very sick.  The lady was put into a room and the door was closed.  And they left me taking care of the man in the wheelchair.

But during one of those moments, they opened the door and I had the temptation to look in.  And I heard the lady say, *don't do it.  My daughter is going to notice*.  But I didn't know what she was talking a out   And they grabbed her between seven men, and he injected her with Botox under the armpit.  They laid her in the bed and they left her there, and we walked out

The next day, they sent us to buy black clothes. So he told me to buy black clothes and to take a -- and take a bath.  That was when we woke up from sleeping in a ranch that we were sleeping in.  I did what I was told.  I took a shower and I dressed in black, and he did, too.

And then we went to a house where the lady was there crying and crying saying, *Miguel, those dogs killed -- killed him -- killed her*.  She said *those dogs from the PFP killed my mother*.  And Miguel faked that he didn't know what they were talking about.

MR. BELDEN:  Your Honor, may we approach?

THE COURT:  Yes.  Stand by.

JMGV00000052

*(Sidebar discussion begins.)*

MR. BELDEN:  Yes.  One of the Court's interpreters, because she keeps interpreting assassins as "men," and we're not very comfortable with the interpretation.

THE COURT:  She is the government's interpreter, but she has been sworn.  Do you have a problem with her interpretation?

MR. BELDEN:  Well, I keep hearing "assas ins."

MR. GONZALEZ:  I speak perfec  Spanish, and I don't have a problem with her interception

MR. BELDEN:  But she's say ng "assassins," and it's coming back as "men."

MR. GONZALEZ:  I did 't hear that.

THE COURT   Is that the only --

MR. BELDEN:  Yeah.

THE COURT   -- issue you had?

MR. BE DEN:  Yeah.

THE COURT:  Okay.

MR. BELDEN:  I was just making sure that if she's sworn and qualified, I just don't want -- I certainly don't want my guy coming back on a writ saying that I didn't -- if she is a federally certified interpreter, that's --

MR. GONZALEZ:  She's interpreted before, yes.

MR. BELDEN:  Okay.

MR. GONZALEZ:  Like I said, I speak perfect

JMGV00000053

234

Spanish.  I haven't seen any flaw in her interpretation.

THE COURT:  Okay.  If there is anything else that comes up -- but she's been sworn.  It seems as though it's going fine.

MR. BELDEN:  Okay.

*(Sidebar discussion concludes.)*

THE COURT:  All right.  Mr. Gonzalez, y u can continue.

BY MR. GONZALEZ:

Q.    You were saying that the woman  or Miguel Trevino's wife, was accusing the PFP of k lling this woman?

A.    Yes.

Q.    Did you ever find  ut who that woman was to Miguel Trevino's wife?

A.    The wife must not know until now.  I didn't know what woman that they were talking about until I looked and I saw that it was the same woman that they had injected.  And I saw there that it was her very own mother-in-law that had been mu dered

Q.    It was his mother-in-law.  He had killed his own mother-in-law.

A.    The grandmother of his children.

Q.    So he had killed his own mother -- his own mother-in-law.

A.    That is true.

JA1272
JMGV00000054

Q.    And was portraying himself as not knowing what had happened to her.

A.    Yes, he was pretending.  And the wife was demanding that he kill those of the PFP.

Q.    Did he ever tell you why he killed his own mother-in-law?

A.    He later told me.  And then he told me that if I ever said anything, he would kill me and my family  He said that *if you ever say anything about what you saw today, I will kill you and your family.*

Q.    And what reason did he gi e you for killing his mother-in-law?

A.    The mother-in-law  as doing the role of a mother-in-law and told the children not to get in the car with their father because the government wa  after their father.  And he was afraid that if the soldiers stopped him in the middle of the Nuevo Laredo and they wanted to shoot him, and because the children were with their father, that they would get shot and mu dered -- and killed, too.

Q.    So she was trying to be a good grandmother to his kids and protect them.

A.    Yes, that is the way of it.  They told -- she told the children not to say anything to their father.  But since this five-year-old child Alfonso was very small, he told his father that the grandmother had said that, and he -- this guy

JMGV00000055

236

got really mad.  And when he heard this, that's when he started to orchestrate this malicious thing.

Q.   And is that the way Miguel Trevino operates?  When you cross him, he kills you.  When you don't do what he says, he kills you.  When you have something that he wants and you won't give it to him, he kills you.  When you have something that he wants and you won't sell it to him at the price he wants to pay you, he'll kill you.

A.   Even if I was at a party and I w s better dressed than him, he would plan to kill me.

Q.   And he was --

A.   You had to be very careful with that.

Q.   And he was also --

A.   He is a very dysfunctional person.

Q.   And he was also int  horse racing; correct?

A.   He loved it.

Q.   And when his horses under-produced or under -- didn't do well, what would he do with those horses?

A   He would take them out of their corrals and he would run over them with their trucks, with the bulletproof trucks, and go over them and over them and then play with them that way until they died.

He would kill people all day.  And he didn't have no -- he had no respect for human life, and worse with animals.

JMGV00000056

Case 1:16-cr-00065-BAH   Document 179-1   Filed 07/07/23   Page 29 of 47
USCA Case #23-3126   Document #2057130   Filed: 05/30/2024   Page 33 of 308

237

Q.    Let me bring you to May -- I'm sorry, March 20th, 2011, Allende, Mexico.

A.    Excuse me?

Q.    March 20, 2011, Allende, Mexico, the massacre that occurred there.  Were you there with him?

A.    Yes, Your Honor.

Q.    And why did that massacre occur?

A.    Because they had detained Poncho Cuell r here in Eagle Pass, Texas.

Q.    And did he pick up anyone that was associated with Mario Poncho Cuellar, or Poncho Cuellar?

A.    Excuse me?

Q.    Did he pick up the individuals -- any individual that was related to, or friends with, Mario Poncho Cuellar?

A.    Yes, even the friends of his children from school.

Q.    And were they taken to a location to be interrogated?

A.    Well, I saw one.  But days before that, Omar Trevino, Z-42, had already killed several people related to Poncho Cu llar.  Neighbors.  Where the wife went to the gym, the owners of the gym.  Where Poncho Cuellar would go to a restaurant, the owners of that restaurant.  The owners of the place where the wife would go buy clothes.  Anything that had anything to do with Poncho.  This a lot of innocent people.  And I was witness to one of those tragedies.

Q.    What was it that you saw?

JA1275

PROTECTED MATERIAL

A.    In the football field, it was around -- it was 9:00 p.m., there were about -- there were many Zeta trucks, about 30.  Around 80 to a hundred Zetas with vests and long arms, there were a lot of them walking up and down.  And there were about 20 blindfolded people in line, all standing:  Owners of the gym; owners of restaurants; friends of the sons of Poncho; his friends from school.  Miguel was telling me this with the paper in the truck.  He was saying, *there s everything here, Carlitos, friends and everything.*

He's always taking advant ge of the situation to cause a psychosis between us.  There were women.  At a distance, I could see kids that were 15, 20-years old.  I couldn't see very well.  They were at a distance from here to that big TV.  It was a long line of blindfolded people and everything.  And they were questioning them and investigating them about Poncho Cuellar's family, about his wife, the children, about Poncho, family members of Poncho.  And, well, the people would defend themselves by saying they were just cl ents from the gym or the restaurants.

And since Miguel didn't realize that they really didn't have any good information for him, he just told -- Miguel told his brother, Omar, *kill them all.*  And when people heard that order, they started to cry and to scream. *Please, we have nothing to do with Poncho.  Don't kill us, please.  I have a family.  I have kids.*  And they would hug

JMGV00000058

239

each other, lay on the ground.  And Omar would give them the orders to *lift them up, lift them up.*  Commander Peluchin, 20, would pick them up.  They would pick them up.  And they would cry, they would hug each other.  They would lean on each other emotionally.

Q.    And did he kill them?

A.    All of them.  He had to reload his -- his firearm twice.  There were so many that he had to reload it twice.

Q.    And that was because they were in some way connected to Poncho Cuellar?

A.    Yes, that's true.

Q.    And did you also see the destruction of the property belonging to Poncho Cuellar?  Were they ransacking and destroying the properties th t Poncho Cuellar owned in that area?

A.    Yes.  I saw the destruction of one of his ranches and a home in Nava, Coahuila, and a ranch that he had near Zaragoza.  They put it on fire.  And they took all the fu niture out of the house.  Because Poncho Cuellar loved opulence, he had a lot of art, he had a home that was worth over $5 million in Nava, Coahuila.

        And Omar had several trucks come to pick up the beds and art.  And then he had them bring a machine with a ball and a chain.  And the machine was there for about three days destroying the house.  Miguel would go every day to eat

JA1277

JMGV00000059

tacos near there, in the street, so that he could monitor the destruction.  They were men of destruction.  He liked to destroy.

Q.   All right, Mr. Guizar.  Let's focus back on the defendant here.

You said that you were aware, based on your position with the cartel as being one of the top leaders, that he was one of the top producers, he and Poncho Cuellar were the ones that were selling the most cocaine.

A.   Yes, they were the preferred  f th  cartel of the Zetas.

Q.   Was there ever an occasion where you saw them counting large sums of money?

A.   Yes.

Q.   Tell us ab ut th t  ccasion where you saw the defendant present and there was counting of large quantities of money.

A.   We were in a house in an enclosed area, large area; 40 and 42 were there.  Pepito Sarabia was there.  Navia and Papiruchis  And there were many of my cousins and many, many Zetas more.  The house was full.

Poncho arrived and Vecino arrived.  They were taken with three trucks.  They left the trucks parked inside because the land was covered with our trucks, with our vehicles.  They set up a table, long line -- a long table like that one, and they set up the money counting machine.

JMGV00000060

There were three or four machines.

And Poncho Cuellar and El Vecino arrived with like three or four other people, and they started to count money and we were there all day with Omar.  They labeled all the packets with W, because that was going to Comandante W.

They were counting the money all day there, packaging, wrapping them with rubber bands, label them with 2,000, 10,000, 20,000, 50,000, and hundred-thousand increments.  They would put them in pa kages and seal them.

I remember it was between 15 and $21 million dollars.  I'm not quite sure.    don't really remember.  They put it all together there.  They put it all in line and they accommodated it.  They p t it all together.  And Poncho Cuellar told Omar *I'm giving you this amount of millions of dollars, Command r 42.  I need you to confirm it.*

And Omar came up and confirmed and counted the packets.  And he began to add it and to multiply and add it all up.  And Poncho asked *Are we in agreement, commander?*

And he said, *yes, it's about 18 or 21 million.*  I can't remember what he said.

Q.    And did the defendant Vecino help him?

A.    Exactly.  He also had a ledger he was writing in.  And that was a debt that they had with Omar Trevino Morales and Miguel for the delivery that they were doing for them, of the tons of cocaine that they were doing for them.  It was a

JMGV00000061
PROTECTED MATERIAL

payment for the debt that they had with the brothers Trevino.

Q.    When you say *they*, you say *they* because the defendant and Poncho Cuellar were partners.

A.    Yes, partners.  Yes.  Yes, partners.  And this man was his right-hand man.  This man here was not just any worker, he was one of the closest for people and a partner.  I can identify other people that were just simple workers, but this man I can identify as a person that's very close to him as a partner, a very close partner.  He was a leader of the drug trafficking group that was in charg  of trafficking thousands and thousands of kilos of cocaine from Piedras Negras to different cities in Texas.  He was made partner of Cuellar. He was not just a common worker

MR. GONZALEZ:  That's all I have.  I pass the witness.

THE WITNESS:  I want to say something.

THE COURT:  For the witness, I'm sorry, but you can't provide any testimony unless you're answering a qu stion of Mr. Gonzalez.

Mr. Belden, I think we may take a short -- how long do you think you're going to have?

MR. BELDEN:  A short break will be fine.  I am going to be a little bit with this guy.

THE COURT:  All right.  Because we're at ten to four.  We're going to take about a ten-minute break and we'll

JMGV00000062

come back at four o'clock.

THE COURT SECURITY OFFICER:  All rise.

(Recess taken.)

THE COURT:  Please be seated.

All right.  When we had left off, Mr. Belden, you were going to begin your cross-examination of Mr. Valencia.  And you can proceed when you're ready.

CROSS-EXAMINATION

BY MR. BELDEN:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   It's undisputed that you're a Zeta at the top of the food chain; is that corr ct?

THE COURTROOM DEPUTY:  (Indecipherable.)

THE COURT:  Oh  I think you might want that on.

BY MR. BELDEN:

Q.   It's undisputed that you're a Zeta at the top of the food chain; is that correct?

A    Yes, that is true.

Q.   You're up -- you're on the same level as the Trevino brothers, Mr. Lazcano; is that correct?

A.   That is true.

Q.   Did Taliban ever make that level?

A.   Taliban, well, he was higher up than I was.

Q.   And to be a Z, is it a fair statement that you have to

JMGV00000065
PROTECTED MATERIAL

commit a murder?

A.    No.

Q.    Okay.  Have you committed any murders?

A.    That is a myth.

Q.    Okay.  Have you committed any murders?

A.    Never.

Q.    So is it your statement to the Court that you've just been present as an extremely high-ranking member at all these murders and all these massacres, but y u've never participated?

A.    Yes, that's true.  I've n ver participated in killing anybody directly.

Q.    Okay.  Have you helped them kill anybody?

A.    No.  And I've never even given the order because that was not my role.  My r le was to get kilos of cocaine.

Q.    And the massacre in Guatemala --

A.    And they have their own role.

Q.    So you're telling the Court that even if you are a hi h-ranking, top-level Zeta member, that it's not required that you have murdered anybody or assisted murders when requested?

A.    In the cartel of the Zetas, it wasn't that way.  You didn't have to kill anybody to get up that high.  You could show yourself another way.

Q.    And in most organized criminal units, you can rise by

JA1282

JMGV00000064

being a good earner; is that correct?

A.    How is that?

Q.    By being a good earner, by making a lot of money for the organization?

A.    There are very many ways.  One of those ways is that way.

Q.    Okay.  What are the other ways?

A.    Be a good chief of plaza, know how to handle the operatives and the police that you pay

Q.    Okay.  Basically be a good buiness manager?

A.    Yes.  You could say like  municipal police.

Q.    Okay.  And how did you specifically earn your Z?

A.    I earned that because of the influences that I had in Guatemala.  I knew the narco trafficking world in Guatemala.

Q.    And how long have you been in the narco trafficking business?

A.    I started more or less in 2006.

Q.    How old were you in 2006?

A    Twenty-six years old.

Q.    When you say you met Mr. Hugo Chavarria, where did you meet him?

A.    Who?

Q.    Hugo Roman, the defendant here today.

A.    Oh, Vecino.

Q.    When did you meet him?

JMGV00000065

A.   More or less in 2009.

Q.   And where did you meet him?

A.   I met him at the house where they were counting money also, but I had already seen him before.

Q.   Okay.  And would it not be logical for even lower-level people to count money when they're dealing with Miguel and Omar Trevino?

A.   Wouldn't it be logical to what?

Q.   For lower-level people to take d tailed accounts of money that they're transferring within the cartel?

A.   Miguel Angel Trevino Mora es was the one who was writing stuff down.

Q.   Okay.  Didn't you say that Vecino was writing things down?

A.   Yes.

Q.   Okay.  And wouldn't that be wise of him when doing business?

A.   Well, in this business accounting is vital, you have to wr te it down.

Q.   Okay.

A.   There has to be an accounting.

Q.   And if he didn't account for his money properly or if he didn't account for his drugs properly, that could get him killed.

A.   I'm confused.  Just a moment.  I didn't understand your

JMGV00000066

question.

Q.    If he didn't account for his money or drugs properly, that could get him killed.

A.    Yes, also it's happened.

Q.    And in fact, I mean, you -- many people have reportedly been killed because Z-40 or Z-42 thought they owed him money.

A.    Yes.  They kill people left and right.

Q.    Okay.  And one of the main reasons is because they think they shorted them money, or stol money, or there was another problem with the money.

A.    Yes, that was one of the  easons, but that wasn't the only reason or the major reason.  There are lots of reasons.

Q.    Okay.  And the entire time that you were dealing with -- let me rephrase.

How many times would you say you had ran into Hugo, the defendant here, during your time working with the Zetas?

A.    I saw him about three times, if not more.  Maybe more.

Q.    And has the Zeta cartel always, to your knowledge, been at war with the Sinaloa cartel?

A.    When I came in, yes.

Q.    Okay.  Are they still at war?

A.    As far as I know, yes, but I've been gone for a while.

Q.    Okay.  How long have you --

A.    If they're still going.  But there was a time in 2007 when they had a truce.  The truce lasted around nine months.

JA1285

JMGV00000067

It was in public domain.  That truce was in public domain.

Q.    And after nine months they went back to war, and they've been continuously at war, to your knowledge?

A.    I don't know how they are now because ever since I've been -- since I've been free, I removed myself.

Q.    Okay.  Now, the times you met Mr. Chavarria, are you telling us he was a leader because you saw him counting money and because other people told you this?

A.    Because Miguel Angel Trevino Mor les kept on saying that, and Omar, too.  And I was with them all the time.  That's why I know it.  That's why I know the hierarchy of this person.

Q.    Okay.  They said that Poncho was running all the best drug business in Dallas; is that correct?

A.    He was the favorite client of the cartel, the one who distributed the most drugs of all.

Q.    And did you ever personally experience any business interactions between Poncho and Hugo, other than the money be ng counted that one time?

A.    Another interaction?

Q.    As far as business goes.

A.    Drug deliveries.

Q.    Okay.  And who did you deliver to on that occasion?

A.    To Poncho Cuellar, and other workers showed up, and also this individual, too.

JA1286
JMGV00000068

Q.   Okay.  You personally delivered that drug load?

A.   Omar and Miguel arrived.  That drug had -- those drugs had just arrived from Guatemala.  And it was delivered to a ranch that was on the outside of Piedras Negras that bel nged to -- that was in Piedras Negras.  It was a ranch that belonged to Poncho Cuellar that's right on the outside of Piedras Negras, around 5 kilometers.  We used to go there a lot to sleep, with Miguel, and that's where  he delivery was made.

Q.   Okay.  So this ranch was owned by Poncho Cuellar; is that correct?

A.   I don't know if he was the owner or if he rented it.

Q.   Okay.  Now, wouldn t it be logical that if Hugo -- if El Vecino, as you know him, was partners with Poncho Cuellar, that he would have been killed in 2011?

A.   Well, it's my understanding that someone spoke for him.

Q.   Okay.

A.   So that they wouldn't kill him.

        MR. BELDEN:  One moment, Your Honor.

        (Pause in the proceedings.)

BY MR.  BELDEN:

Q.   You're hoping to get a benefit out of your testimony here today; is that correct?

A.   I have the hopes that in the future I can do that, but I have not been offered anything.

JMGV00000069

Case 1:16-cr-00065-BAH   Document 179-1   Filed 07/07/23   Page 42 of 47
USCA Case #23-3126   Document #2057130   Filed: 05/30/2024   Page 46 of 308

250

Q.   Okay.  Do you have an attorney?

A.   Yes, I have an attorney.

Q.   And has that attorney explained to you how the federal sentencing process works?

A.   Not yet, because he's from McAllen and he hasn't come to see me.

Q.   Okay.  Has anyone explained to you how the federal sentencing process works?

A.   More or less.

Q.   And you understand that if you testify to the benefit of the government, that you can receive a third or half off your sentence?

A.   No, I didn't know  hat.

Q.   Have you met with the government before?

A.   Yes.  The prosecutor has gone to see me.

Q.   And did he not explain to you how the federal sentencing process works?

A.   No, none of that.  He has not offered me any years, any re uction in sentence or anything.

Q.   Okay.  Have you pled guilty in this case?

A.   I'm guilty, just as this person here is guilty, of the crimes that I've committed outside.

Q.   Okay.  And but have you legally entered a plea in this case?

A.   Yes.  By declaring these facts that I've participated

JMGV00000070

in, I am declaring myself guilty.

Q.   Okay.  Now, how long have you been in the United States?

A.   I've been here for about a year and five months since I've arrived, or maybe a little bit more.

Q.   Now, you said you were trained as a military Zeta; is that correct?

A.   Well, I did go to the trainings, but I don't know if you could call it military training because it was only for about 15 days.  More than anything, it was shooting, just like any other person, like the person who goes hunting to kill deer.  I saw the training because we did like to go watch it, but I wasn't a complete part of it.

MR. BELDEN:  I'll pass the witness, Your Honor.

THE COURT:  Thank you, Mr. Belden.

Anything further, Mr. Gonzalez?

MR. GONZALEZ:  Just a couple of questions, Your Honor

REDIRECT EXAMINATION

BY MR. GONZALEZ:

Q.   Sir, you kept saying *this person*, *this person*, *this person*, when you were referring to the defendant, but you know him by his alias as "El Vecino"; correct?

A.   Yes, that's true.

Q.   And the person that you know as El Vecino, can you tell

JMGV00000071

us what he's wearing?

A.    He's in stripes as a prisoner, the same as me.

Q.    What color are the stripes?

A.    Gray with white.

        MR. GONZALEZ:  Your Honor, may the record reflect that he's identified the defendant.

        THE COURT:  The record will reflect that Mr. Guizar Valencia has identified the defendant.

BY MR. GONZALEZ:

Q.    And there was, lastly, something that you said you wanted to tell me right before the cross-examination.  What was it that you were wanting to tell me?

A.    The kilos that we got in Guatemala has two marks, two stamps.  Miguel would personalize them as he chose.  Some kilos had "200" on them.  And others had "XL."  The Roman numerals meant 40.  In honor of Zeta 40, he numbered them that way for him.

Q.    Okay.

A.    That was the line that the Zetas were running.

        MR. GONZALEZ:  Okay, thank you.

        THE COURT:  All right.  We're going to go ahead and excuse Mr. Valencia at this time.

JMGV00000072



THE COURT SECURITY OFFICER:  All rise.

(Recess taken.)

THE COURT:  You can be seated

All right.  So we brought Mr. Guizar Valencia back to the stand.  And, Mr. Guizar Valencia, you remain under oath.

Mr. Belden, you have a few more questions to ask Mr. Valencia, and you  an proceed.

MR  BELDEN:  Yes, Your Honor.  Thank you.

JOSE MARIA GUIZAR VALENCIA,

recalled as a witness, was previously sworn.

RECROSS-EXAMINATION

BY MR. BELDEN:

Q.    Mr. Valencia, have you ever been convicted of a felony?

A.    No.

Q.    In any country?

A.    No.

Q.    What about theft or similar crime?

JMGV00000073

A.    No -- yes, I mean.  I'm sorry.  Yes, I do have a sentence in Mexico.

Q.    Okay.  And what was that sentence?

A.    For a gun.

Q.    When were you found with a gun in Mexico?

A.    Well, the Marines planted it on me when they ca tured me.  It wasn't mine.

Q.    Okay.  And what year was that?

A.    In 2018.

Q.    Okay.  Was that when you were originally arrested in this case?

A.    Yes, that's true.

Q.    Okay.  And one las  question.  Mr. -- or El Vecino, as you know him, doesn't have a Z or a Z number; is that correct?

A.    That I know of  no.

        MR. BE DEN:  Okay.  No further questions, Your Honor

        THE COURT:  Thank you, Mr. Belden.

        And I assume nothing further from the government.

        MR. GONZALEZ:  No, Your Honor.

        THE COURT:  All right.  Mr. Valencia, you are excused.

JMGV00000074

CERTIFICATE OF OFFICIAL REPORTER

I, Gayle Wear, Federal Official Court Reporter, in and for the United States District Court for the Eastern District of Texas, do hereby certify that pursuant to Section 753, Title 28 United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conforman e with the regulations of the Judicial Conference of the United States.

Dated 12th day  f August 2021.

/s/ Gayle Wear
GAYLE WEAR, RPR, CRR
FEDERAL OFFICIAL COURT REPORTER

PROTECTED MATERIAL

JA1293
JMGV00000075

# **EXHIBIT G**

#28



EMR00000231

# **<u>EXHIBIT S</u>**

JA1296

**Sentencia Nro. 13/2017**                                    IUE 474-76/2016

Montevideo, 28 de Agosto de 2017

**VISTOS:**

Para sentencia definitiva de primera instancia estos autos caratulados **"GONZÁLEZ VALENCIA, Gerardo.- EXTRADICIÓN IUE 474-76/2016,** con la intervención del sr. Fiscal Letrado Nacional en lo Penal Especializado en Crimen Organizado de Segundo Turno Dr. Luis Pacheco y la Defensa de Confianza Dr. Víctor Della Valle y Dr. Carlos Balbi.-

**RESULTANDO:**

1) El 16 de junio de 2016 se recibió en esta sede solicitud de extradición de Gerardo González Valencia remitida vía diplomática por el Departamento de Justicia de Estados Unidos de América (fs. 1-107).

Previa vista del Ministerio Público, por providencia n° 701/2016 del 27 de junio de 2016, la sede realizó objeción a la solicitud por inobservancia de presupuestos de admisibilidad dispuestos por el art. 10 numeral 5 literal a) del Tratado de Asistencia Mutua en materia Penal y Extradición (ley n° 15.476) y exigió al Estado requirente el cumplimiento de tales requisitos así como información complementaria de acuerdo al art. 11 primer párrafo in fine del mismo Tratado (fs. 108-114).

2) El 2 de febrero de 2017 se recibió documentación remitida vía diplomática por el Estado requirente (fs. 125-131).

Por dictamen n° 156/2017 del 23 de febrero de 2017, el representante del Ministerio Público entendió cumplidos los requisitos necesarios para dar trámite a la solicitud de extradición (fs. 132 vto.-135).

Por resolución n° 181/2017 del 3 de marzo de 2017 y de conformidad con el dictamen fiscal, se dio inicio al proceso de extradición de acuerdo a las previsiones de los Tratados de Montevideo, específicamente los arts. 33 a 37 del Tratado de Derecho Penal Internacional de 1940 -aplicables por analogía en el caso de acuerdo a los principios del debido proceso y reglas que informan el proceso en general, en lo que no estuviere expresamente previsto (fs. 136-137).

00054527

3) En audiencia convocada –la cual fuera prorrogada en dos oportunidades a solicitud del propio requerido- y en presencia de su defensor, Gerardo González Valencia no aceptó la extradición solicitada (fs. 141-160).

Conferida vista del requerimiento formulado por las autoridades estadounidenses, la Defensa de Confianza del requerido compareció a deducir oposición, por las razones que se exponen en fundado escrito presentado en tiempo y forma, con documentación adjunta (fs. 161-220).

4) Por su parte, por dictamen n° 682/2017 del 12 de junio de 2017 el representante del Ministerio Público abogó por acoger la solicitud de extradición supeditada a las condiciones que establece (fs. 222-227).

5) Por auto n° 682/2017 del 15 de junio de 2017 la Jueza subrogante de la sede citó a las partes para resolución, habiendo subido los autos al despacho con fecha 23 de junio de 2017 (fs. 228-230 vto.).

**CONSIDERANDO:**

1) Se sustancia en estos obrados el proceso de la extradición solicitada por las autoridades competentes de los Estados Unidos de América respecto de Gerardo González Valencia a fin de ser sometido a proceso penal en dicho país por cargos de narcotráfico.

La extradición constituye un instituto de cooperación jurídica penal internacional, entendida como "toda aquella actividad de naturaleza procesal realizada en un Estado al servicio de un proceso penal promovido o a promoverse ante extraña jurisdicción". Cooperación que se hace efectiva "cuando el aparato jurisdiccional de un Estado, que no tiene imperio sino dentro de su territorio, recurre a la colaboración que le pueden prestar otros Estados a través de su actividad jurisdiccional" (Vieira, M., García Altolaguirre, C.- Extradición, FCU, ps. 108-109). Por su parte, sostiene el Prof. Miguel Langón que la extradición es la máxima expresión del principio de cooperación jurídica internacional entre los Estados en la lucha contra la delincuencia, consagrándose una verdadera obligación del Estado requerido de acceder al pedimento respectivo, dentro de los límites convencionales y legales en su caso (Curso de Der. Penal y Procesal Penal, ed. Del Foro, año 2003, ps. 119-121; Cfme. Cairoli, M. La cooperación penal internacional, la asistencia mutua y la Extradición, FCU, año 2000, p. 59).

En el mismo sentido se ha pronunciado la jurisprudencia nacional, afirmando pacíficamente que "la extradición como tal instituto se ubica modernamente dentro de la cooperación judicial penal internacional, la cual necesariamente debe ser encarada como un estatuto global integrado de solidaridad y garantías y a su vez habilita a visualizar a aquélla como un estatuto global de auxilio interestático y de garantías" (Rev. Der. Penal, n° 20, c. 146. p. 574).

JA1298

00054528

Estos principios han sido recogido por numerosos tratados, los que consagran la obligación de los Estados de conceder la extradición cuando se cumplan las condiciones que se establecen, a modo de ejemplo: el Tratado Modelo de Extradición aprobado por la Asamblea General de las Naciones Unidas el 3 de abril de 1991, la Convención de Viena de 1988 sobre tráfico internacional de drogas, el Tratado de Extradición y Cooperación en Materia Penal entre la República Oriental del Uruguay y los Estados Unidos de América ratificado por nuestro país por dec-ley n° 15.476, el Tratado de Extradición entre Argentina y Uruguay ratificado por nuestro país por ley n° 17.225, el Acuerdo de Extradición entre los Estados partes del Mercosur ratificado por Uruguay por ley n° 17.499.

En mérito a todo ello, es indiscutible que existe una obligación internacional de extraditar a las personas reclamadas que se encuentren en las condiciones previstas en la normativa aplicable y de acuerdo a los principios que rigen la extradición.

2) El régimen de la extradición se regula en primer lugar por los Tratados ratificados entre los países, los cuales son "ley entre las partes". En defecto de Tratado, nuestro ordenamiento interno prevé el régimen de extradición en el art. 13 del C.P. y el art. 32 del C.P.P (Langón, ob. cit., ed. 2003, p. 128-129).

En el caso de autos es de aplicación el Tratado de Extradición y Cooperación en Materia Penal entre la República Oriental del Uruguay y los Estados Unidos de América, suscrito en Washington el 6 de abril de 1973 y aprobado por nuestro país por el dec-ley n°15.476 del 26 de octubre de 1983. Ello sin perjuicio de la aplicación de los principios generales del debido proceso y específicamente los principios que rigen la extradición.

El Tratado no establece el procedimiento a seguir ante el pedido de extradición sino que éste se rige por la *lex fori*, esto es, la de la nacionalidad del juez que conoce en el asunto: en la especie, la legislación uruguaya. El Código del Proceso Penal vigente en nuestro ordenamiento tampoco regula el proceso de extradición, por lo cual la jurisprudencia, en forma prácticamente unánime, aplica el procedimiento previsto en los Tratados de Montevideo de 1989 y 1940, en vía analógica.

En mérito a ello, en estos obrados se dio cumplimiento al procedimiento establecido en el capítulo IV del Tratado de Montevideo de 1989, lo cual fue consentido por las partes quienes no formularon objeción al respecto.

Solamente cabe agregar que es actualmente unánime la jurisprudencia en entender que la sentencia a dictarse tiene naturaleza definitiva, desde que pone fin al proceso de extradición, proceso principal y único. Según expresara el Tribunal de Apelaciones de Primer Turno, "el juicio extraditorio configura un procedimiento contradictorio cuyo objeto principal y exclusivo es un fallo declarando la procedencia o improcedencia del requerimiento del país extranjero"

JA1299

00054529

(Rev. Der. Penal, n°11, c. 453, p. 319). Por lo tanto, el plazo para su dictado es el previsto en el art. 90 inc. 2° lit. A del C.P.P.

3) El objeto del proceso extraditorio consiste en controlar la regularidad formal de la demanda, no correspondiendo al Tribunal del Estado requerido proceder a la valoración del fondo del asunto, lo cual constituiría una invasión de las atribuciones de la autoridad requirente –sin perjuicio del eventual análisis del cumplimiento del requisito *non bis in idem* si correspondiere. Como ha señalado reiteradamente nuestra doctrina y jurisprudencia, el proceso de extradición no valora las pruebas de culpabilidad, no decide la antijuridicidad de la conducta del requerido ni resuelve el fondo del asunto, sino que todo el examen se reduce a la simple verificación de la regularidad de la demanda de extradición, a la luz de las disposiciones internacionales y nacionales aplicables en cada caso.

Esta ha sido la posición constante de la Suprema Corte de Justicia, afirmando en sentencia n° 51/2010 que: "...En el procedimiento de extradición, lo único que debe valorarse es la legitimidad formal del pedido, puesto que toda otra consideración acerca del fondo, es decir de la tipicidad del o de los delitos por los que se cursa la solicitud, son absolutamente violatorias del principio de competencia de las autoridades requirentes. Los tribunales del país requerido que aceptan o no el pedido de extradición no son competentes para juzgar el mérito de la causa. En tal sentido De Olarte en su tratado sobre 'Extradición', pág. 49, afirmaba que el Juez que interviene no es convocado para declarar la inocencia o culpabilidad, porque 'la extradición no importa juicio ni castigo', limitándose su función a verificar si la solicitud es ajustada a las formalidades y exigencias sustanciales del Tratado Internacional ratificado por los dos Estados..." (Cf. sentencias de la Suprema Corte de Justicia n° 154/999, n° 184/001, n° 216/003, n° 191/005, n° 41/006, n° 219/007, n° 32/2010 entre otras).

En consecuencia, esta sentencia deberá pronunciarse exclusivamente respecto de la procedencia formal de la solicitud de extradición, analizándose para ello los Tratados aplicables en el caso.

4) Analizadas las resultancias de las presentes actuaciones a la luz del citado Tratado de Extradición y Cooperación en materia penal que vincula a nuestro país con Estados Unidos de América, resulta que la solicitud cumplió las formalidades exigidas por el art. 10, a saber:

a) se tramitó por vía diplomática, desde que González Valencia fue requerido formalmente por las correspondientes autoridades judiciales de los Estados Unidos de América ante la Cancillería de nuestro País y la Suprema Corte de Justicia (fs. 1-8 y 100-107);

b) la petición contiene una relación circunstanciada del hecho incriminado (fs. 12-18 y fs. 32-35 y las respectivas traducciones a fs. 57-63 y fs. 77-80);

c) se adjunta la documentación necesaria para la identificación del requerido (fs. 46-53 y

Protected Material

traducción a fs. 91-99) y la normativa aplicable (fs. 20-30 y traducción a fs. 77-80);

c) se acompaña la orden de detención o de prisión dictada por la autoridad competente del Estado requirente (fs. 37 traducida a fs. 82).

d) se acompaña traducción al español de toda la documentación remitida, según se detallara en literales anteriores.

En relación a la previsión del art. 10.5 literal a del Tratado, los documentos se encuentran firmados por las autoridades competentes y cuentan con la certificación y el sello del Departamento de Estado de los Estados Unidos de América (fs. 9, traducido a fs. 54). Si bien no cuentan con la legalización por agente diplomático o consular de la República Oriental del Uruguay en los Estados Unidos de América, se entendió, de conformidad con el dictamen fiscal nº 156/2017, que dicho requisito no es exigible de acuerdo a lo dispuesto por el Convenio Suprimiendo la Exigencia de Legalización de Documentos Públicos Extranjeros, suscrito en la Haya en el año 1961 y aprobado por nuestro país por ley nº 18.836 del 15 de noviembre de 2011. Sin perjuicio de lo expuesto, cabe señalar que este punto no fue cuestionado por la Defensa del requerido.

5) Asimismo resulta de se cumplen los presupuestos exigidos en los arts. 1 y 2 del Tratado, que consagran los principios generales en materia de extradición: jurisdicción del Estado requirente, doble incriminación y gravedad de la pena. A saber:

a) Gerardo González Valencia es requerido por la comisión de delitos perpetrados en el país requirente (fs. 77-78), de acuerdo a lo previsto en el art. 1º del Tratado, por lo cual es indiscutible la jurisdicción de las autoridades competentes de dicho país.

b) El requerido es acusado por la comisión de delitos de narcotráfico, específicamente conspiración para introducir y distribuir sustancias que contenían cantidad detectable de cocaína y metanfetamina en Estados Unidos (fs. 77-78), lo que encuadra en la previsión del art. 2 nº 17 del Tratado. Delitos que también están previstos en nuestro ordenamiento nacional, de acuerdo a las tipificaciones establecidas en los arts. 31 a 33 y 59 del dec-ley nº 14.294 (en su actual redacción dada por la ley nº 17.016).

La condición referida en este literal consagra el principio de doble incriminación, el cual exige que "la imputación por la cual se solicita laextradición, esté también tipificada como delito, en el orden jurídico del Estado requerido, apreciándose ello con la debida flexibilidad y aun cuando no existiera el mismo *nomen iuris* en los tipos. Es decir, que lo exigible, es que el hecho y la forma de participación en el mismo, por el que la persona es reclamada, debe estar previsto como delito por la ley de las dos partes contratantes, aunque tengan distinta denominación y aunque el tipo delictivo tienda eventualmente a proteger distintos bienes jurídicos en ambas legislaciones

00054331

... la calificación de la conducta, debe realizarse en el marco de las disposiciones convencionales creadas por la voluntad de las partes, dicho de otra manera, *in ordinem* como enseñaba Alfonsín" (Viera y otro, ob. cit., p. 427).

c) Los delitos por los que se lo reclama son castigados en ambos países con pena mínima de prisión superior a un año, tal como exige el acápite del art. 2 del Tratado: en nuestro país, los arts. 31 y 34 del dec-ley n° 14.294; en el país requirente, se sanciona la conducta que se pretende imputar al requerido con penas no menores a diez años de privación de libertad (fs. 71-72). Se cumple así entonces el principio de gravedad de la pena.

6) Por último, la solicitud de extradición no encuadra en ninguna de las hipótesis previstas en el art. 5 del Tratado en las cuáles la extradición no es procedente.

En relación a la hipótesis prevista en el literal a del art. 5, la misma consagra el principio *ne bis in ídem*. Este principio significa que nadie puede ser juzgado ni condenado dos veces por el mismo delito. Así expresó el Dr. Armando Tommasino: "La disposición impide el doble enjuiciamiento, y aunque no lo expresa, naturalmente también ... la condena reiterada a un mismo individuo, por atribución del mismo hecho penal" (Principios, Derechos y Garantías en el Proceso, p. 63). El mismo principio vigente en el Derecho Nacional ha sido recogido en los Tratados de Extradición y aun cuando así no sea, se ha entendido que está "implícitamente consagrado en las disposiciones del art. 14.7 del Pacto Universal de los Derechos Civiles y Políticos que expresa: 'nadie podrá ser juzgado o condenado ni sancionado por un delito por el cual haya sido condenado o absuelto, por una sentencia firme de acuerdo con la Ley y el procedimiento penal de cada país'. Norma que ha sido tomada, aunque con algunas variantes, en el Pacto de San José de Costa Rica (art. 8.4) y constituye en nuestra opinión el de ser una norma de *ius cogens* internacional (Vieira-Altolaguirre, "Extradición", Pág. 200).

El Tratado de Extradición celebrado entre Estados Unidos y Uruguay recoge en el principio mencionado, al disponer que no se concederá la extradición: "a) cuando la persona cuya entrega se gestiona ya hubiera sido juzgada y condenada o absuelta o estuviere siendo juzgada en el territorio del Estado requerido por el delito por el cual se solicita la extradición".

Al respecto corresponde señalar que si bien Gerardo González Valencia registra causa penal abierta en nuestro país, la solicitud de extradición no incurre en violación del principio *ne bis in ídem*, desde que no refiere a los mismos hechos por los cuales está siendo juzgado en nuestro país. En efecto, el requerido se encuentra sometido a proceso penal ante este Juzgado Letrado Penal Especializado en Crimen Organizado de Primer Turno en autos IUE 2-37467/2016, imputado de la comisión de un delito de Lavado de activos previsto en el art. 54 del dec-ley n° 14.294, en su actual redacción dada por el art. 2 de la ley n° 18.494. No se le imputa en dicho proceso la comisión de delito de narcotráfico en ninguna de sus modalidades. Por lo cual la hipótesis no encuadra en la previsión del art. 5 literal a del Tratado.

00054532

En relación a la previsión del art. 5 literal c, que dispone que no se concederá la extradición "cuando la acción o la pena haya prescrito según las leyes del Estado requerido o requirente", se comparten las consideraciones de la Fiscalía en cuanto entiende que no ha operado la prescripción de los delitos por los cuales se requiere a González Valencia. Sin perjuicio de lo que se dirá más adelante al analizar las objeciones formuladas por la Defensa del requerido.

Resulta claramente de autos que la solicitud de extradición de González Valencia no encuadra en ninguna de las restantes hipótesis previstas en el art. 5 ya citado.

7) En suma, entiende la sentenciante que la extradición solicitada reúne los requisitos formales exigidos por el Tratado de Extradición que vincula a nuestro país con el Estado requirente y no encuadra en ninguna de las hipótesis de improcedencia de la solicitud antes mencionadas.

Sin perjuicio de ello, esta sentencia deberá resolver las cuestiones planteadas en la oposición formulada por la Defensa de Confianza de González Valencia, que fueran claramente reseñadas en la contestación del Ministerio Público, a saber: a) que el Tratado de Extradición refiere a personas procesadas o condenadas, lo cual no se configura en la especie y se trata de un juicio en rebeldía; b) que la declaración jurada presentada por el país requirente está viciada; c) que la declaración jurada no presenta evidencia que respalde ningún delito ocurrido dentro de los cinco años de la fecha del procesamiento por lo que ha operado la prescripción; d) que la declaración jurada no presenta evidencia y solo contiene afirmaciones de dos testigos colaboradores, respecto de los cuales omite información sobre su credibilidad; e) que el requerido enfrenta riesgos de ser condenado a muerte o a cadena perpetua.

8) En primer lugar, tal como señala la Defensa, el art. 2 del Tratado dispone que "serán entregadas las personas procesadas o condenadas por cualquiera de los delitos siguientes ......". Por otra parte, el art. 10.3 establece, entre los requisitos exigidos a la solicitud de extradición, que "cuando el requerimiento se refiera a una persona que aún no ha sido condenada, deberá ser acompañado de una orden de detención o de prisión o del auto de procesamiento judicial equivalente, emanado de la autoridad competente de la Parte requirente".

En este sentido, se comparte la posición de la Fiscalía, entendiendo que es admisible la solicitud de extradición cuando la persona aún no se encuentra "procesada" desde que alcanza para su requisitoria la orden de detención y teniendo en cuenta que el término "procesado" puede tener significado diverso en cada sistema procesal.

También se discrepa con la Defensa desde que, a juicio de la suscrita, no se ha cumplido respecto del requerido un juicio en rebeldía en el país requirente. De la documentación recibida resulta que con fecha 19 de abril de 2016 un jurado indagatorio del Distrito de Columbia presentó una acusación contra González Valencia por el cargo de conspiración para la introducción y distribución de sustancias estupefacientes en Estados Unidos (fs. 77-80). En mérito a dicha

JA1303
00054533

acusación, el Tribunal de Distrito de Estados Unidos para el Distrito de Columbia libró la orden de detención correspondiente (fs. 82).

La declaración jurada de la Fiscal Litigante de la Unidad contra Narcóticos y Drogas Peligrosas de la División Penal del Departamento de Justicia de Estados Unidos Amanda Liskamm reseña claramente cuál es el procedimiento a seguir por el jurado indagatorio: el mencionado jurado examina las pruebas presentadas por las autoridades del orden público y en caso de entender que existen indicios suficientes para determinar que el hecho delictivo se ha cometido y que el acusado es el autor, dicta una "resolución de acusación" (fs. 58 numeral I). Ese fue el procedimiento seguido respecto de González Valencia, de acuerdo a lo reseñado en el párrafo anterior.

Esto en modo alguno significa que se haya sustanciado un proceso penal contra el requerido, sino que como se especifica en la declaración de la Fiscal Litigante "para que se profiera una sentencia condenatoria en contra de González Valencia ...... Estados Unidos debe demostrar en el juicio que González Valencia llegó a un acuerdo ...." , esto es, el Estado deberá acreditar en juicio los hechos invocados en la acusación (fs. 61 nº 17). A fin de llevar a cabo el juicio es que se solicita la extradición (fs. 62 nº 20).

8) En segundo lugar, respecto de la declaración jurada del Agente Especial Kyle Mori de la Agencia de Control de Drogas, no es de relevancia en este proceso de extradición el control de las observaciones formales esgrimidas por la Defensa, tales como la competencia del Tribunal ante el cual se rindió la declaración. Por el contrario la declaración reseña las actividades delictivas que se pretenden imputar al requerido González Valencia y a las pruebas recolectadas a tal fin, siendo éstos sí los extremos relevantes para el dictado de la presente sentencia.

En este sentido, tampoco se comparte que la prueba mencionada por el Agente Especial Kyle Mori sea insuficiente para respaldar la acusación y que ésta se funde casi exclusivamente en la declaración de dos testigos colaboradores.

Cabe reiterar los conceptos vertidos en el considerando nº 3 de esta sentencia, según los cuales en materia de extradición el juez lo único que tiene que hacer es controlar la regularidad formal de la solicitud y el cumplimiento de los requisitos exigidos por el Tratado aplicable al caso.

No corresponde entonces valorar la prueba producida por el Estado requirente sino que únicamente apreciarla para determinar que el pedido de extradición y la orden de arresto no sean manifiestamente infundados, de acuerdo a lo previsto por el art. 10.3 in fine del Tratado, que establece que "la parte requerida podrá solicitar que la requirente presente pruebas suficientes para establecer *prima facie* que la persona reclamada ha cometido el delito por el cual la extradición se formula. La parte requerida puede denegar la extradición si un examen del caso demuestra que la orden de arresto es manifiestamente infundada".

00054334

En el caso, la solicitud de extradición adjunta recaudos a fin de acreditar los hechos que se imputan a González Valencia, a saber: declaración jurada de la Fiscal Litigante de la Unidad contra Narcóticos y Drogas Peligrosas de la División Penal del Departamento de Justicia de Estados Unidos, declaración del Agente Especial Kyle Mori y resolución de acusación del jurado indagatorio del Distrito de Columbia presentada ante el Tribunal de Distrito de Estados Unidos para el Distrito de Columbia. Los recaudos reseñan los hechos investigados y los medios de prueba recolectados, en mérito a lo cual el Tribunal mencionado libró la orden de detención correspondiente.

A juicio de la sentenciante, los elementos de convicción referidos alcanzan el estándar probatorio exigido por el Tratado, no pudiendo concluirse que la orden de arresto librada por el Tribunal del Estado requirente sea manifiestamente infundada. Tal como ha expresado la Suprema Corte de Justicia en consideraciones trasladables al caso de autos, "más allá del resultado que recaiga oportunamente en el proceso a llevarse a cabo en el Estado requirente, es evidente que el pedido de extradición no tiene, ni cercanamente, la nota de manifiestamente infundado que requiere la norma al no surgir de la documentación presentada ningún elemento de juicio que haga suponer que - en realidad - el requerido no cometió los delitos de los que se lo acusa" (Sentencia n° 145/2002).

9) En tercer lugar, en cuanto a la prescripción de los delitos invocada por la Defensa, la suscrita ya se ha pronunciado en el considerando n° 6 compartiendo la conclusión del Ministerio Público.

En efecto, de acuerdo a los hechos reseñados en los documentos remitidos, los hechos delictivos que se imputan a González Valencia en la resolución de acusación, habrían ocurrido desde enero de 2003 y de forma permanente hasta la presentación de dicha acusación, esto es, el 19 de abril de 2016 (fs. 77-80), lo cual resulta reiterado en los restantes recaudos adjuntos, de los que surge asimismo que en el año 2013 se detectó una llamada telefónica del requerido referida a una transacción de narcotráfico. En la misma fecha antes mencionada, el Tribunal competente libró la orden de detención correspondiente (fs. 82).

Atendiendo a los hechos referidos y de acuerdo a las normas que acompañan la solicitud (fs. 67-73), no ha operado la prescripción de los delitos en el Estado requirente.

Tampoco ha operado la prescripción de acuerdo a las normas de nuestro país, específicamente el art. 117 del Código Penal.

Por lo cual también corresponde desestimar la oposición de la Defensa en esta cuestión, desde que no se adecua a la previsión del art. 5 literal c, como se señalara anteriormente.

No obstante ello, cabe señalar que según ha entendido nuestra jurisprudencia, "por más que el derecho extranjero debe probarse y surge en el caso de la documentación remitida, no

JA1305
00054535

corresponde a los tribunales del Estado requerido -Uruguay- profundizar sobre dicho extremo y considerar o no la procedencia del pedido en función de un instituto que a los ojos del Tratado es una cuestión de mérito" (sentencia nº 380/2008 del Tribunal de Apelaciones en lo Penal de Primer Turno).

10) Finalmente, la Defensa solicita el rechazo de la extradición desde que entiende que González Valencia corre el riesgo que las autoridades competentes del Estado requerido le impongan condenas de cadena perpetua o pena de muerte.

Asiste razón a la Defensa en cuanto las penas previstas en Estados Unidos para los delitos que se imputan al requerido son mucho más severas que las establecidas en nuestro país. Esta circunstancia queda a la vista ante la simple lectura de las normas que acompañan la solicitud de extradición, de las que resultan que los delitos por los cuales se lo requiere se sancionan con penas de "privación de libertad no menos de diez años y no mayor de pena de reclusión a perpetuidad" y pena de encarcelamiento de "no más de veinte años" (fs. 72). Penas notoriamente más gravosas que las previstas en los arts. 31 a 35 y 59 del dec-ley nº 14.294 (en la actual redacción dada por la ley nº 17.016), cuyos guarismos máximos no superan los dieciocho años de penitenciaría.

En relación al riesgo que plantea la Defensa, tal como señala la Fiscalía, el art. 7 del Tratado prevé que "cuando el delito por el que se solicita la extradición fuera punible con la pena de muerte según la legislación de la Parte requirente, y las leyes del Estado requerido no admitieren esa pena para ese delito, este último podrá supeditar el otorgamiento de la extradición a que la Parte requirente otorgue garantías consideradas suficientes por la Parte requerida en el sentido que no será impuesta dicha sanción o que, de ser impuesta, la misma no será aplicada".

De conformidad a lo dispuesto por el art. 26 de la Constitución de la República, según el cual "a nadie se le aplicará la pena de muerte", es indudable que nuestro país está habilitado para supeditar el otorgamiento de la extradición a que el requirente otorgue garantías suficientes que no será impuesta o aplicada la pena de muerte.

Por el contrario, nada dispone el Tratado en relación a la eventual condena a prisión perpetua, la cual está prevista como tope máximo en la normativa agregada por el requirente (fs. 72).

Sin perjuicio de ello y compartiendo la posición del Ministerio Público, entiende la sentenciante que es admisible imponer al Estado requirente la condición prevista en el art. 7 del Tratado también en relación a la pena de prisión perpetua, desde que la misma no está prevista en nuestro orden público interno y contraviene nuestro orden público internacional (Cfme. Sentencia nº 135/2003 de la Suprema Corte de Justicia).

En efecto, la Convención de Naciones Unidas contra la Tortura (aprobada por ley nº 15798) y la

Protected Material

00054536

248

Convención Interamericana para prevenir y sancionar la tortura (aprobada por ley n° 16.294) establecen que los Estados Partes tomarán medidas efectivas para prevenir y sancionar, todos aquellos actos que –sin llegar a la tortura- constituyan penas crueles, inhumanas o degradantes (art. 16 y 6 de las convenciones citadas, respectivamente). Puede concluirse que la prisión perpetua constituye una pena inhumana y por lo tanto inadmisible para nuestro orden público internacional. Asimismo, la reclusión a perpetuidad está consagrada como supuesto que excluye la extradición en otros instrumentos internacionales firmados por nuestro país, tales como el Tratado de Extradición entre Uruguay y España (aprobado por ley n° 16.799) y el Tratado de Extradición entre Uruguay y Argentina (aprobado por ley n° 17.225). Ambas tratados establecen que no procederá la extradición cuando los hechos en que se funda la solicitud estuvieren castigados con pena de muerte o pena privativa de libertad a perpetuidad en el Estado requirente, pudiendo concederse en caso que el Estado requirente otorgare seguridades suficientes que la pena a cumplir será la máxima admitida en la ley penal del Estado requerido (arts. 9 y 8 respectivamente).

Como se señalara en considerandos anteriores, la cooperación internacional constituye un deber entre los Estados en la lucha por el combate del delito –especialmente la delincuencia organizada trasnacional. Sin embargo, es pertinente en este punto recordar las palabras del Profesor Raúl Cervini quien expresa: "En ese frágil equilibrio dinámico entre eficacia de la prestación asistencial y garantías de los concernidos, se encuentra precisamente la funcionalidad legitimante de la moderna cooperación penal internacional, la cual debe ser concebida en base a un concepto de Derecho de raíz antropocéntrica y garantizador de los Derechos Humanos. Eso es así porque en el ámbito de la cooperación judicial penal internacional está superada la época en que se asociaba su funcionamiento con el poder negociador de los Estados, con la igualmente difusa cortesía internacional e inclusive más modernamente con la concepción meramente instrumental del respeto y continuidad del proceso. Hoy día, estas últimas fundamentaciones vinculadas al trato entre Estados Soberanos deben estar también acompañadas por el imperioso reconocimiento de los derechos del concernido (sujeto afectado por las medidas de cooperación). Con ello se estará observando la función legitimante del derecho penal, tal como deber ser inexorablemente comprendido a partir de la concepción del pensamiento garantista" (Cervini, Raúl.- Principios de cooperación judicial penal internacional en el MERCOSUR, p. 13, Publicaciones del Instituto de Derecho Penal, Facultad de Derecho, UDELAR).

En conclusión y compartiendo la posición sustentada por la Fiscalía, entiende la sentenciante que es procedente condicionar la entrega de González Valencia a que el Estado requirente preste garantías suficientes que en caso de resultar condenado en el proceso penal que se le pretende iniciar, no se le impondrá pena de muerte ni pena de prisión perpetua.

11) En el mismo sentido, por los mismos fundamentos expuestos en el considerando anterior en referencia a las garantías del extraditado que deben respetarse en la cooperación internacional y

JA1307

00054337

de acuerdo a lo previsto en el art. 13 del Tratado, se accederá a la solicitud fiscal disponiendo que el Estado requirente deberá asegurar que no se juzgará ni condenará al requerido por delitos distintos a los que se refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del citado artículo.

12) Por todo lo expuesto, se concluye que la solicitud de extradición de Gerardo González Valencia ha cumplido los requisitos exigidos por el Tratado de Extradición suscrito entre Uruguay y Estados Unidos, así como los principios jurídicos que rigen la extradición (doble incriminación, especialidad, legalidad) y que corresponde desestimar la oposición formulada por la Defensa de Confianza, con la salvedad referida en el numeral anterior.

En su mérito, se procederá a conceder la extradición de Gerardo González Valencia para ser sometido a proceso penal ante las autoridades competentes de Estados Unidos por los delitos referidos en la solicitud, con las condiciones que se indicarán a continuación.

En primer lugar, de acuerdo a lo peticionado por el Ministerio Público, la entrega se hará efectiva una vez que el requerido obtenga su excarcelación provisional o libertad definitiva en la causa que se le sigue en Uruguay ante esta sede IUE 2-37467/2016.

A tales efectos, debe tenerse presente que la causa IUE 2-37467/2016 se encuentra en etapa de sumario y Gerardo González Valencia está recluido desde su procesamiento en prisión preventiva a disposición de la misma. Por tal razón no ha cumplido arresto administrativo en el presente proceso de extradición.

En segundo lugar, de acuerdo a lo previsto por el art. 13 del Tratado, se condiciona la extradición concedida a que las autoridades del Estado requirente aseguren que no se juzgará ni condenará al requerido por delitos distintos a los que se refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del citado artículo.

En tercer lugar, de acuerdo a lo previsto por el art. 7 del Tratado y de conformidad con nuestro orden público interno e internacional y el respeto de las garantías del requerido emergentes del derecho internacional de los derechos humanos, se condiciona la extradición concedida a que las autoridades requirentes otorguen garantías consideradas suficientes por las autoridades nacionales intervinientes en este proceso, que en caso que Gerardo González Valencia resulte condenado en el proceso penal que se le pretende iniciar en el país requirente, no se le impondrá pena de muerte ni pena de prisión perpetua.

Finalmente, se solicitará al Estado requirente que exprese si acepta las condiciones en que se admite la extradición dentro del plazo de cuarenta días a partir de la notificación de la presente sentencia.

**FALLO:**

00054538

Concédese la extradición de Gerardo González Valencia solicitada por las autoridades competentes de Estados Unidos, bajo las siguientes condiciones: I) se difiere la entrega hasta que el requerido obtenga su excarcelación provisional o libertad definitiva en la causa que se le sigue en Uruguay ante esta sede IUE 2-37467/2016; II) se condiciona la extradición concedida a que las autoridades del Estado requirente aseguren que no se juzgará ni condenará al requerido por delitos distintos a los que se refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del citado artículo; III) se condiciona la extradición concedida a que las autoridades requirentes otorguen garantías consideradas suficientes por las autoridades nacionales intervinientes en este proceso, que en caso que Gerardo González Valencia resulte condenado en el proceso penal que se le pretende iniciar en el país requirente, no se le impondrá pena de muerte ni pena de prisión perpetua; IV) las autoridades competentes del Estado requirente deberán expresar si aceptan las condiciones dispuestas en los numerales anteriores, dentro del plazo de cuarenta días a partir de la notificación del presente fallo.

Líbrense las comunicaciones correspondientes a la autoridad requirente vía diplomática, con las formalidades que correspondan.-

Notifíquese y ejecutoriada, cúmplase.-

Dra. Beatriz LARRIEU DE LAS CARRERAS
Juez Ldo.Capital

Esc. ANDRES ROMANO TRINIDAD
ACTUARIO ADJUNTO

JA1309

[hw:] 238

IUE (*Identificación Unica de Expedientes* [Unique Case Identification]) 474-76/2016

**Judgment No. 13/2017**

Montevideo, August 28, 2017

**RECITALS:**

For the final judgment of the first instance, these proceedings entitled **"GONZÁLEZ VALENCIA, Gerardo.- EXTRADITION IUE 474-76/2016,** with the intervention of Mr. Federal Criminal Prosecutor Specialized in Organized Crime of the Second Rotation, Dr. Luis Pacheco and the Personal Attorneys Dr. Víctor Della Valle and Dr. Carlos Balbi.-

**RESULTING:**

1) On June 16, 2016, a request for the extradition of Gerardo González Valencia was received at this Court, sent by diplomatic channels by the Department of Justice of the United States of America (pages 1-107).

Upon the hearing by the Public Prosecutor's Office, by order No. 701/2016 of June 27, 2016, the court objected to the request given that the admissibility provisions provided for by Article 10 number 5 letter a) of the Mutual Assistance Treaty in Criminal Matters and Extradition (Law No. 15,476) were not met, and required the requesting State to comply with such requirements, as well as the complementary information in accordance with Article 11 of the first paragraph in fine of the same Treaty (pages 108-114).

2) On February 2, 2017, the documentation sent was received via diplomatic channels by the requesting State (pages 125-131).

By advisory opinion No. 156/2017 of February 23, 2017, the representative of the Public Prosecutor's Office deemed that the necessary requirements had been met to process the extradition request (p. 132 overleaf -135).

By ruling No. 181/2017 of March 3, 2017, and in accordance with the prosecution advisory opinion, the extradition process was initiated in accordance with the provisions of the Treaties of Montevideo, specifically Articles 33 to 37 of the Treaty of International Criminal Law of 1940 - applicable by analogy to the case in accordance with the principles of due process and the rules that report the process in general, in what is not expressly provided for (pages 136-137).

Protected Material

00054527

JA1310

[hw:] 239

3) In a convened hearing - which was delayed on two occasions at the request of the party subject to the extradition request himself - and in the presence of his defense counsel, Gerardo González Valencia did not accept the extradition requested (pages 141-160).

Having seen the request made by the U.S. authorities, the Personal Attorneys of the party subject to the extradition request appeared to file an objection, for the reasons set out in a written grounds submitted in due time and proper form, with attached documentation (pages 161-220).

4) For its part, by advisory opinion No. 682/2017 of June 12, 2017, the representative of the Public Prosecutor's Office recommended that the extradition request be accepted subject to the conditions established (pages 222-227).

5) By order No. 682/2017 of June 15, 2017, the subrogating Judge of the court summoned the parties for resolution, having referred the proceedings to the office on June 23, 2017 (pages 228-230 overleaf).

**WHEREAS:**

1) The extradition process requested by the competent authorities of the United States of America with respect to Gerardo González Valencia in order to be subject to criminal proceedings in that country for drug trafficking charges is substantiated herein.

Extradition constitutes a legal concept of international criminal legal cooperation, understood as "any activity of a procedural nature carried out in a State at the service of a criminal proceeding brought or to be brought before a foreign jurisdiction. Cooperation that becomes effective "when the jurisdictional apparatus of a State, which has authority only within its territory, resorts to the collaboration that other States can provide through their jurisdictional activity" (Vieira, M., García Altolaguirre, C.-Extradition, FCU, pages 108-109). For his part, Prof. Miguel Langón argues that extradition is the maximum expression of the principle of legal international cooperation between the States in the fight against crime, establishing a true obligation of the State required to access the respective request, within the conventional and legal limits, where appropriate (Curso de Der. Penal y Procesal Penal [Course of Criminal Law and Criminal Procedure], ed. Del Foro, year 2003, pages 119-121; Cfme. Cairoli, M. La cooperación penal internacional, la asistencia mutua y la Extradición [International criminal cooperation, mutual assistance, and Extradition], FCU, year 2000, p. 59).

In the same sense, national case law has been pronounced, peacefully affirming that "extradition as a legal concept is modernly located within international criminal legal cooperation, which must necessarily be addressed as an integrated global statute of solidarity and guarantees and, in turn, enables it to be viewed as a global statute of inter-State aid and of guarantees" (Rev. Der Penal [Criminal Law Rev.], No. 20, c. 146. p. 574).

Protected Material

These principles have been collected by numerous treaties, those that enshrine the obligation of the States to grant extradition when the conditions that are established are met, as an example: the Model Treaty of Extradition approved by the United Nations General Assembly on April 3, 1991, the 1988 Vienna Convention on International Drug Trafficking, the Treaty on Extradition and Cooperation in Penal Matters between the Oriental Republic of Uruguay and the United States of America ratified by our country by decree law No. 15,476, the Extradition Treaty between Argentina and Uruguay ratified by our country by law No. 17,225, the Extradition Agreement between the States that are parties to Mercosur ratified by Uruguay by Law No. 17,499.

In view of all this, it is indisputable that there is an international obligation to extradite the persons subject to extradition who fall within the conditions provided for in the applicable regulations and in accordance with the principles governing extradition.

2) The extradition regime is regulated first by the Treaties ratified between the countries, which are "law between the parties". In the absence of a Treaty, our internal law provides for the extradition regime in Article 13 of the Criminal Code and Article 32 of the Code of Criminal Procedure (Langón, op. cit., ed. 2003, p. 128-129).

In the case at hand, the Treaty on Extradition and Cooperation in Penal Matters between the Oriental Republic of Uruguay and the United States of America, signed in Washington on April 6, 1973, and approved by our country by decree law No. 15,476 of October 26, 1983, is applicable. This notwithstanding the application of the general principles of due process and specifically the principles governing extradition.

The Treaty does not establish the procedure to be followed before the extradition request, but rather, it is governed by the *lex fori,* that is, that of the nationality of the judge who hears the case: in the case in question, Uruguayan legislation. The Code of Criminal Procedure in force in our legal system does not regulate the extradition process and, therefore, case law, practically unanimously, applies the procedure provided for in the Treaties of Montevideo of 1989 and 1940, by an analogue path.

In view of this, these proceedings complied with the procedure established in chapter IV of the Treaty of Montevideo of 1989, which was agreed upon by the parties, which did not make any objection in this regard.

It is only worth adding that case law is currently unanimous in understanding that the judgment to be issued is definitive in nature, since it puts an end to the extradition process, the main and unique process. According to the Court of Appeals of the First Rotation, "the extradition trial establishes an adversarial proceedings whose main and exclusive purpose is a ruling declaring the admissibility or inadmissibility of the request of the foreign country" (Criminal Law Rev., No. 11, c. 453, p. 319). Therefore, the term for its issuance is that provided for in Article 90 section 2 letter A of the Code of Criminal Procedure

Protected Material

3) The purpose of the extradition process consists of controlling the formal regularity of the claim, and the Court of the requested State is not responsible for proceeding to the assessment of the merits of the case, which would constitute an invasion of the powers of the requesting authority - without prejudice to the eventual analysis of the fulfillment of the requirement *non bis in idem*, if applicable. As our doctrine and case law have repeatedly pointed out, the extradition process does not assess evidence of guilt, it does not decide on the unlawfulness of the conduct of the party subject to the extradition request, nor does it resolve the merits of the matter, but rather the entire examination is subject to the simple verification of the regularity of the extradition claim in light of the international and national provisions applicable in each case.

This has been the constant position of the Supreme Court of Justice, affirming in judgment No. 51/2010 that: "...In the extradition procedure, the only thing that must be assessed is the formal legitimacy of the request, since any other consideration regarding the merits, which is to say, the classification of the crime or crimes for which the request is made, are absolutely violated of the principle of competence of the requesting authorities. The courts of the requested country that accept or do not accept the request for extradition are not competent to rule on the merit of the case. In this sense, De Olarte, in his treatise on 'Extradition', p. 49, stated that the Judge involved is not summoned to declare innocence or guilt, because 'extradition does not matter to trial or punishment', limiting his function to verifying whether the request is in accordance with the substantial formalities and requirements of the International Treaty ratified by the two States..." (Cf. Supreme Court of Justice Judgments No 154/999, No 184/001, No. 216/003, No. 191/005, No. 41/006, No. 219/007, No 32/2010, among others).

Consequently, this judgment must be issued exclusively with respect to the formal admissibility of the extradition request, analyzing for this purpose the Treaties applicable in the case.

4) Having analyzed the results of these proceedings considering the aforementioned Treaty on Extradition and Cooperation in Penal Matters that links our country to the United States of America, it results that the request complied with the formalities required by Article 10, namely:

a) it was processed through the diplomatic channels, since González Valencia was formally requested by the corresponding judicial authorities of the United States of America before the Ministry of Foreign Affairs of our Country and the Supreme Court of Justice (pages 1-8 and 100-107);

b) the request contains a detailed list of the incriminated event (pages 12-18 and page 32-35 and the respective translations on page 57-63 and page 77-80);

c) the necessary documentation is attached for the identification of the party subject to the extradition request (page 46-53 and translation on page 91-99) and the applicable regulations (page 20-30 and translation on page 77-80);

[hw:] 242

c) it includes the bench warrant or arrest warrant issued by the competent authority of the requesting State (page 37 translated to pages 82).

d) a translation into Spanish of all the documentation submitted is attached, as detailed in the previous subsections.

In relation to the provision of Art. 10.5 letter a of the Treaty, the documents are signed by the competent authorities and have the certification and seal of the Department of State of the United States of America (page 9, translation on page 54). Although they do not have the legalization by a diplomatic or consular agent of the Oriental Republic of Uruguay in the United States of America, it was understood, in accordance with the prosecution advisory opinion No. 156/2017, that said requirement is not necessary in accordance with the provisions of the Agreement Suppressing the Requirement of Legalization of Foreign Public Documents, signed in the Hague in 1961 and approved by our country under Law No. 18,836 of November 15, 2011. Notwithstanding the foregoing, it should be noted that this point was not questioned by the Defense of the party subject to the request.

5)  Likewise, it results that the presumptions required in Articles 1 and 2 of the Treaty are complied with, which enshrine the general principles of extradition: jurisdiction of the requesting State, double criminality, and severity of the penalty. Namely:

a)  Gerardo González Valencia is required for the commission of offenses perpetrated in the requesting country (pages 77-78), in accordance with the provisions of Article 1 of the Treaty, so the jurisdiction of the competent authorities of that country is undisputed.

b)  The party subject to the extradition request is accused of committing drug trafficking offenses, specifically conspiracy to introduce and distribute substances containing detectable amounts of cocaine and methamphetamine in the United States (pages 77-78), which falls within the provisions of Article 2 No. 17 of the Treaty. Offenses that are also provided for in our national regulations, in accordance with the classifications established in Articles 31 to 33 and 59 of Decree Law No. 14,294 (in its current wording given by Law No. 17,016).

The condition referred to in this subsection enshrines the principle of double criminality, which requires that "the accusation for which extradition is requested is also classified as an offense under the laws of the requested State, with due flexibility and even when the same *nomen iuris* does not exist in the classifications. In other words, what is required is that the act and the form of participation in it, for which the person is claimed, must be provided for as an offense by the law of the two contracting parties, even if they have different names and even if the type of offense may tend to protect different legal assets in both legislations.

Protected Material

[hw:] 243

... the qualification of the conduct must be made within the framework of the conventional provisions created by the will of the parties, in other words, *in ordinem* as Alfonsín taught" (Viera et al. op. cit., p. 427).

c)  The offenses for which it he is requested in extradition are punished in both countries with a minimum prison term of more than one year, as required by the paragraph of Article 2 of the Treaty: in our country, Articles 31 and 34 of decree law No. 14,294; in the requesting country, the conduct that is intended to be imputed to the party subject to the extradition request is punished with sentences of no less than ten years (page 71-72). The principle of punishment severity is thus met.

6)  Finally, the request for extradition does not fall within any of the cases provided for in Article 5 of the Treaty in which extradition is not appropriate.

In relation to the hypothesis provided for in letter a of art. 5, it enshrines the principle *ne bis in idem.* This principle means that no one can be tried or convicted twice for the same crime. This is how Dr. Armando Tommasino stated it: "The provision prevents double prosecution, and although it does not express it, naturally also... the repeated conviction to the same individual, for attribution of the same criminal act" (Principios, Derechos y Garantías en el Proceso [Principles, Rights, and Guarantees in the Process], p. 63). The same principle in force in National Law has been set out in the Extradition Treaties and, even if it is not, it has been understood that it is "implicitly enshrined in the provisions of Article 14.7 of the Universal Covenant on Civil and Political Rights that states that 'no one may be tried or convicted or punished for a crime for which he has been convicted or acquitted by a final judgment in accordance with the Law and the criminal procedure of each country.' This rule has been taken, although with some variations, in the Pact of San José in Costa Rica (Article 8.4) and it constitutes, in our opinion, an international *ius cogens* rule (Vieira-Altolaguirre "Extradición [Extradition]," Page 200).

The Extradition Treaty entered into between the United States and Uruguay includes in the aforementioned principle, by providing that extradition will not be granted: "a) when the person whose handing over is being processed has already been tried and convicted or acquitted or is being tried in the territory of the requested State for the crime for which the extradition is requested."

In this regard, it should be noted that, although Gerardo González Valencia has a criminal case open in our country, the request for extradition does not violate the principle *ne bis in idem,* since it does not refer to the same facts for which he is being judged in our country. Indeed, the party subject to the extradition request is subject to criminal proceedings before this Criminal Trial Court Specialized in Organized Crime of the First Rotation in proceedings IUE 2-37467/2016, charged with the commission of an offense of Money Laundering provided for in Article 54 of decree law No. 14,294, in its current wording given by Article 2 of Law No. 18,494. He is not accused of committing drug trafficking crimes in any of its modalities in said proceedings. Therefore, the hypothesis does not fall within the provision of art. 5 letter a of the Treaty.

In relation to the provision of art. 5 letter c, which provides that extradition will not be granted "when the action or penalty has expired according to the laws of the required or requesting State," the considerations of the Public Prosecutor's Office are shared as long as it is deemed that the statute of limitations for which González Valencia is requested in extradition has not elapsed. Without prejudice to what will be said below when analyzing the objections made by the Defense of the party subject to the request.

It is clear in the proceedings that González Valencia's extradition request does not fall within any of the remaining hypotheses provided for in Article 5 cited above.

7)   In summary, the judge understands that the extradition requested meets the formal requirements demanded by the Extradition Treaty that links our country to the requesting State *and* does not fall within any of the aforementioned hypotheses of inadmissibility of the request.

Notwithstanding this, this judgment must resolve the issues raised in the opposition filed by the Personal Attorneys of González Valencia, which were clearly outlined in the reply from the Public Prosecutor's Office, namely: a) that the Extradition Treaty refers to persons who have been processed or convicted, which does not occur in the case in question and is a trial in absentia; b) that the affidavit submitted by the requesting country is defective; c) that the affidavit does not show evidence supporting any crime occurring within five years of the date of the prosecution, and therefore, the statute of limitations has elapsed; d) that the affidavit does not contain evidence and only contains statements from two collaborating witnesses, for which it omits information about its credibility; e) that the party subject to the request faces risks of being sentenced to death or life in prison.

8)   In the first place, as the Defense points out, Article 2 of the Treaty provides that "the persons who are prosecuted or convicted for any of the following offenses shall be handed over...." On the other hand, Art. 10.3 establishes, among the requirements necessary in the extradition request, that "when the request refers to a person who has not yet been convicted, it must be accompanied by a bench warrant or arrest warrant or an equivalent indictment, issued by the competent authority of the requesting Party."

In this sense, the position of the Public Prosecutor's Office is shared, understanding that the request for extradition is admissible when the person is not yet "processed," since the arrest warrant suffices for its requirement and taking into account that the term "processed" may have different meaning in each procedural system.

It also disagrees with the Defense since, in the opinion of the undersigned, a trial in absentia in the requesting country has not been carried out regarding the party subject to the request. From the documentation received, it can be seen that. on April 19, 2016, an Grand Jury from the District of Columbia filed an accusation against González Valencia for the charge of conspiracy for the introduction and distribution of narcotic substances in

the United States (page 77-80). On the basis of said indictment, the United States District Court for the District of Columbia issued the corresponding bench warrant (page 82).

The affidavit of the Trial Attorney of the Narcotic and Dangerous Drug Section of the Criminal Division of the United States Department of Justice, Amanda Liskamm, clearly outlines the procedure to be followed by the grand jury: the aforementioned jury examines the evidence submitted by the public order authorities and, if it is understood that there are sufficient indications to determine that the criminal act was committed and that the accused is the perpetrator, it issues an "indictment" (page 58 numeral I). That was the procedure followed with respect to González Valencia, as outlined in the previous paragraph.

This in no way means that a criminal proceeding has been substantiated against the party subject to the request, but, as is specified in the statement of the Trial Attorney, "for a judgment to be issued against González Valencia…The United States must prove at trial that Gonzalez Valencia reached an agreement ...." , that is, the State must prove at trial the facts alleged in the indictment. (page 61 No 17). Extradition is requested in order to carry out the trial (page 62 No. 20).

8) Secondly, with respect to the affidavit of the Special Agent Kyle Mori of the Drug Control Agency, the control of the formal observations made by the Defense, such as the competence of the Court before which the affidavit was submitted, is not relevant in this extradition process. On the contrary, the statement outlines the criminal activities that are intended to be charged to the party subject to the request, González Valencia, and the evidence collected for this purpose, these being the relevant elements for the issuance of this judgment.

In this sense, it is also not shared that the evidence mentioned by the Special Agent Kyle Morí is insufficient to support the indictment and that it is based almost exclusively on the statement of two collaborating witnesses.

It is worth reiterating the concepts set out in recital No. 3 of this judgment, according to which, in matters of extradition, the only thing the judge has to do is control the formal regularity of the request and compliance with the requirements of the Treaty applicable to the case.

It is then not appropriate to assess the evidence produced by the requesting State, but rather only to assess it to determine that the extradition request and the arrest warrant are not manifestly unfounded, in accordance with the provisions of Art. 10.3 in fine of the Treaty, which establishes that "the party subject to the request may ask that the requesting party to submit sufficient evidence to establish *prima facie* that the person subject to the request has committed the crime for which the extradition is made. The requested party may deny extradition if an examination of the case shows that the arrest warrant is manifestly unfounded."

Protected Material

[hw:] 246

In the case at hand, the extradition request attaches supporting documents in order to prove the facts that are imputed to González Valencia, namely: affidavit of the Trial Attorney of the Narcotic and Dangerous Drug Section of the Criminal Division of the Department of Justice of the United States, testimony of the Special Agent Kyle Morí, and the indictment issued by the grand jury of the District of Columbia, filed in the United States District Court for the District of Columbia. The records outline the facts investigated and the means of evidence collected, based on which the aforementioned Court issued the corresponding bench warrant.

In the opinion of the judge, the evidential elements referred to reaches the evidentiary standard required by the Treaty, and it cannot be concluded that the arrest warrant issued by the requesting State Court is clearly unfounded. As the Supreme Court of Justice has expressed in recitals transferable to the case at hand, "beyond the outcome achieved in the process to be carried out in the requesting State, it is evident that the extradition request does not have, even remotely, the note of being manifestly unfounded, which the rule requires, since no element of judgment arises from the documentation presented that makes it assume that - in reality - the party subject to the request did not commit the offenses of which he is accused" (Judgment No. 145/2002).

9) Thirdly, with regard to the statute of limitations for the offenses invoked by the Defense, the undersigned has already pronounced itself in clause no. 6 sharing the conclusion of the Public Prosecutor's Office.

Indeed, in accordance with the facts outlined in the documents submitted, the criminal acts that are attributed to González Valencia in the indictment, would have occurred since January 2003 and permanently until the filing of said indictment, this is, April 19, 2016 (pages 77-80), which is reiterated in the rest of the attached records, from which it appears that, in 2013, a telephone call was detected from the person subject to the request in relation to a drug trafficking transaction. On the same date mentioned above, the competent Court issued the corresponding bench warrant (page 82).

In accordance with the facts referred to and in accordance with the rules that accompany the request (pages 67-73), the statute of limitations for the offenses has not elapsed in the requesting State.

Nor has the statute of limitations elapsed in accordance with the rules of our country, specifically Article 117 of the Criminal Code.

Therefore, it is also appropriate to dismiss the opposition of the Defense in this matter, since it does not comply with the provisions of Art. 5 letter c, as noted above.

Notwithstanding this, it should be noted that, as our case law has understood, "even though foreign law must be proven and arises in the case of the documentation submitted, it is not the case of the courts of the requested State – Uruguay – to delve deeper into said point and consider whether or not the request is admissible based on an institute that, in the view of the Treaty, is a matter of merit" (judgment No. 380/2008 of the Criminal

Protected Material

00054535

JA1318

Court of Appeals of the First Rotation).                                                    [hw:] 247

10)   Finally, the Defense requests the rejection of the extradition, since it understands that González Valencia runs the risk that the competent authorities of the requested State impose sentences with life sentences or the death penalty.

The Defense is right in saying that the penalties provided in the United States for the crimes attributed to the party subject to the request are much more severe than those established in our country. This circumstance remains in view of the simple reading of the rules that accompany the extradition request, from which it results that the offenses for which he is required are punished with "imprisonment of no less than ten years and no greater than a life sentence" and a prison sentence of "no more than twenty years" ([pg]. 72). Penalties clearly more onerous than those provided for in Articles 31 to 35 and 59 of decree law No. 14,294 (in the current wording given by Law No. 17,016), whose maximum terms do not exceed eighteen years of prison.

In relation to the risk posed by the Defense, as indicated by the Public Prosecutor's Office, art. 7 of the Treaty provides that, "when the crime for which the extradition is requested is punishable with the death penalty according to the legislation of the requesting Party, and the laws of the requested State do not allow that penalty for that crime, the latter may subject the admission of the extradition to the requesting Party to the granting guarantees considered sufficient by the requested Party in the sense that said penalty will not be imposed or that, if it is imposed, it will not be applied."

In accordance with the provisions of Article 26 of the Constitution of the Republic, according to which "no one shall be subject to the death penalty," it is possible without a doubt that our country is authorized to subject the granting of the extradition to the requesting party granting sufficient guarantees that the death penalty will not be imposed or applied.

On the contrary, the Treaty does not have any provisions in relation to the eventual sentence to life in prison, which is provided for as the maximum limit in the regulations added by the requesting party (page 72).

Without prejudice to this, and sharing the position of the Public Prosecutor's Office, the judge understands that it is admissible to impose on the requesting State the condition provided for in Article 7 of the Treaty also in relation to the sentence of life in prison, since it is not provided for in our internal public order and contravenes our international public order (Pursuant to Judgment No. 135/2003 of the Supreme Court of Justice).

Indeed, the United Nations Convention against Torture (approved by Law No. 15,798) and the Inter-American Convention on the Prevention and Sanction of Torture (approved by Law No. 16,294) establish that the Member States shall take effective measures to prevent and sanction, respectively, all those acts that - without reaching torture - constitute cruel, inhuman, or degrading penalties (Article 16 and 6 of the aforementioned conventions,

Protected Material

respectively). It can be concluded that life in prison constitutes an inhumane and, therefore, inadmissible penalty for our international public order. Likewise, life in prison is enshrined as an assumption that excludes extradition in other international instruments signed by our country, such as the Extradition Treaty between Uruguay and Spain (approved by Law No. 16,799) and the Extradition Treaty between Uruguay and Argentina (approved by Law No. 17,225). Both treaties establish that extradition shall not proceed when the facts on which the request is based are punished with the death penalty or life in prison in the requesting State, and may be granted in the event that the requesting State grants sufficient assurances that the penalty to be fulfilled shall be the maximum allowed in the criminal law of the requested State (Articles 9 and 8, respectively).

As noted in previous recitals, international cooperation constitutes a duty among States in the fight against crime —especially transnational organized crime. However, it is relevant at this point to remember the words of Professor Raúl Cervini, who states: "The legitimate functionality of modern international criminal cooperation is found precisely in this fragile dynamic balance between the effectiveness of the provision of aid and the guarantees of the concerned parties, which must be conceived on the basis of a concept of anthropocentric and guaranteeing root right of human rights. This is because, in the field of international criminal judicial cooperation, the period in which its functioning was associated with the negotiating power of the States is exceeded, with the equally diffuse international courtesy and, even more modernly, with the merely instrumental conception of respect and continuity of the process. Today, these latter grounds linked to the treatment between Sovereign States must also be accompanied by the essential recognition of the rights of the concerned party (subject affected by cooperation measures). With this, the legitimate function of criminal law will be observed, as must be inexorably understood from the conception of the guaranteeing thought" (Cervini, Raúl.- Principios de cooperación judicial penal internacional en el MERCOSUR [Principles of international criminal judicial cooperation in MERCOSUR], p. 13, Publications of the Institute of Criminal Law, Faculty of Law, UDELAR).

In conclusion and sharing the position supported by the Public Prosecutor's Office, the judge understands that it is appropriate to subject the delivery of González Valencia to the condition that the requesting State provide sufficient guarantees that, in the event of being convicted in the criminal proceedings that are intended to be initiated, the death penalty or a life in prison sentence will not be imposed.

11)   In the same sense, for the same grounds set forth in the previous recital in reference to the extradited party guarantees that must be respected in international cooperation, and in accordance with the provisions of art. 13 of the Treaty, the public prosecutor's request will be accepted, stating that the requesting State must ensure that the party subject to the request will not be tried or convicted for crimes other than those referred to in the request for extradition, with the exception of the assumptions enshrined in numbers 1 and 2 of the aforementioned article.

12)   Based on the foregoing, it is concluded that the extradition request of Gerardo González Valencia has met the requirements of the Extradition Treaty signed between Uruguay and the United States, as well as the legal principles governing extradition (double criminality, specialty, legality) and that it is appropriate to dismiss the opposition made by the Personal Attorneys, with the exception referred to in the previous section.

Based on the above, the extradition of Gerardo González Valencia will be granted to be subject to criminal proceedings before the competent authorities of the United States for the crimes referred to in the request, with the conditions indicated below.

Firstly, according to the request made by the Public Prosecutor's Office, the delivery will take effect once the party subject to the request obtains his provisional release or final freedom in the case that is followed in Uruguay before this court IUE 2-37467/2016.

For such purposes, it should be borne in mind that the case IUE 2-37467/2016 is in the summary stage and Gerardo González Valencia has been held since his indictment in pretrial detention at the disposal of the same. For this reason, he has not fulfilled the administrative detention in this extradition process.

Secondly, in accordance with the provisions of Article 13 of the Treaty, the extradition granted is conditional on the authorities of the requesting State ensuring that the party subject to the request will not be judged or convicted for crimes other than those referred to in the extradition request, with the exception of the cases enshrined in paragraphs 1 and 2 of the aforementioned article.

Thirdly, in accordance with the provisions of Article 7 of the Treaty, and in accordance with our internal and international public order and the respect for the guarantees of the party subject to the request emerging from international human rights law, the extradition granted is made upon the conditions that the requesting authorities granting guarantees considered sufficient by the national authorities intervening in this process, that, in the event that Gerardo González Valencia is convicted in the criminal proceedings that are intended to be initiated in the requesting country, a death penalty or a life in prison sentence will not be imposed on him.

Finally, the requesting State will be asked to express whether it accepts the conditions under which extradition is admitted within forty days as of the notification of this judgment.

**RULING:**

Protected Material

It is ordered to grant the extradition of Gerardo González Valencia requested by the competent authorities of the United States, under the following conditions: I) the handing over is deferred until the party subject to the request obtains his provisional release or definitive release in the case that is followed in Uruguay before this court, IUE 2 - 37467/2016, II) the extradition granted is made upon conditions that the authorities of the requesting State ensure that the party subject to the request will not be judged or convicted for crimes other than those referred to in the request for extradition, with the exception of the cases enshrined in numbers 1 and 2 of the aforementioned article; III) the extradition granted is made upon the conditions that the requesting authorities granting guarantees considered sufficient by the national authorities involved in this process, that, in the event that Gerardo González Valencia is convicted in the criminal proceedings that are intended to be initiated in the requesting country, he shall not be punished with the death penalty or a life in prison sentence; IV) the competent authorities of the requesting State must state whether they accept the conditions set forth in the previous sections within forty days of the notification of this ruling.

It is ordered that the communications corresponding to the requesting authority be submitted via diplomatic channels, with the corresponding formalities.-

It is ordered that it be notified and executed. It is ordered that be enforced. -

[signature]

Dr. Beatriz LARRIEU DE LAS CARRERAS

Professional Judge, Capital

[signature]
[stamp:]Mr. ANDRES ROMANO TRINIDAD
DEPUTY CLERK

Protected Material



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document " **00054527-00054539**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Dan McCourt

Sworn to before me this
June 29, 2023

Signature, Notary Public



Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE

JA1323

# **<u>EXHIBIT T</u>**



**Fiscalía**
GENERAL DE LA NACIÓN

Vista Nº: 613

**Juzgado Letrado de Primera Instancia en lo Penal Especializado en Crimen Organizado de 1º Turno.**
**Ficha: IUE 474-76/2016 "GONZALEZ VALENCIA, Gerardo. EXTRADICION"**

//ñora Juez Subrogante:

    **1.-** Con fecha 1.6.2016 fue recibida en la Suprema Corte de Justicia la Nota Nº 125 procedente de la Embajada de Estados Unidos de América acompañado de actuaciones y traducción, en relación a los autos caratulados: "EXTRADICION DE GERARDO GONZALEZ VALENCIA".

    Nancy Larroca se comunicó al Juzgado de Crimen Organizado de 1º Turno, siendo informada por la Actuaria Esc. Olid que González – Valencia iba a estar arrestado por mucho tiempo y que se tenía conocimiento de la solicitud de Extradición de parte de los Estados Unidos de América.

    Con fecha 15 de junio de 2016 por mandato verbal la Suprema Corte de Justicia dispuso que se cumpliera lo dispuesto con fecha 7 de junio a fs. 101 vto., esto es remitir las actuaciones al Juzgado de Primera Instancia en lo Penal Especializado en Crimen Organizado de 1º Turno, oficiándose, las que fueron recibidas con fecha 16.6.2016.

    **2.-** Con fecha 22.6.2016, fueron recibido el presente en Fiscalía con pase en vista.

    Respecto de la recepción del pedido de Extradición

JA1325
00054284

110

de **Gerardo GONZALEZ VALENCIA**, cabe consignar:

Rige estas actuaciones el Tratado bilateral vigente entre los Estados Unidos de América y la Replública Oriental del Uruguay, ratificado por la Ley 15.476 el cual entró en vigor el 26.10.1983.

Controlados los extremos requeridos por dicho Tratado se puede afirmar que la presente Extradición cumple con los requisitos formales requeridos salvo por lo que se dirá:

a) Respecto de los delitos cometidos, el art. 11 de la ley 18.494 incluye a los delitos establecidos en el DL 14.394, los precedentes de los tipificados en los arts. 54 a 57 de ese Decreto Ley y los establecidos por la ley 17.835 de 23.9.2004, sin perjuicio de lo dispuesto en el art. 17 del Tratado. Se cumple lo dispuesto en el art. 13 del Código Penal.

b) También lo establecido en el art. 8 así como las formalidades requeridas para aceptar la solicitud de extradición previstas en el art. 10, encuadrando además esta situación en lo dispuesto en el art. 8, en tanto Gonzalez Valencia se encuentra procesado en nuestro país por un delito de "Lavado de Activos".

c) Respecto de la pena a cumplir, existe una diferencia que **deberá ser respetada por el estado requirente a efectos de que se de cabal curso a la petición de Extradición**.

Surge de fs. 62, nal. 18 de la solicitud de Extradición, que "*La pena máxima par una violación del Cargo Uno de la acusación es la <u>privación de libertad a perpetuidad</u>, ...*".

En nuestro país <u>no está prevista la privación de libertad a perpetuidad o cadena perpetua</u>. Es así que nuestra legislación prevé en el art 66 del Código Penal que son penas

Protected Material

JA1326
00054285

principales: *"Penitenciaria..."* y el art. 68 *"ejusdem"* establece la duración de la pena de penitenciaría, dice la ley: *"La pena de penitenciaría durará de dos a treinta años"*. Y el art. 92 *"ejusdem"* dispone respecto de las medidas de seguridad: *"Las medidas de seguridad son de cuatro clases: curativa, educativas, eliminativas y preventivas....las terceras, (se aplican) a los delincuentes habituales ... y a los violadores u homicidas que por la excepcional gravedad del hecho, derivada de la naturaleza de los móviles, de la forma de ejecución, de los antecedentes y demás y demás circunstancias afines, denuncien una gran peligrosidad"*.

Y el art. 95 del Código Penal establece la duración máxima de las medidas eliminativas descriptas "supra", como máximo *"quince"* años.

Por tanto el país requirente deberá acoger como pena la mayor prevista en nuestro derecho es decir: 30 años de penitenciaría y 15 años más de medidas eliminativas, en su caso, si correspondieren. Sumando un total de *45 años.* Ello en tanto en nuestro país la duración de las penas son consideradas de orden público.

Por lo expuesto la Fiscalía solicita:

1) Se acceda al trámite de la Extradición de **Gerardo GONZALEZ VALENCIA**, según se requiere por los Estados Unidos de América con la salvedad de que la pena máxima a aplicarse es de 45 años, en tanto no se admite en nuestro derecho pena de privación de libertad a perpetuidad.

2) Se cite a declarar dentro del plazo de 24 horas que establece el art. 16 de la Constitución de la República, al recluso cuya extradición se requiere, debidamente asistido, para imponerle la solicitud del país requirente, muy

JA1327

00054286

especialmente si acepta ser extraditado, hecho sobre el cual manifestara en audiencia que estaría dispuesto a allanarse.

3) Se forme pieza con las actuaciones de Gerardo GONZALEZ VALENCIA, a efectos de agilizar el trámite en caso de que el mismo se allane a la Extradición. Se tiene presente además, que en tanto está vigente la Convención Interamericana para el cumplimiento de condenas penales en el extranjero, existe la posibilidad que una vez que el encausado sea condenado pueda cumplir pena en el país requirente.

4) Se agregue por cordón a la pieza principal un testimonio de la solicitud de Extradición del encausado Gerardo Gonzalez Valencia. (MAC)

Montevideo, 23 de junio de 2016.

**Dra. María de los Ángeles Camiño Moreno**
**Fiscal Letrado Nacional de lo Penal**
**Especializado en Crimen Organizado de 2° Turno**

Protected Material

00054287

[hw:] *109*



[logo:] FEDERAL Attorney General's Office

Review No.: [hw:] *613*

**First Instance Criminal Law Court Specialized in Organized Crime of the 1st Panel.**

**File: IUE 474-76/2016 "GONZALEZ VALENCIA, Gerardo. EXTRADITION"**

//dam Acting Judge:

**1.-** On 6/1/2016, Note No. 125 was received at the Supreme Court of Justice from the Embassy of the United States of America accompanied by actions and translation, in relation to the proceedings entitled: "EXTRADITION DE GERARDO GONZALEZ VALENCIA."

Nancy Larroca contacted the 1st Panel Organized Crime Court, being informed by the Esc Act. Olid that González - Valencia was going to be arrested for a long time and that he was aware of the petition for Extradition from the United States of America.

On June 15, 2016, by verbal order, the Supreme Court of Justice ordered that the provisions of June 7 on page 101 be complied with, that is, to send the proceedings to the First Instance Criminal Court Specialized in Organized Crime of the 1st Panel, giving notice that they were received on 6/16/2016.

**2.-** On 6/22/2016, this was received at the Attorney General's Office and passed in review.

Regarding the receipt of the Extradition order for **Gerardo GONZALEZ VALENCIA,** it is worth noting.

These proceedings are governed by the bilateral Treaty in force between the United States of America and the Oriental

Protected Material

JA1329

Republic of Uruguay, ratified by Law 15,476, which entered into force on 10/26/1983.

Having controlled the facts required by said Treaty, it can be affirmed that this Extradition complies with the formal requirements required except for what will be said:

**a)** With regard to the offenses committed, Art. 11 of Law 18,494 includes the offenses established in Decree Law 14,394, the precedents of those classified in Arts. 54 to 57 of that Decree Law and those established by Law 17,835 of 9/23/2004, without prejudice to the provisions of Art. 17 of the Treaty. The provisions of Article 13 of the Criminal Code are satisfied.

**b)** As well as what is set forth in the provisions of Art. 8 as well as the formalities required to accept the petition for extradition provided for in Art. 10, also framing this situation in the provisions of Art. 8, while Gonzalez Valencia is prosecuted in our country for a crime of "Money Laundering".

**c)** With respect to the penalty to be served, there is a difference that **must be respected by the petitioning state in order for the request for Extradition to be fully carried out.**

It states on page 62, section 18 of the petition for Extradition, that *the maximum penalty for a violation of Charge One of the indictment is the deprivation of freedom in perpetuity, ...".*

In our country, the deprivation of freedom in perpetuity or life imprisonment is not foreseen. Thus, our legislation provides in Article 66 of the Criminal Code that the main penalties are: ***"Penitentiary..."*** *and* Art. 68 "of the same" establishes the duration of the prison sentence, the law says: "***The prison sentence will last from two to thirty years."*** And Art. 92 "of the same" provides with respect to security measures: ***"The security***

Protected Material

*measures consist of four classes: curative, educational, elimination and preventive...the third ones, (apply) to habitual criminals ... and to rapists or murderers who, due to the exceptional severity of the fact, derived from the nature of the motives, the form of execution, the background and so on and other related circumstances, report a great danger."*

And Art. 95 of the Criminal Code establishes the maximum duration of the elimination measures described "above", at most **"fifteen"** years.

Therefore, the petitioning country must accept as a penalty the longest provided for in our law, that is: 30 years of prison and 15 more years of probationary measures, if applicable. Totaling **45 years.** This, while in our country, the duration of the penalties is considered public order.

Based on the foregoing, the Attorney General's Office requests:

1) The process of the Extradition of **Gerardo GONZALEZ VALENCIA is carried out,** as requested by the United States of America with the exception that the maximum penalty to be applied is 45 years, as it is not admitted in our law to deprive an individual of freedom in perpetuity.

2) The inmate whose extradition is petitioned, duly represented by a lawyer, to impose on him the request of the petitioning country, especially if he agrees to be extradited, on which he stated at a hearing that he would be willing to agree, is summoned to declare within the 24-hour period established by Art. 16 of the Constitution of the Republic.

3) It forms part of the actions of Gerardo GONZALEZ VALENCIA, for the purpose of speeding up the procedure in the event that it is brought to the Extradition. It is also taken

into account that while the Inter-American Convention on Serving Criminal Sentences Abroad is in force, there is a possibility that once the defendant is convicted, he may be punishable in the petitioning country.

4) A testimony of the request for Extradition of the accused Gerardo Gonzalez Valencia is added by agreement to the main piece. **(MAC)**

Montevideo, June 23, 2016.

[signature]
**Dr. Maria de los Angeles Camiño Moreno**
**National Criminal Attorney General**
**Specialized in 2nd Shift Organized Crime.**

Protected Material

JA1332

00052287



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**00054284-00054287**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.



Dan McCourt

Sworn to before me this
June 29, 2023

_____
Signature, Notary Public

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

JA1333

# <u>EXHIBIT U</u>

JA1334



**PODER JUDICIAL**

Sentencia Nro. 208

**Ministra Redactora:**

**Doctora Gabriela Merialdo Cobelli**

Montevideo, 2 de octubre de 2018.

**VISTOS:**

Para Sentencia definitiva de Segunda Instancia, estos autos caratulados: **"GONZÁLEZ VALENCIA, Gerardo – Extradición" - IUE 474-76/2016,** venidos a conocimiento del Tribunal, en mérito al recurso de apelación interpuesto por la Defensa del encausado, Dr. Víctor Della Valle, contra la sentencia definitiva Nº 13, de fecha 28 de agosto de 2017, dictada por la Sra. Jueza Letrada en lo Penal de Crimen Organizado de 1er. Turno, Dra. Beatriz Larrieu De Las Carreras, con intervención del Sr. Fiscal Letrado en lo Penal de Crimen Organizado de 2º Turno, Dr. Luis Pacheco.

**RESULTANDO:**

1) Aceptando y dando por reproducida la relación de antecedentes procesales de la apelada, pues se ajusta a las resultancias del proceso.

Por la misma se concedió la extradición de Gerardo González Valencia solicitada por las autoridades competentes de Estados Unidos bajo las siguientes condiciones:

1) Se difiere la entrega hasta que el requerido obtenga su excarcelación provisional o libertad definitiva en la causa que se le sigue en Uruguay ante esta sede IUE: 2-37467/2016

Protected Material

JA1335
00053245

2) se condiciona la extradición concedida a que las autoridades del Estado requirente aseguren que no se juzgará ni condenará al requerido por delitos distintos a ios que se refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del citado artículo;

3) se condiciona la extradición concedida a que las autoridades requirentes otorguen garantías consideradas suficientes por las autoridades nacionales intervinientes en este proceso, que en caso que Gerardo González Valencia resulte condenado en el proceso penal que se le pretende iniciar en el país requirente, no se le impondrá pena de muerte ni pena de prisión perpetua;

4) las autoridades competentes del Estado requirente deberán expresar si aceptan las condiciones dispuestas en los numerales anteriores, dentro del plazo de cuarenta días a partir de la notificación del presente fallo.

**2)** Se alzó la Defensa del encausado agraviándose en cuanto considera que la a-quo ordenó en forma errónea la extradición de Gerardo González Valencia. Manifiesta que si bien se identificó correctamente los principios jurídicos de control, ignoró esos principios al ordenar la extradición sujeta a condiciones inadecuadas. En tal sentido sostuvo lo siguiente:

1- que las garantías exigidas a Estados Unidos son inadecuadas para proteger los principios uruguayos.

2- que la solicitud de extradición es sustancial y formalmente defectuosa y debe ser denegada. Sostuvo que la a-quo se equivocó al afirmar que no se permite una revisión del contenido de la solicitud de extradición para determinar si procede o no la misma. Sin ningún examen de fondo no se

JA1336

Protected Material

00053246



PODER JUDICIAL

hace más que someterse a las conclusiones de Estados Unidos. El Tratado contiene una serie de disposiciones que demuestran que se requiere un examen de fondo. Los Tribunales uruguayos deben realizar un examen de fondo de los hechos para determinar si la solicitud está respaldada por prueba que demuestre una causa probable. Afirmó que el delito ha prescrito.

3- la petición no entra en el Tratado porque el presunto delito no ocurrió dentro del territorio estadounidense, por ello la solicitud de extradición debe denegarse.

4- no existe doble incriminación. González Valencia es acusado de conspiración para distribuir cocaína y metanfetamina para su importación en Estados Unidos. No existe en el Código Penal uruguayo el delito de distribución de narcotráfico.

5- no se proporciona prueba para demostrar una causa probable según lo requiere el Tratado.

6- la solicitud es formalmente defectuosa. Señaló que la declaración jurada está viciada formal y fundamentalmente porque contiene una carátula que hace referencia a un caso que no existe y fue firmada por el Juez en forma incorrecta en el Tribunal incorrecto.

En definitiva reclamó que no se haga lugar a la solicitud de extradición. Previamente el Tribunal debe exigir a Estados Unidos que presente pruebas reales que apoyen su solicitud. Que de no compartirse esto se exija a las autoridades de Estados Unidos que previamente a conceder la extradición otorgue garantías suficientes que no aplicara pena de muerte ni

Protected Material

JA1337

cadena perpetua ni pena superior a los 18 años de penitenciaría (máxima pena de la Ley uruguaya) ni agregar delitos o cargos de idéntica naturaleza.

**3)** El Ministerio Público evacuó el traslado conferido, abogando fundadamente por el mantenimiento de la recurrida.

**4)** Se franqueó la alzada. En esta Sede, citadas las partes, pasaron los autos a estudio, acordándose sentencia en legal forma.

**CONSIDERANDO:**

**I)** La Sala, con la unánime voluntad de sus miembros naturales, procederá a confirmar la sentencia en examen, descartando los agravios de la Defensa que no logran conmover los sólidos fundamentos de la apelada.

**II)** Formalmente la causa se desarrolló correctamente.

**III)** Sustancialmente se coincide con las conclusiones de la sentencia en estudio, por lo que se confirmará.

**IV)** Por la impugnada, se dispuso conceder la extradición de Gerardo González Valencia a los EEUU, sujeta a las condiciones que fueron impuestas en la misma.

**V)** La solicitud de extradición, cumple con los requisitos legales previstos en el Tratado de Extradición y Cooperación en Materia Penal suscrito entre la República Oriental del Uruguay y los Estados Unidos de América del año 1973, que vincula a nuestro país con EE.UU., que fuera ratificado por Dec. Ley 15.476:

\* La solicitud formal de extradición, luce agregada en estos autos de fs. 5 a 8.

Protected Material

JA1338



PODER JUDICIAL

\* En la misma se consigna que Gerardo González Valencia es requerido para ser sometido a juicio por cargos de narcotráfico.

\* Se indica, que con fecha 19 de abril de 2016, el Tribunal de Distrito de los Estados Unidos para el Distrito de Columbia emitió una orden para el arresto del mismo la que se mantiene válida y ejecutable.

\* Se señala, además, que dentro de los elementos relevantes de la investigación, se encuentran evidencias que desde enero de 2003 hasta el 19 de abril de 2016, González Valencia, habría sido el presunto líder de una organización de narcotráfico radicada en México, desde donde habría transportado varios envíos de varias toneladas de cocaína y metanfetaminas con fines de importación y distribución en Estados Unidos. Para ello, González Valencia, habría coordinado la importación y el traslado de la sustancia estupefaciente (cocaína) desde Colombia hasta México, utilizando para ellos camiones con remolque, lanchas, submarinos, etc. y desde allí a Estados Unidos, que era el destino final. A su vez, los precursores químicos, los habría trasladado desde Honduras hasta México, para producir metanfetaminas, las cuales luego habría transportado en aviones privados desde México hasta Estados Unidos para su distribución.

**VI)** Luego de presentada la solicitud de extradición, fundada en la eventual participación de González Valencia, en esos hechos, se convocó al mismo a la audiencia de precepto, la que luego de algunas prórrogas se cumplió el 29 de mayo de

Protected Material

JA1339

00053249

2017 (fs. 160), en la que manifestó que no aceptaba la solicitud de extradición (procedimiento abreviado de extradición).

Para la tramitación de la referida solicitud, no estando previsto en el Tratado de Extradición y Cooperación en Materia Penal suscrito entre la República Oriental del Uruguay y los Estados Unidos de América del año 1973 ratificado por el Dec. Ley 15.476, normas procesales para su tramitación, la Sede "a quo" por aplicación analógica aplicó las normas procesales previstas al Tratado de Montevideo de 1940.

**VII)** Los agravios de la Defensa no son de recibo:

a.- Así en lo que hace al primer agravio, esto es que no existen garantías que se han de cumplir las condiciones impuestas en la sentencia, no se comparte, se entiende que son adecuadas, pues las mismas están fijadas en la sentencia y deben ser aceptadas por el estado requirente para que se haga efectiva la entrega del requerido.

Se estableció, como condición que no se le imponga pena de muerte o cadena perpetua.

La Defensa, pretende que se imponga como condición al Estado requirente, que no se puede fijar una pena que supere los 18 años, por ser ésta la pena máxima en nuestro país.

Dicho agravio es de franco rechazo, pues el quantum punitivo, dependerá del juicio a llevarse a cabo en el Estado requirente y las condiciones que no se pueden vulnerar son las antes indicadas, pero entre ellas no se encuentran un máximo legal de pena (siempre que no sea perpetua).

b.- En lo que hace al segundo agravio se entiende que tampoco es de recibo. En el aspecto sustancial, se tiene en



Protected Material



PODER JUDICIAL

cuenta que la S.C.J ha dicho que en el procedimiento de extradición lo único que debe valorarse en la legitimidad formal del pedido, puesto que toda otra consideración acerca del fondo, es decir de la tipicidad del o de los delitos por lo que se cursa la solicitud son absolutamente violatorios del principio de competencia de las autoridades requirentes. Los tribunales del país requerido que aceptan o no el pedido de extradición no son competentes para juzgar el mérito de la causa (Sentencia Nº 125 del 2015).

En el aspecto formal se entiende que no ha operado la prescripción. En tal sentido se comparte la posición de la Fiscalía y la a-quo respecto a que los hechos habrían ocurrido hasta la presentación de la acusación lo que tuvo lugar el 19 de abril de 2016 sin que corresponda entrar a considerar los eventuales elementos de prueba obrantes en tal sentido (Mensaje de textos, declaración de testigos protegidos). Esto tendrá que elucidarse en el juicio a llevarse a cabo ante las autoridades del estado requirente.

c.- Tampoco es de recibo el agravio relativo a que el delito no fue cometido en el territorio de los EEUU. En efecto entre los delitos a que se hace referencia en el pedido de extradición de fs. 6, es que el requerido habría transportado varios envíos con varias toneladas de cocaína y metanfetaminas desde México hacia EE.UU., destino final para la distribución tanto de la cocaína como de las metanfetaminas.

Por lo tanto no es posible rechazar a priori la solicitud, en la fundamentación que pretende la Defensa, quien argumenta que el delito no se cometió en el territorio del estado requirente,

JA1341

00053251

de acuerdo a la solicitud de extradición, ello no es así, pues la misma se funda en el ingreso al territorio del Estado requirente de varias toneladas de cocaína y metanfetaminas (transporte, importación y distribución de las mismas) y existiendo, objeción de la Defensa, dicha circunstancia se tendrá que resolver en el respectivo juicio a llevarse a cabo en el Estado requirente.

d.- El agravio de la doble incriminación tampoco es de recibo, la distribución de narcotráficos está tipificada como delito en nuestro país en el art. 31 del Dec. Ley 14.294 concordantes y modificativas, uno de cuyos verbos nucleares es precisamente distribuir (además, del transporte e importación).

**VIII)** En suma, en autos se cumplieron con los requisitos adjetivos y sustanciales previstos en el Tratado de Extradición y Cooperación en Materia Penal suscrito entre la República Oriental del Uruguay y los Estados Unidos de América, el 6 de abril de 1973, en vigencia desde el 11 de abril de 1984.

Ha de recordarse que la extradición es un acto de asistencia judicial interetático en materia penal que versa sobre el envío de un individuo penalmente inculpado o requerido, de la esfera de soberanía de un Estado a la de otro.

En efecto, desde el ámbito extradicional existen cada vez más tratados bi y multilaterales, tendientes a reafirmar la cooperación internacional en materia de persecución de la criminalidad.

Así, la entrega de delincuentes ya no es más para los países un acto de cortesía internacional "comitas gentium" sino

Protected Material

JA1342



**PODER JUDICIAL**

una imposición que emerge de los acuerdos, pasible de crear responsabilidad internacional para el Estado que no cumpla.

Concomitantemente a este avance incesante de la cooperación interetática, hoy es absolutamente incontrastable que la extradición entroniza el instrumento más gravoso y extremo en sede de cooperación internacional. Y ello es así, por los daños irreparables a los que puede enfrentarse el sujeto extraído.

Por ello, como contrapartida, de la flexibilización en la cooperación y el latente riesgo de daño de la entrega es que irremediablemente deberá ser contrarrestado con un fuerte valladar de principios tutelares que protejan al extraído, como se realizó en la recurrida al disponerse en el fallo condiciones que el estado requirente debe cumplir para hacerse efectiva la entrega del requerido.

Ese conjunto de principios tutelares, consignados vía condiciones para la entrega en la recurrida, en definitiva otorgan legitimidad tanto a la actuación del Tribunal requirente como a la del requerido. (Joao Marcelo de Araujo Junior -Concepto y naturaleza jurídica de la extradición en Curso de Cooperación Penal Internacional -Ed. Carlos Álvarez -Año 1994- Pág. 151; Jorge Pereyra Schurmann- La extradición como instituto garantizador de los Derechos Humanos en Rev. Ciencias Penales. Nº 1 -Año 1995- Pág. 92, Carlos Alvarez Cozzi -Extradición- El caso de los militares argentinos "carapintadas" En Rev. Jca. del CED Nº 11 -Año 1996- Pág. 109)".

JA1343

00053253

En suma, los agravios de la Defensa carecen no sólo de virtualidad jurídica, sino de poder convictivo como para modificar los sólidos fundamentos en que reposa la recurrida, por lo que se irá al rechazo de los mismos y a la confirmación de la apelada.

Por los fundamentos expuestos, lo dispuesto en Tratado de Extradición y Cooperación en Materia Penal suscrito entre la República Oriental del Uruguay y los Estados Unidos de América de 1973, ratificado por el Dec. Ley 15.476, Tratado de Montevideo de 1940, art. 31 del Dec. Ley 14.294 concordantes y modificativas y arts. 253 y ss. del C.P.P., **el Tribunal**, *FALLA*:

*CONFÍRMASE LA SENTENCIA DE PRIMERA INSTANCIA APELADA.*

*OPORTUNAMENTE, DEVUÉLVASE A LA SEDE DE ORIGEN.*

Dr. Ángel Cal Shabán
Ministro

Dra. Gabriela Merialdo Cobelli
Ministra

Dr. LUIS CHARLES
Ministro Tribunal de Apelaciones
Penal de 4to. Turno

Esc. FERNANDO DURAN SANCHEZ
SERETARIO I
TRIBUNAL DE APELACIONES
PENAL 4to TURNO

JA1344

Protected Material



PODER JUDICIAL

# *CEDULÓN*

**Tribunal de Apelaciones en lo Penal de 4° Turno**
Yi 1523 ps.2°    Tel 2900 3922   Fax 29089659

**Fiscalía de Crimen Organizado**

**Domicilio: Su Despacho**

**En autos: "GONZALEZ VALENCIA, Gerardo". (IUE: 474-76/2016)**
notifico a Ud. la Sentencia N° 208 de fecha 02/10/2018, cuya copia se
adjunta.-

Habiéndome constituido en su domicilio, dejo el presente Cedulón

el día     2 5. OCT. 2018

Por comisión de secretaría

........................................
Notificador.

Protected material

JA1345

00053255

Judgment No. 208

[emblem:]
JUDICIAL
BRANCH

**Drafting Judge:**

**Doctor Gabriela Merialdo Cobelli**

Montevideo, October 2, 2018.

[seal:] [Criminal
Court of Appeals
4th Rotation]

### RECITALS:

For a final Judgment of the Second Instance, these proceedings are entitled: **"GONZÁLEZ VALENCIA, Gerardo - Extradition" - IUE (*Identificación Unica de Expedientes* [Unique Case Identification]) 474-76/2016,** brought to the attention of the Court, based on the appeal filed by the Defense of the Defendant, Dr. Víctor Della Valle, against the final judgment No. 13, dated August 28, 2017, issued by the Judge of the Criminal Court on Organized Crime of the 1st Rotation, Dr. Beatriz Larrieu De Las Carreras, with the intervention of the Federal Prosecutor Criminal Court on Organized Crime of the 2nd Rotation, Dr. Luis Pacheco.

### RESULTING:

**1)**    Accepting and deeming as reproducing the details of the procedural record of the appellee, as it conforms to the results of the process.

The extradition of Gerardo González Valencia requested by the competent authorities of the United States was granted under the following conditions:

1) The handing over is deferred until the party subject to the extradition request obtains his provisional release or definitive

Protected Material

release in the case that is followed in Uruguay before this IUE headquarters: 2-37467/2016

2)   the extradition granted is made upon condition that the authorities of the requesting state ensure that the party subject to the extradition request will not be judged or convicted for offenses other than those referred to in the request for extradition, with the exception of the cases enshrined in numbers 1 and 2 of the aforementioned article;

3)   the extradition granted is made upon condition that the requesting authorities grant guarantees considered sufficient by the national authorities involved in this proceeding, that, in the event that Gerardo González Valencia is convicted in the criminal proceeding that is intended to be initiated in the requesting country, a death penalty or a life in prison sentence will not be imposed on him;

4)   the competent authorities of the requesting State shall state [signature] whether they accept the conditions set forth in the previous numbers within forty days from the notification of this ruling.

**2)**   The defense of the defendant filed an appeal as it considers that the a-quo erroneously ordered the extradition of Gerardo González Valencia. It states that, although the legal principles of control were correctly identified, it ignored those principles by ordering extradition subject to inadequate conditions. In this regard, it argued the following:

1-   that the guarantees required from the United States are inadequate to protect Uruguayan principles.

2-   that the extradition request is substantially and formally defective and must be denied. It maintained that the a

Protected Material

[emblem:]
JUDICIAL
BRANCH

[seal:] [illegible]

quo was wrong in stating that a review of the content of the extradition request is not allowed to determine whether or not it is admissible. Without any in-depth examination, there is nothing more than submitting to the conclusions of the United States. The Treaty contains a number of provisions that demonstrate that an in-depth examination is required. The Uruguayan courts must conduct an in-depth examination of the facts to determine whether the application is supported by evidence showing probable cause. He stated that the crime his time-barred.

3-      the request does not enter into the Treaty because the alleged crime did not occur within the United States, therefore, the extradition petition must be denied.

4-      there is no double criminality. González Valencia is accused of conspiracy to distribute cocaine and methamphetamine for importation into the United States. There is no Uruguayan Criminal Code for the crime of drug distribution.

5-      there is no evidence provided to demonstrate a probable cause as required by the Treaty.

6-      the request is formally defective. It pointed out that the affidavit is formally and fundamentally defective because it contains a cover sheet that refers to a case that does not exist and was signed incorrectly by the Judge in the incorrect Court.

It ultimately claimed that the extradition request would not be made. The Court must previously ask the United States to present real evidence to support its request. That, if this is not granted, the United States authorities be required to grant sufficient guarantees prior to granting the extradition that the

Protected Material

JA1348

00053247

death penalty, life in prison, or a penalty of more than 18 years of prison (the maximum penalty under Uruguayan law) will not be applied, nor will they add offenses or charges of an identical nature.

3)    The Public Prosecutor's Office answered the court's request, advocating with grounds for the maintenance of the appeal.

4)    The appeal was granted. The parties being summoned, the proceedings were under review in this Court, with the judgment being legally agreed upon.

**WHEREAS:**

I)    The Chamber, with the unanimous will of its natural members, will proceed to uphold the judgment under review, dismissing the grievances of the Defense that failed to disprove the solid grounds of the appellee.

II)    Formally, the case was developed correctly.

[signature]

III)    It is substantially consistent with the conclusions of the judgment under review, so it will be upheld.

IV)    By the appealed ruling, it was ordered to grant the extradition of Gerardo González Valencia to the US, subject to the conditions that were imposed therein.

V)    The extradition request complies with the legal requirements set forth in the Treaty on Extradition and Cooperation in Penal Matters signed between the Oriental Republic of Uruguay and the United States of America in 1973, which links our country to the US, which was ratified by Dec. Law 15,476:

* The formal extradition request appears to be added in

[hw:] *319*

these proceedings on pages 5 to 8.

[emblem:]
JUDICIAL
BRANCH

[seal:] [illegible]

* It is stated therein that Gerardo González Valencia is requested to be submitted to trial for charges of drug trafficking.

* It is indicated that, on April 19, 2016, the United States District Court for the District of Columbia issued an arrest warrant for him, which remains valid and enforceable.

* It is also noted that, among the relevant elements of the investigation, there is evidence that, from January 2003 to April 19, 2016, González Valencia had been the alleged leader of a drug trafficking organization based in Mexico, from which he would have transported several tons of cocaine and methamphetamines for import and distribution purposes in the United States. To do this, González Valencia would have coordinated the import and transfer of the narcotic substance (cocaine) from Colombia to Mexico, using for this trucks with trailers, boats, submarines, etc. and from there to the United States, which was the final destination. In turn, the chemical precursors would have moved them from Honduras to Mexico to produce methamphetamines, which would then have been transported in private planes from Mexico to the United States for distribution.

**VI)** After submitting the request for extradition, based on the possible participation of González Valencia, in these events, the same was convened to the legal hearing, which after some extensions was fulfilled on May 29, 2017 (p. 160), in which he stated that he did not accept the request for extradition (abbreviated extradition procedure).

Protected Material

00053249
JA1350

For the processing of the aforementioned application, not being provided for in the Treaty on Extradition and Cooperation in Criminal Matters signed between the Oriental Republic of Uruguay and the United States of America of 1973 ratified by Dec. Law 15,476, procedural rules for processing, the "a quo" Court, by analogous application, applied the procedural rules provided for the Treaty of Montevideo of 1940.

**VII)**   The grievances of the Defense are not admissible:

a.-   As regards the first grievance, that is, that there are no guarantees that must meet the conditions imposed in the judgment, it is not shared, as it is understood that they are adequate, since they are set in the judgment and must be accepted by the requesting state for the handing over of the party subject to the extradition request to be effective.

It was established as a condition that a death penalty or a life in prison sentence will not be imposed on him.   [signature]

The Defense intends to set as a condition on the requesting State, that a penalty that exceeds 18 years cannot be imposed, as this is the maximum penalty in our country.

This grievance is clearly to be rejected, since the punitive quantum will depend on the trial to be carried out in the requesting State and the conditions that cannot be violated are those indicated above, but among them, there is no legal maximum penalty (provided it is not life in prison).

b.-   With regard to the second grievance, it is understood that it cannot be admitted either. In the substantive aspect, it is taken into account that the S.C.J. has said that in the extradition procedure the only thing that must be assessed is the formal

Protected Material

[emblem:]
JUDICIAL
BRANCH

[seal:] [illegible]

legitimacy of the request, since any other consideration regarding the substance, i.e. the criminality of the offense or offenses for which the request is made, absolutely violates the principle of competence of the requesting authorities. The courts of the requested country that accept or reject the request for extradition are not competent to judge the merit of the case (Judgment No. 125 of 2015).

In the formal aspect, it is understood that the statute of limitations has not elapsed. In this sense, the position of the Public Prosecutor's Office and the a-quo are shared in that the facts would have occurred until the presentation of the accusation, which took place on April 19, 2016, without it being necessary to consider the possible evidence found in this sense (Text message, declaration of protected witnesses). This will have to be clarified in the trial to be carried out before the authorities of the requesting state.

c.-   The grievance relating to the fact that the offense was not committed within the territory of the United States is also not admissible. In effect, among the offenses referred to in the extradition request on page 6, the party subject to the extradition request would have transported several shipments with several tons of cocaine and methamphetamines from Mexico to the US, the final destination for the distribution of both cocaine and methamphetamines.

Therefore, it is not possible to reject a priori the request, in the grounds that the Defense claims, who argues that the crime was not committed in the territory of the requesting State, according to the extradition request, this is not so, since it is

Protected Material

based on the entry into the territory of the requesting State of several tons of cocaine and methamphetamines (transportation, importation and distribution of the same) and if there is an objection from the Defense, such circumstance will have to be resolved in the respective trial to be carried out in the requesting State.

d.- The grievance of double criminality is also not admissible, as the distribution of drug trafficking is classified as a crime in our country in Article 31 of Dec. Law 14.294, concordant and modifying, one of whose nuclear verbs is precisely to distribute (in addition, of transport and import).

**VIII)** In summary, the adjective and substantial requirements provided for in the Treaty on Extradition and Cooperation in Penal Matters signed between the Oriental Republic of Uruguay and the United States of America, on April 6, 1973, in force since April 11, 1984, were met in the proceedings. [signature]

It must be remembered that extradition is an act of inter-State judicial assistance in criminal matters that deals with the sending of a criminally charged or requested individual, from the sphere of sovereignty of one State to that of another.

Indeed, from the extradition scope, there are more and more bilateral and multilateral treaties, aimed at reaffirming international cooperation on the subject of the persecution of criminality.

Thus, the handing over of criminals is no longer an act of international courtesy "comitas gentium," but an imposition that emerges from the agreements, which could engage

Protected Material

00053252
JA1353

[emblem:]
JUDICIAL
BRANCH

[seal:] [illegible]

international responsibility for the State that does not comply.

Concurrently with this incessant advancement of inter-State cooperation, it is absolutely incontrovertible today that extradition introduces the most burdensome and extreme instrument in the headquarters of international cooperation. And this is so due to the irreparable damages that the extradited subject may face.

Therefore, as a counterpart of the flexibility in cooperation and the latent risk of harm of the delivery is that it must be irremediably counteracted with a strong protection of the guardianship principles that protect the extradited person, as was done in the appealed ruling when conditions were set with which the requesting state must comply to make the handing over of the requested effective.

This set of guardianship principles, consigned through conditions for delivery found in the appealed ruling, ultimately grants legitimacy to both the action of the requesting Court and that of the party subject to the request. (Joao Marcelo de Araujo Junior - *Concepto y naturaleza jurídica de la extradición* [Concept and legal nature of the extradition] in *Curso de Cooperación Penal Internacional* [Course of International Criminal Cooperation] - Ed. Carlos Álvarez -Year 1994- Page 151; Jorge Pereyra Schurmann- *La extradición como instituto garantizador de los Derechos Humanos* [Extradition as a Human Rights Guarantee Institute] in *Rev. Ciencias Penales* [Criminal Sciences Rev.] No. 1 -Year 1995- Page 92, Carlos Alvarez Cozzi - *Extradición- El caso de los militares argentinos "carapintadas"* [Extradition- The case of Argentine military right-

Protected Material

wing ultranationalists] In *Rev. Jca. del CED* [CED Legal Rev.] No. 11 -Year 1996- Page 109)".

In summary, the grievances of the Defense lack not only legal virtuality, but also convictive power to modify the solid grounds on which the appealed ruling is based, and therefore, they will be rejected and the appealed ruling will be upheld.

On the basis of the foregoing, the provisions of the Treaty on Extradition and Cooperation in Criminal Matters signed between the Oriental Republic of Uruguay and the United States of America of 1973, ratified by Dec. Law 15.476, Treaty of Montevideo of 1940, art. 31 of Dec. Law 14.294, concordant and modifying, and Articles 253 and following of the CPP (Código del Proceso Penal [Code of Criminal Procedure]), **the Court, RULES**:

[signature]

*TO UPHOLD THE JUDGMENT OF THE FIRST INSTANCE UNDER APPEAL.*

*IT IS ORDERED THAT IT BE RETURNED TO THE COURT OF ORIGIN IN A TIMELY MANNER.*

[signature]                                    [signature]
Dr. Ángel Cal Shabán              Dr. Gabriela Merialdo Cobelli

Justice                                         Judge

[signature]
[stamp:] Dr. [LUIS] CHARLES [illegible]

[signature]
[stamp:] Mr. FERNANDO DURAN SANCHEZ
JUDGE OF THE COURT OF APPEALS
4th Rotation [illegible]

00053254
JA1355

# NOTIFICATION

[emblem:]
JUDICIAL
BRANCH

## Criminal Court of Appeals 4th Rotation
Yi 1523 ps.2º Tel 2900 3922 Fax 29089659

**Organized Crime Public Prosecutor's Office**

**Address: Delivered by Hand**

**In proceedings: "GONZALEZ VALENCIA, Gerardo" (IUE: 474-76/2016) notified you of Judgment No. 208 dated 02/10/2018, a copy of which is attached.-**

**Having been present at your home address, I hereby leave this Notification on** [stamp:] OCT 25, 2018

By court clerk

........................[signature]........................

**Notifier.**

[signature]

Protected Material

00053255

JA1356



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**00053245-00053255**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Dan McCourt

Sworn to before me this
June 29, 2023

_____
Signature, Notary Public



_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE

JA1357

# **<u>EXHIBIT V</u>**



**SUPREMA CORTE
DE JUSTICIA**

//tencia No. 18

MINISTRA REDACTORA:

DOCTORA ELENA MARTINEZ

Montevideo, once de febrero de dos mil veinte.

**VISTOS:**

Para sentencia definitiva, estos autos caratulados: **"GONZALEZ VALENCIA, GERARDO. EXTRADICIÓN - CASACIÓN PENAL" - IUE: 474-76/2016.**

**RESULTANDO:**

I) Por sentencia No. 13, de fecha 28 de agosto de 2017, el Juzgado Letrado de Primera Instancia en lo Penal Especializado en Crimen Organizado de 1° Turno, falló:

*"Concédese la extradición de Gerardo González Valencia solicitada por las autoridades competentes de Estados Unidos, bajo las siguientes condiciones: I) se difiere la entrega hasta que el requerido obtenga su excarcelación provisional o libertad definitiva en la causa que se le sigue en Uruguay ante esta Sede IUE 2-37467/2016; II) Se condiciona la extradición concedida a que las autoridades del Estado requirente aseguren que no se juzgará ni condenará al requerido por delitos distintos a los que refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del citado artículo; III) se condiciona la extradición concedida a que las autoridades requirentes*

Protected Material

JA1359

otorguen *garantías consideradas suficientes por las autoridades nacionales intervinientes en este proceso, que en caso que Gerardo González Valencia resulte condenado en el proceso penal que se le pretende iniciar en el país requirente no se le impondrá pena de muerte ni pena de prisión perpetua; IV) las autoridades competentes del Estado requirente deberán expresar si aceptan las condiciones dispuestas en los numerales anteriores, dentro del plazo de cuarenta días a partir de la notificación del presente fallo (...)"* (fs. 238/250).

II) Por sentencia No. 208, dictada el día 2 de octubre de 2018, por el Tribunal de Apelaciones en lo Penal de 4° Turno, se dispuso:

*"Confírmase la sentencia de primera instancia apelada. (...)"* (fs. 317/321 vta.).

III) Contra el antedicho fallo, la defensa de GONZALEZ VALENCIA interpuso el recurso de casación en estudio (fs. 334/344).

En tal sentido, sostuvo, en síntesis, lo siguiente.

a) Inicialmente, expresó que el Tribunal erró al aplicar el Tratado de Extradición y Cooperación en materia penal celebrado entre Estados Unidos de América y la República Oriental del Uruguay (de fecha 6 de abril de 1973 firmado en la ciudad de

Protected Material

JA1360
00053801

2



**SUPREMA CORTE DE JUSTICIA**

Washington), dado que tal acuerdo no refiere al caso de autos.

Recordó que GONZÁLEZ no se encuentra procesado o condenado, tal como exige el art. 1º "eiusdem".

Entendió que el Tratado aplicable a la causa es el de Asistencia Jurídica mutua en asuntos penales celebrado el 6 de mayo de 1991 y ratificado por nuestro país a través de la ley 16.431.

b) Alegó, como otro vicio del dispositivo atacado, que no se exigió prueba a los efectos de constatar los hechos narrados por el estado requirente.

Insistió en que el art. 10 del Tratado en su nral. 3 indica que "*la parte requerida podrá solicitar que la requirente presente pruebas suficientes para establecer 'prima facie' que la persona reclamada ha cometido el delito por el cual la extradición se formula, pudiendo la parte requerida denegar la extradición si un examen del caso demuestra que la orden de arresto es manifiestamente infundada*".

Mencionó que la simple declaración fiscal no es evidencia. Asimismo, cuestionó el rol que cumplen los testigos protegidos y el valor probatorio que las autoridades norteamericanas le otorgan a los mensajes de texto.

Protected Material

JA1361

3

c) Indicó que a su criterio ha operado la prescripción de los delitos que se pretenden imputar.

Enfatizó que en el mejor de los casos el presunto ilícito ocurrió en el mes de agosto de 2007, mientras que la acusación data de fecha 19 de abril de 2016.

En consecuencia, aseveró que habiendo pasado más de cinco años el delito se encuentra prescripto, de acuerdo con las normas del país requirente.

d) Esgrimió peligro de violación de los derechos humanos en caso de concederse la extradición.

Mencionó -a vía de ejemplo- que el Tribunal Superior de Justicia de Irlanda rechazó la solicitud de los Estados Unidos de extraditar a un individuo que enfrenta un juicio debido a las severas condiciones de reclusión en dicho país.

Además, manifestó que para el caso de ser extraditado corre riesgo de ser condenado a cadena perpetua o incluso a la pena de muerte.

e) Refirió que debe considerarse también que GONZÁLEZ tiene una causa en Uruguay, donde la defensa al contestar la acusación fiscal solicitó la declaración ampliatoria del reo y sostuvo

Protected Material

JA1362

4



**SUPREMA CORTE
DE JUSTICIA**

que corresponde a Derecho que esté en nuestro país a disposición de dicha causa hasta que sea condenado. Tal como surge del art. 8 de ambos Tratados en cuestión, el de 1973 y el de 1991, Uruguay tiene la facultad de aplazar la extradición en caso de que fuera concedida hasta la conclusión del proceso penal al que se encuentra sometido en nuestro país.

f) Finalmente, afirmó que la pena máxima a aplicar debería ser limitada al "quántum" más gravoso que establece el decreto-ley No. 14.294 y la ley No. 17.016, respecto al delito de análoga naturaleza, que es la establecida en el art. 31, o sea 18 años de penitenciaría. Entendió que se debe de agregar como condición, para el caso de que se haga lugar a la extradición, que la pena máxima a recaer sea de 18 años por ser el tope legal para un delito similar en nuestro país.

IV) Por providencia No. 219, de fecha 20 de febrero de 2019 (foja 357), se ordenó dar ingreso al recurso de casación movilizado.

V) Conferidos los respectivos traslados, compareció el Sr. Fiscal Letrado Especializado en Crimen Organizado, solicitando el rechazo de la impugnación (fs. 363/366); en igual sentido se pronunció el Sr. Fiscal de Corte (fs. 399/404).

JA1363

00053804

5

VI) Por decreto No. 883, de 16 de mayo de 2019 (fojas 406), se dispuso el pasaje de los autos a estudio (fs. 406); concluido el estudio se acordó el dictado de sentencia para el día de hoy.

CONSIDERANDO:

I) La Suprema Corte de Justicia, por unanimidad de sus miembros naturales, desestimará el recurso de casación interpuesto por el encausado, por los fundamentos jurídicos que se expresarán, pues los agravios articulados como sustento de la impugnación no resultan eficientes para resolver en sentido opuesto a lo decidido en segunda instancia.

II) De la extradición que tramita en autos y de los agravios articulados en casación.

La presente causa trata de la solicitud de extradición impetrada por Estados Unidos de América contra Gerardo GONZÁLEZ VALENCIA, a quien se le imputa la comisión de reiterados delitos vinculados con el tráfico de estupefacientes.

En dicho marco, recayeron sendas sentencias de mérito que habilitaron la entrega de GONZÁLEZ VALENCIA a las autoridades del Estado requirente, lo que motivó, por parte del nombrado, la presentación del recurso de casación en estudio.

En concreto, del libelo impugnativo se pueden identificar los siguientes

JA1364

00053805



**SUPREMA CORTE
DE JUSTICIA**

agravios:

1) agravios referidos a la aplicación en el caso del Tratado de Extradición y Cooperación en materia penal celebrado en el año 1973 entre la República Oriental del Uruguay y los Estados Unidos de América (ratificado en nuestro país por decreto-ley No. 15.476);

2) agravios relacionados con la alegada ausencia de prueba suficiente para conceder la extradición;

3) agravios relativos a la invocada prescripción de los delitos por los cuales se solicitó la extradición;

4) agravios vinculados al supuesto riesgo de violación a los derechos humanos en caso de concederse la extradición;

5) agravios asociados al invocado error al haberse diferido la entrega hasta la obtención de la excarcelación provisional o de la libertad definitiva; y

6) agravios ligados al pretendido error al no haberse condicionado la extradición a que la pena máxima a ser aplicada en el Estado requirente sea la de 18 años de penitenciaría.

En el orden propuesto, serán analizados en lo sucesivo.

Protected Material

JA1365

III.1)     De los agravios referidos a la aplicación en el caso del Tratado de Extradición y Cooperación en materia penal celebrado en el año 1973 entre la República Oriental del Uruguay y los Estados Unidos de América (ratificado en nuestro país por decreto-ley nro. 15.476)

III.1.1) Como primera línea de defensa, el recurrente señala que el Tribunal de Apelaciones incurrió en un error de derecho al sostener que el Tratado aplicable en relación a la solicitud de extradición incoada es el ratificado por el decreto-ley nro. 15.476.

Entiende que la solicitud se cursó a los efectos de someter a juicio al Sr. GONZÁLEZ VALENCIA y que dicha solicitud está basada en un Tratado que no resulta aplicable, por contravenir el estatuto jurídico del denunciado, quien al no haber sido procesado ni penado, no está sujeto al Tratado de 6 de abril de 1973.

Insiste en que, en la especie, el Tratado aplicable es el celebrado el 6 de mayo de 1991 entre el Estado Uruguayo y los Estados Unidos de América, sobre Asistencia Jurídica Mutua en Asuntos Penales, ratificado por ley No. 16.431.

A juicio de la Corte, el planteo recursivo no es de recibo, pues el encuadre

Protected Material

JA1366

00053807

8



SUPREMA CORTE
DE JUSTICIA

normativo del caso efectuado en ambas sentencias de mérito, resulta irreprochable.

En efecto, en el particular, se aplica el Tratado de Extradición y Cooperación en Materia Penal suscrito en Washington (EE.UU.), el 6 de abril de 1973, aprobado por decreto-ley No. 15.476 (en adelante: Tratado de 1973); en el entendido de que la situación jurídica de GONZÁLEZ VALENCIA se acopla perfectamente al supuesto previsto por la mentada norma bilateral.

Contra lo que dice el recurrente, el Tratado de 1973 no se ha visto derogado, modificado o sustituido por las previsiones del Tratado de Asistencia Jurídica Mutua en Asuntos Penales celebrado en Montevideo, el 6 de mayo de 1991, ratificado por ley No. 16.431 (en adelante: Tratado de 1991). Si bien dicho Tratado es posterior, ciertamente regula otro tipo de asistencia jurídica mutua en asuntos penales y no estrictamente a la extradición.

En verdad, las hipótesis que regula el Tratado de 1991 no refieren a la extradición de personas (la norma bilateral en ningún momento habla de extradición), sino que refiere a otro tipo de asistencia en materia penal.

En otras palabras: no resulta de aplicación el Tratado de 1991, por referir a grados

Protected Material

de cooperación de menor intensidad a la extradición, a saber: "*a. notificación de documentos; b. recepción de testimonios o declaraciones de personas, así como también la realización de peritajes y examen de objetos y lugares; c. localización o identificación de personas; d. notificación a testigos o peritos para la comparecencia voluntaria para prestar testimonios en el Estado requirente; e. traslado de personas sujetas a un proceso penal a efectos de comparecer como testigos o con otros propósitos expresamente indicados en la solicitud; f. Medidas cautelares o inmovilización de bienes; g. cumplimiento de solicitudes de registro y secuestro; h. entrega de documentos y otros elementos de prueba; i. inmovilización, confiscación o trasferencia de bienes confiscados, así como en materia de indemnizaciones y multas impuestas por sentencia penal; y j. cualquier otra forma de asistencia no prohibida por las leyes del Estado requerido para la investigación y enjuiciamiento de delitos*" (art. 2).

En este último sentido, la referencia a "*propósitos expresamente indicados en la solicitud*" (lit. e), como bien anota el Sr. Fiscal Letrado, "*no puede entenderse que pueda solicitarse por esta vía una extradición, pues se trata la extradición de un proceso sujeto a múltiples condiciones y requisitos, que deben estar expresamente previstos en la*

Protected Material

00053809



SUPREMA CORTE
DE JUSTICIA

norma bilateral (delitos incluidos, delitos excluidos, plazos para cursar la solicitud, arresto preventivo, documentación exigible, formalidades, etc.) que no lo están en el Tratado de 1991" (fs. 363 vta.).

Lo dicho resulta suficiente para repeler este primer sector del agravio.

III.1.2) En otro orden, como defensa subsidiaria, GONZÁLEZ VALENCIA aduce que no ha sido procesado ni condenado en los Estados Unidos de América, por lo que a su respecto no se verificarían los requisitos exigidos por el art. 1° del Tratado de 1973 para conceder la extradición.

Nuevamente, no le asiste razón.

A juicio de la Corte, el recurrente efectúa una lectura sesgada del art. 1° de la norma bilateral para sostener que hasta tanto no exista un procesamiento no se puede hacer lugar a la extradición.

En primer lugar, con criterio general, tal interpretación colide con los fundamentos y principios de la cooperación judicial internacional en materia penal.

No puede perderse de vista que a la hora de interpretar los Tratados (a diferencia de la interpretación que efectúa el impugnante) debe hacerse en la forma que favorezca el fin por el que

Protected Material

fueron convenidos, en el entendido de que deben regir las premisas de cooperación entre los estados y la tutela de la sociedad más allá del lugar físico en donde se encuentre el sujeto al cual se le pretende imputar el ilícito.

Tal como sobre el particular ha sostenido el Sr. Ministro de la Corte Dr. Tabaré SOSA AGUIRRE: "...*el criterio en materia de asistencia judicial internacional ha de ser de facilitarla, ampliarla y abreviar los trámites pertinentes en el aspecto procesal y reducir las condiciones en el plano sustantivo*" (cf. "Independencia judicial como condición para la cooperación internacional", publicado en "Curso de Cooperación Penal Internacional", Río de Janeiro 1994, Ed. Carlos Álvarez, Primera Edición, Montevideo, 1994, pág. 141).

En segundo lugar, en específica referencia a la interpretación de los términos "procesadas" y "condenadas", utilizados por el citado art. 1° del Tratado de 1973, estima la Corte que debe hacerse mediante la aplicación del criterio o método lógico-sistemático, conforme con el cual, corresponde acudir al contexto normativo, esto es, al resto del articulado del propio instrumento internacional en análisis (además del preámbulo y sus anexos), a efectos de indagar si el propio Tratado contiene alguna

Protected Material

JA1370

00053811



**SUPREMA CORTE
DE JUSTICIA**

definición de los términos a ser interpretados (art. 31.1 de la Convención de Viena sobre el derecho de los tratados).

De ahí que la defensa del encausado se equivoca en pretender que el procesamiento exigido por la norma debe entenderse en los términos similares al ordenamiento doméstico.

En tal sentido, el propio Tratado de 1973 refiere, en su art. 10 nral. 3, que cuando "*el requerimiento se refiera a una persona que aún no ha sido condenada, deberá ser **acompañado de una orden de detención o de prisión o auto de procesamiento judicial equivalente**, emanado de la autoridad competente de la Parte requirente*" (tal como se verifica "infolios").

Pretender sostener que se requiera procesamiento o condena a la luz de los términos que maneja nuestro ordenamiento es limitar la cooperación en materia de extradición a sujetos que se fugaron con anterioridad o posterioridad al procesamiento, o a quienes se les realizó un juicio en rebeldía en su contra.

Sucede que la interpretación efectuada por la defensa choca con aristas básicas del propio instituto de la extradición.

Al respecto, Manuel A. VIEIRA y

Protected Material

00053812

13

Carlos GARCÍA ALTOLAGUIRRE expresan: "...*cuando el indagado (persona contra la cual se ha reunido la prueba requerida por la ley interna para ser sometida a proceso y así lo ha requerido el Ministerio Público), el imputado (persona contra la cual se ha dictado un auto de procesamiento) o el condenado (persona contra la cual ha recaído una sentencia definitiva de condena) no se encuentra dentro de la jurisdicción territorial del juez que entienda en su causa, sino que se halla en otro país y no está dispuesto a comparecer voluntariamente ante el mismo, o sea, no tiene voluntad de acatar la sujeción procesal que le corresponde, dicho Magistrado cuenta con una herramienta tendiente a remediar esta dificultad, y asegurar el resultado del proceso a su cargo, que es el instituto de la extradición*" (cf. "Extradición", Ed. FCU, Primera Edición, Montevideo, 2001, pág.125).

Existe jurisprudencia constante de la Suprema Corte de Justicia en el entendido de que la exigencia debe limitarse a que el sujeto pueda ejercer su derecho de defensa en el proceso (v.gr.: sentencia No. 274/2002). En consecuencia, en numerosos fallos hizo lugar a extradiciones en causas cuyo procesamiento ocurrió en rebeldía.

En términos coincidentes, el Sr. Ministro de la Corte Dr. Tabaré SOSA AGUIRRE, siendo titular del Juzgado Letrado de Primera Instancia en lo

Protected Material



SUPREMA CORTE
DE JUSTICIA

Penal y de Menores de 2° Turno, por sentencia dictada el 19 de mayo de 1989, sentó las siguientes bases interpretativas:

"...que la persona requerida nunca haya declarado ante una autoridad judicial es una petición de principio, pues no se puede poner como condición lo que es precisamente el objeto del proceso de extradición y que ello sea un presupuesto del enjuiciamiento en nuestro derecho, no cabe extenderlo a otras legislaciones. El único requisito (y considerado al ratificar el Tratado) es que existan en el Estado peticionante, en su caso, las garantías del debido proceso legal, pero las características o modalidades concretas que en cada país asume esta garantía es propio de cada Estado y en ello no cabe inmiscuirse" (cf. LJU, caso individualizado con el No. 11.475).

Pues bien, con tales consideraciones en mente, corresponde abordar el análisis de esta fase del agravio.

La defensa de GONZÁLEZ VALENCIA interpreta que la referencia a personas que hayan sido "procesadas" implica el sometimiento al proceso penal en términos parangonables con el procesamiento regulado en el Código de Proceso Penal doméstico de 1980.

Sin embargo, como viene de decirse, la interpretación que formula es absolutamente

Protected Material

JA1373

00053814

15

parcial y no responde al sentido natural y obvio que se infiere del análisis contextual de las disposiciones del Tratado.

En el caso, la conjunción disyuntiva "o" contenida en la norma última citada, indica la existencia de alternativas entre diversas opciones previstas en el Tratado, no exigiéndose que el sujeto objeto de la extradición haya sido derechamente sometido a proceso penal -en los términos definidos por la normativa vernácula-. La norma admite que la solicitud de extradición pueda estar acompañada de una orden de detención o de prisión, que son hipótesis más amplias al procesamiento, asociadas a un señalamiento por determinados delitos, que requieren la sujeción jurídica a un proceso penal.

Como bien señala el Sr. Fiscal de Corte: *"El claro texto de la norma, no deja de dudas en cuanto a que resulta admisible la solicitud de extradición, aún cuando la persona no se encuentre "procesada", ya que para dar andamiento a esa petición, es suficiente la orden de detención.*

*Y tal extremo se cumple en las presentes actuaciones ya que, salvando las diferencias de terminología y procedimiento, surge agregada en autos, la formal orden de captura contra Gerardo González Valencia, emitida por el Tribunal de Distrito*

Protected Material

JA1374
00053815



**SUPREMA CORTE
DE JUSTICIA**

*de Estados Unidos para el Distrito de Colombia fechada el 19 de abril de 2016 (fs. 82)." (fs. 402 vta.).*

En la lógica del recurrente, únicamente podría requerirse la extradición de sujetos que hubieren sido -al menos- procesados en el país requerido, hipótesis que solo se podría dar en supuestos de procesos en rebeldía sin la presencia física del extraditable o en supuestos de fuga. Naturalmente, esta interpretación que formula el impugnante no resulta razonable, porque restringiría el campo de aplicación del Tratado.

En suma, en el marco del multicitado Tratado de 1973, no resulta compartible exigir el procesamiento o la condena por parte del Estado requirente para que nuestro país haga lugar a la extradición solicitada.

III.2) <u>De los agravios relacionados a la alegada ausencia de prueba suficiente para conceder la extradición.</u>

En este ámbito, el Tratado de 1973 requiere -como ya se vio- que cuando la persona cuya extradición se impetra no haya sido condenada, la solicitud deberá ser acompañada de: *"…una orden de detención o de prisión o del auto de procesamiento judicial equivalente, emanado de la autoridad competente de la Parte requirente."*. A esto añade que: *"La Parte*

Protected Material

JA1375

*requerida podrá solicitar que la requirente presente pruebas suficientes para establecer 'Prima facie' que la persona reclamada ha cometido el delito por el cual la extradición se formula. La Parte requerida puede denegar la extradición si un examen del caso demuestra que la orden de arresto es manifiestamente infundada."* (art. 10.3).

En su expresión de agravios, GONZÁLEZ VALENCIA aseveró que el Tribunal ha aplicado incorrectamente esta norma, porque ha aceptado sin cuestionamiento el "decir" de fiscales y agentes del gobierno de Estados Unidos. Refirió que se consideraron como elementos probatorios los dichos de funcionarios gubernamentales del país requirente, que en estricto rigor no constituyen elementos de prueba. Insistió en que la opinión de estos agentes no es una evidencia.

La contrariedad a Derecho de la sentencia -según se afirma en la impugnación- derivaría de que el Tribunal aceptó que se extradite a GONZÁLEZ VALENCIA sin que previamente se haya demostrado que existen evidencias suficientes que conformen semiplena prueba para conceder la extradición. Reclama que Uruguay debe ser más exigente y solicitar al menos una ampliación de las evidencias presentadas, por no cumplir con el estándar de semiplena prueba. Reconoce que si bien en el juicio de extradición la jurisdicción

00053817

Protected Material



SUPREMA CORTE
DE JUSTICIA

requerida no debe examinar el mérito probatorio de la causa para determinar si el requerido es culpable o inocente, sí debe establecerse que existen elementos que configuran semiplena prueba, tal como lo exige la jurisprudencia uruguaya para dictar un auto de procesamiento.

En suma, refiere que la declaración jurada de funcionarios del gobierno del Estado requirente no satisfacen los requisitos del Tratado en orden a acreditar la causa probable de la extradición, pues se hace caudal de afirmaciones vagas y confusas como las que indican que el Sr. GONZÁLEZ VALENCIA es un narcotraficante, que no son evidencia, ni conforman indicios para justificar la decisión de extraditarlo a Estados Unidos de América.

Pues bien, en cuanto a este punto, tampoco le asiste razón a la recurrente.

De la lectura del Tratado de 1973 no emerge un apartamiento del sistema que, de regla, opera en nuestro país en materia de extradición, que es el llamado "sistema belga-holandés", según el cual solo cabe realizar un análisis formal de la solicitud de extradición, sin requerir un análisis sobre el fondo de la cuestión, ni la prueba de los hechos que se le atribuyen al sujeto extraditable. El juez no declara si el requerido es inocente o culpable, sino si

Protected Material

JA1377

la solicitud cursada satisface los requisitos formales previstos en el Tratado.

En tal sentido, tal como recuerda el Sr. Fiscal Letrado (fs. 364 vta.), la Corte se ha pronunciado en múltiples oportunidades (sentencias Nos. 216/2003, 191/2005, 341/2006, 219/2007, 640/2012, 769/2012 y 125/2015).

En todo caso, como bien lo señala el Sr. Fiscal Letrado al evacuar el traslado del recurso, el Tratado faculta, pero no exige solicitar que el Estado requirente presente pruebas suficientes para establecer, "prima facie", que la persona reclamada ha cometido el delito por el cual la extradición se formula.

En efecto, la solicitud de prueba al amparo del art. 10 del Tratado de 1973 es una facultad que se le otorga al Juez al utilizar el verbo "podrá"; aserto que se verifica a partir de lo dispuesto en la parte final del precepto, donde se habilita la denegación de la extradición solo "*si un examen del caso demuestra que la orden de arresto es manifiestamente infundada*", concepto que no dice relación con el análisis y valoración de los elementos probatorios.

Por otra parte, como bien indica el Sr. Fiscal de Corte: "*La naturaleza discrecional de la norma, determina entonces que no*

Protected Material

JA1378

00053819

20



**SUPREMA CORTE
DE JUSTICIA**

*pueda señalarse como error de derecho en esta instancia"* (fs. 403).

En cualquier caso, no es posible advertir, a partir del examen de la solicitud de extradición, que la orden de arresto librada por las autoridades del Estado requirente sea "manifiestamente infundada", por lo que no se verifica ilegitimidad en el obrar de los órganos de mérito al haber concedido la extradición de marras.

El recurrente busca desconocer que los argumentos concernientes a la suficiencia de los elementos probatorios, en orden a acreditar la comisión del delito, son materia del juicio a desarrollarse en Estados Unidos de América, pero ajenos a este proceso jurisdiccional (cf. sentencia de la S.C.J. No. 145/2002, publicada en LJU, caso No. 14.492; y sentencia s/n, de fecha 26/12/1984, dictada por el TAP 3° T., publicada en la LJU, caso No. 10.356).

Sobre el punto, nuestra jurisprudencia ha dicho: *"...además, esa posibilidad de que el estado requirente presente pruebas suficientes es una potestad del Estado requerido, el texto dice 'la Parte requerida podrá solicitar que la requirente presente pruebas suficientes ...'.*

*La crítica que la recurrente hace de las pruebas de cargo en el num. 13 de fs. 202,*

Protected Material

en resumidas cuentas hablan de la seriedad de los procedimientos del requirente, y si finalmente no se prueba la participación del requerido en los ilícitos que se le atribuyen, seguramente al igual que los restantes involucrados en los hechos, saldrá indemne del juicio que se le siga.

La eficacia de las pruebas no es asunto en que deban pronunciarse nuestros tribunales sino que le corresponde hacerlo a los tribunales encargados de administrar justicia en el Estado requirente, lo contrario sería una intromisión inadmisible.

El conceder la extradición de ninguna manera significa que el extraditado vaya a ser condenado sino únicamente que será sometido a juicio con todas las garantías del debido con todas las seguridades que ello conlleva" (cf. sentencia No. 283/2000 del TAP 2° T., publicado en la LJU, caso No. 14.131).

Corolario de lo anterior es que no existe, a juicio de la Corte, reproche alguno a la labor jurisdiccional cumplida, en el entendido de que los requisitos formales (en especial los previstos en el artículo 10 del Tratado), fueron cumplidos. Los reproches que se efectúan a la prueba (fundamentalmente a la declaración de determinados testigos, evidencias que menciona el fiscal y mensaje de texto, entre otros),

Protected Material

JA1380

22
00053821



**SUPREMA CORTE
DE JUSTICIA**

serán objeto de discusión ante la justicia estadounidense una vez que el sujeto sea extraditado.

Los Dres. VIEIRA y GARCÍA ALTOLAGUIRRE, en tal aspecto, sintetizaron: "...*la jurisprudencia uruguaya, en relación con la aportación de pruebas en el procedimiento de extradición es clara y uniforme en el sentido de mantener que en el sistema continental al que se afilia nuestro orden jurídico, no cabe la admisión de pruebas dirigidas a desvirtuar o a verificar los hechos relatados en la demanda extradicional. Esto quiere decir, que en el proceso de extradición no se puede juzgar, sobre el delito por el que se solicita al reclamado, ni realizar el control jurisdiccional sobre la consistencia de las pruebas en que se apoya la solicitud de extradición*" (ob. cit., pág. 430).

Asimismo, sobre la cuestión en análisis, este Colegiado ha dicho en sentencia No. 125/2015:

"*Corresponde tener presente que, como reiteradamente lo ha sostenido la Corporación, en el ámbito del proceso de extradición no corresponde ingresar al tratamiento de cuestiones de fondo, sino que el órgano jurisdiccional debe limitarse a controlar la regularidad formal del pedido y el cumplimiento de los requisitos establecidos en los tratados aplicables*

Protected Material

JA1381

23

(cfme. *Sentencias de la Suprema Corte de Justicia Nos. 154/000 y 191/005, entre muchas otras*).

Dicha premisa conceptual es consecuencia de la adopción por parte de la normativa convencional aplicable del sistema belga-holandés que, a diferencia de otros recogidos en derecho comparado, limita los poderes del Estado requerido impidiéndole pronunciarse sobre la probabilidad o verosimilitud de los hechos atribuidos.

En el procedimiento de extradición, lo único que debe valorarse es la legitimidad formal del pedido, puesto que toda otra consideración acerca del fondo, es decir de la tipicidad del o de los delitos por los que se cursa la solicitud, son absolutamente violatorios del principio de competencia de las autoridades requirentes. Los tribunales del país requerido que aceptan o no el pedido de extradición no son competentes para juzgar el mérito de la causa. En tal sentido De Olarte en su tratado sobre 'Extradición', pág. 49, afirmaba que el Juez que interviene no es convocado para declarar la inocencia o culpabilidad, porque 'la extradición no importa juicio ni castigo', limitándose su función a verificar si la solicitud es ajustada a las formalidades y exigencias sustanciales del Tratado Internacional ratificado por los dos Estados...' (cfme. *Sentencia de la Suprema Corte*

Protected Material

24

00053825

USCA Case #23-3126   Document #2057130        Filed: 05/30/2024      Page 141 of 308



SUPREMA CORTE
DE JUSTICIA

de *Justicia No. 154/999)"* (ver además sentencia de la Corte No. 145/2002, publicada en LJU, caso No. 14.492).

Lo dicho justifica el rechazo de esta segunda fase de la impugnación.

III.3) <u>De los agravios relativos a la invocada prescripción de los delitos por los cuales se solicitó la extradición.</u>

El tercer planteo del recurrente refiere a la alegada prescripción de los delitos que se le pretenden imputar, en tanto -siempre a su criterio- emergería de la prueba aportada por los Estados Unidos de América que el presunto hecho delictivo habría tenido lugar el 20 de agosto de 2007, por lo que, a la fecha en que se realizó la acusación formal (19 de abril de 2016), había vencido el plazo de prescripción de cinco años previsto en la normativa vigente en el Estado requirente.

En concreto, afirma que en la prueba aportada por los Estados Unidos de América, existen dos testigos colaboradores, ex líderes de una organización de estupefacientes en México, que refieren a un cargamento de cocaína el 20 de agosto de 2007 e individualizan a GONZÁLEZ VALENCIA en ese accionar. Por lo tanto, en el caso, señala que la acusación formal data del 19 de abril de 2016, cuando ya habían transcurrido más de cinco años, por lo cual, el delito

JA1383
00053824

prescribió.

Pues bien, a criterio de la Corte, el agravio resulta de rechazo, por la carencia de virtualidad jurídica y del escaso poder convictivo de su fundamentación.

Surge de la declaración jurada -en apoyo de la solicitud de extradición- prestada por la Fiscal Litigante de la Unidad Contra Narcóticos y Drogas Peligrosas de la División Penal del Departamento de Justicia de Estados Unidos que:

*"Debido a que la ley de prescripción aplicable es de cinco años, y a que la acusación, la cual alega violaciones penales que ocurrían entre enero de 2003 y abril de 2016, se presentó el 19 de abril de 2016, se le acusó a González Valencia dentro del plazo previsto de cinco años. De manera que la ley de prescripción no prohíbe la persecución penal en esta causa."* (fs. 60).

Debe de verse que la Sección nro. 3282 del Título 18 del Código de Estados Unidos- Delitos no capitales, dispone que:

*"En general, con las excepciones expresamente previstas por la ley, ninguna persona será enjuiciada, o sancionada por ningún delito no capital, al menos que la acusación formal se funde o de la información se instituya dentro de los cinco años*

26

00053825
Protected Material



**SUPREMA CORTE
DE JUSTICIA**

*siguientes después de que dicho delito se haya cometido."* (fs. 67).

Entonces, si nos atenemos a la acusación formal realizada por el Jurado Indagatorio ante el Tribunal de Distrito de EE.UU., Distrito de Columbia, el requerido GONZÁLEZ VALENCIA: *"Desde aproximadamente enero de 2003, y de forma permanente a partir de entonces, hasta la fecha de presentación de esta Acusación, inclusive, siendo ambas fechas aproximadas e inclusive, en los países de México, Estados Unidos y otros lugares, el acusado, **GERARDO GONZÁLEZ VALENCIA, alias "Lalo", "Flaco", "Silver", "Silverio", "Eduardo", y "Laline",** junto con otros, tanto conocidos como desconocidos al Jurado Indagatorio, conspiraron a consciente, intencionada y deliberadamente para: (1) de manera consciente e intencionada, distribuir cinco (5) kilogramos o más de una mezcla y sustancia que contenía una cantidad detectable de cocaína, una sustancia controlada de la Lista II; (2) de manera consciente e intencionada, distribuir (500) gramos o más de una mezcla o sustancia que contenía cantidad detectable de metanfetaminas, una sustancia controlada de la Lista II, pretendiendo y sabiendo que dichas sustancias serían introducidas ilícitamente en Estados desde un territorio externo..."* (fs. 77/78, el destacado está en el original).

Protected Material

00053826

Quiere decir que, como bien destacan tanto el Fiscal actuante, como el Sr. Fiscal de Corte, los cargos por los delitos que se le imputan refieren a hechos que se extienden desde el año 2003 hasta aproximadamente el momento en el que se cristaliza la acusación formal en Estados Unidos.

El recurrente, en forma parcializada, pretende ubicar la supuesta comisión de los delitos en el año 2007, a partir de las declaraciones testimoniales de los testigos colaboradores, pero ello se basa en una valoración aislada de los documentos que acompañan la solicitud de extradición.

Precisamente, porque el recurrente omite indicar que en la declaración jurada del Agente Especial de la DEA, Sr. Kyle J. MORI, se explica que: *"La investigación reveló que desde aproximadamente desde enero de 2003 hasta el 19 de abril de 2016, González Valencia, el dirigente de una organización de tráfico de estupefacientes basada en México, transportó cargamentos en cantidades de múltiples toneladas de cocaína y metanfetaminas desde México, para introducción y distribución en Estados Unidos…"* (fs. 85) y el investigador añadió que como parte de la investigación existieron comunicaciones electrónicas legalmente interceptadas.

Protected Material

28

00053827



SUPREMA CORTE
DE JUSTICIA

En efecto, el mentado Agente señaló que: *"Como parte de esta investigación, las autoridades del orden público legalmente interceptaron a González Valencia y sus co conspiradores por comunicaciones electrónicas. Lo que sigue a continuación es un resumen de unos mensajes de texto, legalmente interceptados en California, entre González Valencia y un co-conspirador.*

*El 26 de junio de 2013, en unos mensajes de texto legalmente interceptados, González Valencia y un co conspirador discutieron sobre si una transacción de narcotráfico fue consumada...González Valencia también habló sobre cantidades adicionales de drogas que se estaban preparando para enviar "allá arriba", lo cual creo que es una referencia a los Estados Unidos...".*

Por lo tanto, el argumento del recurrente de que la acción penal está prescripta, carece de todo asidero. En particular, porque los cargos no refieren exclusivamente a hechos que datan de agosto de 2007 (cargamento al que hacen referencia testigos colaboradores), sino a maniobras extendidas en el tiempo, en base a evidencia por interceptaciones telefónicas.

En el "sub-exámine", teniendo en consideración la evidencia sobre los intercambios por

Protected Material

JA1387

00053828

29

mensajes de texto, entre GONZÁLEZ VALENCIA y un co-conspirador, que datan del año 2013, no puede razonablemente entenderse operada la prescripción de la acción penal, ya que la acusación formal fue presentada el 19 de abril de 2016, sin haber pasado los 5 años a los que refiere la normativa vigente en Estados Unidos.

De acuerdo al art. 5.3 del Tratado de 1973, no podrá concederse la extradición en ninguna circunstancia cuando la acción o la pena haya prescripto según las leyes del Estado requerido o requirente.

Por lo tanto, resta analizar si de acuerdo a la normativa interna de la República Oriental del Uruguay, la acción está (o no) prescripta.

El art. 117 del Código Penal, para supuestos como el de autos (que encuadraría en el art. 31 del Decreto-Ley 14.294), tiene un guarismo punitivo de dos a diez años de penitenciaría, por referir a un grupo delictivo organizado.

En función de ello, el literal c) del art. 117 del Código Penal prescribe que tratándose de delitos con una pena de penitenciaría cuyo máximo es mayor a dos años hasta los diez años, el delito prescribe a los diez años, por lo que -desde esta óptica- no cabe duda que la acción penal no está prescripta.

30

JA1388

00053829



**SUPREMA CORTE
DE JUSTICIA**

Protected Material

En suma, no puede concluirse, al menos con los elementos a la vista, que el delito por el que se solicita la extradición se encuentre prescripto.

Además, tratándose de conductas interactivas por las que se reclama la extradición (continuidad o reiteración delictual), sea cual fuere el sistema, el comienzo del cómputo prescriptivo es la cesación de la ilicitud, extremo que ni siquiera fue alegado por la defensa letrada.

Nuevamente, cabe insistir en que las facultades del Estado requerido se encuentran limitadas en la materia, por resultar de aplicación el llamado sistema belga-holandés, según el cual aquel Estado debe estar a las resultancias de la solicitud del Estado requirente, por lo que, si surge de ésta que el delito se habría cometido de forma permanente hasta abril de 2016, es a dicha fecha que debe estarse como inicio del plazo de prescripción.

Lógicamente, ello no supone un juicio definitivo ni vinculante para el Estado requirente respecto a la no prescripción del delito imputado al sujeto extraditable, pues corresponderá a las autoridades de aquel Estado determinar, en el marco del juicio que habrá de seguirse al sujeto extraditado, si se configuró o no la prescripción del delito por el

cual se concede su entrega.

III.4) De los agravios vinculados al supuesto riesgo de violación de los derechos humanos en caso de concederse la extradición.

El recurrente se agravió por entender que, de concederse la extradición, existe riesgo que se le imponga la pena de muerte o de prisión perpetua en Estados Unidos. Además, denunció que las condiciones de reclusión en Estados Unidos no brindan garantía alguna.

A criterio de la Corte, el agravio es de franco y total rechazo.

A decir verdad, la defensa no identifica cuál sería la regla de derecho violada por la sentencia atacada, limitándose a realizar una serie de apreciaciones genéricas sobre supuestas violaciones a los derechos humanos en aquel país, pero sin esgrimir un motivo válido habilitante de casación, por lo que el planteo no satisface las exigencias del art. 272 del C.P.P. de 1980, siendo este motivo suficiente para desestimar esta fase de la impugnación.

Más aún, no existe agravio en lo atinente a la eventual imposición de la pena de muerte, que es la única que contempla el Tratado vinculante en su artículo 7 para supeditar el otorgamiento de la extradición a que la parte requirente



**SUPREMA CORTE DE JUSTICIA**

otorgue garantías consideradas suficientes por la parte requerida en el sentido que no será impuesta dicha sanción o que, de ser impuesta, tal pena no se aplicará.

Cabe observar entonces que la pena a aplicar está prevista en el Tratado sólo en dos supuestos, a saber, el mínimo punitorio de un año de prisión a cumplir (art. 2 in fine) y la máxima pena (la de muerte) donde se faculta a disponer como condición que la misma no será aplicada (art. 7).

A la luz de esta conclusión, es claramente improcedente tomar en cuenta la penalidad (ya sea en su contenido, monto o forma de aplicación), salvo esos dos excepcionales supuestos, para negar o condicionar la extradición.

En opinión de la Corte, sea cual fuere el método interpretativo, no puede desconocerse la primacía que tiene todo Tratado de extradición firmado por el Estado, dada su naturaleza específica y de fuente original de previsiones que no pueden alterarse salvo por medio de otro tratado o denuncia del vigente de acuerdo con las normas de derecho internacional público aplicables.

En efecto, por los Tratados de extradición, el Estado limita sus derechos soberanos en favor de lo que en aquellos se estipula, por lo que no puede prevalecer otra previsión que la consignada en su

Protected Material

00053832

cuerpo normativo.

Asimismo, el tenor de lo previsto por el art. 9 del propio Tratado es por demás claro en el sentido que el método interpretativo ha de ser el textual (de consuno con los métodos y reglas de interpretación consagrados en la Convención de Viena de 1969).

Por último, forzoso es significar que este carácter obligatorio, específico y taxativo, se impone a todos los órganos del Estado destinatario, sean jurisdiccionales o no (jueces o fiscales respectivamente).

Por otra parte, de acuerdo con lo dicho, en la medida de que el Tratado de extradición se encuentra vigente y no ha sido denunciado, no puede ser un argumento válido para negar la extradición el de las condiciones de cumplimiento de la pena en el Estado requirente. Si existiera ese riesgo, lo que correspondería es que el Estado uruguayo denunciara el Tratado; pero no resulta un argumento válido para incumplir -en definitiva esto es lo que propone el impugante- el Tratado vigente.

Por otra parte, el riesgo de que se le imponga la pena de prisión perpetua o la pena de muerte, está conjurada porque la sentencia de primera instancia (confirmada por la impugnada) condicionó la

34

00053835



SUPREMA CORTE
DE JUSTICIA

concesión de la extradición a que las autoridades intervinientes aseguren que, en caso de ser condenado, no se le impondrá a GONZÁLEZ VALENCIA la pena de muerte ni de prisión perpetua (ver la parte dispositiva de la sentencia de primera instancia a fs. 250).

En suma, el agravio habrá de ser desestimado por las razones referidas.

III.5) De los agravios asociados al invocado error al haberse diferido la entrega hasta la obtención de la excarcelación provisional o de la libertad definitiva.

Al respecto, la defensa señala que se padeció error en la sentencia de primer grado, confirmada por la atacada, al afirmarse que se difiere la entrega hasta que el requerido obtenga su excarcelación provisional o libertad definitiva, pues el art. 8 del Tratado de 1973 dispone que la entrega podrá ser postergada "hasta la conclusión del proceso y, en caso de condena hasta la extinción o cumplimiento de la pena", sin hacer mención a la libertad obtenida en forma provisional.

En el punto, tampoco se advierte que las sentencias de mérito hayan incurrido en error de derecho, por lo que este sector de la impugnación también será desestimado.

El art. 8 del Tratado de 1973

Protected Material

JA1393

00053834

35

establece:

"*Cuando la persona cuya extradición se solicita estuviera sometida a proceso o cumpliendo una condena en el territorio de la Parte requerida por un delito distinto a aquel por el que se solicita la extradición su entrega podrá ser postergada hasta la conclusión del proceso y, en caso de condena hasta la extinción o cumplimiento de la pena*".

Ciertamente, la norma faculta al Estado requerido a postergar la entrega del extraditado, en caso de que éste hubiera sido previamente condenado en aquel país, hasta la extinción o cumplimiento de la pena.

Empero, ello no supone que el Estado requerido deba necesariamente diferir la entrega del extraditable hasta que se cumpla o extinga la pena en su totalidad. Se trata de una condicionante que el Estado requerido puede o no imponer al conceder la extradición. En consecuencia, no existe ilegitimidad alguna en el hecho de permitir que, eventualmente, la entrega del sujeto requerido se haga antes de la extinción o cumplimiento total de la pena, si es que se verificara previamente la excarcelación provisional del extraditable.

III.6) De los agravios ligados al pretendido error al no haberse condicionado la

36

Protected Material



**SUPREMA CORTE
DE JUSTICIA**

Protected Material

extradición a que la pena máxima a ser aplicada en el Estado requirente sea la de 18 años de penitenciaría.

El último planteo del recurrente consiste en señalar que la extradición, en caso de concederse, debería condicionarse a que la pena máxima a aplicar al extraditado sea limitada al "quantum" más gravoso que establece nuestra legislación penal (decreto-ley No. 14.294 y ley No. 17.016) respecto al delito de análoga naturaleza, o sea, 18 años de penitenciaría.

Tampoco le asiste razón en el punto.

El Tratado de 1973, ni los Tratados de Montevideo de 1889 y 1940 aplicables en subsidio, prevén que el Estado requerido imponga tal condición al momento de conceder la extradición. La determinación del "quantum" punitivo corresponderá que sea efectuada por las autoridades judiciales del Estado requirente, de acuerdo a la legislación aplicable, con las limitantes indicadas en la sentencia de primera instancia.

Con tales criterios en mente, es correcto concluir que la individualización de la pena será impuesta por el Estado requirente, conforme a su normativa interna, condicionada en el presente caso a que no podrá imponerse prisión perpetua, ni pena de

JA1395

37

muerte. La imposición de las penas, dentro de los mínimos y máximos previstos en la legislación del Estado requirente, es una cuestión privativa de las autoridades judiciales de este último Estado, y en ello las autoridades judiciales del Estado requerido no deben inmiscuirse.

En consecuencia, por cuanto viene de decirse, el dispositivo impugnado no adolece de vicios que causen nulidad, lo cual determina la solución desestimatoria anunciada.

IV) De las costas y costos.

No existe mérito para imponer condenas causídicas en el grado (arts. 56.1 y 279 del C.G.P y art. 688 del C.C.).

Por los fundamentos expuestos, la Suprema Corte de Justicia, por unanimidad,

FALLA:

I) DESESTÍMASE EL RECURSO DE CASACIÓN INTERPUESTO; SIN ESPECIAL CONDENA PROCESAL.

II) ESTÍMANSE LOS HONORARIOS FICTOS EN 20 B.P.C.

III) NOTIFÍQUESE Y, OPORTUNAMENTE, DEVUÉLVESE.

DRA. BERNADETTE MINVIELLE
PRESIDENTE DE LA SUPREMA
CORTE DE JUSTICIA

JA1396
00053837
38

**SUPREMA CORTE
DE JUSTICIA**



**DRA. ELENA MARTÍNEZ**
MINISTRA DE LA SUPREMA
CORTE DE JUSTICIA

**DR. EDUARDO TURELL**
MINISTRO DE LA SUPREMA
CORTE DE JUSTICIA

**DR. LUIS TOSI BOERI**
MINISTRO DE LA SUPREMA
CORTE DE JUSTICIA

**DR. TABARÉ SOSA AGUIRRE**
MINISTRO DE LA SUPREMA
CORTE DE JUSTICIA

**DR. GUSTAVO NICASTRO SEOANE**
SECRETARIO LETRADO DE LA SUPREMA
CORTE DE JUSTICIA

Protected Material

39

JA1397
00053838



SUPREMA CORTE
DE JUSTICIA   [logo:] SUPREME COURT OF JUSTICE

//Judgment No. [hw:] *18*                    DRAFTING JUDGE:

                                   DOCTOR ELENA MARTINEZ

Montevideo, February eleventh, two thousand twenty.

### RECITALS:

        For   a   final   judgment,   these
proceedings   are   entitled:   **"GONZALEZ   VALENCIA,   GERARDO.
EXTRADITION - CRIMINAL CASSATION" - IUE: 474-76/2016.**

### RESULTING:

        I)  By Judgment No. 13, dated August
28,   2017,   the   Criminal   Court   of   First   Instance
Specializing in Organized Crime, 1st Panel, ruled:

                 *"It  is  ordered  to  grant  the*
*extradition of Gerardo González Valencia requested by*
*the competent authorities of the United States, under*
*the following conditions: I) the hand-over be deferred*
*until  the  party  subject  to  the  extradition  request*
*obtains his provisional release or definitive release in*
*the case that is prosecuted in Uruguay before this Court,*
*IUE  2-37467/2016;  II)  the  extradition  granted  be*
*conditioned on the authorities of the requesting State*
*ensuring that the party subject to the request will not*
*be judged or convicted for offenses other than those*
*referred  to  in  the  extradition  request,  with  the*
*exception of the cases enshrined in sections 1 and 2 of*
*the aforementioned article; III) the extradition granted*
*be conditioned on the requesting authorities granting*

Protected Material

1

*guarantees considered sufficient by the national authorities involved in this trial that, in the event that Gerardo González Valencia is convicted in the criminal proceedings that are intended to be initiated in the requesting country, he shall not receive the death penalty or a sentence of life imprisonment; IV) the competent authorities of the requesting State must state whether they accept the conditions set forth in the previous sections within forty days from the notification of this ruling (…)"* (p. 238/250).

II) By judgment No. 208, issued on October 2, 2018, by the Criminal Court of Appeals, 4th Panel, the following was ordered:

"*The appealed Judgment of the Court of First Instance is confirmed. (…)"* (p. 317/321 reverse).

III) GONZALEZ VALENCIA's defense filed the appeal for cassation in question against the aforementioned ruling (p. 334/344).

In this regard, it argued the following, in summary.

a) Initially, it stated that the Court erred in applying the Treaty on Extradition and Cooperation in Criminal Matters between the United States of America and the Oriental Republic of Uruguay (dated April 6, 1973, signed in the city of Washington),

2



[logo:] SUPREME COURT OF JUSTICE

since such agreement does not refer to the case at hand.

It recalled that GONZÁLEZ is not prosecuted or convicted, as required by Article 1 "eiusdem".

It considered that the Treaty applicable to the case is that of Mutual Legal Assistance in criminal matters, entered into on May 6, 1991 and ratified by our country through Law 16,431.

b) It alleged, as another defect of the challenged ruling, that no evidence was required for the purposes of verifying the facts narrated by the requesting State.

It insisted that Article 10 of the Treaty in its section 3 indicates that "*the requested party may request that the requesting party submit sufficient evidence to establish 'prima facie' that the person sought has committed the offense for which extradition is sought, and the requested party may refuse extradition if an examination of the case shows that the arrest warrant is manifestly unfounded*".

It mentioned that a simple tax return is not evidence. Likewise, it questioned the role of protected witnesses and the evidentiary value that the U.S. authorities grant to text messages.

c) It indicated that in its opinion, the statute of limitations of the crimes to be

3

charged applies.

It emphasized that at best the alleged wrongdoing occurred in August 2007, while the indictment is dated April 19, 2016.

Consequently, it asserted that since more than five years have passed since the offense, the statute of limitations has expired, according to the rules of the requesting country.

d) It claimed a danger of violation of human rights if the extradition was granted.

It mentioned - by way of example - that the High Court of Justice of Ireland rejected the request of the United States to extradite an individual facing trial due to the severe conditions of confinement in that country.

In addition, it stated that in the event of being extradited, he is at risk of being sentenced to life imprisonment or even death.

e) It stated that it should also be considered that GONZÁLEZ has a case in Uruguay, where the defense, when answering the prosecution's indictment, requested that the accused provide extended testimony and argued that it is in accordance with the Law applicable to this case in our country until he is sentenced. As arises from Art. 8 of both Treaties in question, that of 1973 and 1991, Uruguay has the power

4

Protected Material

JA1401



[logo:] SUPREME COURT OF JUSTICE

to defer extradition, in the event that it is granted, until the conclusion of the criminal trial to which he is subject in our country.

f) Finally, it stated that the maximum penalty to be imposed should be limited to the most burdensome "quantum" established in Decree-Law No. 14,294 and Law No. 17,016, with respect to the crime of a similar nature, which is that established in Article 31, that is, 18 years of imprisonment. It understood that it should be added as a condition, in the event that extradition is granted, that the maximum sentence to be imposed should be 18 years, since this is the legal limit for a similar offense in our country.

IV) By Order No. 219, dated February 20, 2019 (page 357), it was ordered to admit the appeal for cassation filed.

V) Once the respective responses were made available, the Federal Prosecutor Specializing in Organized Crime appeared, requesting the rejection of the appeal (pages 363/366); the Court Prosecutor made the same pronouncement (pages 399/404).

VI) By Decree No. 883, dated May 16, 2019 (p. 406), the transfer of the case to be examined was ordered (p. 406); once the examination was concluded, it was agreed that the judgment would be rendered today.

*__WHEREAS:__*

5

JA1402

I)  The Supreme Court of Justice, by unanimity of its natural members, will dismiss the Appeal for Cassation filed by the defendant, for the legal grounds that will be expressed, since the grievances set forth in support of the appeal are not effective to resolve to the contrary of what was decided in the Court of Second Instance.

II) <u>The extradition processed in court proceedings and the grievances set forth in cassation</u>.

This case deals with the extradition request filed by the United States of America against Gerardo GONZÁLEZ VALENCIA, who is accused of committing repeated offenses related to drug trafficking.

In this context, the above judgments were handed down that authorized the handing over of GONZÁLEZ VALENCIA to the authorities of the requesting State, which led to the filing of the Appeal for Cassation under review.

Specifically, the following grievances can be identified from the contesting petition:

1) grievances regarding the application in the case of the Treaty on Extradition and Cooperation in Criminal Matters entered into in 1973

Protected Material

6

[hw:] 755



[logo:] SUPREME COURT OF JUSTICE

between the Oriental Republic of Uruguay and the United States of America (ratified in our country by Decree-Law No. 15,476);

2) grievances related to the alleged absence of sufficient evidence to grant the extradition;

3) grievances related to the invoked statute of limitations on the offenses for which the extradition was requested.

4) grievances related to the alleged risk of violation of human rights if the extradition is granted.

5) grievances associated with the alleged error in having deferred the hand-over until the provisional release or definitive freedom is obtained; and

6) grievances related to the alleged error in not having made the extradition conditional on the fact that the maximum sentence to be imposed in the requesting State be 18 years of imprisonment.

They will be analyzed hereinafter in the proposed order.

III.1)   The grievances referring to the application in the case of the Treaty on Extradition and Cooperation in Criminal Matters entered

Protected Material

7

JA1404

00053406

into in 1973 between the Oriental Republic of Uruguay and the United States of America (ratified in our country by Decree-Law No. 15,476)

III.1.1) As the first line of defense, the appellant notes that the Court of Appeal committed a legal error by arguing that the Treaty applicable in relation to the request for extradition initiated is that ratified by Decree-Law no. 15,476.

It understands that the request was made for the purpose of subjecting Mr. GONZÁLEZ VALENCIA to trial and that said request is based on a Treaty that is not applicable, since it contravenes the legal status of the defendant, who, not having been prosecuted or convicted, is not subject to the Treaty of April 6, 1973.

It insists that, in the case in question, the applicable Treaty is the one concluded on May 6, 1991 between the Uruguayan State and the United States of America, on Treaty on Mutual Legal Assistance in Criminal Matters, ratified by law No. 16,431.

In the Court's opinion, the appeal is not admissible, since the legal framework of the case in the above judgments is irreproachable.

Indeed, in this regard, the Treaty on Extradition and Cooperation in Penal Matters signed in Washington (USA) on April 6, 1973, approved by

Protected Material

8



[logo:] SUPREME COURT OF JUSTICE

decree-law No. 15,476 (hereinafter: 1973 Treaty), is applied, on the understanding that the legal status of GONZÁLEZ VALENCIA fits perfectly with the assumption provided for by the aforementioned bilateral regulation.

Against what the appellant says, the 1973 Treaty has not been repealed, modified or replaced by the provisions of the Treaty on Mutual Legal Assistance in Criminal Matters held in Montevideo, on May 6, 1991, ratified by law No. 16,431 (hereinafter: 1991 Treaty). While such a Treaty is subsequent, it certainly regulates another type of mutual legal assistance in criminal matters and not strictly to extradition.

In fact, the hypotheses regulated by the 1991 Treaty do not refer to the extradition of persons (at no time does the bilateral regulation refer to extradition), but to another type of assistance in criminal matters.

In other words: the 1991 Treaty does not apply, for referring to degrees of cooperation of less intensity to extradition, namely: "*a. notification of documents; b. receipt of testimonies or statements from persons, as well as the conducting of surveys and examination of objects and places; c. location or identification of persons; d. notification to witnesses or experts for the voluntary*

9

JA1406

*appearance to give testimony in the requesting State; e.
transfer of persons subject to criminal proceedings for
the purpose of appearing as witnesses or for other
purposes expressly indicated in the application; f.
Precautionary measures or immobilization of property; g.
compliance with requests for search and seizure; h.
handing over of documents and other evidence; i.
immobilization, confiscation or transfer of confiscated
property, as well as in matters of compensation and fines
imposed by criminal judgment; and j. any other form of
assistance not prohibited by the laws of the requested
State for investigation and prosecution of
offenses"* (Art. 2).

In this last sense, the
reference to *"purposes expressly indicated in the
request"* (letter e), as the Federal Prosecutor notes *"it
cannot be understood that extradition can be requested
in this way, since extradition is a process subject to
multiple conditions and requirements, which must be
expressly provided for in the bilateral regulation
(included offenses, excluded offenses, deadlines for
making the request, preventive arrest, required
documentation, formalities, etc.) which are not provided
for in the 1991 Treaty"* (p. 363 reverse).

The foregoing is sufficient to
repel this first area of grievance.

10

JA1407



[logo:] SUPREME COURT OF JUSTICE

Protected Material

III.1.2) In another vein, as a subsidiary defense, GONZÁLEZ VALENCIA argues that he has not been prosecuted or convicted in the United States of America, for which reason the requirements of Article 1 of the 1973 Treaty to grant extradition would not be met.

Again, he is incorrect.

In the Court's opinion, the appellant makes a biased reading of Article 1 of the bilateral regulation to argue that extradition cannot be granted until there is an indictment.

First, as a general criterion, such an interpretation goes against the bases and principles of international judicial cooperation in criminal matters.

It should not be overlooked that when interpreting the Treaties (unlike the interpretation made by the appellant), this must be done in a manner that favors the purpose for which they were agreed, in the understanding that the premises of cooperation between States and the protection of society must govern beyond the physical location of the subject to which the wrongful act is being imputed.

As the Justice of the Court, Dr. Tabaré SOSA AGUIRRE, has stated: "*...the criterion in matters of international judicial assistance must be to*

11

*facilitate, expand and shorten the relevant procedures in the procedural aspect and reduce the conditions in the substantive aspect"* (see "Judicial independence as a condition for international cooperation", published in "Curso de Cooperación Penal Internacional (International Criminal Cooperation Course)", Rio de Janeiro 1994, Ed. Carlos Álvarez, First Edition, Montevideo, 1994, p. 141).

Secondly, with specific reference to the interpretation of the terms "prosecuted" and "convicted", used by the aforementioned Article 1 of the 1973 Treaty, the Court considers that this must be done by applying the logical-systematic criterion or method, according to which, it is necessary to resort to the regulatory context, that is, to the rest of the articles of the international instrument under analysis (in addition to the preamble and its annexes), in order to determine whether the Treaty itself contains any definition of the terms to be interpreted (Article 31.1 of the Vienna Convention on the Law of Treaties).

Hence, the defendant's defense is wrong in claiming that the prosecution required by the regulation should be understood in terms similar to the domestic system.

In this regard, the 1973 Treaty

12



[logo:] SUPREME COURT OF JUSTICE

itself refers, in Article 10(3), that when *"the request refers to a person who has not yet been convicted, it must be **accompanied by a bench warrant or arrest warrant or an equivalent indictment,** issued by the competent authority of the requesting Party"* (as verified by "extensive documents on record").

To claim that prosecution or conviction is required in light of the terms used in our legal system is to limit cooperation in extradition matters to individuals who fled before or after prosecution, or who were tried in absentia against them.

It so happens that the interpretation made by the defense clashes with basic aspects of the legal concept of extradition itself.

In this regard, Manuel A. VIEIRA and Carlos GARCÍA ALTOLAGUIRRE state: *".... when the defendant (person against whom the evidence required by domestic law to be tried has been gathered and the Public Prosecutor's Office has so requested), the accused (person against whom an indictment has been issued) or the convicted person (person against whom a final judgment has been handed down) is not within the territorial jurisdiction of the judge hearing the case, but is in another country and is not willing to appear voluntarily before it, that is, is unwilling to comply with the procedural subjection that corresponds to him,*

Protected Material

13

*the Justice has a tool to remedy this difficulty, and ensure the outcome of the process he is responsible for, which is the legal concept of extradition"* (see "Extradición (Extradition)", Publisher FCU, First Edition, Montevideo, 2001, p.125. ).

There is consistent case law of the Supreme Court of Justice with the understanding that the requirement must be limited to the subject being able to exercise his right of defense in the proceedings (e.g.: Judgment No. 274/2002). Consequently, in numerous judgments it has granted extraditions in cases in which the prosecution occurred in absentia.

In coinciding terms, The Judge of the Court Dr. Tabaré SOSA AGUIRRE, presiding over the Court of First Instance in Criminal and Juvenile Matters, 2nd Panel, by judgment issued on May 19, 1989, established the following interpretative bases:

*"...that the defendant has never declared before a judicial authority is a petition for principle, since what is precisely the object of the extradition process cannot be established as a condition and that this is a trial requirement in our law, it is not possible to extend it to other legislations. The only requirement (and considered when ratifying the Treaty) is the existence in the requesting State, if applicable, of the guarantees of due process of law, but*

14

Protected Material

JA1411

 [logo:] SUPREME COURT OF JUSTICE

*the specific characteristics or modalities that this guarantee assumes in each country is a matter for each State and cannot be interfered with"* (see LJU (La Justicia Uruguaya [Uruguayan Justice Journal]), individualized case No. 11,475).

Well, with such considerations in mind, it is appropriate to address the analysis of this phase of grievance.

The defense of GONZÁLEZ VALENCIA interprets the reference to persons who have been "prosecuted" as implying submission to criminal proceedings in terms comparable to the prosecution regulated in the 1980 Domestic Code of Criminal Procedure.

However, as has just been said, the interpretation it sets out is absolutely partial and does not respond to the natural and obvious meaning that can be inferred from the contextual analysis of the provisions of the Treaty.

In this case, the disjunctive conjunction "or" contained in the last mentioned regulation indicates the existence of alternatives among various options provided for in the Treaty, not requiring that the subject of the extradition has been directly subjected to criminal proceedings -in the terms defined by the relevant legislation-. The regulation admits that

15

JA1412

the extradition request may be accompanied by a bench warrant or arrest warrant, which are broader hypotheses than prosecution, associated with an indictment for certain offenses, which require legal subjection to criminal proceedings.

As pointed out by the Court Prosecutor: *"The clear text of the regulation leaves no doubt that the extradition request is admissible, even when the person is not "processed", since the bench warrant is sufficient to give effect to the request.*

*And such a circumstance is fulfilled in these proceedings since, overcoming the differences in terminology and procedure, the formal arrest warrant against Gerardo González Valencia, issued by the United States District Court for the District of Colombia dated April 19, 2016 is added in the proceedings (p. 82)."* (p. 402 overleaf).

According to the appellant's logic, extradition could only be requested for individuals who have been - at least - prosecuted in the requested country, a hypothesis that could only occur in cases of proceedings in absentia without the physical presence of the party subject to the extradition request or in cases of absconding. Naturally, this interpretation the appellant sets out is not reasonable, as it would restrict the scope of application of the

16

Protected Material

JA1413

00053415



[logo:] SUPREME COURT OF JUSTICE

Treaty.

In short, within the framework of the aforementioned 1973 Treaty, it is not comparable to require prosecution or conviction by the requesting State for our country to grant the requested extradition.

III.2)   The grievances related to the alleged absence of sufficient evidence to grant the extradition..

In this context, the 1973 Treaty requires - as we have already seen - that when the person whose extradition is sought has not been convicted, the request must be accompanied by: *"a bench warrant or arrest warrant or the equivalent judicial indictment issued by the competent authority of the requesting Party.". To* this is added that: *"The requested Party may request that the requesting Party submit sufficient evidence to establish 'prima facie' that the person sought has committed the offense for which extradition is sought. The requested Party may deny extradition if an examination of the case shows that the arrest warrant is manifestly unfounded."* (Article 10.3).

In his statement of grievances, GONZÁLEZ VALENCIA asserted that the Court has misapplied this regulation, because it has accepted without question the "say-so" of prosecutors and agents of the U.S. government. It stated that the statements of

17

Protected Material

00053416

government officials of the requesting country, which strictly do not constitute evidence, were considered evidence. It insisted that the opinion of these agents is not evidence.

The unlawfulness of the judgment -according to the challenge procedure- would derive from the fact that the Court accepted the extradition of GONZÁLEZ VALENCIA without having previously demonstrated that there was sufficient evidence that would constitute prima facie evidence to grant the extradition. It claims that Uruguay should be more demanding and request at least an expansion of the evidence presented, as it does not meet the standard of prima facie evidence. It recognizes that although in the extradition trial the requested jurisdiction must not examine the evidentiary merits of the case to determine whether the party subject to the extradition request is guilty or innocent, it must establish that there are elements that constitute prima facie evidence, as required by Uruguayan case law to issue an indictment.

In summary, it states that the affidavit of officials of the government of the requesting State does not satisfy the requirements of the Treaty in order to prove probable cause for extradition, since it is based on vague and confusing statements such as those indicating that Mr. GONZÁLEZ

18

JA1415



[logo:] SUPREME COURT OF JUSTICE

VALENCIA is a drug trafficker, which are not evidence, nor do they constitute evidence to justify the decision to extradite him to the United States of America.

Well, on this point, the appellant is not right either.

A reading of the 1973 Treaty does not reveal a departure from the system that, as a rule, operates in our country in extradition matters, which is the so-called "Belgian-Dutch system", according to which only a formal analysis of the extradition request can be made, without requiring an analysis of the merits of the matter, or proof of the facts attributed to the party subject to the extradition request. The judge does not declare whether the party subject to the extradition request is innocent or guilty, but only whether the request satisfies the formal requirements of the Treaty.

In this regard, as recalled by the Federal Prosecutor (p. 364 overleaf), the Court has ruled on multiple occasions (Judgments Nos. 216/2003, 191/2005, 341/2006, 219/2007, 640/2012, 769/2012 and 125/2015).

In any case, as the Federal Prosecutor correctly points out in his response to the appeal, the Treaty authorizes, but does not require, that the requesting State present sufficient evidence to

19

Protected Material

establish, "prima facie", that the person sought has committed the offense for which the extradition is being sought.

In effect, the request for evidence under Article 10 of the 1973 Treaty is a power granted to the Judge when using the verb "may"; an assertion that is verified by the final part of the precept, which allows the denial of extradition only *"if an examination of the case shows that the arrest warrant is manifestly unfounded",* a concept that is not related to the analysis and evaluation of the evidentiary elements.

On the other hand, as indicated by the Court Prosecutor: *"The discretionary nature of the regulation then determines that it cannot be designated as an error of law in this instance"* (p. 403).

In any case, it is not possible to observe, from the examination of the extradition request, that the arrest warrant issued by the authorities of the requesting State is "manifestly unfounded", and therefore there is no illegitimacy in the actions of the merit bodies in having granted the extradition in question.

The appellant seeks to ignore that the arguments concerning the sufficiency of the evidentiary elements, in order to prove the commission

Protected Material

20



[logo:] SUPREME COURT OF JUSTICE

of the offense, are the subject of the trial to be held in the United States of America, but outside the scope of this jurisdictional proceeding (see Supreme Court of Justice Judgment No. 145/2002, published in LJU, case No. 14,492; and unnumbered judgment, dated 12/26/1984, issued by the TAP (Tribunal de Apelaciones en lo Penal [Court of Criminal Appeals]) 3rd Panel, published in LJU, case No. 10,356).

On this point, our case law has stated: "...*in addition, the possibility for the requesting state to present sufficient evidence is a power of the requested State, the text says 'the requested Party may request that the requesting party present sufficient evidence ...'.*

*The appellant's criticism of the prosecution's evidence in No. 13 of p. 202, in short, speaks of the seriousness of the petitioner's procedures, and if the participation of the party subject to the extradition request in the offenses attributed to him is not proven, he will surely, like the others involved in the facts, emerge from the trial unscathed.*

*The effectiveness of the evidence is not a matter for our courts to rule upon, but for the courts in charge of administering justice in* the *requesting State, otherwise it would be an inadmissible interference.*

21

JA1418

*Granting the extradition in no way means that the extradited person will be sentenced, but only that he will be tried with all the guarantees of due process with all the assurances that this entails"* (see Judgment No. 283/2000 of the Court of Criminal Appeals, 2nd Panel, published in LJU, case No. 14,131).

Corollary to the foregoing is that, in the opinion of the Court, there is no reproach to the jurisdictional work carried out, in the understanding that the formal requirements (especially those provided for in Article 10 of the Treaty) were complied with. The reproaches made to the evidence (mainly to the testimony of certain witnesses, evidence mentioned by the prosecutor and text messages, among others), will be subject to discussion before the U.S. justice system once the subject is extradited.

Drs. VIEIRA and GARCÍA ALTOLAGUIRRE, in this respect, summarized: "... *Uruguayan case law, in relation to the production of evidence in extradition proceedings, is clear and uniform in the sense of maintaining that in the civil law system to which our legal system is affiliated, the admission of evidence aimed at disproving or verifying the facts stated in the extradition request is not admissible. This means that in the extradition process*

Protected Material

22

00053221



SUPREMA CORTE
DE JUSTICIA   [logo:] SUPREME COURT OF JUSTICE

*it is not possible to judge the offense for which the defendant is requested, nor to carry out jurisdictional control over the consistency of the evidence on which the extradition request is based"* (op. cit., p. 430).

Likewise, on the matter under analysis, this Court has set out in judgment No. 125/2015:

*"It should be borne in mind that, as has been repeatedly held by the Court, in the scope of the extradition process it is not appropriate to enter into the substance of the case, but rather the jurisdictional body must limit itself to controlling the formal regularity of the request and compliance with the requirements established in the applicable treaties (pursuant to Judgments of the Supreme Court of Justice Nos. 154/000 and 191/005, among many others).*

*This conceptual premise is a consequence of the adoption by the applicable conventional rules of the Belgian-Dutch system which, unlike others in comparative law, limits the powers of the requested State by preventing it from ruling upon the probability or plausibility of the alleged facts.*

*In the extradition proceeding, the only thing that must be assessed is the formal legitimacy of the request, since any other consideration regarding the merits, which is to say, the classification*

Protected Material

23

*of the offense or offenses for which the request is made, are absolutely violated of the principle of competence of the requesting authorities. The courts of the requested country that accept or do not accept the request for extradition are not competent to rule on the merit of the case. In this sense, De Olarte, in his treatise on 'Extradition', p. 49, stated that the Judge involved is not summoned to declare innocence or guilt, because ?extradition does not imply trial or punishment? [sic], limiting its function to verifying if the request is in accordance with the formalities and substantial requirements of the International Treaty ratified by the two States…' (pursuant to Supreme Court of Justice Judgment No. 154/999)"* (see also Court Judgment No. 145/2002, published in LJU, case No. 14,492).

This justifies the rejection of this second phase of the challenge procedure.

III.3)   <u>The grievances relating to the invoked statute of limitations on the offenses for which the extradition was requested</u>.

The appellant's third argument refers to the alleged statute of limitations of the offenses with which he is allegedly charged, inasmuch as - still in his opinion - it would emerge from the evidence provided by the United States of America that the alleged criminal act would have taken place on August

Protected Material

24

00053423



[logo:] SUPREME COURT OF JUSTICE

20, 2007, for which reason, as of the date on which the indictment was filed (April 19, 2016), the five-year statute of limitations period provided for in the rules in force in the requesting State had expired.

Specifically, he states that in the evidence provided by the United States of America, there are two collaborating witnesses, former leaders of a narcotics organization in Mexico, who refer to a shipment of cocaine on August 20, 2007 and identify GONZÁLEZ VALENCIA in that action. Therefore, in the case, he points out that the indictment dates from April 19, 2016, when more than five years had already elapsed, therefore, the offense was time-barred.

Well, in the Court's opinion, the grievance is to be rejected, due to the lack of legal merit and the weak evidentiary power of its legal basis.

It appears from the affidavit -in support of the extradition request- given by the Trial Attorney of the Narcotic and Dangerous Drug Section of the Criminal Division of the U.S. Department of Justice that:

*"Because the applicable statute of limitations is five years, and because the indictment, which alleges criminal violations occurring between January 2003 and April 2016, was filed on April 19, 2016, Gonzalez Valencia was charged within the five-year time*

Protected Material

25

JA1422

*limit. So the statute of limitations does not prohibit criminal prosecution in this case."* (p. 60).

It should be noted that Section No. 3282 of Title 18, United States Code-Offenses not capital, provides that:

*"In general, with the exceptions expressly provided by law, no person shall be prosecuted, or punished for any non-capital offense, unless the indictment is founded or of the information is instituted within five years after such offense has been committed."* (p. 67).

Therefore, if we abide by the indictment brought by the Grand Jury before the U.S. District Court, District of Columbia, the party subject to the extradition request GONZÁLEZ VALENCIA: *"Since approximately January 2003, and continuously thereafter, up to and including the date of the filing of this Indictment, both dates being approximate and inclusive, in the countries of Mexico, the United States and elsewhere, the defendant, **GERARDO GONZÁLEZ VALENCIA, alias "Lalo", "Flaco" [Skinny], "Silver", "Silverio", "Eduardo", and "Laline",** together with others, both known and unknown to the Grand Jury, knowingly, intentionally and willfully conspired to: (1) knowingly and intentionally distribute five (5) kilograms or more of a mixture and substance containing a detectable amount*

26

Protected Material



[logo:] SUPREME COURT OF JUSTICE

*of cocaine, a Schedule II controlled substance; (2) knowingly and intentionally distribute (500) grams or more of a mixture or substance containing detectable amount of methamphetamine, a Schedule II controlled substance, intending and knowing that such substances would be illegally brought into States from a foreign territory…"* (p. 77/78, emphasis is in the original).

This means that, as both the acting Prosecutor and the Court Prosecutor point out, the charges for the offenses he is accused of refer to events that extend from 2003 to approximately the time when the indictment was filed in the United States.

The appellant, in a biased manner, seeks to place the alleged commission of the offenses in the year 2007, based on the witness statements of the collaborating witnesses, but this is based on an isolated assessment of the documents accompanying the extradition request.

Precisely because the appellant fails to indicate that in the affidavit of the Special Agent of the DEA, Mr. Kyle J. MORI, it is explained that: *"The investigation revealed that from approximately January 2003 until April 19, 2016, Gonzalez Valencia, the leader of a Mexico-based narcotics trafficking organization, transported shipments in multi-ton quantities of cocaine and methamphetamine from Mexico,*

Protected Material

27

JA1424

*for introduction into and distribution in the United States…"* (p. 85) and the investigator added that as part of the investigation, there were legally intercepted electronic communications.

In effect, the aforementioned Agent pointed out that: "*As part of this investigation, law enforcement authorities lawfully intercepted Gonzalez Valencia and his co-conspirators via electronic communications. The following is a summary of* text *messages, legally intercepted in California, between González Valencia and a co-conspirator.*

*On June 26, 2013, in legally intercepted text messages, Gonzalez Valencia and a co-conspirator discussed whether a drug trafficking transaction was consummated...González Valencia also spoke about additional amounts of drugs being prepared to ship "up there," which I believe is a reference to the United States...".*

Therefore, the appellant's argument that the criminal action is time-barred by the statute of limitations is groundless. In particular, because the charges do not refer exclusively to facts dating back to August 2007 (the shipment referred to by collaborating witnesses), but to maneuvers extended over time, based on evidence from telephone interceptions.

In the "sub-examine", taking

28

JA1425



SUPREMA CORTE
DE JUSTICIA   [logo:] SUPREME COURT OF JUSTICE

into consideration the evidence on the exchanges by text messages between GONZÁLEZ VALENCIA and a co-conspirator, which date back to 2013, it cannot reasonably be understood that the statute of limitations of the criminal action is time-barred, since the indictment was filed on April 19, 2016, without the 5 years referred to in the rules in force in the United States having passed.

According to Article 5.3 of the 1973 Treaty, extradition may not be granted under any circumstances when the statute of limitations is time-barred under the laws of the requested or requesting State.

Therefore, it remains to be analyzed whether the action is (or is not) time-barred by the statute of limitations under the domestic laws of the Oriental Republic of Uruguay.

Section 117 of the Criminal Code, for cases such as the one at hand (which would fall under Section 31 of Decree-Law 14.294), has a punitive term of two to ten years of imprisonment, since it refers to an organized criminal group.

Accordingly, letter c) of Article 117 of the Criminal Code provides that in the case of offenses with a maximum sentence of imprisonment of more than two years up to ten years, the statute of limitations expires after ten years, so that - from this

Protected Material

29

00053428

point of view - there is no doubt that the criminal action is not time-barred.

In sum, it cannot be concluded, at least with the elements at hand, that the offense for which extradition is requested is time-barred.

Furthermore, in the case of interactive conducts for which extradition is requested (continuity or recurrence of the offense), regardless of the system, the beginning of the statute of limitations is the cessation of the offense, which was not even alleged by the defense counsel.

Again, it should be emphasized that the powers of the requested State are limited in this matter, since the so-called Belgian-Dutch system applies, according to which the requested State must comply with the results of the request of the requesting State, so that, if it appears from the request that the offense would have been committed on a permanent basis until April 2016, it is that date that must be considered as the beginning of the statute of limitations period.

Logically, this does not imply a definitive or binding judgment for the requesting State with respect to there being no statute of limitations for the offense imputed to the party subject to the extradition request, since it will be up to the authorities of that State to determine, within the

30

Protected Material

JA1427

 [logo:] SUPREME COURT OF JUSTICE

framework of the trial to be followed by the extradited subject, whether or not the statute of limitations of the offense for which his handing over is granted has been established.

III.4)    <u>Grievances related to the alleged risk of violation of human rights in the event extradition is granted</u>.

The appellant complained that, if extradition is granted, there is a risk that he will be sentenced to death or life imprisonment in the United States. Furthermore, he denounced that the conditions of imprisonment in the United States do not provide any guarantees.

In the Court's opinion, the grievance is frankly and totally rejected.

To tell the truth, the defense does not identify which rule of law was violated by the judgment being challenged, limiting itself to making a series of generic assessments on alleged human rights violations in that country, but without presenting a valid ground for cassation, for which reason the argument does not meet the requirements of Article 272 of the 1980 CPP (Código del Proceso Penal [Code of Criminal Procedure]), this being sufficient reason to dismiss this phase of the challenge procedure.

Moreover, there is no grievance

31

Protected Material

with regard to the possible imposition of the death penalty, which is the only penalty considered in Article 7 of the Binding Treaty for granting of extradition that the requesting party provide assurances considered sufficient by the requested party that such penalty will not be imposed or that, if imposed, it will not be applied.

It should be noted then that the penalty to be imposed is provided for in the Treaty only in two cases, namely, the minimum penalty of one year of imprisonment to be served (Article 2 last part) and the maximum penalty (death penalty) where it is empowered to provide as a condition that it shall not be imposed (Article 7).

In light of this conclusion, it is clearly inappropriate to take into account the penalty (whether in its content, amount or form of application), except for these two exceptional cases, to deny extradition or extradite upon conditions.

In the opinion of the Court, whatever the interpretative method, the primacy of any Extradition Treaty signed by the State cannot be disregarded, given its specific nature and its original source of provisions that cannot be altered except by means of another treaty or denouncing of the one in force in accordance with the applicable rules of public

Protected Material

32

[hw] 768

 [logo:] SUPREME COURT OF JUSTICE

international law.

Indeed, by the extradition Treaties, the State limits its sovereign rights in favor of what is stipulated therein, so that no other provision than the one set forth in its regulatory body can prevail.

Furthermore, the wording of Article 9 of the Treaty itself is quite clear in the sense that the interpretative method must be textual (in accordance with the methods and rules of interpretation enshrined in the 1969 Vienna Convention).

Finally, it must be noted that this mandatory, specific and exhaustive nature is imposed on all bodies of the State to which it is addressed, whether they are jurisdictional or not (judges or prosecutors, respectively).

On the other hand, according to the above, to the extent that the Extradition Treaty is in force and has not been denounced, it cannot be a valid argument to deny extradition to the conditions for the fulfillment of the penalty in the requesting State. If such a risk existed, what would be appropriate is for the Uruguayan State to denounce the Treaty; but it is not a valid argument to breach -in short, this is what the appellant is proposing- the Treaty in force.

On the other hand, the risk of

Protected Material

33

being sentenced to life imprisonment or the death penalty is averted because the Judgment of Court of First Instance (confirmed by the contested judgment) conditioned the granting of extradition on the intervening authorities' assurances that, if convicted, GONZÁLEZ VALENCIA would not be sentenced to death or life imprisonment (see p. 250 of the decision of the first instance judgment).

As such, the grievance must be dismissed for the aforementioned reasons.

III.5) <u>The grievances associated with the alleged error in having deferred the hand-over until the provisional release or definitive freedom is obtained</u>.

In this regard, the defense notes that there was an error in the first instance judgment, confirmed by the judgment being challenged, in stating that the handing over is deferred until the party subject to the extradition request obtains his provisional release or definitive freedom, since Article 8 of the 1973 Treaty provides that the handing over may be deferred *"until the conclusion of the proceedings and, in case of conviction, until the termination or completion of the sentence",* without mentioning the freedom obtained provisionally.

On this point, it is also not

34



[logo:] SUPREME COURT OF JUSTICE

evident that the above judgments have incurred in an error of law, and therefore this part of the challenge procedure will also be dismissed.

Article 8 of the 1973 Treaty states:

*"When the person whose extradition is requested is being prosecuted or is serving a sentence in the territory of the requested Party for an offense other than that for which extradition is requested, his handing over may be postponed until the conclusion of the proceedings and, in the case of a conviction, until the sentence has expired or has been served".*

Certainly, the regulation empowers the requested State to postpone the handing over of the extradited person, in the event that they have been previously sentenced in that country, until the sentence has expired or has been served.

However, this does not imply that the requested State must necessarily defer the handing over of the party subject to the extradition request until the sentence is served or expired in its entirety. This is a condition that the requested State may or may not impose when granting extradition. Consequently, there is no illegitimacy whatsoever in allowing that, eventually, the handing over of the party

35

Protected Material

00053434

subject to the extradition request be made before the extinction or total serving of the sentence, if the provisional release of the party subject to the extradition request is previously verified.

III.6) <u>Grievances related to the alleged error in not having made the extradition conditional on the fact that the maximum sentence to be imposed in the requesting State be 18 years of imprisonment.</u>

The appellant's last argument is that extradition, if granted, should be made upon conditions that the maximum penalty to be applied to the extradited person is limited to the most severe "quantum" established by our criminal legislation (Decree-Law No. 14,294 and Law No. 17,016) for an offense of a similar nature, that is, 18 years of imprisonment.

He is also incorrect in this point.

Neither the 1973 Treaty, nor the Montevideo Treaties of 1889 and 1940 applicable in the alternative, provide for the requested State to impose such a condition at the time of granting extradition. The determination of the punitive "quantum" shall be made by the judicial authorities of the requesting State, in accordance with the applicable legislation, with the limitations indicated in the Judgment of Court of First

36

 [logo:] SUPREME COURT OF JUSTICE

Instance.

With such criterion in mind, it is correct to conclude that sentencing will be imposed by the requesting State, in accordance with its domestic law, made upon conditions in the present case that neither life imprisonment nor the death penalty may be imposed. The imposition of penalties, within the minimum and maximum sentences provided for in the legislation of the requesting State, is a matter for the judicial authorities of the requesting State, and the judicial authorities of the requested State should not interfere.

Consequently, as stated above, the appealed provision is not vitiated by defects that cause nullity, which leads to the rejection of the challenged provision.

IV) <u>Court costs and fees</u>.

There is no merit in imposing legal costs in the instance (Articles 56.1 and 279 of the CGP (Código General del Proceso [General Procedural Code]) and Article 688 of the CC).

On the basis stated above, the Supreme Court of Justice, unanimously,

***RULES:***

**I)   TO DISMISS THE APPEAL FOR CASSATION FILED; WITHOUT SPECIAL PROCEDURAL SENTENCE.**

**II) TO ESTIMATE THE NOTIONAL FEES AT 20 B.P.C.**

37

Protected Material

JA1434

**III) LET IT BE NOTIFIED AND PROMPTLY RETURNED.**

[signature]
**Dr. BERNADETTE MINVIELLE**
**PRESIDING JUDGE OF THE SUPREME COURT OF JUSTICE**

[signature]
**Dr. ELENA MARTINEZ**
**JUDGE OF THE SUPREME COURT OF JUSTICE**

[signature]
**DR. EDUARDO TURELL**
**JUDGE OF THE SUPREME COURT OF JUSTICE**

[signature]
**DR. LUIS TOSI BOERI**
**JUDGE OF THE SUPREME COURT OF JUSTICE**

[signature]
**DR. TABARÉ SOSA AGUIRRE**
**JUDGE OF THE SUPREME COURT OF JUSTICE**

[signature]
**DR. GUSTAVO NICASTRO SEOANE**
**COURT CLERK OF THE SUPREME COURT OF JUSTICE**

Protected Material

38

00053437



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**00053800-00053838**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Dan McCourt

Sworn to before me this
June 29, 2023

Signature, Notary Public



Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

JA1436

# **EXHIBIT W**



MICHAEL PALACIOS
Auxiliar II
Mesa de Entrada
Suprema Corte de Justicia

Juzgado Letrado Penal Especializado
en Crimen Org. 1° T

1 9 FEB. 2020

Bartolomé Mitre 1275 2° Piso - Montevideo

Tel. 1907 Int. 8406

**REPÚBLICA ORIENTAL DEL URUGUAY PODER JUDICIAL**

### OFICIO

Montevideo, 18 de Febrero de 2020

**Oficio N° 82/2020**

**AUTORIDADES DE LA EMBAJADA DE ESTADOS UNIDOS DE AMÉRICA EN URUGUAY**

LA SRA. JUEZA ADRIANA CHAMSARIÁN CANO, del Juzgado Letrado de Primera Instancia en lo Penal Especializado en Crimen Organizado de Primer Turno de la ciudad de Montevideo, República Oriental del Uruguay, a las autoridades de la Embajada de Estados Unidos de América en Uruguay.

**SALUDA, EXHORTA Y HACE SABER:**

Que en los autos caratulados "GONZALEZ VALENCIA, GERARDO -EXTRADICION-", Identificación Única de Expediente 474-76/2016, resolvió por Sentencia N° 13 de fecha 28 de agosto de 2017 (de la cual se adjunta testimonio), confirmada por el Tribunal de Apelaciones en lo Penal de Cuarto Turno y por la Suprema Corte de Justicia, **CONCEDER LA EXTRADICIÓN de GERARDO GONZÁLEZ VALENCIA** norteamericano, pasaporte N° GO8 747371, nacido el 11 de mayo de 1977, a **vuestro país, BAJO LAS SIGUIENTES CONDICIONES:**

1) Se difiere la entrega hasta que el Sr. González Valencia obtenga su excarcelación provisional o libertad definitiva en la causa que se le sigue en Uruguay ante esta Sede (IUE 2-37467/2016). Se hace saber que al requerido se le concedió la excarcelación provisional el día 27 de junio de 2018, y actualmente cumple arresto administrativo por la presente causa de extradición;

2) Se condiciona la extradición concedida a que las autoridades de vuestro Estado aseguren que no se juzgará ni condenará al requerido por delitos distintos a los que se refiere la solicitud de extradición, a excepción de los supuestos consagrados en los numerales 1 y 2 del artículo 13 del Tratado de Extradición entre los Estados Unidos y Uruguay.

JA1438
00053873

3) Se condiciona la extradición concedida a que vuestras autoridades otorguen garantías consideradas suficientes por las autoridades nacionales intervinientes en este proceso, que en caso que Gerardo González Valencia resulte condenado en el proceso penal que se le pretende iniciar en vuestro país, no se le impondrá pena de muerte ni pena de prisión perpetua.

**Las autoridades competentes del Estado requirente deberán expresar si aceptan las condiciones dispuestas en los numerales anteriores, dentro del plazo de <u>cuarenta días a partir de la notificación del presente fallo</u>.**

Saluda a Usted con la más alta consideración.

DADO, FIRMADO Y SELLADO EN LA SALA DE SU DESPACHO SITO EN LA CALLE BARTOLOME MITRE Nº 1275, SEGUNDO PISO, DE LA CIUDAD DE MONTEVIDEO, REPÚBLICA ORIENTAL DEL URUGUAY, A LOS DIECIOCHO DÍAS DEL MES DE FEBRERO DEL AÑO DOS MIL VEINTE.

Protected Material

00053874

[stamp:] MICHAEL
PALACIOS Assistant II
Department of
Correspondence [illegible]
Court of Justice
[signature]
[hw:] 8 30
[stamp:] FEB. 19 2020



**ORIENTAL REPUBLIC
OF URUGUAY
JUDICIAL BRANCH**

Criminal Court Specializing in Organized
Crime 1ST

Bartolomé Mitre 1275 2° Piso - Montevideo

Tel. 1907 Int. 8406

## OFFICIAL LETTER

Montevideo, February 18, 2020

**Official Letter No. 82/2020**

**AUTHORITIES OF THE EMBASSY OF THE UNITED STATES OF AMERICA IN URUGUAY**

ATTN.: JUDGE ADRIANA CHAMSARIÁN CANO, of the Criminal Court of First Instance Specializing in Organized Crime in the city of Montevideo, Oriental Republic of Uruguay, to the authorities of the Embassy of the United States of America in Uruguay.

GREETS, URGES AND INFORMS YOU:

That in the proceedings entitled "GONZALEZ VALENCIA, GERARDO -EXTRADITION-", Unique File Identification 474-76/2016, it was resolved by Judgment No. 13 dated August 28, 2017 (a certified copy of which is attached), confirmed by the Fourth Panel of the Criminal Court of Appeal and by the Supreme Court of Justice, **to GRANT THE EXTRADITION of GERARDO GONZÁLEZ VALENCIA,** United States citizen, passport No. GO8 747371, born on May 11, 1977, **to your country, UNDER THE FOLLOWING CONDITIONS:**

**1)**   The hand-over is deferred until Mr. González Valencia obtains his provisional release or definitive freedom in the case underway in Uruguay before this Court (IUE 2-37467/2016). It is hereby stated that the defendant was granted provisional release on June 27, 2018, and is currently under administrative arrest for this extradition case.

**2)**   The extradition granted is conditioned on the authorities of your country ensuring that the party subject to the extradition request will not be judged or convicted for offenses other than those referred to in the extradition request, with the exception of the cases enshrined in sections 1 and 2 of Article 13 of the Extradition Treaty between the United States and Uruguay.

3)   The extradition granted is conditioned upon your authorities granting guarantees considered sufficient by the national authorities involved in this proceeding that, in the event that Gerardo González Valencia is convicted in the criminal proceeding that is intended to be initiated in your country, he will not receive the death penalty or a sentence of life imprisonment.

**The competent authorities of the requesting country shall state whether they accept the conditions set forth in the previous sections within <u>forty days from the notification of this ruling.</u>**

Please accept my most esteemed regards.

GIVEN, SIGNED AND SEALED IN THE CHAMBER OF HER OFFICE LOCATED AT CALLE BARTOLOME MITRE NO. 1275, SECOND FLOOR, OF THE CITY OF MONTEVIDEO, ORIENTAL REPUBLIC OF URUGUAY, ON THE EIGHTEENTH DAY OF THE MONTH OF FEBRUARY OF THE YEAR TWO THOUSAND TWENTY.

Protected Material



City of New York, State of New York, County of New York

I, Dan McCourt, hereby certify that the document "**00053873-00053874**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Dan McCourt

Sworn to before me this
June 29, 2023

Signature, Notary Public



Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

JA1442

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO. 16-065 (BAH)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GERARDO GONZALEZ-VALENCIA,** | ) | |
| also known as "Lalo," "Flaco," | ) | |
| "Silver," "Silverio," "Eduardo," | ) | |
| and "Laline,"  | ) | |
| | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S REPLY IN SUPPORT OF**
**SUPPLEMENTAL SENTENCING MEMORANDUM**

The United States respectfully submits this reply to Defendant Gerardo Gonzalez-Valencia's (hereafter the "Defendant's") Post-Hearing Response Brief in Aid of Sentencing. Dkt. No. 179. For the reasons set forth below, and in the Government's Supplemental Sentencing Memorandum, Dkt. No. 170, the Court should impose the Guideline sentence of life imprisonment to reflect the nature, circumstances, and seriousness of the Defendant's unlawful conduct.

## I.    Criminal History

The Defendant disagrees with the Probation Office and the Government and argues that he should not be a Criminal History Category III because it misrepresents his criminal history. It does not. A Criminal History Category of III applies to the Defendant and does not "substantially over-represent[] the seriousness of the defendant's criminal history[.]" U.S.S.G. § 4A1.3(b). Following his 1998 conviction for use of a communication facility to facilitate a methamphetamine-trafficking offense, the Defendant was given the opportunity to serve a portion of his sentence in a halfway house designed to provide structure and resources to help

1

JA1443

prisoners prepare for reentry into the community. *See* 18 U.S.C. § 3624(c). The Defendant abused that trust by lying to the halfway house that he was leaving to seek employment, fleeing to Mexico, and shortly thereafter returning to drug trafficking on a much larger scale. This was not a minor lapse in judgment, but instead a deliberate abuse of the system in order to re-offend. A Criminal History Category of III is an accurate calculation, appropriately reflects the seriousness of his prior criminal conduct, and no departure from that calculation is warranted.

## II.   Enhancements

The Government has proven by a preponderance of the evidence that the applicable drug quantity is 450 kilograms or more and that enhancements for leadership, violence, and use of a dangerous weapon apply.[1] The Defendant's challenges to the credibility of the Government's witnesses and the sufficiency of the evidence are not supported by the record or the applicable caselaw. The sentencing enhancements sought by the Government are well supported in the record, and Defendant's argument that these sentencing enhancements do not apply to him are without merit.

### A.  Witness Credibility

The Defendant spends much of his Post-Hearing Brief arguing that the witnesses' disclosure or non-disclosure of information at certain times undermines their credibility. To the contrary, as multiple witnesses testified, the topic of conversation in proffers with the Government is decided by the agents and prosecutors, not the witness. Tr. 5/3/23 at 47, 165–66; Hr'g Tr. 5/4/23 at 7. In a long-running investigation, such as the investigation of Los Cuinis and the Cartel de Jalisco Nueva Generacion (CJNG), new targets naturally become the focus over

---

[1] The parties do not dispute the application of a two-point enhancement for use of a semi-submersible to import a controlled substance pursuant to U.S.S.G. § 2D1.1(b)(3)(B).

JA1444

time.  Hr'g Tr. 5/4/23 at 7.  The inclusion or omission of information in the proffer notes is, in large part, a result of the topics chosen and questions asked by the Government on a particular date.  Moreover, the notes are not intended to be a verbatim transcript of what the witness said during the proffer.  *Id.*

The Defendant also urges the Court to discredit *all* testimony of the Government's cooperating witnesses.  However, the Defendant has not established that any portion of the cooperator testimony should be discarded, let alone all of it.  Moreover, the witnesses corroborate each other on key events, several of which are documented in news articles and intercepted BlackBerry Messenger (BBM) communications, demonstrating the reliability of the testimony.

Oscar Nava Valencia's testimony should not be discarded because he briefly attempted to recant a prior statement out of fear of testifying in the Genaro Garcia Luna trial.  Nava Valencia and his family had been threatened, and members of his family disappeared, as a result of his cooperation.  Hr'g Tr. 5/3/23 at 50.  Nava Valencia was placed in protective housing while in U.S. custody and was placed in isolation for eight months solely for his own protection.  *Id.* at 50–51.  Nava Valencia's hesitancy to testify in a high-profile trial with substantial media attention after receiving threats, losing family members, and being placed in protective custody is understandable.  Despite his fear, Nava Valencia testified in the Garcia Luna trial consistent with his prior proffered statements and the Defendant's sentencing at great risk to himself and his family.

Nor should Nava Valencia's testimony be discarded because he ordered acts of violence.  Not only has Nava Valencia admitted to, and taken responsibility for, acts of violence, but at least one act of violence that he ordered—the killing of Antonio Guizar Valencia—was at the

3

JA1445

request of the Defendant and his brothers.  Thus, the violence ordered by Nava Valencia is particularly relevant and does not undermine Nava Valencia's credibility.

Jose Maria Guizar Valencia's entire testimony is not discredited simply because the Government did not show him a photo of the Defendant prior to the evidentiary hearing. Whether Guizar Valencia was shown a photo of the Defendant prior to the hearing has no bearing on whether he could identify the Defendant in court or elsewhere.  In fact, Guizar Valencia confidently identified the Defendant in the courtroom, and, when asked if he wanted the Defendant to remove his facemask for purposes of identification, Guizar Valencia responded, "No.  I can identify him very well.  I know him well." *Id.* at 57–58.

Finally, Elpidio Mojarro Ramirez's testimony is not discredited due to a prior misidentification of an old photograph of the Defendant.  At the evidentiary hearing, Mojarro Ramirez identified the Defendant as the person he knew as "Lalo or Flaco," who was a member of Los Cuinis.  *Id.* at 132–33.  Mojarro Ramirez stated that no other Gonzalez-Valencia sibling went by the nickname "Lalo," and he proceeded to discuss in-person meetings and drug transactions in which they both participated.  *Id.* at 134; *see also* Hr'g Tr. 5/4/23 at 128 (Investigator Joseph Smith testifying that he was not aware of a "Lalo" in the Defendant's family other than the Defendant).  Accordingly, there is no legitimate basis for discarding any witness's testimony in its entirety.

**B. Drug Quantity**

The Government has proven by a preponderance of the evidence that the Defendant is responsible for more than 450 kilograms of cocaine as part of the conspiracy to which he has pleaded guilty.  The Government has presented evidence of numerous cocaine transactions in which the Defendant participated, including cocaine shipments destined for the United States.

JA1446

Those shipments collectively totaled at least tens of thousands of kilograms of cocaine, as detailed in the Government's Supplemental Sentencing Memorandum, Dkt. No. 170, and Motion for Preliminary Order of Forfeiture, Dkt. No. 172.

The Defendant's attempt to distance himself from these transactions by claiming that the witnesses previously identified "Los Cuinis" as participants, and not the Defendant personally, is misleading as a matter of both fact and law.  Nava Valencia and Mojarro Ramirez both testified that when they used the term "Los Cuinis," they were referring to the Defendant and his brothers Abigael and Jose.  Hr'g Tr. 5/2/23 at 29–30, 39; Hr'g Tr. 5/3/23 at 145.  Further, Nava Valencia, Mojarro Ramirez, and Guizar Valencia all testified about drug transactions exceeding 450 kilograms in which the Defendant personally participated.

Additionally, the Government need not prove that the Defendant's personal contributions to the cocaine shipments exceeded 450 kilograms of cocaine.  A defendant's base offense level is determined by "relevant conduct."  U.S.S.G. § 1B1.3.  In a drug conspiracy case, "relevant conduct" includes not only "all acts . . . committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," but also "all reasonably foreseeable acts . . . of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G. § 1B1.3(a)(1); *see also United States v. Booze*, 108 F.3d 378, 381 (D.C. Cir. 1997).  This standard is based on the "well-settled principle of conspiracy law that someone who jointly undertakes a criminal activity with others is accountable for their reasonably foreseeable conduct in furtherance of the joint undertaking."  *United States v. Saro*, 24 F.3d 283,

JA1447

288 (D.C. Cir. 1994).  The amount of cocaine that the charged conspiracy distributed for importation into the United States greatly exceeded 450 kilograms of cocaine, and that quantity was reasonably foreseeable to the Defendant.

Although the Government presented evidence of numerous cocaine shipments in which the Defendant participated, the Court need only look to the cocaine shipment on the semi-submersible seized by the U.S. Coast Guard in 2007 to find that the amount of cocaine the Defendant conspired to distribute exceeded 450 kilograms.  The Defendant admits to being an investor in the seized semi-submersible shipment and that he knew and intended that the cocaine on board the semi-submersible ultimately would be imported into the United States.  Dkt. No. 139 ¶ 3.  Nava Valencia testified that the semi-submersible was carrying approximately 5,000 kilograms of cocaine.  Hr'g Tr. 5/2/23 at 39.  Nava Valencia also explained that the minimum amount of cocaine that the Milenio Cartel and its partners would send via semi-submersible was 3,000 kilograms, given the substantial time and expense of building a semi-submersible, which would only be used once, as well as the slower speed at which the semi-submersible transported the cocaine from Colombia to Mexico compared to other transportation methods.  *Id.* at 38–39.  In other words, it would not make sense as a matter of business to use a semi-submersible to transport only 280 kilograms of cocaine, the amount the U.S. Coast Guard recovered from the water after the semi-submersible crew scuttled the vessel.  Additionally, Special Agent Kevin Novick, who has personally participated in the interdiction of a semi-submersible while a member of the U.S. Coast Guard, testified that a semi-submersible like the one interdicted in this case could hold more than two metric tons.  Hr'g Tr. 5/2/23 at 11–12.  Thus, by all accounts, the quantity of cocaine on the semi-submersible exceeded 450 kilograms.

JA1448

Finally, the Government did not err in charging the Defendant with conspiring to distribute five kilograms or more of cocaine, rather than 450 kilograms or more of cocaine. Any fact that increases the mandatory minimum must be specifically alleged, *Alleyne v. United States*, 570 U.S. 99, 103 (2013); however, there is no such requirement for drug quantities that trigger higher Sentencing Guidelines calculations. Here, 21 U.S.C. § 960(b)(1)(B)(ii) sets a threshold of "5 kilograms or more of a mixture or substance containing a detectable amount of cocaine . . . ." for the application of a mandatory minimum "term of imprisonment of not less than 10 years." The quantity charged in the Indictment reflects the quantity needed to trigger the ten-year mandatory minimum. *See* Dkt. No. 1. Thus, the drug quantity in the Indictment correctly reflects the quantity in Section 960(b)(1)(B)(ii), rather than a quantity in the U.S. Sentencing Guidelines, and does not impose any cap on the amount of cocaine for which the Defendant may be held responsible.

## C. Violence

The Government has proven by a preponderance of the evidence that the violence enhancement applies pursuant to U.S.S.G. § 2D1.1(b)(2). The evidence to support the enhancement is not "unreliable hearsay," as the Defendant contends, Dkt. No. 179 at 23, but rather testimony of individuals with firsthand knowledge. Further, the fact that the Defendant asked, directed, and paid others to put their lives at risk and commit acts of violence on his behalf does not make the Defendant any less culpable for that violence. Even if the evidence was hearsay, it was not unreliable because it was corroborated by percipient witnesses, and hearsay is admissible for purposes of sentencing.

The evidence of the Defendant's involvement in the murder of Antonio Guizar Valencia is corroborated by all three cooperating witnesses, who have personal knowledge of the

7

JA1449

Defendant's participation.  Nava Valencia and Mojarro Ramirez both testified that the Defendant and his brothers Abigael and Jose, collectively referred to as "Los Cuinis," asked Nava Valencia at an in-person meeting for gunmen to find Antonio Guizar Valencia and make him "pay" for stealing a shipment of cocaine belonging to Los Cuinis.  Hr'g Tr. 5/2/23 at 51–52; Hr'g Tr. 5/3/23 at 19.  Nava Valencia sent his gunmen to find Antonio Guizar Valencia at the request of Los Cuinis, and they killed Antonio Guizar Valencia and several others.  Hr'g Tr. 5/2/23 at 52; Hr'g Tr. 5/3/23 at 68–69.  The Defendant's attempt to create doubt about which brother made the request of Nava Valencia is futile, as all three brothers came to Nava Valencia jointly to make the request to have Antonio Guizar Valencia killed.  Further confirming the Defendant's involvement in the murder, Jose Maria Guizar Valencia testified that he heard the Defendant claim responsibility for the murder and demand $12 million from the Guizar Valencia family for the cocaine that the Defendant believed Antonio Guizar Valencia stole in a phone call.  Hr'g Tr. 5/3/23 at 69, 95.  The notion that all three witnesses—including one from a rival drug trafficking organization—were fabricating the Defendant's involvement in the murder of Antonio Guizar Valencia under oath strains credulity.

Regarding the murder of Efrain Teodoro Torres, also known as "Chispa" and "Zeta 14," Guizar Valencia personally witnessed the killing at a racetrack and heard an individual on the assassin's cell phone self-identify as "La Barbie."[2]  Hr'g Tr. 5/3/23 at 71–74.  Separately, Nava

---

[2] The Government did not "withhold" *Brady* material, as the Defendant alleges.  The testimony of Jose Carlos Hinojosa at issue is publicly available, and "there cannot be a *Brady* violation for failure to disclose public documents which the Defendants could have found on their own."  *United States v. Borda*, 941 F. Supp. 2d 16, 25 (D.D.C. 2013).  Upon learning of Hinojosa's testimony in the Western District of Texas, the trial team attempted to locate notes about Hinojosa's basis of knowledge, asked an agent to interview Hinojosa about his basis of knowledge, and provided the agent's summary of the interview to the defense.  *See* Def. Ex. 57.  Moreover, the Defendant had transcripts of Hinojosa's testimony and was able to make use of them at sentencing and thus suffered no prejudice.

Valencia testified that he discussed the shooting with La Barbie in person, and La Barbie confirmed that the Defendant ordered the murder, La Barbie had been present with the Defendant in Mexico City at the time of the murder, and the Defendant asked La Barbie to contribute money to pay the gunmen.  Hr'g Tr. 5/2/23 at 56–58.  Guizar Valencia testified that the top leadership of Los Zetas was aware that the Defendant and Los Cuinis ordered the murder.  Hr'g Tr. 5/3/23 at 79.  The Defendant's attempt to place blame for the murder on Zetas member Miguel Angel Trevino Morales or Nava Valencia using unsubstantiated hearsay from Jose Carlos Hinojosa does not undermine the testimony of Nava Valencia and Guizar Valencia about the Defendant's involvement.  Hinojosa himself describes the information about Nava Valencia's involvement as merely "rumors," and Hinojosa concedes having no personal basis of knowledge as to Trevino Morales' supposed involvement.  *See* Def. Ex. 57.

Regarding the murder of Domingo Mendoza Sandoval, also known as "Mingo," Mojarro Ramirez learned that the Defendant ordered the murder of Mendoza Sandoval from the victim himself while he was on the run and pleading for help in 2011.  Hr'g Tr. 5/3/23 at 147–48.  As Mendoza Sandoval explained to Mojarro Ramirez, the Defendant told Mendoza Sandoval that he would send his brother-in-law Nemesio Oseguera Cervantes, also known as Mencho, to see Mendoza Sandoval after the Defendant and Mendoza Sandoval got into an accounting dispute.  *Id.* at 148.  Mendoza Sandoval told Mojarro Ramirez that Oseguera Cervantes arrived at Mendoza Sandoval's ranch while Mendoza Sandoval was present and killed Mendoza Sandoval's brother and three workers; however, Mendoza Sandoval managed to get away.  *Id.* at 148–49.  Mojarro Ramirez has been consistent in his account of what transpired.  Additionally, Mojarro Ramirez's information is corroborated by BBM communications in which Oseguera

9

JA1451

Cervantes and Los Cuinis were still actively looking for Mendoza Sandoval in 2013 in order to kill him. *See* Dkt. No. 170 at 11–12 (collecting examples).

Finally, Nava Valencia testified that he learned from the Defendant that the Defendant had ordered the murder of a family in Michoacan. Hr'g Tr. 5/2/23 at 61. Nava Valencia testified with no ambiguity that, "It was Lalo[,] Directly Lalo," who ordered the murder. *Id.* at 60.

## D. Dangerous Weapons

The Defendant regularly carried a pistol during meetings to negotiate and receive cocaine shipments and caused others to carry firearms in furtherance of the cocaine conspiracy, warranting a two-point enhancement for possession of a dangerous weapon pursuant to U.S.S.G. § 2D1.1(b)(1).

Carrying a firearm to meetings to discuss or conduct drug transactions is sufficient to warrant the application of U.S.S.G. § 2D1.1(b)(1). *See United States v. Leyva,* 916 F.3d 14, 26–27 (D.C. Cir. 2019) (affirming two-point weapons enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) where government presented evidence that defendant carried pistol "as he conducted drug trafficking business" and defendant had pistol at time of arrest); *United States v. Vega*, 826 F.3d 514, 543 (D.C. Cir. 2016) (affirming two-point weapons enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) where defendant carried firearm while running cocaine lab and carried handgun while committing drug offenses); *United States v. Gonzalez-Vazquez*, 34 F.3d 19, 24 (1st Cir. 1994) (affirming two-point weapons enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) where defendant carried pistol "while one of his coconspirators negotiated the terms of a proposed narcotics transaction.")

Here, Nava Valencia testified that the Defendant carried a .38 super or a 9mm pistol to meetings to conduct drug trafficking, Hr'g Tr. 5/2/23 at 54, and Guizar Valencia testified that the

10

JA1452

Defendant was always armed with a .38 super pistol in meetings to receive cocaine from Guizar Valencia, Hr'g Tr. 5/3/23 at 66. Further, Nava Valencia testified that the Defendant would sometimes bring armed bodyguards to meetings to discuss drug trafficking, Hr'g Tr. 5/2/23 at 54, and Guizar Valencia testified that Defendant's workers had AK-47 rifles in their vehicles when the Defendant met with Guizar Valencia to receive cocaine, Hr'g Tr. 5/3/23 at 66. Such conduct is sufficient to warrant the two-point weapons enhancement.

The Defendant's reliance on *United States v. Bagcho*, 923 F.3d 1131 (D.C. Cir. 2019), to argue otherwise is misplaced. Dkt. No. 179 at 33–34. In *Bagcho*, the D.C. Circuit addressed the defendant's alleged "constructive possession" of a firearm found during a raid of his compound. *Bagcho*, 923 F.3d at 1139–40. The D.C. Circuit found the record insufficient to apply the weapons enhancement because the government "provided no evidence linking the weapon to [the defendant being sentenced] beyond the fact that it was found at the compound he owned," the defendant was not present on the compound at the time of the raid, and "many people either lived or worked in the compound." *Id*. In contrast, both Nava Valencia and Guizar Valencia saw the Defendant personally carrying a pistol at meetings to discuss and/or conduct drug transactions and saw workers the Defendant directed acting as armed bodyguards for him.

Finally, the Defendant attempts to sow confusion about witness testimony regarding firearms where there is none. Nava Valencia did not say that the Defendant "only armed himself after the rooster fight incident in 2007," as the Defendant contends. Dkt. No. 179 at 32. Rather, Nava Valencia stated that the Defendant "started caring *more* about security and hiring *more* people," including armed gunmen, after the 2007 rooster fight incident. Hr'g Tr. 5/2/23 at 53–54 (emphasis added). Nava Valencia's testimony indicates that the Defendant had some armed

11

JA1453

security prior to the rooster fight incident.  Moreover, Nava Valencia's testimony does not contradict Guizar Valencia's testimony that the Defendant carried a pistol prior to 2007.

### E. Leadership

The Defendant contests any leadership enhancement.  However, the Government has proven by a preponderance of the evidence that the Defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," warranting a four-point enhancement pursuant to U.S.S.G. § 3B1.1(a).

The Defendant's portrayal of himself as a modest investor in some cocaine shipments who may have occasionally performed "low-level functionary duties" is completely contradicted by the evidence.  *See* Dkt. No. 179 at 34–36.  Nava Valencia, Guizar Valencia, and Mojarro Ramirez all testified that the Defendant was a leader, if not the primary leader, of the Los Cuinis DTO, which was allied with such powerful drug cartels as the Milenio Cartel and the CJNG. Hr'g Tr. 5/2/23 at 31; Hr'g Tr. 5/3/23 at 92, 135.  The testimony of Nava Valencia, Mojarro Ramirez, and Guizar Valencia, as well as the Defendant's own BBM communications, also show that the Defendant exercised decision-making authority as a leader of Los Cuinis, was an active participant in planning and organizing cocaine shipments as part of an extensive distribution network, exercised control and authority over at minimum dozens of subordinates, and amassed substantial wealth from his cocaine-trafficking operation.  *See* Dkt. No. 170 at 6–7 (summarizing testimony).

Although the Defendant did invest in some large cocaine shipments primarily organized by other drug traffickers, the Defendant need not have personally organized every cocaine shipment in which he invested to be a leader or organizer under Section 3B1.1(a).

12

JA1454

### III.   Conditions of Extradition

Finally, contrary to the Defendant's assertion, the Court is not required to impose a sentence below the Guideline sentence of life imprisonment.  Any "condition" on the Defendant's sentence imposed by the Uruguayan court was unilateral or one-sided, and therefore it does not bind the United States.

"Ordinarily, the protocol for requesting and approving conditions on extradition is quite formal: the foreign country formally requests the agreement of the United States, generally through diplomatic channels, and the United States affirmatively conveys its agreement, generally through diplomatic channels."  *United States v. Cuevas*, 402 F. Supp. 2d 504, 507 (S.D.N.Y. 2005), *aff'd in part, remanded in part,* 496 F.3d 256 (2d Cir. 2007).  Where, as here, the united States did not give any diplomatic assurance regarding non-imposition of a life sentence and the extradition treaty does not impose such a requirement, the "unilateral belief" by the extraditing country that the United States would not seek a particular sentence "is insufficient to bind the United States."  *Cuevas*, 496 F.3d at 263; *see also Rodriguez Benitez v. Garcia*, 495 F.3d 640, 644 (9th Cir. 2007) (affirming District Court finding that Venezuelan extradition decree attempting to unilaterally limit defendant's sentence in United States was unenforceable); *United States v. Banks*, 464 F.3d 184, 191–92 (2d Cir. 2006) (finding that, in absence of any agreement with United States limiting defendant's sentence, Dominican Republic's unilateral expectation that sentence would be limited to maximum under Dominican law would not bind United States); *United States v. Lopez-Aguilar*, No. CR 09-2962 WJ, 2015 WL 13662853, at *4 (D.N.M. July 9, 2015) (finding that, where United States gave no assurance as to life sentence, "hopes" expressed in order granting extradition from El Salvador "that the United States would

13

## JA1455

honor its wishes concerning certain sentencing limitation . . . does not bind the United States to those expressions.").

It is undisputed that the United States provided no diplomatic assurances regarding a life sentence as part of the Defendant's extradition arrangement.  When Uruguay requested an assurance that a life sentence would not be imposed, the United States responded via diplomatic note that the extradition treaty between the United States and Uruguay "does not provide a basis for conditioning extradition on the provision of the assurance requested," and therefore "the United States is under no obligation to provide such an assurance."  Dkt. No. 179 at Ex. X.  Even absent an assurance, Uruguay relinquished custody of the Defendant and extradited him to the United States to face the charges in this case.  Thus, the unilateral "condition" expressed in the Uruguayan court order regarding a life sentence is unenforceable.

Notably, nearly all exhibits to the Defendant's Post-Hearing Response Brief that purport to impose a condition on the Defendant's sentence predate Uruguay's request for an assurance and the United States' response.  *See* Dkt. No. 179 at Exs. S–X.  The only exception is the Uruguayan Attorney General's Office's motion to proceed with the extradition after receiving the United States' diplomatic note.  *See id.* at Ex. Y.  In that motion, the Uruguayan Attorney General's Office acknowledged the lack of an assurance by the United States and stated, "The failure to provide guarantees with respect to the non-imposition of the sentence of life imprisonment is justified, since it is understood that the petitioning State has alleged a valid legal argument to be exempted from such obligation, covered by the rules of the Treaty applicable between the parties."  *Id.* at Ex. Y, p.12.  With full knowledge that the United States refused to provide an assurance as to the non-imposition of a life sentence, and therefore explicitly did not foreclose asking for such a sentence, Uruguay nevertheless extradited the Defendant to the

14

JA1456

United States.  Consequently, any unilateral condition imposed by Uruguayan courts on the Defendant's sentence is non-binding and unenforceable.

**IV.      <u>Conclusion</u>**

For the reasons set forth above and in the Government's Supplemental Sentencing Memorandum, the Government respectfully requests that the Court impose a Guideline sentence of life imprisonment which is reasonable, appropriate, and matches the severity of the crime committed by the Defendant.  A life sentence is sufficient, but not greater than necessary, to hold the Defendant accountable for his crimes, promote respect for the law, deter the Defendant and others from committing similar serious crimes and protect the public.

Respectfully Submitted,
MARLON COBAR
Acting Chief, Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice


By:      */s/ Kaitlin Sahni*
Kaitlin Sahni
Assistant Deputy Chief
Kate Naseef
Kirk Handrich
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division, U.S. Department of Justice
Washington, D.C.  20530
Telephone: (202) 514-0917

JA1457

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing

(ECF) system with the United States District Court for the District of Columbia to counsel of

record for the Defendant, this 12th day of July, 2023.


By:   /s/  *Kaitlin Sahni*
          Kaitlin Sahni
          Assistant Deputy Chief
          Narcotic and Dangerous Drug Section
          Criminal Division
          U.S. Department of Justice

JA1458

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    ) CRIMINAL ACTION NO.:
    ) 16-0065-BAH
         Plaintiff,    )
    vs.    )
    )
GERARDO GONZALEZ VALENCIA    ) Washington, D.C.
    ) July 21st, 2023
        Defendant.    ) 10:00 a.m.
_____ )

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE BERYL A. HOWELL
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Government:  Kaitlin Sahni, Esquire
    Kate Naseeef, Esquire
    Kirk K. Handrich, Esquire
    U.S. Department of Justice
    Narcotics and Dangerous Drug Section
    145 N Street, NE
    Second Floor, East Wing
    Washington, DC 20530

For the Defendant:  Stephen A. Best, Esquire
    Geoffrey H. Coll, Esquire
    Lilly A. Sanchez, Esquire
    Natasha Ertzbischoff, Esquire
    Tiffany B. Lietz, Esquire
    Brown Rudnick, LLP
    601 Thirteenth Street, NW
    Suite 600
    Washington, D.C. 20005

Reported by:    Christine T. Asif, RPR, FCRR
    Official Court Reporter
    United States District Court
    for the District of Columbia
    333 Contitution Avenue, NW
    Washington, D.C., 20001

Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription

2

P R O C E E D I N G S

THE COURT:  Let's call the case.

THE CLERK:  The matter before the Court, criminal case No. 16-65-01, United States of America versus Gerardo Gonzalez Valencia.  Counsel, please come forward and state your names for the record, starting with the government.

MS. SAHNI:  Good morning, Your Honor.  Kaitlin Sahni with Kate Naseef with Kirk Handrich for the United States.  Also at counsel table is Special Agent Kyle Mori.

THE COURT:  Good morning.

MR. BEST:  Again, good morning, Your Honor.  Stephen Best on behalf of Gerard Gonzalez Valencia, with me is Natasha Ertzbischoff, Tiffany Lietz, Jeff Coll, and Lilly Sanchez.

THE COURT:  Good morning all of you.

All right.  So we're here this morning for Mr. Gerardo Gonzalez Valencia's sentencing.  He pleaded guilty December 22, 2022, to the one-count indictment for conspiracy to distribute 5 kilograms or more of cocaine for importation into the United States.

So let me just review the very lengthy list of materials I've read in connection with this sentencing this morning.  It feels like two notebooks already, from the -- certainly I started with the presentence investigation report and sentencing recommendation from the probation office, docketed at ECFs 149 and 150.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1460

I've also reviewed the government's sentencing memo and accompanying exhibits submitted in advance of, and then a supplemental memorandum submitted after the evidentiary sentencing hearing held on May 2, 3 and 4, 2023, and those were docketed at ECFs 153 and 170. I've also reviewed the government's attachment to its supplemental sentencing memo, docket No. ECF 171. And the government's forfeiture motions submitted in advance of and after the evidentiary sentencing hearing, docketed at 157 and 172.

From the defendant, I've reviewed the defendant's sentencing memo and exhibits submitted in advance of and supplemental memo submitted after the evidentiary sentencing hearing, and those are docketed at 156 and 157. I've reviewed the defendant's opposition to the government's original officer motion and to the government's amended forfeiture motion docketed at ECFs 158 and 178. I've also reviewed a letter submitted in support of the defendant -- a number of letters, I think -- submitted in support of the defendant, letters docketed at 160.

And then there were six -- and then I've also reviewed the testimony of the six witnesses who testified at the evidentiary hearing, Oscar Nava Valencia, Jose Maria Guizar Valencia, Elpidio Mojarro Ramirez, James Holohan, Kevin Novick, and Joseph Smith. Those were witnesses for both the defense and the government. And I think that's about it.

Does the government have all those documents and have I missed anything in this voluminous record?

MS. SAHNI:  I don't believe you've missed anything, Your Honor.

THE COURT:  And Mr. Best?

MR. BEST:  I don't believe you missed anything.

THE COURT:  And you reviewed everything that I just listed.

MR. BEST:  Yes, Your Honor.

THE COURT: Okay.  Thank you.  All right. Mr. Gonzalez Valencia let me just tell you how this sentencing hearing will proceed.  I do sentencing hearings in four different steps.  At the first step, I'll review what the factual objections are, if any, to the presentence investigation report.  And there are a number of factual objections to this PSR.  And when I say PSR, I mean the presentence investigation report.  It's a shorthand to sometimes to call it a PSR.  So that's at the first step.

At the second step I'll determine how the advisory guidelines apply in your case and what the advisory sentencing range is that applies in your case.  And the first and second step are interrelated, because the guidelines rest on some factual determinations that must be made in this case that the parties dispute.  And that's why we had the hearing with all the witnesses, to help me resolve those factual disputes.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1462

At the third step I'll hear first from the government, then I'll hear from your counsel about how to apply the factors set out in a statute at 18, U.S.C., Section 3553(a).  And then lastly, after I hear from the government and from your counsel, I'll give you an opportunity to speak to me directly, if you wish.  At the last step I'll explain the reasons for the sentence I'm about to impose and then impose sentence.

So do you have any questions about how this hearing's going to proceed for the next hour or so?

MR. BEST:  No, I have no --

THE INTERPRETER:  The interpreter would request that both counsel and defendant use the microphone at the table when they speak.

THE COURT:  Yes.

All right.  So let's turn to the first step which is the presentence investigation report.  And as I understand it the government lodges four objections to the guidelines calculation in the PSR, based on some of the factual findings that were not made in the presentence investigation report, but as to what is actually in the PSR, factually, does the government have any objection to that?

MS. SAHNI:  No, Your Honor.

THE COURT:  And with respect to the defense, Mr. Best, have you and your client read and discussed the

presentence investigation report?

MR. BEST:  Yes, Your Honor.

THE COURT:  And I understand the defendant has no objections to the factual portions of the PSR; is that correct?

MR. BEST:  Correct.

THE COURT:  All right.  And Mr. Gonzalez Valencia, could you just stand right where you are.  Are you fully satisfied with all of your attorneys in this case?

THE INTERPRETER:  Your Honor, the interpreter cannot hear.

THE DEFENDANT:  Yes, Your Honor, and when I get the opportunity to speak in this case, I will express my appreciation of all the efforts that my attorneys have given me in this case, and all the support that they've provided me.

THE COURT:  All right.  Thank you.  And Mr. Gonzalez Valencia, do you feel that you've had enough time to talk to your attorneys about all the papers submitted in connection with your sentencing?

THE DEFENDANT:  Yes, Your Honor.  I have I've been keeping close tabs on how the case is progressing with them and they kept me up to date through visits to the place where I am now by my attorneys.

THE COURT:  All right.  Thank you, you may be

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1464

seated.  All right.  So to the extent that the factual portions of the PSR are undisputed by the parties, although from the government's perspective incomplete, I will accept those as part of my factual findings at sentencing, supplemented by the defendant's admitted facts at the time of the plea, and by the evidence submitted at the sentencing hearing held on May 2, 3, and 4.

All right.  Now we're at the second step of the hearing where I have to make a determination of how the guidelines apply in this case.  I'm going to separate this part of the hearing into two parts starting with the criminal history.  And then I'll address how the guidelines apply with the specific offense characteristics that the parties dispute and role adjustment that the parties dispute.

But let's start with the criminal history.  As I understand the dispute, let me lay that out, and I think it's clear from the parties' papers, the government disputes that the defendant's Criminal History Category of II, that was reflected in the PSR docketed at ECF 149, is correct.  And the government believes that the criminal history score should be increased by two points because the defendant committed the instant offense while on escape status, having failed to return to a halfway house back in 2001, pursuant to the guideline at Section 4A1.1(d).  And, of course, if this two point increase under Section 4A1.1(d) is applied, it would put

the defendant in Criminal History Category III rather than in Criminal History Category II, as the PSR found.

The probation office did report, as I did disclose to the parties at the evidentiary hearing, that the probation office has revised its calculation of the defendant's criminal history score to include the two-point increase to put defendant in Criminal History Category III. And as I said, I've read the parties' papers about this, but I'll hear argument on the Criminal History Category if either party wants to supplement their briefing on it.

Does the government want to?

MS. SAHNI: No, Your Honor. We rest on --

THE COURT: And, Mr. Best, do you want to supplement your argument?

MR. BEST: No, Your Honor, we submit on papers and we're going to make the argument in allocution.

THE COURT: All right. So having reviewed the record, the government's objection is sustained. And probation's corrected recommendation of Criminal History Category III shall apply.

Let me just explain the reason why. The defendant does concede that he was on escape status when he committed the instant offense, see supplemental memo docketed at 178 at page 5. He nonetheless makes two arguments against applying the full force of the two additional criminal history points

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1466

9

for guideline 4A1.1(d).  That would push him into Criminal History Category III.

First, he argues that the Court should exercise its discretion to depart downward and apply Criminal History Category II, because Criminal History Category III overrepresents the seriousness of his criminal history and unfairly penalizes him.  In particular, he raises that his escape occurred when he was only 20 years old with just six months left on his four-year sentence.  It would dramatically increase his applicable guideline range.  He also contends that the government did not include the escape offense in his extradition papers and extradition request.  So he can never be convicted for this offense, supporting why he thinks it would be fundamentally unfair to apply it.

And let me just say, I don't find that any downward departure for overstatement of criminal history as requested by the defendant under the guideline at Section 4A1.3(d) is warranted here.  Three years prior to the escape offense he had committed a serious felony putting him in prison for four years.  He went from that felony drug conviction for methamphetamine distribution in 1998 and to engaging in the serious drug conspiracy for which he pleaded guilty.  And he participated in the new illegal drug conspiracy for years following his escape.

This is simply not the kind of record providing a

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1467

reason to show the defendant leniency at this time and departing downward to apply the lesser Criminal History Category.  Moreover, the fact that the defendant may not be prosecuted for his escape offense due to his extradition request not covering that offense conduct does not work the unfairness that the defendant suggests, it means only that the way, the fact of defendant's escape offense conduct, which shows a lack of respect for this country's judicial system and judicial orders may be accounted for is in his criminal history, because he can't be prosecuted for it separately. And such a result is neither fundamentally unfair nor does it overrepresent defendant's criminal conduct.

So, consequently, he has five criminal history points, three points from his 1998 conviction in the Northern District of Georgia for possession with intent to distribute methamphetamine, and two points for committing the instant offense while on escape status.  And so his Criminal History Category is III.

All right.  Now let's turn to the offense level determination.  And let me just summarize the four disputes before me, make sure I'm not missing anything in all these voluminous papers.  There are four disputes.

First, there's a dispute about the quantity of cocaine for which the defendant is accountable.  And that has an impact on the applicable base offense level under the

guideline at 2D1.1(c).

There's a dispute about whether the defendant possessed a dangerous weapon warranting a two-point increase to the base offense level under the specific offense characteristic, which I'll sometimes call, Mr. Gonzalez Valencia, an SOC, which is short for specific offense characteristic.

But under the specific offense characteristic at Section 2D1.1(b)(1), there's a dispute whether the defendant used violence, made a credible threat of violence, or directed the use of violence warranting a two-point increase to the base offense level under the SOC at Section 2D1.1(b)(2).

And then finally, whether the defendant was an organizer or leader of the criminal activity that involved five or more participants or was otherwise extensive, warranting a four-point increase to the base offense level for a role adjustment under Section 3B1.1(a).

Okay. Have I covered everything that the government believes is in dispute for the determination of the appropriate guideline determination?

MS. SAHNI: Yes, Your Honor.

THE COURT: And Mr. Best, have I missed anything?

MR. BEST: You have not, Your Honor.

THE COURT: Okay. So I've reviewed the hearing evidence and testimony from the sentencing hearing, all the

extensive post-hearing briefing.  And I -- does the government want to be heard about any of these particular disputes to supplement what it said in its papers.

MS. SAHNI:  No Your Honor, we rest on the papers.

THE COURT:  And Mr. Best?

MR. BEST:  No, Your Honor.  I do want to point out, if I might --

THE COURT:  If you'd just come forward to the microphone.

MR. BEST:  Yes.  Your Honor, if you recall, we tried to accept responsibility for the enhancement for the additional weight, however, the Department of Justice required us to accept their version of the weight in the form of a forfeiture order, which was fundamentally flawed and double counted a number of instances that are part of this hearing today.  Indeed, you've seen now a corrected enhancement memo, but --

THE COURT:  You mean preliminary forfeiture --

MR. BEST:  I'm sorry, I apologize, preliminary forfeiture.

THE COURT:  Yes.

MR. BEST:  So I do want -- it ties into this acceptance of responsibility question that the government has put forward in their papering.  We have -- and for the purposes of this part of the hearing, accept responsibility of

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1470

the additional quantity because it was attached to the sub incident in 2007.  And so I at least wanted to the make that known to the Court, and that's been our position all along.

THE COURT:  Well, let me just resolve that.  I don't believe in like -- you know, I don't think there should be any secret.  I intend to award the three-level reduction for acceptance of responsibility in this case.

MR. BEST:  Thank you.

THE COURT:  So you don't have to spend anymore time on that.

MR. BEST:  Thank you.

THE COURT:  All right.  And it won't be any surprise at the end.

MR. BEST:  I appreciate it.

THE COURT:  Okay.

Okay.  So let me just -- I'm just going to address each of these four disputes in order.  And explain my reasons for each of them.  So let me just start with what the legal standard is that applies here.  The government carries the burden to demonstrate by a fair preponderance of the evidence that an enhancement to the guidelines is warranted.  See *U.S. v. Leyva*, 916 F.3d 14, jump cite 24, D.C. Circuit 2019, and that a forfeiture amount is appropriate.  See *Leyva* at page 29.

In resolving factual disputes at sentencing, the

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1471

guidelines permit the district court to consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy, see *Leyva* pages 24 through 25.  Also quoting the guideline at Section 6A1.3(a).

As the D.C. Circuit said, and I quote, a district court's decision to rely upon hearsay is necessarily a judgment about the credibility of both the witness and the declarant, see *Leyva* at page 25.  And relatedly, a district court's credibility determinations at sentencing are within the Court's discretion and are given strong deference on appeal.

And with that, I want to start at the outset my assessment of the credibility of the witnesses, since underlying each of the defendant's arguments against application of the specific offense characteristics and a role adjust, is that the cooperating witnesses who testified at the sentencing hearing cannot be believed.  I just want to start by saying that I did find each of the witnesses, presented by both the government and defense to be credible.  Those witnesses include for the Government three cooperating witnesses Oscar Nava Valencia, Jose Maria Guizar Valencia, Elpidio Mojarro Ramirez, and DEA Special Agent Kevin Novick. And for the defendant, James Holohan and Joseph Smith.

Regarding the three cooperating witnesses, they each owned up quite fully to their own individual criminal conduct and those of their colleagues in the conspiracy. They owned up to extraordinary violence being used by the organizations to which -- drug trafficking organizations to which they participated and belonged. And the drug quantities for which they were responsible, at great personal risk to themselves and their families.

Specifically, Nava Valencia painstakingly detailed several shipments of cocaine that he coordinated with defendant and defendant's brothers from 2004 to 2009, when Nava Valencia led the Milenio cartel, as well as direct conversations he had with the defendant regarding drug distribution plans from Columbia, Ecuador and Venezuela to Mexico, and eventually to the United States. He also discussed with the defendant plans to assassinate rival cartel members's or former trusted colleagues that defendant believed betrayed him.

Nava Valencia said he had known the defendant since at least 2003, due to their joint drug trafficking endeavors. And from 2003 to October 28th, 2009, when Nava Valencia was arrested, Nava Valencia met with the defendant and his brothers in person and on a monthly basis to discuss their transactions and the two spoke on the phone regularly.

The defendant raises that Nava Valencia changed his

testimony as a witness in the trial against another person named Genaro Garcia Luna, for which Nava Valencia testified. Defendant did credibly explain his fears surrounding testifying at that trial and the great risk placed upon himself and his family, so he didn't, you know, back away from the fact that he didn't want to testify and that he expressed that concern. And that's what caused him to say things to avoid testifying before ultimately choosing to go forward with testifying.

For his part Guizar Valencia describes experiences in both the Guizar Valencias DTO and the Zetas cartel, which is a rival cartel of the defendant's DTO called Los Cuinis. Guizar Valencia met with the defendant in person approximately six to seven times from 2003 to 2005 to conduct various drug transactions between the Guizar Valencias DTO and the Los Cuinis DTO. He recounted his drug transactions with defendant and Los Cuinis members; his own planned escape from a jail in Mexico and the faking of his own death; the violence he experienced at the hands of the defendant and Los Cuinis; the murder of his brothers at the hands of defendant -- of his brother at the hands of the defendant; his work under the Zetas led by Z40, whom Guizar Valencia, somewhat ironically called a psychopath when it was Guizar Valencia himself who committed over a hundred, or participated in some form or another, with over a hundred murders; and his discussion with

Abigael Gonzalez Valencia in jail in Mexico, during which Abigael said the defendant was responsible for the murder of Guizar Valencia's brother and father.

Mojarro Ramirez for his part described his drug trafficking dealings with defendant and Los Cuinis as the former accountant and leader of the Milenio cartel. Mojarro Ramirez first met defendant and his brothers in 2005, as they worked with the Milenio cartel under Oscar Nava Valencia. They coordinated efforts until approximately 2009, and during that time Mojarro Ramirez frequently spoke and met in person with the defendant on numerous occasions he said. He testified to defendant's leadership roles in Los Cuinis, naming defendant as the true boss of the DTO, to whom defendant's brothers would seek permission for various decisions, and defendant's violence means to retrieve money he believed Antonio Guizar Valencia stole from him.

Based on the content of their testimonies, the three cooperating witnesses all corroborated each other on their accounts of the quantity of drugs attributable to defendant, defendant's acts of violence, his use of dangerous weapons, and his leadership and organizer role within the conspiracy. They also deeply incriminated themselves as to their own illegal conduct. Nava Valencia, as I said, owned up to his own involvement in numerous violent murders.

Defendant objects to inconsistencies in these

witness's testimonies since the beginning of their cooperation with the government, invoking decades old proffer notes, inconsistencies and recollections over time, particularly over events that occurred years in the past are actually not surprising.  They only become troubling if the big picture and important details are all altered in the retelling in some way.  And from what I can see, nothing like that occurred here.

Additionally, as the government explains, it's prosecutors, not witnesses, who dictate the topics of conversations in proffer meetings.  And new targets emerge over the length of a years-long investigation, which explains why certain individuals may not have appeared in the earlier proffer notes with these witnesses.  Moreover, proffer notes are also created by the government, not any witness.  They're not a transcript of the proffer session, but rather a summary by the prosecutors and investigators in attendance.  And so some general inconsistencies are expected between the proffer session summaries and the verbatim words of the testifying witness under oath.  The inconsistencies on which the defendant seizes, to my mind, are no more than that, given the bigger picture and cross-corroboration among the witnesses and their owning up to their own illegal conduct.

So with that credibility findings put aside, I'm now going to address each of the four disputes starting with the

drug quantities.  The guideline at Section 2D1.1 applies to Count 1, charging conspiracy to distribute 5 kilograms or more of cocaine for importation into the United States.  The PSR recommends a base offense level of 36, based on defendant's accountability and admission that he's accountable for 280 kilograms of cocaine.  Under Section 2D1.1(a)(5) and (c)(2), the defendant agrees with the PSR recommendation as to a base offense level of 36, the government argues that the defendant is accountable for tonnage quantities of cocaine so that his base offense level should be 38 under the guideline at Sections 2D1.1(a)(5) and (c)(1), because defendant is responsible for 450 kilograms or more of cocaine.

And the defendant disputes the government's position in varying ways, arguing first that the testimony of the three cooperating witnesses lack credibility, were inconsistent with various proffer notes over the witnesses' years of cooperation, and only arose in proffer notes in the lead up to defendant's sentencing.  Two, that Guizar Valencia was not shown a photo of defendant during proffer sessions.  Three, throughout their proffer sessions the witnesses failed to name defendant specifically in describing Los Cuinis's actions, which is the DTO to which the defendant belonged.  Four, the government failed to prove through the witnesses that the cocaine shipments were bound for the U.S.  And, finally, that the blackberry messenger, or BBM messages, the government

20

provided do not definitively mention cocaine, defendant's name explicitly, or that the drugs were bound for the United States.

Upon my review of the evidence, and my finding that the three cooperating witnesses provide credible testimony, the government's objection to the PSR's base offense level is sustained.  The government has proven by a preponderance of the evidence that defendant is responsible for a number of cocaine shipments that far exceed even 450 kilograms of cocaine.

Nava Valencia testified credible to 30 kilograms -- 30,000 kilograms of cocaine shipments that he coordinated with defendant and Los Cuinis from 2004 until Nava Valencia's arrest in October 2009, for which Los Cuinis was responsible for 70 percent, which amounts to 21,000 kilograms.

Those are shipments transported via air and land, from South America to Tijuana, to the U.S. Mexico border in California and into the United States.

Nava Valencia also testified credibly to 1,500 kilograms of cocaine shipments that defendant coordinated with Nava Valencia himself, and somebody named Rastrojo in 2006 that were transported by go-fast boats.

Nava Valencia also testified credibly to a 5,000 kilogram shipment of cocaine transported on a semi-submersible, in which defendant invested in 2007.  That

was a shipment transported from Columbia to the Pacific Ocean, off the coast of Chiapas, Mexico, when it was interdicted by the U.S. Coast Guard, intentionally scuttled before it could be seized and the Coast Guard only recovered 280 kilograms of cocaine in the vessel's debris, which is the amount of cocaine for which defendant has already taken responsibility, and in fact, the only cocaine shipment for which he has accepted responsibility as part of his plea.

Nava Valencia and Mojarro Ramirez testified credibly about multiple 500 to 700 kilogram shipments of cocaine packaged in shark carcasses, transported from Porto Progresso, Mexico, in which defendant had a 50 percent share. And that final shipment of shark carcasses filled with cocaine was seized by law enforcement in 2009 in Porto Progresso.

He also testified to multiple 2,000 kilogram shipments of cocaine transported by Televisa trucks, which are trucks used by a local news station, from Central America to Mexico in 2007 and 2008. And finally, Nava Valencia testified credibly to multiple 200 kilogram shipments of cocaine transported via commercial aircraft from Guadalajara to Tijuana to the U.S.-Mexican Border, and in some cases directly into the U.S. from 2004 to 2009.

Guizar Valencia testified credibly to 5,400 kilograms of cocaine shipments he sold directly to defendant from 2003 to 2005. In those transactions Guizar Valencia sold

the cocaine to defendant directly and in person six to seven times.  The fact that Guizar Valencia was not shown a photo of defendant during his proffer sessions does not undermine his credibility, because he testified that he has met with the defendant in person more than five times from 2003 to 2005 to execute transactions of cocaine shipments and was able to identify the defendant in court during a hearing and under oath.

Finally, DEA Agent Novick was able credibly to testify -- to decipher and translate the coded language in the BBM messages between defendant and Abigael Gonzalez Valencia, to reveal that the brothers were discussing the sale of cocaine.  And that defendant's user name on the platform was Silverio according to matching travel records of defendant and those described in the messages, and that the drugs were bound for the United States.

The BBM messages about which DEA -- the DEA agent testified show that defendant coordinated the sale of 700 kilograms of cocaine in 2013 with his brother Abigael Gonzalez Valencia, with 500 kilograms being coordinated from "Negro" in Brazil and the sale of 200 kilograms to the "old man," quoting From the BBM messages.

Special Agent Novick's interpretation of the BBM messages was supported by the content of the messages in one instance Abigael was telling the user Silverio to go to the

hospital because their father had a stroke.  And in other messages Abigael, he informed another member of his family that "Lalo" or defendant was on his way to the hospital after Abigael received a message from Silverio saying "I am on the way," confirming that Silverio was, in fact, the defendant in those communications.

The government also confirmed Abigael's identity in the messages, because the user known as "Boss" sent photo messages of himself that Agent Novick identified as Abigael Gonzalez Valencia.

As another example the government obtained defendant's travel records from the governments of Uruguay, Botswana, and Mexico, as well as a copy of his passport.  All showing when defendant traveled between the three countries in 2013.  And government reviewed those travel itineraries in tandem with messages sent from the Silverio user and determined that the BBM messages described the same itinerary captured in the defendant's travel documents.  In analyzing the BBM messaging regarding defendant's travel, Agent Novick explained defendant's use of coded language to attempt to conceal his locations.  And such code was deciphered using the travel documentation.

The defendant's witness Investigator Captain (Retired) James Holohan served to rebut Agent Novick's analysis of the messages based on Holohan's years of

experience working in the narcotics unit of the NYPD and Manhattan DAs detective squad.  Holohan stated that after examining the BBM message stream between the two individuals, whom he did not identify, he could not determine the topics discussed, namely the type of drug, its price, its units of measurement, or to where the drugs were being transported because of the use of coded language.

On cross, however, Holohan revealed that his experience in law enforcement only included limited involvement in narcotics, not to the level of wiretaps, or working closely with undercover or cooperating informants. And he wasn't sure if he, indeed, reviewed the entire BBM message conversations disclosed by the government, nor the defendant's travel records from 2014 to 2016 mapped on to the time stamps of the BBM.

In comparing the divergent testimonies, I find Agent Novick's account to be better supported and thus more credible, permitting a finding that the defendant was accountable for the 700 kilograms of cocaine discussed in the 2013 BBM messages between the defendant and his brother Abigael.

To be sure, any one of the previously described shipments would suffice to give the defendant the increased base offense level of 38, as each series of shipments combined with the 280 kilograms of cocaine to which the defendant

already admitted would amount to more, much more than 450 kilograms, for the base offense level.

Even though defendant argues he should only be held accountable for quantities of drug shipments for which he was personally responsible for purchasing and selling.  The government is correct that any quantity of drugs transacted in furtherance of the conspiracy for which the defendant is convicted may factor into his base offense level, because importing tonnage quantities of cocaine into the United States from any method available; air, land, sea, under the sea and submersibles, contained in shark carcasses, very ingenious methods used to import cocaine into this country, it was certainly -- all of the goal was to get some of these drugs into the United States.  And a quantity far beyond 450 kilograms.  And thus, and all this was reasonably foreseeable outcome of the conspiracy.

So with this finding the defendant's base offense level is 38, under Section 2D1.1(c)(1) of the guidelines, because he is accountable for 450 kilograms or more of cocaine.

I will now turn to dispute No. 2 regarding the defendant's use of a dangerous weapon and violence.  The government argues that this two-offense level increase under Section 2D1.1(b)(1) applies because the defendant possessed a dangerous weapon, specifically a firearm.  The defendant

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1483

counters that Nava Valencia's testimony regarding defendant's possession of a firearm was inconsistent and that application of this SOC requires actual use of the firearm, not just the presence of a firearm.

The government's objection is sustained.  The dangerous weapon enhancement under the SOC at Section 2D1.1(b)(1) applies, the government has established by a preponderance of the evidence that the defendant possessed a dangerous weapon in furtherance of the conspiracy.

Although the defendant has focused on Nava Valencia's testimony, both Nava Valencia and Guizar Valencia testified credibility that defendant regularly carried either a .38mm pistol or a .9mm pistol to meetings to negotiate the sale of cocaine or to receive a cocaine shipment.  They also testified credibly that the defendant required his subordinates to carry firearms in furtherance of the conspiracy resulting in those subordinates carrying AK-47 rifles in their vehicles and serving as armed bodyguards when accompanying the defendant.

Nava Valencia also testified credibly that in 2008 the defendant provided the Milenio cartel with 200 rifles, AK-47s, AR-15s, and gear without charge to assist the Milenio cartel gain power.  The defendant invokes *U.S. v. Bagcho*, 923 F.3d 1131, a D.C. Circuit case from 2019, to argue that for this enhancement to apply, and I quote, There must be some

action, some word, or some conduct that links the individual to the contraband. See *Bagcho* at page 1138. But the D.C. Circuit in *Bagcho* described the requirement for constructive possession of a firearm, and the evidence of two cooperating witnesses that this defendant had actual, not merely constructive, possession of guns, so the cited language from *Bagcho,* is really -- and that whole case is just not applicable.

Nava Valencia and Guizar Valencia both testified that defendant carried certain firearms on his person as he conducted cocaine transactions in furtherance of the conspiracy. And evidence of such conduct is sufficient to warrant the enhancement. See for example *Leyva*, 916 F.3d at page 26 through 27. And given the violence associated with these cartels lends further credible to the testimony of these witnesses as to application of this SOC. Consequently, two offense levels are added under the guideline and SOC at Section 2D1.1(b)(1) because the defendant possessed a weapon in connection with the drug conspiracy.

With respect to the third dispute. The government objects to the PSR's failure to apply a two-offense level upward adjustment for the SOC at the guidelines Section 2D1.1(b)(2), which applies, and I quote, if the defendant used violence, made a credible threat to use violence, or directed the use of violence.

28

As support for this two-offense level increase under this SOC, the government cites to five instances of this defendant using, threatening, or directing the use of violence.  One, ordering the murder of Antonio Guizar Valencia.  Two, ordering the murder of Efrain Teodoro Torres.  Three, hunting down to kill Domingo Mendoza Sandoval.  Four, ordering the murder of a family in Aguililla.  And five, ordering the murder of Guizar Valencia's father.

The defendant contends that each of these specific incidents should be discounted and not considered, because all of the cooperating witnesses' testimony relies on hearsay and double hearsay, undermining its reliability.  Two, old proffer notes indicated that Jose Gonzalez Valencia, who's the defendant's brother, not the defendant, ordered the murder of Antonio Guizar Valencia.  Three, other proffer notes make no mention that defendant played a role in hunting down Mendoza, Sandoval, and the family.  And four, the government failed to investigate whether the murder of the family in Aguililla indeed occurred and no contemporaneous reports mention any such killing.

So having reviewed the record, the government's objection is sustained and the use of violence enhancement under the SOC in Section 2D1.1(b)(2) shall apply because the government has proven by a preponderance of the evidence that defendant used violence in furtherance of the conspiracy.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1486

Although the government presented evidence of five instances when defendant used -- allegedly used violence to further the conspiracy, application of the enhancement requires that the government prove that only one of these incidents occurred by a preponderance of the evidence. And the government has done that for defendant's role in the murder of Antonio Guizar Valencia. Thus, I will not address the other ones any further.

All three cooperating witnesses credibly testified that the defendant believed that Antonio Guizar Valencia stole cocaine from him and wanted to make Antonio Guizar Valencia pay. They testified the defendant and Abigael Gonzalez Valencia paid gunmen, and provided them with gear and weapons to achieve the assassination of Antonio Guizar Valencia.

Nava Valencia credibly testified that he helped defendant and Abigael secure the gunmen. And Mojarro Ramirez credibly testified that he collected the money paid to Nava Valencia to secure the gunmen.

On January 22, 2005, Antonio Guizar Valencia was found shot to death on his ranch. And Guizar Valencia credibly testified that while at his brother Antonio's funeral, his Uncle Beto received a call from defendant, which the uncle put on speakerphone. And Guizar Valencia heard defendant take responsibility for Antonio's murder and demand $12 million to resolve the cocaine that defendant believed

Antonio had stolen from Los Cuinis.

Guizar Valencia later testified credibly that while detained in a Mexican jail with Abigael Gonzalez Valencia, Abigael admitted that defendant was responsible for Antonio's murder. While that finding alone -- based on that finding alone, 2 offense levels are added under the guideline at the SOC 2D1.2(b)(2), because the defendant used violence, made a credible threat to use violence, and directed the use of violence. And as I said, I won't address the other four instances of violence.

Finally, dispute No. 4 regarding defendant's role adjustment, the government argues that a four offense level increase applies because defendant was an organizer and leader of a criminal activity that involved five or more participants, or was otherwise extensive pursuant to the role adjustment guideline at Section 3B1.1(a).

Defendant says he was simply an investor in the various cocaine shipments, the semi-submersible shipment, the shark carcasses shipments, the go-fast boat shipments, and the Televisa truck shipments, lacked any operational control over the organization, and only performed low-level functionary duties in the DTO. He also adds that the testimony of Nava Valencia was impermissibly conclusory, and that the BBM messages do not corroborate the testimony given.

Having reviewed the record, the government's

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1488

objection is sustained and the leadership enhancement under the role adjustment guideline at Section 3B1.1(a) shall apply because the government has established by a preponderance of the evidence the defendant was a leader and organizer of the conspiracy that involved more than five people and was incredibly extensive in duration, in scope, and in complexity.

All three cooperating witnesses testified credibly that this defendant was a leader, if not the leader, of Los Cuinis.  Nava Valencia and Guizar Valencia testified credibly that they witnessed defendant's decision-making authority in making drug transactions and ordering the DTO's more than 200 subordinates.  Mojarro Ramirez testified credible the defendant's brothers Abigael and Jose would defer to defendant's judgment and seek his opinion before making decisions.  The BBM messages also exhibit defendant's decision-making authority and his direction to Abigael regarding quantities of cocaine shipments and the price to be paid.  And as such, the four offense levels are added under the role adjustment guideline at 3B1.1, because defendant was an organizer and leader of a criminal activity that involved five or more participants and was extensive.

So having resolved those disputes, I will now make my final guideline determination.  The base offense level is 38, pursuant to the guideline at Section 2D1.1(a)(5) and (c)(1).  Two levels are added for the SOC for possession of a

32

firearm under Section 2D1.1(b)(1).  Two offense levels are added for the SOC under Section 2D1.1(b)(2).  And four offense levels are added for the guideline role adjustment at Section 3B1.1(a).  The adjusted offense level is 46.

The parties also agree that two offense levels are added under the guideline at Section 2D1.1(b)(3)(B) because defendant unlawfully imported or exported a controlled substances under circumstances in which a submersible vessel or semi-submersible vessel was used.

And three offense levels are subtracted under the guideline at Section 3E1.1.  And defendant timely notified authorities of his intentions to enter a plea of guilty.

So as a result his total offense level is 45.  The guidelines sentencing table caps the offense level at 43.  So the total offense level is 43, which in combination with his Criminal History Category of III results in an advisory sentencing range of life imprisonment.

Are there any objections not already noted on the record to this guideline determination from the government?

MS. SAHNI:  No, Your Honor.

THE COURT:  Mr. Best?

MR. BEST:  We just stand on our papers.  Thank you.

THE COURT:  Thank you.  All right.  I will now turn to step four of the -- oh, step three, where I will hear from

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1490

the parties.  Starting with the government, the government recommends that a life imprisonment term be imposed.  Both probation and the defendant recommend 188 months incarceration, but this does not take into account resolution of the disputed SOCs, base offense level, or role adjustment.

So I'll hear first from the government.

MS. SAHNI:  Yes, Your Honor.

The government respectfully requests that the Court impose a guidelines sentence of life imprisonment.  The defendant was a leader, if not the primary leader, of a powerful Mexican drug trafficking organization known as Los Cuinis.  The defendant's drug trafficking network spanned at least three continents and transported cocaine by air, land, and sea for over a decade.  As part of his drug trafficking conspiracy, the defendant conspired to distribute tens of thousands of kilograms of cocaine for importation into the United States.

While these staggering quantities of cocaine alone make the offense in this case quite serious, more alarming is the defendant's use of extreme violence to strengthen his drug trafficking enterprise.  The defendant directed murders of rival drug traffickers and those who the defendant believed owed Los Cuinis a drug debt.  In addition to these targeted murders, the evidence showed that the defendant provided firearms and funding to his allies, including the leaders of

the Milenio cartel and the cartel de Jalisco Nueva Generacion in their bloody battles for control of power and territory.

Despite the overwhelming evidence of the defendant's extensive criminal conduct, the defendant has refused to take full responsibility for the nature and the scope of that conduct. The defendant admitted almost the bear minimum necessary to enter a guilty plea in this case. He has repeatedly downplayed his role and the scale of his drug trafficking. He has denied the use of firearms and violence, both to this court and to the probation office. And he claims to have retired from drug trafficking in 2009, although his own blackberry messenger messages prove that was not the case.

The defendant has also repeatedly shown disregard for the law in other contexts. While serving his sentence on a federal methamphetamine conviction, the defendant escaped from a halfway house and fled to Mexico to continue drug trafficking. At the time of the defendant's arrest in Uruguay he smashed his phone, possessed multiple fraudulent identification documents, and was seemingly trying to flee the country. Then once detained in Uruguay, he threatened to hang the interior minister from a bridge, threatened to kill three guards, and threw bleach in the face of another guard causing him to require medical attention. That is not the conduct of someone who is remorseful or accepting full responsibility for their actions.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1492

Accordingly, the government requests that the Court impose a life sentence pursuant to the guidelines, to reflect the nature and seriousness of the crime committed, to protect the public from future acts of violence and drug trafficking by this defendant, and to deter others from engaging in similar conduct.

THE COURT:  And does the government believe that I have to make any other findings for a final order of forfeiture?

MS. SAHNI:  No, Your Honor.

THE COURT:  Mr. Best?

MR. BEST:  It is uncontradicted, Your Honor, that while Mr. Gonzalez Valencia participated in these acts, dating back at this point 15 plus years, that he had physically withdrew from the conspiracy over threats to his family and to himself to start a new life in Argentina.  It is uncontradicted that while in Argentina he led a lawful life. That he set up a new grocery business.  That he and his family, who it is uncontradicted, were threatened with their own lives, moved to Argentina with him to physically remove himself from that which we have heard, that which he has admitted to, and that which he was almost born into.

Your Honor has heard earlier sentencings today of the unfortunate circumstances that befall people who are born into a life of crime.  It's unimaginable to somebody who

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1493

hasn't been in that situation what your real options are. And I think that the government -- and I was in the role of the government for many years -- overlooks that considerably at times when particularly saying life, it's the only thing.

Do you know where Mr. Gonzalez Valencia -- Mr. Gonzalez Valencia's family is right now? They're in Mexico. They were recommended to come to Mexico and stay in Mexico, so that -- they are still under the threat of -- of the relationships and lives that Mr. Gonzalez Valencia still lived -- excuse me, lived and still lives. It is unimaginable.

THE COURT: You're saying this quite obliquely, Mr. Best, when you say that they were recommended to go to Mexico, is that as much as you can say about that?

MR. BEST: He had no options here but to plead guilty or go to trial. There were no other options. And it's his family. He has been born into this. He has been -- in fact, the best example, if you do believe that there was a drug discussion in the blackberry messaging texts, if you believe what was testified to is interpreted by Novick, then you have to believe that his brother who was on the text, was the one reaching out and telling him that he still owes him cocaine. It was the initiation of his brother in those texts that that started that discussion. If you believe that, in fact, it is about a drug transaction.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1494

It wasn't Mr. Gonzalez Valencia -- and by the way, I want to take the myopic horse-blinders off and under -- and have Your Honor and this court understand that there were months and months and thousands and tens of thousands of text messages, and there was no indication of drug activity by Mr. Gonzalez Valencia except this one incident that's been identified in 2013.  And if you believe it involved drugs, then you have to believe, because it's uncontradicted, it was initiated by his brother pulling him back in, despite the fact that he was outside the country and trying to physically absent himself from his past life.

And his life in Argentina was peaceful, they enrolled their kids -- he has three kids, in a school nearby. He picked them up every day from school.  Then they moved to Uruguay.  By the way, he wasn't charged with any criminal activity in Argentina.  And the only activity he was charged with in Uruguay was a laundering of drug proceeds.  By the way, the house that was at issue wasn't his house, it was his wife's father's house.  That charge never got resolved because he was shipped back to the United States.  So at this point he has a -- he has an unblemished criminal record other than this arrest for -- you look like you question this, he was -- the charge at issue in Uruguay involved the house --

THE COURT:  You mean unblemished criminal record since his 1998 conviction.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1495

MR. BEST:  No, no, in Uruguay, I'm talking about in Uruguay.

THE COURT:  Oh, in Uruguay.

MR. BEST:  He didn't commit any acts in Uruguay. When they seized his electronic devices, all of them, there was no history.  They imaged everything.  They used their top imaging team.  By the way, there were no expenses spared on this investigation.  They used their top imaging team to image all his devices.  There was no conduct that was brought before Your Honor to show continued criminal activity.  Not from any of the devices seized in Uruguay.  To evidence, by the way, that he had moved on and did physically remove himself from his past life.

Now, counsel has brought up his horrid threat to hang the head of prisons in Uruguay as something that Your Honor can -- should consider.  Counsel doesn't bring up the fact that it was 38 degrees and he was left naked in the cell and he was being, in essence, tortured.  And it is -- I can't say I wouldn't have made the same comment, given those conditions.  If you left me naked at 38 degrees and left me on the floor and wouldn't give me clothes or bare essentials of living, I would be upset too.

Past that, Your Honor brought up --

THE COURT:  Mr. Best, let me ask, what is it precisely that you're --

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1496

MR. BEST:  I will --

THE COURT:  If I credit that he tried to physically remove himself from his family and the criminal conspiracy, cartel drug trafficking, international narco trafficking goings on in Mexico that's so disruptive to Mexican society and let alone U.S. communities.

MR. BEST:  Yes.

THE COURT:  In 2009, or 2013, or at some point before his arrest in 2016, that does not absolve him of all the conduct that occurred --

MR. BEST:  -- I'm not asking --

THE COURT:  -- in the 20 years before.

MR. BEST:  I'm not asking --

THE COURT:  I just sentenced somebody to five years, as you mentioned before this case, for a much -- an amount of illegal narcotics you can hold in your hand, not tonnage quantities, to five years, with a gun.  And you know, I'm dealing with tonnage quantities over a long -- of a decades long period or more, involving a huge conspiracy, highly disruptive, involving murders.  Even if I credited that he ultimately withdrew, what does that credit amount to, what the guidelines --

MR. BEST:  That is the question that we're -- that I bring out to Your Honor, and here are some other touch points.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1497

THE COURT: What's your recommendation?

MR. BEST: My recommendation, Your Honor, is 25 years, 20 to 25 years, in that range of incarceration. And I'll tell you why. First, the government in this case made a plea offer of 35 years. Two, Jose Gonzalez Valencia has referenced to Your Honor that he's --

THE COURT: Was that a plea of 35 years with cooperation?

MR. BEST: No, no cooperation.

THE COURT: Uh-huh.

MR. BEST: Two --

THE COURT: And then that plea offer expired which is why --

MR. BEST: Yes.

THE COURT: Uh-huh.

MR. BEST: Well, and I'll tell you, and it's touched on the fact that Jose Gonzalez Valencia believes that he is only -- his only exposure is 30 years. And he's attached to this conspiracy as well, as Your Honor knows. Importantly, Oscar Nava Valencia, who you've referenced here, and who appeared, entered into a noncooperation plea and received 25 years for all of his conduct, with the judge indicating, if you're going to cooperate come back and we'll work down from that.

Consistent with that, and critical to how the

guidelines are fashioned, is that in this courthouse Christian Fernando Borda was sentenced to 25 years and he went to trial. And on that case, Your Honor, Christian Fernando Borda was a Criminal History Category III, he had enhancements for firearm, he had enhancements for violence, he had no acceptance of responsibility, because he went to trial, and his weight was over 450 kilos, in fact, it was thousands of kilos, I think 4,500, 5,000 kilos.  And Judge Kessler in 2013 sentenced the defendant to 25 years.  Other than the weight being additional in this case, it's almost precisely exact in the application of enhancements.

So I bring this to your attention because these are critical touch points for Your Honor's consideration as well, when we're talking about the government coming in and saying life is appropriate.

I want to say this, because I think -- I know you don't, but I know that in my experience the government doesn't reflect upon what the amount of time they're asking for really is.  So let me give you some guide posts, if I may.  18 years. 18 years ago my son was born.  It's his entire life.  That's what they're asking for.  20 years, 20 years ago this year, the space shuttle exploded, the concord had its last flight, Saddam Hussein was captured.  That's how long ago 20 -- that's how long 20 years is.  25 years, 25 years in this courthouse was the Clinton Lewinski scandal.  The iMac was founded.  30

years ago -- and 25 years ago, I believe Your Honor was on the Senate Judiciary Committee as an assistant on the Sentencing Commission. Think about how long ago that is. 25 years ago I was in this courthouse, probably coming off that table, making arguments. I had a lot more hair. I was thinner. But that's -- we're talking a lifetime ago.

THE COURT: Just for a correction, I was not working on the Senate Judiciary Committee at the time I was a sentencing commissioner.

MR. BEST: You were on the Sentencing Commission at that time.

THE COURT: Yes, I believe so. I would have to do the math, but I would have never done the two of them at the same time.

MR. BEST: I'm sorry.

Mr. Gonzalez Valencia has three kids. Babies when I first began representing him six years ago. My experience with them at that time while he was being held in Uruguay, the babies were brought into the holding facility where he was in Uruguay. And he had limited time and certainly limited access, but he tried to make a family environment as much as possible in an impossible situation. His son just graduated from ING Academy in Sarasota and is going to University of Arizona.

Mr. Gonzalez Valencia is doing what you asked -- the

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1500

other defendant earlier today to do, which is break the cycle. He absented himself physically from Mexico so his family could have a chance.  He is not saying that he does not bear responsibility and he does stand before Your Honor to accept responsibility and face his punishment, but the cycle is broken with at least one of his children so far by going to the University of Arizona.

I ask -- and I know he wants to address Your Honor -- I ask that you give him a chance to at least spend time with his family in the remainder of his life, to give him a chance to show the world that he has moved on from this.  He tried to move on from it.  He didn't do it in the way that was legally necessary to walk away from this.  He got sucked back into it.  It's -- as Your Honor knows, it's almost impossible to truly exit the life of the Mexican cartel.  But he's done everything he can, truly, to do that.  And he's set up his family for a life that doesn't involve this.  He's broken the cycle.  He's accepted responsibility here.  And he deserves a reasonable sentence within the touch points that I just outlined.  Thank you very much.

THE COURT:  Thank you, Mr. Best.

Mr. Gonzalez Valencia, this is your opportunity to speak to me, you can step forward to the microphone.  You know what you can stay right there use that microphone.

THE DEFENDANT:  I can go there, I prefer.

THE COURT: No, no just stay there. Let me just say that I have received letters from your eldest son, from your ex-wife, comment from Greg Smith, that he left him a voice mail. From Hector Arevalo, Jorge Amaral Arevalo, and from Martha Arevalo. So I have heard from various people about you, but this is your opportunity to speak directly to me now?

THE DEFENDANT: Your Honor, I thank you for the opportunity to speak and I truly appreciate it. And I want to at this point express my true appreciation for all the work that my attorneys have done in representing me and supporting me in this case. Six years ago I was very open with my attorneys and I believe this led to my being able to establish a very good situation with my attorney Mr. Best.

Your Honor, I truly, truly do understand the problems caused and the damage caused by drugs to society at large, both to the addicts and the families. I'm perfectly aware and acknowledge it. And sincerely, Your Honor, I ask for the forgiveness of all of these people, the victims of all those families who have lost their loved ones. And I deeply regret from the bottom of my heart everything that has happened, and I accept my responsibility for what I have tone, I know it was bad to invest in these drugs and draw profits from them. And I acknowledged and accept that there's no justification for what I have done, that these things I have done are bad and I am paying for it now.

I've been involved in this process for seven years now. Seven years that I spent away from my children, away from my wife, away from the family that Mr. Stephen has mentioned. I have a wife, I have children. And while we are divorced on paper, I've been with this person for 20 years. And for 20 years we have never been separated.

And for the same reason, Your Honor, for this very same family that I mentioned, I came to the decision that I had to leave Mexico, that was my plan, my plan was born of the need to move away from this environment in which I did not want my children to grow up with. That was my primary purpose. I did not want them growing up in the same environment I had growing up in. And when I went to South America, I set up a way of life with a business so that I could live in community, I could live with my family, and all of us by all the pictures I have in my devices.

And I accept your decision and all that you have said. I accept everything. In all honesty I am not a violent person. And that is a primary reason I left Mexico, to avoid this violence both as a victim and to avoid any involvement in it. And I accept your decision. I do not want to enter a discussion of contradicting the prosecutors, but there are two points that I would like to make here. And for one thing the prosecutors are painting a picture I am portrayed as a person that with full conflict that does not respect the law.

And I am a person who has lived now within the law. I've lived within community. I've spent time during my time in Uruguay, I've been there for three years, and at no time during this period can you fault me with not having lived in a lawful manner. And I don't want to go on to too much more, but I would ask all the same, I would ask the pardon of the prosecution, the government, they've done a good job. I ask the pardon of Your Honor and this court.

And there is just one subject I would like the underscore and that is the case of the witnesses. I accept your decision, however, there were two witnesses that I don't know, I've never seen them in my life. The witnesses are two and three, Guizar Valencia and Mojarro Ramirez. And I don't know them and I don't know why they said what they said.

But I will say one more thing. For example, Mr. Guizar Valencia said that during the wake for his brother I called his uncle and claimed credit for killing him. And this is a -- it's a big case of a homicide, to say it that way. And I think it's evident that I was not the one who made that call, because during this time the Mexican government has never sought me out for any crime. And this is demonstrated by my comings and goings during the ten years.

But as I said, it is not my place to present arguments here. The attorneys have done a good job. I do not want to argue or contradict anything. But there is

information that stands out, information that does exist.  And I believe I would wish to leave it understood and on the record clear.

And, finally, I would say that I accept everything. I recognize that I am the sole individual responsible for finding myself in this situation.  I put myself here.  But I would just ask for an opportunity to be with my family, with my children in the future.  I know I must pay for this, but I would ask you, if you could, find it in your heart to allow me the opportunity to be with my family, with my children in the future.  I have nothing else to say, Your Honor.  I truly do appreciate the opportunity and have nothing else to add.  Let it be what you decide.

THE COURT:  Thank you.  You can step forward to the microphone.  Mr. Best, you can stand with your client.  Yes, step forward.  I'm going to explain the sentence I'm going to impose and then impose sentence.

So after determining how the Sentencing Guidelines apply in your case, considering the sentencing memoranda, the presentence investigation report, hearing argument, hearing evidence at a three-day hearing, with which I take it that you do dispute some of the evidence that was disputed -- or presented at that hearing by two of the three cooperating witnesses presented by the government.  But taking all that into account I now have to consider the factors that are set

out by Congress in 18, U.S.C., Section 3553(a), because I have to ensure that I impose a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing.

The purposes include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  And let me just say with respect to the seriousness of the offense, your involvement with a significant international drug trafficking organization in Mexico, and based on the evidence I've seen, being a leader of that DTO, that has led to instability in Mexico, instability along the border of our country, the U.S., and significant damage to communities in the United States.  I view this offense as among the most serious of drug trafficking offenses.

So, also supposed to promote respect for the law. And I'm faced with a defendant who was sentenced once already in a court of law, many years ago, and then walked away from a halfway house, with leniency shown then to put you in a halfway house, to facilitate your re-entry into the community in a lawful way.  And you took advantage of that, left, and now only again on these charges stand before a federal judge in this country.

And I'm also to provide just punishment for the offense.  And just punishment actually rests on my

consideration of the seriousness of the offense and promoting respect for the law, as well as a number of other factors that this statute, 3553(a), requires me to consider. And that's to deter criminal conduct. That's in some ways considered general deterrence. What do we have to do to show people they should not be engaged in this kind of conduct? That's general deterrence. To stop people, because they understand the punishment would be so severe they shouldn't engage in it.

Also, have to protect the public from future crimes by you, Mr. Gonzalez Valencia. And having been convicted of one crime before, standing before a federal judge again, this is a serious consideration for the Court. Particularly, given the decades of criminal activity in which you engaged. And I'm also supposed to consider how to promote rehabilitation.

So in addition to the guidelines and policy statements I've already considered extensively, I have to consider the nature and circumstances of the offense, your history and characteristics, the types of sentences available, the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct, and the need to provide restitution to the victims of the offense. There are no identifiable victims here. Even though the victims appear in my court every day as defendants and I read about them in the news, people suffering from drug addictions, people dying of overdoses. But in terms of naming

them and identifying them as connected to this specific offense, there aren't identifiable victims, so I don't need to consider the restitution factor further.

Regarding the nature of the offense, as has already been talked about, you engaged in this massive international drug conspiracy, you facilitated the importation of tonnage quantities of cocaine into the United States over the course of the conspiracy. And as evidenced at the sentencing hearing, you were one of the leaders of Los Cuinis. And that was a conspiracy that had tentacles in Columbia, certainly the headquarters in Mexico. It had tentacles in the United States. It had tentacles in Europe. It was broad reaching with far more than five participants. The estimates were, you know, certainly between 50 and 200 subordinates working for Los Cuinis, helping to be engaged in this narcotics distribution, manufacture, importation, and export business.

You were involved in logistics of carrying out the cocaine shipments, how to price it, the amount of the shipments, the methods, genius as they were, to figure out how the cocaine was going to be transported. How to protect all that cocaine. How to protect Los Cuinis and protecting its territory. Engaging in cartel wars. All of this was extensive, long-term, and as I said before, significant in disrupting normal daily life in Mexico and leaking into this country.

According to the testimony I've seen you used different ways to conceal the criminal activity from the cocaine, using semi-submersible vehicles, to shark carcasses, in your communications using code names, code words, using armed bodyguards for protection. And it is significant to me, even though you said that you had left this whole drug conspiracy at the time of your arrest in 2016, that you crushed your cell phone at the time of your arrest, so that the phone's contents couldn't be accessed.

Now, I appreciate that your defense witness at the hearing, investigator Joseph Smith, testified that he believed that you smashed the phone immediately prior to your arrest because of photos potentially damaging to the relationship with your ex-wife, but the witness was unaware during his interviews with you and your wife that you were divorced. And that did undercut some of the probative value of his testimony that one of those -- that that fairly significant piece of information was not relayed to him.

And it also -- the way you treated your phone at the time of your arrest does raise some doubt about whether you had actually left the conspiracy even at the time in 2016, at the time of your arrest. You claim that you were managing a successful convenience store business during that time. But you might have been doing that as well as continuing to engage, until the time of your arrest, and continuing the

spread of the Los Cuinis and the drug trafficking activity and implanting it in other countries.

But putting aside whether you were still involved in narcotics trafficking in 2016 at the time of your arrest, and that's why you crushed your cell phone before law enforcement could access it, the nature, extensiveness, scope, quantity of drugs involved, the violence involved in your drug activities for over a decade in Mexico as a leader of Los Cuinis, if not the leader, one of the leaders, is so serious that this warrants a very significant sentence here.

Regarding your history and characteristics you have this one prior conviction that I've already talked about for possession with intent to distribute methamphetamine.  It did happen more than two decades ago.  You -- but even with that wake up call of being caught once before, prosecuted in this country, you went on, after flaunting a judicial order, your sentence, you short circuited that, you left and went right back into this huge -- this drug conspiracy, even more involved, apparently, than you've been before, to gain a leadership position in it.

I appreciate that you have three children.  You like any other parent would want to spend time with your children. And I have no reason to question that you removed them from Mexico to get them out of the life that you say you were sucked into with your family of being engaged in this

international drug trafficking network.  But as I look at what's going to happen with your children while you're incarcerated, they've got their mother, and seems like they're now in Mexico where they've got family around them.  So they're going to be well supported financially and emotionally.

The evidence regarding your status with Wendy Amaral, your ex-wife, has been a little bit inconsistent, based on your -- Joseph Smith's testimony, he referred to them as a married couple.  Said in response to the Court's questioning that when he interviewed you and your ex-wife, that they never mentioned that they were divorced.  But in any event, I think it's clear from both the probation office's report, having seen the divorce paper, and your statements that you're divorced on paper, that you are divorced.  She's clearly supportive of you in the letter that has been submitted on your behalf.  So hopefully you'll be able, during your long period of incarceration, be able to maintain that relationship with your family members to the extent allowable.

But the other -- the nature and circumstances of this offense warrant a very significant sentence, both because of general deterrence, and given your prominent position in this international narco trafficking organization, this is a sentencing that needs to send a message to others engaged both in this specific conspiracy and others like it, that this is

54

conduct that warrants -- is taken seriously by federal courts in this country, and warrants a very significant punishment.

As I've said, communities in Mexico and the United States suffer on a daily basis from the activities of these cartels.  And your overt acts in furtherance of the conspiracy, although occurring in Mexico, had direct consequences in communities around this country with the importation of drugs and the harm that that causes here. Regarding specific deterrence, as I've already discussed, you escaped a halfway house while serving your sentence for a 1998 conviction.

And it is probative to me that at the time of your arrest in Uruguay, law enforcement discovered in your car luggage, important documents, electronic equipment, jewelry, watches, multiple forms of fake identification documents, including a fraudulent Mexican passport with your photo on it but a different name, a fraudulent Mexican ID card with the same fake name.  Two birth certificates with your actual name but different places of birth, one in Mexico and the other in California.  All of which indicates that you had with you all sorts of necessary documents to make an escape and to live undercover somewhere, at your choice.

The violence associated with the drug -- Los Cuinis's operations in Mexico, are things that make this even a more serious case than just importing tonnage quantities of

cocaine, because it's that violence and the threats, which your lawyer alludes to may still haunt your family in Mexico, but nonetheless, that is something that -- that's an element associated with your offense conduct, that makes this even more serious.

I am troubled by your statement threatening the Uruguan minister of interior, that if he continues to send his guards to torture you, that you know, you said let him look for the highest bring in Uruguay and I'm going to hang him from it.  This threat is not justified by highlighting your poor prison conditions in Uruguay.  There are lots -- there are ways that you could have complained about that or brought it to the attention of the press without also threatening violence against a public official.

You don't even deny that you made the statement. And Mr. Best, it's not helpful to say that you might have made such a statement yourself if this were conditions of torture, not that I think that torture anywhere is appropriate.  But that is -- that is conduct that evidences the same kind of arrogant threats of violence that is a trademark of some of the cartels in Mexico, to threaten public officials, that is disturbing to say the least.

Following your extradition to the U.S., you did direct violence against prison guards.  In 2019 after leaving your cell without permission, you stated to guards that you

56

were going to kill them.  And in February 2020, when you threw bleach at a guard walking by your cell, requiring the guard to receive medical attention.  And then days later threatening to strangle another guard who was using handcuffs on you.  This is conduct and reflective of an attitude that, as I said, might have been instilled in this defendant during his time growing up in a cartel where he -- and leading a cartel that was able the use violence to get what they wanted, but is an attitude that warrants a significant jail time.

I agree with the government that in pleading guilty you didn't fully own up to everything for which you were accountable, based on the evidence that's been presented to this Court.  But I still granted you a three-level reduction for the even limited acceptance of responsibility.  But I do take into account how full of remorse and full acceptance and recognition and responsibility that defendants have in front of me, in evaluating whether a guidelines sentence is appropriate.

Regarding the types of sentences available, here the minimum term of imprisonment is ten years.  And I do think that a term of imprisonment is the only type of sentence that is available.

Regarding the need to avoid unwarranted sentence disparity, which is an important consideration for the Court, both the government and the defendant provide comparators.

I'm not going to address all of them, but a few of them.  I just have to say that the task of looking at comparators can't be totally exhausting, and every defendant standing in front of a judge has unique factors and unique personal characteristics that have to be taken into account.

Regarding the government's comparators, the government cites to *U.S. v. Leyva* which is the case I cited before, it was decided by the D.C. Circuit 2019 in affirming the sentence there.  Mr. Leyva pleaded guilty to conspiracy to distribute five kilograms or more of cocaine, plus methamphetamine and heroin and marijuana.  And he was, for his conduct as a leader of the Betran Leyva organization, which was also a Mexican-based drug trafficking organization, he was sentenced to life in prison after application of the same five enhancements here for being an organizer or leader of criminal activity, possession of a dangerous weapon, use of violence, he also bribing of a law enforcement official.  And he had a final offense level of 50, which was treated as -- as here, capped at 43.  I do think that that case serves as a fairly reasonable comparator to this one.

Government also cites to U.S. v. Eliu and Waldemar Lorenzana-Cardon, which are two defendants who were brothers and leaders of a Guatemala-based DTO and were convicted after a jury trial.  And they received life sentences also with a base offense level of 38 because of the drug quantity, and

58

various enhancements for being organizers or leaders of the criminal activity, dangerous weapon, and use of an aircraft. And I do think that that case serves as a comparator. I think their offense level, because they went to trial, they didn't get the three-level reduction for acceptance of responsibility.

The defendant cites to Oscar Nava Valencia, who was sentenced to 25 years and as a leader of the Milenio cartel, and he actually testified in front of me about ordering the killing of more than a hundred people, the torture of countless others. But he has been a significant cooperator. And has testified publicly at great risk to himself and his family. And when somebody is a cooperator, they're not always -- I find them to be an inept comparator to people who are not cooperating, because such significant risks are being taken. And it's acknowledged in the sentence meted out.

MR. BEST: If I may, Your Honor, he received a noncooperation -- he hadn't started any cooperation when he was sentenced to 25 years.

THE COURT: To the extent you know.

MR. BEST: To the extent stated on the record by the Court in the transcript that we reviewed. I'm just going on the open record.

THE COURT: All right. And then Jose Guizar Valencia, who was sentenced to 480 months, which is 40 years,

and he has also been a significant cooperator for the Government. And because of that, I also find him to be an inept comparator. I could go through all the rest of these, both Gilberto Lerma-Plata, a Mexican police officer who helped a Mexican based DTO. And he pled guilty with a plea agreement to conspiring to distribute five or more kilograms of cocaine, a thousand kilograms or more of marijuana for importation to the United States, and he was sentenced to 151 months imprisonment. His base offense level was much lower, but he also had increases for abuse of position of trust, adjustment for acceptance of responsibility, he wasn't a leader of the conspiracy, didn't get the enhancement for weapons. I think there was no evidence there use of violence. So he was in some ways an inept comparator because of that.

Jose Maria Corredor-Ibague, also pleaded guilty to counts in an information charging conspiracy to distribute cocaine for importation, engaging in drug trafficking offense, and providing material support or resources to a foreign terrorist organization. And he was sentenced to 194 months imprisonment. I think this is a sealed case, so some of the details are not particularly transparent to the Court to make him an appropriate comparator here.

With respect to Ediel Lopez-Falcon, also cited by the defense, he pleaded guilty with a plea agreement to conspiring to manufacture and distribute 5 kilograms or more

of cocaine, and as well as a thousand kilograms or more of marijuana for importation in connection with the Mexico-based DTO who Judge Rothstein sentenced to 216 months or 18 years with a base offense level of 38 and enhancements for possession of a dangerous weapon, bribery of law enforcement, and an adjustment for acceptance of responsibility resulting in a final offense level of 49.  He was not a leader of a conspiracy, his conduct appears to be far less violent than that of the defendant.  So his basis for him to be a comparator is somewhat off.

Then finally, as Mr. Best discussed, Christian Fernando Borda, Judge Kessler, a case that Judge Kessler formerly of this court sentenced.  He was the leader of a Columbian-based DTO.  And he was convicted by a jury for conspiring to distribute 5 kilograms or more of cocaine, knowing it would be imported into the United States.  And Judge Kessler sentenced him to 300 months imprisonment, or 25 years with base offense level of 38 and enhancements for possessing a firearm, being a leader or organizer and for obstruction, resulting in a final offense level of 46.  His conduct is very different -- is very similar to this defendant's.

I've taken that case into consideration here.  And I may just have a difference of opinion with Judge Kessler, because I believe that a guidelines sentence is appropriate

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1518

61

here, based on the level of violence, the amount of cocaine, the duration and scope of this conspiracy, and the effects on both Mexico and the United States of this level of international narcotics trafficking.

So pursuant to the Sentencing Reform Act of 1984 and in consideration of the provisions of 18, U.S.C., Section 3553, as well as the advisory sentencing guidelines, it is the judgment of the Court that you, Gerardo Gonzalez Valencia are hereby committed to the custody of the Bureau of Prisons for a term of life imprisonment as to Count 1.  In addition, you are ordered to pay a special assessment of $100 in accordance with 18 U.S.C., Section 3013.  The Court finds you do not have the ability to pay a fine, and therefore, waives imposition of a fine in this case.  In accordance with this court's preliminary order of forfeiture issued on July 17th, 2023, you are also ordered to pay a money judgment to the United States in the amount of $341 million.

The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333 Constitution Avenue, Northwest, Washington D.C. 20001.  Within 30 days of any change of address you shall notify the clerk of the Court of the change until such time as the financial obligation is paid in full.

The probation office shall release the presentence investigation report to all appropriate agencies, which

62

includes the U.S. probation office in the approved district of residence in order to execute the sentence of the Court. Treatment agencies shall return the presentence report to the probation office upon the defendant's completion or termination from treatment.

You can appeal your conviction to the U.S. Court of Appeals to the D.C. Circuit if you believe that your guilty plea was somehow unlawful or involuntarily, or if there's some other fundamental defect in the proceedings that was not waived by your guilty plea. Pursuant to 18, U.S.C., Section 3742(a) you also have a statutory right to appeal your sentence to the D.C. Circuit under certain circumstances, including if you think the sentence was imposed in violation of law or was imposed as a result of an incorrect application of the sentencing guidelines, or is more severe than the maximum established in the guideline range. You may also appeal your sentence if you believed you received ineffective assistance of counsel at sentencing. Pursuant to 28 U.S.C. 2255 you also have the right to challenge the conviction entered or sentence imposed, to the extent permitted by that statute.

Any notice of appeal must be filed within 14 days of the entry of judgment, or within 14 days of the filing of a notice of appeal by the government. If you're unable to afford the cost of an appeal, you may request permission of

the Court to file an appeal without cost to you.  On appeal you may also apply for court-appointed counsel.

Are there objections to sentence imposed not already noted on the record from the government?

MS. SAHNI:  No, Your Honor.

THE COURT:  And Mr. Best?

MR. BEST:  All objections are noted.

THE COURT:  All right.  Is there anything else we need to address today from the government?

MS. SAHNI:  No, Your Honor.

THE COURT:  And Mr. Best?

MR. BEST:  I believe he would like Your Honor's consideration and the Bureau of Prisons to note that he would prefer any time in California, that it would be up to them, obviously but --

THE COURT:  I'll make the recommendation that he be designated to a facility in California.

MR. BEST:  Thank you, Your Honor.

THE COURT:  All right.  You're all excused.

MR. BEST:  Thank you.

(The proceedings were concluded.)

I, Christine Asif, RPR, FCRR, do hereby certify that the foregoing is a correct transcript from the stenographic record of proceedings in the above-entitled matter.

_____/s/_____
Christine T. Asif
Official Court Reporter

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1521

< Dates >.
16-65-01
  2:4.
December 22
  2:17.
February 2020
  56:1.
January 22
  29:19.
July 17th
  61:15.
may  18
  41:19.
May 2 7:7.
May 2, 3
  3:4.
October 2009
  20:14.
October 28th
  15:21.
$100 61:11.
$12 29:25.
$341 61:17.
.38mm 26:13.
.9mm 26:13.
.
.
< 1 >.
1 19:2, 32:11,
  61:10.
1(a 11:17,
  30:16,
  32:4.
1(b)(1 32:1.
1(b)(2 11:12,
  32:2.
1(c 11:1.
1(d 7:24,
  9:1.
1,500 20:19.
10:00 a.m.
  1:12.
1131 26:24.
1138 27:2.
14 13:22,
  62:22,
  62:23.
145 1:27.
149 2:25,
  7:19.

15 35:14.
150 2:25.
151 59:8.
153 3:5.
156 3:13.
157 3:9,
  3:13.
158 3:16.
16-0065-BAH
  1:6.
160 3:19.
170 3:5.
171 3:7.
172 3:9.
178 3:16,
  8:23.
18 5:3, 41:20,
  48:1, 60:3,
  61:6, 61:12,
  62:10.
188 33:3.
194 59:19.
1984 61:5.
1998 9:21,
  10:14,
  37:25,
  54:10.
.
.
< 2 >.
2 25:21,
  30:6.
2,000 21:15.
20 9:8, 39:12,
  40:3, 41:21,
  41:23,
  41:24, 45:5,
  45:6.
200 21:19,
  22:21,
  26:21,
  31:11,
  50:14.
20001 1:46,
  61:20.
20005 1:39.
2001 7:23.
2003 15:20,
  15:21,
  16:14,

 21:25,
  22:5.
2004 15:11,
  20:13,
  21:22.
2005 16:14,
  17:7, 21:25,
  22:5,
  29:19.
2006 20:21.
2007 13:2,
  20:25,
  21:18.
2008 21:18,
  26:20.
2009 15:11,
  15:21, 17:9,
  21:14,
  21:22,
  34:11,
  39:8.
2013 22:19,
  23:15,
  24:20, 37:7,
  39:8,
  41:8.
2014 24:14.
2016 24:14,
  39:9, 51:7,
  51:21,
  52:4.
2019 13:22,
  26:24,
  55:24,
  57:8.
2022 2:17.
2023 1:11,
  3:4,
  61:15.
20530 1:29.
21,000
  20:15.
216 60:3.
2255 62:19.
24 13:22,
  14:5.
25 14:5,
  14:10, 40:2,
  40:3, 40:21,
  41:2, 41:9,

 41:24, 42:1,
  42:3, 58:8,
  58:19,
  60:17.
26 27:14.
27 27:14.
28 62:18.
280 19:5,
  21:4,
  24:25.
29 13:24.
2D1 11:1,
  11:12, 32:1,
  32:2.
2D1.1 19:1.
2d1.1(a)(5
  19:6, 19:11,
  31:24.
2d1.1(b)(1
  11:9, 25:24,
  26:7,
  27:18.
2d1.1(b)(2
  27:23,
  28:23.
2d1.1(b)(3)(b
  32:6.
2d1.1(c)(1
  25:18.
2d1.2(b)(2
  30:7.
.
.
< 3 >.
3 7:7.
3(a 14:6.
30 20:11,
  40:18,
  41:25,
  61:21.
30,000
  20:12.
300 60:17.
3013 61:12.
333 1:45,
  61:19.
35 40:5,
  40:7.
3553 61:7.
3553(a 5:4,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1522

48:1, 49:3.
36 19:4, 19:8.
3742(a 62:11.
38 19:10, 24:24, 25:18, 31:24, 38:17, 38:20, 57:25, 60:4, 60:18.
3B1 11:17, 30:16, 32:4.
3B1.1 31:19.
3b1.1(a 31:2.
3E1 32:11.
.
.
< 4 >.
4 3:4, 7:7, 30:11.
4,500 41:8.
40 58:25.
43 32:14, 32:15, 57:19.
45 32:13.
450 19:12, 20:9, 25:1, 25:14, 25:19, 41:7.
46 32:4, 60:20.
480 58:25.
49 60:7.
4A1 7:24, 9:1.
4a1.1(d 7:25.
4a1.3(d 9:17.
.
.
< 5 >.

5 2:18, 8:24, 19:2, 59:25, 60:15.
5,000 20:23, 41:8.
5,400 21:23.
50 21:12, 50:14, 57:18.
500 21:10, 22:20.
.
.
< 6 >.
600 1:38.
601 1:37.
6A1 14:6.
.
.
< 7 >.
70 20:15.
700 21:10, 22:18, 24:19.
.
.
< 9 >.
916 13:22, 27:13.
923 26:23.
_____/s/__
_____
63:27.
.
.
< A >.
A. 1:31, 1:33.
Abigael 17:1, 17:2, 22:11, 22:19, 22:25, 23:2, 23:4, 23:7, 23:9, 24:21, 29:12, 29:16, 30:3, 30:4, 31:13, 31:16.
ability 61:13.

able 22:6, 22:9, 44:12, 53:17, 53:18, 56:8.
above-entitled 63:25.
absent 37:11.
absented 43:2.
absolve 39:9.
abuse 59:10.
Academy 42:23.
accept 7:3, 12:11, 12:13, 12:25, 43:4, 44:21, 44:23, 45:17, 45:18, 45:21, 46:10, 47:4.
acceptance 12:23, 13:7, 41:6, 56:14, 56:15, 58:5, 59:11, 60:6.
accepted 21:7, 43:18.
accepting 34:24.
access 42:21, 52:6.
accessed 51:9.
accompanying 3:2, 26:19.
accordance 61:11, 61:14.
According 22:14, 51:1.

Accordingly 35:1.
account 24:17, 33:4, 47:25, 56:15, 57:5.
accountability 19:5.
accountable 10:24, 19:5, 19:9, 24:19, 25:4, 25:19, 56:12.
accountant 17:6.
accounted 10:9.
accounts 17:19.
accuracy 14:5.
achieve 29:14.
acknowledge 44:17.
acknowledged 44:23, 58:16.
Act 61:5.
ACTION 1:5, 27:1.
actions 19:21, 34:25.
activities 52:7, 54:4.
activity 11:14, 30:14, 31:20, 37:5, 37:16, 38:10, 49:13, 51:2, 52:1, 57:16, 58:2.
acts 17:20, 35:4, 35:13, 38:4, 54:5.
actual 26:3,

27:5, 54:18.
actually 5:21, 18:4, 48:25, 51:21, 58:9.
add 47:12.
added 27:17, 30:6, 31:18, 31:25, 32:2, 32:3, 32:6.
addictions 49:25.
addicts 44:16.
addition 33:23, 49:15, 61:10.
additional 8:25, 12:12, 13:1, 41:10.
Additionally 18:9.
address 7:12, 13:16, 18:25, 29:7, 30:9, 43:8, 57:1, 61:21, 63:9.
adds 30:22.
adjust 14:18.
adjusted 32:4.
adjustment 7:14, 11:17, 27:22, 30:12, 30:16, 31:2, 31:19, 32:3, 33:5, 59:10, 60:6.
admissibility 14:2.
admission 19:5.
admitted 7:5,

25:1, 30:4, 34:6, 35:22.
advance 3:2, 3:8, 3:11.
advantage 48:21.
advisory 4:19, 4:20, 32:16, 61:7.
affirming 57:8.
afford 62:25.
agencies 61:25, 62:3.
Agent 2:9, 14:24, 22:9, 22:17, 22:23, 23:9, 23:19, 23:24, 24:16.
ago 41:20, 41:21, 41:23, 42:1, 42:3, 42:6, 42:17, 44:11, 48:18, 52:14.
agree 32:5, 56:10.
agreement 59:5, 59:24.
agrees 19:7.
Aguililla 28:7, 28:18.
air 20:16, 25:10, 33:13.
aircraft 21:20, 58:2.
AK-47 26:17.
Ak-47s 26:22.

alarming 33:19.
allegedly 29:2.
allies 33:25.
allocution 8:16.
allow 47:9.
allowable 53:19.
alludes 55:2.
almost 34:6, 35:22, 41:10, 43:14.
alone 30:5, 30:6, 33:18, 39:6.
already 2:22, 21:6, 25:1, 32:18, 48:17, 49:16, 50:4, 52:12, 54:9, 63:3.
altered 18:6.
Although 7:2, 26:10, 29:1, 34:11, 54:6.
Amaral 44:4, 53:8.
amended 3:15.
America 1:5, 2:4, 20:17, 21:17, 45:14.
among 18:22, 48:14, 49:19.
amount 13:23, 21:5, 25:1, 39:15, 39:21, 41:18, 50:18, 61:1,

61:17.
amounts 20:15.
analysis 23:25.
analyzing 23:18.
Antonio 17:16, 28:4, 28:15, 29:7, 29:10, 29:11, 29:14, 29:19, 29:21, 29:24, 30:1, 30:4.
apologize 12:19.
apparently 52:19.
appeal 14:13, 62:6, 62:11, 62:17, 62:22, 62:24, 62:25, 63:1.
Appeals 62:7.
appear 49:23.
APPEARANCES 1:20.
appeared 18:13, 40:21.
appears 60:8.
applicable 9:10, 10:25, 14:3, 27:8.
application 14:17, 26:2, 27:16, 29:3, 41:11, 57:14, 62:14.
applied 7:25.

67

applies 4:21, 13:19, 19:1, 25:24, 26:7, 27:23, 30:13.
apply 4:20, 5:3, 7:10, 7:12, 8:20, 9:4, 9:14, 10:2, 26:25, 27:21, 28:23, 31:2, 47:19, 63:2.
applying 8:24.
appreciate 13:14, 44:8, 47:12, 51:10, 52:21.
appreciation 6:14, 44:9.
appropriate 11:20, 13:23, 41:15, 55:18, 56:18, 59:22, 60:25, 61:25.
approved 62:1.
approximately 16:13, 17:9.
Ar-15s 26:22.
Arevalo 44:4, 44:5.
Argentina 35:16, 35:17, 35:20, 37:12, 37:16.
argue 26:24, 46:25.

argues 9:3, 19:8, 25:3, 25:23, 30:12.
arguing 19:14.
argument 8:9, 8:14, 8:16, 47:20.
arguments 8:24, 14:16, 42:5, 46:24.
Arizona 42:24, 43:7.
armed 26:18, 51:5.
arose 19:17.
around 53:4, 54:7.
arrest 20:14, 34:17, 37:22, 39:9, 51:7, 51:8, 51:12, 51:20, 51:22, 51:25, 52:4, 54:13.
arrested 15:22.
arrogant 55:20.
aside 18:24, 52:3.
Asif 1:41, 63:23, 63:28.
assassinate 15:16.
assassination 29:14.
assessment 14:15, 61:11.
assist 26:22.
assistance 62:18.
assistant

42:2.
associated 27:14, 54:23, 55:4.
attached 13:1, 40:18.
attachment 3:6.
attempt 23:20.
attendance 18:17.
attention 34:23, 41:12, 55:13, 56:3.
attitude 56:5, 56:9.
attorney 44:13.
attorneys 6:9, 6:14, 6:19, 6:24, 44:10, 44:12, 46:24.
attributable 17:19.
authorities 32:12.
authority 31:10, 31:16.
available 25:10, 49:18, 56:19, 56:22.
Avenue 1:45, 61:20.
avoid 16:8, 45:19, 45:20, 49:19, 56:23.
award 13:6.
aware 44:17.
away 16:5, 43:13, 45:2,

45:3, 45:10, 48:18.
.
.
< B >.
B. 1:35.
Babies 42:16, 42:19.
back 7:23, 16:5, 35:14, 37:9, 37:20, 40:23, 43:13, 52:18.
bad 44:22, 44:25.
Bagcho 26:23, 27:2, 27:3, 27:7.
bare 38:21.
base 10:25, 11:4, 11:12, 11:16, 19:4, 19:7, 19:10, 20:6, 24:24, 25:2, 25:8, 25:17, 31:23, 33:5, 57:25, 59:9, 60:4, 60:18.
Based 5:19, 17:17, 19:4, 23:25, 30:5, 48:10, 53:9, 56:12, 59:5, 61:1.
basis 15:23, 54:4, 60:9.
battles 34:2.
BBM 19:25, 22:11, 22:17, 22:22, 22:23, 23:17, 23:19, 24:3, 24:12,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1525

24:15, 24:20, 30:23, 31:15.
bear 34:6, 43:3.
become 18:5.
befall 35:24.
began 42:17.
beginning 18:1.
behalf 2:12, 53:17.
believe 4:3, 4:6, 13:5, 35:7, 36:18, 36:20, 36:21, 36:24, 37:7, 37:8, 42:1, 42:12, 44:12, 47:2, 60:25, 62:7, 63:12.
believed 14:19, 15:17, 17:16, 29:10, 29:25, 33:22, 51:11, 62:17.
believes 7:20, 11:19, 40:17.
belonged 15:6, 19:22.
BERYL A. HOWELL 1:17.
Best 1:31, 2:12, 4:5, 5:25, 8:13, 11:22, 12:5, 32:21, 35:11, 36:13, 36:18,

38:24, 43:21, 44:13, 47:15, 55:16, 60:11, 63:6, 63:11.
Beto 29:22.
Betran 57:12.
betrayed 15:18.
better 24:17.
beyond 25:14.
big 18:5, 46:18.
bigger 18:22.
birth 54:18, 54:19.
bit 53:8.
blackberry 19:25, 34:12, 36:19.
bleach 34:22, 56:2.
bloody 34:2.
boat 30:19.
boats 20:22.
bodyguards 26:18, 51:5.
Borda 41:2, 41:3, 60:12.
Border 20:17, 21:21, 48:12.
born 35:22, 35:24, 36:17, 41:20, 45:9.
Boss 17:13, 23:8.
Botswana 23:13.

bottom 44:20.
bound 19:24, 20:2, 22:15.
Brazil 22:21.
break 43:1.
bribery 60:5.
bribing 57:17.
bridge 34:21.
briefing 8:10, 12:1.
bring 38:16, 39:24, 41:12, 55:9.
broad 50:12.
broken 43:6, 43:17.
brother 16:21, 17:3, 22:19, 24:20, 28:14, 29:21, 36:21, 36:23, 37:9, 46:16.
brothers 15:11, 15:23, 16:20, 17:7, 17:14, 22:12, 31:13, 57:22.
brought 38:9, 38:14, 38:23, 42:19, 55:12.
Brown 1:36.
burden 13:20.
Bureau 61:9, 63:13.
business

35:18, 45:14, 50:16, 51:23.
.
.
< C >.
c)(1 19:11, 31:25.
c)(2 19:6.
calculation 5:19, 8:5.
California 20:18, 54:20, 63:14, 63:17.
call 2:2, 4:18, 11:5, 29:22, 46:20, 52:15.
called 16:12, 16:23, 46:17.
capped 57:19.
caps 32:14.
Captain 23:23.
captured 23:18, 41:23.
car 54:13.
card 54:17.
carried 26:12, 27:10.
carries 13:19.
carry 26:16.
carrying 26:17, 50:17.
cartel 15:12,

| | | | |
|---|---|---|---|
| 15:16, 16:11, 16:12, 17:6, 17:8, 26:21, 26:23, 34:1, 39:4, 43:15, 50:22, 56:7, 58:8. | change 61:21, 61:22. | 49:17, 53:20, 62:12. | COLUMBIA 1:2. |
| cartels 27:15, 54:5, 55:21. | changed 15:25. | cite 13:22. | Columbian-based 60:14. |
| cases 21:21. | characteristic 11:5, 11:7, 11:8. | cited 27:6, 57:7, 59:23. | combination 32:15. |
| Category 7:18, 8:1, 8:2, 8:7, 8:9, 8:20, 9:2, 9:5, 10:3, 10:18, 32:16, 41:4. | characteristics 7:13, 14:17, 49:18, 52:11, 57:5. | cites 28:2, 57:7, 57:21, 58:7. | combined 24:24. |
| | | claim 51:22. | coming 41:14, 42:4. |
| | | claimed 46:17. | comings 46:22. |
| | charge 26:22, 37:19, 37:23. | claims 34:10. | comment 38:19, 44:3. |
| caught 52:15. | charged 37:15, 37:16. | clear 7:17, 47:3, 53:13. | commercial 21:20. |
| caused 16:7, 44:15. | charges 48:22. | clearly 53:16. | Commission 42:3, 42:10. |
| causes 54:8. | charging 19:2, 59:16. | Clerk 2:3, 61:19, 61:21. | commissioner 42:9. |
| causing 34:22. | Chiapas 21:2. | client 5:25, 47:15. | commit 38:4. |
| cell 38:17, 51:8, 52:5, 55:25, 56:2. | children 43:6, 45:2, 45:4, 45:11, 47:8, 47:10, 52:21, 52:22, 53:2. | Clinton 41:25. | committed 7:21, 8:22, 9:19, 16:24, 35:3, 61:9. |
| | | close 6:22. | Committee 42:2, 42:8. |
| Central 21:17. | | closely 24:11. | committing 10:16. |
| certain 18:13, 27:10, 62:12. | choice 54:22. | clothes 38:21. | communications 23:6, 51:4. |
| | choosing 16:8. | Coast 21:2, 21:3, 21:4. | |
| certainly 2:23, 25:13, 42:20, 50:10, 50:14. | Christian 41:1, 41:3, 60:11. | code 23:21, 51:4. | communities 39:6, 48:13, 54:3, 54:7. |
| | Christine 1:41, 63:23, 63:28. | coded 22:10, 23:20, 24:7. | community 45:15, 46:2, 48:20. |
| certificates 54:18. | Circuit 13:22, 14:7, 26:24, 27:3, 57:8, 62:7, 62:12. | Coll 1:32, 2:13. | comparator 57:20, 58:3, 58:14, 59:3, 59:14, 59:22, 60:10. |
| certify 63:23. | | colleagues 15:3, 15:17. | |
| challenge 62:19. | circuited 52:17. | collected 29:17. | |
| chance 43:3, 43:9, 43:11. | circumstances 32:8, 35:24, | Columbia 1:44, 15:14, 21:1, 50:10. | comparators 56:25, 57:2, |

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1527

57:6.
comparing 24:16.
complained 55:12.
completion 62:4.
complexity 31:6.
comply 48:3.
computer-aided 1:49.
conceal 23:21, 51:2.
concede 8:22.
concern 16:7.
concluded. 63:21.
conclusory 30:23.
concord 41:22.
conditions 38:20, 55:11, 55:17.
conduct 10:5, 10:7, 10:12, 15:2, 16:14, 17:23, 18:23, 27:1, 27:12, 34:4, 34:6, 34:23, 35:6, 38:9, 39:10, 40:22, 49:4, 49:6, 49:21, 54:1, 55:4, 55:19, 56:5, 57:12, 60:8, 60:21.
conducted 27:11.
confirmed 23:7.
confirming 23:5.
conflict

45:25.
Congress 48:1.
connected 50:1.
connection 2:21, 6:19, 27:19, 60:2.
consequences 54:7.
Consequently 10:13, 27:16.
consider 14:1, 38:16, 47:25, 49:3, 49:14, 49:17, 50:3.
considerably 36:3.
consideration 41:13, 49:1, 49:12, 56:24, 60:23, 61:6, 63:13.
considered 28:10, 49:4, 49:16.
considering 47:19.
Consistent 40:25.
conspired 33:15.
conspiring 59:6, 59:25, 60:15.
Constitution 61:20.
constructive 27:3, 27:6.
contained 25:11.
contemporaneous 28:19.
contends 9:10,

28:9.
content 17:17, 22:24.
contents 51:9.
contexts 34:14.
continents 33:13.
continue 34:16.
continued 38:10.
continues 55:7.
continuing 51:24, 51:25.
Contitution 1:45.
contraband 27:2.
contradict 46:25.
contradicting 45:22.
control 30:20, 34:2.
controlled 32:7.
convenience 51:23.
conversations 15:13, 18:11, 24:13.
convicted 9:13, 25:8, 49:10, 57:23, 60:14.
conviction 9:20, 10:14, 34:15, 37:25, 52:12, 54:11, 62:6, 62:19.
cooperate 40:23.

cooperating 14:18, 14:22, 15:1, 17:18, 19:15, 20:5, 24:11, 27:4, 28:11, 29:9, 31:7, 47:23, 58:15.
cooperation 18:1, 19:17, 40:8, 40:9, 58:18.
cooperator 58:11, 58:13, 59:1.
coordinated 15:10, 17:9, 20:12, 20:20, 22:18, 22:20.
copy 23:13.
Correct 6:5, 6:6, 7:19, 25:6, 63:24.
corrected 8:19, 12:16.
correction 42:7.
Corredor-ibague 59:15.
corroborate 30:24.
corroborated 17:18.
cost 62:25, 63:1.
Counsel 2:5, 2:9, 5:2, 5:5, 5:13, 38:14, 38:16, 62:18, 63:2.
Count 19:2, 61:10.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1528

counted 12:15.
counters 26:1.
countless 58:11.
countries 23:14, 52:2.
country 10:8, 25:12, 34:20, 37:10, 48:13, 48:23, 50:25, 52:16, 54:2, 54:7.
counts 59:16.
couple 53:10.
course 7:24, 50:7.
court-appointed 63:2.
courthouse 41:1, 41:24, 42:4.
courts 54:1.
covered 11:18.
covering 10:5.
created 18:15.
credibility 14:9, 14:11, 14:15, 18:24, 19:15, 22:4, 26:12.
credible 11:10, 14:21, 20:5, 20:11, 24:18, 27:15, 27:24, 30:8, 31:12.

credibly 16:3, 20:19, 20:23, 21:9, 21:19, 21:23, 22:9, 26:15, 26:20, 29:9, 29:15, 29:17, 29:21, 30:2, 31:7, 31:9.
credit 39:2, 39:21, 46:17.
credited 39:20.
crime 35:3, 35:25, 46:21, 49:11.
crimes 49:9.
critical 40:25, 41:13.
cross 24:8.
cross-corroboration 18:22.
crushed 51:8, 52:5.
Cuinis 16:12, 16:16, 16:17, 16:19, 17:5, 17:12, 19:21, 20:13, 20:14, 30:1, 31:9, 33:12, 33:23, 50:9, 50:15, 50:21, 52:1, 52:8, 54:24.
custody 61:9.
cycle 43:1, 43:5, 43:18.

.
.
< D >.
daily 50:24, 54:4.
damage 44:15, 48:13.
damaging 51:13.
Dangerous 1:26, 11:3, 17:20, 25:22, 25:25, 26:6, 26:9, 57:16, 58:2, 60:5.
Das 24:2.
date 6:23.
dating 35:13.
day 37:14, 49:23.
days 56:3, 61:21, 62:22, 62:23.
DC 1:29.
de 34:1.
DEA 14:24, 22:9, 22:17.
dealing 39:18.
dealings 17:5.
death 16:18, 29:20.
debris 21:5.
debt 33:23.
decade 33:14, 52:8.
decades 18:2, 39:18, 49:13, 52:14.
decide 47:13.
decided 57:8.

decipher 22:10.
deciphered 23:21.
decision 14:8, 45:8, 45:17, 45:21, 46:11.
decision-making 31:10, 31:16.
decisions 17:15, 31:15.
declarant 14:10.
deeply 17:22, 44:19.
defect 62:9.
defendants 49:20, 49:23, 56:16, 57:22.
defense 3:25, 5:24, 14:21, 51:10, 59:24.
defer 31:13.
deference 14:12.
definitively 20:1.
degrees 38:17, 38:20.
demand 29:24.
demonstrate 13:20.
demonstrated 46:21.
denied 34:9.
deny 55:15.
depart 9:4.
departing 10:2.
Department 1:25, 12:12.
departure

| | | | |
|---|---|---|---|
| 9:16. | 18:10. | disparity | divorce |
| described | difference | 56:24. | 53:14. |
| 17:4, 22:15, | 60:24. | dispute 4:24, | divorced 45:5, |
| 23:17, | different | 7:13, 7:14, | 51:15, |
| 24:22, | 4:13, 51:2, | 7:16, 10:23, | 53:12, |
| 27:3. | 54:17, | 11:2, 11:9, | 53:15. |
| describes | 54:19, | 11:19, | docket 3:7. |
| 16:10. | 60:21. | 25:21, | docketed 2:25, |
| describing | direct 15:12, | 27:20, | 3:5, 3:9, |
| 19:21. | 54:6, | 30:11, | 3:13, 3:16, |
| deserves | 55:24. | 47:22. | 3:19, 7:19, |
| 43:18. | directed | disputed 33:5, | 8:23. |
| designated | 11:10, | 47:22. | documentation |
| 63:17. | 27:24, 30:8, | disputes 4:25, | 23:22. |
| Despite 34:3, | 33:21. | 7:17, 10:20, | documents 4:1, |
| 37:9. | directing | 10:22, 12:2, | 23:18, |
| detailed | 28:3. | 13:17, | 34:19, |
| 15:9. | direction | 13:25, | 54:14, |
| details 18:6, | 31:16. | 18:25, | 54:15, |
| 59:21. | directly 5:6, | 19:13, | 54:21. |
| detained 30:3, | 21:21, | 31:22. | doing 42:25, |
| 34:20. | 21:24, 22:1, | disregard | 51:24. |
| detective | 44:6. | 34:13. | Domingo |
| 24:2. | disclose | disrupting | 28:6. |
| deter 35:5, | 8:3. | 50:24. | done 29:6, |
| 49:4. | disclosed | disruptive | 42:13, |
| determination | 24:13. | 39:5, | 43:15, |
| 7:9, 10:20, | discounted | 39:20. | 44:10, |
| 11:19, | 28:10. | distribute | 44:24, |
| 11:20, | discovered | 2:18, 10:15, | 44:25, 46:7, |
| 31:23, | 54:13. | 19:2, 33:15, | 46:24. |
| 32:19. | discretion | 52:13, | double 12:14, |
| determinations | 9:4, | 57:10, 59:6, | 28:12. |
| 4:23, | 14:12. | 59:16, | doubt 51:20. |
| 14:11. | discuss | 59:25, | down 28:6, |
| determine | 15:23. | 60:15. | 28:16, |
| 4:19, | discussed | distribution | 40:23. |
| 24:4. | 5:25, 15:16, | 9:21, 15:14, | downplayed |
| determined | 24:5, 24:19, | 50:16. | 34:8. |
| 23:17. | 54:9, | District 1:1, | downward 9:4, |
| determining | 60:11. | 1:2, 1:18, | 9:15, |
| 47:18. | discussing | 1:43, 1:44, | 10:2. |
| deterrence | 22:12. | 10:15, 14:1, | dramatically |
| 49:5, 49:7, | discussion | 14:7, 14:10, | 9:9. |
| 53:22, | 16:25, | 61:19, | draw 44:22. |
| 54:9. | 36:19, | 62:1. | drugs 17:19, |
| devices 38:5, | 36:24, | disturbing | 20:2, 22:15, |
| 38:9, 38:11, | 45:22. | 55:22. | 24:6, 25:6, |
| 45:16. | disparities | divergent | 25:13, 37:7, |
| dictate | 49:19. | 24:16. | 44:15, |

44:22, 52:7, 54:8.
DTO 16:11, 16:12, 16:15, 16:16, 17:13, 19:22, 30:22, 31:11, 48:11, 57:23, 59:5, 60:3, 60:14.
due 10:4, 15:20.
duration 31:6, 61:2.
during 17:1, 17:9, 19:19, 22:3, 22:7, 46:2, 46:4, 46:16, 46:20, 46:22, 51:14, 51:23, 53:17, 56:6.
duties 30:22.
dying 49:25.
.
.
< E >.
earlier 18:13, 35:23, 43:1.
East 1:28.
ECF 3:7, 7:19.
Ecfs 2:25, 3:5, 3:16.
Ecuador 15:14.
Ediel 59:23.
effects 61:2.
efforts 6:14, 17:9.

Efrain 28:5.
either 8:9, 26:12.
eldest 44:2.
electronic 38:5, 54:14.
element 55:3.
Eliu 57:21.
Elpidio 3:23, 14:24.
emerge 18:11.
emotionally 53:6.
end 13:13.
endeavors 15:20.
enforcement 21:14, 24:9, 52:5, 54:13, 57:17, 60:5.
engage 49:8, 51:25.
engaged 49:6, 49:13, 50:5, 50:15, 52:25, 53:24.
Engaging 9:21, 35:5, 50:22, 59:17.
enhancement 12:11, 12:16, 13:21, 26:6, 26:25, 27:13, 28:22, 29:3, 31:1, 59:12.
enhancements 41:4, 41:5, 41:11, 57:15, 58:1, 60:4, 60:18.
enough 6:18.

enrolled 37:13.
ensure 48:2.
enter 32:12, 34:7, 45:21.
entered 40:21, 62:20.
enterprise 33:21.
entire 24:12, 41:20.
entry 62:23.
environment 42:21, 45:10, 45:13.
equipment 54:14.
Ertzbischoff 1:34, 2:13.
escape 7:22, 8:22, 9:8, 9:11, 9:18, 9:24, 10:4, 10:7, 10:17, 16:17, 54:21.
escaped 34:15, 54:10.
Esquire 1:22, 1:23, 1:24, 1:31, 1:32, 1:33, 1:34, 1:35.
essence 38:18.
essentials 38:21.
establish 44:12.
established 26:7, 31:3, 62:16.
estimates 50:13.
Europe 50:12.
evaluating

56:17.
event 53:13.
events 18:4.
eventually 15:15.
everything 4:7, 11:18, 38:6, 43:16, 44:20, 45:18, 47:4, 56:11.
evidence 7:6, 11:25, 13:20, 14:3, 20:4, 20:8, 26:8, 27:4, 27:12, 28:24, 29:1, 29:5, 31:4, 33:24, 34:3, 38:11, 47:21, 47:22, 48:10, 53:7, 56:12, 59:13.
evidenced 50:8.
evidences 55:19.
evident 46:19.
evidentiary 3:3, 3:8, 3:12, 3:22, 8:4.
ex-wife 44:3, 51:14, 53:8, 53:11.
exact 41:10.
examining 24:3.
example 23:11, 27:13, 36:18, 46:15.
exceed 20:9.
except 37:6.
excuse 36:10.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1531

| | | | |
|---|---|---|---|
| excused 63:19. | extensive 11:15, 12:1, 30:15, 31:6, 31:21, 34:4, 50:23. | facts 7:5. | FCRR 1:41, 63:23. |
| execute 22:6, 62:2. | | factual 4:14, 4:15, 4:23, 4:25, 5:19, 6:4, 7:1, 7:4, 13:25. | fears 16:3. |
| exercise 9:3. | extensively 49:16. | | federal 34:15, 48:22, 49:11, 54:1. |
| exhausting 57:3. | extensiveness 52:6. | factually 5:21. | feel 6:18. |
| exhibit 31:15. | extent 7:1, 53:19, 58:20, 58:21, 62:20. | failed 7:22, 19:20, 19:23, 28:17. | feels 2:22. |
| exhibits 3:2, 3:11. | | | felony 9:19, 9:20. |
| exist 47:1. | | failure 27:21. | Fernando 41:2, 41:3, 60:12. |
| exit 43:15. | extradition 9:12, 10:4, 55:23. | fair 13:20. | few 57:1. |
| expected 18:18. | | fairly 51:17, 57:19. | figure 50:19. |
| expenses 38:7. | extraordinary 15:4. | fake 54:15, 54:18. | file 63:1. |
| experience 24:1, 24:9, 41:17, 42:17. | extreme 33:20. | faking 16:18. | filed 62:22. |
| | . | families 15:8, 44:16, 44:19. | filing 62:23. |
| experienced 16:19. | . | | filled 21:13. |
| experiences 16:10. | < F >. | family 16:5, 23:2, 28:7, 28:17, 28:18, 35:15, 35:19, 36:6, 36:17, 39:3, 42:21, 43:2, 43:10, 43:17, 45:3, 45:8, 45:15, 47:7, 47:10, 52:25, 53:4, 53:19, 55:2, 58:13. | final 21:13, 31:23, 35:8, 57:18, 60:7, 60:20. |
| | F.3d 13:22, 26:24, 27:13. | | |
| expired 40:12. | face 34:22, 43:5. | | Finally 11:13, 19:24, 21:18, 22:9, 30:11, 47:4, 60:11. |
| explain 5:6, 8:21, 13:17, 16:3, 47:16. | faced 48:17. | | |
| | facilitate 48:20. | | |
| explained 23:20. | facilitated 50:6. | | financial 61:18, 61:22. |
| explains 18:9, 18:12. | facility 42:19, 63:17. | | financially 53:5. |
| explicitly 20:2. | fact 10:3, 10:7, 16:6, 21:7, 22:2, 23:5, 36:18, 36:25, 37:9, 38:17, 40:17, 41:7. | far 20:9, 25:14, 43:6, 50:13, 60:8. | find 9:15, 14:20, 24:16, 47:9, 58:14, 59:2. |
| exploded 41:22. | | | |
| export 50:16. | | | |
| exported 32:7. | | | finding 20:4, 24:18, 25:17, 30:5, 47:6. |
| exposure 40:18. | | fashioned 41:1. | |
| express 6:13, 44:9. | factor 25:8, 50:3. | father 17:3, 23:1, 28:8, 37:19. | findings 5:19, 7:4, 18:24, 35:8. |
| expressed 16:6. | factors 5:3, 47:25, 49:2, 57:4. | fault 46:4. | finds 61:12. |

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1532

fine 61:13, 61:14.
firearm 25:25, 26:2, 26:3, 26:4, 27:4, 32:1, 41:5, 60:19.
firearms 26:16, 27:10, 33:25, 34:9.
First 4:13, 4:18, 4:21, 5:1, 5:16, 9:3, 10:23, 17:7, 19:14, 33:6, 40:4, 42:17.
five 10:13, 11:15, 22:5, 28:2, 28:7, 29:1, 30:14, 31:5, 31:21, 39:14, 39:17, 50:13, 57:10, 57:14, 59:6.
flaunting 52:16.
flawed 12:14.
fled 34:16.
flee 34:19.
flight 41:22.
Floor 1:28, 38:21.
focused 26:10.
Following 9:24, 55:23.
force 8:25.
foregoing 63:24.
foreign 59:18.

foreseeable 25:15.
forfeiture 3:7, 3:15, 12:14, 12:18, 12:20, 13:23, 35:9, 61:15.
forgiveness 44:18.
form 12:13, 16:24.
former 15:17, 17:6.
formerly 60:13.
forms 54:15.
forward 2:5, 12:8, 12:24, 16:8, 43:23, 47:14, 47:16.
found 8:2, 29:20, 49:20.
founded 41:25.
Four 4:12, 5:18, 9:19, 10:20, 10:22, 13:17, 18:25, 19:22, 28:6, 28:17, 30:9, 30:12, 31:18, 32:2, 32:25.
four-point 11:16.
four-year 9:9.
fraudulent 34:18, 54:16, 54:17.
frequently 17:10.
front 56:16,

57:3, 58:9.
full 8:25, 34:5, 34:24, 45:25, 56:15, 61:23.
fully 6:8, 15:2, 56:11.
functionary 30:21.
fundamental 62:9.
fundamentally 9:14, 10:11, 12:14.
funding 33:25.
funeral 29:22.
furtherance 25:7, 26:9, 26:16, 27:11, 28:25, 54:5.
future 35:4, 47:8, 47:11, 49:9.
.
.
< G >.
gain 26:23, 52:19.
Garcia 16:2.
gear 26:22, 29:13.
Genaro 16:2.
Generacion 34:1.
general 18:18, 49:5, 49:6, 53:22.
genius 50:19.
Geoffrey 1:32.
Georgia 10:15.

Gerard 2:12.
Gerardo 2:4, 2:16, 61:8.
GERARDO GONZALEZ VALENCIA 1:10.
Gilberto 59:4.
give 5:5, 24:23, 38:21, 41:19, 43:9, 43:10.
given 6:14, 14:12, 18:21, 27:14, 30:24, 38:19, 49:12, 53:22.
go-fast 20:22, 30:19.
goal 25:13.
goings 39:5, 46:22.
Gonzalez 2:5, 2:12, 2:16, 4:11, 6:7, 6:17, 11:5, 17:1, 22:11, 22:19, 23:10, 28:13, 29:12, 30:3, 35:13, 36:5, 36:6, 36:9, 37:1, 37:6, 40:5, 40:17, 42:16, 42:25, 43:22, 49:10, 61:8.
governments 23:12.
graduated 42:22.

granted 56:13.
great 15:7, 16:4, 58:12.
greater 48:3.
Greg 44:3.
grocery 35:18.
grow 45:11.
growing 45:12, 45:13, 56:7.
Guadalajara 21:20.
Guard 21:3, 21:4, 34:22, 56:2, 56:4.
guards 34:22, 55:8, 55:24, 55:25.
Guatemala-based 57:23.
guide 41:19.
guideline 7:24, 9:1, 9:10, 9:17, 11:1, 11:20, 14:6, 19:1, 19:10, 27:17, 30:6, 30:16, 31:2, 31:19, 31:23, 31:24, 32:3, 32:6, 32:11, 32:19, 62:16.
Guidelines 4:20, 4:22, 5:18, 7:10, 7:12, 13:21, 14:1, 25:18, 27:22, 32:14, 33:9, 35:2, 39:22, 41:1, 47:18, 49:15,

56:17, 60:25, 61:7, 62:15.
guilty 2:16, 9:22, 32:12, 34:7, 36:16, 49:20, 56:10, 57:9, 59:5, 59:15, 59:24, 62:7, 62:10.
gun 39:17.
gunmen 29:13, 29:16, 29:18.
guns 27:6.
.
.
< H >.
H. 1:32.
hair 42:5.
halfway 7:23, 34:16, 48:19, 48:20, 54:10.
hand 39:16.
handcuffs 56:4.
Handrich 1:24, 2:8.
hands 16:19, 16:20, 16:21.
hang 34:20, 38:15, 55:9.
happen 52:14, 53:2.
happened 44:21.
harm 54:8.
haunt 55:2.
head 38:15.
headquarters 50:11.
hear 5:1, 5:2, 5:4, 6:11, 8:8, 32:25, 33:6.

heard 12:2, 29:23, 35:21, 35:23, 44:5.
hearing 3:4, 3:9, 3:13, 3:22, 4:12, 4:24, 5:10, 7:7, 7:9, 7:11, 8:4, 11:24, 11:25, 12:15, 12:25, 14:19, 22:7, 47:20, 47:21, 47:23, 50:9, 51:11.
hearings 4:12.
hearsay 14:8, 28:11, 28:12.
heart 44:20, 47:9.
Hector 44:4.
held 3:4, 7:7, 25:3, 42:18.
help 4:25.
helped 29:15, 59:4.
helpful 55:16.
helping 50:15.
hereby 61:9, 63:23.
heroin 57:11.
highest 55:9.
highlighting 55:10.
highly 39:19.
History 7:12, 7:15, 7:18,

7:20, 8:1, 8:2, 8:6, 8:7, 8:9, 8:19, 8:25, 9:2, 9:4, 9:5, 9:6, 9:16, 10:2, 10:10, 10:13, 10:17, 32:16, 38:6, 41:4, 49:18, 52:11.
hold 39:16.
holding 42:19.
Holohan 3:23, 14:25, 23:24, 23:25, 24:2, 24:8.
homicide 46:18.
honesty 45:18.
HONORABLE 1:17.
hopefully 53:17.
horrid 38:14.
horse-blinders 37:2.
hospital 23:1, 23:3.
hour 5:10.
house 7:23, 34:16, 37:18, 37:19, 37:23, 48:19, 48:20, 54:10.
huge 39:19, 52:18.
hundred 16:24, 16:25, 58:10.
hunting 28:6,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1534

| | | | |
|---|---|---|---|
| 28:16. | 18:6, 54:14, | included | 18:13, |
| Hussein | 56:24. | 24:9. | 24:3. |
| 41:23. | Importantly | includes | ineffective |
| . | 40:19. | 62:1. | 62:17. |
| . | importation | including | inept 58:14, |
| < I >. | 2:18, 19:3, | 33:25, | 59:3, |
| ID 54:17. | 33:16, 50:6, | 54:16, | 59:14. |
| identifiable | 50:16, 54:8, | 62:13. | informants |
| 49:22, | 59:7, 59:17, | incomplete | 24:11. |
| 50:2. | 60:2. | 7:3. | information |
| identification | imported 32:7, | inconsistencie | 14:2, 14:4, |
| 34:19, | 60:16. | s 17:25, | 47:1, 51:18, |
| 54:15. | importing | 18:3, 18:18, | 59:16. |
| identified | 25:9, | 18:20. | informed |
| 23:9, | 54:25. | inconsistent | 23:2. |
| 37:7. | impose 5:7, | 19:15, 26:2, | ING 42:23. |
| identify 22:7, | 5:8, 33:9, | 53:8. | ingenious |
| 24:4. | 35:2, 47:17, | incorrect | 25:11. |
| identifying | 48:2. | 62:14. | initiated |
| 50:1. | imposed 33:2, | increase 7:25, | 37:9. |
| identity | 62:13, | 8:6, 9:10, | initiation |
| 23:7. | 62:14, | 11:3, 11:11, | 36:23. |
| II 7:18, 8:2, | 62:20, | 11:16, | instability |
| 9:5. | 63:3. | 25:23, 28:1, | 48:12. |
| III 8:1, 8:7, | imposition | 30:13. | instance |
| 8:20, 9:2, | 61:13. | increased | 22:25. |
| 9:5, 10:18, | impossible | 7:21, | instances |
| 32:16, | 42:22, | 24:23. | 12:15, 28:2, |
| 41:4. | 43:14. | increases | 29:2, |
| illegal 9:23, | imprisonment | 59:10. | 30:10. |
| 17:23, | 32:17, 33:2, | incredibly | instant 7:22, |
| 18:23, | 33:9, 56:20, | 31:6. | 8:23, |
| 39:16. | 56:21, 59:9, | incriminated | 10:16. |
| imac 41:25. | 59:20, | 17:22. | instilled |
| image 38:8. | 60:17, | indicated | 56:6. |
| imaged 38:6. | 61:10. | 28:13. | intend 13:6. |
| imaging 38:7, | in. 45:13. | indicates | intent 10:15, |
| 38:8. | incarcerated | 54:20. | 52:13. |
| immediately | 53:3. | indicating | intentionally |
| 51:12, | incarceration | 40:22. | 21:3. |
| 61:18. | 33:4, 40:3, | indication | intentions |
| impact | 53:18. | 37:5. | 32:12. |
| 10:25. | incident 13:2, | indicia | interdicted |
| impermissibly | 37:6. | 14:4. | 21:2. |
| 30:23. | incidents | indictment | interior |
| implanting | 28:10, | 2:17. | 34:21, |
| 52:2. | 29:5. | individual | 55:7. |
| import | include 8:6, | 15:2, 27:1, | international |
| 25:12. | 9:11, 14:22, | 47:5. | 39:4, 48:9, |
| important | 48:5. | individuals | 50:5, 53:1, |

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1535

53:23, 61:4.
interpretation 22:23.
interpreted 36:20.
INTERPRETER 5:12, 6:10.
interrelated 4:22.
interviewed 53:11.
interviews 51:15.
invest 44:22.
invested 20:25.
investigate 28:18.
investigation 2:23, 4:15, 4:17, 5:17, 5:20, 6:1, 18:12, 38:8, 47:20, 61:25.
Investigator 23:23, 51:11.
investigators 18:17.
investor 30:17.
invokes 26:23.
invoking 18:2.
involuntarily 62:8.
involve 43:17.
involved 11:14, 30:14, 31:5, 31:20, 37:7, 37:23, 45:1, 50:17, 52:3, 52:7,

52:19.
involvement 17:24, 24:10, 45:20, 48:9.
involving 39:19, 39:20.
ironically 16:22.
issue 37:18, 37:23.
issued 61:15.
itineraries 23:15.
itinerary 23:17.
.
.
< J >.
jail 16:17, 17:1, 30:3, 56:9.
Jalisco 34:1.
James 3:23, 14:25, 23:24.
Jeff 2:13.
jewelry 54:14.
job 46:7, 46:24.
joint 15:20.
Jorge 44:4.
Jose 3:22, 14:23, 28:13, 31:13, 40:5, 40:17, 58:24, 59:15.
Joseph 3:24, 14:25, 51:11, 53:9.
Judge 1:18, 40:22, 41:8,

48:22, 49:11, 57:4, 60:3, 60:12, 60:17, 60:24.
judgment 14:9, 31:14, 61:8, 61:16, 62:23.
judicial 10:8, 10:9, 52:16.
Judiciary 42:2, 42:8.
July 21st 1:11.
jump 13:22.
jury 57:24, 60:14.
Justice 1:25, 12:12.
justification 44:24.
justified 55:10.
.
.
< K >.
K. 1:24.
Kaitlin 1:22, 2:7.
Kate 1:23, 2:8.
keeping 6:22.
kept 6:23.
Kessler 41:8, 60:12, 60:17, 60:24.
Kevin 3:23, 14:24.
kids 37:13, 42:16.
kill 28:6, 34:21, 56:1.
killing 28:20, 46:17,

58:10.
kilogram 20:24, 21:10, 21:15, 21:19.
kilograms 2:18, 19:2, 19:6, 19:12, 20:9, 20:11, 20:12, 20:15, 20:20, 21:4, 21:24, 22:19, 22:20, 22:21, 24:19, 24:25, 25:2, 25:15, 25:19, 33:16, 57:10, 59:6, 59:7, 59:25, 60:1, 60:15.
kilos 41:7, 41:8.
kind 9:25, 49:6, 55:19.
Kirk 1:24, 2:8.
knowing 60:16.
known 13:3, 15:19, 23:8, 33:11.
knows 40:19, 43:14.
Kyle 2:9.
.
.
< L >.
lack 10:8, 19:15.
lacked 30:20.
Lalo 23:3.
land 20:16,

25:10, 33:13.
language 22:10, 23:20, 24:7, 27:6.
large 44:16.
last 5:6, 41:22.
lastly 5:4.
later 30:2, 56:3.
laundering 37:17.
law 21:14, 24:9, 34:14, 45:25, 46:1, 48:7, 48:16, 48:18, 49:2, 52:5, 54:13, 57:17, 60:5, 62:14.
lawful 35:17, 46:5, 48:21.
lawyer 55:2.
lay 7:16.
lead 19:17.
leader 11:14, 17:6, 30:13, 31:4, 31:8, 31:20, 33:10, 48:11, 52:8, 52:9, 57:12, 57:15, 58:8, 59:11, 60:7, 60:13, 60:19.
leaders 33:25, 50:9, 52:9, 57:23, 58:1.
leadership 17:12, 17:21, 31:1, 52:20.
leading 56:7.
leaking

50:24.
least 13:2, 15:20, 33:13, 43:6, 43:9, 55:22.
leave 45:9, 47:2.
leaving 55:24.
led 15:12, 16:22, 35:17, 44:12, 48:11.
left 9:9, 38:17, 38:20, 44:3, 45:19, 48:21, 51:6, 51:21, 52:17.
legal 13:18.
legally 43:13.
lends 27:15.
length 18:12.
lengthy 2:20.
leniency 10:1, 48:19.
Lerma-plata 59:4.
less 60:8.
lesser 10:2.
letter 3:17, 53:16.
letters 3:18, 3:19, 44:2.
levels 27:17, 30:6, 31:18, 31:25, 32:1, 32:3, 32:5, 32:10.
Lewinski 41:25.
Leyva 13:22, 13:23, 14:5,

14:10, 27:13, 57:7, 57:9, 57:12.
Lietz 1:35, 2:13.
life 32:17, 33:2, 33:9, 35:2, 35:16, 35:17, 35:25, 36:4, 37:11, 37:12, 38:13, 41:15, 41:20, 43:10, 43:15, 43:17, 45:14, 46:12, 50:24, 52:24, 57:14, 57:24, 61:10.
lifetime 42:6.
Lilly 1:33, 2:13.
limited 24:9, 42:20, 56:14.
links 27:1.
list 2:20.
listed 4:8.
little 53:8.
live 45:15, 54:21.
lived 36:10, 46:1, 46:2, 46:4.
lives 35:20, 36:9, 36:10.
living 38:22.
LLP 1:36.
local 21:17.
locations

23:21.
lodges 5:18.
logistics 50:17.
long 39:18, 39:19, 41:23, 41:24, 42:3, 53:18.
long-term 50:23.
look 37:22, 53:1, 55:8.
looking 57:2.
Lopez-falcon 59:23.
Lorenzana-card on 57:22.
Los 16:12, 16:15, 16:17, 16:19, 17:5, 17:12, 19:21, 20:13, 20:14, 30:1, 31:8, 33:11, 33:23, 50:9, 50:15, 50:21, 52:1, 52:8, 54:23.
lost 44:19.
lot 42:5.
lots 55:11.
loved 44:19.
low-level 30:21.
lower 59:9.
luggage 54:14.
Luna 16:2.
.
.
< M >.
machine 1:48.
mail 44:4.

maintain 53:18.
man 22:21.
managing 51:22.
Manhattan 24:2.
manner 46:5.
manufacture 50:16, 59:25.
mapped 24:14.
Maria 3:22, 14:23, 59:15.
marijuana 57:11, 59:7, 60:2.
married 53:10.
Martha 44:5.
massive 50:5.
matching 22:14.
material 59:18.
materials 2:21.
math 42:13.
matter 2:3, 63:25.
maximum 62:16.
mean 4:16, 12:18, 37:24.
means 10:6, 17:15.
measurement 24:6.
medical 34:23, 56:3.
meetings 18:11, 26:13.
member 23:2.
members 15:17, 16:17,

53:19.
memo 3:1, 3:6, 3:11, 3:12, 8:23, 12:16.
memoranda 47:19.
memorandum 3:3.
Mendoza 28:6, 28:16.
mention 20:1, 28:16, 28:19.
mentioned 39:15, 45:4, 45:8, 53:12.
merely 27:5.
message 23:4, 24:3, 24:13, 53:24.
messages 19:25, 22:11, 22:15, 22:17, 22:22, 22:24, 23:2, 23:8, 23:9, 23:16, 23:17, 23:25, 24:20, 30:24, 31:15, 34:12, 37:5.
messaging 23:19, 36:19.
messenger 19:25, 34:12.
met 15:22, 16:13, 17:7, 17:10, 22:4.
meted 58:16.
methamphetamin

e 9:21, 10:16, 34:15, 52:13, 57:11.
method 25:10.
methods 25:12, 50:19.
Mexican 30:3, 33:11, 39:5, 43:15, 46:20, 54:16, 54:17, 59:4, 59:5.
Mexican-based 57:13.
Mexico 15:15, 16:18, 17:1, 20:17, 21:2, 21:12, 21:18, 23:13, 34:16, 36:7, 36:8, 36:14, 39:5, 43:2, 45:9, 45:19, 48:10, 48:12, 50:11, 50:24, 52:8, 52:24, 53:4, 54:3, 54:6, 54:19, 54:24, 55:2, 55:21, 61:3.
Mexico-based 60:2.
microphone 5:13, 12:9, 43:23, 43:24, 47:15.
Milenio 15:12, 17:6, 17:8, 26:21, 26:22, 34:1, 58:8.

million 29:25, 61:17.
mind 18:21.
minimum 34:6, 56:20.
minister 34:21, 55:7.
missed 4:2, 4:3, 4:6, 11:22.
missing 10:21.
Mojarro 3:23, 14:24, 17:4, 17:6, 17:10, 21:9, 29:16, 31:12, 46:13.
money 17:15, 29:17, 61:16.
monthly 15:23.
months 9:9, 33:3, 37:4, 58:25, 59:8, 59:19, 60:3, 60:17.
Mori 2:9.
morning 2:7, 2:10, 2:11, 2:14, 2:15, 2:22.
mother 53:3.
motion 3:15, 3:16.
motions 3:7.
move 43:12, 45:10.
moved 35:20, 37:14, 38:12, 43:11.
MS. SAHNI 2:7, 4:3, 5:23, 8:12, 11:21, 12:4, 32:20, 33:7, 35:10, 63:5,

63:10.
multiple 21:10, 21:15, 21:19, 34:18, 54:15.
murder 16:20, 17:2, 28:4, 28:5, 28:7, 28:8, 28:14, 28:18, 29:7, 29:24, 30:5.
murders 16:25, 17:24, 33:21, 33:24, 39:20.
myopic 37:2.
myself 47:6.
.
.
< N >.
naked 38:17, 38:20.
name 19:20, 20:1, 22:13, 54:17, 54:18.
named 16:2, 20:21.
namely 24:5.
names 2:6, 51:4.
naming 17:13, 49:25.
narco 39:4, 53:23.
Narcotics 1:26, 24:1, 24:10, 39:16, 50:15, 52:4, 61:4.
Naseeef 1:23.
Naseef 2:8.
Natasha 1:34, 2:12.

nature 34:5, 35:3, 49:17, 50:4, 52:6, 53:20.
Nava 3:22, 14:23, 15:9, 15:12, 15:19, 15:21, 15:22, 15:25, 16:2, 17:8, 17:23, 20:11, 20:13, 20:19, 20:21, 20:23, 21:9, 21:18, 26:1, 26:10, 26:11, 26:20, 27:9, 29:15, 29:17, 30:22, 31:9, 40:20, 58:7.
NE 1:27.
nearby 37:13.
necessarily 14:8.
necessary 34:7, 43:13, 48:3, 54:21.
need 45:10, 48:5, 49:19, 49:21, 50:2, 56:23, 63:9.
needs 53:24.
negotiate 26:13.
Negro 22:20.
neither 10:11.
network 33:12, 53:1.
new 9:23, 18:11,

35:16, 35:18.
news 21:17, 49:24.
next 5:10.
No. 1:5, 2:4, 3:7, 25:21, 30:11.
noncooperation 40:21, 58:18.
nonetheless 8:24, 55:3.
nor 10:11, 24:13.
normal 50:24.
Northern 10:14.
Northwest 61:20.
note 63:13.
notebooks 2:22.
noted 32:18, 63:4, 63:7.
notes 18:2, 18:14, 19:16, 19:17, 28:13, 28:15.
nothing 18:7, 47:11, 47:12.
notice 62:22, 62:24.
notified 32:11.
notify 61:21.
Novick 3:24, 14:24, 22:9, 22:23, 23:9, 23:19, 23:24, 24:17, 36:20.

Nueva 34:1.
number 3:17, 4:15, 12:15, 20:8, 49:2.
numerous 17:11, 17:24.
NW 1:37, 1:45.
NYPD 24:1.
.
.
< O >.
oath 18:20, 22:8.
objection 5:22, 8:18, 20:6, 26:5, 28:22, 31:1.
objections 4:14, 4:16, 5:18, 6:4, 32:18, 63:3, 63:7.
objects 17:25, 27:21.
obligation 61:23.
obligations 61:18.
obliquely 36:12.
obstruction 60:20.
obtained 23:11.
obviously 63:15.
occasions 17:11.
occurred 9:8, 18:4, 18:7, 28:19, 29:5, 39:10.
occurring 54:6.
Ocean 21:1.
offenses

48:15.
offer 40:5,
40:12.
office 2:24,
8:3, 8:5,
34:10,
53:13,
61:24, 62:1,
62:4.
officer 3:15,
59:4.
Official 1:42,
55:14,
57:17,
63:29.
officials
55:21.
Okay 4:10,
11:18,
11:24,
13:15,
13:16.
old 9:8, 18:2,
22:21,
28:12.
once 34:20,
48:17,
52:15.
One 22:24,
24:22, 28:4,
29:4, 36:22,
37:6, 43:6,
45:23, 46:9,
46:15,
46:19,
49:11, 50:9,
51:17, 52:9,
52:12,
54:19,
57:20.
one-count
2:17.
ones 29:8,
44:19.
open 44:11,
58:23.
operational
30:20.
operations
54:24.

opinion 31:14,
60:24.
opportunity
5:5, 6:13,
43:22, 44:6,
44:8, 47:7,
47:10,
47:12.
opposition
3:14.
options 36:1,
36:15,
36:16.
order 12:14,
13:17, 35:8,
52:16,
61:15,
62:2.
ordered 28:14,
61:11,
61:16.
ordering 28:4,
28:5, 28:7,
28:8, 31:11,
58:9.
orders 10:9.
organization
30:21,
33:11,
48:10,
53:23,
57:12,
57:13,
59:19.
organizations
15:4,
15:5.
organizer
11:14,
17:21,
30:13, 31:4,
31:20,
57:15,
60:19.
organizers
58:1.
original
3:14.
Oscar 3:22,
14:23, 17:8,

40:20,
58:7.
others 35:5,
53:24,
53:25,
58:11.
otherwise
11:15,
30:15.
outcome
25:16.
outlined
43:20.
outset
14:14.
outside
37:10.
overdoses
49:25.
overlooks
36:3.
overrepresent
10:12.
overrepresents
9:6.
overstatement
9:16.
overt 54:5.
overwhelming
34:3.
owed 33:23.
owes 36:22.
own 15:2,
16:17,
16:18,
17:22,
17:24,
18:23,
34:12,
35:20,
56:11.
owned 15:2,
15:3,
17:23.
owning
18:23.
.
.
< P >.
Pacific

21:1.
packaged
21:11.
page 8:24,
13:23,
14:10, 27:2,
27:14.
pages 14:5.
paid 29:13,
29:17,
31:18,
61:23.
painstakingly
15:9.
painting
45:24.
paper 45:5,
53:14,
53:15.
papering
12:24.
papers 6:19,
7:17, 8:8,
8:15, 9:12,
10:22, 12:3,
12:4,
32:22.
pardon 46:6,
46:8.
parent
52:22.
part 7:4,
7:11, 12:15,
12:25,
16:10, 17:4,
21:8,
33:14.
participants
11:15,
30:15,
31:21,
50:13.
participated
9:23, 15:6,
16:24,
35:13.
particular
9:7, 12:2.
Particularly
18:3, 36:4,

| | | | |
|---|---|---|---|
| 49:12, 59:21. | permitted 62:20. | plan 45:9. | 52:20, 53:22, 59:10. |
| parties 4:24, 7:2, 7:13, 7:14, 7:17, 8:4, 8:8, 32:5, 33:1. | permitting 24:18. | planned 16:17. | possessed 11:3, 25:24, 26:8, 27:18, 34:18. |
| parts 7:11. | person 15:23, 16:1, 16:13, 17:10, 22:1, 22:5, 27:10, 45:5, 45:19, 45:24, 46:1. | plans 15:14, 15:16. | possessing 60:19. |
| party 8:9. | | platform 22:13. | |
| passport 23:13, 54:16. | | played 28:16. | possession 10:15, 26:2, 27:4, 27:6, 31:25, 52:13, 57:16, 60:5. |
| Past 18:4, 37:11, 38:13, 38:23. | personal 15:7, 57:4. | plea 7:6, 21:8, 32:12, 34:7, 40:5, 40:7, 40:12, 40:21, 59:5, 59:24, 62:8, 62:10. | |
| pay 29:12, 47:8, 61:11, 61:13, 61:16. | personally 25:5. | | possible 42:22. |
| | perspective 7:3. | plead 36:15. | post-hearing 12:1. |
| | phone 15:24, 34:18, 51:8, 51:9, 51:12, 51:19, 52:5. | pleaded 2:16, 9:22, 57:9, 59:15, 59:24. | posts 41:19. |
| payable 61:18. | | | potentially 51:13. |
| paying 44:25. | photo 19:19, 22:2, 23:8, 54:16. | pleading 56:10. | power 26:23, 34:2. |
| peaceful 37:12. | photos 51:13. | please 2:5. | powerful 33:11. |
| | | pled 59:5. | |
| penalizes 9:7. | physically 35:14, 35:20, 37:10, 38:12, 39:2, 43:2. | plus 35:14, 57:10. | precisely 38:25, 41:10. |
| people 31:5, 35:24, 44:5, 44:18, 49:5, 49:7, 49:24, 49:25, 58:10, 58:14. | | point 7:25, 12:6, 35:14, 37:20, 39:8, 44:9. | prefer 43:25, 63:14. |
| | picked 37:14. | points 7:21, 8:25, 10:14, 10:16, 39:25, 41:13, 43:19, 45:23. | preliminary 12:18, 12:19, 61:15. |
| percent 20:15, 21:12. | picture 18:5, 18:22, 45:24. | | preponderance 13:20, 20:7, 26:8, 28:24, 29:5, 31:3. |
| perfectly 44:16. | pictures 45:16. | police 59:4. | |
| | piece 51:17. | policy 49:15. | presence 26:4. |
| performed 30:21. | pistol 26:13. | poor 55:11. | present 46:23. |
| period 39:19, 46:4, 53:18. | place 6:23, 46:23. | portions 6:4, 7:2. | presented 14:20, 29:1, 47:23, 47:24, 56:12. |
| | placed 16:4. | Porto 21:11, 21:14. | |
| permission 17:14, 55:25, 62:25. | places 54:19. | portrayed 45:24. | |
| | Plaintiff 1:7. | position 13:3, 19:13, | |
| permit 14:1. | | | |

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1541

| | | | |
|---|---|---|---|
| presentence 2:23, 4:14, 4:17, 5:17, 5:20, 6:1, 47:20, 61:24, 62:3. | process 45:1. | 28:24. | 12:24, 18:24, 29:23, 47:6, 48:19. |
| press 55:13. | produced 1:48. | provide 20:5, 48:7, 48:24, 49:21, 56:25. | putting 9:19, 52:3. |
| previously 24:22. | proffer 18:2, 18:11, 18:14, 18:16, 18:18, 19:16, 19:17, 19:19, 19:20, 22:3, 28:12, 28:15. | provided 6:15, 14:3, 20:1, 26:21, 29:13, 33:24. | . |
| price 24:5, 31:17, 50:18. | | providing 9:25, 59:18. | . |
| primary 33:10, 45:11, 45:19. | | provisions 61:6. | < Q >. |
| prior 9:18, 51:12, 52:12. | profits 44:22. | PSR 4:16, 4:18, 5:19, 5:21, 6:4, 7:2, 7:19, 8:2, 19:3, 19:7, 20:6, 27:21. | quantities 15:6, 19:1, 19:9, 25:4, 25:9, 31:17, 33:18, 39:17, 39:18, 50:7, 54:25. |
| prison 9:19, 55:11, 55:24, 57:14. | progressing 6:22. | | quantity 10:23, 13:1, 17:19, 25:6, 25:14, 52:6, 57:25. |
| Prisons 38:15, 61:9, 63:13. | Progresso 21:11, 21:14. | psychopath 16:23. | question 12:23, 37:22, 39:23, 52:23. |
| probable 14:5. | prominent 53:22. | public 35:4, 49:9, 55:14, 55:21. | |
| probably 42:4. | promote 48:6, 48:16, 49:14. | publicly 58:12. | questioning 53:11. |
| probation 2:24, 8:3, 8:4, 8:19, 33:3, 34:10, 53:13, 61:24, 62:1, 62:4. | promoting 49:1. | pulling 37:9. | questions 5:9. |
| | prosecuted 10:4, 10:10, 52:15. | punishment 43:5, 48:7, 48:24, 48:25, 49:8, 54:2. | quite 15:2, 33:19, 36:12. |
| | prosecution 46:7. | | quote 14:7, 26:25, 27:23. |
| probative 51:16, 54:12. | prosecutors 18:10, 18:17, 45:22, 45:24. | purchasing 25:5. | quoting 14:6, 22:21. |
| | | purpose 45:12. | . |
| problems 44:15. | protect 35:3, 49:9, 50:20, 50:21. | purposes 12:25, 48:3, 48:5. | . |
| | | | < R >. |
| proceed 4:12, 5:10. | protecting 50:21. | Pursuant 7:23, 30:15, 31:24, 35:2, 61:5, 62:10, 62:18. | raise 51:20. |
| Proceedings 1:48, 62:9, 63:21, 63:25. | protection 51:5. | | raises 9:7, 15:25. |
| | prove 19:23, 29:4, 34:12. | | Ramirez 3:23, 14:24, 17:4, 17:7, 17:10, 21:9, 29:16, 31:12, |
| proceeds 37:17. | proven 20:7, | push 9:1. put 7:25, 8:6, | |

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1542

| | | | |
|---|---|---|---|
| 46:13. | 33:3. | regard 14:2. | 34:13. |
| ranch 29:20. | recommendation | Regarding | report 2:23, |
| range 4:21, | 2:24, 8:19, | 15:1, 15:13, | 4:15, 4:17, |
| 9:10, 32:17, | 19:7, 40:1, | 23:19, | 5:17, 5:20, |
| 40:3, | 40:2, | 25:21, 26:1, | 6:1, 8:3, |
| 62:16. | 63:16. | 30:11, | 47:20, |
| Rastrojo | recommended | 31:17, 50:4, | 53:14, |
| 20:21. | 36:7, | 52:11, 53:7, | 61:25, |
| rather 8:1, | 36:13. | 54:9, 56:19, | 62:3. |
| 18:16. | recommends | 56:23, | Reported |
| re-entry | 19:4, | 57:6. | 1:41. |
| 48:20. | 33:2. | regret | Reporter 1:42, |
| reaching | record 2:6, | 44:20. | 63:29. |
| 36:22, | 4:2, 8:18, | regularly | reports |
| 50:12. | 9:25, 28:21, | 15:24, | 28:19. |
| read 2:21, | 30:25, | 26:12. | representing |
| 5:25, 8:8, | 32:19, | rehabilitation | 42:17, |
| 49:24. | 37:21, | 49:14. | 44:10. |
| real 36:1. | 37:24, 47:3, | relatedly | request 5:12, |
| really 27:7, | 58:21, | 14:10. | 9:12, 10:5, |
| 41:18. | 58:23, 63:4, | relationship | 62:25. |
| reason 8:21, | 63:25. | 51:13, | requested |
| 10:1, 45:7, | recorded | 53:19. | 9:16. |
| 45:19, | 1:48. | relationships | requests 33:8, |
| 52:23. | records 22:14, | 36:9. | 35:1. |
| reasonable | 23:12, | relayed | require |
| 43:19, | 24:14, | 51:18. | 34:23. |
| 57:20. | 49:20. | release | required |
| reasonably | recounted | 61:24. | 12:12, |
| 25:15. | 16:16. | relevant | 26:15. |
| reasons 5:7, | recovered | 14:1. | requirement |
| 13:17. | 21:4. | reliability | 27:3. |
| rebut 23:24. | reduction | 14:4, | requires 26:3, |
| recall | 13:6, 56:13, | 28:12. | 29:4, |
| 12:10. | 58:5. | relies | 49:3. |
| receive 26:14, | referenced | 28:11. | requiring |
| 56:3. | 40:6, | rely 14:8. | 56:2. |
| received 23:4, | 40:20. | remainder | residence |
| 29:22, | referred | 43:10. | 62:2. |
| 40:21, 44:2, | 53:9. | remorse | resolution |
| 57:24, | reflect 35:2, | 56:15. | 33:4. |
| 58:17, | 41:18, | remorseful | resolve 4:25, |
| 62:17. | 48:6. | 34:24. | 13:4, |
| recognition | reflected | remove 35:20, | 29:25. |
| 56:16. | 7:19. | 38:12, | resolved |
| recognize | reflective | 39:3. | 31:22, |
| 47:5. | 56:5. | removed | 37:19. |
| recollections | Reform 61:5. | 52:23. | resolving |
| 18:3. | refused | repeatedly | 13:25. |
| recommend | 34:4. | 34:8, | resources |

59:18.
respect 5:24, 10:8, 27:20, 45:25, 48:6, 48:8, 48:16, 49:2, 59:23.
respectfully 33:8.
response 53:10.
responsibility 12:11, 12:23, 12:25, 13:7, 21:6, 21:8, 29:24, 34:5, 34:24, 41:6, 43:4, 43:5, 43:18, 44:21, 56:14, 56:16, 58:6, 59:11, 60:6.
responsible 15:7, 17:2, 19:12, 20:8, 20:14, 25:5, 30:4, 47:5.
rest 4:22, 8:12, 12:4, 59:3.
restitution 49:21, 50:3.
rests 48:25.
result 10:11, 32:13, 62:14.
resulting 26:17, 60:6, 60:20.
results 32:16.
retelling 18:6.
Retired 23:24, 34:11.

retrieve 17:15.
return 7:23, 62:3.
reveal 22:12.
revealed 24:8.
review 2:20, 4:13, 20:4.
reviewed 3:1, 3:5, 3:10, 3:13, 3:16, 3:21, 4:7, 8:17, 11:24, 23:15, 24:12, 28:21, 30:25, 58:22.
revised 8:5.
rifles 26:18, 26:21.
risk 15:7, 16:4, 58:12.
risks 58:15.
rival 15:16, 16:12, 33:22.
role 7:14, 11:17, 14:17, 17:21, 28:16, 29:6, 30:11, 30:15, 31:2, 31:19, 32:3, 33:5, 34:8, 36:2.
roles 17:12.
Rothstein 60:3.
RPR 1:41, 63:23.
Rudnick 1:36.
rules 14:3.

.
< S >.
Saddam 41:23.
Sahni 1:22, 2:7.
sale 22:12, 22:18, 22:21, 26:14.
Sanchez 1:33, 2:13.
Sandoval 28:6, 28:17.
Sarasota 42:23.
satisfied 6:9.
saying 14:20, 23:4, 36:4, 36:12, 41:14, 43:3.
says 30:17.
scale 34:8.
scandal 41:25.
school 37:13, 37:14.
scope 31:6, 34:5, 52:6, 61:2.
score 7:20, 8:6.
scuttled 21:3.
sea 25:10, 33:14.
sealed 59:20.
seated 7:1.
Second 1:28, 4:19, 4:21, 7:8.
secret 13:6.
Section 1:26, 5:3, 7:24, 7:25, 9:17, 11:9, 11:12, 11:17, 14:6,

19:1, 19:6, 25:18, 25:24, 26:6, 27:18, 27:22, 28:23, 30:16, 31:2, 31:24, 32:1, 32:2, 32:3, 32:6, 32:11, 48:1, 61:6, 61:12, 62:10.
Sections 19:11.
secure 29:16, 29:18.
seek 17:14, 31:14.
seemingly 34:19.
seems 53:3.
seen 12:16, 46:12, 48:11, 51:1, 53:14.
seized 21:4, 21:14, 38:5, 38:11.
seizes 18:21.
selling 25:5.
semi-submersible 20:25, 30:18, 32:9, 51:3.
Senate 42:2, 42:8.
send 53:24, 55:7.
sent 23:8, 23:16.
sentence 5:7, 5:8, 9:9, 33:9, 34:14, 35:2, 43:19, 47:16, 47:17, 48:2, 48:5, 49:19,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1544

52:10, 52:17, 53:21, 54:10, 56:17, 56:21, 56:23, 57:9, 58:16, 60:25, 62:2, 62:12, 62:13, 62:17, 62:20, 63:3.
sentenced 39:14, 41:2, 41:9, 48:17, 57:14, 58:8, 58:19, 58:25, 59:8, 59:19, 60:3, 60:13, 60:17.
sentences 49:18, 56:19, 57:24.
SENTENCING HEARING 1:16.
sentencings 35:23.
separate 7:10.
separated 45:6.
separately 10:10.
series 24:24.
serious 9:19, 9:22, 33:19, 48:15, 49:12, 52:9, 54:25, 55:5.
seriously 54:1.
seriousness 9:6, 35:3,

48:6, 48:8, 49:1.
served 23:24.
serves 57:19, 58:3.
serving 26:18, 34:14, 54:10.
session 18:16, 18:19.
sessions 19:19, 19:20, 22:3.
set 5:3, 35:18, 43:16, 45:14, 47:25.
Seven 16:14, 22:1, 45:1, 45:2.
several 15:10.
severe 49:8, 62:15.
shall 8:20, 28:23, 31:2, 61:21, 61:24, 62:3.
share 21:12.
shark 21:11, 21:13, 25:11, 30:19, 51:3.
shipment 20:24, 21:1, 21:7, 21:13, 26:14, 30:18.
shipments 15:10, 19:24, 20:9, 20:12, 20:16, 20:20, 21:10,

21:16, 21:19, 21:24, 22:6, 24:23, 24:24, 25:4, 30:18, 30:19, 30:20, 31:17, 50:18, 50:19.
shipped 37:20.
short 11:6, 52:17.
shorthand 1:48, 4:17.
shot 29:20.
shouldn't 49:8.
show 10:1, 22:18, 38:10, 43:11, 49:5.
showed 33:24.
showing 23:14.
shown 19:19, 22:2, 34:13, 48:19.
shows 10:8.
shuttle 41:22.
significant 48:9, 48:13, 50:23, 51:5, 51:17, 52:10, 53:21, 54:2, 56:9, 58:11, 58:15, 59:1.
Silverio 22:14, 22:25, 23:4, 23:5, 23:16.

similar 35:6, 49:20, 60:21.
simply 9:25, 30:17.
sincerely 44:17.
situation 36:1, 42:22, 44:13, 47:6.
Six 3:20, 3:21, 9:8, 16:14, 22:1, 42:17, 44:11.
smashed 34:18, 51:12.
Smith 3:24, 14:25, 44:3, 51:11, 53:9.
SOC 11:6, 11:12, 26:3, 26:6, 27:16, 27:17, 27:22, 28:2, 28:23, 30:7, 31:25, 32:2.
society 39:5, 44:15.
Socs 33:5.
sold 21:24, 21:25.
sole 47:5.
somebody 20:21, 35:25, 39:14, 58:13.
somehow 62:8.
someone 34:24.
sometimes 4:18, 11:5.
somewhat 16:22,

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1545

| | | | |
|---|---|---|---|
| 60:10. | 13:19. | 62:11. | 31:12, |
| somewhere | standing | stay 36:7, | 50:14. |
| 54:22. | 49:11, | 43:24, | substances |
| son 41:20, | 57:3. | 44:1. | 32:8. |
| 42:22, | stands 47:1. | stenographic | subtracted |
| 44:2. | start 7:15, | 63:24. | 32:10. |
| sorry 12:19, | 13:18, | step 4:13, | successful |
| 42:15. | 14:14, | 4:18, 4:19, | 51:23. |
| sorts 54:21. | 14:19, | 4:22, 5:1, | sucked 43:13, |
| sought | 35:16. | 5:6, 5:16, | 52:25. |
| 46:21. | started 2:23, | 7:8, 32:25, | suffer 54:4. |
| South 20:17, | 36:24, | 43:23, | suffering |
| 45:13. | 58:18. | 47:14, | 49:24. |
| space 41:22. | Starting 2:6, | 47:16. | suffice |
| spanned | 7:11, 18:25, | Stephen 1:31, | 24:23. |
| 33:12. | 33:1. | 2:11, | sufficient |
| spared 38:7. | state 2:5. | 45:3. | 14:4, 27:12, |
| speakerphone | stated 24:2, | steps 4:13. | 48:2. |
| 29:23. | 55:25, | stole 17:16, | suggests |
| Special 2:9, | 58:21. | 29:10. | 10:6. |
| 14:24, | statement | stolen 30:1. | Suite 1:38. |
| 22:23, | 55:6, 55:15, | stop 49:7. | summaries |
| 61:11. | 55:17. | store 51:23. | 18:19. |
| specific 7:13, | statements | strangle | summarize |
| 11:4, 11:6, | 49:16, | 56:4. | 10:20. |
| 11:8, 14:17, | 53:14. | stream 24:3. | summary |
| 28:9, 50:1, | States 1:1, | Street 1:27, | 18:16. |
| 53:25, | 1:5, 1:18, | 1:37. | supplement |
| 54:9. | 1:43, 2:4, | strengthen | 8:10, 8:13, |
| Specifically | 2:8, 2:19, | 33:20. | 12:3. |
| 15:9, 19:21, | 15:15, 19:3, | stroke 23:1. | supplemental |
| 25:25. | 20:3, 20:18, | strong | 3:3, 3:6, |
| spend 13:9, | 22:16, 25:9, | 14:12. | 3:12, |
| 43:9, | 25:14, | sub 13:1. | 8:23. |
| 52:22. | 33:17, | subject | supplemented |
| spent 45:2, | 37:20, | 46:9. | 7:5. |
| 46:2. | 48:14, 50:7, | submersible | support 3:17, |
| spoke 15:24, | 50:12, 54:4, | 32:8. | 3:18, 6:15, |
| 17:10. | 59:8, 60:16, | submersibles | 14:4, 28:1, |
| spread 52:1. | 61:3, | 25:11. | 59:18. |
| squad 24:2. | 61:16. | submit 8:15. | supported |
| staggering | station | submitted 3:2, | 22:24, |
| 33:18. | 21:17. | 3:3, 3:8, | 24:17, |
| stamps | status 7:22, | 3:11, 3:12, | 53:5. |
| 24:15. | 8:22, 10:17, | 3:17, 3:18, | supporting |
| stand 6:8, | 53:7. | 6:19, 7:6, | 9:13, |
| 32:22, 43:4, | statute 5:3, | 53:17. | 44:10. |
| 47:15, | 49:3, | subordinates | supportive |
| 48:22. | 62:21. | 26:16, | 53:16. |
| standard | statutory | 26:17, | supposed |

| | | | |
|---|---|---|---|
| 48:16, 49:14. | termination 62:5. | text 36:21, 37:4. | 23:14, 28:6, 28:15, 29:9, |
| surprise 13:12. | terms 49:25. territory 34:2, 50:22. | texts 36:19, 36:23. | 31:7, 32:10, 32:25, |
| surprising 18:5. | | THE DEFENDANT 6:21. | 33:13, 34:21, |
| surrounding 16:3. | terrorist 59:19. | themselves 15:7, 17:22. | 37:13, 42:16, 46:3, |
| sustained 8:18, 20:7, 26:5, 28:22, 31:1. | testified 3:21, 14:18, 16:2, 17:12, 20:11, 20:19, 20:23, 21:9, 21:15, 21:18, 21:23, 22:4, 22:18, 26:12, 26:15, 26:20, 27:9, 29:9, 29:12, 29:15, 29:17, 29:21, 30:2, 31:7, 31:9, 31:12, 36:20, 51:11, 58:9, 58:12. | they've 6:15, 46:7, 53:3, 53:4. | 46:13, 47:23, 52:21. |
| system 10:8. . . < T >. | | thinks 9:13. thinner 42:5. | three-day 47:21. three-level 13:6, 56:13, 58:5. |
| T. 1:41, 63:28. | | third 5:1, 27:20. Thirteenth 1:37. | threw 34:22, 56:1. |
| table 2:9, 5:13, 32:14, 42:4. | | though 25:3, 49:23, 51:6. | throughout 19:20. ties 12:22. |
| tabs 6:22. talked 50:5, 52:12. | | thousand 59:7, 60:1. | Tiffany 1:35, 2:13. |
| tandem 23:16. | | thousands 33:16, 37:4, 41:7. | Tijuana 20:17, 21:21. timely 32:11. |
| targeted 33:23. | | threat 11:10, 27:24, 30:8, 36:8, 38:14, 55:10. | today 12:16, 35:23, 43:1, 63:9. |
| targets 18:11. | | | tone 44:21. |
| task 57:2. team 38:7, 38:8. | testify 16:6, 22:10. testifying 16:4, 16:8, 16:9, 18:19. | threaten 55:21. threatened 34:20, 34:21, 35:19. | tonnage 19:9, 25:9, 39:16, 39:18, 50:6, 54:25. |
| Televisa 21:16, 30:20. | | | took 48:21. |
| ten 46:22, 56:20. | testimonies 17:17, 18:1, 24:16. | threatening 28:3, 55:6, 55:13, 56:3. | top 38:6, 38:8. |
| tens 33:15, 37:4. | testimony 3:21, 11:25, 16:1, 19:14, 20:5, 26:1, 26:11, 27:15, 28:11, 30:22, 30:24, 51:1, 51:16, 53:9. | | topics 18:10, 24:4. |
| tentacles 50:10, 50:11, 50:12. | | threats 35:15, 55:1, 55:20. | Torres 28:5. torture 55:8, 55:17, 55:18, 58:10. |
| Teodoro 28:5. | | Three 9:18, 10:14, 14:22, 15:1, 17:17, 19:14, 19:19, 20:5, | |
| term 33:2, 56:20, 56:21, 61:10. | | | tortured 38:18. |
| | | | total 32:13, 32:15. totally |

57:3.
touch 39:24, 41:13, 43:19.
touched 40:16.
trademark 55:20.
traffickers 33:22.
trafficking 15:5, 15:20, 17:5, 33:11, 33:12, 33:14, 33:21, 34:9, 34:11, 34:17, 35:4, 39:4, 48:10, 48:15, 52:1, 52:4, 53:1, 53:23, 57:13, 59:17, 61:4.
transacted 25:6.
transaction 36:25.
transactions 15:24, 16:15, 16:16, 21:25, 22:6, 27:11, 31:11.
TRANSCRIPT 1:16, 1:48, 18:16, 58:22, 63:24.
transcription 1:49.
translate 22:10.
transparent 59:21.
transported 20:16, 20:22,

20:24, 21:1, 21:11, 21:16, 21:20, 24:6, 33:13, 50:20.
travel 22:14, 23:12, 23:15, 23:18, 23:19, 23:22, 24:14.
traveled 23:14.
treated 51:19, 57:18.
Treatment 62:3, 62:5.
trial 14:3, 16:1, 16:4, 36:16, 41:2, 41:6, 57:24, 58:4.
tried 12:10, 39:2, 42:21, 43:12.
troubled 55:6.
troubling 18:5.
truck 30:20.
trucks 21:16, 21:17.
true 17:13, 44:9.
truly 43:15, 43:16, 44:8, 44:14, 47:11.
trust 59:10.
trusted 15:17.
trying 34:19, 37:10.
turn 5:16, 10:19, 25:21, 32:24.

Two 2:22, 7:11, 7:21, 7:24, 8:24, 8:25, 10:16, 15:24, 19:18, 24:3, 27:4, 27:16, 28:5, 28:12, 31:25, 32:1, 32:5, 40:5, 40:11, 42:13, 45:22, 46:11, 46:12, 47:23, 52:14, 54:18, 57:22.
two-offense 25:23, 27:21, 28:1.
two-point 8:6, 11:3, 11:11.
type 24:5, 56:21.
types 49:18, 56:19.
.
.
< U >.
U.s.-mexican 21:21.
ultimately 16:8, 39:21.
unable 62:24.
unaware 51:14.
unblemished 37:21, 37:24.
Uncle 29:22, 29:23, 46:17.
uncontradicted 35:12,

35:17, 35:19, 37:8.
undercover 24:11, 54:22.
undercut 51:16.
underlying 14:16.
undermine 22:3.
undermining 28:12.
underscore 46:10.
understand 5:17, 6:3, 7:16, 37:3, 44:14, 49:7.
understood 47:2.
undisputed 7:2.
unfair 9:14, 10:11.
unfairly 9:7.
unfairness 10:6.
unfortunate 35:24.
unimaginable 35:25, 36:11.
unique 57:4.
unit 24:1.
United 1:1, 1:5, 1:18, 1:43, 2:4, 2:8, 2:19, 15:15, 19:3, 20:2, 20:18, 22:16, 25:9, 25:14, 33:17, 37:20, 48:14, 50:7, 50:11, 54:3,

59:8, 60:16, 61:3, 61:16.
units 24:5.
University 42:23, 43:7.
unlawful 62:8.
unlawfully 32:7.
until 17:9, 20:13, 51:25, 61:22.
unwarranted 49:19, 56:23.
upset 38:22.
upward 27:22.
Uruguan 55:7.
Uruguay 23:12, 34:17, 34:20, 37:15, 37:17, 37:23, 38:1, 38:2, 38:3, 38:4, 38:11, 38:15, 42:18, 42:20, 46:3, 54:13, 55:9, 55:11.
user 22:13, 22:25, 23:8, 23:16.
using 23:21, 28:3, 51:3, 51:4, 56:4.
.
.
< V >.
v. 13:22, 26:23, 57:7, 57:21.
Valencias

16:11, 16:15.
value 51:16.
various 16:14, 17:14, 19:16, 30:18, 44:5, 58:1.
varying 19:14.
vehicles 26:18, 51:3.
Venezuela 15:14.
verbatim 18:19.
version 12:13.
versus 2:4.
vessel 21:5, 32:8, 32:9.
via 20:16, 21:20.
victim 45:20.
victims 44:18, 49:21, 49:22, 49:23, 50:2.
view 48:14.
violation 62:13.
violent 17:24, 45:18, 60:8.
visits 6:23.
voice 44:3.
voluminous 4:2, 10:22.
vs 1:8.
.
.
< W >.
waived 62:10.
waives

61:13.
wake 46:16, 52:15.
Waldemar 57:21.
walk 43:13.
walked 48:18.
walking 56:2.
wanted 13:2, 29:11, 56:8.
wants 8:10, 43:8.
warrant 27:13, 53:21.
warranted 9:18, 13:21.
warranting 11:3, 11:11, 11:16.
warrants 52:10, 54:1, 54:2, 56:9.
wars 50:22.
Washington 1:10, 1:29, 1:39, 1:46, 61:20.
watches 54:15.
ways 19:14, 49:4, 51:2, 55:12, 59:14.
weapon 11:3, 25:22, 25:25, 26:6, 26:9, 27:18, 57:16, 58:2, 60:5.
weapons 17:20, 29:13, 59:12.
weight 12:12, 12:13, 41:7, 41:9.

Wendy 53:7.
whether 11:2, 11:9, 11:13, 28:18, 51:20, 52:3, 56:17.
whole 27:7, 51:6.
whom 16:22, 17:13, 24:4.
wife 37:19, 45:3, 45:4, 51:15.
will 4:12, 6:13, 7:3, 25:21, 29:7, 31:22, 32:24, 32:25, 39:1, 46:15.
Wing 1:28.
wiretaps 24:10.
wish 5:6, 47:2.
withdrew 35:15, 39:21.
Within 14:11, 17:21, 43:19, 46:1, 46:2, 61:20, 62:22, 62:23.
without 14:2, 26:22, 55:13, 55:25, 63:1.
witness 14:9, 16:1, 18:1, 18:15, 18:20, 23:23, 51:10, 51:14.
witnessed 31:10.
witnesses

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1549

92

3:21, 3:24, 4:25, 14:15, 14:18, 14:20, 14:22, 14:23, 15:1, 17:18, 18:10, 18:14, 18:22, 19:15, 19:16, 19:20, 19:23, 20:5, 27:5, 27:16, 28:11, 29:9, 31:7, 46:10, 46:11, 46:12, 47:24.

word 27:1.

words 18:19, 51:4.

work 10:5, 16:21, 40:23, 44:9.

worked 17:8.

working 24:1, 24:11, 42:7, 50:14.

world 43:11.

.
.

< Y >.

year 41:21.

years-long 18:12.

yourself 55:17.

.
.

< Z >.

Z40 16:22.

Zetas 16:11, 16:22.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

JA1550