# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 30, 2025        Decided April 11, 2025

No. 23-3126

UNITED STATES OF AMERICA,
APPELLEE

v.

GERARDO GONZALEZ-VALENCIA, ALSO KNOWN AS LALO,
ALSO KNOWN AS FLACO, ALSO KNOWN AS SILVER, ALSO
KNOWN AS SILVERIO, ALSO KNOWN AS EDUARDO, ALSO
KNOWN AS LALINE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cr-00065-1)

*Devin Burstein* argued the cause and filed the briefs for appellant.

*Katherine Twomey Allen*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Kaitlin Sahni*, Acting Deputy Chief, and *Kate Naseef*, Trial Attorney, Narcotic and Dangerous Drug Section, Criminal Division. *Jonathan R. Hornok*, Trial Attorney, entered an appearance.

2

Before: HENDERSON and PAN, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Gerardo Gonzalez-Valencia pleaded guilty, without a plea agreement, to one count of conspiracy to distribute five or more kilograms of cocaine for importation into the United States. The district court sentenced him to life imprisonment. Gonzalez-Valencia appeals his sentence, asserting a range of procedural and substantive claims, most of which are raised for the first time on appeal. We affirm.

**I.**

Gonzalez-Valencia was a leader of Los Cuinis, a Mexican drug-trafficking organization.[1] Over the course of a decade, he coordinated shipments of tens of thousands of kilograms of cocaine into the United States. Gonzalez-Valencia and his associates employed numerous methods to conceal the drugs—like smuggling cocaine in a shipment of shark carcasses—and employed a wide range of transportation methods, including commercial airplanes, watercraft, and local news trucks. For example, in 2007, Gonzalez-Valencia used a semi-submersible ship filled with 5,000 kilograms of cocaine. When the Coast Guard interdicted the vessel off the coast of Mexico, the crew scuttled the craft. The Coast Guard recovered 280 kilograms of cocaine from the wreckage.

Gonzalez-Valencia frequently employed violence and threats of violence in his drug trafficking enterprise. He personally carried a pistol, and he armed his subordinates with

---

[1] We rely on the district court's factual findings from the sentencing hearing.

3

AK-47 rifles. On one occasion in 2005, he hired gunmen, provided them with weapons, and directed them to kill a man he suspected of stealing his cocaine. After the murder, Gonzalez-Valencia called the victim's family—during the funeral—to take responsibility for the killing and to demand $12 million for the supposedly missing drugs.[2]

In 2016, a grand jury in the District of Columbia indicted Gonzalez-Valencia for participation in a conspiracy to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 959(a), 960(b)(1), 963 and 18 U.S.C. § 2. Later that year, he was arrested in Uruguay. When arrested, Gonzalez-Valencia crushed his cell phone; officers found his car loaded with luggage, jewelry, and multiple fake identification documents. While in Uruguayan custody, he threw bleach at a prison guard and threatened to kill several others. And he threatened to hang the Uruguayan Interior Minister from a bridge.

The United States sought his extradition in 2016. Gonzalez-Valencia fought the proceedings in the Uruguayan courts for four years. As relevant to this appeal, he argued that extradition was impermissible because the United States, unlike Uruguay, permits life sentences. One lower court in Uruguay agreed and conditioned extradition on the United States agreeing not to seek a life sentence. The Uruguayan Supreme Court of Justice reversed, holding that the death penalty was the "only penalty" the United States-Uruguay extradition treaty eliminated. S.A. 56. Though that Court seemed to suggest that the condition nevertheless held, the U.S. Embassy later sent a note to the

---

[2] The district court heard and found credible several other accounts of Gonzalez-Valencia using violence to further the cocaine conspiracy. *See* J.A. 1487. For simplicity, however, the court only made a specific factual finding concerning this particular alleged murder in 2005, *see id.*, and we likewise rely on it alone.

4

Uruguayan Attorney General rejecting the legal basis for any such condition. The Uruguayan Attorney General then wrote to the courts, agreeing that "there is nothing regarding life imprisonment" in the extradition treaty and that Uruguay thus "cannot require the [American] counterparty to provide guarantees, since the Treaty does not obligate it to do so." S.A. 92. The letter expressed hope that the United States might voluntarily comply. Shortly thereafter, and without any further representations by the United States, Uruguay extradited Gonzalez-Valencia. He was arraigned in May 2020 and pleaded guilty to the conspiracy charge in December 2022, without a plea agreement. During the plea colloquy, Gonzalez-Valencia stated that he had participated in the conspiracy between 2003 and 2016, and he admitted his involvement in the 2007 semi-submersible smuggling attempt.

After extensive briefing, a three-day evidentiary hearing involving six witnesses, and a separate sentencing hearing, the district court sentenced Gonzalez-Valencia to life imprisonment. Using the Sentencing Guidelines, the district court determined that he was in Criminal History Category III, principally due to his escape from a court-mandated halfway house in 2001. *See* U.S. Sent'g Guidelines Manual §§ 4A1.1(a), (d); 4A1.2(e)(1) (U.S. Sent'g Comm'n 2021). The court calculated his base offense level as thirty-eight: thirty-six points from the conspiracy to distribute cocaine, and two additional points because the quantity exceeded 450 kilograms. *See id.* § 2D1.1(c)(1). The court then tacked on ten points of enhancements—two points for possession of a firearm, two points for the use of violence, four points for a leadership role in the conspiracy, and two points for the use of a semi-submersible smuggling vessel—and subtracted three points for acceptance of responsibility, leaving Gonzalez-Valencia with forty-five points. *See id.* §§ 2D1.1(b)(1), (2), (3)(B); 3B1.1(a); 3E1.1. The court adjusted the final point value to forty-three, the maximum

5

contemplated by the Sentencing Guidelines, which translates into a recommendation of life imprisonment. The court declined to depart downward from the Guidelines given "the level of violence, the amount of cocaine, the duration and scope of this conspiracy, and the effects on both Mexico and the United States." J.A. 1519.

## II.

We review timely objections to sentencing decisions for abuse of discretion. *See United States v. Iracks*, 106 F.4th 61, 66 (D.C. Cir. 2024). That review, while deferential, looks for "significant procedural error," "clearly erroneous" factual findings, or a sentence that is substantively unreasonable. *Id.* If the defendant failed to object at sentencing and raises an objection for the first time on appeal, we review only for "plain error." *Id.* This means that there must be (1) an error that (2) is "plain" and (3) "affect[s] substantial rights," in which case we may exercise our discretion to correct it, (4) provided the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (alterations in original) (last excerpt quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). An error is plain if the district court contravened "an opinion by this circuit or the Supreme Court on the issue," or some other "'absolutely clear' legal norm." *United States v. Andrews*, 532 F.3d 900, 909 (D.C. Cir. 2008) (quoting *United States v. Vizcaino*, 202 F.3d 345, 348 (D.C. Cir. 2000)).

## III.

Gonzalez-Valencia's first objection is to his placement in Criminal History Category III under the Guidelines. At sentencing, the district court determined that his past actions warranted five criminal history points, two of which were due to

6

his previous status as an "escape[e]." J.A. 1466. This translated into Criminal History Category III.

Gonzalez-Valencia does not dispute the district court's determination. Instead, he points out that, after his sentencing, the U.S. Sentencing Commission adopted amendments retroactively affecting his case. Amendment 821 eliminated the two-point bump for "escape status," as applied to individuals like Gonzalez-Valencia, and Amendment 825 made Amendment 821 retroactive. *See* U.S. Sent'g Guidelines Manual supp. to app. C, amends. 821, 825 (U.S. Sent'g Comm'n 2023). Under this new approach, Gonzalez-Valencia has only three criminal history points and is in Criminal History Category II, not III.

However, Gonzalez-Valencia's Guidelines sentence does not change: Criminal History Categories II and III both result in a life sentence recommendation for offense levels of forty-three points. *See* U.S. Sent'g Guidelines Manual ch. 5, pt. A (U.S. Sent'g Comm'n 2021). This makes him ineligible for relief under 18 U.S.C. § 3582(c), the typical route for defendants after a retroactive Guidelines amendment. Section 3582(c) permits resentencing defendants who "ha[ve] been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission," provided that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* But since the Guidelines provide that resentencing "is not consistent with th[e governing] policy statement and therefore is not authorized under 18 U.S.C. § 3582(c)(2) if" the relevant amendment "does not have the effect of lowering the defendant's applicable guideline range," U.S. Sent'g Guidelines Manual § 1B1.10(a)(2) (U.S. Sent'g Comm'n 2021), Gonzalez-Valencia cannot avail himself of § 3582(c). He nevertheless asks this court to remand for resentencing under 28 U.S.C. § 2106, a statute permitting our court to "set aside or reverse any

7

judgment," "remand," "or require such further proceedings to be had as may be just under the circumstances" in any case in which we have jurisdiction. *Id.* This provision provides us "broad discretion to order the appropriate relief." *Waters v. Thornburgh*, 888 F.2d 870, 877 (D.C. Cir. 1989).

Our court has employed § 2106 in the resentencing context. In *United States v. Rhodes*, 106 F.3d 429 (D.C. Cir. 1997), we remanded for resentencing when a new sentencing enhancement became available as a result of intervening Supreme Court precedent, holding that it was "'just under the circumstances' to remand." *Id.* at 433. And two decades earlier, we held that our "settled jurisprudence call[ed] on us to apply 28 U.S.C. § 2106 so as to order a remand following a sentence when there is a possibility that there was a failure to give" all sentencing options "full consideration." *United States v. Moore*, 486 F.2d 1139, 1203 (D.C. Cir. 1973) (Leventhal, J., concurring but controlling on this point).

We decline to exercise our § 2106 authority in this case. Amendments 821 and 825 affect the Guidelines calculations, but they do not affect Gonzalez-Valencia's recommended sentence. In both Category II and Category III, his Guidelines sentence is a life term. Were we to remand, Gonzalez-Valencia would presumably request a downward departure—but that is the same request he already made, a request the district court rejected.

There is nothing to indicate that the district court would change its mind. On the contrary, the district court twice rejected his requests for discretionary leniency.

Gonzalez-Valencia first sought a discretionary adjustment from Criminal History Category III to Category II—precisely what he now seeks—and the district court denied that request. The court found that a downward departure was not "warranted"

8

given both his past felony conviction and his escapee status. J.A. 1467. Category III was "neither fundamentally unfair nor d[id] it overrepresent defendant's criminal conduct," and this case therefore did not have "the kind of record providing a reason to show the defendant leniency." J.A. 1467–68. While those comments were made against the backdrop of the previous Guidelines, they provide strong evidence that the district court believed the sentencing range was appropriate.

Then, in calculating the final sentence, Gonzalez-Valencia requested the court depart downward and sentence him to twenty-to-twenty-five years instead of life. The court rejected that request, finding that "a [G]uidelines sentence [wa]s appropriate here." J.A. 1518–19. The court emphasized the "level of violence, the amount of cocaine, the duration and scope of this conspiracy, and the effects on both Mexico and the United States of this level of international narcotics trafficking." J.A. 1519. In an explanation of the life sentence spanning fifteen transcript pages, the district court discussed Gonzalez-Valencia's "massive international drug conspiracy," J.A. 1508—including his shipment of "tonnage quantities of cocaine," his history of "[e]ngaging in cartel wars," *id.*, his decade-long participation in the conspiracy, his "arrogant threats of violence" even after his arrest, J.A. 1513, and his failure to "fully own up to everything for which [he] w[as] accountable," J.A. 1514. The court mentioned his escapee status only in three brief paragraphs. *See* J.A. 1506–07, 1510. This sentence for "among the most serious of drug trafficking offenses," J.A. 1506, did not principally rest on his Criminal History Category.

This case also differs from the *Moore* and *Rhodes* decisions. In *Moore*, our court remanded for resentencing when there was "a possibility" that alternative sentencing options mandated by the Narcotic Addict Rehabilitation Act had not been considered. 486 F.2d at 1203 (Leventhal, J., concurring but controlling on

9

this point). And in *Rhodes*, we remanded to permit the government to seek a previously unavailable sentencing enhancement that would have altered the Guidelines recommendation. 106 F.3d at 431–33. This case raises no such considerations: the only relevant sentencing option is life imprisonment, and a remand would not affect the Guidelines range.[3]

## IV.

Gonzalez-Valencia also challenges the district court's application of several sentencing enhancements. Since he acknowledges that he did not object to these enhancements in district court, *see* Appellant Br. 25, 34, we review for plain error. None of his objections qualify.

Gonzalez-Valencia waived any objection to the semi-

---

[3] Gonzalez-Valencia also urges us to adopt the Seventh Circuit's approach in *United States v. Claybron*, 88 F.4th 1226 (7th Cir. 2023). There, the same amendment at issue in our case—Amendment 821—shifted the defendant from Criminal History Category VI to Category V, altering the Guidelines range from 168-to-210 months to 151-to-188 months. *Id.* at 1229. While the original sentence of 168 months was technically within both ranges, "the district court did not state it would have imposed the same sentence regardless of the applicable Guidelines range," and the appellate court "ha[d] no way of knowing . . . whether a different guideline range would have prompted the district court to weigh the . . . factors differently." *Id.* at 1231 (first alteration in original) (quoting *United States v. Adams*, 746 F.3d 734, 745 (7th Cir. 2014)). The Seventh Circuit thus utilized its § 2106 power to order resentencing. Unlike *Claybron*, remand here would not provide the district court with a new range. Nor is there any indication that the district court would depart downward, unlike in *Claybron* where the original sentence was at the lowest end of the original range.

10

submersible ship enhancement. At sentencing, he repeatedly conceded that the semi-submersible enhancement applied. *See* J.A. 418 (counsel statement at plea hearing); J.A. 485–86 (sentencing memorandum); J.A. 406 (joint submission regarding sentencing). Accordingly, he has "acquiesced in the . . . calculation and thus invited any error contained therein." *United States v. Benton*, 98 F.4th 1119, 1130 (D.C. Cir. 2024).

The district court's imposition of the violence enhancement was not plain error. Gonzalez-Valencia argues that this enhancement—first added to the Guidelines in 2010—violates the Constitution's Ex Post Facto Clause because the predicate violent conduct occurred in 2005, even if the conspiracy continued until 2016. In other words, he contends that a sentence may not be enhanced using a version of the Sentencing Guidelines adopted after the conduct giving rise to the enhancement but before the conclusion of the criminal acts giving rise to the offense.

This is a novel legal question in our circuit. That in itself likely defeats any plain error claim. In a previous case, our court noted that this situation would have "present[ed] a serious Ex Post Facto question . . . if the objection had been properly preserved." *United States v. Leyva*, 916 F.3d 14, 29 (D.C. Cir. 2019). Gonzalez-Valencia cannot point to any Supreme Court or circuit precedent, and certainly not any "absolutely clear legal norm," demonstrating plain error. *See Andrews*, 532 F.3d at 909 (quoting *Vizcaino*, 202 F.3d at 348).

Even if we were to reach the issue, the district court was likely correct. The Ex Post Facto Clause prohibits the use of Guidelines that post-date the "criminal acts" supporting a conviction. *Peugh v. United States*, 569 U.S. 530, 533 (2013). For many crimes, the date of the criminal act is simple: say, a robbery occurring on a single date. But for complex and ongoing

11

crimes, including conspiracy, we have defined the date of the offense as "the *last* date of the offense." *United States v. Gary*, 291 F.3d 30, 36 (D.C. Cir. 2002) (emphasis added) (quoting U.S. Sent'g Guidelines Manual § 1B1.11 cmt. n.2).[4] Thus, in conspiracy prosecutions, any Guidelines adopted prior to the termination of the conspiracy can be used for sentencing. For example, Guidelines going into effect a day before the end of a ten-year conspiracy can retroactively apply to all acts committed in furtherance of the conspiracy during those ten years. *See United States v. Howard*, 350 F.3d 125, 127 (D.C. Cir. 2003) (holding that the Ex Post Facto Clause permits use of the Guidelines for so-called "straddle" offenses which begin before, but continue after, the Guidelines became effective). Here, since Gonzalez-Valencia pleaded guilty to a conspiracy lasting into 2016, the final "criminal acts" were in 2016. Thus, Guidelines from 2016 or before could be validly applied to those criminal acts. *Cf. United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (holding that the use of Guidelines which post-dated the final criminal act was plain error).

Gonzalez-Valencia's objection is not directly governed by our precedents, however, because it concerns predicate conduct to an enhancement, not predicate conduct to a criminal conviction. Though our court has not explicitly extended our Ex Post Facto Clause jurisprudence to sentencing enhancements, at least two other circuits have done so. In *United States v. Vallone*, 752 F.3d 690 (7th Cir. 2014), the Seventh Circuit held that enhancements could be applied to pre-enactment conduct, provided that the conspiracy continued post-enactment. *Id.* at 699. *Vallone* reasoned that defendants are "on notice" that persisting in criminal conduct opens them to the risk of being sentenced for all their conduct using the latest Guidelines. *Id.*

---

[4] The date is not, as Gonzalez-Valencia argues, *see* Reply Br. 23, the date of the conduct supporting the enhancement.

12

Likewise, *United States v. Minicone*, 960 F.2d 1099 (2d Cir. 1992), *as amended on reh'g in part* (Apr. 13, 1992), involved RICO enhancements based on conduct prior to the enhancements' enactment. While noting that "the length of [defendant's] sentence is determined solely on the basis of pre-Guidelines conduct," the Second Circuit emphasized that the "conspirators in this case continued to act after the effective date of the law here being challenged, with full notice of the consequences." *Id.* at 1111. *Vallone* and *Minicone* indicate that the relevant sentencing enhancement is not being applied retroactively; instead, it is being applied to the post-Guidelines conduct that continued the ongoing conspiracy—and that conduct, by virtue of conspiracy liability, sweeps in all past conduct.

Finally, application of the violence and firearm enhancements was not plain error. Gonzalez-Valencia argues that foreign conduct cannot serve as a predicate act absent a clear statement from Congress. But as with his Ex Post Facto Clause objection, he does not cite any on-point Supreme Court or circuit precedent. Novel legal issues generally do not give rise to plain errors, and Gonzalez-Valencia points to no violation of an established legal norm.

**V.**

In addition to his claims about the Sentencing Guidelines, Gonzalez-Valencia presents two arguments dealing with his extradition.

The first is that the district court, as a matter of international comity, "was required to comply with the Uruguay's [sic] condition" on his extradition, Appellant Br. 46, that he would not be sentenced to life imprisonment.

13

The second argument is that the district court at least had to explain why it rejected his first argument.

In support of his first argument—that Uruguay extradited him on the condition that he would not be sentenced to life imprisonment—Gonzalez-Valencia relies on *United States v. Cuevas*, 496 F.3d 256 (2d Cir. 2007), for the proposition that, "in the sentencing context," a court "must balance its discretionary sentencing decision with the principles of international comity." *Id.* at 262 (second excerpt quoting *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (per curiam)). Accordingly, a district court "should temper [its] discretion in sentencing an extradited defendant *with deference to the substantive assurances made by the United States to an extraditing nation*." *Id.* (emphasis and alterations in original) (quoting *Baez*, 349 F.3d at 93).

The reasoning of the Second Circuit in *Cuevas* and *Baez* is sound, but Gonzalez-Valencia's quotation of those opinions gives away the game. The district court should consider assurances "made by the United States," but in this case the United States made no assurances. Instead, the U.S. Embassy in Montevideo stated that "the United States is not obliged to grant [any] guarantee" about life sentences. S.A. 92.[5] Any "unilateral belief[s]" held by Uruguay are "insufficient to bind the United States" or the district court. *Cuevas*, 496 F.3d at 263. Gonzalez-Valencia's argument is, to put it bluntly, frivolous or close to it.[6]

---

[5] The Government has submitted sealed materials, but we decide this case only on the basis of the public record.

[6] It is an open question whether a criminal defendant may benefit from the government's violation of an extradition treaty. *See, e.g.*, *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 206 (D.C. Cir. 2013) ("We have previously noted conflicting authority as to whether a

14

His second argument is that the district court erred in failing to explain why the court imposed a life sentence despite Uruguay's opposition to such a sentence.

To respond as we have to several of his other claims, no such error is evident. Federal Rule of Criminal Procedure 32(i)(3)(B) requires district courts, for any "controverted matter" at sentencing, to "rule on the dispute or determine that a ruling is unnecessary." Likewise, 18 U.S.C. § 3553(c) demands that the sentencing court "state in open court the reasons for its imposition of the particular sentence." We have repeatedly held that these provisions "do not require the court to expressly address every argument advanced by a defendant," but merely provide "a 'reasoned basis for exercising [the court's] legal decisionmaking authority.'" *United States v. Borda*, 848 F.3d 1044, 1071 (D.C. Cir. 2017) (quoting *United States v. Locke*, 664 F.3d 353, 358 (D.C. Cir. 2011)); *see also Locke*, 664 F.3d at 357 (rejecting the need for "'a full opinion'" on "each and every argument advanced by the defendant" (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007))). The contrary cases Gonzalez-Valencia cites involve far more egregious conduct—for example, district courts applying enhancements "without ever making specific factual findings." *United States v. McCants*, 434 F.3d 557, 561 (D.C. Cir. 2006). Here, by contrast, the district court explained its reasoning in considerable detail.[7]

---

criminal defendant—as opposed to the extraditing state—has standing to assert the [objection to extradition]."); *Casey v. Dep't of State*, 980 F.2d 1472, 1476 n.4 (D.C. Cir. 1992) ("[I]t remains an open question in this circuit whether Casey has 'standing' to raise his claims after extradition.").

[7] Mr. Gonzalez-Valencia also initially argued that the district court erred in denying his motion to dismiss the indictment for extradition-

15

\*\*\*

Since Gonzalez-Valencia has neither demonstrated that the district court committed reversible error nor that remand is warranted under 28 U.S.C. § 2106, we affirm his sentence.

*So ordered.*

---

related reasons. But as his reply brief expressly conceded that this argument was waived, *see* Reply Br. 5, we do not consider it.